# ORIGINAL

## UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
#### (Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff | ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | ) ) ) ) ) | JUDGE KANE |

FILED
HARRISBURG, PA

MAY 0 8 2002

MARY E. D'ANDREA, CL
Per _____
Deputy Clerk

## UNITED STATES FIDELITY AND GUARANTY COMPANY'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Pursuant to Fed. R. Civ. P. 37(a), United States Fidelity & Guaranty Company ("USF&G") hereby moves to compel the production of certain documents which were withheld from production by Brown Schultz Sheridan & Fritz ("Brown Schultz") in response to a Notice of Taking Deposition of the Keeper of Records served on Brown Schultz on or about March 19, 2002. In particular, Brown Schultz refuses to produce documents in its possession relating to Pennsylvania Contractor's Insurance Company ("PCIC") on the grounds that such documents are not relevant and are protected by the "accountant-client privilege." Simply, the statutory accountant-client privilege does not apply and the documents being withheld relate to central issues in the case. Because of the obvious inapplicability of the claimed privilege, USF&G should be awarded its costs and attorneys' fees incurred in bringing this motion.

In further support of this Motion, USF&G avers and asserts as follows:

### Background

1.    On or about May 9, 2001, USF&G commenced an action against the public accounting firm of Brown Schultz alleging, *inter alia*, that the true financial condition of CCI Construction Inc. ("CCI") was materially misstated in audited financial statements prepared by Brown Schultz.  USF&G alleges that relying on the audited financial statements, USF&G extended CCI's bonding capacity and issued numerous payment and performance bonds based on the audited financial statements prepared by Brown Schultz.  As a result of CCI's defaults on projects bonded by USF&G, USF&G incurred losses of approximately $30,000,000.

2.    On or about March 19, 2002, USF&G served the Notice of Taking Deposition of the Keeper of Records of Brown Schultz Sheridan & Fritz (the "Deposition Notice").  The Deposition Notice scheduled a deposition on April 22, 2002 and requested that Brown Schultz produce at the time of the deposition certain documents enumerated on Exhibit "A" to the Deposition Notice.  A true and complete copy of the Deposition Notice is attached hereto and incorporated herein as Exhibit "A."

3.    Among the documents that were requested to be produced on Exhibit A to the Deposition Notice were the following:

> [3]    Any and all documents, including audit reports, referring or relating to PCIC, also known as Pennsylvania Contractors Insurance Co.
> [4]    Any and all agreements between CCI and PCIC.

As will be discussed in greater detail, *infra*, PCIC and CCI are related companies, PCIC is specifically mentioned in the audited financial statements prepared by Brown Schultz, certain PCIC documents are believed to be in the possession of Brown Schultz and such documents are

not only relevant to the instant action but are crucial to any analysis of the audited financial

statements prepared by Brown Schultz.

4.     On or about April 19, 2002, Brown Schultz served Defendants Response to

Plaintiff's Document Requests (the "Response") on USF&G.  In the Response, Brown Schultz

objects to request nos. 3 and 4, in Exhibit "A" to the Deposition Notice as follows:

> Defendants object to this request as seeking information which is
> neither relevant nor reasonably calculated to lead to the discovery
> of admissible evidence.  Defendants further object to this request
> as seeking information subject to the accountant client privilege as
> codified at 63 Pa. C.S.A. §9.11.

A true and complete copy of the Response is attached hereto and incorporated herein as Exhibit

"B."

5.     By letter dated April 19, 2002, counsel for USF&G sought to resolve any disputes

regarding document production issues by informing Brown Schultz of both the statutory

language and pertinent case law demonstrating the utter inapplicability of the privilege asserted

by Brown Schultz.  A true and complete copy of the letter is attached hereto and incorporated

herein as Exhibit "C."  No reply to this letter has been received.  On or about May 3 and 6, 2002,

counsel attempted to resolve this mater during a telephone conference.  A successful resolution

was not achieved.  To date, USF&G has not been able to obtain the documents from other

sources.

## The PCIC Documents Are Relevant

6.     PCIC is nothing more than an offshore tax evasion mechanism that purportedly

insured certain claims of CCI, its sister corporation.  Although incorporated in the Turks and

Caicos Islands, it shared a business address with CCI.  According to deposition testimony of

Bruce J. Brown on January 17, 2002 and documents produced to date, PCIC and CCI share the

not only relevant to the instant action but are crucial to any analysis of the audited financial statements prepared by Brown Schultz.

4.    On or about April 19, 2002, Brown Schultz served Defendants Response to Plaintiff's Document Requests (the "Response") on USF&G.  In the Response, Brown Schultz objects to request nos. 3 and 4, in Exhibit "A" to the Deposition Notice as follows:

> Defendants object to this request as seeking information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  Defendants further object to this request as seeking information subject to the accountant client privilege as codified at 63 Pa. C.S.A. §9.11.

A true and complete copy of the Response is attached hereto and incorporated herein as Exhibit "B."

5.    By letter dated April 19, 2002, counsel for USF&G sought to resolve any disputes regarding document production issues by informing Brown Schultz of both the statutory language and pertinent case law demonstrating the utter inapplicability of the privilege asserted by Brown Schultz.  A true and complete copy of the letter is attached hereto and incorporated herein as Exhibit "C."  No reply to this letter has been received.  On or about May ___, 2002, counsel attempted to resolve this mater during a telephone conference.  A successful resolution was not achieved.  To date, USF&G has not been able to obtain the documents from other sources.

### The PCIC Documents Are Relevant

6.    PCIC is nothing more than an offshore tax evasion mechanism that purportedly insured certain claims of CCI, its sister corporation.  Although incorporated in the Turks and Caicos Islands, it shared a business address with CCI.  According to deposition testimony of Bruce J. Brown on January 17, 2002 and documents produced to date, PCIC and CCI share the

same President, John Ortenzio ("Ortenzio"). Brown Schultz is familiar with both entities and has performed accounting and audit services for PCIC. In the Brown Schultz working papers for CCI's audited financial statement for the year ended December 31, 1998 (the "1998 Audit") and in the prior year's audit reference is made by Brown Schultz to claims made by CCI against its policy written by PCIC. A true and complete copy of the policy is attached hereto and incorporated herein as Exhibit "D."

