UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY,<br>Plaintiff<br><br>v.<br><br>BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ,<br>Defendants. | CIVIL ACTION NO. 1:01-CV-00813<br><br>JUDGE KANE |

FILED
HARRISBURG, PA
JUL 2 2 2002
MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

## UNITED STATES FIDELITY AND GUARANTY COMPANY'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND FOR SANCTIONS

Pursuant to Fed. R. Civ. P. 37(a) United States Fidelity and Guaranty Company ("USF&G") hereby moves for an order compelling Defendants Brown Schultz Sheridan & Fritz and Bruce J. Brown (collectively, "Brown Schultz") to promptly produce clear and legible copies of all documents responsive to document request no. 20 in United States Fidelity & Guaranty Company's First Request for the Production of Documents to the Defendant, Brown Schultz Sheridan & Fritz (the "Document Request"). This request seeks production of written audit procedures employed by Brown Schultz relative to the pertinent audits. Brown Schultz identified the Horwath International Audit Manual ("Horwath Manual") as being responsive to that document request. However, Brown Schultz refuses to allow USF&G to make copies of any portion of the Horwath Manual, thereby rendering it impossible for USF&G to, *inter alia*, utilize parts of that document as deposition exhibits or trial exhibits or to make any portions of that document available for inspection by USF&G's experts. Not only has Brown Schultz taken this position without any legal basis for its refusal to allow copies to be made but Brown Schultz does

so even though it has already produced copies of certain pages of the Horwath Manual and has brought the entire document to a deposition so that USF&G can "inspect" – but not copy – it. Because of USF&G's obvious right to inspect and copy the Horwath Manual and Brown Schultz' inadequate objection, USF&G should be awarded its costs and attorneys' fees incurred in bringing this motion.

In further support of this Motion, USF&G avers and asserts as follows:

1. On or about May 9, 2001, USF&G commenced an action against the public accounting firm of Brown Schultz alleging, *inter alia*, that the true financial condition of CCI Construction Inc. ("CCI") was materially misstated in audited financial statements prepared by Brown Schultz. USF&G alleges that relying on the audited financial statements, USF&G extended CCI's bonding capacity and issued numerous payment and performance bonds based on the audited financial statements prepared by Brown Schultz. As a result of CCI's defaults on projects bonded by USF&G, USF&G incurred losses of approximately $30,000,000.

2. On or about August 22, 2001, USF&G served the Document Request on Brown Schultz. Among the documents that were requested to be produced by the Document Request were the following:

> [20.] All documents relating to Brown Schultz' written procedures for audits used or employed as they relate to the audit reports.

3. In Defendant Brown Schultz Sheridan & Fritz' Responses and Objections to United States Fidelity & Guaranty Company's First Request for the Production of Documents (the "Response"), Brown Schultz responded to document request no. 20 in the Document Request as follows:

> Defendant objects to this request as vague, ambiguous, overly broad and as seeking information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of its objections defendant refers plaintiff to the files previously produced to USF&G. In addition, *defendant utilizes the Horwath International Audit Manual which will be made available for inspection upon request.*

(emphasis supplied). No mention is made of copyright issues nor is any indication given that copies will not be provided – as was done for all other documents produced by Brown Schultz. In fact, Brown Schultz has already produced certain pages of the purportedly copyrighted document. A sample of true and complete copies of several pages from the Horwath Manual that have already been produced – bearing the Bate stamp BS 02032-02038 provided by Brown Schultz – are attached hereto and incorporated herein as Exhibit "A." Only recently, when USF&G asked to obtain a copy of the Horwath Manual, has Brown Schultz raised the spectre of "copyright infringement" as a basis for denying USF&G the opportunity to copy the Horwath Manual or any part therein.

    4.    Not only was "copyright infringement" not raised in the Response but federal copyright law provides no barrier to the reproduction of copyrighted material for litigation purposes. Simply, the "fair use" doctrine abnegates any objections to the production of documents by Brown Schultz based on the basis of a putative violation of copyright law. Documents protected by copyright may be copied and distributed for litigation purposes under the "fair use" exception to the federal copyright laws. 17 U.S.C. §107. In *Religious Technology Center v. Wollersheim*, 971 F.2d 364 (1992), defendants provided copyright protected documents to their expert witnesses for the purpose of preparing their testimony. Under these circumstances, the Court held that the "use of the documents was 'fair use' under 17 U.S.C. §107

