**ORIGINAL**

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

FILED
HARRISBURG, PA
JUL 2 2 2002
MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

| | |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, <br> Plaintiff <br><br> v. <br><br> BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, <br> Defendants | CIVIL ACTION NO. 1:01-CV-00813 <br><br> JUDGE KANE <br><br> MAGISTRATE SMYSER |

### REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Defendants submit this reply brief in further support of defendants' motion to compel reinsurance information. USF&G refuses to produce communications between it and its reinsurers on grounds of relevance and work product immunity.[1]

I.    Reinsurance Information is Relevant

USF&G's principal argument in support of its refusal to produce reinsurance information on grounds of relevance is that the cases cited by defendants involved insurance coverage disputes. According to plaintiff,

---

[1] Plaintiff in its opposition also contends that it objected to the requests on grounds that they were overbroad. However, no such objection is made in their responses to Defendants' Second Set of Requests for Production of Documents. See, Exhibit A to Defendants' Motion to Compel.

this is not a coverage dispute and, therefore, reinsurance information cannot be relevant. Notably, Plaintiff chooses not address the specific facts of the cases cited by defendants in which the courts found that reinsurance communications were relevant where an insurer had raised misrepresentation as a defense to coverage or sought recision of a policy on that basis.

For example, in <u>Rhone Poulenc Rorer Inc. v. The Home Indemnity Co.</u>, 1991 U.S. Dist LEXIS 16336 (E.D. Pa. Nov. 7, 1991)[2], plaintiffs sought discovery of reinsurance agreements and communications with reinsurers for the purpose of refuting the defenses of misrepresentation or non-disclosure raised by many of the insurers. The court found that these misrepresentation defenses clearly put at issue the question of what the defendants knew at the time the policies were issued. The court found that such information may be extremely relevant to the misrepresentation defenses raised by most of the insurers. Because "reinsurance appears to be always discoverable for purposes of rebutting a defense, particularly of misrepresentation (as well as non-disclosure)," the court ordered its production.

---

[2]The principal case cited by USF&G in support of its position that the materials sought are irrelevant, <u>Rhone Poulenc Rorer, Inc. v. Home Indem. Co.</u> 139 F.R.D. 609 (E.D. Pa. 1991) was reversed, in part, by the above cited decision on reconsideration to permit discovery of reinsurance information where an insurer raised a defense of misrepresentation.

Similarly, in <u>National Union Fire Insurance v. Continental Illinois Corp.</u>, 116 F.R.D. 78 (N.D. Ill. 1987), the insurers asked for a rescission of the policies because of alleged misrepresentations. The court held the communications between the insurers and their reinsurers were relevant for determining what information the insurers actually relied on in issuing the policies.

Likewise, in <u>Stonewall Ins. Co. v. National Gypsum Co.</u>, No. 856 Civ. 9671(SWK), 1988 U.S. Dist. LEXIS 9938 (S.D.N.Y., Sept. 6, 1988) the court agreed with the policyholders that reinsurance information may rebut a misrepresentation defense.

In this case, USF&G has raised a claim of misrepresentation. Like the insurers in <u>Rhone Poulenc Rorer</u>, USF&G has put at issue what it knew about CCI and its financial condition at the time it was issuing bonds on CCI's behalf. Accordingly, what USF&G was communicating to its reinsurers with regard to this particular contractor during the period of time USF&G was issuing bonds on CCI's behalf is reasonably calculated to lead to the discovery of admissible evidence to refute USF&G's claim. The fact that this case is not a coverage dispute has no bearing on the applicability of the foregoing cases. They clearly stand for the proposition that communications with reinsurers are relevant to refute a claim of misrepresentation or non-disclosure raised by an insurer, such as USF&G, in this case.

