ORIGINAL

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| United States Fidelity and Guaranty Company, | : | **FILED** |
| **Plaintiff** | : | HARRISBURG, PA |
|  | : | AUG 3 0 2002 |
| **v.** | : |  |
|  | : | MARY E. D'ANDREA CLERK |
| Bruce J. Brown and Brown, Schultz, Sheridan & Fritz, | : | Per _____ Deputy Clerk |
| **Defendants** | : | No: 01-CIV-813 |

## DEFENDANTS MOTION FOR SUMMARY JUDGMENT

Defendants, Bruce J. Brown and Brown Schultz Sheridan & Fritz (collectively

"Brown Schultz") hereby move this court for summary judgment in their

favor and against Plaintiff, United States Fidelity Guaranty Company

("USF&G).  In support of this motion, Brown Schultz relies on the

Statement of Material Facts filed herewith, along with the exhibits thereto

and supporting brief.[1]  In support of their motion Brown Schultz states as

follows:

_____

[1]Pursuant to the LR 7.3 and 7.5 the exhibits to this motion and supporting brief will be filed within ten days of today's date.

I.     Facts

1.  This an action for negligent misrepresentation.

2.  USF&G issued payment and performance bonds to CCI Construction Company ("CCI").  CCI was a contractor engaged in public and private construction work. Complaint at ¶ 6.

3.  Brown Schultz  was CCI's auditor during the entire period USF&G issued bonds on CCI's behalf.  See J. Ortenzio Depo. at p.25: 2-18; 28: 4-30; 21.[2]

4. USF&G contends it  sustained damages as a result of  alleged negligent

misrepresentations contained in audited financial statements prepared by Brown

Schultz for CCI Construction Company for the years ended December 31, 1996,

December 31, 1997, and December 31, 1998. See Complaint.

5.  USF&G contends that it would not have issued 18 sets of payment and

performance bonds had the foregoing audited financial statements correctly reflected

_____

[2] Pertinent portions of the deposition of John Ortenzio are found at Exhibit A of the binder of exhibits submitted in support of this motion (hereinafter Exhibit Binder)

2

the financial condition of the CCI.  See Complaint at ¶ 16, 18, 20, 28.

6.  Plaintiff contends that it issued the following bonds in reliance on the

December 31, 1996 audit report:

| Project | Bond Number |
| --- | --- |
| Johnstown Air Traffic Control Tower | 26-0120-41362-97-1 |
| Lord Fairfax Community College | 26-0120-41364-97-4 |
| Albemarle-Charlottesville Regional Jail | 26-0120-12995-98-7 |
| Outlook Point at Hilliard | 26-0120-13008-98-0 |

Complaint at ¶ 16.

7.  The bonding for the "Perry Point" project was issued on February 13,

1998.  See USFG/BS 0727 (attached as Exhibit 1 to Carson Affidavit.)[3].

8.  The bonds for the "Perry Point" project were issued prior to receipt by

USF&G of the audit report for December 31, 1997.  See Complaint at ¶ 17.  As such,

to the extent USF&G relied on any Brown Schultz Audit Report for these bonds it

would have to be the 1996 Audit Report.

9.  USF&G contends that it issued bonds on the following projects in reliance

_____

[3] The Affidavit of Kathleen Carson is Exhibit B in Exhibit Binder.

3

on the December 31, 1997 audit report:

| Project | Bond No. |
|---|---|
| Scott Air Force Base - Air Craft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 |
| Germplasm Center | 26-0120-28306-98-1 |
| PA Turnpike-Kost Road Central Administration Bldg. Renovation | 26-0120-40371-99-1 |
| Outlook Point at Chesterfield | 26-0120-28307-98-8 |
| Outlook Point at Westerville | 26-0120-28312-98-1 |
| James River Juvenile Detention Center | 26-0120-08946-99-2 |
| Va. Commonwealth Univ. Life Sciences Building | 26-0120-08953-99-9 |

Complaint at ¶ 18.

10.  USF&G alleges that it issued bonds on the following projects in reliance on the December 31, 1998 audit report:

| Project | Bond No. |
|---|---|
| SR II Perry County- Excavation, Presplit Blasting | 26-0120-08953-99-9 |
| Cambria County State Route 22 | 26-0120-08959-99-7 |
| Bedford County State Route 30 | 26-0120-08963-99-4 |
| Summerdale Sitework Laboratory Centers for Excellence | 26-0120-08958-99-1 |

4

| Cool & Cold Aquaculture | 26-0120-08961-99-1 |
| Cool & Cold Aquaculture-<br>Buried Process Water Lines | 26-0120-40396-99-3 |

Complaint at ¶ 20.

11.  Plaintiff's expert, Steven DeBruyn, CPA does not opine that the audit work performed by Brown Schultz for CCI for the year ended December 31, 1996 contained any misstatements or omissions. <u>See</u> DeBruyn Expert Report.[4]

12.  Plaintiff's expert does not opine that there was any violation of GAAS or GAAP in connection with the audits for December 31, 1997 and December 31, 1998.  Rather, he states that the audit work for the years ended December 31, 1997 and December 31, 1998 did not conform to the "standard of care of a Certified Public Accountant" and that this resulted in material misstatements in the 1997 and 1998 audit reports.  DeBruyn Report.

