ORIGINAL

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

United States Fidelity and
Guaranty Company,
      Plaintiff
   v.

Bruce J. Brown and Brown, Schultz
Sheridan & Fritz,
      Defendants

No: 01-CIV-813

**FILED**
HARRISBURG, PA

AUG 3 0 2002

MARY E. D'ANDREA, CLERK
_____
Deputy Clerk

*M. J. Smyser*

### DEFENDANTS' STATEMENT OF MATERIAL FACTS

Defendants, Bruce, J. Brown and Brown Schultz Sheridan & Fritz, by and through their counsel, submit the following statement of material facts as to which defendants contend there is no genuine issue to be tried as required by Local Rule 56.1:

1. This an action for negligent misrepresentation.

2. USF&G issued payment and performance bonds to CCI Construction Company ("CCI"). CCI was a contractor engaged in public and private construction work. Complaint at ¶ 6.

3. Brown Schultz was CCI's auditor during the entire period USF&G issued bonds on CCI's behalf. See J. Ortenzio Depo. at p.25: 2-18; 28: 4-30; 21.[1]

4. USF&G contends it sustained damages as a result of alleged

---

[1] Pertinent portions of the deposition of John Ortenzio are found at Exhibit A of the binder of exhibits submitted in support of this motion (hereinafter Exhibit Binder)

SWARTZ, CAMPBELL & DETWEILER
ATTORNEYS AT LAW 1631 NORTH FRONT STREET • HARRISBURG, PA 17102

negligent

misrepresentations contained in audited financial statements prepared by Brown

Schultz for CCI Construction Company for the years ended December 31, 1996,

December 31, 1997, and December 31, 1998. See Complaint.

     5.  USF&G contends that it would not have issued 18 sets of payment and

performance bonds had the foregoing audited financial statements correctly reflected

the financial condition of the CCI.  See Complaint at  ¶ 16, 18, 20, 28.

     6.  Plaintiff contends that it issued the following bonds in reliance on the

December 31, 1996 audit report:

| Project | Bond Number |
|---|---|
| Johnstown Air Traffic Control Tower | 26-0120-41362-97-1 |
| Lord Fairfax Community College | 26-0120-41364-97-4 |
| Albemarle-Charlottesville Regional Jail | 26-0120-12995-98-7 |
| Outlook Point at Hilliard | 26-0120-13008-98-0 |

Complaint at ¶ 16.

     7.  The bonding for the "Perry Point" project was issued on February 13,

1998.  <u>See</u> USFG/BS 0727 (attached as Exhibit 1 to Carson Affidavit.)[2].

8.  The bonds for the "Perry Point" project were issued prior to receipt by

USF&G of the audit report for December 31, 1997. <u>See</u> Complaint at  ¶ 17. As such,

to the extent USF&G relied on any Brown Schultz Audit Report for these bonds it

would have to be the 1996 Audit Report.

9.  USF&G contends that it issued bonds on the following projects in reliance

on the December 31, 1997 audit report:

| Project | Bond No. |
|---|---|
| Scott Air Force Base - Air Craft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 |
| Germplasm Center | 26-0120-28306-98-1 |
| PA Turnpike-Kost Road Central Administration Bldg. Renovation | 26-0120-40371-99-1 |
| Outlook Point at Chesterfield | 26-0120-28307-98-8 |
| Outlook Point at Westerville | 26-0120-28312-98-1 |
| James River Juvenile Detention Center | 26-0120-08946-99-2 |
| Va. Commonwealth Univ. Life Sciences Building | 26-0120-08953-99-9 |

Complaint at ¶ 18.

---

[2] The Affidavit of Kathleen Carson is Exhibit B in Exhibit Binder.

10.  USF&G alleges that it issued bonds on the following projects in reliance on the December 31, 1998 audit report:

| Project | Bond No. |
|---|---|
| SR II Perry County-Excavation, Presplit Blasting | 26-0120-08953-99-9 |
| Cambria County State Route 22 | 26-0120-08959-99-7 |
| Bedford County State Route 30 | 26-0120-08963-99-4 |
| Summerdale Sitework Laboratory Centers for Excellence | 26-0120-08958-99-1 |
| Cool & Cold Aquaculture | 26-0120-08961-99-1 |
| Cool & Cold Aquaculture-Buried Process Water Lines | 26-0120-40396-99-3 |

Complaint at ¶ 20.

