Law Clerk's Copy

FILED
HARRISBURG, PA

SEP 1 6 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| United States Fidelity and Guaranty Company, **Plaintiff** : : : : | |
| **v.** : : | |
| Bruce J. Brown and Brown, Schultz, Sheridan & Fritz, **Defendants** : : | **No: 01-CIV-813** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

I.     Introduction 1

II.    Statement of Facts 4

       A.     The Complaint 4

       B.     Plaintiff's Expert Report 7

       C.     Brown Schultz's Knowledge Regarding
              USF&G's Use of the Audited Financial
              Statements 8

       D.     USF&G's Underwriting Criteria for CCI
              and Use of Audited Financials In Underwriting the
              CCI Account 10

       E.     USF&G's Bonding Program for CCI from
              1993 through the Fall of 1999 14

III.   Statement of Questions Presented 24

IV.    Argument 25

       A.     Standard for Summary Judgment 25

       B.     Elements of a Negligent Misrepresentation Claim 26

       C.     Plaintiff Cannot Establish a Basis for a Duty
              Owed By Brown Schultz to Plaintiff 28

       D.     Plaintiff Cannot Establish the Requirements of § 552(2) 30

       E.     Plaintiff Cannot Establish a Breach of Duty
              by Defendants 36

              1.     The 1996 Audited Financials 36

              2.     The 1997 Audited Financials 39

              3.     The 1998 Audited Financials 42

       F.     Plaintiff Cannot Establish There Were Material

Misrepresentations In the 1997 and 1998 Audited Financial Statements43

G.    Plaintiff Cannot Establish that It Justifiably Relied on the 1997 and 1998 Financial Statement In Issuing Surety Bonds.46

V.    Conclusion52

## TABLE OF CITATIONS

**Cases**                                                                                    **Page**

*Aikens v. Baltimore and Ohio Railroad Co.*, 348 Pa.Super. 17,
501 A.2d 277, 278,

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,248, 91L.Ed. 2d 202,
106 S. Ct. 2505 (1986).26

*Bortz v. Noon*, 729 A.2d 555, 561 Pa. 1999)27, 36, 37,43

*Celotex Corp. v. Catrett,* 477 U.S. 317, 324,
91 L.Ed. 2d 265, 106 S. Ct. 2548 (1986)26

*Collins v. Prime Table Rest. & Lounge Inc.*
(*In re Lake States Commodities, Inc.*), 271 B.R. 575, 587 (N.D. Ill. 2002)41

*Donegal Mutual Insurance Company v. Grossman*,
195 F. Supp. 2d 657, 662-63 (M.D. Pa. 2001)26

*Dunkin' Donuts Inc. v. Patel*, 174 F. Supp. 2d 202 (D.N.J. 2001) 41

*East River Steamship Co. v. Transamerica Delaware, Inc.,* 476 U.S. 858, 106
S.Ct.2295, 90 L.Ed.2d (1986)39

Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir. 1985)29

*Freeman v. Murray*, 163 F. Supp. 2d 478 (M.D. Pa. 2001)38

*First Options of Chicago, Inc. v. Wallenstein*,
1994 WL 229554 at * 4 (E.D. Pa.1994)29

*Gans v. Mundy,* 762 F.2d 338, 343 (3d Cir. 1985)
*cert. denied* 474 U.S. 1010, 88 L. Ed. 2d 467, 106 S. Ct. 537 (1985)38

*Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994)27

*I & S Associates Trust v. Lasalle National Bank*, 2001 U.S. Dist.
LEXIS 17049, *9 (E.D.Pa. 2001)39

*In re IKON Office Solutions, Inc.*, 277 F.3d 658 (3d Cir. 2002)37
*Incollingo v. Ewing*, 444 Pa. 263, 276 n. 6,
282 A.2d 206, 214, 444 Pa. 299 n. 5a (1971)37

*In re Phar-Mor, Inc. Securities Litigation*,
892 F. Supp. 676, 693 (W.D. Pa. 1995).

*Kramer v. Dunn*, 749 A.2d 984 (Pa. Super. 2000) 27

*Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474 (3d Cir. 1979)37, 38

*Lower Lake Dock v. Messinger Bearing*, ___Pa.Super.___,
577 A.2d 631, 635 (1990)39

*Margolis v. Jackson*, ___Pa.Super.___, 543 A.2d 1238 (1988).39

*Medical Consultants Network, Inc. v. Cantor & Johnston, P.C.*,
2000 U.S. Dist. LEXIS 19279 at 10-11 (E.D. Pa. 2000)41

*National Cash Register v. Haak*, 233 Pa. Super. 562,
335 A.2d 407 (1975). 37

*New York State Elect. & Gas. Corp.*, 387 Pa. Super. 537, 564 A.2d 919 (1989)39

*North American Specialty Insurance Company v. Lapalme*,
258 F.3d 35 (1st Cir. 2001)31-33

*Palco Linings, Inc. v. Pavex, Inc.*, 755 F.Supp. 1269, 1275 (M.D.Pa. 1990)39

*PNC Bank, Kentucky, Inc.  v. Housing Mortgage Corp.*,  899 F. Supp. 1399, 1408 (W.D.
Pa. 1994).27-28

*PPG Industries, Inc. v. Sundstrand Corp.*, 681 F.Supp. 28739

*Powell v. Risser*, 375 Pa. 60, 65, 99 A.2d 454, 456 (1953). 38

*Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996)41

*Rempel v. Nationwide Life Ins. Co., Inc.*, 471 Pa. 404, 409,
370 A.2d 366 (1977)47

*Smith v. Yohe*, 412 Pa. 94, 99, 194 A.2d 167, 170 (1963)37

*Williams Controls, Inc. v. Parente, Randolph,
Orlando, Carey & Associates*, 39 F. Supp. 2d 517 (M.D. Pa. 1999)33-34

## Rules of Court

Federal Rule of Civil Procedure 2641, 43

Federal Rule of Civil Procedure 5625

Federal Rule of Evidence 70241

## Restatements

4

Restatement (Second) of Torts Section 552.27, 30-31, 37

## I.     Introduction

Plaintiff, United States Fidelity & Guaranty Company ("USF&G"), brought this action against Bruce J. Brown and Brown Schultz Sheridan & Fritz (collectively "Brown Schultz") for alleged negligent misrepresentations contained in audited financial statements prepared by Brown Schultz for CCI Construction Company for the years ended December 31, 1996, 1997 and 1998.  The action is based on the contention that Plaintiff issued certain payment and performance bonds for CCI based on the financial statements.  Brown Schultz now seeks summary judgment on grounds that plaintiff, United States Fidelity & Guaranty Company ("USF&G") cannot establish the required elements of its negligent misrepresentation claim.

First, USF&G cannot establish a basis for a duty owed by Brown Schultz to USF&G. Brown Schultz is not in privity with USF&G and had no pecuniary interest in the bond transactions which are the basis for this lawsuit.  Moreover, even if plaintiff could satisfy either of the foregoing requirements, USF&G cannot establish the requirements of Restatement (Second) § 552(2).  There is no evidence that Brown Schultz, prior to releasing its audit report in the years at issue,  was aware of the specific bonds to be issued by USF&G during the coming year or that Brown Schultz released its audit reports with the intention of influencing those transactions.

Second, Plaintiff identifies no misstatements or misrepresentations in the December 31, 1996 financial statements and has produced no expert opinion that the Brown Schultz audit work was not done in accordance with Generally Accepted Auditing Standards ("GAAS") and that Brown Schultz failed to conform to Generally Accepted Accounting Procedures ("GAAP").  Summary judgment should be granted to Defendants with regard to the 1996 audited financials and any damages allegedly resulting to USF&G from the bonds it contends it issued in reliance thereon.

With regard to the December 31, 1997 and December 31, 1998 audited

financials, plaintiff's expert report states that income and equity were overstated in specific amounts. However, plaintiff's expert report is inadequate under F.R.C.P. 26 in that no basis is given for this restatement of the financials and, as such, the opinion is inadmissible. Without the expert opinion, plaintiff cannot establish the purported misstatements in the 1997 financial statement, the standard of care applicable to Brown Schultz's audit work or that Brown Schultz failed to comply with the standard of care.

Third, even if there were a basis for the restated financials, plaintiff cannot establish that such changes in CCI's financial condition would have been material to its decision to continue with the bonding program it had established. None of the USF&G underwriters could identify underwriting criteria used by USF&G in its decisions to extend surety credit to CCI. None of the underwriters could state whether and to what extent "correct" financial information would have changed their decision to continue bonding CCI. In addition, USF&G bonded CCI when it was aware that CCI had sustained significant losses and in circumstances when CCI had less working capitol and less equity than portrayed in the restated financials for 1997. Accordingly, plaintiff cannot establish that the purported misrepresentations were material to its decisions to issue the bonds that are the subject matter of this litigation.

Finally, plaintiff cannot establish that it justifiably relied on the Brown Schultz audited financials in making its underwriting decisions. USF&G was aware that the audited financials were only current as of the closing date of the statement and received interim financial information to see how the company was doing during the year. To the extent USF&G issued bonds on audited financial statements that were considerably out of date and had received more current interim information, the reliance on the year end financials was not justifiable.

In addition, the footnotes to the financials cautioned that estimates were used in the preparation of the financial statement and, as estimates, they could change. The

existence and nature of the relationship between Pennsylvania Contractors Insurance Company ("PCIC"), a company owned by the owner of CCI, and CCI was disclosed in the related party transaction footnotes over the years and USF&G had sufficient information both from the financials and its own bonding agent to determine the circumstances surrounding the related party transaction complained of in connection with the 1998 audited financials.

For these reasons, plaintiff cannot establish the requisite elements of its negligent misrepresentation claim and summary judgment should be granted in favor of defendants.

