UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff | ) ) ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | ) ) ) ) ) | JUDGE CONNOR |

JUDGE CONNOR

MJSmyser ✓

**FILED**
HARRISBURG, PA

OCT 1 0 2002

MARY E. D'ANDREA, CLE[R]
Per_____
Deputy Clerk

**UNITED STATES FIDELITY AND GUARANTY COMPANY'S
RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 56.1, the plaintiff, United States Fidelity and Guaranty Company

("USF&G"), hereby responds to the Defendants' Statement of Material Facts as follows:

Brown Schultz Statement No. 1.[1]

This an action for negligent misrepresentation.

**Response No. 1.**

Admit.

Brown Schultz Statement No. 2.

USF&G issued payment and performance bonds to CCI Construction Company ("CCI").
CCI was a contractor engaged in public and private construction work. Complaint at ¶ 6.

---

[1] *The various statements labeled "Brown Schultz Statement No." are direct quotations taken from the Defendants'
Statement of Material Facts. So as to maintain accuracy, USF&G has endeavored not to alter any typographical
errors, grammatical mistakes or erroneous citations contained in the original as filed and served by Brown Schultz.*
USF&G has, however, renumbered various footnotes in the original that indicate that copies of certain documents
referenced by Brown Schultz are contained in an exhibit binder filed by Brown Schultz. The footnotes in this
pleading that were taken from Brown Schultz' original statement of material facts are italicized.

**Response No. 2.**

Admit.

Brown Schultz Statement No. 3.

Brown Schultz was CCI's auditor during the entire period USF&G issued bonds on CCI's behalf.  See J. Ortenzio Depo. at p.25: 2-18; 28: 4-30; 21.[2]

**Response No. 3.**

Admit.

Brown Schultz Statement No. 4.

USF&G contends it  sustained damages as a result of  alleged negligent misrepresentations contained in audited financial statements prepared by Brown Schultz for CCI Construction Company for the years ended December 31, 1996, December 31, 1997, and December 31, 1998. See Complaint.

**Response No. 4.**

Admit.

Brown Schultz Statement No. 5.

USF&G contends that it would not have issued 18 sets of payment and performance bonds had the foregoing audited financial statements correctly reflected the financial condition of the CCI.  See Complaint at  ¶ 16, 18, 20, 28.

**Response No. 5.**

Admit.

Brown Schultz Statement No. 6.

Plaintiff contends that it issued the following bonds in reliance on the December 31, 1996 audit report:

| Project | Bond Number |
|---|---|
| Johnstown Air Traffic Control Tower | 26-0120-41362-97-1 |
| Lord Fairfax Community College | 26-0120-41364-97-4 |

---

[2] *Pertinent portions of the deposition of John Ortenzio are found at Exhibit A of the binder of exhibits submitted in support of this motion (hereinafter Exhibit Binder)*

| | |
|---|---|
| Albemarle-Charlottesville Regional Jail | 26-0120-12995-98-7 |
| Outlook Point at Hilliard | 26-0120-13008-98-0 |

Complaint at ¶ 16.

**Response No. 6.**

    **Admit.**

Brown Schultz Statement No. 7.

    The bonding for the "Perry Point" project was issued on February 13, 1998.  See USFG/BS 0727 (attached as Exhibit 1 to Carson Affidavit.)[3].

**Response No. 7.**

    **Admit.**

Brown Schultz Statement No. 8.

    The bonds for the "Perry Point" project were issued prior to receipt by USF&G of the audit report for December 31, 1997. See Complaint at ¶ 17.  As such, to the extent USF&G relied on any Brown Schultz Audit Report for these bonds it would have to be the 1996 Audit Report.

**Response No. 8.**

    **Admit.**

Brown Schultz Statement No. 9.

    USF&G contends that it issued bonds on the following projects in reliance on the December 31, 1997 audit report:

| Project | Bond No. |
|---|---|
| Scott Air Force Base - Air Craft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 |
| Germplasm Center | 26-0120-28306-98-1 |

---

[3] *The Affidavit of Kathleen Carson is Exhibit B in Exhibit Binder.*

| | |
|---|---|
| PA Turnpike-Kost Road Central Administration Bldg. Renovation | 26-0120-40371-99-1 |
| Outlook Point at Chesterfield | 26-0120-28307-98-8 |
| Outlook Point at Westerville | 26-0120-28312-98-1 |
| James River Juvenile Detention Center | 26-0120-08946-99-2 |
| Va. Commonwealth Univ. Life Sciences Building | 26-0120-08953-99-9 |

Complaint at ¶ 18.

**Response No. 9.**

   **Admit.**

Brown Schultz Statement No. 10.

   USF&G alleges that it issued bonds on the following projects in reliance on the December 31, 1998 audit report:

| Project | Bond No. |
|---|---|
| SR II Perry County-Excavation, Presplit Blasting | 26-0120-08953-99-9 |
| Cambria County State Route 22 | 26-0120-08959-99-7 |
| Bedford County State Route 30 | 26-0120-08963-99-4 |
| Summerdale Sitework Laboratory Centers for Excellence | 26-0120-08958-99-1 |
| Cool & Cold Aquaculture | 26-0120-08961-99-1 |
| Cool & Cold Aquaculture-Buried Process Water Lines | 26-0120-40396-99-3 |

Complaint at ¶ 20.

## Response No. 10.

Admit.

Brown Schultz Statement No. 11.

Plaintiff's expert, Steven DeBruyn, CPA does not opine that the audit work performed by Brown Schultz for CCI for the year ended December 31, 1996 contained any misstatements or omissions. See DeBruyn Expert Report.[4]

## Response No. 11.

**Denied. It is inaccurate to state that Steven J. DeBruyn, CPA ("DeBruyn") did not opine that the audit work performed by Brown Schultz relative to the 1996 Audit Report contained no "misstatements or omissions." DeBruyn opined as to the 1996 Audit Report that, *inter alia*, Brown Schultz omitted to perform adequate testing of cost controls, omitted testing of unrecorded liabilities for job related expenses, failed to substantiate documentation for CCI's representations, and failed to provide evidence that it read one or more of the contracts for guarantees.[5]**

Brown Schultz Statement No. 12.

Plaintiff's expert does not opine that there was any violation of GAAS or GAAP in connection with the audits for December 31, 1997 and December 31, 1998. Rather, he states that the audit work for the years ended December 31, 1997 and December 31, 1998 did not conform to the "standard of care of a Certified Public Accountant" and that this resulted in material misstatements in the 1997 and 1998 audit reports. DeBruyn Report.

