ORIGINAL

FILED
HARRISBURG, PA

OCT 1 0 2002

MARY E. D'ANDREA, CLER
Per _____
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY,<br>　　　　Plaintiff<br><br>v.<br><br>BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ,<br>　　　　Defendants. | CIVIL ACTION NO. 1:01-CV-00813<br><br>JUDGE CONNOR<br><br>MJ Smyser ✓ |

**UNITED STATES FIDELITY AND GUARANTY
COMPANY'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

<u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      Introduction ..................................................................................................1

II.     Statement Of Facts .......................................................................................2

        A.      The Principal Actors .........................................................................2

        B.      The Basics Of Construction Bonding And Underwriting............................5

        C.      USF&G Establishes A Bonding Program For CCI..................................10

        D.      The Brown Schultz' Audit Reports Are Substantially Inaccurate
                And Contain Material Misinformation .......................................................22

        E.      CCI's Restated Financials Demonstrate That The Losses Incurred
                By USF&G Are Attributable To Brown Schultz' Failure To
                Properly Conduct Its Audits And To Issue Accurate Audit Reports..........30

        F.      CCI Defaults And USF&G Incurs Heavy Losses Under The
                Bonds Issued To CCI .............................................................................32

                1.      The 1996 Brown Schultz Audit Report .........................................33

                2.      The 1997 Brown Schultz Audit Report .........................................34

                3.      The 1998 Brown Schultz Audit Report .........................................34

III.    Statement Of Questions Presented.........................................................35

IV.     Argument .....................................................................................................37

        A.      The Summary Judgment Standard.............................................................37

        B.      The Law Of This Case Has Established That There Is No
                Privity Requirement In An Action For Negligent
                Misrepresentation And That Pennsylvania Has Fully
                Adopted Restatement (Second) Of Torts §552 ...........................................38

        C.      USF&G Meets All Elements Of Restatement (Second) Of
                Torts, §552 .............................................................................................39

                1.      Pennsylvania Has Adopted Restatement (Second)
                        Of Torts §552 .............................................................................39

2.      USF&G Meets The Requirements Of The Restatement
        (Second) Of Torts §552 ................................................................41

D.      Issues Of Material Fact Exist Concerning Brown Schultz'
        Breach Of Its Duty To USF&G ....................................................55

1.      As A Matter Of Law, Brown Schultz Had A Duty To
        Exercise Reasonable Care ............................................................55

2.      USF&G Can Establish That Brown Schultz Breached Its
        Duty Of Care ................................................................................56

3.      Brown Schultz Breached Its Duty Of Care ...................................58

E.      There Are Numerous Material Misrepresentations In The
        Audit Reports ...............................................................................59

F.      USF&G Justifiably Relied On The Audit Reports ..................................61

1.      Justifiable Reliance Is A Matter For The Trier Of Fact.................61

2.      There Is Ample Evidence Of USF&G's Reliance On
        The Audit Reports.........................................................................62

V.      Conclusion ............................................................................................64

#254737 V1/36432/87

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................37

*Bily v. Arthur Young & Co.*, 11 Cal. Rptr. 2d 51, 834 P.2d 745 (1992) .........40, 48, 54, 59

*Blue Bell v. Peat, Marwick*, 715 S.W.2d 408 (Tx. 1986) ...................................63

*Bolden v. Southeastern Pennsylvania Transportation Authority*, 21 F.3d 29
(3rd Cir. 1994)...............................................................................................38, 39

*Borough of Landsdowne v. Stevenson Envir. Serv. Inc.*, 99-3781, 2000 W.L.
1886578 (E.D. Pa. 2000)................................................................................38, 53

*Bortz v. Noon*, 729 A.2d 555 (Pa. 1999)...................................39, 49, 52, 55, 59

*Briggs v. Sterner*, 529 F.Supp. 1155 (S.D. Iowa 1981) .....................................45

*Burland v. Manor Care Health Servs., Inc.*, 1999 WL58580*3 (E.D. Pa.)......................53

*City of East Grand Forks v. Steele*, 121 Minn. 296, 141 N.W. 181 (1913)......................60

*Delahanty v. First Pennsylvania Bank*, 318 Pa. Super. 90 (1983)....................................62

*Diesler v. McCormack Aggregates Co.*, 54 F.3d 1074 (3rd Cir. 1995) .............................39

*Dunkin' Donuts Inc. v. Patel*, 174 F.Supp. 2d 202 (D.Md. 2001) ................................57, 58

*Eisenberg v. Gagnon*, 766 F.2d 770 (3rd Cir. 1985) ....................................38, 39

*Fine v. American Solar King Corp.*, 919 F.2d 290 (5th Cir. 1990) ....................................62

*First Options of Chicago v. Wallenstein*, 1994 WL 229554 *3..........................................53

*Fort Washington Resources, Inc. v. Tannen*, 858 F. Supp. 455
(E.D. Pa. 1994)..........................................................................................55, 58, 59, 62

*Frank Cooke, Inc. v. Hurwitz*, 406 N.E.2d 678 (Mass. App. Ct. 1980)............................63

*Halwrson v. Sooy*, 782 P.2d 161 (Or. Ct. App. 1989) ........................................59

*Hochfelder v. Ernst & Ernst*, 503 F.2d 1100 (7th Cir. 1974) ...............................59

*Holt Cargo. Systems, Inc. v. Delaware River Port Authority*, 20 F. Supp. 2d
803 (E.D. Pa. 1998)..............................................................................37

*In re Atlantic Fin. Management, Inc. Sec. Litig.*, 718 F.Supp. 1003
(D. Mass. 1988)....................................................................................61

*In re Sahlen & Associates, Inc.*, 773 F.Supp. 342 (S.D. Fla. 1991)....................62

*Industrial Indemnity Co. v. Touche Ross & Co.*, 13 Cal. App. 4th 1086 (1993)..........40, 48

*Josey v. John R. Hollingworth Corp.*, 996 F. 2d 632 (3rd Cir. 1993)................................37

*Krisa v. The Equitable Life Assurance Society*, 109 F.Supp. 2d 316 (M.D. Pa. 2000) ....61

*MacNerland v. Barnes*, 129 Ga. App. 367, 199 S.E.2d 564 (1973) ..................................60

*Maduff Mortgage Corp. v. Deloitte, Haskins & Sells*, 779 P.2d 1083
(Or. Ct. App. 1989) ...............................................................................59

*Matter of Hawaii Corp.*, 567 F.Supp. 609 (D. Hawaii 1983)............................................59

*Morrissey v. Procter & Gamble Co.*, 379 F. 2d. 675 (1st Cir. 1967) .................................38

*Neuman v. Corn Exchange Nat. Bank & Trust Co.*, 356 Pa. 442 (1947)...........................62

*North American Specialty Insurance Co. v. Dias & Lapalme*, 258 F.3d 34
(1st Cir. 2001) ...............................................................................49, 50, 51

*Raritan River Steel v. Cherry*, 367 S.E. 2d 609 (N.C. 1998)..............................................41

*Reed v. Binder*, 165 F.R.D. 424 (D.N.J. 1996) .................................................................57

*Rempel v. Nationwide Life Insurance Co., Inc.*, 370 A.2d 366 (Pa. 1977).......................39

*Rhode Island Hospital Trust National Bank v. Swartz, Bresenoff, Yavner
& Jacobs*, 455 F.2d 847 (4th Cir. 1972) ...............................................................60

*Robert Wooler Co. v. Fidelity Bank*, 330 Pa. Super. 523 (1984)......................................55

*Ryan v. Kanne*, 170 N.W.2d 395 (Iowa 1969).................................................................60

*Sain v. Cedar Rapids Community School District*, 626 N.W.2d 115 (Iowa 2001)............52

*Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280 (1971)..............................................62

*Sisken v. Cohen*, 363 Pa. 580 (1950) ................................................................................62

*Tomalski v. State Farm Ins. Co.*, 494 F. 2d 882 (3rd. Cir. 1974) ........................................38

*United States v. Arthur Young & Co.*, 465 U.S. at 817-18 .................................................46

*Weisblatt v. Minnesota Mutual Life Ins.*, 4 F.Supp. 2d 371 (E.D. Pa. 1998).....................53

*Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey
& Associates*, 39 F.Supp 2d 577 (M.D. Pa. 1999) ...................35, 36, 38, 39, 51, 53, 56, 61

Statutes

8 P.S. §191 ...........................................................................................................6, 45

Rules of Court

40 U.S.C. §270...................................................................................................6, 45

Fed. R. Civ. P. 26...............................................................................................56, 57

Fed. R. Civ. P. 56...................................................................................................58

Restatements

Restatement (Second) of Torts §8A...........................................................................41

Restatement (Second) of Torts
§552..................................................1, 2, 35, 38, 39, 40, 41, 43, 45, 46, 47, 49, 52, 53, 54

Other

AICPA Technical Aids, Statement of Position ("SOP") 81-1, Accounting for
Performance of Construction-Type and Certain Production-Type Contracts,
July 15, 1981 .........................................................................................................28

Central Pennsylvania Business Journal .......................................................................3

Horwath International Audit Manual.....................................................................26, 27

International Risk Management Inst. Inc., *Construction Risk Management*,
*Vol. III* XII.A.10 (2000)...........................................................................................21

John B. Fitzgerald, Ray Britt & Daniel D. Waldorf, *Principles of Suretyship*,
*Vol. I* 82, (Insurance Institute of America, 1st ed. 1991)............................................8

O'Reilly, Hirsch, Defliese & Jaenicke, *Montgomery's Auditing*, p. 821
(Wiley, 11th ed. 1990) ....................................................................................60

SAS No. 1, AU Section 230..........................................................................27, 28

SAS No. 22, AU Section 311.........................................................................27, 28

SAS No. 31, AU Section 326..............................................................................21

SAS No. 57, Auditing Accounting Estimates (Professional Standards,
AU Section 342) ..................................................................................................25

SAS No. 57, Related Party Disclosures, March 1982.......................................21

#254739 v1/36432/87

# I. INTRODUCTION

The importance of the independent auditor's report in the commercial world cannot be overemphasized. In most instances, the audit report is the only objective evidence of a company's financial health. Loans and investments are made each year in the United States based upon information contained in audited financial statements. The auditor's role in this process is clear; an unqualified opinion in the independent auditor's report signifies that he has taken all steps reasonable and necessary to ensure that his report presents fairly the financial condition of his audit client in accordance with Generally Accepted Accounting Principles.

There is substantial evidence that Brown Schultz Sheridan & Fritz ("Brown Schultz") fell far short of the level of care and diligence expected of certified public accountants in its preparation of the audited financial statements for CCI Construction, Inc. ("CCI"). The audited financial statements prepared by Brown Schultz for CCI for the year ended December 31, 1997 incorrectly represented that CCI produced a net profit of $706,879 when, in fact, CCI actually *lost* $109,081. In a similar, but a more significant vein, Brown Schultz' audited financial statement prepared for CCI for the year ended December 31, 1998 incorrectly showed that CCI produced a profit of $59,041 when it actually *lost* $3,067,467. The materiality of the differences between the net profit information contained in Brown Schultz' audited financial statements and CCI's actual net losses are readily apparent.

Further, based upon the Report and Recommendation dated August 10, 2001 (Smyser, M.J.) (the "Report") which was adopted by Judge Kane, privity is not a requirement for a claim of negligent misrepresentation under Pennsylvania law, and Pennsylvania has fully adopted Restatement (Second) of Torts §552.

Thus, in light of the plethora of admissible evidence showing that Brown Schultz had actual knowledge that USF&G was the intended recipient of CCI's audited financial statements and that USF&G would rely upon such audited financials relative to its decisions concerning the establishment and continuation of CCI's bonding program, summary judgment on the purported bases that USF&G either lacks privity or cannot establish the requisite elements of Restatement (Second) of Torts §552 cannot be granted. Further, not only are the issues of materiality, justifiability and reliance raised by Brown Schultz generally improper for adjudication as part of a summary judgment motion, there are also numerous issues of material fact in dispute concerning this case that the futility of Brown Schultz' motion is manifest.

## II. STATEMENT OF FACTS

A.    THE PRINCIPAL ACTORS.

### USF&G

USF&G is in the business of issuing payment and performance bonds on behalf of contractor and subcontractor principals engaged in the performance of work on public and private construction projects.[1] In 1998, USF&G merged with St. Paul Fire and Marine Insurance Co. ("St. Paul"). St. Paul and USF&G have both been in the surety bond business for over 100 years. USF&G and St. Paul serve as the bonding company for thousands of construction contractors and subcontractors, including some of the largest construction contractors in the United States.[2]

---

[1] Affidavit of Anthony S. Phillips in Opposition to the Defendants' Motion for Summary Judgment ("Phillips Affidavit"), filed contemporaneously herewith, ¶5.
[2] *Id.*

## CCI

CCI was a contractor engaged in construction work on public and private construction projects and maintained principal offices in Camp Hill, Pennsylvania. John Ortenzio ("Ortenzio") formed CCI, formerly known as Commercial Construction Company, in 1983. Prior to CCI's formation, Ortenzio had obtained a BS degree in Business Management and had worked in the construction industry since 1979. Incidental to the underwriting process, Ortenzio provided USF&G with an organization chart and resumes of the key officers and employees. Personal acquaintances of the individuals and the company concluded all to be of good character and well qualified for their respective corporate duties. There was a good balance of business, engineering and field production capabilities.[3]

CCI's job experience from its inception up to 1993-1994 was primarily in private, negotiated construction of medical and healthcare buildings, predominately for one owner, a large publicly traded corporation headed by Ortenzio's father, Rocco Ortenzio.[4] CCI's financial results since inception were impressive. Its net worth as of December 31, 1993 was $4.1 million. Its business plan included entry into the public bid market. Although this represented a change in the type of market in which CCI had historically operated, by all objective standards, CCI possessed the management and financial capabilities to undertake this new direction.[5]

In 1994, because of the success of CCI, Ortenzio was named "Entrepreneur of the Year" by the Central Pennsylvania Business Journal.[6]

---

[3] Affidavit of Richard D. Farnsworth in Opposition to the Defendants' Motion for Summary Judgment ("Farnsworth Affidavit"), filed contemporaneously herewith, ¶12.
[4] *Id.*, ¶13.
[5] *Id.*, ¶13.
[6] Document USFG/BS 0860, attached to the Affidavit of Bruce Levin ("Levin Affidavit"), filed contemporaneously herewith, as Exhibit "22."

