ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

UNITED STATES FIDELITY AND )
GUARANTY COMPANY, )
       Plaintiff )
  )
  )    CIVIL ACTION NO. 1:01-CV-00813
v. )
  )    JUDGE CONNOR
BRUCE J. BROWN and BROWN )
SCHULTZ SHERIDAN & FRITZ, )
       Defendants. )

MJSmyser ✓

FILED
HARRISBURG, PA

OCT 1 0 2002

MARY E. D'ANDREA, CLERK
Deputy Clerk

**AFFIDAVIT OF ANTHONY S. PHILLIPS IN OPPOSITION
TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Anthony S. Phillips, on oath, deposes and says as follows:

1.      I am a Surety Underwriting Specialist with the St. Paul Fire and Marine Insurance Company ("St. Paul"). I am making this affidavit in opposition to the Defendants' Motion for Summary Judgment. The facts set forth in this affidavit are based upon my own personal knowledge, and the business records of St. Paul and its predecessor, the United States Fidelity and Guaranty Company ("USF&G"), as would be admissible into evidence and as to which I am competent to testify. With respect to those facts which are based upon information and belief, I believe them to be true.

2.      I have been a surety bond underwriter for over 32 years. I have been employed by USF&G and St. Paul for 31 of those years. USF&G merged with St. Paul on or about June 1998. During the years from 1980 to July, 2001, I served as USF&G's and then St. Paul's surety bond underwriting manager in charge of USF&G/St. Paul's Harrisburg, Pennsylvania office. After USF&G merged with St. Paul, St. Paul's insurance and surety services were reorganized and the

Harrisburg, Pennsylvania underwriting office was closed (along with a number of branch offices.)  As a result, I was reassigned to St. Paul's Blue Bell, Pennsylvania office where I currently serve as a Surety Underwriting Specialist handling several of St. Paul's major accounts in the Blue Bell, Pennsylvania office.

3.     While I served as the surety bond underwriting manager of the Harrisburg, Pennsylvania office, my responsibilities included management of the office staff of one other underwriter and two clerical employees.  My duties also included the underwriting of existing surety accounts as well as reviewing the underwriting analysis performed by Steven Salazar, the other underwriter in the Harrisburg, Pennsylvania office.

4.     Steven Salazar was a employee of USF&G and then St. Paul for over 18 years. He worked at the Harrisburg, Pennsylvania office until the Harrisburg, Pennsylvania office closed.  He subsequently became employed as a surety bond underwriter for the Ohio Casualty Company.

5.     Upon information and belief, St. Paul and USF&G (prior to its merger with St. Paul) have been in the surety bond business for over 100 years.  Before the merger, USF&G was the 4th largest surety bond company in the country with annual surety revenues of  in excess of $175 million.  Presently, St. Paul is one of the largest surety bond companies in the United States with annual surety revenues of approximately $392 million.  Both USF&G and St. Paul serve as the bonding company for literally thousands of construction contractors and subcontractors, including some of the largest construction contractors in the United States.

6.     Some of the more prominent projects that USF&G and/or St. Paul have bonded and that may be familiar to the Court include the following:

2

- McCormack Place, Chicago, ILL     $400 million

- Detroit Midfield Terminal (NW Airlines)     $365 million

- Seattle Mariners Stadium     $350 million

- Orange County Convention Center     $294 million

- Ford Field     $235 million

- Boston Convention Center     $181 million

- Heinz Stadium in Pittsburgh, PA     $160 million

- San Francisco City Hall     $103 million

<u>Surety Bonds versus Insurance</u>

7.     Unlike an insurance policy, which is a two-party contract between the insured and the insurance company, a construction surety bond is a three-party instrument between and among the "Surety," the "Principal," and the "Obligee." Construction surety performance bonds are binding commitments by the "Surety" (USF&G or St. Paul, in this instance) by which the Surety guarantees the performance of a construction contract by the contractor procuring the surety bond. The contractor procuring the bond is referred to as the "Principal" and the beneficiary of the bond - usually the project owner - is referred to as the "Obligee." The Surety's obligations to the Obligee gives notice of the Surety of the Principal's default. The surety then has the duty to fulfill its contractual obligations to the Obligee with regard to the completion of the project. Additionally, the Surety's liability under the bond is usually capped by a penal sum set forth in the bond. The penal sum is usually the price stipulated in the bonded construction contract.

8.     Insurance policies and surety bonds also differ in how they are underwritten. Insurance policies are, upon information and belief, usually written for a term of months or years

3

and are priced based on the allocation of the insurance risk over the thousands of insureds. No credit is issued or extended by the insurance company to its insured with respect to insurance policies. In contrast, surety bonds are issued and the allocation of risk is determined on an individual basis. The process of underwriting a construction contractor involves establishing and then reviewing each year what is commonly referred to as a contractor's "bonding program," which is also known as his "bonding capacity." At both USF&G and St. Paul, a contractor's bonding program, much like an insurance policy, is expressed in terms of a single limit, which is the maximum limit of each bond which the underwriter or office has authority to approve and an aggregate limit, meaning the total dollar value of all work to be performed on the uncompleted contracts which are bonded by the Surety.

9.     At the times relevant to this case, it was USF&G's and St. Paul's policy to review each of its bonded contractor accounts at least annually. This review would normally be undertaken shortly after USF&G or St. Paul received the contractor's independent auditor's report. After considering a number of both objective and subjective analyses concerning the contractor, his financial condition, his management and the size and type of projects he would be attempting to successfully bid during the remaining portion of the year, a decision would be made whether to continue, increase, decrease, suspend or cancel a contractor's bonding program. USF&G and St. Paul (and, upon information and belief, most of the other major surety companies) evaluated contractors by analyzing their "Character," "Capacity," and "Capital." These are colloquially referred to as the "three C's" of surety bond underwriting.

10.     Surety bond underwriting is more of an art than a science. Unlike a home mortgage lender who may have specific guidelines and regulations concerning how much money can be borrowed based upon an individual's income and the value of his house, the surety bond

4

underwriter has fewer, more flexible guidelines. This is especially true when underwriting large accounts where the contractor's annual revenue exceeded $20 million.

11.     With rare exception, once a surety bond is issued, it cannot be revoked. Thus, until the construction project is fully completed, the Surety is liable to the Obligee in accordance with the provisions of the bond. Because contractors are given a single project and aggregate limits on the amount of bonds outstanding, the amount of work that can be bonded at any given time is limited. Since a contractor's liability on a project is reduced on a daily basis as the contractor completes more work on the bonded contract, it is possible for a contractor to obtain new bonded work on a continuing basis within its single project and aggregate limits so long as work outstanding is being completed. This reduction of liability is known at USF&G, St. Paul, and upon information and belief, all other sureties, as "working off" the contractor's "backlog." This reduction in liability also has the salutary benefit of keeping the contractor's bonding program on-going since as new bonds are written, the contractor's work on existing bonds reduces the Surety's exposure and, thus, works as an offset against the total value of bonds in effect at any given point in time.

