ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY,  Plaintiff  v.  BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ,  Defendants. | CIVIL ACTION NO. 1:01-CV-00813  JUDGE CONNOR  MJSmyser ✓ |

FILED
HARRISBURG, PA

OCT 1 0 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

**AFFIDAVIT OF JAMES A. DAILY IN OPPOSITION
TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

James A. Daily, on oath, deposes and says as follows:

1.      I am an Assistant Secretary for the Northeast Surety Division of the St. Paul Fire and Marine Insurance Company ("St. Paul"). I am making this affidavit in opposition to the Defendants' Motion for Summary Judgment. The facts set forth in this affidavit are based upon my own personal knowledge, and the business records of St. Paul and its predecessor, the United States Fidelity and Guaranty Company ("USF&G"), as would be admissible into evidence and as to which I am competent to testify. With respect to those facts which are based upon information and belief, I believe them to be true.

2.      I have been a surety bond underwriter for approximately 38 years. I have been employed by USF&G and St. Paul for 23 of those years. USF&G merged with St. Paul on or about June 1998.

3.     I have been Assistant Secretary for the Northeast Surety Division of St. Paul for approximately two years.  Prior to that time, I was the manager of the Northeast Surety Division for St. Paul and for USF&G which merged with St. Paul in 1998.

4.     At all times relevant and material to this action, my responsibilities included the suspension of underwriting activities in the various USF&G/St. Paul branch offices located within the Northeast Surety Division.  The Harrisburg, Pennsylvania office was one of the branch offices over which I had supervisory responsibilities.

<u>CCI Construction Company, Inc.</u>

5.     CCI Construction Company, Inc. ("CCI") became a USF&G account in late 1993.

6.     CCI's initial bonding program, as established by USF&G, consisted of a $15 million per project limit and a $75 million aggregate limit.  This bonding program remained in effect until approximately early October 1999 when USF&G ceased writing bonds for CCI.

7.     CCI's bonding program was established based upon USF&G's analysis of a number of factors, including CCI's reputation, and its capabilities, financial condition, and the general size and type of construction projects that CCI would be seeking to obtain.  The most objective and accurate basis for ascertaining the financial condition of any contractor, including CCI, is the year-end audited financial statement.

8.     USF&G required CCI to furnish an annual audited financial statement.  Each year, that statement was prepared by CCI's certified public accountant, Brown, Schultz Sheridan and Plesic, which was, upon information and belief, re-named Brown, Schultz Sheridan & Fritz ("Brown Schultz").  These annual audited financial statements purportedly covered CCI's entire fiscal year, which ended on December 31 each year.

9.    Each year, the Brown Schultz audited financial statements were sent to USF&G's office in Harrisburg, Pennsylvania where they would be analyzed by Anthony Phillips, the Harrisburg office's manager and Steve Salazar, another underwriter in Harrisburg office who reported to Mr. Phillips.

10.    Steve Salazar's overall analysis of CCI, including his analysis of the Brown Schultz audited financial statements, was memorialized annually in a document entitled "USF&G Interoffice Correspondence" ("Interoffice Correspondence"), which detailed the information contained in the Brown Schultz audited financial statements as well as other information such as CCI's banking relations, insurance coverages, and recommendations concerning CCI's bonding program.

11.    During the time when USF&G was issuing bonds for CCI, I received no information from any source that led me to conclude that the financial information contained in the Brown Schultz audited financial statements was inaccurate or misleading.

12.    As each Interoffice Correspondence demonstrates, USF&G's Harrisburg, Pennsylvania office recommended a continuation of the $15 million/$75 million bonding program for CCI each year from 1994 through 1998. This recommendation was approved by me each year based, in large part, on the Interoffice Correspondence as well as my, Steve Salazar and Anthony Phillips' review and analysis of the Brown Schultz audited financial statements.

13.    During CCI's bonding relationship with USF&G, the foregoing bonding capacity limits continued year-to-year although, on a few occasions, USF&G approved bonds which increased CCI's bonding capacity beyond $75 million. Those "spikes" (as they are known in the surety industry) in CCI's bonding program were short-lived since CCI worked off its backlog, thereby reducing the aggregate limit of the bonding program to $75 million or below. Also, on a

very few occasions, USF&G approved spikes in CCI's single limit bonding program to allow CCI to accept a project larger than $15 million. This was only done after considering the facts and circumstances of the specific project, as well as the financial position of CCI based in large part on the Brown Schultz audited financial statements. During the period from 1997 until USF&G/St. Paul ceased writing bonds for CCI on or about early October, 1999, USF&G only approved four jobs that were larger than the $15 million single limit portion of the bonding program.

