OFFICIAL

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff<br><br>v.<br><br>BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | CIVIL ACTION NO. 1:01-CV-00813<br><br>JUDGE CONNOR<br>MJ Smyser √ |

FILED
HARRISBURG, PA

OCT 1 0 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## AFFIDAVIT OF BRUCE D. LEVIN

Bruce Levin, on oath, deposes and states as follows:

1.    I am a partner in the firm of Bernkopf, Goodman & Baseman LLP, which maintains a business address at 125 Summer Street, Boston, Massachusetts and am a member in good standing of the Massachusetts bar.  I am one of the attorneys representing United States Fidelity and Guaranty Company ("USF&G") in the above-captioned matter.  I am making this affidavit solely for the purpose of authenticating certain documents in support of United States Fidelity & Guaranty Company's Opposition to the Defendants' Motion for Summary Judgment.

2.    A true copy of the Complaint (exhibits omitted) filed by USF&G is attached hereto and incorporated herein as Exhibit "1."

3.    A true copy of USF&G's Answers to Defendants' Set of Interrogatories is attached hereto and incorporated herein as Exhibit "2."

4.    A true copy of Expert Report of Steve J. DeBruyn is attached hereto and incorporated herein as Exhibit "3."

5.      A true copy of the Supplemental and Rebuttal Expert Report of Steve J. DeBruyn is attached hereto and incorporated herein as Exhibit 4."

6.      True copies from excerpts of the Deposition of Bruce Brown dated January 17, 2002 are attached hereto and incorporated herein as Exhibit "5."

7.      True copies from excerpts of the Deposition of Susanne Ehgartner dated June 11, 2002 are attached hereto and incorporated herein as Exhibit "6."

8.      True copies from excerpts of the Deposition of Deborah Bowman dated May 21, 2002 are attached hereto and incorporated herein as Exhibit "7."

9.      True copies from excerpts of the Deposition of Stephen Salazar dated May 22, 2002 are attached hereto and incorporated herein as Exhibit 8."

10.     True copies from excerpts of the Deposition of James Daily dated April 18, 2002 and June 27, 2002 are attached hereto and incorporated herein as Exhibit "9."

11.     True copies from excerpts of the Deposition of Anthony Phillips dated April 17, 2002 are attached hereto and incorporated herein as Exhibit "10."

12.     True copies from excerpts of the Deposition of David Hussey dated May 28, 2002 are attached hereto and incorporated herein as Exhibit "11."

13.     A true copy of Document BY00500 is attached hereto and incorporated herein as Exhibit "12."

14.     A true copy of Document USFG/BS 01853 is attached hereto and incorporated herein as Exhibit "13."

15.     A true copy of Document BS 01590 is attached hereto and incorporated herein as Exhibit "14."

16.    A true copy of Document BS 00772 is attached hereto and incorporated herein as Exhibit "15."

17.    A true copy of Document BS 01755 is attached hereto and incorporated herein as Exhibit "16."

18.    A true copy of Document BS 00169 is attached hereto and incorporated herein as Exhibit "17."

19.    A true copy of Document USFG/BS 0908 is attached hereto and incorporated herein as Exhibit "18."

20.    A true copy of Document USFG/BS 924 is attached hereto and incorporated herein as Exhibit "19."

21.    A true copy of Document USFG/BS 1252 is attached hereto and incorporated herein as Exhibit "20."

22.    A true copy of Document USFG/BS 0870 is attached hereto and incorporated herein as Exhibit "21."

23.    A true copy of Document USFG/BS 0860-0869 is attached hereto and incorporated herein as Exhibit "22."

24.    A true copy of SAS no. 1, AU section 230 is attached hereto and incorporated herein as Exhibit "23."

25.    A true copy of SAS no. 22, AU section 311 is attached hereto and incorporated herein as Exhibit "24."

26.    A true copy of SAS no. 31, AU section 326 is attached hereto and incorporated herein as Exhibit "25."

27.    A true copy of Document BS 00774 is attached hereto and incorporated herein as Exhibit "26."

28.    A true copy of Document BS 2045 is attached hereto and incorporated herein as Exhibit "27."

29.    True copies from excerpts of the Deposition of John Ortenzio dated May 23, 2002 is attached hereto and incorporated herein as Exhibit "28."

30.    True copies of excerpted pages from the audited financial statements for the years ended December 31, 1995 through 1998 are attached hereto and incorporated herein as Exhibit "29."

31.    A true copy of the 1996 Audit Report is attached hereto and incorporated herein as Exhibit "30."

32.    A true copy of the 1997 Audit Report is attached hereto and incorporated herein as Exhibit "31."

33.    A true copy of the 1998 Audit Report is attached hereto and incorporated herein as Exhibit "32."

34.    A true copy of Response No. 20 of Defendant Brown, Shultz, Sheridan & Fritz's Responses and Objections to United States Fidelity and Guaranty Company's First Request for Production of Documents is attached hereto and incorporated herein as Exhibit "33."

35.    A true copy of Section 12.049 of the Horwath International Audit Manual is attached hereto and incorporated herein as Exhibit "34."

36.    A true copy of the Guaranty Agreement dated December 1, 1998 from Pennsylvania Contractors Insurance Company to CCI Construction, Inc. is attached hereto and incorporated herein as Exhibit "35."

Signed under the pains and penalties of perjury this 9th day of October 2002.

_____

Bruce D. Levin

#254551 v1/36432/87

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY,<br>　　　　Plaintiff | ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 01- |
| BRUCE J. BROWN and<br>BROWN SCHULTZ SHERIDAN &<br>FRITZ,<br>　　　　Defendants | ) ) ) ) ) ) | |

**FILED**
HARRISBURG, PA

MAY 0 9 2001

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## COMPLAINT OF UNITED STATES FIDELITY AND GUARANTY COMPANY

### I. INTRODUCTION

By this action, the United States Fidelity and Guaranty Company ("USF&G"), a performance and payment bond surety to CCI Construction Co. ("CCI"), seeks to recover damages which it has sustained as a result of its extension of surety credit and the issuance of construction surety bonds to CCI in reliance upon audited financial statements prepared by the defendants, Bruce J. Brown and Brown Schultz Sheridan & Fritz ("Brown Schultz"), that contain misrepresentations, omissions and/or inaccurate information.

### II. PARTIES, JURISDICTION AND VENUE

#### A. Plaintiff

1.　　Plaintiff, USF&G is a corporation organized under the laws of Maryland and maintains a principal place of business in St. Paul, Minnesota.

**B. Defendant**

2.      Defendant, Brown Schultz, is, upon information and belief, a professional corporation formed, upon information and belief, pursuant to the laws of the Commonwealth of Pennsylvania with a principal place of business at 1011 Mumma Road, Wormleysburg, Pennsylvania.

3.      Defendant, Bruce J. Brown ("Brown") is, upon information and belief, an individual residing in the vicinity of Harrisburg, Pennsylvania, and is a partner with Brown Schultz, as well as the partner-in-charge of the CCI account.

**C. Jurisdiction and Venue**

4.      Jurisdiction obtains pursuant to 28 U.S.C. §1332(a), as USF&G is a Maryland corporation with a principal place of business in St. Paul, Minnesota and Brown Schultz and Brown are citizens of the Commonwealth of Pennsylvania and have a principal place of business or residence in Pennsylvania.  The amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

5.      Venue obtains pursuant to 28 U.S.C. §1391(a) as Brown Schultz has a principal place of business in the Middle District of Pennsylvania and Brown is, upon information and belief, a resident in the Middle District of Pennsylvania.

**III.  FACTUAL BACKGROUND**

**USF&G Issues Bonds To CCI**

6.      CCI was a contractor engaged in construction work on public and private construction projects and maintained principal offices in Camp Hill, Pennsylvania.

- 2 -

7.     USF&G is in the business of, *inter alia*, issuing payment and performance bonds on behalf of contractor and subcontractor principals engaged in the performance of work on public and private construction projects.

8.     In general, in connection with the issuance of payment and performance bonds, USF&G establishes a "bonding program" for its contractor and subcontractor principals, thereby establishing a surety credit line for each such contractor and subcontractor principal.

9.     In general, payment and performance bonds are issued by USF&G to such contractor and subcontractor principals pursuant to the bonding program established, as described in the previous paragraph.

10.     As a condition of the establishment and/or extension of surety credit to CCI and the issuance of the payment and performance bonds to CCI, USF&G required that CCI furnish to it annually an audit report prepared by an independent certified public accountant consisting of, *inter alia*, an audit of CCI's balance sheet and income statement.

11.     On information and belief, at all times material and relevant to this action, Brown and Brown Schultz have been engaged in the business of performing work as independent certified public accountants, including, *inter alia*, preparing audited financial statements for construction contractors and subcontractors for use by their bonding companies.

**Relying Upon the Audits, USF&G Issues Bonds**

12.     Brown and Brown Schultz prepared audited financial statements for CCI for the years ended December 31, 1996, December 31, 1997 and December 31, 1998 (collectively, the "Audited Financial Statements"). Copies of the Audited Financial Statements are attached hereto as Exhibits "A," "B" and "C," respectively.

13.    Brown and Brown Schultz knew that the Audited Financial Statements would be provided by CCI to its bonding company, which at all times material and relevant to this action was USF&G.

14.    Brown and Brown Schultz knew that CCI's bonding company – USF&G – would rely upon the Audited Financial Statements to determine whether to extend, cancel or modify the surety credit program which USF&G established for CCI and to issue payment and performance bonds to CCI.

15.    On or about May 1, 1997, USF&G received a copy of Brown Schultz's Independent Auditor's Report dated February 12, 1997 for CCI for the year ended December 31, 1996 and 1995 (the "1996 Audit Report").

16.    In reliance upon the 1996 Audit Report, USF&G agreed to extend surety credit to CCI and, thereafter, USF&G issued payment and performance bonds to CCI for, *inter alia*, the following projects:

|  | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL SUM AMOUNT |
|---|---|---|---|---|---|
| A. | Albemarle – Charlottesville Regional Jail | Additions and Renovations to Regional Jail | 26-0120-12995-98-7 | 2/6/98 | $14,682,402.00 |
| B. | Johnstown | Air Traffic Control Tower | 26-0120-41362-97-1 | 8/15/97 | $ 3,734,530.00 |
| C. | Lord Fairfax | Phase I-Lord Fairfax Community College | 26-0120-41364-97-4 | 1/5/98 | $ 7,409,292.00 |
| D. | Outlook-Hilliard | Construction of Outlook Point at Hilliard | 26-0120-13008-98-0 | 2/23/98 | $ 5,598,750.00 |

17.    On or about March 5, 1998, USF&G received a copy of Brown Schultz's Independent Auditor's Report dated February 10, 1998 for CCI for the years ended December 31, 1997 (the "1997 Audit Report").

- 4 -

18. In reliance upon the 1997 Audit Report, USF&G agreed to extend surety credit to CCI and, thereafter, USF&G issued payment and performance bonds to CCI for, *inter alia*, the following projects:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL SUM AMOUNT |
|---|---|---|---|---|---|
| A. | Germsplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 4/7/98 | $15,647,035.00 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $ 7,220,942.00 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $ 3,919,156.00 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $ 5,591,730.00 |
| E. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 4/30/98 | $28,231,945.00 |
| F. | Perry Point | 80 bed Psychiatric Care Building | 26-0120-13002-98-1 | 3/12/98 | $13,297,844.00 |
| G. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 3/30/98 | $18,880,298.00 |
| H. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $21,927,111.00 |

19. On or about March 1, 1999, USF&G received a copy of Brown Schultz's Independent Auditor's Report dated February 10, 1999 for CCI for the year ended December 31, 1998 (the "1998 Audit Report").

20. In reliance upon the 1998 Audit Report, USF&G agreed to extend surety credit to CCI and, thereafter, issued payment and performance bonds to CCI for, *inter alia*, the following projects:

- 5 -

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 6/17/99 | $ 514,976.00 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 5/13/99 | $ 835,299.00 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 7/7/99 | $ 1,688,139.00 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 8/12/99 | $ 191,083.00 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 4/15/99 | $12,191,000.00 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $ 4,126,478.00 |

(The projects and the bonds described in paragraphs 16, 18 and 20 of this Complaint are collectively referred to as the "Projects" and the "Bonds," respectively).

21.     The Audited Financial Statements prepared by Brown Schultz were inaccurate, contained omissions and/or were misleading in whole or in part.

### CCI Defaults And USF&G Incurs Heavy Losses

22.     On or about September, 1999, CCI advised USF&G that it lacked the financial resources to continue its operations and, consequently, would not be able to complete its work and pay its suppliers and subcontractors relative to the Projects.

23.     Subsequently, USF&G, as the surety for the payment and performance bonds which it issued for the Projects, was required to and did expend substantial sums satisfying the claims of CCI's unpaid vendors, employees and subcontractors, and in completing the Projects.

24.     On or about May 19, 2000, CCI filed for bankruptcy.

25.     As of this date, USF&G has incurred losses of approximately $31,816,895 in connection with the Bonds issued in reliance upon the 1996, 1997 and 1998 Audited Financial Statements.

## IV. USF&G'S CLAIMS AGAINST BROWN AND BROWN SCHULTZ

### Count I – Negligent Misrepresentation

26.    USF&G hereby restates and realleges the allegations contained in paragraphs 1 through 25 as if fully set forth herein.

27.    At the times relevant and material to this action, Brown and Brown Schultz knew that the Audited Financial Statements would be furnished to USF&G.

28.    At the times relevant and material to this action, Brown and Brown Schultz knew that as an inducement to extend surety bond credit to CCI, USF&G would rely on the Audited Financial Statements.

29.    Brown and Brown Schultz owed a duty of care to USF&G as an intended recipient of the Audited Financial Statements.

30.    USF&G justifiably and reasonably relied upon the Audited Financial Statements.

31.    USF&G justifiably and reasonably relied upon the Audited Financial Statements to its detriment.

32.    The Audited Financial Statements were inaccurate, misleading and/or contained omissions in whole or in part.

33.    As a direct and proximate result of Brown and Brown Schultz's negligent misrepresentations contained in the Audited Financial Statements as aforesaid, USF&G has sustained and continues to sustain damages for which Brown and Brown Schultz are liable to USF&G, together with costs, interest and attorneys' fees.

WHEREFORE, USF&G demands that this Court:

1.    Enter judgment against Brown and Brown Schultz in favor of USF&G as to Count I of this Complaint in the amount of its damages, plus interest, costs and reasonable attorneys' fees;

2.    Grant USF&G such other and further relief as is proper and just.


UNITED STATES FIDELITY &
GUARANTY COMPANY,
By its attorneys,


Jeffrey Rettig, Esq.
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA 17101
Telephone: (717) 237-7100
Telecopier: (717) 237-7105

and

Peter B. McGlynn, Esquire (BBO No. 333660)
Bruce D. Levin, Esquire (BBO No. 548136)
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

Dated: May ____, 2001
#222654 v1/36432/87

- 8 -

2

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff | ) ) ) ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| v. | ) ) | JUDGE KANE |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | ) ) ) ) | |

**UNITED STATES FIDELITY AND GUARANTY COMPANY'S
ANSWERS TO DEFENDANTS' SET OF INTERROGATORIES**

Plaintiff, United States Fidelity & Guaranty Company (the "USF&G") responds to

Defendants' First Set of Interrogatories as follows:

I.    **STATEMENT AND GENERAL OBJECTIONS**

1.    USF&G objects to Defendants' interrogatories and instructions to the extent that

they exceed the scope of both Fed.R.Civ.P. 33 and the Local Rules of the United States District

Courts for the District of Pennsylvania.

2.    Defendants' requests are extremely broad in scope and include information

subject to the attorney-client privilege or the work produce doctrine. Accordingly, USF&G will

answer all interrogatories as indicated below only to the extent that they are not subject to the

attorney-client privilege or work product doctrine.

3.    USF&G reserves the right to supplement its responses in the event that additional

documents or information become available.

4.   All documents proffered pursuant to Fed.R.Civ.P. 33(c) will be produced as required by the Federal Rules of Civil Procedure or as the parties may otherwise agree.

5.   To the extent that any definition, instruction or interrogatory may be construed as calling for the identification of documents reflecting, referring or relating to a particular subject or subjects, USF&G construes such interrogatory as calling for the identification of documents which refer to the designated subject on the face of the documents. If, however, the interrogatory is to be construed otherwise, it would be impossible for USF&G to identify documents on the grounds that the definition, instruction or interrogatory is vague, ambiguous, overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence.

6.   USF&G hereby incorporates by reference each and every one of the general objections in to all of the following interrogatory responses.

## II.   ANSWERS

### INTERROGATORY NO. 1

Identify all persons who participated in the preparation of your responses to Defendants' First Set of Interrogatories to Plaintiff.

### ANSWER NO. 1

Without waiver of the general objections, USF&G states that the responses were prepared by Anthony Phillips, with the assistance of counsel.

### INTERROGATORY NO. 2

Identify all persons, including but not limited to your present or former employees, who participated in the underwriting of payment and performance bonds issued to CCI.

## ANSWER NO. 2

Without waiver of the general objections, and further objecting that "participated" is vague and ambiguous, USF&G states that the following individuals either worked for USF&G regarding the decision to create a bonding program for CCI or provided USF&G with material information, other than audit information, used to make that decision:

Stephen H. Salazar
Senior Underwriting Manager
St. Paul Surety Co.
2605 Interstate Drive
Harrisburg, PA  17110-9364

Jim Dailey
H.O. Surety, National Accounts
St. Paul Surety Co.
2605 Interstate Drive
Harrisburg, PA  17110-9464

Anthony Phillips
Bond Underwriter
St. Paul Surety Co.
2605 Interstate Drive
Harrisburg, PA  17110-9464

John Ortenzio, President
CCI Construction Co., Inc.
2500 Old Gettysburg Road
Camp Hill, PA  17011-7307

Shane Miller
Chief Operating Officer
CCI Construction Co., Inc.
2500 Old Gettysburg Road
Camp Hill, PA  17011-7307

David Barber
Chief Financial Officer
CCI Construction Co., Inc.
2500 Old Gettysburg Road
Camp Hill, PA  17011-7307

James C. Byerly, President
Byerly Insurance
525 North 12th Street
P.O. Box 525
Lemoyne, PA  17043-0525

Dave Dominiani
Vice President/Contract Bond Division
Byerly Insurance
525 North 12th Street
P.O. Box 525
Lemoyne, PA  17043-0525

## INTERROGATORY NO. 3

Identify all persons, including but not limited to your present or former employees, who participated in the establishment of a bonding program for CCI.

## ANSWER NO. 3

Without waiver of the general objections, and further objecting that "participated" is vague and ambiguous, USF&G states that the following individuals either worked for USF&G regarding the decision to create a bonding program for CCI or provided USF&G with material information, other than audit information, used to make that decision:

Stephen H. Salazar
Senior Underwriting Manager
St. Paul Surety Co.
2605 Interstate Drive
Harrisburg, PA  17110-9364

Jim Dailey
H.O. Surety, National Accounts
St. Paul Surety Co.
2605 Interstate Drive
Harrisburg, PA  17110-9464

Anthony Phillips
Bond Underwriter
St. Paul Surety Co.
2605 Interstate Drive
Harrisburg, PA  17110-9464

-4-

John Ortenzio, President
CCI Construction Co., Inc.
2500 Old Gettysburg Road
Camp Hill, PA  17011-7307

Shane Miller
Chief Operating Officer
CCI Construction Co., Inc.
2500 Old Gettysburg Road
Camp Hill, PA  17011-7307

David Barber
Chief Financial Officer
CCI Construction Co., Inc.
2500 Old Gettysburg Road
Camp Hill, PA  17011-7307

James C. Byerly, President
Byerly Insurance
525 North 12th Street
P.O. Box 525
Lemoyne, PA  17043-0525

Dave Dominiani
Vice President/Contract Bond Division
Byerly Insurance
525 North 12th Street
P.O. Box 525
Lemoyne, PA  17043-0525

## INTERROGATORY NO. 4

State the factual basis for your contention that Brown Schultz's Audit Report for the year ended December 31, 1996 was inaccurate, contained omissions and/or was misleading, including but not limited to:

    a.    The nature of each inaccuracy and/or omission contained in the 1996 Audit Report; and

    b.    The manner in which the 1996 Audit Report was misleading.

## ANSWER NO. 4

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. USF&G also states that the interrogatory is duplicative of information to be provided in expert reports which, pursuant to the Case Management Order dated August 17, 2001, are due on July 1, 2002. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery and USF&G reserves the right to amend its responses to reflect such information. Additionally, the instant response focuses on major inadequacies of the audited financial statements for CCI for the year ended December 31, 1996 (the "1996 Audit Report") and is not intended to be a complete recitation of all inaccuracies, omissions and representations contained therein.

USF&G further states that some of the inaccuracies and omissions are relevant only when viewed in the context of other audits of CCI performed by Brown Schultz. Accordingly, USF&G incorporates herein by reference the responses to interrogatories nos. 8 and 12 as if fully set forth herein.

Several aspects of the planning stage of the 1996 Audit Report indicate that Brown Schultz did not perform to professional standards regarding the 1996 Audit Report. During the

planning stage of the audit, significantly greater consideration should have been given to the use of more expansive procedures in regards to management's representations, especially in relation to anticipated gross profit and estimated costs to complete on work-in-progress as of December 31, 1996.

On Form B-2, Part IV, "Evaluating and Considering the Effects of Overall Inherent Risk Factors," the auditor is instructed to consider the effect, individually and in the aggregate, on the audit scope of all significant risk factors identified in Part I of Form B-2. Further, the auditor is instructed to describe the various risk factors and reasons for its significance, any mitigating circumstances, the cycle/assertion most likely affected, and the effect on scope. Brown Schultz identified the following two separate risk factors: (1) that management personnel were awarded bonuses based on company's performance, and that (2) significant creditors were intended financial statement users.

For each of these risk factors, Brown Schultz documented as a mitigating circumstance that "[m]anagement team has high integrity; no problems in the past and none are anticipated." Brown Schultz also commented that these risk factors were likely to effect the "revenue/existence" cycle in regards to the first factor and the "expenditure/completeness" cycle in regards to the second factor. Finally, Brown Schultz documented that these risk factors would have no effect on the audit scope. This was due to audit procedures already in place which, purportedly, "usually result[s] in examining revenue 90%-100." Brown Schultz also noted that "search for unrecorded liabilities is performed." However, the risk factors during the planning stage of the audit were of such significance that Brown Schultz should have been aware that management personnel had an incentive to inflate earnings and net income and, accordingly, should have subjected CCI's financials to markedly greater scrutiny.

In addition to the two risk factors detailed above, Brown Schultz should have also considered the following factors in its audit work:

(1)   Accounting issues such as the complexity and contentiousness of accounting issues affecting the account (i.e. the various difficulties associated with auditing a construction company);

(2)   Auditing difficulties including the frequency or significance of difficult-to-audit transactions affecting the account (i.e. difficulties associated with auditing estimated costs-to-complete;

(3)   The complexity of calculations affecting the account; and

(4)   The extent of judgment involved in determining the account balance.

Despite the foregoing, on the Confirmation Control Sheet, it appears that only Accounts Receivable confirmations and legal representation letters were sent.  The following do not appear to have been used or even considered:

-   Confirmation of the various cash accounts;

-   Confirmation of the Company's line of credit;

-   Confirmation of significant subcontractor agreements; and

-   Confirmation of the Company's investments.

In relation to indirect costs, the presentation of the financial statements appear not to be in accordance with GAAP.  For example, it appears that costs of contracts for each individual contract as represented on the "Earnings from Contracts," "Completed Contracts" and "Contracts-in-Progress" schedules included only direct costs; indirect costs and general and administrative expenses are charged to expense as incurred.  (See Note 1 to the financial statements).  However, GAAP requires all indirect costs to be allocated to individual contracts

-8-

using a reasonable method. Therefore, GAAP does not allow a line item "Indirect Costs" to appear on the financial statements. The result of this departure from GAAP is that actual/estimated gross profit of each individual contract represented on the "Completed Contracts" and "Contracts-in-Progress" was overstated by the amount of indirect costs that should have been allocated to that job.

A comparison of the summary portion of the income statement between the years ended December 31, 1997 and December 31, 1996 also indicates serious inaccuracies. Brown Schultz analytically identified a potential error in the financial statements by performing an analytical review of the overall income statement. It identified an increase in the gross profit from 2.02% in 1995 to 5.39% in 1996. Although this represented an increase of only 3.37%, the 1996 percentage was 166% greater than the 1995 amount. Brown Schultz noted on the workpaper that the increase was the result of higher gross profit recognized from "capital" jobs in 1996.

In Brown Schultz' audit program concerning completed contracts, the procedure used, as described by Brown Schultz, was as follows: "[s]elected two jobs included in the completed contract listing . . . which were around 80% complete in the prior year, in order to get a good test of the client's estimating procedures." This testing was inadequate.

In the audit program dealing with completed contracts, only two contracts were "tested." These contracts represented less than 25% of the total amount of contracts completed during 1996. Therefore, the two contracts were not a representative sample.

In relation to the testing of CCI's job cost system, it appears that 25 job cost items were "haphazardly" selected and tested. This testing included, among other things, payroll costs. To test these costs, weekly transaction distribution reports were obtained. "Haphazardly," one line item for every month plus one additional line item for the fifth and seventh months were selected.

To verify that the transaction distribution represented the total weekly payroll, Brown Schultz agreed the gross payroll report total to the transaction distribution reports to the weekly payroll register total. As for other costs, Brown Schultz merely obtained the monthly purchase journals. Brown Schultz then haphazardly selected one line item that included a job cost and phase number from each month.

Brown Schultz noted that "[a]ll 25 cost items were traced to client source documentation to verify that the cost was coded to the correct job. Also, all cost items were agreed to the job cost history reports to verify proper posting." Brown Schultz also noted that "All invoice and payroll account coding relating to contracts is completed and approved by someone outside of the accounting department . . . [d]ue to this control, only 25 items needed to be selected for testing."

Brown Schultz did not document why a sample of only 25 items was considered a reasonable, representative sample.

It does not appear that job site visits were performed or even considered when the audit was planned. Since this procedure was not performed (nor were confirmation letters sent to subcontractors), there was virtually no independent confirmation or other verification of management's representations concerning the percentage of completion and the estimated costs to complete as of the balance sheet date. Nor was Brown Schultz able to obtain any independent verification of problems on the jobs that might not have been disclosed by management (with the exception of the confirmations received from the owners).

Several errors appear to have been made as to the "Disclosure Requirements" checklist. Question 2 under the section "Notes and Accounts Receivable" concerns amounts due from affiliates or subsidiaries. The preparer noted that this item was "insignificant." However, on the December 31, 1996 balance sheet, it was represented that $268,583 was due from a shareholder.

At the same time, it had previously been documented that the Acceptable Projected Misstatement was $100,000.00. Accordingly, the description of "insignificant" is inaccurate. Moreover, the allowance of doubtful accounts does not appear to have been disclosed, as is required under GAAP.

Summarily, in relation to the testing of contract billing and cost-related accounts, it appears that Brown Schultz performed little, if any, of the above-detailed procedures. It also appears that limited inquiries were made solely to Sherri Phillips, CCI's chief accounting person. There appears to be little, if any, documentation concerning inquiries and discussions made with the construction manager, the project manager of each individual significant job and other key, field employees. In addition, there appears to have been little, if any, analytical review performed on the jobs-in-progress, material departures from GAAP demonstrated by management (in regard to indirect costs), and little, if any, testing performed on the individual components of job costs (direct and indirect costs).

## INTERROGATORY NO. 5

Identify all documents which support your contention that Brown Schultz's Audit Report for the year ended December 31, 1996 was inaccurate, contained omissions and/or was misleading.

## ANSWER NO. 5

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the

-11-

Federal Rules of Civil Procedure. USF&G also states that the interrogatory is duplicative of information to be provided in expert reports which, pursuant to the Case Management Order dated August 17, 2001, are due on July 1, 2002. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery.

Without waiver of the general and foregoing objections, USF&G will make such documents available for inspection and copying at a reasonable time and place pursuant to Fed. R. Civ. P. 33(d). Such documents consist, in the main, of Brown Schultz' working papers, the audit and tax file, correspondence and the appropriate audit report, all of which were previously produced by Brown Schultz.

## INTERROGATORY NO. 6

For each inaccuracy and/or omission identified in response to interrogatory no. 4, is it your contention that it was material to the issuance of the payment and performance bonds identified in Paragraph 16 of the Complaint? If so, state the factual basis for your contention and the sources of proof for the facts which support your contention.

## ANSWER NO. 6

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. USF&G also states that the interrogatory is duplicative of

information to be provided in expert reports which, pursuant to the Case Management Order dated August 17, 2001, are due on July 1, 2002. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery and USF&G reserves the right to amend its responses to reflect such information.

USF&G relied upon the unqualified opinion contained in the audit report in its decision as to the nature and extent of the bonding program it gave to CCI. The errors or omissions discussed in the response to interrogatory 4 resulted in the audit report inaccurately reflecting CCI's true financial condition and numerous risks inherent in the maintenance of a bonding program. Since USF&G would not have issued the bonding program to CCI which it did if the inaccuracies contained in the 1996 Audit Report were known by USF&G, all inaccuracies referred to in the response to interrogatory no. 4 are material because of the cumulative effect they had on the accuracy of the audit.

## INTERROGATORY NO. 7

Is it your contention that defendants should have known of each of the inaccuracies and/or omissions identified in response to interrogatory no. 4 above? If so, state the factual basis for your contention and the sources of proof for the facts which support your contention.

## ANSWER NO. 7

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the

-13-

Federal Rules of Civil Procedure. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery and USF&G reserves the right to amend its responses to reflect such information.

In that, *inter alia*, the errors and omissions identified in response to interrogatory 4 were apparent to USF&G upon review of the working papers and could likely have been either eliminated or avoided by the implementation of procedural and substantive steps mandated by GAAS and GAAP, as well as reasonable professional standards of practice, Brown Schultz either knew or should reasonably have known of such inaccuracies and omissions.

## INTERROGATORY NO. 8

State the factual basis for your contention that Brown Schultz's Audit Report for the year ended December 31, 1997 was inaccurate, contained omissions and/or was misleading including but not limited to:

    a.    The nature of each inaccuracy and/or omission contained in the 1997 Audit Report; and

    b.    The manner in which the 1997 Audit Report was misleading.

## ANSWER NO. 8

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. USF&G also states that the interrogatory is duplicative of

information to be provided in expert reports which, pursuant to the Case Management Order

dated August 17, 2001, are due on July 1, 2002. However, USF&G is providing responses to this

interrogatory based, for the most part, on information known or available to them at this time.

These responses do not include or incorporate information that will be obtained in the course of

discovery and USF&G reserves the right to amend its responses to reflect such information.

Additionally, the instant response focuses on major inadequacies of the audited financial

statements for CCI for the year ended December 31, 1997 (the "1997 Audit Report") and is not

intended to be a complete recitation of all inaccuracies, omissions and representations contained

therein.

USF&G further states that some of the inaccuracies and omissions are relevant only when

viewed in the context of other audits of CCI performed by Brown Schultz. Accordingly, USF&G

incorporates herein by reference the responses to interrogatories nos. 4 and 12 as if fully set forth

herein.

As a part of the statements that were issued for the year ended December 31, 1997, the

statement, as originally reported, contained current assets of $15.3 million, other assets of $1.4

million, total current liabilities of $11.3 million and equity of $5.4 million. As restated, the

current assets were $14.1 million, other assets were $1.4 million, current liabilities were $13.2

million and equity was $2.3 million. The net effect of this is that retained earnings as originally

reported were overstated by $3.1 million dollars.

There was profit fade of $2.8 million on the work in process as of December 31, 1997.

By overstating the estimated profit on these jobs, Brown Schultz had materially overstated

overbillings and net income for 1997. Brown Schultz did not properly allocate indirect costs and

did not properly perform an audit of construction contracts in accordance with GAAS.

Moreover, significant profit increases and slippage were recognized from the represented work-in-progress as of December 31, 1997.

On Form B-2, Part IV, "Evaluating and Considering the Effects of Overall Inherent Risk Factors," the auditor is instructed to consider the effect, individually and in the aggregate, on audit scope of all significant risk factors identified in Part I of Form B-2. The auditor is further instructed to describe the various risk factors and reason for its significance, any mitigating circumstances, the cycle/assertion most likely affected, and the effect on scope. Brown Schultz identified the following four separate risk factors: (1) significant creditors who are financial statement users; (2) significant related party transactions; (3) competitive industry; and (4) management bonuses based on financial results.

For each of these risk factors, Brown Schultz documented as a mitigating circumstance that "[m]anagement team has high integrity; no problems in the past and none are anticipated." Brown Schultz also commented that these risk factors were not likely to effect any specific cycles. Finally, Brown Schultz documented that these risk factors would have no effect on the audit scope. This was due to audit procedures already in place, which, purportedly, "usually result[s] in examining revenue 90%-100%." Brown Schultz also noted that "search of unrecorded liabilities is performed." However, the risk factors during the planning stage of the audit were of such significance that Brown Schultz should have been aware that management (in particular, Shane Miller, CCI's Executive Vice-President, and the individual ultimately responsible for the compilation of the work-in-progress schedule, and Sherri Phillips, the individual responsible for the preparation of the financial statements) had an incentive to inflate earnings and net income and, accordingly, should have subjected CCI's financials to markedly greater scrutiny.

In addition to the four risk factors detailed above, Brown Schultz should have also considered the following factors in its audit work:

(1)     Accounting issues such as the complexity and contentiousness of accounting issues affecting the account (i.e. the various difficulties associated with auditing a construction company);

(2)     Auditing difficulties including the frequency or significance of difficult-to-audit transactions affecting the account (i.e. difficulties associated with auditing estimated costs-to-complete);

(3)     The complexity of calculations affecting the account; and

(4)     The extent of judgment involved in determining the account balance.

Therefore, during this planning stage, consideration should have been made of expanding procedures in regards to management's representations, especially in relation to anticipated gross profit and estimated costs to complete on work-in-progress.

On the "Disclosure Requirements Checklist," Item 2 under cash deals with material bank overdrafts presented as a separate caption amount current liabilities.  Per review of the trial balance, it appears that CCI had an operating account and a payroll account with overdrawn balances as of December 31, 1997, and a cash management account with a balance that exceeded the two overdrawn cash accounts.  Therefore, the possibility exists that the proper financial statement presentation would be to show the cash management account as an asset and the two overdrawn accounts as a current liability.  Or, if in fact the overdrawn balance was caused by held checks, Brown Schultz should have considered adding back the held checks to cash and increasing accounts payable by that same amount.  Brown Schultz noted that this issue was "N/A" with a handwritten statement that the material bank overdrafts were netted with the cash

management account. Although this presentation issue would not effect the "bottom line"; net income and retained earnings, it would effect such critical items as current assets, total assets, and the current ratio. Therefore, Brown Schultz should have checked this issue as "Yes" and considered presenting it as an asset and a current liability.

There appear to be significant errors regarding the confirmation of receivables and treatment of the results obtained. For example, there appears to have been a material difference noted on the "DGS 373-1.1" job (Job #439, Mahonoy Prison) between what was represented on CCI's books and what the owner confirmed. CCI's books overstated the revised contract amount by $10,623. (This appears to have related to change orders as CCI recognized $183,782 of change orders while only $173,159 was confirmed by the owner; a difference of $10,623). CCI's books overstated totaled billings to date by $586,467. CCI's books also overstated accounts receivable ("current") by $176,476. (This appears to have been offset by CCI's understatement of retention by approximately the same amount). On their working papers analyzing the response from the owner, it appears that Brown Schultz incorrectly attempted to reconcile the above-detailed variances.

In regards to the $586,467 variance in regards to billings, it was noted by Brown Schultz that the amount confirmed by the owner excluded retention in the amount of $366,592. However, nowhere was it documented how this assertion was determined. In addition, assuming that Brown Schultz' assertion was accurate concerning retention, there still existed a difference in the amount of $219,875.

In regards to the variance in current receivables, Brown Schultz documented that the $219,875 variance noted in regards to billings was the same variance noted in regards to the receivables. However, Brown Schultz went on to conclude that these two variances would have

-18-

no income statement effect. Rather, it would simply be a debit to the overbillings account (liability) and a credit to the receivables account (asset) in the amount of $219,875. Therefore, no adjustment was made. There are a number of issues raised by this conclusion. Assuming Brown Schultz was correct in simply offsetting the two accounts, it appears that the entry should have been booked since the decrease of assets and liabilities may have effected such items as total assets, total current assets, and the current ratio. This, in turn, may have had an impact on bank and surety underwriting decisions. Moreover, this variance may have been an indication of weaknesses within CCI's internal financial reporting. Nowhere is the reason for the variance documented. In addition, nowhere is it documented why Brown Schultz felt it was not necessary to expand their audit procedures in regards to the billing and receivable functions.

Regarding the confirming of receivables, there also appears to have been a material difference noted on the "DGS 579-3.1" job (Job #445, Houtzdale Prison) between what was represented on CCI's books and what the owner confirmed. CCI's books overstated totaled billings to date by $357,706. CCI's books overstated accounts receivable ("current") by $94,726. CCI's books overstated retention by $6,174. On the working papers analyzing the response from the owner, it appears that Brown Schultz incorrectly attempted to reconcile the above-detailed variances.

In regards to the $357,706 difference in regards to billings, Brown Schultz noted that the amount confirmed by the owner excluded retention in the amount of $254,806. However, nowhere was it documented how this assertion was determined. In addition, assuming that Brown Schultz' assertion was accurate concerning retention, there still existed a difference in the amount of $102,900.

In regards to the variance in current receivables, Brown Schultz noted that the $102,900 variance noted in regards to billings was the same variance noted in regards to the receivables. However, Brown Schultz went on to conclude that these variances would have no income statement effect. Rather, it would simply be a debit to the overbillings account (liability) and a credit to the receivables account (asset) in the amount of $102,900. Therefore, no adjustment was made. There are a number of issues raised by this conclusion. Assuming Brown Schultz was correct in simply offsetting the two accounts, it appears that the entry should have been booked since the decrease of assets and liabilities may have effected such items as total assets, total current assets, and the current ratio. This, in turn, may have had an impact on bank and surety underwriting decisions. Moreover, this variance may have been an indication of weaknesses within CCI's internal financial reporting. Nowhere is this fact documented and nowhere is it documented why Brown Schultz felt it was not necessary to expand their audit procedures in regards to the billing and receivable functions.

It should be noted that there were significant errors based upon the receipt of the confirmations (together, totaling in excess of $320,000), that should have been an indication to Brown Schultz that there were significant deficiencies in CCI's financial cost systems for recording, among other things, job-related receivables, retention and overbillings.

Brown Schultz also erred in the treatment of indirect costs; namely, the presentation of the financial statements in relation to indirect costs appears not to be in accordance with GAAP. It appears that costs of contracts for each individual contract as represented on the "Earnings from Contracts," "Completed Contracts" and "Contracts-in-Progress" schedules included only direct costs (direct material, labor, subcontracting, and other direct costs); indirect costs and general and administrative expenses are charged to expense as incurred. (See Note 1 to the

financial statements.)  However, GAAP (see SOP 81-1) requires all indirect costs to be allocated to individual contacts using a reasonable method.  Therefore, GAAP does not allow a line item "Indirect Costs" to appear on the financial statements.  The result of this departure from GAAP is that actual/estimated gross profit of each individual contract represented on the "Completed Contracts" and "Contracts-in-Progress" was overstated by the amount of indirect cost that should have been allocated to that job.

It does not appear that job site visits were performed or even considered when the audit was planned.  Since this procedure was not performed (nor were confirmation letters set to subcontractors), there was virtually no independent confirmation or other verification of management's representations concerning the percentage of completion, the estimated costs to complete as of the balance sheet date, and the status of pending (unapproved) change orders.  Nor was Brown Schultz able to obtain any independent verification of problems on the jobs that might not have been disclosed by management (with the exception of the confirmations received from the owners).  It would also appear that in the particular situation of CCI, with jobs located in many different states, there is little question that Brown Schultz would have gained a much better knowledge of CCI's operations if job site visits were in fact performed.  This would be especially critical since the compensation of CCI's key personnel (Shane Miller and Sherri Phillips) was affected by the amount of gross profit on jobs and net income recognized.

## INTERROGATORY NO. 9

Identify all documents which support your contention that Brown Schultz's Audit Report for the year ended December 31, 1997 was inaccurate, contained omissions and/or was misleading.

**ANSWER NO. 9**

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery.

Without waiver of the general and foregoing objections, USF&G will make such documents available for inspection and copying at a reasonable time and place pursuant to Fed. R. Civ. P. 33(d). Such documents consist, in the main, of Brown Schultz' working papers, the audit and tax file, correspondence and the appropriate audit reports, all of which were previously produced by Brown Schultz.

**INTERROGATORY NO. 10**

For each inaccuracy and/or omission identified in response to interrogatory No. 8, is it your contention that it was material to the issuance of the payment and performance bonds identified in Paragraph 18 of the Complaint? If so, state the factual basis for your contention and the sources of proof for the facts which support your contention.

**ANSWER NO. 10**

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention

for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. USF&G also states that the interrogatory is duplicative of information to be provided in expert reports which, pursuant to the Case Management Order dated August 17, 2001, are due on July 1, 2002. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery and USF&G reserves the right to amend its responses to reflect such information.

USF&G relied upon the unqualified opinion contained in the audit report in its decision as to the nature and extent of the bonding program it gave to CCI. The errors or omissions discussed in interrogatory 8 resulted in the audit report inaccurately reflecting CCI's true financial condition and numerous risks inherent in the maintenance of a bonding program. Since USF&G would not have issued the bonding program to CCI which it did if the inaccuracies contained in the 1996 Audit Report were known by USF&G, all inaccuracies referred to in the response to interrogatory no. 8 are material because of the cumulative effect they had on the accuracy of the audit.

## INTERROGATORY NO. 11

Is it your contention that defendants should have known of each of the inaccuracies and/or omissions identified in response to interrogatory no. 8 above? If so, state the factual basis for your contention and the sources of proof for the facts which support your contention.

## ANSWER NO. 11

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery and USF&G reserves the right to amend its responses to reflect such information.

In that, *inter alia*, the errors and omissions identified in response to interrogatory 4 were apparent to USF&G upon review of the working papers and could likely have been either eliminated or avoided by the implementation of procedural and substantive steps mandated by GAAP and reasonable professional standards of practice, Brown Schultz either knew or should reasonably have known of such inaccuracies and omissions.

## INTERROGATORY NO. 12

State the factual basis for your contention that Brown Schultz's Audit Report for the year ended December 31, 1998 was inaccurate, contained omissions and/or was misleading including but not limited to:

a. The nature of each inaccuracy and/or omission contained in the 1998 Audit Report; and

b. The manner in which the 1998 Audit Report was misleading.

## ANSWER NO. 12

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. USF&G also states that the interrogatory is duplicative of information to be provided in expert reports which, pursuant to the Case Management Order dated August 17, 2001, are due on July 1, 2002. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery and USF&G reserves the right to amend its responses to reflect such information. Additionally, the instant response focuses on major inadequacies of the audited financial statements for CCI for the year ended December 31, 1998 (the "1998 Audit Report") and is not intended to be a complete recitation of all inaccuracies, omissions and representations contained therein.

USF&G further states that some of the inaccuracies and omissions are relevant only when viewed in the context of other audits of CCI performed by Brown Schultz. Accordingly, USF&G incorporates herein by reference the responses to interrogatories nos. 4 and 8 as if fully set forth herein.

As part of the statements that were issued for the year ended December 31, 1998, the statement, as originally reported, contained current assets of $17.8 million, other assets of $6.8

million, total liabilities of $19.3 million and equity of $5.3 million. As restated, the current assets were $13.0 million, other assets were $6.8 million, liabilities were $20.1 million and equity was a negative $.3 million. The net effect of this is that retained earnings as originally reported were overstated by $5.6 million.

There was profit fade of $5.0 million on the work in process as of December 31, 1998. By overstating the estimated profit on these jobs Brown Schultz had materially overstated overbillings and net income for 1998. Brown Schultz did not properly allocate indirect costs and did not properly perform an audit of construction contracts in accordance with GAAS.

Form B-2; Part 1, "Checklist for Evaluating Business Risk and Overall Inherent and Audit Risk"; question 25 dealing with the safeguarding of assets, segregation of duties, management approvals and the oversight function, it appears that Brown Schultz improperly checked this off as "N/A." The fact that CCI was working in many different states where centralized management and strong central control over assets was not as strong as if all the work was performed near their Harrisburg office, Brown Schultz should have checked this questions as "YES" and considered this issue when planning the audit. This should have been a significant factor to be considered by Brown Schultz when planning the audit.

Included in Brown Schultz' working papers was the Guaranty Agreement dated December 1, 1998 between the Company and PCIC. Included in the agreement was the following: "PCIC will guarantee the claim that was filed by CCI in the amount of . . . $1,200,000 with the Department of General Services, Commonwealth of Pennsylvania, for the project known as Mahanoy State Correctional Institution . . . . If the Department of General Services, Commonwealth of Pennsylvania, fails to pay all of any part of the subject claim, PCIC will pay the difference owing or the full amount of the claim if no part of the claim is paid." The

following are observations concerning this agreement and its impact on the 1998 financial statements:

    (a)    Although it was disclosed in the financial statements (under related party transactions) that PCIC is an entity owned by the sole shareholder of CCI, John Ortenzio, this fact was not documented in the working papers.

    (b)    Nowhere was it documented, either in the planning phase or in any of the audit programs if consideration should have been made in determining if PCIC had the financial resources to pay this claim to CCI.

Assuming, *arguendo*, that Brown Schultz was correct in recognizing the claim as income in 1998, there appears to have been significant disclosure issues. These include that the amount of the claim was included as an "underbilling" (costs and estimated earnings in excess of billings). GAAP requires that this amount be disclosed as a "claim receivable."

Additionally, the following should have been disclosed in regards to this receivable (see AICPA Guide, para. 6.24 and SOP 81-1, para. 65):

    (a)    The total receivable;

    (b)    A description of the nature of the status of the principal items comprising the amount;

    (c)    The portion, if any, expected to be collected after one year; and

    (d)    Revenues from claims recognized.

It should be noted that property and equipment was a much more significant asset in 1998 than in 1997. In 1997, net property comprised approximately 8.7% of total assets, while in 1998, this percentage increased to approximately 27.5%. However, nowhere is it documented that

Brown Schultz expanded its audit testing in this area as the result of the increased significance of these assets.

Included in the Permanent File was an employment agreement dated October 3, 1997 between the Company and Shane A. Miller, CCI's Executive Vice-President and the individual responsible for field operations. This agreement provided for bonus incentives to be paid to Mr. Miller based upon CCI's net operating income. Essentially, the higher CCI's net income the higher Mr. Miller's bonus would be. Therefore, Brown Schultz should have planned the audit with the expectation that CCI's management would tend to overstate net income in order to realize the bonus. Moreover, this may be a possible explanation for the profit fade recognized by CCI subsequent to December 31, 1998 from represented amounts previously recognized.

Brown Schultz also erred relative to its treatment of the inclusion of at least a significant portion of unapproved (pending) change orders. There did not appear to be proper documentation for the inclusion of approximately $500,000 of this amount, according to GAAP. In addition, assuming, *arguendo*, that Brown Schultz was correct in recognizing the unapproved change orders, there was not proper disclosure of the approximately $600,000 of unapproved change orders included in the 1998 statements. Rather, it appears Brown Schultz simply "buried" these unapproved change orders together with underbillings and overbillings without proper disclosure.

In general, virtually no audit testing was performed in regards to verifying management's representations of costs to complete.

GAAP (SOP-81-1, para. 88) requires that provisions for losses on contracts be shown separately as liabilities on the balance sheet. Per the 1998 financial statements, included in the work-in-progress schedule, one job-in-progress (job #451, Lord Fairfax) was projected to incur a

loss of approximately $218,000. However, nowhere in the liability section of the balance sheet is this reflected. Rather, Brown Schultz noted on page 5 of the "Supplemental Disclosure Requirement-Construction" checklist indicates that the loss was included in the work-in-progress adjustment.

The 1998 financial statements ("Contracts-in-Progress" schedule) reflects an underbilling amount (Costs and estimated earnings in excess of billings) in excess of $6,300,000. Most of these underbillings relate to the following jobs:

| Job # | Job Name | Amount |
|-------|----------|--------|
| 439 | Mahonoy Prison | $1,216,401 |
| 450 | Johnstown | $ 449,818 |
| 454 | Albermarle Prison | $ 717,560 |
| 455 | Perry Point | $2,234,503 |
| 460 | Germ Plasma Center | $ 831,756 |
| 461 | Outlook-Chesterfield | $ 509,709 |

However, nowhere in the working papers was it documented that these significant underbillings were analyzed for reasonableness and the likelihood that CCI would eventually be able to bill the applicable owner these amounts.

In regards to the confirming of receivables, there appears to have a significant amount of unapproved (pending) change orders recorded as income in regards to the Lord Fairfax job (Job # 451) in the amount of $108,653.

In summary, CCI booked the following unapproved (pending) change orders as of December 31, 1998:

| Job # | Job Name | Amount |
|-------|----------|--------|
| 454 | Albemarle | $279,334 |
| 455 | Perry Point | 107,846 |
| 426 | U.E.P.H. Complex | 88,731 |
| 449 | U.E.P.H. Headquarters | 21,086 |
| 460 | Germ Plasma Center | 65,000 |
| 459 | Scott Air Force Base | 17,993 |
| 451 | Lord Fairfax | 108,653 |
| TOTAL | | $688,643 |

Brown Schultz documented its research into unapproved change orders as follows (from a "review" of the AICPA Audit and Accounting Guide for Construction Contractors):

"For all unpriced change orders, recovery should be deemed probable if the future event or events necessary for recovery are likely to occur. Some of the factors to consider in evaluating whether recover is probable are the customer's written approval of the scope of the change order, separate documentation for change order costs that are identifiable and reasonable, and the entity's favorable experience in negotiating change orders, especially as it relates to the specific type of contract and the change order being evaluated."

"If it is probable that the contract price will be adjusted by an amount that exceeds the costs attributable to the change order and the amount of the excess can be reliably estimated, the original contract price should also be adjusted for that amount when the costs are recognized as costs of contract performance if its realization is probable. Revenue in excess of the costs attributable to unpriced change orders should only be recorded in which realization is assured beyond a reasonable doubt, such as circumstances in which realization is assured beyond a reasonable doubt, such as circumstances in which an entity's historical experience provides such

assurance or in which an entity has received a bona fide pricing offer from a customer and records only the amount of the offer as revenue."

Brown Schultz went on to document that, "[p]er discussion with Stan Sechrist, V.P. of Operations, CCI is very conservative and will only add pending (unapproved) change orders to the contract amount if they are certain they will be approved.  In the past, CCI has not had any significant problems payment for any change orders (approved or unapproved)."

Finally, Brown Schultz documented that, "[p]er review of the prior year workpapers, the *majority* (emphasis added) of pending change orders recorded as of 12/31/97 had been authorized by the owner subsequent to the year end."

The following indicate possible errors in the booking of unapproved change orders by CCI as of and for the year ended December 31, 1998:

(1)    In prior years, it had not been CCI's practice to book and recognize unapproved change orders.  This, in turn, assuming, *arguendo*, that CCI was correct in recognizing these unapproved change orders, and assuming there were unapproved/pending change orders in prior years which were not recognized until 1998, probably caused a distortion of 1998 income.

(2)    It is not clear what Brown Schultz intended to document by stating that "the *majority* of pending change orders recorded as of 12/31/97 had been authorized by the owner subsequent to the year end."  (emphasis added)  If the amount ultimately authorized was only 51% of the total population (majority), then Brown Schultz may have had to modify this representation.  In addition, it is not clear what audit procedures (if any) were performed on prior year pending change orders in order to formulate this conclusion (with the exception of "reviewing prior year workpapers" and inquiries of some members of management).

(3)    To be able to book an unapproved change order, consideration must be made of whether the change order has been priced and whether the price and scope have been approved by the owner.

Summarily, based solely on documentation provided by Brown Schultz, the following pending change orders appear to not have been recorded in accordance with GAAP:

| Job # | Job Name | Amount |
|---|---|---|
| 454 | Albemarle | $279,334 |
| 455 | Perry Point | 107,846 |
| 460 | Germ Plasma Center | 65,000 |
| 459 | Scott Air Force Base | 17,993 |
| 451 | Lord Fairfax | 31,742 |
| TOTAL | | $501,915 |

Accordingly, it appears that Brown Schultz may have overstated revenues and net income by approximately $501,915. (This would give Brown Schultz "credit" for U.E.P.H. Complex in the amount of $88,731, U.E.P.H. Headquarters in the amount of $21,086, and a portion of Lord Fairfax in the amount of $76,944.) However, even under the assumption that GAAP would have permitted recognizing these pending change orders as of and for the year ended December 31, 1998, the following were required to be disclosed in the 1998 financial statements:

(1)    The total receivable;

(2)    A description of the nature and status of the principal items comprising the amount;

(3)    The portion, if any, expected to be collected after one year; and

(4)    Revenues from claims recognized.

It appears that Brown Schultz did not disclose any of the above, but simply "buried" the amounts of the pending change orders together with underbillings and overbillings reported on other jobs.

In Brown Schultz' audit program concerning completed contracts, the procedure used was as follows: "Selected two jobs included in the completed contract listing . . . which were between 40% and 80% complete in the prior year, in order to get a good test of the client's estimating procedures." It was not documented why Brown Schultz did not choose jobs that were less than 40% or greater than 80% complete of December 31, 1997. It appears that this test should have been expanded to include jobs in various stages of completion as of December 31, 1997 in order to analyze CCI's estimating ability in regards to location, project manager, type of work, etc. This analysis should then have been used for determining the reasonableness of management's representations as of December 31, 1998. Therefore, Brown Schultz' conclusions that based on analyzing two jobs completed in 1997 that were between 40% and 80% complete as of December 31, 1997, the client's estimating procedures were consistent with the prior years may have been flawed.

In relation to the testing of CCI's job cost system, it appears that only the following procedures were performed:

-    25 job cost items (12 related to payroll and 13 related to other costs) were "haphazardly" selected and testing. This testing included:

(a)    Obtaining the purchase and payroll journals for the year;

(b)    Requesting the Company provide the appropriate documentation for the job costs "haphazardly" selected (i.e., purchase order and invoice), subcontract agreement, timesheet, etc.; and

(c)    Ascertaining that the cost was coded to the correct job by review of source documentation and job cost history reports.

Brown Schultz did not document why testing only 25 items was adequate in expressing their opinion. In addition, nowhere was the definition of a "haphazard" sample documented nor is there documentation concerning what procedures were employed by Brown Schultz to determine which individual items of the population were sampled.)

The obtaining of the summary of contracts as of December 31, 1998 also appears flawed. This schedule should include what would normally be found on a contractor's work-in-progress schedule. However, the audit program did not detail any audit procedures Brown Schultz was to perform on this schedule.

There also appears to be error regarding obtaining of the contracts in progress at the balance sheet date. From this schedule, the auditor was to perform the following tasks:

(1)     Determine which jobs were in process at year-end based upon percentage of completion and discussion with the client. The program instructed the auditor to exclude contracts greater than 97% complete or les than 3% started.

(2)     For substantially completed contracts, the program instructed the auditor to verify that no significant costs were recorded after year-end. Also the auditor was instructed to verify with the client that the job was substantially complete. It should be noted that Brown Schultz documented that "[a]ll necessary costs were accrued as 12/31/98 and the jobs were listed in the completed contract listings." However, nowhere was it documented what testing was performed by Brown Schultz to reach this conclusion.

There was also error regarding obtaining of signed contract and change orders in that there was a failure to note agreement as to job number, job name and contract amount.

CCI was improperly omitting some of the indirect costs from the cost of each individual contract in 1998. This omission had the effect of overstating gross profit for each individual

contract in progress and completed by the amount of allocable indirect costs that should have been allocated.

In addition, it does not appear that projected indirect costs needed to complete the jobs were included in management's estimated costs to complete as of December 31, 1998.

Both GAAP and tax rules require that indirect costs be allocated to contracts, regardless of whether the percentage-of-completion or completed-contract method is used. Moreover, a significant error in the allocation of indirect costs could indicate a major problem with the company's bidding procedures (management may be bidding contracts at a loss). Also, Brown Schultz should have noted that indirect costs must also have been allocated to estimated costs to complete for all contracts still in progress as of December 31, 1998, 1997, and 1996.

It appears that Brown Schultz performed limited testing on the adequacy of management's estimate of costs to complete included on the work in progress. These procedures included comparing actual costs incurred subsequent to year-end and estimated costs to complete as of December 31, 1998 and comparing original estimates and total estimated costs to complete the job. In regards to the second procedure detailed above (comparing original estimates and total estimated costs to complete the job), it appears that Brown Schultz tested all ten jobs-in-progress. This test produced the following results in regards to the gross profit percentage as originally estimated, the gross profit percentage as of December 31, 1998 ("WIP"), and the amount of profit increase (slippage) recognized between the time the job was originally bid and as of December 31, 1998:

| Job # | Original Projection % | "WIP" @12/31/98 % | Dollar amount of Increase (Slippage) |
|---|---|---|---|
| 454 | 6.63% | 11.35% | $764,754 |
| 460 | 2.78% | 5.77% | $466,976 |
| 450 | 1.46% | .66% | ($26,064) |
| 451 | 10.11% | (3.08%) | ($914,055) |
| 461 | 6.24% | 5.53% | ($27,840) |
| 456 | 10.98% | 10.77% | ($4,776) |
| 462 | 6.73% | 6.65% | ($4,310) |
| 455 | 9.09% | 11.39% | $313,189 |
| 459 | 7.43% | 6.33% | ($76,784) |
| 439 (A) | (.41%) | (4.06%) | ($374,578) |

On each page of the analysis, Brown Schultz attempted to explain these significant "swings" (which appear to have gone "both ways" in regards to gross profit). However, none of the explanations provided documentation that inquiries were made of project managers associated with each job.

In addition, the fact that large variances between original projections and current represented results (while the job was still in progress) should have been an indication to Brown Schultz that further inquiries and audit procedures should have been performed.

Included in the 1998 working papers was one titled "CCI Construction Management Work-in-Progress" (BSSF 2075). Detailed on this schedule were billings and costs incurred in 1998 in regards to contracts that were considered completed during 1997. This schedule documents that overstated costs were understated. The 1998 income statement impact of these billings and cost errors are as follows:

| | |
|---|---|
| Overstated revenue | $111,935 |
| Understated costs | $148,743 |
| Total overstatement of 1997 net income | $260,678 |

On the "Disclosure Requirement" checklist, page -23-, question 8 deals with the inclusion of a "Going Concern" disclosure in the financial statements.  SAS No. 59 (AU 341.02) requires the auditor to "evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited."  A contractor's inability to complete contracts or obtain required performance bonds would be a serious indication of a going concern problem.  The auditor should consider whether information obtained from audit procedures applied during the audit identifies conditions and events that indicate there could be substantial doubt about the contractor's ability to continue as a going concern for a reasonable period of time.  Examples of conditions and events which may have applied to the Company as of December 31, 1998 indicating a possible substantial doubt about CCI's ability to continue as a going concern include, without limitation, the following:

(1)    Negative trends such as recurring operating losses, working capital deficiencies, and declining backlog levels;

(2)    Internal matters such as labor difficulties, substantial dependence on the success of a particular contract, and loss of key people;

(3)    External matters such as denial of a surety bond, significant legal proceedings, and environmental legislation with potential adverse effects; and

(4)    Projected negative cash flow on the Company's jobs-in-progress as of the balance sheet date.

Generally, if a contractor incurs substantial losses on contracts that have been front-end loaded (thereby creating significant "overbillings"), a cash deficiency toward the end of those contracts may be experienced.  The deficiency may prevent the contractor from meeting current

-37-

obligations, and the contractor may have to front-end load new contract in order to generate funds to meet those obligations.  The necessity to generate cash may cause the contractor to accept jobs that are only marginally profitable.  This issue is specifically discussed in the AICPA Guide at Paragraph 11.11.  It appears that Brown Schultz took none of the foregoing into account in planning or conducting its audit, particularly as regards going-concern disclosures.

It does not appear that job site visits were performed or even considered when the audit was planned.  Since this procedure was not performed (nor were confirmation letters sent to subcontractors), there was virtually no independent confirmation or other verification of management's representations concerning the percentage of completion and the estimated costs to complete as of the balance sheet date.  Nor was Brown Schultz able to obtain any independent verification of problems on the jobs that might not have been disclosed by management (with the exception of the confirmations received from the owners).

Brown Schultz also erred in the treatment of indirect costs; namely, the presentation of the financial statements in relation to indirect costs appears not to be in accordance with GAAP. It appears that costs of contracts for each individual contract as represented on the "Earnings from Contracts," "Completed Contracts" and "Contracts-in-Progress" schedules included only direct costs (direct material, labor, subcontracting, and other direct costs); indirect costs and general and administrative expenses are charged to expense as incurred.  (See Note 1 to the financial statements.)  However, GAAP (see SOP 81-1) requires all indirect costs to be allocated to individual contacts using a reasonable method.  Therefore, GAAP does not allow a line item "Indirect Costs" to appear on the financial statements.  The result of this departure from GAAP is that actual/estimated gross profit of each individual contract represented on the "Completed

Contracts" and "Contracts-in-Progress" was overstated by the amount of indirect cost that should have been allocated to that job.

## INTERROGATORY NO. 13

Identify all documents which support your contention that Brown Schultz's Auditor's Report for the year ended December 31, 1998 was inaccurate, contained omissions and/or was misleading.

## ANSWER NO. 13

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatory call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery.

Without waiver of the general and foregoing objections, USF&G will make such documents available for inspection and copying at a reasonable time and place pursuant to Fed. R. Civ. P. 33(d). Such documents consist, in the main, of Brown Schultz' working papers, the audit and tax file, correspondence and the appropriate audit reports, all of which were previously produced by Brown Schultz.

## INTERROGATORY NO. 14

For each inaccuracy and/or omission identified in response to interrogatory No. 12, is it your contention that it was material to the issuance of the payment and performance bonds identified in Paragraph 20 of the Complaint? If so, state the factual basis for your contention and the sources of proof for the facts which support your contention.

## ANSWER NO. 14

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. USF&G also states that the interrogatory is duplicative of information to be provided in expert reports which, pursuant to the Case Management Order dated August 17, 2001, are due on July 1, 2002. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time and USF&G reserves the right to amend its responses to reflect such information. These responses do not include or incorporate information that will be obtained in the course of discovery.

USF&G relied upon the unqualified opinion contained in the audit report in its decision as to the nature and extent of the bonding program it gave to CCI. The errors or omissions discussed in interrogatory 4 resulted in the audit report inaccurately reflecting CCI's true financial condition and numerous risks inherent in the maintenance of a bonding program. Since USF&G would not have issued the bonding program to CCI which it did if the inaccuracies contained in the 1996 Audit Report were known by USF&G, all inaccuracies referred to in the

response to interrogatory no. 12 are material because of the cumulative effect they had on the accuracy of the audit.

## INTERROGATORY NO. 15

Is it your contention that defendants should have known of each of the inaccuracies and/or omissions identified in response to interrogatory no. 12 above?  If so, state the factual basis for your contention and the sources of proof for the facts which support your contention.

## ANSWER NO. 15

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G.  In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint.  As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure.  However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time.  These responses do not include or incorporate information that will be obtained in the course of discovery and USF&G reserves the right to amend its responses to reflect such information.

In that, *inter alia*, the errors and omissions identified in response to interrogatory 4 were apparent to USF&G upon review of the working papers and could likely have been either eliminated or avoided by the implementation of procedural and substantive steps mandated by GAAP and reasonable professional standards of practice, Brown Schultz either knew or should reasonably have known of such inaccuracies and omissions.

### INTERROGATORY NO. 16

Identify all persons whom USF&G expects to call as expert witnesses at the trial of this action and describe their training, experience, employments history, educational background and fields of expertise.

### ANSWER NO. 16

Without waiver of the general objections, USF&G states that it has not yet decided whom it will call as expert witnesses at the trial of this action. USF&G will identify such individuals in accordance with the appropriate provisions of the Case Management Order.

### INTERROGATORY NO. 17

With regard to each person listed in response to the preceding interrogatory describe with specificity:

a.    the subject matter upon which each expert is expected to testify at the time of trial;

b.    the substance of the facts and opinions to which the expert is expected to testify; and

c.    a summary of the grounds of each opinion.

### ANSWER NO. 17

Without waiver of the general objections, USF&G states that it has not yet decided whom it will call as expert witnesses at the trial of this action. USF&G will identify such individuals in accordance with the appropriate provisions of the Case Management Order.

Anthony Phillips, being first duly sworn, deposes and says that he is authorized by USF&G to respond to the foregoing Interrogatories; that while he does not have personal knowledge of all of the facts recited in the foregoing responses, the information contained therein has been collected and made available to him by others, and the responses to the interrogatories are true to the best of his knowledge and belief based upon the information made available to him.

UNITED STATES FIDELITY & GUARANTY COMPANY,

By *Anthony S. Phillips*

Its duly authorized:

COMMONWEALTH OF PENNSYLVANIA

_____, ss.                    *December 11*, 2001

Then personally appeared the above-named Anthony Phillips, duly authorized representative of United States Fidelity & Guaranty Company and acknowledged the foregoing instrument to be the free act and deed of said corporation, before me.

*J. M. Violante*

NOTARY PUBLIC
Print Name:_____
My Commission expires:_____

Notarial Seal
Joan M. Violante, Notary Public
Whitpain Twp., Montgomery County
My Commission Expires Nov. 22, 2003

-43-

AS TO OBJECTIONS:

UNITED STATES FIDELITY
 & GUARANTY COMPANY,
By its attorneys,

_____
Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA  02110
Telephone:    (617) 790-3000

and

Jeffrey Rettig, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:    (717) 237-7100

Dated: December  7  , 2001
#233259 v1/36432/87

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(HARRISBURG DIVISION)

UNITED STATES FIDELITY          :
AND GUARANTY COMPANY,           :
         PLAINTIFF          :          NO. 1:01 CV 00813
                         :          (JUDGE KANE)
         v.          :
                         :
BRUCE J. BROWN AND BROWN,        :
SCHULTZ, SHERIDAN & FRITZ        :
     DEFENDANTS          :

### EXPERT REPORT OF STEVE J. DeBRUYN, CPA

      I am a Certified Public Accountant and am a Partner in the firm of Clifton Gunderson

LLP. I also serve as the Construction Contractor Industry Group Leader for Clifton Gunderson

LLP. A copy of my *Curriculum Vitae* is attached hereto as Exhibit "A." I am being

compensated for my professional services at the rate of $250 per hour.

      I have been engaged by Bernkopf, Goodman & Baseman LLP to determine if I could

render certain opinions concerning the audit procedures performed by and conclusions reached

with respect to the audited financial statements prepared by Brown, Schultz, Sheridan & Fritz

("Brown Schultz") for CCI Construction Company, Inc. ("CCI") for the fiscal years ended

December 31, 1996, 1997 and 1998. I have determined that I am able to render such opinions.

      In connection with my engagement, I have reviewed the audit procedures and

conclusions reached by Brown Schultz as they relate to that firm's audits of CCI for the calendar

years ended in 1996, 1997 and 1998 (the "Audit Reports"). In particular, I analyzed whether the

audit procedures and conclusions conformed to Generally Accepted Accounting Principles

(GAAP) and Generally Accepted Auditing Standards (GAAS).

In analyzing the Audit Reports, I have reviewed and relied upon the following

documents:

- Brown Schultz' audit workpapers for CCI for the fiscal years ended December 31, 1996, 1997, & 1998.

- Brown Schultz' "Permanent File" for CCI.

- AICPA TECHNICAL PRACTICE AIDS, Statement of Position 81-1, Accounting for Performance of Construction - Type and Certain Production-Type Contracts, July 15, 1981;

- AICPA AUDIT AND ACCOUNTING GUIDE FOR CONSTRUCTION CONTRACTORS, May 1, 1997

- Statement on Auditing Standards No. 47, Audit Risk & Materiality In Conducting An Audit (American Institute of Certified Public Accountants, 1983);

- Statement on Auditing Standards No. 57. Auditing Accounting Estimates (American Institute of Certified Public Accountants, 1988);

- FAS No. 5, Accounting for Contingencies; March 1975

- FAS No. 57, Related Party Disclosures; March 1982.

- Statement on Auditing Standards No. 22, Planning and Supervision, (American Institute of Certified Public Accountants 1978).

- Statement on Auditing Standards No 31, Evidential Matter, (American Institute of Certified Public Accountants 1980).

- Depositions of Bruce J. Brown dated January 17, 2002 and a preliminary draft of

the deposition of July 19, 2002;   I have also reviewed portions of the deposition

of Sherri Phillips, taken on July 10, 2002, and portions of the deposition of

Deborah Bowman dated May 21, 2002.

- Various pleadings filed in the above-captioned action;

- 1998 Audited Financial Statements prepared by Brown Schultz for Pennsylvania

  Contractors Insurance Co., Inc. ("PCIC");

- Brown Schultz' work papers for the audit of "PCIC" for the fiscal year ended

  December 31, 1998;

- Work in process schedule as of December 31, 1999 prepared by CCI personnel.

In general, for reasons explained below, it is my opinion that the audit work performed

by Brown Schultz for CCI for the fiscal years ended December 31, 1997 and 1998 did not

conform to applicable standards of care of a Certified Public Accountant and this resulted in

material misstatements and omissions in Brown Schultz' 1997 and 1998 Audit Reports.

Specifically, the negligent audit work performed by Brown Schultz resulted in an overstatement

of both income and equity in the amount of $815,960 for 1997 and $3,126,508 for 1998.   It is

also my opinion that these misstatements were material to the financial position of CCI.

The primary causes of the material misstatements in the 1997 and 1998 Audit Reports

include, but are not limited to, the following:

1.    Brown Schultz' workpapers demonstrate Brown Schultz' failure to properly

assess the risk involved with the audit of CCI  from 1996 through 1998. Because of this failure to

properly identify the risks associated with CCI, Brown Schultz' audit programs and its audit

fieldwork were inadequate to provide the required assurance that the Audit Reports were fairly

presented in accordance with GAAP.  A primary objective of an audit is to identify high-risk

audit areas and plan the audit procedures accordingly.   Brown Schultz' workpapers identified

high-risk characteristics in both CCI and CCI's individual contracts.  Brown Schultz' audit

planning work papers for 1996, 1997 and 1998 were virtually identical to each other and did not

reflect any of the increasing audit risks inherent in the CCI audit engagement.  Further, the audit

work performed by Brown Schultz for the fiscal years ended December 31, 1996, 1997 and 1998

did not change materially from year to year.  This is significant in light of the fact that the audit

risk profile of CCI was increasing in each successive year due to the following:

- A significant dollar volume of work was being performed by CCI's subcontractors.

- Brown Schultz' knowledge of and its documentation of past and present claims and defaults with respect to CCI's subcontractors;

- CCI's expansion in new geographical areas;

- The profit fades noted by Brown Schultz on contracts completed in subsequent years required Brown Schultz to question the reliability of CCI's management's ability to estimate costs-to-complete;

- At the end of 1997 and throughout 1998, CCI was self-performing some of the work which it previously subcontracted to others and purchased a substantial amount (approximately $7 million) of construction equipment;

- CCI was not properly allocating indirect costs to individual contracts;

- The presence of significant related-party transactions.

2.      There were inadequate audit procedures performed by Brown Schultz in the areas

of contracts-in-progress; specifically, the design and implementation of substantive procedures in

connection with accumulated costs and estimated costs to complete.  In my opinion, undue

reliance was placed by Brown Schultz on CCI management's assertions with respect to costs to complete and estimated profits. The determination of the accuracy of the accumulated costs to date and the estimated costs-to-complete is critical to contractors like CCI using the percentage of completion method of accounting.

Brown Schultz acknowledged that its testing of contract costs was a test of CCI's cost controls only. This was inappropriate under the circumstances extant here. The testing of 25 costs was a test of transactions which an auditor can use to make qualitative assessments from the results. However, such testing does not replace the need to perform substantive procedures, such as vouching significant contract costs and analytical review. CCI had significant direct costs related to subcontractors and there was documentation contained in Brown Schultz' workpapers relating to past and present claims with subcontractors as well as evidence of subcontractor defaults. Nonetheless, Brown Schultz did not send out any subcontractor confirmations, nor does Brown Schultz' "Permanent Files" or its work papers demonstrate that it read any subcontracts and other similar construction agreements. In addition, Brown Schultz specifically excluded any testing of unrecorded liabilities for any job related expenses. Instead, as noted above, Brown Schultz relied on a test of 25 "haphazardly" selected costs throughout each year and there was no evidence that Brown Schultz performed any analytical procedures related to accumulated job costs.

The estimated costs-to-complete contained in the 1996, 1997 and 1998 Audit Reports were deficient in that they relied on CCI's representations with no documentation substantiating CCI's management estimates other than they had allegedly been verified by Sherri Phillips, CCI's chief financial officer and/or Stan Sechrist, CCI's Vice President - Construction Operations. In 1998, CCI was estimating gross profits on several contracts-in-progress that were

- 5 -

materially higher than the historical or originally projected amounts.  Subsequent review revealed that these contracts had significant profit fades and one job - no. 454 - had a loss of $957,000.00, and profit fade from the 1998 workpaper of approximately $2,600,000.  Also, Brown Schultz' 1998 workpaper files contained no evidence of any consideration of the allocation of indirect costs to estimated costs to complete despite Brown Schultz' knowledge that CCI was self performing more of its subcontract work than in the past.  In addition, there was no follow - up between the documented preliminary analytical review work and the final work, despite a material increase in the net over/underbillings.  Brown Schultz also failed to document the reasons for the significant underbillings reported at the end of the 1998 year.

There was no evidence in Brown Schultz' workpapers for the 1996, 1997 and 1998 Audit Reports that Brown Schultz read one or more of the contracts for guarantees, penalty and incentive provisions or cancellation and postponement provisions.

3.      There was inappropriate recording and inadequate disclosure of related-party transactions between PCIC and CCI.  It is my opinion that Brown Schultz sanctioned the recording of $1,162,460 of revenue in 1998 from PCIC, a related-party to CCI.  The transaction involved the guarantee or insurance of a third party contract claim by PCIC; a company owned by the sole owner of CCI.  Brown Schultz also performed the audit work on PCIC.  The third party contract claim did not meet the recognition standards set forth in SOP 81-1, and in my opinion the guarantee by the related party did not support the recognition of revenue.  In addition, the recording and disclosure of the third party transaction was misleading to the user of the 1998 Audit Report.  Further, the related-party transaction was recorded as an underbilling instead as a separate line item on the balance sheet.  The result was a material misstatement to the 1998 Audit Report of $1,162,460.

In summary, Brown Schultz' workpapers demonstrated that undue reliance was placed on CCI management's assertions; the workpapers fail to demonstrate adequate independent verification, and do not support the conclusions reached by Brown Schultz as they relate to the Audit Reports for calendar years 1997 and 1998. In addition, Brown Schultz' workpapers have numerous other deficiencies including, without limitation, the following:

- Lack of documentation of time to indicate the partner in charge participated in the audit planning in 1998;

- The financial disclosure checklist included in the audit workpapers does not appear to be reviewed;

- Job site visits were not done and considerations not documented; and

- 1998 search for unrecorded liabilities did not go through the last day of fieldwork.

Attached hereto as Exhibit B-1 and B-2 are comparisons of CCI's Balance Sheets and Income Statements containing those adjustments warranted as a result of the defects and deficiencies in the procedures for and preparation of the Audit Reports for CCI for the fiscal years ended December 31, 1997 and 1998.

During my review of the 1996 audit workpapers, I noted that the audit procedures performed were similar to the 1997 and 1998 audits.

This report is subject to revisions based upon any other information which is obtained during discovery in the above-captioned action.

Steve J. DeBruyn, CPA

Dated: July 22, 2002
#249885 v1/36432/87

- 7 -

# EXHIBIT A

# CURRICULUM VITAE

**STEPHEN J. DEBRUYN, CPA**

| | |
|---|---|
| **POSITION** | **Partner** |
| **EDUCATION** | B.S. in Accounting<br>Southern Illinois University, 1982 |
| **PROFESSIONAL DESIGNATIONS** | Certified Public Accountant, 1984<br>American Institute of Certified Public Accountants<br>Illinois CPA Society |
| **LICENSES** | Licensed CPA - Illinois |
| **YEARS OF EXPERIENCE** | 20 |
| **PRIOR EXPERIENCE** | 7 years with audit staff of large regional firm. Promoted to manager in 1986, joined Clifton Gunderson June, 1989, promoted to Partner in 1993. |
| **SUPERVISORY EXPERIENCE** | Partner in charge of various audit, review and compilation engagements servicing manufacturers, contractor, retail and wholesale industries as well as employee benefit plans.<br><br>Supervision of staff on multiple concurrent engagements. |
| **AREAS OF SPECIALIZATION** | Firm-wide Construction Industry Group Leader<br><br>Audit, accounting and consulting services for various industries and employee benefit plans.<br><br>Corporate finance; merger and acquisition services.<br><br>Peer reviews and internal inspection programs.<br><br>Consulting services in connection with prospective financial statements, executive search, interpretation of financial results, succession of ownership and business valuations. |

**Stephen J. DeBruyn** (continued)

Income tax planning and preparation for corporations, S-corporations, partnerships and L.L.C.s.

**OTHER SIGNIFICANT
EXPERIENCES IN
PUBLIC ACCOUNTING**

Advanced training through experience with previous employer in areas of audit efficiencies, documentation of accounting systems in manual or automated environments.

Speaker at annual audit and accounting conference.

Selected to the firms Leadership Career Program class of 1994.

1997 Clifton Gunderson Outstanding Performance Award.

**PUBLICATIONS**

Speaker at the Clifton Gunderson Annual Audit & Accounting Conference.  Sessions on Construction Contractors.
    October, 2000
    October, 1999
    October, 1998

Improved Software Keeps Construction Companies Ahead of Competitors, Clifton Gunderson LLP Relationships Magazine, Issue 6 Summer 2002.

**PREVIOUS TRIAL
EXPERIENCE**

IN RE:  Marriage of Lawrence Edward Kuchefski, Petitioner and Sherri Marie Kuchefski, Respondent, Cause #99D284 Circuit Court for the 5th Judicial Circuit of Illinois located in Danville, Illinois, March 2002.

# EXHIBIT B-1

# CCI CONSTRUCTION COMPANY, INC.
## BALANCE SHEET – DECEMBER 31, 1997

### ASSETS

| | As Reported | Adjustments | As Restated |
|---|---|---|---|
| Current assets: | | | |
| Cash and cash equivalents | $  1,128,337 | $        - | $  1,128,337 |
| Investments in marketable securities | 3,702,992 | - | 3,702,992 |
| Accounts receivable, trade: | | | |
| Customers: | | | |
| Current | 8,230,674 | - | 8,230,674 |
| Retained | 1,121,610 | - | 1,121,610 |
| Shareholder | - | - | - |
| Affiliates | 3,485 | - | 3,485 |
| Note receivable | 22,569 | | 22,569 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 1,072,281 | (429,978) | 642,303 |
| Prepaid expenses | 6,185 | - | 6,185 |
| Shop inventory | 639 | - | 639 |
| Total current assets | 15,288,772 | (429,978) | 14,858,794 |
| Property and equipment: | | | |
| Automobiles and trucks | 427,342 | - | 427,342 |
| Furniture | 553,587 | - | 553,587 |
| Machinery and equipment | 1,323,233 | - | 1,323,233 |
| Other | 72,453 | - | |
| | 2,376,615 | - | 2,376,615 |
| Less accumulated depreciation | 920,919 | - | 920,919 |
| | 1,455,696 | - | 1,455,696 |
| | $   16,744,468 | $   (429,978) | $ 16,314,490 |

**LIABILITIES AND SHAREHOLDER'S EQUITY**

|  | As Reported | Adjustments | As Restated |
|---|---|---|---|
| Current liabilities: | | | |
| Accounts payable, trade: | | | |
| Vendors: | | | |
| Current | $  7,846,395 | $         - | $  7,846,395 |
| Retained | 1,078,950 | - | 1,078,950 |
| Notes payable | 815,781 | - | 815,781 |
| Accrued loss on jobs | - | 732,685 | 732,685 |
| Accrued expenses | 808,601 | - | 808,601 |
| Taxes withheld and accrued | 58,023 | - | 58,023 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 681,924 | (346,703) | 335,221 |
| Total current liabilities (all current) | 11,278,674 | 385,982 | 11,675,656 |
| | | | |
| Shareholder's equity: | | | |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | - | 39 |
| Capital in excess of par | 9,758 | - | 9,758 |
| Retained earnings | 5,208,489 | (815,960) | 4,392,529 |
| Unrealized gain on marketable securities | 236,508 | - | 236,508 |
| | 5,454,794 | (815,960) | 4,638,834 |
| | $  16,744,468 | $   (429,978) | $ 16,314,490 |

**CCI CONSTRUCTION COMPANY, INC.**
**STATEMENT OF INCOME**
**Year Ended December 31, 1997**

|  | Original | Adjustments | As Restated |
|---|---|---|---|
| Revenue | $ 34,921,676 | $ (815,960) | $34,105,716 |
| Cost of contracts | 32,617,473 | - | 32,617,473 |
| Gross profit | 2,304,203 | (815,960) | 1,488,243 |
| General and administrative expenses | 1,954,380 | - | 1,954,380 |
| Income from operations | 349,823 | (815,960) | (466,137) |
| Other income | 357,056 | - | 357,056 |
| Net income (loss) | $ 706,879 | $ (815,960) | $ (109,081) |

# EXHIBIT B-2

# CCI CONSTRUCTION COMPANY, INC.
## BALANCE SHEET – DECEMBER 31, 1998

### ASSETS

| | As Reported | Adjustments | As Restated |
|---|---|---|---|
| Current assets: | | | |
| Cash and cash equivalents | $ 2,429,866 | $ - | $ 2,429,866 |
| Investments in marketable securities | 631,481 | - | 631,481 |
| Accounts receivable, trade: | | | |
| Customers: | | | |
| Current | 5,964,311 | - | 5,964,311 |
| Retained | 1,822,224 | - | 1,822,224 |
| Affiliates | 365,756 | - | 365,756 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 6,341,726 | (2,379,122) | 3,962,604 |
| Prepaid expenses | 170,232 | - | 170,232 |
| Shop inventory | 38,161 | - | 38,161 |
| Total current assets | 17,763,757 | (2,379,122) | 15,384,635 |
| Property and equipment: | | | |
| Automobiles and trucks | 1,269,567 | - | 1,269,567 |
| Furniture | 851,738 | - | 851,738 |
| Machinery and equipment | 5,947,290 | - | 5,947,290 |
| Other | 344,128 | - | 344,128 |
| | 8,412,723 | - | 8,412,723 |
| Less accumulated depreciation | 1,651,485 | - | 1,651,485 |
| | 6,761,238 | - | 6,761,238 |
| Other assets: | | | |
| Cash surrender value of officer's life insurance | 55,453 | - | 55,453 |
| Investments | 34,000 | - | 34,000 |
| | 89,453 | - | 89,453 |
| | $ 24,614,448 | $ (2,379,122) | $22,235,326 |

## LIABILITIES AND SHAREHOLDER'S EQUITY

|  | As Reported | Adjustments | As Restated |
|---|---|---|---|
| Current liabilities: |  |  |  |
| Accounts payable, trade: |  |  |  |
| Current | $  10,974,274 | $          - | $ 10,974,274 |
| Retained | 2,180,967 | - | 2,180,967 |
| Current portion of long-term debt | 1,338,280 | - | 1,338,280 |
| Accrued loss on jobs | - | 1,826,956 | 1,826,956 |
| Accrued expenses | 333,060 | - | 333,060 |
| Taxes withheld and accrued | 91,601 | - | 91,601 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 288,208 | (263,610) | 24,598 |
| Total current liabilities | 15,206,390 | 1,563,346 | 16,769,736 |
| Long-term debt, net of current portion | 4,164,375 | - | 4,164,375 |
| Total liabilities | 19,370,765 | 1,563,346 | 20,934,111 |
| Shareholder's equity: |  |  |  |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | - | 39 |
| Capital in excess of par | 9,758 | - | 9,758 |
| Retained earnings | 5,254,834 | (3,942,468) | 1,312,366 |
| Accumulated other comprehensive income (loss), unrealized gain (loss) on marketable securities | (20,948) | - | (20,948) |
|  | 5,243,683 | (3,942,468) | 1,301,215 |
|  | $   24,614,448 | $ (2,379,122) | $22,235,326 |

**CCI CONSTRUCTION COMPANY, INC.**
**STATEMENT OF INCOME**
**Year Ended December 31, 1998**

|  | Original | Adjustments | As Restated |
|---|---|---|---|
| Revenue | $  52,534,453 | $      (3,126,508) | $49,407,945 |
| Cost of contracts | 51,145,382 | - | 51,145,382 |
| Gross profit | 1,389,071 | (3,126,508) | (1,737,437) |
| General and administrative expenses | 1,505,700 | - | 1,505,700 |
| Income (loss) from operations | (116,629) | (3,126,508) | (3,238,137) |
| Other income | 175,670 | - | 175,670 |
| Net income (loss) | $        59,041 | $      (3,126,508) | $(3,067,467) |

4

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff | ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 1:01-CV-00813<br><br>JUDGE CONNOR |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | ) ) ) ) ) | |

## SUPPLEMENTAL AND REBUTTAL EXPERT REPORT OF STEVE J. DEBRUYN, CPA

This report supplements my report dated July 22, 2002 and also addresses certain issues

contained in the reports of Miller Coffey Tate LLP and The Brenner Group.

### THE RESTATEMENTS IN GENERAL

My original report discloses numerous deficiencies in the audit procedures regarding the

contracts in process. Therefore, to determine the potential effect on the financial statements for

the respective years, I started with the contracts-in-process schedules from the supplemental

financial statements of CCI Construction Company, Inc. "(CCI)" prepared by Brown Schultz. The

restatements for both 1997 and 1998 are a result of recasting the contracts-in-process schedules

for the those years. Exhibits I and III attached hereto are the recast schedules of CCI's contract-

in-process. Exhibits II and IV attached hereto are the original schedules reproduced from the

audited financial statements of CCI for the respective years. Exhibit V attached hereto is the

actual contracts-in-process schedule for the year ended December 31, 1999. The recast

methodology used was similar to the "look back" method utilized by the Internal Revenue Service.

The method involves recasting contracts-in-process in a given year from information obtained in a

subsequent year. For example, if a contract was in process at the end of 1997 and subsequently

completed in 1998, we recalculated, among other things, the 1997 percentage complete, revenue

recognized and the profit and loss utilizing the actual numbers from the completed contract. As

noted on the attached Exhibits I and III, there are a few exceptions. However, the methodology

was consistently used to recast both 1997 and 1998 contracts-in-process schedule.

**THE RESTATEMENT OF THE 1997 BROWN SCHULTZ AUDIT REPORT**

I calculated the total estimated cost by using the "actual" gross profit percentage of the job when it was completed. There were two exceptions to this method. Job 439 was calculated estimating the loss as determined or estimated at December 31, 1997 by CCI. Job 451 was calculated using the original gross profit estimated by CCI. I then recalculated the percentage complete, which changed the over/under billings. For the 1997-year end, the effect on over/under billings and on the net income of CCI was $815,960. Exhibit I details the revised calculations as well as reporting the differences between the recast and originally reported balances. The differences arose mainly due to the change in gross profit percentages from the 1997 estimates to the actual completed contracts. One job in particular (job 445), was reported as a projected loss on the original schedule of $82, 956. When the job was completed in 1998, the actual loss was $436,063. Brown Schultz' workpapers document that there were significant problems on the job with subcontractor defaults, although it is not evident that they substantiated management's representations by vouching to subcontractor agreements or reviewing subsequent costs. The job was 38% complete and because this showed a loss it should have alerted Brown Schultz that it was necessary to do some additional inquiry and audit testing. This also relates back to my comments made in my original report regarding Brown Schultz' undue reliance placed on management's assertions, their conscious decision not to include job costs in the review of subsequent disbursements and their decision to not test subcontractor costs.

**THE RESTATEMENT OF THE 1998 BROWN SCHULTZ AUDIT REPORT**

The same methodology was used as the 1997 approach by utilizing the "actual" or "revised" gross profit percentage from the completed contract schedule and contracts-in-process schedule prepared as of December 31, 1999. The 1998-year resulted in overstating income by $3,126,508.

The two year cumulative effect on net income was $3,942,467.

I chose to use the foregoing methodology for the following reasons:

- My contention is that due to lack of audit work, specifically with the testing of subcontractors, accumulated costs to complete and subsequent job costs, Brown Schultz did not have the opportunity to correctly ascertain the profit fade on the individual contracts.

- Brown Schultz should have taken into account the material profit fade from the 1997 jobs in connection with the 1998 audit work. However, the facts are that gross profit

2

percentages on several jobs were in excess of any historical amounts and well above the amounts originally estimated in the contracts by the contractor (CCI).

The process used to recast the earnings and estimate the misstatement in the 1997 and 1998 audited financial statements was, in my opinion, a conservative approach. The results using the above approach yielded material exceptions. The lack of audit procedures employed by Brown Schultz did not allow them the opportunity to ascertain the misstatements regardless of the amount. Even though I took a conservative approach by using actual results, the resulting differences were significant enough such that they have to relate back to the lack of effective audit procedures employed by Brown Schultz.

## PCIC RECEIVABLE

To clarify my position and opinion on the PCIC transaction recorded in the 1998 financial statements in the amount of $1,162,460, I believe that the amount should not have been recorded and disclosed as additional contract revenue and contract overbillings. In my 1998 recast contracts-in-process schedule I did not include the total contract amount for that specific job. In my opinion, the transaction did not meet the standards to be recorded as contract revenue. In addition, a more useful disclosure would have been to report the transaction as a separate line on the balance sheet of CCI indicating that it was a guarantee by the stockholder.

## PROFESSIONAL STANDARDS ISSUES

My original report noted that the audit work for Brown Schultz for the years 1997 and 1998 did not conform to applicable standards of care of a Certified Public Accountant. For example, Generally Accepted Accounting Standards (GAAS) require "Due professional care is to be exercised in the performance of the audit and the preparation of the report" (source: SAS no.1, AU section 230). Included in this section is the fact that due professional care requires the auditor to exercise professional skepticism. Based on my review of the audit workpapers for the years 1996, 1997 and 1998, Brown Schultz failed to act with sufficient professional skepticism and was not diligent in evaluating the audit evidence. Furthermore, the first standard of fieldwork requires that the work "is adequately planned and properly supervised" (source: SAS no.22, AU section 311). As noted in my earlier report, Brown Schultz's planning documentation was virtually unchanged between 1996 – 1998. Brown Schultz failed to properly address the risk involved in the audit of CCI and, therefore, did not allow the firm to modify or change the audit procedures or approach. In addition, the third standard of fieldwork requires "sufficient competent evidential matter is to be obtained ..." (source: SAS no. 31, AU section 326). As a result of Brown Schultz' limiting the testing of accumulated job costs, subcontractor costs and subsequent

3

disbursement of job costs, Brown Schultz denied itself the opportunity to obtain all possible evidential matter available to properly perform the audit.

Dated:   September 20, 2002

Steve J. DeBruyn, CPA

EXHIBIT 1

## SCHEDULE OF CONTRACTS IN PROGRESS - REVISED
### 31-Dec-97

| Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Gross Earnings Recog | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Excess Billings Over Cost and Earnings | GP % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 426 6> | | $ 15,878,479 | $ 1,430,469 | $ 17,308,948 | 91.74% | $ 18,961,022 | $ 1,652,074 | $ 1,515,541 | $ 17,394,020 | $ 16,899,942 | $ 494,078 | $ - | 8.71% |
| 439 4> | | $ 6,309,222 | $ 4,214,516 | $ 10,523,738 | 59.95% | $ 10,289,145 | $ (234,593) | $ (234,593) | $ 6,074,629 | $ 6,337,295 | $ - | $ 262,666 | -2.28% |
| 445 6> | | $ 4,169,371 | $ 6,624,479 | $ 10,793,850 | 38.63% | $ 10,357,787 | $ (436,063) | $ (436,063) | $ 3,733,308 | $ 4,349,670 | $ - | $ 616,362 | -4.21% |
| 448 6> | | $ 521,254 | $ 3,913,779 | $ 4,435,033 | 11.75% | $ 4,604,000 | $ 168,967 | $ 19,859 | $ 541,113 | $ 509,198 | $ 31,915 | $ - | 3.67% |
| 449 4> | | $ 515,339 | $ 934,356 | $ 1,449,695 | 35.55% | $ 1,387,666 | $ (62,029) | $ (62,029) | $ 453,310 | $ 473,383 | $ - | $ 20,073 | -4.47% |
| 450 | | $ 115,461 | $ 3,127,293 | $ 3,242,754 | 3.56% | $ 3,266,600 | $ 23,846 | $ 849 | $ 116,310 | $ - | $ 116,310 | $ - | 0.73% |
| 451 5> | | $ 411,608 | $ 6,170,750 | $ 6,582,358 | 6.25% | $ 6,880,993 | $ 298,635 | $ 18,674 | $ 430,282 | $ 599,088 | $ - | $ 168,806 | 4.34% |
| **TOTALS** | | $ 27,920,734 | $ 26,415,641 | $ 54,336,375 | 51.38% | $ 55,747,213 | $ 1,410,838 | $ 822,239 | $ 28,742,973 | $ 29,168,576 | $ 642,303 | $ 1,067,906 | 2.53% |

Net $ (425,603)

| | Difference | | |
|---|---|---|---|
| Previously reported | $ 1,072,281 | $ 681,924 | |
| Difference | $ (429,978) | $ (385,982) | $ (815,960) |

**Critical Assumptions:**

1> Column C, G & K from the supplemental schedules of the audited statements.

2> Column E calculated from Gross Profit % in column N.

3> Gross Profit %'s are based on actual from schedule prepared as of 12/31/99 with exception of Job's #439 & 451 as explained below.

4> Gross Profit % used is the 1997 estimated loss as documented in the workpapers. The job performed better and the income realized in 1998 & 1999

5> Gross Profit % used was based on clients original estimate as documented in 1997 workpaper file since the job had just started and auditors knowledge of the loss is probably not reasonable.

6> Job completed in 1998

EXHIBIT II

**SCHEDULE OF CONTRACTS IN PROGRESS**

**31-Dec-97**

| | Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Earnings Recog. | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Billings Over Cost and Earnings | GP% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | |
| 12 | 426 | | $ 15,878,479 | $ 1,070,222 | $ 16,948,701 | 93.69% | $ 18,961,022 | $ 2,012,321 | $ 1,885,253 | $ 17,763,732 | $ 16,899,942 | $ 863,790 | $ - | 10% |
| 13 | 439 | | $ 6,309,222 | $ 4,214,542 | $ 10,523,764 | 59.95% | $ 10,289,145 | $ (234,619) | $ (234,619) | $ 6,074,603 | $ 6,337,295 | $ - | $ 262,692 | -2% |
| 14 | 445 | | $ 4,169,371 | $ 6,271,372 | $ 10,440,743 | 39.93% | $ 10,357,787 | $ (82,956) | $ (82,956) | $ 4,086,415 | $ 4,349,670 | $ - | $ 263,255 | -1% |
| 15 | 448 | | $ 521,254 | $ 3,807,336 | $ 4,328,590 | 12.04% | $ 4,604,000 | $ 275,410 | $ 33,165 | $ 554,419 | $ 509,198 | $ 45,221 | | 6% |
| 16 | 449 | | $ 515,339 | $ 859,520 | $ 1,374,859 | 37.48% | $ 1,387,666 | $ 12,807 | $ 4,800 | $ 520,139 | $ 473,383 | $ 46,756 | | 1% |
| 17 | 450 | | $ 115,461 | $ 3,121,650 | $ 3,237,111 | 3.57% | $ 3,266,600 | $ 29,489 | $ 1,052 | $ 116,513 | $ 116,513 | $ - | | 1% |
| 18 | 451 | | $ 411,608 | $ 5,980,177 | $ 6,391,785 | 6.44% | $ 6,880,993 | $ 489,208 | $ 31,503 | $ 443,111 | $ 590,088 | $ - | $ 155,977 | 7% |
| 19 | TOTALS | | $ 27,920,734 | $ 25,324,819 | $ 53,245,553 | 52.44% | $ 55,747,213 | $ 2,501,660 | $ 1,638,199 | $ 29,558,933 | $ 29,168,576 | $ 1,072,281 | $ 681,924 | |
| 20 | | | | | | | | 4.49% | | | | Net $ 390,357 | | |
| 21 | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | |

EXHIBIT III

## SCHEDULE OF CONTRACTS IN PROGRESS - REVISED
### 31-Dec-98

| | Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Gross Earnings Recog. | Cost and Earnings To Date | Billings To Date | Excess Cost and Earnings Over Billings | Excess Billings Over Cost and Earnings | GP % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
| 4> | 439 | | $ 10,666,808 | $ 1,164 | $ 10,667,972 | 99.99% | $ 10,536,958 | $ (131,014) | $ (131,014) | $ 10,535,794 | $ 10,481,740 | $ 54,054 | $ - | 12.4% |
| | 450 | | $ 1,172,766 | $ 2,069,988 | $ 3,242,754 | 36.17% | $ 3,266,600 | $ 23,846 | $ 8,624 | $ 1,181,390 | $ 730,724 | $ 450,666 | $ - | 0.73% |
| | 451 | | $ 6,659,984 | $ 1,161,755 | $ 7,821,739 | 85.15% | $ 7,082,984 | $ (738,755) | $ (738,755) | $ 5,921,229 | $ 6,570,468 | $ - | $ 649,239 | 10.43% |
| | 454 | | $ 4,819,694 | $ 10,662,333 | $ 15,482,027 | 31.13% | $ 14,524,840 | $ (957,187) | $ (957,187) | $ 3,862,507 | $ 4,719,426 | $ - | $ 856,919 | 8.59% |
| | 455 | | $ 4,734,492 | $ 7,222,199 | $ 11,956,691 | 39.60% | $ 12,937,341 | $ 980,650 | $ 388,308 | $ 5,122,800 | $ 3,108,536 | $ 2,014,264 | $ - | 27.88% |
| | 456 | | $ 2,715,193 | $ 2,166,757 | $ 4,881,950 | 55.62% | $ 5,380,745 | $ 498,795 | $ 277,415 | $ 2,992,608 | $ 2,732,602 | $ 260,006 | $ - | 9.27% |
| | 457 | | $ 547,295 | $ 898,978 | $ 1,446,273 | 37.84% | $ 1,495,629 | $ 49,356 | $ 18,677 | $ 565,972 | $ 617,799 | $ - | $ 51,827 | 8.30% |
| | 459 | | $ 6,026,575 | $ 8,247,282 | $ 14,273,857 | 42.22% | $ 14,870,150 | $ 596,293 | $ 251,761 | $ 6,278,336 | $ 6,571,905 | $ - | $ 293,569 | 8.30% |
| | 460 | | $ 2,905,995 | $ 12,433,313 | $ 15,339,308 | 18.94% | $ 15,565,000 | $ 225,693 | $ 42,757 | $ 2,948,752 | $ 2,252,156 | $ 696,596 | $ - | 4.01% |
| | 461 | | $ 1,518,251 | $ 2,274,170 | $ 3,792,421 | 40.03% | $ 3,842,372 | $ 49,951 | $ 19,997 | $ 1,538,248 | $ 1,097,444 | $ 440,804 | $ - | 1.30% |
| | 462 | | $ 458,553 | $ 5,045,263 | $ 5,503,816 | 8.33% | $ 5,589,900 | $ 86,084 | $ 7,172 | $ 465,725 | $ 419,511 | $ 46,214 | $ - | 1.54% |
| | TOTALS | | $ 42,225,606 | $ 52,183,201 | $ 94,408,807 | 44.73% | $ 95,092,519 | $ 683,712 | $ (812,244) | $ 41,413,362 | $ 39,302,311 | $ 3,962,604 | $ 1,851,554 | |

0.72%

Difference | Previously reported | Net

$ (2,379,122)

$ 6,341,726

$ (1,563,346)

Net $ 2,111,051

$ 288,208

$ (3,942,467)

**Critical Assumptions:**

1> Column C, G & K from the supplemental schedules of the audited statements.

2> Column E calculated from Gross Profit % in column N.

3> Gross Profit % are based on actual from schedule prepared as of 12/31/99 with exception of Job #439 as explained below.

4> Gross Profit % is the 1998 amount based on total estimated cost to date and contract income reduced for $1,162,460 in revenue recorded by the auditor incorrectly. A claim amount was recived and recognized in 1999

EXHIBIT IV

## SCHEDULE OF CONTRACTS IN PROGRESS
### 31-Dec-98

| Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Earnings Recog. | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Excess Billings Over Cost and Earnings | GP % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 439 | | $ 10,666,808 | $ 1,164 | $ 10,667,972 | 99.99% | $ 11,699,418 | $ 1,031,446 | $ 1,031,333 | $ 11,698,141 | $ 10,481,740 | $ 1,216,401 | $ - | |
| 450 | | $ 1,172,766 | $ 2,072,316 | $ 3,245,082 | 36.14% | $ 3,266,600 | $ 21,518 | $ 7,777 | $ 1,180,543 | $ 730,724 | $ 449,819 | $ - | |
| 451 | | $ 6,659,984 | $ 641,127 | $ 7,301,111 | 91.22% | $ 7,082,984 | $ (218,127) | $ (218,127) | $ 6,441,857 | $ 6,570,468 | $ - | $ 128,611 | |
| 454 | | $ 4,819,694 | $ 8,056,057 | $ 12,875,751 | 37.43% | $ 14,524,840 | $ 1,649,089 | $ 617,292 | $ 5,436,986 | $ 4,719,426 | $ 717,560 | $ - | |
| 455 | | $ 4,734,492 | $ 6,729,348 | $ 11,463,840 | 41.30% | $ 12,937,341 | $ 1,473,501 | $ 608,546 | $ 5,343,038 | $ 3,108,536 | $ 2,234,502 | $ - | |
| 456 | | $ 2,715,193 | $ 2,086,117 | $ 4,801,310 | 56.55% | $ 5,380,745 | $ 579,435 | $ 327,677 | $ 3,042,870 | $ 2,732,602 | $ 310,268 | $ - | |
| 457 | | $ 547,295 | $ 824,978 | $ 1,372,273 | 39.88% | $ 1,495,629 | $ 123,356 | $ 49,197 | $ 596,492 | $ 617,799 | $ - | $ 21,307 | |
| 459 | | $ 6,026,575 | $ 7,902,775 | $ 13,929,350 | 43.27% | $ 14,870,150 | $ 940,800 | $ 407,040 | $ 6,433,615 | $ 6,571,905 | $ - | $ 138,290 | |
| 460 | | $ 2,905,995 | $ 11,761,029 | $ 14,667,024 | 19.81% | $ 15,565,000 | $ 897,976 | $ 177,917 | $ 3,083,912 | $ 2,252,156 | $ 831,756 | $ - | |
| 461 | | $ 1,518,251 | $ 2,111,573 | $ 3,629,824 | 41.83% | $ 3,842,372 | $ 212,548 | $ 88,903 | $ 1,607,154 | $ 1,097,444 | $ 509,710 | $ - | |
| 462 | | $ 458,553 | $ 4,759,387 | $ 5,218,140 | 8.79% | $ 5,589,900 | $ 371,760 | $ 32,669 | $ 491,222 | $ 419,511 | $ 71,711 | $ - | |
| | *TOTALS* | $ 42,225,606 | $ 46,946,071 | $ 89,171,677 | 47.35% | $ 96,254,979 | $ 7,083,302 | $ 3,130,225 | $ 45,335,831 | $ 39,302,311 | $ 6,341,728 | $ 288,208 | |
| | | | | | 7.36% | | | | | | Net $ 6,053,520 | | |

EXHIBIT V

## SCHEDULE OF CONTRACTS IN PROGRESS
### 31-Dec-99

| Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Earnings Recog. | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Billings Over Cost and Earnings | GP % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 439 | | $ 10,704,600 | $ - | $ 10,704,600 | 100.00% | $ 10,787,727 | $ 83,127 | $ 83,127 | $ 10,787,727 | $ 10,787,727 | $ - | $ - | |
| 450 | | $ 3,705,315 | $ - | $ 3,705,315 | 100.00% | $ 3,732,569 | $ 27,254 | $ 27,254 | $ 3,732,569 | $ 3,732,569 | $ - | $ - | |
| 451 | | $ 7,963,660 | $ 21,222 | $ 7,984,882 | 99.73% | $ 7,230,740 | $ (754,142) | $ (754,142) | $ 7,209,518 | $ 7,220,117 | $ - | $ 10,599 | |
| 454 | | $ 12,681,811 | $ 2,862,660 | $ 15,544,471 | 81.58% | $ 14,582,917 | $ (961,554) | $ (961,554) | $ 11,720,257 | $ 12,014,911 | $ - | $ 294,654 | |
| 455 | | $ 11,214,162 | $ 799,792 | $ 12,013,954 | 93.34% | $ 12,999,654 | $ 985,700 | $ 920,080 | $ 12,134,242 | $ 12,592,012 | $ - | $ 457,770 | |
| 456 | | $ 5,081,715 | $ - | $ 5,081,715 | 100.00% | $ 5,600,748 | $ 519,033 | $ 519,033 | $ 5,600,748 | $ 5,600,748 | $ - | $ - | |
| 457 | | $ 1,446,265 | $ - | $ 1,446,265 | 100.00% | $ 1,495,629 | $ 49,364 | $ 49,364 | $ 1,495,629 | $ 1,495,629 | $ - | $ - | |
| 459 | | $ 18,700,567 | $ 278,916 | $ 18,979,483 | 98.53% | $ 19,772,015 | $ 792,532 | $ 780,885 | $ 19,481,452 | $ 15,332,896 | $ 4,148,556 | $ - | |
| 460 | | $ 9,850,590 | $ 6,071,422 | $ 15,922,012 | 61.87% | $ 16,155,581 | $ 233,569 | $ 144,504 | $ 9,995,094 | $ 10,055,938 | $ - | $ 60,844 | |
| 461 | | $ 3,940,304 | $ 121,249 | $ 4,061,553 | 97.01% | $ 4,115,065 | $ 53,512 | $ 51,915 | $ 3,992,219 | $ 4,053,770 | $ - | $ 61,551 | |
| 462 | | $ 3,601,849 | $ 2,077,590 | $ 5,679,439 | 63.42% | $ 5,767,995 | $ 88,556 | $ 56,161 | $ 3,658,010 | $ 3,667,008 | $ - | $ 8,998 | |
| TOTALS | | $ 88,890,838 | $ 12,232,851 | $ 101,123,689 | 87.90% | $ 102,240,640 | $ 1,116,951 | $ 916,627 | $ 89,807,465 | $ 86,553,325 | $ 4,148,556 | $ 894,416 | |

1.09%

Net $ 3,254,140

COPY

5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(HARRISBURG DIVISION)

UNITED STATES FIDELITY :
AND GUARANTY COMPANY, :
   PLAINTIFF : NO. 1:01-CIV-00813
     : (JUDGE KANE)
   V  : (MAGISTRATE JUDGE SMYSER)
     :
BRUCE J. BROWN AND BROWN, :
SCHULTZ, SHERIDAN & FRITZ,:
   DEFENDANTS :


   DEPOSITION OF: BRUCE J. BROWN, CPA, CVA

   TAKEN BY:  PLAINTIFF

   BEFORE:  DONNA E. RICHARDS, RPR
       NOTARY PUBLIC

   DATE:  JANUARY 17, 2002, 9:00 A.M.

   PLACE:  THOMAS, THOMAS & HAFER, LLP
       305 NORTH FRONT STREET
       HARRISBURG, PENNSYLVANIA


APPEARANCES:

  BERNKOPF, GOODMAN & BASEMAN, LLP
  BY:  PETER B. McGLYNN, ESQUIRE

   FOR - PLAINTIFF

  SWARTZ, CAMPBELL & DETWEILER
  BY:  KATHLEEN CARSON, ESQUIRE

   FOR - DEFENDANTS


ALSO PRESENT:
  MARTIN McCARTHY



HAFN REPORTING SERVICE INC.

Hughes
Albright
Foltz
Natale

2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • fax 717.540.0221 • Lancaster 717.393.5101

Page 10

1  mind that are -- that are awarded people. That's my
2  problem.
3  Q  All right. So the answer is no?
4  A  I suppose it's no, because I don't understand
5  the question.
6  Q  Now, sir, you're familiar with a company called
7  CCI Construction; are you not?
8  A  Yes.
9  Q  How did you become familiar with CCI?
10 A  We began doing their accounting work sometime
11 during the 1980s.
12 Q  Were you the so-called responsible or managing
13 partner for that account?
14 A  Yes.
15 Q  All right. Has that always been the case?
16 A  Yes.
17 Q  Were you -- did you have a relationship with
18 any particular person within CCI?
19 A  Well, John Ortenzio was the sole shareholder.
20 So obviously being the audit partner, I had a working
21 relationship with Mr. Ortenzio.
22 Q  Were you friends with him?
23 A  No.
24 Q  How did you meet Mr. Ortenzio?
25 A  Actually a friend of mine who had been a former

Page 11

1  associate of mine at Laventhol knew him, and he -- Mr.
2  Ortenzio had spoken with Mr. Richardson, and they are
3  friends, and asked if he knew of anybody that would be
4  qualified to service his work. And Mr. Richardson
5  contacted me.
6  Q  And this was approximately what year?
7  A  I'm saying it's the 1980s. I can't remember
8  back that far.
9  Q  And when did you -- strike that. When I use
10 the word you sometimes I should be more specific, but I'm
11 generally referring to Brown, Schultz, your firm. When
12 did Brown, Schultz first perform audit work for CCI?
13 A  Are you including Laventhol? I mean, because I
14 believe -- and I don't remember exactly when. Once again,
15 I was trying to recall if we started doing that engagement
16 as a review as opposed to an audit. I just -- since it
17 goes back, I'm getting older. I can't remember anymore.
18 Q  The -- as I understand it then, what you're
19 saying is that CCI first became a client of the Laventhol
20 firm?
21 A  Correct.
22 Q  Before you formed Brown, Schultz?
23 A  Correct.
24 Q  All right. Okay. And do you recall whether or
25 not either Laventhol or Brown, Schultz performed audit

Page 1?

1  work? And, if so, what year did that start?
2  A  Both firms prepared audit work, and I don't
3  remember when it started.
4  Q  Now, Brown, Schultz currently does not perform
5  any services for CCI; is that correct?
6  A  Correct.
7  Q  When did Brown, Schultz cease performing
8  services for CCI?
9  A  The last work we did was for the tax return for
10 1999.
11 Q  And that was in connection with CCI's
12 bankruptcy proceeding?
13 A  Correct.
14 Q  Prior to -- prior to 1999, in addition to the
15 audit work, what other services did Brown, Schultz perform
16 for CCI?
17 A  I'm sorry. Say that again.
18 Q  Prior to 1999 what other work other than tax
19 services did Brown, Schultz perform for CCI?
20 A  All we ever did was audit and tax work. We did
21 no consulting services.
22 Q  Did you provide any services for John Ortenzio
23 personally?
24 A  Yes, yes.
25 Q  What type of services did you provide for Mr.

Page 1?

1  Ortenzio?
2  A  Tax return preparation.
3  Q  Anything else?
4  A  And we prepared a personal balance sheet for
5  him for a number of years.
6  Q  Do you mean a personal financial statement?
7  A  Yes.
8  Q  You needed that for his bonding companies and
9  his banks, personal financial statement?
10 A  My understanding was he primarily needed it for
11 his banks.
12 Q  Over the years Brown, Schultz has also served
13 -- strike that. Has also provided services for a number
14 of Mr. Ortenzio's partnerships and other entities in which
15 he has an interest, correct?
16 A  Yes.
17 Q  All right. I'm going to show you what's been
18 previously marked as Exhibit 7. You can identify that;
19 can you not?
20 A  Yes.
21 Q  Can you identify those entities on Exhibit 7
22 which at any time Brown, Schultz performed services for?
23 A  Yes. Can I give a little -- there's -- it
24 would probably be easier, because you'll probably ask the
25 question, a little bit of background.

Page 14

1       American Asset Recovery was a Subchapter S
2 Corporation that was started and liquidated probably
3 within a year or so of each other. So that was a very
4 recent company, very small. I'm not even sure if it had
5 any operations.
6     Q Did you perform -- can you tell us with each
7 company what types of services you performed?
8     A Certainly. Tax returns. Avonland Company,
9 which was an S Corporation, we only did tax return
10 preparation work for. Its only asset was a property in
11 Colorado ,and that company was liquidated in 2000.
12     Q Please continue.
13     A I'm looking down the list. CH – CSH
14 Industries is an S Corporation. We've only done work --
15 we'd only done work on that company for the last two
16 years, for the years '99 and 2000. And that company was
17 -- its operations ceased sometime during the early part of
18 2000. Mechanicsburg Land Company.
19     Q I take it you did tax work for CSH?
20     A That's what I said, tax work only.
21 Mechanicsburg Land Company was -- I don't remember much
22 about that. I think we did that company. It was an S
23 Corporation. If we did anything, it's -- it was only tax
24 work. And to be honest, I just don't remember that
25 company anymore. It was a very, very minor company.

Page 15

1       Montgomery Land Company, tax return work only.
2 It was an S Corporation, had an ownership interest in a
3 property somewhere in the south. And I believe that
4 company has since been liquidated.
5       Pennsylvania Contractors Insurance Company is a
6 Subchapter C Corporation. We did an audit of that company
7 because it was required by the insurance commissioner and
8 the Turks and Caicous. The Ortenzio Family Partnership is
9 a partnership.
10     Q Before we go on, PCIC, did you perform tax and
11 audit services for that firm?
12     A Yes. May I state this? When we do the work
13 for a company, we do both the accounting and the tax.
14 It's not separated. So either we -- if I say we do
15 accounting services, it's accounting and tax. If I say
16 tax, it's tax only.
17     Q All right.
18     A The Ortenzio Family Partnership, we do a
19 partnership tax return. Reliance Finance, Inc. is a
20 Subchapter S Corporation. I think we've been doing that
21 for three years only. There was another accountant that
22 did the work for years, and we took over it. I believe
23 this year will be our third year. We do a financial
24 statement. We did a compilation statement in the year
25 2000 and tax returns.

Page 16

1     Q Let me just go back. PCIC, what's the status
2 of PCIC as you understand it right now?
3     A PCIC is in the process of being liquidated. I
4 -- I believe that the final return on that was filed for
5 the year 2000. And the reason I'm a little unclear -- I
6 can't remember. See, the Turks and Caicous, the insurance
7 commissioner has to give approval for final liquidation,
8 and for some reason I'm fuzzy. I can't remember if that
9 actually happened in 2000, or it happened in early 2001
10 since we're -- we're already in 2002. That's why I'm a
11 little fuzzy on that.
12     Q Is Mechanicsburg Land Company still in
13 existence so far as you know?
14     A I can't recall. I don't -- I don't think so,
15 but I can't say that unequivocally.
16     Q How about Ortenzio Family Partnership?
17     A Yes, it's still in existence.
18     Q How about Reliance Finance?
19     A It's still in existence.
20     Q Okay. All right. Please continue.
21     A That's it.
22     Q That's it. So you've gone over that entire
23 list, and these are the companies that you had or did
24 perform work for in the past?
25     A Correct.

Page 17

1     Q Now, do you still perform work for John
2 Ortenzio or any of his other interests?
3     A I think I stated I still do his personal tax
4 return. I do not do a personal financial statement. And
5 I named the companies that were still in existence that we
6 still do work for.
7     Q All right. All right. So just so I understand
8 your answer, make it clear in my mind, other than
9 performing some -- some tax work and perhaps preparing a
10 personal financial statement for John Ortenzio, your firm
11 performs no other work for Mr. Ortenzio or any of his --
12 his business enterprises?
13     MS. CARSON: I object to the form.
14     MR. McGLYNN: You may answer.
15     MS. CARSON: I also object that it's been asked
16 and answered.
17 BY MR. McGLYNN:
18     Q You can still answer it?
19     A I did answer it, but I'll state it again. I
20 still do work on Reliance Finance. I still do work on the
21 family -- the Ortenzio Family Partnership, and I still do
22 work for John Ortenzio. And on CSH Industries I will be
23 filing a final tax return because it was inactive this
24 year. I will be filing the final tax return for 2001.
25     So once again, John Ortenzio, Reliance Finance,

**Page 22**

1    A   Yes.  If -- if -- you can't see it, but as part
2  of the normal process when I review the planning work
3  papers for a client, I review the permanent file contents
4  where we update certain things.  And these initials that
5  you can't see, I can -- I can barely make out my initials,
6  but I believe they are mine.
7    Q   And with respect to -- with respect to that
8  last page -- and, again, the reproduction of these copies
9  of your work papers are not as good as I had hoped, but
10  can you identify the initials under the column prepared by
11  starting with BOW on the top?
12    A   Well, the first is Deb Bowman for '96.  '97 is
13  Deb Bowman.  And I can't make out the initials -- the
14  first three initials.
15    Q   Would that be Ehgartner, do you think?
16    A   I can't tell.
17    Q   All right.
18    A   '98 was Bowman, and '99 was Rebinski.
19    Q   Now, what is the purpose of this particular
20  document, Exhibit No. 1?
21    A   Well, generally accepted auditing standards
22  require us to have an understanding of our client.  And
23  this is one of the documents that's part of the audit
24  service that we use that we gather that information.
25  There's several documents that we use to gather client

**Page 23**

1  information.
2    Q   Do you recall when this particular document --
3  strike that.  Is a new document -- a new Exhibit 1
4  prepared every year, or is the existing document merely
5  updated?
6    A   It's updated.
7    Q   So, for example, if we turn to page 9, which is
8  bate stamped No. 01588, do you see that at the paragraph
9  No. 3, investment bankers and underwriters?
10    A   Yes.
11    Q   Do you see that?  There are names and telephone
12  numbers and addresses crossed out?
13    A   Correct.
14    Q   And that's -- that's updating the original
15  form, correct?
16    A   That's correct.
17    Q   Do you know when this original form was
18  prepared?
19    A   It would appear from page 12 of 12 that it was
20  originally prepared on November 29th of 1995 by Bowman.
21    Q   And if you can turn, please, to page 11 of 12,
22  paragraph 7.  That question asks you to list the primary
23  users of the financial statements.  Do you see that?
24    A   Yes.
25    Q   Do you recognize that handwriting?

**Page 24**

1    A   I would say most of it is Deb Bowman's.
2    Q   And what is the -- why is it important to --
3  for an auditor to know the primary users of the financial
4  statements being audited by the accountant?
5    A   Because generally accepted auditing standards
6  suggest that we know that.
7    Q   Is there a purpose so far as you know?
8    A   Just to have an idea of the distribution of the
9  financial statements.
10    Q   All right.  So 7 really speaks to those users
11  that are going to receive a copy of your financial
12  statement?
13    MS. CARSON:  Object to the form.
14  BY MR. McGLYNN:
15    Q   You may answer.
16    A   That's our expectations as to who the users
17  would be.  We don't know factually the client distributes
18  it to all those people.
19    Q   Now, how long have you been en -- you
20  personally, how long have you been engaged in the audit of
21  general contractors and subcontractors?
22    A   At least since 1981.
23    Q   And during that time period approximately how
24  many general slash subcontractor audits have you
25  personally been involved in?

**Page 25**

1    A   I would have to estimate, because I didn't go
2  back and look at my records.  But I would estimate
3  somewhere between 150 and 200.
4    Q   Okay.  You are -- you are familiar, are you
5  not, sir, with the concept of construction bonding?
6    A   Yes.
7    Q   Do you know what a construction bond -- a
8  surety bond is?
9    A   Yes.
10    Q   What's the purpose of a construction surety
11  bond?
12    A   Typically it's a performance bond to basically
13  guarantee that if the contractor is unable to complete
14  their work, that the surety steps up to the plate and is
15  responsible for the -- the financial performance of the --
16  of the -- of the entity being bonded.
17    Q   You have familiarity with construction bonding
18  for the past 20 years or so?
19    A   Correct.
20    Q   And you know that the surety companies use and
21  rely on the financial statements of their construction
22  contractors as a basis for writing these bonds; do you
23  not?
24    MS. CARSON:  I object to the form of the
25  question.

Page 26

BY MR. McGLYNN:

Q  You may answer.

A  I guess I could answer it this way.  Yes, I know that surety bonding companies obtain the financial statements.  I'm not going to specifically guess exactly what they do.  I know that they use those to determine how they give bonds.

I don't know what their procedures are for evaluating or authenticating the information that we audit.  We don't have contact with them, so therefore, I don't -- I don't know -- I can't say specifically, firsthand knowledge, that I know what they do.

Q  You -- in the 30 to 50 other contractors that the Brown, Schultz firm has performed services for there have been, on occasion, times when Brown, Schultz has prepared financial statements to be sent to the bonding companies, correct?

MS. CARSON:  I object to the form of the question.

BY MR. McGLYNN:

Q  Let me rephrase it.  You know that from -- of the 30 to 50 clients that Brown, Schultz has many of them have financial statements that are prepared for the purpose of getting them in the hands of the bonding companies, correct?

Page 27

MS. CARSON:  Object to the form.

BY MR. McGLYNN:

Q  You may answer it.

A  We deliver financial statements to the clients. I believe, yes, that they send those financial statements on to bonding companies.

Q  Do you know the purpose that they send those financial statements to the bonding companies?

A  To obtain bonds.

Q  And in this particular instance on Exhibit 1, paragraph 7, you've -- Ms. Bowman apparently has listed a number of primary users, CIT and CAT Financial.  Do you see that?

A  Yes.

Q  Well, you're not looking at the document.

A  I saw it when you first asked the question.

Q  I'm just testing your memory.  Do you have a photographic memory?

A  No.

Q  And CIT and CAT Financial, they were what, equipment lessors or equipment lenders for CCI?

A  Equipment lenders.

Q  And USF & G, parenthesis, St. Paul, parenthesis, do you know who or what they were?

A  Bonding company.

Page 2

Q  All right.  Had you had any dealings with USF & G or St. Paul either during your work for CCI or before?

A  Direct work, direct contact?

Q  Um-hum.

A  None.

Q  How do you know how Ms. Bowman learned of the identity of USF & G in St. Paul as primary users of the CCI financial statements?

A  Inquiry of the client.

Q  The next one I can't read.  If you can help me out.  It's a bank, obviously?

A  Dauphin Deposit, which is now Allfirst Bank.

Q  All right.  And the final one is?

A  Management.  And actually there's -- you say the final one, the final one is actually bids.  Because frequently an owner who's requested CCI to request a bid may require a copy of their financial statement.

Q  And this -- this particular exhibit was updated in -- help me out here, in the years 199 -- well, first prepared in 1995, correct, by Ms. Bowman, November 29?

A  For the 1995 audit, yes.

Q  Prepared November 29, 1995.  And then it was updated in 1996, correct?

A  Updated 1996, updated 1997, updated 1998, updated 1999.

Page 2

Q  Thank you.  And it appears that paragraph 7 was not changed during that entire preparation slash update period, correct?

MS. CARSON:  I object to the form of that question.  It mischaracterizes his testimony.

BY MR. McGLYNN:

Q  You may answer.

A  Well, I don't think we can say that because we -- since it's a cumulative type document, there could have been changes from 1995 through 1999, and we can't tell when those changes occurred on this copied document.

Q  All right.  So Brown, Schultz does not have some mechanism in place to annotate on this form when various things were updated?

A  In certain cases we do.  They'll -- they'll color code it.  I -- I can't tell because of the xerox copy whether it's in pencil or could be in green, could be in blue.  So for that reason I -- I'm saying I can't tell.

Q  Okay.  Now, going to the 1996 audit, sir. before we do that I would like to ask you one question. You had indicated that you -- your firm had performed work for CCI while in bankruptcy, preparation of the final tax return?

A  Correct.

Q  And you prepared this particular affidavit in

Case 1:01-cv-00813-CCC    Document 88    Filed 10/10/2002    Page 90 of 269

Page 34

1 me?
2    A  That's what it sounds like, but I -- I put more
3 time than that in.  I'm not a very good record keeper.
4 But that's what the -- that's what the billing run does
5 say.
6    Q  Now, sir, in connection with this particular
7 assignment there was an engagement letter that was
8 prepared; was there not?
9    A  Yes.
10    Q  And Exhibit 29, is that a copy of the
11 engagement letter?  I have a question before you, Mr.
12 Brown.
13    A  Excuse me for a second.  I'm just looking at
14 something else.
15    Q  Let the record show that he's looking at his
16 time sheets.
17    A  The reason -- because you were reading off the
18 April 3rd billing run, and the April 17th billing run is
19 in here also.  I'm sorry.  So you -- yes.  Your question
20 was on the engagement letter this appears to be our
21 engagement letter for the year ended 1996.
22    Q  All right.  You signed that?
23    A  Yes, I did.
24    Q  And you quote in there a fee for the services
25 of how much?

Page 35

1    A  We quoted an estimate of fee.  It wasn't a
2 fixed fee.  It was an estimate of what our fee was going
3 to be.  $21,100.
4    Q  And that -- that was for both the audit and tax
5 --
6    A  Correct.
7    Q  -- preparation?
8    A  Correct.
9    Q  And you'll agree with me, however, that you
10 don't specify the tax services are in there?
11    A  That is correct.
12    Q  Is there a reason for that?
13    A  I think it was an oversight.
14    Q  And do you recall how much Brown, Schultz
15 billed CCI for the 1996 audit and tax services as -- as
16 enumerated in your engagement letter plus the tax
17 preparation that was not put in there through oversight?
18    A  I didn't go back and look at the billing file,
19 so I can't say specifically.
20    Q  Is it your understanding that if you provided a
21 company with an estimate, such as you did in Exhibit 29,
22 that absent some unusual circumstance that's what the
23 company was going to get billed?
24    A  I stated it wasn't a fixed fee.  We -- their
25 request was that we give them an estimate for their

Page 3[6]

1 budgeting purposes of approximately what the fee was going
2 to be.  That was our policy with them.
3    Q  Um-hum.
4    A  If I had unusual circumstances that would have
5 suggested I should bill more, I would have billed more and
6 simply informed management that I was doing it and why I
7 was doing it.
8    Q  Okay.  Do you have any memory as to whether you
9 did, in fact, bill more for those services; sir?
10    A  I don't have any memory.
11    Q  Now, sir, directing your attention to Exhibit
12 28.  This has been previously identified as the annual
13 budget form for 1996?
14    A  Yes.
15    Q  And you'll agree with me that in that
16 particular document it does indicate that there is a -- it
17 quotes the estimate or the plan fee and costs at $21,100,
18 correct?
19    A  Based upon our budget we had estimated that our
20 billing would be $21,100.
21    Q  And you'll see on the first page, sir, it has
22 the phrase planned variance, and then there's the number
23 $3,570.  Do you see that?
24    A  Yes, I do.
25    Q  What's that mean?

Page 3[7]

1    A  The way we establish our billing rates, because
2 all of my partners and I have come from working with
3 larger firms, we establish a billing rate which is in
4 excess of what we typically expect to realize.
5        And there's -- there's a management theory
6 behind that in that we believe that from having come from
7 where we come that people don't tend to write up work.
8 They try to bill exactly the billing rate that's been
9 suggested, or they write it down.
10        So what we do is we establish a billing rate
11 based upon a multiple of the cost rate for each employee,
12 and that's typically anywhere from a multiple of 2.8 to
13 maybe 3.5, and that's what we call the standard rate.
14        Our billing runs generate the information based
15 upon what we call the standard rate, and then we adjust
16 that accordingly based upon the nature of the services.
17        For instance, I may have a billing rate of $175
18 an hour.  There are times that the work that I do is worth
19 $175, and I may bill 175.  There are times that perhaps I
20 have to work below -- I have to do services that are below
21 those that are deserving of $175 rate, and I may only bill
22 that at $125, so that that constitutes a write down.
23        The average write down of all the services that
24 we perform in the course of a year is approximately 22
25 percent.  So that reflects that our standard -- our

**JANUARY 17, 2002**

Page 38

1 planned time, the 280 hours, had a -- based upon the
2 standard rates had an estimate of simply multiplying the
3 hours times the standard rates of $24,670.
4      We planned to bill this based upon previous
5 experience at approximately 21,100, meaning that we were
6 writing down from our standard rates at 14 percent, which
7 was -- is roughly two thirds of what our normal write down
8 is for the firm as a whole.
9      Q   Why wouldn't you just -- why wouldn't you just
10 bill out your time straight to CCI? If it was 24,000, you
11 bill them 24,000?
12     A   Well, like I say, what we do is we create these
13 rates. It's a management theory. We create the rates
14 higher than what we really expect to realize.
15     You have to understand billing philosophies and
16 the people that are in your organization. And I applaud
17 your firm if you're able to get your standard rate all the
18 time. We find that we don't.
19     We have some work that we can get standard
20 rates. We have some work that we can get above standard
21 rates. But typically, because of the competition in the
22 marketplace, our standard write down is approximately 22
23 percent.
24     Q   So in -- in the case of Exhibit 28 there was a
25 projected write down of 14 percent?

Page 39

1      A   Which was --
2      Q   Better than your --
3      A   Much better than --
4      Q   The standard?
5      A   Than the normal for the firm. You realize, of
6 course, that like the national firms, they're billing
7 rates for -- I would probably bill out at $600 an hour.
8 In -- in this marketplace -- in this marketplace you can't
9 get $600 an hour. That's a standard that's set.
10     We do the same thing. We go by the same
11 philosophy. We use a standard rate. Because I know my
12 partners. My partners will write down. They will not
13 choose to write up. So I set the bar a little higher in
14 the hope that they don't take it down too low.
15     Q   Now, in this particular case the members of the
16 team for 1996 were Ehgartner, you, Bowman, and, I believe,
17 Ricchiuti?
18     A   Correct.
19     Q   And Ehgartner was the so-called manager on this
20 particular assignment?
21     A   Correct. Sue was a person who had started with
22 me in 1985. So by 1996 she had 11 years of experience.
23 Our managers are working managers. They work in the
24 field. So by nine years I was already a partner. She had
25 11 years experience. So she was -- she was the major

Page 40

1 person responsible for the field work.
2      Q   Now, Ms. Bowman was also involved in this
3 particular audit as well; was she not?
4      A   Correct. She started with the firm in 1986,
5 and so she had ten years experience at that point.
6      Q   Ms. Rebinski also worked on this particular
7 audit as well, correct?
8      A   No, she did not. Well --
9      Q   She performed tax work on this particular
10 assignment?
11     A   That is correct.
12     Q   She also was, in the past, a so-called
13 supervisor; was she not?
14     A   That's correct.
15     Q   What was Bowman's official title at Brown,
16 Schultz?
17     A   She was a supervisor.
18     Q   How about Ms. Ehgartner?
19     A   Manager.
20     Q   And the manager is above a supervisor?
21     A   Correct.
22     Q   You heard testimony that in all three years Ms.
23 Rebinski did not serve as a supervisor on any of the three
24 -- three audits for CCI. Did you hear that testimony?
25     MS. CARSON: You can answer.

Page 41

1 BY MR. McGLYNN:
2      Q   Yes or no? Well, I mean, did you hear it, or
3 didn't you hear it? Let's start with that.
4      A   Well, the difficulty that you're getting into
5 is it's a play on words. She was a supervisor, which
6 identifies the -- level of experience that she had.
7 She was not responsible on this particular engagement to
8 run the day to day operation of the engagement.
9     Therein lies the difference. It's that she was
10 a supervisor, was qualified to supervise, but because of
11 having two other people with over ten years experience on
12 the job, we didn't need for her to supervise on this job.
13     Q   How much experience in 1986 -- excuse me, 1996
14 did Ms. Rebinski have?
15     A   She's got -- I -- I didn't look at her records.
16 I think that she started around 1984 or 1985 also. So she
17 had about 12 years of experience.
18     Q   Now, sir, what, if any, role did you have in
19 formulating the audit plan for this particular 1996 CCI
20 audit?
21     A   Well, the way -- the way the process works is
22 prior to the engagement the person who's performing the
23 audit planning and I will meet briefly to discuss the
24 staffing, discuss generally what some of our expectations
25 are.

Page 38 - Page 41

**HUGHES, ALBRIGHT, FOLTZ & NATALE**
**717-540-0220\717-393-5101**

BRUCE J. BROWN, CPA, CVA
JANUARY 17, 2002

Multi-Page™

## Page 78

1  Q  Now, you're familiar with, as we covered it
2  earlier this morning, PCIC?
3  A  Correct.
4  Q  And PCIC stands for what, sir?
5  A  Pennsylvania Contractors Insurance Corporation.
6  Q  And this was a company that was owned or
7  controlled by Mr. John Ortenzio?
8  A  Correct.
9  Q  Was it set up as of 1996 to your knowledge?
10  A  Yes.
11  Q  And PCIC was an offshore company?
12  A  Correct.
13  Q  Turks and Caicous company, as I understand it,
14  correct?
15  A  Correct.
16  Q  And it was set up by Mr. Ortenzio to serve as a
17  captive insurance company for CCI?
18  A  Correct.
19  Q  And what was the purpose of that particular
20  company as you understand it?
21  A  My understanding -- and we did not make the
22  recommendation that this be, so it wasn't our idea.
23  Q  It wasn't your idea to do what?
24  A  It was not our idea to form PCIC. It was not a
25  tax recommendation.

## Page 79

1  Q  All right.
2  A  PCIC was basically a mechanism -- it was a tax
3  consideration. There was a recommendation by consultants
4  that Mr. Ortenzio had that recommended that by creating a
5  qualified offshore insurance company he could defer income
6  taxes by -- by paying premiums to this company and then
7  utilizing those proceeds to fund remedial warranty work as
8  it became necessary based upon the premiums that were paid
9  in.
10  And basically because of the continued
11  profitability of CCI, PCIC was formed as a mechanism to
12  defer income taxes.
13  Q  PCIC was solely funded by the premiums paid by
14  CCI?
15  A  Not solely, because there was some other
16  insurance that was sold by PCIC. But the majority of the
17  funding came from CCI.
18  Q  To your knowledge was PCIC set up and running,
19  if you will, during the 1996 audit year? And, again,
20  you're referring to Exhibit 17?
21  A  I'm referring to Exhibit 17 because I'm going
22  to look at the related party transactions.
23  Q  Paragraph 7?
24  A  Yes. And it does not appear in 1996 that any
25  premiums were paid to PCIC in that particular year.

## Page 80

1  Although I know in 1997 that there were. So, therefore, I
2  know it was in existence in 1996.
3  MR. McGLYNN: All right. Can we take a short
4  break, two minutes?
5  MS. CARSON: Sure.
6  (Recess was taken from 11:13 a.m. to 11:24
7  a.m.)
8  BY MR. McGLYNN:
9  Q  Brown, Schultz performed the audit work for
10  PCIC, correct?
11  A  Correct.
12  Q  Now, in terms of job cost analysis there was
13  also a audit program for work in process for 1996,
14  correct?
15  A  Correct.
16  Q  Is this a copy of it, sir?
17  A  I'm sorry. You said this was the audit program
18  step. This was not the audit program step. This was one
19  of the work papers for the work in process testing.
20  Q  All right. This is the -- and I'm sorry. I
21  misspoke. This is the work paper that describes what was
22  done to analyze the work in progress, correct -- work in
23  process, correct?
24  A  No. Unfortunately that's not totally correct.
25  This is the Tickmark legend which supports the actual work

## Page 81

1  papers. There actually could be some -- without looking
2  at them, there might be more documentation on the various
3  pages.
4  Q  Could you point out -- since I'm obviously
5  having some difficulty locating it myself, point out what
6  the -- where the work paper is that relates to work in
7  process? While he's looking I will have this marked as
8  the next exhibit though.
9  (Completed contracts sheet was produced and
10  marked as Deposition Exhibit No. 33.)
11  BY MR. McGLYNN:
12  Q  Perhaps you can look at Exhibit 21. Would that
13  have it on there on page bate stamp 00940?
14  A  I know it's the R6 work papers. And the
15  problem is, as we discussed, they don't all copy real
16  well. And I'm trying to see which are the R6 work papers.
17  Q  And, again, R6 is?
18  A  It's an internal reference to work papers.
19  Q  And that's -- that particular description, R6,
20  is shown on Exhibit 33, correct?
21  A  I'm sorry. I wasn't listening.
22  Q  R6 is found on Exhibit 33?
23  A  That's one in the series, yes. Yes, here it
24  is. Okay. The work papers with respect to work in
25  process starts at bate stamp 00986 and appears to continue

HUGHES, ALBRIGHT, FOLTZ & NATALE
717-540-0220\717-393-5101

**Multi-Page™**                    BRUCE J. BROWN, CPA,
                                   JANUARY 17,

---

**Page 154**

1 any cost or any claim that arose as a result of a -- of a
2 defaulting subcontractor other than replacement of the
3 masonry subcontractor, Johnson Masonry, Inc.?
4    A  And replacement of the sheet issues and the
5 fault of the sheet metal fabricator. If you look at 00305
6 and 00303, the net impact of the budgets were 448 and
7 452,000, which is 900,000 out of a claim of 1,162,000.
8    Q  Who prepared this document on 00305?
9    A  The same people that prepared the claim. This
10 is all CCI's work.
11   Q  All right. But you'll agree with me the claim
12 submission appearing on CCI's letterhead only appears at
13 00291 through 00299?
14       MS. CARSON: I object to the form.
15 BY MR. McGLYNN:
16   Q  You may answer. In fact, it's not even the
17 same typeface?
18   A  It's on the guaranty. It's all part -- it's
19 part and parcel of all the documentation provided by PCI
20 -- CCI to our audit people.
21   Q  Can you point to any portion of these work
22 papers that details the analysis that Brown, Schultz made
23 to support its conclusion that this 1,162,000 was fully
24 insured under the policy appearing at 00306?
25   A  There are comments on 00291 and comments on

---

**Page 155**

1 00305, which is the audit documentation with respect to
2 our assessment. And it is -- it is as documented.
3    Q  Now, if, in fact, it turns out -- strike that.
4 Was there any determination made as part of this audit
5 whether or not PCIC had the ability to satisfy in full a
6 claim of 1,162,000?
7    A  Yes.
8    Q  Is that reflected in these work papers?
9    A  It's not needed to be reflected since we had
10 the audit files. It was all cash and securities. So it's
11 very easy to claim, and we didn't document it.
12   Q  But it's your testimony today that as of 12/31
13 -- actually as of February, 1999, which was when you
14 completed your field work for this particular audit, PCIC
15 had approximately $1.2 million in cash that they could
16 have used to satisfy this claim?
17   A  Yes.
18   Q  PCIC now is undergoing liquidation?
19   A  Yes.
20   Q  And when did that formal liquidation process
21 start?
22   A  I'm thinking it was the -- honestly, I can't
23 remember. I -- I can't remember if it was the fall of
24 2000. It was sometime -- best of my recollection, it's
25 between June of 2000 and June of 2001.

---

**Page**

1    Q  Roughly about a year and a half after this
2 audit had been completed?
3    A  Correct.
4    Q  Do you know whether or not PCIC ever paid the
5 1,162,000 claim?
6    A  I believe it was paid.
7    Q  Where would that be reflected? When was the
8 last time -- strike that. I'll withdraw that question.
9 What was the last year that Brown, Schultz audited PCI
10   A  1998.
11   Q  All right. So there was no audit for 1999?
12   A  Correct.
13   Q  And if this claim was paid, it would not have
14 been paid until after -- clearly after February, 1999,
15 correct?
16   A  That's correct. But we did an audit of PCIC
17 for 1999, and we would have done a tax return for 200
18   Q  I'm sorry. I thought you just said the last
19 audit you did for PCIC was 1998?
20   A  I didn't say that. I said CCI. If I said
21 that, I misspoke.
22   Q  All right. So you did an audit for PCIC in
23 1999?
24   A  I believe that's correct. Because the Turks --
25 the insurance commissioner of the Turks and Caicos s

---

**Page**

1 required the audit.
2    Q  And you have a memory of this 1,162,000 bein
3 paid by PCIC?
4    A  I -- yes. Although I -- I can't say I remember
5 when or -- I do believe it was paid.
6    Q  How much money did they -- did PCIC have on
7 hand that was unrestricted in terms -- it was not reserv
8 against other losses as of February, 1999?
9    A  I don't remember. All I do recall though is
10 because the -- they had to communicate with the insura
11 commissioner, there was a required minimum amount
12 a reserve that was required under -- under the insuranc
13 laws. And that was the only amount still remaining af
14 all claims had been paid out.
15       And they were making application to the
16 insurance commissioner documenting that all insuranc
17 claims had been paid out and to waive any kind of wa
18 period to run out claims because all -- all contracts --
19 all claims had been settled by the end of -- of 1999 or
20 2000. 2000, actually.
21   Q  If -- if you had determined in whole or in
22 part the $1,162,000 claim was uninsured by the PCIC
23 policy, how would that have impacted on the -- on the
24 Brown, Schultz audit report?
25       MS. CARSON: I object to the form.

---

1

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

HARRISBURG DIVISION

\* \* \* \* \* \* \*

UNITED STATES     \*

FIDELITY AND     \* Civil Action

GUARANTY COMPANY, \* No. 1:01-CV00813

    Plaintiff     \*

    vs.     \*

BRUCE J. BROWN    \*

and BROWN SCHULTZ \*

SHERIDAN & FRITZ, \*

    Defendants    \*

      \* \* \* \* \* \* \*


DEPOSITION OF

SUSANNE EHGARTNER

JUNE 11, 2002


Any reproduction of this transcript

is prohibited without authorization

by the certifying agency

Page 78

1 parenthetical, Saint Paul?
2 A.    Yes.
3 Q.    Can you identify that
4 handwriting?
5 A.    No.
6 Q.    Is that Corrine Rabinsky's
7 handwriting?
8 A.    I don't know.
9 Q.    To your knowledge was Mrs.
10 Rabinsky working on the 1996 audit
11 along with you and Ms. Bowman?
12 A.    Yes, I believe she was.
13 Q.    Do you know her
14 handwriting? Can you recognize her
15 handwriting?
16 A.    I don't know if I would.
17 No, I'm not sure I would recognize
18 it.
19 Q.    And do you know what the
20 question seven is designed to
21 elicit, what information question
22 seven is designed to elicit?
23 A.    Who we felt the primary
24 users of the financial statements
25 would be.

Page 79

1 Q.    Is that important in
2 connection with the planning of an
3 audit ---
4 A.    Yes.
5 Q.    --- to know who the
6 primary users are?
7 A.    Yes.
8 Q.    Why?
9 A.    It helps assess who is
10 going to be using the financial
11 statements and what they may be
12 looking for. It may help in
13 determining what kind of risk there
14 is.
15 Q.    What do you mean by what
16 kind of risk there is?
17 A.    We look at overall
18 inherent risk in an audit.
19 Q.    Can you be more specific
20 in what you mean by more inherent
21 risk?
22 A.    More inherent risk?
23         ATTORNEY CARSON:
24         Object to the form.
25         That's not what she said.

Page 80

1       It mischaracterizes her
2 testimony.
3       ATTORNEY MCGLYNN:
4       Well, no, I think
5 maybe the witness has to
6 speak up a little bit.
7 I'm just having a little
8 ---.
9       ATTORNEY CARSON:
10      One second. Peter,
11 if you can't hear the
12 witness, please just let
13 her know so that she can
14 speak up.
15 BY ATTORNEY MCGLYNN:
16 Q.    Please speak up. You said
17 something about inherent risk.
18 A.    Overall inherent risk.
19 Q.    Overall inherent risk.
20 And would you be more specific on
21 what you mean by overall inherent
22 risk?
23         ATTORNEY CARSON:
24         Object to the form.
25 A.    Well, if I recall, there

Page 81

1 was a form that we would go through
2 and look at overall inherent risk,
3 whether it was a high risk or a
4 normal risk client.
5 BY ATTORNEY MCGLYNN:
6 Q.    And did you understand at
7 the time that you were involved in
8 the 1996 audit that among others,
9 USF&G would be a primary user of the
10 financial statement?
11 A.    Yes.
12 Q.    Did you undertake to learn
13 anything further as to what use
14 USF&G would have with the financial
15 statement?
16         ATTORNEY CARSON:
17         Object to the form.
18 BY ATTORNEY MCGLYNN:
19 Q.    You may answer.
20 A.    I'm not sure I understand
21 the question.
22 Q.    You knew that USF&G was
23 going to be one of the primary users
24 of the financial statement?
25 A.    Yes.

Multi-Page™

Page 82

1 Q.    For the 1996 audit;
2 correct?
3 A.    Yes.
4 Q.    Did you know for what
5 purpose USF&G would use the
6 financial statement?
7 A.    Well, responding companies
8 require audited financial
9 statements, I would assume to assess
10 their own --- whether they wanted to
11 continue to provide bond into a
12 company or not.
13 Q.    Did you know that that was
14 the case with respect to USF&G in
15 connection with the 1996 audit?
16        ATTORNEY CARSON:
17        Object to the form.
18 BY ATTORNEY MCGLYNN:
19 Q.    You may answer.
20 A.    I would assume I knew
21 that, yes.
22 Q.    And was this something
23 that you learned for the first time
24 in connection with the 1996 audit of
25 CCI?

Page 83

1        ATTORNEY CARSON:
2        Object to the form.
3 A.    Yes.
4 BY ATTORNEY MCGLYNN:
5 Q.    You knew that USF&G was a
6 bonding company; correct?
7 A.    Yes.
8 Q.    And did you know that
9 USF&G at that time issued bonds ---
10 considered issuing bonds to CCI?
11 A.    Not to my recollection.
12 Q.    Did you take any steps to
13 check out whether or not CC ---
14 whether or not USF&G had issued or
15 was considering issuing bonds to
16 CCI, in connection with the 1996
17 audit?
18        ATTORNEY CARSON:
19        Objection to the
20        form.
21 A.    To my recollection, I knew
22 they were the bonding company for
23 CCI. I don't recall whether --- I
24 guess I'm not sure I understand the
25 question, whether they provided

Page

1 specific bonds. I don't ---.
2 BY ATTORNEY MCGLYNN:
3 Q.    You indicated that one of
4 the things that question seven was
5 designed to answer is the types of
6 companies or individuals that would
7 be receiving and using in some way
8 the audited financial statements
9 prepared by Brown Schultz; correct?
10 A.    Yes.
11 Q.    And that was information
12 that you as an auditor would employ
13 in the overall planning of the
14 audit; correct?
15 A.    Yes.
16 Q.    And the reason why you
17 would employ that would be to assess
18 the overall inherent risk that would
19 be attendant with the financial
20 statements prepared by CCI's
21 management; correct?
22 A.    Can you repeat the
23 question?
24 Q.    You would use the
25 information in question seven to

Page

1 assess the level of scrutiny that
2 you would put into the audit of CCI;
3 correct?
4        ATTORNEY CARSON:
5        Object to the form.
6 BY ATTORNEY MCGLYNN:
7 Q.    You may answer.
8 A.    Yes, that among other
9 things.
10 Q.    If you knew, for example,
11 that the Dauphin Deposit Bank was
12 relying on audited financial
13 statements in connection with the
14 extension or the continuation of a
15 line of credit, how would that
16 impact on the planning of the audit
17 for CCI?
18 A.    Well, you know the bank is
19 an user, it might be more than
20 that. I mean, perhaps in the line
21 of credit agreement there was
22 certain performance rate --- you
23 know, issues or ---.
24 Q.    Financial evidence?
25 A.    Yes, that might have to be

Page 154

1  A.    Yes.
2  Q.    And so the answer to
3  question four was that there was a
4  risk of overstatement by CCI so that
5  the financial condition of the
6  company would be more favorably to
7  its bank and its bonding company;
8  correct?
9        ATTORNEY CARSON:
10       Object to the form.
11 BY ATTORNEY MCGLYNN:
12 Q.    You may answer.
13 A.    I think we're identifying
14 that the fact that there are
15 creditors, that because of that you
16 would tend to have an overstatement
17 risk, if that answers your
18 question.  I'm sorry.
19 Q.    Maybe I'm just not asking
20 the question correctly.  Let's start
21 again.  It lists the bank and the
22 bonding company as significant
23 creditors; correct, according to
24 this question four, the answer to
25 this question four?

Page 15[5]

1  overstatement, what would the
2  auditor normally do having been
3  armed with that information?
4  A.    Well, you intended to
5  design your tests to test for
6  overstatement of assets and revenue
7  and understatement of liabilities
8  and expenses.
9  Q.    And in connection with a
10 construction company, what would you
11 do to determine whether things had
12 been over or understated, as you've
13 just testified?
14 A.    I would design tests to
15 --- I mean, depending on the cycle,
16 for example, in accounts payable,
17 you would want to do a search
18 looking for things that weren't
19 recorded that should have been as
20 opposed to if it was understatement,
21 you'd want to look at what was there
22 that possibly shouldn't be.
23 Q.    Now, question six, same
24 page, BSSF1061, take a moment to
25 read that.

Page 155

1  A.    Yes.
2  Q.    All right.  And as
3  significant creditors, did you have
4  any knowledge that they would be
5  relying on anything contained in the
6  audited financial statement?
7  A.    Yes.
8  Q.    And they would be relying
9  on the audited financial statement
10 in connection with either the
11 extension of bank credit or the
12 extension of a surety credit.
13       ATTORNEY CARSON:
14       Object to the form.
15 BY ATTORNEY MCGLYNN:
16 Q.    You may answer.
17 A.    Yes.
18 Q.    And because of that there
19 was a risk that management would
20 overstate its financial condition in
21 order to continue to get bank and
22 surety credit?
23 A.    Yes.
24 Q.    And when such a condition
25 is noted, that there is a risk of

Page 15[6]

1  A.    Okay.
2  Q.    Can you identify the
3  handwriting opposite question six,
4  is that Ms. Bowman's or anyone
5  elses?
6  A.    It looks like Deb
7  Bowman's.
8  Q.    And what is this question
9  designed to elicit?
10 A.    Whether we think the
11 financial statements are going to
12 come under unusual or different
13 scrutiny than you would typically
14 expect.
15 Q.    How does the information
16 that's being elicited in question
17 six differ from that which is being
18 elicited in question four?
19 A.    Well, to me, question four
20 is asking whether there are any
21 significant creditors and question
22 six is asking what kind of scrutiny
23 will those creditors give the
24 financial statements.
25 Q.    And Ms. Bowman answers no



# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES FIDELITY AND :
GUARANTY COMPANY, :
     : CIVIL ACTION
       PLAINTIFF : NO. 1:01-CV-00813
     :
    V : 
     :
BRUCE J. BROWN AND BROWN SCHULTZ: JUDGE KANE
SHERIDAN & FRITZ, :
     :
       DEFENDANTS :


DEPOSITION OF: DEBORAH BOWMAN

TAKEN BY: PLAINTIFF

BEFORE: TAMMY J. BAKER, REPORTER
NOTARY PUBLIC

DATE: MAY 21, 2002, 10:00 A.M.

PLACE: THOMAS, THOMAS & HAFER
305 NORTH FRONT STREET
HARRISBURG, PENNSYLVANIA


APPEARANCES:

BERNKOPF, GOODMAN & BASEMAN, LLP
BY: PETER B. McGLYNN, ESQUIRE

    FOR - PLAINTIFF

SWARTZ, CAMPBELL & DETWILER
BY: KATHLEEN M. CARSON, ESQUIRE

    FOR - DEFENDANTS



**DEBORAH BOWMAN**
**MAY 21, 2002**

Multi-Page™

---

Page 30

1    Q  Do you know whether or not USF&G ever actually
2  received copies of audited financial statements of CCI
3  prepared by Brown Schultz?
4    A  I do not.
5    Q  But somebody told you or you had perceived
6  knowledge that USF&G would be receiving financial
7  statements, such financial statements?
8      MS. CARSON: Object to the form.
9      THE WITNESS: Perceived knowledge, yes.  I assumed
10  the client -- Brown Schultz was not responsible for
11  providing that to them, the client would have been.
12  BY MR. McGLYNN:
13    Q  And you learned that the client was going to be
14  providing these financial statements to USF&G from somewhere
15  or somebody?
16      MS. CARSON: Object to the form.
17  BY MR. McGLYNN:
18    Q  You may answer.
19    A  Yes.
20    Q  And you cannot recall who that person or who
21  those persons were?
22    A  I just knew the bonding company was a user and
23  the client would be submitting them financials.  I don't
24  know from where or who or...
25    Q  Did you, during the period 1991 to 1999, did you

---

Page 31

1  take any steps to understand generally the relationship
2  between a bonding company and a construction contractor?
3    A  Just what I have already told you.
4    Q  Did you take any steps to understand the reason
5  or the circumstances under which a bonding company like
6  USF&G would be receiving or would be a user of the audited
7  financial statements of CCI?
8      MS. CARSON: Object to the form.
9      THE WITNESS: They would be a user just as the
10  bank would be a user or somebody interested in -- who might
11  have loaned them money or whatever.  I mean they were a user
12  of the financials.  What they did with the financial
13  statements, I don't know.
14  BY MR. McGLYNN:
15    Q  Did CCI have any banks that were users of the
16  audited financial statements of CCI?
17    A  I know they had -- I'm not really sure of their
18  total debt situation at that point.  I know they had, you
19  know, operating accounts with banks and that kind of thing.
20  As far as lines of credit, debt, I can't speak to that.  I
21  don't recall.
22    Q  But you knew that a bank or banks were users of
23  the CCI audited financial statements?
24    A  In general, yeah, they would have had a
25  relationship with a financial institution.

---

Page 32

1    Q  Do you know the reason why CCI's bank or banks
2  were users of the audited financial statements?
3      MS. CARSON: Object to the form.
4      THE WITNESS: Again, just their relationship with
5  CCI, whether or not they had lines of credit or loans or
6  something out there.  And they might have.  I just don't
7  recall at this point what their debt situation was during
8  that time period.
9  BY MR. McGLYNN:
10    Q  Were the banks using -- to your knowledge were
11  the banks using these financial statements to determine
12  whether to extend further credit to CCI?
13    A  I don't have knowledge of that.
14    Q  You didn't -- as part of your work as an auditor
15  of CCI, you reviewed various contracts and loan documents
16  each year, did you not?
17      MS. CARSON: Object to the form.
18  BY MR. McGLYNN:
19    Q  You may answer.
20    A  Yes, we might have looked at whatever agreements
21  were out there.  If there was a line of credit, we would
22  have confirmed any debt.
23    Q  And you, from your experience reviewing these
24  various documents, you know that those documents contain
25  covenants or requirements that audited financial statements

---

Page 33

1  be provided to the bank, don't you?
2      MS. CARSON: Object to the form.
3  BY MR. McGLYNN:
4    Q  You may answer.
5    A  They might have.
6    Q  And you don't know the reason the bank required
7  or was a user of these financial statements?
8      MS. CARSON: Object to the form.
9      THE WITNESS: Again, I don't know if they were --
10  you know, if they have a line of credit out there I'm sure
11  they would be very interested in making sure that CCI was
12  falling within the ratios that they put out in their debt
13  covenants.
14  BY MR. McGLYNN:
15    Q  To see how the company's doing financially?
16    A  Sure.
17    Q  And with respect to USF&G, USF&G was issuing
18  construction surety bonds to CCI, correct?
19      MS. CARSON: Object to the form.
20  BY MR. McGLYNN:
21    Q  You may answer.
22    A  As I recall.
23    Q  And that was, to your knowledge, every year from
24  1991 at least until your departure in 1999?
25      MS. CARSON: Object to the form.

---

**HUGHES, ALBRIGHT, FOLTZ & NATALE**
**717-540-0220\717-393-5101**

DEBORAH BOWMAN
MAY 21, 2002

Multi-Page™

**Page 62**

1 Exhibit No. 5.)
2 BY MR. McGLYNN:
3    Q  Now, if you would please turn to BS 01756. And
4 here's a separate -- what I believe and hope is a separate
5 copy of that particular page.
6    A  It looks like the same document.
7    Q  Can you identify this document?
8       MS. CARSON:  Do you want her to read you the
9 title?
10       MR. McGLYNN:  Excuse me?
11       MS. CARSON:  Would you like her to read you the
12 title?  Is that what you're asking her to do.
13 BY MR. McGLYNN:
14    Q  We are all able to read.  It says master surety
15 agreement.  Can you identify this document?  Have you seen
16 it before?
17    A  Again, I don't recall.
18    Q  It refers to a master surety agreement between
19 CCI Construction Company and United States Fidelity and
20 Guaranty Company.  Do you see that?
21    A  Yes.
22    Q  And do you have any personal knowledge of a
23 master surety agreement between USF&G and CCI?
24    A  I don't have any recall of the surety agreement
25 other than knowing, you know, there was a bonding company

**Page 63**

1 involved.
2    Q  All right.  You will agree with me, though, that
3 this is at least part of what you generally identified as
4 part of the permanent file of CCI at Brown Schultz, correct?
5    A  Yes.
6       MR. McGLYNN:  Why don't we have this marked as
7 Bowman 6.
8       (Master Surety Agreement produced and marked
9 Bowman Exhibit No. 6.)
10 BY MR. McGLYNN:
11    Q  If -- could you please turn to BS 01853.  And if
12 you would, please, just compare that page with the page I've
13 just handed to you, Ms. Bowman.
14    A  It looks like the same document.
15    Q  All right.  Do you have any knowledge of what
16 this particular document is, BS 01853?
17    A  It appears to be testing -- a work paper to
18 determine if the levels were -- if everything fell within
19 the levels.
20    Q  The -- would you agree that the left hand portion
21 of -- let's have this marked.  Why don't we have this marked
22 as Bowman 7 so we have an accurate record.
23       (Work paper and Consent of Shareholder produced
24 and marked Bowman Exhibit No. 7.)
25 BY MR. McGLYNN:

**Page 64**

1    Q  Would it be fair to say that the left hand
2 portion of Bowman 7 is kind of a chopped up version or a
3 reduced version of Bowman No. 5, this document?
4    A  Yes.
5    Q  And the right hand portion appears to be a work
6 paper?
7    A  Yes.
8    Q  And this is a Brown Schultz work paper?
9    A  If it was in the Brown Schultz permanent file,
10 yes.
11    Q  And this is a -- this is a work paper that was
12 prepared by Corrine Rebinski?
13    A  It looks like her -- yes, her sign off.
14    Q  And do you know anything -- did you have any
15 involvement with the preparation of this work paper?
16    A  No, I did not.
17    Q  Do you know what the work paper -- strike that.
18       Do you know the circumstances under which this
19 work paper was prepared?
20    A  Again, to make sure we were within the levels as
21 stated.
22    Q  All right.  So -- and you don't have any personal
23 knowledge of the preparation of this work paper?
24    A  No, I don't.
25    Q  This was done it says year ended 12/31/1997?

**Page 65**

1    A  Yes, it does.
2    Q  So this would have been prepared in connection
3 with the audit report for the fiscal year ended December
4 1997?
5    A  Yes.
6    Q  You were involved in that audit, were you not?
7    A  Yes.
8    Q  You were a supervisor at that time?
9    A  Yes.
10    Q  Do you recall -- and Ms. Rebinski reported to
11 you, did she not?
12    A  We were both supervisors.
13    Q  And did you report to anybody in connection with
14 the 1997 audit report?
15    A  I don't -- again, as I stated earlier, I know
16 Suzanne Eghartner would have been the manager on the job
17 that year, but again I don't -- I'm not certain on that.
18    Q  If you would please turn to BS 02593.  And if you
19 could identify this as being a true and accurate copy of
20 that particular page that you're looking at in Bowman 2?
21    A  Yes, it appears to be.
22       MR. McGLYNN:  May we have this marked as the next
23 exhibit, Bowman 8.
24       (Performance Bond produced and marked Bowman
25 Exhibit No. 8.)

HUGHES, ALBRIGHT, FOLTZ & NATALE
717-540-0220\717-393-5101

**DEBORAH BOWMAN**
**MAY 21, 2002**

**Page 78**

1 S user and that's an abbreviation for financial statement?
2    A  Yes.
3    Q  And over towards the right you say bonding
4 company is also F slash S user?
5    A  Uh-huh.
6    Q  And the bonding company to your knowledge was
7 USF&G at this time?
8    A  Again, I know that by looking at documents here.
9    Q  All right.  But this is your handwriting?
10   A  Yes.
11   Q  And this is handwriting under a paragraph that
12 deals with significant creditors, correct?
13   A  Uh-huh.
14   Q  Does your memory -- does this refresh your memory
15 at all as to whether or not the bonding company was a
16 creditor or became a significant creditor of CCI?
17   A  They were a user of the financial statements.
18   Q  But you put the bonding company as a user of the
19 financial statements in reference to a question asking who
20 the significant creditors were.  Do you see that?
21      MS. CARSON:  Is there a question?
22 BY MR. McGLYNN:
23   Q  That's a question.
24   A  Yes, I did.
25   Q  Did anybody tell you to put this in?

**Page 79**

1    A  Not that I recall.
2    Q  You did it yourself?
3    A  I don't recall.  That is my writing, so...
4    Q  Over on the far right it says Part B, code, do
5 you see a zero.
6    A  Right.
7    Q  What does the zero mean?
8    A  I believe that means overstatement.
9    Q  In other words, overstatement in that management
10 might be trying to enhance the financial statement because
11 banks and bonding companies were going to be users of the
12 financial statement?
13   A  That would be the risk involved.
14   Q  And so, in other words, this particular form at
15 least tries to identify --
16   A  Possible.
17   Q  -- possible risks in terms of the information
18 that you're getting from management that you're going to
19 audit, correct?
20   A  Right.
21   Q  And this would indicate that there would be or
22 there should be a -- at least consideration of a higher
23 level of scrutiny because management might want to try to
24 askew the financial statements to look more favorably to
25 banks and bonding companies?

**Page 80**

1      MS. CARSON:  Object to the form.
2 BY MR. McGLYNN:
3    Q  You may answer.
4    A  Yes.
5    Q  Paragraph 5, this paragraph asks about
6 indications of significant or unusual related party
7 transactions?
8    A  Uh-huh, yes.
9    Q  Can you read that?  That's your handwriting
10 there, Ms. Bowman?
11   A  Yes.
12   Q  All right.  Can you read that for us?
13   A  Just my handwriting or the whole --
14   Q  Yes.
15   A  Transactions with related parties do occur;
16 however, they are not considered significant or unusual.
17   Q  Do you know what kind of related party
18 transactions there were back in the year 1996?
19   A  I don't recall specifics.
20   Q  Paragraph 6, this paragraph or question deals
21 with what type -- strike that.  Deals with what?
22   A  If the financial statements receive unusual
23 scrutiny by their users.
24   Q  And then you have certain handwriting under there
25 as well?

**Page 81**

1    A  Yes.
2    Q  And could you read that for us?
3    A  My indication is the user as being management,
4 the bank.  I believe that says bonding company and then I
5 have a slash where I say no unusual scrutiny.
6    Q  Okay.  Six deals with -- well, six deals with
7 users that might be scrutinizing the financial statements,
8 correct?
9    A  Users that are looking at the financial
10 statements, yes.
11   Q  And you said -- is that no unusual scrutiny?  Is
12 that your handwriting?
13   A  That's right.
14   Q  What do you mean by no unusual scrutiny?
15   A  They wouldn't be looking at them in any different
16 way than a bank would look at another client.
17   Q  Can you differentiate for me or distinguish the
18 difference between usual and unusual scrutiny?
19   A  No.
20   Q  You don't have a memory as to why you indicated
21 no unusual scrutiny underneath Paragraph 6?
22   A  No.
23   Q  Would you please turn to Paragraph 15, second
24 page.
25   A  Yes.

**HUGHES, ALBRIGHT, FOLTZ & NATALE**
717-540-0220\717-393-5101

Page 122

1 that this $430,000 approximately of indirects did not tie
2 into any particular job?
3     A  Well, if I can find --
4     Q  I think it's 734 and 735.
5     A  I was looking for the trial balance, too.  I
6 can't find that.  If I recall correctly, there were direct
7 costs, there were indirect costs and then there would have
8 been management in general type costs specifically on their
9 trial balance.
10    Q  All right.
11    A  I can't find a copy of the trial balance in here,
12 so I don't have a reference for that.
13    Q  All right. Let's move on.  Turn to Page 00830.
14    A  I'm there.
15    Q  What does this particular work paper relate to?
16    A  This relates to confirmations that would have
17 been sent out for accounts receivable.  It also looks like
18 attorney letters are here, also.
19    Q  Do you know what other types of confirmations
20 were made with respect to the 1996 audit?
21    A  Specifically for that audit I don't recall if we
22 would have set anything up for like a debt confirmation for
23 the bank, I don't know.
24    Q  But these are just the confirmations for accounts
25 receivable, again looking at 00830?

Page 123

1     A  Yes, that's right.
2     Q  So confirmations were only sent out to these
3 entities listed on 830?
4     A  That's what this is saying.
5     Q  Is there a work paper that indicates the basis
6 for selecting eight accounts receivable?
7     A  00943.
8     Q  Can you explain work paper 00943 for me?
9     A  Basically starting out, took the total from their
10 accounts receivable report, which was on Page BS 00942.
11    Q  Uh-huh?
12    A  And added in year end accruals, took out their
13 old receivables and came up with a total trade accounts
14 receivable and then the line, it looks like 3,086,750
15 rounded was the total of those six jobs that we confirmed
16 and we indicated that we're confirming 87 percent of the
17 total receivables.
18    Q  Job site visits, were there any made in
19 connection with the 1996 audit?
20    A  No, not that I'm aware of.
21    Q  Were there any confirmations that were sent out
22 to subcontractors?
23    A  Not that I'm aware of.
24    Q  Now, you'd agree with me that with respect to the
25 -- excuse me.  Where is the work paper that relates to the

Page 12

1 accounts payable confirmations?
2     A  I don't recall that we confirmed any accounts
3 payable.
4     Q  You did not confirm any accounts payable.  Is
5 that a standard auditing procedure with respect to the audit
6 of CCI?
7        MS. CARSON: Object to the form.
8        THE WITNESS: We would have done a search for
9 accounts payable for invoices that would not have been
10 recorded, but should have been recorded.
11 BY MR. McGLYNN:
12    Q  Was there a search for so-called unrecorded
13 liabilities?
14    A  I'm sure there was.  Do you want me to find that
15 page?
16    Q  If you could, that would be great.
17    A  It looks like BS 01006.
18    Q  301 --
19    A  -- 006.
20    Q  That goes on to 007, correct?
21    A  Yes.
22    Q  Now, you indicated just a few minutes ago that
23 there were no confirmations sent out to subcontractors,
24 correct?
25    A  Not that I remember.

Page 12

1     Q  Do you recall ever doing that in connection with
2 any audit while you were employed by Brown Schultz or
3 Laventhol?
4        MS. CARSON: Objection to the form.
5        THE WITNESS: I don't recall.
6 BY MR. McGLYNN:
7     Q  Do you know what confirmations to subcontractors
8 would tend to show?
9     A  I don't know exactly what would be put on the
10 confirmation to a subcontractor.
11    Q  All right.  And job site visits, you indicated
12 none were done in 1996, correct?
13    A  Not that I'm aware of.
14    Q  And do you know if anyone from Brown Schultz
15 interviewed any of the project managers or the project
16 supervisors for CCI to determine the status of jobs in 1996?
17    A  We would have talked to -- I don't know the exact
18 title -- but there would have been specific people, specific
19 CCI employees that would have been in charge of each job;
20 plus I remember Stan Sechrist, I believe he was in charge of
21 all jobs.
22    Q  Can you point to a work paper in 1996 to show
23 those people that you talked to concerning the status of
24 jobs in progress or the completed jobs?
25       MS. CARSON: I'll object to the form of that

Page 174

1    Q   You may answer.  You selected 25 job costs to
2 test direct costs in 1997, correct?
3    A   Yes.
4    Q   And to determine whether or not management's
5 estimated costs to complete in 1997, what tests did you
6 perform?
7    A   We looked at estimated costs to complete from two
8 jobs that were completed in the year that were in -- that
9 had been in process in the previous year.  We would have
10 talked to the client.
11       We would have also looked at subsequent costs,
12 meaning costs that were incurred in January of the previous
13 year which would be January 1998 through whatever, February
14 10th or whatever that date is, to determine what kind of
15 costs had come in subsequent to the end of the year to see
16 if it was reasonable compared to the estimated costs that we
17 were given to complete the job.
18    Q   And where is the work paper that shows the
19 subsequent events testing that you performed with respect to
20 those job costs?
21    A   I haven't found the work paper yet, but it's
22 referenced as R 6-B on 02230 where we say see R 6-B for
23 comparison of actual cost incurred subsequent to year end
24 and the estimated cost to complete the job as of 12/31/97.
25    Q   You're just having trouble finding R 6-B?

Page 175

1    A   I am. It might be 02232.  It's very difficult to
2 read.  It looks as if the total cost is the total cost.
3 Again, I wish I could read the date.  I believe it says
4 2/5/98, but I can't read it correctly.
5    Q   You believe that this particular document, 02232
6 shows the actual costs that were incurred from January 1 to
7 whatever your cut off date was?
8       MS. CARSON:  Object to the form.
9 BY MR. McGLYNN:
10    Q   1998?
11    A   I believe the total cost column is that, yes.
12    Q   Let me see if I can find where is the total cost
13 column on this -- I see it.  1,779,089?
14    A   Right.
15    Q   Now -- strike that.  No site visits were
16 performed in 1997, were they, for the 1997 audit, were they?
17    A   Not that I'm aware of.
18    Q   And to your knowledge the only person that Brown
19 Schultz talked to at least as reflected in these work papers
20 concerning the progress of jobs was Stan Sechrist?
21       MS. CARSON:  I object to the form.
22       THE WITNESS:  That's what was documented on that
23 work paper, but there may have been -- again, he was in
24 charge of all of the jobs; so he would have had direct
25 knowledge of all of the jobs in process.

Page 176

1 BY MR. McGLYNN:
2    Q   And did Sechrist report to Shane Miller?
3    A   I believe so.
4    Q   And was there any work paper that indicated that
5 Stan Sechrist's estimates were reasonable?
6       MS. CARSON:  Object to the form.
7       THE WITNESS:  I guess I would refer back to the
8 -- our test of the estimated costs to complete.
9 BY MR. McGLYNN:
10    Q   And -- just so I understand again the tests
11 concerning the estimated cost to complete, were a testing of
12 the two -- two out of the eight completed jobs in 1997?
13       MS. CARSON:  Object to the form, mischaracterizes
14 her testimony.
15 BY MR. McGLYNN:
16    Q   You may answer.
17    A   We looked at two completed jobs.
18    Q   Now -- off the record.
19       (Discussion held off the record.)
20 BY MR. McGLYNN:
21    Q   Let's turn, please, to BS 02008.  It's the
22 balance sheet.  And can you point out two things, the
23 accounts receivable current and retained.  Is there a work
24 paper or series of work papers that show how those
25 receivables were tested?

Page 177

1    A   Again, as in the previous year, we would have
2 confirmed the receivables.  It starts with 02181 and 02182.
3 That's the total accounts receivable ageing report as of
4 12/31/97.  And then it looks like we took -- there's a
5 little calculation here on the side where it starts with 9
6 million.
7    Q   On 2182?
8    A   Yes. I'm guessing that.
9       MS. CARSON:  Don't guess.
10       THE WITNESS:  It's the right.  It would be the
11 total receivable, which would be the balance and the
12 retained to get to a total trade accounts receivable -- I
13 can't remember the number.  The 9.3 million dollar number.
14 We confirmed 8.6 million of that or 92 percent of that
15 balance.
16    Q   All right.  And those are pursuant to the written
17 confirmations that appear in the work papers?
18    A   Right.
19    Q   All right.  Now, can you point to the --
20    A   Are we back on 2008?
21    Q   Very good.  Yes, we are.  The under billings,
22 costs and estimated earnings in excess of billings on
23 uncompleted projects 1,072,281.  Do you see that?
24    A   Yes.
25    Q   Is there a work paper that relates to those under

## Page 218

1 included in the contract amount because they -- the profit
2 analysis showed that the profit was insignificant, correct.
3     MS. CARSON: Object to the form.
4     THE WITNESS: No.
5 BY MR. McGLYNN:
6   Q The fact that they were unapproved standing alone
7 would have meant that they should not have been included in
8 revenue, correct?
9     MS. CARSON: Object to the form.
10 BY MR. McGLYNN:
11   Q You may answer.
12   A Just because they were pending change orders, it
13 might have meant that the owner -- there was a time lag
14 between when the change order was sent to the owner and when
15 the owner sent a signed change order back.
16   Q All right. But you indicate, for example, on
17 00250 for the Lord Fairfax project that these were
18 unapproved?
19     MS. CARSON: Is there a question?
20 BY MR. McGLYNN:
21   Q Correct?
22   A Unapproved meaning the copy, the pending change
23 orders is what I'm saying.
24   Q Well, no, I'm looking at 31,742. Do you see that
25 on BS 00250?

## Page 219

1   A Say the number again.
2   Q 31,742?
3   A Yes.
4   Q Do you see that?
5   A Yes.
6   Q You say it's unapproved, correct?
7   A I'm saying that the 76,000 that we subsequently
8 knew was approved because of the payment certificate that
9 came in, we were left with 31 left and we determined that
10 the effect was insignificant and did not perform additional
11 procedures.
12   Q All right. But standing alone if the change
13 order is not approved, it can't be booked as revenue?
14     MS. CARSON: Object to the form.
15 BY MR. McGLYNN:
16   Q Correct?
17   A I don't recall the specifics of the PPC -- if
18 it's -- if it is an unapproved change order. I don't recall
19 the specifics involved with that.
20   Q And there's nothing else on this particular work
21 paper, BS 00250 that indicates that it's pending or that it
22 might be approved in a month or anything, it just says it's
23 unapproved, correct?
24     MS. CARSON: Objection to form.
25 BY MR. McGLYNN:

## Page 22

1   Q You may answer.
2   A Again, it was the significance of the dollar
3 number.
4   Q Is there any work paper that indicates there was
5 any kind of an analysis of whether or not it could have been
6 approved or -- strike that -- could have been booked as
7 revenue under -- as you testified the PPC guidelines?
8   A I don't recall.
9   Q So the only analysis that appears on that work
10 paper and the other work paper for the Albermarle project
11 was the significance or insignificance of the amount?
12     MS. CARSON: Object to the form.
13     MR. McGLYNN: Correct?
14     MS. CARSON: Object to the form, it
15 mischaracterizes her testimony.
16     MS. CARSON: Objection to the form.
17     THE WITNESS: I'm still unclear about what your
18 total question is.
19 BY MR. McGLYNN:
20   Q All right. So you don't understand my question?
21   A I'm not sure of your question.
22   Q The analysis that is reflected in those two work
23 papers for Lord Fairfax and Albermarle concerning the
24 unapproved component of the change orders only concerns
25 itself to whether or not the unapproved amount is

## Page 2

1 significant or insignificant, correct?
2   A Yes.
3   Q All right. There is no analysis as to whether or
4 not the unapproved change order could be booked as an ass
5 in accordance with PPC guidelines?
6     MS. CARSON: Object to the form.
7     THE WITNESS: Again, an insignificant number.
8 BY MR. McGLYNN:
9   Q No site visits in 1998, correct?
10   A Not to my knowledge.
11   Q And you never sent out -- Brown Schultz never
12 sent out any confirmations to subcontractors in terms of ho
13 much was owed?
14   A Not to my knowledge.
15   Q And was there any independent analysis made as to
16 the percentage of completion of the work in progress other
17 than your discussions with Stan Sechrist?
18     MS. CARSON: Object to the form.
19     THE WITNESS: We did other work on the work in
20 process schedule as we talked about for the prior two years.
21 BY MR. McGLYNN:
22   Q Right. But you didn't go out and talk to the
23 owner or interview --
24   A The owner of the --
25   Q -- project?

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Civil Action No. 1:01-CV-00813
-------------------------------------x
UNITED STATES FIDELITY AND          :
GUARANTY COMPANY,                    :
                                     :
                 Plaintiff,          :
                                     :
          - vs -                     :
                                     :
BRUCE J. BROWN and BROWN, SHUTLZ,    :
SHERIDAN & FRITZ,                    :
                                     :
                 Defendants.         :
-------------------------------------x


Deposition Testimony of STEPHEN SALAZAR


1631 North Front Street          May 22, 2002
Harrisburg, PA                   10:00 a.m.


    IT IS HEREBY STIPULATED and agreed that the
reading, sealing, and signing of the within
transcript are waived;
    IT IS FURTHER STIPULATED and agreed that all
objections except as to the form of the question
are reserved to the time of trial.


LEARY REPORTING
112 West Main Street, Ste. 200
Mechanicsburg, Pennsylvania  17055

(717) 233-2660    Fax (717) 691-7768

Page 98

1 Those are the main ones.
2    Q  Was the financial statement used to
3 evaluate whether to allow an exception to the
4 program parameters -- start over.
5         Was the financial statement from
6 the outside accountants used in deciding whether
7 to allow exceptions to the program parameters
8 for CCI Construction?
9         MR. McGLYNN: Objection.
10    A  The financial statement review is
11 part of the underwriting of the particular job,
12 as well as the experience of the contractor and
13 the particulars of the job.
14    Q  Was there other financial
15 information which you used in the underwriting
16 process other than the financial statement from
17 the outside accountant?
18    A  We would occasionally review
19 interim, in-house statements.
20    Q  How often did you have or receive
21 interim financial statements?
22    A  I don't recall with CCI, but I
23 believe we got a six-month statement and maybe
24 quarterly.  I am not 100 percent certain on
25 that.

Page 99

1    Q  Why did you get that financial
2 information?
3    A  You want to obtain interim
4 information so that you can see how the
5 contractor is doing during the course of the
6 year; because you only get the CPA year-end
7 statement once a year.
8    Q  Was there a concern that the CPA
9 financial statement was not an accurate picture
10 of the financial condition of the company for
11 that period after the financial statement was
12 issued?
13         MR. McGLYNN: Objection.
14    A  You obtain the interim information
15 just to determine how he is doing since the
16 year-end statement was prepared.
17    Q  Did you consider the interim
18 internal financial statement information to be
19 accurate?
20    A  As far as I know, it was accurate.
21    Q  Did you rely on the interim
22 financial information in making underwriting
23 decisions for the bond program for CCI
24 Construction?
25    A  We would use the interim

Page 10

1 information just to confirm that there has not
2 been material changes from the CPA year-end.
3    Q  Does that mean, yes, you used the
4 interim financial information in making
5 underwriting decisions for the bond program for
6 CCI Construction?
7    A  Yes, in conjunction with the CPA
8 year-end statement, yes.  We used both.
9    Q  Will you agree an interim financial
10 statement which was for a period ending eight
11 months prior to the date on which the bond was
12 under consideration for issuance would not be an
13 accurate reflection of the then present
14 financial condition?
15         MR. McGLYNN: Objection.
16    A  It could. However, like I said,
17 you want to see independent CPA verification as
18 a confirmation that the numbers are, indeed,
19 accurate.
20    Q  For how long a period of time did
21 you rely on the year-end financial statement
22 issued by outside accountants after the issuance
23 date as an accurate reflection of the financial
24 condition of the company?
25    A  You would use the CPA year-end

Page 10

1 statement as the base point in determining the
2 financial condition of the company.  And you
3 would use interims just to confirm if there were
4 any material changes from the year-end.
5    Q  So wasn't it essential to get the
6 interim financial information to determine
7 whether there was a change since the year-end
8 financial statement was produced?
9    A  It is not vital, but it is helpful.
10    Q  It is not vital to receive interim
11 information to determine whether a material
12 change from the year-end financial statement has
13 occurred?
14    A  You can have some accounts where
15 you do not get interim information; but like I
16 said, it is helpful to have interim information.
17    Q  It possible as of the date of the
18 interim -- isn't it the situation that the
19 financial statement only reflects the financial
20 condition of the company as of the closing date
21 on that financial statement?
22         MR. McGLYNN: Objection.
23    A  Repeat that, please.
24    Q  Did you understand that a financial
25 statement created by outside accountants

Page 246

1       MR. McGLYNN: Objection.
2    A   You need to repeat that one.
3    Q   To what extent was there a
4  tolerance in the underwriting to modifications
5  to the information included within the
6  description of operations, working capital,
7  balance sheet, and work in progress as reflected
8  on Exhibit 7 for the 1994 annual review before
9  it would be significant to the underwriting
10  process?
11    A   I don't understand what you mean by
12  a tolerance.
13    Q   If the amounts expressed on the
14  1994 review change by $1, you would agree that
15  that would not be significant to underwriting,
16  wouldn't you?
17    A   Yes.
18    Q   So wouldn't you agree that the
19  change in information would have to be --
20  wouldn't just be any change to be significant to
21  underwriting, would it?
22       MR. McGLYNN: Objection.
23    A   It is all relative to what program
24  you are going on.  I mean, $10,000 could be
25  significant depending on what size of account or

Page 247

1  what account you are looking at.
2    Q   For CCI Construction, sir, to what
3  extent would a change in amounts and other
4  information be tolerated before it had an impact
5  on underwriting?
6    A   I can't determine that.
7    Q   I am showing you Exhibit 8, which
8  is the 1994 annual review.  Is that right?
9    A   Yes.
10    Q   And again, you prepared the     1995
11  annual review just like you prepared the 1994
12  annual review?
13    A   Yes.
14    Q   And incidentally, at the conclusion
15  of the 1994 annual review, you recommended the
16  continuation of approval for the bond program
17  for CCI Construction.  Is that true?
18    A   Yes.
19    Q   Now, can you tell us whether any of
20  the information which is included in the annual
21  review you prepared for 1995, which is Exhibit
22  8, changed in any material respect from 1994 in
23  the annual review as expressed in Salazar
24  Exhibit 7?
25    A   Say that again?  Did anything

Page 24

1  change?
2    Q   Did any of the information included
3  in Salazar Exhibit 8, which was the annual
4  review you prepared for 1995 --
5       MR. McGLYNN:  1994.
6       MR. McCARRON:  No. 8 is 1994.
7       MR. McGLYNN:  You just said it was
8    1994 about a minute ago.  So it's now
9    1995?
10    Q   Let me start over.
11       Did any of the information which is
12  included in Salazar Exhibit 8, which is the
13  annual review statement or report you prepared
14  for 1995, concerning CCI Construction change in
15  any manner materially significant to
16  underwriting from the 1994 information as
17  reflected in Salazar Exhibit 7?
18    A   I would really have to look at it,
19  please.  Repeat the question.
20    Q   Is there any material change from
21  an underwriting standpoint between the
22  information reflected in Exhibit 8, which is the
23  1995 annual review, from the information which
24  you included in the annual review for 1994,
25  which is Exhibit 7?

Page 24

1       MR. McGLYNN: Objection.
2    A   My opinion is there is not a
3  material change, no.
4    Q   Can you tell us the extent to which
5  the information included in Exhibit 8 would have
6  to change in order to be material from an
7  underwriting standpoint?
8       MR. McGLYNN: Objection.
9    A   I can't determine exactly what
10  material is -- what material would be for it to
11  change.
12    Q   So you can't tell us how much the
13  values which are included within Exhibit 8 would
14  have to change before would it become
15  significant from an underwriting standpoint.  Is
16  that right?
17       MR. McGLYNN: Objection.
18    A   I would say if it was a change of a
19  couple million dollars or something, that would
20  be a material change.  I am not giving you an
21  exact amount because -- comparing the program of
22  the work and the financial capacity of the
23  contractor, what is material and what is not
24  material changes from account to account.
25    Q   With the CCI account, how much

JAMES DAILEY

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

(Harrisburg Division)

- - -

UNITED STATES FIDELITY  :  CIVIL ACTION

and GUARANTY COMPANY  :

  :

-vs-  :  JUDGE KANE

  :

BRUCE BROWN and  BROWN  :

SCHULTZ SHERIDAN &  :

FRITZ  :  NO. 1:01-CV-00913

- - -

Oral deposition of JAMES
DAILY, taken at the Law Offices of SWARTZ,
CAMPBELL & DETWEILER, 1601 Market Street,
34th Floor, Philadelphia, Pennsylvania
19103, on Thursday, April 18, 2002,
commencing at or about 10:08 a.m., before
Kristy Kupiec, a Certified Court Reporter
and Commissioner of Deeds.

- - -

REPORTING SERVICE ASSOCIATES (RSA)

A Veritext Company

1845 Walnut Street - 15th Floor

Philadelphia, Pennsylvania 19103

(215) 241-1000

JAMES DAILEY

46

1  determination of the treatment, we needed
2  to look at several other aspects of the
3  case. And these would lead to discussion
4  and ultimately an agreement as to how we
5  were going to treat certain items on the
6  balance sheet analysis. And if they didn't
7  agree, my position prevailed.
8  Q.    What difference would it make then
9  whether the field office made a certain
10  determination even if it was different than
11  yours?
12  A.    Well, their primary responsibility
13  is to produce the business.
14  Q.    You are talking about the field
15  office?
16  A.    That's right.
17       My primary responsibility is
18  to underwrite the business. Now, they had
19  underwriting responsibilities and I had
20  production responsibilities. But my
21  primary responsibility was to underwrite
22  and theirs was to produce. In the home
23  office you are not under pressure of
24  regular contact with either the agency or

47

1  the customer. So my analysis would have
2  been more objective rather than subjective
3  and affected by the relationships with the
4  agent or the customer.
5  Q.    Well, in what manner did
6  underwriters produce business?
7       MR. McGLYNN: At the field
8       office?
9       MR. McCARRON: I'm sorry.
10  BY MR. McCARRON:
11  Q.    In what manner did the field
12  office underwriters produce business?
13  A.    Well, they had relationships with
14  producing agents. And if we could see eye
15  to eye in basic customer handling with an
16  agency, they would offer us new business,
17  new accounts that they picked up. But we
18  don't -- the field people didn't do any
19  direct production, the actual marketing
20  people were the independent insurance
21  agents who represent a number of companies.
22  Q.    Surety companies?
23  A.    Yes, surety companies.
24       So essentially their

48

1  production efforts were agency
2  relationships and expertise.
3  Q.    Were there any specific criteria
4  that you used in connection with
5  underwriting bond programs during the 1990s
6  for USF&G?
7  A.    Yes.
8  Q.    What were the criteria that you
9  used in connection with bond underwriting
10  for USF&G during the 1990s?
11  A.    Well, we looked at working
12  capital, we looked at equity, we looked at
13  cash management, we looked at experience
14  for that type of job, the location of the
15  job, owner, financing, we looked at trends
16  extensively and the trends in the financial
17  analysis on the 4.80, and I don't think it
18  has a number but we looked at what they did
19  with their money, how they earned their
20  money, where they earned their most money,
21  whether they did better with public or
22  private work, small or large jobs.
23  Q.    Were there any particular criteria
24  applied to the construction company bonds?

49

1  A.    The ones I have just...
2  Q.    Is there any particular item in
3  the criteria that is unique to underwriting
4  construction companies for bond purposes?
5  A.    There is lots of classes for the
6  construction companies; you have general
7  builders, you have road contractors, you
8  have subcontractors, mechanical,
9  electrical, roofers, people that just do
10  concrete, people that don't do anything but
11  framing, floors, carpets, windows, doors.
12  There are all different kinds of businesses
13  and so you have different sorts of
14  criteria. Well, it's not criteria, it's a
15  different way of looking at, say, prime
16  contractors and subcontractors. Everyone
17  has to wait for the next person to be paid
18  before he gets paid. So there is a long
19  wait time for him to get his money.
20       When I started the surety
21  business with the bond contractors, all
22  surety is a result of the Miller Act of
23  1933 or '35 or something like that where
24  the federal government passed a law that

13 (Pages 46 to 49)

JAMES DAILY

210

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3

UNITED STATES FIDELITY           ) DEPOSITION UPON

4  AND GUARANTY COMPANY

5                    Plaintiff    ) ORAL EXAMINATION

6        vs.                      )  OF

7  BRUCE BROWN AND                ) JAMES DAILY

   BROWN SCHULTZ SHERIDAN

8  & FRITZ                        )

9                    Defendants   )

10 — — — — — — — — — — — — —

11

12

13              TRANSCRIPT OF CONTINUED

14 DEPOSITION, taken by and before MARGIE A. ROMEO,

15 Professional Reporter and Notary Public, at the

16 Law Offices of Swartz, Campbell & Detweiler, 1601

17 Market Street, 34th Floor, Philadelphia, PA on

18 Thursday, June 27, 2002 commencing at 10:20 a.m.

19                    — — —

20

21

22

23          REPORTING SERVICE ASSOCIATES (RSA)

             A Veritext Company

          1845 Walnut Street - 15th Floor

24          Philadelphia, PA  19103

             (215) 241-1000

# JAMES DAILY

275

1  Q.    In what way would correct information
2  have effected the decisions by USF & G to bond or
3  issue bonds for CCI Construction?
4  A.    Well, we probably wouldn't have given
5  them as much credit as they were getting.
6  Q.    And how did you make that determination?
7  A.    We didn't make that determination.
8  Q.    How did you determine that you, that USF
9  & G may not have given CCI Construction as much
10 bond credit as was given to CCI Construction if
11 the financial statements had correctly reflected
12 the financial information relative to CCI
13 Construction?
14 A.    Well, the amount of -- the amount of
15 credit you give is directly related to the
16 financial condition of the customer.
17 Q.    Is that the end of your answer?
18 A.    Yes.
19 Q.    Did you determine or did anyone on behalf
20 of USF & G determine the extent to which the
21 credit for bonding extended by USF & G to CCI
22 Construction might have changed if the financial
23 statements had correctly reflected financial
24 condition of CCI Construction?

276

1  A.    No.
2  Q.    Are you able to tell us the extent to
3  which the bonding credit might have changed by
4  USF & G as extended to CCI Construction, if the
5  financial statements had correctly stated or
6  reflected the financial condition of CCI
7  Construction?
8  A.    No.
9  Q.    Why can't you tell us?
10 A.    I would have to see the restated
11 financial statements first.
12 Q.    If I could just ask a full question.
13 A.    I thought you were through.
14 Q.    I understand. I'm not blaming you.
15        Why can't you determine the
16 extent to which the credit for bonding extended
17 by USF & G might have changed for the CCI account
18 if the financial statements had correctly
19 reflected the financial condition of CCI
20 Construction.
21        MR. McGLYNN: Objection.
22        THE WITNESS: I would have to see
23 the restated information first, but even then I
24 don't think I could give you a definitive answer

277

1  of exactly what would have changed. I know it
2  would have changed.
3        - - -
4  BY MR. McCARRON:
5  Q.    When you say you would have to see
6  restated financial information, you mean you
7  would have to see corrected or correct financial
8  statements which accurately reflected the
9  financial condition of CCI Construction during
10 the period involved?
11 A.    Yes.
12 Q.    Would you need to see information or
13 consider information in addition to the restated
14 financial statements in order to evaluate whether
15 and to what extent underwriting decisions would
16 have been effected by correctly presented
17 financial statements in the underwriting for the
18 CCI bond account?
19 A.    Well, we would first have to see the
20 restated financial statements, then if we needed
21 additional information for clarification, we
22 might have asked for something else, but I can't
23 identify what it might have been because we don't
24 have that information.

278

1  Q.    In addition to the restated financial
2  statements, would your evaluation about the,
3  about whether the restated financial statements
4  would have had an impact on underwriting for the
5  CCI bond credited --
6        MR. McGLYNN: Objection.
7        THE WITNESS: I'm lost.
8        MR. McCARRON: I am too. I'm
9  sorry.
10       - - -
11 BY MR. McCARRON:
12 Q.    Would you need to consider information in
13 addition to the restated financial statements in
14 order to determine whether and to what extent the
15 bond credit by USF & G might have been different
16 for CCI Construction?
17       MR. McGLYNN: Objection.
18       THE WITNESS: I don't know.
19       - - -
20 BY MR. McCARRON:
21 Q.    What I'm trying to understand, sir, is
22 would you have to review other information which
23 was already in the possession, perhaps of USF & G
24 and which had been taken into account during the

Pages 275 to 278

87b508a0-93f4-11d6-88e6-c775628c2b14

## JAMES DAILY

383

1  off-shore captive, which is not unheard of.  It
2  is not common, but I think -- that's it.
3        _ _ _
4  BY MR. McCARRON:
5    Q.    What I'm trying to understand, sir, do
6  you have any complaint about the information
7  which was disclosed by Brown Schultz concerning
8  the relationship between PCIC and CCI?
9    A.    Not at the time.
10   Q.    Well, do you now have any complaints in
11  retrospect about the information and adequacy of
12  the information reflected by Brown Schultz in the
13  financial statements for CCI Construction as it
14  relates to the relationship with PCIC?
15   A.    Do I have any complaints, I don't have
16  any complaints.
17   Q.    Well, do you believe the information
18  included within the financial statements prepared
19  by Brown Schultz for CCI Construction
20  inadequately reflected information about PCIC?
21   A.    Well, I don't think --
22        MR. McGLYNN:  Objection.
23        THE WITNESS:  I don't think it
24  was very good disclosure.

384

1        _ _ _
2  BY MR. McCARRON:
3    Q.    Was there more which you needed to know
4  about PCIC than as reflected in the financial
5  statements?
6        MR. McGLYNN:  Objection.
7        THE WITNESS:  There probably
8  was.
9    Q.    I'm sorry?
10   A.    It did not occur to us at the time.
11   Q.    Did you ever ask any questions to learn
12  additional information about PCIC?
13   A.    I don't think so.
14   Q.    What information did you -- what
15  additional information did you want to know about
16  PCIC that is reflected in the financial
17  statements?
18   A.    Well, we should probably have asked for a
19  financial statement.
20   Q.    A PCIC financial statement?
21   A.    Yes.
22   Q.    You are saying USF & G should have asked
23  for a financial statement of PCIC?
24   A.    In retrospect, it would have been a smart

385

1  move.
2    Q.    Why do you say it would have been a smart
3  move?
4    A.    Well, it was providing a guarantee to
5  CCI, and we should have known whether it could
6  keep its promises.
7    Q.    Was it important to you -- was it
8  important to USF & G to know whether PCIC could
9  make good on the guarantee for payment to CCI?
10   A.    I don't think we thought so at the time.
11   Q.    You didn't think it was important to know
12  whether PCIC could make good on its guarantee?
13   A.    Not at the time.
14   Q.    Do you now believe it was important or
15  should have been important to know whether PCIC
16  could make good on its guarantee for payment to
17  CCI?
18   A.    It would have been good information to
19  have, but I don't think it would have stopped the
20  loss.
21   Q.    Does that mean it would not have
22  influenced whether USF & G committed to bonds for
23  CCI Construction?
24        MR. McGLYNN:  Objection.

386

1        THE WITNESS:  I don't think so.
2        - - -
3  BY MR. McCARRON:
4    Q.    Do you know whether PCIC satisfied its
5  commitment on the guarantee to pay CCI certain
6  amounts?
7    A.    I don't.  Well, the footnote says they
8  paid $845,000.00 one year, but I don't know about
9  the rest of it.
10   Q.    Does that mean no, you don't know?
11   A.    No, I don't know.
12   Q.    If PCIC made good and its guarantee for
13  payment --
14   A.    Well, it made good on one because the
15  footnote says that.
16   Q.    Does that mean no, you don't know whether
17  PCIC made good on all of its guarantees to CCI
18  Construction for payment?
19   A.    I don't know.
20   Q.    On Page 13 of Salazar exhibit 5, which is
21  the financial statement for the year ending
22  December 31, 1998, it appears the note Related
23  Party Transactions; is that right?
24   A.    Yes.

Pages 383 to 386

87b508a0-93f4-11d6-88e6-c775628c2b14

# JAMES DAILY

415

1 as strong -- the financial condition of December
2 31, '98 was going to be as strong also as the
3 prior year.
4            - - -
5 BY MR. McCARRON:
6 Q.    Why did you believe on January 5, 1998
7 the financial condition of CCI Construction would
8 be as good as the prior year?
9 A.    They told us that.
10 Q.    CCI Construction told you that?
11 A.    Yes.
12 Q.    Did you have any other information to
13 confirm the financial condition of CCI
14 Construction would be as good as the prior year
15 as of January 5th, 1999?
16 A.    I don't think so.
17 Q.    So you relied on information received
18 from CCI Construction concerning its financial
19 condition when USF & G underwrote, committed to
20 bond CCI Construction during January, 1999; is
21 that right?
22            MR. McGLYNN:  Objection.
23            THE WITNESS:  I've lost you.
24 What's the verb?

416

1            - - -
2 BY MR. McCARRON:
3 Q.    USF & G relied on financial
4 representations or representations concerning
5 financial condition for the coming year based on
6 information -- USF & G relied on representations
7 from CCI Construction about its financial
8 condition when it decided to commit to bonding
9 during January, 1999?
10            MR. McGLYNN:  Objection.
11            THE WITNESS:  Yes.
12            MR. McCARRON:  This has been
13 marked Phillips-6.
14            - - -
15 BY MR. McCARRON:
16 Q.    Sir, I'm showing you what has been
17 previously marked Phillips-6.  It is a letter
18 from Mr. Dominiani to Mr. Ortenzio dated March 5,
19 1998.
20            Are you familiar with this, and
21 it is bate stamped USF & G slash BS 0915.
22            Are you familiar with this
23 document, which is Phillips --
24 A.    I don't think so.

417

1 Q.    Okay.  Were you aware in, that in 1997
2 there were bonuses paid to the officers of CCI
3 Construction?
4 A.    I don't remember.
5 Q.    Does the comment made in the second
6 sentence of the second paragraph by Mr. Dominiani
7 which says they, referring to USF & G asked me to
8 send their congratulations to you and your
9 management staff; is that an accurate reflection
10 of USF & G's position?
11 A.    Well, I think that -- I think that was
12 probably from Tony Phillips.
13 Q.    So that does not, Mr. Phillips' statement
14 to Mr. Dominiani was not reflective of the
15 enthusiasm of USF & G?
16            MR. McGLYNN:  Objection.
17            THE WITNESS:  He doesn't say who
18 he met with.  He said I had the opportunity to
19 meet with USF & G.  It could have been Tony
20 Phillips.  It could have been Dave Hussey.  It
21 was not me.
22            - - -
23 BY MR. McCARRON:
24 Q.    Well, I'm just asking.  Is that comment

418

1 that USF & G was extending congratulations to CCI
2 in March of 1998 reflective of the sentiment of
3 USF & G?
4 A.    Well, as I recall, '97 was a pretty good
5 year.  And whoever Dominiani met with, very
6 likely asked him to extend their congratulations
7 for another good year.
8 Q.    Okay.  You see the next sentence where it
9 says I understand that your operating profit, do
10 you see that, sir?
11 A.    Yes.
12 Q.    Do you know who he's referring to in that
13 letter?
14 A.    Well, this letter is dated March 5, 1998
15 so it wouldn't have been the three percent, five
16 percent discussed in the January, '99 meeting.
17 So, no, I don't understand.  I don't know what it
18 refers to.
19 Q.    Does this letter, Phillips-6 refresh your
20 recollection about whether there were minimum
21 equity requirements or ratios of work program?
22 What you are looking at, sir?
23 A.    Oh, this is Phillips-6.  Does this
24 refresh my recollection?

**Pages 415 to 418**

87b508a0-93f4-11d6-88e6-c775628c2b14

ANTHONY S. PHILLIPS

1            IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3                            NO.  1-01-CV-00813

4

5

   UNITED STATES FIDELITY AND )   DEPOSITION UPON
6  GUARANTY COMPANY,          )
              Plaintiff,      )  ORAL EXAMINATION
7                            )
          - vs -             )          OF
8                            )
   BRUCE BROWN AND BROWN,     )      ANTHONY S.
9  SCHULTZ, SHERIDAN & FRITZ, )       PHILLIPS
                            )
10            Defendants.     )
   - - - - - - - - - - - - - -)

11

12

13

14                    TRANSCRIPT OF DEPOSITION,

15  taken by and before KIMBERLY MUNI,

16  Professional Reporter, at the offices of

17  SWARTZ, CAMPBELL & DETWEILER, 1601 Market

18  Street, 34th Floor, Philadelphia,

19  Pennsylvania, on Wednesday, April 17, 2002,

20  commencing at 10:05 a.m.

21

22

        REPORTING SERVICE ASSOCIATES, (RSA)
23           A Veritext Company
        1845 Walnut Street - 15th Floor
24      Philadelphia, Pennsylvania   19102
               (215) 735-2332

ANTHONY S. PHILLIPS

54

1  financial information prepared by an -- a CPA
2  who is also an employee of CCI?
3  A.    No.
4  Q.    Was a bonding program approved by
5  USF&G for CCI Construction?
6  A.    Yes.
7  Q.    When did the approval occur?
8  A.    Various times.
9  Q.    Was there a specific program that was
10  developed with respect to limits and bonds?
11  A.    Various programs.
12  Q.    Okay. What was the first program for
13  bonds for CCI which was developed?
14  A.    Honestly, I don't remember. There
15  were various amounts at various times. It
16  was a fluid situation as any large account
17  that Saint Paul or USF&G bonds may be.
18  Q.    Okay.
19  A.    Fluid from the standpoint on one piece
20  of criteria that we may have changed the form
21  to not halt a contractor. Additional pieces
22  of information of a substantial nature may
23  increase the bond program, even as much as on
24  a day-to-day or week-to-week basis depending

55

1  upon what kind of underwriting information
2  came in, the validity of the information, and
3  the verifiability of the information.
4  Q.    What were the parameters in applying a
5  program initial list applied by USF&G for
6  CCI?
7  A.    I answered that. I am not sure right
8  now as to whether or not it was a $60 million
9  or $75 million, because programs for large
10  contracts are fluid depending upon the type
11  of information that comes in, the job itself,
12  the knowledge of the contractor to the
13  particular obligee, and the overall financial
14  capacity of the contractor at the time. It
15  may be that a program that is set up for 60
16  million on a particular job well suited for
17  him, experienced by him, et cetera, you may
18  go up to one hundred million dollars the next
19  time. Which is a one-shot deal on a
20  particular job to go back to the $60 million
21  unless a whole different set of criteria are
22  that -- are developed based upon additional
23  monies coming into the company, additional
24  monies leaving the company. Jobs going

56

1  better and verifiability better, jobs going
2  worse -- are verifiability worse. It changes
3  that quick at times based upon our
4  understanding of the information provided to
5  us either by a CPA or by internal sources.
6  Q.    Did you -- let me start over -- once
7  USF&G approved a bonding program for CCI, was
8  approval in -- additional to -- approval for
9  the bonding program required for the issuance
10  of each and every bond by USF&G for CCI
11  Construction?
12  A.    I believe there would -- is what is
13  called a working line setup on the account
14  given to the branch office that anything
15  falling within that criteria of the work line
16  per job, and program of work could be
17  approved by the branch based upon the
18  acquisition of all of the underwriting
19  information culminating with the year end
20  audit verifying the information that we had
21  on hand.
22  Q.    So was it the situation that once the
23  bonding program was approved for CCI
24  Construction, then thereafter no further

57

1  underwriting approval was required with
2  respect to the issuance of bonds for CCI
3  Construction within the parameters
4  established for the bonding program?
5        MR. McGLYNN: Objection as to
6        form.
7        THE WITNESS: No. There is
8  various levels of authority to execute
9  bonds. The branch office would still
10  have to underwrite the particular job,
11  see that the additional information
12  that would be coming in on status
13  reports on particular jobs saying how
14  they are doing direct from the
15  obligee. Seeing how the internal
16  information would tie in with the
17  previous audit that was done at year
18  end. And various other criteria would
19  have to be reviewed by the branch to
20  keep up with the line of authority
21  that the branch office was given by
22  the home office.
23  BY MR. McCARRON:
24  Q.    And what was the line of the authority

15 (Pages 54 to 57)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

U.S. FIDELITY and GUARANTY CO.      :
                                    :
                                    :
      -VS-                          :   NO. 1-01-CV-00813
                                    :
                                    :
BRUCE BROWN & BROWN, SCHULTZ,       :
SHERIDAN, & FRITZ,                  :


Volume III


DEPOSITION OF:   ANTHONY S. PHILLIPS

         BEFORE:   Michelle S. Parke,
                   Court Reporter

          PLACE:   1631 North Front St.
                   Harrisburg, Pa

      BEGINNING:   June 20, 2002
                   10:10 a.m.


APPEARANCES:

      BERNKOPF, GOODMAN, & BASEMAN, LLP
      BY:  PETER B. McGLYNN, ESQUIRE
      125 Summer Street
      Boston, Massachusetts 02110-1621

            For - Plaintiff

      SWARTZ, CAMPBELL, & DETWEILER
      BY:  JEFFREY McCARRON, ESQUIRE
      1601 Market Street, 34th floor
      Philadelphia, Pennsylvania 19103-2337

            For - Defendants


            Leary Reporting   (717) 233-2660

U.S. Fidelity v Bruce Brown          Multi-Page™          **Anthony Phillips**
                                                          **6/20/02**

---

Page 440

1    Q    Did you share Phillips 7 with Jim Daily?
2         MR. McGLYNN:  Objection.  I don't
3 understand what you mean by share.  Did you give him a
4 copy?
5         MR. McCARRON:  Yes.
6         MR. McGLYNN:  Ask it that way.
7 BY MR. McCARRON:
8    Q    Did you share it would be the same.
9 Either give him a copy, hand it to him, the original
10 you received or otherwise?
11   A    Could be.  I am not sure.
12   Q    How would we determine whether you shared
13 Phillips Exhibit 7 with Jim Daily?
14   A    If you got a copy of this information
15 from Jim Daily.
16   Q    Did you discuss the information, which is
17 included in Phillips Exhibit 7 with Mr. Daily?
18   A    I don't remember.
19   Q    Did you have an understanding about the
20 phrase or the sentence in the third paragraph on the
21 first page of Phillips Exhibit 7, "CCI can actually use
22 this as a buffer to offset losses or profit fades in
23 certain jobs during any given year", referring to PCIC?
24   A    I didn't think of it at the time.
25   Q    Did it occur to you that CCI Construction

---

Page 441

1 was suggesting it could use money from PCIC to improve
2 its financial condition and offset losses or profit
3 fades?
4         MR. McGLYNN:  Objection.
5         THE WITNESS:  I didn't think of it at the
6 time.
7 BY MR. McCARRON:
8    Q    Does that sentence now suggest to you
9 that CCI Construction was indicating it could use PCIC
10 money to improve its financial condition by offsetting
11 losses and profit fades?
12        MR. McGLYNN:  Objection.
13        THE WITNESS:  That they were using what
14 kind of funds did you say?
15 BY MR. McCARRON:
16   Q    PCIC funds.
17        MR. McGLYNN:  Objection.
18        THE WITNESS:  Possibly.
19 BY MR. McCARRON:
20   Q    Does that sentence have any other
21 significance to you?
22   A    No.
23   Q    Did you personally review all of the
24 financial statements in the ordinary course of business
25 for CCI Construction?

---

Page 442

1         MR. McGLYNN:  Objection.
2         THE WITNESS:  What do you mean by review?
3 BY MR. McCARRON:
4    Q    Receive and review the information which
5 is included.  Actually review the financial statements.
6    A    I can say I read the financial
7 statements.
8    Q    Did you read all of the financial
9 statements for CCI Construction as they were received
10 in the ordinary course of business in connection with
11 the underwriting?
12   A    Yes.
13   Q    The last time, sir, you told us that you
14 didn't look at the financial statement for 1998.  Have
15 you changed your answer?
16   A    Did I specifically say I did not look at
17 the financial statement at all or I did not analyze the
18 financial statement?
19   Q    You did not read the financial statement
20 for 1998.
21   A    I would look at every financial statement
22 that came in.  Read every financial statement to me
23 would mean every part of the financial statement.  It
24 possibly could be 1998 I did a peripheral read and
25 asked my underwriter to do a more thorough read and

---

Page 443

1 then a more thorough analysis.  That's the only reason
2 I could say I would give an answer that I didn't read
3 the 1998 financial statement.
4    Q    Are you able to tell us that you reviewed
5 in detail the financial statements for every year for
6 CCI Construction?
7         MR. McGLYNN:  Objection.  That's not what
8 he said.
9         THE WITNESS:  No.
10 BY MR. McCARRON:
11   Q    Did you evaluate the financial statements
12 for CCI Construction for every year?
13        MR. McGLYNN:  Objection.
14        THE WITNESS:  Again, what do you mean by
15 evaluate?
16 BY MR. McCARRON:
17   Q    Did you personally review and evaluate
18 the financial statement for CCI Construction as they
19 were received in the ordinary course of business in
20 underwriting for CCI Construction?
21        MR. McGLYNN:  Objection.
22        THE WITNESS:  Not fully.
23 BY MR. McCARRON:
24   Q    Isn't it the case that the bear flags for
25 CCI Construction were never considered green?

---

Page 460

BY MR. McCARRON:

2    Q   Showing you page 7 of the financial
3  statement for CCI Construction for 1996, which is
4  identified as Salazar Exhibit 2 and under footnote 1
5  which is on page 7, it indicates use of estimates, does
6  it not?

7    A   Yes.

8    Q   It explains that in certain circumstances
9  the values expressed in the financial statements are
10  based on estimates, doesn't it?

11    A   No, not in certain circumstances. I
12  don't see that.

13    Q   Does the footnote relating to the use of
14  estimates indicate an explanation about the use of
15  estimates?

16    A   Yes.

17    Q   Do you understand what is indicated under
18  use of estimates, which is in footnote 1 of the
19  financial statement?

20    A   Pretty much.

21    Q   Did you understand that those instances
22  in which the amounts are reflected as estimates, that
23  they are indeed estimates and that actual results could
24  differ from those estimates?

25    A   Estimates given by management to the

Page 461

1  auditor, yes.

2    Q   Did you understand that the values
3  expressed as estimates were only estimates and that the
4  actual results could differ from those amounts
5  reflected as estimates?

6    A   Yes.

7       MR. McGLYNN: It's just 10 after now.

8  BY MR. McCARRON:

9    Q   What specific changes to the financial
10  statements of CCI Construction would have changed your
11  underwriting decision?

12       MR. McGLYNN: Objection.

13       THE WITNESS: I can't say. It's too
14  vague a question.

15  BY MR. McCARRON:

16    Q   What changes to the financial statement
17  of CCI Construction have changed your underwriting
18  decision?

19       MR. McGLYNN: Is that a question?
20  Objection.

21       THE WITNESS: Would you repeat the
22  question?

23  BY MR. McCARRON:

24    Q   Would changes to the financial statement
25  of CCI have changed your underwriting decision?

Page 462

1    A   Would changes have --

2       MR. McGLYNN: Objection. You may answer.

3       THE WITNESS: -- changed my decision,
4  yes.

5  BY MR. McCARRON:

6    Q   What changes to the financial statement
7  would have changed your underwriting decision?

8       MR. McGLYNN: Objection.

9       THE WITNESS: That's too broad a
10  question. I couldn't say.

11  BY MR. McCARRON:

12    Q   Were there any changes to the financial
13  statement for CCI Construction, which have effected
14  your underwriting decision for only some bonds?

15       MR. McGLYNN: Objection.

16       THE WITNESS: I will answer it this way:
17  Any changes to financial statements would change my
18  underwriting of an account depending upon the extent to
19  which the changes effected the financial condition of
20  any firm.

21  BY MR. McCARRON:

22    Q   How would you determine whether a change
23  to the financial statement of an account was
24  significant enough to effect your underwriting
25  decision?

Page 463

1    A   That's too broad a question.

2    Q   Can you determine whether a change to a
3  financial statement would have been significant enough
4  to have changed your underwriting decision?

5       MR. McGLYNN: Can he?

6       MR. McCARRON: Yes, can he.

7       MR. McGLYNN: Is he capable of doing
8  that?

9       MR. McCARRON: Yes.

10       THE WITNESS: Yes.

11  BY MR. McCARRON:

12    Q   What would you need to know in order to
13  evaluate and determine whether a change to a financial
14  statement was significant enough to have changed your
15  underwriting decision?

16    A   I would need to know the degree of change
17  upward or downward and the working capital and equity,
18  what effect this had on existing work, how the existing
19  work changed in profitability, how the existing work
20  had receivables that were not to be received, and how
21  all other related information that I previously
22  referred to, like other work-in process, bank credit,
23  the relationship of the change to other jobs and
24  process would effect it.

25    Q   Can you make a determination about

**Page 464**

1 whether changes to financial statements for CCI
2 Construction would have been material to your
3 underwriting decision without the benefit of restated
4 financial statement?
5     A   I could not.
6     Q   Have you prepared restated or corrected
7 financial statements for CCI Construction?
8     A   No.
9     Q   Do you know whether there exists
10 corrected or restated financial statements for CCI
11 Construction?
12     A   I believe there are.
13     Q   Have you reviewed restated financial
14 statements for CCI Construction?
15     A   No.
16     Q   Who has the restated or corrected
17 statements for CCI Construction?
18     MR. McGLYNN: If it involves any
19 discussions between counsel, I am instructing the
20 witness not to answer.
21     THE WITNESS: I think I couldn't say.
22 BY MR. McCARRON:
23     Q   Do you plan to review restated or
24 corrected financial statements for CCI Construction?
25     MR. McGLYNN: Objection.

**Page 465**

1     THE WITNESS: I don't know at this point.
2 BY MR. McCARRON:
3     Q   How will you determine whether you will
4 review stated or corrected financial statements for CCI
5 Construction?
6     MR. McGLYNN: Objection.
7     THE WITNESS: It's too vague a question
8 for me to give a proper answer to.
9 BY MR. McCARRON:
10     Q   Under what circumstances are you going to
11 review restated or corrected financial statements?
12     MR. McGLYNN: Objection.
13     THE WITNESS: I never thought of that or
14 planned to at this particular point.
15 BY MR. McCARRON:
16     Q   Have you determined whether any of the
17 criticisms expressed in the answers by USF & G to
18 interrogatories which were identified as Phillips 3
19 would have changed your underwriting decision?
20     MR. McGLYNN: Objection. That's been
21 covered in day 2 rather thoroughly.
22     MR. McGLYNN: And it's quarter after.
23 You can answer this last question.
24     THE WITNESS: Probably.
25 BY MR. McCARRON:

**Page 466**

1     Q   I asked you: Did you determine whether
2 any of the problems or criticisms identified in Answers
3 to Interrogatories, which is identified as Phillips
4 Exhibit 2 would have changed your underwriting
5 decision?
6     A   The question must be restated. I don't
7 understand the question.
8     Q   Did you determine whether any of the
9 information which is criticisms by USF & G about the
10 financial statement by Brown Shultz would have changed
11 -- which is included in Answers to Interrogatories,
12 which is identified as Phillips 2 -- would have changed
13 your underwriting decision?
14     MR. McGLYNN: Objection.
15     THE WITNESS: Possibly.
16 BY MR. McCARRON:
17     Q   So does that mean you did not determine?
18     A   Was I the expert who determined this?
19     Q   No. No. Did you determine whether the
20 information included in Phillips Exhibit 2 would have
21 changed your underwriting decision in connection with
22 CCI Construction bonds?
23     A   Yes, it would have changed.
24     Q   Did you make that determination, sir,
25 that the information included in Phillips 2 would have

**Page 467**

1 changed your underwriting decision in connection with
2 CCI Construction bonds?
3     A   Was I asked to make that?
4     Q   No. Did you?
5     A   In my mind?
6     Q   Did you make a determination about
7 whether the information included in Phillips Exhibit 2,
8 which is answers by USF & G to interrogatories, would
9 have changed -- if you had known about it at the time
10 -- would have changed your underwriting decision for
11 CCI Construction bonds?
12     A   Yes.
13     Q   How did you determine whether the
14 information included in Phillips 2 which was answers to
15 interrogatories by USF & G would have changed your
16 underwriting decision?
17     A   By the substantial change in working
18 capital and equity.
19     Q   Do the answers to interrogatories, which
20 are identified as Phillips 2, reflect substantial
21 changes should have been made to working capital and to
22 equity?
23     A   Yes.
24     Q   Identify where in the answers it shows
25 that working capital and equity would have materially

David Hussey - 5/28/02

1

```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
   UNITED STATES FIDELITY
3  and GUARANTY COMPANY

4              Plaintiff

5      vs.                        CIVIL ACTION NO:
                                  NO. 1-01-CV-00813
6  BRUCE BROWN and BROWN,
   SCHULTZ, SHERIDAN & FRITZ
7
              Defendants
8  _____/

9

10             The deposition of DAVID HUSSEY was held on

11  Tuesday, May 28, 2002, commencing at 10:00 A.M., at the

12  Law Offices of The St. Paul Companies, 5801 Smith

13  Avenue, Baltimore, Maryland 21209, before Ronda J.

14  Thomas, Notary Public.

15  APPEARANCES:

16          PETER B. MCGLYNN, ESQUIRE
                On behalf of Plaintiff
17
            JEFFREY B. MCCARRON, ESQUIRE
18              On behalf of Defendants

19

20

21  REPORTED BY:  Ronda J. Thomas, RPR
```

David Hussey - 5/28/02

106

1        MR. McGLYNN: Objection.

2    Q    -- and I'm sorry, I was going to blame you

3 for making me lose, but I don't think I can.

4        MR. McGLYNN: The problem is you hesitate

5 about three or four seconds and I interpret that as

6 meaning you ended the question.

7        MR. McCARRON: If I close my mouth, I think

8 I'm done.

9        MR. McGLYNN: Very rarely you have closed

10 your mouth.

11        MR. McCARRON: I'll try to make the effort

12 of actually closing my mouth.

13        MR. McGLYNN: Why don't we start again.

14    Q    Did your decision to allow bonding for CCI

15 for jobs which included self-performed work which CCI

16 had previously subcontracted, let me start again.

17        Was your decision to approve bonding for

18 CCI for jobs which involved self-performed work by CCI

19 which CCI had previously subcontracted based on your

20 belief CCI could properly self-perform the work which

21 it had previously subcontracted?

107

1        MR. McGLYNN: Objection.

2    A    Yes.

3    Q    What led you to believe CCI could properly

4 and adequately self-perform work which it had

5 previously subcontracted which led to your decision to

6 approve bonding for CCI for jobs which included

7 self-performed work?

8    A    Their track record and that the management

9 team was intact. The management team had made some

10 hires.

11    Q    Is that your complete answer?

12    A    Yes.

13    Q    Can we rule out then financial condition

14 and the amount of money which CCI had as a factor

15 which -- on which your decision to approve bonding for

16 CCI for jobs which involved self-performed work by CCI?

17    A    No.

18        MR. McGLYNN: Objection.

19    A    That would be -- again, they would have the

20 money to lose. That they had more than enough at stake

21 if they made their own mistake, they'd be hurting

108

1 themselves.

2    Q    Mr. Daily was the source of your

3 information about the amount of money which CCI had at

4 stake when you decided to approve bonding for CCI for

5 jobs which included self-performed work?

6        MR. McGLYNN: Objection.

7    A    Yes.

8    Q    Do you know the source of Mr. Daily's

9 information about the amount of money which CCI had at

10 stake when you approved the bonds for CCI for jobs

11 which included self-performed work?

12    A    We have been through this. It was his

13 knowledge of the financials, conversations with the

14 region, that's where he would have developed any

15 understanding about the CCI account.

16    Q    Region being Mike Walter?

17    A    No. It would have been --

18    Q    Harrisburg field office?

19    A    Harrisburg field office.

20    Q    Do you agree USF&G during 1990s was a

21 sophisticated user of financial statements in its

109

1 underwriting?

2        MR. McGLYNN: Objection.

3    A    What do you mean by sophisticated?

4    Q    Was USF&G sophisticated user of financial

5 statements --

6        MR. McGLYNN: Objection.

7    Q    -- in its underwriting for bonding?

8        MR. McGLYNN: How do you define

9 sophistication.

10        MR. McCARRON: I'm asking.

11        MR. McGLYNN: Why don't you ask him how he

12 defines sophistication then. Let's move this along.

13 There are time limits on these depositions and, you

14 know, you've asked questions --

15        MR. McCARRON: Stop using my time, please.

16        MR. McGLYNN: Then ask the question

17 properly.

18        MR. McCARRON: Stop using --

19        MR. McGLYNN: Do it in a succinct manner --

20        MR. McCARRON: Knock it off. You know I

21 don't listen to what you have to say, I never will, I'm

GORE BROTHERS Reporting & Video Co., Inc.        Towson Reporting Company
410-837-3027                                      410-828-4148

David Hussey - 5/28/02

102

1 the day after the effective date or the closing date of
2 the financial statement; is that true?
3     A    It reflects -- the financial statement is
4 the day and time that reflects the condition of the
5 company as of that specific date and time.
6     Q    And not thereafter?
7     A    Not thereafter.
8     Q    You agree that a favorable financial
9 condition as of the closing date or last date of the
10 financial statement period could be remarkably
11 different than the ensuing financial condition
12 following the closing date or last date included within
13 the financial statement period?
14        MR. McGLYNN: Objection.
15     A    It could. But not -- it doesn't
16 necessarily follow that.
17     Q    What did you or anyone else at USF&G do to
18 make sure your understanding about the financial
19 condition of CCI Construction on whether it was
20 profitable, operated on a deficit, gaining or losing on
21 its net worth, increasing equity, had a favorable cash

103

1 position was correct since the issuance of the 1990 or
2 the last date included within the 1997 financial
3 statement when you made the determination not to accept
4 the recommendation of Mr. Daily and authorized the
5 continuation of the bonding of CCI by USF&G?
6        MR. McGLYNN: Objection.
7     A    The discussion that Jim and I would have
8 would center around where we were, where we are and
9 where we're headed. And you would take into
10 consideration how much money they had, the competency
11 of the management and your track record with the firm.
12 Meaning do they accomplish what they set out to do or
13 don't they.
14     Q    Just to be clear, your evaluation of
15 Mr. Daily's opinion not to approve the bonds for CCI
16 during December 1998 took into account how much money
17 CCI Construction had, the track record experience by
18 USF&G with CCI and the experience of CCI's management;
19 is that right?
20        MR. McGLYNN: Objection, I think you used
21 the word bonds?

104

1        MR. McCARRON: I'm sorry.
2        MR. McGLYNN: You used the word bonds
3 plural. The only one I've heard about is Fulkrod. I'm
4 just trying to move this along. If you intended to use
5 the word bonds plural.
6        MR. McCARRON: Okay. I'm going to try
7 again because I don't know what you're talking about.
8     A    If he doesn't know what you're talking
9 about, I don't know what you're talking about.
10        MR. McCARRON: I don't know what he's
11 talking about.
12        MR. McGLYNN: I'm not trying to be an
13 obstructionist, for the last three-quarters of an hour
14 we have been working about the Fulkrod project and
15 Mr. Hussey's decision to approve a bond for that
16 project.
17        MR. McCARRON: Not so, sir. Not if you
18 listen to his answers. He doesn't know if it was in
19 connection with the Fulkrod project.
20        MR. McGLYNN: I'm not talking about his
21 answers, I'm talking about your questions.

105

1     Q    Now, you're not able to say that
2 Mr. Daily's opinion against approval for bonds for CCI
3 once you learned CCI planned to self-perform work it
4 had previously subcontracted was limited to the bonds
5 for Fulkrod project, are you?
6        MR. McGLYNN: Objection.
7     A    No, I'm not.
8     Q    Did your evaluation of the opinion
9 expressed by Mr. Daily not to approve bonding for CCI
10 for projects which involved self-performed work by CCI
11 which had previously been subcontracted take into
12 account any factors other than the amount of money
13 which CCI had the track record of management and the
14 experience which USF&G had with CCI?
15     A    Yes, I believe they could do it. He
16 believed they couldn't. That's as simple as that gets.
17     Q    Well, ultimately did the decision by you to
18 approve bonding for CCI Construction for jobs which
19 involved self-performing work which CCI had previously
20 subcontracted come down to your belief that CCI could
21 adequately do the job?

27 (Pages 102 to 105)



# Byerly
## Insurance
### AGENTS AND BROKERS, INC.

DAVID A. DOMINIANI
EXECUTIVE VICE PRESIDENT

525 North 12th Street
P.O. Box 525
Lemoyne, PA 17043-0525
(717) 761-4010
1-800-872-1127
FAX (717) 761-4320

FILE COPY

November 7, 1997

Mr. John Ortenzio
President
CCI Construction Co., Inc.
203 Lynndale Court
Mechanicsburg, PA  17055-2893

Re:    Bonding Requirements

Dear John:

As you are aware, our current bonding program with USF&G requires your corporate balance sheet to maintain an equity level of no less than $4,800,000.  To clarify, this means that your net equity position cannot fall, at any time, below $4,800,000 or your bonding program may be put on hold.  I realize that this will require you to maintain additional equity above and beyond $4,800,000 to take into consideration the seasonal and monthly fluctuations in profitability.  It is critical that you maintain these levels based on our agreement with USF&G.

If you have any questions, please feel free to contact me.

Sincerely,

David A. Dominiani, CPA
Executive Vice President

DAD/sz
cc:    Bruce Brown

BY 00500

## CCI CONSTRUCTION CO., INC.

### Written Consent of Shareholder
### in Lieu of Special Meeting

**August 27, 1997**

I, the undersigned, being the sole Shareholder of CCI CONSTRUCTION CO., INC., a Pennsylvania corporation, do hereby consent in writing, pursuant to the applicable provisions of the Pennsylvania General Association Act of 1988, as amended, and the Corporation's Bylaws, to the adoption of the following resolutions hereinafter set forth and direct that they shall, in all respects, be deemed as valid actions as though such actions and resolutions had been duly approved and authorized at a joint special meeting of the Shareholder.

WHEREAS, the Shareholder has determined it to be in the Corporation's best interest for the Shareholder to be released of any personal indemnity for surety bonding purposes; therefore, Shareholder has agreed to maintain the equity level of the Corporation no less than $4,800,000 and require an aggregate work program no higher than $60,000,000. If the work program requirements of the Corporation consistently go above the $60,000,000 level and/or the equity level fall below $4,800,000, Shareholder understands that United Fidelity and Guaranty Company reserves the right to discuss the potential need to reinstate personal indemnity.

NOW, THEREFORE, BE IT RESOLVED, that the foregoing resolution is hereby approved and authorized this 27th day of August, 1997.

Sole Shareholder:

CCI CONSTRUCTION CO., INC.

By /John M. Ortenzio/
    John M. Ortenzio
    Director/President

/Sheri L. Phillips/
Sheri L. Phillips
Secretary

| Year Ended | Equity > $4,800,000 | Sales $60 million | Compliance Reviewed | Prepared by | | |
|---|---|---|---|---|---|---|
| 12/31/97 | < 5,500,000 | < 35,000,000 | ✓ | CAR 2/5/98 | | |

BSSF 1890

BS 01853

Form A-1
Page 11 of 12

4. Describe specialized accounting practices or principles applicable to client's industry:

  *% OF COMPLETION TO RECOGNIZE REVENUE*

5. Describe special regulatory or reporting requirements that apply to companies in client's industry:

  *N/A*

6. Describe special regulatory or reporting requirements, for example, SEC, that apply to client:

  *N/A*

7. List primary users of the financial statements:

| Name | Relationship to client |
|---|---|
| CIT & CAT FINANCIAL | LENDERS |
| USF&G (Saint Paul) | SURETY/Bonding |
| DAUPHIN DEPOSIT | BANK |
| MANAGEMENT | |
| BIDS | |

8. Basis of accounting used for financial reporting:

  ☒ Accrual   ☐ Cash   ☐ Income tax   ☐ Other (describe) *% OF COMPLETION*

9. Who are the principal accounting and EDP personnel? List:

| Name | Title or Function | Responsible for: |
|---|---|---|
| Steve Evans (Jackie Scrimshaw) | MR. MFR. | |
| DARLA KUEGMAN | GENERAL. OF OPERATIONS | |
| JIM CROWLEY | SEC/TREAS/CFO | |
| SHERI PHILLIPS | | |
| DEL. APPO | ACCOUNTANT | |
| DARLA MACITE | | |
| JACKIE RUNDZIE | PAYROLL/ACCTS. REC. | |
| TERRI FISHER | | |
| NANCY DELLILLO | ACCTS. PAY/SUBCONTRACTS | |
| SUE BISHEL | ASSTS. PAY | |
| FAITH FRUCHTL | ACCOUNTING ACCTG. FIXED ASSETS ETC | |

5/91

BS 01590

BSSF 1626

Form B-2
**Page 1 of 4**

## CHECKLIST FOR EVALUATING BUSINESS RISK AND
## OVERALL INHERENT AND AUDIT RISK

CLIENT _CCI Construction Co, Inc._        PERIOD ENDED _12/31/96_

### PART I: BUSINESS RISK FACTORS

> Business risk is considered in the audit process in connection with client acceptance or retention decisions and in determining audit scope as follows:
>
> • In selecting the desired precision level of the audit and, therefore, materiality (factors involving user needs and expectations)
>
> • In selecting a maximum acceptable audit risk level, used in conjunction with assessed inherent and control risk factors, to determine detection risk.
>
> *In completing PART I, indicate the presence or absence of a risk factor by checking the box at the right. (Complete the column at the right in accordance with the instructions in PART II after completing PART I.)*

|  |  | YES | NO | PART II CODE |
|---|---|---|---|---|

**A. FACTORS INDICATING HIGHER AUDIT PRECISION LEVELS (LOWER MATERIALITY)** (Some of these may also require reducing APM levels below 1/3 of MTM; see Form B-3.)

1. Are the client's securities publicly held? — ☐ ☑ ___

   If yes:        ☑ N/A

   a. Are they widely held? — ☐ ☐ ___

   b. Are securities holders primarily institutional? — ☐ ☐ ___

   c. Are securities heavily traded (high volume), or have unusually volatile prices or high or low price/earnings ratio? — ☐ ☐ ___

   d. Is there evidence of significant attention to client's financial statements and affairs by securities analysts, stock exchanges or the SEC? — ☐ ☐ ___

2. Is the client planning or contemplating a public (or private) offering of securities? — ☐ ☑ ___

3. Is the client planning or contemplating a sale of the business or a significant portion thereof, has there been recently, or is there likely to be soon, a significant change in ownership interests? — ☐ ☑ ___

   a. If yes, will the sale price be dependent, or subject to adjustment based upon amounts to be reported in the financial statements? ☑ N/A — ☐ ☐ ___

4. Are there (or will there likely be) significant creditors who are financial statement users? — ☑ ☐ _0_
   _Bank is the user - no funds drawn on LCC / Bonding Co. is also user_
   If yes:        ☑ N/A user

   a. Are there (or will there likely be) debt covenant tests related to the financial statements, compliance with which will likely be relatively marginal or uncertain? — ☐ ☑ ___

   b. Has the client had less than satisfactory relationships with its lenders? — ☐ ☑ ___

5. Are there indications of significant or unusual related party transactions, possible irregularities or illegal acts, transactions questionable as to business purpose, or other potentially user-sensitive matters? _transactions with related parties do occur however, they are not considered significant or unusual._ — ☐ ☑ ___

6. Have the client's financial statements or affairs received, or are they likely to receive, unusual scrutiny by financial statement users, regulators (other than stock exchanges or the SEC) or litigants? _user: mgmt, bank - bonding co. - no unusual scrutiny_ — ☐ ☑ ___

7. Will our work be subject to review by a regulatory agency, litigant or a principal auditor? — ☐ ☑ ___

8. Will we likely be succeeded by another audit firm? — ☐ ☑ ___

9. Other? _____        BSSF 1061 — ☐ ☑ ___

_____

10/94        Copyright © 1993, 1994, Richard A. Eisner & Company. All rights reserved.

BS 00772

# CCI CONSTRUCTION CO., INC.

## Written Consent of Shareholder
### in Lieu of Special Meeting

### August 27, 1997

I, the undersigned, being the sole Shareholder of CCI CONSTRUCTION CO., INC., a Pennsylvania corporation, do hereby consent in writing, pursuant to the applicable provisions of the Pennsylvania General Association Act of 1988, as amended, and the Corporation's Bylaws, to the adoption of the following resolutions hereinafter set forth and direct that they shall, in all respects, be deemed as valid actions as though such actions and resolutions had been duly approved and authorized at a joint special meeting of the Shareholder.

WHEREAS, the Shareholder has determined it to be in the Corporation's best interest for the Shareholder to be released of any personal indemnity for surety bonding purposes; therefore, Shareholder has agreed to maintain the equity level of the Corporation no less than $4,800,000 and require an aggregate work program no higher than $60,000,000. If the work program requirements of the Corporation consistently go above the $60,000,000 level and/or the equity level fall below $4,800,000, Shareholder understands that United Fidelity and Guaranty Company reserves the right to discuss the potential need to reinstate personal indemnity.

NOW, THEREFORE, BE IT RESOLVED, that the foregoing resolution is hereby approved and authorized this 27th day of August, 1997.

Sole Shareholder:

CCI CONSTRUCTION CO., INC.

By _____
John M. Ortenzio
Director/President

_____
Sheri L. Phillips
Secretary

*Note that all audit evaluations are made with respect to projected misstatement. If PART III, line 5, exceeds line 6, results are unacceptable. Also, if any individual proposed adjustment listed, or the total in column B on line 18 in either PART I or II, exceeds line 6, results may be unacceptable (if user-sensitive financial statement line items are materially misstated). Also, if the column B total on line 18 for the direction opposite the primary direction of risk (if any) exceeds 50% of the amount on line 6, it could mean we have underassessed inherent risk in the opposite direction (or we have misdetermined the primary direction) and should consider whether more auditing in the opposite direction is warranted.  Comment in PART VI regarding such results, and indicate what further action, if any, is taken, or if none is needed, why not.*

## PART IV: RE-EVALUATION OF MAXIMUM TOLERABLE MISSTATEMENT (MTM) AND ACCEPTABLE PROJECTED MISSTATEMENT (APM)

1.  a.  Original planning materiality base (Form B-3, line 3)          $ 45,000,000
    b.  80% of line 1a                                                 $ 36,000,000
    c.  120% of line 1a                                                $ 54,000,000
    d.  Total audited revenue                                          $ 50,534,453
    e.  Total audited assets                                           $ 54,614,448

> If the greater of line 1d and 1e is less than line 1b, a recomputation of MTM and APM, subject to any further adjustment indicated in line 2, is necessary for evaluation purposes.  If the greater of line 1d and 1e exceeds line 1c, a recomputation of MTM and APM, subject to any further adjustment indicated in line 2, is permissible, if necessary, for evaluation purposes.

2.  Based on all information obtained during the course of the audit, I have reviewed the business risk factors in PART IA of Form B-2, reconsidered the audit precision level selected on Form B-3, line 1, and decided that the MTM percentage originally selected on Form B-3 (line 4) should (check one):

    a. ☑ remain the same.    b. ☐ be changed to _____% for the following reason(s):

    _____

    _____

    _____

3.  If box 2b is checked, recompute MTM and APM (as per lines 4 and 5 of Form B-3).          N/A ☑

    If you have reason to believe that client's materiality base for the next audit period will be significantly smaller than the current audit period (indicating the possibility that the current period's waived adjustments will cause material misstatement in the succeeding period), recompute APM (but not MTM),          N/A ☐

    or if client is resisting further adjustments, and you nevertheless believe the financial statements would not be materially misstated if APM were adjusted upward (to a maximum of 50% of MTM, subject to appropriate approval), recompute APM (but not MTM).          N/A ☑

    Enter results below:          N/A ☑

    a.  Revised MTM $_____      b.  Revised APM $_____      (to PART III, line 6)

4.  If revised MTM is lower than the original MTM, indicate below how audit scope has been (or will be) increased as a result, or if not, why not (if more space is needed, attach separate memorandum):          N/A ☑

    _____

    _____

    _____

5.  If special presentation and disclosure APM thresholds are needed, refer to, review and revise (if necessary) or prepare Form B-3A (line 1) and compare results appropriately on a separate attachment to Form B-10.          N/A ☑

BSSF 2209



**CONSTRUCTION**

RECEIVED

SEP 0 8 1997

BOND DEPT.
HARRISBURG, PA.

September 5, 1997

*Noted T.P.*

Mr. Anthony S. Phillips
Bond Manager
United States Fidelity and
  Guaranty Company
Post Office Box 188
Harrisburg, PA  17108-0188

Dear Tony:

I understand as part of our agreement to release my personal indemnity for surety bonding purposes, I will maintain the equity level of CCI Construction Co., Inc. no less than $4,800,000 and require an aggregate work program no higher than $60,000,000. Should the work program requirements consistently go above the $60,000,000 level and/or the equity level fall below $4,800,000, I understand that USF&G reserves the right to discuss the potential need to reinstate personal indemnity.

Sincerely,

CCI CONSTRUCTION  CO., INC.

John M. Ortenzio
President

cc:   David A. Dominiani
      Byerly Insurance Agents and
         Brokers, Inc.

USFG/BS  0908

CCI CONSTRUCTION CO., INC.

Mailing Address:
P.O. Box 1129
Mechanicsburg, PA  17055-1129
Telephone:  (717) 691-3600

Street Address:
203 Lynndale Court
Mechanicsburg, PA  17055-2893
FAX:  (717) 796-9300



# **DJL** Associates, Inc.

(717) 441-1600
Fax (717) 441-1605

DAVID A. DOMINIANI, CPA
*President*

August 17, 1998

Mr. Tony Phillips
USF&G
2605 Interstate Drive, Suite 200
P.O. Box 188
Harrisburg, PA 17108-0188

RECEIVED
AUG 1 8 1998
BOND DEPT.
HARRISBURG, PA.

Re:    CCI Construction - Financial Projections

*Copy to H.O. Bob Dillon 8/18/97*
*JS*

Dear Tony:

As we discussed in detail, I am submitting for your review CCI Construction Company, Inc.'s internal financial statements for the six months ended June 30, 1998. As you are aware, they are off to a significantly slow start for 1998, but the outlook is to finish the year strong. Their projections at this time are to achieve $60,000,000 in revenue and, as you can see, they have only generated $17,000,000 through the first half of the year. There were some profit fades on some jobs in the beginning of 1998, specifically the Mahanoy and Houtzdale Prisons which were caused by common issues. I will explain that in further detail later on.

As you are aware, the company is going through some significant changes, building their capabilities in both the mechanical and civil areas. They have invested substantially in equipment and are about to finance approximately $2,000,000 worth of that equipment over four years through CIT. That will improve the cash position once again.

As you can see, CCI is reflecting a $1,600,000 loss through six months. However, they will turn that number around by 12/31/98. I have included with this report the profit projections by project for 1998. Please kind in mind that these numbers are conservative and suggest that the projected loss from operations in 1998 will be approximately $200,000. This will be offset by investment income and in addition, please remember that we have PCIC available to fund warranty claims if we choose to utilize it. As you are aware, we funded almost $900,000 into PCIC last year for warranty coverages on existing projects. There is approximately $2,000,000 funded into that insurance vehicle and can be drawn on for warranty claims at any time. CCI can actually use this as a buffer to offset losses or profit fades on certain jobs during any given year. That is an additional feature that none of my other contractors have available to them.

As you can see for 1998, the projected overhead is going to be approximately $3,200,000 of which $700,000 is depreciation. In 1997, in total, CCI only had $150,000 depreciation. In addition to the depreciation increase, CCI has staffed up with professionals in the

---

Mr. Tony Phillips
August 17, 1998
Page 2


mechanical and civil areas so that they can self perform that work in the future. They see that as giving them not only a competitive advantage on existing general construction jobs, but also will diversify them into other opportunities.

With respect to the Mahanoy and Houtzdale Prison projects, the majority of the problem was a mechanical subcontractor, Bennett Heating & Air Conditioning, that went out of business in the middle of those jobs. Bennett had quoted both prisons and they were currently doing a fine job on the UEPH project. CCI was forced to jump in and self perform on both of those jobs and it cost them a significant amount of money. There were also profit fades and/or poor estimates on the pre-engineer piping (the underground portion), the pump packages, the utility work and there was also a mason problem on Mahanoy Prison. As usual, CCI managed through these processes in an effective manner, but obviously cost them some significant dollars. There was about $500,000 in profit fades on those two jobs alone reflected in 1998.

The additional loss is strictly caused by CCI being unable to bill work in the beginning of 1998. However, the good news is that they have a solid profitable backlog as of this date and their projections for profits for the second half of the year appear to be conservative. Please keep in mind above all else that we have a solid long term track record with CCI in managing their way through these processes. They continue to have a very solid balance sheet and we will continue to meet the minimum equity requirements that we have discussed previously. John Ortenzio is well aware of those commitments and will do whatever is necessary to assure us that they will be satisfied including utilizing PCIC.

I appreciate your continued support of John and his fine organization. We are in a growth mode and going through a transition in building up the mechanical and civil areas of the organization. I have no concerns or doubts about CCI being able to meet the projections that we have suggested. We will be getting additional internal financial information along the way to monitor their progress in 1998. Thanks again for your support and should you have any questions, please feel free to contact me at your convenience.

Sincerely,

David A. Dominiani, CPA
President

USFG/BS 0925

DAD/sz
Enclosures

'08-14-98 11:14AM  FROM CCI CONSTRUCTION CO   TO 4411005                P.017/001

# CCI - PROJECTED PROFIT ANALYSIS

| JOB NUMBER | CONTRACT VALUE | PROJECTS | TOTAL G/P PROJECTED | 1996 | 1997 | 1998 | 1999 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| 454 | 14,321,036 | ALBEMARLE PRISON | 1,808,809 | | | 818,338 | 990,471 | 1,808,809 |
| 435 | 45,566 | BIENVILLE FAC BILOXI | 25,847 | | 17,347 | 8,500 | | 25,847 |
| 421 | 2,397,292 | CAPITAL ELECTRICAL | 727,965 | 482,128 | 247,799 | (1,962) | | 727,965 |
| 442 | 731,888 | CAPITAL PORTICOES | 94,683 | | 69,607 | 25,076 | | 94,683 |
| 418 | 7,783,855 | CAPITAL SPRINKL-A | 1,773,180 | 1,654,398 | 216,351 | (97,569) | | 1,773,180 |
| 438 | 191,713 | CAPITAL SPRINKL-H | 12,721 | | 13,582 | (861) | | 12,721 |
| 437 | 1,304,525 | CAP RENOV-WINDOW | 115,187 | | 140,126 | (24,939) | | 116,187 |
| 436 | 15,500,000 | GERMPLASM CTR | 930,000 | | | 203,553 | 726,447 | 930,000 |
| 460 | 15,636,610 | HOUTZDALE PRISON | (345,760) | | (82,935) | (262,825) | | (345,760) |
| 445 | 3,288,600 | JOHNSTOWN TRAFFIC | 35,739 | | 1,652 | 18,609 | 16,078 | 35,739 |
| 450 | 6,981,398 | LORD FAIRFAX | 458,418 | | (234,619) | 389,713 | | 458,418 |
| 451 | 11,017,675 | MAHANOY PRISON | 256,000 | | | 157,235 | | 256,000 |
| 439 | 3,850,000 | OUTLOOK-Chesterfield | 218,836 | | | 185,671 | 33,165 | 218,836 |
| 461 | 4,600,214 | OUTLOOK-Creekview | 571,058 | | | 426,258 | 144,802 | 571,058 |
| 448 | 5,235,000 | OUTLOOK-Hilliard | 63,500 | | | 34,524 | 28,976 | 63,500 |
| 458 | 204,940 | PA TURNPIKE COMM | 1,265,120 | | | 553,785 | 711,335 | 1,265,120 |
| 453 | 12,791,714 | PERRY POINT-MD | 821,897 | | | 612,888 | 209,008 | 821,897 |
| 455 | 13,688,277 | SCOTT A F BASE | (35,913) | | 4,800 | (40,713) | | (35,913) |
| 459 | 1,414,420 | UEPH - CD HQTRS. | 350,000 | | | 123,885 | 226,005 | 350,000 |
| 449 | 19,080,288 | U.E.P.H. (Includes Barracks) | 1,837,313 | | 1,885,254 | (47,941) | | 1,837,313 |
| 426 | 5,200,000 | WESTERVILLE, OHIO | 788,250 | | | 63,050 | 726,200 | 788,250 |
| | 17,765,000 | ESTIMATED WORK | | | | | | |
| 462 | | MISCELLANEOUS | 80,622 | | | 80,622 | | 80,622 |
| | 158,017,889 **TOTAL** | | 11,413,852 | 2,136,524 | 2,383,022 | 3,000,017 | 3,914,289 | 11,413,852 |

EST OVERHEAD FOR 1998..    (3,197,024)

PROJECTED LOSS ON OPERATIONS IN 1998    (197,027)

11:08 AM   8/14/98

SUMMARYREVLR8.xls

USFG/BS 0926

**USF&G INTEROFFICE CORRESPONDENCE**

**DATE:** 4/15/98

**TO:** H.O. Surety, Jim Daily, Mail Code: LB0202

**FROM:** Harrisburg Surety Dept., Steve Salazar

**SUBJECT:** CCI Construction Company, Inc. - Annual Review
Stress Score as of 3/97: 29 (Yellow)
Bear Flags: A20-Gross Profit Fade Factor is greater
than 20%; M01-Equity less than 10% of Total Program.

Review of the 12/31/97 CPA audit on CCI Construction Co.
prepared by Brown, Schultz, Wormleyburg, Pa.

<u>Principles</u> <u>of</u> <u>Accounting:</u> Income is reported on the
percentage of completion, cost to cost basis, while the
company has elected Subchapter S. Corp. status for federal
tax reporting purposes.   Effective January 1, 1995, the
company re-established itself as a Pennsylvania corporation
and changed its name to CCI Construction Company, Inc.

Depreciation is provided using an accelerated method over the
estimated useful lives of the respective assets.

<u>Background:</u> Business started in 1990 by the current principal
and was a spin-off of Commercial Construction, Inc., with all
assets and liabilities being transferred from Commercial
Construction, Inc. to CCI Construction Co.   CCI is general
contractor specializing in the construction of and renovation
of hospitals and healthcare facilities.   The company is also
involved in the general construction of institutional and
commercial buildings and operates in the contiguous United
States.   John Ortenzio is the president and 100% owner.   He
has 23 years experience in construction and has been the
president of CCI for over 10 years.   Shane Miller is the Sr.
Vice president and Chief Operating Officer and has been with
the company since May of 1991.   He has been an executive in
construction for over 10 years working previously for Howard
Elec./Mech., Denver, Co.; Leon Wintermyer, Lemoyne, Pa.; and
Campbell Resign Group, St. Louis, Mo.   Dave Barber is Chief
Financial Officer and has been with CCI since 1986.   Prior to
joining CCI he was comptroller for a rehab. hospital in
Pleasant Gap, Pa.

<u>Continuity:</u> The business is 100% owned by John Ortenzio.
He has a $1,000,000 key-man life policy payable to the
construction company and working trusts set up for continuity
purposes in his will.

<u>Operations:</u> Sales increased from $24,466,000 last year to
$34,922,000 this year, an increase of $10,456,000.   Gross
Profit increased from $1,319,000 last year to $2,304,000 this
year.   The Gross Margin increased from 5.4% to 6.6%.   Due to
the increase in sales, G&A expenses showed a corresponding
increase from $1,180,000 last year to $1,954,000 this year.
This resulted in income from operations increasing from
$139,000 last year to a $302,700 this year.   Investment

USFG/BS 1252

income also increased from $275,000 to $368,000.  The
increase in income from operations and investment income
resulted in a significant increase in net profit from
$363,000 last year to $707,000 this fiscal year-end.

Working Capital: Working capital decreased slightly from
$4,281,000 last year to a still strong $3,965,000.  This was
due to purchases of additional equipment during the year.
Please note that the contractor's working capital remains
highly liquid consisting of cash and cash equivalents of
$1,128,000 and marketable securities of $3,703,000.

Balance Sheet: Account remains in a strong financial position
with working capital of $3,965,000 and net worth of
$5,454,800.  The Debt/Equity ratio increased from (1.0 to 1)
to (2.07 to 1.) due to an increase in accounts payables and
equipment debt.  All material receivables are fully
collectable.  Cash and marketable securities totaled
$4,831,000 and CCI was borrowing zero on the $1,000,000
working capital line of credit.

Work-in-Progress: Profits are being maintained on WIP.  The
gross margin on work-in-progress is 4.5%. The Fade Factor A
Flag was due to the losses on the $10,289,000 Mahanoy Prison
and $10,357,000 Houtzdale prison projects.  All other
projects in progress and completed in 1997 were profitable.

|                        | 12/31/97     | 12/31/96      |
|------------------------|--------------|---------------|
| Total Contract Price   | $55,747,000  | $ 31,120,000  |
| Revised Gross Profit   | $ 2,502,000  | $  4,162,000  |
| Gross Margin           | 4.5%         | 13.4%         |
| Backlog                | $26,191,000  | $ 17,599,000  |

Long-term Debt: No long-term debt.

Contingent Liabilities: None.

Affiliates: None.  Medcom Resource Corporation and CRI
General Contractors are no longer active related companies.

Bank Relations: CCI continues to have a strong relationship
with their bank, Dauphin Deposit, Harrisburg, Pa.  Dauphin
Deposit has established an unsecured working capital line of
credit in the amount of $1,000,000 at the bank's prime rate.

Relations: Account has been with USF&G since 1993 and
continues to be one of the Harrisburg Branch Office's
premiere accounts.  During 1997, 9 final bonds were written
generating contract bond premiums of approximately $218,000.
A history of the account reveals a single job consideration
of $62,000,000 on the DGS Houtzdale State Correctional
Institution when the account was acquired.  The largest total
work program consideration was $117,000,000 which also
occurred when the previously mentioned $62,000,000 project
was approved.  The contractor has actually assumed total work
programs in the $75,000,000-$80,000,000 range during 1994.

Insurance: Byerly Insurance Agency handles both the insurance
and bonds.  The account has adequate insurance in place.

<u>Recommendations:</u> The Harrisburg Branch Office strongly recommends the continuance of the Merit Rate approval on the account and renewal of our Specific Discretionary Authority of single job $15,000,000 and $75,000,000 total work program.

USFG/BS 1254

# Byerly
## Insurance
### AGENTS AND BROKERS, INC.

525 North 12th Street
P.O. Box 525
Lemoyne, PA 17043-0525
(717) 761-4010
1-800-872-1127
FAX (717) 761-4320

July 21, 1994

STEVE SALAZAR
USF&G BOND DEPT
3211 N FRONT STREET
HARRISBURG PA  17110

JUL 25 1994

**RE:  CCI Construction Company**

Dear Steve:

I met with Dave Barber, Shane Miller, and Doug McAninch from CCI yesterday to discuss the questions in your July 14, 1994 letter. With respect to the profit fades listed in your memo, please understand the time frame we are talking about.  The most significant reason for these profit fades is the extreme winter weather, which caused delays, extra costs, and significant inefficiencies on all of these jobs.  In addition, please keep in mind that CCI takes a very conservative approach in preparing their work in progress reports.  Shane Miller informed me that on the NCI, and ABE Airport projects there are additional revenues and/or change orders which will be processed sometime in the future.  All of the additional costs are built into the estimates, but there are no projections for the revenues that will be received for these additional change orders.

On the Bloomsburg B-1 project, there were several delays and problems created by the owner.  However, since this was one of CCI's first local projects, they decided not to pursue recovery of additional costs due to goodwill and reputation issues with the owner.  CV Middle School is a similar issue.  Beyond the major weather issue, CCI is a multiple prime, and several other prime contractors have created some problems and delays.  Since this is a very visible local project, CCI is willing to absorb some of the additional costs to preserve goodwill and future opportunities.

With respect to the gross margin being very thin on many projects, I don't think that surprises any of us.  As you are well aware, CCI is totally reliant on the competitive bid arena in 1994, and although they have been very competitive, the realization is that the margins, if you are to be a successful low bidder, are extremely thin.

In reaction to the low profit margins, CCI has taken drastic measures with respect to overhead.  The 12/31/93 CPA prepared financial statements, if you combine the G & A costs and

USFG/BS  0870

**Steve Salazar**

the indirect costs, the total overhead for 1993 was $4,000,000. The total overhead for 1994 is approximately $2,500,000 if you combine G & A and indirect. This represents a $1,500,000 reduction in overhead costs for the year. In addition to closing down their California operation, CCI has streamlined the Mechanicsburg workforce and cut overhead in almost every major category. I think that our initial confidence in John Ortenzio and his management team are truly evident in 1994 when these measures need to be taken quickly and completely.

Dave Barber will be providing me with the June 30, 1994 internal financial statements as well as work in process reports and budget information. Dave informs me that the original budget showed revenue projections for 1994 to be approximately $55,000,000. However, this included the University of California at Davis project which has since folded, and a certain amount of Continental Medical Systems work which has never happened, and a Penn National start to be sometime mid-year 1994. We understand that the project now will not start at best until late 1994.

Due to these lost or delayed opportunities, the estimated revenues for 1994 are now only $35,000,000. That combined with a poor winter and extremely competitive bidding, CCI has needed to streamline the overhead and make drastic reductions in order to salvage the year.

Due to the slow winter start, CCI will show a small loss at June 30, 1994. Dave Barber and Shane Miller are confident that with the current work on the books, this loss will be reversed by December 31, 1994. They anticipate a break even year or small profit.

We have had recent discussions about the work on hand approaching our capacity. I discussed that issue in detail with Shane, Dave and Doug, and they understand our position clearly. However, we must factor in the Penn National project, which is absorbing $26,000,000 bond capacity right now, and USF&G has not yet issued a bond on that job. The bond will be required when the construction phase starts, and at this time there are no significant resources or working capital required for this project. I feel that it is appropriate to discount the impact of the Penn National project as we approach our capacity. I will have further discussions with you on that issue as needed.

I trust that this information satisfactorily answers your questions. I feel that several of the responses and measures taken in 1994 truly demonstrate the competence of the CCI management team. The fact that they have extremely timely and accurate information to work with and they are willing to take quick and drastic measures to adjust overhead and react to what the

# REAL ESTATE/CONSTRUCTION



**John M. Ortenzio**
**CCI Construction**

**AWARD RECIPIENT**

After college, when most graduates are looking for a job to start their careers, John M. Ortenzio already knew he wanted to go into business for himself. Working for someone else was just a rung on the ladder of getting to the top on his own.

Ortenzio began as an apprentice carpenter, then worked at a real estate development company where he gained the experience he'd need to go it alone. He founded CCI Construction Co. in 1984. Much of the early work was performed in Florida through a partnership with Rehabilitation Hospital Services

Corp.

In the early years, there was a lot of travel involved. Most of CCI's projects were out of state, and Ortenzio was responsible for planning and implementing business administration, contract negotiations, labor relations and on-site project management. In the mid 1980s, the company grew, particularly in the health care industry, and expanded its offices to Florida and California within a span of five years.

CCI Construction is ready to tackle the 1990s with a new strategic plan and restructured management team. CCI redirected its resources to the Pennsylvania market and eventually the public-sector work, and CCI has positioned itself for the marketplace of the 1990s. Flexibility is one of the keys to CCI's success.

As the construction economy has changed over the past five years, so has CCI. Private development of the 1980s has been replaced with larger, well-established construction companies. The company also opened an office outside of Washington, D.C. with plans to develop in that area.

Recently, the firm was awarded a major contract to build Penn National Insurance Co.'s headquarters facility in downtown Harrisburg.

CCI has moved fast and kept on top of a changing economy with careful planning, research and study. It has positioned itself not only for the 1990s, but for the year 2000 and beyond.

## VITAL STATISTICS

**Nominee:** John M. Ortenzio
**Title:** President
**Company:** CCI Construction
**Business:** General contractor/construction manager
**Location:** Mechanicsburg
**Year Established:** 1984

USFG/BS 0860

# When pushing the limits of performance, you need the Ernst & Young team behind you.



## ERNST & YOUNG ENTREPRENEURIAL SERVICES
*"Our only business is entrepreneurs."*

USFG/BS 0861



Entrepreneur Of The Year

# The 1994 Entrepreneur Of The Year Awards

ERNST & YOUNG

Inc.    Merrill Lynch

BUSINESS JOURNAL    WHFSB

USFG/BS 0862



# *W*ith *A*ppreciation

Ernst & Young and national co-sponsors <u>Inc.</u> Magazine and
Merrill Lynch extend their thanks and appreciation to the
distinguished panel of judges whose job it was to select
this year's Entrepreneur Of The Year award recipients.

**S. Dale High**
*High Industries, Inc.*

**Marlin Miller, Jr.**
*Arrow International, Inc.*

**Allan S. Noddle**
*Giant Foods, Inc.*

**Rocco A. Ortenzio**
*Continental Medical Systems, Inc.*

**Sandy Solmon**
*Sweet Street Desserts*

**Thomas W. Wolf**
*Wolf Organization*

**Kenneth L. Wolfe**
*Hershey Foods Corporation*

**Joyce S. Zeigler**
*Technology Council of Central Pennsylvania*

USFG/BS 0863



# $P$ROGRAM

Thank you for joining us in honoring
Central Pennsylvania's outstanding entrepreneurs.

Reception - 6:00 p.m.

Dinner - 7:00 p.m.

## WELCOME AND INTRODUCTIONS

**Lester S. Fry, Jr.**
*Managing Partner Central Pennsylvania Practice*
*Ernst & Young*

Thomas E. Philips
*First Vice President - Complex Director*
*Central Pennsylvania Complex*
*Merrill Lynch*

Terry C. Kile
*General Manager*
*WHP 580*

## AWARDS PRESENTATION

Jeffrey J. Vrabel
*Director of Entrepreneurial Services*
*Central Pennsylvania Practice*
*Ernst & Young*

David A. Schankweiler
*Publisher*
*Central Penn Business Journal*

USFG/BS 0864

# THE FINALISTS

## EMERGING

| | |
|---|---|
| Rebecca J. Chick | Alternatives in Health Care Management, Inc. |
| Donald J. Farinelli | Farinelli Construction Inc. |
| Daniel L. Harple, Jr. | InSoft, Inc. |
| Jeffrey L. Kissling | Soft Systems Engineering, Inc. |

## MANUFACTURING

| | |
|---|---|
| Robert D. Fogal, Sr. | International Marketing, Inc. |
| Franklin C. Schoch | M.G.P., Inc. |
| James M. Stine | Cressona Aluminum Company |
| Marlin S. Walmer | Electron Energy Corporation |
| Richard Witwer | Kalas Manufacturing, Inc. |

## CONSTRUCTION

| | |
|---|---|
| Paul E. Lehman | Paul E. Lehman, Inc. |
| John M. Ortenzio | CCI Construction Company |

## SERVICES

| | |
|---|---|
| Donald C. Donagher, Jr. | Central Credit Control |
| Kevin M. Harter | Keystone Medical Systems |
| Joseph T. Maurer | |
| Anthony A. Pascotti | The Underwriters' Group |
| Alan D. Todd | ADT Data Systems, Inc. |
| Gary R. Seibert | KidSports International |

## SOCIALLY RESPONSIBLE

| | |
|---|---|
| Dawn A. Magaro | Access to America, Inc. |
| Donald F. Mazziotti | Delta Development Group, Inc. |
| Thomas M. McMahon P.E. | Entech Engineering Inc. |
| Gail Siegel | Children's Play Room Inc. |

USFG/BS  0865



# THE FINALISTS

## SUPPORTER OF ENTREPRENEURSHIP

| | |
|---|---|
| Thomas S. Capello | First Capitol Bank |
| David Benson Carver | Y.C.I.D.C. |
| Gerald K. Morrison | Buchanan Ingersoll |

## MINORITY / WOMAN ENTREPRENEUR

| | |
|---|---|
| Shaun N. Balani | Travel Time Travel Agency, Inc. |
| Anne Beiler | Auntie Anne's |
| Trish Greenberg | Movie Merchants |
| Janie Robins | |
| Hasu P. Shah | Hersha Enterprises Ltd. |
| Anil C. Thakrar | Anil C. Thakrar |

## RETAIL

| | |
|---|---|
| Ann Barnett | The Kichen Works |
| Stephen Barnett | |
| Wayne Block | Block Business Systems |
| Gary W. Croft | Pennsylvania Prescriptions, Inc. |
| Philip R. Wenger | Isaac's Deli, Inc. |

## TURNAROUND

| | |
|---|---|
| J. Albert Dame | Dame Media, Inc. |
| John D. DeFelice | Precision Components Corp. |

## MASTER ENTREPRENEUR

| | |
|---|---|
| James E. Grandon, Jr. | Jack Gaughen Realtor |
| Donald B. Stabler | Stabler Companies Inc. |



# SPONSORS

### ≡Ⅱ ERNST & YOUNG

Ernst & Young Entrepreneurial Services is a nationwide organization of professionals dedicated solely to the service of owner managed businesses. Ernst & Young is the leading international professional services firm with 64,000 people in more than 600 cities in over 100 countries, including 20,000 people in more than 100 U.S. cities.

### Inc. MAGAZINE

Inc. is the magazine for growing companies. It is circulated to 2.4 million business owners and managers. Inc. features news of entrepreneurial businesses, management, finance, personnel, marketing, and other issues critical to the business community.

### 🦁 Merrill Lynch

Merrill Lynch Business Financial Services is a leader in providing small and mid-sized businesses with a range of comprehensive, efficient and convenient investment, financing and employee benefit services throughout the business life cycle. Merrill Lynch currently provides services to more than 450,000 business owners, through 11,000 Financial Consultants in over 450 offices nationwide.

### CENTRAL·PENN BUSINESS JOURNAL

CENTRAL PENN BUSINESS JOURNAL is a bi-weekly newspaper read by more than 50,000 business owners, managers and executives. It covers commerce news in the Harrisburg, Lancaster and York metropolitan areas, and also provides readers with insights into specific industry topics, ranging from health care to business and the environment, through its Inside Business section.

### WHP580

WHP 580 provides a full News, Information, Entertainment and Service package to the population reached by its powerful signal in Central Pennsylvania. WHP 580 provides a full-time coverage of special events. Programming includes stimulating talk shows, where people of diverse views and ages turn to discuss any topic, with all types of opinions welcomed.

USFG/BS 0867



# BANQUET PATRONS

## AMP

Still thriving on the entrepreneurial spirit in which it was founded more than 50 years ago, AMP today is the world's supplier-of-choice for complete interconnection systems, products and services. Meeting the electronic, optical, electrical, and business requirements of industry worldwide, from locations in 36 nations, AMP delivers local attention and world-class service around the globe. 1993 sales $3.45 billion, employment 27,200.

## Buchanan Ingersoll
### PROFESSIONAL CORPORATION

Buchanan Ingersoll ranks among the oldest, most experienced law firms in the mid-Atlantic region. As one of the few state-wide firms with an established Central Pennsylvania practice, our Harrisburg office is comprised of experienced attorneys with roots in the legal, business and governmental communities. The firm has additional offices in Philadelphia, Pittsburgh, Miami, Tampa, Princeton and Lexington.



## Capital BlueCross
## Pennsylvania BlueShield
Independent Licensee of the
Blue Cross and Blue Shield Association

Capital Blue Cross and Pennsylvania Blue Shield provide health insurance coverage for businesses, families and individuals throughout central Pennsylvania. Working in partnership and through their subsidiaries, the companies offer a wide range of health benefit options - from traditional health insurance to managed care options and third-party administrative services. Serving subscriber needs since the 1930's, the companies continue as recognized leaders in the health insurance industry.

## Edison
VENTURE FUND

Edison Venture Fund provides financing and guidance to growing companies in the Midatlantic Region through offices in Harrisburg, Lawrenceville, NJ and Washington, DC. Edison seeks promising enterprises with unique products, services and market opportunities. Edison has invested in 50 companies, including 15 companies in Pennsylvania. Edison's capital pool exceeds $150 million, with an average initial investment of about $2 million.

*(Patrons continued on back page)*

USFG/BS 0868



# $\mathcal{B}$ANQUET $\mathcal{P}$ATRONS



**Hershey Foods Corporation**

Hershey Foods Corporation, a leading North American producer of
chocolate, confectionery and pasta products, is celebrating its 100th
anniversary this year! For a century, Hershey Foods Corporation has
produced great-tasting products that have become American traditions.

**TECHNOLOGY
COUNCIL
OF CENTRAL
PENNSYLVANIA**

The Technology Council of Central Pennsylvania is a division of Eastern Technology
Council - a 750-member networking association whose members include
technology-driven companies and organizations. Members have access to over
100 free technology briefings, telecommunications discounts, venture capital funds,
mentoring programs, as well as several other entrepreneurial services that encourage
business relationships which in turn help grow the region's economic base.

**ACKNOWLEDGMENT:**

*Preproduction video services underwritten by PHICO Video Center.*
*Awards Banquet floral designs underwritten by Royer's Flowers.*

**USFG/BS 0869**

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

# AU Section 230

## *Due Professional Care in the Performance of Work fn \*(1)*

**Source: SAS No. 1, section 230; SAS No. 41; SAS No. 82.**

**Issue date, unless otherwise indicated: November, 1972.**

.01     The third general standard is:

> Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report. fn 1(2)

[As amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

.02     This standard requires the independent auditor to plan and perform his or her work with due professional care. Due professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting. [As amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

.03     *Cooley on Torts*, a legal treatise, describes the obligation for due care as follows:

> Every man who offers his services to another and is employed assumes the duty to exercise in the employment such skill as he possesses with reasonable care and diligence. In all these employments where peculiar skill is requisite, if one offers his services, he is understood as holding himself out to the public as possessing the degree of skill commonly possessed by others in the same employment, and if his pretentions are unfounded, he commits a species of fraud upon every man who employs him in reliance on his public profession. But no man, whether skilled or unskilled, undertakes that the task he assumes shall be performed successfully, and without fault or error; he undertakes for good faith and integrity, but not for infallibility, and he is liable to his employer for negligence, bad faith, or dishonesty, but not for losses consequent upon pure errors of judgment. fn 2(3)

[As amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

.04    The matter of due professional care concerns what the independent auditor does and how well he or she does it. The quotation from *Cooley on Torts* provides a source from which an auditor's responsibility for conducting an audit with due professional care can be derived. The remainder of the section discusses the auditor's responsibility in the context of an audit. [As amended, April 1982, by Statement on Auditing Standards No. 41 (see section 339). As amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

.05    An auditor should possess "the degree of skill commonly possessed" by other auditors and should exercise it with "reasonable care and diligence" (that is, with due professional care). [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

.06    Auditors should be assigned to tasks and supervised commensurate with their level of knowledge, skill, and ability so that they can evaluate the audit evidence they are examining. The auditor with final responsibility for the engagement should know, at a minimum, the relevant professional accounting and auditing standards and should be knowledgeable about the client. fn 3(4)  The auditor with final responsibility is responsible for the assignment of tasks to, and supervision of, assistants. fn 4(5)  [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

## Professional Skepticism

.07    Due professional care requires the auditor to exercise *professional skepticism*. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

.08    Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

.09    The auditor neither assumes that management is dishonest nor assumes unquestioned honesty. In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

## Reasonable Assurance

.10    The exercise of due professional care allows the auditor to obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud. Absolute assurance is not attainable because of the nature of audit evidence and the characteristics of fraud. Therefore, an audit conducted in accordance with generally accepted auditing standards may not detect a material misstatement. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

.11    The independent auditor's objective is to obtain sufficient competent evidential matter to provide him or her with a reasonable basis for forming an opinion. The nature of most evidence derives, in part, from the concept of selective testing of the data being audited, which involves judgment regarding both the areas to be tested and the nature, timing, and extent of the tests to be performed. In addition, judgment is required in interpreting the results of audit testing and evaluating audit evidence. Even with good faith and integrity, mistakes and errors in judgment can be made. Furthermore, accounting presentations contain accounting estimates, the measurement of which is inherently uncertain and depends on the outcome of future events. The auditor exercises professional judgment in evaluating the reasonableness of accounting estimates based on information that could reasonably be expected to be available prior to the completion of field work. fn 5(6)  As a result of these factors, in the great majority of cases, the auditor has to rely on evidence that is persuasive rather than convincing. fn 6(7)  [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

.12    Because of the characteristics of fraud, particularly those involving concealment and falsified documentation (including forgery), a properly planned and performed audit may not detect a material misstatement. For example, an audit conducted in accordance with generally accepted auditing standards rarely involves authentication of documentation, nor are auditors trained as or expected to be experts in such authentication. Also, auditing procedures may be ineffective for detecting an intentional misstatement that is concealed through collusion among client personnel and third parties or among management or

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

employees of the client. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

.13    Since the auditor's opinion on the financial statements is based on the concept of obtaining reasonable assurance, the auditor is not an insurer and his or her report does not constitute a guarantee. Therefore, the subsequent discovery that a material misstatement, whether from error or fraud, exists in the financial statements does not, in and of itself, evidence (*a*) failure to obtain reasonable assurance, (*b*) inadequate planning, performance, or judgment, (*c*) the absence of due professional care, or (*d*) a failure to comply with generally accepted auditing standards. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

## Endnotes

**1 (Popup - Footnote)**

\*        [Title amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**2 (Popup - Footnote)**

1        This amendment revises the third general standard of the ten generally accepted auditing standards. [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**3 (Popup - Footnote)**

2        D. Haggard, *Cooley on Torts*, 472 (4th ed., 1932). [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**4 (Popup - Footnote)**

3        See section 311, *Planning and Supervision*, **paragraph .07**. [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**5 (Popup - Footnote)**

4        See **section 311.11**. [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**6 (Popup - Footnote)**

5        See **section 342**, *Auditing Accounting Estimates*. [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**7 (Popup - Footnote)**

6        See **section 326**, *Evidential Matter*. [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

# AU Section 311

## *Planning and Supervision*

**Source: SAS No. 22; SAS No. 47; SAS No. 48; SAS No. 77.**

**See section 9311 for interpretations of this section.**

**Effective for periods ending after September 30, 1978, unless otherwise indicated.**

.01   The first standard of field work requires that "the work is to be adequately planned and assistants, if any, are to be properly supervised." This section provides guidance to the independent auditor conducting an audit in accordance with generally accepted auditing standards on the considerations and procedures applicable to planning and supervision, including preparing an audit program, obtaining knowledge of the entity's business, and dealing with differences of opinion among firm personnel. Planning and supervision continue throughout the audit, and the related procedures frequently overlap.

.02   The auditor with final responsibility for the audit may delegate portions of the planning and supervision of the audit to other firm personnel. For purposes of this section, (*a*) firm personnel other than the auditor with final responsibility for the audit are referred to as *assistants* and (*b*) the term *auditor* refers to either the auditor with final responsibility for the audit or assistants.

## Planning

.03   Audit planning involves developing an overall strategy for the expected conduct and scope of the audit. The nature, extent, and timing of planning vary with the size and complexity of the entity, experience with the entity, and knowledge of the entity's business. In planning the audit, the auditor should consider, among other matters:

    *a.*    Matters relating to the entity's business and the industry in which it operates (see paragraph .07).

    *b.*    The entity's accounting policies and procedures.

    *c.*    The methods used by the entity to process significant accounting information (see paragraph .09), including the use of service organizations, such as outside service

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

centers.

*d.*   Planned assessed level of control risk. (See section 319.)

*e.*   Preliminary judgment about materiality levels for audit purposes.

*f.*   Financial statement items likely to require adjustment.

*g.*   Conditions that may require extension or modification of audit tests, such as the risk of material error or fraud or the existence of related party transactions.

*h.*   The nature of reports expected to be rendered (for example, a report on consolidated or consolidating financial statements, reports on financial statements filed with the SEC, or special reports such as those on compliance with contractual provisions).

[As amended, December, 1983, by Statement on Auditing Standards No. 47.] (See section 312.14.) [As amended, effective for periods beginning after August 31, 1984, by Statement on Auditing Standards No. 48.]

.04   Procedures that an auditor may consider in planning the audit usually involve review of his records relating to the entity and discussion with other firm personnel and personnel of the entity. Examples of those procedures include:

*a.*   Reviewing correspondence files, prior year's working papers, permanent files, financial statements, and auditor's reports.

*b.*   Discussing matters that may affect the audit with firm personnel responsible for non-audit services to the entity.

*c.*   Inquiring about current business developments affecting the entity.

*d.*   Reading the current year's interim financial statements.

*e.*   Discussing the type, scope, and timing of the audit with management of the entity, the board of directors, or its audit committee.

*f.*   Considering the effects of applicable accounting and auditing pronouncements, particularly new ones.

*g.*   Coordinating the assistance of entity personnel in data preparation.

*h.*   Determining the extent of involvement, if any, of consultants, specialists, and

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

internal auditors.

*i.*      Establishing the timing of the audit work.

*j.*      Establishing and coordinating staffing requirements.

The auditor may wish to prepare a memorandum setting forth the preliminary audit plan, particularly for large and complex entities.

**.05**      In planning the audit, the auditor should consider the nature, extent, and timing of work to be performed and should prepare a written audit program (or set of written audit programs) for every audit. The audit program should set forth in reasonable detail the audit procedures that the auditor believes are necessary to accomplish the objectives of the audit. The form of the audit program and the extent of its detail will vary with the circumstances. In developing the program, the auditor should be guided by the results of the planning considerations and procedures. As the audit progresses, changed conditions may make it necessary to modify planned audit procedures. [As amended, effective for engagements beginning after December 15, 1995, by Statement on Auditing Standards No. 77.]

**.06**      The auditor should obtain a level of knowledge of the entity's business that will enable him to plan and perform his audit in accordance with generally accepted auditing standards. That level of knowledge should enable him to obtain an understanding of the events, transactions, and practices that, in his judgment, may have a significant effect on the financial statements. The level of knowledge customarily possessed by management relating to managing the entity's business is substantially greater than that which is obtained by the auditor in performing his audit. Knowledge of the entity's business helps the auditor in:

*a.*      Identifying areas that may need special consideration.

*b.*      Assessing conditions under which accounting data are produced, processed, reviewed, and accumulated within the organization.

*c.*      Evaluating the reasonableness of estimates, such as valuation of inventories, depreciation, allowances for doubtful accounts, and percentage of completion of long-term contracts.

*d.*      Evaluating the reasonableness of management representations.

*e.*      Making judgments about the appropriateness of the accounting principles applied

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

and the adequacy of disclosures. [fn 1](1)

.07    The auditor should obtain a knowledge of matters that relate to the nature of the entity's business, its organization, and its operating characteristics. Such matters include, for example, the type of business, types of products and services, capital structure, related parties, locations, and production, distribution, and compensation methods. The auditor should also consider matters affecting the industry in which the entity operates, such as economic conditions, government regulations, and changes in technology, as they relate to his audit. Other matters, such as accounting practices common to the industry, competitive conditions, and, if available, financial trends and ratios should also be considered by the auditor.

.08    Knowledge of an entity's business is ordinarily obtained through experience with the entity or its industry and inquiry of personnel of the entity. Working papers from prior years may contain useful information about the nature of the business, organizational structure, operating characteristics, and transactions that may require special consideration. Other sources an auditor may consult include AICPA accounting and audit guides, industry publications, financial statements of other entities in the industry, textbooks, periodicals, and individuals knowledgeable about the industry.

.09    The auditor should consider the methods the entity uses to process accounting information in planning the audit because such methods influence the design of the internal control. The extent to which computer processing is used in significant accounting applications, fn 2(2) as well as the complexity of that processing, may also influence the nature, timing, and extent of audit procedures. Accordingly, in evaluating the effect of an entity's computer processing on an audit of financial statements, the auditor should consider matters such as—

   a.    The extent to which the computer is used in each significant accounting application.

   b.    The complexity of the entity's computer operations, including the use of an outside service center. fn 3(3)

   c.    The organizational structure of the computer processing activities.

   d.    The availability of data. Documents that are used to enter information into the computer for processing, certain computer files, and other evidential matter that may be required by the auditor may exist only for a short period or only in computer-readable form. In some computer systems, input documents may not exist at all because information is directly entered into the system. An entity's data

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

retention policies may require the auditor to request retention of some information for his review or to perform audit procedures at a time when the information is available. In addition, certain information generated by the computer for management's internal purposes may be useful in performing substantive tests (particularly analytical procedures). fn 4(4)

e.   The use of computer-assisted audit techniques to increase the efficiency of performing audit procedures. [fn 5](5) Using computer-assisted audit techniques may also provide the auditor with an opportunity to apply certain procedures to an entire population of accounts or transactions. In addition, in some accounting systems, it may be difficult or impossible for the auditor to analyze certain data or test specific control procedures without computer assistance.

[Paragraph added, effective for periods beginning after August 31, 1984, by Statement on Auditing Standards No. 48.]

.10   The auditor should consider whether specialized skills are needed to consider the effect of computer processing on the audit, to understand the controls, or to design and perform audit procedures. If specialized skills are needed, the auditor should seek the assistance of a professional possessing such skills, who may be either on the auditor's staff or an outside professional. If the use of such a professional is planned, the auditor should have sufficient computer-related knowledge to communicate the objectives of the other professional's work; to evaluate whether the specified procedures will meet the auditor's objectives; and to evaluate the results of the procedures applied as they relate to the nature, timing, and extent of other planned audit procedures. The auditor's responsibilities with respect to using such a professional are equivalent to those for other assistants. fn 6(6) [Paragraph added, effective for periods beginning after August 31, 1984, by Statement on Auditing Standards No. 48.]

## Supervision

.11   Supervision involves directing the efforts of assistants who are involved in accomplishing the objectives of the audit and determining whether those objectives were accomplished. Elements of supervision include instructing assistants, keeping informed of significant problems encountered, reviewing the work performed, and dealing with differences of opinion among firm personnel. The extent of supervision appropriate in a given instance depends on many factors, including the complexity of the subject matter and the qualifications of persons performing the work. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984.]

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

.12     Assistants should be informed of their responsibilities and the objectives of the procedures that they are to perform. They should be informed of matters that may affect the nature, extent, and timing of procedures they are to perform, such as the nature of the entity's business as it relates to their assignments and possible accounting and auditing problems. The auditor with final responsibility for the audit should direct assistants to bring to his attention significant accounting and auditing questions raised during the audit so that he may assess their significance. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984.]

.13     The work performed by each assistant should be reviewed to determine whether it was adequately performed and to evaluate whether the results are consistent with the conclusions to be presented in the auditor's report. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984.]

.14     The auditor with final responsibility for the audit and assistants should be aware of the procedures to be followed when differences of opinion concerning accounting and auditing issues exist among firm personnel involved in the audit. Such procedures should enable an assistant to document his disagreement with the conclusions reached if, after appropriate consultation, he believes it necessary to disassociate himself from the resolution of the matter. In this situation, the basis for the final resolution should also be documented. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984.]

## Effective Date

.15     Statements on Auditing Standards generally are effective at the time of their issuance. However, since this section provides for practices that may differ in certain respects from practices heretofore considered acceptable, this section will be effective for audits made in accordance with generally accepted auditing standards for periods ending after September 30, 1978. [Formerly paragraph .13, number changed by issuance of Statement on Auditing Standards No. 48, effective for periods beginning after August 31, 1984.]

# AU Section 312

## *Audit Risk and Materiality in Conducting an Audit fn \*(7)*

**Source: SAS No. 47; SAS No. 82; SAS No. 96.**

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

**See** section 9312 **for interpretations of this section.**

**Effective for audits of financial statements for periods beginning after June 30, 1984, unless otherwise indicated.**

.01    This section provides guidance on the auditor's consideration of audit risk and materiality when planning and performing an audit of financial statements in accordance with generally accepted auditing standards. Audit risk and materiality affect the application of generally accepted auditing standards, especially the standards of field work and reporting, and are reflected in the auditor's standard report. Audit risk and materiality, among other matters, need to be considered together in determining the nature, timing, and extent of auditing procedures and in evaluating the results of those procedures.

.02    The existence of audit risk is recognized in the description of the responsibilities and functions of the independent auditor that states, "Because of the nature of audit evidence and the characteristics of fraud, the auditor is able to obtain reasonable, but not absolute, assurance that material misstatements are detected." fn 1(8)  Audit risk fn 2(9) is the risk that the auditor may unknowingly fail to appropriately modify his or her opinion on financial statements that are materially misstated. fn 3(10)  [As amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

.03    The concept of materiality recognizes that some matters, either individually or in the aggregate, are important for fair presentation of financial statements in conformity with generally accepted accounting principles, fn 4(11) while other matters are not important. The representation in the auditor's standard report regarding fair presentation, in all material respects, in conformity with generally accepted accounting principles indicates the auditor's belief that the financial statements taken as a whole are not materially misstated. [As amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82. Revised, October 2000, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 93.]

.04    Financial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in conformity with generally accepted accounting principles. Misstatements can result from errors or fraud. fn 5(12)  [As amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**Revised May 2002**                          7

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

**.05**    In planning the audit, the auditor is concerned with matters that could be material to the financial statements. The auditor has no responsibility to plan and perform the audit to obtain reasonable assurance that misstatements, whether caused by errors or fraud, that are not material to the financial statements are detected. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.06**    The term *errors* refers to unintentional misstatements or omissions of amounts or disclosures in financial statements. Errors may involve—

- Mistakes in gathering or processing data from which financial statements are prepared.

- Unreasonable accounting estimates arising from oversight or misinterpretation of facts.

- Mistakes in the application of accounting principles relating to amount, classification, manner of presentation, or disclosure. fn 6(13)

[Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.07**    Although *fraud* is a broad legal concept, the auditor's interest specifically relates to fraudulent acts that cause a misstatement of financial statements. Two types of misstatements are relevant to the auditor's consideration in a financial statement audit—misstatements arising from fraudulent financial reporting and misstatements arising from misappropriation of assets. These two types of misstatements are further described in section 316, *Consideration of Fraud in a Financial Statement Audit*. The primary factor that distinguishes fraud from error is whether the underlying action that results in the misstatement in financial statements is intentional or unintentional. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.08**    When considering the auditor's responsibility to obtain reasonable assurance that the financial statements are free from material misstatement, there is no important distinction between errors and fraud. There is a distinction, however, in the auditor's response to detected misstatements. Generally, an isolated, immaterial error in processing accounting data or applying accounting principles is not significant to the audit. In contrast, when fraud is detected, the auditor should consider the implications for the integrity of management or employees and the possible effect on other aspects of the audit. [Paragraph added, effective for audits of financial statements for periods ending on or

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.09**    When concluding as to whether the effect of misstatements, individually or in the aggregate, is material, an auditor ordinarily should consider their nature and amount in relation to the nature and amount of items in the financial statements under audit. For example, an amount that is material to the financial statements of one entity may not be material to the financial statements of another entity of a different size or nature. Also, what is material to the financial statements of a particular entity might change from one period to another. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

**.10**    The auditor's consideration of materiality is a matter of professional judgment and is influenced by his or her perception of the needs of a reasonable person who will rely on the financial statements. The perceived needs of a reasonable person are recognized in the discussion of materiality in Financial Accounting Standards Board Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information*, which defines materiality as "the magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement." That discussion recognizes that materiality judgments are made in light of surrounding circumstances and necessarily involve both quantitative and qualitative considerations. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

**.11**    As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements. For example, an illegal payment of an otherwise immaterial amount could be material if there is a reasonable possibility that it could lead to a material contingent liability or a material loss of revenue. fn 7(14) [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

## Planning the Audit

**.12**    The auditor should consider audit risk and materiality both in (*a*) planning the audit and designing auditing procedures and (*b*) evaluating whether the financial statements taken as a whole are presented fairly, in all material respects, in conformity with generally accepted accounting principles. The auditor should consider audit risk and materiality in the first circumstance to obtain sufficient competent evidential matter on which to properly

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

evaluate the financial statements in the second circumstance. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

## Considerations at the Financial Statements Level [fn 8](15)

.13    The auditor should plan the audit so that audit risk will be limited to a low level that is, in his or her professional judgment, appropriate for expressing an opinion on the financial statements. Audit risk may be assessed in quantitative or nonquantitative terms. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

.14    Section 311, *Planning and Supervision,* requires the auditor, in planning the audit, to take into consideration, among other matters, his or her preliminary judgment about materiality levels for audit purposes. fn 9(16)  That judgment may or may not be quantified. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

.15    According to section 311, the nature, timing, and extent of planning and thus of the considerations of audit risk and materiality vary with the size and complexity of the entity, the auditor's experience with the entity, and his or her knowledge of the entity's business. Certain entity-related factors also affect the nature, timing, and extent of auditing procedures with respect to specific account balances and classes of transactions and related assertions. (See paragraphs .24 through .33.) [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

.16    An assessment of the risk of material misstatement (whether caused by error or fraud) should be made during planning. The auditor's understanding of internal control may heighten or mitigate the auditor's concern about the risk of material misstatement. fn 10(17)  In considering audit risk, the auditor should specifically assess the risk of material misstatement of the financial statements due to fraud. fn 11(18)  The auditor should consider the effect of these assessments on the overall audit strategy and the expected conduct and scope of the audit. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

.17    Whenever the auditor has concluded that there is significant risk of material misstatement of the financial statements, the auditor should consider this conclusion in determining the nature, timing, or extent of procedures; assigning staff; or requiring appropriate levels of supervision. The knowledge, skill, and ability of personnel assigned significant engagement

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

responsibilities should be commensurate with the auditor's assessment of the level of risk for the engagement. Ordinarily, higher risk requires more experienced personnel or more extensive supervision by the auditor with final responsibility for the engagement during both the planning and the conduct of the engagement. Higher risk may cause the auditor to expand the extent of procedures applied, apply procedures closer to or as of year end, particularly in critical audit areas, or modify the nature of procedures to obtain more persuasive evidence. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

.18   In an audit of an entity with operations in multiple locations or components, the auditor should consider the extent to which auditing procedures should be performed at selected locations or components. The factors an auditor should consider regarding the selection of a particular location or component include (*a*) the nature and amount of assets and transactions executed at the location or component, (*b*) the degree of centralization of records or information processing, (*c*) the effectiveness of the control environment, particularly with respect to management's direct control over the exercise of authority delegated to others and its ability to effectively supervise activities at the location or component, (*d*) the frequency, timing, and scope of monitoring activities by the entity or others at the location or component, and (*e*) judgments about materiality of the location or component. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

.19   In planning the audit, the auditor should use his or her judgment as to the appropriately low level of audit risk and his or her preliminary judgment about materiality levels in a manner that can be expected to provide, within the inherent limitations of the auditing process, sufficient evidential matter to obtain reasonable assurance about whether the financial statements are free of material misstatement. Materiality levels include an overall level for each statement; however, because the statements are interrelated, and for reasons of efficiency, the auditor ordinarily considers materiality for planning purposes in terms of the smallest aggregate level of misstatements that could be considered material to any one of the financial statements. For example, if the auditor believes that misstatements aggregating approximately $100,000 would have a material effect on income but that such misstatements would have to aggregate approximately $200,000 to materially affect financial position, it would not be appropriate for him or her to design auditing procedures that would be expected to detect misstatements only if they aggregate approximately $200,000. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

.20   The auditor plans the audit to obtain reasonable assurance of detecting misstatements that

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

he or she believes could be large enough, individually or in the aggregate, to be quantitatively material to the financial statements. Although the auditor should be alert for misstatements that could be qualitatively material, it ordinarily is not practical to design procedures to detect them. Section 326, *Evidential Matter*, states that "an auditor typically works within economic limits; his or her opinion, to be economically useful, must be formed within a reasonable length of time and at reasonable cost." [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

.21    In some situations, the auditor considers materiality for planning purposes before the financial statements to be audited are prepared. In other situations, planning takes place after the financial statements under audit have been prepared, but the auditor may be aware that they require significant modification. In both types of situations, the auditor's preliminary judgment about materiality might be based on the entity's annualized interim financial statements or financial statements of one or more prior annual periods, as long as recognition is given to the effects of major changes in the entity's circumstances (for example, a significant merger) and relevant changes in the economy as a whole or the industry in which the entity operates. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

.22    Assuming, theoretically, that the auditor's judgment about materiality at the planning stage was based on the same information available at the evaluation stage, materiality for planning and evaluation purposes would be the same. However, it ordinarily is not feasible for the auditor, when planning an audit, to anticipate all of the circumstances that may ultimately influence judgments about materiality in evaluating the audit findings at the completion of the audit. Thus, the auditor's preliminary judgment about materiality ordinarily will differ from the judgment about materiality used in evaluating the audit findings. If significantly lower materiality levels become appropriate in evaluating audit findings, the auditor should re-evaluate the sufficiency of the auditing procedures he or she has performed. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

.23    In planning auditing procedures, the auditor should also consider the nature, cause (if known), and amount of misstatements that he or she is aware of from the audit of the prior period's financial statements. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

## Considerations at the Individual Account-Balance or Class-of-Transactions Level

.24    The auditor recognizes that there is an inverse relationship between audit risk and

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

materiality considerations. For example, the risk that a particular account balance or class of transactions and related assertions could be misstated by an extremely large amount might be very low, but the risk that it could be misstated by an extremely small amount might be very high. Holding other planning considerations equal, either a decrease in the level of audit risk that the auditor judges to be appropriate in an account balance or a class of transactions or a decrease in the amount of misstatements in the balance or class that the auditor believes could be material would require the auditor to do one or more of the following: (*a*) select a more effective auditing procedure, (*b*) perform auditing procedures closer to year end, or (*c*) increase the extent of a particular auditing procedure. [Paragraph renumbered and amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

.25    In determining the nature, timing, and extent of auditing procedures to be applied to a specific account balance or class of transactions, the auditor should design procedures to obtain reasonable assurance of detecting misstatements that he or she believes, based on the preliminary judgment about materiality, could be material, when aggregated with misstatements in other balances or classes, to the financial statements taken as a whole. Auditors use various methods to design procedures to detect such misstatements. In some cases, auditors explicitly estimate, for planning purposes, the maximum amount of misstatements in the balance or class that, when combined with misstatements in other balances or classes, could exist without causing the financial statements to be materially misstated. In other cases, auditors relate their preliminary judgment about materiality to a specific account balance or class of transactions without explicitly estimating such misstatements. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

.26    The auditor needs to consider audit risk at the individual account-balance or class-of-transactions level because such consideration directly assists in determining the scope of auditing procedures for the balance or class and related assertions. The auditor should seek to restrict audit risk at the individual balance or class level in such a way that will enable him or her, at the completion of the audit, to express an opinion on the financial statements taken as a whole at an appropriately low level of audit risk. Auditors use various approaches to accomplish that objective. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

.27    At the account-balance or class-of-transactions level, audit risk consists of (*a*) the risk (consisting of inherent risk and control risk) that the balance or class and related assertions contain misstatements (whether caused by error or fraud) that could be material to the financial statements when aggregated with misstatements in other balances or classes and (*b*) the risk (detection risk) that the auditor will not detect such misstatements. The

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

discussion that follows describes audit risk in terms of three component risks. fn 12(19) The way the auditor considers these component risks and combines them involves professional judgment and depends on the audit approach.

a.    *Inherent risk* is the susceptibility of an assertion to a material misstatement, assuming that there are no related controls. The risk of such misstatement is greater for some assertions and related balances or classes than for others. For example, complex calculations are more likely to be misstated than simple calculations. Cash is more susceptible to theft than an inventory of coal. Accounts consisting of amounts derived from accounting estimates pose greater risks than do accounts consisting of relatively routine, factual data. External factors also influence inherent risk. For example, technological developments might make a particular product obsolete, thereby causing inventory to be more susceptible to overstatement. In addition to those factors that are peculiar to a specific assertion for an account balance or a class of transactions, factors that relate to several or all of the balances or classes may influence the inherent risk related to an assertion for a specific balance or class. These latter factors include, for example, a lack of sufficient working capital to continue operations or a declining industry characterized by a large number of business failures.

b.    *Control risk* is the risk that a material misstatement that could occur in an assertion will not be prevented or detected on a timely basis by the entity's internal control. That risk is a function of the effectiveness of the design and operation of internal control in achieving the entity's objectives relevant to preparation of the entity's financial statements. Some control risk will always exist because of the inherent limitations of internal control.

c.    *Detection risk* is the risk that the auditor will not detect a material misstatement that exists in an assertion. Detection risk is a function of the effectiveness of an auditing procedure and of its application by the auditor. It arises partly from uncertainties that exist when the auditor does not examine 100 percent of an account balance or a class of transactions and partly because of other uncertainties that exist even if he or she were to examine 100 percent of the balance or class. Such other uncertainties arise because an auditor might select an inappropriate auditing procedure, misapply an appropriate procedure, or misinterpret the audit results. These other uncertainties can be reduced to a negligible level through adequate planning and supervision and conduct of a firm's audit practice in accordance with appropriate quality control standards.

[Paragraph renumbered and amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No.

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

82.]

**.28**   Inherent risk and control risk differ from detection risk in that they exist independently of the audit of financial statements, whereas detection risk relates to the auditor's procedures and can be changed at his or her discretion. Detection risk should bear an inverse relationship to inherent and control risk. The less the inherent and control risk the auditor believes exists, the greater the detection risk that can be accepted. Conversely, the greater the inherent and control risk the auditor believes exists, the less the detection risk that can be accepted. These components of audit risk may be assessed in quantitative terms such as percentages or in nonquantitative terms that range, for example, from a minimum to a maximum. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

**.29**   When the auditor assesses inherent risk for an assertion related to an account balance or a class of transactions, he or she evaluates numerous factors that involve professional judgment. In doing so, the auditor considers not only factors peculiar to the related assertion, but also, other factors pervasive to the financial statements taken as a whole that may also influence inherent risk related to the assertion. If an auditor concludes that the effort required to assess inherent risk for an assertion would exceed the potential reduction in the extent of auditing procedures derived from such an assessment, the auditor should assess inherent risk as being at the maximum when designing auditing procedures. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

**.30**   The auditor also uses professional judgment in assessing control risk for an assertion related to the account balance or class of transactions. The auditor's assessment of control risk is based on the sufficiency of evidential matter obtained to support the effectiveness of internal control in preventing or detecting misstatements in financial statement assertions. If the auditor believes controls are unlikely to pertain to an assertion or are unlikely to be effective, or believes that evaluating their effectiveness would be inefficient, he or she would assess control risk for that assertion at the maximum. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

**.31**   The auditor might make separate or combined assessments of inherent risk and control risk. If the auditor considers inherent risk or control risk, separately or in combination, to be less than the maximum, he or she should have an appropriate basis for these assessments. This basis may be obtained, for example, through the use of questionnaires, checklists, instructions, or similar generalized materials and, in the case of control risk, the understanding of internal control and the performance of suitable tests of controls.

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

However, professional judgment is required in interpreting, adapting, or expanding such generalized material as appropriate in the circumstances. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

.32   The detection risk that the auditor can accept in the design of auditing procedures is based on the level to which he or she seeks to restrict audit risk related to the account balance or class of transactions and on the assessment of inherent and control risks. As the auditor's assessment of inherent risk and control risk decreases, the detection risk that can be accepted increases. It is not appropriate, however, for an auditor to rely completely on assessments of inherent risk and control risk to the exclusion of performing substantive tests of account balances and classes of transactions where misstatements could exist that might be material when aggregated with misstatements in other balances or classes. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

.33   An audit of financial statements is a cumulative process; as the auditor performs planned auditing procedures, the evidence obtained may cause him or her to modify the nature, timing, and extent of other planned procedures. As a result of performing auditing procedures or from other sources during the audit, information may come to the auditor's attention that differs significantly from the information on which the audit plan was based. For example, the extent of misstatements detected may alter the judgment about the levels of inherent and control risks, and other information obtained about the financial statements may alter the preliminary judgment about materiality. In such cases, the auditor may need to re-evaluate the auditing procedures he or she plans to apply, based on the revised consideration of audit risk and materiality for all or certain of the account balances or classes of transactions and related assertions. [Paragraph renumbered and amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

## Evaluating Audit Findings

.34   In evaluating whether the financial statements are presented fairly, in all material respects, in conformity with generally accepted accounting principles, the auditor should aggregate misstatements that the entity has not corrected in a way that enables him or her to consider whether, in relation to individual amounts, subtotals, or totals in the financial statements, they materially misstate the financial statements taken as a whole. Qualitative considerations also influence the auditor in reaching a conclusion as to whether misstatements are material. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

**.35**    The aggregation of misstatements should include the auditor's best estimate of the total misstatements in the account balances or classes of transactions that he or she has examined (hereafter referred to as likely misstatement (20)fn 13), not just the amount of misstatements specifically identified (hereafter referred to as known misstatement). fn 14(21) When the auditor tests an account balance or a class of transactions and related assertions by an analytical procedure, he or she ordinarily would not specifically identify misstatements but would only obtain an indication of whether misstatement might exist in the balance or class and possibly its approximate magnitude. If the analytical procedure indicates that a misstatement might exist, but not its approximate amount, the auditor ordinarily would have to employ other procedures to enable him or her to estimate the likely misstatement in the balance or class. When an auditor uses audit sampling to test an assertion for an account balance or a class of transactions, he or she projects the amount of known misstatements identified in the sample to the items in the balance or class from which the sample was selected. That projected misstatement, along with the results of other substantive tests, contributes to the auditor's assessment of likely misstatement in the balance or class. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

**.36**    The risk of material misstatement of the financial statements is generally greater when account balances and classes of transactions include accounting estimates rather than essentially factual data because of the inherent subjectivity in estimating future events. Estimates, such as those for inventory obsolescence, uncollectible receivables, and warranty obligations, are subject not only to the unpredictability of future events but also to misstatements that may arise from using inadequate or inappropriate data or misapplying appropriate data. Since no one accounting estimate can be considered accurate with certainty, the auditor recognizes that a difference between an estimated amount best supported by the audit evidence and the estimated amount included in the financial statements may be reasonable, and such difference would not be considered to be a likely misstatement. However, if the auditor believes the estimated amount included in the financial statements is unreasonable, he or she should treat the difference between that estimate and the closest reasonable estimate as a likely misstatement and aggregate it with other likely misstatements. The auditor should also consider whether the difference between estimates best supported by the audit evidence and the estimates included in the financial statements, which are individually reasonable, indicate a possible bias on the part of the entity's management. For example, if each accounting estimate included in the financial statements was individually reasonable, but the effect of the difference between each estimate and the estimate best supported by the audit evidence was to increase income, the auditor should reconsider the estimates taken as a whole. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

**.37**   In prior periods, likely misstatements may not have been corrected by the entity because they did not cause the financial statements for those periods to be materially misstated. Those misstatements might also affect the current period's financial statements. fn 15(22) If the auditor believes that there is an unacceptably high risk that the current period's financial statements may be materially misstated when those prior-period likely misstatements that affect the current period's financial statements are considered along with likely misstatements arising in the current period, the auditor should include in aggregate likely misstatement the effect on the current period's financial statements of those prior-period likely misstatements. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

**.38**   If the auditor concludes, based on the accumulation of sufficient evidential matter, that the aggregation of likely misstatements causes the financial statements to be materially misstated, the auditor should request management to eliminate the material misstatement. If the material misstatement is not eliminated, the auditor should issue a qualified or an adverse opinion on the financial statements. Material misstatements may be eliminated by, for example, application of appropriate accounting principles, other adjustments in amounts, or the addition of appropriate disclosure of inadequately disclosed matters. Even though the aggregate effect of likely misstatements on the financial statements may be immaterial, the auditor should recognize that an accumulation of immaterial misstatements in the balance sheet could contribute to material misstatements of future financial statements. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

**.39**   If the auditor concludes that the aggregation of likely misstatements does not cause the financial statements to be materially misstated, he or she should recognize that they could still be materially misstated because of further misstatement remaining undetected. As aggregate likely misstatement increases, the risk that the financial statements may be materially misstated also increases. The auditor generally reduces this risk of material misstatement in planning the audit by restricting the extent of detection risk he or she is willing to accept for an assertion related to an account balance or a class of transactions. The auditor can reduce this risk of material misstatement by modifying the nature, timing, and extent of planned auditing procedures on a continuous basis in performing the audit. (See paragraph .33.) Nevertheless, if the auditor believes that such risk is unacceptably high, he or she should perform additional auditing procedures or satisfy himself or herself that the entity has adjusted the financial statements to reduce the risk of material misstatement to an acceptable level. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

**.40**    The auditor should document the nature and effect of aggregated misstatements. The auditor also should document his or her conclusion as to whether the aggregated misstatements cause the financial statements to be materially misstated. [Paragraph added, effective for audits of financial statements for periods beginning on or after May 15, 2002, by Statement on Auditing Standards No. 96.]

**.41**    In aggregating known and likely misstatements that the entity has not corrected, pursuant to paragraphs .34 and .35, the auditor may designate an amount below which misstatements need not be accumulated. This amount should be set so that any such misstatements, either individually or when aggregated with other such misstatements, would not be material to the financial statements, after the possibility of further undetected misstatements is considered. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82. Paragraph renumbered by the issuance of Statement on Auditing Standards No. 96, January 2002.]

## Effective Date

**.42**    This section is effective for audits of financial statements for periods beginning after June 30, 1984. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 96, January 2002.]

# AU Section 326

## *Evidential Matter*

**(Supersedes section 330, "Evidential Matter")**

**Source: SAS No. 31; SAS No. 48; SAS No. 80.**

**See section 9326 for interpretations of this section.**

**Issue date, unless otherwise indicated: August, 1980**

**.01**    The third standard of field work is:

Sufficient competent evidential matter is to be obtained through inspection,

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

.02    Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter fn 1 (23)concerning the assertions in such financial statements. The measure of the validity of such evidence for audit purposes lies in the judgment of the auditor; in this respect audit evidence differs from legal evidence, which is circumscribed by rigid rules. Evidential matter varies substantially in its influence on the auditor as he or she develops an opinion with respect to financial statements under audit. The pertinence of the evidence, its objectivity, its timeliness, and the existence of other evidential matter corroborating the conclusions to which it leads all bear on its competence.

## Nature of Assertions

.03    Assertions are representations by management that are embodied in financial statement components. They can be either explicit or implicit and can be classified according to the following broad categories:

- Existence or occurrence

- Completeness

- Rights and obligations

- Valuation or allocation

- Presentation and disclosure

.04    Assertions about existence or occurrence address whether assets or liabilities of the entity exist at a given date and whether recorded transactions have occurred during a given period. For example, management asserts that finished goods inventories in the balance sheet are available for sale. Similarly, management asserts that sales in the income statement represent the exchange of goods or services with customers for cash or other consideration.

.05    Assertions about completeness address whether all transactions and accounts that should be presented in the financial statements are so included. For example, management asserts that all purchases of goods and services are recorded and are included in the financial statements. Similarly, management asserts that notes payable in the balance sheet include all such obligations of the entity.

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

**.06**    Assertions about rights and obligations address whether assets are the rights of the entity and liabilities are the obligations of the entity at a given date. For example, management asserts that amounts capitalized for leases in the balance sheet represent the cost of the entity's rights to leased property and that the corresponding lease liability represents an obligation of the entity.

**.07**    Assertions about valuation or allocation address whether asset, liability, equity, revenue, and expense components have been included in the financial statements at appropriate amounts. For example, management asserts that property is recorded at historical cost and that such cost is systematically allocated to appropriate accounting periods. Similarly, management asserts that trade accounts receivable included in the balance sheet are stated at net realizable value. [As amended, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

**.08**    Assertions about presentation and disclosure address whether particular components of the financial statements are properly classified, described, and disclosed. For example, management asserts that obligations classified as long-term liabilities in the balance sheet will not mature within one year. Similarly, management asserts that amounts presented as extraordinary items in the income statement are properly classified and described.

## Use of Assertions in Developing Audit Objectives and Designing Substantive Tests

**.09**    In obtaining evidential matter in support of financial statement assertions, the auditor develops specific audit objectives in the light of those assertions. In developing the audit objectives of a particular engagement, the auditor should consider the specific circumstances of the entity, including the nature of its economic activity and the accounting practices unique to its industry. For example, one audit objective related to the assertion about completeness that an auditor might develop for inventory balances is that inventory quantities include all products, materials, and supplies on hand.

**.10**    There is not necessarily a one-to-one relationship between audit objectives and procedures. Some auditing procedures may relate to more than one objective. On the other hand, a combination of auditing procedures may be needed to achieve a single objective. Paragraph .26 provides illustrative audit objectives for inventories of a manufacturing company for each of the broad categories of assertions listed in paragraph .03 and examples of substantive tests that may achieve those audit objectives.

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

**.11**  In selecting particular substantive tests to achieve the audit objectives he or she has developed, an auditor considers, among other things, the risk of material misstatement of the financial statements, including the assessed levels of control risk, and the expected effectiveness and efficiency of such tests. These considerations include the nature and materiality of the items being tested, the kinds and competence of available evidential matter, and the nature of the audit objective to be achieved. For example, in designing substantive tests to achieve an objective related to the assertion of existence or occurrence, the auditor selects from items contained in a financial statement amount and searches for relevant evidential matter. On the other hand, in designing procedures to achieve an objective related to the assertion of completeness, the auditor selects from evidential matter indicating that an item should be included in the relevant financial statement amount and investigates whether that item is so included.

**.12**  The auditor's specific audit objectives do not change whether information is processed manually or electronically. However, the methods of applying audit procedures to gather evidence may be influenced by the method of processing. The auditor may use either manual auditing procedures, information technology-assisted audit techniques, or a combination of both to obtain sufficient competent evidential matter. Because of the growth in the use of computers and other information technology, many entities process significant information electronically. Accordingly, it may be difficult or impossible for the auditor to access certain information for inspection, inquiry, or confirmation without using information technology. [Paragraph added, effective for periods beginning after August 31, 1984, by Statement on Auditing Standards No. 48. As amended, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

**.13**  The nature, timing, and extent of the procedures to be applied on a particular engagement are a matter of professional judgment to be determined by the auditor, based on the specific circumstances. However, the procedures adopted should be adequate to achieve the auditor's specific objectives and reduce detection risk to a level acceptable to the auditor. The evidential matter obtained should be sufficient for the auditor to form conclusions concerning the validity of the individual assertions embodied in the components of financial statements. The evidential matter provided by the combination of the auditor's assessment of inherent risk and control risk and on substantive tests should provide a reasonable basis for his or her opinion (see section 319, *Consideration of Internal Control in a Financial Statement Audit*, paragraphs .105 through .108). [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. As amended, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80. Revised, May 2001, to reflect conforming

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

changes necessary due to the issuance of Statement on Auditing Standards No. 94.]

**.14**    In entities where significant information is transmitted, processed, maintained, or accessed electronically, the auditor may determine that it is not practical or possible to reduce detection risk to an acceptable level by performing only substantive tests for one or more financial statement assertions. For example, the potential for improper initiation or alteration of information to occur and not be detected may be greater if information is produced, maintained, or accessed only in electronic form. In such circumstances, the auditor should perform tests of controls to gather evidential matter to use in assessing control risk, fn 2(24) or consider the effect on his or her report (see paragraph .25 of this section). [Paragraph added, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

## Nature of Evidential Matter

**.15**    Evidential matter supporting the financial statements consists of the underlying accounting data and all corroborating information available to the auditor. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 80, December 1996.]

**.16**    The books of original entry, the general and subsidiary ledgers, related accounting manuals, and records such as work sheets and spreadsheets supporting cost allocations, computations, and reconciliations all constitute evidence in support of the financial statements. These accounting data are often in electronic form. Accounting data alone cannot be considered sufficient support for financial statements; on the other hand, without adequate attention to the propriety and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

**.17**    Corroborating evidential matter includes both written and electronic information such as checks; records of electronic fund transfers; invoices; contracts; minutes of meetings; confirmations and other written representations by knowledgeable people; information obtained by the auditor from inquiry, observation, inspection, and physical examination; and other information developed by, or available to, the auditor which permits him or her to reach conclusions through valid reasoning. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

**.18**   In certain entities, some of the accounting data and corroborating evidential matter are available only in electronic form. Source documents such as purchase orders, bills of lading, invoices, and checks are replaced with electronic messages. For example, entities may use Electronic Data Interchange (EDI) or image processing systems. In EDI, the entity and its customers or suppliers use communication links to transact business electronically. Purchase, shipping, billing, cash receipt, and cash disbursement transactions are often consummated entirely by the exchange of electronic messages between the parties. In image processing systems, documents are scanned and converted into electronic images to facilitate storage and reference, and the source documents may not be retained after conversion. Certain electronic evidence may exist at a certain point in time. However, such evidence may not be retrievable after a specified period of time if files are changed and if backup files do not exist. Therefore, the auditor should consider the time during which information exists or is available in determining the nature, timing, and extent of his or her substantive tests, and, if applicable, tests of controls. [Paragraph added, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

**.19**   The auditor tests underlying accounting data by (*a*) analysis and review, (*b*) retracing the procedural steps followed in the accounting process and in developing the allocations involved, (*c*) recalculation, and (*d*) reconciling related types and applications of the same information. Through the performance of such procedures, the auditor may determine that the accounting records are internally consistent. Such internal consistency ordinarily provides evidence about the fairness of presentation of the financial statements. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

**.20**   The pertinent accounting data and corroborating evidential matter to support entries in the accounts and assertions in the financial statements ordinarily are available from the entity's files and accessible to the auditor for examination at certain points or periods in time. Both within the entity's organization and outside it are knowledgeable people to whom the auditor can direct inquiries. Assets having physical existence are available to the auditor for his or her inspection. Activities of the entity's personnel can be observed. Based on observations of these or other conditions or circumstances, the auditor may reach conclusions about the validity of various assertions in the financial statements. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984.

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

## Competence of Evidential Matter

**.21**   To be competent, evidence, regardless of its form, must be both valid and relevant. The validity of evidential matter is so dependent on the circumstances under which it is obtained that generalizations about the reliability of various kinds of evidence are subject to important exceptions. If the possibility of important exceptions is recognized, however, the following presumptions, which are not mutually exclusive, about the validity of evidential matter in auditing have some usefulness:

*a.*   When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity.

*b.*   The more effective the internal control, the more assurance it provides about the reliability of the accounting data and financial statements.

*c.*   The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly.

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

## Sufficiency of Evidential Matter

**.22**   The independent auditor's objective is to obtain sufficient competent evidential matter to provide him or her with a reasonable basis for forming an opinion. The amount and kinds of evidential matter required to support an informed opinion are matters for the auditor to determine in the exercise of his or her professional judgment after a careful study of the circumstances in the particular case. However, in the great majority of cases, the auditor has to rely on evidence that is persuasive rather than convincing. Both the individual assertions in financial statements and the overall proposition that the financial statements as a whole are fairly presented are of such a nature that even an experienced auditor is seldom convinced beyond all doubt with respect to all aspects of the statements being audited. [Paragraph renumbered by the issuance of Statement on Auditing Standards No.

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

**.23**    An auditor typically works within economic limits; the auditor's opinion, to be economically useful, must be formed within a reasonable length of time and at reasonable cost. The auditor must decide, again exercising professional judgment, whether the evidential matter available to him or her within the limits of time and cost is sufficient to justify expression of an opinion. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 80, December 1996.]

**.24**    As a guiding rule, there should be a rational relationship between the cost of obtaining evidence and the usefulness of the information obtained. The matter of difficulty and expense involved in testing a particular item is not in itself a valid basis for omitting the test. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 80, December 1996.]

## Evaluation of Evidential Matter

**.25**    In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved. The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation. In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles. fn 3(25) In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements. To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion. fn 4(26) [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

# Appendix

**Financial Statement Assertions, Illustrative Audit Objectives, and Examples of Substantive Tests**

**.26**

**Illustrations for Inventories of a Manufacturing Company**

This appendix illustrates the use of assertions in developing audit objectives and designing substantive tests. The following examples of substantive tests are not intended to be all-inclusive nor is it expected that all of the procedures would be applied in an audit.

| _Illustrative Audit Objectives_ | _Examples of Substantive Tests_ |
|---|---|
| _Existence or Occurrence_ | |
| Inventories included in the balance sheet physically exist | • Observing physical inventory counts |
| | • Obtaining confirmation of inventories at locations outside the entity |
| | • Testing of inventory transactions between a preliminary physical inventory date and the balance sheet date. |
| Inventories represent items held for sale or use in the normal course of business. | • Reviewing perpetual inventory records, production records, and purchasing records for indications of current activity. |
| | • Comparing inventories with a current sales catalog and subsequent sales and delivery reports. |
| | • Using the work of specialists to corroborate the nature of specialized products. |
| _Completeness_ | |
| Inventory quantities include all products, materials, and supplies on hand | • Observing physical inventory counts |

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

|  |  |
|---|---|
|  | • Analytically comparing the relationship of inventory balances to recent purchasing, production, and sales activities. |
|  | • Testing shipping and receiving cutoff procedures. |
| Inventory quantities include all products, materials, and supplies owned by the company that are in transit or stored at outside locations. | • Obtaining confirmation of inventories at locations outside the entity. |
|  | • Analytically comparing the relationship of inventory balances to recent purchasing, production, and sales activities. |
|  | • Testing shipping and receiving cutoff procedures. |
| Inventory listings are accurately compiled and the totals are properly included in the inventory accounts. | • Tracing test counts recorded during the physical inventory observation to the inventory listing. |
|  | • Accounting for all inventory tags and count sheets used in recording the physical inventory counts. |
|  | • Testing the clerical accuracy of inventory listings. |
|  | • Reconciling physical counts to perpetual records and general ledger balances and investigating significant fluctuations. |

### *Rights and Obligations*

|  |  |
|---|---|
| The entity has legal title or similar rights of ownership to the inventories. | • Observing physical inventory counts. |
|  | • Obtaining confirmation of inventories at locations outside the entity. |
|  | • Examining paid vendors' invoices, consignment agreements, and contracts. |

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

| | |
|---|---|
| Inventories are properly classified in the balance sheet as current assets. | • Reviewing drafts of the financial statements. |
| The major categories of inventories and their bases of valuation are adequately disclosed in the financial statements. | • Reviewing drafts of the financial statements. |
| | • Comparing the disclosures made in the financial statements to the requirements of generally accepted accounting principles. |
| The pledge or assignment of any inventories is appropriately disclosed. | • Obtaining confirmation of inventories pledged under loan agreements. |

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 80, December 1996.]

# AU Section 334

## *Related Parties*

**(Supersedes Statement on Auditing Standards No. 6, AICPA, *Professional Standards*, vol. 1, AU sec. 335.01-.19) fn \*(27)**

**Source: SAS No. 45.**

**See section 9334 for interpretations of this section.**

**Effective for periods ended after September 30, 1983, unless otherwise indicated.**

.01    This section provides guidance on procedures that should be considered by the auditor when he is performing an audit of financial statements in accordance with generally accepted auditing standards to identify related party relationships and transactions and to satisfy himself concerning the required financial statement accounting and disclosure. fn 1(28) The procedures set forth in this section should not be considered all-inclusive. Also, not all of them may be required in every audit.

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

## Accounting Considerations

.02   FASB Statement No. 57, *Related Party Disclosures* [AC section R36], gives the requirements for related party disclosures. Certain accounting pronouncements prescribe the accounting treatment when related parties are involved; however, established accounting principles ordinarily do not require transactions with related parties to be accounted for on a basis different from that which would be appropriate if the parties were not related. The auditor should view related party transactions within the framework of existing pronouncements, placing primary emphasis on the adequacy of disclosure. In addition, the auditor should be aware that the substance of a particular transaction could be significantly different from its form and that financial statements should recognize the substance of particular transactions rather than merely their legal form. fn 2(29)

.03   Transactions that because of their nature may be indicative of the existence of related parties include fn 3 (30)—

    *a.*   Borrowing or lending on an interest-free basis or at a rate of interest significantly above or below market rates prevailing at the time of the transaction.

    *b.*   Selling real estate at a price that differs significantly from its appraised value.

    *c.*   Exchanging property for similar property in a nonmonetary transaction.

    *d.*   Making loans with no scheduled terms for when or how the funds will be repaid.

## Audit Procedures

.04   An audit performed in accordance with generally accepted auditing standards cannot be expected to provide assurance that all related party transactions will be discovered. Nevertheless, during the course of his audit, the auditor should be aware of the possible existence of material related party transactions that could affect the financial statements and of common ownership or management control relationships for which FASB Statement No. 57 [AC section R36] requires disclosure even though there are no transactions. Many of the procedures outlined in the following paragraphs are normally performed in an audit in accordance with generally accepted auditing standards, even if the auditor has no reason to suspect that related party transactions or control relationships exist. Other audit procedures set forth in this section are specifically directed to related party transactions.

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

**.05**  In determining the scope of work to be performed with respect to possible transactions with related parties, the auditor should obtain an understanding of management responsibilities and the relationship of each component to the total entity. He should consider controls over management activities, and he should consider the business purpose served by the various components of the entity. Normally, the business structure and style of operating are based on the abilities of management, tax and legal considerations, product diversification, and geographical location. Experience has shown, however, that business structure and operating style are occasionally deliberately designed to obscure related party transactions.

**.06**  In the absence of evidence to the contrary, transactions with related parties should not be assumed to be outside the ordinary course of business. The auditor should, however, be aware of the possibility that transactions with related parties may have been motivated solely, or in large measure, by conditions similar to the following:

    *a.*    Lack of sufficient working capital or credit to continue the business

    *b.*    An urgent desire for a continued favorable earnings record in the hope of supporting the price of the company's stock

    *c.*    An overly optimistic earnings forecast

    *d.*    Dependence on a single or relatively few products, customers, or transactions for the continuing success of the venture

    *e.*    A declining industry characterized by a large number of business failures

    *f.*    Excess capacity

    *g.*    Significant litigation, especially litigation between stockholders and management

    *h.*    Significant obsolescence dangers because the company is in a high-technology industry

### Determining the Existence of Related Parties

**.07**  The auditor should place emphasis on testing material transactions with parties he knows are related to the reporting entity. Certain relationships, such as parent-subsidiary or investor-investee, may be clearly evident. Determining the existence of others requires the application of specific audit procedures, which may include the following:

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

# AU Section 326

## *Evidential Matter*

**(Supersedes section 330, "Evidential Matter")**

**Source: SAS No. 31; SAS No. 48; SAS No. 80.**

**See section 9326 for interpretations of this section.**

**Issue date, unless otherwise indicated: August, 1980**

.01     The third standard of field work is:

> Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

.02     Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter fn 1 (1)concerning the assertions in such financial statements. The measure of the validity of such evidence for audit purposes lies in the judgment of the auditor; in this respect audit evidence differs from legal evidence, which is circumscribed by rigid rules. Evidential matter varies substantially in its influence on the auditor as he or she develops an opinion with respect to financial statements under audit. The pertinence of the evidence, its objectivity, its timeliness, and the existence of other evidential matter corroborating the conclusions to which it leads all bear on its competence.

## Nature of Assertions

.03     Assertions are representations by management that are embodied in financial statement components. They can be either explicit or implicit and can be classified according to the following broad categories:

- Existence or occurrence
- Completeness
- Rights and obligations

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

- •     Valuation or allocation

- •     Presentation and disclosure

.04     Assertions about existence or occurrence address whether assets or liabilities of the entity exist at a given date and whether recorded transactions have occurred during a given period. For example, management asserts that finished goods inventories in the balance sheet are available for sale. Similarly, management asserts that sales in the income statement represent the exchange of goods or services with customers for cash or other consideration.

.05     Assertions about completeness address whether all transactions and accounts that should be presented in the financial statements are so included. For example, management asserts that all purchases of goods and services are recorded and are included in the financial statements. Similarly, management asserts that notes payable in the balance sheet include all such obligations of the entity.

.06     Assertions about rights and obligations address whether assets are the rights of the entity and liabilities are the obligations of the entity at a given date. For example, management asserts that amounts capitalized for leases in the balance sheet represent the cost of the entity's rights to leased property and that the corresponding lease liability represents an obligation of the entity.

.07     Assertions about valuation or allocation address whether asset, liability, equity, revenue, and expense components have been included in the financial statements at appropriate amounts. For example, management asserts that property is recorded at historical cost and that such cost is systematically allocated to appropriate accounting periods. Similarly, management asserts that trade accounts receivable included in the balance sheet are stated at net realizable value. [As amended, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

.08     Assertions about presentation and disclosure address whether particular components of the financial statements are properly classified, described, and disclosed. For example, management asserts that obligations classified as long-term liabilities in the balance sheet will not mature within one year. Similarly, management asserts that amounts presented as extraordinary items in the income statement are properly classified and described.

## Use of Assertions in Developing Audit Objectives and Designing Substantive

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

## Tests

.09    In obtaining evidential matter in support of financial statement assertions, the auditor develops specific audit objectives in the light of those assertions. In developing the audit objectives of a particular engagement, the auditor should consider the specific circumstances of the entity, including the nature of its economic activity and the accounting practices unique to its industry. For example, one audit objective related to the assertion about completeness that an auditor might develop for inventory balances is that inventory quantities include all products, materials, and supplies on hand.

.10    There is not necessarily a one-to-one relationship between audit objectives and procedures. Some auditing procedures may relate to more than one objective. On the other hand, a combination of auditing procedures may be needed to achieve a single objective. Paragraph .26 provides illustrative audit objectives for inventories of a manufacturing company for each of the broad categories of assertions listed in paragraph .03 and examples of substantive tests that may achieve those audit objectives.

.11    In selecting particular substantive tests to achieve the audit objectives he or she has developed, an auditor considers, among other things, the risk of material misstatement of the financial statements, including the assessed levels of control risk, and the expected effectiveness and efficiency of such tests. These considerations include the nature and materiality of the items being tested, the kinds and competence of available evidential matter, and the nature of the audit objective to be achieved. For example, in designing substantive tests to achieve an objective related to the assertion of existence or occurrence, the auditor selects from items contained in a financial statement amount and searches for relevant evidential matter. On the other hand, in designing procedures to achieve an objective related to the assertion of completeness, the auditor selects from evidential matter indicating that an item should be included in the relevant financial statement amount and investigates whether that item is so included.

.12    The auditor's specific audit objectives do not change whether information is processed manually or electronically. However, the methods of applying audit procedures to gather evidence may be influenced by the method of processing. The auditor may use either manual auditing procedures, information technology-assisted audit techniques, or a combination of both to obtain sufficient competent evidential matter. Because of the growth in the use of computers and other information technology, many entities process significant information electronically. Accordingly, it may be difficult or impossible for the auditor to access certain information for inspection, inquiry, or confirmation without using information technology. [Paragraph added, effective for periods beginning after August

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

31, 1984, by Statement on Auditing Standards No. 48. As amended, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

.13    The nature, timing, and extent of the procedures to be applied on a particular engagement are a matter of professional judgment to be determined by the auditor, based on the specific circumstances. However, the procedures adopted should be adequate to achieve the auditor's specific objectives and reduce detection risk to a level acceptable to the auditor. The evidential matter obtained should be sufficient for the auditor to form conclusions concerning the validity of the individual assertions embodied in the components of financial statements. The evidential matter provided by the combination of the auditor's assessment of inherent risk and control risk and on substantive tests should provide a reasonable basis for his or her opinion (see section 319, *Consideration of Internal Control in a Financial Statement Audit,* paragraphs .105 through .108). [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. As amended, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80. Revised, May 2001, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 94.]

.14    In entities where significant information is transmitted, processed, maintained, or accessed electronically, the auditor may determine that it is not practical or possible to reduce detection risk to an acceptable level by performing only substantive tests for one or more financial statement assertions. For example, the potential for improper initiation or alteration of information to occur and not be detected may be greater if information is produced, maintained, or accessed only in electronic form. In such circumstances, the auditor should perform tests of controls to gather evidential matter to use in assessing control risk, fn 2(2) or consider the effect on his or her report (see paragraph .25 of this section). [Paragraph added, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

## Nature of Evidential Matter

.15    Evidential matter supporting the financial statements consists of the underlying accounting data and all corroborating information available to the auditor. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 80, December 1996.]

.16    The books of original entry, the general and subsidiary ledgers, related accounting

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

manuals, and records such as work sheets and spreadsheets supporting cost allocations, computations, and reconciliations all constitute evidence in support of the financial statements. These accounting data are often in electronic form. Accounting data alone cannot be considered sufficient support for financial statements; on the other hand, without adequate attention to the propriety and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

.17    Corroborating evidential matter includes both written and electronic information such as checks; records of electronic fund transfers; invoices; contracts; minutes of meetings; confirmations and other written representations by knowledgeable people; information obtained by the auditor from inquiry, observation, inspection, and physical examination; and other information developed by, or available to, the auditor which permits him or her to reach conclusions through valid reasoning. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

.18    In certain entities, some of the accounting data and corroborating evidential matter are available only in electronic form. Source documents such as purchase orders, bills of lading, invoices, and checks are replaced with electronic messages. For example, entities may use Electronic Data Interchange (EDI) or image processing systems. In EDI, the entity and its customers or suppliers use communication links to transact business electronically. Purchase, shipping, billing, cash receipt, and cash disbursement transactions are often consummated entirely by the exchange of electronic messages between the parties. In image processing systems, documents are scanned and converted into electronic images to facilitate storage and reference, and the source documents may not be retained after conversion. Certain electronic evidence may exist at a certain point in time. However, such evidence may not be retrievable after a specified period of time if files are changed and if backup files do not exist. Therefore, the auditor should consider the time during which information exists or is available in determining the nature, timing, and extent of his or her substantive tests, and, if applicable, tests of controls. [Paragraph added, effective for engagements beginning on or after January 1, 1997, by Statement on Auditing Standards No. 80.]

.19    The auditor tests underlying accounting data by (a) analysis and review, (b) retracing the procedural steps followed in the accounting process and in developing the allocations involved, (c) recalculation, and (d) reconciling related types and applications of the same

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

information. Through the performance of such procedures, the auditor may determine that the accounting records are internally consistent. Such internal consistency ordinarily provides evidence about the fairness of presentation of the financial statements. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

.20    The pertinent accounting data and corroborating evidential matter to support entries in the accounts and assertions in the financial statements ordinarily are available from the entity's files and accessible to the auditor for examination at certain points or periods in time. Both within the entity's organization and outside it are knowledgeable people to whom the auditor can direct inquiries. Assets having physical existence are available to the auditor for his or her inspection. Activities of the entity's personnel can be observed. Based on observations of these or other conditions or circumstances, the auditor may reach conclusions about the validity of various assertions in the financial statements. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

## Competence of Evidential Matter

.21    To be competent, evidence, regardless of its form, must be both valid and relevant. The validity of evidential matter is so dependent on the circumstances under which it is obtained that generalizations about the reliability of various kinds of evidence are subject to important exceptions. If the possibility of important exceptions is recognized, however, the following presumptions, which are not mutually exclusive, about the validity of evidential matter in auditing have some usefulness:

a.    When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity.

b.    The more effective the internal control, the more assurance it provides about the reliability of the accounting data and financial statements.

c.    The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly.

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

## Sufficiency of Evidential Matter

.22    The independent auditor's objective is to obtain sufficient competent evidential matter to provide him or her with a reasonable basis for forming an opinion. The amount and kinds of evidential matter required to support an informed opinion are matters for the auditor to determine in the exercise of his or her professional judgment after a careful study of the circumstances in the particular case. However, in the great majority of cases, the auditor has to rely on evidence that is persuasive rather than convincing. Both the individual assertions in financial statements and the overall proposition that the financial statements as a whole are fairly presented are of such a nature that even an experienced auditor is seldom convinced beyond all doubt with respect to all aspects of the statements being audited. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

.23    An auditor typically works within economic limits; the auditor's opinion, to be economically useful, must be formed within a reasonable length of time and at reasonable cost. The auditor must decide, again exercising professional judgment, whether the evidential matter available to him or her within the limits of time and cost is sufficient to justify expression of an opinion. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 80, December 1996.]

.24    As a guiding rule, there should be a rational relationship between the cost of obtaining evidence and the usefulness of the information obtained. The matter of difficulty and expense involved in testing a particular item is not in itself a valid basis for omitting the test. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered by the issuance of Statement on Auditing Standards No. 80, December 1996.]

## Evaluation of Evidential Matter

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

.25     In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved. The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation. In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles. fn 3(3) In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements. To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion. fn 4(4) [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 48, July 1984. Paragraph subsequently renumbered and amended, effective for engagements beginning on or after January 1, 1997, by the issuance of Statement on Auditing Standards No. 80.]

## Appendix

### Financial Statement Assertions, Illustrative Audit Objectives, and Examples of Substantive Tests

.26

### Illustrations for Inventories of a Manufacturing Company

This appendix illustrates the use of assertions in developing audit objectives and designing substantive tests. The following examples of substantive tests are not intended to be all-inclusive nor is it expected that all of the procedures would be applied in an audit.

| _Illustrative Audit Objectives_ | _Examples of Substantive Tests_ |
| --- | --- |
| _Existence or Occurrence_ | |
| Inventories included in the balance sheet physically exist | • Observing physical inventory counts |
| | • Obtaining confirmation of inventories at locations outside the entity |

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

|  |  |
|---|---|
|  | •     Testing of inventory transactions between a preliminary physical inventory date and the balance sheet date. |
| Inventories represent items held for sale or use in the normal course of business. | •     Reviewing perpetual inventory records, production records, and purchasing records for indications of current activity. |
|  | •     Comparing inventories with a current sales catalog and subsequent sales and delivery reports. |
|  | •     Using the work of specialists to corroborate the nature of specialized products. |

*Completeness*

|  |  |
|---|---|
| Inventory quantities include all products, materials, and supplies on hand | •     Observing physical inventory counts |
|  | •     Analytically comparing the relationship of inventory balances to recent purchasing, production, and sales activities. |
|  | •     Testing shipping and receiving cutoff procedures. |
| Inventory quantities include all products, materials, and supplies owned by the company that are in transit or stored at outside locations. | •     Obtaining confirmation of inventories at locations outside the entity. |
|  | •     Analytically comparing the relationship of inventory balances to recent purchasing, production, and sales activities. |
|  | •     Testing shipping and receiving cutoff procedures. |
| Inventory listings are accurately compiled and the totals are properly included in the inventory accounts. | •     Tracing test counts recorded during the physical inventory observation to the inventory listing. |
|  | •     Accounting for all inventory tags and count sheets used in recording the physical inventory counts. |

COPYRIGHT © 2002, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (AICPA)

|  |  |
|---|---|
|  | • Testing the clerical accuracy of inventory listings. |
|  | • Reconciling physical counts to perpetual records and general ledger balances and investigating significant fluctuations. |

### Rights and Obligations

|  |  |
|---|---|
| The entity has legal title or similar rights of ownership to the inventories. | • Observing physical inventory counts. |
|  | • Obtaining confirmation of inventories at locations outside the entity. |
|  | • Examining paid vendors' invoices, consignment agreements, and contracts. |
| Inventories exclude items billed to customers or owned by others. | • Examining paid vendors' invoices, consignment agreements, and contracts. |
|  | • Testing shipping and receiving cutoff procedures. |

### Valuation or Allocation

|  |  |
|---|---|
| Inventories are properly stated at cost (except when market is lower). | • Examining paid vendors' invoices. |
|  | • Reviewing direct labor rates. |
|  | • Testing the computation of standard overhead rates. |
|  | • Examining analyses of purchasing and manufacturing standard cost variances. |
| Slow-moving, excess, defective, and obsolete items included in inventories are properly identified. | • Examining an analysis of inventory turnover. |
|  | • Reviewing industry experience and trends. |

## PART II: PRIMARY DIRECTION OF OVERALL INHERENT RISK

The factors indicated in PART IA, while not actually creating inherent risk, sometimes generate management motivations that cause the risk factors in PART IB, when present, to manifest themselves primarily in a particular direction.

*After determining materiality (see Form B-3, CHECKLIST FOR DETERMINING MATERIALITY), consider the significance of the risk factors listed in PART IB, in terms of their likelihood of contributing to a material (>MTM) misstatement in the financial statements, and whether the indicated risk factors in PARTs I, A or B, suggest management motivation or any other reason to expect a substantially higher probability of misstatements in one particular direction.*

1.  For those risk factors indicated in PART I as present, enter the appropriate codes in the right column, as follows:

    O = Significantly contributes to OVERSTATEMENT (of assets/income) risk

    U = Significantly contributes to UNDERSTATEMENT risk

    C = Significantly contributes to CONTROL risk (refer to in preparing Form B-2A, CHECKLIST FOR ASSESSING CONTROL ENVIRONMENT)

    N = Relatively insignificant

    Documentation of principal reasons for the foregoing evaluations may be noted in PART IV, or in an attachment.

2.  Based on the risk factors identified as significant, determine if there is any primary direction of inherent risk. If yes, indicate primary direction of overall inherent risk (see also Forms B-9, CYCLE RISK ASSESSMENT):

    (Check one)   ☑ OVERSTATEMENT   ☐ UNDERSTATEMENT   ☐ BIDIRECTIONAL
    and note principal reason(s):  _BONDING CO. : BANK EXPECT FAVORABLE FINANCIAL_
    _STATEMENTS_

3.  Use the accompanying matrix (PART IV) to summarize and evaluate identified inherent risk factors (including those indicated as relatively insignificant), any mitigating circumstances (including factors contributing to a preliminary control risk assessment of moderate or low) and the effects, if any, given to them in the selection and scope of substantive audit procedures.

## PART III: OVERALL AUDIT RISK CONCLUSION

Audit risk is the risk of issuing an inappropriate opinion on the financial statements, for example, an unqualified opinion when they are materially misstated. As we know, it is a function of three principal risk component factors, the first two of which (inherent and control risk) are client-associated, and the third (detection risk), which is auditor controlled. Consequently, audit risk is an expression of how much risk the auditor is willing to accept by being associated with the financial statements. (The lower the acceptable audit risk level, the more auditing is necessary.) It is determined or set judgmentally based on circumstances, particularly business risk factors. Maximum acceptable audit risk, as determined on an overall basis for the audit as a whole, generally applies to all significant cycles, and only in the primary direction, if any. A higher acceptable level of audit risk ordinarily applies to insignificant cycles and assertions. However, special circumstances may give rise to use of a lower acceptable audit risk for certain sensitive cycles or assertions.

Since inherent risk is only a component of audit risk, it has an independent effect on audit scope. The higher the inherent risk, the more auditing necessary to achieve the desired maximum audit risk level. But since many inherent risk factors (most particularly those in PART IB of this checklist that relate to management integrity and attitudes) likewise contribute significantly to business risk, they may further affect audit scope when considered, along with those relating primarily to financial statement user needs and expectations, by limiting maximum acceptable audit risk. (Although one might expect that a high level of inherent risk would lead to a lower acceptable audit risk, the opposite is possible because these factors function independently to influence audit scope. Likewise, it is possible to have low inherent risk, yet because of business risk factors that do not cause inherent risk, such as those listed in PART IA, only a low audit risk level is acceptable.)

As a guide, one might view "high", "moderate" and "low" audit risk, as the approximate equivalent of a 20%, 10% and 5% risk of incorrect acceptance, respectively, as might be used in a sampling application when there will be moderate reliance on an analytical or other corroborative substantive test, and no reliance on any test of internal controls.

Considering the factors (PARTs IA and B, and PART II) as business risk factors, determine whether the maximum acceptable audit risk level (applicable to the primary direction, or both directions, if equal) should be:

(Check one)   ☐ HIGH (minimum scope, consistent with GAAS)   ☑ MODERATE   ☐ LOW (highest scope)
Note principal reason(s):  _INHERENT & CONTROL RISK ARE NORMAL ~ HISTORICALLY NO_
_SIGNIFICANT PROBLEMS HAVE BEEN FOUND. (✻)_

Prepared by _____(ROLL)_____   Date _12/3/96_

Approved by _____   Date _____   BSSF 106.3

10/94 (✻) _CHOICE BETWEEN HIGH OR MODERATE ACCEPTABLE AUDIT RISK LEVELS DOES_
_NOT AFFECT AUDIT SCOPE!_

10/31/97

Planning notes

| Date | Prepared By | | Work |
|------|-------------|---|------|
| 10/31/97 | Bou | | Paper No. |
| | Reviewed By | | |
| | Euf | | |

- Insurance policies with premiums totalling approx 1 million will be purchased from PHS prior to year end.

- All other related party transactions are insignificant. Generally reimbursements for services rendered or amounts paid on their behalf.

- New debt for purchase of heavy equipment.

- New lease agreements for new equipment.

- Self performing HVAC and excavation. Hired several new employees. Started at the end of 1997.

BSSF2727

BS 02045



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES FIDELITY AND    :
GUARANTY COMPANY,
                              :  CIVIL ACTION
        PLAINTIFF             :  NO. 1:01-CV-00813
                              :
    V                         :
                              :
BRUCE J. BROWN AND BROWN SCHULTZ:  JUDGE KANE
SHERIDAN & FRITZ,             :
                              :
        DEFENDANTS            :



        DEPOSITION OF:  JOHN M. ORTENZIO


        TAKEN BY:       PLAINTIFF


        BEFORE:         TAMMY J. BAKER, REPORTER
                        NOTARY PUBLIC


        DATE:           MAY 23, 2002, 10:19 A.M.


        PLACE:          THOMAS, THOMAS & HAFER
                        305 NORTH FRONT STREET
                        HARRISBURG, PENNSYLVANIA


APPEARANCES:


    BERNKOPF, GOODMAN & BASEMAN, LLP
    BY: PETER B. McGLYNN, ESQUIRE

        FOR - PLAINTIFF

    SWARTZ, CAMPBELL & DETWILER
    BY: KATHLEEN M. CARSON, ESQUIRE

        FOR - DEFENDANTS



HAFN

Hughes
Albright
Foltz
Natale

Reporting Services, Inc.

2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • fax 717.540.0221 • Lancaster 717.393.5101

Page 82

1 construction accounting.
2    Q  Did you ever discuss with Mr. Brown what that
3 construction knowledge consisted of?
4       MS. CARSON: Objection to the form.
5       THE WITNESS: Only to the extent probably when I
6 first met him was how many construction companies was he
7 doing, was that something that they did.
8 BY MR. McGLYNN:
9    Q  Did you ever discuss with him at that time or any
10 other time that one of the things that CCI needed was for
11 Brown Schultz to prepare audited financial statements for
12 bonding companies?
13       MS. CARSON: Object to the form.
14       THE WITNESS: Are you talking about at the
15 inception of the relationship or. . .
16 BY MR. McGLYNN:
17    Q  At the inception of the relationship?
18    A  At the inception of the relationship, no.
19    Q  How about any time thereafter?
20    A  Later, sure.
21    Q  You specifically discussed with Bruce Brown the
22 fact that CCI needed an audited financial statement each
23 year for USF&G?
24       MS. CARSON: Object to the form.
25       THE WITNESS: No. There came a point in time

Page

1       MS. CARSON: Object to the form.
2 BY MR. McGLYNN:
3    Q  You may answer.
4    A  At the point in time when we began a relationship
5 with USF&G, certainly I would have communicated to Bru
6 though I probably wouldn't have had to because by that po
7 in time we had been doing audited statements for a numbe
8 years and it really wasn't anything to change other than
9 who was going to get it.
10    Q  All right.  And that was discussed with Bruce,
11 Bruce Brown?
12       MS. CARSON: Object to the form.
13       THE WITNESS: Well I certainly would have
14 informed him of a change in any -- who we were using fro
15 bonding company standpoint; so to that extent he would h
16 been aware of who was going to get it.
17 BY MR. McGLYNN:
18    Q  Did you hire Mr. Brown -- strike that.  Did you
19 ever discuss with Mr. Brown specifically about his knowl
20 of construction contracting auditing?
21    A  I'm sure back at the point in time when I went
22 from a review to that I would have talked to him about it,
23 although probably by that point in time I was comfortable
24 enough with Bruce's work product that I probably wouldr
25 have really questioned it I guess at that point in time.

Page 83

1 where I said to Bruce Brown that -- and this would have been
2 after doing a number of years of reviewed statements -- I
3 indicated to Bruce Brown that probably what I needed to
4 start doing was to have an audit as opposed to a review and
5 that would have come at a point in time when I had a
6 stronger person in the controller's position and the company
7 was growing and for whatever reason at that point in time I
8 felt that it was better for the company going forward on a
9 long term basis to have an audited statement as opposed to a
10 review; though at that specific and particular time the
11 issue of having it specifically for a bonding company I
12 don't think was part of the reasoning.
13 BY MR. McGLYNN:
14    Q  But that changed at some point in time in the
15 future?
16    A  Somewhere later it changed.
17    Q  And that was communicated by you to Mr. Brown?
18       MS. CARSON: Object to the form.
19       THE WITNESS: When the change going from a review
20 to an audit occurred?
21 BY MR. McGLYNN:
22    Q  Did you have any discussions at any time with
23 Bruce Brown, you directly with Bruce Brown concerning
24 USF&G's need for audited financial statements on an annual
25 basis?

Page

1    Q  Did you ever have any discussions with Mr.
2 Diminiani concerning the importance of having an auditor
3 CCI that was experienced in construction auditing?
4    A  Specifically, no, there was never any question in
5 terms of the quality of the audit that was done.  Dave
6 Diminiani never expressed any reservations relative to the
7 work product from Bruce's company.
8    Q  Did Mr. Diminiani know Bruce Brown other than
9 connection with the audit work that his firm was providin
10 to CCI?
11    A  I don't know.  I mean I know he knows Bruce
12 Brown.  They're both CPAs, so they certainly knew each
13 other.  They may have had other businesses that they both
14 consulted to, but beyond ours, I really don't know.
15    Q  Now, sir, you -- as part of CCI's relationship
16 with USF&G, you and other entities were required to execu
17 a master surety agreement, correct?
18    A  That's about right.
19    Q  Is that a copy of it?
20    A  It looks like one.
21    Q  Does your signature appear on there at all,
22 either individually or on behalf of any other entity?
23    A  I think it appears here as the president of an
24 entity as well as individually.
25       MR. McGLYNN: Why don't we have that marked as

## CCI CONSTRUCTION COMPANY, INC.

### CONTRACTS-IN-PROGRESS

### DECEMBER 31, 1997

| Job number | Project | Total contract price | Estimated total direct contract costs | Estimated total contract earnings (loss) before indirect costs | Inception to December 31, 1997 Direct contract costs to December 31, 1997 | Inception to December 31, 1997 Contract earnings (loss) accrued to December 31, 1997 before indirect costs | December 31, 1997 Costs and estimated earnings in excess of billings | December 31, 1997 Billings in excess of costs and estimated earnings | Billings to December 31, 1997 | Year ended December 31, 1997 Revenues earned | Year ended December 31, 1997 Direct cost of revenues earned | Year ended December 31, 1997 Gross profit (loss) before indirect costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 428 | U.E.P.H. Complex | $ 18,961,022 | $ 16,948,701 | $ 2,012,321 | $ 15,878,479 | $ 1,885,254 | $ 863,791 | $ 282,692 | $ 16,899,942 | $ 17,256,553 | $ 15,422,131 | $ 1,834,422 |
| 439 | Mahanoy Prison | 10,289,145 | 10,523,764 | ( 234,619) | 6,309,222 | ( 234,619) | | 283,255 | 6,337,295 | 6,074,603 | 6,309,222 | ( 234,619) |
| 445 | Houtzdale Prison | 10,357,787 | 10,440,743 | ( 82,956) | 4,169,371 | ( 82,956) | | | 4,349,670 | 4,086,415 | 4,169,371 | ( 82,956) |
| 448 | Outlook Pointe | 4,604,000 | 4,328,560 | 275,410 | 521,254 | 33,165 | 45,221 | | 509,198 | 554,419 | 521,254 | 33,165 |
| 449 | U.E.P.H. Headquarters | 1,387,666 | 1,374,859 | 12,807 | 515,339 | 4,800 | 46,756 | | 473,383 | 520,139 | 515,339 | 4,800 |
| 450 | Johnstown | 3,266,600 | 3,237,111 | 29,489 | 115,461 | 1,052 | 116,513 | | | 115,461 | 115,461 | 1,052 |
| 451 | Lord Fairfax | 8,860,993 | 6,391,785 | 489,208 | 411,608 | 31,503 | | 155,977 | 599,008 | 443,111 | 411,608 | 31,503 |
| | | $ 55,747,213 | $ 53,245,553 | $ 2,501,660 | $ 27,920,734 | $ 1,638,199 | $ 1,072,281 | $ 681,924 | $ 29,168,528 | $ 29,051,253 | $ 27,464,386 | $ 1,587,367 |

USFG/BS 0438

17

## CCI CONSTRUCTION COMPANY, INC.

CONTRACTS-IN-PROGRESS

DECEMBER 31, 1996

| Job number | Project | Total contract price | Estimated total direct contract costs | Estimated total contract earnings before indirect costs | Inception to December 31, 1996 — Direct contract costs to December 31, 1996 | Inception to December 31, 1996 — Contract earnings accrued to December 31, 1996 before indirect costs | Billings to December 31, 1996 | December 31, 1996 — Costs and estimated earnings in excess of billings | December 31, 1996 — Billings in excess of costs and estimated earnings | Year ended December 31, 1996 — Revenues earned | Year ended December 31, 1996 — Direct cost of revenues earned | Year ended December 31, 1996 — Gross profit before indirect costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 418 | Capital Sprinkler | $ 7,315,964 | $ 5,566,247 | $ 1,749,717 | $ 5,271,160 | $ 1,656,958 | $ 6,716,258 | $ 211,860 | | $ 5,320,564 | $ 3,668,043 | $ 1,452,541 |
| 420 | Capital HVAC | 298,050 | 223,180 | 74,870 | 92,420 | 31,004 | 181,922 | | 38,498 | 123,424 | 92,420 | 31,004 |
| 421 | Capital Electrical | 1,944,646 | 1,414,085 | 530,561 | 1,288,482 | 482,685 | 1,601,384 | 167,803 | | 1,769,167 | 1,286,482 | 482,685 |
| 422 | Home Depot | 5,040,319 | 4,902,610 | 137,709 | 4,034,072 | 113,311 | 4,562,418 | | 415,035 | 4,147,303 | 4,034,072 | 113,311 |
| 425 | Capital Senate | 90,557 | 67,821 | 22,736 | 34,345 | 11,514 | 57,220 | | 11,361 | 45,859 | 34,345 | 11,514 |
| 426 | U.E.P.H. Complex | 16,430,103 | 14,783,976 | 1,646,187 | 456,348 | 50,832 | 551,917 | | 44,737 | 507,190 | 456,348 | 50,832 |
| | | $ 31,120,309 | $ 26,957,919 | $ 4,162,300 | $ 11,174,827 | $ 2,346,304 | $ 13,651,099 | $ 319,663 | $ 509,631 | $ 11,913,497 | $ 9,771,710 | $ 2,141,881 |

USFG/BS 0418

19

# CCI CONSTRUCTION COMPANY, INC.

## CONTRACTS-IN-PROGRESS

### DECEMBER 31, 1995

| Job number | Project | Total contract price | Estimated total direct contract costs | Estimated total contract earnings (losses) before indirect costs | Inception to December 31, 1995 — Direct contract costs to December 31, 1995 | Contract earnings (losses) accrued to December 31, 1995 before indirect costs | Billings to December 31, 1995 | December 31, 1995 — Costs and estimated earnings (losses) in excess of billings | Billings in excess of costs and estimated earnings (losses) | Year ended December 31, 1995 — Revenues earned | Direct cost of revenues earned | Gross profit (loss) before indirect costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 209 | National Cancer Institute | $ 13,981,125 | $ 13,521,869 | $ 459,257 | $ 12,227,944 | $ 415,310 | $ 12,583,005 | $ 60,249 | | $ 6,134,030 | $ 5,894,106 | $ 239,924 |
| 304 | Lincoln University | 13,461,321 | 13,754,517 | ( 293,196) | 8,914,508 | ( 293,196) | 8,690,229 | | $ 58,917 | 7,387,637 | 7,998,028 | ( 260,391) |
| 311 | Lightner Road Elementary School | 5,868,799 | 6,379,576 | ( 510,837) | 6,314,158 | ( 510,837) | 5,862,741 | | 59,420 | 3,190,028 | 3,514,858 | ( 334,830) |
| 329 | Consolidation RDT&E | 15,381,515 | 14,633,120 | 748,385 | 13,255,498 | 626,784 | 12,932,907 | | 50,615 | 11,920,800 | 11,329,085 | 591,715 |
| 338 | N.W. Houston | 110,000 | 70,534 | 39,466 | 35,547 | 19,890 | 110,000 | | 54,563 | 55,437 | 35,547 | 19,890 |
| 339 | Mid-America | 186,784 | 138,887 | 47,897 | 108,243 | 37,329 | 186,784 | | 41,212 | 145,572 | 108,243 | 37,329 |
| 381 | Crestfield Hospital | 4,878,147 | 4,648,647 | 229,500 | 4,044,067 | 199,652 | 4,203,036 | 40,683 | | 2,736,176 | 2,596,603 | 141,573 |
| 384 | State College Area Middle School | 12,201,263 | 11,572,882 | 628,381 | 11,531,714 | 628,146 | 12,153,501 | 4,359 | | 5,713,273 | 5,404,288 | 308,985 |
| 385 | Carlisle Hospital | 3,030,894 | 2,857,872 | 173,022 | 2,546,440 | 154,298 | 2,711,689 | | 8,961 | 2,574,461 | 2,427,992 | 147,439 |
| 414 | Kaufmann's | 3,973,184 | 3,685,107 | 288,077 | 3,433,226 | 268,387 | 3,704,754 | | 3,141 | 3,701,613 | 3,433,226 | 268,387 |
| 416 | Capital Sprinkler | 5,898,000 | 5,148,000 | 750,000 | 1,403,117 | 204,417 | 953,170 | 654,364 | | 1,607,534 | 1,403,117 | 204,417 |
| | | $ 78,970,973 | $ 78,411,011 | $ 2,559,992 | $ 62,816,492 | $ 1,749,190 | $ 64,061,816 | $ 759,655 | $ 276,829 | $ 45,158,899 | $ 43,814,461 | $ 1,344,438 |

19

BY 00733

## CCI CONSTRUCTION COMPANY, INC.

### CONTRACTS-IN-PROGRESS

### DECEMBER 31, 1998

| Job number | Project | Total contract price | Estimated total direct contract costs | Estimated total contract earnings (loss) before indirect costs | Direct contract costs to December 31, 1998 | Contract earnings (loss) accrued to December 31, 1998 before indirect costs | Billings to December 31, 1998 | Costs and estimated earnings in excess of billings | Billings in excess of costs and estimated earnings | Revenues earned | Direct cost of revenues earned | Gross profit (loss) before indirect costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 439 | Mahanoy Prison | $ 11,699,418 | $ 10,687,972 | $ 1,031,446 | $ 10,666,608 | $ 1,031,333 | $ 10,481,740 | $ 1,216,401 | | $ 5,623,543 | $ 4,357,566 | $ 1,265,957 |
| 450 | Johnstown | 3,266,600 | 3,245,082 | 21,518 | 1,172,766 | 7,776 | 730,724 | 449,818 | | 1,064,029 | 1,057,305 | 6,724 |
| 451 | Lord Fairfax | 7,082,984 | 7,301,111 | ( 218,127) | 6,659,984 | ( 218,127) | 6,570,468 | | $ 128,611 | 5,998,746 | 6,248,376 | ( 248,630) |
| 454 | Albemarle Prison | 14,524,840 | 12,875,751 | 1,649,089 | 4,819,694 | 617,292 | 4,719,426 | 717,560 | | 5,438,986 | 4,819,694 | 617,292 |
| 455 | Perry Point | 12,937,341 | 11,463,840 | 1,473,501 | 4,734,492 | 608,547 | 3,108,536 | 2,234,503 | | 5,343,039 | 4,734,492 | 608,547 |
| 456 | Outlook - Hilliard | 5,380,745 | 4,801,310 | 579,435 | 2,715,193 | 327,677 | 2,732,602 | 310,268 | | 3,042,810 | 2,715,193 | 327,617 |
| 457 | Camp Hill | 1,495,629 | 1,372,273 | 123,356 | 547,295 | 49,197 | 617,799 | | 21,307 | 596,492 | 547,295 | 49,197 |
| 459 | Scott Air Force Base | 14,870,150 | 13,929,350 | 940,800 | 6,026,515 | 407,040 | 6,511,905 | | 138,290 | 6,433,815 | 6,026,515 | 407,040 |
| 460 | Glenn Plasma Center | 15,565,000 | 14,667,024 | 897,976 | 2,905,995 | 177,917 | 2,252,156 | 831,756 | | 3,063,912 | 2,905,995 | 177,917 |
| 461 | Outlook - Chesterfield | 3,842,372 | 3,629,824 | 212,548 | 1,518,251 | 88,902 | 1,097,444 | 509,709 | | 1,607,153 | 1,518,251 | 88,902 |
| 462 | Outlook - Westerville | 5,569,900 | 5,218,140 | 311,760 | 458,553 | 32,669 | 419,511 | 71,711 | | 491,222 | 458,553 | 32,669 |
| | | $ 96,254,979 | $ 89,171,677 | $ 7,083,302 | $ 42,225,696 | $ 3,130,223 | $ 39,302,311 | $ 6,341,728 | $ 288,208 | $ 38,721,692 | $ 35,389,315 | $ 3,332,292 |

USFG/BS  0459

18


*CCI CONSTRUCTION COMPANY, INC.*

*YEARS ENDED*
*DECEMBER 31, 1996 AND 1995*

USFG/BS 0398

BROWN
SCHULTZ
SNYDER
PLESIC
CERTIFIED PUBLIC ACCOUNTANTS
A Professional Corporation

B R O W N
S C H U L T Z
S N Y D E R
P L E S I C

Independent Auditors' Report

Board of Directors
CCI Construction Company, Inc.
Mechanicsburg, Pennsylvania

We have audited the accompanying balance sheets of CCI Construction Company, Inc. as of December 31, 1996 and 1995 and the related statements of income, shareholder's equity and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of CCI Construction Company, Inc. as of December 31, 1996 and 1995 and the results of its operations and its cash flows for the years then ended, in conformity with generally accepted accounting principles.

Our audits of the financial statements were made for the purpose of forming an opinion on the basic financial statements taken as a whole. The accompanying information is presented for purposes of additional analysis and is not a required part of the basic financial statements. Such information has been subjected to the auditing procedures applied in the audits of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

*Brown Schultz Snyder & Plesic*

February 12, 1997

USFG/BS 0399

1

## CCI CONSTRUCTION COMPANY, INC.

### BALANCE SHEETS - DECEMBER 31, 1996 AND 1995

#### ASSETS

| | 1996 | 1995 |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $ 3,346,115 | $ 2,238,057 |
| Investments in marketable securities | 1,803,677 | 2,541,970 |
| Accounts receivable, trade: | | |
| Shareholder | 268,583 | |
| Affiliates | 9,570 | 24,774 |
| Other customers: | | |
| Current | 2,606,101 | 4,419,308 |
| Retained | 954,777 | 1,630,553 |
| Note receivable | 31,689 | |
| Costs and estimated earnings in excess of billings | | |
| on uncompleted contracts | 379,663 | 759,655 |
| Prepaid expenses | 53,232 | 104,041 |
| Total current assets | 9,453,407 | 11,718,358 |
| Property and equipment: | | |
| Automobiles and trucks | 279,361 | 298,142 |
| Furniture | 654,220 | 665,216 |
| Leasehold improvements | 3,558 | 88,161 |
| Machinery and equipment | 187,559 | 184,684 |
| Small tools | 11,124 | 11,124 |
| | 1,135,822 | 1,247,327 |
| Less accumulated depreciation | 956,849 | 929,279 |
| | 178,973 | 318,048 |
| | $ 9,632,380 | $ 12,036,406 |

See notes to financial statements.

USFG/BS 0400

## LIABILITIES AND SHAREHOLDER'S EQUITY

| | 1996 | 1995 |
|---|---|---|
| Current liabilities: | | |
| Accounts payable, trade: | | |
| Affiliates | $      2,300 | $      2,300 |
| Other vendors: | | |
| Current | 2,777,935 | 4,285,641 |
| Retained | 1,232,823 | 2,838,191 |
| Accrued expenses | 278,159 | 103,348 |
| Taxes withheld and accrued | 10,857 | 28,368 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 509,631 | 276,829 |
| | | |
| Total liabilities (all current) | 4,811,705 | 7,534,677 |
| | | |
| Shareholder's equity: | | |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | 39 |
| Capital in excess of par | 9,758 | 9,758 |
| Retained earnings | 4,768,011 | 4,465,253 |
| Unrealized gain on marketable securities | 42,867 | 26,679 |
| | 4,820,675 | 4,501,729 |
| | $  9,632,380 | $  12,036,406 |

USFG/BS 0401

2

**CCI CONSTRUCTION COMPANY, INC.**

STATEMENTS OF INCOME

YEARS ENDED DECEMBER 31, 1996 AND 1995

| | 1996 | 1995 |
|---|---|---|
| Revenue, construction contracts | $ 24,465,870 | $ 48,181,072 |
| Cost of contracts | 23,146,686 | 47,208,857 |
| Gross profit | 1,319,184 | 972,215 |
| General and administrative expenses | 1,180,087 | 1,280,577 |
| Income (loss) from operations | 139,097 | ( 308,362) |
| Other income (expense): | | |
| Investment | 275,016 | 335,065 |
| Miscellaneous | 17,210 | 19,864 |
| Gain (loss) on sale of: | | |
| Property and equipment | ( 72,051) | ( 770) |
| Marketable securities | 3,852 | 57,413 |
| | 224,027 | 411,572 |
| Net income | $ 363,124 | $ 103,210 |

USFG/BS 0402

See notes to financial statements.

3

**CCI CONSTRUCTION COMPANY, INC.**

STATEMENTS OF SHAREHOLDER'S EQUITY

YEARS ENDED DECEMBER 31, 1996 AND 1995

| | Shares of common stock | Capital in excess of par | Retained earnings | Unrealized gain (loss) on marketable securities | Total |
|---|---|---|---|---|---|
| Balance, December 31, 1994 | $ 39 | $ 7,857 | $ 4,362,043 | $( 79,603) | $ 4,290,336 |
| Net income | | | 103,210 | | 103,210 |
| Contributions | | 1,901 | | | 1,901 |
| Unrealized gain on marketable securities | | | | 106,282 | 106,282 |
| Balance, December 31, 1995 | 39 | 9,758 | 4,465,253 | 26,679 | 4,501,729 |
| Net income | | | 363,124 | | 363,124 |
| Distributions | | | ( 60,366) | | ( 60,366) |
| Unrealized gain on marketable securities | | | | 16,188 | 16,188 |
| Balance, December 31, 1996 | $ 39 | $ 9,758 | $ 4,768,011 | $ 42,867 | $ 4,820,675 |

See notes to financial statements.

USFG/BS 0403

**CCI CONSTRUCTION COMPANY, INC.**

STATEMENTS OF CASH FLOWS

YEARS ENDED DECEMBER 31, 1996 AND 1995

|  | 1996 | 1995 |
|---|---|---|
| Cash flows from operating activities: |  |  |
| Net income | $ 363,124 | $ 103,210 |
| Adjustments: |  |  |
| Depreciation | 96,945 | 132,782 |
| (Gain) loss on sale of: |  |  |
| Property and equipment | 72,051 | 770 |
| Marketable securities | ( 186) | ( 36,671) |
| (Increase) decrease in: |  |  |
| Marketable securities | 80,000 | 49,250 |
| Accounts receivable | 2,235,604 | 1,864,507 |
| Costs and estimated earnings in excess of billings |  |  |
| on uncompleted contracts | 379,992 | ( 476,877) |
| Prepaid expenses | 50,809 | ( 7,943) |
| Increase (decrease) in: |  |  |
| Accounts payable | ( 3,113,074) | ( 666,218) |
| Accrued expenses | 174,811 | ( 231,759) |
| Taxes withheld and accrued | ( 17,511) | 5,799 |
| Billings in excess of costs and estimated earnings |  |  |
| on uncompleted contracts | 232,802 | ( 3,227,035) |
| Total adjustments | 192,243 | ( 2,593,395) |
| Net cash provided by (used in) operating activities | 555,367 | ( 2,490,185) |
| Cash flows from investing activities: |  |  |
| Purchase of investments | ( 100,681) | ( 842,552) |
| Proceeds from sale and maturities of investments | 775,348 | 1,052,595 |
| Due from shareholder |  | 13,594 |
| Issuance of note receivable | ( 35,000) |  |
| Repayment of note receivable | 3,311 |  |
| Purchase of property and equipment | ( 37,196) | ( 32,312) |
| Proceeds from sale of property and equipment | 7,275 | 23,996 |
| Net cash provided by investing activities | 613,057 | 215,321 |

(continued)

USFG/BS 0404

5

**CCI CONSTRUCTION COMPANY, INC.**

STATEMENTS OF CASH FLOWS (CONTINUED)

YEARS ENDED DECEMBER 31, 1996 AND 1995

|  | 1996 | 1995 |
|---|---|---|
| Cash flows from financing activities: |  |  |
| Contributions from shareholder |  | $ 1,901 |
| Distributions to shareholder | $( 60,366) |  |
| Net cash provided by (used in) financing activities | ( 60,366) | 1,901 |
| Net increase (decrease) in cash and cash equivalents | 1,108,058 | ( 2,272,963) |
| Cash and cash equivalents, beginning of year | 2,238,057 | 4,511,020 |
| Cash and cash equivalents, end of year | $ 3,346,115 | $ 2,238,057 |
| Supplemental disclosure of cash flow information: |  |  |
| Cash paid during the year for interest | $ 1,462 | $ 3,977 |
| Noncash activities: |  |  |
| Net unrealized gain on marketable securities (see statements of shareholder's equity) | 16,188 | 106,282 |

USFG/BS 0405

See notes to financial statements.

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS

YEARS ENDED DECEMBER 31, 1996 AND 1995

1.   **Summary of significant accounting policies:**

   *Form of business:*

   Effective January 1, 1995, the Company re-established itself as a Pennsylvania corporation and as of that date changed its name from CCI Construction Co. to CCI Construction Company, Inc.

   *Operations and operating cycle:*

   The Company constructs commercial buildings primarily under fixed-price contracts in the northeast United States.  The Company's receivables are concentrated among customers in this geographic area.  The Company extends credit to its customers and generally requires no collateral.

   The length of the Company's contracts varies but is typically between one to two years.  In accordance with normal practice in the construction industry, the Company includes asset and liability accounts relating to construction contacts in current assets and liabilities even when such amounts are realizable or payable over a period in excess of one year.

   *Use of estimates:*

   The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

   *Revenue and cost recognition:*

   Revenues from construction contracts are recognized on the percentage-of-completion method, measured by the percentage of direct cost incurred to date to estimated total direct cost for each contract.  That method is used because management considers total cost to be the best available measure of progress on the contracts.  Because of inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates used will change within the near term.

USFG/BS  0406

7

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1996 AND 1995

1.  **Summary of significant accounting policies (continued):**

*Revenue and cost recognition (continued):*

Contract costs include all direct material, labor and subcontracting costs and other direct costs related to contract performance. Indirect costs and general and administrative costs are charged to expense as incurred. Provisions for estimated losses on uncompleted contracts are made in the period in which such losses are first determined. Changes in job performance, job conditions and estimated profitability may result in revisions to costs and income and are recognized in the period in which the revisions are determined. An amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.

The asset, "Costs and estimated earnings in excess of billings on uncompleted contracts," represents revenues recognized in excess of amounts billed. The liability, "Billings in excess of costs and estimated earnings on uncompleted contracts," represents billings in excess of revenues recognized.

*Cash and cash equivalents:*

For purposes of reporting cash flows, the Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

*Marketable securities:*

Marketable securities consist of debt and equity securities.

The Company has adopted Statement of Financial Accounting Standards No. 115, Accounting for Certain Investments in Debt and Equity Securities. This statement addresses the accounting and reporting for investments in equity securities that have readily determinable fair values and for all investments in debt securities. Those investments are to be classified in three categories and accounted for as follows:

- Debt securities that the enterprise has the positive intent and ability to hold to maturity are classified as held-to-maturity securities and reported at amortized cost.

- Debt and equity securities that are bought and held principally for the purpose of selling in the near term are classified as trading securities and reported at fair value, with unrealized gains and losses included in earnings.

USFG/BS 0407

8

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1996 AND 1995

1. **Summary of significant accounting policies (continued):**

   *Marketable securities (continued):*

   - Debt and equity securities not classified as either held-to-maturity securities or trading securities are classified as available-for sale securities and reported at fair value, with unrealized gains and losses excluded from earnings and reported in a separate component of stockholder's equity. Fair value of the marketable securities is based on quoted market prices for those or similar securities or quotes from brokers.

   Gains and losses are determined using the specific identification method when securities are sold.

   *Property and equipment:*

   Property and equipment are stated at cost. Depreciation is provided using an accelerated method over the estimated useful lives of the assets.

   *Reclassification:*

   Certain 1995 amounts have been reclassified to conform with 1996 classifications.

2. **Cash and cash equivalents:**

   Cash and cash equivalents consist of the following:

   |  | 1996 | 1995 |
   |---|---|---|
   | Cash | $     792,232 | $(    506,611) |
   | Certificates of deposit | 191,723 | 638,805 |
   | Money market funds | 887,014 | 1,020,034 |
   | Repurchase agreements | 1,475,146 | 1,085,829 |
   |  | $  3,346,115 | $  2,238,057 |

   The amount of deposits in cash held at the bank exceeded the Federal Deposit Insurance Corporation (FDIC) by $984,523. The certificates of deposit and money market funds held by brokers and the repurchase agreements are not insured by the FDIC. The repurchase agreements sold by a bank were held in custody by this bank for the account of CCI Construction Company, Inc. and were invested in securities.

USFG/BS  0408

9

## CCI CONSTRUCTION COMPANY, INC.

### NOTES TO FINANCIAL STATEMENTS (CONTINUED)

### YEARS ENDED DECEMBER 31, 1996 AND 1995

3. **Marketable securities:**

The cost or amortized cost and the aggregate fair value of investments in the debt and equity securities at December 31, 1996 and 1995 are as follows:

| | 1996 | | | 1995 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Cost or amortized cost | Gross unrealized losses | Gross unrealized gains | Estimated fair value | Cost or amortized cost | Gross unrealized losses | Gross unrealized gains | Estimated fair value |

| | Cost or amortized cost | Gross unrealized losses | Gross unrealized gains | Estimated fair value | Cost or amortized cost | Gross unrealized losses | Gross unrealized gains | Estimated fair value |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Trading securities, corporate equity securities | | | | | $ 100,000 | $ 20,000 | | $ 80,000 |
| Available-for-sale securities: | | | | | | | | |
| Mutual funds | $ 1,482,961 | $ 11,387 | $ 66,313 | $ 1,537,887 | 1,675,109 | | $ 39,214 | 1,714,323 |
| Obligations of states and political subdivisions | 277,849 | 12,059 | | 265,790 | 760,182 | 12,535 | | 747,647 |
| | $ 1,760,810 | $ 23,446 | $ 66,313 | $ 1,803,677 | $ 2,535,291 | $ 32,535 | $ 39,214 | $ 2,541,970 |

USFG/BS 0409

10

### CCI CONSTRUCTION COMPANY, INC.

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1996 AND 1995

3. Marketable securities (continued):

During 1995, the Company sold securities classified as held-to-maturity with an amortized cost of $702,679 for a gain of $35,502. On December 31, 1995, the Company transferred the held-to-maturity securities remaining at that date which had an amortized cost of $760,182 and an unrealized gain of $12,535 to the available-for-sale category due to a change of intent to hold these securities until maturity.

The amortized cost and estimated fair value of available-for-sale debt securities at December 31, 1996 by contractual maturity are shown below. Expected maturities will differ from contractual maturities because borrowers may have the right to call or prepay obligations with or without call or prepayment penalties.

|  | Amortized cost | Estimated fair value |
|---|---|---|
| Due after ten years | $ 277,849 | $ 265,790 |

| Available-for-sale securities: | 1996 | 1995 |
|---|---|---|
| Cost of securities sold | $ 775,162 | $ 313,245 |
| Proceeds from sale | 775,347 | 314,116 |
| Gross realized gains | 12,047 | 5,318 |
| Gross realized losses | 11,862 | 4,447 |

Realized gains of $513 on trading securities were included in the net income for 1996 and unrealized gains of $3,000 on these securities were included in the net income for 1995.

USFG/BS 0410

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1996 AND 1995

4.  Uncompleted contracts:

|  | 1996 | 1995 |
|---|---|---|
| Contract costs | $ 11,174,827 | $ 62,816,462 |
| Estimated earnings thereon | 2,346,304 | 1,748,180 |
|  | 13,521,131 | 64,564,642 |
| Less billings applicable thereto | 13,651,099 | 64,081,816 |
|  | $( 129,968) | $ 482,826 |

| Included in the balance sheet as: |  |  |
|---|---|---|
| Costs and estimated earnings in excess of billings on uncompleted contracts | $ 379,663 | $ 759,655 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | ( 509,631) | ( 276,829) |
|  | $( 129,968) | $ 482,826 |

5.  Line of credit:

The Company has available a $1,000,000 unsecured line of credit expiring on April 30, 1997 which requires interest at the bank's prime rate. The Company has no outstanding balance on the line at December 31, 1996.

6.  Rent expense:

Various equipment and operating facilities are leased under noncancelable agreements. Total rent expense for all leases, including the related party lease discussed in Note 7, was $120,623 and $177,186 in 1996 and 1995, respectively.

USFG/BS 0411

12

*CCI CONSTRUCTION COMPANY, INC.*

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1996 AND 1995

6. **Rent expense (continued):**

The aggregate minimum rental commitments under all noncancelable leases at December 31, 1996 are as follows:

| Year ending December 31, | Amount |
|---|---|
| 1997 | $ 72,233 |
| 1998 | 11,784 |
| | $ 84,017 |

7. **Related party transactions:**

The Company leased an operating facility from a related party, Old Gettysburg Associates II through November 30, 1996. The sole shareholder of the Company has a 20% partnership interest in Old Gettysburg Associates II. Total rent expense relating to this facility for 1996 and 1995 was $71,864 and $97,335, respectively.

Effective December 1, 1996, the Company began leasing an operating facility owned by its sole shareholder on a year-to-year basis. The lease requires an annual rental payment of $45,000. Rent expense for this facility was $3,750 for 1996. At December 31, 1996, the sole shareholder was billed $268,270 for costs incurred by the Company relating to renovations made to the operating facility noted above.

8. **Income taxes:**

No provision has been made for federal income taxes and certain state income taxes. Under a provision of the Internal Revenue Code and the Commonwealth of Pennsylvania Tax Act, and the revenue codes of certain states, the Company has elected not to be taxed as a corporation and the sole shareholder has consented to include the income in his individual return. Taxes have been provided on income earned in states that do not recognize these tax provisions.

USFG/BS 0412

13

**CCI CONSTRUCTION COMPANY, INC.**

COST OF CONTRACTS

YEARS ENDED DECEMBER 31, 1996 AND 1995

|  | 1996 | 1995 |
|---|---|---|
| Direct costs: | | |
| Labor | $ 1,726,413 | $ 1,805,825 |
| Payroll taxes | 183,327 | 191,852 |
| Employee benefits | 207,848 | 74,384 |
| Equipment rental | 7,437 | 23,371 |
| Materials | 2,031,948 | 2,505,759 |
| Other | 753,330 | 1,514,061 |
| Subcontractors | 17,773,935 | 40,267,339 |
| Temporary help |  | 54,907 |
| | 22,684,238 | 46,437,498 |
| Indirect costs: | | |
| Salaries | 174,179 | 488,820 |
| Payroll taxes | 19,727 | 45,197 |
| Employee benefits | 13,044 | 34,176 |
| Blueprints | 703 | 7,925 |
| Depreciation | 28,576 | 46,645 |
| Dues and permits | 293 | 595 |
| Employee recruitment | 1,702 | 4,439 |
| Insurance | 1,718 | 1,555 |
| Miscellaneous | 706 | 1,932 |
| Office supplies and expense | 2,515 | 16,622 |
| Postage | 1,790 | 6,237 |
| Professional services | 131,915 | 1,425 |
| Rent | 36,360 | 60,765 |
| Repairs and maintenance | 4,324 | 3,096 |
| Safety | 128 | 1,186 |
| Telephone | 16,446 | 23,210 |
| Temporary help | 581 | 4,037 |

USFG/BS 0413

(continued)

14

**CCI CONSTRUCTION COMPANY, INC.**

COST OF CONTRACTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1996 AND 1995

|  | 1996 | 1995 |
|---|---|---|
| Indirect costs (continued): |  |  |
| Trade books and journals | $ 89 | $ 387 |
| Training and seminars | 122 |  |
| Travel and entertainment | 440 | 14,118 |
| Utilities | 2,014 | 2,678 |
| Warehouse expenses | 776 | 1,015 |
| Warranty service | 24,300 | 5,299 |
|  | 462,448 | 771,359 |
| Total cost of contracts | $ 23,146,686 | $ 47,208,857 |

USFG/BS 0414

15

**CCI CONSTRUCTION COMPANY, INC.**

GENERAL AND ADMINISTRATIVE EXPENSES

YEARS ENDED DECEMBER 31, 1996 AND 1995

| | 1996 | 1995 |
|---|---|---|
| Salaries: | $      271,680 | $      215,480 |
| Officers | 399,009 | 395,996 |
| Office | 46,920 | 52,615 |
| Payroll taxes | | |
| Employee: | 38,686 | 55,052 |
| Benefits | 322 | 106 |
| Recruitment | 1,746 | 2,800 |
| Advertising | 3,273 | 4,536 |
| Bank charges | 4,712 | 8,790 |
| Blueprints | 855 | 7,272 |
| Company sponsored activities | 2,298 | 5,340 |
| Contributions | 68,369 | 86,137 |
| Depreciation | 8,150 | 7,251 |
| Dues | 15,148 | 17,714 |
| Insurance | 46,230 | 72,830 |
| Licenses and taxes | 268 | 204 |
| Miscellaneous | 11,099 | 6,363 |
| Office supplies | 9,305 | 13,338 |
| Postage | 98,874 | 161,453 |
| Professional services | 45,930 | 57,671 |
| Rent | 11,582 | 10,920 |
| Repairs and maintenance | 59,435 | 58,236 |
| Telephone | | 444 |
| Temporary help | 20,809 | 15,054 |
| Trade books and journals | 4,257 | 937 |
| Training and seminars | 9,737 | 24,038 |
| Travel and entertainment | 1,393 | |
| Utilities | | |
| Total general and administrative expenses | $   1,180,087 | $   1,280,577 |

USFG/BS 0415

16

*CCI CONSTRUCTION COMPANY, INC.*

EARNINGS FROM CONTRACTS

YEAR ENDED DECEMBER 31, 1996

| | Revenues earned | Cost of revenues earned | | Gross profit (loss) |
|---|---|---|---|---|
| Contracts completed during the year | $ 12,093,252 | $ 12,408,317 | (a) | $( 315,065) |
| Contracts-in-progress at year-end | 11,913,597 | 9,771,710 | (a) | 2,141,887 |
| Construction management contracts | 175,357 | 225,490 | (a) | ( 50,133) |
| Time and material jobs | 283,664 | 278,721 | (a) | 4,943 |
| | 24,465,870 | 22,684,238 | | 1,781,632 |
| Indirect costs | | 462,448 | | 462,448 |
| | $ 24,465,870 | $ 23,146,686 | | $ 1,319,184 |

(a) Excludes indirect costs not allocated to specific jobs.

USFG/BS 0416

17

## CCI CONSTRUCTION COMPANY, INC.

### COMPLETED CONTRACTS

### YEAR ENDED DECEMBER 31, 1996

| Job number | Contract | Contract totals | | | Before January 1, 1996 | | | During the year ended December 31, 1996 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Revenues earned | Cost of revenues earned | Gross profit (loss) before indirect costs | Revenues earned | Cost of revenues earned | Gross profit (loss) before indirect costs | Revenues earned | Cost of revenues earned | Gross profit (loss) before indirect costs |
| 206 | National Cancer Institute | $ 14,546,469 | $ 14,124,022 | $ 422,447 | $ 12,643,254 | $ 12,227,944 | $ 415,310 | $ 1,903,215 | $ 1,896,078 | $ 7,137 |
| 304 | Lincoln University | 13,713,429 | 14,436,461 | ( 723,032) | 8,621,312 | 8,914,508 | ( 293,196) | 5,092,117 | 5,521,953 | ( 429,836)(1) |
| 311 | Lightner Road Elementary School | 5,855,100 | 6,481,003 | ( 625,983) | 5,803,321 | 6,314,158 | ( 510,837) | 51,779 | 166,925 | ( 115,146)(1) |
| 329 | Consolidated ROTC&E | 15,708,691 | 15,016,387 | 692,504 | 12,882,292 | 12,255,498 | 626,794 | 2,826,599 | 2,760,889 | 65,710 |
| 338 | N.W. Houston | 110,000 | 46,669 | 63,331 | 55,437 | 35,547 | 19,890 | 54,563 | 11,122 | 43,441 |
| 339 | Mid-America | 186,784 | 127,464 | 59,320 | 145,572 | 108,243 | 37,329 | 41,212 | 19,221 | 21,991 |
| 381 | Clearfield Hospital | 4,966,370 | 4,724,210 | 242,160 | 4,243,719 | 4,044,067 | 199,652 | 722,651 | 680,143 | 42,508 |
| 384 | State College Area Middle School | 12,141,747 | 11,504,638 | 637,109 | 12,157,660 | 11,531,714 | 625,946 | ( 16,113) | ( 27,076) | 10,963 |
| 385 | Carlisle Hospital | 3,003,664 | 2,799,792 | 203,872 | 2,702,728 | 2,548,440 | 154,288 | 300,936 | 251,352 | 49,584 |
| 414 | Kaufmann's | 3,973,184 | 3,699,655 | 273,529 | 3,701,613 | 3,433,226 | 268,387 | 271,571 | 266,429 | 5,142 |
| 417 | Villa Teresa | 949,281 | 825,661 | 123,620 | 267,059 | 107,766 | 159,293 | 682,222 | 717,895 | ( 35,673)(2) |
| 423 | Capital Cafeteria | 68,000 | 60,289 | 7,711 | | | | 68,000 | 60,289 | 7,711 |
| 427 | EPW1 | 94,500 | 83,097 | 11,403 | | | | 94,500 | 83,097 | 11,403 |
| | | $ 75,317,419 | $ 73,929,428 | $ 1,387,991 | $ 63,224,167 | $ 61,521,111 | $ 1,703,056 | $ 12,093,252 | $ 12,408,317 | $ (315,065) |

(1) The loss incurred in 1996 was caused by additional costs associated with subcontractor defaults and the related legal expenses to defend those cases which were unforeseen at December 31, 1995.

(2) Construction management contract at December 31, 1995.

USFG/BS 0417

18

## CCI CONSTRUCTION COMPANY, INC.

CONTRACTS-IN-PROGRESS

DECEMBER 31, 1996

| Job number | Project | Total contract price | Estimated total direct contract costs | Estimated total contract earnings before indirect costs | Inception to December 31, 1996 | | | December 31, 1996 | | Year ended December 31, 1996 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Direct contract costs to December 31, 1996 | Contract earnings accrued to December 31, 1996 before indirect costs | Billings to December 31, 1996 | Costs and estimated earnings in excess of billings | Billings in excess of costs and estimated earnings | Revenues earned | Direct cost of revenues earned | Gross profit before indirect costs |
| 418 | Capital Sprinkler | $ 7,315,964 | $ 5,566,247 | $ 1,749,717 | $ 5,271,160 | $ 1,656,998 | $ 6,718,258 | $ 211,860 | | $ 5,320,584 | $ 3,868,043 | $ 1,452,541 |
| 420 | Capital HVAC | 298,050 | 223,180 | 74,870 | 92,420 | 31,004 | 181,922 | | $ 38,498 | 123,424 | 92,420 | 31,004 |
| 421 | Capital Electrical | 1,944,646 | 1,414,085 | 530,561 | 1,286,482 | 482,685 | 1,601,364 | 187,803 | | 1,769,167 | 1,286,482 | 482,685 |
| 422 | Home Depot | 5,040,379 | 4,902,670 | 137,709 | 4,034,072 | 113,311 | 4,562,418 | | 415,035 | 4,147,383 | 4,034,072 | 113,311 |
| 425 | Capital Senate | 90,557 | 67,821 | 22,736 | 34,345 | 11,514 | 57,220 | 11,361 | | 45,859 | 34,345 | 11,514 |
| 426 | U.E.P.H. Complex | 16,430,163 | 14,783,976 | 1,646,187 | 459,348 | 50,832 | 551,917 | 44,737 | | 507,160 | 459,348 | 50,832 |
| | | $ 31,120,359 | $ 28,957,979 | $ 4,192,360 | $ 11,174,827 | $ 2,346,344 | $ 13,651,099 | $ 379,663 | $ 529,631 | $ 11,913,597 | $ 9,771,710 | $ 2,141,887 |

USFG/BS 0418

19

*CCI CONSTRUCTION COMPANY, INC.*


*YEARS ENDED*
*DECEMBER 31, 1997 AND 1996*

USFG/BS 0419

*CCI CONSTRUCTION COMPANY, INC.*

YEARS ENDED DECEMBER 31, 1997 AND 1996

CONTENTS

|  | Page |
|---|---|
| Independent auditors' report | 1 |
| Financial statements: |  |
| Balance sheets | 2 |
| Statements of income | 3 |
| Statements of shareholder's equity | 4 |
| Statements of cash flows | 5-6 |
| Notes to financial statements | 7-11 |
| Accompanying information to financial statements: |  |
| Cost of contracts | 12-13 |
| General and administrative expenses | 14 |
| Earnings from contracts | 15 |
| Completed contracts | 16 |
| Contracts-in-progress | 17 |

USFG/BS 0420

**BROWN
SCHULTZ**

<u>Independent Auditors' Report</u>

Board of Directors
CCI Construction Company, Inc.
Mechanicsburg, Pennsylvania

We have audited the accompanying balance sheets of CCI Construction Company, Inc. as of December 31, 1997 and 1996 and the related statements of income, shareholder's equity and cash flows for the years then ended.  These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of CCI Construction Company, Inc. as of December 31, 1997 and 1996 and the results of its operations and its cash flows for the years then ended, in conformity with generally accepted accounting principles.

Our audits of the financial statements were made for the purpose of forming an opinion on the basic financial statements taken as a whole.  The accompanying information is presented for purposes of additional analysis and is not a required part of the basic financial statements.  Such information has been subjected to the auditing procedures applied in the audits of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

*Brown Schultz*

February 10, 1998

USFG/BS 0421

CERTIFIED PUBLIC ACCOUNTANTS
AND
BUSINESS ADVISORS

A PROFESSIONAL CORPORATION

1811 MUMMA ROAD
WORMLEYSBURG, PA 1704

PO BOX 6784
HARRISBURG, PA 17106-784
717-761-717
PA: 800-294-734
FAX: 717-737-445

2501 OREGON PIK
SUITE THRE
LANCASTER, PA 176
717-560-83
FAX: 717-560-87

1

## CCI CONSTRUCTION COMPANY, INC.

BALANCE SHEETS - DECEMBER 31, 1997 AND 1996

ASSETS

|  | 1997 | 1996 |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $ 1,128,337 | $ 3,346,115 |
| Investments in marketable securities | 3,702,992 | 1,803,677 |
| Accounts receivable, trade: | | |
| Customers: | | |
| Current | 8,230,674 | 2,606,101 |
| Retained | 1,121,610 | 954,777 |
| Shareholder | | 268,583 |
| Affiliates | 3,485 | 9,570 |
| Note receivable | 22,569 | 31,689 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 1,072,281 | 379,663 |
| Prepaid expenses | 6,185 | 53,232 |
| Shop inventory | 639 | |
| Total current assets | 15,288,772 | 9,453,407 |
| Property and equipment: | | |
| Automobiles and trucks | 427,342 | 279,361 |
| Furniture | 553,587 | 654,220 |
| Machinery and equipment | 1,323,233 | 187,559 |
| Other | 72,453 | 14,682 |
|  | 2,376,615 | 1,135,822 |
| Less accumulated depreciation | 920,919 | 956,849 |
|  | 1,455,696 | 178,973 |
|  | $ 16,744,468 | $ 9,632,380 |

See notes to financial statements.

USFG/BS 0422

## LIABILITIES AND SHAREHOLDER'S EQUITY

|  | 1997 | 1996 |
|---|---|---|
| **Current liabilities:** | | |
| Accounts payable, trade: | | |
| Vendors: | | |
| Current | $ 7,846,395 | $ 2,777,935 |
| Retained | 1,078,950 | 1,232,823 |
| Affiliates | | 2,300 |
| Notes payable | 815,781 | |
| Accrued expenses | 808,601 | 278,159 |
| Taxes withheld and accrued | 58,023 | 10,857 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 681,924 | 509,631 |
| | | |
| Total liabilities (all current) | 11,289,674 | 4,811,705 |
| | | |
| **Shareholder's equity:** | | |
| Common stock, $1 par, 1,000 shares authorized; | | |
| 39 shares issued and outstanding | 39 | 39 |
| Capital in excess of par | 9,758 | 9,758 |
| Retained earnings | 5,208,489 | 4,768,011 |
| Unrealized gain on marketable securities | 236,508 | 42,867 |
| | 5,454,794 | 4,820,675 |
| | $ 16,744,468 | $ 9,632,380 |

USFG/BS 0423

2

## CCI CONSTRUCTION COMPANY, INC.

### STATEMENTS OF INCOME

#### YEARS ENDED DECEMBER 31, 1997 AND 1996

|  | 1997 | 1996 |
|---|---|---|
| Revenue | $ 34,921,676 | $ 24,465,870 |
| Cost of contracts | 32,617,473 | 23,146,686 |
| Gross profit | 2,304,203 | 1,319,184 |
| General and administrative expenses | 1,954,380 | 1,180,087 |
| Income from operations | 349,823 | 139,097 |
| Other income (expense): | | |
| Investment | 367,538 | 275,016 |
| Miscellaneous | ( 1,546) | 17,210 |
| Gain (loss) on sale of: | | |
| Property and equipment | ( 2,920) | ( 72,051) |
| Marketable securities and cash equivalents | ( 6,016) | 3,852 |
| | 357,056 | 224,027 |
| Net income | $ 706,879 | $ 363,124 |

USFG/BS 0424

See notes to financial statements.

# CCI CONSTRUCTION COMPANY, INC.

## STATEMENTS OF SHAREHOLDER'S EQUITY

### YEARS ENDED DECEMBER 31, 1997 AND 1996

| | Shares of common stock | Capital in excess of par | Retained earnings | Unrealized gain on marketable securities | Total |
|---|---|---|---|---|---|
| Balance, December 31, 1995 | $ 39 | $ 9,758 | $ 4,465,253 | $ 26,679 | $ 4,501,729 |
| Net income | | | 363,124 | | 363,124 |
| Distributions | | | ( 60,366) | | ( 60,366) |
| Unrealized gain on marketable securities | | | | 16,188 | 16,188 |
| Balance, December 31, 1996 | 39 | 9,758 | 4,768,011 | 42,867 | 4,820,675 |
| Net income | | | 706,879 | | 706,879 |
| Distributions | | | ( 266,401) | | ( 266,401) |
| Unrealized gain on marketable securities | | | | 193,641 | 193,641 |
| Balance, December 31, 1997 | $ 39 | $ 9,758 | $ 5,208,489 | $ 236,508 | $ 5,454,794 |

See notes to financial statements.

USFG/BS  0425

4

**CCI CONSTRUCTION COMPANY, INC.**

STATEMENTS OF CASH FLOWS

YEARS ENDED DECEMBER 31, 1997 AND 1996

|  | 1997 | 1996 |
|---|---|---|
| Cash flows from operating activities: |  |  |
| Net income | $ 706,879 | $ 363,124 |
| Adjustments: |  |  |
| Depreciation | 156,504 | 96,945 |
| (Gain) loss on sale of: |  |  |
| Property and equipment | 2,920 | 72,051 |
| Marketable securities | 6,293 | ( 186) |
| (Increase) decrease in: |  |  |
| Marketable securities |  | 80,000 |
| Accounts receivable | ( 5,516,738) | 2,235,604 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | ( 692,618) | 379,992 |
| Prepaid expenses | 47,047 | 50,809 |
| Shop inventory | ( 639) |  |
| Increase (decrease) in: |  |  |
| Accounts payable | 4,912,287 | ( 3,113,074) |
| Accrued expenses | 530,442 | 174,811 |
| Taxes withheld and accrued | 47,166 | ( 17,511) |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 172,293 | 232,802 |
| Total adjustments | ( 335,043) | 192,243 |
| Net cash provided by operating activities | 371,836 | 555,367 |
| Cash flows from investing activities: |  |  |
| Purchase of investments | ( 11,093,130) | ( 100,681) |
| Proceeds from sale and maturities of investments | 9,381,163 | 775,348 |
| Issuance of note receivable |  | ( 35,000) |
| Repayment of note receivable | 9,120 | 3,311 |
| Purchase of property and equipment | ( 560,929) | ( 37,196) |
| Proceeds from sale of property and equipment | 13,864 | 7,275 |
| Net cash provided by (used in) investing activities | ( 2,249,912) | 613,057 |

(continued)

USFG/BS 0426

5

**CCI CONSTRUCTION COMPANY, INC.**

STATEMENTS OF CASH FLOWS (CONTINUED)

YEARS ENDED DECEMBER 31, 1997 AND 1996

| | 1997 | 1996 |
|---|---|---|
| Cash flows from financing activities: | | |
| Distributions to shareholder | $( 266,401) | $( 60,366) |
| Repayment of notes payable | ( 73,301) | |
| Net cash used in financing activities | ( 339,702) | ( 60,366) |
| Net increase (decrease) in cash and cash equivalents | ( 2,217,778) | 1,108,058 |
| Cash and cash equivalents, beginning of year | 3,346,115 | 2,238,057 |
| Cash and cash equivalents, end of year | $ 1,128,337 | $ 3,346,115 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for interest | $ 1,707 | $ 1,462 |
| Noncash activities: | | |
| Net unrealized gain on marketable securities (see statements of shareholder's equity) | $ 193,641 | 16,188 |
| Notes payable totaling $889,082 were incurred for the acquisition of new equipment | | |

USFG/BS 0427

See notes to financial statements.

6

## CCI CONSTRUCTION COMPANY, INC.

NOTES TO FINANCIAL STATEMENTS

YEARS ENDED DECEMBER 31, 1997 AND 1996

1.  **Summary of significant accounting policies:**

    *Operations and operating cycle:*

    The Company constructs and renovates commercial buildings primarily under fixed-price contracts in the northeast United States. The Company's receivables are concentrated among customers in this geographic area. The Company extends credit to its customers and generally requires no collateral.

    The length of the Company's contracts varies but is typically between one to two years. In accordance with normal practice in the construction industry, the Company includes asset and liability accounts relating to construction contacts in current assets and liabilities even when such amounts are realizable or payable over a period in excess of one year.

    *Use of estimates:*

    The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

    *Revenue and cost recognition:*

    Revenues from construction contracts are recognized on the percentage-of-completion method, measured by the percentage of direct cost incurred to date to estimated total direct cost for each contract. That method is used because management considers direct cost to be the best available measure of progress on the contracts. Because of inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates used will change within the near term.

    For purposes of determining percentage of completion estimates, contract costs include all direct material, labor and subcontracting costs and other direct costs related to contract performance. Indirect costs and general and administrative costs are charged to expense as incurred. Provisions for estimated losses on uncompleted contracts are made in the period in which such losses are first determined. Changes in job performance, job conditions and estimated profitability may result in revisions to costs and income and are recognized in the period in which the revisions are determined. An amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.

USFG/BS 0428

7

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1997 AND 1996

1. **Summary of significant accounting policies (continued):**

   *Revenue and cost recognition (continued):*

   The asset, "Costs and estimated earnings in excess of billings on uncompleted contracts," represents revenues recognized in excess of amounts billed. The liability, "Billings in excess of costs and estimated earnings on uncompleted contracts," represents billings in excess of revenues recognized.

   *Cash and cash equivalents:*

   For purposes of reporting cash flows, the Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

   *Marketable securities:*

   Marketable securities are reported at fair value, with unrealized gains and losses excluded from earnings and reported in a separate component of stockholder's equity. Fair value of the marketable securities is based on quoted market prices for those or similar securities or quotes from brokers. Gains and losses are determined using the specific identification method when securities are sold.

   *Property and equipment:*

   Property and equipment are stated at cost. Depreciation is provided using an accelerated method over the estimated useful lives of the assets.

2. **Cash and cash equivalents:**

   Cash and cash equivalents consist of the following:

   |  | 1997 | 1996 |
   |---|---|---|
   | Cash | $ 451 | $ 792,232 |
   | Certificates of deposit | | 191,723 |
   | Money market funds | 403,714 | 887,014 |
   | Repurchase agreements, net of cash overdraft of $601,973 | 724,172 | 1,475,146 |
   | | $ 1,128,337 | $ 3,346,115 |

USFG/BS 0429

8

*CCI CONSTRUCTION COMPANY, INC.*

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1997 AND 1996

2. **Cash and cash equivalents (continued):**

At December 31, 1997, the amount of deposits in cash held at the bank exceeded the Federal Deposit Insurance Corporation (FDIC) by $48,396. The money market funds and the repurchase agreements are not insured by the FDIC. The repurchase agreements sold by a bank were held in custody by this bank for the account of CCI Construction Company, Inc. and were invested in securities, which are not pledged as collateral.

3. **Marketable securities:**

The cost or amortized cost and the aggregate fair value of investments in the debt and equity securities at December 31, 1997 and 1996 are as follows:

|  | 1997 | | | | 1996 | | | |
|---|---|---|---|---|---|---|---|---|
|  | Cost or amortized cost | Gross unrealized losses | Gross unrealized gains | Estimated fair value | Cost or amortized cost | Gross unrealized losses | Gross unrealized gains | Estimated fair value |
| Available-for-sale securities: | | | | | | | | |
| Mutual funds | $ 3,386,480 | $ 16,845 | $ 253,465 | $ 3,623,100 | $ 1,482,961 | $ 11,387 | $ 66,313 | $ 1,537,887 |
| Obligations of states and political subdivisions | 80,004 | 112 | | 79,892 | 277,849 | 12,059 | | 265,790 |
| | $ 3,466,484 | $ 16,957 | $ 253,465 | $ 3,702,992 | $ 1,760,810 | $ 23,446 | $ 66,313 | $ 1,803,677 |

The available-for-sale debt securities at December 31, 1997 are due after ten years. Expected maturities will differ from contractual maturities because borrowers may have the right to call or prepay obligations with or without call or prepayment penalties.

USFG/BS 0430

9

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1997 AND 1996

3.  **Marketable securities (continued):**

|  | 1997 | 1996 |
|---|---|---|
| Cost of securities sold | $ 9,387,456 | $ 775,162 |
| Proceeds from sale | 9,381,163 | 775,347 |
| Gross realized gains |  | 12,047 |
| Gross realized losses | 6,293 | 11,862 |

4.  **Uncompleted contracts:**

|  | 1997 | 1996 |
|---|---|---|
| Contract costs | $ 27,920,734 | $ 11,174,827 |
| Estimated earnings thereon | 1,638,199 | 2,346,304 |
|  | 29,558,933 | 13,521,131 |
| Less billings applicable thereto | 29,168,576 | 13,651,099 |
|  | $ 390,357 | $( 129,968) |

|  | 1997 | 1996 |
|---|---|---|
| Included in the balance sheet as: |  |  |
| Costs and estimated earnings in excess of billings on uncompleted contracts | $ 1,072,281 | $ 379,663 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | ( 681,924) | ( 509,631) |
|  | $ 390,357 | $( 129,968) |

5.  **Notes payable:**

Equipment is pledged as collateral for these notes which require monthly installments of $74,600, including interest at 1.27%, through December 1998.

6.  **Line of credit:**

The Company has available a $1,000,000 unsecured line of credit expiring on April 30, 1998 which requires interest at the bank's prime rate. The Company has no outstanding balance on the line at December 31, 1997.

USFG/BS 0431

10

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1997 AND 1996

7. **Rent expense:**

Various equipment and operating facilities are leased under noncancelable agreements.  Total rent expense for all leases, including the related party lease discussed in Note 8, was $432,492 and $120,623 in 1997 and 1996, respectively.

The aggregate minimum rental commitments under all noncancelable leases at December 31, 1997 are as follows:

| Year ending December 31, | Amount |
|---|---|
| 1998 | $ 95,796 |
| 1999 | 21,730 |

8. **Related party transactions:**

The Company leased an operating facility from a related party, Old Gettysburg Associates II through November 30, 1996.  The sole shareholder of the Company has a 20% partnership interest in Old Gettysburg Associates II.  Total rent expense relating to this facility for 1996 was $71,864.

Effective December 1, 1996, the Company began leasing an operating facility owned by its sole shareholder on a year-to-year basis.  The lease requires an annual rental payment of $45,000.  Rent expense for this facility was $45,000 and $3,750 for 1997 and 1996, respectively.  At December 31, 1996, the sole shareholder was billed $268,270 for costs incurred by the Company relating to renovations made to this operating facility.  This balance was paid in 1997.

During 1997, the Company incurred warranty insurance expense of $825,000 with Pennsylvania Contractors Insurance Company, a corporation under common control.  These costs are allocated as direct cost of contracts.

9. **Income taxes:**

No provision has been made for federal or state income taxes.  Under provisions of the Internal Revenue Code and the Commonwealth of Pennsylvania Tax Act, the Company has elected not to be taxed as a corporation and the sole shareholder has consented to include the income in his individual return.

USFG/BS 0432

11

**CCI CONSTRUCTION COMPANY, INC.**

COST OF CONTRACTS

YEARS ENDED DECEMBER 31, 1997 AND 1996

|  | 1997 | 1996 |
|---|---|---|
| Direct costs: | | |
| Labor | $ 2,886,054 | $ 1,726,413 |
| Payroll taxes | 335,936 | 183,327 |
| Employee benefits | 677,477 | 207,848 |
| Equipment | 41,373 | |
| Equipment rental | 381,924 | 7,437 |
| Materials | 4,259,253 | 2,031,948 |
| Other | 1,679,129 | 753,330 |
| Subcontractors | 22,099,706 | 17,773,935 |
| | 32,360,852 | 22,684,238 |
| | | |
| Indirect costs: | | |
| Salaries | 86,208 | 174,179 |
| Payroll taxes | 11,217 | 19,727 |
| Employee benefits | 8,324 | 13,044 |
| Blueprints | 6 | 703 |
| Depreciation | 95,723 | 28,576 |
| Dues and permits | 710 | 293 |
| Employee recruitment | 7,151 | 1,702 |
| Insurance | 716 | 1,718 |
| Miscellaneous | | 706 |
| Office supplies and expense | 8,112 | 2,515 |
| Postage | 253 | 1,790 |
| Professional services | | 131,915 |
| Rent | 8,636 | 36,360 |
| Repairs and maintenance | 3,648 | 4,324 |
| Safety | 2,157 | 128 |
| Telephone | 11,802 | 16,446 |
| Temporary help | | 581 |

USFG/BS 0433

(continued)

12

**CCI CONSTRUCTION COMPANY, INC.**

COST OF CONTRACTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1997 AND 1996

|  | 1997 | 1996 |
|---|---|---|
| Indirect costs (continued): | | |
| Trade books and journals | $ 556 | $ 89 |
| Training and seminars | | 122 |
| Travel and entertainment | 728 | 440 |
| Utilities | 1,413 | 2,014 |
| Warehouse expenses | 9,261 | 776 |
| Warranty service | | 24,300 |
| | 256,621 | 462,448 |
| Total cost of contracts | $ 32,617,473 | $ 23,146,686 |

USFG/BS 0434

13

**CCI CONSTRUCTION COMPANY, INC.**

GENERAL AND ADMINISTRATIVE EXPENSES

YEARS ENDED DECEMBER 31, 1997 AND 1996

|  | 1997 | 1996 |
|---|---|---|
| Salaries: | | |
| Officers | $ 1,038,273 | $ 271,680 |
| Office | 410,023 | 399,009 |
| Payroll taxes | 73,399 | 46,920 |
| Employee: | | |
| Benefits | 33,722 | 38,686 |
| Recruitment | 2,237 | 322 |
| Advertising | 1,038 | 1,746 |
| Bank charges | 3,667 | 3,273 |
| Blueprints | 13,507 | 4,712 |
| Company sponsored activities | 1,098 | 855 |
| Contributions | 3,030 | 2,298 |
| Depreciation | 60,781 | 68,369 |
| Dues | 8,058 | 8,150 |
| Insurance | 12,162 | 15,148 |
| Licenses and taxes | 44,270 | 46,230 |
| Miscellaneous | 265 | 268 |
| Office supplies | 18,875 | 11,099 |
| Postage | 7,914 | 9,305 |
| Professional services | 95,337 | 98,874 |
| Rent | 33,744 | 45,930 |
| Repairs and maintenance | 7,689 | 11,582 |
| Telephone | 31,328 | 59,435 |
| Trade books and journals | 22,995 | 20,809 |
| Training and seminars | 1,086 | 4,257 |
| Travel and entertainment | 5,948 | 9,737 |
| Utilities | 23,934 | 1,393 |
| Total general and administrative expenses | $ 1,954,380 | $ 1,180,087 |

USFG/BS 0435

14

**CCI CONSTRUCTION COMPANY, INC.**

EARNINGS FROM CONTRACTS

YEAR ENDED DECEMBER 31, 1997

| | Revenues earned | Cost of revenues earned | | Gross profit |
|---|---|---|---|---|
| Contracts completed during the year | $ 4,940,855 | $ 4,076,410 | (a) | $ 864,445 |
| Contracts-in-progress at year-end | 29,051,753 | 27,464,386 | (a) | 1,587,367 |
| Construction management contracts | 45,890 | 31,325 | (a) | 14,565 |
| Time and material jobs | 883,178 | 788,731 | (a) | 94,447 |
| | 34,921,676 | 32,360,852 | | 2,560,824 |
| Indirect costs | | 256,621 | | 256,621 |
| | $ 34,921,676 | $ 32,617,473 | | $ 2,304,203 |

(a) Excludes indirect costs not allocated to specific jobs.

USFG/BS 0436

15

## CCI CONSTRUCTION COMPANY, INC.

### COMPLETED CONTRACTS

### YEAR ENDED DECEMBER 31, 1997

| Job number | Contract | Contract totals | | | Before January 1, 1997 | | | During the year ended December 31, 1997 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Revenues earned | Cost of revenues earned | Gross profit before indirect costs | Revenues earned | Cost of revenues earned | Gross profit before indirect costs | Revenues earned | Cost of revenues earned | Gross profit before indirect costs |
| 418 | Capital Sprinkler - A | $ 7,808,776 | $ 5,935,467 | $ 1,873,309 | $ 6,928,118 | $ 5,271,160 | $ 1,656,958 | $ 880,658 | $ 664,307 | $ 216,351 |
| 420 | Capital HVAC | 204,058 | 103,588 | 100,470 | 123,424 | 92,420 | 31,004 | 80,634 | 11,168 | 69,466 |
| 421 | Capital Electrical | 2,460,065 | 1,729,583 | 730,482 | 1,769,167 | 1,286,482 | 482,685 | 690,898 | 443,101 | 247,797 |
| 422 | Home Depot | 5,200,440 | 5,034,557 | 165,883 | 4,147,383 | 4,034,072 | 113,311 | 1,053,057 | 1,000,485 | 52,572 |
| 425 | Capital Senate | 93,741 | 47,294 | 46,447 | 45,859 | 34,345 | 11,514 | 47,882 | 12,949 | 34,933 |
| 436 | Capital Sprinkler - H | 191,714 | 178,131 | 13,583 | | | | 191,714 | 178,131 | 13,583 |
| 437 | Capital renovation | 1,290,074 | 1,149,938 | 140,136 | | | | 1,290,074 | 1,149,938 | 140,136 |
| 442 | Capital porticoes | 705,938 | 616,331 | 89,607 | | | | 705,938 | 616,331 | 89,607 |
| | | $ 17,954,806 | $ 14,794,889 | $ 3,159,817 | $ 13,013,951 | $ 10,718,479 | $ 2,295,472 | $ 4,940,855 | $ 4,076,410 | $ 884,445 |

USFG/BS 0437

16

# CCI CONSTRUCTION COMPANY, INC.

## CONTRACTS-IN-PROGRESS

### DECEMBER 31, 1997

| Job number | Project | Total contract price | Estimated total direct contract costs | Estimated total contract earnings (loss) before indirect costs | Inception to December 31, 1997 — Direct contract costs to December 31, 1997 | Inception to December 31, 1997 — Contract earnings (loss) accrued to December 31, 1997 before indirect costs | Billings to December 31, 1997 | December 31, 1997 — Costs and estimated earnings in excess of billings | December 31, 1997 — Billings in excess of costs and estimated earnings | Year ended December 31, 1997 — Revenues earned | Year ended December 31, 1997 — Direct cost of revenues earned | Year ended December 31, 1997 — Gross profit (loss) before indirect costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 438 | U.E.P.H. Complex | $ 18,061,022 | $ 16,048,701 | $ 2,012,321 | $ 15,878,476 | $ 1,855,254 | $ 16,899,942 | $ 863,791 | | $ 17,256,553 | $ 15,422,131 | $ 1,834,422 |
| 439 | Mahanoy Prison | 10,289,145 | 10,523,764 | ( 234,619) | 6,309,222 | ( 234,619) | 6,337,295 | | 262,692 | 6,074,603 | 6,309,222 | ( 234,619) |
| 445 | Houtzdale Prison | 10,357,787 | 10,440,743 | ( 82,956) | 4,169,371 | ( 82,956) | 4,348,670 | | 263,235 | 4,096,415 | 4,169,371 | ( 82,956) |
| 448 | Outlook Pointe | 4,604,000 | 4,328,590 | 275,410 | 521,254 | 33,165 | 569,198 | 45,221 | | 554,416 | 521,254 | 33,165 |
| 449 | U.E.P.H. Headquarters | 1,387,666 | 1,374,859 | 12,807 | 515,339 | 4,800 | 473,383 | 46,756 | | 520,139 | 515,339 | 4,800 |
| 450 | Johnstown | 3,266,600 | 3,237,111 | 29,489 | 115,461 | 1,052 | | 116,513 | | 116,513 | 115,461 | 1,052 |
| 451 | Lord Fairfax | 8,080,993 | 6,391,785 | 469,208 | 411,608 | 31,503 | 599,089 | | 155,977 | 443,111 | 411,608 | 31,503 |
| | | $ 55,747,213 | $ 52,345,553 | $ 2,501,660 | $ 27,920,734 | $ 1,638,199 | $ 29,188,516 | $ 1,012,281 | $ 681,924 | $ 29,061,750 | $ 27,464,386 | $ 1,597,367 |

17

USFG/BS  0438

*CCI CONSTRUCTION COMPANY, INC.*

*YEARS ENDED*
*DECEMBER 31, 1998 AND 1997*

USFG/BS 0439

*CCI CONSTRUCTION COMPANY, INC.*

YEARS ENDED DECEMBER 31, 1998 AND 1997

CONTENTS

|                                                    | Page  |
|----------------------------------------------------|-------|
| Independent auditors' report                       | 1     |
| Financial statements:                              |       |
| Balance sheets                                     | 2     |
| Statements of income                               | 3     |
| Statements of shareholder's equity                 | 4-5   |
| Statements of cash flows                           | 6-7   |
| Notes to financial statements                      | 8-13  |
| Accompanying information to financial statements:  |       |
| Cost of contracts                                  | 14    |
| General and administrative expenses                | 15    |
| Earnings from contracts                            | 16    |
| Completed contracts                                | 17    |
| Contracts-in-progress                              | 18    |

USFG/BS 0440



BROWN SCHULTZ

SHERIDAN FRITZ

<u>Independent Auditors' Report</u>

Board of Directors
CCI Construction Company, Inc.
Mechanicsburg, Pennsylvania

We have audited the accompanying balance sheets of CCI Construction Company, Inc. as of December 31, 1998 and 1997 and the related statements of income, shareholder's equity and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of CCI Construction Company, Inc. as of December 31, 1998 and 1997 and the results of its operations and its cash flows for the years then ended, in conformity with generally accepted accounting principles.

Our audits of the financial statements were made for the purpose of forming an opinion on the basic financial statements taken as a whole. The accompanying information is presented for purposes of additional analysis and is not a required part of the basic financial statements. Such information has been subjected to the auditing procedures applied in the audits of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

*Brown Schultz Sheridan & Fritz*

February 10, 1999

CERTIFIED PUBLIC ACCOUNTANTS
AND
BUSINESS ADVISORS

a PROFESSIONAL CORPORATION

1911 MILANIA RD
WORMLEYSBURG PA 17043

PO BOX 67888
HARRISBURG PA 17106-7888
717-737-7000
PA 800-294-7350
FAX 717-737-8636

1725 OREGON PIKE
LANCASTER PA 17601
717-560-5511
800-994-7204
FAX 717-560-8747

WEBSITE WWW.BSSF.COM

USFG/BS 0441

1

**CCI CONSTRUCTION COMPANY, INC.**

BALANCE SHEETS - DECEMBER 31, 1998 AND 1997

ASSETS

|  | 1998 | 1997 |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $ 2,429,866 | $ 1,128,337 |
| Investments in marketable securities | 631,481 | 3,702,992 |
| Accounts receivable, trade: | | |
| Customers: | | |
| Current | 5,964,311 | 8,230,674 |
| Retained | 1,822,224 | 1,121,610 |
| Affiliates | 365,756 | 3,485 |
| Note receivable | | 22,569 |
| Costs and estimated earnings in excess of billings | | |
| on uncompleted contracts | 6,341,726 | 1,072,281 |
| Prepaid expenses | 170,232 | 6,185 |
| Shop inventory | 38,161 | 639 |
| Total current assets | 17,763,757 | 15,288,772 |
| Property and equipment: | | |
| Automobiles and trucks | 1,269,567 | 427,342 |
| Furniture | 851,738 | 553,587 |
| Machinery and equipment | 5,947,290 | 1,323,233 |
| Other | 344,128 | 72,453 |
|  | 8,412,723 | 2,376,615 |
| Less accumulated depreciation | 1,651,485 | 920,919 |
|  | 6,761,238 | 1,455,696 |
| Other assets: | | |
| Cash surrender value of officer's life insurance | 55,453 | |
| Investments | 34,000 | |
|  | 89,453 | |
|  | $ 24,614,448 | $ 16,744,468 |

See notes to financial statements.

USFG/BS 0442

## LIABILITIES AND SHAREHOLDER'S EQUITY

|  | 1998 | 1997 |
|---|---|---|
| **Current liabilities:** | | |
| Accounts payable, trade: | | |
| Current | $ 10,974,274 | $ 7,846,395 |
| Retained | 2,180,967 | 1,078,950 |
| Notes payable | | 815,781 |
| Current portion of long-term debt | 1,338,280 | |
| Accrued expenses | 333,060 | 808,601 |
| Taxes withheld and accrued | 91,601 | 58,023 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 288,208 | 681,924 |
| Total current liabilities | 15,206,390 | 11,289,674 |
| Long-term debt, net of current portion | 4,164,375 | |
| Total liabilities | 19,370,765 | 11,289,674 |
| **Shareholder's equity:** | | |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | 39 |
| Capital in excess of par | 9,758 | 9,758 |
| Retained earnings | 5,254,834 | 5,208,489 |
| Accumulated other comprehensive income (loss), unrealized gain (loss) on marketable securities | ( 20,948) | 236,508 |
|  | 5,243,683 | 5,454,794 |
|  | $ 24,614,448 | $ 16,744,468 |

USFG/BS 0443

2

## CCI CONSTRUCTION COMPANY, INC.

STATEMENTS OF INCOME

YEARS ENDED DECEMBER 31, 1998 AND 1997

|  | 1998 | 1997 |
|---|---|---|
| Revenue | $ 52,534,453 | $ 34,921,676 |
| Cost of contracts | 51,145,382 | 32,617,473 |
| Gross profit | 1,389,071 | 2,304,203 |
| General and administrative expenses | 1,505,700 | 1,954,380 |
| Income (loss) from operations | ( 116,629) | 349,823 |
| Other income (expense): | | |
| Gain (loss) on sale of: | | |
| Marketable securities and cash equivalents | 260,927 | ( 6,016) |
| Property and equipment | 10,069 | ( 2,920) |
| Interest | ( 161,296) | |
| Investment | 151,592 | 367,538 |
| Miscellaneous | ( 85,622) | ( 1,546) |
| | 175,670 | 357,056 |
| Net income | $ 59,041 | $ 706,879 |

USFG/BS 0444

See notes to financial statements.

3

## CCI CONSTRUCTION COMPANY, INC.

### STATEMENTS OF SHAREHOLDER'S EQUITY

### YEARS ENDED DECEMBER 31, 1998 AND 1997

| | Common stock | Capital in excess of par | Retained earnings | Accumulated other comprehensive income (loss) | Total |
|---|---|---|---|---|---|
| Balance, December 31, 1996 | $ 39 | $ 9,758 | $ 4,768,011 | $ 42,867 | $ 4,820,675 |
| Comprehensive income: | | | | | |
| Net income | | | 706,879 | | 706,879 |
| Other comprehensive income: | | | | | |
| Unrealized holding gains arising during the period on marketable securities | | | | 187,348 | 187,348 |
| Add reclassification adjustment | | | | 6,293 | 6,293 |
| | | | | | 193,641 |
| Comprehensive income | | | | | 900,520 |
| Distributions | | | ( 266,401) | | ( 266,401) |
| Balance, December 31, 1997 (carried forward) | 39 | 9,758 | 5,208,489 | 236,508 | 5,454,794 |

(continued)

USFG/BS 0445

**CCI CONSTRUCTION COMPANY, INC.**

STATEMENTS OF SHAREHOLDER'S EQUITY (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

| | Common stock | Capital in excess of par | Retained earnings | Accumulated other comprehensive income (loss) | Total |
|---|---|---|---|---|---|
| Balance, December 31, 1997 (brought forward) | $ 39 | $ 9,758 | $ 5,208,489 | $ 236,508 | $ 5,454,794 |
| Comprehensive loss: | | | | | |
| Net income | | | 59,041 | | 59,041 |
| Other comprehensive income (loss): | | | | | |
| Unrealized holding gains arising during the period on marketable securities | | | | 3,469 | 3,469 |
| Less reclassification adjustment | | | | ( 260,925) | 260,925) |
| | | | | | ( 257,456) |
| Comprehensive loss | | | | | ( 198,415) |
| Distributions | | | ( 12,696) | | ( 12,696) |
| Balance, December 31, 1998 | $ 39 | $ 9,758 | $ 5,254,834 | $( 20,948) | $ 5,243,683 |

See notes to financial statements.

USFG/BS 0446

5

**CCI CONSTRUCTION COMPANY, INC.**

STATEMENTS OF CASH FLOWS

YEARS ENDED DECEMBER 31, 1998 AND 1997

|  | 1998 | 1997 |
|---|---:|---:|
| Cash flows from operating activities: | | |
| Net income | $ 59,041 | $ 706,879 |
| Adjustments: | | |
| Depreciation | 793,014 | 156,504 |
| (Gain) loss on sale of: | | |
| Property and equipment | ( 10,069) | 2,920 |
| Marketable securities | ( 260,927) | 6,293 |
| (Increase) decrease in: | | |
| Accounts receivable | 1,203,478 | ( 5,516,738) |
| Costs and estimated earnings in excess of billings on uncompleted contracts | ( 5,269,445) | ( 692,618) |
| Prepaid expenses | ( 164,047) | 47,047 |
| Shop inventory | ( 37,522) | ( 639) |
| Cash surrender value of officer's life insurance | ( 55,453) | |
| Increase (decrease) in: | | |
| Accounts payable | 4,229,896 | 4,912,287 |
| Accrued expenses | ( 475,541) | 530,442 |
| Taxes withheld and accrued | 33,578 | 47,166 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | ( 393,716) | 172,293 |
| Total adjustments | ( 406,754) | ( 335,043) |
| Net cash provided by (used in) operating activities | ( 347,713) | 371,836 |
| Cash flows from investing activities: | | |
| Purchase of: | | |
| Investments | ( 161,670) | ( 11,093,130) |
| Property and equipment | ( 98,793) | ( 560,929) |
| Repayment of note receivable | 22,569 | 9,120 |
| Proceeds from: | | |
| Sale and maturities of investments | 3,202,652 | 9,381,163 |
| Sale of property and equipment | 28,502 | 13,864 |
| Net cash provided by (used in) investing activities | 2,993,260 | ( 2,249,912) |

(continued)                    USFG/BS 0447

6

**CCI CONSTRUCTION COMPANY, INC.**

STATEMENTS OF CASH FLOWS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

|  | 1998 | 1997 |
|---|---|---|
| Cash flows from financing activities: | | |
| Distributions to shareholder | $( 12,696) | $( 266,401) |
| Proceeds from issuance of notes payable and long-term debt | 17,990,666 | |
| Repayment of notes payable and long-term debt | ( 19,321,988) | ( 73,301) |
| Net cash used in financing activities | ( 1,344,018) | ( 339,702) |
| Net increase (decrease) in cash and cash equivalents | 1,301,529 | ( 2,217,778) |
| Cash and cash equivalents, beginning of year | 1,128,337 | 3,346,115 |
| Cash and cash equivalents, end of year | $ 2,429,866 | $ 1,128,337 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for interest | $ 161,296 | $ 1,707 |
| Noncash activities: | | |
| Net increase (decrease) in unrealized gain on marketable securities (see statements of shareholder's equity) | $( 257,456) | $ 193,641 |
| Notes payable incurred for the acquisition of new equipment | $ 6,018,196 | $ 889,082 |

USFG/BS 0448

See notes to financial statements.

7

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS

YEARS ENDED DECEMBER 31, 1998 AND 1997

1.    **Summary of significant accounting policies:**

*Operations and operating cycle:*

The Company constructs and renovates commercial buildings primarily under fixed-price contracts in the eastern United States.  The Company's receivables are concentrated among customers in this geographic area.  The Company extends credit to its customers and generally requires no collateral.

The length of the Company's contracts varies but is typically between one to two years.  In accordance with normal practice in the construction industry, the Company includes asset and liability accounts relating to construction contacts in current assets and liabilities even when such amounts are realizable or payable over a period in excess of one year.

*Use of estimates:*

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

*Revenue and cost recognition:*

Revenues from construction contracts are recognized on the percentage-of-completion method, measured by the percentage of direct cost incurred to date to estimated total direct cost for each contract.  That method is used because management considers direct cost to be the best available measure of progress on the contracts.  Because of inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates used will change within the near term.

For purposes of determining percentage of completion estimates, contract costs include all direct material, labor and subcontracting costs and other direct costs related to contract performance.  Indirect costs and general and administrative costs are charged to expense as incurred.  Provisions for estimated losses on uncompleted contracts are made in the period in which such losses are first determined.  Changes in job performance, job conditions and estimated profitability may result in revisions to costs and income and are recognized in the period in which the revisions are determined.  An amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.

USFG/BS 0449

8

## CCI CONSTRUCTION COMPANY, INC.

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

1.  Summary of significant accounting policies (continued):

*Revenue and cost recognition (continued):*

The asset, "Costs and estimated earnings in excess of billings on uncompleted contracts," represents revenues recognized in excess of amounts billed. The liability, "Billings in excess of costs and estimated earnings on uncompleted contracts," represents billings in excess of revenues recognized.

*Cash and cash equivalents:*

For purposes of reporting cash flows, the Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

*Marketable securities:*

Marketable securities are reported at fair value, with unrealized gains and losses excluded from earnings and reported in a separate component of stockholder's equity. Fair value of the marketable securities is based on quoted market prices for those or similar securities or quotes from brokers. Gains and losses are determined using the specific identification method when securities are sold.

*Property and equipment:*

Property and equipment are stated at cost. Depreciation is provided using straight-line and accelerated methods over the estimated useful lives of the assets.

*Change in presentation:*

During 1998, the Company adopted Statement of Financial Accounting Standards No. 130, Reporting Comprehensive Income (SFAS No. 130). SFAS No. 130 requires the reporting of comprehensive income in addition to net income from operations. Comprehensive income is a more inclusive financial reporting methodology that includes disclosure of certain financial information that historically has not been recognized in the calculation of net income. SFAS No. 130 requires that the earlier year provided for comparative purposes be reclassified to conform to the statement.

USFG/BS 0450

9

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

2. **Cash and cash equivalents:**

Cash and cash equivalents consist of the following:

|  | 1998 | 1997 |
|---|---|---|
| Cash | $ 374,464 | $ 451 |
| Money market funds | 1,035 | 403,714 |
| Repurchase agreements | 2,054,367 | 724,172 |
|  | $ 2,429,866 | $ 1,128,337 |

At December 31, 1998, the amount of deposits in cash held at the bank exceeded the Federal Deposit Insurance Corporation (FDIC) insurance by $867,883. The money market funds and the repurchase agreements are not insured by the FDIC. The repurchase agreements sold by a bank were held in custody by this bank for the account of CCI Construction Company, Inc. and were invested in securities, which are not pledged as collateral.

3. **Marketable securities:**

The cost or amortized cost and the aggregate fair value of investments in the debt and equity securities at December 31, 1998 and 1997 are as follows:

|  | 1998 | | |
|---|---|---|---|
|  | Cost or amortized cost | Gross unrealized losses | Estimated fair value |
| Available-for-sale securities, mutual funds | $ 652,429 | $ 20,948 | $ 631,481 |

|  | 1997 | | | |
|---|---|---|---|---|
|  | Cost or amortized cost | Gross unrealized losses | Gross unrealized gains | Estimated fair value |
| Available-for-sale securities: | | | | |
| Mutual funds | $ 3,386,480 | $ 16,845 | $ 253,465 | $ 3,623,100 |
| Obligations of states and political subdivisions | 80,004 | 112 |  | 79,892 |
|  | $ 3,466,484 | $ 16,957 | $ 253,465 | $ 3,702,992 |

10

USFG/BS  0451

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

3.   Marketable securities (continued):

| | 1998 | 1997 |
|---|---|---|
| Cost of securities sold | $ 2,941,725 | $ 9,387,456 |
| Proceeds from sale | 3,202,652 | 9,381,163 |
| Gross realized gains | 262,391 | |
| Gross realized losses | 1,464 | 6,293 |

4.   Uncompleted contracts:

| | 1998 | 1997 |
|---|---|---|
| Contract costs | $ 42,225,606 | $ 27,920,734 |
| Estimated earnings thereon | 3,130,223 | 1,638,199 |
| | 45,355,829 | 29,558,933 |
| Less billings applicable thereto | 39,302,311 | 29,168,576 |
| | $ 6,053,518 | $ 390,357 |

Included in the balance sheet as:

| | 1998 | 1997 |
|---|---|---|
| Costs and estimated earnings in excess of billings on uncompleted contracts | $ 6,341,726 | $ 1,072,281 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | ( 288,208) | ( 681,924) |
| | $ 6,053,518 | $ 390,357 |

5.   Long-term debt:

Long-term debt consists of the following:

| | 1998 |
|---|---|
| Obligations to various financing corporations due in current monthly installments totaling $116,074, including interest at fixed rates approximating 7%. The notes, which are secured by the financed equipment, mature at various dates through August 2003. | $ 3,964,581 |

USFG/BS 0452

11

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

5.  **Long-term debt (continued):**

| | 1998 |
|---|---|
| Borrowings under a $2,000,000 bank equipment line of credit are secured by the financed equipment. The agreement requires the December 31, 1998 balance to be repaid by December 2003 in monthly installments of $30,238, including interest at a fixed rate of 6.7%. | $ 1,538,074 |
| Total long-term debt | 5,502,655 |
| Less current portion | 1,338,280 |
| Long-term debt portion | $ 4,164,375 |

Aggregate principal payments due on long-term debt for the five years subsequent to December 31, 1998 are as follows:

| | |
|---|---|
| 1999 | $ 1,338,280 |
| 2000 | 1,415,424 |
| 2001 | 1,242,569 |
| 2002 | 961,559 |
| 2003 | 544,823 |
| | $ 5,502,655 |

6.  **Operating line of credit:**

The Company has available a $2,000,000 unsecured operating line of credit expiring on April 30, 1999 which requires interest at the bank's prime rate less 1/2%. The Company has no outstanding balance on the line at December 31, 1998.

7.  **Rent expense:**

Various equipment and operating facilities are leased under noncancellable agreements. Total rent expense for all leases, including the related party lease discussed in Note 8, was $1,689,666 and $432,492 in 1998 and 1997, respectively.

The aggregate minimum rental commitments under all noncancellable leases at December 31, 1998 totaling $28,639 are due in 1999.

12

USFG/BS 0453

*CCI CONSTRUCTION COMPANY, INC.*

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

8. **Related party transactions:**

The Company is leasing an operating facility owned by its sole shareholder through March 31, 1999. The lease requires a monthly rental payment of $4,037. Rent expense for this facility was $48,444 and $45,000 for 1998 and 1997, respectively.

Effective April 1, 1999, the Company will begin leasing an operating facility from Mechanicsburg Land Company, which is owned by the Company's sole shareholder, on a year-to-year basis. The initial lease, which expires December 31, 1999, requires monthly lease payments of $14,329. Additionally, the Company entered into a contract for the construction of this facility with Mechanicsburg Land Company. Billings of $339,203 were included in accounts receivable as of December 31, 1998.

During 1997, the Company incurred warranty insurance expense of $825,000 with Pennsylvania Contractors Insurance Company, a corporation under common control. These costs are allocated as direct cost of contracts. There were no such costs in 1998.

During 1998, two insurance claims for contract losses incurred of $900,000 were paid by Pennsylvania Contractors Insurance Company. These claims were covered under the terms of a remedial work period insurance policy.

In addition, Pennsylvania Contractors Insurance Company has guaranteed a claim of $1,162,460 filed by the Company with a contract owner. If the owner fails to pay all or any part of this claim, the insurance company will pay the unpaid portion.

9. **Income taxes:**

No provision has been made for federal or state income taxes. Under provisions of the Internal Revenue Code and the Commonwealth of Pennsylvania Tax Act, the Company has elected not to be taxed as a corporation and the sole shareholder has consented to include the income in his individual return.

10. **Year 2000 issues:**

Like any other company, advances and changes in available technology can significantly affect the business and operations of the Company. A challenging problem exists as many computer systems worldwide do not have the capability of recognizing the year 2000 or years thereafter. No easy technology "quick fix" has yet been developed for this problem. While the Company has not requested verification of its year 2000 status from its auditors, it believes its computer systems will effectively deal with transactions in the year 2000 and beyond. This "Year 2000 Computer Problem" creates risk for the Company from unforeseen problems from third parties with whom the Company deals on financial transactions. Failures of the third parties' computer systems could have an impact to the Company's ability to conduct its business. The effect, if any, is unknown at this time.

**CCI CONSTRUCTION COMPANY, INC.**

COST OF CONTRACTS

YEARS ENDED DECEMBER 31, 1998 AND 1997

|  | 1998 | 1997 |
|---|---|---|
| Direct costs: | | |
| Labor | $ 6,457,982 | $ 2,886,054 |
| Payroll taxes | 702,129 | 335,936 |
| Employee benefits | 667,597 | 677,477 |
| Equipment | 111,207 | 41,373 |
| Equipment rental | 1,625,224 | 381,924 |
| Materials | 10,371,108 | 4,259,253 |
| Other | 1,745,316 | 1,679,129 |
| Subcontractors | 27,802,562 | 22,099,706 |
| | 49,483,125 | 32,360,852 |
| Indirect costs: | | |
| Salaries | 528,517 | 86,208 |
| Payroll taxes | 61,224 | 11,217 |
| Employee benefits | 70,560 | 8,324 |
| Blueprints | 163 | 6 |
| Depreciation | 687,512 | 95,723 |
| Dues and permits | 5,340 | 710 |
| Employee recruitment | 44,621 | 7,151 |
| Insurance | 4,486 | 716 |
| Office supplies and expense | 53,393 | 8,112 |
| Postage | 2,187 | 253 |
| Professional services | 37,338 | |
| Rent | 40,731 | 8,636 |
| Repairs and maintenance | 12,655 | 3,648 |
| Safety | 2,732 | 2,157 |
| Telephone | 28,926 | 11,802 |
| Temporary help | 7,591 | |
| Trade books and journals | 1,892 | 556 |
| Training and seminars | 8,303 | |
| Travel and entertainment | 10,290 | 728 |
| Utilities | 10,397 | 1,413 |
| Warehouse expenses | 43,399 | 9,261 |
| | 1,662,257 | 256,621 |
| Total cost of contracts | $ 51,145,382 | $ 32,617,473 |

14

USFG/BS 0455

**CCI CONSTRUCTION COMPANY, INC.**

GENERAL AND ADMINISTRATIVE EXPENSES

YEARS ENDED DECEMBER 31, 1998 AND 1997

|  | 1998 | 1997 |
|---|---|---|
| Salaries: | | |
| Officers | $ 353,939 | $ 1,038,273 |
| Office | 480,807 | 410,023 |
| Payroll taxes | 60,247 | 73,399 |
| Employee: | | |
| Benefits | 53,857 | 33,722 |
| Recruitment | 4,379 | 2,237 |
| Advertising | 3,067 | 1,038 |
| Bad debt | 22,569 | |
| Bank charges | 5,111 | 3,667 |
| Blueprints | 17,551 | 13,507 |
| Company sponsored activities | 2,373 | 1,098 |
| Contributions | 14,220 | 3,030 |
| Depreciation | 105,502 | 60,781 |
| Dues | 16,335 | 8,058 |
| Insurance | 12,399 | 12,162 |
| Licenses and taxes | 44,559 | 44,270 |
| Miscellaneous | | 265 |
| Office supplies | 50,617 | 18,875 |
| Postage | 8,967 | 7,914 |
| Professional services | 109,543 | 95,337 |
| Rent | 23,711 | 33,744 |
| Repairs and maintenance | 6,555 | 7,689 |
| Telephone | 19,164 | 31,328 |
| Temporary help | 1,719 | |
| Trade books and journals | 24,222 | 22,995 |
| Training and seminars | 5,938 | 1,086 |
| Travel and entertainment | 30,687 | 5,948 |
| Utilities | 27,662 | 23,934 |
| Total general and administrative expenses | $ 1,505,700 | $ 1,954,380 |

USFG/BS 0456

15

**CCI CONSTRUCTION COMPANY, INC.**

EARNINGS FROM CONTRACTS

YEAR ENDED DECEMBER 31, 1998

| | Revenues earned | Cost of revenues earned | | Gross profit (loss) |
|---|---|---|---|---|
| Contracts completed during the year | $ 13,541,950 | $ 13,969,824 | (a) | $( 427,874) |
| Contracts-in-progress at year-end | 38,721,607 | 35,389,315 | (a) | 3,332,292 |
| Construction management contracts | 83,777 | 20,444 | (a) | 63,333 |
| Time and material jobs | 187,119 | 103,542 | (a) | 83,577 |
| | 52,534,453 | 49,483,125 | | 3,051,328 |
| Indirect costs | | 1,662,257 | | ( 1,662,257) |
| | $ 52,534,453 | $ 51,145,382 | | $ 1,389,071 |

(a) Excludes indirect costs not allocated to specific jobs.

USFG/BS 0457

16

## CCI CONSTRUCTION COMPANY, INC.

### COMPLETED CONTRACTS

### YEAR ENDED DECEMBER 31, 1998

| Job number | Contract | Contract totals | | | Before January 1, 1998 | | | During the year ended December 31, 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Revenues earned | Cost of revenues earned | Gross profit (loss) before indirect costs | Revenues earned | Cost of revenues earned | Gross profit before indirect costs | Revenues earned | Cost of revenues earned | Gross profit (loss) before indirect costs |
| 426 | U.E.P.H. Complex | $ 19,272,256 | $ 17,479,889 | $ 1,792,367 | $ 17,763,732 | $ 15,878,479 | $ 1,885,253 | $ 1,508,524 | $ 1,601,410 | $( 92,886) |
| 445 | Houtzdale Prison | 10,937,202 | 11,397,234 | ( 460,032) | 4,086,420 | 4,169,371 | ( 82,951) | 6,850,782 | 7,227,863 | ( 377,081) |
| 448 | Outlook Creekview | 4,800,644 | 4,655,443 | 145,201 | 554,419 | 521,254 | 33,165 | 4,246,225 | 4,134,189 | 112,036 |
| 449 | U.E.P.H. Headquarters | 1,459,558 | 1,521,701 | ( 65,143) | 520,139 | 515,339 | 4,800 | 936,419 | 1,006,362 | ( 69,943) |
| | | $ 36,469,660 | $ 35,054,267 | $ 1,412,393 | $ 22,924,710 | $ 21,084,443 | $ 1,840,267 | $ 13,541,950 | $ 13,969,824 | $( 427,874) |

17

USFG/BS  0458

# CCI CONSTRUCTION COMPANY, INC.

## CONTRACTS-IN-PROGRESS

### DECEMBER 31, 1998

| Job number | Project | Total contract price | Estimated total direct contract costs | Estimated total contract earnings (loss) before indirect costs | Inception to December 31, 1998 — Direct contract costs to December 31, 1998 | Contract earnings (loss) accrued to December 31, 1998 before indirect costs | Billings to December 31, 1998 | December 31, 1998 — Costs and estimated earnings in excess of billings | Billings in excess of costs and estimated earnings | Year ended December 31, 1998 — Revenues earned | Direct cost of revenues earned | Gross profit (loss) before indirect costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 439 | Mahanoy Prison | $ 11,699,418 | $ 10,667,972 | $ 1,031,446 | $ 10,666,808 | $ 1,031,333 | $ 10,481,740 | $ 1,216,401 | | $ 5,623,543 | $ 4,357,566 | $ 1,265,957 |
| 450 | Johnstown | 3,266,600 | 3,245,082 | 21,518 | 1,172,766 | 7,776 | 730,724 | 449,818 | | 1,064,009 | 1,057,305 | 6,724 |
| 451 | Lord Fairfax | 7,082,984 | 7,301,111 | ( 218,127) | 6,659,984 | ( 218,127) | 6,570,468 | | $ 126,611 | 5,998,746 | 6,248,376 | ( 249,630) |
| 454 | Albemarle Prison | 14,524,840 | 12,875,751 | 1,649,089 | 4,819,694 | 617,292 | 4,719,426 | 717,560 | | 5,436,986 | 4,819,694 | 611,292 |
| 455 | Perry Point | 12,937,341 | 11,463,840 | 1,473,501 | 4,734,492 | 608,547 | 3,108,536 | 2,234,503 | | 5,343,039 | 4,734,492 | 608,547 |
| 456 | Outlook - Hilliard | 5,380,745 | 4,801,310 | 579,435 | 2,715,193 | 327,677 | 2,732,602 | 310,268 | | 3,042,870 | 2,715,193 | 327,677 |
| 457 | Camp Hill | 1,495,629 | 1,372,273 | 123,356 | 547,295 | 49,197 | 617,709 | | 21,307 | 596,492 | 547,295 | 49,197 |
| 459 | Scott Air Force Base | 14,870,150 | 13,929,350 | 940,800 | 6,026,575 | 407,040 | 6,571,905 | | 138,290 | 6,433,615 | 6,026,575 | 407,040 |
| 460 | Germ Plasma Center | 15,565,000 | 14,667,024 | 897,976 | 2,905,995 | 177,917 | 2,252,156 | 831,756 | | 3,063,912 | 2,905,995 | 177,917 |
| 461 | Outlook - Chesterfield | 3,842,372 | 3,629,824 | 212,548 | 1,518,251 | 88,902 | 1,091,444 | 509,709 | | 1,607,153 | 1,518,251 | 88,902 |
| 462 | Outlook - Westerville | 5,569,900 | 5,218,140 | 371,760 | 458,553 | 32,669 | 419,511 | 71,711 | | 491,222 | 458,553 | 32,669 |
| | | $ 96,254,979 | $ 89,171,677 | $ 7,083,302 | $ 42,225,606 | $ 3,130,223 | $ 39,302,311 | $ 6,341,726 | $ 286,208 | $ 38,721,607 | $ 35,389,315 | $ 3,332,292 |

USFG/BS  0459

18

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY,<br>Plaintiff | ) ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| BRUCE J. BROWN and<br>BROWN SCHULTZ SHERIDAN &<br>FRITZ,<br>Defendants | ) ) ) ) ) | JUDGE KANE |

## DEFENDANT BROWN, SCHULTZ, SHERIDAN & FRITZ'S RESPONSES AND OBJECTIONS TO UNITED STATES FIDELITY AND GUARANTY COMPANY'S FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS

Defendant, Brown, Schultz, Sheridan & Fritz, by and through its attorneys, hereby responds to United States Fidelity & Guaranty Company's ("USF&G") First Request for Production of Documents, as follows:

### GENERAL OBJECTIONS

The following general objections are incorporated by reference into each and every response to plaintiff's requests for production:

1. Defendant objects to these requests to the extent that seek documents which are protected from disclosure by the attorney client privilege and/or the work product doctrine.

2. Defendant objects to the document requests to the extent they go beyond the scope permitted by the Federal Rules of Civil Procedure.

**RESPONSE:**

Defendant objects to this request as overly broad and as seeking information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of its objections, defendant responds that the documents responsive to this request, to the extent they exist, have previously been produced to USF&G

19.   All documents relating to completion costs on any CCI projects.

**RESPONSE:**

Defendant objects to this request as overly broad and as seeking information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of its objections, defendant responds that the documents responsive to this request, to the extent they exist, have previously been produced to USF&G

20.   All documents relating to Brown Schultz's written procedures for audits used or employed as they relate to the Audit Reports.

**RESPONSE:**

Defendant objects to this request as vague, ambiguous, overly broad and as seeking information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of its objections defendant refers plaintiff to the files previously produced to USF&G. In addition, defendant utilizes the Horwath International Audit Manual which will be made available for inspection upon request.

21.   All documents relating to the procedures governing internal review of audits employed or used by Brown Schultz.

# Horwath International Audit Manual

## (U.S. Version)

# 2000 Edition



to recorded sales), because confirmations cannot be relied upon to test completeness.

**12.045** If the types of misstatements found in respondents' and nonrespondents' accounts are significantly different, we should determine whether we discovered misstatements in the confirmation replies that we could not find by performing alternate procedures. If so, and we are unable to obtain confirmation replies from nonrespondents, we should design and perform additional alternate procedures capable of detecting the types of misstatements necessary to achieve our objectives, such as would likely be found in the confirmation replies.

**12.046** For example, assume that of the 65 replies, four customers had misstated invoice prices. If alternate procedures included a check of pricing by comparing the prices on nonrespondents' accounts to the correct prices, we may combine the evaluations because all pricing misstatements in the test would have come to our attention. As another example, assume two misstatements in confirmation replies reveal that the customer returned merchandise and no credit was given (and the client agrees that credit is owed to the customer). Alternate procedures such as examination of remittance advices and shipping documents would not cause us to detect this type of misstatements, so we should determine the cause of the misstatements and design another substantive test to search for unrecorded merchandise and determine the extent. In this situation, we might perform a test comparing receiving reports of returned merchandise to credits issued in the subsequent period. If each test is a sample, we may combine the results of the two tests to compute known and projected misstatements.

**12.047** For each confirmation request, we should determine an audited amount considering the accumulated evidence. Then we can evaluate the results of the test and determine known and projected misstatements.

**12.048** When we evaluate negative and positive confirmations, we usually define as a misstatement a confirmation reply that:

- Cannot be reconciled,

- Is reconciled and the client's records are misstated, or

- Cannot be delivered because the address is incorrect (we might perform alternative procedures to prove the amount exists, but when the client does not have a proper address, consider whether there might be a valuation problem).

In-transit items usually are not misstatements if we are satisfied the items are properly recorded according to shipping terms and documents.

**Special Industry Considerations**

*Construction*

**12.049** In the construction industry, under percentage-of-completion accounting, revenue and "work-in-process" (unbilled receivables) is recorded before billing and recording accounts receivable. Because we cannot confirm the amount of unbilled receivables with the client's customers, we should design an alternative test of revenue. In this situation, we might test billing and collections in the period after the confirmation date. If unbilled construction receivables is significant, we ordinarily need to evaluate and test the client's method of estimating percentage of completion and costs to complete, including, perhaps,

# GUARANTY AGREEMENT

This Guaranty Agreement, given on this _1st_ day of _December_ 1998, by PENNSYLVANIA CONTRACTORS INSURANCE COMPANY ("PCIC") to CCI CONSTRUCTION CO., INC. ("CCI") as follows:

PCIC will guarantee the claim that was filed by CCI, in the amount of One Million Two Hundred Thousand Dollars ($1,200,000.00), with the Department of General Services, Commonwealth of Pennsylvania, for the project known as Mahanoy State Correctional Institution, Frackville, Pennsylvania.  If the Department of General Services, Commonwealth of Pennsylvania, fails to pay all or any part of the subject claim, PCIC will pay the difference owing or the full amount of the claim if no part of the claim is paid.

All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several and respective heirs, legal and personal representatives, successors and assigns of said parties.  No rights, however, shall inure to the benefit of any assignee of CCI unless the assignment to such assignee has been approved by PCIC.

This writing contains the entire agreement between the parties hereto, and no agent, representative or officer of either party has authority to make or has made any statement, agreement or representation, either oral or written, in connection herewith, modifying, adding or changing the terms and conditions herein set forth.  No dealings between the parties or custom shall be permitted to contradict various additions to or

BSSF2333

BS 00300       1

modify the terms hereto.  No modification of this Agreement shall be binding unless such modifications shall be in writing and signed by the parties hereto.

IN WITNESS WHEREOF, the parties, intending to be legally bound hereby, have caused this Agreement to be duly signed upon the day, month and year first above written.

ATTEST:

_E M Qveny_
_Asst. Secretary_

PCIC:
PENNSYLVANIA CONTRACTORS
INSURANCE COMPANY

By: _[signature]_

BSSF2334

2