2 Cr

ORIGINAL

70
11/5/

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

United States Fidelity and
Guaranty Company

       v.

Bruce J. Brown and Brown, Schultz
Sheridan & Fritz

:
:
:
:
:
:
:
:
:

Judge Connor

MJSnyscru

No: 01-CIV-813

**FILED**
HARRISBURG, PA

NOV 0 4 2002

MARY E. D'ANDREA, CLERK
Per_____
         Deputy Clerk

**EXHIBITS TO DEFENDANTS REPLY BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| Exhibit A | August 6 and 7, 2002 letter from K. Carson to Bruce Levin |
| Exhibit B | Plaintiff's Response to 8/7/02 letter |
| Exhibit C | October 16, 2002 Letter from Bruce Levin to Kathleen Carson |
| Exhibit D | Excerpts of T. Phillips Deposition |
| Exhibit E | Excerpts of J. Daily Deposition |
| Exhibit F | Excerpts of D. Hussey Deposition |
| Exhibit G | Excerpts of 7/19/02 Bruce Brown Deposition and Exhibit 19 thereto |

*Swartz* | *Campbell* | *Detweiler*

**Kathleen M. Carson**
*Attorney at Law*

Swartz, Campbell & Detweiler
1601 Market Street
34th Floor
Philadelphia, PA 19103-2316

phone   215-299-4272
fax      215-299-4301
e-mail  kcarson@scdlaw.com
web     www.scdlaw.com

August 6, 2002

**VIA FACSIMILE**
Bruce J. Levin, Esquire
Bernkopf, Goodman & Baseman, LLP
125 Summer Street
Boston, MA 02110

     **Re:   USF&G v. Brown Schultz Sheridan & Fritz**

Dear Bruce:

     We request that you immediately produce Mr. DeBruyn's working paper files with regard to his opinions and report, including the restated financials attached as exhibits to his expert. Please advise us by close of business today if and when you will produce that information.

     Very truly yours,

     SWARTZ, CAMPBELL & DETWEILER

     BY: _Kathleen M Carson_
       JEFFREY B. MC CARRON
       KATHLEEN M. CARSON

KMC/kc

# Swartz | Campbell | Detweiler

**Kathleen M. Carson**
*Attorney at Law*

Swartz, Campbell & Detweiler
1601 Market Street
34th Floor
Philadelphia, PA 19103-2316

phone  215-299-4272
fax      215-299-4301
e-mail  kcarson@scdlaw.com
web     www.scdlaw.com

August 7, 2002

**VIA FACSIMILE**
Bruce Levin, Esquire
Bernkopf, Goodman & Baseman, LLP
125 Summer Street
Boston, MA 02110

### Re: USF&G v. Brown Schultz Sheridan & Fritz

Dear Bruce:

I write pursuant to Local Rule 7.1 and 26.3 to determine when Mr. DeBruyn's workpapers will be produced. In addition, I write to determine if you will agree to an amendment of the case management order regarding the timing of defendants' expert disclosures in light of the fact that Mr. DeBruyn's workpapers have yet to be produced.

First, Mr. DeBruyn's workpapers should have been produced with your expert disclosures on July 22, 2002 pursuant to F.R.C.P. 26. In addition, we also requested that this information in our last set requests for production directed to USF&G. We requested that USF&G

Produce any restated financial statements prepared by you or on your behalf with regard to CCI and any and all documents relied upon by you in connection with the preparation of those restated financials.

UFS&G's response was that the restated financials and all discoverable materials related thereto would be produced. However, to date we have not received Mr. DeBruyn's working papers or any other documents responsive to this request.

When we spoke at the depositions of Messrs. Daily and Silverstein on July 30, 2002, I

Bruce Levin
August 7, 2002
Page 2

requested that the working papers be produced.   I did not receive a response to my request.  I called you yesterday to discuss the production of this information and again today and have received no response from you. In addition, by letter dated August 6, 2002, I requested that you advise whether and when the work papers would be produced.  Please advise us when we may expect to receive them as they are necessary for our expert's preparation of his report.

Finally, in light of USF&G's failure to timely produce the working papers, we request that USF&G stipulate to a thirty day extension of the deadline for production of defendants' expert reports.  We would, of course, be willing to stipulate to a similar extension of the date for USF&G's disclosures with regard to its rebuttal experts.

Please advise us whether and when the working papers will be produced and whether you will agree to the proposed extension or if it will be necessary to file a motion with the Court.

Very truly yours,

SWARTZ, CAMPBELL & DETWEILER

BY: _Kathleen M. Carson_
JEFFREY B. MC CARRON
KATHLEEN M. CARSON

kmc/kc

B

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW

125 SUMMER STREET

BOSTON, MASSACHUSETTS 02110-1621

TELEPHONE (617) 790-3000

TELECOPIER (617) 790-3300

October 16, 2002

Bruce D. Levin
DIRECT DIAL: (617) 790-3314
e-mail: blevin@bgblaw.com

**VIA TELECOPIER**

Kathleen Carson, Esq.
Swartz Campbell Detweiler
1601 Market Street
Philadelphia, PA 19103-2316

RE:    **United States Fidelity & Guaranty v. Bruce J. Brown et al.**
       **M.D. Pa. No. 01-00813**

Dear Kathleen:

I would like to formerly designate the following as constituting expert reports (and supplements thereto) regardless of whether previously designated as such:

1.    Expert Report of Steve J. DeBruyn, CPA, dated July 22, 2002;
2.    Supplemental and Rebuttal Expert Report of Steve J. DeBruyn, CPA, dated September 20, 2002;
3.    Affidavit of Steve J. DeBruyn, CPA in Opposition to the Defendants' Motion for Summary Judgment, dated October 8, 2002 (served October 9, 2002) ;
4.    Expert Report of Richard D. Farnsworth, dated September 20, 2002; and
5.    Affidavit of Richard D. Farnsworth in Opposition to the Defendants' Motion for Summary Judgment, dated September 27, 2002 (served October 9, 2002).

The designated reports are subject to and without waiver of any rights we have to serve further supplementations of these reports.

Please feel free to contact me if you have any questions.

BERNKOPF, GOODMAN & BASEMAN LLP

Very truly yours,

*Bruce D. Levin* /RVB

Bruce D. Levin

BDL:alb
cc:    Peter B. McGlynn, Esq.
       Mark Holtschneider, Esq.

#255189 v1/36432/87

1              VOLUME II

2        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3
UNITED STATES FIDELITY
4 and GUARANTY COMPANY

5              Plaintiff

6      vs.                          CIVIL ACTION NO:
                                    NO. 1-01-CV-00813
7 BRUCE BROWN and BROWN,
  SCHULTZ, SHERIDAN & FRITZ

8              Defendants

9 _____/

10

11        The deposition of TONY PHILLIPS was held on

12 Wednesday, May 29, 2002, commencing at 10:20 A.M., at

13 the Law Offices of The St. Paul Companies, 5801 Smith

14 Avenue, Baltimore, Maryland 21209, before Ronda J.

15 Thomas, Notary Public.

16 APPEARANCES:

17          PETER B. MCGLYNN, ESQUIRE
              On behalf of Plaintiff
18
            JEFFREY B. MCCARRON, ESQUIRE
19            On behalf of Defendants

20

21 REPORTED BY:  Ronda J. Thomas, RPR

Tony Phillips (Vol. II) - 5/29/02

226

1          STIPULATION
2          It is stipulated and agreed by and between
3 counsel for the respective parties that the filing of
4 this deposition with the Clerk of Court be and the same
5 is hereby waived.
6          - - - - - - -
7 Whereupon,
8          TONY PHILLIPS,
9 called as a witness, having been previously duly sworn
10 to tell the truth, the whole truth, and nothing but the
11 truth, was examined and testified as follows:
12          MR. McGLYNN:  Same stipulations we had
13 previously.
14          EXAMINATION BY MR. McCARRON:
15      Q    Mr. Phillips, you realize you're still
16 under oath from the last time we had your deposition;
17 is that right?
18      A    Yes.
19      Q    You were previously deposed on April 17,
20 2002, in connection with this case; is that right?
21      A    Yes.

227

1      Q    On that occasion I asked you questions and
2 you provided answers; is that right?
3      A    Yes.
4      Q    You realize you were under oath at that
5 time; is that right?
6      A    Yes.
7      Q    You realize you're now still under oath
8 just as you were on April 17th, 2002; is that right?
9      A    Yes.
10      Q    Did you review your deposition from
11 April 17, 2002 before today?
12      A    Yes.
13      Q    Did you notice any information or answers
14 which you provided on April 17, 2002 in that deposition
15 which you believe was either incorrect, wrong or
16 incomplete?
17      A    There were a few words that were
18 mispronounced or spelled wrong.  The general scope of
19 the answers were all correct.
20      Q    Who made the initial approval of the bond
21 program for CCI on behalf of USF&G?

