*CC:JConner, MJSmyser; attys McGlynn, Levin, Speaker, McCarron & Carson + R+R Tickler*

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES FIDELITY AND     :     **CIVIL NO. 1:01-CV-0813**
GUARANTY COMPANY,              :
                               :
            Plaintiff          :     (Judge Conner)
                               :
        v.                     :     (Magistrate Judge Smyser)
                               :
BRUCE J. BROWN and             :     **FILED**
BROWN SCHULTZ SHERIDAN &       :     HARRISBURG, PA
FRITZ,                         :
                               :     NOV 0 5 2002
            Defendants         :
                               :     MARY E. D'ANDREA, CLERK
                                     Per_____
                                         Deputy Clerk

## REPORT AND RECOMMENDATION

The plaintiff, United States Fidelity and Guaranty Company, commenced this action by filing a complaint on May 9, 2001. The defendants are Bruce J. Brown and the accounting firm of Brown Schultz Sheridan & Fritz.

The plaintiff alleges the following facts in the complaint. The plaintiff is in the business of issuing payment and performance bonds on behalf of contractors and subcontractors engaged in the performance of work on public and private construction projects. *Complaint* at ¶7.

CCI Construction Co. was a contractor engaged in construction work on public and private construction projects.

*Id.* at ¶6.  As a condition of the issuance of payment and performance bonds to CCI, the plaintiff required CCI to furnish to it annually an audit report by an independent certified public accountant consisting of, *inter alia*, an audit of CCI's balance sheet and income statement. *Id.* at ¶10.

The defendants perform work as independent certified public accountants including preparing audited financial statements for construction contractors and subcontractors for use by bonding companies. *Id.* at ¶11.  The defendants prepared audited financial statements for CCI for the years ending December 31, 1996, December 31, 1997 and December 31, 1998. *Id.* at ¶12.  The defendants knew that the audited financial statements would be provided by CCI to its bonding company, which at all relevant times was the plaintiff. *Id.* at ¶13.  The defendants knew that CCI's bonding company would rely upon the audited financial statements to determine whether to issue payment and performance bonds to CCI. *Id.* at ¶14.  In reliance on the audited financial statements prepared by the defendants, the plaintiff extended surety credit to CCI and issued payment and performance bonds to CCI. *Id.* at ¶¶16, 18 & 20.  The audited financial statements prepared by the defendants were

2

inaccurate, contained omissions and were misleading. *Id.* at
¶¶21, 32.

On or about September of 1999, CCI informed the
plaintiff that CCI lacked the financial resources to continue
its operations and that it would not be able to complete its
work and pay its suppliers and subcontractors on the projects
for which the plaintiff had issued payment and performance
bonds. *Id.* at ¶ 22. On May 19, 2000, CCI filed for bankruptcy.
*Id.* at ¶24. As surety for the payment and performance bonds,
the plaintiff was required to and did expend substantial sums
in completing the projects and satisfying the claims of CCI's
unpaid vendors, employees and subcontractors. *Id.* at ¶23. The
plaintiff has incurred losses of approximately $31,816,895 in
connection with the bonds issued to CCI. *Id.* at ¶25.

The complaint contains only one count - a claim for
negligent misrepresentation.

On August 30, 2002, the defendants filed a motion for
summary judgment and a statement of material facts. On
September 16, 2002, the defendants filed a brief and documents
in support of their motion. After requesting and receiving an

3

extension of time, on October 10, 2002, the plaintiff filed a
response to the defendants' statement of material facts, a
brief and documents in opposition to the motion.  On October
31, 2002, the defendants filed a reply brief.[1]

Summary judgment is appropriate if the "pleadings,
depositions, answers to interrogatories, and admissions on
file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving
party is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c).  The moving party bears the initial
responsibility of informing the court of the basis for its
motion and identifying those portions of the record which
demonstrate the absence of a genuine issue of material fact.
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving
party may discharge that burden by "'showing'-- that is,
pointing out to the district court -- that there is an absence

---

[1] The reply brief was not timely filed.  On October
24, 2002, the parties filed a stipulation indicating that they
agree to an extension of time until October 31, 2002 to allow
the defendants to file a reply brief.  Counsel do not have the
power to alter the deadlines set forth in the local rules of
court, and the court is not bound by stipulations entered into
by counsel.  The reply brief is untimely.  The reply brief,
which is twenty pages in length, is also in violation of Local
Rule 7.8(b).  Nevertheless, we have considered the reply brief.

4

of evidence to support the nonmoving party's case." *Id.* at 325.
Once the moving party has met its burden, the nonmoving party
may not rest upon the mere allegations or denials of its
pleading; rather, the nonmoving party must "set forth specific
facts showing that there is a genuine issue for trial."
Fed.R.Civ.P. 56(e).