7. The relevance of the PCIC documents sought to the instant litigation is manifest. As discussed in greater detail in paragraph 11, *infra*, Bruce J. Brown has already testified at length about PCIC, that it is a captive insurance company for CCI and that it had the resources to pay various claims of CCI. What Brown Schultz knew, reviewed or should have known regarding PCIC is crucial to a determination as to whether Brown Schultz was negligent in booking the alleged PCIC insurance claims and the sufficiency of the disclosures which were made concerning the relationship between PCIC, Ortenzio and CCI.

### The Accountant Client Privilege Is Inapplicable

8. Since the relevant statute relied upon by Brown Schultz, 63 Pa. Stat. §9.11a, "is in derogation of the common law which does not accord an accountant client privilege, the privilege which it accords must be strictly construed." *United States v. Bowman*, 358 F.2d 421 (3rd Cir. 1966). Any change in the common law effected by such statute is, thus, unenforceable unless it is clearly indicated. *Rubin v. Katz*, 347 F.Supp. 322 (E.D. Pa. 1972). As discussed, *infra*, both in its express language and in the pertinent judicial interpretations, the privilege has been found to be extremely narrow and inapplicable to the type of information sought by USF&G.

9. The relevant statute expressly provides that the accountant client privilege does not apply to actions against accountants. 63 Pa. Stat. §9.11a provides, in pertinent part, that the

accountant client privilege does not apply to "proceeding[s] when *the professional services of the certified public accountant are at issue in an action*, investigation, or proceeding in which the certified public accountant . . . *is a party*." (emphasis supplied). Without question, the professional services of Brown Schultz are at issue and Brown Schultz is a party to the instant action.

10.    The accountant client privilege belongs to the client and only the client may raise it as an objection. *Continental Casualty Co. v. Dickerson*, 338 F.Supp. 759, 761 (W.D. Pa. 1972). The "client," whether CCI or PCIC, has not asserted the privilege. Moreover, CCI is currently in bankruptcy and is being liquidated under Chapter 11 of the United States Bankruptcy Code. Indeed, according to deposition testimony given by Bruce J. Brown, PCIC has been or is in the process of being liquidated. A true and complete copy of an excerpt from the deposition testimony of Bruce J. Brown is attached hereto and incorporated herein as Exhibit "E." Thus, even if the "client" wished to assert the privilege, such assertion should not be possible. *Cf., James Talcott, Inc. v. C.I.J. Corp.*, 14 Pa. D.&C. 3d 204 (1980) (because the accountant client privilege belongs only to the client, no one might claim the privilege in connection with a bankrupt corporate client whose charter has been voided).

11.    Even if, *arguendo*, the privilege applied, it has been waived. The accountant client privilege is waived when a party "place[s] in issue communications which they now decline to divulge." *Albert M. Greenfield Foundation v. Bankers Securities Corp.*, 7 Pa. D.&C. 3d 535, 543 (Pa. Com. Pl. 1978). Moreover, the privilege is waived to the extent that the information sought is material to plaintiff's claims or any defenses thereto. *Continental Casualty Co. v. Dickerson*, 338 F.Supp. at 761. The issue of whether PCIC insured claims should be booked as revenue in the Brown Schultz audited financial statements when, among other things,

the accountant is aware of the familial nature of the insured and the insurer is one of the central issues of the case. Moreover, during his deposition on January 17, 2002, Bruce J. Brown spoke at length concerning, *inter alia*, work his firm performed for PCIC, PCIC's present status, the treatment of the claim relative to Mahanoy Prison and the working papers relative to that claim. In fact, Bruce J. Brown specifically stated that PCIC had the ability to satisfy a certain claim regarding the Mahanoy Prison project. A true and complete excerpt from the deposition of Bruce Brown on January 17, 2002 is attached hereto and incorporated herein as Exhibit "F." Having made numerous statements about that claim and why it was booked as revenue, it would be unfair and prejudicial to USF&G to allow Brown Schultz to defend itself based upon information it allegedly reviewed yet deny USF&G an opportunity to examine the underlying information. Bruce J. Brown's statement that PCIC has sufficient assents coupled with the decision to withhold the production of documents that could verify or disprove that statement presents a paradigm case for waiver.

12.     Brown Schultz' cursory objection provides little information as to the nature of the documents being withheld from production. No privilege log has been provided. However, Pennsylvania law explicitly provides "the statute [63 Pa. §9.11a] excludes from the privilege which it creates information acquired by the accountant as a result of 'the examination of or report on any financial statements, books, records or accounts, which he may be engaged to make or requested by a prospective client to discuss.'" *Marine Midland Trust Co. of Southern New York v. Douvanis*, 50 Pa. D.&C. 2d 403 (1970) (accountant ordered to produce all "information acquired by the accountant from defendant's books and records). The Court also acknowledges the "absence of a privilege extending to defendant's books and records . . . ." *Id.* at 410. Thus,

neither PCIC's books and records nor information acquired from the examination of such records is protected by the accountant client privilege.

WHEREFORE, USF&G respectfully requests that the Court enter an order:

1.     Providing that all documents relating to PCIC as requested in the Deposition Notice be produced to USF&G within seven (7) days;

2.     Awarding USF&G its costs incurred, including reasonable attorneys' fees relative to bringing the instant motion; and

3.     Providing such other and further relief as is just and proper.

UNITED STATES FIDELITY
& GUARANTY COMPANY,
By its attorneys,

Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA  02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

and

Jeffrey Rettig, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:    (717) 237-7100
Facsimile:    (717) 237-7105

Dated: May 6, 2002
#244626 v1/36432/87

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each other party by mail (by hand) 5/6/07

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff | ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | ) ) ) ) ) | JUDGE KANE |

**NOTICE OF TAKING DEPOSITION OF THE KEEPER OF
RECORDS OF BROWN SCHULTZ SHERIDAN & FRITZ**

TO:    Kathleen Carson, Esquire
Swartz Campbell Detweiler
1601 Market Street
Philadelphia, PA  19103-2316

PLEASE TAKE NOTICE that at 9:00 a.m. on April 22, 2002 at the offices of Thomas, Thomas & Hafer, LLP, 305 North Front Street, Sixth Floor, Harrisburg, Pennsylvania, United States Fidelity & Guaranty Company, by its counsel, will take the deposition upon oral examination of the Keeper of Records of Brown Schultz Sheridan & Fritz, relative to the documents listed on Schedule "A," attached hereto and incorporated herein by reference.