- 3 -

and not an infringement." *Id.* at 367. In its opinion, the *Wollersheim* court relied on the treatise *Nimmer on Copyright,* quoting "works are customarily reproduced in various types of judicial proceedings . . . and it seems inconceivable that any court would hold such reproduction to constitute infringement . . . for offering the work in evidence." *See also City Consumer Services, Inc. v. Horne et al*, 100 F.R.D. 740 (1983) (plaintiffs' compilation of business records, even if protected under copyright laws, constitutes fair use). In *Images Audio Visual Productions, Inc. v. Perini Building Co, Inc.*, 91 F. Supp. 2d 1075 (E.D. Michigan 2000), the court found a copyright violation where a party hired a photographer for purposes of preparing photographs for use in a specific arbitration proceeding and then copied the photos for use by other parties. Such a finding is easily distinguished from the instant case because the protected material was created for the litigation. The plaintiffs' "copyrighted photographs did not just 'happen' serve as evidence in Defendant's arbitration proceedings. Rather, they were intended to serve that purpose." *Id.* at 1082. *Images Audio*, however, contains a lengthy discussion on using copyright protected materials in litigation, relying on *Nimmer on Copyright* and *Wollwersheim* for the proposition that "reproductions of copyrighted works in judicial proceedings constitute fair use." *Id.* at 1081-82.

5. USF&G seeks to utilize copies from the Horwath Manual solely for purposes of the instant litigation. In fact, by letter dated June 28, 2002, USF&G's counsel represented that USF&G "will not use [the Horwath Manual] to perform auditing work nor will [USF&G] sell it or make it otherwise available to those who will . . . ." A true and complete copy of the letter dated June 28, 2002 is attached hereto and incorporated herein as Exhibit "B." USF&G reiterates that it does not seek to utilize the Horwath Manual for commercial purposes and will not use the Horwath Manual, or any portion thereof, other than for purposes of the instant litigation.

6.  USF&G's right to inspect and copy the Horwath Manual is manifest. In fact, in the Response, Brown Schultz identifies the Horwath Manual as a document used by Brown Schultz relative to the relevant audits. Further, Brown Schultz has found certain pages of the Horwath Manual to be of sufficient relevance to have already produced copies of certain pages from that document. The arbitrary distinction between inspecting the Horwath Manual and copying it for litigation purposes is without a legal basis and serves no rational purpose.

7.  USF&G should be awarded its expenses, including reasonable attorneys' fees, incurred relative to the instant motion. Pursuant to Fed. R. Civ. P. 37(a)(4), a prevailing party is entitled to reasonable expenses, including attorneys' fees, unless the court finds that the refusal to produce documents was substantially justified. *Marcarelli v. Delaware County Mem'l Hosp., Inc.*, 1987 WL 15213, at *2 (E.D. Pa. July 30, 1987). As discussed, *supra*, no rational ground for Brown Schultz to withhold reproduction has been proffered nor can Brown Schultz cogently explain why it was not a copyright violation for it to previously produce copies of certain pages – such as the document Bate stamped BS 02032 – but it is now a purported violation for USF&G to receive copies of other pages from the Horwath Manual. Moreover, sanctions are appropriate because this motion constitutes the *second* time that USF&G has had to seek judicial intervention to validate its rights. By Order dated June 13, 2002, Magistrate Judge Smyser not only granted USF&G's motion to compel Brown Schultz to produce certain documents but ordered that Brown Schultz "shall pay to the plaintiff the reasonable expenses, including attorneys' fees, the plaintiff incurred in filing its motion to compel."

WHEREFORE, USF&G respectfully requests that this Court enter an Order:

1. Requiring Brown Schultz to produce clear and legible copies of all documents responsive to Interrogatory No. 20 of the Document Request, including the Horwath International Audit Manual, within seven (7) days;

2. Awarding USF&G its costs and expenses, including reasonable attorneys' fees incurred in bringing this motion; and

3. Providing such other and further relief as is necessary and just.

    UNITED STATES FIDELITY & GUARANTY COMPANY,
By its attorneys,

_____
Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA  02110
Telephone:   (617) 790-3000
Facsimile:    (617) 790-3300

and

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:   (717) 237-7100
Facsimile:    (717) 237-7105

Dated: July 22, 2002
#249780 v1/36432/87

Form B-2
Page 1 of 6

## CHECKLIST FOR EVALUATING BUSINESS RISK AND OVERALL INHERENT AND AUDIT RISK

CLIENT _CCI Construction Co. Inc._

## PART I: BUSINESS RISK FACTORS

> Business risk is considered in the audit process in connection with client acceptance or retention decisions and in determining audit scope as follows:
> - In selecting the desired precision level of the audit and, therefore, materiality (factors involving user needs and expectations) — Section A
> - In selecting a maximum acceptable audit risk level, used in conjunction with assessed inherent and control risk factors (including fraud risk), to determine detection risk. — Section B
>
> In completing PART I, indicate the presence or absence of a risk factor by checking the box at the right. (Complete the column at the right in accordance with the instructions in PART II after completing PART I.)