The cases cited by plaintiff for the proposition that reinsurance information is not relevant are completely inapposite. They simply do not address the relevance of reinsurance information in the context of a misrepresentation claim. Reinsurance information was sought in those cases was for purposes of the interpretation of the scope of policy coverage. In the <u>Rhone Poulenc</u> case cited by plaintiff, the court initially found that reinsurance information was not relevant to the issue of insurance policy interpretation. <u>Rhone Poulenc Rorer, Inc. v. Home Indemnity Co.</u>, 139 F.R.D. 78 (E.D. Pa. 1991). However, as set forth above, the court granted a request for reconsideration and ordered production of reinsurance information finding it relevant to the misrepresentation defenses raised by certain insurers. See <u>Rhone Poulenc Rorer</u>, 1991 U.S. Dist. LEXIS 16336 (E.D. Pa. Nov. 7, 1991). In <u>Great Lakes Dredge & Dock Co. v. Commerical Union Assur. Co.</u> 159 F.R.D. 502, 504 (N.D. Ill. 1995), the court, in denying discovery, specifically noted that while other cases have found communications regarding reinsurance relevant where the issue of whether an insurer had relied on allegedly material misrepresentations of the defendants, that issue was not present in matter before it. In <u>Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co.</u>, 117 F.R.D. 283, 284 (D.D.C. 1986), the court denied discovery of reserves and reinsurance on the basis of relevance to the issue of <u>policy coverage</u>. <u>Id.</u> at 288. The court

did not address the relevance of reinsurance information to a misrepresentation claim.

Discovery regarding reinsurance communications created after issuance of the bonds is also reasonably calculated to lead to the discovery of admissible evidence. Gregory Daily, a St. Paul employee in the surety claims department, testified that USF&G is reinsured under an excess of loss treaty which applies once USF&G sustains a loss in excess of $5,000,000. Daily Depo. at p. 19:6-15. When USF&G's reserve is above $2,500,000 it is required to put its reinsurers on notice. Daily Depo. p.27:20-28-1. USF&G prepares both narrative reports and claims bordereaux that are sent to its reinsurers on a periodic basis. Daily Depo. at pp. 37:17-21; 46:8-14. Mr. Daily testified he generated the initial draft of narrative reports to reinsurers that would go out under Mr. Simanski's signature. Daily Depo. 15:14-20. Mr. Simanski is a Senior Vice President and head of surety claims for St. Paul. Daily Depo. at p. 13:6-12. Mr. Daily testified that the reports would contain information regarding the background of the contractor in claim, the type of work that the contractor does, what is left for the bonding company to complete and information regarding how the contractor ended up in a claim situation. Daily Depo. at p. 16:6-16. Mr. Daily further testified that the reports to reinsurers were prepared in the ordinary course of USF&G's business of communicating to reinsurers to advise them of particular claims and that the reports are required pursuant to the terms of

the reinsurance agreement. Daily Depo. pp. 24:2-6; 16:17-19. The pertinent portions of Mr. Daily's deposition are attached hereto as Exhibit A.

Based on Mr. Daily's testimony it is clear that these reports are also relevant to the issues in the instant litigation and, as such, should be produced. They may contain information regarding the extent of USF&G's claimed loss which is relevant to the issue of plaintiff's damages. In addition, the correspondence between USF&G and its reinsurers may contain information and/or admissions regarding USF&G's handling of the CCI account from both an underwriting and claims perspective. These are relevant to the affirmative defenses raised by defendants that: Plaintiff failed to mitigate its alleged damages; that Plaintiff's contributory negligence bars recovery from defendants; that Plaintiff assumed the risk of loss which forms the basis for this action; and that Plaintiff could have avoided its alleged loss without undue burden, expense, or humiliation, an affirmative defense raised by defendants. The documents are reasonably calculated to lead to the discovery of admissible evidence and their production should be ordered.

II.  The Work Product Doctrine Does Not Apply to USF&G's Communications with Its Reinsurers

Plaintiff's contention that the documents created after issuance of the bonds are "replete with the thoughts and mental impressions of counsel" is without support. Plaintiff, for the first time in its opposition to the motion to compel, has provided a chart which identifies only six letters

to reinsurers which plaintiff contends contain work product. Plaintiff does not state that these are the only communications between it and its reinsurers created after issuance of the bonds. Accordingly, as to those documents not listed on plaintiff's chart, work product immunity would not apply.