13.  USF&G contends that there was an "overstatement of income and equity" in the amount of $815,960 for 1997 and $3,126,508 for 1998." DeBruyn report at p. 3.

14.  The DeBruyn report does not indicate the source and components of the adjustments by DeBruyn to the amounts in the 1997

_____

[4]A copy of the DeBruyn Report is Exhibit C in the Exhibit Binder.

5

Brown Schultz financial statement and the report does not indicate the reason or give an explanation for the adjustments or any information from which the propriety of the adjustments can be evaluated. See generally, DeBruyn Report.

15. With regard to the December 31, 1998 audited financials, USF&G contends that $1,162,460 of revenue from a related party PCIC was improperly recognized as revenue and the disclosure contained in the financials was inadequate. DeBruyn Report.

16. Other than conceivably the $1,162,460 from PCIC, the DeBruyn report identifies no other basis for the alleged overstatement of income and equity of $3,126,508 in the December 31, 1998 audited financials. See DeBruyn Report.

17. While Brown Schultz was aware that USF&G was a user of the audited financial statements, there is no evidence that Brown Schultz knew the specific purpose for which USF&G intended to use the financial statements or had knowledge of the specific bonds underwritten by USF&G on CCI's behalf. See, C. Rebinski Depo. at p. 41:2-20; D. Bowman Depo. at p. 38:22-39:18; B. Brown Depo. at p. 22:20, 25:12.

18. John Ortenzio, CCI's president and sole shareholder, when asked if he made Bruce Brown aware of the reasons the bonding company was requiring the audited financial statements testified:

6

> I think the only reason I would have communicated to Bruce Brown
> was because that's what they wanted. They wanted audited financials
> and that's what we gave them.

Ortenzio Depo. at p. 44:18-24; 20:7-8.

19.  The CCI audited financial statements were not given by Brown
Schultz to USF&G.  Sheri Phillips Depo. at p. 88:15-22. Brown Schultz sent
copies of the audited financials to CCI. Id. CCI provided its audited
financial statements to the bonding agent. USF&G received the financial
statements from its agent.  Id. [5]

20.  There was no contact or communication between USF&G and
Brown Schultz. J. Daily Depo. at p. 125:17-20; T. Phillips Depo. at p. 184:13-
17; S. Salazar Depo. at p. 70-71. [6]

21.  There is no evidence Brown Schultz was informed about the
specific bond transactions before it provided the financial statements.

22.  USF&G began its bonding program with CCI in late 1993 or early
1994.  See J. Daily Depo. at p. 335: 8-13.

23.  The CCI bond account came to USF&G through the Byerly
Agency an independent agency through whom USF&G marketed its
business. S. Salazar Depo.  at p. 63.  Dave Dominiani of the Byerly Agency

-------------------

[5]  The pertinent portions of Sheri Phillips deposition are found at
Exhibit D of the Exhibit Binder.

[6]  The pertinent portions of Jim Daily. Tony Phillips and Steve
Salazar depositions are found at Exhibit E, F, and G respectively.

7

was agent for the CCI account. When Mr. Dominiani left the Byerly Agency in or around 1998 to form DJL Associates, he      continued as the agent for the CCI bond program. J. Ortenzio depo. at p. 73:11-74:12.

24.  The relationship between CCI and USFG was formed after Fireman's Fund Insurance Company would not underwrite a bond for CCI. Salazar Depo. at p. 93:16-21.

25.  At the time USF&G began its bonding program for CCI, the majority of CCI's revenues and receivables were the result of contracts entered into with Continental Medical Systems for the construction of rehabilitation hospitals throughout the United States.  See December 31, 1993 Financial Statement of CCI at Footnote 8.[7]  During 1993 and 1992 CMS accounted for 71% and 83% of CCI's revenues respectively.  Id. Continental Medical Systems was controlled by John Ortenzio's father, Rocco Ortenzio.  Id. ; J. Daily depo. at p. 107:23-108:5.

26.  When USF&G began its bonding program with CCI, the contractor was beginning to enter the hard bid market.  J. Daily depo. at p. 108:5-13.

27.  The individuals from USF&G involved in the underwriting of the CCI account included: Tony Phillips, the bond  manager of USF&G's

---

[7]The 12/31/93 audited financial statement of CCI is found at as Exhibit H in the Exhibit Binder.

8

Harrisburg field office; Steve Salazar, senior underwriter in the Harrisburg field office; Jim Daily, manager of the Northeast Surety Division for USF&G; and David Hussey, the Director of the Northern Division of USF&G's Surety Department. See USF&G's Answers to Defendants [First] Set of Interrogatories at p. 3[8]; J. Daily depo at p. 113.

28. Mr. Salazar, the senior underwriter in the Harrisburg field office, had the authority to approve bonds up to $2,000,000. S. Salazar Depo. at p. 64. Above that amount, he needed the approval of Tony Phillips. Id. Above Mr. Phillips' level of authority, bonds would be approved by Mr. Daily. S. Salazar Depo. at p. 65.