11.  Plaintiff's expert, Steven DeBruyn, CPA does not opine that the audit work performed by Brown Schultz for CCI for the year ended December 31, 1996 contained any misstatements or omissions. <u>See</u> DeBruyn Expert Report.[3]

12.  Plaintiff's expert does not opine that there was any violation of GAAS or GAAP in connection with the audits for December 31, 1997 and December 31, 1998.  Rather, he states that the audit work for the years ended December 31, 1997 and December 31, 1998 did not conform to the "standard of care of a Certified Public Accountant" and that this resulted

---

[3]A copy of the DeBruyn Report is Exhibit C in the Exhibit Binder.

in material misstatements in the 1997 and 1998 audit reports. DeBruyn Report.

13. USF&G contends that there was an "overstatement of income and equity" in the amount of $815,960 for 1997 and $3,126,508 for 1998." DeBruyn report at p. 3.

14. The DeBruyn report does not indicate the source and components of the adjustments by DeBruyn to the amounts in the 1997 Brown Schultz financial statement and the report does not indicate the reason or give an explanation for the adjustments or any information from which the propriety of the adjustments can be evaluated. See generally, DeBruyn Report.

15. With regard to the December 31, 1998 audited financials, USF&G contends that $1,162,460 of revenue from a related party PCIC was improperly recognized as revenue and the disclosure contained in the financials was inadequate. DeBruyn Report.

16. Other than conceivably the $1,162,460 from PCIC, the DeBruyn report identifies no other basis for the alleged overstatement of income and equity of $3,126,508 in the December 31, 1998 audited financials. See DeBruyn Report.

17. While Brown Schultz was aware that USF&G was a user of the audited financial statements, there is no evidence that Brown Schultz knew the specific purpose for which USF&G intended to use the financial

statements or had knowledge of the specific bonds underwritten by USF&G on CCI's behalf. <u>See</u>, C. Rebinski Depo. at p. 41:2-20; D. Bowman Depo. at p. 38:22-39:18; B. Brown Depo. at p. 22:20, 25:12.

18.  John Ortenzio, CCI's president and sole shareholder, when asked if he made Bruce Brown aware of the reasons the bonding company was requiring the audited financial statements testified:

> I think the only reason I would have communicated to Bruce Brown was because that's what they wanted. They wanted audited financials and that's what we gave them.

Ortenzio Depo. at p. 44:18-24; 20:7-8.

19.  The CCI audited financial statements were not given by Brown Schultz to USF&G.  Sheri Phillips Depo. at p. 88:15-22. Brown Schultz sent copies of the audited financials to CCI. <u>Id.</u> CCI provided its audited financial statements to the bonding agent. USF&G received the financial statements from its agent.  <u>Id.</u> [4]

20.  There was no contact or communication between USF&G and Brown Schultz. J. Daily Depo. at p. 125:17-20; T. Phillips Depo. at p. 184:13-17; S. Salazar Depo. at p. 70-71. [5]

21.  There is no evidence Brown Schultz was informed about the specific bond transactions before it provided the financial statements.

------------------------------------------------------------

[4]  The pertinent portions of Sheri Phillips deposition are found at Exhibit D of the Exhibit Binder.

[5]  The pertinent portions of Jim Daily, Tony Phillips and Steve Salazar depositions are found at Exhibit E, F, and G respectively.

22.  USF&G began its bonding program with CCI in late 1993 or early 1994.  See J. Daily Depo. at p. 335: 8-13.

23.  The CCI bond account came to USF&G through the Byerly Agency an independent agency through whom USF&G marketed its business. S. Salazar Depo.  at p. 63.  Dave Dominiani of the Byerly Agency was agent for the CCI account. When Mr. Dominiani left the Byerly Agency in or around 1998 to form DJL Associates, he     continued as the agent for the CCI bond program. J. Ortenzio depo. at p. 73:11-74:12.

24.  The relationship between CCI and USFG was formed after Fireman's Fund Insurance Company would not underwrite a bond for CCI. Salazar Depo. at p. 93:16-21.