## II.    Statement of Facts

### A.  The Complaint

USF&G contends that it issued certain payment and performance bonds on behalf of CCI Construction Company ("CCI"), a contractor engaged in construction work on public and private construction projects.  Complaint at ¶ 6. USF&G contends that as a condition of the establishment and/or extension of surety credit to CCI and the issuance of payment and performance bonds to CCI, USF&G required CCI to  provide an audited financial statement prepared by an independent certified public accountant annually. Complaint at ¶ 10.  Brown Schultz annually audited the financial statements of CCI during the entire course of CCI's relationship with USF&G. See J. Ortenzio Depo. at p. 25:2-18; 28:4-30:21.[1] USF&G contends that, in reliance upon those audit reports, USF&G issued payment and performance bonds for a number of projects.  Complaint at ¶¶ 13, 16, 18, 20.

In September 1999, according to the Complaint, CCI advised USF&G that it lacked the financial resources to continue its operations and, as a result, would not be able to complete its work and pay its suppliers and subcontractors.  Complaint at ¶ 22. On May 19, 2000, CCI filed for bankruptcy. Complaint at ¶ 24.  USF&G alleges that as surety for the payment and performance bonds, it was required to expend substantial sums to satisfy claims of CCI's unpaid vendors, employees and subcontractors in completing the projects. Complaint at ¶ 23.

USF&G seeks to recover from Brown Schultz under a theory of negligent misrepresentation, claiming that the audited financial statements prepared by Brown Schultz for the years ended December 31, 1996, December 31, 1997 and December

---

[1]See Exhibit A in the Exhibit Binder.

4

31, 1998 were inaccurate, misleading or contained omissions and that as a result of the alleged negligent misrepresentations contained in the financials, USF&G sustained damages for which Brown Schultz is liable.  See Complaint at ¶¶ 27-33.

USF&G contends that it would not have issued 18 sets of payment and performance bonds had the foregoing audited financial statements correctly reflected the financial condition of the CCI.  See Complaint at ¶ 16, 18, 20, 28.

Plaintiff contends that it issued the following bonds in reliance on the December 31, 1996 audit report:

| Project | Bond Number |
|---|---|
| Johnstown Air Traffic Control Tower | 26-0120-41362-97-1 |
| Lord Fairfax Community College | 26-0120-41364-97-4 |
| Albemarle-Charlottesville Regional Jail | 26-0120-12995-98-7 |
| Outlook Point at Hilliard | 26-0120-13008-98-0 |

Complaint at ¶ 16.  In addition, the bonding for the "Perry Point" project was issued on February 13, 1998.  See USFG/BS 0727 (Exhibit 1 to Carson Affidavit.)[2].  The bonds for the "Perry Point" project were issued prior to receipt by USF&G of the audit report for December 31, 1997. See Complaint at ¶ 17.  As such, to the extent USF&G relied on any audited financial statements for the issuance of these bonds, it could only have been the 1996 Audit Report.

USF&G contends that it issued bonds on the following projects in reliance on the December 31, 1997 audit report:

| Project | Bond No. |
|---|---|

---

[2] The Affidavit of Kathleen Carson is Exhibit B in Exhibit Binder.

5

| | |
|---|---|
| Scott Air Force Base - Air Craft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 |
| Germplasm Center | 26-0120-28306-98-1 |
| PA Turnpike-Kost Road Central Administration Bldg. Renovation | 26-0120-40371-99-1 |
| Outlook Point at Chesterfield | 26-0120-28307-98-8 |
| Outlook Point at Westerville | 26-0120-28312-98-1 |
| James River Juvenile Detention Center | 26-0120-08946-99-2 |
| Va. Commonwealth Univ. Life Sciences Building | 26-0120-08953-99-9 |

Complaint at ¶ 18.

USF&G alleges that it issued bonds on the following projects in reliance on the December 31, 1998 audit report:

| **Project** | **Bond No.** |
|---|---|
| SR II Perry County- Excavation, Presplit Blasting | 26-0120-08953-99-9 |
| Cambria County State Route 22 | 26-0120-08959-99-7 |
| Bedford County State Route 30 | 26-0120-08963-99-4 |
| Summerdale Sitework Laboratory Centers for Excellence | 26-0120-08958-99-1 |
| Cool & Cold Aquaculture | 26-0120-08961-99-1 |
| Cool & Cold Aquaculture- Buried Process Water Lines | 26-0120-40396-99-3 |

Complaint at ¶ 20.

### B.  Plaintiff's Expert Report

6

Plaintiff produced its expert report presumably to identify the misrepresentations in the audited financial statements and to opine as to whether Brown Shultz, knew or should have known of the alleged misrepresentations in the audited financial statements.

With regard to December 31, 1996 audited financials, Plaintiff's expert, Steve DeBruyn, CPA, does not opine that the audit work performed by Brown Schultz for CCI for the year ended December 31, 1996 contained any misstatements or omissions. See DeBruyn Expert Report.[3]

Plaintiff's expert does not opine that there was any violation of GAAS or GAAP in connection with the audits for December 31, 1997 and December 31, 1998.  Rather, he states that the audit work for the years ended December 31, 1997 and December 31, 1998 did not conform to the "standard of care of a Certified Public Accountant" and that this resulted in material misstatements in the 1997 and 1998 audit reports.  DeBruyn Report.

USF&G, through Mr. DeBruyn, contends that there was an "overstatement of income and equity" in the amount of $815,960 for 1997 and $3,126,508 for 1998." DeBruyn report at p. 3.  The DeBruyn report does not indicate the source and components of the adjustments to the amounts in the 1997 audited financial statement and the report does not indicate the reason or give an explanation for the adjustments, or any information from which the propriety of the adjustments can be evaluated. See generally, DeBruyn Report.

With regard to the December 31, 1998 audited financials, USF&G contends that

---

[3]A copy of the DeBruyn Report is Exhibit C in the Exhibit Binder.

$1,162,460 of revenue from a related party, PCIC, was improperly recognized as revenue and the disclosure contained in the financials was inadequate. DeBruyn Report.  However, other than conceivably the $1,162,460 from PCIC, the DeBruyn report identifies no other basis or explanation for the opinion there was an overstatement of income and equity of $3,126,508 in the December 31, 1998 audited financials. See DeBruyn Report.

## C.    Brown Schultz's Knowledge Regarding USF&G's Use of the Audited Financial Statements

Brown Schultz was CCI's auditor during the entire time USF&G provided bonding to CCI.  Ortenzio Depo. at pp. 25:2-18; 28:4-30:21.  Brown Schultz was aware that USF&G was a user of the audited financial statements.  However, there is no evidence that Brown Schultz knew the specific purpose for which USF&G intended to use the financial statements or had knowledge of the specific bonds underwritten by USF&G on CCI's behalf. See, C. Rebinski Depo. at p. 41:2-20; D. Bowman Depo. at p. 38:22-39:18; B. Brown Depo. at p. 22:20, 25:2.[4]  In fact, John Ortenzio, CCI's president and sole shareholder, when asked if he made Bruce Brown aware of the reasons the bonding company was requiring the audited financial statements testified:

> I think the only reason I would have communicated to Bruce Brown was because that's what they wanted. They wanted audited financials and that's what we gave them.

Ortenzio Depo. at p. 44:18-24; 20:7-8.  CCI's audited financial statements were not even given by Brown Schultz directly to USF&G.  Sheri Phillips Depo. at p. 88:15-22. Brown Schultz sent copies of the audited financials to CCI. *Id*. CCI then provided its

---

[4]The excerpts of the Rebinski, Bowman and Brown depositions are Exhibits C1, C2 and C3 respectively in the Exhibit Binder.

audited financial statements to the bonding agent. USF&G received the audited
financial statements from the bonding agent. *Id.*[5]

There was no contact or communication between USF&G and Brown Schultz. J.
Daily Depo. at p. 125:17-20; T. Phillips Depo. at p. 184:13-17; S. Salazar Depo. at p.
70-71.[6]   Nor is there evidence that Brown Schultz was ever informed about specific
bond transactions before it provided the financial statements.

---

[5]  The pertinent portions of Sheri Phillips deposition are found at Exhibit D of the
Exhibit Binder.
[6]  The pertinent portions of Jim Daily. Tony Phillips and Steve Salazar
depositions are found at Exhibit E, F, and G respectively.

**D.      USF&G's Underwriting Criteria for CCI and Use of Audited Financials In Underwriting CCI Account**

The individuals from USF&G involved in the underwriting of the CCI account included: Tony Phillips, the bond  manager of USF&G's Harrisburg field office; Steve Salazar, senior underwriter in the Harrisburg field office; Jim Daily, manager of the Northeast Surety Division for USF&G; and David Hussey, the Director of the Northern Division of USF&G's Surety Department.  See USF&G's Answers to Defendants [First] Set of Interrogatories at p. 3[7]; J. Daily Depo at p. 113.

Mr. Salazar, the senior underwriter in the Harrisburg field office, had the authority to approve bonds up to $2,000,000.  S. Salazar Depo. at p. 64.  Above that amount, he needed the approval of Tony Phillips. *Id*.  Above Mr. Phillips' level of authority, bonds would be approved by Mr. Daily. S. Salazar Depo. at p. 65. David Hussey had final approval of USF&G's bond program for CCI. J.  Daily Depo. at p. 113:20-23.

Mr. Salazar, in underwriting the CCI account, reviewed the CPA year end financial statements and interim CCI prepared financials.  S. Salazar Depo. at p. 98. The CCI prepared, interim financial statements were provided to USF&G on either a quarterly or bi-annual basis.  CCI also provided USF&G with monthly or quarterly work in process information on its construction projects. J.  Daily Depo. at. p. 217:24-218:10; S. Salazar Depo. at 98:20-25. USF&G also received Dun & Bradstreet reports on CCI and had annual meetings with the contractor and the bonding agent to discuss the bonding program. S. Salazar Depo. at p. 108:19-109:2.