## Response No. 12.

**Denied. The statement is a misleading and inaccurate recitation of both the pertinent law and the salient facts. In many aspects, it is irrelevant whether or not Brown Schultz complied with GAAS or GAAP. The proper test - and the only one material to the**

---

[4] *A copy of the DeBruyn Report is Exhibit C in the Exhibit Binder.*
[5] Expert Report of Steve J. DeBruyn, CPA ("DeBruyn Report"), p. 5 and 6, attached to Affidavit of Bruce Levin, Esq. ("Levin Affidavit") as Exhibit "3"; Affidavit of Steve J. DeBruyn, C.P.A. in opposition to Defendants' Motion for Summary Judgment ("DeBruyn Affidavit"), ¶8.

instant litigation - is whether or not Brown Schultz' work conformed to the standard of care of a Certified Public Accountant.  DeBruyn opined that the work did *not* comply with that standard.[6]  Of course, Brown Schultz's violation of these standards may be evidence of its failure to comply with applicable professional standards.  *Rhode Island Hospital Trust Nat'l Bank v. Swartz, Bresenoff, Yavner & Jacobs*, 455 F.2d 847 (4th Cir. 1972).  Moreover, although the DeBruyn Report does not identify specific breaches of GAAP by reference to the applicable standard, he indicates in the DeBruyn Report numerous instances in which recognized GAAS standards were violated.  For example, the DeBruyn Report indicates that the audit work performed by Brown Schultz for the years 1997 and 1998 did not conform to applicable standards of care for a Certified Public Accountant.  Such a failure is a violation of the GAAS requirement that "[d]ue professional care is to be exercised in the performance of the audit and the preparation of the report.  SAS no. 1, AU section 230.[7]  In the DeBruyn Report he also opines that field work was not adequately planned and supervised.[8]  Such failure violates GAAS.  SAS no. 22, AU section 311.[9]  Mr. DeBruyn also opines that sufficient competent evidential matter was not obtained.  This, too, violates GAAS.  SAS no. 31, AU section 326.[10]  Further, in the Supplemental and Rebutted Expert Report of Steve J. DeBruyn (the "DeBruyn Supplement") served on Brown Schultz on or about September 20, 2002, DeBruyn identifies various violations of GAAS.[11]

---

[6]  DeBruyn Report, p. 3, attached to Levin Affidavit as Exhibit "3"; DeBruyn Affidavit, ¶7-8.
[7]  A copy of SAS no. 1 AU section 230 is attached to the Levin Affidavit as Exhibit "23."
[8]  DeBruyn Report p. 3-7, attached to Levin Affidavit as Exhibit "3."
[9]  A copy of SAS no. 22, AU section 311 is attached to the Levin Affidavit as Exhibit "24."
[10]  A copy of SAS no. 31, AU Section 326 is attached to the Levin Affidavits as Exhibit "25."
[11]  DeBruyn Supplement, p. 3, attached to the Levin Affidavit as Exhibit "4"; DeBruyn Affidavit, ¶8, 9, 10, 14, 15, 16.

Brown Schultz Statement No. 13.

USF&G contends that there was an "overstatement of income and equity" in the amount of $815,960 for 1997 and $3,126,508 for 1998." DeBruyn report at p. 3.

**Response No. 13.**

**Admit.**

Brown Schultz Statement No. 14.

The DeBruyn report does not indicate the source and components of the adjustments by DeBruyn to the amounts in the 1997 Brown Schultz financial statement and the report does not indicate the reason or give an explanation for the adjustments or any information from which the propriety of the adjustments can be evaluated.  See generally, DeBruyn Report.

**Response No. 14.**

**Denied.  The statement fails to acknowledge the nature of the restatement prepared by Mr. DeBruyn as well as the nature of restatements in general.  In the DeBruyn Report, sources and components "reviewed and relied upon" are expressly and explicitly identified.[12]  Essentially, in creating the restated financials, DeBruyn reviewed and analyzed the same CCI documents that were purportedly analyzed and utilized by Brown Schultz in its creation of the audited financial statements.  Likewise, the statement that the DeBruyn Report "does not indicate the reason or give an explanation for the adjustments" ignores the discussion of Brown Schultz' misstatements and omissions contained in the DeBruyn Report.[13]  Additionally, the DeBruyn Supplement goes into great detail, far greater than that required by the pertinent rules, to spell out the basis upon which it was determined that Brown Schultz negligently prepared the audited financial statements at issue.[14]**

---

[12] DeBruyn Report, p. 2-3.
[13] Id., p. 5-6.
[14] DeBruyn Supplement, p. 1-3, attached to the Levin Affidavit as Exhibit "4"; DeBruyn Affidavit, ¶7-18.

Brown Schultz Statement No. 15.

With regard to the December 31, 1998 audited financials, USF&G contends that $1,162,460 of revenue from a related party PCIC was improperly recognized as revenue and the disclosure contained in the financials was inadequate. DeBruyn Report.

**Response No. 15.**

**Denied. The DeBruyn Report simply does not make the contentions alleged in the statement.[15] DeBruyn opined, *inter alia*, that the third party contract claim by PCIC did not meet the recognition standards set forth in SOP 81-1[16] and that the guarantee by the related party did not support the recognition of revenue. Additionally, he opined that the recording and disclosure of the third party transaction was misleading to a user of the 1998 audited financial statement. There are additional defects in the recording of the $1,162,460 claim set forth in paragraphs 16-18 of the DeBruyn Affidavit. This resulted in a material misstatement of $1,162,460.[17]**

Brown Schultz Statement No. 16.

Other than conceivably the $1,162,460 from PCIC, the DeBruyn report identifies no other basis for the alleged overstatement of income and equity of $3,126,508 in the December 31, 1998 audited financials. See DeBruyn Report.

**Response No. 16.**

**Denied. The statement - which cites only to the DeBruyn Report generally - simply ignores the plain written contents of the DeBruyn Report. The DeBruyn Report identifies numerous factors, such as failure to adequately investigate contracts that had significant profit fades, improper testing and procedures with respect to underbillings, and failure to properly test contracts in progress that contributed to the overstatement.[18] Further details**

---

[15] DeBruyn Report, attached to the Levin Affidavit as Exhibit "3."
[16] Since SOP 81-1 is extremely lengthy, no copy is attached. However, a copy will be made available upon request.
[17] DeBruyn Report, p. 6, attached to the Levin Affidavit as Exhibit "3," DeBruyn Affidavit, paragraphs 16-18.
[18] DeBruyn Report, p. 5-6., attached to the Levin Affidavit as Exhibit "3."

contradicting Brown Schultz's statement appear in the DeBruyn Supplement and the

DeBruyn Affidavit.  DeBruyn states, *inter alia*, that because of inadequate testing, Brown

Schultz did not correctly ascertain the profit fade on the individual contracts and that

Brown Schultz failed to take into account the material profit fade from the 1997 jobs in

connection with the 1998 audit work.[19]

Brown Schultz Statement No. 17.

While Brown Schultz was aware that USF&G was a user of the audited financial
statements, there is no evidence that Brown Schultz knew the specific purpose for which
USF&G intended to use the financial statements or had knowledge of the specific bonds
underwritten by USF&G on CCI's behalf. See, C. Rebinski Depo. at p. 41:2-20; D. Bowman
Depo. at p. 38:22-39:18; B. Brown Depo. at p. 22:20, 25:12.

Response No. 17.

Denied.  There is significant evidence that Brown Schultz knew the specific purpose

for which USF&G intended to use the financial statements.  Brown Schultz not only knew

that USF&G relied upon the financial statements to determine whether or not it should

issue bonds, but knew the parameters of the bonding program.[20]  There is also significant

documentary evidence that Brown Shultz knew of the specific purpose for which USF&G

intended to use the financial statements.[21]  Moreover, Brown Schultz even conducted a risk

assessment based on its knowledge of the intended use of the financial statements and the

levels of risk.[22]  USF&G admits that Brown Schultz could not have had knowledge of the

---

[19] DeBruyn Supplement, p. 3., attached to the Levin Affidavit as Exhibit "4"; DeBruyn Affidavit, ¶8, 11.

[20] Deposition of Bruce Brown, p. 25, lines 20-25, p. 26, lines 1-7, p. 27, lines 7-9, attached to the Levin Affidavit as
Exhibit "5"; Deposition of Susanne Ehgartner p. 81, lines 22-25; p. 82, lines 1-21, p. 155, lines 2-17, attached to the
Levin Affidavit as Exhibit "6."