<u>Brown Schultz Sheridan & Fritz</u>

At all times material and relevant to this action, Brown Schultz and its staff have been engaged in business as independent Certified Public Accountants.  Also, according to its website, Brown Schultz "is one of the largest regional firms in central Pennsylvania with offices in Harrisburg and Lancaster" and claims to have "extensive experience in," among other fields, construction and insurance.  Brown Schultz has fifteen (15) principals, including Bruce J. Brown ("Brown"), who "is one of the founding principals, Chief Executive Officer and Shareholder of Brown Schultz Sheridan & Fritz, 1990 to present."[7]

<u>Pennsylvania Contractors Insurance Co.</u>

Pennsylvania Contractors Insurance Co. ("PCIC") is a captive insurance company formed for tax planning purposes and to fund the cost of performing warranty work on rehabilitation hospitals which CCI had previously constructed.  PCIC is wholly owned by CCI's sole stockholder, Ortenzio.  Ortenzio is also President of both PCIC and CCI.[8]  Although incorporated in the Turks & Caicos Islands, PCIC shared a business address with CCI in Pennsylvania.  On information and belief, PCIC is no longer operational and is in the process of being liquidated.[9]

Since its inception, Brown Schultz prepared tax returns and audited financial statements for PCIC.[10]

---

[7] http://www.bssf.com
[8] Deposition of Bruce J. Brown ("Brown Deposition"), p. 78, lines 1-25, p. 79, lines 1-12, attached to the Levin Affidavit as Exhibit "5."
[9] *Id.*, p. 155, lines 18-25, attached to the Levin Affidavit as Exhibit "5."
[10] *Id.*, p.15, lines 10-16, p. 78, lines 9-10, p. 80, lines 9-11, attached to the Levin Affidavit as Exhibit "5."

4

B.    THE BASICS OF CONSTRUCTION BONDING AND UNDERWRITING.

<u>Surety Bonds Versus Insurance</u>

Unlike an insurance policy, which is a two-party contract between the insured and the insurance company, a construction surety bond is a three-party instrument between and among the "Surety", the "Principal," and the "Obligee."  Construction surety performance bonds are binding commitments by the "Surety" (USF&G in this instance) by which the surety guarantees the performance of a construction contract by the contractor procuring the surety bond.  The contractor procuring the bond is referred to as the "Principal" and the beneficiary of the bond – usually the project owner – is referred to as the "Obligee."  In this action, CCI was the Principal and the various project owners – including the Commonwealth of Pennsylvania – were the obligees as to all performance bonds issued by USF&G.[11]

The surety's obligations to the obligee arise only if there has been a default by the Principal.  In such a case, the obligee makes demand upon the Surety to perform the work that should have been performed by the Principal or, in the case of payment bonds, to pay the claims of various unpaid supplies of labor and material.  Additionally, the surety's liability under the bond is usually capped by a penal sum set forth in the bond.  The penal sum is usually the price stipulated in the bonded construction contract.[12]

Insurance policies and surety bonds also differ in how they are underwritten.  Insurance policies are usually written for a term of months or years and are priced based on the allocation of the insurance risk over thousands of insureds.  No credit is issued or extended by the insurance

---

[11] Phillips Affidavit, ¶7.
[12] *Id.*

5

company to its insured with respect to insurance policies. In contrast, surety bonds are issued and the allocation of risk is determined on an individual basis.[13]

Pennsylvania, most other states and the United States have statutes which require all contractors working on public projects to provide payment and performance bonds. *See*, 8 P.S. §191, *et seq.*; 40 U.S.C. §270 *et seq.* Thus, a bonding program is crucial to any contractor seeking to perform public construction work.

The Process For Underwriting A Bonding Program

Underwriting is the process of gathering facts relevant to the risk of bonding a contractor. The process includes evaluating the pertinent data, determining the strengths and weaknesses of the account and deciding upon a course of action. The primary function of the surety in the contract bond underwriting process is the prequalification of the contractor. When the surety executes a bond it is, in effect, saying to the obligee that it has performed an analysis of the contractor's management and technical skills; that it has studied the contractor's financial condition; and that it believes the contractor is fully qualified in all respects to perform the contract in question. The surety is prepared to back this judgment by committing the assets of its company in support of this decision. Before the surety can make such a commitment, it must first underwrite the account to satisfy itself that this is a company that it can support and that it is a company that possesses the ability to meet current and future obligations. If the surety's analysis is that it is an acceptable account, the surety then makes a decision on the amount of bonding capacity they are willing to provide to the contractor.[14]

---

[13] *Id.*, ¶8.
[14] Farnsworth Affidavit, ¶7.

Contract bond underwriting involves both objective and subjective evaluations by the underwriter and is considered more "art" than "science." Therefore, reducing surety underwriting to quantitative terms is very difficult, if not impossible, in most cases. The underwriter evaluates the contractor through three primary categories: Character, Capacity, and Capital. These are colloquially referred to as the "three C's" of surety bond underwriting. The underwriter analyzes and interprets the information provided to him by the contractor, such as, for example, financial statements, references, company history, management procedures, resumes of key personnel, prior job experience and from information provided by outside sources, the underwriter analyzes, interprets and applies financial data. He also assesses the history, organization, and management capabilities of the contractor, the contractor's capacity to perform each new project and the backlog of projects undertaken by the contractor. The underwriter also assesses the organization and contractor owner's reputation for fair dealing with project owners, subcontractors, suppliers, lenders, and other creditors, as well as the contractor's general reputation within the industry.[15]

### Bonds Are Issued As Part Of The Bonding Program

The process of underwriting a construction contractor involves establishing and then reviewing each year the contractor's "bonding program," also known as his "bonding capacity." Based on its assessment of the contractor, a surety will "prequalify" the contractor and create a line of credit that establishes both the maximum penal sum it will write for the contractor on a single bond and the maximum aggregate limit for all bonds combined. International Risk Management Inst. Inc., *Construction Risk Management, Vol. III* XII.A.10 (2000). This amount is expressed in terms of a single job dollar amount (contract price) and the aggregate dollar amount

---

[15] *Id.*, ¶8.

7

of work to be performed on uncompleted contracts (backlog or work on hand) and is often referred to as the "bonding program." The bonding program may be expressed both as a single job and as an aggregate backlog limitation. John B. Fitzgerald, Ray Britt & Daniel D. Waldorf, *Principles of Suretyship, Vol. I* 82, (Insurance Institute of America, 1st ed. 1991). For example, a contractor's bonding program may be set at $5 million for a single project and $20 million as an aggregate limit. This aggregate limit is computed based upon the amount of backlog a contractor has and not on the total penal sum of all bonds issued by the surety. The reason for this is that the contractor works off his backlog daily, thereby reducing the surety's exposure on existing bonds and enabling the contractor to obtain new bonded work within the parameters of the bonding program. For bonds written within the bonding program, the amount of underwriting on a bond is usually minimal. The program is normally conditioned on there being no material adverse changes in the contractor's finances and management and is limited to jobs that are within the contractor's normal type of work and geography, subject to standard contract terms and conditions. The program normally stays in place for one year.[16]

It is necessary to establish a bonding program, because it is almost always impossible to predict the identity and size of the projects on which a contractor will be successful in obtaining throughout the year. Thus, the bonding program allows a contractor to bid jobs knowing that, absent an adverse change in his business or finances, he is eligible to receive bonding within the bonding program's parameters. This is especially true of public work where initial bid advertisements may not be published until after the annual underwriting review and after the

---

[16] *Id.*, ¶9.

determination as to whether the establishment or continuation of the bonding program has been made.[17]

The surety reviews the bonding program on an annual basis, normally after the surety receives the contractor's audited financial statement.  A meeting is held between the contractor, agent and underwriter at that time to review the contractor's business plan for the remainder of the year. Sometimes, no meeting will be required. The underwriter determines the level of bonding support the contractor needs in order to meet his business plan and, if acceptable to the underwriter, an understanding is reached between the contractor, agent and surety as to the size of the bonding program.[18]

From USF&G's (and most other sureties') perspective, the bonding program is determined based on the volume of business which the contractor expects to perform in the coming year and not the issuance of specific bonds.  In CCI's case, once its bonding program was approved each year, CCI's request for bonds within the parameters of that program would normally be granted.[19]

Therefore, although each job must be submitted to the surety for specific approval prior to bidding, a new annual audit is not required each time a bond is requested as long as the new request is within the parameters of the bonding program.  Indeed, it would be extremely expensive and impractical (if not impossible) to require the contractor to provide the surety with an audit report every time the contractor obtains a new contract.  Once a bond has been issued, it is nearly impossible for that bond to be revoked.[20]

---

[17] *Id.*, ¶10.
[18] *Id.*
[19] *Id.*
[20] *Id.*

C.    USF&G ESTABLISHES A BONDING PROGRAM FOR CCI.

<u>CCI Establishes a Bonding Program with USF&G</u>

CCI became a USF&G account in late 1993. At that time, CCI and its management team enjoyed a very good reputation and had previously been bonded with a large top-tier national surety company.[21]

As a condition of the establishment and the annual extension of CCI's bonding program and the issuance of the payment and performance bonds to CCI, USF&G required that CCI furnish to it annually an audit report prepared by an independent certified public accountant consisting of, *inter alia*, an audit of CCI's balance sheet and income statement.[22] USF&G also required that CCI, as well as Ortenzio, execute the Master Surety Agreement by which they agreed to, *inter alia*, indemnify and hold harmless USF&G for any losses USF&G might incur relative to its issuance of bonds on behalf of CCI.[23]

CCI's bonding program consisted of a $15 million per project limit and a $75 million aggregate limit. CCI had a total annual revenue of approximately $48.2 when the bonding program was established in 1993. This bonding program remained in effect until approximately early October 1999 when USF&G ceased writing bonds for CCI.[24]

<u>Brown Schultz Knew That USF&G Would Receive And Rely Upon Its Audits</u>

As the long term auditor of CCI – as well as other entities owned by Ortenzio and his family – Brown Schultz was familiar with CCI's business operations and its financial

---

[21] Phillips Affidavit, ¶12.
[22] *Id.*, ¶16.
[23] Deposition of John Ortenzio, p. 85, lines 15-25, attached to the Levin Affidavit as Exhibit "28."
[24] Phillips Affidavit, ¶3.

condition.[25]  Brown Schultz also knew that the audited financial statements it prepared for CCI would be provided to CCI's bonding company, which at the times material and relevant to this action, Brown Schultz knew to be USF&G and St. Paul.  Brown Schultz' working papers show that the audits were done for the benefit of CCI's "bonding company," which they identify as USF&G and St. Paul.[26]

Brown Schultz also knew that USF&G would rely upon its audited financial statements to determine whether to extend, suspend, cancel or modify the bonding program which USF&G established for CCI and to issue payment and performance bonds to CCI.  Brown Schultz's principal, Brown, testified that "[h]e knows that [bonding companies] use [financial statements] to determine how they give bonds."[27]

Not only did Brown Schultz know that USF&G would receive and rely upon its audited financial statements, Brown Schultz also considered USF&G's intended use of the financial statements in designing its audit plan for CCI.[28]  Brown Schultz' working papers indicate that Brown Schultz knew that because the audited financials would be used by USF&G there was a risk of an "overstatement" of the financials by CCI's management.[29]  Brown Schultz' working papers also indicate that bonding companies "expect favorable financial statements."[30]

---

[25] Brown Deposition, p. 78, lines 1-25, p. 79, lines 1-9, p. 80, lines 9-11, attached to the Levin Affidavit as Exhibit "5."

[26] Document BS 1590, attached to the Levin Affidavit as Exhibit "14"; Document BS 00772 attached to the Levin Affidavit as Exhibit "15."

[27] Brown Deposition, p. 26, lines 3-7, attached to the Levin Affidavit as Exhibit "5."

[28] Brown Deposition, p. 25, lines 20-25, p. 26, lines 1-7, p. 27, lines 7-9, attached to the Levin Affidavit as Exhibit "5"; Deposition of Susanne Ehgartner ("Ehgartner Deposition"), p. 81, lines 22-25; p. 82, lines 1-21, p. 155, lines 2-17, attached to the Levin Affidavit as Exhibit "6"; Document BY 00500, Document USFG/BS 01853, Document BS 01590, Document BS 00772, Document BS 01755, and Document BS 00169, attached to the Levin Affidavit as Exhibits "12," "13," "14," "15," "16" and "17."

[29] Document BS 00772, attached to the Levin Affidavit as Exhibit "15"; Ehgartner Deposition, p. 155, lines 1-23.

[30] Document BS 00774, attached to the Levin Affidavit as Exhibit "26."