CCI Construction Company, Inc.

12.     CCI Construction Company, Inc. ("CCI") became a USF&G account in late 1993. At that time, CCI and its management team had, upon information and belief, enjoyed a very good reputation and had previously been bonded with a large top-tier national surety company. CCI was formerly known as Commercial Construction Company, which was, upon information and belief, formed on or about 1983.

13.     CCI's bonding program, as established by USF&G, consisted of a $15 million per project limit and a $75 million aggregate limit. CCI had a total annual revenue of approximately

5

$48.2 million in 1993. This bonding program remained in effect until approximately early October 1999 when USF&G ceased writing bonds for CCI.

14. CCI's bonding program was established based upon USF&G's analysis of a number of factors, including CCI's reputation, and its capabilities, financial condition, and the general size and type of construction projects that CCI would be seeking to obtain.

15. The most objective and accurate basis for ascertaining the financial condition of any contractor, including CCI, is the year-end audited financial statement.

16. USF&G required CCI to furnish an annual audited financial statement. Each year, that statement was prepared by CCI's certified public accountant, Brown, Schultz Sheridan and Plesic, which was, upon information and belief, re-named Brown, Schultz Sheridan & Fritz ("Brown Schultz"). These annual audited financial statements covered CCI's fiscal year, which ended on December 31 each year. According to USF&G's records, USF&G received the annual statements for the years 1996 through 1998 on the following dates:

| Statement Year | Date of Receipt |
|---|---|
| 1996 | 03/02/97 |
| 1997 | 03/03/98 |
| 1998 | 03/02/99 |

Each year, the Brown Schultz audited financial statements were sent to USF&G's office in Harrisburg, Pennsylvania by CCI's bonding agent, David Dominiani ("Dominiani").

17. Following USF&G's receipt of the Brown Schultz audited financial statements each year, my office would begin the task of reviewing and analyzing each statement. From 1993-1998, I personally read each statement and performed a basic analysis of each statement relative to CCI. However, it was Steve Salazar's job to perform a more detailed analysis which

6

was then reviewed by me and James Daily, the senior bond underwriter for USF&G and St. Paul in Baltimore, Maryland.

18.     Steve Salazar's overall analysis of CCI, including his analysis of the Brown Schultz audited financial statements, was memorialized annually in a document entitled "USF&G Interoffice Correspondence" ("Interoffice Correspondence"), which detailed the information contained in the Brown Schultz audited financial statements as well as other information such as CCI's banking relations, insurance coverages, and recommendations concerning CCI's bonding program.  Attached hereto as Exhibits "A" - "E" are copies the Interoffice Correspondence prepared by Steve Salazar for CCI for the years 1993, 1994, 1995, 1996 and 1997.    To my knowledge, no Interoffice Correspondence was prepared by Steve Salazar for 1998.  However, both Steve Salazar and I reviewed and analyzed the 1998 Brown Schultz audited financial statements shortly after our receipt of them on or about March 2, 1999. In fact, as will be discussed in greater detail later in this affidavit, the 1998 Brown Schultz audited financial statements were reviewed by me several times during 1999.

19.     In each of the years at issue in the instant litigation, the Brown Schultz audited financial statements appeared to be well-presented.   On their face, the audited financial statements did not reveal any defects in the manner in which Brown Schultz audited CCI's balance sheet or prepared their audited financial statements for CCI.  To my knowledge, Brown Schultz enjoyed a good reputation in the Harrisburg, Pennsylvania area and it claimed to have specific expertise in the auditing of construction contractors.  Moreover, during the time when USF&G was issuing bonds for CCI, I received no information from any sources that led me to conclude that the financial information contained in the Brown Schultz audited financial statements was inaccurate or misleading.

20.    As each Interoffice Correspondence demonstrates, USF&G's Harrisburg, Pennsylvania office recommended a continuation of the $15 million/$75 million bonding program for CCI each year from 1994 through 1998.  Indeed, throughout CCI's bonding relationship with USF&G, those bonding capacity limits continued year-to-year although, on a few occasions, USF&G approved bonds which increased CCI's bonding capacity beyond $75 million.  Those "spikes" (as they are known in the surety industry) in CCI's bonding program were short-lived since CCI worked off its backlog, thereby reducing the aggregate limit of the bonding program to $75 million or below.  Also, on a very few occasions, USF&G approved spikes in CCI's single limit bonding program to allow CCI to accept a project larger than $15 million.  This was only done after considering the facts and circumstances of the specific project, as well as the financial position of CCI based in large part on the Brown Schultz audited financial statements.  During the period from 1997 until USF&G/St. Paul ceased writing bonds for CCI on or about early October, 1999, USF&G only approved four jobs that were larger than the $15 million single limit portion of the bonding program.

21.    During the time when USF&G was writing bonds for CCI, USF&G did not have any specific, formal, underwriting guidelines for its bonding accounts.  Rather, USF&G relied upon a series of documents issued by USF&G's home office known as "gray letters" as well as an unofficial underwriting training manual.  The "gray letters" and the manual provided general guidance on the types of information USF&G should be obtaining from its contractors (such as, for example, obtaining an audited financial statement each year) and general guidance on underwriting methods and procedures.    However, with respect to CCI and, upon information and belief, many other USF&G accounts of a size similar to CCI, USF&G generally wanted the accounts to maintain a working capital-to-backlog ratio of 3% or better and a net worth-to-

bonding capacity ratio of 5% or better.  "Working capital" is the dollar amount obtained when current liabilities are subtracted from current assets and "net worth" is determined by subtracting all liabilities from all assets.

22.    Based upon the annual Brown Schultz audited financial statements, CCI maintained the 3%-5% ratios described above, except on certain, limited occasions when USF&G approved a bond which temporarily increased CCI's bonding capacity beyond $75 million.