14.    During the time when USF&G was writing bonds for CCI, USF&G did not have any specific, formal, underwriting guidelines for its bonding accounts. Rather, USF&G relied upon a series of documents issued by USF&G's home office known as "gray letters" as well as an unofficial underwriting training manual. The "gray letters" and the manual provided general guidance on the types of information USF&G should be obtaining from its contractors (such as, for example, obtaining an audited financial statement each year) and general guidance on underwriting methods and procedures.   However, with respect to CCI and, upon information and belief, many other USF&G accounts of a size similar to CCI, USF&G generally wanted the accounts to maintain a working capital-to-bonding capacity ratio of 3% or better and a net worth-to-bonding capacity ratio of 5% or better. "Working capital" is the dollar amount obtained when current liabilities are subtracted from current assets and "net worth" is determined by subtracting all liabilities from all assets.

15.    Based upon the annual Brown Schultz audited financial statements, CCI maintained the 3%-5% ratios described above, except on certain, limited occasions when USF&G approved a bond which temporarily increased CCI's bonding capacity beyond $75 million.

4

16.     In addition to receiving the Brown Schultz audited financial statements each year, USF&G would also generally receive an interim financial statement prepared internally by CCI (generally for the first six months of each year), as well as certain internally prepared work-in-progress schedules which were received quarterly. From CCI management's point of view, these work-in-progress schedules detailed how CCI's incomplete construction projects were performing.  Although these interim reports from CCI were important, they were not nearly as important as the audited financial statements prepared by Brown Schultz each year.  Moreover, CCI's interim financial statements were unaudited.  Accordingly, USF&G compared the interim financial statements to the Brown Schultz audited financial statements issued immediately prior to our receipt of the interim statements, as well as the audited financial statements issued after the interim information had been received.  This comparison was especially important when CCI experienced profit fades or losses on some of its projects.  USF&G also used the prior Brown Schultz audited financial statements to compute what CCI's cash and equity positions would be if such profit fades or losses continued.  Almost every aspect of USF&G's underwriting process, including its underwriting of the CCI account, relied upon the (then) most recently issued Brown Schultz audited financial statement as a basis for comparing CCI's profitability, net worth, and ability to perform work.  The information gleaned from the Brown Schultz' audited financial statements was an integral part of USF&G's analysis.  It also served as an indicator of the credibility of information being received from CCI and its management.

5

17.    In reliance upon the 1996 Brown Schultz Audit Report, I  approved the issuance

of payment and performance bonds to CCI for the following projects:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Albemarle     – Charlottesville Regional Jail | Additions and Renovations to Regional Jail | 26-0120-12995-98-7 | 1/21/98 | $14,682,402 |
| B. | Johnstown | Air Traffic Control Tower | 26-0120-41362-97-1 | 9/30/97 | $ 3,734,530 |
| C. | Lord Fairfax | Phase I-Lord Fairfax Community College | 26-0120-41364-97-4 | 10/20/97 | $ 7,409,292 |
| D. | Outlook-Hilliard | Construction of Outlook Point at Hilliard | 26-0120-13008-98-0 | 2/23/98 | $ 5,598,750 |
| E. | Perry Point | 80 Bed Psychiatric Care Building | 26-0120-13002-98-1 | 2/13/98 | $13,297,844 |

18.    On or about August 1997, we received notification from CCI's president, John

Ortenzio ("Ortenzio") that he wanted to have his personal indemnity agreement with USF&G

terminated.  Ortenzio had the right to terminate his indemnity agreement upon giving proper

notice to USF&G, which he properly gave, upon information and belief.  Ortenzio did agree,

however, that if CCI's equity level fell below $4.8 million and/or CCI's bonding program

consistently went above $60 million, Ortenzio understood that USF&G reserved the right to

discuss the need for reinstatement of his personal indemnity.  Based upon the Brown Schultz

audited financial statements for 1997 and 1998, CCI's equity levels were well in excess of $4.8

million; in 1997, CCI's net equity was approximately $5,455,000 and in 1998 it was

approximately $5,250,000.  This supported at least a $60 million bonding program.