228

1      A    I believe the initial approval of the bond
2 program for CCI was made by Jim Daily and John Huss.
3      Q    What was the position/title of John Huss?
4      A    Vice president.
5      Q    Once the bond program was established for
6 CCI Construction who had the ultimate authority about
7 whether to commit USF&G to bond particular contracts
8 for CCI Construction?
9          MR. McGLYNN:  Initially?
10          MR. McCARRON:  Well, once the program got
11 up and running who then had the ultimate
12 responsibility, ultimate authority about whether to
13 commit USF&G to bonds.
14      A    There were various authority levels
15 depending upon the job size and program.
16      Q    Who, though, at USF&G had the ultimate
17 authority about whether USF&G would commit to bonds for
18 CCI Construction contracts?
19      A    Depending upon the job size and program
20 there was various levels of authority given to the
21 branch or above those levels would have to be referred

229

1 to the home office.
2      Q    So was it the situation that the field
3 office which you worked had a limited authority to
4 approve individual bonds within the bond program for
5 CCI Construction once the bond program was established?
6          MR. McGLYNN:  Objection.  You may answer.
7      A    Yes.
8      Q    Was there any occasion when the field
9 office did not approve a bond for CCI Construction?
10      A    I can't think of any.
11      Q    If the field office did not approve a bond
12 for CCI Construction was there a means by which CCI
13 Construction could obtain approval for USF&G to commit
14 to a bond?
15          MR. McGLYNN:  Objection.  You may answer.
16      A    That's hypothetical.  I couldn't give an
17 answer to that.
18      Q    Well, if you or someone else in the field
19 office of USF&G refused to approve a bond for CCI
20 Construction would that have been the final word that
21 USF&G would not have issued the bond?

GORE BROTHERS Reporting & Video Co., Inc.
410-837-3027                                    Towson Reporting Company
                                                410-828-4148

Tony Phillips (Vol. 1) - 5/29/02

366

1  Q  So to understand the extent of the revenue
2 generated from a warranty claim you would have to ask
3 further -- you would have to ask questions to obtain
4 additional information?
5  A  If that was important to us, yes.
6  Q  Did you ever do that?
7  A  If that was important to us.
8  Q  Did you --
9  A  I never did that because as of the date you
10 make reference to here it wasn't important to us.
11  Q  Was it important on any other occasion
12 which prompted anyone affiliated with USF&G to
13 determine the extent to which income was actually
14 derived or revenue was derived by CCI from a PCIC
15 warranty paid claim?
16  A  It might have been to the extent that there
17 was a substantial amount of warranty income generated
18 against a substantial losing operations of CCI that
19 would have a net effect of showing say a slight profit
20 then questions probably should have been asked at that
21 time.

367

1  Q  Does that mean no, no one ever asked about
2 the extent to which CCI received revenue because of a
3 warranty claim paid by PCIC?
4  MR. McGLYNN: Objection.
5  A  No one ever asked.
6  Q  Was it ever important to know the extent to
7 which revenue received by CCI was derived from a
8 warranty claim paid by PCIC?
9  MR. McGLYNN: Objection, asked and
10 answered.
11  A  To the extent that the company had
12 sufficient cash, working capital, net worth and what we
13 believe was profitable operations going forward, it was
14 not that important.
15  Q  Does that mean no it wasn't important for
16 USF&G to determine the extent to which revenue was
17 received by CCI from a warranty claim?
18  MR. McGLYNN: Objection.
19  A  Depending upon the circumstances at the
20 time it was not that important.
21  Q  Well, what does it depend on? I'm asking,

368

1 was it ever determined it was important to know the
2 extent to which revenue was derived by CCI from a
3 warranty claim?
4  MR. McGLYNN: Objection.
5  A  If it was so substantial corresponding to a
6 loss of income from construction operations that it
7 would jump out and grab a person who would be looking
8 at the financial analysis, then it would have become
9 apparent which I believe it never did.
10  Q  I'm showing you a document Phillips
11 Exhibit 5 which is the 1998 and 1997 financial
12 statement and on page 13 footnote eight it's titled
13 related party transactions; isn't that true?
14  A  True.
15  Q  Now, did you read the footnote eight
16 included within Phillips Exhibit 5 when you received
17 the financial statement during your work for CCI bond
18 program?
19  A  Possibly. Although the financial statement
20 was analyzed by Steve Salazar.
21  Q  Well, did you depend on Steve Salazar to

369

1 personally analyze the information included within the
2 financial statements?
3  A  Yes.
4  Q  Including the financial statement for the
5 years ending December 31, 1997 and 1998 which is
6 Phillips Exhibit 5; is that true?
7  A  True.
8  Q  Now, did you read the last paragraph under
9 footnote eight in or about the time you received the
10 financial statement, which is Phillips Exhibit 5, which
11 reads in addition Pennsylvania Contractors Insurance
12 Company has guaranteed a claim of $1,162,460 filed by
13 the company with a contract owner. If the owner fails
14 to pay all or any part of this claim, the insurance
15 company will pay the unpaid portion?
16  A  I personally don't remember that. My
17 underwriter may have.
18  Q  Did Mr. Salazar bring to your attention
19 that for 1998 the financial statement of CCI
20 Construction included in its revenue amount $1,162,460
21 which was based on a guarantee from PCIC in case the

Tony Phillips (Vol. II) - 5/29/02

370

1 owner didn't pay?

2    A    I don't believe it was included in revenue
3 where it should have been.  So I don't think he caught
4 that.

5    Q    Was it included, sir?

6    A    No.

7    Q    Well, was there any -- if you had read this
8 paragraph which starts out in addition PCIC has
9 guaranteed a claim of $1,162,460, would you have
10 understood it?

11        MR. McGLYNN:  Objection.

12    A    Possibly.

13    Q    Well, why wouldn't you have understood what
14 the last paragraph indicates?

15        MR. McGLYNN:  Objection.

16    A    I'm looking at this in little more than a
17 precursory review and looking at the notes and seeing
18 that an insurance company is guaranteeing a claim with
19 a contract owner.  I don't know what claim that would
20 be.  It says that the insurance company will pay the
21 unpaid portion.  I don't know the parameters of PCIC as

371

1 to whether or not they had a fire policy in effect, a
2 liability policy or what policy in effect that would
3 allow them to do that.

4    Q    Would it be important for you to know that
5 information?

6        MR. McGLYNN:  Objection.

7    Q    That is the basis and reason for the claim
8 guaranteed by PCIC?

9        MR. McGLYNN:  Objection.

10    A    It would be important.

11    Q    Did you ask the question --

12        MR. McGLYNN:  Let him finish.

13    Q    I'm sorry.

14    A    It would be important if we had reason to
15 believe that it was reflected or reflective of a
16 construction job or construction jobs that we believed
17 were at least going okay that were deteriorating as to
18 lost profits or increased losses.  If there was a note
19 to that effect then it would be important to us.

20    Q    So is it unimportant to you simply because
21 it doesn't reflect one way or the other whether the

372

1 warranty payment or the guarantee rather is for a
2 which you thought was going well or not or you didn't
3 know whether it was going well?

4        MR. McGLYNN:  Objection.

5    A    I don't think when my underwriter analyzed
6 that he put together anything regarding the fact that
7 this was related to a construction job that was going
8 bad.

9    Q    And why not?

10    A    There was not sufficient notes.  There was
11 not sufficient scheduling to show that these two were
12 related to a specific job or jobs in which it would
13 state the actual jobs in process identified as job
14 number this, job number this, job number that were
15 showing the following additional cost which would have
16 been picked up by this policy.  If that was the case
17 then it would have raised a red flag.

18    Q    Well, you didn't know one way or the other
19 did you, from that statement?

20    A    It wasn't asked.

21    Q    And you didn't ask the question?

373

1    A    No.

2    Q    But you had no comfort in knowing that
3 1.162460 amount was for any particular job, did you?

4        MR. McGLYNN:  Objection.

5    A    If you're asking me in that standpoint, I
6 don't know what my underwriter thought in that regard.

7    Q    Yeah, but the underwriter is under your
8 management and supervision, right?

9    A    Yes, and I'm under -- at the time I'm under
10 Mike Walter's supervision who's under Jim Daily's
11 supervision who's under somebody else's supervision and
12 to the extent that we are looking at an overall
13 picture.

14        We're looking at income that is profitable.
15 We're looking at cash, working capital and net worth
16 which we feel is sufficient.  We didn't put together
17 the fact that that one sentence or two sentence notes
18 would have been reflective of a change in accounting
19 principles or procedures or etiquette to show that some
20 particular job which had unrecognized cost would be
21 guaranteed if they weren't paid.