An issue of fact is "'genuine' only if a reasonable
jury, considering the evidence presented, could find for the
non-moving party." *Childers* v. *Joseph*, 842 F.2d 689, 693-94
(3d Cir. 1988) (citing *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 249 (1986)). A material factual dispute is a dispute
as to a factual issue that will affect the outcome of the trial
under governing law. *Anderson*, *supra*, 477 U.S. at 248. In
determining whether an issue of material fact exists, the court
must consider all evidence in the light most favorable to the
non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d
56, 59 (3d Cir. 1988).

"[T]he plain language of Rule 56(c) mandates the entry
of summary judgment, after adequate time for discovery and upon
motion, against a party who fails to make a showing sufficient
to establish the existence of an element essential to that

5

party's case, and on which that party will bear the burden of proof at trial." *Celotex, supra*, 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d. Cir. 2002)(quoting *Celotex, supra*, 477 U.S. at 323).

The following facts are not in dispute for purposes of the instant motion for summary judgment.

USF&G began its bonding program with CCI in late 1993 or early 1994. *Defendants' Statement of Material Facts* at ¶22 *and the plaintiff's response thereto*. Dave Dominiani of the Byerly Agency was agent for the CCI account. *Id.* at ¶23.

The individuals from USF&G involved in the underwriting of the CCI account included: Tony Phillips, the bond manager of USF&G's Harrisburg field office; Steve Salazar, senior underwriter in the Harrisburg field office; Jim Daily, manager of the Northeast Surety Division for USF&G; and David Hussey, director of the Northern Division of USF&G's Surety Department.

6

*Id*. at ¶27.  Mr. Salazar had the authority to approve bonds up to $2,000,000. *Id*. at ¶28.   Above that amount, he needed the approval of Tony Phillips. *Id*.  Above Mr. Phillips' level of authority, bonds would be approved by Mr. Daily. *Id*.   Mr. Hussey had final approval of USF&G's bond program for CCI. *Id*. at ¶49.

CCI provided USF&G with CCI-prepared, interim financial statements on either a quarterly or biannual basis and either monthly or quarterly work in progress information. *Id*. at ¶30. USF&G also received Dun & Bradstreet reports on CCI and had annual meetings with the contractor and the bonding agent to discuss the bonding program. *Id*.  Mr. Salazar, in underwriting the CCI account, reviewed the CPA year-end financial statements and the interim CCI-prepared financials. *Id*. at ¶29.

Mr. Salazar testified that each contract for which bonds were issued by USF&G was individually underwritten.  *Id*. at ¶32.  According to Mr. Salazar, USF&G had no specific underwriting guidelines. *Id*. at ¶33.  Mr. Salazar testified that there were no underwriting guidelines used for net worth in the 1990's.  *Id*.  He also testified that there was no guideline used to evaluate a contractor's cash position or

7

profitability in connection with issuance of a bond program in the 1990's. *Id.* Salazar used general underwriting guidelines of five percent (5%) working capitol and ten percent (10%) net worth to total work program. *Id.* at ¶34. According to Mr. Salazar, the larger the contractor, the more the surety could deviate from these guidelines. *Id.* at ¶35.

Mr. Phillips testified that his responsibilities included the overall underwriting of the CCI account plus supervising Mr. Salazar and that he was responsible for any recommendation made by Mr. Salazar on any bond liability on the account. *Id.* at ¶ 37.

Jim Daily's responsibilities in the 1990's included, among other things, the supervision of underwriting in the field offices. *Id.* at ¶46. In connection with that supervisory role, Mr. Daily would handle new account submissions and bond requests up to a certain limit of authority. *Id.* With regard to bond requests over that limit of authority, Mr. Daily had to seek approval from his boss, David Hussey, to whom Mr. Daily reported. *Id.* at ¶47. Mr. Hussey testified that he did not review any of the Brown Schultz audited financials. *Id.* at ¶49.

8

USF&G agreed at a 1/31/95 meeting with CCI to hold to a $100,000,000 program level. *Id.* at ¶60. On April 19, 1995, USF&G's home office received the Brown Schultz audited financials for the year ended December 31, 1994. *Id.* at ¶61. The 1994 financials indicated a net loss of $317,000 and an operating loss of $864,663. *Id.* Working capital was $2,384,192 and equity was $4,290,336. *Id.* In the Related Party Transactions footnote in the 1994 audited financial statements, it was disclosed that Pennsylvania Contractors Insurance Co. (PCIC) was a corporation under common control and that there were no warranty insurance costs incurred for 1994. *Id.* at ¶62. The footnote also disclosed that CCI had submitted a claim to PCIC of $397,800 in 1994 and that the claim was pending as of December 31, 1994. *Id.*

Each year, Steve Salazar prepared an "annual review" describing CCI's results for the year and made a recommendation as to a bonding program for the following year. *Id.* at ¶65. In his annual review of the 12/31/94 CPA audit, Salazar recommended continuing with the bond program for CCI. *Id.* at ¶66.