The deposition shall be taken before a Notary Public in and for the Commonwealth of Pennsylvania, or before some other officers authorized by law to administer oaths. The oral examination will continue from day to day until completed or suspended.

You are invited to attend and cross-examine.

Pursuant to Fed. R. Civ. P. 45, you are further required to bring with you the items set forth on the attached **Schedule "A."**

UNITED STATES FIDELITY & GUARANTY COMPANY,
By its attorneys,


Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA  02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

and

Jeffrey Rettig, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:    (717) 237-7100
Facsimile:    (717) 237-7105

Dated: March _19_, 2002
#239454 v1/36432/87

- 2 -

## SCHEDULE "A"

United States Fidelity & Guaranty Company, pursuant to Rules 30 and 34 of the Federal Rules of Civil Procedure, hereby request that Brown Schultz Sheridan & Fritz ("Brown Schultz") produce all documents requested below at the time of the scheduled deposition.

## I. INSTRUCTIONS

1.      You are requested to produce all documents in your custody, possession or control, including all documents which are in the custody, possession or control of your employees, servants, attorneys, consultants, accountants or agents, regardless of the location of such documents.

2.      You are requested to produce all documents maintained by you personally.  If you object to any Request for Production set forth above, the precise grounds for your objection(s) shall be stated with particularity.  If any objection rests in whole or in part on a claim of privilege, the privilege claimed should be stated and all facts and all documents relied upon in support of such claim shall be stated or identified with particularity.

3.      In the event that you object to, or claim a privilege with respect to, any Definition, Instruction or Request for Production, in whole or in party, you are requested to produce all documents (or portions thereof) requested in that portion of the Request for Production as to which you have no objection or claim of privilege.

4.      With respect to each document withheld from production on any basis whatsoever, state or identify the following:  (a) the date of the document; (b) the document's author(s) or originator(s) and any persons involved in creating the document; (c) the title and duties of the author(s) or originator(s) and all persons involved in creating the document; (d) all recipients of the document and all persons coming into possession of the document; (e) the

subject matter(s) of the document; (f) the number of pages of the document; and (g) the precise

basis, in detail, for the privilege claimed or the objection made with respect to the document.

5.    In the event that you are able to provide only some of the documents responsive to

the Request for Production within the allotted time, you are requested to produce the documents

which can be produced and to state the reason for your asserted inability to provide the remaining

documents.  Once the remaining responsive documents are obtained, those documents should be

produced promptly at a mutually agreeable time.

6.    If any document responsive to the Request for Production was, but no longer is, in

your possession, custody or control, please identify that document and state whether any such

document (a) is missing or lost; (b) has been destroyed; (c) has been transferred voluntarily or

involuntarily; or (d) has been otherwise disposed of, and, in each instance, please explain in

detail the circumstances surrounding any such disposition thereof.

7.    This Request for Production of Documents shall be deemed continuing so as to

require an immediate supplemental response if any additional responsive documents are

discovered, located, identified or obtained after you complete production of documents

responsive to this Request for Production of Documents.

8.    Unless otherwise stated, the documents requested herein are those prepared, sent

or received during the period beginning April 1, 1991 through the date of full compliance with

this Request for Production of Documents.

9.    The singular form of a noun or pronoun shall be considered to include within its

meaning the plural form of the noun or pronoun used, and vice versa; the use of the masculine

form of a pronoun shall be considered to include also within its meaning the feminine form of the

pronoun so used, and vice versa; and the use of any tense of any verb shall be considered to include also within its meaning all other tenses of the verb so used.

10.     Documents produced in response to this Request for Production of Documents are to be segregated and identified according to the particular paragraph of the Request for Production set forth above pursuant to which each such document is being produced.

## II. **DEFINITIONS**

1.     Solely for the purposes of this Request for Production, the term "Brown Schultz" refers to Brown Schultz Sheridan & Fritz and any subsidiary division or affiliate thereof and any present or former officer, employee, agent, servant, representative or other person acting for or on his behalf.

2.     The term "USF&G" refers to United States Fidelity & Guaranty Company, its respective officers, employees, servants, agents, representatives, accountants, attorneys, experts, or any other person or entity acting or purporting to act on its behalf.

3.     The term "Brown Schultz" refers to Brown Schultz Sheridan & Fritz, its respective officers, employees, servants, agents, representatives, accountants, attorneys, experts, or any other person or entity acting or purporting to act on its behalf.

4.     The term "CCI" refers to CCI Construction Company, Inc., its respective officers, employees, servants, agents, representatives, accountants, attorneys, experts, or any other person or entity acting or purporting to act on its behalf.

5.     The word "person" means any individual, natural person and/or any entity or entities including, but not limited to any corporation, partnership, sole proprietorship, firm, trust, group, association, joint venture, governmental agency or form of public or private entity, and shall include the singular as well as plural.

6.    The words "document" and "documents" mean and include any and all written, sketched, typed, printed, prerecorded, photographed, copied, photocopied, taped or recorded material whatsoever regardless of the identity of the person or persons who prepared, produced, reproduced or made the document.  This Request for Production of Documents includes and encompasses both the front and reverse side of all copies of such original documents (and attachments thereto) and the front and revise side of all copies of such original documents (and attachments thereto) containing markings or notations which are not set forth on the original documents.  For purposes of illustration only, and without limiting the foregoing definition, the term "documents" includes: microfilm, microfiche, computer printouts and other printouts of any type whatsoever, books, corporate minutes or other minutes of meetings, records, quotations, contracts, guarantees, letters of credit, security agreements, liens, mortgages, orders, memoranda, agreements, pamphlets, financing or refinancing agreements, work out plans, proposals or agreements, prospectus(es), circulars, bulletins, income statements, financial statements, projections, marketing plans, balance sheets, statistics, audits, analyses, computer data sheets, computer software, computer tapes or discs, computer programs, computer runs, transfers, ledgers, wire transfers, mail ledgers, telecopy ledgers, letters and correspondence (whether sent or received), requests for bids or quotations, specifications, notes or memoranda of telephone conversations or other conversations, discussions or activities, diaries, day books, calendars, desk pads, inter-office communications, note pads, purchase orders, bookings, invoices, summaries, analyses, reports, papers, recommendations, indexes, tapes, data compilations, journals, statements, studies, comparisons, graphs, charts, worksheets, work files, or any other written or printed materials whatsoever.