A. **FACTORS INVOLVING USER CONSIDERATIONS, THEREFORE, INDICATING HIGHER AUDIT PRECISION LEVELS (LOWER MATERIALITY)** (Some of these may also require reducing APM levels below 1/3 of MTM; see Form B-3.)            YES  NO   PART II CODE

1. Are the client's securities publicly held?   ☐ ☑
   If yes:                                                   ☑ N/A
   a. Are they widely held?   ☐ ☐
   b. Are securities holders primarily institutional?   ☐ ☐
   c. Are securities heavily traded (high volume), or have unusually volatile prices or high or low price/earnings ratio?   ☐ ☐
   d. Is there evidence of significant attention to client's financial statements and affairs by securities analysts, stock exchanges or the SEC?   ☐ ☐

2. Is the client planning or contemplating a public (or private) offering of securities?   ☐ ☑

3. Is the client planning or contemplating a sale of the business or a significant portion thereof, has there been recently, or is there likely to be soon, a significant change in ownership interests?   ☐ ☑
   a. If yes, will the sale price be dependent, or subject to adjustment based, upon amounts to be reported in the financial statements?   ☑ N/A   ☐ ☐

4. Are there (or will there likely be) significant creditors who are financial statement users?   ☐ ☑
   If yes: _Bank is the user - no funds drawn on LCC and none expected at YE._  ☑ N/A
   a. Are there (or will there likely be) debt covenant tests related to the financial statements, compliance with which will likely be relatively marginal or uncertain?   ☐ ☐
   b. Has the client had less than satisfactory relationships with its lenders?   ☐ ☐

5. Are there indications of significant related party transactions, possible fraud or illegal acts, transactions questionable as to business purpose, or other potentially user-sensitive matters?   ☑ ☐  _U_
   _Insurance policies with premiums totaling approx 1 million were purchased from PCIC prior to year end. Policies have been purchased in the past - this is not an unusual transaction._

6. Have the client's financial statements/or affairs received, or are they likely to receive, unusual scrutiny by financial statement users, regulators (other than stock exchanges or the SEC) or litigants? _Users: Mgmt, Bank, _____   ☐ ☑

7. Will our work be subject to review by a regulatory agency, litigant or a principal auditor?   ☐ ☑

8. Will we likely be succeeded by another audit firm?   ☐ ☑

9. Other? _____

_____   ☐ ☑

BSSF2714

BS 02032

12/96                          Copyright © 1996, 1994 and 1993, Horwath International. All rights reserved.

Form B-2
Page 3 of 6

B. **OVERALL INHERENT OR CONTROL RISK FACTORS THAT CONTRIBUTE TO FRAUD RISK AND ALSO CONTRIBUTE TO BUSINESS RISK (CONTINUED)**
(*Refer to responses on Form B-2A.*)

YES  NO   PART II CODE

15. Is the client's industry characterized by <u>rapidly changing technology</u> and increasing obsolescence, <u>high or rapidly increasing competition</u>, declining or saturated markets, eroding margins, or increasing business failures among its customer bases? ☑ ☐ _A_
    *Construction Contractor — real competitive industry!*

**Operating Characteristics and Financial Stability**

16. Does the nature of the business (for example, operations in foreign markets) or its multi-level or decentralized management structure increase the risk of occurrence of illegal acts by management or asset misappropriations? ☐ ☑ ___

17. Is the business extremely dependent on relatively few customers or suppliers? ☐ ☑ ___

18. Is client having difficulty meeting its cash flow obligations, otherwise in poor financial condition, or has operating performance been substantially below industry norms or other expectations? *Very good year.* ☐ ☑ ___

19. Are there management compensation plans or other incentives linked to financial results (including intended uses of the financial statements, as indicated in PART IA)? ☑ ☐ _A_
    *See PFD2*

20. Do the experience, knowledge, skill, workload, attitude or motivation of financial accounting personnel, our prior experience or analytical planning procedures indicate that substantial audit adjustments will likely be required? ☐ ☑ ___

21. Are there significant affiliated entities to be unaudited, audited by other auditors, on different fiscal years or excluded from the financial statements? ☐ ☑ ___

**Susceptibility of Assets to Misappropriation**

22. Are there large amounts on hand of currency, redeemable cash substitutes (*e.g.*, gift certificates, scrip, gaming chips or tokens), negotiable or bearer instruments or other securities, a high volume of cash transactions, checks to cash or transfers among multiple bank accounts? ☐ ☑ ___