As to the six documents on the chart, it is plaintiff's burden to to demonstrate the application of the privilege. <u>Joyner v. Southeastern Pa. Transportation Authority</u>, 736 A.2d 35, 38, n.3 (Pa. Super. 1999). The information contained in the chart is insufficient to determine the privileged nature of the six documents for which work product immunity is claimed. The work product doctrine only protects material prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative. Fed. R. Civ. P. 26(b)(3). The material in question must have been produced in anticipation of litigation and the anticipation of future litigation must have been the primary motivation which led to the creation of the documents. <u>In Re: Diet Drugs (Phentermine/fenfluramine/dexfenfluramine) Products Liability Litigation</u>, 2001 U.S. Dist. LEXIS 5494 (E.D. Pa. 2001) citing, <u>Allendale Mutual Ins. Company v. Bull Data Systems, Inc.</u>, 152 F.R.D. 132, 136 (N.D. Ill. 1993). Among other things, the description of the documents is too vague to establish that these documents were prepared in anticipation of litigation. Even if plaintiff's description of the document was sufficient, Mr. Daily's

testimony makes it clear that the documents in question were created in the ordinary course of reporting to reinsurers and were prepared pursuant to a contractual obligation to provide such reports.

Finally, Mr. Simanski, who is listed as the author of the reports, is a Senior Vice President and head of surety claims for St. Paul. While he may have a law degree nowhere does plaintiff state that he was acting as such in preparing these reports.

III.    The Common Interest Doctrine Does Not Apply

The common interest doctrine does not protect the documents listed on Plaintiff's chart. The common interest doctrine preserves privilege where two or more persons or companies that share a common interest in a legal issue exchange privileged communications with one another. In Re: Diet Drugs (Phentermine/fenfluramine/dexfenfluramine) Products Liability Litigation, 2001 U.S. Dist. LEXIS 5494 (E.D. Pa. 2001). At its core, it applies when one attorney represents multiple individuals on the same matter. Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 446 (S.D.N.Y. 1995). The party asserting this narrowly applied doctrine has the burden of establishing its elements. United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989).

In this case, because the reinsurance communications are not protected by the work product doctrine in the first instance, the common interest doctrine is inapplicable. The common interest doctrine does not

apply unless the conditions of privilege are otherwise satisfied. <u>Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.</u>, 174 F.R.D. 609, 634 (M.D. Pa. 1997).

In addition, the parties among whom privileged matter is shared must have a common legal, as opposed to commercial, interest. <u>Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.</u>, 160 F.R.D. 437, 447 (S.D.N.Y. 1995). They must have demonstrated cooperation in formulating a common legal strategy. <u>Id.</u> at 447. The common interest doctrine does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation. <u>Id.</u>

Plaintiff has produced no facts of record to suggest that the communications with its reinsurers were anything more than business communications. There is nothing to suggest that they were made for purposes of or in cooperation in formulating a common legal strategy. As such, plaintiff cannot rely on the common interest doctrine to protect these documents from discovery.

IV. Conclusion

Based on the foregoing, defendants respectfully request that this court grant defendants' motion to compel and order plaintiff to produce documents responsive to requests 1 and 2 of Defendants' Second Set of Document Requests.

                                  Respectfully submitted,

                                  SWARTZ, CAMPBELL & DETWEILER

BY: _____
  for  JEFFREY B. MC CARRON
        KATHLEEN M. CARSON

Dated: July 22, 2002

# EXHIBIT "A"

Page 10

1   of the merger between Saint Paul and USF&G.
2     Q   Would that be in 1998 sometime?
3     A   Yes, I think that was around April of
4   1998.
5     Q   Okay.
6     A   I was still managing Stacey and Joyce, but
7   I also then was managing another attorney, Kim Rennie,
8   a claim administrator by the name of Julie Frankland
9   and two secretaries.
10    Q   Did your group have any particular
11  responsibilities --
12    A   No.
13    Q   -- in terms of the types of claims that
14  you handled?
15    A   No. They would handle any type of claim
16  that came in that needed to be assigned.
17    Q   Now, did you continue to handle claims as
18  a claim manager --
19    A   Yes.
20    Q   -- as well as perform oversight or manage
21  the individuals that you mentioned, correct?

Page 11

1     A   That is correct.
2     Q   So, to the extent that they were also
3   handling claims, you had ultimate responsibility for
4   those claims?
5     A   I had -- yes. Yes.
6     Q   And did you report to someone?
7     A   Yes.
8     Q   In 1998, who was that?
9     A   1998, I believe at that time it was Bruce
10  Corriveau, C-O-R-R-I-V-E-A-U.
11    Q   Is he an assistant vice-president?
12    A   Yes, he is.
13    Q   Was he then?
14    A   Yes.
15    Q   Is he one of the number of assistant
16  vice-presidents in the surety claims area?
17    A   That is correct.
18    Q   Is surety claims considered a department
19  within Saint Paul?
20    A   Yes. Yes.
21    Q   Okay. How many surety claims assistant