29. Salazar, in underwriting the CCI account, reviewed the CPA year end financial statements and interim CCI prepared financials. S. Salazar Depo. at p. 98. According to Mr. Salazar, his purpose in reviewing the interim information was to see how the contractor was doing during the year. Id. at p. 99. Mr. Salazar relied on the interim financials along with the CPA year end financials to make underwriting decisions. Id.

30. CCI provided USF&G with CCI prepared, interim financial statements on either a quarterly or bi-annual basis and either monthly or quarterly work in process information. J. Daily Depo. at. p. 217:24-218:10;

---

[8] USF&G's Answers to Defendants [First] Set of Interrogatories are found at Exhibit I to the Exhibit Binder.

S. Salazar Depo. at 98: 20-25.   USF&G also received Dun & Bradstreet reports on CCI and had annual meetings with the contractor and the bonding agent to discuss the bonding program. S. Salazar Depo. at 108: 19-109:2.

31.  Mr. Salazar testified that the year end audited financial statements only reflected the financial condition of the company as of the closing date for the statement.  Id. at p. 99.

32.  Mr. Salazar testified each contract for which bonds were issued by USF&G was individually underwritten.  S. Salazar Depo. at 58.

33. According to Mr. Salazar, USF&G had no specific underwriting guidelines. S. Salazar Depo. at p. 58.   Mr. Salazar testified that there were no underwriting guidelines used for net worth in the 1990's.  Salazar Depo. at p. 38:5-7. He also testified that there was no guideline used to evaluate a contractor's cash position or profitability in connection with issuance of a bond program in the 1990's. Salazar Depo. at p. 38:16-19.

34.  Salazar, himself, used  general underwriting guidelines of five percent (5%) working capitol and ten percent (10%) net worth [to total work program]. S. Salazar depo. at p. 39-40.

35.  According to Mr. Salazar, the larger the contractor, the more the surety could deviate from these guidelines.  Id.  In order to determine the extent to which it was appropriate to all deviation from these guidelines,

10

Salazar said he would need to know the size of work the contractor had previously completed and whether the contractor had successfully and profitably completed the previous work. S. Salazar depo. at p. 45:17-25.

36. Mr. Salazar could not state for CCI to what changes in the company's operations, working capitol balance sheet of work in progress could be tolerated before they had an impact on underwriting Salazar 246: 3-247.

37. Tony Phillips, the bond manager for USF&G's Harrisburg field office testified that his responsibilities included the overall underwriting of the CCI account plus supervising Mr. Salazar and that he was responsible for any recommendation made by Mr. Salazar on any bond liability on the account.  T. Phillips depo. at p. 35:5-

38. Mr. Phillips testified that it was significant in the underwriting process to know whether the source of a contractor's profit was from construction operations or from other sources.  T. Phillips Depo. at p. 423:9-13.

39. Mr. Phillips stated that in the course of underwriting the CCI bond program, he did not fully review and evaluate the audited financial statements for CCI Construction.  T. Phillips Depo. at p. 443.

40. Mr. Phillips verified USF&G Answers to Defendants [First] Set of Interrogatories.  See Exhibit I.

11

41.  In the answers to interrogatories, with respect to the 1997 audit report, USF&G when asked to identify the inaccuracies or omission contained therein or the manner in which they were misleading stated, inter alia, that indirect costs were not properly allocated, no job site visits were preformed by Brown Schultz, that there was no independent confirmation of management's representations concerning the percentage of completion, estimated costs to complete and the status of pending change orders. See USF&G Answers to Defendants [First]Set of Interrogatories at No. 8 pp. 14-21.

42. Similar issues were identified with respect to the 1998 audit report. Id. at p. .  In addition, USF&G complained that a claim guaranteed by Pennsylvania Contractor's Insurance Company, a company owned by John Ortenzio, should not have been recorded as revenue and that audit report contained inadequate disclosure with regard to it.  Id at p. 26-27.

43.  US&G did not identify in its interrogatory answers the extent to which purported deficiencies would have changed CCI's balance sheet. Id.

44.  Tony Phillips, who verified the interrogatories on USF&G's behalf, testified that, without the benefit of restated financials, he could not make a determination about whether changes to CCI's financial condition would have been material to his underwriting decisions. T. Phillips depo. at 463:25-464:5.

SWARTZ, CAMPBELL & DETWEILER

45.  Phillips, at his deposition, testified that he believed that restated financials existed for CCI, but that he had not reviewed them.  Phillips at 464:9-15.

46.  Jim Daily's responsibilities in the 1990's included, among other things, the supervision of underwriting in the field offices. J. Daily depo. at p. 16.   In connection with that supervisory role, Mr. Daily would handle new account submissions and bond requests up to a certain limit of authority. J. Daily depo. at p. 17.

47.  With regard to bond requests over that limit of authority, Mr. Daily had to seek approval from his boss, David Hussey, to whom Mr. Daily reported. J. Daily depo. at pp. 17:4-12; p. 43:11-13.

48.  According to Mr. Daily, the primary responsibility of the field office was to produce the business.  Daily's responsibility was to underwrite the business.  J. Daily depo at. p. 46:12-22.