25.  At the time USF&G began its bonding program for CCI, the majority of CCI's revenues and receivables were the result of contracts entered into with Continental Medical Systems for the construction of rehabilitation hospitals throughout the United States.  See December 31, 1993 Financial Statement of CCI at Footnote 8.[6]  During 1993 and 1992 CMS accounted for 71% and 83% of CCI's revenues respectively.  Id. Continental Medical Systems was controlled by John Ortenzio's father, Rocco Ortenzio.  Id. ; J. Daily depo. at p. 107:23-108:5.

26.  When USF&G began its bonding program with CCI, the

---

[6]The 12/31/93 audited financial statement of CCI is found at as Exhibit H in the Exhibit Binder.

contractor was beginning to enter the hard bid market.  J. Daily depo. at p. 108:5-13.

27.  The individuals from USF&G involved in the underwriting of the CCI account included: Tony Phillips, the bond  manager of USF&G's Harrisburg field office; Steve Salazar, senior underwriter in the Harrisburg field office; Jim Daily, manager of the Northeast Surety Division for USF&G; and David Hussey, the Director of the Northern Division of USF&G's Surety Department.  See USF&G's Answers to Defendants [First] Set of Interrogatories at p. 3[7]; J. Daily depo at p. 113.

28.  Mr. Salazar, the senior underwriter in the Harrisburg field office, had the authority to approve bonds up to $2,000,000.  S. Salazar Depo. at p. 64.  Above that amount, he needed the approval of Tony Phillips.  Id. Above Mr. Phillips' level of authority, bonds would be approved by Mr. Daily. S. Salazar Depo. at p. 65.

29.  Salazar, in underwriting the CCI account, reviewed the CPA year end financial statements and interim CCI prepared financials.  S. Salazar Depo. at p. 98.  According to Mr. Salazar, his purpose in reviewing the interim information was to see how the contractor was doing during the year.  Id. at p. 99. Mr. Salazar relied on the interim financials along with the CPA year end financials to make underwriting decisions.  Id.

---

[7] USF&G's Answers to Defendants [First] Set of Interrogatories are found at Exhibit I to the Exhibit Binder.

30.  CCI provided USF&G with CCI prepared, interim financial statements on either a quarterly or bi-annual basis and either monthly or quarterly work in process information.  J.  Daily Depo. at. p. 217:24-218:10; S. Salazar Depo. at 98: 20-25.  USF&G also received Dun & Bradstreet reports on CCI and had annual meetings with the contractor and the bonding agent to discuss the bonding program. S. Salazar Depo. at 108: 19-109:2.

31.  Mr. Salazar testified that the year end audited financial statements only reflected the financial condition of the company as of the closing date for the statement.  Id. at p. 99.

32.  Mr. Salazar testified each contract for which bonds were issued by USF&G was individually underwritten.  S. Salazar Depo. at 58.

33. According to Mr. Salazar, USF&G had no specific underwriting guidelines. S. Salazar Depo. at p. 58.  Mr. Salazar testified that there were no underwriting guidelines used for net worth in the 1990's.  Salazar Depo. at p. 38:5-7. He also testified that there was no guideline used to evaluate a contractor's cash position or profitability in connection with issuance of a bond program in the 1990's. Salazar Depo. at p. 38:16-19.

34.  Salazar, himself, used  general underwriting guidelines of five percent (5%) working capitol and ten percent (10%) net worth [to total work program]. S. Salazar depo. at p. 39-40.

35.  According to Mr. Salazar, the larger the contractor, the more the

surety could deviate from these guidelines.  Id.  In order to determine the extent to which it was appropriate to all deviation from these guidelines, Salazar said he would need to know the size of work the contractor had previously completed and whether the contractor had successfully and profitably completed the previous work. S. Salazar depo. at p. 45:17-25.

36.  Mr. Salazar could not state for CCI to what changes in the company's operations, working capitol balance sheet of work in progress could be tolerated before they had an impact on underwriting Salazar 246: 3-247.

37.  Tony Phillips, the bond manager for USF&G's Harrisburg field office testified that his responsibilities included the overall underwriting of the CCI account plus supervising Mr. Salazar and that he was responsible for any recommendation made by Mr. Salazar on any bond liability on the account.  T. Phillips depo. at p. 35:5-

38.  Mr. Phillips testified that it was significant in the underwriting process to know whether the source of a contractor's profit was from construction operations or from other sources.  T. Phillips Depo. at p. 423:9-13.