Mr. Salazar's purpose in reviewing the interim information was to see how the contractor was doing during the year.  *Id*. at p. 99. Mr. Salazar testified that he relied on

---

[7] USF&G's Answers to Defendants [First] Set of Interrogatories are found at Exhibit I to the Exhibit Binder.

the interim financials along with the CPA year end financials to make underwriting decisions. *Id.* As Mr. Salazar testified, the year end audited financial statements only reflected the financial condition of the company as of the closing date for the particular statement. *Id.* at p. 99.

Each contract for which bonds were issued by USF&G was individually underwritten. S. Salazar Depo. at p. 58. According to Mr. Salazar, USF&G, however, had no specific underwriting guidelines. S. Salazar Depo. at p. 58. Mr. Salazar testified that there were no underwriting guidelines used for net worth in the 1990's. Salazar Depo. at p. 38:5-7. He also testified that there were no guidelines used to evaluate a contractor's cash position or profitability in connection with issuance of a bond program in the 1990's. Salazar Depo. at p. 38:16-19. Salazar, himself, used general underwriting guidelines of five percent (5%) working capitol and ten percent (10%) net worth [to total work program]. S. Salazar Depo. at pp. 39-40. The larger the contractor, the more the surety could deviate from these guidelines. *Id.* In order to determine the extent to which it was appropriate to all deviation from these guidelines, Salazar said he would need to know the size of work the contractor had previously completed and whether the contractor had successfully and profitably completed the previous work. S. Salazar Depo. at p. 45:17-25.

Mr. Salazar could not state for CCI to what changes in the company's operations, working capitol, balance sheet, or work in progress could be tolerated before they had an impact on underwriting. See S. Salazar depo. at pp. 246:3-247.

Tony Phillips was the bond manager for USF&G's Harrisburg field office whose responsibilities included the overall underwriting of the CCI account and the supervision of Mr. Salazar. He was also responsible for any recommendation made by Mr. Salazar on any bond liability on the account. T. Phillips Depo. at p. 35. Mr. Phillips stated that in the course of underwriting the CCI bond program, he did not fully review

and evaluate the audited financial statements for CCI Construction.  T. Phillips Depo. at p. 443.

Mr. Phillips also testified that it was significant in the underwriting process to know whether the source of a contractor's profit was from construction operations or from other sources.  T. Phillips Depo. at p. 423:9-13.

Mr. Phillips verified USF&G Answers to Defendants [First] Set of Interrogatories. *See* Exhibit I.  In the answers to interrogatories, with respect to the 1997 audit report, USF&G, when asked to identify the inaccuracies or omission contained therein or the manner in which they were misleading stated, *inter alia*, that indirect costs were not properly allocated, no job site visits were performed by Brown Schultz, that there was no independent confirmation of management's representations concerning the percentage of completion, estimated costs to complete and the status of pending change orders.  *See* USF&G Answers to Defendants [First] Set of Interrogatories at No. 8 pp. 14-21.

Similar issues were identified with respect to the 1998 audit report. *Id.* at pp. 24-39.  In addition, USF&G complained that a claim guaranteed by Pennsylvania Contractor's Insurance Company ("PCIC"), a company owned by John Ortenzio, should not have been recorded as revenue and that audit report contained inadequate disclosure with regard to it.  *Id* at pp. 26-27.

US&G did not identify in its interrogatory answers the extent to which purported deficiencies in the audited financial statements would have changed CCI's balance sheet. *Id.*  Mr. Phillips, who verified the interrogatories on USF&G's behalf, testified that, without the benefit of restated financials, he could not make a determination about whether changes to CCI's financial condition would have been material to his underwriting decisions. T. Phillips Depo. at 463:25-464:5.  Phillips further testified that he believed that restated financials for CCI had been prepared by USF&G but that he

had not reviewed them.  Phillips at 464:9-15.

Jim Daily's responsibilities in the 1990's included, among other things, the supervision of underwriting in the field offices. J. Daily Depo. at p. 16.   In connection with that supervisory role, Mr. Daily would handle new account submissions and bond requests up to a certain limit of authority. J. Daily Depo. at p. 17. According to Mr. Daily, the primary responsibility of the field office was to produce the business and  Daily's responsibility was to underwrite it.  J. Daily Depo at. p. 46:12-22.  With regard to bond requests over that limit of authority, Mr. Daily had to seek approval from his boss, David Hussey, to whom Mr. Daily reported. J. Daily Depo. at pp. 17:4-12; p. 43:11-13.  Mr. Daily was unable to state how correct information would affect USF&G's decision to bond CCI.  In that regard Mr. Daily was asked:

> In what way would correct information have affected the decisions by USF&G
> to bond or issue bonds for CCI Construction?

Daily Depo. at p. 275:1-3.  In response he could only state that "we probably wouldn't have given them as much credit as they were getting." Daily Depo. at p. 275:4-5.

Mr. Hussey, the individual with ultimate authority over the account, testified that he did not review any of the Brown Schultz audited financials.  D. Hussey depo. at pp. 130: 20-131:16

### E.    USF&G's Bonding Program for CCI from 1993 through the Fall of 1999

USF&G began its bonding program with CCI in late 1993 or early 1994.  See J. Daily Depo. at p. 335:8-13.  The relationship between CCI and USFG was formed after Fireman's Fund Insurance Company would not underwrite a bond for CCI. Salazar Depo. at p. 93:16-21.  The CCI bond account came to USF&G through the Byerly Agency, an independent agency through whom USF&G marketed its business. S.

Salazar Depo. at p. 63. Dave Dominiani of the Byerly Agency was agent for the CCI account. When Mr. Dominiani left the Byerly Agency in or around 1998 to form DJL Associates, he continued as the agent for the CCI bond program. J. Ortenzio Depo. at p. 73:11-74:12.

At the time USF&G began its bonding program for CCI, the majority of CCI's revenues and receivables were the result of contracts entered into with Continental Medical Systems (CMS) for the construction of rehabilitation hospitals throughout the United States. See December 31, 1993 Financial Statement of CCI at Footnote 8.[8] During 1993 and 1992 CMS accounted for 71% and 83% of CCI's revenues respectively. *Id.* Continental Medical Systems was controlled by John Ortenzio's father, Rocco Ortenzio. *Id.* ; J. Daily Depo. at p. 107:23-108:5. When the USF&G bonding program started, CCI was beginning to enter the hard bid market. J. Daily Depo. at p. 108:5-13.

Early in the bonding relationship between CCI and USF&G, Dave Dominiani, the bond agent, advised Tony Phillips of the following:

> Footnote 9 specifies that in 1992 the company [CCI] incurred warranty insurance expense of $1,000,000 with Pennsylvania Contractors Insurance company (PCIC). Per Dave Barber, CFO, CCI took $1,000,000 from a very successful completed project, Wesley and funded their future warranty expense under PCIC. They did this primarily for tax planning purposes, but also to fund those future warranty expenses with current profits from a very successful project.

USFG/BS 846 (Exhibit 2 to Carson Affidavit). The "Related Party Transactions" footnote in the December 31, 1993 audited financials for CCI also disclosed that PCIC was a corporation under common control and that CCI had incurred warranty insurance

---

[8]The 12/31/93 audited financial statement of CCI is found at as Exhibit H in the Exhibit Binder.

expense of $335,317 and $1,000,000 with PCIC for 1992 and 1993 respectively. See Exhibit H.

On July 14, 1994, Steve Salazar requested information from the bond agent regarding significant profit fades on four jobs then in progress and thin margins on 8 of CCI's projects. USFG/BS 1175. (Exhibit 3 to Carson Affidavit). On July 21, 1994 Dave Dominiani advised Steve Salazar that as of June 30, 1994, CCI would be showing a "small loss." See USFG/BS 870-872 (Exhibit 4 to Carson Affidavit). Dominiani, in that same letter, also acknowledged that the gross margin on many of CCI's project was "very thin." *Id.*

On November 2, 1994, Dominiani reported to Tony Phillips that the 6/30/94 interim financials prepared by CCI showed that CCI sustained a $500,000 loss for the first half of 1994. See USFG/BS 0873-75 (Exhibit 5 to Carson Affidavit). Dominiani informed Phillips that CCI was projecting a loss of approximately $400,000 to $500,000 at year end. *Id.* On December 28, 1994, Jim Daily expressed  concern that CCI's liquid position was less than half of what it had been at 12/31/93 and that there were continuing profit fades. USFG/BS 1102 (Exhibit 6 to Carson Affidavit).

On January 3, 1995, Dominiani advised Steve Salazar that CCI's projected loss for December 31, 1994 remained in the $400,000-$500,000 range. See S. Salazar Depo. Exhibit 13. In addition, Dominiani addressed the concerns raised by USF&G with regard to profit fades on two CCI projects – Lightner Road and Lincoln University. *Id.* In late January, 1995, notwithstanding the loss sustained at mid- year and the projected loss at year end, USF&G issued a bid bond for CCI for the Shady Grove Project without having received the Brown Schultz audited financials for the year ended 12/31/94. USFG/BS 1106 (Exhibit 6a To Carson Affidavit).  At a meeting with CCI on January 31, 1995, again prior to receiving CCI's year end audited financial statements, USF&G agreed  to hold to a $100,000,000 program level. USFG/BS 1111 (Exhibit 6b To Carson

Affidavit).