[21] Document BY 00500, attached to the Levin Affidavit as Exhibit "12"; Document USFG/BS 01853, attached to the
Levin Affidavit as Exhibit "13"; Document BS 01590, attached to the Levin Affidavit as Exhibit "14"; Document
BS 00772, attached to the Levin Affidavit as Exhibit "15"; Document BS 01755, attached to the Levin Affidavit as
Exhibit "16"; Document BS 00169, attached to the Levin Affidavit as Exhibit "17."

[22] Deposition of Deborah Bowman, p. 63, lines 17-19, p. 64, lines 18-21, p. 79, lines 3-25, p. 87, lines 4-20, p. 88,
lines 9-13, attached to the Levin Affidavit as Exhibit "7"; Deposition of Susanne Ehgartner, p. 79, lines 1-18,
attached to the Levin Affidavit as Exhibit "6."

specific bonds to be underwritten by USF&G, although such knowledge would be

immaterial because, *inter alia*, Brown Schultz had specific knowledge of the actual

transaction at issue.

Brown Schultz Statement No. 18.

    John Ortenzio, CCI's president and sole shareholder, when asked if he made Bruce
Brown aware of the reasons the bonding company was requiring the audited financial statements
testified:

    I think the only reason I would have communicated to Bruce Brown was because that's
what they wanted. They wanted audited financials and that's what we gave them.

Ortenzio Depo. at p. 44:18-24; 20:7-8.

**Response No. 18.**

    **Conditionally Admit.  The Ortenzio deposition was suspended when Mr. Ortenzio
walked out of the deposition.  He has failed to provide acceptable dates for the continuation
of his deposition.**

Brown Schultz Statement No. 19.

    The CCI audited financial statements were not given by Brown Schultz to USF&G.
Sheri Phillips Depo. at p. 88:15-22. Brown Schultz sent copies of the audited financials to CCI.
Id. CCI provided its audited financial statements to the bonding agent. USF&G received the
financial statements from its agent.  Id. [23]

**Response No. 19.**

    **Denied.  The statement is misleading in that although Brown Schultz did not

physically deliver any audit reports into USF&G's possession, there is ample evidence that

Brown Schultz not only knew of USF&G's intended use of the audited financial statements

but gave such audited financial statements to individuals that Brown Schultz knew would

promptly and reliably make the physical delivery to USF&G.[24]**

---

[23] *The pertinent portions of Sheri Phillips deposition are found at Exhibit D of the Exhibit Binder.*
[24] Deposition of Deborah Bowman, p. 30, lines 13-19, attached as Exhibit "7" to the Levin Affidavit; Deposition of
Bruce Brown, p. 27, lines 4-6, attached as Exhibit "5" to the Levin Affidavit.

Brown Schultz Statement No. 20.

There was no contact or communication between USF&G and Brown Schultz. J. Daily Depo. at p. 125:17-20; T. Phillips Depo. at p. 184:13-17; S. Salazar Depo. at p. 70-71. [25]

**Response No. 20.**

Admit.

Brown Schultz Statement No. 21.

There is no evidence Brown Schultz was informed about the specific bond transactions before it provided the financial statements.

**Response No. 21.**

**Denied. There is significant evidence that Brown Schultz had knowledge of the bonding program, which is the "transaction" at issue in the instant litigation. Additionally, Brown Schultz' statement is ambiguous with respect to the term "specific bond transactions."[26] Moreover, in the Defendants' Statement of Material Facts ("Defendants' Statement") there is repeated reference to the "bonding program."[27] There is also documentary evidence taken from Brown Schultz' files, as well as Byerly Insurance files, that indicates Brown Schultz was aware of the parameters of the bonding program.[28]**

Brown Schultz Statement No. 22.

USF&G began its bonding program with CCI in late 1993 or early 1994. See J. Daily Depo. at p. 335: 8-13.

---

[25] *The pertinent portions of Jim Daily. Tony Phillips and Steve Salazar depositions are found at Exhibit E, F, and G respectively.*

[26] Deposition of Bruce Brown, p. 25, lines 20-25, p. 26, lines 1-7, p. 27, lines 7-9, attached to the Levin Affidavit as Exhibit "5"; Deposition of Susanne Ehgartner p. 81, lines 22-25, p. 82, lines 1-21, p. 155, lines 2-17, attached to the Levin Affidavit as Exhibit "6."

[27] Defendants' Statement, ¶26, 30, 33, 39, 65 and 85.

[28] Document BY 00500, attached to Levin Affidavit as Exhibit "12"; Document BS 01853, attached to the Levin Affidavit as Exhibit "13"; Document BS 01755, attached to the Levin Affidavit as Exhibit "16"; Document BS 00169, attached to the Levin Affidavit as Exhibit "17" to the Levin Affidavit; Document BS 01590, attached to the Levin Affidavit as Exhibit "14"; Document BS 00772, attached to the Levin Affidavit as Exhibit "15."

**Response No. 22.**

  **Admit.**

Brown Schultz Statement No. 23.

  The CCI bond account came to USF&G through the Byerly Agency an independent agency through whom USF&G marketed its business. S. Salazar Depo. at p. 63. Dave Dominiani of the Byerly Agency was agent for the CCI account. When Mr. Dominiani left the Byerly Agency in or around 1998 to form DJL Associates, he continued as the agent for the CCI bond program. J. Ortenzio depo. at p. 73:11-74:12.

**Response No. 23.**

  **Partially Admit.  The Byerly Agency, Mr. Dominiani and DJL Associates were**

**CCI's insurance and bonding agents for purposes of processing bonding for USF&G.**

Brown Schultz Statement No. 24.

  The relationship between CCI and USFG was formed after Fireman's Fund Insurance Company would not underwrite a bond for CCI. Salazar Depo. at p. 93:16-21.

**Response No. 24.**

  **Admit.**

Brown Schultz Statement No. 25.

  At the time USF&G began its bonding program for CCI, the majority of CCI's revenues and receivables were the result of contracts entered into with Continental Medical Systems for the construction of rehabilitation hospitals throughout the United States.  See December 31, 1993 Financial Statement of CCI at Footnote 8.[29]   During 1993 and 1992 CMS accounted for 71% and 83% of CCI's revenues respectively.  Id.   Continental Medical Systems was controlled by John Ortenzio's father, Rocco Ortenzio. Id. ; J. Daily depo. at p. 107:23-108:5.

**Response No. 25.**

  **Admit.**

Brown Schultz Statement No. 26.

  When USF&G began its bonding program with CCI, the contractor was beginning to enter the hard bid market. J. Daily depo. at p. 108:5-13.

---

[29] *The 12/31/93 audited financial statement of CCI is found at as Exhibit H in the Exhibit Binder.*

**Response No. 26.**

    **Admit.**

Brown Schultz Statement No. 27.

    The individuals from USF&G involved in the underwriting of the CCI account included: Tony Phillips, the bond manager of USF&G's Harrisburg field office; Steve Salazar, senior underwriter in the Harrisburg field office; Jim Daily, manager of the Northeast Surety Division for USF&G; and David Hussey, the Director of the Northern Division of USF&G's Surety Department. See USF&G's Answers to Defendants [First] Set of Interrogatories at p. 3[30]; J. Daily depo at p. 113.

**Response No. 27.**

    **Admit.**

Brown Schultz Statement No. 28.

    Mr. Salazar, the senior underwriter in the Harrisburg field office, had the authority to approve bonds up to $2,000,000. S. Salazar Depo. at p. 64. Above that amount, he needed the approval of Tony Phillips. Id. Above Mr. Phillips' level of authority, bonds would be approved by Mr. Daily. S. Salazar Depo. at p. 65.

**Response No. 28.**

    **Admit.**

Brown Schultz Statement No. 29.