11

Brown Schultz' working papers also contain several documents which show that Brown Schultz was aware of the size of CCI's bonding program.  A document contained in Brown Schultz' "Permanent File" entitled "Written Consent of Shareholder in Lieu of Special Meeting" ("Written Consent") dated August 27, 1997 states, in pertinent part, that Ortenzio "has agreed to maintain the equity level of [CCI] no less than $4,800,000 and require an aggregate work [bonding] program no higher than $60,000,000 . . . ."[31]  Another document bearing the same title and date contains an excerpt from Brown Schultz' working papers showing that for the year ended "12/31/97" CCI had equity greater than $4,800,000 and its sales were less than $60,000,000.00 (with actual sales being listed as "$35,000,000").[32]  The working paper was prepared by "CPR," the initials of Brown Schultz' former employee Corinne Rebinski.  Another former Brown Schultz employee, Deborah Bowman, testified that the foregoing document "appears to be testing - - a work paper to determine if the levels were - - if everything fell within the levels."[33]

Two months later, in a letter dated November 7, 1997, CCI's bonding agent, David Dominiani ("Dominiani") wrote to Ortenzio concerning "[CCI's] current bonding program" and reminded Ortenzio about CCI's earlier agreement reflected in the Written Consent that "USF&G requires your corporate balance sheet to maintain an equity level of no less than $4,800,000.00." Brown is an indicated recipient of a copy of Dominiani's letter.[34]

Brown Schultz was not only CCI's longtime auditor, but continued in that capacity. Brown Schultz charged CCI annual audit fees oftentimes with a planned loss of $2,000-$3,000

---

[31] Document BS 001755, attached to the Levin Affidavit as Exhibit "16."
[32] Document BS 1853, attached to the Levin Affidavit as Exhibit "13."
[33] Deposition of Deborah Bowman ("Bowman Deposition"), p. 63, lines 17-19, attached to the Levin Affidavit as Exhibit "7."
[34] Document BY 00500, attached to the Levin Affidavit as Exhibit "12."

on the audit assignment, likely as an inducement not only for future business from CCI, but in the hope of obtaining business from other entities with which Ortenzio was affiliated.[35]

Brown Schultz also knew that CCI intended to self-perform various tasks that it formerly subcontracted out and that CCI intended to engage in increased amount of heavy construction and highway work.[36] Further, Brown Schultz knew of the type of work engaged in by CCI, including – at least from 1993 onwards – a considerable amount of public construction work that, as a matter of Pennsylvania and federal law, would require that Brown Schultz be able to procure payment and performance bonds.[37]

Brown Schultz was also familiar with the scope and parameters of the total amount of work which CCI performed each year, as well as the anticipated amount of work it would perform in subsequent years. In fact, the range and type of work performed by CCI in the years pertinent to this action were remarkably similar. This can be seen in the schedule labeled "Contracts-in-Progress" which is part of Brown Schultz' audited financial statements for the years ended December 31, 1995 through 1998.[38] This schedule identifies the projects which remained incomplete in each year; a good indicator of the outstanding work which CCI had to complete and a close approximation of the extent to which CCI had used the aggregate limit portion of its bonding program. It also showed that the size of CCI's projects did not materially change from year to year. For example, the "Contracts-in-Progress" chart incorporated into the 1995 Audit Report shows that CCI was engaged in 9 projects ranging in total contract price from approximately $3 million to $15.3 million (contracts showing a total contract price of less than

---

[35] Brown Deposition, p. 36-38, attached to the Levin Affidavit as Exhibit "5."
[36] Document BS 2045, attached to the Levin Affidavit as Exhibit "27."
[37] Excerpted pages from the audited financial statements for the years ended December 31, 1995 through 1998 are attached to the Levin Affidavit as Exhibit "29."
[38] *Id.*

13

$300,000 are excluded because they likely represent repair work). The "Contracts-in-Progress" chart incorporated into the 1996 Audit Report shows that CCI was engaged in 4 significant projects ranging from approximately $2 million to $16.4 million. The "Contracts-in-Progress" chart incorporated into the 1998 Audit Report shows that CCI was engaged in 11 significant projects ranging from approximately $1.5 million to $15.5 million.

Accordingly, the mix and size of projects – heavily tilted to the public sector – shows that Brown Schultz was aware of the type and scale of the work being performed by CCI and the approximate amount of bonding capacity that would be needed by CCI to do such work.

Relying Upon The Audits Prepared By Brown Schultz, USF&G Issues Bonds To CCI

Brown and Brown Schultz prepared audited financial statements for CCI for several years beginning on or before 1993 including audited statements for the years ended December 31, 1996 (the "1996 Audit Report"), December 31, 1997 (the "1997 Audit Report") and December 31, 1998 (the "1998 Audit Report") (collectively, the "Audited Financial Statements").[39]

On May 2, 1997, USF&G received a copy of the 1996 Audit Report and in reliance, USF&G agreed to continue its $15 million/$75 million bonding program for CCI and, thereafter, USF&G issued payment and performance bonds to CCI for, *inter alia*, the following projects:[40]

|   | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Albemarle – Charlottesville Regional Jail | Additions and Renovations to Regional Jail | 26-0120-12995-98-7 | 1/21/98 | $14,682,402 |
| B. | Johnstown | Air Traffic Control Tower | 26-0120-41362-97-1 | 9/30/97 | $3,734,530 |
| C. | Lord Fairfax | Phase I-Lord Fairfax Community College | 26-0120-41364-97-4 | 10/20/97 | $7,409,292 |

---

[39] Copies of the 1996 Audit Report, 1997 Audit Report and 1998 Audit Report are attached to the Levin Affidavit as Exhibits "30," "31," and "32," respectively.

[40] Phillips Affidavit ¶24; Affidavit of James Daily in Opposition to Defendants' Motion for Summary Judgment ("Daily Affidavit"), filed contemporaneously herewith, ¶17; Affidavit of David L. Hussey in Opposition to the Defendants' Motion for Summary Judgment ("Hussey Affidavit"), filed contemporaneously herewith, ¶12.

| | | | | | |
|---|---|---|---|---|---|
| D. | Outlook-Hilliard | Construction of Outlook Point at Hilliard | 26-0120-13008-98-0 | 2/23/98 | $5,598,750 |
| E. | Perry Point | 80 Bed Psychiatric Care Building | 26-0120-13002-98-1 | 2/13/98 | $13,297,844 |

In August 1997, USF&G received notification from CCI's president, Ortenzio, that he wanted to have his personal indemnity agreement with USF&G terminated.[41]  Ortenzio had the right to terminate his indemnity agreement upon giving proper notice to USF&G.[42]  Ortenzio did agree, however, that if CCI's equity level fell below $4.8 million and/or CCI's bonding program consistently went above $60 million, Ortenzio understood that USF&G reserved the right to discuss the need for reinstatement of his personal indemnity.[43]  This was reflected in the Written Consent discussed on page 11 *supra*.  Based upon the Brown Schultz audited financial statements for 1997 and 1998, CCI's equity levels were well in excess of $4.8 million; in 1997, CCI's net equity was approximately $5,455,000 and in 1998 it was approximately $5,250,000.  This would support at least a $60 million bonding program.[44]

On March 3, 1998, USF&G received a copy of the 1997 Audit Report and in reliance, USF&G agreed to continue the $15 million/$75 million bonding program for CCI, thereafter, USF&G issued payment and performance bonds to CCI for, *inter alia*, the following projects:[45]

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $15,647,035 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $7,220,942 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $3,919,156 |

---

[41] Phillips Affidavit, ¶25; Daily Affidavit, ¶18.
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] Phillips Affidavit, ¶16, 26; Daily Affidavit, ¶19; Hussey Affidavit, ¶13.

15

| | | | | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $5,591,730 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $18,880,298 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $21,927,111 |

On March 2, 1999, USF&G received a copy of the 1998 Audit Report and in reliance, USF&G agreed to continue the $15 million/$75 million bonding program for CCI and it issued payment and performance bonds to CCI for, *inter alia*, the following projects:[46]

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $514,976 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $835,299 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $1,688,139 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $191,083 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $12,191,000 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $4,126,478 |
| E. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $28,231,945 |

### USF&G's Underwriting Process For CCI

Following USF&G's receipt of the Audited Financial Statements each year, USF&G's underwriters began the task of reviewing and analyzing each statement. From 1993 through 1998, Anthony S. Phillips ("Phillips"), a 32 year veteran underwriter currently serving as a St. Paul Surety Underwriting Specialist handling several of St. Paul's major accounts, personally read each statement and performed a basic analysis of each statement relative to CCI. Phillips served as USF&G's and then St. Paul's surety bond underwriting manager in charge of USF&G/St. Paul's Harrisburg, Pennsylvania office. However, it was Steven Salazar's

_____

[46] *Id.*, ¶16, 27, 20, 14.

("Salazar"), the other underwriter in the Harrisburg office, job to perform a more detailed analysis, which would then be reviewed by Phillips and James Daily ("Daily"), the senior bond underwriter for USF&G and St. Paul in Baltimore, Maryland.[47]

Salazar's overall analysis of CCI, including his analysis of the Brown Schultz audited financial statements, was memorialized annually in a document entitled "USF&G Interoffice Correspondence" ("Interoffice Correspondence"), which detailed the information contained in the Brown Schultz audited financial statements as well as other information, such as CCI's banking relations, insurance coverages, and recommendations concerning CCI's bonding program.[48]  Apparently, no Interoffice Correspondence was prepared by Salazar for 1998. However, both Salazar and Phillips reviewed and analyzed the 1998 Audit Report shortly after receipt on March 2, 1999.[49]

The Audited Financial Statements appeared to be well-presented and, on their face, they did not reveal any defects in the manner in which Brown Schultz audited CCI's balance sheet.[50] Moreover, Phillips believed Brown Schultz enjoyed a good reputation in the Harrisburg, Pennsylvania area and claimed to have specific expertise in the auditing of construction contractors.[51]  During the time when USF&G was issuing bonds for CCI, Phillips received no information from any sources that would have led him to conclude that the financial information contained in the Brown Schultz audited financial statements was inaccurate or misleading.[52]

---

[47] Phillips Affidavit, ¶2, 3, 17.
[48] Id., ¶18.
[49] Id.
[50] Id., ¶19.
[51] Id.
[52] Id.

As each Interoffice Correspondence demonstrates, USF&G's Harrisburg, Pennsylvania office recommended a continuation of the $15 million/$75 million bonding program for CCI.[53] Indeed, throughout CCI's bonding relationship with USF&G, those bonding capacity limits continued year-to-year although, on a few occasions, USF&G approved bonds which temporarily increased CCI's bonding capacity beyond $75 million. Those "spikes" (as they are known in the surety industry) in CCI's bonding program were short-lived since CCI worked off its backlog, thereby reducing the aggregate limit of the bonding program to $75 million or below.[54] Also, on a very few occasions, USF&G approved a spike in CCI's single limit bonding program to allow CCI to accept a project larger than $15 million. This was only done after considering both the facts and circumstances of the project and the financial position of CCI. The analysis of CCI's financial position was based, in large part, on the Audited Financial Statements.[55] During the period from 1997 until USF&G/St. Paul ceased writing bonds for CCI in early October 1999, USF&G only approved four jobs that were larger than the $15 million single limit portion of the bonding program.[56]

During the time when USF&G was writing bonds for CCI, USF&G did not have any specific, formal, underwriting guidelines for its bonding accounts. Rather, USF&G relied upon a series of documents issued by USF&G's home office known as "gray letters," as well as an unofficial underwriting training manual. The "gray letters" and the manual provided general guidance on the types of information USF&G should be obtaining from its contractors (such as, for example, obtaining an audited financial statement each year) and general guidance on

---

[53] *Id.*, ¶20.
[54] *Id.*
[55] *Id.*
[56] *Id.*

underwriting methods and procedures.[57]  However, with respect to CCI and other USF&G

accounts of a size similar to CCI, USF&G generally wanted the accounts to maintain a working

capital-to-bonding capacity ratio of 3% or better and a net worth-to-bonding capacity ratio of 5%

or better.  "Working capital" is the dollar amount obtained when current liabilities are subtracted

from current assets and "net worth" is determined by subtracting all liabilities from all assets.[58]

Based upon the Audited Financial Statements, CCI maintained the 3%-5% ratios described above

except on limited occasions when USF&G approved a bond which temporarily increased CCI's

bonding capacity beyond $75 million.[59]

     USF&G would also receive an unaudited interim financial statement prepared internally

by CCI (generally for the first six months of each year), as well as certain internally prepared

work-in-progress schedules which were received quarterly.  These work-in-progress schedules

detailed how CCI's incomplete construction projects were performing.  Although these interim

reports from CCI were important, they were not nearly as important as the audited financial

statements prepared by Brown Schultz each year.[60]  Accordingly, USF&G would compare the

interim financial statements with the Audited Financial Statements issued before the interim

statements, as well as the Audited Financial Statements issued after the interim financial

information had been received.  This comparison was important when CCI experienced profit

fades or losses on some of its projects.  In those circumstances, USF&G reexamined the Audited

Financial Statements issued before the interim financial statement to determine whether the profit

fades or losses were new occurrences or represented continuing losses on contracts in progress.

---

[57] *Id.*, ¶21.
[58] *Id.*
[59] *Id.*, ¶22.
[60] *Id.*, ¶23.

USF&G also used the prior Audited Financial Statements to compute what CCI's cash and equity positions would be if such profit fades or losses continued. Almost every aspect of USF&G's underwriting process relied upon the then most recently issued audited financial statement as a basis for comparing CCI's profitability, net worth, and ability to perform work. The information gleaned from the Audited Financial Statements was an integral part of USF&G's underwriting analysis for CCI. It also served as an indicator of the credibility of information being received from CCI and its management.[61]

<u>An Interim Loss In 1998 Turns Into a Profit by Year End According to the 1998 Audit Report</u>

On or about August 17, 1998, Dominiani reported that CCI had posted a net loss of $1.6 million for the first six months of 1998.[62] Dominiani reported that this loss was attributable to certain problem jobs which had been rectified. In fact, according to Dominiani, CCI expected to show a small loss or break even by December 31, 1998.[63] Dominiani's statements and the corrective action allegedly implemented by CCI proved, based on the 1998 Audit Report, to be true.[64] Thus, the decision was again made by USF&G to continue CCI's bonding program at the $15 million/$75 million levels, at least until USF&G could verify and review the year end results for 1998.[65]

USF&G's Harrisburg, Pennsylvania office received a copy of the 1998 Audit Report on March 2, 1999.[66] The Audit Report confirmed what Dominiani had represented to Phillips; namely, that CCI had its problem jobs under control and that CCI expected a break-even or

---

[61] *Id.*
[62] *Id.*, ¶28.
[63] *Id.*
[64] *Id.*, ¶29.
[65] *Id.*
[66] *Id.*, ¶30.

slightly profitable year.  In fact, as reported in the 1998 Audit Report, CCI produced a profit of $59,041.00 and reduced its operating loss to $116,629.00.  CCI also maintained a comparatively strong net worth – $5,254,834.00 – and had, according to Brown Schultz, cash and cash equivalents of at least $2,429,866.00 and marketable securities of $631,481.00.[67]

During the years 1997, 1998 and at least until October 1, 1999, Phillips was not aware of any serious problems that CCI had suffered such as labor strikes, uninsured losses, or project defaults.[68]

### USF&G Issues CCI's Last Bond

On or about August 30, 1999, Phillips received a letter from Dominiani reporting that CCI had sustained a loss of approximately $900,000.00 during the first six months of 1999 due to certain problem projects.[69]  In that letter, Dominiani advised Phillips that CCI anticipated losing approximately $1 million in 1999.[70]

Upon Phillips' receipt of the foregoing information from Dominiani, he requested a meeting with CCI management to ascertain exactly what problems CCI was experiencing.[71]  The only bond issued by USF&G thereafter was a very small bond in the penal sum of $191,083 for the Cool & Cold Aqua project.  This was a bond related to the same project as to which USF&G issued a $12 million bond on or about July 12, 1999.  Thereafter, in early October 1999, further bonding by USF&G of CCI was suspended.  No further bonds were ever issued to CCI by USF&G.[72]

---

[67] *Id.*
[68] *Id.*, ¶31.
[69] *Id.*, ¶32.
[70] *Id.*
[71] Phillips Deposition, p. 42, line 23-24, p. 43, lines 1-2, 19-24, attached to the Levin Affidavit as Exhibit "10."
[72] Phillips Affidavit, ¶32.