23.    In addition to receiving the Brown Schultz audited financial statements each year, USF&G would also receive an interim financial statement prepared internally by CCI (generally for the first six months of each year), as well as certain internally prepared work-in-progress schedules which were received quarterly. From CCI management's point of view, these work-in-progress schedules detailed how CCI's incomplete construction projects were performing. Although these interim reports from CCI were important, they were not nearly as important as the audited financial statements prepared by Brown Schultz each year.  Moreover, CCI's interim financial statements were unaudited.  Accordingly, USF&G compared the interim financial statements to the Brown Schultz audited financial statements issued immediately prior to our receipt of the interim statements, as well as the audited financial statements issued after the interim information had been received.  This comparison was especially important when CCI experienced profit fades or losses on some of its projects.  In those circumstances, USF&G reexamined the Brown Schultz audited financial statements which had been issued before the interim financial statement to determine whether the profit fades or losses were new occurrences or represented continuing losses on contracts-in-progress.  USF&G also used the prior Brown Schultz audited financial statements to compute what CCI's cash and equity positions would be

if such profit fades or losses continued. Almost every aspect of USF&G's underwriting process, including its underwriting of the CCI account, relied upon the (then) most recently issued Brown Schultz audited financial statement as a basis for comparing CCI's profitability, net worth, and ability to perform work. The information gleaned from the Brown Schultz' audited financial statements was an integral part of USF&G's analysis. It also served as an indicator of the credibility of information being received from CCI and its management.

24.    In reliance upon the 1996 Brown Schultz Audit Report, I recommended and USF&G issued payment and performance bonds to CCI for the following projects:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Albemarle – Charlottesville Regional Jail | Additions and Renovations to Regional Jail | 26-0120-12995-98-7 | 1/21/98 | 14,682,402 |
| B. | Johnstown | Air Traffic Control Tower | 26-0120-41362-97-1 | 9/30/97 | 3,734,530 |
| C. | Lord Fairfax | Phase I-Lord Fairfax Community College | 26-0120-41364-97-4 | 10/20/97 | 7,409,292 |
| D. | Outlook-Hilliard | Construction of Outlook Point at Hilliard | 26-0120-13008-98-0 | 2/23/98 | 5,598,750 |
| E. | Perry Point | 80 Bed Psychiatric Care Building | 26-0120-13002-98-1 | 2/13/98 | 13,297,844 |

25.    On or about August 1997, we received notification from CCI's president, John Ortenzio ("Ortenzio") that he wanted to have his personal indemnity agreement with USF&G terminated. Ortenzio had the right to terminate his indemnity agreement upon giving proper notice to USF&G, which he properly gave, upon information and belief. Ortenzio did agree, however, that if CCI's equity level fell below $4.8 million and/or CCI's bonding program consistently went above $60 million, Ortenzio understood that USF&G reserved the right to discuss the need for reinstatement of his personal indemnity. Based upon the Brown Schultz

audited financial statements for 1997 and 1998, CCI's equity levels were well in excess of $4.8 million; in 1997, CCI's net equity was approximately $5,455,000 and in 1998 it was approximately $5,250,000. This would support at least a $60 million bonding program.

26.    In reliance upon the 1997 Brown Schultz audit report, I recommended and USF&G issued payment and performance bonds to CCI for the following projects:

|  | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | 15,647,035 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | 7,220,942 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | 3,919,156 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | 5,591,730 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | 18,880,298 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | 21,927,111 |

27.    In reliance upon the 1998 Brown Schultz audit report, I recommended and USF&G issued payment and performance bonds to CCI for the following projects:

|  | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | 514,976 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | 835,299 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | 1,688,139 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and | 26-0120-40376-99-3 | 9/30/99 | 191,083 |

11

| | | | | | |
|---|---|---|---|---|---|
| E. | Cool & Cold Aqua | Valve Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | 12,191,000 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | 4,126,478 |
| G. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | 28,231,945 |

28.     Although all of the Brown Schultz audited financial statements were read and relied upon by USF&G in connection with the issuance of bonds to CCI, the Brown Schultz audited financial statements played an even more important role in USF&G's decision to continue CCI's bonding program in 1998 and 1999.  On or about August 17, 1998, Dominiani reported that CCI had posted a net loss of $1.6 million for the first six months of 1998.  Dominiani reported that this loss was attributable to certain problem jobs which had been rectified.  In fact, according to Dominiani, CCI expected to break even or show a small profit by December 31, 1998.  Dominiani's explanation of the 1998 mid-term loss seemed reasonable, and I had no logical reason to question it.

29.     Based in part upon Dominiani's assurance, USF&G made the decision to continue bonding CCI, at least until the 1998 year-end financial results could be verified and reviewed.  In addition, USF&G continued to rely upon the 1997 audited financial statements, which showed that CCI had a net worth of $5,454,794.00, cash and cash equivalents of $1,128,337.00, and marketable securities of $3,702,992.00.   Dominiani's statements and the corrective action allegedly implemented by CCI proved, based on the Brown Schultz audited financial statements for the year ending December 31, 1998, to be true.

30.     My office received a copy of Brown Schultz' 1998 audited financial statement on March 2, 1999.  That audit report again confirmed what Dominiani had represented to me;

namely, that CCI had its problem jobs under control and that CCI expected a break-even or slightly profitable year. In fact, as reported in the 1998 Brown Schultz audited financial statements, CCI showed a small profit of $59,041.00 and reduced its operating loss to $116,629.00. Yet, CCI still maintained a strong net worth - $5,254,834.00 - and had, according to Brown Schultz, cash and cash equivalents of at least $2,429,866.00 and marketable securities of $631,481.00.

31.     During the years 1997, 1998 and at least until October 1, 1999, I was not aware of any serious problems that CCI had – such as labor strikes, uninsured losses, or project defaults. In fact, I was not aware of anything that would indicate that CCI had any serious problems with its financial condition.

32.     On or about August 30, 1999, I received a letter from Dominiani reporting that CCI had sustained a loss of approximately $900,000.00 during the first six months of 1999 due to certain problem projects. Dominiani advised me that CCI anticipated losing approximately $1 million in 1999. My office received this letter on September 1, 1999. The only bond written thereafter contained a very small penal sum in the amount of $191,083 for the Cool & Cold Aqua project. This bond was an adjunct to a $12 million bond for the same project issued in July, 1999.

33.     Thereafter, I advised the home office that further bonding should be suspended.

34.     Ultimately, CCI filed for bankruptcy on or about May 19, 2000. CCI also defaulted on virtually all of the USF&G bonded projects on which it was working before it filed for bankruptcy, thereby requiring USF&G to fulfill its obligations under the bonds, complete CCI's work, and pay CCI's unpaid subcontractors and suppliers.