19.     In reliance upon the 1997 Brown Schultz audit report, I approved the issuance of

payment and performance bonds to CCI for the following projects:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $15,647,035 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $ 7,220,942 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $ 3,919,156 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $ 5,591,730 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $18,880,298 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $21,927,111 |

20.     In reliance upon the 1998 Brown Schultz audit report, I approved the issuance of

payment and performance bonds to CCI for the following projects:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $ 514,976 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $ 835,299 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $1,688,139 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $ 191,083 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $12,191,000 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $ 4,126,478 |
| G. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $28,231,945 |

7

21.    I have reviewed the Affidavit of Stephen J. DeBruyn, CPA, offered by USF&G in opposition to the Defendants' Motion for Summary Judgment and the exhibits attached to his affidavit.    According to Mr. DeBruyn's restated balance sheet for CCI for the year ended December 31, 1997, CCI's reported net income of $706,879.00 turned into a net loss of $109,081 and its retained earnings dropped from $5,208,489.00 to $4,392,529.00.    This would have prompted Anthony Phillips and Steve Salazar at the Harrisburg office to conduct an in depth review of CCI's finances to ascertain the reason for the $109,000.00 loss.    I have reviewed the underwriting file for CCI and I note that the Harrisburg office received interim financial statements from CCI for the period ending June 30 and September 30, 1997 in which CCI reported net profits respectively of $283,339.31 and $807,000.00.    Given this information, an immediate suspension of the CCI account would have been made until USF&G could fully ascertain the circumstances under which CCI's reported profit at the end of September ($807,000.00) had dropped to a loss of $109,081.00.

22.    In addition, according to Steve DeBruyn's report, CCI's restated net worth of $4,638,834.00 represented a 15% drop in net worth from the $5,454,794.00 reported in the 1997 Brown Schultz audit report.    Further, Ortenzio, had, only a few months earlier in August 1997, notified USF&G that he was exercising his rights to terminate his obligation to personally indemnify USF&G.

8

23. Based upon the foregoing and assuming that Ortenzio was unwilling to inject additional capital into CCI and was unwilling to reinstate his personal indemnity, USF&G would have not approved any of the bonds for the following projects:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $15,647,035 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $ 7,220,942 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $ 3,919,156 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $ 5,591,730 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $18,880,298 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $21,927,111 |

24. The 1998 Brown Schultz audited financial statements did not disclose the fact that a CCI claim for delay damages and winter conditions in the amount of $1,162,460.00 for the Mahanoy Prison project had been booked as revenue. Footnote Number 8 contained in the Brown Schultz 1998 audit report merely shows that that Mahanoy Prison claim had been guaranteed by Pennsylvania Contractor's Insurance Company ("PCIC"). To me, that footnote meant that if CCI did not receive payment of all or a portion of the claim asserted by CCI relative to the Mahanoy Prison, PCIC would guaranty payment of the unpaid portion sometime in the future. Neither the footnote nor the 1998 Brown Schultz audit report contained any information indicating that the Mahanoy Prison claim had already been included as revenue for CCI in 1998.

Taking that claim out of revenue would have, standing alone, caused CCI to suffer a net loss of over $1 million.  That information, standing alone, would have caused USF&G to suspend CCI's bonding program as of March 2, 1999.

1.     With respect to Stephen DeBruyn's restated financial statements for CCI for the year ended December 31, 1998, attached as Exhibits F-1 and F-2 to his affidavit, based upon the facts enumerated in the proceeding paragraphs, none of the bonds written after USF&G's receipt of the 1998 Brown Schultz audit report on March 2, 1999 would have been written based upon the restated 1998 Brown Schultz audit report prepared by Stephen DeBruyn.  These bonds are as follows:

|    | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|----|---------|-------------|----------|-----------|--------------|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $ 514,976 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $ 835,299 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $ 1,688,139 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $ 191,083 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $12,191,000 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $ 4,126,478 |
| G. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $28,231,945 |

Signed under the pains and penalties of perjury this 8th day of October, 2002.

James A. Daily

10