Tony Phillips (Vol. II) - !  9/02

374

1   Q    You didn't think it was significant about
2 whether there was a valid source of payment for
3 $1.162 million for CCI?
4   A    As I said --
5   Q    During 1998?
6        MR. McGLYNN:  Let him finish.
7   Q    I'm not finished my question.
8        MR. McGLYNN:  Well then don't raise your
9 voice.
10  Q    During 1998 when it already had -- you
11 learned halfway through the year it was losing or had
12 lost $1.6 million?
13  A    Was that important to --
14  Q    Yes.
15  A    -- the bottom line?
16  Q    Yes.
17  A    Yes, it was important to the bottom line.
18  Q    Did anyone at USF&G make an inquiry to
19 better understand the source and the extent of the
20 guarantee for the $1.162 million?
21  A    Since it was not properly footnoted, I

375

1 don't think anybody did.
2   Q    What is wrong with the footnote there, sir,
3 that you think should have been more inclusive?
4        MR. McGLYNN:  Don't raise your voice.
5   A    Okay.  To the extent that it did not
6 specifically say that it was paid, number one it
7 says --
8   Q    It doesn't say paid, does it?
9   A    I didn't say that.  Could I finish?
10  Q    Sure.
11  A    If the owner fails to pay, okay, the
12 insurance company will pay the unpaid portion.  That's
13 an insurance policy.  It did not say that something was
14 not paid.  So we weren't concerned to the extent that
15 we had a unrecognized cost.  It stated right here it
16 was just filed and it was a guarantee.
17       So from the standpoint of us doing further
18 investigation it would have been more prevalent for us
19 to investigate, we would have I'm sure investigated if
20 it was indicated that there were unpaid portions of
21 unapproved change orders for certain jobs and that

376

1 based upon that there is an insurance policy for which
2 funds will be taken out of, then we had full knowledge
3 that it was an actual event not a potential event.
4   Q    Well, you couldn't have been confident that
5 the guaranteed portion of the claim was an actual
6 event, right?
7   A    It didn't say it happened.
8   Q    Wouldn't it be important for you to know
9 whether it was or wasn't an actual event?
10       MR. McGLYNN:  Objection.
11  A    I am assuming that if it happened the
12 footnote would have said the owner failed to pay any
13 part of this claim and enumerated who the owner was
14 because it would be important to outside sources to
15 know the reflection it would have on the jobs in
16 process but it didn't say that.  It didn't say anything
17 to that whatsoever.  It says if this happens then this
18 will happen.  We didn't know that it was going to
19 happen.
20  Q    And you weren't asking, right?  You weren't
21 going to ask whether it was going to happen or not?

377

1        MR. McGLYNN:  Objection.  Asked and
2 answered.
3   A    I answered that.  We didn't ask because it
4 didn't happen.
5   Q    How do you know why the question wasn't
6 posed?
7        MR. McGLYNN:  Objection.
8   A    Because we're dealing with assumptions
9 here.
10  Q    You mean you're dealing with the assumption
11 that the question wasn't posed because Mr. Salazar
12 didn't have enough information, right?
13  A    Not correct.
14  Q    Well, you didn't even take note of this
15 particular sentence about the claim guaranteed by PCIC
16 at the time you received the financial statement, did
17 you?
18  A    I don't know.  I may have and what was
19 important to me is the fact that it did not occur.
20  Q    Why was it important to you that it -- what
21 didn't occur?

GORE BROTHERS Reporting & Video Co., Inc.        Towson Reporting Company
410-837-3027                                     410-828-4148

378

1    A    The fact that the owner failed to pay the
2 claim.  It does not say that the owner failed to pay
3 the claim.  It only states if the owner fails to pay
4 the claim then such-and-such will be paid.  This is not
5 a natural event.  Well, doesn't it raise your concern
6 that an owner may not pay.  It doesn't say that the
7 owner may not pay.
8    Q    Didn't the reference that if the owner
9 doesn't pay then PCIC will guarantee the claim raise
10 your concern that the owner may not pay?
11    A    Again for my underwriter and myself now the
12 fact that it states that there was a claim of 1,162,000
13 filed by the company with a contractor owner doesn't
14 give any information as to the extent of this, who it
15 was, et cetera, therefore if an audited financial
16 statement doesn't make reference to a substantial
17 amount like that, then it would not be important to us.
18        What would be important to us is the fact
19 that there was a policy in effect that if it wasn't
20 paid there was a guarantee of payment there.  Now, if
21 that was paid, then it was substantial to the financial

379

1 statement or if it wasn't able to be paid there would
2 be a loss of 1,162,000 in December of 1998.  I am sure
3 the question would have been asked and answered.
4        MR. McGLYNN:  Note that it's 3:30.  How
5 much more do you have?
6        MR. McCARRON:  Not five minutes.
7        MR. McGLYNN:  Well you know --
8        MR. McCARRON:  Well what?
9        MR. McGLYNN:  It's 3:30 if you have five
10 minutes I can stay for five minutes but --
11        MR. McCARRON:  Let me finish this issue and
12 I'll talk to you for a second if I can.
13        MR. McGLYNN:  Are you talking to yourself?
14        MR. McCARRON:  I'm sorry no, I was talking
15 to you.  I said let me finish this little thing in two
16 minutes and then we'll talk about what we're going to
17 do.
18        MR. McGLYNN:  All right.  Two minutes.
19    Q    Sir, you knew as of 1998 when you received
20 the financial statement for 1998 which was Phillips
21 Exhibit 5 that PCIC was owned by common ownership with

380

1 CCI; is that true?
2    A    Where does it say common ownership here?
3    Q    I'm asking you, sir?
4    A    No, I did not.
5    Q    You didn't know that?
6    A    In looking --
7    Q    Do you want to go back and look at Exhibit
8 4 and talk about that again?
9        MR. McGLYNN:  Are you going to raise your
10 voices again?
11    A    Can I finish my answer?
12    Q    Go ahead, sir.
13    A    In looking at this, you understand that in
14 all of the analysis it's done one year apart, number
15 one.  Number two, it's done by in this particular case
16 the same underwriter, number three we're dealing with a
17 event that may or may not happen in the future that
18 actually did not happen.
19    Q    Sir, I asked you a question about whether
20 you understood in 1998 there was common ownership
21 between PCIC and CCI?

381

1        MR. McGLYNN:  Objection.
2    A    No.
3    Q    You didn't so --
4    A    From this statement, no.
5    Q    No, I didn't ask you that, sir.  From 1998
6 were you aware there was common ownership between PCIC
7 and CCI?
8    A    No.
9    Q    So that you didn't learn anything from the
10 1995 financial statement which is Phillips Exhibit 2
11 footnote seven which said that PCIC and CCI are owned
12 by the same sole shareholder?
13        MR. McGLYNN:  Objection.
14    A    Can I answer that?
15        MR. McGLYNN:  You may answer.
16    A    Are you saying that I'm to go from 1995
17 through 1998 and automatically assume that since the
18 footnote didn't state the same statement as it did
19 in '95 and there are number of notes, there are a
20 number of companies that we handle that I should have
21 remembered from three or four years ago?

Tony Phillips (Vol. II) - 5  /02

382

1    Q    Does the phrase which appears under
2 footnote eight for Phillips Exhibit 5 after the
3 reference to Pennsylvania Contractors Insurance Company
4 a corporation under common control has no significance
5 to you?
6         MR. McGLYNN:  Jeff, this has been asked and
7 answered.
8    Q    Not for 1998 it hasn't?
9         MR. McGLYNN:  Ask him one more time and
10 we're going to suspend and do something, but I'm not
11 going to listen to this for the tenth time.  Objection.
12    A    Under common control could mean a number of
13 people are involved with that.  So it didn't mean
14 anything to me in that regard.
15    Q    Sir, it's a related party under the head
16 note -- I'm sorry let me start over.
17         The phrase a corporation under common
18 control appears under footnote headed related party
19 transactions, doesn't it?
20    A    Yes, it does.
21    Q    And that wouldn't alert you to the

383

1 possibility that PCIC and CCI are commonly owned or
2 controlled?
3         MR. McGLYNN:  Objection.
4    A    Not by who.
5    Q    I didn't ask you that question.  Well did
6 you have an understanding about the ownership and
7 control of CCI?
8    A    The ownership and control of CCI?
9    Q    Yes.
10    A    Yes.
11    Q    Who owned and controlled CCI?
12    A    John Ortenzio.
13    Q    Well then wouldn't it -- wouldn't you be
14 prompted to realize that PCIC was owned and controlled
15 by the same person as CCI when you read a company -- a
16 corporation under a common control which is a phrase
17 appearing after PCIC under a footnote identified as
18 related party transactions?
19    A    No.
20    Q    It wouldn't?
21    A    No.

384

1    Q    All right.
2         MR. McGLYNN:  The levity is not
3 appropriate.
4         MR. McCARRON:  We're stopping today because
5 Mr. Phillips and Mr. McGlynn, I believe, is that true,
6 have to leave?
7         MR. McGLYNN:  Well, I have a plane to catch
8 and as I indicated to you earlier we gave you until
9 3:30.  You've had the full day of Mr. Phillips earlier
10 this month.  You've also had until 3:30 today and we
11 worked up until about 10 minutes we worked through
12 lunch almost nonstop with a few breaks.  As far as
13 we're concerned at this particular juncture either we
14 have ended unless we can make some arrangements at some
15 point in time to finish up.  How much more time do you
16 feel you have right now?
17         MR. McCARRON:  I believe we could probably
18 get done within two hours hopefully less.
19         MR. McGLYNN:  Now you said three hours ago
20 you had three hours left.
21         MR. McCARRON:  It wasn't quite three hours.