9

In March 1996, USF&G received the audited financial statements for the year ended December 31, 1995. *Id.* at ¶ 67. The financial statement showed a small profit of $103,210 but a loss from operations of $308,362. *Id.* Working capital was $4,183,681 and equity was $4,820,675. *Id.* The related party transactions footnote disclosed that during 1994, CCI submitted a warranty insurance claim of $397,800 to PCIC, "a company owned by the sole shareholder. This claim was paid during 1995." *Id.* at ¶68.

The May 3, 1996 Annual Review of CCI Construction prepared by Steve Salazar showed a Yellow Stress Score and a "Bear Flag Fl -Net Worth less than 10% of work program. *Id.* at ¶70. Salazar recommended continuing the CCI bond program. *Id.*

On May 1, 1997, USF&G received a copy of the audit report for the year ended December 31, 1996. *Id.* at ¶71. The financial statement reflected net income of $363,124, and for the first time since 1993, an operating profit of $139,097, working capital in the amount of $4,641,702, and equity of $4,802,675. *Id.* Steve Salazar's annual review of CCI dated May 1, 1997, again showed a yellow stress score as of March 1997 and the following bear flags: A20-gross profit fade factor is

10

greater that 20% and MO1-Equity less that 10% of total program.
*Id.* at ¶ 72.  Mr. Salazar recommended that the bonding program
be continued. *Id.* at ¶73.

On March 5, 1998, USF&G received the audited financials
for the year ended December 31, 1997. *Id.* at ¶79.  Income from
operations was $350,000. *Id.*   The related party transaction
footnote disclosed that PCIC was a corporation under common
control and that CCI had incurred warranty expense of $825,000
with PCIC. *Id.* at ¶81.  On April 15, 1998, Steve Salazar
prepared his annual review of the audited financials for 1997.
*Id.* at ¶82.  The annual review showed a yellow stress score and
bear flags "A20-gross profit fade factor is greater than 20%"
and "MO1-Equity less than 10% of total program. *Id.*

On August 17, 1998, Dave Dominiani wrote to Tony
Phillips and advised:

> As you can see CCI is reflecting a $1,600,000
> loss through six months.  However, they will
> turn that number around by 12/31/98. I have
> included with the report the profit
> projections by project for 1998.  Please kind
> [sic] in mind that these numbers are
> conservative and suggest that the projected
> loss from operations will be approximately
> $200,000. This will be offset by investment
> income and in addition, please remember that
> we have PCIC available to fund warrant claims

> if we choose to utilize it. As you are aware,
> we funded almost $900,000 into PCIC last year
> for warranty coverages on existing projects.
> There is approximately $2,000,000 funded into
> that insurance vehicle and can be drawn on for
> warranty claims at any time. CCI can actually
> use this as a buffer to offset losses or
> profit fades on certain jobs during any given
> year. That is an additional feature that none
> of my other contractor's have.

*Id.* at ¶84.


On March 1, 1999, Dominiani submitted the December 31, 1998 audited financials to Tony Phillips. *Id.* at ¶94. The audited financials showed that while CCI had made a small profit of $59,015, working capitol decreased to $2.5 million and the company had an operating loss of $116,629. *Id.* The financial statement also showed under billings of $6,341,726 representing 36% of total current assets. *Id.* This was an increase from prior years. *Id.* In 1997, underbillings were $1,072,281 and in 1996 underbillings were $37,663. *Id.* The 1998 financials also indicated that PCIC had guaranteed a claim of $1,162,460. *Id.* at ¶95. No Annual Review of the 12/31/98 financials by Mr. Salazar has been found. *Id.* at ¶96.


USF&G continued with the CCI bonding program. *Id.* at ¶97. The first analysis of the 1998 financial statements that

12

appears to have been done by USF&G is dated August 20, 1999. *Id.* at ¶98. The "Folder Exceptions Report" noted the account's status as "red" for the following reasons: underbillings were greater than 50% of equity; the folder had five open claim files; equity was less than 10% of the total program; net quick was less than 5% of the total program the debt to equity was greater than 3 to 1; underbillings were 120% of equity, notes payable were 104.9% of equity, and the indemnity agreement did not include the owner/principal. *Id.* at ¶99.

In early October of 1999, the plaintiff ceased writing bonds for CCI. *Phillips Decl.* at ¶13.

Pennsylvania has adopted the Restatement (Second) of Torts § 552. *Bortz v. Noon*, 729 A.2d 555 (Pa. 1999); *Rempel v. Nationwide Life Ins. Co., Inc.*, 370 A.2d 366 (Pa. 1977)(adopting first Restatement of Torts § 552, which is substantially the same as the Restatement (Second) of Torts § 552). Section 552 provides:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their

13

>justifiable reliance upon the information, if
>he fails to exercise reasonable care or
>competence in obtaining or communicating the
>information.
>(2) Except as stated in Subsection (3), the
>liability stated in Subsection (1) is limited
>to loss suffered
>(a) by the person or one of a limited group of
>persons for whose benefit and guidance he
>intends to supply the information or knows
>that the recipient intends to supply it; and
>(b) through reliance upon it in a transaction
>that he intends the information to influence
>or knows that the recipient so intends or in a
>substantially similar transaction.
>(3) The liability of one who is under a public
>duty to give information extends to loss
>suffered by any of the class of persons for
>whose benefit the duty is created, in any of
>the transactions in which it is intended to
>protect them.