-4-

7.      The word "communication" or "communications" as used herein means any oral or written transmittal or any information whatsoever made from one person to another person, whether made in person, by wire, telephone, correspondence, message or by any other means whatsoever.

8.      The word "or" shall be all inclusive and shall be taken in the conjunctive as well as the disjunctive and shall mean "and" as well as "or" and it shall be construed to bring the maximum number of documents within the scope of this Request for Production of Documents.

9.      To "identify" a document means to provide all of the information requested in subparts (a) through (f) of Instruction No. 5 of this Request for Production of Documents.

10.     The "Little Building" shall mean the building located at 76-84 Boylston Street and 195-215 Tremont Street, Boston, Massachusetts and popularly known as the Little Building, as well as all associated real property fixtures and personal property thereon.

11.     "Related to", "relating to", "referring to", or "relate to", means referring to, relating to, reporting to, embodying, establishing, evidencing, comprising, connected with, commenting on, responding to, showing, describing, analyzing, reflecting, presenting or constituting.

## III.  DOCUMENTS REQUESTS

1.      Any and all documents, including reports, prepared by or for Ms. Susinski which refer or relate to any audit reports prepared by Brown Schultz relative to CCI.

2.      Any and all "management letters" sent to CCI.

3.      Any and all documents, including audit reports, referring or relating to PCIC, also known as Pennsylvania Contractors Insurance Co.

4.      Any and all agreements between CCI and PCIC.

#239458 v1/36432/87

# EXHIBIT B

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

April 19, 2002

Bruce D. Levin
DIRECT DIAL: (617) 790-3314
e-mail: blevin@bgblaw.com

*VIA FACSIMILE*

Kathleen Carson, Esquire
Swartz Campbell Detweiler
1601 Market Street
Philadelphia, PA   19103-2316

Re:    United States Fidelity & Guaranty Company v. Brown Schultz Sheridan & Fritz

Dear Kathleen:

When we spoke last night you indicated that you would promptly provide me with the "Sosinski documents" in lieu of having them produced at a keeper of the records deposition. You also stated that you would not produce any documents relating to Pennsylvania Contractors Insurance Company ("PCIC") on the grounds of "accountant client" privilege and that you would send me a formal written response to the deposition notice served on the Keeper of the Records of Brown Schultz Sheridan & Fritz.

In light of the foregoing and pursuant to our conversation today, the deposition is cancelled based upon our agreement that the parties have reserved their rights to object to production of documents and to compel production as if the deposition took place. It is further agreed that all objections – and oppositions thereto – will be treated as if they were made on the record. Additionally, your client has agreed to produce without need of a deposition the "Sosinski documents," as well as any of the PCIC documents upon which either the parties can agree or the Court so orders.

Although I am somewhat limited in the type of response I can make to your intended assertion of privilege until such objection has actually been made and a privilege log has been provided, I note that the assertion of the accountant-client privilege by your client concerning the PCIC documents would likely be frivolous. The applicable statute appears to specifically provide that the putative privilege does not apply to "proceeding when the professional services of the certified public accountant, public accountant or firm are at issue in an action, investigation or proceeding in which the certified public accountant . . . is a party." PA. Stat. Ann. Title 63 §9.11a. Furthermore, the accountant-client privilege belongs to the client and only the client may raise it as an objection. *Continental Casualty Co. v. Dickerson*, 338 F.Supp. 759, 761 (W.D. Pa. 1972).

BERNKOPF, GOODMAN & BASEMAN LLP

Kathleen Carson, Esquire
April 19, 2002
Page 2

Undoubtedly, we should attempt to resolve any differences on this issue consensually. However, my client reserves its right to compel production of the PCIC documents and – in light of the apparent inapplicability of the pertinent statute to the instant case – will likely seek sanctions when it does so.

Please feel free to call me if you have any questions or comments.

Very truly yours,

Bruce D. Levin

cc:     Peter B. McGlynn, Esquire
        Mark Holtschneider, Esquire
BDL/mlb
#243952 v1/36432/87

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

United States Fidelity and
Guaranty Company                                    :
                                                    :
                                                    :       CIVIL ACTION NO. 1:01-CV-00813
                  v.                                :
                                                    :
Bruce J. Brown and Brown, Schultz                   :
Sheridan & Fritz                                    :       JUDGE KANE

## DEFENDANTS RESPONSE TO PLAINTIFF'S DOCUMENT REQUESTS

Pursuant to F.R.C.P. 34, Defendants, hereby respond to Plaintiff's document requests dated March 19, 2002, as follows:

### GENERAL OBJECTIONS

Defendants object to these requests to the extent that they purport to require production of documents "prepared sent or received from April 1, 1991 through the date of full compliance" with the requests. The time frame for the requests is overly broad in that plaintiff's complaint alleges negligent misrepresentations only for the audited financial statements for the years ended December 31, 1996, December 31, 1997 and December 31, 1998. The requests, therefore, are overly broad and seek information which is neither relevant, nor reasonably calculated to lead to the discovery of admissible evidence.

### RESPONSES TO SPECIFIC REQUESTS

1. Any and all documents, including reports, prepared by or for Ms. Susinski which refer or relate to any audit reports prepared by Brown Schultz relative to CCI.

**RESPONSE:**

Defendants have no documents responsive to this request.

2. Any and all "management letters" sent to CCI.

**RESPONSE:**

Defendants object to this request to the extent that it is overly broad and seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of their objections, defendants will produce the documents in its possession responsive to this request to the extent such documents exist.

3. Any and all documents, including audit reports, referring or relating to PCIC, also known as Pennsylvania Contractors Insurance Company.

**RESPONSE:**

Defendants object to this request as seeking information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this request as seeking information subject to the accountant client privilege as codified a 63 Pa. C.S.A. § 9.11.