23. Does the inventory contain large quantities of easily concealed and convertible items of high value, such as jewelry or electronics? *No inventory.* ☐ ☑ ___

24. Do the fixed assets contain <u>large quantities</u> of movable items of value, with no (or easily removed) ownership identification? *Most valuable fixed assets — trucks and heavy equipment which have CCI #'s* ☐ ☑ ___

**Controls Against Asset Misappropriation** *Telephone and computer system housed in locked room. Individual offices locked during non-business @ CCI*

25. In the presence of any of the foregoing three conditions, considering the client's size and organizational structure, are there significant control weaknesses that may require special attention in the audit scope, for example, with respect to:   N/A ☑
    *has never had any problems with asset misappropriation.*

    • Physical safeguards over currency, cash registers, cash substitutes, unused checks, securities and other financial instruments, inventories or movable equipment or related accounting data? ☐ ☐ ___

    • Segregation of duties or mandatory vacation policies? ☐ ☐ ___

    • Management authorizations, approvals and oversight function? ☐ ☐ ___

12/96

BSSF2716

BS 02034

2. Based on the risk factors identified as significant, determine if there is any primary direction of inherent risk. *Indicate primary direction of overall inherent risk, or check "BIDIRECTIONAL" (see also Forms B-9, CYCLE RISK ASSESSMENT):*

(Check one)   ☒ OVERSTATEMENT   ☐ UNDERSTATEMENT   ☐ BIDIRECTIONAL

Note principal reason(s): _Bonding Co. and Bank expect favorable financial statements._

## PART III: OVERALL AUDIT RISK CONCLUSION

> Audit risk is the risk of issuing an inappropriate opinion on the financial statements, for example, an unqualified opinion when they are materially misstated. As we know, it is a function of three principal risk component factors, the first two of which (inherent and control risk) are client-associated, and the third (detection risk), which is auditor controlled. Consequently, audit risk is an expression of how much risk the auditor is willing to accept by being associated with the financial statements. (The lower the acceptable audit risk level, the more auditing is necessary.) Maximum acceptable audit risk is determined or set judgmentally based on circumstances, particularly business risk factors. As determined on an overall basis for the audit as a whole, it generally applies to all significant cycles, and only in the primary direction, if any. A higher acceptable level of audit risk ordinarily applies to insignificant cycles and assertions. However, special circumstances may give rise to use of a lower acceptable audit risk for certain sensitive cycles or assertions, for example, if there is a significant fraud risk in a certain area.
>
> As a significant, independent component of audit risk, the higher the inherent risk, the more auditing necessary to mitigate it and achieve the desired maximum audit risk level. But since many inherent risk factors (most particularly those in PART IB of this checklist that relate to management integrity and attitudes, and other conditions often associated with fraud) likewise contribute significantly to business risk, they may further affect audit scope by limiting maximum acceptable audit risk. (Although one might expect that a high level of inherent risk would lead to a lower acceptable audit risk, the opposite is possible because these factors function independently to influence audit scope. Likewise, although we may have assessed inherent risk relatively low or moderate, because of user concerns (which ordinarily do not increase inherent risk), such as the business risk factors listed in PART IA, we often decide to do more auditing to further limit acceptable audit risk to a lower level.
>
> As a guide, one might view "high", "moderate" and "low" audit risk, as the approximate equivalent of a 20%, 10% and 5% risk of incorrect acceptance, respectively, as might be used in a sampling application when there will be moderate reliance on an analytical or other corroborative substantive test, and no reliance on any test of internal controls.

*Considering the factors (PART I) as business risk factors, individually and in the aggregate, determine whether the maximum acceptable audit risk level (applicable to the primary direction of risk, or both directions, if equal) should be:*

(Check one)   ☐ **HIGH** (minimum scope, consistent with GAAS)   ☒ **MODERATE**   ☐ **LOW** (highest scope)

Note principal reason(s): _Inherent and control risk are normal - historically no significant problems have been found. Choice between high or moderate acceptable audit risk level does not affect audit scope._

| Period Ending | Prepared/Updated by | Date | Approved by | Date |
|---|---|---|---|---|
| 12/31/97 | BCW | 12/2/97 | | |

12/96

BSSF2718

BS 02036

Form B-3
Page 2 of 2

### PART I — AUDIT PLANNING MATERIALITY (continued):

Compute MTM as follows:

| | | |
|---|---|---|
| Base (line 3, above) | $ | 26,500,000 |
| X MTM percentage (from table) | | 1.2 % |
| MTM (not less than minimum ☐) | $ | 318,000 |