Page 12

1   vice-presidents are there?
2     A   I believe six.
3     Q   How does or how did Mr. Corriveau's duties
4   differ from yours, if you know?
5     A   To the extent that I know, he would have a
6   more broad picture oversight over the managers.
7         He may get involved in very large claims,
8   besides having more of the duties that are budgetary
9   in nature, where as a claims manager I don't have
10  those types of duties regarding budgets and expenses.
11    Q   Is there a particular dollar level at
12  which you need to consult or obtain, obtain authority
13  from him?
14    A   Yes.
15    Q   What's the dollar amount?
16    A   My authority is up to $500,000.
17    Q   When you say your authority is up to
18  $500,000, is that in terms of payments that can be
19  made by USF&G under a bond?
20    A   That is the total amount of payments under
21  a single bond that can be made without his approval.

Page 13

1   As we would call it, it's the total reserve that can
2   be set on a claim file.
3     Q   Whenever there is a reserve that will be
4   set that is in excess of $500,000, Mr. Corriveau needs
5   to be consulted?
6     A   His authority is to $1,000,000. Up above
7   $1,000,000, we then go to the head of the claim
8   department, head of the surety claim department, Jack
9   Simanski, S-I-M-A-N-S-K-I.
10    Q   What is Mr. Simanski's official title, if
11  you know?
12    A   I think it's senior vice-president.
13    Q   And he is the head of surety claims?
14    A   That is correct.
15    Q   Do you know how long he has held that
16  position?
17    A   Since the merger. At the time of the
18  merger, he became head of the claim department.
19    Q   Was he a USF&G employee?
20    A   Yes.
21    Q   What was his position with USF&G, if you

Page 14

1  know?
2  A  I don't know. He was in a different
3  department.
4  Q  Not surety claims?
5  A  No.
6  Q  Now, you've mentioned the setting of
7  reserves. How are reserves set just in general, in
8  connection with a particular project, for example, a
9  performance bond?
10 A  We would first try to, before we could set
11 a reserve, we have to determine to make our best
12 estimate what we believe the reserves will be.
13    So, on a performance bond, we would look
14 at what is left to complete in the contract, either
15 using an estimated cost to complete or by hard bids
16 taken.
17    We would then set, you know, the reserve
18 corresponding to what those costs would be. We would
19 also set an offsetting reserve for any contract money
20 we were going to receive.
21 Q  The offset reserve, is that contract money

Page 15

1  that you anticipate receiving, correct?
2  A  That is correct.
3  Q  So it may not be the, whatever the
4  remaining balance of the contract price is at that
5  time?
6  A  It may not.
7  Q  And, correspondingly, you may recover more
8  than what the reserve is?
9  A  Sometimes, yes.
10 Q  Does that happen often?
11 A  I would say not very often.
12 Q  Do you communicate with reinsurers?
13 A  Yes.
14 Q  What is your role in connection with
15 communications with reinsurers?
16 A  Mostly it's to go over reports that we
17 generate. If it's on a file that I'm handling, I will
18 generate the first draft of the report which will go
19 out under Mr. Simanski's signature and he will have
20 final review of.
21    There have been times where reinsurers

Page 16

1  have come in to discuss files, and I will talk to them
2  about my files.
3  Q  Have you discussed CCI with any
4  reinsurers?
5  A  Yes.
6  Q  You mentioned that you generate the first
7  draft of the reports that are sent to your reinsurers.
8  What is contained within these reports?
9  A  The reports would talk about first the
10 background of the contractor, what type of work they
11 do, what is left for us to complete, the situation,
12 how the situation arose.
13    After that, we would then give a status
14 update at that point in time as to what is going on.
15 Obviously, that update changes each time we do the
16 report.
17 Q  Are you required to make these reports
18 pursuant to the terms of the reinsurance agreements?
19 A  I believe so.
20 Q  Do you know if the reinsurance on CCI is
21 facultative?