49.  Mr. Hussey had final approval of USF&G's bond program for CCI. J.  Daily Depo. at p. 113:20-23. Mr. Hussey testified that he did not review any of the Brown Schultz audited financials.  D. Hussey depo. at 130: 20-131:16.

50.  Daily testified that in committing to bonding for CCI in January of 1999, USF&G relied on representations from CCI Construction as to its financial condition for the coming years. J. Daily Depo. at p. 416: 6-417:11.

13

51.  There is no evidence that the bonds that form the basis of USF&G's loss in this action would not have been issued even if there had not been the alleged problems in the 1997 and 1998 audited financials.  <u>See</u> pp.  36-44; J. Daily depo at p. 275:1-5.

52.  By letter dated November 16, 1993, apparently in response to questions raised by USF&G's reinsurers, Dave Dominiani, the bond agent, advised Tony Phillips of the following:

> Footnote 9 specifies that in 1992 the company [CCI] incurred warranty insurance expense of $1,000,000 with Pennsylvania Contractors Insurance company (PCIC). Per Dave Barber, CFO, CCI took $1,000,000 from a very successful completed project, Wesley and funded their future warranty expense under PCIC.  They did this primarily for tax planning purposes, but also to fund those future warranty expenses with current profits from a very successful project.

USFG/BS 846 (Exhibit 2 to Carson Affidavit.)

53.  The "Related Party Transactions" footnote in the December 31, 1993 audited financials for CCI disclosed that PCIC was a corporation under common control and that CCI had incurred warranty insurance expense of $335,317 and $1,000,000 with PCIC for 1992 and 1993 respectively. See Exhibit H.

54.  On July 14, 1994, Steve Salazar requested information from the bond agent regarding significant profit fades on four jobs then in progress and thin margins on 8 of CCI's projects.  USFG/BS 1175. (Exhibit 3 to Carson Affidavit).

14

55.  On July 21, 1994 Dave Dominiani advised Steve Salazar that as of June 30, 1994, CCI would be showing a "small loss". <u>See</u> USFG/BS 870-872 (Exhibit 4 to Carson Affidavit). Dominiani, in that same letter, also acknowledged that the gross margin on many of CCI's project was "very thin". <u>Id.</u>

56.  On November 2, 1994, Dominiani reported to Tony Phillips that the 6/30/94 interim financials prepared by CCI showed CCI sustained a $500,000 loss for the first half of 1994.  <u>See</u> USFG/BS 0873-75 (attached as Exhibit 5 to Carson Affidavit).  Dominiani informed Phillips that CCI was projecting a loss of approximately $400,000 to $500,000 at year end. <u>Id.</u>

57. On December 28, 1994, Jim Daily noted concerns that CCI's liquid position was less than half of what it had been at 12/31/93 and that there were continuing profit fades.  USFG/BS 1102 (Exhibit 6 to Carson Affidavit).

58.  On January 3, 1995, Dominiani advised Steve Salazar that CCI's projected loss for December 31, 1994 remained in the $400,000-$500,000 range. <u>See</u> S. Salazar Depo. Exhibit 13. In addition, Dominiani addressed the concerns raised by USF&G with regard to profit fades on two CCI projects – Lightner Road and Lincoln University. <u>Id.</u>

59.  In late January 24, 27 and 31, 1995, notwithstanding the loss sustained at mid- year and the projected loss at year end, USF&G issued

15

bid bonds for the Altoona Railroad Memorial Museum, Shady Grove and Andrews Air Force Base Projects without having received the Brown Schultz audited financials for the year ended 12/31/94.(Exhibits 3-5 To Carson Affidavit).

60.  USF&G agreed at a 1/31/95 meeting with CCI to hold to a $100,000,000 program level. USFG/BS 1111 (Exhibit 6 To Carson Affidavit).

61. On April 19, 1995, USF&G's home office received the Brown Schultz audited financials for the year ended December 31, 1994.  The 1994 financials indicated a net loss of $317,000 and an operating loss of $864,663. Working capital was $2,384,192 and equity was $4,290,336. A copy of the 1994 Audited Financial Statements is Exhibit I in the Exhibit Binder.

62.  In the Related Party Transactions footnote in the 1994 audited financial statements, it was disclosed that PCIC was a corporation under common control and that there were no warranty insurance costs incurred for 1994.  The footnote also disclosed that CCI had submitted a claim to PCIC of $397,800 in 1994 and that the claim was pending as of December 31, 1994.

63.  The December 31, 1994 financial statement also contained the following statement in footnote 1 "Summary of significant accounting policies":

"An amount equal to the contract costs attributable to claims is included

16

in revenues when realization is probable and the amount can be reliably estimated."

64. The 1994 audited financial statement and all of the audited financial statements thereafter through 1998, also showed earnings from contracts before allocation of indirect costs. The amount of unallocated indirect costs was reflected in the financial statements and was used to determine the cumulative ne profit from contracts. Similarly, the completed contracts and contracts in progress schedules clearly show "gross profit before indirect costs" and contract earnings (accrued or earned) before indirect costs. Copies of the December 31, 1995 through December 31, 1998 audited financial statements for CCI are found in the Exhibit Binder at Exhibit J through M respectively.