39.  Mr. Phillips stated that in the course of underwriting the CCI bond program, he did not fully review and evaluate the audited financial statements for CCI Construction.  T. Phillips Depo. at p. 443.

40.  Mr. Phillips verified USF&G Answers to Defendants [First] Set of

Interrogatories.  See Exhibit I.

41.  In the answers to interrogatories, with respect to the 1997 audit report, USF&G when asked to identify the inaccuracies or omission contained therein or the manner in which they were misleading stated, inter alia, that indirect costs were not properly allocated, no job site visits were preformed by Brown Schultz, that there was no independent confirmation of management's representations concerning the percentage of completion, estimated costs to complete and the status of pending change orders. See USF&G Answers to Defendants [First]Set of Interrogatories at No. 8 pp. 14-21.

42. Similar issues were identified with respect to the 1998 audit report. Id. at p. .  In addition, USF&G complained that a claim guaranteed by Pennsylvania Contractor's Insurance Company, a company owned by John Ortenzio, should not have been recorded as revenue and that audit report contained inadequate disclosure with regard to it.  Id at p. 26-27.

43.  US&G did not identify in its interrogatory answers the extent to which purported deficiencies would have changed CCI's balance sheet. Id.

44.  Tony Phillips, who verified the interrogatories on USF&G's behalf, testified that, without the benefit of restated financials, he could not make a determination about whether changes to CCI's financial condition would have been material to his underwriting decisions. T. Phillips depo. at 463:25-464:5.

45. Phillips, at his deposition, testified that he believed that restated financials existed for CCI, but that he had not reviewed them.  Phillips at 464:9-15.

46. Jim Daily's responsibilities in the 1990's included, among other things, the supervision of underwriting in the field offices. J. Daily depo. at p. 16.  In connection with that supervisory role, Mr. Daily would handle new account submissions and bond requests up to a certain limit of authority. J. Daily depo. at p. 17.

47. With regard to bond requests over that limit of authority, Mr. Daily had to seek approval from his boss, David Hussey, to whom Mr. Daily reported. J. Daily depo. at pp. 17:4-12; p. 43:11-13.

48. According to Mr. Daily, the primary responsibility of the field office was to produce the business.  Daily's responsibility was to underwrite the business.  J. Daily depo at. p. 46:12-22.

49. Mr. Hussey had final approval of USF&G's bond program for CCI. J. Daily Depo. at p. 113:20-23. Mr. Hussey testified that he did not review any of the Brown Schultz audited financials.  D. Hussey depo. at 130: 20-131:16.

50. Daily testified that in committing to bonding for CCI in January of 1999, USF&G relied on representations from CCI Construction as to its financial condition for the coming years. J. Daily Depo. at p. 416: 6-417:11.

51. There is no evidence that the bonds that form the basis of

USF&G's loss in this action would not have been issued even if there had

not been the alleged problems in the 1997 and 1998 audited financials.  <u>See</u>

pp. 36-44; J. Daily depo at p. 275:1-5.

52.  By letter dated November 16, 1993, apparently in response to

questions raised by USF&G's reinsurers, Dave Dominiani, the bond agent,

advised Tony Phillips of the following:

> Footnote 9 specifies that in 1992 the company [CCI] incurred
> warranty insurance expense of $1,000,000 with Pennsylvania
> Contractors Insurance company (PCIC). Per Dave Barber, CFO, CCI
> took $1,000,000 from a very successful completed project, Wesley and
> funded their future warranty expense under PCIC.  They did this
> primarily for tax planning purposes, but also to fund those future
> warranty expenses with current profits from a very successful
> project.

USFG/BS 846 (Exhibit 2 to Carson Affidavit.)

53.  The "Related Party Transactions" footnote in the December 31,

1993 audited financials for CCI disclosed that PCIC was a corporation

under common control and that CCI had incurred warranty insurance

expense of $335,317 and $1,000,000 with PCIC for 1992 and 1993

respectively. See Exhibit H.

54.  On July 14, 1994, Steve Salazar requested information from the

bond agent regarding significant profit fades on four jobs then in progress

and thin margins on 8 of CCI's projects.  USFG/BS 1175. (Exhibit 3 to

Carson Affidavit).