On April 19, 1995, USF&G's home office received the Brown Schultz audited financials for the year ended December 31, 1994. The 1994 financials indicated a net loss of $317,000 and an operating loss of $864,663. Working capital was $2,384,192 and equity was $4,290,336.[9] In the related party transactions footnote in the 1994 audited financial statements, it again was disclosed that PCIC was a corporation under common control and that there were no warranty insurance costs incurred for 1994. The footnote further disclosed that CCI had submitted a claim to PCIC of $397,800 in 1994 and that the claim was pending as of December 31, 1994.

The December 31, 1994 financial statement also contained the following statement in footnote 1 "Summary of significant accounting policies": "An amount equal to the contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated." The 1994 audited financial statement and all of the audited financial statements thereafter through 1998, also showed earnings from contracts before allocation of indirect costs. The amount of unallocated indirect costs was reflected in the financial statements and was used to determine the cumulative net profit from contracts. Similarly, the completed contracts and contracts in progress schedules clearly show "gross profit before indirect costs" and contract earnings (accrued or earned) before indirect costs.[10]

Each year, after receiving the audited financials for CCI, Steve Salazar prepared an "annual review" describing CCI's results for the year and made a recommendation

_____

[9]A copy of the 1994 Audited Financial Statements is Exhibit J in the Exhibit Binder

[10]Copies of the December 31, 1995 through December 31, 1998 audited financial statements for CCI are found in the Exhibit Binder at Exhibits K through N respectively.

as to a bonding program for the following year.  S. Salazar Depo. at pp. 238-240;
Salazar Depo. Exhibits 7-11.  In his annual review of the December 31, 1994 audited
financials, even though the company sustained a $300,000 net loss for the year and an
operating loss of over $800,000, Salazar recommended continuing with the bond
program for CCI. See, Salazar Depo. Exhibit 8.

   In March 1996,  USF&G received the audited financial statement for the year
ended December 31, 1995.  The financial statement showed a small profit of $103,210
but a loss from operations of $308,362.  Working capital was $4,183,681 and equity
was $4,820,675. See Exhibit K in the Exhibit Binder.  The related party transactions
footnote disclosed that during 1994, CCI submitted a warranty insurance claim of
$397,800 to PCIC, "a company owned by the sole shareholder. This claim was paid
during 1995."  The footnotes to the 1995 audited financials and the subsequent years
also state

   Use of Estimates:
   The preparation of financial statements in conformity with generally accepted
   accounting principles requires management to make estimates and assumptions
   that affect the reported amount of assets and liabilities and disclosure of
   contingent assets and liabilities at the date of the financial statements and the
   reported amounts of revenues and expenses during the reporting period.  Actual
   results could differ from those estimates.

   Revenue and costs recognition:
   . . . Because of inherent uncertainties in estimating costs, it is at least reasonably
   possible that the estimates used will change in the near term.

   . . . An amount equal to contract costs attributable to claims is included in
   revenues when realization is probable and the amount can be reliably estimated.

   The May 3, 1996 Annual Review of CCI Construction prepared by Steve Salazar
showed a Yellow Stress Score and a "Bear Flag F1 -Net Worth less than 10% of work
program. See Salazar Depo. Exhibit 9.  Notwithstanding the loss from operations, in his

annual review, Salazar again recommended continuing the CCI bond program. *Id.*

On May 1, 1997, USF&G received a copy of the audit report for the year ended December 31, 1996. See Complaint at ¶15 . The financial statement reflected net income of $363,124, and for the first time since 1993, an operating profit of $139,097, working capital in the amount of $4,641,702, and equity of $4,802,675. See Exhibit L. Steve Salazar's annual review of CCI dated May 1, 1997, again showed a yellow stress score as of March, 1997 and the following bear flags: A20-gross profit fade factor is greater than 20% and M01-Equity less that 10% of total program. See Salazar Depo. Exhibit 10. Even with the foregoing warning signs, Mr. Salazar recommended that the bonding program be continued. Id.

On June 3, 1997, Jim Daily approved Steve Salazar's request for approval of a bid bond for the $15.9 million Md. D.G.S. Camp Fretterd Armory project. Salazar, in support of his approval request, referenced CCI's in-house financials as of March 31, 1997. See USFG/BS 795-96 (Exhibit 6c to Carson Affidavit.) On June 26, 1997, Salazar requested and received approval from Jim Daily of a bid bond for a $30,000,000 job. USFG/BS 0790. (Exhibit 7 To Carson Affidavit). In August of 1997, Dave Dominiani advised Tony Phillips that John Ortenzio wanted his personal indemnity on the Master Surety Agreement removed. USFG/BS 1233 (Exhibit 8 to Carson Affidavit). Jim Daily consented to the removal of the indemnity. USFG/BS 1120 (Exhibit 9 to Carson Affidavit).

On August 20, 1997 Salazar requested and received approval of a bid bond for an $18,300,000 project at McGuire Air Force Base and, in support of that request cited to the June 30, 1997, CCI in-house financials. USFG/BS 0784. (Exhibit 10 to Carson Affidavit). On December 1, 1997, Steve Salazar requested approval of the $15.7 million Albemarle-Charlottesville Regional Jail bid bond again referencing the June 30, 1997 CCI in house financials in support of his request. USFG/BS 0778 (Exhibit 11 To

Carson Affidavit).  Mr. Daily approved the request as submitted. *Id.*

On March 5, 1998, USF&G received the audited financials for the year ended December 31, 1997. Complaint at ¶ 17.  Income from operations was $350,000. See Exhibit M .  Footnote 5 of the audited financials indicated that $816,000 current notes payable were collateralized by equipment.  There is no evidence that USF&G inquired as to what equipment was purchased and why.  The related party transactions footnote once again disclosed that PCIC was a corporation under common control and that CCI had incurred warranty expense of $825,000 with PCIC.

On April 15, 1998, Steve Salazar prepared his annual review of the audited financials for 1997.  Salazar Depo. Exhibit 11. The annual review again showed a yellow stress score and bear flags "A20-gross profit fade factor is greater than 20%" and "M01-Equity less than 10% of total program. *Id.*  Mr. Salazar recommended continuing the bonding program for CCI. *Id.*

On August 17, 1998, Dave Dominiani wrote to Tony Phillips and advised:
As you can see CCI is reflecting a $1,600,000 loss through six months. However, they will turn that number around by 12/31/98.  I have included with the report the profit projections by project for 1998.  Please kind [sic] in mind that these numbers are conservative and suggest that the projected loss from operations will be approximately $200,000.  This will be offset by investment income and in addition, please remember that we have PCIC available to fund warranty claims if we choose to utilize it. As you are aware, we funded almost $900,000 into PCIC last year for warranty coverages on existing projects.  There is approximately $2,000,000 funded into that insurance vehicle and can be drawn on for warranty claims at any time.  CCI can actually use this as a buffer to offset losses or profit fades on certain jobs during any given year.  That is an additional feature than none of my other contractor's have.

Salazar Depo. Exhibit 1 (emphasis added).

In spite of the significant mid-year loss, USF&G continued with its bonding program.  On December 23, 1998, Dominiani  wrote Tony Phillips wrote outlining CCI's desire to bid on any upcoming $40,000,000 heavy highway project in joint venture with

Fulkroad Construction. T. Phillips Depo. Exhibit 9.  On, January 5, 1999, prior to receipt of the audited financials for December 31, 1998, USF&G met with CCI and Dominiani to discuss the joint venture project. T. Phillips Exhibit 10.

Mr. Phillips was aware as of August 1998 that CCI was self-performing work it had previously subcontracted.  T. Phillips Depo. at p. 439:11-14. Jim Daily testified he became aware in 1998 that CCI was performing work it had previously subcontracted and that he did not think it was a good idea.  J. Daily Depo. at p. 239-40.  Daily testified that a change in business to self perform work which it had previously subcontracted was a genuine risk and would have been of concern to him.  *Id.*  Dave Hussey also became aware of CCI's decision to self perform work during 1998 having been advised of this by Jim Daily.  Hussey Depo. at pp. 83-84.

Daily recommended to Dave Hussey that USF&G not approve bonds for the Fulkroad project because the project was a different kind of work than previously performed by CCI, and because CCI planned to self perform work it previously subcontracted.  Hussey Depo. at pp. 104-106.  Ignoring Mr. Daily's concerns, Dave Hussey approved the bonds for the Fulkroad joint venture. Hussey Depo. at pp. 104-106.

Without having the benefit of the December 31, 1998 audited financial statement, USF&G agreed to support the joint venture bid with CCI's portion of the bid being about $22,000,000. USFG/BS 1271-72 (Exhibit 12 to Carson Affidavit).   USF&G further agreed to handle the CCI account on a 3% working capitol and 5% net worth basis. *Id*.  Daily testified that in committing to bonding for CCI in January of 1999, USF&G relied on representations from CCI as to its financial condition for the coming year. J. Daily Depo. at pp. 416:6-417:11.

On March 1, 1999, Dominiani submitted the December 31, 1998 audited financials to Tony Phillips.  Complaint at ¶ 19. The audited financials showed that while

CCI had made a small profit of $59,015, working capitol decreased to $2.5 million and the company had an operating loss of $116,629. See Exhibit N.

The 1998 audited financial statement also showed underbillings of $6,341,726 representing 36% of total current assets. This was a significant increase from prior years. In 1997, underbillings were $1,072,281 and in 1996 underbillings were $37,663. This increase in underbillings prompted no comment or investigation by USF&G.

The related party transactions footnote in the 1998 audited financials also indicated that PCIC had guaranteed a claim of $1,162,460. *Id.* No inquiry was made by USF&G with regard to this transaction. See Daily Depo. at p. 384.

Notwithstanding the significant increase in underbillings and yet another loss from operations, USF&G continued with the CCI bonding program. In 1999 after receipt of the 1998 audited financials, USF&G issued final bonds on the Phase 1 Laboratory Center (Summerdale) and Cambria County, Bedford County and Cool and Cold Aquaculture projects. See Complaint at ¶ 20.