    Salazar, in underwriting the CCI account, reviewed the CPA year end financial statements and interim CCI prepared financials. S. Salazar Depo. at p. 98. According to Mr. Salazar, his purpose in reviewing the interim information was to see how the contractor was doing during the year. Id. at p. 99. Mr. Salazar relied on the interim financials along with the CPA year end financials to make underwriting decisions. Id.

**Response No. 29.**

    **Admit.**

Brown Schultz Statement No. 30.

    CCI provided USF&G with CCI prepared, interim financial statements on either a quarterly or bi-annual basis and either monthly or quarterly work in process information. J. Daily Depo. at. p. 217:24-218:10; S. Salazar Depo. at 98: 20-25. USF&G also received Dun &

---

[30] USF&G's Answers to Defendants [First] Set of Interrogatories are found at Exhibit I to the Exhibit Binder.

Bradstreet reports on CCI and had annual meetings with the contractor and the bonding agent to discuss the bonding program. S. Salazar Depo. at 108: 19-109:2.

**Response No. 30.**

     **Admit.**

Brown Schultz Statement No. 31.

     Mr. Salazar testified that the year end audited financial statements only reflected the financial condition of the company as of the closing date for the statement.  Id. at p. 99.

**Response No. 31.**

     **Denied.  Brown Schultz mischaracterizes Mr. Salazar's testimony.  In essence, Brown Schultz is quoting not Mr. Salazar's testimony *but its own questions*.  In fact, Mr. Salazar testified that USF&G obtained interim financial information to determine how the contractor was doing since the year-end statement was prepared. USF&G used the interim information and compared it with the prior audit report.[31]**

Brown Schultz Statement No. 32.

     Mr. Salazar testified each contract for which bonds were issued by USF&G was individually underwritten.  S. Salazar Depo. at 58.

**Response No. 32.**

     **Admit.**

Brown Schultz Statement No. 33.

     According to Mr. Salazar, USF&G had no specific underwriting guidelines. S. Salazar Depo. at p. 58.   Mr. Salazar testified that there were no underwriting guidelines used for net worth in the 1990's.  Salazar Depo. at p. 38:5-7. He also testified that there was no guideline used to evaluate a contractor's cash position or profitability in connection with issuance of a bond program in the 1990's. Salazar Depo. at p. 38:16-19.

**Response No. 33.**

     **Admit.**

---

[31]  Deposition of Stephen Salazar, p. 99, lines 14-16, attached to the Levin Affidavit as Exhibit "8."  Affidavit of Anthony S Phillips, paragraph 23.

Brown Schultz Statement No. 34.

Salazar, himself, used general underwriting guidelines of five percent (5%) working capitol and ten percent (10%) net worth [to total work program]. S. Salazar depo. at p. 39-40.

**Response No. 34.**

**Admit.**

Brown Schultz Statement No. 35.

According to Mr. Salazar, the larger the contractor, the more the surety could deviate from these guidelines. Id. In order to determine the extent to which it was appropriate to all deviation from these guidelines, Salazar said he would need to know the size of work the contractor had previously completed and whether the contractor had successfully and profitably completed the previous work. S. Salazar depo. at p. 45:17-25.

**Response No. 35.**

**Admit.**

Brown Schultz Statement No. 36.

Mr. Salazar could not state for CCI to what changes in the company's operations, working capitol [sic] balance sheet of work in progress could be tolerated before they had an impact on underwriting Salazar 246: 3-247.

**Response No. 36.**

**Denied. The statement is a non-sequitur. Additionally, it appears that Brown Schultz mischaracterizes Mr. Salazar's testimony and presents it out of context. Mr. Salazar could not state any exact amount that "could be tolerated" because "what is material and what is not material changes from account to account."[32]**

Brown Schultz Statement No. 37.

Tony Phillips, the bond manager for USF&G's Harrisburg field office testified that his responsibilities included the overall underwriting of the CCI account plus supervising Mr. Salazar and that he was responsible for any recommendation made by Mr. Salazar on any bond liability on the account. T. Phillips depo. at p. 35:5-

---

[32] Deposition of Stephen Salazar, p. 249, lines 18-24, attached to the Levin Affidavit Exhibit "8."

<u>**Response No. 37.**</u>

      **Admit.**

<u>Brown Schultz Statement No. 38.</u>

      Mr. Phillips testified that it was significant in the underwriting process to know whether the source of a contractor's profit was from construction operations or from other sources.  T. Phillips Depo. at p. 423:9-13.

<u>**Response No. 38.**</u>

      **Admit.**

<u>Brown Schultz Statement No. 39.</u>

      Mr. Phillips stated that in the course of underwriting the CCI bond program, he did not fully review and evaluate the audited financial statements for CCI Construction.  T. Phillips Depo. at p. 443.

<u>**Response No. 39.**</u>

      **Denied.  Brown Schultz takes Mr. Phillips' testimony out of context.  During the deposition, Brown Schultz asked whether or not Mr. Phillips reviewed in detail the financial statements for CCI Construction.  Although the witness asked for clarification of the word "evaluate," such clarification was not given.  Additionally, Brown Schultz asked whether Mr. Phillips personally reviewed and evaluated the financial statements. To this series of questions, Mr. Phillips responded "not fully" because he worked with other people who contributed to the review and evaluation process.[33]  Brown Schultz neglects to mention that earlier in his deposition Mr. Phillips testified that he personally reviewed the statements.[34]**

<u>Brown Schultz Statement No. 40.</u>

      Mr. Phillips verified USF&G Answers to Defendants [First] Set of Interrogatories.  See Exhibit I.

---

[33]  Deposition of Anthony Phillips, p. 443, lines 4-22, attached to the Levin Affidavit as Exhibit "10."

[34]  Deposition of Anthony Phillips, p. 442, lines 21-22, attached to the Levin Affidavit as Exhibit "10."

**Response No. 40.**

Denied.  Anthony Phillips did not "verify" the responses to Defendants' First Set of Interrogatories.  As required by Fed.R.Civ.P.33(b)(1), he did swear, under oath, that "he is authorized by USF&G to respond to the foregoing Interrogatories that while he does not have personal knowledge of all of the facts recited in the foregoing responses, the information contained therein has been collected and made available to him by others and the responses to the Interrogatories are true to the best of his knowledge and belief based upon the information made available to him."[35]

Brown Schultz Statement No. 41.

In the answers to interrogatories, with respect to the 1997 audit report, USF&G when asked to identify the inaccuracies or omission contained therein or the manner in which they were misleading stated, inter alia, that indirect costs were not properly allocated, no job site visits were preformed by Brown Schultz, that there was no independent confirmation of management's representations concerning the percentage of completion, estimated costs to complete and the status of pending change orders. See USF&G Answers to Defendants [First]Set of Interrogatories at No. 8 pp. 14-21.

**Response No. 41.**

Admit.

Brown Schultz Statement No. 42.

Similar issues were identified with respect to the 1998 audit report. Id. at p. .  In addition, USF&G complained that a claim guaranteed by Pennsylvania Contractor's Insurance Company, a company owned by John Ortenzio, should not have been recorded as revenue and that audit report contained inadequate disclosure with regard to it.  Id at p. 26-27.

**Response No. 42.**

Denied.  USF&G did not "complain." The interrogatory response provides, *inter alia*, that the recording of the claim purportedly guaranteed by PCIC as revenue was

---

[35] United States Fidelity and Guaranty Company's Answers to Defendants' Set of Interrogatories (" Interrogatory Response"), attached to the Levin Affidavit as Exhibit "2."

improper and violative of recognized accounting principles, including SOP 81-1.[36]

USF&G has since provided detailed information concerning the impropriety of Brown

Schultz' treatment of the claim incurred by PCIC as revenue.[37]

Brown Schultz Statement No. 43.