D.    THE BROWN SCHULTZ' AUDIT REPORTS ARE SUBSTANTIALLY
      INACCURATE AND CONTAIN MATERIAL MISINFORMATION.

<u>The Audited Financial Statements</u>

Generally Accepted Auditing Standards ("GAAS") comprises the standards and procedures which must be followed in the planning, preparation and issuance of an audit report by a Certified Public Accountant.[73]  One of the primary objectives of an audit is to identify high-risk audit areas and to plan the audit procedures accordingly.[74]

As noted below, Brown Schultz' workpapers identified high-risk characteristics in CCI and in CCI's individual construction contracts.  However, Brown Schultz' audit plan working papers for 1996, 1997 and 1998 were virtually identical to each other and did not reflect any consideration or additional testing procedures for any of the increased audit risks inherent in the CCI audit engagement.  Further, the actual audit work performed by Brown Schultz for the fiscal years ended December 31, 1996, 1997 and 1998 did not change significantly from year to year.[75]  This is significant in light of the fact that CCI's audit risk profile increased for 1996 through 1998 due to, among other things, the following:

• A significant dollar volume of work was being performed by CCI's subcontractors.  This should have led the auditor to consider audit procedures directed at testing subcontract costs.  For example, review of subcontractor agreements; confirmation with subcontractors; review and testing of significant subcontractor costs accumulated to date and estimated costs to complete;

---

[73] GAAS are "general standards of conduct relating to the auditor's professional qualities as well as to the judgments exercised by him in the performance of his examination and issuance of his report."  *SEC v. Arthur Young & Co.*, 590 F.2d 785, 708 n.2 (9th Cir. 1979).
[74] Affidavit of Steve J. DeBruyn in Opposition to Defendants' Motion for Summary Judgment ("DeBruyn Affidavit"), ¶7.
[75] *Id.*, ¶8.

- Brown Schultz' knowledge of and its documentation in its audit work papers of past and present claims and defaults with respect to CCI's subcontractors;

- CCI's expansion in new, non-contiguous states;

- Profit fades as acknowledged by Brown Schultz in its working papers on CCI's contracts completed in subsequent years. [Profit fades are declines in the estimated or the interim profits (or losses) at the end of the preceding year to the project's actual performance at its completion. Profit fades can be due to a number of factors ranging from the contractor's performance to the default or insolvency of its subcontractors or suppliers. It can also signify that the contractor's original estimate of its costs to perform the work and its profits were inaccurate.] The primary objective of the auditor is to determine the level of reliance that can be placed on the contractor's estimated costs to complete the project. It is the auditor's job to perform sufficient testing and analysis to determine whether the contractor's estimates of its costs and profits is sound and reasonable. In light of the profit fades on a number of CCI projects from 1996 to 1997 and 1997 to 1998, Brown Schultz was required under GAAS to question the reliability of CCI's estimates and its costs to complete contracts in progress and estimated profits thereon;

- By the end of 1997 and throughout 1998, CCI was self-performing some contract work which had previously subcontracted out to others and it also purchased approximately $6-7 million worth of new construction equipment in connection with its new self-performing work;

- CCI was not properly allocating indirect costs to individual contracts. This had the effect of artificially inflating CCI's profits (or reducing losses) on individual

23

projects.  This is important for any user of CCI's audit reports who is interested to see how profitable CCI's contract work was or, alternatively, how much CCI was losing on individual contracts; and,

- The presence of significant-related party transactions including, CCI's relationship with PCIC.  (The significance of the CCI/PCIC transactions is discussed in greater detail, *infra.*)[76]

There were inadequate audit procedures performed by Brown Schultz in such important areas as CCI's contracts-in-progress generally and, specifically, the design and implementation (or the lack of) substantive audit procedures in connection with accumulated costs and estimated costs to complete of CCI's contracts.  Undue reliance was placed by Brown Schultz on CCI management's assertions with respect to costs-to-complete and estimated profits on the CCI contracts.  The determination of the accuracy of the accumulated costs to date and the estimated costs-to-complete is critical to contractors like CCI using the percentage of completion method of accounting.   The percentage of completion method recognizes revenue based on costs incurred to date divided by total estimated costs on the job, multiplied by the contract amount.[77]

In its CCI audit working papers, Brown Schultz acknowledged that its testing of 25 of CCI's cost transactions was only a test of CCI's cost controls.  That is to say, no specific testing of CCI's contract costs was performed.  This was incorrect under the circumstances extant.  The testing of 25 costs allows the auditor to make qualitative assessments about a contractor's cost

---

[76] *Id.*, ¶8.
[77] *Id.*, ¶9.

controls.  However, such testing does not replace the need to perform substantive procedures, such as vouching (ascertaining the truth of ) significant contract costs and an analytical review.[78]

CCI had substantial direct costs related to its subcontractors and there was documentation in Brown Schultz' working papers relating to past and present claims between CCI and its subcontractors, as well as evidence of subcontractor defaults.  In fact, in the December 31, 1996 financial statements of CCI, Brown Schultz footnoted that the reason for losses on certain projects was "caused by additional costs associated with subcontractor defaults and the related legal expenses to defend those cases."  Nonetheless, Brown Schultz did not send out any confirmations of amounts owed by CCI to CCI's subcontractors, nor did Brown Schultz' "Permanent Files" or its other work papers document that it reviewed CCI's subcontracts and other similar construction agreements.  In addition, Brown Schultz specifically excluded any job related expenses in its testing of unrecorded liabilities.  Instead, as noted above, Brown Schultz relied on a test of 25 selected costs throughout each year - for contract testing purposes only - and there was no evidence in Brown Schultz' working papers that it performed any analytical procedures related to accumulated job costs.[79]

The estimated costs-to-complete CCI's contracts schedule contained in the Audited Financial Statements were also deficient because Brown Schultz relied on CCI's representations as to such costs with no documentation substantiating the fact that CCI's management estimates were reasonable other than the fact that they had allegedly been verified by Sherri Phillips, CCI's Chief Financial Officer and/or Stan Sechrist, CCI's Vice President - Construction Operations.  Brown Schultz misunderstood the requirements of SAS No. 57, Auditing Accounting Estimates

---

[78] *Id.*, ¶13.
[79] *Id.*, ¶12.

25

(Professional Standards, AU Section 342), and did not follow the guidelines to properly assess the reasonableness of CCI's management estimates.[80]

In addition, it does not appear that Brown Schultz followed the *Horwath International Audit Manual* – the audit procedures manual it claims to have utilized – with respect to "basic" approaches to evaluate accounting estimates. The requirements include:

- Reviewing and testing management's process used to develop the estimates;

- Developing an independent expectation to corroborate management's estimates; and,

- Reviewing subsequent events and transactions.[81]

To the contrary, Brown Schultz' working papers show that in 1998, CCI was estimating gross profits on several contracts-in-progress that were materially higher than the historical or originally projected amounts. Subsequent review of these projects revealed that these contracts had significant profit fades and one job - no. 454, Albemarle Prison - had a loss of $957,000.00, and profit fade based on Brown Schultz' 1998 workpapers of approximately $2,600,000. Also, the files in Brown Schultz' 1998 working papers contained no evidence of any consideration by it of the allocation of indirect costs to estimated costs-to-complete, despite Brown Schultz' knowledge that CCI was self-performing more of its subcontract work than in the past. In addition, there was no follow up between the documented preliminary analytical review work and the final work, despite a material increase in the contracts in process schedule. Brown Schultz also failed to document the reasons for the significant underbillings reported at the end of

---

[80] *Id.*, ¶10.
[81] *Id.*, ¶10; Response No. 20 of Defendant Brown, Schultz, Sheridan & Fritz's Responses and Objections to United States Fidelity and Guaranty Company's First Request for the Production of Documents, attached to the Levin Affidavit as Exhibit "33."

the 1998 year.[82]  The *Horwath International Audit Manual* in section 12.049, specifically

addresses the procedures to follow if unbilled construction receivables are significant, including

the physical inspection of construction sites and architects' or engineers' reports, and, possibly,

obtaining assistance from outside specialist.[83]  Job site visits were never conducted by Brown

Schultz and the reasons therefor were not documented in Brown Schultz' work papers.[84]

In general, Brown Schultz' audit planning and its audit procedures fell below those

applicable standards of care of a certified public accountant performing the audit of CCI's

financial statements.[85]  In particular, Brown Schultz failed to conform its audit work for CCI is as

follows:

- GAAS requires all auditors to exercise "due professional care…in the
performance of the audit and the preparation of the report."  SAS No. 1, AU Section 230.
Included in the foregoing section, is the fact that due professional care requires the
auditor to exercise professional skepticism.  Based upon Stephen DeBruyn's review of
Brown Schultz audit work papers for the years 1996, 1997 and 1998 and its Audit
Reports for those years, it is my opinion that Brown Schultz failed to act with sufficient
professional skepticism and was not diligent in evaluating audit evidence;

- GAAS also requires that audit field work must be "adequately planned and
properly supervised."  SAS No. 22, AU Section 311.  As noted above, Brown Schultz'
planning documentation for the audit reports for 1996, 1997 and 1998 remain virtually

---

[82] *Id.*, ¶11.
[83] *Id.*, ¶11; a copy of Section 12.049 of the *Horwath International Audit Manual* are attached to the Levin Affidavit as Exhibit "32."
[84] DeBruyn Affidavit, ¶11; Bowman Deposition, p. 123, lines 18-20, p. 125, lines 11-13, p. 175, lines 15-17, p. 221, lines 9-10, attached to the Levin Affidavit as Exhibit "7."
[85] *Id.*, ¶6.

unchanged despite the fact that CCI had experienced significant growth in those years, was self-performing more work and had exhibited significant profit fades on a number of jobs;

- Brown Schultz also failed to properly address the risks involved in the audit of CCI and, consequently, Brown Schultz did not modify or change its audit procedures or its approach to the audit work for CCI. SAS No. 1, AU Section 230 and SAS No. 22, AU Section 311; and,

- Further, Brown Schultz' limited its testing of, among other things, accumulated job costs, subcontractor costs and subsequent disbursement of job costs. Accordingly, Brown Schultz failed to insure during its performance of audit field work for CCI that "sufficient competent evidential matter . . . was obtained . . . ." SAS No. 31, AU Section 326.[86]

### Brown Schultz' Inappropriate Recording And Inadequate Disclosure Of Related-Party Transactions Between PCIC And CCI

As discussed in greater detail, *supra*, PCIC was a captive insurance company owned by CCI's sole stockholder, Ortenzio. Brown Schultz also performed the audit and tax work for PCIC. According to applicable accounting standards, PCIC was a related party to CCI. *See* SAS No. 57, Related Party Disclosures, March 1982. On December 1, 1998, PCIC issued a Guaranty Agreement guaranteeing full payment of a CCI claim in the amount of $1,162,460.00 against the Commonwealth of Pennsylvania on Job Number 439, Mahanoy Prison. The CCI claim of $1,162,460.00 did not meet the recognition standards set forth in AICPA Technical Aids, Statement of Position ("SOP") 81-1, Accounting for Performance of Construction-Type and

---

[86] *Id.*, ¶15.

28

Certain Production-Type Contracts, July 15, 1981. Further, the Guaranty Agreement executed by PCIC in favor of CCI and dated less than a month before the close of CCI's books for the year ended December 31, 1998 did not support the recognition of $1,162,460.00 in revenue for CCI for the year ended December 31, 1998 as recorded in the 1998 Audit Report. SOP 81-1, par. 65 states that recognition of additional contract revenue relating to claims is appropriate when it is "probable" the claim will result in additional revenue and the amount can be reliably estimated.[87] In satisfying those requirements, Brown Schultz failed to document evidence that:

- • There was a legal basis for the claim or a legal opinion had been obtained (SOP 81-1 par. 65 a); and,

- • The evidence supporting the claim was objective and verifiable and not based upon management's "feel" for the situation or on unsupported representations (SOP 81-1 par. 65 d).[88]

In addition, the recording and disclosure of the third-party transaction involving PCIC and CCI in the 1998 Audit Report was misleading to the user of that report since the PCIC Guaranty was recorded by Brown Schultz as revenue. Further, the PCIC transaction was recorded as an underbilling instead of as a separate line item on the balance sheet clearly denoted as being a related party transaction. The result was a material misstatement in the 1998 Audit Report of $1,162,460.00 incorrectly reported as revenue. A more appropriate disclosure would have been to report the transaction as a separate line item on the balance sheet of CCI indicating that it was specifically guaranteed by a company owned by the sole stockholder of CCI.[89]

---

[87] *Id.*, ¶16.
[88] *Id.*, ¶16.
[89] *Id.*, ¶17.