35.     USF&G's current losses on the bonded projects (which may be subject to further adjustment) by year and by reference to the Brown Schultz audit reports received by USF&G before the bonds were issued follows:

A.     The 1996 Brown Schultz Audit Report:

|  | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Albemarle — Charlottesville Regional Jail | Additions and Renovations to Regional Jail | 26-0120-12995-98-7 | 1/21/98 | $2,140,539.39 |
| B. | Johnstown | Air Traffic Control Tower | 26-0120-41362-97-1 | 9/30/97 | $273,945.69 |
| C. | Lord Fairfax | Phase I-Lord Fairfax Community College | 26-0120-41364-97-4 | 10/20/97 | $176,787.63 |
| D. | Outlook-Hilliard | Construction of Outlook Point at Hilliard | 26-0120-13008-98-0 | 2/23/98 | $27,978.93 |
| E. | Perry Point | 80 Bed Psychiatric Care Building | 26-0120-13002-98-1 | 2/13/98 | $1,435,403.53 |

Subtotal:    $4,054,655.17

B.     The 1997 Brown Schultz Audit Report:

|  | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $3,828,459 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $2,376,103.34 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $139,194.88 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $2,610,876.50 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $1,045,910.35 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $4,486,554.06 |

Subtotal:    $14,487,098.13

14

### C.    The 1998 Brown Schultz Audit Report:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $235,002.59 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $79,529.64 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $411,807.72 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $228,201.80 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $4,691,871.94 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $1,360,394.87 |
| E. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $2,932,500.04 |
| | | | | Subtotal: | $9,939,308.60 |

36.    I have reviewed the Affidavit of Stephen J. DeBruyn, CPA, offered by USF&G in opposition to the Defendant's Motion for Summary Judgment and the exhibits attached to his affidavit.    According to Mr. DeBruyn's restated balance sheet for CCI for the year ended December 31, 1997, CCI's reported net income of $706,879.00 turned into a net loss of $109,081 and its retained earnings dropped from $5,208,489.00 to $4,392,529.00.  This information would have surprised me since CCI's interim income statement for the period ending June 30, 1997 showed that CCI had made an interim profit of $283,339.31 and the interim statement for the period ending September 30, 1997 reported a profit of approximately $807,000.00, and I had received no information from CCI that the company was experiencing any significant job problems.  This restated information would have sent a strong message to USF&G that CCI's

15

management did not have things under control..  This meant to me that at least two of the "three

C's" in surety bond underwriting - Character and Capacity - were lacking at CCI.

37.     In addition, according to Steve DeBruyn's report, CCI's restated net worth of

$4,638,834.00 represented a 15% drop in net worth from the $5,454,794.00 reported in the 1997

Brown Schultz audit report.  Further, John Ortenzio, CCI's President had, only a few months

earlier in August 1997, notified USF&G that he was exercising his rights to terminate his

obligation to personally indemnify USF&G.

38.     Based upon the foregoing and assuming that John Ortenzio was unwilling to inject

additional capital into CCI and was unwilling to reinstate his personal indemnity, USF&G would

have not approved any of the bonds for the following projects:

|   | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---------|-------------|----------|-----------|--------------|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $15,647,035 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $ 7,220,942 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $ 3,919,156 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $ 5,591,730 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $18,880,298 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $21,927,111 |

39.     As reported to me by CCI, Pennsylvania Contractors Insurance Company

("PCIC") was an entity related to CCI, and which was formed for tax planning purposes to fund

the cost of performing warranty work on rehabilitation hospitals which CCI has previously

16

constructed.  Also, as I understood it, PCIC was an insurance company for CCI and other contractors in Pennsylvania as well.

40.    The 1998 Brown Schultz audited financial statements did not disclose the fact that a CCI claim for delay damages and winter conditions in the amount of $1,162,460.00 for the Mahanoy Prison project had been booked as revenue.  Footnote number 8 contained in the Brown Schultz 1998 audit report merely shows that that Mahanoy Prison claim had been guaranteed by PCIC.  To me, that footnote meant that if CCI did not receive payment of all or a portion of the claim asserted by CCI relative to the Mahanoy Prison, PCIC would guaranty payment of the unpaid portion sometime in the future.  Neither the footnote nor the Brown Schultz audit report contained any information indicating that the Mahanoy Prison claim had already been included as revenue for CCI in 1998.  Taking that claim out of revenue would have, standing alone, caused CCI to suffer a net loss of over $1 million.  That information, standing alone, would have caused me to suspend CCI's bonding program as of March 2, 1999.

41.    With respect to Stephen DeBruyn's restated financial statements for CCI for the year ended December 31, 1998, again attached as Exhibits F-1 and F-2 to his affidavit, based upon the facts enumerated in the proceeding paragraphs, none of the bonds written after USF&G's receipt of the 1998 Brown Schultz audit report on March 2, 1999, would have been written based on the restated 1998 Brown Schultz audit report prepared by Stephen DeBruyn. These bonds are as follows:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $ 514,976 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $ 835,299 |

17

| | | | | | |
|---|---|---|---|---|---|
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $ 1,688,139 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $ 191,083 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $12,191,000 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $ 4,126,478 |
| G. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $28,231,945 |

Signed under the pains and penalties of perjury this 8th day of October, 2002.

Anthony S. Phillips

#253806 v1/36432/87

18

# EXHIBIT A

### USF&G INTEROFFICE CORRESPONDENCE

**DATE:** 7/12/94

**TO:** H.O. Contract Surety, National Accounts, Jim Daily

**FROM:** Harrisburg Bond Dept., Steve Salazar

**SUBJECT:** CCI Construction Co.
Annual Review of Operations

Review of the 12/31/93 CPA Audit for CCI Construction Co. prepared by Brown, Schultz, Snyder, and Plesic.

<u>Principals of Accounting</u>: Income is reported on the percentage of completion basis, on the cost to cost basis, while the company has elected Subchapter S corporation status for Federal tax purposes.  On June 29, 1993, the company established itself as a Pennsylvania Business Trust and, as of that date, changed its name from CCI Construction Company, Inc. to CCI Construction Co.  The reason for this change is that, as a Pennsylvania Business Trust, the company is exempt from Pennsylvania state income tax.  Prior to this change to a Pennsylvania business trust, the contractor met with their attorneys regarding the legal ramifications of this change and were advised that as a Pa. business trust, the company would still be a legal business entity and their indemnity would be still be legally binding on any standard indemnity agreement obtained by any bonding company.

Depreciation is computed using accelerated methods over the estimated useful lives of the respective assets.

<u>Background</u>: Business was started in 1990 by the current principal of CCI, and was a spin-off of Commercial Construction Inc., with all assets and liabilities being transferred from Commercial Construction, Inc. to CCI.  USF&G picked up this account in December of 1993.  CCI is a general contractor specializing in the construction and renovation of hospitals and healthcare facilities.  The company is also involved in the general construction of institutional and commercial buildings and operates in the contiguous United States.  John Ortenzio is the president and 100% owner.  He has 23 years experience in construction and has been president of Commercial Construction/CCI for the past 10 years.  Shane Miller is the Sr. Vice-president and Chief Operation Officer and has been with the company since May of 1991.  He has been an executive in construction for over 10 years working previously for Howard Elec./Mech., Denver, Co.; Leon Wintermyer, Lemoyne, Pa.; and Campbell Resign Group, St. Louis, Mo.  David Barber is the Chief Financial Officer, and has been with Commercial Construction/CCI since 1986.  Prior to joining CCI, he was a comptroller for a rehab. hospital in Pleasant Gap., Pa.