385

1         MR. McGLYNN:  About 12:15 now it's 3:30.
2 Now you have three hours.
3         MR. McCARRON:  The questioning of
4 Mr. Phillips is a slow process for many reasons.
5         MR. McGLYNN:  Quit the ad hominem attacks,
6 if you're not insinuating that he's taking time or
7 being slow on purpose.
8         MR. McCARRON:  Not at all.
9         MR. McGLYNN:  You hesitated between
10 sentences, half sentences.
11         MR. McCARRON:  Sir, my comment was not
12 intended to be critical of the witness.  It was meant
13 to be that it takes time in questioning and simply
14 because there's a lot of time associated with the
15 questioning.
16         MR. McGLYNN:  You've gone over and over --
17         MR. McCARRON:  Are you going to let me
18 finish?
19         MR. McGLYNN:  No, as far as I'm concerned,
20 the deposition has ended.  If you want to get back to
21 me some time later on and give me a good faith estimate

GORE BROTHERS Reporting & Video Co., Inc.
410-837-3027

Towson Reporting Company
410-828-4148

Tony Phillips (Vol. II) - 5/29/02

386

1 of how much for time, if any, you need of Mr. Phillips
2 I'll consider it.  You've gone way over the allotted
3 time.  We have given you until 3:30 today working
4 through lunch and that's it.  I've got a plane to
5 catch.
6        MR. McCARRON:  All I wanted to do is state
7 my position is, one, the questioning did not go quickly
8 in part because the witness takes time answering the
9 questions.  I am not finished my questions as I've
10 clearly indicated to you.  We're stopping to
11 accommodate your schedule and Mr. Phillips who has
12 other obligations or schedules to meet and so with that
13 I am agreed to accommodate you.  I'm asking that you
14 provide or produce Mr. Phillips on another occasion
15 which hopefully we can schedule in order to complete
16 the deposition.
17        MR. McGLYNN:  I want from you prior to that
18 a good faith estimate of the amount of time that we
19 need for Mr. Phillips and since we're going to be down
20 in Harrisburg on some other depositions, maybe we can
21 fit Mr. Phillips in at a time that is mutually

387

1 convenient.  But I'm not going to sit here and say I'm
2 going to agree to two more hours, four more hours, five
3 more hours, one more hour unless and until you go back,
4 go over your notes and find out what it is that you
5 need out of Mr. Phillips at this point in time which we
6 can agree to fit him in at a mutually convenient time.
7 That's all I have to say.
8        MR. McCARRON:  Are we done?
9        MR. McGLYNN:  You're not going to have the
10 last word.  I'm leaving now.  As far as I'm concerned
11 the deposition is ended or suspended.
12        MR. McCARRON:  I asked you are you done?
13 That's all I asked you.  I am not like you, I don't
14 have to have the last word.
15        MR. McGLYNN:  You can close the record.
16        (Deposition was adjourned at 3:35 p.m.)
17
18
19
20
21

388

1        CERTIFICATE OF DEPONENT
2
3        I hereby certify that I have read and
4 examined the foregoing transcript, and the same is a
5 true and accurate record of the testimony given by me.
6
7        Any additions or corrections that I feel
8 necessary, I will attach on a separate sheet of
9 paper to the original transcript.
10
11
12        _____
              Tony Phillips
13
14
15
16
17
18
19
20
21

389

1 State of Maryland
2 County of Baltimore, to wit:
3        I, RONDA J. THOMAS, a Notary Public of the
4 State of Maryland, Baltimore County, do hereby certify
5 that the within-named witness personally appeared
6 before me at the time and place herein set out, and
7 after having been duly sworn by me, according to law,
8 was examined by counsel.
9        I further certify that the examination was
10 recorded stenographically by me and this transcript is
11 a true record of the proceedings.
12        I further certify that I am not of counsel
13 to any of the parties, nor in any way interested in the
14 outcome of this action.
15        As witness my hand and notarial seal this
16 18th day of June, 2002.
17
18        _____
              RONDA J. THOMAS, RPR
19              Notary Public
20 My Commission Expires:
21 October 1, 2005

42 (Pages 386 to 389)

Tony Phillips (Vol. II) - 5/29/02

390

```
 1                    INDEX
 2         Deposition of Tony Phillips
 3              May 29, 2002
 4
 5  Examination by:                    Page
 6     Mr. McCarron                     226
 7
 8  Exhibit No.              Marked
 9  3   USF&G Answers to Interrogatories    293
10  4   Financial statements for 1996-1997  350
11  5   Financial statements for 1997-1998  350
12
13
14
15
16
17
18
19
20
21
```

U.S. Fidelity v Bruce Brov.    Multi-Page™    **Anthony Phillips**
6/20/02

---

Page 440

1    Q    Did you share Phillips 7 with Jim Daily?
2        MR. McGLYNN: Objection. I don't
3 understand what you mean by share. Did you give him a
4 copy?
5        MR. McCARRON: Yes.
6        MR. McGLYNN: Ask it that way.
7 BY MR. McCARRON:
8    Q    Did you share it would be the same.
9 Either give him a copy, hand it to him, the original
10 you received or otherwise?
11   A    Could be. I am not sure.
12   Q    How would we determine whether you shared
13 Phillips Exhibit 7 with Jim Daily?
14   A    If you got a copy of this information
15 from Jim Daily.
16   Q    Did you discuss the information, which is
17 included in Phillips Exhibit 7 with Mr. Daily?
18   A    I don't remember.
19   Q    Did you have an understanding about the
20 phrase or the sentence in the third paragraph on the
21 first page of Phillips Exhibit 7, "CCI can actually use
22 this as a buffer to offset losses or profit fades in
23 certain jobs during any given year", referring to PCIC?
24   A    I didn't think of it at the time.
25   Q    Did it occur to you that CCI Construction

---

Page 441

1 was suggesting it could use money from PCIC to improve
2 its financial condition and offset losses or profit
3 fades?
4        MR. McGLYNN: Objection.
5        THE WITNESS: I didn't think of it at the
6 time.
7 BY MR. McCARRON:
8    Q    Does that sentence now suggest to you
9 that CCI Construction was indicating it could use PCIC
10 money to improve its financial condition by offsetting
11 losses and profit fades?
12       MR. McGLYNN: Objection.
13       THE WITNESS: That they were using what
14 kind of funds did you say?
15 BY MR. McCARRON:
16   Q    PCIC funds.
17       MR. McGLYNN: Objection.
18       THE WITNESS: Possibly.
19 BY MR. McCARRON:
20   Q    Does that sentence have any other
21 significance to you?
22   A    No.
23   Q    Did you personally review all of the
24 financial statements in the ordinary course of business
25 for CCI Construction?

---

Page 442

1        MR. McGLYNN: Objection.
2        THE WITNESS: What do you mean by review?
3 BY MR. McCARRON:
4    Q    Receive and review the information which
5 is included. Actually review the financial statements.
6    A    I can say I read the financial
7 statements.
8    Q    Did you read all of the financial
9 statements for CCI Construction as they were received
10 in the ordinary course of business in connection with
11 the underwriting?
12   A    Yes.
13   Q    The last time, sir, you told us that you
14 didn't look at the financial statement for 1998. Have
15 you changed your answer?
16   A    Did I specifically say I did not look at
17 the financial statement at all or I did not analyze the
18 financial statement?
19   Q    You did not read the financial statement
20 for 1998.
21   A    I would look at every financial statement
22 that came in. Read every financial statement to me
23 would mean every part of the financial statement. It
24 possibly could be 1998 I did a peripheral read and
25 asked my underwriter to do a more thorough read and

---

Page 443

1 then a more thorough analysis. That's the only reason
2 I could say I would give an answer that I didn't read
3 the 1998 financial statement.
4    Q    Are you able to tell us that you reviewed
5 in detail the financial statements for every year for
6 CCI Construction?
7        MR. McGLYNN: Objection. That's not what
8 he said.
9        THE WITNESS: No.
10 BY MR. McCARRON:
11   Q    Did you evaluate the financial statements
12 for CCI Construction for every year?
13       MR. McGLYNN: Objection.
14       THE WITNESS: Again, what do you mean by
15 evaluate?
16 BY MR. McCARRON:
17   Q    Did you personally review and evaluate
18 the financial statement for CCI Construction as they
19 were received in the ordinary course of business in
20 underwriting for CCI Construction?
21       MR. McGLYNN: Objection.
22       THE WITNESS: Not fully.
23 BY MR. McCARRON:
24   Q    Isn't it the case that the bear flags for
25 CCI Construction were never considered green?