The defendants argue that they are entitled to summary judgment because the plaintiff can not establish that it was in privity with the defendants. In the context of a prior motion to dismiss, the defendants raised an analogous argument – that the complaint fails to state a claim upon which relief can be granted because the plaintiff has not alleged that it was in privity with the defendants. In a Report and Recommendation dated August 10, 2001, we rejected the defendants' contention that privity is a requirement of a negligent misrepresentation

14

AO 72A
(Rev. 8/82)

claim under Pennsylvania law.    We reasoned:

> The defendants argue that complaint fails
> to state a claim upon when relief can be
> granted against them for negligent
> misrepresentation because the plaintiff has
> not alleged that it was in privity with the
> defendants or that the defendants had a
> pecuniary interest in the transaction.
> The defendants cite *First Options of
> Chicago, Inc. v. Wallenstein*, No. Civ. A. 92-
> 5770, 1994 WL 229554 (E.D.Pa. 1994); *PNC Bank,
> Kentucky, Inc. v. Housing Mortgage Corp.*, 899
> F.Supp. 1399 (W.D. Pa. 1994); and *In re Phar-
> Mor, Inc. Securities Litigation*, 892 F.Supp.
> 676 (W.D.Pa. 1995) to support their argument
> that the plaintiff is required to allege
> privity or that the defendants had a pecuniary
> interest in the transaction.  Although these
> cases do support that argument, we do not find
> the cases persuasive.
> First, "a close reading of section 552
> itself reveals that the Restatement is
> concerned with liability in cases where
> contract remedies are unavailable," i.e. where
> there is no privity of contract. *Duquesne
> Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d
> 604, 620 (3d Cir. 1995).  As the Third Circuit
> stated:
>> The section's imposition of
>> liability on those who 'suppl[y]
>> false information for the guidance
>> of others in their business
>> transactions,' does not lend itself
>> very easily to a contract situation.
>> Indeed, virtually all the examples
>> provided in the section involve
>> liability to third parties.  The
>> reason is simple: where there is
>> privity in contract between two
>> parties, and where the policies
>> behind tort law are not implicated,
>> there is no need for an additional
>> tort of negligent misrepresentation.
>> Breach of contract, promissory

15

> estoppel, unjust enrichment, and
> other contract or quasi-contract
> remedies all protect parties who
> negotiate and reduce their agreement
> to writing.

*Id.* at 620.

As stated above, the Pennsylvania Supreme
Court has adopted the Restatement (Second) of
Torts § 552; yet that Court has not indicated
that it applies only in cases where there is
privity of contract.

The defendants argue that if privity is
not a required element of a negligent
misrepresentation claim against a
professional, a plaintiff can avoid the
Pennsylvania Supreme Court's holding in *Guy v.
Liederbach*, 459 A.2d 744 (Pa. 1983), that
privity is a requirement in a malpractice
action, by simply pleading his claim as a
negligent misrepresentation claim.  We do not
find this argument persuasive.

A negligent misrepresentation claim under
§ 552 is a more specific claim than a general
malpractice claim.  Thus, it is not necessary
that the two claims contain the exact same
elements.

Moreover, in *Guy, supra*, a malpractice
action against an attorney, the court held
that a "plaintiff must show an attorney-client
relationship or a specific undertaking by the
attorney furnishing professional services, as
in *Lawall*, as a necessary prerequisite for
maintaining such suits in trespass on a theory
of negligence." *Id.* at 750.  The reference to
*Lawall* is a reference to *Lawall v. Groman*, 37
A. 98 (Pa. 1897).  In *Lawall,* the court
stated: "If, therefore, defendant, knowing
that plaintiff was relying on him, in his
professional capacity, to see that her
mortgage was the first lien, although Roberts
was to pay the fees, undertook to perform that
duty, he was bound to it with ordinary and
reasonable skill and care in his profession,
and would be liable for negligence in that
respect."  Section 552 can be seen to meet

16

the specific undertaking requirement of
*Lawall*.  Liability on the part of a
misrepresenter under Section 552 is limited to
liability to those persons to whom the
misrepresenter intended to supply the
information, or to whom the misrepresenter
knew the information would be supplied, in
connection with transactions that the
misrepresenter intended to influence or knew
would be influenced by the information or
substantially similar transactions.