4. Any and all agreements between CCI and PCIC.

**RESPONSE:**

Defendants object to this request as seeking information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this request as seeking information subject to the

2

accountant client privilege as codified at 63 Pa. C.S.A. § 9.11.

SWARTZ, CAMPBELL & DETWEILER

BY: _____
Jeffrey B. McCarron
Kathleen M. Carson

Dated: April 19, 2002

3

# EXHIBIT D

# REMEDIAL WORK PERIOD INSURANCE POLICY

## PENNSYLVANIA CONTRACTORS INSURANCE COMPANY
### FIRST FLOOR, NORTH WING, HIBISCUS SQUARE
### POND STREET, GRAND TURK
### TURKS AND CAICOS ISLANDS
### BRITISH WEST INDIES

**POLICY NO.:**   97-003

**INSURED:**   CCI Construction Company, Inc.

**BUSINESS ADDRESS:**   P.O. Box 1129, Mechanicsburg, PA  17055-1129

**COVERAGE:   LOSS UNDER DESIGNATED CONTRACTS**

**JOB# AND CONTRACT:**   43900   Mahanoy Prison

**CONTRACT AMOUNT:** $10,066,600   **PREMIUM:** $166,099

**EFFECTIVE DATE:**   04/01/97   **TIME:**   12:01 a.m.

**POLICY LIMIT OF LIABILITY:**   $10,066,600

**ISSUE DATE:**   03/11/98

## I.    INSURING CLAUSE

In consideration of the payment of the premium and subject to all of the terms and conditions of this POLICY, Pennsylvania Contractors Insurance Company (or its successor corporation) (the "INSURANCE COMPANY") agrees to reimburse the INSURED for all COSTS reasonably incurred in fulfilling its legally binding obligations under each DESIGNATED CONTRACT, as defined is Section II, VALIDLY ISSUED by the INSURED during the POLICY TERM, in accordance with the terms and conditions of such DESIGNATED CONTRACT.  In the event such COSTS are incurred by the INSURED's performance of remedial work services pursuant to such obligations, the reimbursement of those COSTS shall be made directly to the INSURED and in the event such COSTS are incurred by another party's performance of remedial work services pursuant to such obligations, the reimbursement may be made, on behalf of the INSURED, directly to such other party upon authorization of the INSURED subject to prior remedial work authorization as provided in Section V.

1

BSSF 2339

BS 00306

## II.   DEFINITIONS

### 1.   COSTS

The ordinary and customary charge for the type of services performed, in the geographical area where the remedial work services are performed, provided that if such services are performed by the INSURED, the charge shall not exceed the following amounts:

a.   **Materials**.  The percentage of the actual COST to the INSURED of the materials used.

b.   **Labor**.  The product of (i) the number of labor hours spent, multiplied by (ii) the retail time hourly rate.

c.   **Rental**.  The rental charge ordinarily billed by the INSURED for such rentals.

d.   **Other**.  Legal fees, consulting fees, engineering fees, and travel expenses directly related to the remedial work services of a DESIGNATED CONTRACT.

### 2.   DESIGNATED CONTRACT

The contract for Construction, including the Agreement between Owner and Contractor, the General Conditions of the Contract for Construction and such other agreements and modifications as may be agreed upon by the Owner and Contractor in the form attached to this POLICY as Schedule A or such other form as the INSURANCE COMPANY may approve, in writing, pursuant to Paragraph X of this POLICY.

### 3.   DESIGNATED CONTRACT HOLDER

A person, organization, or corporation which has entered into a DESIGNATED CONTRACT with the INSURED during the POLICY TERM (or the authorized transferee of such party as may be provided in the DESIGNATED CONTRACT).

### 4.   DESIGNATED CONTRACT PREMIUM

The amount attributable to any given DESIGNATED CONTRACT, as determined in accordance with Schedule B attached to this POLICY or such other table as the INSURANCE COMPANY may from time to time substitute, in writing, pursuant to Paragraph X of this POLICY.

2

BSSF2340

BS 00307

5.    **INSURED**

The named INSURED or the assignee or transferee of the named INSURED subject to the conditions of Paragraph VII of this POLICY.

6.    **LOSS**

The COSTS reasonably incurred by the INSURED in fulfilling its obligations under each DESIGNATED CONTRACT VALIDLY ISSUED during the POLICY TERM.

7.    **POLICY TERM**

The period beginning on the Effective Date and continuing thereafter until canceled or terminated pursuant to the terms of this POLICY.

8.    **VALIDLY ISSUED**

If issued in accordance with the terms, conditions, and requirements of this POLICY and the DESIGNATED CONTRACT.

## III.  PREMIUM AND SUBMISSION OF DESIGNATED CONTRACTS

1.    The aggregate premium for this POLICY shall be the sum of the DESIGNATED CONTRACT PREMIUMS attributable to each DESIGNATED CONTRACT VALIDLY ISSUED by the INSURED during the POLICY TERM.

2.    The INSURED shall deliver or cause to be delivered the DESIGNATED CONTRACT PREMIUM attributable to each DESIGNATED CONTRACT in U.S. funds to the INSURANCE COMPANY not later than sixty (60) days following the end of the calendar month during which such DESIGNATED CONTRACT was VALIDLY ISSUED.

3.    Except as otherwise provided in this Paragraph III(3), the INSURANCE COMPANY shall not be liable for the return of any portion of the aggregate premium for this POLICY.

4.    The INSURED agrees to submit a copy of each DESIGNATED CONTRACT to the INSURANCE COMPANY or its authorized representative within ten (10) days following the end of the calendar month during which such DESIGNATED CONTRACT was issued, along with the DESIGNATED CONTRACT PREMIUM as provided in Paragraph 2 above.