### PART II — ACCEPTABLE PROJECTED MISSTATEMENT:

> Based on our auditing materiality, we also determine acceptable projected misstatement (APM), which is a limitation (set tentatively at the planning stage, subject to reevaluation) on unadjusted misstatements (known and projected), an accounting materiality concept. We ordinarily encourage clients to make all adjustments but often encounter resistance for practical reasons. APM ordinarily should be set at 1/3 (33.3%) of MTM but may be lower in certain circumstances, for example, when there are debt covenants and waived adjustments could make a difference as to whether the financial statements show marginal compliance (or noncompliance). Another instance when a lower APM would be appropriate is when the business has contracted in size or is expected to contract in the subsequent period, thus increasing the likelihood that unadjusted misstatements that are immaterial to the current period will be material to the subsequent period. (A higher APM — say, up to 50% of MTM — may be approved in some circumstances, but usually not at the planning stage; see Form B-10.)

5.  Compute APM as follows: 33.3% (or lower* ___ %) X MTM $ 318,000 = $ 105,994 use 106,000

    \* If a lower APM percentage is used, explain why.

    _____

    _____

6.  Select a *de minimis* threshold below which adjustments may be waived without bringing them forward to Form B-10, SUMMARY AND EVALUATION OF UNADJUSTED MISSTATEMENTS. (The *de minimis* threshold ordinarily is 5-10% X APM, but may be as low as 1%, depending on the perceived likelihood of small misstatements and number of audit areas likely to produce them.)

    APM $ 106,000  X *de minimis* percentage  5 % = $ 5,300

### PART III — SPECIAL-PURPOSE MATERIALITIES:

> In addition to using MTM and APM for general materiality purposes, as described, we might also compute other materiality thresholds for special purposes, for example, regarding classification and other presentation and disclosure assertions, in cases of expected marginal compliance or noncompliance with debt covenants or similar regulatory or other performance tests, irregularities, illegal acts, related party transactions, and other potentially user-sensitive matters said to have qualitative materiality. Another special-purpose materiality determination is necessary for first year engagements, and possibly those in which we know or believe that prior period misstatements exist (for example, from prior year's waived adjustments or subsequently discovered facts) for prior period adjustments.
>
> Special-purpose materialities should be determined and approved as early as practical after concluding they are necessary, which may be later than the planning stage. Use Form B-3A, CHECKLIST FOR DETERMINING SPECIAL-PURPOSE MATERIALITIES, generally, as multiples or fractions of APM or MTM, if deemed applicable in the circumstances, or check the box at the right.    ☐ N/A

Prepared by: _____   Date: _____

Approved by: _____   Date: _____

3/96

BSSF 2721

BS 02038

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

June 28, 2002

Bruce D. Levin
DIRECT DIAL: (617) 790-3314
e-mail: blevin@bgblaw.com

*VIA FACSIMILE*

Kathleen Carson, Esquire
Swartz Campbell Detweiler
1601 Market Street
Philadelphia, PA 19103-2316

Re: United States Fidelity & Guaranty Company v. Brown Schultz Sheridan & Fritz

Dear Kathy:

At least in the large library of a big 4 accounting firm, I have been unable to locate the Horwarth Manual (*See*, BSSF 4477). Because this document was purportedly relied upon by your client in conducting its audit, its relevance is manifest. Because of its apparent length, it will not be sufficient for it to be made available for review at your office. Accordingly, I would like to request that it be copied and sent to me. Because of the late stage of litigation, I would request that it be sent to me by an overnight delivery service so that it arrives no later than July 3, 2002. My client will reimburse your client for all copying and mailing costs. I note that my client will not use it to perform auditing work nor will my client sell it or make it otherwise available to those who will; accordingly, there are no copyright problems.

Very truly yours,

Bruce D. Levin

cc: Peter B. McGlynn, Esquire
BDL/mlb
#248562 v1/36432/87

## CERTIFICATE OF SERVICE

I, Jason F. Ernest, Paralegal, of the law firm of Thomas, Thomas & Hafer, LLP, hereby certify that a true and correct copy of the foregoing document was sent to the following counsel of record by facsimile and United States first-class mail, postage prepaid, at Harrisburg, Pennsylvania addressed as follows:

>Jeffrey B. McCarron, Esquire
>Swartz, Campbell & Detweiler
>1601 Market Street
>34th Floor
>Philadelphia, PA 19103-2316

THOMAS, THOMAS & HAFER, LLP

Dated: 7/22/02

By_____
Jason F. Ernest, Paralegal
P. O. Box 999
305 North Front Street
Harrisburg, PA 17108
(717) 237-7101