Page 17

1     MR. LEVIN: I'm going to object. I think,
2  as you already know, our position has been stated that
3  we do not believe you're entitled to information on
4  the specifics of reinsurance.
5     I have no problem with you asking general
6  questions as you have so far, but I do as to
7  particular reinsurance issues relating to CCI.
8     MS. CARSON: Are you instructing him not
9  to answer that question?
10    MR. LEVIN: I'm instructing him not to
11 answer that question.
12    MS. CARSON: You're really instructing him
13 not to answer as to whether reinsurance that CCI has
14 is facultative --
15    MR. LEVIN: That is specific as opposed to
16 general.
17    MS. CARSON: What is the basis?
18    MR. LEVIN: The basis would be that it is
19 entirely irrelevant to the instant action as well as
20 the fact that more specific things such as, well, you
21 have not gotten to it yet but, if you ask him more

Gregory L. Daily - 6/13/02

Page 26

1  reasons stated and will not let him answer the
2  specifics of his communications with the reinsurer.
3      MS. CARSON: All right. We will just go
4  through it, and you can raise your objections as we
5  go.
6      If I can remember back to when we were
7  asking questions, you believe you drafted the initial
8  report to the reinsurers with regard to CCI?
9      THE WITNESS: Yes.
10  Q   Would you have been advising them of the
11  default at that time?
12  A   Yes.
13  Q   You wouldn't have, well, you didn't
14  prepare any reports prior to advising them of the
15  default. Is that your understanding or recollection?
16  A   That is my recollection, yes.
17  Q   And you don't know whether anybody, well,
18  do you know whether anybody reported prior to the
19  default to the reinsurers with regard to potential
20  problems on the horizon with respect to CCI?
21  A   I don't know.

Page 27

1  Q   Is that something that is typically done?
2  A   I don't know. I don't know what is
3  required in the treaty regarding initial notices.
4  Q   I'm not asking about what is required in
5  the treaty. I'm asking what's typically done by USF&G
6  in reporting to the reinsurers?
7  A   All I can say is I would be involved when
8  reports would be necessary. I don't know what
9  communication may go on, other than those reports.
10     I'm not a party to or a part of those
11  kinds of conversations with the reinsurers.
12  Q   Okay. So, within your range of
13  experience, you've not had the opportunity to
14  communicate to a reinsurer the existence of a
15  potential claim?
16  A   No.
17  Q   It has only been after there has been a
18  default that you've communicated to a reinsurer; is
19  that correct?
20  A   No. When our reserve is above 2 and a
21  half million dollars, we are required to put the

Page 28

1  reinsurers on notice. That is when I get involved.
2  Q   In connection with CCI, when were your
3  reserves above 2 and a half million dollars,
4  initially?
5  A   Probably sometime about March or April of
6  2000. That is an estimate.
7  Q   Would that have been the initial reserves
8  set for CCI?
9  A   I don't think so. There may have been
10  some lower initial reserves set to deal with the
11  short-term financing that we gave CCI.
12  Q   And the reserves set for short-term
13  financing would have been less than 2 and a half
14  million?
15  A   Yes.
16  Q   So, at some point in March or April,
17  reserves exceeded 2 and a half million dollars?
18  A   To the best of my recollection, that was
19  about the time frame.
20  Q   Were you involved in the setting of those
21  reserves?

Page 29

1  A   Yes.
2  Q   Who else was involved?
3  A   When you say setting of reserves?
4  Q   Establishment.
5  A   There were, we had several people involved
6  in establishing that. The initial estimates were put
7  together by the claim attorneys handling the file.
8      The approval of those reserves was done
9  between myself, Todd Kazlow, Bruce Corriveau, Jack
10  Simanski.
11  Q   Mr. Kazlow, he is also an assistant
12  vice-president?
13  A   Correct.
14  Q   And he is no longer with the company?
15  A   Correct. And I can't remember if anybody
16  else would have been involved, but I know they would
17  have been involved in discussing and agreeing to the
18  amounts.
19  Q   Okay. What would have been contained in a
20  particular reserve that is established for a CCI
21  performance bond, let's use that?