65. Each year, Steve Salazar prepared an "annual review" describing CCI's results for the year and made a recommendation as to a bonding program for the following year. S. Salazar Depo. at p. 238-240; Salazar Depo. Exhibits 7-11.

66. In his annual review of the 12/31/94 CPA audit, Salazar recommended continuing with the bond program for CCI. See, Salazar Depo. Exhibit 8.

67. In March 1996, USF&G received the audited financial statements for the year ended December 31, 1995. The financial statement showed a

SWARTZ, CAMPBELL & DETWEILER
ATTORNEYS AT LAW • 1631 NORTH FRONT STREET • HARRISBURG, PA 17102

small profit of $103,210 but a loss from operations of $308,362. Working

capital was $4,183,681 and equity was $4,820,675. See Exhibit J in the

Exhibit Binder.

68. The related party transactions footnote disclosed that during

1994, CCI submitted a warranty insurance claim of $397,800 to PCIC, "a

company owned by the sole shareholder. This claim was paid during 1995."

69. The footnotes to the 1995 audited financials also state

Use of Estimates:

The preparation of financial statements in conformity with generally
accepted accounting principles requires management to make
estimates and assumptions that affect the reported amount of assets
and liabilities and disclosure of contingent assets and liabilities at
the date of the financial statements and the reported amounts of
revenues and expenses during the reporting period. Actual results
could differ from those estimates.

Revenue and costs recognition:

. . . Because of inherent uncertainties in estimating costs, it is at least
reasonably possible that the estimates used will change in the near
term.

. . . An amount equal to contract costs attributable to claims is
included in revenues when realization is probable and the amount
can be reliably estimated.

70. The May 3, 1996 Annual Review of CCI Construction prepared by

Steve Salazar showed a Yellow Stress Score and a "Bear Flag F1 -Net

Worth less than 10% of work program. See Salazar Depo. Exhibit 9.

Salazar again recommended continuing the CCI bond program. Id.

SWARTZ, CAMPBELL & DETWEILER
ATTORNEYS AT LAW •1631 NORTH FRONT STREET •HARRISBURG, PA 17102

71. On May 1, 1997, USF&G received a copy of the audit report for the year ended December 31, 1996. See complaint at ¶15 . The financial statement reflected net income of $363,124, and for the first time since 1993, an operating profit of $139,097, working capital in the amount of $4,641,702, and equity of $4,802,675. See Exhibit K.

72. Steve Salazar's annual review of CCI dated May 1, 1997, again showed a yellow stress score as of March 1997 and the following bear flags: A20-gross profit fade factor is greater that 20% and M01-Equity less that 10% of total program. See Salazar Depo. Exhibit 10.

73. Mr. Salazar recommended that the bonding program be continued. Id.

74. On June 3, 1997, Jim Daily approved Steve Salazar's request for approval of a bid bond for the $15.9 million Md. D.G.S. Camp Fretterd Armory project. Salazar in support of his approval request referenced CCI's in-house financials as of March 31, 1997. See USFG/BS 795-96 (Exhibit   to Carson Affidavit.)

75. On June 26, 1997, Salazar requested and received approval from Jim Daily of a bid bond for a $30,000,000 job. USFG/BS 0790. (Exhibit 6 To Carson Affidavit).

76. In August of 1997, Dominiani wrote to Tony Phillips advising that John Ortenzio wanted his personal indemnity on the Master Surety

19

Agreement removed.  USFG/BS 1233.  Jim Daily consented to the removal of the indemnity. USFG/BS <u>1120</u>. (Exhibit 8 and 9 To Carson Affidavit).

77.  On August 20, 1997 Salazar requested and received approval of a bid bond for an $18,300,000 project at McGuire Air Force Base and, in support of that request cited to the June 30, 1997, CCI in-house financials. USFG/BS 0784. (Exhibit 10  to Carson Affidavit).

78.  On December 1, 1997, Steve Salazar requested approval of the $15.7 million Albemarle-Charlottesville Regional Jail bid bond again referencing the June 30, 1997 CCI in house financials in support of his request.  USFG/BS 0778.  Mr. Daily approved the request as submitted. <u>Id.</u> (Exhibit      To Carson Affidavit.)

79.  On March 5, 1998, USF&G received the audited financials for the year ended December 31, 1997 complaint at ¶ 17.  Income from operations was $350,000.  <u>See</u> Exhibit L .

80.  Footnote 5 of the audited financials indicated that $816,000 current notes payable were collateralized by equipment.  There is no evidence that USF&G inquired as to what equipment was purchased and why.

81.  The related party transaction footnote disclosed that PCIC was a corporation under common control and that CCI had incurred warranty expense of $825,000 with PCIC.