55.  On July 21, 1994 Dave Dominiani advised Steve Salazar that as of

June 30, 1994, CCI would be showing a "small loss". <u>See</u> USFG/BS 870-872

(Exhibit 4 to Carson Affidavit). Dominiani, in that same letter, also acknowledged that the gross margin on many of CCI's project was "very thin". Id.

56.  On November 2, 1994, Dominiani reported to Tony Phillips that the 6/30/94 interim financials prepared by CCI showed CCI sustained a $500,000 loss for the first half of 1994.  See USFG/BS 0873-75 (attached as Exhibit 5 to Carson Affidavit).  Dominiani informed Phillips that CCI was projecting a loss of approximately $400,000 to $500,000 at year end. Id.

57. On December 28, 1994, Jim Daily noted concerns that CCI's liquid position was less than half of what it had been at 12/31/93 and that there were continuing profit fades.  USFG/BS 1102 (Exhibit 6 to Carson Affidavit).

58.  On January 3, 1995, Dominiani advised Steve Salazar that CCI's projected loss for December 31, 1994 remained in the $400,000-$500,000 range. See S. Salazar Depo. Exhibit 13. In addition, Dominiani addressed the concerns raised by USF&G with regard to profit fades on two CCI projects – Lightner Road and Lincoln University. Id.

59.  In late January 24, 27 and 31, 1995, notwithstanding the loss sustained at mid- year and the projected loss at year end, USF&G issued bid bonds for the Altoona Railroad Memorial Museum, Shady Grove and Andrews Air Force Base Projects without having received the Brown Schultz audited financials for the year ended 12/31/94.(Exhibits 3-5 To

Carson Affidavit).

60.  USF&G agreed at a 1/31/95 meeting with CCI to hold to a $100,000,000 program level. USFG/BS 1111 (Exhibit 6 To Carson Affidavit).

61. On April 19, 1995, USF&G's home office received the Brown Schultz audited financials for the year ended December 31, 1994.  The 1994 financials indicated a net loss of $317,000 and an operating loss of $864,663. Working capital was $2,384,192 and equity was $4,290,336. A copy of the 1994 Audited Financial Statements is Exhibit I in the Exhibit Binder.

62.  In the Related Party Transactions footnote in the 1994 audited financial statements, it was disclosed that PCIC was a corporation under common control and that there were no warranty insurance costs incurred for 1994.  The footnote also disclosed that CCI had submitted a claim to PCIC of $397,800 in 1994 and that the claim was pending as of December 31, 1994.

63.  The December 31, 1994 financial statement also contained the following statement in footnote 1 "Summary of significant accounting policies":
"An amount equal to the contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated."

64.  The 1994 audited financial statement and all of the audited financial statements thereafter through 1998, also showed earnings from

contracts before allocation of indirect costs. The amount of unallocated indirect costs was reflected in the financial statements and was used to determine the cumulative ne profit from contracts.  Similarly, the completed contracts and contracts in progress schedules clearly show "gross profit before indirect costs" and contract earnings (accrued or earned) before indirect costs. Copies of the December 31, 1995 through December 31, 1998 audited financial statements for CCI are found in the Exhibit Binder at Exhibit J through M respectively.

65.  Each year, Steve Salazar  prepared an "annual review" describing CCI's results for the year and made a recommendation as to a bonding program for the following year.  S. Salazar Depo. at p. 238-240; Salazar Depo. Exhibits 7-11.

66.  In his annual review of the 12/31/94 CPA audit, Salazar recommended continuing with the bond program for CCI.  See, Salazar Depo. Exhibit 8.

67.  In March 1996,  USF&G received the audited financial statements for the year ended December 31, 1995.  The financial statement showed a small profit of $103,210 but a loss from operations of $308,362.  Working capital was $4,183,681 and equity was $4,820,675. See Exhibit J in the Exhibit Binder.

68.  The related party transactions footnote disclosed that during 1994, CCI submitted a warranty insurance claim of $397,800 to PCIC, "a

company owned by the sole shareholder. This claim was paid during 1995."

69. The footnotes to the 1995 audited financials also state

**Use of Estimates:**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Revenue and costs recognition:**

. . . Because of inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates used will change in the near term.

. . . An amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.