Even more incredible is that it appears that the first analysis of the 1998 financial statements by USF&G did not occur until August 20, 1999. See Salazar Depo. Exhibit 15. The "Folder Exceptions Report" noted the account's status as "red" because of the following reasons: underbillings were greater than 50% of equity; the folder had five open claim files; equity was less than 10% of the total program; net quick was less than 5% of the total program; the debt to equity ratio was greater that 3 to 1; underbillings were 120% of equity; notes payable were 104.9% of equity; and the indemnity agreement did not include the owner/principal. See Salazar Depo. Ex. 15. Notwithstanding this report, on the very same day the Folder Exceptions Report was generated, Steve Salazar recommended to and received approval from Jim Daily for a bid bond on a $20,000,000 road construction project. USFG/BS 0760 (Exhibit 13 to Carson Affidavit).

21

On August 30, 1999, Dave Dominiani reported that CCI reported that CCI had a loss of $900,000 through the first six months of 1999. See USFG/BS 0945 (Exhibit 14 to Carson Affidavit). Notwithstanding that advice, on September 30, 1999, a performance bond was issued in the amount of $191,083 on the Cool and Cold Aquaculture project. See USFG/BS 0726 (Exhibit 15 to Carson Affidavit).

## III.    Statement of Questions Presented

A.  Whether USF&G can establish a basis for a duty owed by Brown Schultz to plaintiff?

Suggested Answer: No.

B.  Whether USF&G can establish the requirements of Restatement (Second) § 552(2), i.e., that Brown Schultz, prior to releasing its audit report in the years at issue, was aware of the specific bonds to be issued by USF&G during the coming year and that Brown Schultz released its audit reports with the intention of influencing those transactions?

Suggested Answer: No.

C.  Whether USF&G can establish a misrepresentation of material fact in the 1996, 1997 and 1998 audited financial statements of which Brown Schultz was aware or should have been aware?

Suggested Answer: No.

D. Whether, if plaintiff could establish such a misrepresentation, plaintiff can establish the representation was material to USF&G's underwriting of bonds for CCI?

Suggested Answer: No.

E.  Whether plaintiff can establish that it justifiably relied on the 1997 and 1998 audited financial statements in issuing bonds to CCI?

Suggested Answer: No.

## IV.    Argument

## A.    Standard for Summary Judgment

Summary judgment is proper pursuant to Federal Rule of Civil Procedure 56 when

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

A factual dispute is material if it might affect the outcome of the suit under the applicable law. *Donegal Mutual Insurance Company v. Grossman*, 195 F. Supp. 2d 657, 662-63 (M.D. Pa. 2001) *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91. L.Ed. 2d 202, 106 S. Ct. 2505 (1986). A factual dispute is genuine only if there is a sufficient evidentiary basis which would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.*

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations of its complaint. The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Donegal Mutual Insurance Company*, 195 F. Supp. 2d at 663-64, *citing, Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 91 L.Ed. 2d 265, 106 S. Ct. 2548 (1986). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Id.*

## B.    Elements of a Negligent Misrepresentation Claim

In this action, USF&G seeks to recover under a theory of negligent misrepresentation. A negligent misrepresentation claim requires proof of several elements. A cause of action for negligent misrepresentation arises if the proof

23

establishes: 1) a misrepresentation of material fact; 2) made under circumstances in which the person who represented the information should have known, in the exercise of appropriate care, was false; (3) with an intent to induce another to act on the misrepresentation; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bortz v. Noon*, 729 A.2d 555, 561 Pa. 1999); *see also Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994) *citing* Page Keaton, Prosser and Keaton on the Law of Torts § 105 (5ᵗʰ ed. 1984). Furthermore, "like any action in negligence, there must be an existence of a duty owed by one party to another." *Kramer v. Dunn*, 749 A.2d 984 (Pa. Super. 2000) *citing, Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999); *Gibbs*, 647 A.2d at 890. Furthermore, in the absence of privity, a negligent misrepresentation claim can be established only if plaintiff can establish the elements of Restatement (Second) of Torts Section 552. Section 552 provides:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) . . . . The liability stated in Subsection (1) is limited to loss suffered
>
> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) Torts § 552.

### C. Plaintiff Cannot Establish a Basis for a Duty Owed By Brown Schultz To Plaintiff

Under § 552, a duty arises only if there was privity between plaintiff and
defendant, or the defendant had a pecuniary interest in the transaction. *First Options of
Chicago, Inc. v. Wallenstein*, 1994 WL 229554 at * 4 (E.D. Pa.1994). "[T]he
Pennsylvania Supreme Court, in adopting section 552 of the Restatement, did not
intend to eliminate the privity requirement for the maintenance of negligence claims ...."
*In re Phar-Mor, Inc. Securities Litigation*, 892 F. Supp. 676, 693 (W.D. Pa. 1995). The
negligent misrepresentation claim cannot serve as a basis for a third-party to avoid the
privity requirement of a negligence claim:

> In sum, we conclude that the negligent misrepresentation
> claims of plaintiffs are merely cloaked professional
> malpractice claims and that, under Pennsylvania law, privity
> is a requisite element to such claims.

*Phar-Mor*, 892 F. Supp. at 694. "Pennsylvania's strict adherence to the privity rule
would result in a ruling that negligent misrepresentation may not be used to plead
professional negligence claims by persons not in privity with the professional
defendant." *PNC Bank, Kentucky, Inc. v. Housing Mortgage Corp.*, 899 F. Supp.
1399, 1408 (W.D. Pa. 1994).

In *PNC Bank*, the court considered a claim against an accountant for negligent
misrepresentation in connection with the preparation of audited financial records which
were relied upon by a party not in privity with the accountant. In rejecting the claim for
failing to properly audit a company, the court concluded:

> [t]he plaintiffs' claim, although couched in terms of negligent
> misrepresentation, clearly involves the alleged breach by the accountant
> of his obligation to perform audits of HMC financial statement according to
> generally accepted auditing principals. This the very heart of a
> professional negligence claim.

*Id.* at 1407. Accordingly, privity or a pecuniary interest in the transaction, a
misrepresentation, and the failure to exercise appropriate care in the transmission of

the information is required to maintain a negligent misrepresentation claim.

There is no evidence that privity exists between USF&G and Brown Schultz. It is undisputed that Brown Schultz's client, with whom it had a contractual relationship, was CCI, not USF&G.

A third party can maintain a Section 552 action against a professional notwithstanding an absence of privity where the professional had a pecuniary interest in the transaction. See *Eisenberg v. Gagnon*, 766 F.2d 770, 779-80 (3d Cir.    1985) (holding that privity was not required in limited partners' Section 552 action against an attorney who provided opinion letter concerning tax implications of investing in a partnership in which attorney was the general partner.) In *Eisenberg*, the court distinguished negligent misrepresentation actions from ordinary negligence claims on the basis that where an attorney negligently misrepresents facts concerning a transaction in which he has a pecuniary interest

> the action does not hinge on the breach of a duty an attorney owes clients or others in privity, but rests on the more general principles applicable to a seller or other interested party who misrepresents the nature and value of goods. . .

*Eisenberg*, 766 F.2d at 779.

USF&G cannot establish a pecuniary interest in the transaction sufficient to form the basis for a duty owed by Brown Schultz to USF&G. *First Options of Chicago, Inc. v. Wallenstein*, 1994 WL 229554 at * 4 (E.D. Pa.1994), involved a situation in which a lawyer was sued for negligent misrepresentation for information he provided to others. The defendant lawyer provided the information during and in connection with the representation of his client for the transaction. The court refused to allow plaintiff to proceed with a negligent misrepresentation claim since there was no privity and the involvement of the lawyer as a paid professional did not establish a pecuniary interest in the transaction.

26

Here, there is simply no evidence that Brown Schultz's involvement was other than as a paid professional. There is nothing to suggest that Brown Schultz profited or expected to profit from the bond transactions between USF&G and CCI.

Because Plaintiff cannot establish that it was in privity with Brown Schultz or that Brown Schultz had a sufficient pecuniary interest so as to warrant dispensing with the privity requirement, summary judgment should be granted to defendants because plaintiff cannot establish a basis for a duty on the part of Brown Schultz.

**D.    Plaintiff Cannot Establish the Requirements of § 552(2)**

Even if privity is not a requirement under Section 552, the Restatement still limits an accountant's liability for negligent misrepresentation to those third parties who the accountant actually knows will receive the information, and then, only for transactions that are the same as, or substantially similar to, the ones the accountant actually knows will be influenced by the supplied information. *Restatement (Second) of Torts* at § 552(2); *North American Specialty Insurance Company v. Lapalme*, 258 F.3d 35 (1st Cir. 2001). "An accountant remains potentially liable in situations in which he actually knows that a third party recipient of his information will rely on that information in the course of a specific transaction, even though the transaction itself does not transpire as long as it is supplanted by a substantially similar transaction." *Id.* at 40.

*Lapalme* involved a situation strikingly similar to the facts of the instant case. In *Lapalme*, the accounting firm of Dias & Lapalme rendered accounting services to Canty Roofing and Sheetmetal, Inc. Canty, because it was doing repair work on public buildings, was required to post payment and performance bonds. In 1994, North American Specialty Insurance Company inspected Canty's financial records as well as those of Canty's principal and entered into a bonding relationship with Canty. North American required that Canty provide updated financial statements prepared by an independent certified public accountant for each succeeding calendar year. In late

1995, the sole shareholder of Canty sold the company to a group of businessmen. Shortly after the transaction, the accounting firm prepared an independent, review level financial statement which lacked specific information concerning the change in ownership and the notes to the financial statement contained misleading comments that implied the prior owner's continuing participation as sole shareholder. Canty obtained new work on public buildings for which North American issued bonds. North American claimed it relied on the 1995 financial statement in issuing those bonds. Canty foundered under its new owners and defaulted on the bonds. North American, as surety, was forced to step in, which cost it nearly $2,000,000. North American then sued the accountants alleging among other things, negligent misrepresentation, i.e., but for the accountants' omission of accurate ownership information in the 1995 financial statement, it would not have continued furnishing bonds to Canty and would have avoided the ensuing loss.