US&G did not identify in its interrogatory answers the extent to which purported deficiencies would have changed CCI's balance sheet. Id.

**Response No. 43.**

**Denied. Although the interrogatory responses do not contain a "restated" balance sheet, some of the changes to the balance sheet that would occur if Brown Schultz properly performed its duties are readily apparent from the interrogatory response. For example, the effect of the removal of improperly attributed revenue of $1,162,460 from the revenue column from the balance sheet would turn CCI's $60,000 profit into a $1 million plus loss.[38]**

Brown Schultz Statement No. 44.

Tony Phillips, who verified the interrogatories on USF&G's behalf, testified that, without the benefit of restated financials, he could not make a determination about whether changes to CCI's financial condition would have been material to his underwriting decisions. T. Phillips depo. at 463:25-464:5.

**Response No. 44.**

**Denied. As previously stated, Mr. Phillips did not "verify" the responses to Defendants' First Set of Interrogatories. Moreover, Brown Schultz mischaracterizes Mr. Phillip's testimony. Brown Schultz asked the following question: " Can you make a determination about whether changes to financial statements for CCI Construction would**

---

[36] Interrogatory Response, Answer No. 12, p. 26-28, attached to the Levin Affidavit as Exhibit "2."

[37] DeBruyn Report, p. 6, attached to the Levin Affidavit as Exhibit "3"; DeBruyn Supplement, p. 3, attached to the Levin Affidavit as Exhibit "4"; DeBruyn Affidavit, ¶17-18.

[38] Interrogatory Response, p. 26-27, attached to the Levin Affidavit as Exhibit "2". USF&G has since provided Brown Schultz with restated financial information. DeBruyn Report, Exhibit B, attached to the Levin Affidavit as Exhibit "3"; DeBruyn Supplement, Exhibit I-V, attached to the Levin Affidavit as Exhibit "4."

have been material to your underwriting decision without the benefit of restated financial statement?" Mr. Phillips replied that: "I could not."[39]  In context, it is obvious that Mr. Phillips is merely indicating that absent review of specific documents it is impossible to determine what effect that specific document would have.  Mr. Phillips did testify, however, that "changes to financial statements" would have changed his underwriting decision.  The Phillips Affidavit contains Mr. Phillips' statement that, as restated by Stephen J. DeBruyn, the CCI financial statements would have caused USF&G to suspend or cancel bonding to CCI.[40]

Brown Schultz Statement No. 45.

Phillips, at his deposition, testified that he believed that restated financials existed for CCI, but that he had not reviewed them.  Phillips at 464:9-15.

Response No. 45.

Denied.  This statement is materially misleading in that it fails to indicate the proper time period in which "restated financials" either existed or were reviewed.  USF&G admits that at the time of the deposition, Mr. Phillips had not reviewed certain restated financials because, *inter alia*, such restatements were in the process of being prepared by an expert retained by USF&G for purposes of the instant litigation.  These restated financials were given to Brown Schultz on or about July 22, 2002.[41]  As written, however, Brown Schultz's statement could be interpreted as implying that Mr. Phillips knew of but did not review restated financials at a time before when they were created, such as at the time that bonds were being underwritten.  This would be false because underwriting decisions were based upon the audited financial statements prepared by Brown Schultz and not any restatement created by or on behalf of USF&G.

---

[39] Deposition of Anthony Phillips, p. 463, line 25, p. 464, lines 1-5, attached to the Levin Affidavit as Exhibit "10."
[40] Deposition of Anthony Phillips, p. 461, lines 24-25 – p. 462, lines 1-20, attached to the Levin Affidavit as Exhibit "10," Phillips Affidavit, paragraphs 36-41.
[41] DeBruyn Report, Exhibit "B," attached to the Levin Affidavit as Exhibit "3."

Brown Schultz Statement No. 46.

Jim Daily's responsibilities in the 1990's included, among other things, the supervision of underwriting in the field offices. J. Daily depo. at p. 16.   In connection with that supervisory role, Mr. Daily would handle new account submissions and bond requests up to a certain limit of authority. J. Daily depo. at p. 17.

**Response No. 46.**

   **Admit.**

Brown Schultz Statement No. 47.

With regard to bond requests over that limit of authority, Mr. Daily had to seek approval from his boss, David Hussey, to whom Mr. Daily reported. J. Daily depo. at pp. 17:4-12; p. 43:11-13.

**Response No. 47.**

   **Admit.**

Brown Schultz Statement No. 48.

According to Mr. Daily, the primary responsibility of the field office was to produce the business.  Daily's responsibility was to underwrite the business.  J. Daily depo at. p. 46:12-22.

**Response No. 48.**

   **Admit.**

Brown Schultz Statement No. 49.

Mr. Hussey had final approval of USF&G's bond program for CCI. J.  Daily Depo. at p. 113:20-23. Mr. Hussey testified that he did not review any of the Brown Schultz audited financials.  D. Hussey depo. at 130: 20-131:16.

**Response No. 49.**

   **Admit.**

Brown Schultz Statement No. 50.

Daily testified that in committing to bonding for CCI in January of 1999, USF&G relied on representations from CCI Construction as to its financial condition for the coming years. J. Daily Depo. at p. 416: 6-417:11.

**Response No. 50.**

Denied.  Mr. Daily responded to the following question: "USF&G relied on financial representations or representations concerning financial condition for the coming year based on information - - USF&G relied on representations from CCI Construction about its financing condition when it decided to commit to bonding during January, 1999?"  To this confusing question, objected to by USF&G's counsel, Mr. Phillip's answered "Yes." [42] The statement proffered by Brown Schultz is, thus, inaccurate and misleading.

Brown Schultz Statement No. 51.

There is no evidence that the bonds that form the basis of USF&G's loss in this action would not have been issued even if there had not been the alleged problems in the 1997 and 1998 audited financials.  See pp. 36-44; J. Daily depo at p. 275:1-5.

**Response No. 51.**

Denied.  Mr. Phillips indicates that, based on the information contained in restated financial information prepared by DeBruyn, the bonding programs continued in reliance upon the audited financial statements for the years ending in 1997 and 1998 would have been severely curtailed or eliminated.[43]  Messrs. Phillips and Daily testified that changes to CCI's financial statements would have changed their underwriting decisions and the Affidavits of Messrs. Daily, Phillips and Hussey have all confirmed that, based upon the restated CCI financial statements, CCI bonding would have been suspended or cancelled.[44]

Brown Schultz Statement No. 52.

By letter dated November 16, 1993, apparently in response to questions raised by USF&G's reinsurers, Dave Dominiani, the bond agent, advised Tony Phillips of the following: Footnote 9 specifies that in 1992 the company [CCI] incurred warranty insurance expense of $1,000,000 with Pennsylvania Contractors Insurance company (PCIC). Per Dave Barber, CFO, CCI took $1,000,000 from a very successful completed project, Wesley and funded their future

---

[42] Deposition of James Daily, p. 416, lines 3-11, attached to the Levin Affidavit as Exhibit "9."
[43] Affidavit of Anthony S. Phillips in Opposition to the Defendants' Motion for Summary Judgment ("Phillips Affidavit"), ¶36-38.
[44] Affidavits of James Daily, Anthony Phillips and David Hussey.

warranty expense under PCIC.  They did this primarily for tax planning purposes, but also to fund those future warranty expenses with current profits from a very successful project.

USFG/BS 846 (Exhibit 2 to Carson Affidavit.)