In sum, the delineated errors, omissions and violations of professional standards resulted in the Audited Financial Statements presenting a skewed and highly inaccurate portrait of CCI's true financial conditions.  Restated financial statements prepared by Stephen J. DeBruyn, C.P.A., an expert retained by USF&G, reveal the magnitude of the effect Brown Schultz' errors had on CCI's financial picture and, consequently the underwriting process.

E.    CCI'S RESTATED FINANCIALS DEMONSTRATE THAT THE LOSSES INCURRED BY USF&G ARE ATTRIBUTABLE TO BROWN SCHULTZ' FAILURE TO PROPERLY CONDUCT ITS AUDITS AND TO ISSUE ACCURATE AUDIT REPORTS.

According to the restated balance sheet for CCI for the year ended December 31, 1997 prepared by Stephen J. DeBruyn, C.P.A., CCI's reported net income of $706,879.00 turned into a net *loss* of $109,081 and its retained earnings dropped from $5,208,489.00 to $4,392,529.00.[90] As restated, the net loss for the fiscal year ended December 31, 1997 was in stark contrast to the June 30 and September 30, 1997 interim financial statements which reported that CCI had made profits as of each of those dates of $283,339.31 and $807,000.00 respectively.[91]

In addition, CCI's restated net worth of $4,638,834.00 represented a 15% drop from the $5,454,794.00 reported in the 1997 Brown Schultz Audit Report.[92]

Based upon the foregoing, and assuming that Ortenzio was unwilling to inject additional capital into CCI and was also unwilling to reinstate his personal indemnity, USF&G's underwriters are unequivocal that USF&G would not have approved any of the bonds for the following projects:[93]

---

[90] Phillips Affidavit, ¶36; Hussey Affidavit, ¶15; Daily Affidavit, ¶21.
[91] *Id.*
[92] Phillips Affidavit, ¶37; Hussey Affidavit, ¶16; Daily Affidavit, ¶22.
[93] Phillips Affidavit, ¶38; Daily Affidavit, ¶23; Hussey Affidavit, ¶17.

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $15,647,035 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $7,220,942 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $3,919,156 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $5,591,730 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $18,880,298 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $21,927,111 |

The 1998 Audit Report did not disclose that a CCI claim for delay damages and winter conditions in the amount of $1,162,460.00 for the Mahanoy Prison project had been booked as revenue. Footnote number 8 contained in the Brown Schultz 1998 audit report merely shows that that Mahanoy Prison claim had been guaranteed by PCIC. USF&G's underwriters interpreted this footnote as meaning that if CCI did not receive payment of all or a portion of the claim asserted by CCI relative to the Mahanoy Prison, PCIC would guaranty payment of the unpaid portion sometime in the future. Neither the footnote nor the Audit Report contained any information indicating that the Mahanoy Prison claim had already been included as revenue for CCI in 1998. *Taking that claim out of revenue would have, standing alone, caused CCI to suffer a net loss of over $1 million.* That information, standing alone, would have caused USF&G to suspend CCI's bonding program as of March 2, 1999.[94]

---

[94] Levin Affidavit, Exhibit 35 (the Guaranty Agreement); Phillips Affidavit, ¶4; Daily Affidavit, ¶24.

31

With respect to the restated financial statement for CCI for the year ended December 31, 1998, based upon the factors enumerated in the proceeding paragraphs, none of the following bonds issued after USF&G's receipt of the 1998 Audit Report on March 2, 1999 would have been issued had that 1998 Audit Report contained the information in restated financials:[95]

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $514,976 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $835,299 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $1,688,139 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $191,083 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $12,191,000 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $4,126,478 |
| G. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $28,231,945 |

F.    CCI DEFAULTS AND USF&G INCURS HEAVY LOSSES UNDER THE BONDS ISSUED TO CCI.

In September 1999, CCI advised USF&G that it lacked the financial resources to continue its operations and, consequently, would not be able to complete its work and pay its suppliers and subcontractors relative to the projects bonded by USF&G. This was shocking to USF&G.[96] As discussed, *supra*, the Audit Reports gave no indication of CCI's financial troubles. Likewise,

---

[95] Phillips Affidavit, ¶41; Daily Affidavit, ¶25; Hussey Affidavit, ¶18.
[96] Phillips Affidavit, ¶31.

Phillips knew of no serious problems that would have indicated CCI's financial collapse in the fall of 1999.[97]

Subsequently, USF&G, as the surety for the payment and performance bonds which it issued for the Projects, was required to and did expend substantial sums satisfying the claims of CCI's unpaid vendors, employees and subcontractors, and in completing the projects USF&G bonded on behalf of CCI.[98]

In February 2000, CCI closed business operations and in May 2000, it filed for bankruptcy protection.[99]

As of this date, USF&G has incurred losses of approximately $28,481,061 in connection with the bonds issued in reliance upon the Audited Financial Statements. The breakdown of these losses is illustrated on the following schedules:[100]

1.   The 1996 Brown Schultz Audit Report:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Albemarle – Charlottesville Regional Jail | Additions and Renovations to Regional Jail | 26-0120-12995-98-7 | 1/21/98 | $2,140,539.39 |
| B. | Johnstown | Air Traffic Control Tower | 26-0120-41362-97-1 | 9/30/97 | $273,945.69 |
| C. | Lord Fairfax | Phase I-Lord Fairfax Community College | 26-0120-41364-97-4 | 10/20/97 | $176,787.63 |
| D. | Outlook-Hilliard | Construction of Outlook Point at Hilliard | 26-0120-13008-98-0 | 2/23/98 | $27,978.93 |
| E. | Perry Point | 80 Bed Psychiatric Care Building | 26-0120-13002-98-1 | 2/13/98 | $1,435,403.53 |
| | | | | Subtotal: | $4,054,655.17 |

---

[97] Id.
[98] Id., ¶¶34-35.
[99] Id., ¶34.
[100] Id., ¶35.

33

2.    The 1997 Brown Schultz Audit Report:

|  | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $3,828,459 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $2,376,103.34 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $139,194.88 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $2,610,876.50 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $1,045,910.35 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $4,486,554.06 |
|  |  |  |  | Subtotal: | $14,487,098.13 |

3.    The 1998 Brown Schultz Audit Report:

|  | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $235,002.59 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $79,529.64 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $411,807.72 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $228,201.80 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $4,691,871.94 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $1,360,394.87 |
| G. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $2,932,500.04 |
|  |  |  |  | Subtotal: | $9,939,308.60 |

34

## III. STATEMENT OF QUESTIONS PRESENTED[101]

A.      "Whether USF&G can establish a basis for a duty owed by Brown Schultz to plaintiff?"

Answer:  Yes.  As discussed in greater detail, *infra*, Pennsylvania law unequivocally provides that an accountant has a duty to refrain from making negligent misrepresentations regardless of whether there is a lack of privity between the accountant and a non-client who relied to its detriment upon the accountant's work product.  *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates* 39 F.Supp 2d 577 (M.D. Pa. 1999); Restatement (Second) of Torts §552.

B.      "Whether USF&G can establish the requirements of Restatement (Second) §552(2), i.e., that Brown Schultz, prior to releasing its audit report in the years at issue, was aware of the specific bonds to be issued by USF&G during the coming year and that Brown Schultz released its audit reports with the intention of influencing those transactions?"

Answer:  Yes.  As evidenced by Section II, *supra*, USF&G has presented substantial evidence that Brown Schultz was not only aware that USF&G was an intended recipient of the financial statements, but that Brown Schultz was aware of the transaction or a substantially similar transaction that the information provided in the audited financials was designed to influence; vis., the establishment and parameters of a bonding program for CCI.

---

[101] The questions are all taken from Brown Schultz' Memorandum of Law in Support of Defendants' Motion for Summary Judgment and are exact quotations as presented by Brown Schultz in its motion.  Although USF&G does not believe that the questions necessarily define all the issues extant, nor that they are material, by responding to the questions  as defined by Brown Schultz USF&G demonstrates that even on terms most favorable to Brown Schultz, the entry of summary judgment is unwarranted.

C.    "Whether USF&G can establish a misrepresentation of material fact in the 1996,
1997 and 1998 audited financial statements of which Brown Schultz was aware or should have
been aware?"

Answer:  Yes.  The DeBruyn Affidavit establishes, *inter alia*, the existence of numerous
material misrepresentations in the audited financial statements.  Some of the more egregious
errors and omissions are discussed in greater detail in Section II, *supra*.

D.    "Whether, if plaintiff could establish such a misrepresentation, plaintiff can
establish the representation was material to USF&G's underwriting of bonds for CCI?"

Answer:  Yes.  Affidavits of various underwriters involved in the underwriting of bonds
on behalf of CCI establish that the misrepresentations were material to USF&G's underwriting
decisions.  Moreover, the Affidavit of Richard Farnsworth in Opposition to the Defendants'
Motion for Summary Judgment (the "Farnsworth Affidavit"), an expert retained by USF&G,
establishes that audited financial statements are a critical part of the underwriting process and are
heavily relied upon by underwriters in making underwriting decisions.  In addition, the DeBruyn
Affidavit establishes that not only did Brown Schultz failed to meet the standard of care of a
certified public accountant, but that, once restated, the audited financial statements vary
significantly and materially from those provided by Brown Schultz.

E.    "Whether plaintiff can establish that it justifiably relied on the 1997 and 1998
audited financial statements in issuing bonds to CCI?"

Answer:  Yes.  The determination of whether any reliance was justifiable is for the trier of
fact and, accordingly, is inappropriate for summary judgment.  *Williams Controls, Inc. v.
Parente, Randolph, Orlando, Carey & Associates*, 39 F.Supp. 2d at 534.  The Farnsworth
Affidavit provides that reliance on audited financials as part of the underwriting process is

standard and usual industry practice.  The affidavits of certain of USF&G's underwriters –

Phillips, David Hussey ("Hussey") and Daily – also establish USF&G's reliance on the Brown

Schultz audited financial statements.

IV.  <u>ARGUMENT</u>

A.      THE SUMMARY JUDGMENT STANDARD.

The party moving for summary judgment bears the burden of demonstrating that the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that (1) there is no genuine issue as to any material fact and that (2) the

moving party is entitled to a judgment as a matter of law.  *Josey v. John R. Hollingworth Corp.*,

996 F. 2d 632 (3rd Cir. 1993).

An issue of fact is "material" if it "might affect the outcome of a suit under the governing

law."  *Holt Cargo. Systems, Inc. v. Delaware River Port Authority*, 20 F. Supp. 2d 803 (E.D. Pa.

1998), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of

material fact exists where the "evidence is such that a reasonable jury could return a verdict for

the non-moving party."  *Id.,* quoting *Anderson*, 477 U.S. at 248.  All doubts concerning

"genuine" issues and all inferences from the facts contained in supporting or opposing documents

and affidavits must be viewed in the light most favorable to the opposing party.  *Holt Cargo*, 20

F. Supp. 2d at 817, relying on *Anderson*, 477 U.S. 242 at 255.

The moving party has the initial burden of demonstrating that no genuine issue of

material fact exists.  *Josey v. John R. Hollingworth Corp.* 996 F. 2d at 637.  If the movant

sustains his burden of proof, the burden shifts to the non-moving party to present evidence that

there is a disputed genuine issue for trial.  *Id.*  Once an opponent makes an appropriate showing

that a genuine issue of material fact exists, the summary judgment motion must be denied.  *Id.,*

37

relying on *Morrissey v. Procter & Gamble Co.,* 379 F. 2d. 675, 677 (1st Cir. 1967); *see also*

*Tomalski v. State Farm Ins. Co.,* 494 F. 2d 882, 884 (3rd. Cir. 1974) (summary judgment must be

denied where there is the slightest doubt as to the facts).

> B.    THE LAW OF THIS CASE HAS ESTABLISHED THAT THERE IS NO
> PRIVITY REQUIREMENT IN AN ACTION FOR NEGLIGENT
> MISREPRESENTATION AND THAT PENNSYLVANIA HAS FULLY
> ADOPTED RESTATEMENT (SECOND) OF TORTS §552.

As this Court previously recognized in its opinion denying Brown Schultz' Motion to

Dismiss, *"[u]nder Pennsylvania law, privity is not a requirement of a claim for negligent*

*misrepresentation."* Report, p. 9[102]. (citations omitted) (emphasis supplied). Further, according

to the Report, "the Pennsylvania Supreme Court has adopted the Restatement (Second) of Torts

§552 . . . ." *Id.,* p. 7. The Court's denial of Brown Schultz' motion was based on the

unambiguous holdings of several applicable and analogous cases. *E.g., Williams Controls v.*

*Parente, Randolph, Orlando, Carey & Associates,* 39 F.Supp. 2d at 517; *Eisenberg v. Gagnon,*

766 F.2d 770, 779 (3rd Cir. 1985); *Borough of Landsdowne v. Stevenson Envir. Serv. Inc.,* 99-

3781, 2000 W.L. 1886578 (E.D. Pa. 2000). Brown Schultz' assertion that privity is a necessary

element of a cause of action for negligent misrepresentation is nothing more than a rehash of the

same discredited claim it made in its Motion to Dismiss; no new cases or novel arguments have

been added in the instant motion.

"The law of the case doctrine applies to issues expressly decided by a court in prior

rulings and to issues decided by necessary implication." *Bolden v. Southeastern Pennsylvania*

*Transportation Authority,* 21 F.3d 29 (3rd Cir. 1994). Under the law of the case, "when a court

decides upon a rule of law, that rule should continue to govern the same issues in subsequent

---

[102] The Report was neither appealed nor was any review sought by Brown Schultz. Accordingly, it was adopted by the Court (Kane, J.) on August 30, 2001. *See,* 28 U.S.C.S. 636(b)(7)(B).

stages in the litigation." *Diesler v. McCormack Aggregates Co.*, 54 F.3d 1074, 1087 (3rd Cir.

1995); *Bolden v. Southeastern Pennsylvania Transportation Authority*, 21 F.3[rd] 29 (3rd Cir. 1994)

(law of the case doctrine applies both to issues expressly decided by a court in prior rulings and

to issues decided by necessary implication).