<u>Continuity</u>: The business is 100% owned by John Ortenzio.  He has a $1,000,000 key-man life policy payable to the construction company and working trusts set up for continuity purposes in his will.

CCI Construction - Annual Review                    page 2

<u>Operations:</u> Sales increased from $42,620,000 last year to $48,183,000 this year. Gross profit decreased from $3,671,400 to $2,846,200, with a gross margin of 5.9%. Despite the increase in sales, G & A expenses decreased from $3,141,800 to $2,409,400 this year. Other income decreased from $694,700 to $348,200 due to income from management fees decreasing from income of $341,500 to a management fee expense of $167,900. This resulted in net income decreasing from $1,224,200 last year to $785,000 this year. This should be regarded as quite an accomplishment considering the decreased in management fees income of over $500,000, and taking into account the continued sluggish construction economy.

<u>Working Capital:</u> Working capital remained relatively the same as the previous year decreasing slightly from $4,448,000 to a still very strong $4,439,300. $10,550,000 of the working capital shown at 12/31/93 is highly liquid consisting of $6,118,200 of cash and cash equivalents, and $4,432,000 of investments in tax exempt bonds and mutual funds.

<u>Balance Sheet:</u> Account remains in a strong financial position with working capital of $4,439,300 and net worth of $4,681,800. The Debt-to-Equity Ratio improved from (6.12 to 1) to (2.90 to 1). Receivables decreased by approximately $2,400,000, while payables remained relatively the same as the previous year. Cash balances decreased from $20,160,000 to $6,118,200. mainly due to an increase in investment in securities of $3,700,000 and a decrease in advance payments held in escrow of $7,000,000. At 12/31/93 there was no borrowing on the $1,000,000 unsecured bank line of credit.

<u>Work-in-Progress:</u> Profitability is being maintained on work-in-progress. The gross margin decreased from 9.4% to 5.3%. This is mainly due to the fact that the backlog includes the $25,254,100 Penn National Insurance (PNI) project. This is a Construction Management project with a guaranteed fee of 2% with the opportunity to earn additional fees. This project is still in the pre-construction phase and will not begin until October of 1994 at the earliest.

|                      | 12/31/93      | 12/31/92      |
|----------------------|---------------|---------------|
| Total Contract Price | $104,680,821  | $ 83,765,345  |
| Revised Gross Profit | $   5,556,900 | $  7,900,052  |
| Gross Margin         | 5.3%          | 9.4%          |
| Backlog              | $ 63,719,900  | $ 47,280,718  |

<u>Long-term Debt:</u> No Long-term debt.

<u>Contingent Liabilities:</u> None.

<u>Affiliates:</u> Medcom Resource Corporation is a related company and its principal business activity consists of sales of furnishings and equipment for rehabilitation hospitals. The fiscal year-end statement of Medcom shows working capital of

CCI Construction Annual Review                      page 3

$428,000 and net worth of $202,000.  1993 sales were
$14,237,000 and the company showed a net profit of $91,300.
CRI General Contractors, Inc. is a related company created to
construct commercial buildings in California.  At 12/31/93,
this company showed a deficit working capital of ($18,400)
and net worth of only $1,000.  This is mainly due to the fact
that all the net income from operations of this company is
transferred to CCI Construction Co. via management fees.

<u>Bank</u> <u>Relations:</u> CCI continues to have a strong relationship
with their bank, Dauphin Deposit, Harrisburg, Pa.  Dauphin
Deposit has established a working capital line of credit in
the amount of $1,000,000 at the bank's prime rate, on an
unsecured basis.

<u>Surety</u> <u>Relations:</u> Account has become one of the Harrisburg
Branch Office's premiere accounts.  During April of 1994, we
wrote two final bonds for CCI which generated approximatley
$100,000 in contract bond premiums.  A history of the
accounts reveals a single job consideration of $62,000,000 on
the DGS Houtzdale State Correctional Institution project when
the account was initially obtained.  The largest total work
program consideration was $117,000,000 which also occurred
when the above mentioned $62,000,000 project was approved.

<u>Insurance:</u> Byerly Insurance Agency handles both the insurance
and bonds. The account has adequate insurance coverages in
place.

<u>Recommendations:</u> The Harrisburg Branch Office recommends
renewal of our specific discretionary authority on the
account at $15,000,000 single job and $75,000,000 total work
program.  It should be recognized, however, that we have been
above the $100,000,000 total work program level on several
approvals for CCI, and it was agreed by the Home Office when
the account was obtained that we would give consideration for
total work programs above $100,000,000 on the account.

Approved: _____
           Hbg. Bond Mgr.

USFG/BS 1171

# EXHIBIT B

**USF&G INTEROFFICE CORRESPONDENCE**

**DATE:** 4/17/95

**TO:** H.O. Contract Surety, National Accounts, Jim Daily

**FROM:** Harrisburg Bond Dept., Steve Salazar

**SUBJECT:** CCI Construction Co.
Annual Review of Operations

Review of the 12/31/94 CPA audit on CCI Construction Co. prepared by Brown, Schultz, Snyder & Plesic, Wormleyburg, Pa.

<u>Principles</u> <u>of</u> <u>Accounting:</u> Income is reported on the percentage of completion basis, on the cost to cost basis, while the company has elected Subchapter S. corporation status for Federal Tax purposes. On June 29, 1993, the company established itself as a Pennsylvania business trust and as of that date, changed its name to CCI Construction Co. The reason for the change was that, as a Pa. Business Trust, the company would be exempt from Pa. State Income tax.

Depreciation is provided using an accelerated method over the estimated useful lives of the respective assets.

<u>Background:</u> Business started in 1990 by the current principal and was a spin-off of Commercial Construction, Inc., with all assets and liabilities being transferred from Commercial Construction, Inc. to CCI Construction Co. CCI is general contractor specializing in the construction of and renovation of hospitals and healthcare facilities. The company is also involved in the general construction of institutional and commercial buildings and operates in the contiguous United States. John Ortenzio is the president and 100% owner. He has 23 years experience in construction and has been the president of CCI for over 10 years. Shane Miller is the Sr. Vice president and Chief Operating Officer and has been with the company since May of 1991. He has been an executive in construction for over 10 years working previously for Howard Elec./Mech., Denver, Co.; Leon Wintermyer, Lemoyne, Pa.; and Campbell Resign Group, St. Louis, Mo. Dave Barber is Chief Financial Officer and has been with CCI since 1986. Prior to joining CCI he was comptroller for a rehab. hospital in Pleasant Gap, Pa.