---

U.S. Fidelity v Bruce Bro           Multi-Page™         Anthony Phillip
6/20/0

**Page 444**

1       MR. McGLYNN: Objection.
2       THE WITNESS: I couldn't say without
3 seeing all of the financial statements and having an
4 evaluation done in reference to what you refer to as
5 bear flags.
6 BY MR. McCARRON:
7     Q   Were there any financial statements which
8 you reviewed and analyzed for any year in connection
9 with CCI Construction for any underwriting process?
10     A   I don't think so.
11     Q   Did the financial statements for CCI
12 Construction reflect any material change in financial
13 condition throughout the years there was a bonding
14 relationship between CCI Construction and USF & G?
15     A   I don't remember.
16       MR. McGLYNN: Objection. I don't
17 understand the question.
18 BY MR. McCARRON:
19     Q   Are you able to tell us whether the
20 financial condition of CCI Construction is reflected by
21 the financial statements for each of the years there
22 was a bonding relationship between USF & G and CCI
23 Construction reflected any material change in financial
24 condition?
25       MR. McGLYNN: Objection.

**Page 44**

1     A   Possibly.
2     Q   You don't know if there were?
3     A   I don't remember.
4     Q   Did you review the annual review reports
5 which were prepared for the CCI account?
6     A   Probably.
7     Q   Did you analyze the information included
8 in the CCI annual review reports?
9     A   I don't remember.
10     Q   I am showing you what has been marked
11 Salazar Exhibit 7, Salazar 8, Salazar Exhibit 9,
12 Salazar Exhibit 10, Salazar Exhibit 11. Are those all
13 annual review reports for the CCI account?
14     A   Yes.
15     Q   Are you able to confirm that there were
16 annual review reports for the CCI Construction account
17 prepared by USF & G on an annual basis?
18     A   Yes.
19     Q   Does the information included in the
20 annual review reports reflect any material change of
21 financial condition from year to year for CCI
22 Construction?
23     A   I don't remember.
24     Q   Are you able to review the annual review
25 reports and tell us whether there was a material change

**Page 445**

1       THE WITNESS: If I had the proper amount
2 of time to review financial information from report to
3 report, I probably would be able to tell you.
4 BY MR. McCARRON:
5     Q   Did you review the annual review reports
6 for the CCI Construction account?
7     A   I don't know what you mean by that.
8     Q   Did you read the annual review reports
9 for the CCI account?
10       MR. McGLYNN: Objection. I think he is
11 having trouble with what you mean by annual review
12 reports.
13 BY MR. McCARRON:
14     Q   Were there annual review reports prepared
15 by Mr. Salazar in connection with CCI Construction?
16     A   Probably.
17     Q   Do you know whether Mr. Salazar prepared
18 annual reports for the CCI account?
19     A   Possibly.
20     Q   Showing you what is identified as Salazar
21 Exhibit 7, is that an annual review report for the CCI
22 Construction account for the year 1993?
23     A   Yes.
24     Q   Were there other annual review reports
25 prepared for the CCI account?

**Page 447**

1 in financial condition from year to year for CCI
2 Construction?
3       MR. McGLYNN: Objection.
4       THE WITNESS: It depends what you mean by
5 material change.
6 BY MR. McCARRON:
7     Q   Are you able to tell us from a review of
8 the annual review reports prepared for the CCI
9 Construction account whether there was a material
10 change to the financial condition of CCI Construction
11 from year to year from an underwriting perspective?
12       MR. McGLYNN: Objection.
13       THE WITNESS: No.
14 BY MR. McCARRON:
15     Q   Why can't you tell us if there was a
16 material change in the financial condition of CCI
17 Construction from year to year which was material to
18 the underwriting process?
19       MR. McGLYNN: Objection.
20       THE WITNESS: My definition of material
21 change and other people's definition of material change
22 may be different.
23 BY MR. McCARRON:
24     Q   Well, whose definition of material change
25 from an underwriting perspective would be important to

JAMES DAILEY

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

(Harrisburg Division)

- - -

UNITED STATES FIDELITY : CIVIL ACTION
and GUARANTY COMPANY :

:

-vs- : JUDGE KANE

:

BRUCE BROWN and BROWN :
SCHULTZ SHERIDAN & :
FRITZ : NO. 1:01-CV-00913


- - -



Oral deposition of JAMES
DAILY, taken at the Law Offices of SWARTZ,
CAMPBELL & DETWEILER, 1601 Market Street,
34th Floor, Philadelphia, Pennsylvania
19103, on Thursday, April 18, 2002,
commencing at or about 10:08 a.m., before
Kristy Kupiec, a Certified Court Reporter
and Commissioner of Deeds.

- - -


REPORTING SERVICE ASSOCIATES (RSA)

A Veritext Company

1845 Walnut Street - 15th Floor

Philadelphia, Pennsylvania 19103

(215) 241-1000

JAMES DAILEY

**190**

1  Q.      Were you involved in taking over
2  the jobs for which the bonds had been
3  issued and handled by CCI Construction?
4  A.      No.
5  Q.      Did you blame anybody for the
6  problem?
7  A.      You know, this sort of thing
8  happens.  I mean, this is not the first
9  loss that I had been involved with.  Do you
10  blame people, well, generally, no.  I mean,
11  we all did our best, we just missed the
12  mark or something.
13  Q.      Do you think that the problem
14  which developed with CCI Construction was
15  predictable?
16  A.      No.
17  Q.      So do you also agree that you
18  could not have predicted the problems with
19  CCI Construction?
20  A.      If we would have been able to, we
21  would have.
22  Q.      Did you criticize anyone who
23  worked for USF&G?
24  A.      No.

**191**

1  Q.      Did you criticize anyone else for
2  the problem which developed with CCI
3  Construction?
4  A.      No.
5       MR. McGLYNN:  You mean other
6       than filing suit against your
7       client?
8  BY MR. McCARRON:
9  Q.      Well, did you ever form an opinion
10  that Brown Schultz had formed for the work
11  it did for the preparational financial
12  statements?
13  A.      I didn't personally, no.
14  Q.      Did Schultz do anything wrong in
15  connection with the financial statements?
16  A.      No.
17  Q.      Have you reviewed your Answers to
18  Interrogatories, otherwise known as written
19  questions, prepared by USF&G in connection
20  with this lawsuit against Brown Schultz?
21  A.      I don't remember it.
22  Q.      Let me ask you this; have you ever
23  read any written forms about the criticisms
24  for which USF&G has over the financial

**192**

1  statements prepared by Brown Schultz?
2  A.      No.
3  Q.      Have you ever been asked to
4  consider whether the deficiencies in the
5  financial statements prepared by
6  Brown Schultz as alleged by USF&G were
7  material in any respect to the underwriting
8  process?
9  A.      No.
10  Q.      Do you plan to make that
11  determination?
12  A.      I have no information.
13  Q.      You have no information about
14  that?
15  A.      Right.
16  Q.      Is that right?
17  A.      Yes.
18  Q.      How would you determine whether
19  the deficiencies in the financial
20  statements of CCI Construction prepared by
21  Brown Schultz as alleged by USF&G would
22  have been material in the underwriting
23  process for the bond program for the USF&G
24  customer?

**193**

1  A.      It's not something I would be able
2  to do.  I would have to rely on the
3  analysis by another CPA.
4  Q.      If you had the benefit of
5  financial statements which were in
6  conformity with the corrections which USF&G
7  contends should have been in the financial
8  statements, in other words, a corrected
9  form of financial statements in the opinion
10  of USF&G, would you be able to make a
11  determination about whether underwriting
12  decisions would have been affected if that
13  information had been provided during the
14  underwriting process?
15  A.      I think so.
16  Q.      What would control your decision
17  with respect to whether you could determine
18  the impact of --
19  A.      I would have to see --
20  Q.      -- different financial information
21  on --
22  A.      I would have to see it first.
23  Q.      Were you criticized by anyone in
24  connection with the problem which developed

49 (Pages 190 to 193)

JAMES DAILEY

194

1 from CCI Construction?
2 A.    No.
3 Q.    Did you have any adverse
4 employment experience because of the
5 problem which developed with CCI
6 Construction?
7 A.    No.
8 Q.    What information would you need to
9 know in order to determine whether the
10 alleged deficiencies with the financial
11 statements were material to the
12 underwriting material in connection with
13 CCI Construction?
14 A.    If the financial statements were
15 restated, I would have to see the
16 restatement and I would have to know
17 something, I guess, about who did the
18 restatement.
19       MR. McCARRON:  Off the
20       record.
21          - - -
22       (Whereupon, at this time a
23       discussion took place off the
24       stenographic record.)