Under Pennsylvania law, privity is not a
requirement of a claim for negligent
misrepresentation. *Williams Controls v.
Parente, Randolph, Orlando, Carey & Assoc.*, 39
F.Supp.2d 517 (M.D.Pa. 1999)(Vanaskie,
J.)(denying summary judgment motion which was
based on argument that privity is required to
maintain a negligent misrepresentation claim);
*Borough of Lansdowne v. Sevenson Envir. Serv.,
Inc.* 99-3781, 2000 WL 1886578 (E.D.Pa. Dec.
12, 2000)("Under Pennsylvania law, which
incorporates the Restatement (Second) of Torts
§ 552, contractual privity is not necessary to
maintain a claim for negligent
misrepresentation."); *Eisenberg v. Gagnon*, 766
F.2d 770, 779 (3d Cir. 1985)(stating the there
is no strict privity requirement in a claim
for negligent misrepresentation against an
attorney who had a pecuniary interest in the
transaction with respect to which the
misrepresentation was made).

*Doc. 14* at 6-9.  By an Order dated August 31, 2002, Judge Kane

adopted the Report and Recommendation and denied the

defendants' motion to dismiss.  This court in this case has

already decided that privity is not required for a negligent

misrepresentation claim under Pennsylvania law.  That

determination is the law of the case.

17

The defendants contend that they are entitled to
summary judgment because the plaintiff can not establish that
they had a pecuniary interest in the transaction.  We agree
with the defendants that in order to be liable under the
Restatement they must have a pecuniary interest in supplying
the information that forms the basis of the misrepresentation
claim.  However, we disagree with the defendants' contention
that the plaintiff can not establish that the defendants had
such a pecuniary interest.

The Restatement provides that "one who, in the course
of his business, profession or employment, or in any other
transaction in which he has a pecuniary interest" supplies
false information may be liable for negligent
misrepresentations.  The Restatement applies "only when the
defendant has a pecuniary interest in the transaction in which
the information is given." *Restatement (Second) of Torts* § 552,
comment c.  "The defendant's pecuniary interest in supplying the
information will normally lie in a consideration paid to him
for it or paid in a transaction in the course of and as a part
of which it is supplied." *Restatement (Second) of Torts* § 552,
comment d.  The fact that  the information is given in the
course of the defendants' business, profession or employment is

18

generally a sufficient indication that he has a pecuniary interest in it. *Id.*

In the instant case, there is no dispute that the defendants prepared the audit reports as part of their profession and that they were paid for their services. Accordingly, it is clear that the defendants had a pecuniary interest in the information they provided.

The defendants contend that the plaintiff can not establish that they owed it a duty under Section 552 with respect to the bonds on which CCI defaulted because the plaintiff can not establish that they were aware that their audit reports would be used by the plaintiff in deciding whether to issue future bonds on behalf of CCI.

Pursuant to § 552, liability is limited to loss suffered "(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar

AO 72A
(Rev. 8/82)

transaction." The Restatement requires the identification of a specific class of persons and a specific transaction that the supplier of information intends the information to influence or knows that the recipient of the information intends the information to influence. This standard imposes liability where "the supplier undertakes to supply information to a third party whom he or she knows is likely to rely on it in a transaction that has sufficiently specific economic parameters to permit the supplier to assess the risk of moving forward." *Bily v. Arthur Young & Co.*, 834 P.2d 745, 769 (Cal. 1992). The risk perceived by the supplier at the time of the engagement cabins the extent of the duty that the supplier owes to known third parties. *North American Specialty Ins. Co. v. Lapalme*, 258 F.3d 35, 41 (1st Cir. 2001). "By confining what might otherwise be unlimited liability to those persons whom the engagement is designed to benefit, the Restatement rule requires that the supplier of information receive notice of potential third party claims, thereby allowing it to ascertain the potential scope of its liability and make rational decisions regarding the undertaking." *Bily, supra.*, 834 P.2d at 769. The Restatement creates "an *objective standard* that looks to the specific circumstances (e.g., supplier-client engagement and the supplier's communications with the third

20

party) to ascertain whether a supplier has undertaken to inform and guide a third party with respect to *an identified transaction or type of transaction*. *Id*. at 669-70 (italics in original).

The defendants admit that they were aware that the plaintiff received a copy of the audited financial reports they prepared but the defendants contend that there is no evidence that they knew of the specific purpose for which the plaintiff intended to use the reports or that they had knowledge of the specific bonds to be underwritten by the plaintiff on CCI's behalf.

We conclude that there is evidence sufficient to allow a fact finder to reasonably conclude that the defendants were aware that CCI was going to supply the audit reports to the plaintiff for the purpose of securing future surety bonds.