3

BSSF 2341

BS 00308

## IV. PROOF OF LOSS

1.  The INSURED shall give written Proof of LOSS to the INSURANCE COMPANY within thirty (30) days (i) after each remedial work repair made by the INSURED pursuant to the terms and conditions of any DESIGNATED CONTRACT VALIDLY ISSUED by the INSURED during the POLICY TERM, (ii)    after each receipt by the INSURED of sworn proof by a DESIGNATED CONTRACT HOLDER of remedial work done by another party for which the INSURED is liable to the DESIGNATED CONTRACT HOLDER pursuant to the terms and conditions of any DESIGNATED CONTRACT VALIDLY ISSUED by the INSURED during the POLICY TERM, and after each receipt by the INSURED of evidence of remedial work done in accordance with the INSURED's instructions and pursuant to the terms and conditions of any DESIGNATED CONTRACT VALIDLY ISSUED by the INSURED during the Policy Term. The Insurance Company shall have no liability or obligation to reimburse the INSURED for any LOSS if proof of such *LA)SS* is not given within the foregoing period, unless the INSURED shall show to the reasonable satisfaction of the Insurance Company that it was not reasonably possible to give Proof of LOSS within such period and that Proof of LOSS was given as soon as was reasonably possible, and INSURANCE company's rights are not prejudiced by delay.

2.  Proof of LOSS shall be given on forms furnished by the INSURANCE COMPANY unless the INSURANCE COMPANY shall have failed to furnish such forms within thirty (30) days after receiving a written request for such forms from the INSURED. All Proofs of LOSS shall include a full description of the nature and extent of the LOSS and shall include all other details of the LOSS entering into the determination of the amount payable by the INSURANCE COMPANY. Upon receipt of the INSURED's Proof of LOSS, the INSURANCE COMPANY may require the INSURED to submit, as often as may reasonably be requested by the INSURANCE COMPANY, to examination under oath by any person named by the INSURANCE COMPANY.

## V. AUTHORIZATION OF PERFORMANCE OF SERVICES

1.  The INSURED agrees that prior to performing any remedial work repair services pursuant to its obligations under a DESIGNATED CONTRACT VALIDLY ISSUED during the POLICY TERM, it shall notify, and shall request authorization therefor from, the INSURANCE COMPANY. Such notice (and request) shall be made by telephone and in making such notification (and request) the INSURED shall provide the INSURANCE COMPANY with information sufficient for it to determine whether such repair is covered under the terms and conditions of such DESIGNATED CONTRACT and with the INSURED's estimate of the COSTS to be incurred in making such repair. As soon as practical after being so notified, the INSURANCE COMPANY will determine whether the proposed repair is covered under the terms and conditions of such DESIGNATED

4

BSSF2342

BS 00309

CONTRACT and whether the INSURED's estimate of the COSTS is reasonable, and, if so, will immediately grant its authorization, therefor by telephone.

2.   The INSURED agrees that if it is unable or unwilling to perform any remedial work repair services pursuant to its obligations under a DESIGNATED CONTRACT, or if under the circumstances it would be impractical for the INSURED to perform such services, it shall immediately notify the INSURANCE COMPANY by telephone and will provide the INSURANCE COMPANY with information sufficient for it: (i) to determine whether such proposed repair is covered under the terms and conditions of the DESIGNATED CONTRACT, and (ii) to designate another party to perform such repair.  As soon as practical after being notified, the INSURANCE COMPANY will determine whether the proposed repair is covered under the terms and conditions of the DESIGNATED CONTRACT and, if so, will (i) immediately grant its authorization therefor by telephone, and (ii) designate an Authorized Repair Facility to perform those services.

3.   The INSURANCE COMPANY shall have no liability or obligation to reimburse the INSURED for any COSTS incurred by the INSURED's performance of remedial work repair services which were not authorized in accordance with this Paragraph V or for any COSTS incurred by another party's performance of remedial work repair services pursuant to the INSURED's obligations under a DESIGNATED CONTRACT if the performance of such services by such other party was not authorized in accordance with this Paragraph V.

Notwithstanding any provision to the contrary, INSURANCE COMPANY shall be liable and obligated to reimburse for any authorized repairs if and only if the DESIGNATED CONTRACT is VALIDLY ISSUED.  INSURED shall be liable for and shall hold INSURANCE COMPANY harmless for any authorized repairs under a DESIGNATED CONTRACT with has not been VALIDLY ISSUED.

## VI.   NO BENEFIT TO THIRD PARTIES

The insurance afforded by this POLICY is solely for the benefit of the INSURED (or assignee or transferee as provided in Paragraph VII), and in no circumstances shall any person or entity other than the INSURED (or such assignee or transferee) have any rights or be entitled to any benefits under this POLICY.

BSSF2343

BS 00310

## VII.  ASSIGNMENT

This POLICY may not be assigned or transferred by the INSURED, including an assignment or transfer by operation of law, without the written consent of the INSURANCE COMPANY, which consent shall not be unreasonably withheld by the INSURANCE COMPANY, The INSURANCE COMPANY shall have no liability or obligation under this POLICY to either the INSURED or any other person or entity arising after an attempted assignment or transfer of this POLICY unless and until the INSURANCE COMPANY consents in writing to such assignment or transfer.

## VIII.  CHANGES

Notice to its authorized representative or to any other agent or representative of the INSURANCE COMPANY or knowledge possessed by any such agent or representative or by an other person shall not effect a waiver or change in any part of this POLICY or prevent the INSURANCE COMPANY from asserting any right under the terms of this POLICY; nor shall the terms of this POLICY be waived or changed, except by written supplement or endorsement issued to form a part of this POLICY.

## IX.  CANCELLATION AND TERMINATION

### 1.    Cancellation by the INSURANCE COMPANY

The INSURANCE COMPANY has the right to cancel this POLICY at any time: (a) without cause, by giving ninety (90) days written notice to the INSURED (stating when thereafter the cancellation shall be effective), or (b) for any of the following reasons, by giving thirty (30) days written notice to the INSURED (stating when thereafter the cancellation shall be effective):  (i) for failure to pay the DESIGNATED CONTRACT PREMIUM attributable to any DESIGNATED CONTRACT in accordance with Paragraph III (2) of this POLICY, (ii) in the event of any fraudulent act of the INSURED, or (iii) in the event of the INSURED's violation of any of the terms and conditions of this POLICY, and (c) if required to do so by any regulatory authority, by giving written notice to the INSURED stating that the cancellation shall be effective on the earliest date permitted by such authority).

### 2.    Cancellation by the INSURED

The INSURED has the right to cancel this POLICY at any time by giving thirty (30) days written notice to the INSURANCE COMPANY (stating when thereafter the cancellation shall be effective).

BSSF2344

BS 00311

**3.** **Termination**

This POLICY shall automatically terminate upon the sale or other change in control of the INSURED's construction business, unless this POLICY is assigned or transferred as provided in Section VII.