Page 18

1   specifics, I think that could be violative of work
2   product and attorney-client privilege.
3       MS. CARSON: He has already testified that
4   he is required to make these reports as part of the
5   reinsurance agreements, so it's done in the ordinary
6   course of business.
7       I don't see how you're going to get work
8   product or attorney-client privilege.
9       MR. LEVIN: Go on with your questions. I
10  think this is the kind of thing that we have to do on
11  a question-to-question basis.
12      But I will instruct him not to answer as
13  to specifics of the case, particularly anything that
14  was done after the initiation of the instant
15  litigation.
16      MS. CARSON: Well, whether the type of
17  reinsurance they have on CCI --
18      MR. LEVIN: Fair enough. I will allow him
19  to answer that general question.
20      But, again, as to specifics, particularly
21  post initiation of litigation, we will have to take

Page 19

1   that when we come to it, but I will likely instruct
2   him not to answer.
3       MS. CARSON: Well, we will get to that
4   bridge when we get to that bridge.
5       MR. LEVIN: That is what we will do.
6   Q   What type of reinsurance does USF&G have
7   for CCI's account?
8   A   I don't know all the specifics. I know
9   that we have a reinsurance policy once our loss is
10  above $5,000,000.
11  Q   From zero to 5,000,000 you're not
12  reinsured; is that correct?
13  A   That is correct.
14  Q   Is that an excessive loss treaty?
15  A   Yes.
16  Q   And does that apply to a number of
17  different accounts, not just CCI?
18  A   Yes.
19  Q   So USF&G is responsible for zero to
20  5,000,000 of any particular claim. Is it done on a
21  bond-by-bond basis?

Page 20

1   A   Principal.
2   Q   Okay.
3   A   Contractor-by-contractor basis.
4   Q   Have you prepared reports to reinsurers
5   relating to CCI?
6   A   Yes.
7   Q   Do you know when you prepared your first
8   report?
9   A   No, I don't remember when the first report
10  was.
11  Q   Was it prior to February of 2000?
12  A   No.
13  Q   Do you know if any reports were provided
14  to reinsurers with regard to CCI prior to February of
15  2000?
16  A   I don't believe so.
17  Q   Did you draft the initial report with
18  regard to CCI to the reinsurers?
19  A   I don't remember if I did. I think I did,
20  but I don't remember.
21  Q   Do you recall what was in that report?

Page 21

1       MR. LEVIN: I'm going to object. I don't
2   want any of the --
3       MS. CARSON: Whether or not he recalls
4   what was in the report?
5       MR. LEVIN: Whether or not he recalls,
6   fine, but I thought that you asked him what he
7   recalled. Whether or not he recalls --
8       MS. CARSON: I haven't gotten to that yet.
9       MR. LEVIN: Fair game.
10      THE WITNESS: Can I have the question
11  again, please?
12  Q   Do you recall what was in that initial
13  report?
14  A   I don't remember the specifics.
15  Q   Do you recall generally?
16  A   Generally it would have been the
17  background of the contractor, the status, what was
18  going on at the time, those types of things.
19  Q   What did you tell them about the
20  background of the contractor, CCI?
21  A   I don't remember the specifics.

Gregory L. Daily - 6/13/02

Page 22

1  Q  What did you tell them about CCI's
2  financial problems?
3      MR. LEVIN: I'm going to object again. I
4  don't want him to answer as to the specifics of
5  communications with the reinsurer.
6      MS. CARSON: Are you instructing him not
7  to answer?
8      MR. LEVIN: I'm instructing him not to
9  answer.
10     MS. CARSON: The basis for your
11 instruction?
12     MR. LEVIN: The basis would be work
13 product, attorney-client privilege and what has been
14 known as the common interest privilege, a subset of
15 each of those.
16     MS. CARSON: So you're instructing him not
17 to answer as to the facts of what CCI's problems were?
18     MR. LEVIN: I'm instructing him not to
19 answer as to what he communicated to the reinsurer
20 what problems there may have been.
21     You're certainly free to ask him about

Page 23

1  what problems he had with CCI, just not what he
2  communicated to the reinsurer.
3      MS. CARSON: Well, I mean the facts of
4  what he viewed was the problem are not privileged.
5      MR. LEVIN: That is correct, but I believe
6  you asked him what he communicated. Again, I said,
7  ask him what he thinks the problems are. Fair enough.
8      MS. CARSON: Whether or not he
9  communicated, the fact that he communicated them to a
10 reinsurer doesn't make them privileged either so, and
11 there is no --
12     MR. LEVIN: I disagree with that.
13     MS. CARSON: This litigation was --
14     MR. LEVIN: What he chose to communicate
15 is very important. It shows his impressions about the
16 case.
17     MS. CARSON: Which case?
18     MR. LEVIN: The instant case.
19  Q  Mr. Daily, do you have any role in
20 connection with the action against Bruce Brown and
21 Brown, Schultz, Sheridan & Fritz?