SWARTZ, CAMPBELL & DETWEILER
ATTORNEYS AT LAW •1631 NORTH FRONT STREET •HARRISBURG, PA 17102

82.  On April 15, 1998, <u>See</u> Steve Salazar prepared his annual review of the audited financials for 1997.  Salazar Depo. Exhibit 11. The annual review showed a yellow stress score and bear flags "A20-gross profit fade factor is greater than 20%" and "M01-Equity less than 10% of total program.  <u>Id.</u>

83.  Mr. Salazar recommended continuing the bonding program for CCI.

84.   On August 17, 1998, Dave Dominiani wrote to Tony Phillips and advised:

> As you can see <u>CCI is reflecting a $1,600,000 loss through six months</u>.  However, they will turn that number around by 12/31/98.  I have included with the report the profit projections by project for 1998.  Please kind [sic] in mind that these numbers are conservative and suggest that the projected loss from operations will be approximately $200,000.  This will be offset by investment income and in addition, <u>please remember that we have PCIC available to fund warranty claims if we choose to utilize it. As you are aware, we funded almost $900,000 into PCIC last year for warranty coverages on existing projects.  There is approximately $2,000,000 funded into that insurance vehicle and can be drawn on for warranty claims at any time.  CCI can actually use this as a buffer to offset losses or profit fades on certain jobs during any given year.</u>  That is an additional feature than none of my other contractor's have.

Salazar Depo. Exhibit 1 (emphasis added).

85.  In spite of the loss, USF&G continued with its bonding program.

86.  On December 23, 1998, Dominiani  wrote Tony Phillips wrote outlining CCI's desire to bid on any upcoming $40,000,000 heavy highway project in joint venture with Fulkroad Construction. T. Phillips depo. Ex 9.

21

87. On, January 5, 1999, prior to receipt of the audited financials for December 31, 1998, USF&G met with CCI and Dominiani to discuss the joint venture project. T. Phillips Exhibit 10.

88. Mr. Phillips was aware as of August 1998 that CCI was self-performing work it had previously subcontracted.  T. Phillips Depo. at p. 439:11-14.

89. Dave Hussey was aware of CCI's decision to self perform work during 1998 having been advised of this by Jim Daily.  Hussey depo. at pp. 83-84.

90. Jim Daily testified he became aware in 1998 that CCI was performing work it had previously subcontracted and that he did not this it was a good idea.  J. Daily Depo. at p. 239-40.  Jim Daily testified that a change in business to self perform work which it had previously subcontracted was a genuine risk and would have been of concern to him. Id.

91. Jim Daily recommended to Dave Hussey that USF&G not approve bonds fo the Fulkroad project because the project was a different kind of work than previously performed by CCI, and because CCI planned to self perform work it previously subcontracted.  Hussey depo. at 104-106.

92. Dave Hussey approved the bonds for the Fulkroad joint venture notwithstanding Jim Daily's concerns.  Hussey depo. 104-106.

22

93.  Tony Phillips January 5, 1999 memo to file indicated that USF&G agreed to support the joint venture bid with CCI's portion of the bid being about $22,000,000.  USF&G agreed to handle the CCI account on a 3% working capitol and 5% net worth basis. USFG/BS 1271-72 ( Exhibit 13 to Carson Affidavit)

94.  On March 1, 1999, Dominiani submitted the December 31, 1998 audited financials to Tony Phillips.  The audited financials showed that while  CCI had made a small profit of $59,015, working capitol decreased to $2.5 million and the company had an operating loss of $116,629.  The financial statement also showed underbillings of $6,341,726 representing 36% of total current assets.  This was a significant increase from prior years.  In 1997, underbillings were $1,072,281 and in 1996 underbillings were $37,663. This increase in underbillings prompted no comment or investigation by USF&G. A copy of the 12/31/98 audited financials for CCI is Exhibit  in the Exhibit Binder.

95.  The 1998 financials also indicated that PCIC had guaranteed a claim of $1,162,460.  Id.  No inquiry was made by USF&G with regard to this transaction. See Daily depo. at p. 384.

96.  There is no Annual Review of the 12/31/98 financials by Mr. Salazar.

97.  USF&G continued with the CCI bonding program.  In 1999 after

SWARTZ, CAMPBELL & DETWEILER
ATTORNEYS AT LAW •1631 NORTH FRONT STREET •HARRISBURG, PA 17102

receipt of the 1998 audited financials, USF&G issued final bonds on the Phase 1 Laboratory Center (Summerdale) and Cambria County, Bedford County and Cool and Cold Aquaculture projects. See complaint at ¶ 20.

98. The first analysis of the 1998 financial statements that appears to have been done by USF&G is dated August 20, 1999. See Salazar depo. Exhibit 15.

99. The "Folder Exceptions Report" noted the account's status as "red" because of the following reasons: underbillings were greater than 50% of equity; the folder had five open claim files; equity was less than 10% of the total program; net quick was less than 5% of the total program the debt to equity was greater that 3 to 1; underbillings were 120% of equity; notes payable were 104.9% of equity; and the indemnity agreement did not include the owner/principal. See Salazar Depo. Ex. 15.

100. Notwithstanding this report, on August 20, Steve Salazar recommended to and received approval from Jim Daily for a bid bond on a $20,000,000 road construction project. (Exhibit 13 to Carson Affidavit).

101. On August 30, 1999, Dave Dominiani reported that CCI reported that CCI had a loss of $900,000 through the first six months of 1999. See USFG/BS 0945 (Exhibit 14 to Carson Affidavit).