70. The May 3, 1996 Annual Review of CCI Construction prepared by Steve Salazar showed a Yellow Stress Score and a "Bear Flag F1 -Net Worth less than 10% of work program. See Salazar Depo. Exhibit 9. Salazar again recommended continuing the CCI bond program. Id.

71. On May 1, 1997, USF&G received a copy of the audit report for the year ended December 31, 1996. See complaint at ¶15 . The financial statement reflected net income of $363,124, and for the first time since 1993, an operating profit of $139,097, working capital in the amount of $4,641,702, and equity of $4,802,675. See Exhibit K.

72. Steve Salazar's annual review of CCI dated May 1, 1997, again

showed a yellow stress score as of March 1997 and the following bear flags: A20-gross profit fade factor is greater that 20% and M01-Equity less that 10% of total program.  <u>See</u> Salazar Depo. Exhibit 10.

73.  Mr. Salazar recommended that the bonding program be continued. <u>Id.</u>

74.  On June 3, 1997, Jim Daily approved Steve Salazar's request for approval of a bid bond for the $15.9 million Md. D.G.S. Camp Fretterd Armory project. Salazar in support of his approval request referenced CCI's in-house financials as of March 31, 1997. See USFG/BS 795-96 (Exhibit   to Carson Affidavit.)

75.  On June 26, 1997, Salazar requested and received approval from Jim Daily of a bid bond for a $30,000,000 job. USFG/BS 0790. (Exhibit 6 To Carson Affidavit).

76.  In August of 1997, Dominiani wrote to Tony Phillips advising that John Ortenzio wanted his personal indemnity on the Master Surety Agreement removed.  USFG/BS 1233.  Jim Daily consented to the removal of the indemnity. USFG/BS <u>1120</u>. (Exhibit 8 and 9 To Carson Affidavit).

77.  On August 20, 1997 Salazar requested and received approval of a bid bond for an $18,300,000 project at McGuire Air Force Base and, in support of that request cited to the June 30, 1997, CCI in-house financials. USFG/BS 0784. (Exhibit 10  to Carson Affidavit).

78.  On December 1, 1997, Steve Salazar requested approval of the

$15.7 million Albemarle-Charlottesville Regional Jail bid bond again referencing the June 30, 1997 CCI in house financials in support of his request.  USFG/BS 0778.  Mr. Daily approved the request as submitted. Id. (Exhibit    To Carson Affidavit.)

79.  On March 5, 1998, USF&G received the audited financials for the year ended December 31, 1997 complaint at ¶ 17.  Income from operations was $350,000.  See Exhibit L .

80.  Footnote 5 of the audited financials indicated that $816,000 current notes payable were collateralized by equipment.  There is no evidence that USF&G inquired as to what equipment was purchased and why.

81.  The related party transaction footnote disclosed that PCIC was a corporation under common control and that CCI had incurred warranty expense of $825,000 with PCIC.

82.  On April 15, 1998, See Steve Salazar prepared his annual review of the audited financials for 1997.  Salazar Depo. Exhibit 11. The annual review showed a yellow stress score and bear flags "A20-gross profit fade factor is greater than 20%" and "M01-Equity less than 10% of total program.  Id.

83.  Mr. Salazar recommended continuing the bonding program for CCI.

84.  On August 17, 1998, Dave Dominiani wrote to Tony Phillips and

advised:

> As you can see <u>CCI is reflecting a $1,600,000 loss through six months</u>. However, they will turn that number around by 12/31/98. I have included with the report the profit projections by project for 1998. Please kind [sic] in mind that these numbers are conservative and suggest that the projected loss from operations will be approximately $200,000. This will be offset by investment income and in addition, <u>please remember that we have PCIC available to fund warranty claims if we choose to utilize it. As you are aware, we funded almost $900,000 into PCIC last year for warranty coverages on existing projects. There is approximately $2,000,000 funded into that insurance vehicle and can be drawn on for warranty claims at any time. CCI can actually use this as a buffer to offset losses or profit fades on certain jobs during any given year.</u> That is an additional feature than none of my other contractor's have.

Salazar Depo. Exhibit 1 (emphasis added).

85. In spite of the loss, USF&G continued with its bonding program.

86. On December 23, 1998, Dominiani wrote Tony Phillips wrote outlining CCI's desire to bid on any upcoming $40,000,000 heavy highway project in joint venture with Fulkroad Construction. T. Phillips depo. Ex 9.