     The court in the *Lapalme* case held that North American failed to raise facts with regard to whether the accountant actually had knowledge of the critical transactions, i.e., the issuance of the bonds on which Canty defaulted. According to the First Circuit, the critical issue was what the accountants knew about North American's intent to use the statement in deciding whether to maintain a bonding program which involved writing new bonds for Canty in 1996. While the accountants were apparently told that Canty's new owners intended to use the financial statement meet the corporation's obligations for ongoing bonds, there was no evidence that the financial statement would be used to obtain future bonds. The court found no evidence to support the conclusion that the accountants knowingly undertook "the substantial risks inherent in the issuance of future bonds."

     The court also found that defaulted bonds were not transactions which were substantially similar to those that the accountants intended to influence. The court

found that without some evidence that the accountants knew that they were undertaking "additional, open ended liability with respect to future bonds by releasing the financial statement" there was no basis for liability under Section 552.

> Simply because transactions are of the same general nature (e.g. "bonds") is not enough to render them substantially similar for purposes of the Restatement rule. Any other conclusion would make a mockery of the basic premise that underbraces the Restatement rule: that an acquiescent accountant is only deemed to accept the risks of specific transactions that were made known to him in advance (or substantially similar ones).

*Id*. at 44.

While the *Lapalme* court was applying Massachusetts law, as set forth above, Pennsylvania, like Massachusetts, follows the Section 552 with regard to negligent misrepresentation claims. Moreover, cases applying Pennsylvania law, in which liability has been imposed against an accountant, have involved a situation where the accountant knew that the information he was providing would be used for a specific transaction.

For example, in *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F. Supp. 2d 517, (M.D. Pa. 1999), Parente prepared audited financial statements for Sparkomatic for the period from 1990 to 1992. In June of 1993, Sparkomatic and Williams Controls entered in to a Memorandum of Intent for the purchase of certain assets of the Kenco Division. For purposes of the transaction, Sparkomatic engaged Parente to perform audit the Kenco financial statements for the years ended December 31, 1990, 1991 and 1992 and the certify and interim balance sheet dated July 31, 1993.

The *Williams* court found that Pennsylvania would recognize a negligent misrepresentation claim under these facts because Parente knew it was performing its work solely for the sale of the Kenco Division and knew that its work would be relied

upon in this transaction.  According to the court,

> Parente was not performing services generically for its client; rather, its work was specifically requested for a sales transaction. . . .  This case does not present the specter of near limitless liability caused by the accountants knowledge "of the ever present possibility of repetition to anyone, and the possibility of action in reliance upon [the information] on the part of anyone to whom it may be repeated."  Restatement (Second) of Torts § 552 cmt. h.  Indeed it presents a scenario sufficiently approaching privity as to warrant liability.

*Id.* at 534.  The *Williams* court like the court in *Lapalme* indicated that an accountant could have liability where the information provided to a third party was provided in connection with a specific transaction of which the accountant was aware and where the accountant knew that the information would be relied upon by the third party in connection with *that transaction.*

In the instant case, as in *Lapalme*, plaintiff cannot establish that Brown Schultz had actual knowledge of and intended to influence the issuance of the bonds which are the subject of this litigation.  Brown Schultz was aware that USF&G received  a copy of the audited financials was provided by CCI to USF&G.  However, there is no evidence that Brown Schultz knew of the specific purpose for which USF&G intended to use the financial statements or had knowledge of the specific bonds to be underwritten by USF&G on CCI's behalf.  See, C. Rebinski Depo. at p. 41:2-20; D. Bowman Depo. at p. 38:22-39:18; B. Brown Depo. at p. 22:20, 25:12.  John Ortenzio, CCI's president and sole shareholder, when asked if he made Bruce Brown aware of the reasons the bonding company was requiring the audited financial statements testified:

> I think the only reason I would have communicated to Bruce Brown was because that's what they wanted. They wanted audited financials and that's what we gave them.

Ortenzio Depo. at p. 44:18-24; 20:7-8.  CCI's audited financial statements were not even given by Brown Schultz directly to USF&G.  Sheri Phillips Depo. at p. 88:15-22.  Brown Schultz sent copies of the audited financials to CCI.  *Id.* CCI then provided its

audited financial statements to the bonding agent. USF&G received the audited financial statements from the bonding agent. *Id.* Nor was there any contact or communication between USF&G and Brown Schultz. J. Daily Depo. at p. 125:17-20; T. Phillips Depo. at p. 184:13-17; S. Salazar Depo. at p. 70-71.

There is nothing to suggest that prior to releasing its audit report in any of the years at issue, the nature of the bonding program with USF&G or the specific bonds to be issued during that year were discussed or even disclosed to Brown Schultz. There is no evidence to suggest that Brown Schultz in issuing its audit reports at year end did so with the intention of influencing those transactions and with the understanding that it was undertaking open ended liability for all bonds issued during that year.

Plaintiff cannot establish that Brown Schultz was provided information about any transactions before it provided the financial statements. Plaintiff cannot establish that USF&G's issuance of the particular bonds in 1996, 1997, 1998 and 1999 upon which CCI defaulted, constituted transactions that Brown Schultz knew of, actually sought to influence, or, were substantially similar to transactions of which Brown Schultz was aware and sought to influence. There is nothing to suggest that Brown Schultz was informed that USF&G intended to use the audited financial statements as a basis for evaluating whether to issue any specific future bond.

There is no evidence that Brown Schultz knew that they were undertaking open-ended liability with respect to future bonds by releasing the audited financial statement in each of the years at issue. As such, Plaintiff cannot establish a duty under Section 552 of the Restatement on the part of Brown Schultz with regard to the bonds. Summary judgment should be granted in favor of defendants.

**E.    Plaintiff Cannot Establish a Breach of Duty by Defendants**    Under Pennsylvania law, in order to establish a claim for negligent misrepresentation, *inter alia,* plaintiff must show a misrepresentation of material fact made under circumstances

31

in which the person who represented the information should have known, in the exercise of appropriate care, was false. *Bortz v. Noon*, *supra*, 729 A.2d at 561. Plaintiff cannot establish these required elements with regard to the audited financials statements at issue.

### 1.     The 1996 Audited Financials

A person is not a guarantor of the correctness of the statements he provides. Rather, a person is liable for negligent misrepresentation only if "he has failed to exercise the care or competence of a reasonable man in obtaining or communicating the information."  Restatement (Second) of Torts § 552, comment on § 1 (e).  An audit

> does not guarantee that a client's accounts and financial statements are correct any more than a sanguine medical diagnosis guarantees well-being; indeed, even an audit conducted in strict accordance with professional standards countenances some degree of calibration for tolerable error which, on occasion, may result in a failure to detect a material omission or misstatement.  Rather, the "objective of the ordinary examination of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present financial position, results of operations, and changes in financial position in conformity with generally accepted accounting principles."  In other words, in issuing an opinion, the auditor certifies only that it exercised appropriate, not flawless, levels of professional care and judgment.

*In re IKON Office Solutions, Inc.*, 277 F.3d 658 (3d Cir. 2002)(citations omitted).

Proof of negligent misrepresentation depends on expert testimony or other evidence of a failure to exercise ordinary care.  *Bortz v. Noon*, 729 A.2d at 563 (expert testimony or other competent evidence of appropriate care required to establish a breach of duty for a negligent misrepresentation claim). The standard of care in Pennsylvania malpractice cases is measured by the skill generally possessed and employed by practitioners of the profession. See *Incollingo v. Ewing*, 444 Pa. 263, 276 n. 6, 282 A.2d 206, 214, 444 Pa. 299 n. 5a (1971); *Smith v. Yohe*, 412 Pa. 94, 99, 194 A.2d 167, 170 (1963); *National Cash Register v. Haak*, 233 Pa. Super. 562, 335 A.2d

32

407 (1975). Expert testimony is required to establish the relevant standard and whether the defendant complied with that standard. *Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474 (3d Cir. 1979).   The plaintiff has the burden to present expert testimony to establish that the defendant's actions failed to meet the appropriate standard of care. *Gans v. Mundy,* 762 F.2d 338, 343 (3d Cir. 1985) (interpreting Pennsylvania law) *cert. denied* 474 U.S. 1010, 88 L. Ed. 2d 467, 106 S. Ct. 537 (1985); *Freeman v. Murray*, 163 F. Supp. 2d 478 (M.D. Pa. 2001). The requirement of expert testimony applies to malpractice actions against members of all professions. See *Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474 (3d Cir. 1979); *Powell v. Risser*, 375 Pa. 60, 65, 99 A.2d 454, 456 (1953).

Plaintiff cannot establish that the 1996 financial statements were negligently prepared or contained any incorrect information or misrepresentation of the financial condition of CCI.  Plaintiff's expert, Stephen DeBruyn, in his report, identifies no misstatements or misrepresentations in the December 31, 1996 financial statements and offers no opinion that the audit work for the December 31, 1996 financial statements was not done in accordance with Generally Accepted Auditing Standards ("GAAS") or that Brown Schultz failed to conform to Generally Accepted Accounting Procedures ("GAAP").