**Response No. 52.**

    **Admit.**

Brown Schultz Statement No. 53.

    The "Related Party Transactions" footnote in the December 31, 1993 audited financials for CCI disclosed that PCIC was a corporation under common control and that CCI had incurred warranty insurance expense of $335,317 and $1,000,000 with PCIC for 1992 and 1993 respectively. See Exhibit H.

**Response No. 53.**

    **Denied.  The "December 31, 1993 audited financials for CCI" does not contain a "related party transactions" footnote.[45]  There are eleven (11) footnotes in that audit report.  None – unlike audit reports for later years – are labeled "related party transactions."**

Brown Schultz Statement No. 54.

    On July 14, 1994, Steve Salazar requested information from the bond agent regarding significant profit fades on four jobs then in progress and thin margins on 8 of CCI's projects. USFG/BS 1175. (Exhibit 3 to Carson Affidavit).

**Response No. 54.**

    **Admit.**

Brown Schultz Statement No. 55.

    On July 21, 1994 Dave Dominiani advised Steve Salazar that as of June 30, 1994, CCI would be showing a "small loss". See USFG/BS 870-872 (Exhibit 4 to Carson Affidavit). Dominiani, in that same letter, also acknowledged that the gross margin on many of CCI's project was "very thin". Id.

---

[45]  Exhibit H to Exhibits to Defendants' Motion for Summary Judgment.

**Response No. 55.**

Denied.  Although Mr. Dominiani did state that CCI would be showing a "small loss," he reassured USF&G and explained that this loss could be attributable to extreme winter weather, which caused delays, extra costs and inefficiencies.[46]

Brown Schultz Statement No. 56.

On November 2, 1994, Dominiani reported to Tony Phillips that the 6/30/94 interim financials prepared by CCI showed CCI sustained a $500,000 loss for the first half of 1994.  See USFG/BS 0873-75 (attached as Exhibit 5 to Carson Affidavit).  Dominiani informed Phillips that CCI was projecting a loss of approximately $400,000 to $500,000 at year end.  Id.

**Response No. 56.**

Admit.

Brown Schultz Statement No. 57.

On December 28, 1994, Jim Daily noted concerns that CCI's liquid position was less than half of what it had been at 12/31/93 and that there were continuing profit fades.  USFG/BS 1102 (Exhibit 6 to Carson Affidavit).

**Response No. 57.**

Admit.

Brown Schultz Statement No. 58.

On January 3, 1995, Dominiani advised Steve Salazar that CCI's projected loss for December 31, 1994 remained in the $400,000-$500,000 range.  See S. Salazar Depo. Exhibit 13.  In addition, Dominiani addressed the concerns raised by USF&G with regard to profit fades on two CCI projects – Lightner Road and Lincoln University.  Id.

**Response No. 58.**

Admit.

Brown Schultz Statement No. 59.

In late January 24, 27 and 31, 1995, notwithstanding the loss sustained at mid- year and the projected loss at year end, USF&G issued bid bonds for the Altoona Railroad Memorial

---

[46]  Document USF&G/BS 0870, attached to the Levin Affidavit as Exhibit "21."

Museum, Shady Grove and Andrews Air Force Base Projects without having received the Brown Schultz audited financials for the year ended 12/31/94.(Exhibits 3-5 To Carson Affidavit).

Response No. 59.

Denied. Although USF&G issued the bid bonds identified in the statement prior to receipt of the audited financials for the year ending December 31, 1994, it is incorrect to state that this was done "notwithstanding the loss sustained at mid-year and the projected loss at year end." Such statement also ignores the methodology used by USF&G's underwriters, which, among other things, requires analyzing, weighing and balancing numerous factors.[47]

Brown Schultz Statement No. 60.

USF&G agreed at a 1/31/95 meeting with CCI to hold to a $100,000,000 program level. USFG/BS 1111 (Exhibit 6 To Carson Affidavit).

Response No. 60.

Admit.

Brown Schultz Statement No. 61.

On April 19, 1995, USF&G's home office received the Brown Schultz audited financials for the year ended December 31, 1994. The 1994 financials indicated a net loss of $317,000 and an operating loss of $864,663. Working capital was $2,384,192 and equity was $4,290,336. A copy of the 1994 Audited Financial Statements is Exhibit I in the Exhibit Binder.

Response No. 61.

Admit.

Brown Schultz Statement No. 62.

In the Related Party Transactions footnote in the 1994 audited financial statements, it was disclosed that PCIC was a corporation under common control and that there were no warranty insurance costs incurred for 1994. The footnote also disclosed that CCI had submitted a claim to PCIC of $397,800 in 1994 and that the claim was pending as of December 31, 1994.

---

[47] Deposition of James Daily, p. 48, lines 8-22; attached to the Levin Affidavit as Exhibit "9"; Phillips Affidavit, ¶9-10; Affidavit of Richard D. Farnsworth in Opposition to Defendants' Motion for Summary Judgment ("Farnsworth Affidavit"), ¶7-10.

**Response No. 62.**

    **Admit.**

Brown Schultz Statement No. 63.

    The December 31, 1994 financial statement also contained the following statement in footnote 1 "Summary of significant accounting policies": "An amount equal to the contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated."

**Response No. 63.**

    **Admit.**

Brown Schultz Statement No. 64.

    The 1994 audited financial statement and all of the audited financial statements thereafter through 1998, also showed earnings from contracts before allocation of indirect costs. The amount of unallocated indirect costs was reflected in the financial statements and was used to determine the cumulative ne profit from contracts.  Similarly, the completed contracts and contracts in progress schedules clearly show "gross profit before indirect costs" and contract earnings (accrued or earned) before indirect costs. Copies of the December 31, 1995 through December 31, 1998 audited financial statements for CCI are found in the Exhibit Binder at Exhibit J through M respectively.

**Response No. 64.**

    **Denied.  USF&G does not deny the allegations in the first and third sentences concerning the contents of the audited financial statements.  However, the assertion in the second sentence concerning the treatment of unallocated costs is misleading.  The AICPA Construction Contractor Audit Guide provides for a separate line item for unallocated indirect job costs.  However, Brown Schultz appears to have made no attempt to allocate any indirect costs in the audited financial statements.**

Brown Schultz Statement No. 65.

    Each year, Steve Salazar  prepared an "annual review" describing CCI's results for the year and made a recommendation as to a bonding program for the following year.  S. Salazar Depo. at p. 238-240; Salazar Depo. Exhibits 7-11.

**Response No. 65.**

    **Admit.**

Brown Schultz Statement No. 66.

    In his annual review of the 12/31/94 CPA audit, Salazar recommended continuing with the bond program for CCI.  See, Salazar Depo. Exhibit 8.

**Response No. 66.**

    **Admit.**

Brown Schultz Statement No. 67.

    In March 1996,  USF&G received the audited financial statements for the year ended December 31, 1995.  The financial statement showed a small profit of $103,210 but a loss from operations of $308,362.  Working capital was $4,183,681 and equity was $4,820,675. See Exhibit J in the Exhibit Binder.

**Response No. 67.**

    **Admit.**

Brown Schultz Statement No. 68.

    The related party transactions footnote disclosed that during 1994, CCI submitted a warranty insurance claim of $397,800 to PCIC, "a company owned by the sole shareholder. This claim was paid during 1995."

**Response No. 68.**

    **Denied.  The "related party transaction" footnote referred to in the statement contains the quote attributed to it in Brown Schultz's statement but such quote is not emphasized, underlined, italicized or made bold.**

Brown Schultz Statement No. 69.