 Brown Schultz has proffered no new legal arguments or factual averments that would

justify overturning not only what is indisputably the "law of the case" but is also the

acknowledged and undisputable state of the law in Pennsylvania. *E.g., Williams Controls v.*

*Parente, Randolph, Orlando, Carey & Associates*, 39 F.Supp. 2d at 528; *Eisenberg v. Gagnon*,

766 F.2d at 779. Moreover, none of the cases relied upon by the Court in the Report were

overturned on appeal, distinguished as to relevant holdings in subsequent cases or supplanted by

statute or new case law. Accordingly, neither re-argument by USF&G nor re-adjudication of this

issue by the Court is necessary or appropriate.

 C.     USF&G MEETS ALL ELEMENTS OF RESTATEMENT (SECOND) OF
        TORTS, §552.

 1.     Pennsylvania has adopted Restatement (Second) of Torts §552.

 The standard for an accountant's liability to non-clients for negligent misrepresentation is

governed by Pennsylvania's adoption of the Restatement (Second) of Torts §552. *Bortz v. Noon*,

729 A.2d 555 (Pa. 1999); *Rempel v. Nationwide Life Insurance Co., Inc.*, 370 A.2d 366 (Pa.

1977) (adopting the first Restatement of Torts §552, which is held to be substantially the same as

the Restatement (Second) of Torts §552). This Court has previously recognized Pennsylvania's

adoption of this standard. Report, p.5. The Restatement provides, in relevant part, that:

> (1)    One who, *in the course of his business, profession or*
> *employment*, or in any other transaction in which he has a
> pecuniary interest, supplies false information for the guidance of
> others in their business transactions, is subject to liability of

> pecuniary loss caused to them by their justifiable reliance upon the
> information, if he fails to exercise reasonable care or competence
> in obtaining or communicating the information.
> (2)     . . . [T]he liability stated in Subsection (1) is limited to loss
> suffered
> (a)     by the person or one of a limited group of persons for
> whose benefit and guidance he intends to supply the information or
> *knows that the recipient intends to supply it*; and
> (b)     through reliance upon it *in a transaction that he intends the
> information to influence or knows that the recipient so intends or
> in a substantially similar transaction.*

Restatement (Second) of Torts §552 (1977) (emphasis supplied).

In adopting this standard, Pennsylvania joined the majority of states that have chosen this moderate test to determine the liability of accountants to non-clients in lieu of the more restrictive "near-privity" test  and the broader "foreseeability" test.  *See, Bily v. Arthur Young & Co.*, 11 Cal. Rptr. 2d 51, 64-67 (1992) (detailed discussion of the differing standards utilized to define the scope of liability of accountants to non-clients, including citation to the 17 states that had adopted Restatement (Second) of Torts §552 to that date).[103]  Courts adopting the Restatement have recognized that, when properly interpreted, §552(2) limits potential liability of an accountant to a select group of non-client third parties who can demonstrate knowledge on the part of accountants of the limited-though unnamed-group of potential third parties that will rely upon the accountant's report, as well as knowledge of the particular financial transaction that such information is designed to influence, or a substantially similar transaction.  *Id.*; *see Industrial Indemnity Co. v. Touche Ross & Co.,* 13 Cal. App. 4th 1086, 1095 (1993).

Although, under the Restatement, an accountant is liable only where he or she "intends" certain things, it is important to note that the word "intent," as defined in the Restatement, is not

---

[103] To date, a total of at least twenty-three (23) states have adopted the standard annunciated in Restatement (Second) of Torts §552.

limited to the subjective state of wishing to bring about a certain result.  Thus, the Restatement

provides that the word "intent" means "that the actor desires to cause consequences of his act, *or*

*that he believes that the consequences are substantially certain to result from it."*  Restatement

(Second) of Torts §8A (1964) (emphasis supplied).

     2.     <u>USF&G meets the requirements of the Restatement (Second) of Torts §552.</u>

          (a)     Brown Schultz Had Knowledge of USF&G's Intended Reliance Upon the
Audit Reports.

It cannot be credibly doubted that Brown Schultz knew that USF&G was the intended

recipient of the Audited Financial Statements and that USF&G would rely upon such audited

financial statements concerning the continuation of the bonding program it established for CCI in

late 1993.  Brown Schultz' knowledge that USF&G was an intended recipient is not only

supported by several references to USF&G and St. Paul in Brown Schultz' working papers, but

by the deposition testimony of Brown Schultz' principal and employees.[104]  *See, Raritan River*

*Steel v. Cherry*, 367 S.E. 2d 609, 617 (N.C. 1998) (The Restatement requires only that the

auditor "know" that his client intends to supply information to another person.  Whether the

auditor acquires this knowledge from his client or elsewhere is irrelevant.).  The requirement of

§552 that Brown Schultz know of "the limited-though unnamed-group of potential [third

parties]…" has not only been met, but has been surpassed: it is undisputed that Brown Schultz

knew not just that the Audited Financial Statements would be supplied to an "unnamed group,"

but the intended recipients were acknowledged by name – USF&G and St. Paul.

     Brown Schultz not only knew that USF&G and St. Paul would receive and rely upon the

Audited Financial Statements, but understood the purposes for which they would be used by

---

[104] *See* Footnote 28, *supra.*

41

USF&G.  Besides having generalized knowledge as to the purposes for which bonding companies utilized audited financials, Brown Schultz personnel testified during their depositions that they understood that USF&G would rely on the Audited Financial Statements relative to its decisions concerning the extension of surety credit.[105]  Brown Schultz personnel also testified and their working papers reveal that they weighed and considered USF&G's status as a "significant user" as a factor relevant to their decisions concerning the creation and implementation of an audit plan.[106]

Section II, *supra*, shows that there is a surfeit of competent and admissible evidence that, at minimum, Brown Schultz knew the following:

- CCI intended to provide USF&G with the Audit Reports;

- USF&G's intended use of the Audited Financial Statements to make decisions regarding the extension of surety credit to CCI;

- the type of construction work performed by CCI and its typical mix of clients;

- the need for CCI to obtain bonds because bonds are legally required for virtually all of the public projects on which CCI engages;

- the nature and extent of the liability risks assumed by Brown Schultz' in its preparation of the Audit Reports based on the intended use of the audited financial statements by USF&G;

- the parameters and size of CCI's bonding program;

- the identity and contract prices of CCI's public construction projects in progress, as reflected in the "Contracts-in-Progress" schedules incorporated into each of the Audit Reports; and,

- CCI's intent not only to continue performing construction work in the public sector, but to expand that part of its business.

---

[105] *Id.*

[106] *See* Footnote 27, 28, 29, 30, *supra*.

(b)    Brown Schultz Had Knowledge of the Transaction or a Substantially
Similar Transaction That the Information was Designed to Influence.

(i)    The "transaction" is USF&G's continuation of CCI's bonding
program.

Ample evidence exists of Brown Schultz' knowledge of the transaction that the Audited

Financial Statements were designed to influence; vis, the continuation of the bonding program

established for CCI by USF&G in late 1993.

Brown Schultz' erroneous assumption that the "transaction" at issue is the provision of

"specific" payment and performance bonds for a specific construction project is not only

illogical, but imposes requirements far beyond those of §552, which does not define

"transaction."  At the time the decision was made by USF&G each year to continue CCI's

bonding program, the identity of all future, as yet to be bid upon and awarded, projects was both

unknown and unknowable.  Rather, the commercial reality of the construction and surety

businesses dictates that financial statements can only be relied upon in connection with a surety

underwriter's decision to continue a bonding program at a particular financial level.  Thus, CCI's

bonding program provided that bonds up to a certain amount could be written on behalf of CCI,

without, again, analyzing CCI's status before the issuance of each bond for CCI's newly acquired

projects.  Documents in Brown Schultz' working papers discuss CCI's bonding program and that

according to Brown Schultz it would generally be in the $60 million aggregate limit range with

expected increases beyond $60 million so long as the program did not "continuously exceed $60

million."

Brown Schultz knew that the "transaction" in question was the continuation of CCI's

bonding program, and was aware of the nature and parameters of the bonding program and,

consequently, the extent of its own level of risk in providing the financials that would form a

43

significant part of USF&G's decisions concerning the bonding program.  Thus, it is neither unfair nor unexpected that Brown Schultz be held responsible for its negligently prepared work product.

The illogic of Brown Schultz' contention that the "transaction" must be linked with USF&G's issuance of bonds for specific projects in the future - as opposed to the continuation of the bonding program – is evident when analogies are made to lending transactions.  For example, to establish a revolving line of credit, a bank will normally rely upon financial statements prepared by an independent accountant.  Once the decision is made to establish a line of credit, the bank will usually not analyze the debtor's financial statements every time a sum is drawn down by the borrower, especially when the amount drawn down is within the maximum level established.  The "transaction" is not each individual sum drawn down but, rather, the decision by the bank to establish a line of credit for a certain amount.

Here the "transaction" was USF&G's decision shortly after its receipt of the Audited Financial Statements each year to allow CCI's bonding program to continue; a decision made in reliance upon the financial statements and not every time a bond was issued.  Evidence that Brown Schultz understood that the continuation and extension of CCI's bonding program was the "transaction" includes the following:

- Correspondence – *on which Brown is copied* – from CCI's agent, Dominiani, to Ortenzio referencing "our current bonding program" reflected in the Written Consent and the minimum equity levels that must be maintained by CCI;[107]

- Brown Schultz' knowledge of CCI's operations, including the contracts-in -progress schedules which it audited;[108]

---

[107] Document BY 00500, attached to the Levin Affidavit as Exhibit "12."
[108] Excerpted pages from the audited financial statements for the years ended December 31, 1995 through 1998 are attached to the Levin Affidavit as Exhibit "29."

44

- Brown Schultz' use of the phrase "bonding program" 6 times in Defendant's Statement of Material Facts;

- Brown Schultz' understanding of the construction bonding process;[109]

- Brown Schultz' knowledge of Ortenzio's agreement with USF&G concerning the abrogation of Ortenzio's liability under the Master Surety Agreement so long as the "work program requirements" remain under a certain level and Brown Schultz' analysis in its working papers for the 1997 Audit Report of CCI's compliance with that agreement, and;[110]

- Documentation in the working papers regarding CCI's "aggregate work program."[111]

Moreover, Brown Schultz knew that CCI intended to continue to bid on public construction projects which, as a matter of law, required that bonds be issued.  8 P.S. §191, *et seq.;* 40 U.S.C. §270 *et seq.*

>           (ii)     Brown Schultz was aware of the magnitude and types of risks it was undertaking.

One of the key legal precepts concerning the interpretation of §552 is that courts are hesitant to impose liability on a professional that greatly exceeds that professional's understanding of the risks undertaken in accepting a particular assignment.  *See, Briggs v. Sterner,* 529 F.Supp. 1155, 1177 (S.D. Iowa 1981) (The Restatement is a compromise between the harshness of strict privity requirements and the "specter of unlimited liability.")  This litigation simply does not involve a situation in which Brown Schultz was being asked to accept unlimited liability for an unbounded time to an ill-defined class of plaintiffs.  The evidence here shows that Brown Schultz was aware of and even planned for the risks undertaken and, as a

---

[109] Brown Deposition, p. 25, lines 4-25, p. 26, lines 3-7, attached to the Levin Affidavit as Exhibit "5."
[110] Document BY 00500, attached to the Levin Affidavit as Exhibit "12"; Document BS01755, attached to the Levin Affidavit as Exhibit "16."
[111] Copies of the 1996 Audit Report, 1997 Audit Report, and 1998 Audit Report are attached to the Levin Affidavit as Exhibits "30," "31," and "32."

consequence, cannot claim that it is inequitable, unfair or unexpected for it to be held responsible for losses caused by its negligence. The total shield from liability which Brown Schultz seeks is not only contrary to the tests enunciated in §552 but at variance with the unique role of accountants in the commercial community as "public watchdogs." *United States v. Arthur Young & Co.*, 465 U.S. at 817-18.

> (iii)    *Arguendo*, even if CCI's bonding program was not a "transaction" for §552 purposes, it was a "substantially similar transaction" of which Brown Schultz had knowledge

Although it is undisputed that Brown Schultz knew that CCI planned to bid on public construction contracts in the future and that it was and would continue to be involved in bonded work, Brown Schultz attempts to insulate itself from liability simply because it did not know the identity of specific bonds that CCI might procure, even though any such bonds were to be obtained as part of the bonding program established for CCI by USF&G. Such an absurdly narrow position must fail because, under §552, a "transaction" and a "substantially similar transaction" are to be viewed broadly and within the context of the accountant's knowledge of his client's business. There is nothing in §552 which mandates that a "transaction" can only be a single, discrete activity. Thus, a "transaction" can be a sale of an asset, a loan, the consideration of whether to continue or curtail bond credit to a contractor or virtually any other activity which is predicated on reliable financial data. Restatement (Second) of Torts §552, comment j.

Further, the requirement in §552 that the accountant know the proposed use of a financial statement is not consonant with a requirement that the accountant be immersed in the minutiae and details of that use. In this case, Brown Schultz knew that CCI was bidding on projects that required bonds, was intimately familiar with CCI's business history and was aware of the nature of CCI's work-in-progress.

An examination of the rationale for the "substantially similar transaction" language in §552(2)(b) reveals why it would be illogical – as long as the risk assumed by Brown Schultz is not materially increased - to shield Brown Schultz from liability for a future bond issued pursuant to a previously established bonding program. The risk assumed by Brown Schultz was the program – and not the individual bonds.

The comments to §552 recognize the significance of the "substantially similar transaction" language:

> On the other hand, it is not necessary that the transaction in which the opinion is relied on should be identical in all of its minute details with the one intended. It is enough that it is substantially the same transaction. Thus, in the situation above stated, if the corporation finding that at the moment, it does not need the credit to obtain which the audit was procured, uses it a month later to obtain the same credit from the same bank, the accountants will remain subject to liability . . . ."