<u>Continuity:</u> The business is 100% owned by John Ortenzio. He has a $1,000,000 key-man life policy payable to the construction company and working trusts set up for continuity purposes in his will.

<u>Operations:</u> Sales decreased from $48,181,500 last year to $38,250,200 this year, a decrease of $9,932,300. Gross profit decreased from $2,846,200 last year to $483,700 this year due to the decrease in sales and due to the normal learning process in regard to the contractor's transition from the "negotiated job" to the "bid job" market. However, there was a dramatic decrease in G&A expenses from $2,409,400 to $1,348,300 this year, a decrease of $1,060,000 showing that

USFG/BS 1185



the contractor took the necessary steps to cut overhead in response to the decrease in sales. This resulted in net profit decreasing from a net profit of $298,000 (after withdraws of $487,000) to a net loss of ($317,300) which we consider quite outstanding due to the decrease in sales; and also due to the fact that the contractor was previously projecting a net loss of $500,000 this fiscal year-end.

Working Capital: Working capital decreased from $4,439,300 last year to a still very strong $3,291,600 due to the loss of $317,000 and moderate capital expenditures of $246,000. Please note that the contractor's working capital remains highly liquid consisting of cash and cash equivalents of $4,511,000 and marketable securities of $2,658,000.

Balance Sheet: Account remains in a strong financial position with working capital of $3,291,600 and net worth of $4,290,300. The Debt-to-Equity ratio decreased to 2.7 to 1. All material receivables are fully collectable. Cash and Cash Equivalents were $4,511,000 and CCI was borrowing zero on the $1,000,000 working capital line of credit.

Work-in-Progress: Profits are being maintained on WIP. The gross margin is 2.7% due to the Lightner Rd. and Lincoln University jobs that were previously addressed prior to FYE.

|                       | 12/31/94     | 12/31/93      |
|-----------------------|--------------|---------------|
| Total Contract Price  | $93,786,150  | $104,680,821  |
| Revised Gross Profit  | $ 2,548,243  | $  5,556,900  |
| Gross Margin          | 2.7%         | 9.4%          |
| Backlog               | $46,815,615  | $ 47,280,718  |

Long-term Debt: No long-term debt.

Contingent Liabilities: None.

Affiliates: Medcom Resource Corporation is a related company and its principal business activity consists of sales of furnishing and equipment for rehab. hospitals. We are pending receipt of the 12/31/94 FYE statement on Medcom. CRI General Contractors is no longer an active related company.

Bank Relations: CCI continues to have a strong relationship with their bank, Dauphin Deposit, Harrisburg, Pa. Dauphin Deposit has established an unsecured working capital line of credit in the amount of $1,000,000 at the bank's prime rate.

Relations: Account has been with USF&G since 1993 and continues to be one of the Harrisburg Branch Office's premiere accounts. During 1994, 4 final bonds were written generating contract bond premiums of approximately $201,000. A history of the account reveals a single job consideration of $62,000,000 on the DGS Houtzdale State Correctional Institution when the account was acquired. The largest total work program consideration was $117,000,000 which also occurred when the previously mentioned $62,000,000 project was approved. The contractor has actually assumed total work programs in the $75,000,000-$80,000,000 range during 1994.

USFG/BS 1186

<u>Insurance:</u> Byerly Insurance Agency handles both the insurance and bonds.  The account has adequate insurance in place.

<u>Recommendations:</u> The Harrisburg Branch Office strongly recommends the continuance of the Merit Rate approval on the account and renewal of our Specific Discretionary Authority of single job $15,000,000 and $75,000,000 total work program. It should be recognized, however, that we have been above these levels on several approvals for the account during the past year, and we will continue to do so with National Account Department concurrence.

USFG/BS 1187

# EXHIBIT C

**USF&G INTEROFFICE CORRESPONDENCE**

**DATE:** 5/03/96

**TO:** Northern Division Contract Surety, Jim Daily

**FROM:** Harrisburg Bond Dept., Steve Salazar

**SUBJECT:** CCI Construction Company, Inc. - Annual Review
Stress Score 20 (Yellow)
Bear Flag F1-Net Worth less than 10% of work program

Review of the 12/31/95 CPA audit on CCI Construction Co.
prepared by Brown, Schultz, Snyder & Plesic, Wormleyburg, Pa.

Principles of Accounting: Income is reported on the
percentage of completion, cost to cost basis, while the
company has elected Subchapter S. Corp. status for federal
tax reporting purposes.  Effective January 1, 1995, the
company re-established itself as a Pennsylvania corporation
and changed its name to CCI Construction Company, Inc.

Depreciation is provided using an accelerated method over the
estimated useful lives of the respective assets.

Background: Business started in 1990 by the current principal
and was a spin-off of Commercial Construction, Inc., with all
assets and liabilities being transferred from Commercial
Construction, Inc. to CCI Construction Co.  CCI is general
contractor specializing in the construction of and renovation
of hospitals and healthcare facilities.  The company is also
involved in the general construction of institutional and
commercial buildings and operates in the contiguous United
States.  John Ortenzio is the president and 100% owner.  He
has 23 years experience in construction and has been the
president of CCI for over 10 years.  Shane Miller is the Sr.
Vice president and Chief Operating Officer and has been with
the company since May of 1991.  He has been an executive in
construction for over 10 years working previously for Howard
Elec./Mech., Denver, Co.; Leon Wintermyer, Lemoyne, Pa.; and
Campbell Resign Group, St. Louis, Mo.  Dave Barber is Chief
Financial Officer and has been with CCI since 1986.  Prior to
joining CCI he was comptroller for a rehab. hospital in
Pleasant Gap, Pa.

Continuity: The business is 100% owned by John Ortenzio.
He has a $1,000,000 key-man life policy payable to the
construction company and working trusts set up for continuity
purposes in his will.

Operations: Sales increased from $38,250,200 last year to
$48,181,100 this year, an increase of $9,930,900. Gross
profit increased from $483,700 last year to $972,200 this
year due to the increase in sales.  Despite the dramatic
increase in total sales, the contractor did an excellent job
of controlling G&A expenses with G&A expenses actually
decreasing from $1,348,300 last year to $1,280,600 this year.
This resulted in net profit increasing from a net loss of
($317,300) last year to a net profit of $103,200 this year.