195

1          - - -
2 BY MR. McCARRON:
3 Q.    Do you agree with the request that
4 the alleged deficiencies and the financial
5 statements would have to be material and
6 material change the information in the
7 financial statements in order to affect the
8 underwriting decisions?
9       MR. McGLYNN:  Objection.
10       THE WITNESS:  Yes.
11 BY MR. McCARRON:
12 Q.    Did you take notice in the manner
13 in which indirect costs were treated in the
14 financial statements prepared by
15 Brown Schultz?
16 A.    No.
17 Q.    Did it matter to you how indirect
18 costs were treated by the accounts in
19 connection with the purpose of financial
20 statements prepared by Brown Schultz?
21 A.    Well, that's part of the profit
22 and loss generally, I mean what we see any
23 way.  If there seemed to be an anomaly, we
24 would ask a question.  But it is not one of

196

1 the hot buttons that we use.
2 Q.    Do you believe the manner in which
3 the accountants treated indirect costs was
4 a material item that affected the
5 information on the financial statements?
6 A.    Well, I guess it could be, but I
7 don't really know.
8 Q.    Did you ever complain about the
9 manner in which indirect costs were treated
10 in the financial statements?
11 A.    No.
12 Q.    Did you have any complaint about
13 the manner in which the indirect costs were
14 treated on the financial statements
15 prepared by Brown Schultz?
16 A.    No.
17 Q.    Did you ever take notice that the
18 manner in which the indirect costs on the
19 financial statements was incorrect?
20 A.    I didn't notice any anomalies.
21 Q.    Let me ask you this real quick;
22 was there a rating system for bond
23 customers?
24 A.    I wish there were.  I am not sure

197

1 what kind of rating system.
2 Q.    Was the amount of premium
3 determined by risk factors?
4 A.    No.
5 Q.    No?
6 A.    No.
7 Q.    It was the same price no matter
8 who the customer?
9 A.    Well, we had several rate
10 programs.  I believe this came in as a
11 merit rate customer, and that was because
12 so that was the rate USF&G had at the time.
13 And this was a file rate.  It was filed in
14 all of the states.  So if they met the
15 criteria of the file rate, we gave it to
16 them.  We had fewer rates for customers who
17 didn't meet the criteria.
18 Q.    What did it require to maintain
19 the merit rate?
20 A.    There are five criteria, and I am
21 not sure if I can quite remember them; CPA
22 audits, interim work in progress and maybe
23 financial statements, net worth exceeding a
24 half million dollars.  That's three that --

JAMES DAILY

210

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3

UNITED STATES FIDELITY        ) DEPOSITION UPON

4  AND GUARANTY COMPANY

5                  Plaintiff    ) ORAL EXAMINATION

6      vs.                      )  OF

7  BRUCE BROWN AND              ) JAMES DAILY

   BROWN SCHULTZ SHERIDAN

8  & FRITZ                      )

9              Defendants    )

10  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11

12

13              TRANSCRIPT OF CONTINUED

14  DEPOSITION, taken by and before MARGIE A. ROMEO,

15  Professional Reporter and Notary Public, at the

16  Law Offices of Swartz, Campbell & Detweiler, 1601

17  Market Street, 34th Floor, Philadelphia, PA on

18  Thursday, June 27, 2002 commencing at 10:20 a.m.

19                    _ _ _

20

21

22

                REPORTING SERVICE ASSOCIATES (RSA)

23              A Veritext Company

            1845 Walnut Street - 15th Floor

24              Philadelphia, PA  19103

                (215) 241-1000

# JAMES DAILY

275

1  Q.     In what way would correct information
2  have effected the decisions by USF & G to bond or
3  issue bonds for CCI Construction?
4  A.     Well, we probably wouldn't have given
5  them as much credit as they were getting.
6  Q.     And how did you make that determination?
7  A.     We didn't make that determination.
8  Q.     How did you determine that you, that USF
9  & G may not have given CCI Construction as much
10  bond credit as was given to CCI Construction if
11  the financial statements had correctly reflected
12  the financial information relative to CCI
13  Construction?
14  A.     Well, the amount of -- the amount of
15  credit you give is directly related to the
16  financial condition of the customer.
17  Q.     Is that the end of your answer?
18  A.     Yes.
19  Q.     Did you determine or did anyone on behalf
20  of USF & G determine the extent to which the
21  credit for bonding extended by USF & G to CCI
22  Construction might have changed if the financial
23  statements had correctly reflected financial
24  condition of CCI Construction?

277

1  of exactly what would have changed.  I know it
2  would have changed.
3                    - - -
4  BY MR. McCARRON:
5  Q.     When you say you would have to see
6  restated financial information, you mean you
7  would have to see corrected or correct financial
8  statements which accurately reflected the
9  financial condition of CCI Construction during
10  the period involved?
11  A.     Yes.
12  Q.     Would you need to see information or
13  consider information in addition to the restated
14  financial statements in order to evaluate whether
15  and to what extent underwriting decisions would
16  have been effected by correctly presented
17  financial statements in the underwriting for the
18  CCI bond account?
19  A.     Well, we would first have to see the
20  restated financial statements, then if we needed
21  additional information for clarification, we
22  might have asked for something else, but I can't
23  identify what it might have been because we don't
24  have that information.

276

1  A.     No.
2  Q.     Are you able to tell us the extent to
3  which the bonding credit might have changed by
4  USF & G as extended to CCI Construction, if the
5  financial statements had correctly stated or
6  reflected the financial condition of CCI
7  Construction?
8  A.     No.
9  Q.     Why can't you tell us?
10  A.     I would have to see the restated
11  financial statements first.
12  Q.     If I could just ask a full question.
13  A.     I thought you were through.
14  Q.     I understand.  I'm not blaming you.
15         Why can't you determine the
16  extent to which the credit for bonding extended
17  by USF & G might have changed for the CCI account
18  if the financial statements had correctly
19  reflected the financial condition of CCI
20  Construction.
21         MR. McGLYNN:  Objection.
22         THE WITNESS:  I would have to see
23  the restated information first, but even then I
24  don't think I could give you a definitive answer

278

1  Q.     In addition to the restated financial
2  statements, would your evaluation about the,
3  about whether the restated financial statements
4  would have had an impact on underwriting for the
5  CCI bond credited --
6         MR. McGLYNN:  Objection.
7         THE WITNESS:  I'm lost.
8         MR. McCARRON:  I am too.  I'm
9  sorry.
10                    - - -
11  BY MR. McCARRON:
12  Q.     Would you need to consider information in
13  addition to the restated financial statements in
14  order to determine whether and to what extent the
15  bond credit by USF & G might have been different
16  for CCI Construction?
17         MR. McGLYNN:  Objection.
18         THE WITNESS:  I don't know.
19                    - - -
20  BY MR. McCARRON:
21  Q.     What I'm trying to understand, sir, is
22  would you have to review other information which
23  was already in the possession, perhaps of USF & G
24  and which had been taken into account during the

87b508a0-93f4-11d6-88e6-c775628c2b14

## JAMES DAILY

415

1 as strong -- the financial condition of December
2 31, '98 was going to be as strong also as the
3 prior year.
4            - - -
5 BY MR. McCARRON:
6 Q.    Why did you believe on January 5, 1998
7 the financial condition of CCI Construction would
8 be as good as the prior year?
9 A.    They told us that.
10 Q.    CCI Construction told you that?
11 A.    Yes.
12 Q.    Did you have any other information to
13 confirm the financial condition of CCI
14 Construction would be as good as the prior year
15 as of January 5th, 1999?
16 A.    I don't think so.
17 Q.    So you relied on information received
18 from CCI Construction concerning its financial
19 condition when USF & G underwrote, committed to
20 bond CCI Construction during January, 1999; is
21 that right?
22            MR. McGLYNN:  Objection.
23            THE WITNESS:  I've lost you.
24 What's the verb?

416

1            - - -
2 BY MR. McCARRON:
3 Q.    USF & G relied on financial
4 representations or representations concerning
5 financial condition for the coming year based on
6 information -- USF & G relied on representations
7 from CCI Construction about its financial
8 condition when it decided to commit to bonding
9 during January, 1999?
10            MR. McGLYNN:  Objection.
11            THE WITNESS:  Yes.
12            MR. McCARRON:  This has been
13 marked Phillips-6.
14            - - -
15 BY MR. McCARRON:
16 Q.    Sir, I'm showing you what has been
17 previously marked Phillips-6.  It is a letter
18 from Mr. Dominiani to Mr. Ortenzio dated March 5,
19 1998.
20            Are you familiar with this, and
21 it is bate stamped USF & G slash BS 0915.
22            Are you familiar with this
23 document, which is Phillips --
24 A.    I don't think so.

417

1 Q.    Okay.  Were you aware in, that in 1997
2 there were bonuses paid to the officers of CCI
3 Construction?
4 A.    I don't remember.
5 Q.    Does the comment made in the second
6 sentence of the second paragraph by Mr. Dominini
7 which says they, referring to USF & G asked me to
8 send their congratulations to you and your
9 management staff; is that an accurate reflection
10 of USF & G's position?
11 A.    Well, I think that -- I think that was
12 probably from Tony Phillips.
13 Q.    So that does not, Mr. Phillips' statement
14 to Mr. Dominiani was not reflective of the
15 enthusiasm of USF & G?
16            MR. McGLYNN:  Objection.
17            THE WITNESS:  He doesn't say who
18 he met with.  He said I had the opportunity to
19 meet with USF & G.  It could have been Tony
20 Phillips.  It could have been Dave Hussey.  It
21 was not me.
22            - - -
23 BY MR. McCARRON:
24 Q.    Well, I'm just asking.  Is that comment

418

1 that USF & G was extending congratulations to CCI
2 in March of 1998 reflective of the sentiment of
3 USF & G?
4 A.    Well, as I recall, '97 was a pretty good
5 year.  And whoever Dominiani met with, very
6 likely asked him to extend their congratulations
7 for another good year.
8 Q.    Okay.  You see the next sentence where it
9 says I understand that your operating profit, do
10 you see that, sir?
11 A.    Yes.
12 Q.    Do you know who he's referring to in that
13 letter?
14 A.    Well, this letter is dated March 5, 1998
15 so it wouldn't have been the three percent, five
16 percent discussed in the January, '99 meeting.
17 So, no, I don't understand.  I don't know what it
18 refers to.
19 Q.    Does this letter, Phillips-6 refresh your
20 recollection about whether there were minimum
21 equity requirements or ratios of work program?
22 What you are looking at, sir?
23 A.    Oh, this is Phillips-6.  Does this
24 refresh my recollection?