Documents from the defendants' files indicate that the defendants knew that plaintiff would use the financial statements they prepared. *See Doc. 66* at Exhibit 14 (naming USF&G (Saint Paul) as primary user of the financial statements and identifying the relationship between USF&G and CCI as

21

"Surety/Bonding") & *Doc. 66* at Exhibit 15 (identifying bonding company as a creditor and financial statement user). Further, Bruce Brown testified that has been engaged in the audit of contracting companies since at least 1981, that he has been involved in 150 to 200 audits involving contractors, that he knows the purpose of a construction surety bond, that he knows that surety bonding companies use financial statements to determine how they give bonds, and that he knows that construction companies send their financial statements to bonding companies in order to obtain bonds. *Brown Dep.* at 25-27. Susanne Ehgartner, an employee of Brown Shultz, testified at her deposition that at the time she was involved in the 1996 audit she knew that the plaintiff would be a primary user of the financial statement. *Ehgartner Dep.* at 81. Ehgartner further testified that she assumes that she knew at that time that the plaintiff would require an audited financial statement to assess whether or not it wanted to continue to provide bonds to CCI and that the plaintiff would rely on the financial statement in its decision to extend surety credit. *Id.* at 82 & 155.

There is also evidence that the defendants had knowledge of the CCI's bonding program with the plaintiff.

22

John Ortenzio, the President of CCI, testified at his
deposition that he does not recall Brown being present at any
meetings he had with the plaintiff but that he thinks that
Bruce Brown was aware of CCI's aggregated limits and individual
job limits under its bonding program with the plaintiff.
*Ortenzio Dep*. at 43. Sheri Phillips, an officer of CCI,
testified that she does not recollect having any specific
discussions with Brown Shultz concerning CCI's bonding program
but that she would give them updates on what CCI's level of
bonding was and who CCI's bonding company was. *Phillips Dep*.
at 89. Further, there is a letter dated November 7, 1997 to
John Ortenzio from David A. Dominiani. *Doc. 66* at Exhibit 12.
In this letter, Dominiani references the bonding requirements
and bonding program with the plaintiff. *Id*. The letter
indicates that a copy was sent to Bruce Brown. *Id*. Also, a
working paper from Brown Shultz's file indicates that it had a
copy of a document dated August 27, 1997 and entitled "Written
Consent of Shareholder in Lieu of Special Meeting" which
references the plaintiff's requirement that CCI maintain an
equity level of $4,800,000 and an aggregate work program of no
more than $60,000,000. *Doc. 66* at Exhibit 13.

23

In this case, unlike in the case of *Lapalme, supra,*
relied on by the defendants, there is evidence from which a
reasonable fact finder could conclude that the defendants knew
their reports would be used by the plaintiff in deciding
whether or not to issue future bonds on behalf of CCI.

Negligent misrepresentation requires proof of: 1) a
misrepresentation of a material fact; 2) made under
circumstances in which the misrepresenter ought to have known
its falsity; 3) with an intent to induce another to act on it;
and 4) which results in injury to a party acting in justifiable
reliance on the misrepresentation. *Bortz, supra,* 729 A.2d 555,
561 (Pa. 1999).

The defendants contend that the plaintiff has not
presented any evidence that the 1996 audit report contained a
material misrepresentation.  We agree.

The plaintiff has not identified any alleged
misrepresentation in the 1996 audit report.  The plaintiff's
expert states in his declaration that although the work
performed by the defendants in connection with the 1996 Audit

24

Report was deficient, it did not result in any material misstatements. *Debruyn Decl.* at ¶19.

Since the plaintiff has failed to presented any evidence that the 1996 Audit Report contained a material misrepresentation, the defendants are entitled to summary judgment with respect to the 1996 Audit Report.

Although he did not identify any misrepresentations in the 1996 Audit Report, the plaintiff's expert states in his report that the audit work performed by the defendants in connection with the 1997 and 1998 reports did not conform to applicable standards of care of a Certified Public Accountant and resulted in material misstatements and omissions in the 1997 and 1998 reports. Specifically, he opines that the negligent work performed by the defendants resulted in an overstatement of both income and equity in the amount of $815,960 for 1997 and $3,126,508 for 1998. The plaintiff's expert sets forth three causes of the misstatements in the 1997 and 1998 reports: 1) the defendants failed to properly assess the risk involved in the audits and, therefore, their audit programs and audit fieldwork were inadequate to provide the required assurance that the reports were fairly presented in

25

accordance with Generally Accepted Accounting Principles; 2)
the defendants performed inadequate audit procedures in the
areas of contracts-in-progress; and 3) there was inappropriate
recording and inadequate disclosure of related-party
transactions between PCIC and CCI.  The plaintiff's expert
presented in his report his basis for each of the above three
causes of the alleged misstatements.  The plaintiff's expert
attached to his report restated Balance Sheets and Income
Statements for 1997 and 1998 containing adjustments he
considered to be warranted.  The plaintiff's expert, however,
did not explain how he arrived at those particular restated
figures.   In a supplemental report dated September 20, 2002,
the plaintiff's expert does explain the methodology he used to
arrive at the restated figures.

The defendants argue that the plaintiff's expert report
fails to comply with the requirements of Fed.R.Civ.P. 26, and,
thus, should not be considered and that without an expert
report the plaintiff can not establish that the defendants
negligently made material misrepresentations in the 1997 and
1998 reports.