**4.** **Effect of Cancellation or Termination**

Neither the cancellation of this POLICY by either party nor the termination of this POLICY shall affect the duties or rights of the INSURED or the INSURANCE COMPANY, as to DESIGNATED CONTRACTS VALIDLY ISSUED before the effective date of such cancellation or termination. It is expressly understood (i) that the INSURED shall deliver to the INSURANCE COMPANY the DESIGNATED CONTRACT PREMIUM attributable to each DESIGNATED CONTRACT VALIDLY ISSUED by it prior to the effective date of cancellation or termination, and (ii) that except as otherwise provided in Paragraph III (3) of the POLICY the INSURANCE COMPANY shall not be obligated to return to the INSURED the DESIGNATED CONTRACT PREMIUM attributable to any DESIGNATED CONTRACT VALIDLY ISSUED by the INSURED prior to the effective date of cancellation or termination.

## X. SUBSTITUTIONS

**1.** **Substitution**

At any time during the POLICY TERM, the INSURANCE COMPANY, by giving written notice of the substitutions (together with a copy of the new Schedule(s)) to the INSURED, (i) may substitute as the DESIGNATED CONTRACT a new form of construction contract for the form of construction contract attached to this POLICY as Schedule A, and (ii) may substitute a new table for determining the DESIGNATED CONTRACT PREMIUMS for the table then attached to this POLICY as Schedule B. Such substitutions shall become effective immediately upon the INSURED's receipt of such notice or at such other time as the INSURANCE COMPANY may specify therein.

**2.** **Effect of Substitution**

Neither the substitution of remedial work repair service agreement nor the substitution of a new table for determining the DESIGNATED CONTRACT PREMIUMS pursuant to Paragraph X (1) shall affect the duties or rights of the INSURED or the INSURANCE COMPANY as to DESIGNATED CONTRACTS VALIDLY ISSUED before such substitution. It is expressly understood (i) that the DESIGNATED CONTRACT PREMIUMS delivered to the INSURANCE COMPANY by the INSURED shall be determined in

7

BSSF 2345

BS 00312

accordance with the table attached to this POLICY as Schedule B on the date of issuance of the corresponding DESIGNATED CONTRACTS, and (ii) that the liabilities and obligations of the INSURANCE COMPANY with respect to each DESIGNATED CONTRACT VALIDLY ISSUED by the INSURED shall not in any manner be enlarged, limited, or otherwise affected by the substitution of a new form of DESIGNATED CONTRACT subsequent to each issuance.

## XI.    INSPECTION AND EXAMINATION

In order to verify the information set forth in any Proof of LOSS submitted by the INSURED or made by the INSURED in any examination made pursuant to Paragraph IV (2) of this POLICY, the INSURANCE COMPANY shall be permitted to inspect and examine the INSURED's premises, books, and records (insofar as such books and records relate to the premium basis or the subject matter of this insurance) at any time during the POLICY TERM and any extension thereof and within one (1) year after the expiration of all DESIGNATED CONTRACTS VALIDLY ISSUED during the POLICY TERM.

## XII.    RECOVERIES

Upon payment of any LOSS by the INSURANCE COMPANY, amounts recovered by the INSURED for which the INSURED has been reimbursed by such payment of LOSS shall belong to, and be paid by the INSURED to, the INSURANCE COMPANY, up to the total amount paid by the INSURANCE COMPANY for such LOSS.

## XIII.    SUBROGATION

Upon payment of any LOSS by the INSURANCE COMPANY, the INSURANCE COMPANY shall be subrogated to all of the INSURED's rights of recovery therefor against any person or organization, and the INSURED shall execute and deliver instruments and papers and do whatever is necessary, to secure such rights. The INSURED shall do nothing after such LOSS to prejudice such rights.

8

BSSF2346

BS 00313

## XIV.  APPLICABILITY AND EXCLUSIONS

1.    This POLICY shall be of no force of effect, and the INSURANCE COMPANY shall have no liability or obligation to the INSURED, other than with respect to the INSURED's legal obligations under DESIGNATED CONTRACTS VALIDLY ISSUED by it during the POLICY TERM and with respect to which the INSURED has paid the applicable DESIGNATED CONTRACT PREMIUM.

2.    This POLICY is not applicable, and imposes no liability or obligation whatsoever on the INSURANCE COMPANY, with respect to (a) any DESIGNATED CONTRACT for which the INSURANCE COMPANY has not received the applicable DESIGNATED CONTRACT PREMIUM; (b) any obligation of the INSURED under any DESIGNATED CONTRACT which contains any false or misleading material statement concerning the DESIGNATED CONTRACT HOLDER, or the agreement period of the DESIGNATED CONTRACT; (c) any fraudulent, dishonest, or criminal act by the INSURED, a partner therein, or any officer, employee, director, trustee, or agent thereof, while working or otherwise and whether acting alone or in collusion with others (which such fraudulent acts shall include, without limitation, issuance of a DESIGNATED CONTRACT which such person believes, or has reason to believe, is likely to have a remedial work repair covered by such DESIGNATED CONTRACT); (d) any liability assumed by the INSURED under any contract or agreement other than the DESIGNATED CONTRACT or under any modification, amendment or waiver of any term or condition of a DESIGNATED CONTRACT not expressly approved in writing by the INSURANCE COMPANY; and (e) any repairs made, or costs incurred by, the INSURED for which it is not liable to a DESIGNATED CONTRACT HOLDER pursuant to the terms and conditions of a DESIGNATED CONTRACT VALIDLY ISSUED during the POLICY TERM.

## XV.   GIVING OF NOTICE

All notices, Proofs of LOSS, and submissions of DESIGNATED CONTRACTS under this POLICY shall be deemed to be given: (a) to the INSURANCE COMPANY, upon deposit in the U.S. mails, certified and postage prepaid, addressed to the INSURANCE COMPANY, at the INSURANCE COMPANY's principal office, or (b) to the INSURED, upon deposit in the U.S. mails, certified and postage prepaid, addressed to the INSURED at the address set forth in the Application or such other address as may be delivered in writing to the INSURANCE COMPANY.