Page 24

1  A  No.
2  Q  Did you understand your reports to
3  reinsurers to be anything other than reports prepared
4  in the ordinary course of communicating with
5  reinsurers to advise them of particular claims?
6  A  No, that is what they would be.
7      MS. CARSON: Are you still instructing him
8  not to answer?
9      MR. LEVIN: I will allow him to answer to
10 the extent that it's clear it's not a general waiver,
11 and to the extent it is communications concerning CCI
12 prior to CCI's default, that is fair game.
13     Past, say, January 1st, 2000, I will not
14 allow him to answer.
15     MS. CARSON: Well, what is the basis for
16 that?
17     MR. LEVIN: That would be the same basis
18 as I've already stated.
19     MS. CARSON: What is the basis for the
20 January 1 deadline?
21     MR. LEVIN: That I believe was roughly

Page 25

1  when we had the voluntary default declared.
2      MS. CARSON: Well, one, your date is
3  wrong. It's February 7th is when the letter came
4  through.
5      And, two, I mean I don't know what the
6  basis is for your contention that that somehow makes
7  this either privileged or work product.
8      MR. LEVIN: Or relevant; and I
9  reiterated --
10     MS. CARSON: Certainly what he
11 communicated to reinsurers as to what USF&G's
12 understanding of CCI's problems are is relevant to
13 this action.
14     If they took the position that it was
15 faulty underwriting, for example, that led to these
16 claims, it's certainly relevant. Those documents may
17 contain admissions, and we are entitled to them.
18     There is no way they're privileged, and we
19 are entitled to inquire as to the draft, from the
20 drafter, what the contents of those documents are.
21     MR. LEVIN: I have to disagree for the

7 (Pages 22 to 25)

07/22/02 15:57 FAX 215 299 4301    SWARTZ CAMPBELL&DETWEILR    ☒007/008
Case 1:01-cv-00813-CCC   Document 38   Filed 07/22/2002   Page 17 of 19

Gregory L. Daily - 6/13/02

Page 34

1  projected by USF&G with respect to payment bonds, CCI
2  payment bonds, those are fairly large numbers?
3     A    They should be.
4     Q    That is mostly money actually paid at this
5  point?
6     A    Yes.
7     Q    And there should be very little in terms
8  of --
9     A    Yes.
10    Q    -- anticipated future claims?
11    A    Yes.
12    Q    -- or reserve in that respect?
13    A    Yes.
14    Q    So you consult with, in connection with
15  CCI, anyway, Todd Kazlow, Bruce Corriveau and Jack
16  Simanski in terms of the setting of reserves?
17    A    Yes.
18    Q    And then, when they're above 2 and a half
19  million dollars or when they went above 2 and a half
20  million dollars, you reported CCI's default to the
21  reinsurers?

Page 35

1     A    Yes.
2     Q    But you didn't report it at the time it
3  happened?
4     A    Correct.
5     Q    Is the excessive loss treaty with one
6  reinsurer, or are there a number of reinsurers?
7     A    A number.
8     Q    Would they have been provided with
9  information during the course of underwriting of the
10 bonds?
11    A    I don't know.
12    Q    Do you have any information with respect
13 to what information reinsurers may be provided with
14 when a bonding program is undertaken?
15    A    No.
16    Q    So your initial report to the reinsurers,
17 I believe, you think it was in March or April of 2000?
18    A    I would guess that it would be sometime
19 after that.
20    Q    Okay.
21    A    We are, we are generally a little behind

Page 36

1  in actually getting the report out. It takes us a
2  while to draft and review it, you know, and actually
3  get it sent.
4         So history tells me that it was probably a
5  couple of months after that that they actually saw the
6  report. I would also say, though, they may have
7  gotten some kind of communication in March or April.
8     Q    Okay. Are there form notices that are
9  sent to reinsurers by USF&G as opposed to the reports
10 that you participate in drafting?
11        MR. LEVIN: Just I'm going to object on
12 that, if you could just elucidate on what you mean by
13 form notice.
14        MS. CARSON: Well, are there, for example,
15 forms that would constitute an initial notice of loss,
16 simply a form that has been generated and contains
17 relatively little substantive information but is a
18 communication with the reinsurer.
19        THE WITNESS: I don't know specifically.
20    Q    Okay.
21    A    I do believe there is some kind of report