102. Notwithstanding that advice, on September 30, 1999, a performance bond was issued in the amount of $191,083 on the Cool and

24

Cold Aquaculture project. See USFG/BS 0726 (Exhibit 15 to Carson Affidavit).

## II. Argument

### A. Brown Schultz Owed No Duty to USF&G

103. Under Pennsylvania law, the existence of duty is necessary in order to establish a negligent misrepresentation claim. Plaintiff cannot establish the existence of a duty on the part of Brown Schultz because there is no privity between USF&G and Brown Schultz and Brown Schultz did not have a financial interest in the transaction. It is undisputed that CCI and not USF&G was Brown Schultz's client.

104. While Pennsylvania has adopted of § 552 of the Restatement of Torts, it has not relaxed the requirement of privity in professional negligence claims.

105. Accordingly, USF&G claim against Brown Schultz fails for that reason alone.

106. Even if Section 552 eliminates the privity requirement in a claim for negligent misrepresentation, plaintiff cannot establish a basis for liability on the part of Brown Schultz.

107. Section 552 limits an accountant's liability for negligent misrepresentation to those third parties who the accountant actually knows will receive the information, and then, only for transactions that

25

are the same as, or substantially similar to, the transaction which the accountant actually knows about and intends to influence by supplying the information of the contemplated bond.

108.  Brown Schultz was not provided information about any transactions before it provided the financial statements. Plaintiff cannot establish that USF&G's issuance of the particular bonds in 1997, 1998 and 1999 upon which CCI defaulted, constituted transactions that Brown Schultz knew of,  actually sought to influence, or, were substantially similar to transactions of which Brown Schultz was aware and sought to influence.

109.  While Brown Schultz was aware that USF&G was CCI's bonding company and that it was a user of the financial statements, there is no evidence that Brown Schultz knew the specific purpose or the specific bonds for which USF&G intended to use the financial statements. There is no evidence that Brown Schultz was aware or was informed that USF&G intended to use the audited financial statements as a basis for evaluating whether to issue any specific future bond.

110.  Brown Schultz did not send the audited financials directly to USF&G.  Rather they were given to CCI who forwarded the statements to the bonding agent who forwarded it to USF&G.

111.  USF&G's underwriters all indicated that they had no contact

26

with anyone from Brown Schultz.

112.  John Ortenzio, CCI's president and sole shareholder, did not discuss the specific reasons why USF&G wanted audited financials with Brown Schultz.

113.  There is no evidence that Brown Schultz knew that they were undertaking  open-ended  liability with respect to future bonds by releasing the audited financial statement in each of the years at issue.

114.  As such, Plaintiff cannot establish a duty under Section 552 of the Restatement on the part of Brown Schultz with regard to the bonds.

115.  For this reason, plaintiff cannot establish a necessary element of its claim and summary judgment should be granted in favor of defendants.

B.  Plaintiff Cannot Establish a Breach of Duty by of Defendants

116.  Under Pennsylvania law, in order to establish a claim for negligent misrepresentation, *inter alia*, a misrepresentation of material fact, made under circumstances in which the misrepresenter ought to have known of its falsity.

Plaintiff cannot establish these required elements.

1.    The 1996 Audit Report

117.  Plaintiff cannot identify a misrepresentation or omission in the 1996 audited financials.

SWARTZ, CAMPBELL & DETWEILER

118.  Plaintiff's expert, Stephen DeBruyn, in his report, identifies no misstatements or misrepresentations in the December 31, 1996 financial statements.

119.  DeBruyn did not offer an opinion that the audit work for the December 31, 1996 financial statements was not done in accordance with Generally Accepted Auditing Standards ("GAAS") or that Brown Schultz failed to conform to Generally Accepted Accounting Procedures ("GAAP").

120.  Plaintiff cannot establish that the 1996 audited financials misrepresented the financial condition of CCI. summary judgment should be granted to Defendants with regard to the 1996 audited financials and any damages allegedly resulting to USF&G from bonds it contends it issued in reliance thereon.

121. The 1996 financial statements did not contain any incorrect information or misrepresentation of the financial condition of CCI.

2.  The 1997 Audited Financials

122.  Plaintiff does not identify any incorrect information in the 1997 audited financial statements.

123.  While plaintiff's expert has indicated that the financials for 1997 should be restated, there is nothing in his report that establishes a basis for that restatement.  There is no evidence to establish Brown, Schultz knew or had any reason to know the information it included in the

28

1997 f/s was not correct.  The 1997 f/s did not contain any incorrect information or misrepresent the financial condition of CCI.

C.    Plaintiff Cannot Establish that it Justifiably Relied on the 1997 and 1998 Financial Statement In Issuing Surety Bonds.

124.  Plaintiff must show that it justifiably relied on the 1997 and 1998 financial statements in order to establish its claim for negligent misrepresentation.

125.  Plaintiff cannot establish justifiable reliance on the 1997 and 1998 f/s in connection with its decision to issue the bonds which form the basis for the loss which is the subject of this action.  Tony Phillips, the bond manager for the Harrisburg field office, testified that he did not fully review and analyze the statements even though it was his responsibility to review and approve Steve Salazar's recommendations with regard to CCI's bonding program.