87. On, January 5, 1999, prior to receipt of the audited financials for December 31, 1998, USF&G met with CCI and Dominiani to discuss the joint venture project. T. Phillips Exhibit 10.

88. Mr. Phillips was aware as of August 1998 that CCI was self-performing work it had previously subcontracted. T. Phillips Depo. at p. 439:11-14.

89. Dave Hussey was aware of CCI's decision to self perform work during 1998 having been advised of this by Jim Daily. Hussey depo. at pp. 83-84.

90. Jim Daily testified he became aware in 1998 that CCI was performing work it had previously subcontracted and that he did not this it was a good idea. J. Daily Depo. at p. 239-40. Jim Daily testified that a change in business to self perform work which it had previously subcontracted was a genuine risk and would have been of concern to him. Id.

91. Jim Daily recommended to Dave Hussey that USF&G not approve bonds fo the Fulkroad project because the project was a different kind of work than previously performed by CCI, and because CCI planned to self perform work it previously subcontracted. Hussey depo. at 104-106.

92. Dave Hussey approved the bonds for the Fulkroad joint venture notwithstanding Jim Daily's concerns. Hussey depo. 104-106.

93. Tony Phillips January 5, 1999 memo to file indicated that USF&G agreed to support the joint venture bid with CCI's portion of the bid being about $22,000,000. USF&G agreed to handle the CCI account on a 3% working capitol and 5% net worth basis. USFG/BS 1271-72 ( Exhibit 13 to Carson Affidavit)

94. On March 1, 1999, Dominiani submitted the December 31, 1998 audited financials to Tony Phillips. The audited financials showed that while CCI had made a small profit of $59,015, working capitol decreased to $2.5 million and the company had an operating loss of $116,629. The financial statement also showed underbillings of $6,341,726 representing

36% of total current assets.  This was a significant increase from prior years.  In 1997, underbillings were $1,072,281 and in 1996 underbillings were $37,663. This increase in underbillings prompted no comment or investigation by USF&G. A copy of the 12/31/98 audited financials for CCI is Exhibit  in the Exhibit Binder.

95.  The 1998 financials also indicated that PCIC had guaranteed a claim of $1,162,460.  Id.  No inquiry was made by USF&G with regard to this transaction. See Daily depo. at p. 384.

96.  There is no Annual Review of the 12/31/98 financials by Mr. Salazar.

97.  USF&G continued with the CCI bonding program.  In 1999 after receipt of the 1998 audited financials, USF&G issued final bonds on the Phase 1 Laboratory Center (Summerdale) and Cambria County, Bedford County and Cool and Cold Aquaculture projects.  See complaint at ¶ 20.

98.  The first analysis of the 1998 financial statements that appears to have been done by USF&G is dated August 20, 1999. See Salazar depo. Exhibit 15.

99.  The "Folder Exceptions Report" noted the account's status as "red" because of the following reasons: underbillings were greater than 50% of equity; the folder had five open claim files; equity was less than 10% of the total program; net quick was less than 5% of the total program the debt to equity was greater that 3 to 1; underbillings were 120% of equity;

notes payable were 104.9% of equity; and the indemnity agreement did not include the owner/principal.  See Salazar Depo. Ex. 15.

100.  Notwithstanding this report, on August 20, Steve Salazar recommended to and received approval from Jim Daily for a bid bond on a $20,000,000 road construction project.  (Exhibit 13 to Carson Affidavit).

101.  On August 30, 1999, Dave Dominiani reported that CCI reported that CCI had a loss of $900,000 through the first six months of 1999.  See USFG/BS 0945 (Exhibit 14 to Carson Affidavit).

102. Notwithstanding that advice, on September 30, 1999, a performance bond was issued in the amount of $191,083 on the Cool and Cold Aquaculture project. See USFG/BS 0726 (Exhibit 15 to Carson Affidavit).

SWARTZ, CAMPBELL & DETWEILER

BY: *Kathleen M. Carson*

**Jeffrey B. McCarron**
**Kathleen M. Carson**
1601 Market Street
Philadelphia, PA 19103

Attorneys for Defendants

DATE August 30, 2002