Here expert testimony is required to establish the standard of care and whether Brown Schultz complied with it.  See, *Lentino*, 611 F.2d 474 (3d Cir. 1979).  Plaintiff cannot establish Brown Schultz in the course of its work in connection with the 1996 audited financials misrepresented the financial condition of CCI or that the audit work

---

[11]The court must be careful to distinguish between a negligent misrepresentation claim from a negligence claim.  Although not asserted by plaintiff, plaintiff cannot base a claim on negligence due to the bar imposed by the economic loss rule.  As a general

done by Brown Schultz was not in accordance with the standard of care. [11]

Summary judgment should be granted to Defendants with regard to the 1996 audited financials and with regard any damages allegedly resulting to USF&G from bonds issued in reliance thereon.

### 2.    The 1997 Audited Financials

Plaintiff fails to identify any incorrect information in the 1997 audited financial statements. While plaintiff's expert has indicated that the financials for both 1997 and 1998 should be restated, there is nothing in his report that establishes a basis for the restatement in either year. Federal Rule of Civil Procedure 26(b) requires that the expert give the basis for his opinion. Plaintiff's expert, however, does not give any basis for his opinion that the "negligent audit work performed by Brown Schultz resulted in an overstatement of both income and equity in the amount of $815,960 for 1997 and $3,126,508 for 1998."

Plaintiff's expert report identifies the following deficiencies with the 1997 audited financial statements:

---

rule, a plaintiff cannot recover strictly economic loss which is not the result of bodily injury or property damage on a negligence cause of action. East River Steamship Co. v. Transamerica Delaware, Inc., 476 U.S. 858, 106 S.Ct.2295, 90 L.Ed.2d (1986); Aikens v. Baltimore and Ohio Railroad Co., 348 Pa.Super. 17, 501 A.2d 277, 278, Lower Lake Dock v. Messinger Bearing, ___Pa.Super.___, 577 A.2d 631, 635 (1990); PPG Industries, Inc. v. Sundstrand Corp., 681 F.Supp. 287, Palco Linings, Inc. v. Pavex, Inc., 755 F.Supp. 1269, 1275 (M.D.Pa. 1990); Margolis v. Jackson, ___Pa.Super.___, 543 A.2d 1238 (1988). "[T]he economic loss doctrine bars a plaintiff from bringing a negligence action solely for economic losses absent physical injury or property damage." I & S Associates Trust v. Lasalle National Bank, 2001 U.S. Dist. LEXIS 17049, *9 (E.D.Pa. 2001), citing, Ellenbogen v. PNC Bank, 1999 Pa. Super. 131, 731 A.2d 175, 188 (1999). The economic loss doctrine is designed to "maintain[ ] the separate spheres of the law of contract and tort." New York State Elect. & Gas. Corp., 387 Pa. Super. 537, 564 A.2d 919 (1989)(en banc). Therefore, plaintiff cannot recover for strictly economic loss.

- Brown Schultz failed to properly identify the risks associated with CCI and because of this Brown Schultz's audit programs and audit fieldwork were inadequate to provide the required assurance that the Audit Reports were fairly presented in accordance with GAAP;

- Inadequate audit procedures were performed by Brown Schultz in areas of contracts in progress;

- The financial disclosure checklist included in the audit workpapers does not appear to be reviewed and job site visits were not done and considerations not documented

Mr. DeBruyn then simply states that Exhibit B-1 to his report is a comparison of CCI's balance sheets and income statements containing "those adjustments warranted as a result of the above defects and deficiencies in the procedures for an preparation of the Audit Reports" for the fiscal year ended December 31, 1997. DeBruyn Report at p. 7. The report is devoid of any explanation as to what specifically is the basis for the restatement for 1997 let alone his claim that the restatement found at Exhibits B-1 is warranted. Plaintiff's expert report is inadequate to establish a misrepresentation of material fact with regard to the 1997 audit report made under circumstances in which Brown Schultz should have known, in the exercise of appropriate care, was false.

An expert report cannot serve as substantive evidence in those instances in which the report does not disclose sufficient information and explanation for the court to determine the validity of the opinions expressed in the report. *Medical Consultants Network, Inc. v. Cantor & Johnston, P.C.*, 2000 U.S. Dist. LEXIS 19279 at 10-11 (E.D. Pa. 2000)(The expert report however, does not include an explanation or reference to the analysis ... . Therefore, [the expert's] report does not comply with the requirements of Rule 26 and for that reason as well, his testimony on the topic he described ... is inadmissible."); *Collins v. Prime Table Rest. & Lounge Inc. (In re Lake States*

*Commodities, Inc.*, 271 B.R. 575, 587 (N.D. Ill. 2002). Additionally, the testimony of an expert witness whose report does not comply with F.R.C.P. 26(a)(2)(B) concerning detailed required disclosures is not admissible under F.R.E. 702 since the reliability factors cannot be determined and summary judgment is properly granted if the expert's testimony was essential to sustain the burden of proof to survive summary judgment. *Dunkin' Donuts Inc. v. Patel*, 174 F. Supp. 2d 202, 213 (D.N.J. 2001); *see also, Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996)

("nothing causes greater prejudice than to have to guess how and why an adversarial expert reached his or her conclusion.") Plaintiff's expert report fails to comply with the requirements of Rule 26 and, therefore, his testimony with regard to the standard of care and the manner in which it was not complied with by defendants should be inadmissible.

Without Mr. De Bruyn's report, plaintiff cannot establish the necessary elements of a negligent misrepresentation claim with regard to the 1997 year end audited financials, summary judgment should be granted with regard to this year as well.

### 3.    The 1998 Audited Financials

Plaintiff's expert, in connection with the 1998 audited financial statements, also fails to provide an explanation or analysis for his opinion that the "negligent audit work performed by Brown Schultz resulted in an overstatement of both income and equity in the amount of . . . $3,126,508 for 1998."

Plaintiff's expert has the same complaints with regard to the audit work performed by Brown Schultz for the 1998 year end audit as those listed in connection with the 1997 audit. In addition, plaintiff's expert contends that:

- There was an inappropriate recording and inadequate disclosure of related-party transaction between PCIC and CCI, a party related to CCI;

- There was a lack of documentation of time to indicate the partner in

36

charge participated in the audit planning in 1998; and

- The 1998 search for unrecorded liabilities did not go through the last day of fieldwork.

As with 1997, Mr. DeBruyn simply states that Exhibit B-2 is a comparison of CCI's balance sheet and income statement containing "those adjustments warranted as a result of the above defects and deficiencies in the procedures for an preparation of the Audit Reports" for the fiscal year ended . . . December 31, 1998." DeBruyn Report at p. 7. As with the 1997 audit report, Mr. DeBruyn provides no explanation as to what specifically is the basis for the restatement for 1998 let alone a basis for his claim that the restatement found at Exhibits B-2 is warranted. Plaintiff's expert report is inadequate to establish a misrepresentation of material fact with regard to the 1998 audit report made under circumstances in which Brown Schultz should have known, in the exercise of appropriate care, was false. For the reasons set forth above in connection with the 1997 audited financials, Plaintiff's expert report fails to comply with the requirements of F.R.C.P. 26 and, therefore, his testimony with regard to the standard of care and the manner in which it was not complied with by defendants should be inadmissible. Again, without Mr. De Bruyn's report, plaintiff cannot establish the necessary elements of a negligent misrepresentation claim with regard to the 1998 year end audited financials, summary judgment should be granted with regard to this year as well.

**F.    Plaintiff Cannot Establish There Were Material Misrepresentations In the 1997 and 1998 Audited Financial Statements**

USF&G, in order to succeed on its negligent misrepresentation claim, must establish that the misrepresentation was material. *Bortz v. Noon, supra.*, 729 A.2d at 561. With respect to both the 1997 and 1998 audited financials, even if plaintiff's expert report is admissible, USF&G cannot establish that the misrepresentations were such

that plaintiff would not have underwritten the bonds it contends it issued in reliance upon those financial statements.

USF&G's underwriters testified that there was no specific underwriting criteria pursuant to which bonds issued on CCI's behalf were underwritten. See e.g., S. Salazar Depo. at p. 58. There were no requirements that a contractor have a particular net worth, cash position or profitability. Salazar depo. at p. 38. Mr. Salazar could not state what changes to CCI's operations, balance sheet, working capitol or work-in-progress could be tolerated before it would have had an impact on underwriting. Salazar Depo. at pp. 246-247.

Mr. Phillips, Mr. Salazar's supervisor, could not make a determination about whether changes to CCI's financial condition would been material to his underwriting decisions without the benefit of restated financials which he had not seen. T. Phillips Depo. at pp. 463-464.

Mr. Daily, the home office underwriter charged with overseeing Mr. Salazar's and Mr. Philips' underwriting of the CCI account could not identify how "correct" information would have affected USF&G's decision to bond CCI. At most, he could state "we probably wouldn't have given them as much credit as they were getting." Daily Depo. at p. 275:1-5.

In addition, USF&G continued to bond CCI when it was aware that CCI had sustained a loss in 1994 and losses from operations in 1994, 1995 and 1998. USF&G continued to bond CCI after August 17, 1998 when it was notified that CCI's interim financials showed that the company sustained a $1,600,000 loss through the first six months of 1998.

Finally, even though the audited financials for December 31, 1998 showed an increase in underbillings from a little over a million dollars in 1997 to over $6,000,000 as of December 31, 1998, USF&G continued to issue bonds on CCI projects.

USF&G cannot establish that any misrepresentation of CCI's financial condition contained in the 1997 or 1998 audited financials would have been material to its decision to continue bonding CCI. It is not the situation that the change in financial placed CCI beyond required minimum criteria. There were no criteria or requirements which CCI had to meet to gain bond approval. USF&G did not impose or observe any requirements. USF&G had no instance during the entire relationship when it withheld bond approval based on the financial condition of CCI. Plaintiff cannot possibly establish that changes to the financial statements would have led plaintiff to withhold surety credit.