The footnotes to the 1995 audited financials also state

Use of Estimates:

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Revenue and costs recognition:

. . . Because of inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates used will change in the near term.

. . . An amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.

**Response No. 69.**

**Admit.**

Brown Schultz Statement No. 70.

The May 3, 1996 Annual Review of CCI Construction prepared by Steve Salazar showed a Yellow Stress Score and a "Bear Flag F1 -Net Worth less than 10% of work program. <u>See</u> Salazar Depo. Exhibit 9. Salazar again recommended continuing the CCI bond program. <u>Id.</u>

**Response No. 70.**

**Admit.**

Brown Schultz Statement No. 71.

On May 1, 1997, USF&G received a copy of the audit report for the year ended December 31, 1996. See complaint at ¶15 . The financial statement reflected net income of $363,124, and for the first time since 1993, an operating profit of $139,097, working capital in the amount of $4,641,702, and equity of $4,802,675. See Exhibit K.

**Response No. 71.**

**Admit.**

Brown Schultz Statement No. 72.

Steve Salazar's annual review of CCI dated May 1, 1997, again showed a yellow stress score as of March 1997 and the following bear flags: A20-gross profit fade factor is greater that 20% and M01-Equity less that 10% of total program.  See Salazar Depo. Exhibit 10.

**Response No. 72.**

    **Admit.**

Brown Schultz Statement No. 73.

Mr. Salazar recommended that the bonding program be continued. Id.

**Response No. 73.**

    **Admit.**

Brown Schultz Statement No. 74.

On June 3, 1997, Jim Daily approved Steve Salazar's request for approval of a bid bond for the $15.9 million Md. D.G.S. Camp Fretterd Armory project. Salazar in support of his approval request referenced CCI's in-house financials as of March 31, 1997. See USFG/BS 795-96 (Exhibit   to Carson Affidavit.)

**Response No. 74.**

    **Admit.**

Brown Schultz Statement No. 75.

On June 26, 1997, Salazar requested and received approval from Jim Daily of a bid bond for a $30,000,000 job. USFG/BS 0790. (Exhibit 6 To Carson Affidavit).

**Response No. 75.**

    **Admit.**

Brown Schultz Statement No. 76.

In August of 1997, Dominiani wrote to Tony Phillips advising that John Ortenzio wanted his personal indemnity on the Master Surety Agreement removed.  USFG/BS 1233.  Jim Daily consented to the removal of the indemnity. USFG/BS 1120. (Exhibit 8 and 9 To Carson Affidavit).

**Response No. 76.**

       **Denied.  Although it is true that Mr. Dominiani wrote to Mr. Phillips regarding Mr. Ortenzio's indemnity agreement, it is incorrect to state that Mr. Daily "consented" to the removal.  Mr. Ortenzio could terminate his indemnity by giving written notice to USF&G.  Also, as indicated in a letter from Mr. Ortenzio to Mr. Phillips dated September 5, 1997, Mr. Ortenzio agreed, *inter alia*, that he would maintain the equity level of CCI at not less than $4,800,000.00 and would require an aggregate work program no higher, on a continuous basis, than $60,000,000.00.[48]**

Brown Schultz Statement No. 77.

       On August 20, 1997 Salazar requested and received approval of a bid bond for an $18,300,000 project at McGuire Air Force Base and, in support of that request cited to the June 30, 1997, CCI in-house financials. USFG/BS 0784. (Exhibit 10  to Carson Affidavit).

**Response No. 77.**

       **Admit.**

Brown Schultz Statement No. 78.

On December 1, 1997, Steve Salazar requested approval of the $15.7 million Albemarle-Charlottesville Regional Jail bid bond again referencing the June 30, 1997 CCI in house financials in support of his request.  USFG/BS 0778.  Mr. Daily approved the request as submitted. Id. (Exhibit      To Carson Affidavit.)

**Response No. 78.**

       **Admit.**

Brown Schultz Statement No. 79.

       On March 5, 1998, USF&G received the audited financials for the year ended December 31, 1997 complaint at ¶ 17.  Income from operations was $350,000.  See Exhibit L .

---

[48] Document USFG/BS 0908, attached to the Levin Affidavit as Exhibit "18"; Document BS 01755, attached to the Levin Affidavit as Exhibit "16."

<u>Response No. 79.</u>

Admit.

<u>Brown Schultz Statement No. 80.</u>

Footnote 5 of the audited financials indicated that $816,000 current notes payable were collateralized by equipment. There is no evidence that USF&G inquired as to what equipment was purchased and why.

<u>Response No. 80.</u>

**Denied.  USF&G made appropriate inquiries as to the nature of the equipment purchased.**[49]

<u>Brown Schultz Statement No. 81.</u>

The related party transaction footnote disclosed that PCIC was a corporation under common control and that CCI had incurred warranty expense of $825,000 with PCIC.

<u>Response No. 81.</u>

Admit.

<u>Brown Schultz Statement No. 82.</u>

On April 15, 1998, <u>See</u> Steve Salazar prepared his annual review of the audited financials for 1997.  Salazar Depo. Exhibit 11. The annual review showed a yellow stress score and bear flags "A20-gross profit fade factor is greater than 20%" and "M01-Equity less than 10% of total program. <u>Id.</u>

<u>Response No. 82.</u>

Admit.

<u>Brown Schultz Statement No. 83.</u>

Mr. Salazar recommended continuing the bonding program for CCI.

---

[49] Document USFG/BS 924, attached to the Levin Affidavit as Exhibit "19"; Document USFG/BS 1252, attached to the Levin Affidavit as Exhibit "20."

**program was continued "[i]n spite of the loss" because such statement ignores the**

**numerous factors upon which a decision to continue a bonding program is based.**[50]

<u>Brown Schultz Statement No. 86.</u>

On December 23, 1998, Dominiani  wrote Tony Phillips wrote outlining CCI's desire to bid on any upcoming $40,000,000 heavy highway project in joint venture with Fulkroad Construction. T. Phillips depo. Ex 9.

**<u>Response No. 86.</u>**

**Admit.**

<u>Brown Schultz Statement No. 87.</u>

On, January 5, 1999, prior to receipt of the audited financials for December 31, 1998, USF&G met with CCI and Dominiani to discuss the joint venture project. T. Phillips Exhibit 10.

**<u>Response No. 87.</u>**

**Admit.**

<u>Brown Schultz Statement No. 88.</u>

Mr. Phillips was aware as of August 1998 that CCI was self-performing work it had previously subcontracted.  T. Phillips Depo. at p. 439:11-14.

**<u>Response No. 88.</u>**

**Admit.**

<u>Brown Schultz Statement No. 89.</u>

Dave Hussey was aware of CCI's decision to self perform work during 1998 having been advised of this by Jim Daily.  Hussey depo. at pp. 83-84.

**<u>Response No. 89.</u>**

**Admit.**

---

[50] Deposition of James Daily, p. 48 lines 11-22, attached to the Levin Affidavit as Exhibit "9"; Deposition of Anthony Phillips, p. 55, lines 4-24, p. 56, lines 1-5, attached to the Levin Affidavit as Exhibit "10"; Phillips Affidavit, ¶9-10; Farnsworth Affidavit, ¶7-10.

Brown Schultz Statement No. 90.

Jim Daily testified he became aware in 1998 that CCI was performing work it had previously subcontracted and that he did not this it was a good idea. J. Daily Depo. at p. 239-40. Jim Daily testified that a change in business to self perform work which it had previously subcontracted was a genuine risk and would have been of concern to him. Id.

**Response No. 90.**

**Admit.**

Brown Schultz Statement No. 91.