Restatement (Second) of Torts §552 comment j (1977). In addition, comment j. provides, in pertinent part, that

> [t]he ordinary practices and attitudes of the business world are to be taken into account, and the question becomes one of *whether the departure from the contemplated transaction is so major and so significant that it cannot be regarded as essentially the same transaction.* It is also possible, of course, that *more than one kind of transaction* may be understood as intended.

(emphasis supplied). Accordingly, when evidence exists of transactions that are claimed to be similar, an issue of fact exists as to whether they are "substantially similar."

Thus, the proper focus is that Brown Schultz knew USF&G would rely upon the Audited Financial Statements relative to the continuation of a bonding program for CCI's public construction work – a program under which bonds would be underwritten – up to a limit defined, in part, by representations contained in Brown Schultz' Audited Financial Statements – not that

47

Brown Schultz did not know the exact details of the future projects for which bonds would be written under the bonding program.

In *Bily v. Arthur Young & Co.*, the California Supreme Court interpreted the Restatement test to impose liability as to "a specific transaction or *a well-defined type of transaction*" that the auditor knows about and intends to influence in supplying its report. (emphasis supplied). Essentially, there is no liability if the transaction's nature and extent are not within "sufficiently specific economic parameters to permit the [information] supplier to assess the risk of moving forward." *Bily v. Arthur Young & Co.*, 11 Cal. Rptr. 2d at 75. (emphasis added). Thus, a factual issue almost always exists as to whether the transaction involves risks different from those which the accountant understood it had accepted. *Industrial Indemnity Co. v. Touche Ross & Co.*, 13 Cal. App. 4th at 1097, n.11.

Evidence that Brown Schultz knew the details of the particular contracts for which bonds were to be issued in the future — information which even CCI could not know until bids were accepted and contracts signed — is not required. It is sufficient that Brown Schultz knew that USF&G would rely upon the Audited Financial Statements to continue a bonding program substantially similar in size and scope to the previous bonding programs with which Brown Schultz was familiar and for which Brown Schultz prepared audited financial statements. Indeed, they were all the same. Thus, at best for Brown Schultz, disputed factual issues exist as to whether the continuation of the bonding program and the underwriting of bonds thereunder were substantially similar transactions to those transactions which Brown Schultz undisputedly knew that USF&G would enter upon in reliance upon the Audit Reports.

It is also reasonable to conclude that any alleged lack of knowledge by Brown Schultz as to the size and scope of a bonding program must be attributable to Brown Schultz' "willful

ignorance." Brown Schultz' working papers contain ample documentation by which even a casual observer could glean the parameters of CCI's bonding program. The Restatement (Second) of Torts §552 denies the willfully ignorant accountant any shield from liability.

      (c)    The First Circuit's Narrow Interpretation of Restatement (Second) of Torts §552 is Neither Applicable Nor Appropriate Here.

Brown Schultz devotes over five pages of its memorandum to the First Circuit's decision in *North American Specialty Insurance Co. v. Dias & Lapalme*, 285 F.3d 35 (1st Cir. 2001). That case is, however, readily distinguishable from this case not only because it is not a Third Circuit or even a Pennsylvania District Court decision, but because it is based on Massachusetts and, not Pennsylvania law. This distinction is important because while Pennsylvania has fully and unequivocally adopted Restatement (Second) of Torts §552, Massachusetts has not. *Compare, North American Specialty Insurance Co. v. Dias & Lapalme*, 258 F.3d at 40 (Court says it is unclear as to whether Massachusetts has fully accepted §552) *with Bortz v. Noon*, 729 A.2d at 500 (Pennsylvania adopts §552 without qualification).

Additionally, the determinative factor in *North American Specialty Insurance Co.* was the evidence of the level of risk assumed by the accountant. *North American Specialty Insurance Co. v. Dias & Lapalme*, 258 F.3d at 43. The First Circuit voices hesitation at exposing an accountant to "additional, open-ended liability with respect to future bonds," unless there is evidence that the accountant was aware of that risk. *Id.* at 44. It is the significant differences between the level of knowledge of Brown Schultz and that of the accountants in *North American Specialty Insurance Co.* concerning the risks undertaken that mandate that even if, *arguendo*, the First Circuit's legal reasoning was adopted in the instant case, the facts extant here would make

for a radically different result.  At a minimum, USF&G has established that Brown Schultz was aware of both the level and type of risk for which USF&G seeks to hold it responsible.

     In *North American Specialty Insurance Co.,* the accountants knew that the contractor, Canty Roofing and Sheetmetal, Inc. ("Canty") was being sold and that, accordingly, *it would be the last engagement the accountants performed for that client. Id.*  ("It strains credulity to believe that an experienced C.P.A. would undertake liability . . . when he had no reasonable anticipation of working for the principal in the future.") (emphasis supplied).  Moreover, although there was evidence that the accountants  in *North American Specialty Insurance Co.* were informed by a Canty employee that the audited financial statements would be used to evaluate "ongoing bonds," the First Circuit interpreted this phrase as indicating that no bonds would be issued *in the future* in reliance upon the audit work then being performed by Dias & Lapalme.  *Id.*  (the testimony does not "support a conclusion that the defendants knowingly undertook the substantial risks inherent in the issuance of *future* bonds.")  (emphasis original). *Id.*  Additionally, the First Circuit found that although Dias & Lapalme might have known about the "general nature" of Canty's bonding program, there was insufficient evidence that the accountant was aware of the size and parameters of the bonding program or, most importantly, any future plans of Canty regarding any putative bonding needs.  *Id.* at 44.

     In the present case, there is significant and substantial evidence showing that Brown Schultz knew the purposes for which the Audited Financial Statements would be utilized, *but that it knew that the Audited Financial Statements would be relied upon for a "continuation" or extension of the bonding program.*  In fact, Brown Schultz knew of the parameters of CCI's bonding program and, consequently, CCI's future bonding needs.  Further, not only did Brown Schultz anticipate continuing to perform services for CCI, but performed accounting and

50

consulting services for other Ortenzio family businesses.  Brown Schultz also knew that CCI was

expanding into new business lines and that such new business lines, primarily heavy construction

for the public sector, required that CCI's bond capacity be continued and extended.  Finally,

Brown Schultz passed up an opportunity which only it had; namely, the ability to have placed

limitations or qualifications in the Audited Financial Statements that would have informed users

either that certain aspects of the Audited Financial Statements were not fully reliable or that users

should refrain from utilizing the Audited Financial Statements for certain purposes, such as

continuing or expanding CCI's credit or bonding lines.

       (d)      Brown Schultz' Interpretation of *Williams Controls, Inc.* is Unjustified.

Brown Schultz' interpretation of *Williams Controls, Inc.* is unduly narrow and

presupposes a similarity of facts that are contrary to those in the instant case.  The accountants in

*Williams Controls, Inc.* prepared audited financials for one specific purpose – a sale of corporate

assets.  This is not consonant with a holding that the only "specific purpose" under which

liability can accrue is for an asset sale.  *Williams* involved only *one* event capable of being the

"transaction."  For obvious reasons, the Court was never presented with the need to define the

"transaction" or a "similar transaction."  A finding here that the continuation of a bonding

program is the "transaction" is supported not only by objective industry practice, but by Brown

Schultz' knowledge of the bonding process as it was applied to CCI.

In *North American Specialty Insurance Co.*, the First Circuit even recognized that when

there is sufficient record support, trade usage can be examined to determine what, in fact,

constitutes a "transaction."  *See, North American Specialty Insurance Co.*, 258 F.2d at 43.

(e)    USF&G Need Not Prove That Brown Schultz Had a "Pecuniary Interest" in any Transaction.

Brown Schultz assert that summary judgment is proper because USF&G can not prove that Brown Schultz "had a pecuniary interest in this matter." Such proof, however, is simply not required for a negligent misrepresentation claim. *See, Bortz v. Noon* 556 Pa. at 500.

Section 552 of the Restatement provides, in pertinent part, that:

> One who, in the ordinary course of his business, profession or employment, *or* in any other transaction in which he has a pecuniary interest, supplies false information . . . is subject to liability . . . if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts §552 (emphasis supplied). The word "or" in §552 indicates the existence of a disjunctive requirement; namely, the pertinent section of the Restatement is applicable *either* to one who is rendering advice in the "ordinary course of his business, profession or employment *or* to one that is doing so in a transaction in which he has a pecuniary interest." *Sain v. Cedar Rapids Community School District*, 626 N.W.2d 115 (Iowa 2001) (§552 of the Restatement provides that a duty arises when information is provided by persons in the business or profession of supplying information to others). Simply, Brown Schultz cannot seriously contend that by performing an audit and issuing an audit report that Brown Schultz, a certified public accounting firm, and Brown, the partner in charger of the CCI account, did not act "in the ordinary course of [its] business, profession or employment." Accordingly, fulfillment of the former of two disjunctive requirements eliminates any need for allegations of any pecuniary interest. *Id.*

Further, the weight of authority in Pennsylvania is that the existence of a pecuniary interest is not required to establish a *prima facie* case of negligent misrepresentation: "Under

Pennsylvania law, the tort of negligent misrepresentation has been interpreted to require a plaintiff to prove: (1) a misrepresentation of material fact, (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation." *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F.Supp. at 526; *Borough of Landsdowne, Penn. v. Sevenson Environmental Services, Inc.*, 2000 WL 1886578*3; *Burland v. Manor Care Health Servs., Inc.*, 1999 WL58580*3 (E.D. Pa.); *Weisblatt v. Minnesota Mutual Life Ins.*, 4 F.Supp. 2d 371, 377 (E.D. Pa. 1998). The requirement of a "pecuniary interest" is simply not part of the equation.

Brown Schultz' assertion that a duty under §552 arises *only* if the defendant has a pecuniary interest in the transaction" is misleading. In fact, the very *case utilized by Brown Schultz* to support this assertion provides in relevant part as follows:

> Thus, the express language of section 552 appears to create *two scenarios* under which individuals could be liable to third parties for negligent misrepresentation. *First, an individual can be subjected to liability if he negligently supplies false information "in the course of his profession."* Second, an individual can be subjected to liability if he negligently supplies false information "in any . . . transaction in which he has a pecuniary interest."

*First Options of Chicago v. Wallenstein*, 1994 WL 229554 *3 (emphasis added). The phrase "two scenarios" indicates the disjunctive nature of the requirements of §552 and indicates that a plaintiff need satisfy only one of the "two scenarios."

(f)    Public Policy Considerations Mandate Rejection of the Overly Broad
Interpretation of Restatement (Second) of Torts §552 Advocated by Brown
Schultz.

The legal position advocated by Brown Schultz would lead to unfair and untenable

results.  The limited protection afforded to accountants by §552 is not designed to shield an

accountant who is aware of the general nature of the investment decision that is being made by a

non-client in reliance upon the accountant's work.  Brown Schultz advocates, in effect, that an

accountant be shielded from liability even though the accountant knows of the nature of the non-

client's investment decision, but is not sufficiently prescient to know precisely what the ultimate

result of the investment will be.

Holding Brown Schultz responsible for its negligent misrepresentations in work which it

was aware would be supplied to USF&G for a known purpose offends neither the letter nor spirit

of §552.  In fact, the position advocated by Brown Schultz is contrary to the recognition that

"Section 552 'recognizes commercial realities by *avoiding* both unlimited and uncertain liability .

. . *and exoneration of the auditor in situations where it clearly intended to undertake the*

*responsibility of influencing particular business transactions involving third parties . . . .*" *Bily*

*v. Arthur Young & Co.,* 11 Cal. Rptr. 2d at 75.  (emphasis supplied).

If Brown Schultz' misinterpretation of §552 was followed to its logical extreme, an

accountant could almost never be liable for its negligence to parties it knows will rely on the

accountant's work unless the accountant is sufficiently prescient to have "actual knowledge" of

future events that are inherently unknowable such as, for example, whether CCI would be the

low bidder on a particular project, even though the underwriting decisions leading up to the

issuance of bonds for those projects occurred days, weeks or months before their issuance.  This

would result in an unfair situation in which accountants profit from preparing financial

54

statements for construction companies like CCI – which *need* to furnish such statements to bonding companies and lenders – but take no responsibility for losses attributable to their mistakes.

The interpretation advocated by Brown Schultz is also detrimental to the bonding industry and, as a result, could adversely effect the economics and efficiency of public construction projects. If bonding companies cannot legally rely on financial information that is created for their use by accountants, they will either utilize stricter underwriting standards – a detriment to small and incipient contractors – or significantly raise the bond premiums to compensate for increased risk. In that bonds are *required* for public construction projects in Pennsylvania, (and most other states) and for construction projects awarded by the United States, the increased cost of obtaining bonds is ultimately passed on to the awarding authority and its revenue base, the taxpayer.

D. ISSUES OF MATERIAL FACT EXIST CONCERNING BROWN SCHULTZ' BREACH OF ITS DUTY TO USF&G.

1. <u>As a matter of law, Brown Schultz had a duty to exercise reasonable care.</u>

To prove negligent misrepresentation, a party is only required to show by a preponderance of the evidence that there was a failure to "exercise reasonable care or competence in obtaining or communicating the information." *Fort Washington Resources, Inc. v. Tannen*, 858 F. Supp. 455,461 (E.D. Pa. 1994); *Robert Wooler Co. v. Fidelity Bank*, 330 Pa. Super. 523 (1984) (accounting firm has duty to exercise care and skill customarily exercised by an accountant); Restatement (Second) of Torts §229A, comment c. The speaker need not know that his words are untrue, but must have failed to make reasonable investigation of the truth of the words. *Bortz v Noon*, 556 Pa. at 500.

55

Thus, Brown Schultz' implication that it did not breach any duty unless it intentionally set out to provide incorrect information is baseless and ignores the distinction between "negligent" misrepresentation, the cause of action asserted by USF&G, and "fraudulent" misrepresentation, a cause of action not asserted in the instant litigation.  It is sufficient for purposes of establishing negligent misrepresentation that "the representor must make the misrepresentation without knowledge as to its truth or falsity *or must make the representation under circumstances in which he ought to have known of its falsity. . . ." Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F.Supp. at 526 (emphasis supplied).