USFG/BS 1201



**Working Capital:** Working capital increased from $3,291,600 last year to a strong $4,057,300. Please note that the contractor's working capital remains highly liquid consisting of cash and cash equivalents of $2,238,100 and marketable securities of $2,542,000.

**Balance Sheet:** Account remains in a strong financial position with working capital of $4,057,300 and net worth of $4,501,800. The Debt/Equity ratio decreased from (2.7 to 1) to only (1.7 to 1.) All material receivables are fully collectable. Cash and marketable securities totaled $4,780,000 and CCI was borrowing zero on the $1,000,000 working capital line of credit.

**Work-in-Progress:** Profits are being maintained on WIP. The gross margin increased to 3.2% despite the net losses on the $5,900,000 Lightner Road and $13,500,000 Lincoln University jobs that we received reasons for these losses previously.

|  | 12/31/95 | 12/31/94 |
|---|---|---|
| Total Contract Price | $78,970,973 | $ 93,786,150 |
| Revised Gross Profit | $ 2,559,962 | $ 2,549,243 |
| Gross Margin | 3.2% | 2.7% |
| Backlog | $14,406,331 | $ 46,815,615 |

**Long-term Debt:** No long-term debt.

**Contingent Liabilities:** None.

**Affiliates:** Medcom Resource Corporation is a related company and its principal business activity consists of sales of furnishing and equipment for rehab. hospitals. We are pending receipt of the 12/31/95 FYE statement on Medcom. CRI General Contractors is no longer an active related company.

**Bank Relations:** CCI continues to have a strong relationship with their bank, Dauphin Deposit, Harrisburg, Pa. Dauphin Deposit has established an unsecured working capital line of credit in the amount of $1,000,000 at the bank's prime rate.

**Relations:** Account has been with USF&G since 1993 and continues to be one of the Harrisburg Branch Office's premiere accounts. During 1995, 2 final bonds were written generating contract bond premiums of approximately $40,605. A history of the account reveals a single job consideration of $62,000,000 on the DGS Houtzdale State Correctional Institution when the account was acquired. The largest total work program consideration was $117,000,000 which also occurred when the previously mentioned $62,000,000 project was approved. The contractor has actually assumed total work programs in the $75,000,000-$80,000,000 range during 1994.

**Insurance:** Byerly Insurance Agency handles both the insurance and bonds. The account has adequate insurance in place.

**Recommendations:** The Harrisburg Branch Office strongly recommends the continuance of the Merit Rate approval on the account and renewal of our Specific Discretionary Authority of single job $15,000,000 and $75,000,000 total work program.

# EXHIBIT D

**USF&G INTEROFFICE CORRESPONDENCE**

DATE: 5/01/97

TO: H.O. Surety, Jim Daily, Mail Code: LB0202

FROM: Harrisburg Surety Dept., Steve Salazar

MAY 0 6 1997

SUBJECT: CCI Construction Company, Inc. - Annual Review
Stress Score as of 3/97: 29 (Yellow)
Bear Flags: A20-Gross Profit Fade Factor is greater
than 20%; M01-Equity less than 10% of Total Program.

Review of the 12/31/96 CPA audit on CCI Construction Co.
prepared by Brown, Schultz, Snyder & Plesic, Wormleyburg, Pa.

Principles of Accounting: Income is reported on the
percentage of completion, cost to cost basis, while the
company has elected Subchapter S. Corp. status for federal
tax reporting purposes.  Effective January 1, 1995, the
company re-established itself as a Pennsylvania corporation
and changed its name to CCI Construction Company, Inc.

Depreciation is provided using an accelerated method over the
estimated useful lives of the respective assets.

Background: Business started in 1990 by the current principal
and was a spin-off of Commercial Construction, Inc., with all
assets and liabilities being transferred from Commercial
Construction, Inc. to CCI Construction Co.  CCI is general
contractor specializing in the construction of and renovation
of hospitals and healthcare facilities.  The company is also
involved in the general construction of institutional and
commercial buildings and operates in the contiguous United
States.  John Ortenzio is the president and 100% owner.  He
has 23 years experience in construction and has been the
president of CCI for over 10 years.  Shane Miller is the Sr.
Vice president and Chief Operating Officer and has been with
the company since May of 1991.  He has been an executive in
construction for over 10 years working previously for Howard
Elec./Mech., Denver, Co.; Leon Wintermyer, Lemoyne, Pa.; and
Campbell Resign Group, St. Louis, Mo.  Dave Barber is Chief
Financial Officer and has been with CCI since 1986.  Prior to
joining CCI he was comptroller for a rehab. hospital in
Pleasant Gap, Pa.

Continuity: The business is 100% owned by John Ortenzio.
He has a $1,000,000 key-man life policy payable to the
construction company and working trusts set up for continuity
purposes in his will.

Operations: Sales decreased from $48,181,100 last year to
$24,465,900 this year, a decrease of $23,715,200.  Despite
the significant decrease in Sales, Gross Profit increased
from $972,200 last year to $1,319,200 this year.  CCI also did
an excellent job of controlling G&A expenses with G&A
expenses decreasing from $1,280,600 last year to $1,180,100
this year.  This resulted in net profit increasing from
$103,200 last year to a net profit of $302,700 this FYE.

USFG/BS 1226

**Working Capital:** Working capital increased from $4,057,300 last year to a strong $4,281,000. Please note that the contractor's working capital remains highly liquid consisting of cash and cash equivalents of $3,346,100 and marketable securities of $1,803,700.

**Balance Sheet:** Account remains in a strong financial position with working capital of $4,281,000 and net worth of $4,821,800. The Debt/Equity ratio decreased from (1.7 to 1) to only (1.0 to 1.) All material receivables are fully collectable. Cash and marketable securities totaled $5,150,000 and CCI was borrowing zero on the $1,000,000 working capital line of credit.

**Work-in-Progress:** Profits are being maintained on WIP. The gross margin increased from 3.2% to 13.4%. The Fade Factor A Flag was due to the losses on the $5,900,000 Lightner Road and $13,500,000 Lincoln University jobs that we received reasons for these losses previously. The jobs were completed during 1996 and as you can see, CCI now has a very profitable backlog of work as evidenced by the 13.4% gross margin.

|                       | 12/31/96     | 12/31/95     |
|-----------------------|--------------|--------------|
| Total Contract Price  | $31,120,359  | $ 78,970,973 |
| Revised Gross Profit  | $ 4,162,380  | $ 2,559,962  |
| Gross Margin          | 13.4%        | 3.2%         |
| Backlog               | $17,599,228  | $ 14,406,331 |

**Long-term Debt:** No long-term debt.

**Contingent Liabilities:** None.

**Affiliates:** Medcom Resource Corporation and CRI General Contractors are no longer an active related companies.

**Bank Relations:** CCI continues to have a strong relationship with their bank, Dauphin Deposit, Harrisburg, Pa. Dauphin Deposit has established an unsecured working capital line of credit in the amount of $1,000,000 at the bank's prime rate.