Pages 415 to 418

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
    UNITED STATES FIDELITY
 3  and GUARANTY COMPANY

 4              Plaintiff

 5      vs.                        CIVIL ACTION NO:
                                   NO. 1-01-CV-00813
 6  BRUCE BROWN and BROWN,
    SCHULTZ, SHERIDAN & FRITZ
 7
                Defendants
 8  _____/

 9

10          The deposition of DAVID HUSSEY was held on

11  Tuesday, May 28, 2002, commencing at 10:00 A.M., at the

12  Law Offices of The St. Paul Companies, 5801 Smith

13  Avenue, Baltimore, Maryland 21209, before Ronda J.

14  Thomas, Notary Public.

15  APPEARANCES:

16              PETER B. MCGLYNN, ESQUIRE
                   On behalf of Plaintiff
17
                JEFFREY B. MCCARRON, ESQUIRE
18                 On behalf of Defendants

19

20

21  REPORTED BY:  Ronda J. Thomas, RPR
```

David Hussey - 5/28/0.

142

1 that USF&G would insist the three percent working
2 capital and a five percent net worth would be, if it
3 was below those amounts, would be corrected in advance
4 of bonding?
5    A    In advance of issuing final bonds, yes.
6    Q    So is it the situation then that there
7 should not have been any bonds issued by USF&G while
8 CCI had a working capital less than three percent
9 and/or a net worth less than five percent?
10    MR. McGLYNN: Objection.
11    A    Without an understanding of how that would
12 be corrected there shouldn't have been any bonds
13 issued.
14    Q    What would satisfy the criteria of an
15 explanation for the manner in which CCI would correct
16 the deficiency below three percent working capital and
17 the deficiency below five percent net worth in order to
18 qualify for bonding?
19    MR. McGLYNN: Objection.
20    A    There would have to be an infusion of money
21 that would bring the deficient, the deficiency, whether

143

1 it be in working capital or net worth, to re-establish
2 it.
3    Q    To reach the minimum levels; is that right?
4    A    Yes.
5    Q    Now, did the infusion of money or other
6 means by which to reach net worth have to occur in
7 advance of the issuance of bonds or was it simply
8 sufficient to have an explanation or a means by which
9 to ultimately reach the minimum threshold amounts for
10 working capital and net worth in order to receive
11 bonds?
12    A    As long as there was an agreement between
13 the parties as to how the deficiencies would be
14 corrected, Jim Daily was in complete control to do
15 whatever.
16    Q    Just to be clear, the deficiency below
17 three percent working capital and five percent net
18 worth didn't have to be resolved before bonds would be
19 approved or could be approved for CCI; is that true?
20    A    That's true as long as there was an
21 agreement. As long as somebody understood how the

144

1 deficiency was going to be corrected.
2    Q    But the correction didn't have to occur in
3 advance of the actual issuance of bonds, is that true
4 or commitment to bond?
5    MR. McGLYNN: Objection.
6    A    No, it's not true.
7    Q    Tell me why I'm wrong?
8    A    No, no, in most instances you would want
9 the correction to occur because the only leverage you'd
10 have is the bond, giving them the bond. So by holding
11 back the bond usually we'd get concurrence. But if
12 you're dealing with an account that you have developed
13 a trust and a relationship with and have no reason to
14 doubt if they say they're going to correct it but they
15 have to do -- they have to sell a piece of property or
16 they have to liquidate a stock portfolio, you know,
17 they have the means to get the money in but it will
18 take a certain amount of days, 30, 45 days whatever.
19 There are instances when on the promise, on that kind
20 of a situation on that kind of promise the bonds would
21 be issued because it's a give and take.

145

1    Q    So it was acceptable to issue bonds in
2 spite of working capital below three percent and net
3 worth below five percent provided there was an
4 understanding about the means by which CCI would
5 quickly come into conformity with the three percent
6 working capital requirement and the five percent net
7 worth requirement; is that right?
8    A    Yes, that's correct.
9    Q    What was your tolerance for a change in the
10 financial condition of CCI before you would withhold
11 approval for bonding?
12    MR. McGLYNN: Objection.
13    A    In accounts of this size and this nature
14 doing the volume that it's doing, that they were doing,
15 and the fact that you have a substantial amount of
16 bonded work underway or exposure you would -- the
17 tolerance would be -- you couldn't cut and run. You
18 couldn't just wake up one day and say I'm not going to
19 give them anymore bonds because you'd be laying
20 yourself exposed. Because for whatever reason that you
21 have come to that conclusion would be the exact reason

GORE BROTHERS Reporting & Video Co., Inc.          Towson Reporting Company
410-837-3027                                        410-828-4148

David Hussey - 5/28/02

146

1  no other surety would give them credit.

2  So the tolerance, the tolerance wouldn't --

3  you would certainly react strongly to losing half their

4  net worth but you wouldn't expect an account of this

5  size and stature to disintegrate overnight considering

6  the track record of the firm. Therefore, there should

7  be in instances of this sort enough time to react to a

8  negative situation and give them a chance to rebound.

9  Q  Well, would a loss of 50 percent of the net

10  worth be enough to change the financial condition of

11  CCI so that bonding approval would have been withheld?

12  MR. McGLYNN: Objection.

13  A  It's speculative.

14  Q  Why is it?

15  A  Because a loss of 50 percent of the net

16  worth would have shocked -- would have driven -- would

17  have left us shellshocked. The fact of the matter is

18  is when these guys hit the wall I was stunned, I am

19  still stunned today that they disintegrated as quickly

20  as they did. There was no time to react.

21  Q  To what degree would you have allowed a

147

1  change in net worth before the change in net worth

2  would have an impact adversely on underwriting?

3  MR. McGLYNN: Objection.

4  Q  For CCI?

5  MR. McGLYNN: Objection.

6  A  Almost any -- with CCI in terms of the

7  underwriting change in net worth of a half a million

8  dollars would have caused a concern so that we -- yeah,

9  we would have watched a negative situation very closely

10  considering the fact that over the course of the last

11  few years they had managed to reverse unprofitable

12  interim results and they had always been showing signs

13  of managing their problems. So that they had showed

14  signs that they were on top of situations well before

15  we were or could have been.

16  Q  Well, the net worth of C CI fluctuated by

17  amounts greater than $500,000 over the course of the

18  bonding relationship with USF&G, didn't it?

19  A  Right.

20  Q  Did it cause USF&G alarm and concern every

21  time the net worth fluctuated or reduced by $500,000 or

148

1  greater?

2  MR. McGLYNN: Objection.

3  A  In this instance no because by the time we

4  would catch up to the fact that the fluctuation had

5  occurred steps had already been taken to reverse the

6  situation and to bring the net worth back. So that

7  they had proven to us that they could manage their

8  peaks and valleys.

9  Q  Well, to what degree did the financial

10  condition as reflected on the financial statements of

11  CCI have to change in order to prompt a decision by

12  USF&G not to continue to approve bonds?

13  MR. McGLYNN: Objection.

14  A  Well, the answer to that would have been

15  the fact they called a meeting in October of 1999 and

16  said they were in trouble that they needed assistance

17  and we instituted a call to our claim department to go

18  out and look at the situation. So you have a situation

19  where you have the answer to your question in terms of

20  when they called the meeting to say they were having

21  temporary cash flow problems that John Ortenzio was

149

1  going to the bank for more money.

2  There was enough concern with that

3  conversation to cause us to turn to our expertise to

4  send in the auditors and the project evaluation, to go

5  through the project evaluation to see -- just to take a

6  forensic look at the firm to see what was wrong. What

7  was the problem.

8  Q  So did it have to be a financial change as

9  extreme as what was discovered at the end of 1999 for

10  USF&G to decide not to continue to approve bonds for

11  CCI?

12  MR. McGLYNN: Objection.

13  A  The situation blossomed very quickly and it

14  was --

15  Q  You're speaking about the situation at the

16  end of 1999?

17  A  Yes.

18  Q  But what I'm asking is, along the

19  relationship, along the way with the relationship

20  between USF&G and CCI to what extent did the financial

21  condition as reflected by CCI on the financial

38 (Pages 146 to 149)

G

1

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT

 3                  OF PENNSYLVANIA

 4                HARRISBURG DIVISION

 5              * * * * * * *

 6   UNITED STATES FIDELITY     *

 7   AND GUARANTY COMPANY,      *

 8        Plaintiff            * Civil Action

 9        vs.                  * No. 1:01-CV00813

10   BRUCE J. BROWN and BROWN   *

11   SCHULTZ SHERIDAN & FRITZ,  *

12        Defendants           *

13              * * * * * * *

14              DEPOSITION OF

15              BRUCE BROWN

16              JULY 19, 2002

17

18

19

20        Any reproduction of this transcript

21        is prohibited without authorization

22        by the certifying agency

23

24

25
```

98

1   Q.        Was that your opinion with respect to the

2   1998 audit, that because it was a covered claim, you

3   could look at it as revenue.