26

Fed.R.Civ.P. 26(a)(2)(A) requires a party to disclose to other parties the identity of any person who may be used at trial to present expert testimony. Fed.R.Civ.P. 26(a)(2)(B) provides, in pertinent part:

> Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case . . . be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

The expert report required under Fed.R.Civ.P. 26(a)(2)(B) is intended to be "a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefor." *Advisory Committee Notes to the 1993 Amendments to Rule 26*. The reasons for requiring an expert report are "the elimination of unfair surprise to the opposing party and the

27

conservation of resources." *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995). "To satisfy the Rule, 'the report must provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions. It must explain factually why and how the witness has reached them.'" *Dunkin Donuts Inc. v. Patel*, 174 F.Supp.2d 202, 211 (D.N.J. 2001)(quoting *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 185 (D.Kan. 1997)). "The test of a report is whether it was sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced." *Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996).

We agree with the defendants that the original report by the plaintiff's expert was deficient in that it did not explain how the expert arrived at the specific figures he set forth in the restated Balance Sheets and Income Statements for 1997 and 1998. However, the plaintiff's expert cured this deficiency by filing a supplemental report in which he sets

AO 72A
(Rev. 8/82)

forth the methodology he used to arrived at the restated figures.[2]

Fed.R.Civ.P. 37(c)(1), provides that a party who "without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at trial, at a hearing, or in a motion any witness or information not so disclosed.  In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions."  Rule 37 is written in mandatory terms.  However, the rule expressly provides that sanctions should not be imposed if substantial justification exists for the failure to disclose or if the failure to disclose was harmless.  The district court has discretion in deciding whether to issue sanctions under Rule 37.  *Newman v. GHS Osteopathic, Inc.*, 60 F.3d. 153, 156 (3d Cir. 1995).  The United States Court of Appeals for the Third Circuit has identified factors to

---

[2] We note that the expert's supplemental report was filed in a timely manner according to the Order of June 14, 2002.  However, the methodology the expert used to arrived at his restated figures should have been set forth in his original report rather than a supplemental report.

consider in deciding whether to exclude or permit a witness'
testimony: (1) the prejudice or surprise in fact of the party
against whom the excluded witnesses are to testify; (2) the
ability of that party to cure the prejudice; (3) the extent to
which the waiver of the rule against calling unlisted witnesses
would disrupt the orderly and efficient trial of the case or of
other cases in the court; and (4) bad faith or willfulness in
failing to comply with the court's order. *Meyers v. Pennypack
Woods Home Ownership Ass'n*, 559 F.2d 894, 904-905 (3d Cir.
1977). The court should also consider the importance of the
excluded testimony. *Sowell v. Butcher & Singer, Inc.*, 926 F.2d
289, 302 (3d Cir. 1991). "The exclusion of critical evidence
is an 'extreme' sanction, not normally to be imposed absent a
showing of willful deception or 'flagrant disregard' of a court
order by the proponent of the evidence." *In re Paoli RR Yard
PCB Litigation*, 35 F.3d 717, 791-92 (3d Cir. 1994)(quoting
*Pennypack, supra*, 559 F.2d at 905).

In the instant case, the plaintiff must present expert
testimony to prove its claim. If we were to determine that the
plaintiff's expert reports should not be considered in
connection with the instant summary judgment motion, then it
would follow that the defendants should be granted summary

30

judgment.  In the instant case, given that the deficiency in
the original expert report has been cured and therefore the
defendants have not been harmed by the deficiency, the extreme
sanction of precluding consideration of the expert reports is
not warranted.

The defendants contend that the plaintiff can not
establish that any of the alleged misrepresentations in the
1997 and 1998 reports were material to its decision to continue
issuing bonds of behalf of CCI.  In support of that contention,
the defendants point out that the plaintiff had no specific
underwriting criteria for its decisions to issue bonds on
behalf of CCI, that the plaintiff's underwriters when
questioned in their depositions could not state whether and to
what extent correct financial information about CCI would have
changed their decisions about issuing bonds on behalf of CCI,
and that the plaintiff issued bonds on behalf of CCI in prior
years when the plaintiff was aware that CCI had sustained
losses and had less working capital and less equity than that
shown in the restated financial statement prepared by the
plaintiff's expert for 1997.

31

The defendants also contend that the plaintiff can not
establish that it justifiably relied on the 1997 and 1998
reports in issuing bonds on behalf of CCI.  In support of that
contention, the defendants assert that at their depositions Mr.
Phillips testified that he did not fully review and analyze the
statements and Mr. Hussey testified that he did not read any of
the reports.  The defendants further assert that any reliance
on the reports was not justified because the reports contained
footnotes cautioning that the numbers used were merely
estimates, the plaintiff was aware that the reports were only
accurate as to the financial condition of CCI as of the closing
date of the statement and the plaintiff received interim
financial information directly from CCI upon which it relied.
Further, as to the $1,162,460 claim guaranteed by PCIC, the
defendants assert that the plaintiff was aware of the
relationship between PCIC and CCI.