BSSF 2347

BS 00314

## XVI. DECLARATIONS

By acceptance of this POLICY, the INSURED agrees that the statements in the Application are the INSURED's agreements and representations, that this POLICY is issued in reliance upon the truth of such representations, and that this POLICY embodies all agreements and understandings existing between the INSURED and the INSURANCE COMPANY relating to the subject of this POLICY and agrees that it may not rely on any statements or representations relating to the terms and conditions of this POLICY made by any other party (whether or not purporting to act of behalf of the INSURANCE COMPANY) other than those statements and representations set forth in this POLICY.

IN WITNESS WHEREOF, the INSURANCE COMPANY has caused this POLICY to be executed and attested; but this POLICY shall not be valid unless countersigned by a duly authorized agent of the INSURANCE COMPANY.

PENNSYLVANIA CONTRACTORS INSURANCE COMPANY

Date _3/11/98_____    By _____
                                              Signature

10

BSSF2348

BS 00315

# EXHIBIT E

155

1    00305, which is the audit documentation with respect to

2    our assessment.  And it is -- it is as documented.

3        Q    Now, if, in fact, it turns out -- strike that.

4    Was there any determination made as part of this audit

5    whether or not PCIC had the ability to satisfy in full a

6    claim of 1,162,000?

7        A    Yes.

8        Q    Is that reflected in these work papers?

9        A    It's not needed to be reflected since we had

10   the audit files.  It was all cash and securities.  So it's

11   very easy to claim, and we didn't document it.

12       Q    But it's your testimony today that as of 12/31

13   -- actually as of February, 1999, which was when you

14   completed your field work for this particular audit, PCIC

15   had approximately $1.2 million in cash that they could

16   have used to satisfy this claim?

17       A    Yes.

18       Q    PCIC now is undergoing liquidation?

19       A    Yes.

20       Q    And when did that formal liquidation process

21   start?

22       A    I'm thinking it was the -- honestly, I can't

23   remember.  I -- I can't remember if it was the fall of

24   2000.  It was sometime -- best of my recollection, it's

25   between June of 2000 and June of 2001.

# EXHIBIT F

1    00305, which is the audit documentation with respect to

2    our assessment.  And it is -- it is as documented.

3        Q    Now, if, in fact, it turns out -- strike that.

4    Was there any determination made as part of this audit

5    whether or not PCIC had the ability to satisfy in full a

6    claim of 1,162,000?

7        A    Yes.

8        Q    Is that reflected in these work papers?

9        A    It's not needed to be reflected since we had

10    the audit files.  It was all cash and securities.  So it's

11    very easy to claim, and we didn't document it.

12        Q    But it's your testimony today that as of 12/31

13    -- actually as of February, 1999, which was when you

14    completed your field work for this particular audit, PCIC

15    had approximately $1.2 million in cash that they could

16    have used to satisfy this claim?

17        A    Yes.

18        Q    PCIC now is undergoing liquidation?

19        A    Yes.

20        Q    And when did that formal liquidation process

21    start?

22        A    I'm thinking it was the -- honestly, I can't

23    remember.  I -- I can't remember if it was the fall of

24    2000.  It was sometime -- best of my recollection, it's

25    between June of 2000 and June of 2001.

1       Q   Roughly about a year and a half after this

2   audit had been completed?

3       A   Correct.

4       Q   Do you know whether or not PCIC ever paid the

5   1,162,000 claim?

6       A   I believe it was paid.

7       Q   Where would that be reflected?  When was the

8   last time -- strike that.  I'll withdraw that question.

9   What was the last year that Brown, Schultz audited PCIC?

10      A   1998.

11      Q   All right.  So there was no audit for 1999?

12      A   Correct.

13      Q   And if this claim was paid, it would not have

14   been paid until after -- clearly after February, 1999,

15   correct?

16      A   That's correct.  But we did an audit of PCIC

17   for 1999, and we would have done a tax return for 2000.

18      Q   I'm sorry.  I thought you just said the last

19   audit you did for PCIC was 1998?

20      A   I didn't say that.  I said CCI.  If I said

21   that, I misspoke.

22      Q   All right.  So you did an audit for PCIC in

23   1999?

24      A   I believe that's correct.  Because the Turks --

25   the insurance commissioner of the Turks and Caicous still

1   required the audit.

2       Q   And you have a memory of this 1,162,000 being

3   paid by PCIC?

4       A   I -- yes.  Although I -- I can't say I remember

5   when or -- I do believe it was paid.

6       Q   How much money did they -- did PCIC have on

7   hand that was unrestricted in terms -- it was not reserved

8   against other losses as of February, 1999?

9       A   I don't remember.  All I do recall though is

10   because the -- they had to communicate with the insurance

11   commissioner, there was a required minimum amount of -- of

12   a reserve that was required under -- under the insurance

13   laws.  And that was the only amount still remaining after

14   all claims had been paid out.

15       And they were making application to the

16   insurance commissioner documenting that all insurance

17   claims had been paid out and to waive any kind of waiting

18   period to run out claims because all -- all contracts --

19   all claims had been settled by the end of -- of 1999 or

20   2000.  2000, actually.

21       Q   If -- if you had determined that in whole or in

22   part the $1,162,000 claim was uninsured by the PCIC

23   policy, how would that have impacted on the -- on the

24   Brown, Schultz audit report?

25       MS. CARSON:  I object to the form.

BY MR. McGLYNN:

    Q    You may answer.

    A    Well, if they had not agreed to not record the claim, if -- let me go through the process.  If they had recorded a claim, and we had determined that the claim was not covered by the insurance contract, we would have required them to eliminate the claim from the records and -- financial records, and simply they could have disclosed the fact that there was a claim pending.

    If we had -- if that had been the case and they had been refused, we would have given them a qualified opinion, because it would not have been in accordance with GAAS.

    Q    And how would that have impacted on including this 1,162,000 in as revenue?

    A    It would have reduced the profits by 1,162,000.

    Q    And that would have been true for the year 1998 even if, hypothetically speaking, the claim was ultimately paid a year and a half later, correct?

    A    I'm sorry.  I don't understand your question.

    Q    In other words, it makes no difference whether or not this claim was paid a year and a half later if there had been a determination made as of February, 1999 that this claim was uninsured?

    MS. CARSON:  Object to the form.