Page 37

1  strictly on a numbers or reserve basis.
2     Q    Okay.
3     A    But, if there is anything more than that,
4  I don't know.
5     Q    Is that called a bordereau?
6     A    I believe so.
7     Q    And is that something that is received by
8  the reinsurer, reinsurers on a quarterly basis?
9     A    I don't know how often it's sent.
10    Q    But it encompasses all claims against all
11 contractors under the treaty?
12    A    I don't know. I don't know what it
13 includes.
14    Q    Okay.
15    A    I don't know to what extent it is on that
16 borderline.
17    Q    You do know there is something called a
18 bordereau that is sent to reinsurers on a periodic
19 basis?
20    A    Yes, and they may receive that before I
21 actually get a report.

Gregory L. Daily - 6/13/02

Page 46

1  A  I'm not sure if they were regularly
2  prepared, so I don't know how often they were. I
3  would estimate every 6 months.
4  Q  The report that you participated in
5  drafting, that was essentially a narrative report,
6  correct?
7  A  Correct.
8  Q  And was a narrative report on a particular
9  contractor prepared for each contractor under the
10 treaty or was it only prepared for contractors who had
11 experienced large losses?
12 A  It would only be prepared for those that
13 required over a 2 and a half million dollar loss
14 reserve.
15 Q  Well, did the bordereau, if you know,
16 contain losses under the 2 and a half million?
17 A  I don't know. I don't know what was
18 submitted to the reinsurers.
19 Q  Do you recall what was contained in any of
20 the subsequent reports sent to the reinsurers
21 regarding CCI?

Page 47

1  A  Generally the only change would be what's
2  happened since the last report and any change in plan
3  from previously communicated.
4  Q  Do you recall specifically what was
5  contained in the reports, in any of the reports with
6  respect to the reserves?
7  A  If there were any reserve changes from
8  previous report.
9  Q  Do you recall there being reserve changes?
10 A  I think there probably were, yes.
11 Q  Do you recall the direction of those
12 changes?
13 A  Some went up and I think one or two may
14 have gone down, but I don't remember. I know some
15 went up.
16 Q  Do you recall anything about what you
17 included in your reports with respect to what had
18 transpired or was transpiring with respect to various
19 payment of performance bonds?
20 A  We would basically just state what was
21 going on with the projects. We didn't necessarily get

Page 48

1  into the payment bonds.
2  We would just, the status of the projects,
3  what was getting completed, what was left to be done,
4  were there any major issues that would affect the
5  reserves left.
6  Q  Do you recall any specifics that you
7  reported to the reinsurers with regard to any
8  particular project?
9  A  Yes.
10 Q  What was that?
11 MR. LEVIN: Objection.
12 MS. CARSON: Are you instructing --
13 MR. LEVIN: Instruction not to answer for
14 the reasons previously stated.
15 MS. CARSON: And they're attorney-client
16 privilege, attorney work product?
17 MR. LEVIN: Common interest, relevancy.
18 Q  Okay. I take it you intend to follow your
19 counsel's advice?
20 A  Yes.
21 Q  Do you recall what you included in those

Page 49

1  subsequent reports with respect to USF&G's plans,
2  future plans with respect to the various projects?
3  A  Yes, I remember some of them, yes, some of
4  the specifics.
5  Q  And what are those specifics?
6  MR. LEVIN: That would be objection,
7  instruction not to answer for the reasons previously
8  stated.
9  MS. CARSON: We obviously disagree with
10 your objections, and we will take it up with the
11 court.
12 Other than the bordereaux and narrative
13 reports that you participated in preparing, were there
14 any other reports to reinsurers?
15 THE WITNESS: Not that I was involved
16 with. I'm not aware of any others if there are.
17 Q  What was Mr. Simanski's involvement with
18 the preparation of the narrative reports?
19 A  He generally reviews them. He may ask
20 questions.
21 If he does not think things are clear to

13 (Pages 46 to 49)

## CERTIFICATE OF SERVICE

I Kathleen M. Carson certify that I served a true and correct copy of defendants' reply brief in support of its motion to compel on counsel for plaintiff by first class mail postage pre-paid this 22nd day of July 2002.

for _____
Kathleen M. Carson

SWARTZ, CAMPBELL & DETWEILER
ATTORNEYS AT LAW • 1631 NORTH FRONT STREET • HARRISBURG, PA 17102