126.  Similarly, Dave Hussey, who was the ultimate authority at USF&G with regard to the CCI account, testified that he did not read any of the audited financial statements for CCI.

127.  The financial statements from 1993 through 1998 all presented indirect costs in the same manner and the manner in which such costs was evident from a review of the statements.  The earnings from contracts, contracts in progress, and completed projects all indicated that estimated gross profits or gross profits did not include indirect costs.

29

128.  USF&G were not included in the determination of gross profits on contracts.

129.  The audited financials disclosed as early as in the footnotes regarding related party transactions that CCI and PCIC were both owned by John Ortenzio and CCI was incurring warranty expense or receiving payments on warranty claims from PCIC.  In addition, USF&G was aware of the existence, nature, and purpose of PCIC as a result of correspondence from its agent, Dave Dominiani.  USF&G was aware that PCIC could be used to "enhance" CCI's profitability.

130.  USF&G had sufficient information from the audited financials and other sources to understand of the circumstances concerning $1,162,460 claim guaranteed by PCIC.

131.  USF&G did not analyze the 1998 f/s until August 20, 1998. USF&G did not rely on the 1998 financial statement in its decision to issue to bonds prior to August 20, 1998.

132.  The bonds issued on the Cool & Cold Aquaculture (Buried Process Water Lines) project were not issued until September 30, 1999 which as after USF&G received notice that CCI had sustained a significant loss for the first six months of the year and was projecting a loss at year end.

30

133. USF&G had sufficient information when issued bonds after August 20, 1999 to realize the financial condition financial conditions of CCI had significantly deteriorated..

134. There is no evidence that USF&G made any inquiry to its agent or CCI with regard to the cause of the significant increase in underbillings,

135. Based on the foregoing, USF&G cannot establish that it reasonably relied on the 1997 and 1998 audited financial statements in issuing bonds on behalf of CCI, a necessary element of its negligent misrepresentation claim.  For that reason, summary judgment should be granted in favor of defendants.

D.    USF&G Cannot Establish that Any Reliance on the 1997 and 1998 Financial Statements Was the Cause of Its Loss

136. Plaintiff cannot establish what, if any, change in the financial condition was material to its underwriting of the CCI bonding program such that it would have permitted USF&G to avoid its claimed loss.

137. USF&G's underwriters testified without exception that there was no specific underwriting criteria pursuant to which bonds issued on CCI's behalf were underwritten.

138. Even if there was a basis for Mr. DeBruyn's restatement of the 1997 financials, cannot raise an issue of fact that the change was material.

139. Even accepting as true his proposed restatement of the

31

December 31, 1997 Balance Sheet, equity would have been $4,638,834. This was greater than equity reported for 1994 ($4,290,336) and 1995 ($4,501,729). Compare DeBruyn Report, Exhibit B to December 31, 1994 and December 31, 1995 audited financials.

140. Similarly, as restated in DeBruyn's report, working capitol would have been $3,183,138. This was greater than the working capitol reported for CCI in 1994 ($2,384,192) and the amount reported as working capitol in 1998 ($2,557,367).

141. USF&G continued its bonding program for CCI in 1994 when the company had less working capitol and equity than that which is shown on the restated financials of plaintiff's expert.

142. USF&G continued to bond CCI in 1998 with less working capitol and equity than the amount shown on the restated financials of plaintiff's expert.

143. Plaintiff cannot establish that, except for the purported misstatements in the 1997 audited financials that USF&G would not have issued the bonds it allegedly issued on the basis of those financials.

144. USF&G cannot prove the 1998 financial statement was the cause of its loss the bonds issued after receipt of the 1998 f/s . No analysis of the 1998 year end financial was performed by USF&G until August 20, 1999, the date of the folder exception report. USF&G did not, therefore rely on the

32

1998 f/s when it issued bonds before August 20, 1999.

145.  All bonds issued after August 20, 1999 were issued with an awareness of CCI's declining financial condition including  that CCI had sustained a loss of $900,000 for the first six months of 1999 and would sustain a loss at year end.

146. USF&G's cannot establish the bonds which form the basis for the loss which is the subject of this action would not have been issued even if the financial statements had reflected the information as USF&G contends.

147.  Based on the foregoing, there is no negative issue of material fact and summary judgment should be granted in favor of defendants and against plaintiff

WHEREFORE, defendants request that the Court to grant their summary judgment motion and enter judgment in their favor and against plaintiffs.

Respectfully submitted,

SWART, CAMPBELL & DETWEILER

BY: _Kathleen M. Carson_

Jeffrey B. McCarron
Kathleen M. Carson
1601 Market Street
Philadelphia, PA 19103
Attorneys for Defendants

33

Dated: August 30, 2001

## CERTIFICATE OF SERVICE

I, Kathleen M. Carson, Esquire, counsel for defendants, Bruce J. Brown and Brown, Schultz Sheridan & Fritz, hereby certify that a copy of defendants' motion for summary judgment and statement of material facts, was served upon all counsel listed below by first class U.S. mail, postage prepaid on August 30, 2002

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA 17101

Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA 02110

*Kathleen M. Carson*
Kathleen M. Carson

Date: August 30, 2002

34