While this is true for both years it is particularly evident with regard to the 1997 audited financials. Even if there were a basis for Mr. DeBruyn's proposed restatement of the December 31, 1997 balance sheet, equity for 1997 would still have been $4,638,834. This amount is greater that the equity reported for CCI in either 1994 or 1995.[12] Compare DeBruyn Report at Exhibit B-1 to the December 31, 1994 and December 31, 1995 audited financials.

Similarly, as restated in plaintiff's expert report, CCI's working capitol would have been $3,183,138. This was greater than the working capitol in either 1994 or 1998.[13]

USF&G continued its bonding program for CCI in both 1994 and 1995 when the equity was less than that which is shown on the restated financials of plaintiff's expert. USF&G continued bonding CCI after the 1994 and 1998 year end financials showed the company had less working capitol than that which is indicated on plaintiff's expert report for 1997.

---

[12]Equity for CCI in 1994 was $4,290,336 and in 1995 was $4,501,729.
[13]Working capitol as of 12/31/94 was $2,384,192 and as of 12/31/98 was $2,557,367.

Given the lack of underwriting criteria and its willingness to issue bonds on CCI's behalf when the company had sustained operating losses or overall losses both at mid-year and year end, Plaintiff cannot establish that any misrepresentation with regard to CCI's financial condition would be material to its decision to issue bonds to CCI. Plaintiff certainly cannot establish that the "misrepresentations" identified by its expert for the financial statements for the year ended December 31, 1997 were, in any way, material to its underwriting decisions with regard to bonds purportedly issued in reliance thereon. Plaintiff cannot prove that any of the purported "misrepresentations" regarding CCI's financial condition were material. Plaintiff, therefore, cannot establish a necessary element of its negligent misrepresentation claim and summary judgment should be granted in favor of defendants.

G.    **Plaintiff Cannot Establish that It Justifiably Relied on the 1997 and 1998 Financial Statement In Issuing Surety Bonds.**

Plaintiff must show that it justifiably relied on the 1997 and 1998 financial statements in order to establish its claim for negligent misrepresentation. *Bortz v. Noon*, 729 A.2d at 561. Justifiable reliance requires consideration of the relationship of the parties involved and the nature of the transaction.  See *Rempel v. Nationwide Life Ins. Co., Inc.*, 471 Pa. 404, 409, 370 A.2d 366 (1977).

In this case, plaintiff cannot establish actual or justifiable reliance on the 1997 and 1998 audited financial statements in making its bonding decisions.  First, Mr. Phillips, whose responsibility it was to review and approve Mr. Salazar's recommendations with regard to CCI's bonding program did not fully review and analyze the statements.  Mr. Hussey, who was the ultimate authority at USF&G with regard to the CCI account, testified that he did not read any of the audited financial statements for CCI.

Second, one of USF&G's complaints with regard the 1997 and 1998 financial statements is that there were inadequate audit procedures performed by Brown Schultz to determine the accuracy of CCI's estimated costs to complete on contracts in progress. See DeBruyn Report. Plaintiff does not identify the projects as to which it contends the estimated costs to complete were inaccurate.  However, in any event, the footnotes to the audited financial statements for each year beginning in 1995 contained the following language:

Use of Estimates:

> The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  <u>Actual results could differ from those estimates</u>.

Revenue and costs recognition:
> . . . Because of inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates used will change in the near term.

The fact that certain of numbers in the 1997 and 1998 audited financials were estimates and, therefore, could change was disclosed. The fact there are "inherent uncertainties" in estimating costs and that it is possible that the estimates could change in the "near term" was also disclosed.  There is no justification for USF&G's reliance on these estimates as absolutes.

With regard to the 1997 audited financials, it is clear that USF&G was aware that the statements were only accurate as to the financial condition of CCI as of the closing date of the statement.  See S. Salazar Depo. at p. 99. USF&G also received interim

financial information prepared by CCI on either a quarterly or bi-annual basis. *Id.* at p.
98. CCI also provided USF&G with monthly or quarterly work in process information on
its construction projects.  Daily Depo. at pp. 217:24-218:10; Salazar Depo. at p.
98:20-25.  Mr. Salazar's purpose in reviewing the interim information was to see how
the contractor was doing during the year. He relied on the interim financials along with
the CPA year end financials to make underwriting decisions.  Salazar Depo. at  p. 99.

        USF&G did not reasonably rely on audited financial statements in issuing bonds
where it had more recent interim information.  For example, plaintiff claims it relied upon
the December 31, 1997 financial statement in issuing bonds on the Outlook Westerville,
James River, and VCU Life Science Building projects.  See Complaint at ¶ 18.  The
bonds for Outlook Westerville were issued on September 27, 1998.  *Id.*  The bonds for
James River were issued on January 7, 1999.  *Id.* The bonds for the VCU Life Science
Building were issued on January 15, 1999.  *Id.*  Each of these sets of bonds were
issued after USF&G received interim CCI financials indicating that CCI had sustained a
$1.6 million dollar loss as of June 30, 1998. See Salazar Depo. Exhibit 1.  These bonds
were also issued long after the information contained in the December 31, 1997 audited
financials was stale.   Plaintiffs reliance on the 1997 audited financial statements with
regard to these bonds was clearly not justified.

        Plaintiff complains that in the December 31, 1998 financial statement, there was
inappropriate recognition of revenue in 1998 and inadequate disclosure with regard to a
related party transaction with PCIC.  PCIC guaranteed a claim of CCI in the amount of
$1,162,460.  The related part transaction footnote in the 1998 financials states:

> During 1997, the company incurred warranty insurance expense of $825,000
> with Pennsylvania Contractors Insurance Company, a corporation under
> common control.  These costs are allocated as direct cost of contracts.  There
> were no such costs in 1998.
>
> During 1998 two insurance claims for contract losses incurred of $900,000 were
> paid by Pennsylvania Contractors Insurance Company.  There claims were

covered under the terms of a remedial work period insurance policy.

In addition, Pennsylvania Contractors Insurance Company has guaranteed a claim of $1,162,460 filed by the Company with a contract owner. If the owner fails to pay all or any part of this claim, the insurance company will pay the unpaid portion.

In addition, the audited financials disclosed as early as 1993 in the footnotes regarding related party transactions that CCI and PCIC were both owned by John Ortenzio and CCI was incurring warranty expense or receiving payments on warranty claims from PCIC. In addition, USF&G was aware of the existence, nature, and purpose of PCIC as a result of correspondence from its agent, Dave Dominiani. USF&G was aware that PCIC could be used to enhance CCI's profitability. Finally, it was clear from the footnote that as of the date of the financial statement, the claim had not yet been paid by either the owner or PCIC. It was equally clear from footnote 1 to the financial statement that the amount of the claim was included in revenue:

. . . An amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.

USF&G had sufficient information from the audited financials and other sources to understand of the circumstances concerning $1,162,460 claim guaranteed by PCIC and to make a determination as to how it wished to take that information into account when underwriting future bonds.

USF&G did not justifiably rely on the December 31, 1998 financials in continuing CCI's bonding program. A significant increase in underbillings was evident from the 1998 financials which USF&G now claims was indicative of a problem and warranted further investigation on the part of Brown Schultz. There is no evidence that USF&G, upon receipt of the 1998 financial statements made any inquiry to its agent or CCI with regard to the cause of the significant increase in underbillings.

In addition, USF&G did not analyze the 1998 financial statements until August

20, 1998.   As such, USF&G did not in fact or  justifiably rely on the 1998 financial statement with regard to its decision to issue to bonds prior to August 20, 1998, which include all of the bonds plaintiff contends it issued in reliance upon the December 31, 1998 audited financial statements with the exception of the Cool & Cold Aquaculture (Buried Process Water Lines) project. See Complaint at ¶ 20.

The bonds issued on the Cool & Cold Aquaculture (Buried Process Water Lines) project were not issued until September 30, 1999 which was after USF&G received notice that CCI had sustained a significant loss for the first six months of the year and was projecting a loss at year end.  See USFG/BS 0945-946 (Exhibit 14 to Carson Affidavit). USF&G had sufficient information when issued bonds after August 20, 1999 to realize the financial condition of CCI had significantly deteriorated. Its reliance at that time on the December 31, 1998 audited financials was not reasonable in light of the more recent CCI prepared financial information available to it indicating changes to CCI's financial condition.

Based on the foregoing, USF&G cannot establish that it reasonably or justifiably relied on the 1997 and 1998 audited financial statements in issuing bonds on behalf of CCI, a necessary element of its negligent misrepresentation claim.  As such, summary judgment should be granted in favor of defendants and against USF&G.

## V.    Conclusion

Based on the foregoing, defendants, Bruce J. Brown and Brown, Schultz, Sheridan & Fritz request that the court enter summary judgment favor of defendants and against plaintiff.

Respectfully submitted,

SWARTZ, CAMPBELL & DETWEILER

BY: *Kazleen M. Carson*

44

Jeffrey B. McCarron
Kathleen M. Carson
1601 Market Street
Philadelphia, PA 19103
Attorneys for Defendants

Dated: September 16, 2002

## CERTIFICATE OF SERVICE

I, Kathleen M. Carson, Esquire, counsel for defendants, Bruce J. Brown and

Brown, Schultz Sheridan & Fritz, hereby certify that a copy of defendants' brief

in support of their motion for summary judgment and the exhibits thereto were

served upon all counsel listed below by  first class U.S. mail, postage prepaid or

overnight mail as indicated below on September 16, 2002.


Peter Speaker, Esquire          BY FIRST CLASS MAIL
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA 17101

Peter B. McGlynn, Esquire VIA FEDERAL EXPRESS
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA 02110



*Kathleen M. Carson*
Kathleen M. Carson



Date: September 16, 2002