Jim Daily recommended to Dave Hussey that USF&G not approve bonds fo the Fulkroad project because the project was a different kind of work than previously performed by CCI, and because CCI planned to self perform work it previously subcontracted. Hussey depo. at 104-106.

**Response No. 91.**

**Denied. This statement cannot be admitted because Hussey did not testify as to the basis for Mr. Daily's recommendations for the Fulkrod Project. Although Hussey testified that Mr. Daily did not recommend approving bonding for CCI, Mr. Hussey did not discuss any of Mr. Daily's reasons within the pages cited.[51]**

Brown Schultz Statement No. 92.

Dave Hussey approved the bonds for the Fulkroad joint venture notwithstanding Jim Daily's concerns. Hussey depo. 104-106.

**Response No. 92.**

**Denied. Although Mr. Hussey approved bonds for the Fulkrod project, this was not done "notwithstanding Jim Daily's concerns." The statement ignores the multi-faceted analysis used to determine whether bonds should be issued.[52]**

---

[51] Deposition of David Hussey, pp. 104-106, attached to the Levin Affidavit as Exhibit "11."

[52] Deposition of David Hussey, p. 103, 7-13, attached to the Levin Affidavit as Exhibit "11"; Phillips Affidavit, ¶9-10; Farnsworth Affidavit, ¶7-10.

<u>Brown Schultz Statement No. 93.</u>

      Tony Phillips January 5, 1999 memo to file indicated that USF&G agreed to support the joint venture bid with CCI's portion of the bid being about $22,000,000.  USF&G agreed to handle the CCI account on a 3% working capitol and 5% net worth basis. USFG/BS 1271-72 (Exhibit 13 to Carson Affidavit)

**<u>Response No. 93.</u>**

      **Admit.**

<u>Brown Schultz Statement No. 94.</u>

      On March 1, 1999, Dominiani submitted the December 31, 1998 audited financials to Tony Phillips.  The audited financials showed that while  CCI had made a small profit of $59,015, working capitol decreased to $2.5 million and the company had an operating loss of $116,629.  The financial statement also showed underbillings of $6,341,726 representing 36% of total current assets.  This was a significant increase from prior years.  In 1997, underbillings were $1,072,281 and in 1996 underbillings were $37,663. This increase in underbillings prompted no comment or investigation by USF&G. A copy of the 12/31/98 audited financials for CCI is Exhibit  in the Exhibit Binder.

**<u>Response No. 94.</u>**

      **Denied.  It is not necessarily true that the underbillings represented "a significant increase from prior years."  Brown Schultz cites to no authority for this gratuitous interpretation of the audited financial statement.**

<u>Brown Schultz Statement No. 95.</u>

      The 1998 financials also indicated that PCIC had guaranteed a claim of $1,162,460.  Id. No inquiry was made by USF&G with regard to this transaction. See Daily depo. at p. 384.

**<u>Response No. 95.</u>**

      **Denied.  Mr. Daily merely testified that USF&G did not obtain financial statements from PCIC. [53]  This does not mean that "no inquiry was made by USF&G."  Moreover, not only is the term "inquiry" vague in the context in which it is used but it is misleading to**

---

[53] Deposition of James Daily, p. 384, lines 14-19, attached to the Levin Affidavit as Exhibit "9."

imply that USF&G had any duty or obligation to conduct its own audit of the financial

statements presumably audited by Brown Schultz.

Brown Schultz Statement No. 96.

There is no Annual Review of the 12/31/98 financials by Mr. Salazar.

**Response No. 96.**

**Denied.  USF&G has been unable to locate a written review summary of the**

**financials for the year ended December 31, 1998.[54]  Further, an expert retained to review**

**the performance of USF&G's underwriters opined, *inter alia*, that USF&G's underwriters**

**complied with industry practices and standards relative to their review of CCI's financial**

**information.[55]**

Brown Schultz Statement No. 97.

USF&G continued with the CCI bonding program.  In 1999 after receipt of the 1998
audited financials, USF&G issued final bonds on the Phase 1 Laboratory Center (Summerdale)
and Cambria County, Bedford County and Cool and Cold Aquaculture projects.  See complaint
at ¶ 20.

**Response No. 97.**

**Denied.  Paragraph 20 of the Complaint indicates that "payment and performance**

**bonds" were issued relative to several different projects.  It does not indicate that "final**

**bonds," whatever they may be, were issued.  Additionally, USF&G issued payment and**

**performance bonds in reliance upon the audited financials for the year ended December 31,**

**1998 to several projects in addition to those listed in the statement.[56]**

Brown Schultz Statement No. 98.

The first analysis of the 1998 financial statements that appears to have been done by
USF&G is dated August 20, 1999. See Salazar depo. Exhibit 15.

---

[54] Phillips Affidavit, ¶17-18.
[55] Farnsworth Affidavit, ¶4, 16, 21, 26 and 27.
[56] Complaint, ¶20, attached to the Levin Affidavit as Exhibit "1."

### Response No. 98.

   Admit.

### Brown Schultz Statement No. 99.

The "Folder Exceptions Report" noted the account's status as "red" because of the following reasons: underbillings were greater than 50% of equity; the folder had five open claim files; equity was less than 10% of the total program; net quick was less than 5% of the total program the debt to equity was greater that 3 to 1; underbillings were 120% of equity; notes payable were 104.9% of equity; and the indemnity agreement did not include the owner/principal.  See Salazar Depo. Ex. 15.

### Response No. 99.

   Admit.

### Brown Schultz Statement No. 100.

Notwithstanding this report, on August 20, Steve Salazar recommended to and received approval from Jim Daily for a bid bond on a $20,000,000 road construction project.  (Exhibit 13 to Carson Affidavit).

### Response No. 100.

   **Denied.  Although approval was received to issue a particular bid bond, such approval was not given "notwithstanding this report."  Such statement also ignores the methodology used by USF&G's underwriters which, among other things, requires analyzing, weighing and balancing numerous factors.**[57]

### Brown Schultz Statement No. 101.

On August 30, 1999, Dave Dominiani reported that CCI reported that CCI had a loss of $900,000 through the first six months of 1999.  See USFG/BS 0945 (Exhibit 14 to Carson Affidavit).

### Response No. 101.

   Admit.

---

[57] Phillips Affidavit, ¶9-10; Farnsworth Affidavit, ¶7-10.

Brown Schultz Statement No. 102.

Notwithstanding that advice, on September 30, 1999, a performance bond was issued in the amount of $191,083 on the Cool and Cold Aquaculture project. See USFG/BS 0726 (Exhibit 15 to Carson Affidavit).

**Response No. 102.**

**Denied. Although USF&G admits that the Cool and Cold aquaculture bond was issued, it disputes the conclusion that such bonds were issued "[n]otwithstanding that advice." Such statement also ignores the methodology used by USF&G's underwriters which, among other things, requires analyzing, weighing and balancing numerous factors.[58]**

USF&G further states that any statement from Defendants' Statement of Material Facts deemed "admitted" is admitted only as to the specific facts admitted, and not as to any characterization, implication, speculation or conclusion in the specific allegation or in Defendants' Statement of Undisputed Facts as a whole. Moreover, in statements in which Brown Schultz states that an individual "stated" or "testified," USF&G is only admitting or denying whether or not the individual did, in fact, convey certain words or phrases. USF&G neither admits nor denies the accuracy or veracity of the substance of such communication.

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each other party by mail (by hand) 10/9/02 .
Fed Ex

UNITED STATES FIDELITY
& GUARANTY COMPANY,
By its attorneys,

Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA 02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

---

[58] Phillips Affidavit, ¶9-10; Farnsworth Affidavit, ¶7-10.