As discussed in Section E, *infra*, the Audited Financial Statements contained numerous material omissions and inaccuracies.  USF&G has also identified substantial and specific violations of GAAS.  Moreover, USF&G has introduced expert testimony showing that Brown Schultz' work fell below the standard to be expected of a Certified Public Accountant.  The DeBruyn Affidavit details, *inter alia*, accounting practices and procedures ignored by Brown Schultz which a competent accountant would have performed.

2.   USF&G can establish that Brown Schultz breached its duty of care.

The gravamen of Brown Schultz' argument concerning its duty of care is that because the introduction of any expert testimony by USF&G is allegedly barred because of its alleged failure to comply with Fed. R. Civ. P. 26(b) USF&G cannot prove an essential element of its case; namely, that Brown Schultz breached its duty of care.  The basis of Brown Schultz' invocation of this rule is that USF&G's expert purportedly failed to "disclose sufficient information and explanation for the court to determine the validity of the opinions expressed . . . ." Memorandum of Law in Support of Defendants' Motion for Summary Judgment, p. 39-42.

Fed. R. Civ. P. 26(a)(2), subtitled, "Disclosure of Expert Testimony," states, in pertinent part, that

> (B) Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case . . . be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed *and the basis and reasons therefor*; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authorized by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed. R. Civ. P. 26(a)(2)(B). (emphasis supplied). The test as to whether a particular expert report is compliant with this rule is "whether [the report is] sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced. *Dunkin' Donuts Inc. v. Patel*, 174 F.Supp. 2d 202, 212 (D.Md. 2001) quoting *Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996).

On July 22, 2002, USF&G served the Expert Report of Steve J. DeBruyn ("DeBruyn Report") on Brown Schultz' counsel. After receiving expert reports from Brown Schultz on August 20, 2002, USF&G served the Supplemental Expert Report of Steve J. DeBruyn ("Supplemental Report") on September 20, 2002, as was allowed under the Court's Case Management Order. USF&G also files contemporaneously herewith the DeBruyn Affidavit. To date, no expert depositions have been taken, by either party, and no trial date has been set.

The DeBruyn Report meets the enumerated test for compliance with Fed. R. Civ. P. 26(a)(2). The DeBruyn Report delineates the documents and professional standards "reviewed and relied upon," by Stephen J. DeBruyn, C.P.A., in rendering his opinions thereon. DeBruyn

Report, p. 2-3. The DeBruyn Report also identifies material misstatements and indicates the "primary causes of the material misstatements" in three enumerated sections. DeBruyn Report, p. 3-6. Finally, the DeBruyn Report appends as exhibits "comparisons of CCI's Balance Sheets and Income Statements containing those adjustments warranted as a result of the defects and deficiencies" in the Audit Report. Summarily, the DeBruyn Report identifies what is wrong, discusses the basis upon which such acts and omissions were determined to be wrong and then not only indicates what adjustments are warranted but shows such adjustments in the appended restated financials.

Moreover, assuming, *arguendo*, that the DeBruyn Report was insufficient, the Supplemental Report provides a more than adequate explanation of the basis and reasons contained therein. In addition to rebutting various assertions advanced by Brown Schultz' experts, the Supplemental Report discusses in depth the methodology utilized in creating the restated financials. Supplemental Report, p. 1-2. By any standard, the Supplemental Report, taken in conjunction with the DeBruyn Report, is more than sufficient to ensure that "surprise is eliminated." *Dunkin' Donuts, Inc. v. Patel*, 174 F.Supp. at 212.

Finally, for purposes of Brown Schultz' summary judgment motion, the DeBruyn Affidavit fully complies with the requirements of Fed. R. Civ. P. 56(e).

3.     Brown Schultz breached its duty of care.

The DeBruyn Report, the Supplemental Report and the DeBruyn Affidavit, Stephen J. DeBruyn all show that Brown Schultz did not conform to the standards of care of a Certified Public Accountant. As such, an issue of material fact exists as to whether Brown Schultz breached its duty of care. *Fort Washington Resources, Inc. v. Tannen*, 858 F.Supp. 455, 459 (E.D. Pa. 1994). This is evidenced by numerous material misrepresentations in the Audited

58

Financial Statements, violation of GAAS and other professional standards and audit planning and conduct falling below professional standards.

    E.    THERE ARE NUMEROUS MATERIAL MISREPRESENTATIONS IN THE AUDIT REPORTS.

    "The elements of negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern a material fact and *the speaker need not know his or her words are untrue*...." *Bortz v. Noon*, 556 Pa. at 500. (emphasis supplied).  A party alleging negligent misrepresentation need only show that there was a failure to "exercise reasonable care or competence in obtaining or communicating the information." *Fort Washington Resources, Inc. v. Tannen*, 858 F.Supp. at 459.

    The standard of care for accountants has been expressed as follows:

> "Accountants and auditors have the duty to exercise that degree of care, skill and competence exercised by reasonably competent members of their profession under the circumstances . . . .

*Matter of Hawaii Corp.*, 567 F.Supp. 609 617 (D. Hawaii 1983).  Compliance with GAAP and GAAS will not immunize an accountant when he consciously chooses not to disclose on a financial statement a known material fact.  *Matter of Hawaii Corp., supra; Halwrson v. Sooy*, 782 P.2d 161 (Or. Ct. App. 1989).  Furthermore, compliance with GAAS has been held not to be a defense where GAAS is found to be deficient.  *Hochfelder v. Ernst & Ernst*, 503 F.2d 1100 (7th Cir. 1974).  Accountants must meet those standards of expertise and diligence appropriate under the facts and circumstances of the particular case, as established by the testimony of an appropriately qualified expert witness.  *Bily v. Arthur Young & Co.*, 11 Cal. Rptr. 2nd at 76; *Maduff Mortgage Corp. v. Deloitte, Haskins & Sells*, 779 P.2d 1083 (Or. Ct. App. 1989).  The DeBruyn Report, Supplemental Report and DeBruyn Affidavit identify several failures by Brown

59

Schultz to comply with professional standards, including GAAS.  A breach of duty is found

when an accountant does not adhere to the rules and standards of his profession.  *Rhode Island*

*Hospital Trust National Bank v. Swartz, Bresenoff, Yavner & Jacobs*, 455 F.2d 847 (4th Cir.

1972); *MacNerland v. Barnes*, 129 Ga. App. 367, 199 S.E.2d 564 (1973).

Moreover, where an auditor's engagement is for a particular purpose or the auditor has

notice of the special importance of a particular aspect of the auditing work, the auditor may be

held to a higher standard of performance than might otherwise be applicable.  *Ryan v. Kanne*,

170 N.W.2d 395 (Iowa 1969); *City of East Grand Forks v. Steele*, 121 Minn. 296, 141 N.W. 181

(1913).  As discussed, *supra*, Brown Schultz was well aware not only that the Audited Financial

Statements were for the use and benefit of USF&G, but that USF&G intended to use the Audited

Financial Statements to make decisions regarding the continuation of CCI's bonding program.[112]

Moreover, Brown Schultz employees have testified that USF&G's intended use was a factor that

Brown Schultz considered in designing its audit plan.[113]  This knowledge is reflected in Brown

Schultz' working papers and has been testified to by Brown Schultz employees in depositions.[114]

Additionally, leading commentators have stated that an auditor is well advised when

auditing a construction firm to perform adequate job-cost testing and percentage – of –

completion estimates.  O'Reilly, Hirsch, Defliese & Jaenicke, *Montgomery's Auditing*, p. 821

(Wiley, 11th ed. 1990).  Despite its knowledge that USF&G would rely upon the audits in making

bonding decisions regarding CCI, despite the importance of job-cost testing and analysis of work

in progress in an audit of a construction company and despite Brown Schultz' purported

expertise and experience in auditing construction companies, Brown Schultz, for all practical

---

[112] *See* Footnote 28, *supra*.
[113] *Id.*
[114] *Id.*

purposes, ignored these crucial matters.  No site visits were performed.  No prior projects were analyzed to determine management's ability to successfully estimate its profits.

Further, Brown Schultz violated numerous accounting standards and procedures.  The DeBruyn Affidavit indicates that, *inter alia*, Brown Schultz violated GAAS, had inadequate audit planning and in numerous other ways failed to exercise due care.  Moreover, the restated financials demonstrate the general sloppiness and indifference exhibited by Brown Schultz had a material "bottom-line" impact on the numbers in the Audit Reports.

The magnitude and materiality of Brown Schultz' negligence is apparent in the restated financials prepared by USF&G's expert.  In sum, the 1997 Audit Report shows a profit of $706,879 when, in fact, there was actually a *loss* of $109,081.  The 1998 Audit Report shows a profit of $59,041 when, in fact, there was actually a *loss* of $3,067,467.  As a matter of common sense, the differences between the Audited Financial Statements as prepared by Brown Schultz, and as restated by Stephen DeBruyn are of sufficient magnitude to draw the attention of even a casual user of such information.  Profits become serious losses.

F.      USF&G JUSTIFIABLY RELIED ON THE AUDIT REPORTS.

1.      Justifiable reliance is a matter for the trier of fact.

As an initial matter, "[t]he question of justifiable reliance is most appropriately left to the jury.  Reasonableness of reliance involves all of the elements of the transaction, and is rarely susceptible of summary disposition."  *Williams Controls v. Parente, Randolph, Orlando, Carey & Associates*, 39 F.Supp. at 534, quoting *In re Atlantic Fin. Management, Inc. Sec. Litig.*, 718 F.Supp. 1003, 1008 (D. Mass. 1988); *Krisa v. The Equitable Life Assurance Society*, 109 F.Supp. 2d 316 (M.D. Pa. 2000) ("justifiable reliance issue is properly left for jury resolution").  Regardless of the inappropriateness of this issue for resolution by summary judgment, as

61

discussed in greater detail, *infra*, USF&G's underwriters not only relied upon the audited

financial statements prepared by Brown Schultz but, in doing so, were acting justifiably and in

accordance with established industry practices.

      2.    <u>There is ample evidence of USF&G's reliance on the audit reports.</u>

     The test for justifiable reliance is whether the recipient knew or should have known that

the information supplied was false. *Fort Washington Resources, Inc. v. Tannen*, 858 F. Supp. at

455, citing *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285 (1971). Where the means of

obtaining information is not equal, the "representations of the person believed to possess superior

information may be relied upon." *Id.* at 460, citing *Sisken v. Cohen,* 363 Pa. 580 (1950).

Essentially, a plaintiff can satisfy the reliance element by demonstrating that he actually relied, in

part, on an accountant's opinion in taking some action. *Fine v. American Solar King Corp.*, 919

F.2d 290, 299 (5th Cir. 1990); *In re Sahlen & Associates, Inc.*, 773 F.Supp. 342, 352-53 (S.D. Fla.

1991). In *Fort Washington,* a consultant alleged that the company who hired him misrepresented

that $2.5 million was available to fund a project. Although the consultant had initially proposed

budgets less than $343,000.00, the court still found that he could have justifiably relied upon the

chief executive officer's representation of the $2.5 million budget. The court emphasized that

that the person deceived *does not have to prove that the misrepresentation was the sole*

*inducement. Fort Washington Resources, Inc. v. Tannen*, 858 F.Supp. at 460.

     USF&G need not prove that any particular audit report was the sole inducement for its

decision to issue payment and performance bonds on behalf of CCI. *Delahanty v. First*

*Pennsylvania Bank*, 318 Pa. Super. 90 (1983). USF&G can prove justifiable reliance for

purposes of the cause of action for negligent misrepresentation by proving that the information in

the audit reports was a "substantial factor" in determining its course of conduct. *Neuman v. Corn*

*Exchange Nat. Bank & Trust Co.*, 356 Pa. 442, 445 (1947); *Blue Bell v. Peat, Marwick*, 715 S.W.2d 408, 415 (Tx. 1986).

The gravamen of Brown Schultz' position on justifiability appears to be that since Brown Schultz disagrees with various underwriting methods employed by USF&G or has questioned – in 20/20 hindsight – the underwriting decisions USF&G made, that USF&G would have continued CCI's bonding program regardless of the contents in the Audit Reports.  Further, Brown Schultz audaciously suggests that USF&G had an obligation to audit the auditors, a position which bespeaks little professional pride and ignores the very reason that USF&G - and other bonding companies - require *audited* financials from bonded principals and not just financials prepared by the contractor's in-house personnel.  *Frank Cooke, Inc. v. Hurwitz*, 406 N.E.2d 678, 684 (Mass. App. Ct. 1980) (plaintiff's reliance on accountant's advice and services is reasonable if alleged shortcomings would not have been apparent without unreasonable degree of surveillance).

USF&G's underwriters are unequivocal that if they had been presented with audited financial statements that reflected the true financial condition of CCI – as reflected in the restated financial statements prepared by Steve J. DeBruyn, C.P.A. – that the bonding program for CCI would have been suspended at the very least with respect to 1997 or cancelled with respect to 1998.[115]  Common sense also indicates that any individual would act differently when presented with financials showing profit and good revenue - as represented in the Audited Financial Statements – as opposed to being presented with financial statements indicating serious losses.

---

[115] Phillips Affidavit, ¶38, 41; Hussey Affidavit, ¶17, 18; Daily Affidavit, ¶23, 25.

Moreover, the industry-wide reliance of underwriting professionals on audited financial statements as a crucial component of the underwriting equation is established.  In fact, even Brown Schultz admits that bonding companies obtain audited financial statements for a particular purpose; namely, to make decisions regarding the extension of surety credit.  Accordingly, it is disingenuous for Brown Schultz to assert that USF&G was not justified in relying upon audited financial statements prepared by a firm of Certified Public Accountants.  Such arguments by Brown Schultz only deprecates its own work product and reputation.

V.  CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment must be denied and that USF&G should be granted such other and further relief as is proper and just.

Respectfully submitted,
UNITED STATES FIDELITY & GUARANTY COMPANY,
By its attorneys,

Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA  02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

and

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:    (717) 237-7100
Facsimile:    (717) 237-7105

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each other party by mail (by hand) on 10/9/02.

Dated: October 9, 2002
#253234 v1/36432/87

64