**Relations:** Account has been with USF&G since 1993 and continues to be one of the Harrisburg Branch Office's premiere accounts. During 1996, 4 final bonds were written generating contract bond premiums of approximately $96,911. A history of the account reveals a single job consideration of $62,000,000 on the DGS Houtzdale State Correctional Institution when the account was acquired. The largest total work program consideration was $117,000,000 which also occurred when the previously mentioned $62,000,000 project was approved. The contractor has actually assumed total work programs in the $75,000,000-$80,000,000 range during 1994.

**Insurance:** Byerly Insurance Agency handles both the insurance and bonds. The account has adequate insurance in place.

**Recommendations:** The Harrisburg Branch Office strongly recommends the continuance of the Merit Rate approval on the account and renewal of our Specific Discretionary Authority of single job $15,000,000 and $75,000,000 total work program.

USFG/BS 1227

# EXHIBIT E

**USF&G INTEROFFICE CORRESPONDENCE**

APR 17 1998

DATE: 4/15/98

TO: H.O. Surety, Jim Daily, Mail Code: LB0202

FROM: Harrisburg Surety Dept., Steve Salazar

SUBJECT: CCI Construction Company, Inc. – Annual Review
Stress Score as of 3/97: 29 (Yellow)
Bear Flags: A20-Gross Profit Fade Factor is greater
than 20%; M01-Equity less than 10% of Total Program.

Review of the 12/31/97 CPA audit on CCI Construction Co.
prepared by Brown, Schultz, Wormleyburg, Pa.

<u>Principles of Accounting:</u> Income is reported on the
percentage of completion, cost to cost basis, while the
company has elected Subchapter S. Corp. status for federal
tax reporting purposes. Effective January 1, 1995, the
company re-established itself as a Pennsylvania corporation
and changed its name to CCI Construction Company, Inc.

Depreciation is provided using an accelerated method over the
estimated useful lives of the respective assets.

<u>Background:</u> Business started in 1990 by the current principal
and was a spin-off of Commercial Construction, Inc., with all
assets and liabilities being transferred from Commercial
Construction, Inc. to CCI Construction Co. CCI is general
contractor specializing in the construction of and renovation
of hospitals and healthcare facilities. The company is also
involved in the general construction of institutional and
commercial buildings and operates in the contiguous United
States. John Ortenzio is the president and 100% owner. He
has 23 years experience in construction and has been the
president of CCI for over 10 years. Shane Miller is the Sr.
Vice president and Chief Operating Officer and has been with
the company since May of 1991. He has been an executive in
construction for over 10 years working previously for Howard
Elec./Mech., Denver, Co.; Leon Wintermyer, Lemoyne, Pa.; and
Campbell Resign Group, St. Louis, Mo. Dave Barber is Chief
Financial Officer and has been with CCI since 1986. Prior to
joining CCI he was comptroller for a rehab. hospital in
Pleasant Gap, Pa.

<u>Continuity:</u> The business is 100% owned by John Ortenzio.
He has a $1,000,000 key-man life policy payable to the
construction company and working trusts set up for continuity
purposes in his will.

<u>Operations:</u> Sales increased from $24,466,000 last year to
$34,922,000 this year, an increase of $10,456,000. Gross
Profit increased from $1,319,000 last year to $2,304,000 this
year. The Gross Margin increased from 5.4% to 6.6%. Due to
the increase in sales, G&A expenses showed a corresponding
increase from $1,180,000 last year to $1,954,000 this year.
This resulted in income from operations increasing from
$139,000 last year to a $302,700 this year. Investment

USFG/BS 1255



income also increased from $275,000 to $368,000. The increase in income from operations and investment income resulted in a significant increase in net profit from $363,000 last year to $707,000 this fiscal year-end.

Working Capital: Working capital decreased slightly from $4,281,000 last year to a still strong $3,965,000. This was due to purchases of additional equipment during the year. Please note that the contractor's working capital remains highly liquid consisting of cash and cash equivalents of $1,128,000 and marketable securities of $3,703,000.

Balance Sheet: Account remains in a strong financial position with working capital of $3,965,000 and net worth of $5,454,800. The Debt/Equity ratio increased from (1.0 to 1) to (2.07 to 1.) due to an increase in accounts payables and equipment debt. All material receivables are fully collectable. Cash and marketable securities totaled $4,831,000 and CCI was borrowing zero on the $1,000,000 working capital line of credit.

Work-in-Progress: Profits are being maintained on WIP. The gross margin on work-in-progress is 4.5%. The Fade Factor A Flag was due to the losses on the $10,289,000 Mahanoy Prison and $10,357,000 Houtzdale prison projects. All other projects in progress and completed in 1997 were profitable.

|                        | 12/31/97     | 12/31/96     |
|------------------------|--------------|--------------|
| Total Contract Price   | $55,747,000  | $ 31,120,000 |
| Revised Gross Profit   | $ 2,502,000  | $ 4,162,000  |
| Gross Margin           | 4.5%         | 13.4%        |
| Backlog                | $26,191,000  | $ 17,599,000 |

Long-term Debt: No long-term debt.

Contingent Liabilities: None.

Affiliates: None. Medcom Resource Corporation and CRI General Contractors are no longer active related companies.

Bank Relations: CCI continues to have a strong relationship with their bank, Dauphin Deposit, Harrisburg, Pa. Dauphin Deposit has established an unsecured working capital line of credit in the amount of $1,000,000 at the bank's prime rate.

Relations: Account has been with USF&G since 1993 and continues to be one of the Harrisburg Branch Office's premiere accounts. During 1997, 9 final bonds were written generating contract bond premiums of approximately $218,000. A history of the account reveals a single job consideration of $62,000,000 on the DGS Houtzdale State Correctional Institution when the account was acquired. The largest total work program consideration was $117,000,000 which also occurred when the previously mentioned $62,000,000 project was approved. The contractor has actually assumed total work programs in the $75,000,000-$80,000,000 range during 1994.

Insurance: Byerly Insurance Agency handles both the insurance and bonds. The account has adequate insurance in place.

<u>Recommendations:</u> The Harrisburg Branch Office strongly recommends the continuance of the Merit Rate approval on the account and renewal of our Specific Discretionary Authority of single job $15,000,000 and $75,000,000 total work program.

Done 4/20/98

USFG/BS 1257