4                   ATTORNEY CARSON:

5                   I object to the form, it

6                   mischaracterizes his testimony.

7   A.        I'm going to state one more time, I think

8   that we had two pieces here.  I think that we looked

9   at the guarantee we felt that, number one, the

10  guarantee indicated that PCIC, for whatever reason,

11  the related party basically, they agreed that should

12  DGS, the Department of General Services, not recognize

13  the claim, that to the extent that the claim went

14  unrecognized that they would submit to the claim.

15                  We also.  And I refer to the work paper

16  which is your Exhibit 20, the second page of that, we

17  also made the statement that per review of the policy,

18  it says PCIC will be reimbursed for all costs

19  reasonably performed in conjunction with fulfilling

20  its obligations.  So I think that further solidified

21  why PCIC would even provide the guarantee, that there

22  was basis for PCIC having a claim against it.  They

23  provided guarantee which guaranteed that the amount of

24  the $1,162,460 was going to be recovered by CCI in

25  some shape or form, and which essentially it did

1   happen in 1999.

2   BY ATTORNEY MCGLYNN:

3   Q.         Why the need for the guarantee if it were

4   fully covered under the remedial work insurance

5   policy?

6   A.         I didn't request the guarantee, to the best

7   of my recollection, although I can't say that I did

8   have a conversation with Sheri Phillips.  I don't

9   recall that, to be honest to you.

10   Q.         Was there any question in your mind as to

11   whether or not the Claimant in Exhibit 20 was fully

12   covered by the remedial insurance policy?

13                    ATTORNEY CARSON:

14                    Object to form.

15   A.         They provided us a copy of the guarantee, I

16   think, before we audited the claim.  So it was

17   management's decision to go this route.  It wasn't a

18   requested by Brown, Schultz, Sheridan and Fritz.

19   BY ATTORNEY MCGLYNN:

20   Q.         Did you make any determination as to whether

21   or not the guarantee issued by PCIC fully covered the

22   claim in Exhibit 20?

23   A.         The guarantee was for $1,200,000.  The claim

24   was for $1,162,460.  The assets of PCIC exceeded the

25   amount of the guarantee.

```
 1                    ATTORNEY MCGLYNN:

 2                    Are you instructing him not to

 3          answer?

 4                    ATTORNEY CARSON:

 5                    Yes.

 6                    ATTORNEY CARSON:

 7                    If he can relate it to.

 8                    (Exhibit 36 marked

 9                     for identification.)

10   BY ATTORNEY MCGLYNN:

11   Q.        Was this $40,179 and $84,636 paid to CCI?

12   A.        I believe from looking at something you gave

13   me previously, that it was paid to CCI.

14   Q.        Take a moment and look at what we've marked

15   as --- I think that is Exhibit 36.

16   A.        Yes.  What's the question?

17   Q.        That was the question.  Now that you've

18   reviewed it, I'm going to ask you some questions about

19   it.  What is this document?

20   A.        This looks to be a work paper that

21   reconciles the total claims incurred back to the work

22   papers in the December 31, 1999, engagement.  It's

23   simply an analysis of claims by type and it's just a

24   work paper to reconcile to what's on the company's

25   general ledger.
```

1  Q.        It says claims paid up at the top on the

2  remedial $942,460, do you see that?

3  A.        Right.

4  Q.        You do see it?

5  A.        Yes.

6  Q.        Is that $942,460, is that the amount that

7  was paid on the Mahanoy prison project?

8  A.        Yes.

9  Q.        And does that relate to the total payments

10 made as reflected in --- can you read the Exhibit

11 Number ---?

12 A.        Exhibit 26.

13 Q.        And those payments were made on or after

14 June of 1999?

15 A.        Under item A tick mark it shows when three

16 payments were made, making up the $942,460 paid on

17 June 28th, $72,460 on September 8th and $70,000 on

18 September 24th.

19 Q.        How was this payment booked on PCICs

20 records?

21 A.        As claim paid.

22 Q.        Claim under the remedial insurance policy?

23 A.        Yes.

24 Q.        As opposed to the guarantee?

25 A.        They only had one classification of

1    expense.  So that's what it was booked as.

2    Q.        And how is it booked on the CCI side of

3    things?

4    A.        I didn't do work for CCI in 1999.  So I have

5    no idea.

6    Q.        Again, referring to this most recent

7    exhibit, what is that?

8    A.        Thirty-six (36).

9    Q.        It also indicate that $220,000 was paid on

10   the claim on the Mahanoy prison claim from the

11   Department of General Services?

12   A.        Correct.

13   Q.        And down below, the payments to CCI and it

14   has 6/28/99, $800,000 and then the two payments in

15   September of 1999.  Those are the dates when the

16   payments were made to CCI?

17   A.        Correct.

18   Q.        Thank you.  Now, the final payment to CCI

19   for this Mahanoy prison claim was made on the 24th of

20   September, according to this exhibit?

21   A.        Yes.

22                       (Exhibit 37 marked

23                       for identification.)

24   BY ATTORNEY MCGLYNN:

25   Q.        Can you identify that letter, which we've

# UNITED STATES FIDELITY AND GUARANTY CO. V BRUCE J. BROWN

## WITNESS: BRUCE BROWN

## DATE: JULY 19, 2002

## EXHIBITS: 1-4A, 18-39

SPHERION DEPOSITION SERVICES
545 FIFTH AVENUE, SUITE 900
NEW YORK, NEW YORK 10017

# GUARANTY AGREEMENT

This Guaranty Agreement, given on this first day of December, 1998, by PENNSYLVANIA CONTRACTORS INSURANCE COMPANY ("PCIC") to CCI CONSTRUCTION CO., INC. ("CCI") as follows:

PCIC will guarantee the claim that was filed by CCI, in the amount of One Million One Hundred Sixty-Two Thousand Four Hundred Sixty Dollars ($1,162,460.00), with the Department of General Services, Commonwealth of Pennsylvania, for the project known as Mahanoy State Correctional Institution, Frackville, Pennsylvania. If the Department of General Services, Commonwealth of Pennsylvania, fails to pay all or any part of the subject claim, PCIC will pay the difference owing or the full amount of the claim if no part of the claim is paid.

All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several and respective heirs, legal and personal representatives, successors and assigns of said parties. No rights, however, shall inure to the benefit of any assignee of CCI unless the assignment to such assignee has been approved by PCIC.

This writing contains the entire agreement between the parties hereto, and no agent, representative or officer of either party has authority to make or has made any statement, agreement or representation, either oral or written, in connection herewith, modifying, adding or changing the terms and conditions herein set forth. No dealings between the parties or custom shall be permitted to contradict various additions to or



**PCIC**
**Claims Incurred**
**12/31/99**

| | Remedial | | Reinsured | | Total |
|---|---|---|---|---|---|
| Claims paid | (I) 942,460.00 | (a) | R2A 3,030.35 | | 945,490.35 |
| Claims payable | 0.00 | (b) | 0.00 | (c) | 0.00 |
| Claims reserve - beginning | (862,338.00) | (b) | 0.00 | | (862,338.00) |
| Claims reserve - ending | 0.00 | (b) | 0.00 | (c) | 0.00 |
| Claims incurred | 80,122.00 | | 3,030.35 | | 83,152.35 |
| | | | | | |
| | Per general ledger | | | | 83,152.35 |
| | | | | | N(?) |
| | Difference | | | | 0.00 |
| | | | | | |
| (a) Total Mahanoy Prison claims | | | 1,162,460.00 | N | |
| Less; payment Dept Genl Services | | | (220,000.00) | | Per Sheri Phillips & John Ortenzio settlement amt |
| Remainder | | | 942,460.00 | (I) | |
| | | | | | |
| Payment to CCI | 06/28/99 | | 800,000.00 | | |
| " | 09/08/99 | | 72,460.00 | | |
| " | 09/24/99 | | 70,000.00 | | |
| | | | 942,460.00 | | |
| | Difference | | 0.00 | | |

(b) Policies all expired through 9/30/99 (last policy written was Outlook Pointe; policy began 9/30/98 for one year term. Policies are written on claim made basis, therefore the insured has until expolicy to submit claims. Per Sheri Phillips 1/2000, there were no claims reported.

(c) The Consumers Reinsurance Company reinsurance contract was terminated effective 5/31/99, therefore no claim liabilities exist at 12/31/99; See termination agreement and recapture calcuation at N2

04/27/200003:17 PM1CLAIMS.WK4)