The preceding contentions by defendants may, or may
not, lead a fact finder to determine that the alleged
misrepresentations in the 1997 and 1998 reports were not
material to the plaintiff's decision to issue bonds on behalf
of CCI, that the plaintiff did not actually rely on those
reports in making its decisions to issue bonds on behalf of

AO 72A
(Rev. 8/82)

CCI, or if the plaintiff did rely on such reports their

reliance thereon was not justified. However, the plaintiff has

presented evidence, in the form of declarations from those who

were involved in the decision whether or not to issue bonds on

behalf of CCI, that it did rely on the 1997 and 1998 reports

in making its decisions to issue bonds on behalf of CCI and

that those reports were material to its decision to issue bonds

on behalf of CCI. *See Phillips Decl.* at ¶36-41 and *Daily Decl.*

at ¶19-25.[3]  Further, the plaintiff presented evidence that

their reliance on the reports was justifiable. *See Farnsworth*

_____

[3] The defendants assert in their reply brief that the
declarations of Phillips and Daily should not be considered
because those declarations conflict with the testimony given
during depositions. "When, without a satisfactory explanation,
a nonmovant's affidavit contradicts earlier deposition
testimony, the district court may disregard the affidavit in
determining whether a genuine issue of material fact exists."
*Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991).
"[T]he objectives of summary judgment would be seriously
impaired if the district court were not free to disregard the
conflicting affidavit." *Id.* (quoting *Martin v. Merrell Dow
Pharmaceuticals, Inc.*, 851 F.2d 703, 706 (3d Cir. 1988)).  The
defendants have not provided to the court all of the pages of
deposition testimony that they cite as being in contradiction
to the declarations. We have reviewed those portions of the
deposition testimony cited by the defendants which have been
provided to the court. Although the statements made by
Phillips and Daily in their declarations more detailed than the
statements made during their depositions, we conclude that the
declarations do not necessarily contradict the earlier
deposition testimony.

AO 72A
(Rev. 8/82)

*Decl.* at ¶15 ("From a surety underwriter's perspective, these audit reports appeared to be professional and lent itself to a high degree of reliance by USF&G.").

Viewing the evidence in the light most favorable to the plaintiff as the non-moving party, as we must when deciding a summary judgment motion, we conclude that there is evidence from which a reasonable fact finder could conclude that the defendants negligently made material misrepresentations in the 1997 and 1998 reports and that the plaintiff justifiably relied on those misrepresentations to its detriment. Accordingly, the defendants are not entitled to summary judgment on the plaintiff's claim with respect to the 1997 and 1998 reports.

Based on the foregoing, it is recommended that the defendants' motion (doc. 46) for summary judgment be granted in part and denied in part. It is recommended that the defendants be granted summary judgment on the plaintiff's claim with respect to the 1996 Audit Report, but that the defendants not

AO 72A
(Rev. 8/82)

be granted summary judgment on the plaintiff's claim with
respect to the 1997 Audit Report and the 1998 Audit Report.


J. Andrew Smyser
Magistrate Judge


Dated: November 5, 2002.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES FIDELITY AND            :        **CIVIL NO. 1:01-CV-0813**
GUARANTY COMPANY,                     :
                                      :
            Plaintiff                 :        (Judge Conner)
                                      :
        v.                            :        (Magistrate Judge Smyser)
                                      :
BRUCE J. BROWN and                    :            **FILED**
BROWN SCHULTZ SHERIDAN &              :        HARRISBURG, PA
FRITZ,                                :
                                      :        NOV 0 5 2002
            Defendants                :

                  **NOTICE**                   MARY E. _____EA, CLERK
                                               Per _____
                                                        Deputy Clerk

        Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3 of the Rules of Court, M.D.Pa., which provides:

        Any party may object to a magistrate judge's proposed findings, recommendations
        or report addressing a motion or matter described in 28 U.S.C. §636(b)(1)(B) or
        making a recommendation for the disposition of a prisoner case or a habeas corpus
        petition **within ten (10) days** after being served with a copy thereof. Such party
        shall file with the clerk of court, and serve on the magistrate judge and all parties,
        written objections which shall specifically identify the portions of the proposed
        findings, recommendations or report to which objection is made and the basis for
        such objections. The briefing requirements set forth in Local Rule 72.2 shall
        apply. A judge shall make a de novo determination of those portions of the report
        or specified proposed findings or recommendations to which objection is made and
        may accept, reject, or modify, in whole or in part, the findings or recommendations
        made by the magistrate judge. The judge, however, need conduct a new hearing
        only in his or her discretion or where required by law, and may consider the record
        developed before the magistrate judge, making his or her own determination on the
        basis of that record. The judge may also receive further evidence, recall witnesses
        or recommit the matter to the magistrate judge with instructions.

                                               _____
                                               J. Andrew Smyser
                                               Magistrate Judge

Dated: November 5, 2002.