**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FILED
HARRISBURG, PA

JAN 2 4 2003

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

| | |
|---|---|
| United States Fidelity and Guaranty Company | : |
| | : |
| v. | : |
| | : Judge Christopher Connor |
| Bruce J. Brown and Brown, Schultz Sheridan & Fritz | : No: 01-CIV-813 |

---

### MOTION TO STRIKE SUPPLEMENTAL EXPERT REPORT AND AFFIDAVIT OF STEPHEN DEBRUYN, CPA

Defendants, Bruce J. Brown and Brown, Schultz, Sheridan & Fritz, by and through their attorneys, Swartz, Campbell & Detweiler, move this court for an order striking the Supplemental Expert Report of Stephen DeBruyn, CPA ("Supplemental DeBruyn Report") and Mr. DeBruyn's Affidavit submitted in support of Plaintiff's opposition to defendants' motion for summary judgment which plaintiff now seeks to designate as yet another supplemental report ("Affidavit").[1] In support of their motion, defendants state as follows:

1.     This action involves a claim for negligent misrepresentation against an accountant and his accounting firm.

2.     Defendants audited the financial statements for CCI Construction

---

[1]Defendants in their objections to Magistrate's Smyser's Report and Recommendation regarding defendants' motion for summary judgment also address the question of whether the Supplemental DeBruyn Report and Affidavit should have been considered by the court.

Company ("CCI") for a number of years including the years ended December 31, 1996, 1997 and 1998.

3.     Plaintiff is a company that issued surety bonds on CCI's behalf during the period from 1993 to 1999.

4.     CCI, in the winter of 2000, defaulted on those projects in process as of that time and filed for bankruptcy in May of 2000 requiring USF&G to fulfill its obligations under the payment and performance bonds issued on CCI's behalf.

5.     USF&G contends that it would not have issued 19 sets of payment and performance bonds had the audited financials for the years ended 12/31/96, 12/31/97 and 12/31/98 not negligently misrepresented the financial condition of the CCI. Plaintiff seeks to recover the approximately $31,000,000 it contends it has spent or will spend in performing its obligations under the payment and performance bonds issued on CCI's behalf.

6.     USF&G filed its complaint if this matter on May 9, 2001.  Plaintiff's complaint did not identify the manner in which the audit reports for the years at issue misrepresented the financial condition of the company.  Defendants moved for dismissal of the complaint on this ground as well as others. By order dated August 31, 2001, Judge Kane accepted the Magistrate's recommendation and denied defendants' motion to dismiss.

7.     Defendants served plaintiffs with discovery on or about October 5, 2001. Defendants' interrogatories, *inter alia*, requested that for each audit report at issue,

2

plaintiff state the factual basis for its contention that the report was inaccurate, contained omissions, or was misleading. Plaintiff was also asked to state the basis for its contention and the sources of proof for the facts that support the contention that any inaccuracies and/or omissions were material to the issuance of the payment and performance bonds identified in the complaint. A copy of defendants interrogatories and plaintiff's responses thereto is attached as Exhibit A.

8.    Plaintiff in response to those interrogatories identified the inaccuracies or omissions in the 1997 audit report as, among other things, that indirect costs were not properly allocated, that no job site visits were performed by Brown Schultz, and that there was no independent confirmation of management's representations concerning the percentage of completion, estimated costs to complete and the status of pending change orders. Similar issues were identified with respect to the 1998 audit report. In addition, USF&G complained that a claim guaranteed by Pennsylvania Contractor's Insurance Company ("PCIC"), a company owned by John Ortenzio, should not have been recorded as revenue and that audit report contained inadequate disclosure with regard to it. US&G did not identify in its interrogatory answers the extent to which purported deficiencies in the audited financial statements would have changed CCI's balance sheet.

9.    Pursuant to the Case Management Order dated August 17, 2001, as amended by order dated May 8, 2002, plaintiff's expert reports were due on July 22, 2002 and defendants' expert reports were due on August 21, 2002.

3

10.    By letter dated June 5, 2002, plaintiff requested defendants' concurrence in a proposal whereby plaintiff would be permitted to submit expert reports in rebuttal to reports received from defendants. Specifically plaintiff stated

> Based on various exchanges during the discovery process, it appears that you [sic] client may assert as defenses certain issues possibly requiring the submission of expert testimony. Because the exact topics for which your client may introduce expert testimony will be unknown by my client until approximately August 21, 2002, it will be difficult, if not impossible, for my client to produce reports or to designate topics for which it is currently unaware. Accordingly my client is considering filing a motion that would provide it with 30 days from receipt of Brown Schultz' expert reports to file expert report (and designate experts) in rebuttal to the reports received from your client.

A copy of the letter is attached hereto as Exhibit B.

11.    On June 10, 2002, prior to receiving a response from defendants regarding the proposal, USF&G requested leave of court to file expert reports in rebuttal to designations made by Brown Schultz by September 20,2002. With regard to that motion USF&G advised the court that it intended to submit an expert report as to "what it avers are the various accounting errors by Brown Schultz no later than July 22, 2002. This USF&G believes will be the only expert necessary for USF&G to prove its prima facie case. . . ."

> Plaintiff indicated that the relief sought was justified because
>
> It is difficult, if not impossible, for a party to determine the nature of all expert testimony it may need until the other party has fully made known the detailed nature of its claims (or, as applicable to Brown Schultz, its defenses). During the course of discovery, it has become apparent that Brown Schultz may rely upon various affirmative defenses–such as failure to mitigate–for which it will bear the burden of proof. Unless and until expert reports are provided by Brown Schultz, USF&G is unable to submit

4

any expert reports to rebut or respond to such defendants.

A copy of plaintiff's motion is attached hereto as Exhibit C.

12.    Magistrate Smyser, by order dated June 14, 2002, prior to any response to the motion being due, granted plaintiff's motion to amend case management order regarding expert reports to permit the filing of rebuttal expert reports.  A copy of the June 14, Order is attached hereto as Exhibit D.

13.    Plaintiff submitted to defendants the Expert Report of Stephen DeBruyn, CPA on or about July 22, 2002.  A copy of the original report is attached hereto Exhibit E.

14.    Mr. DeBruyn's report contained restated balance sheets and income statements for  CCI Construction Company for the years ended December 31, 1997 and December 31, 1998.  The report, however, contained no information as to how Mr. DeBruyn arrived at the restated amounts contained in those exhibits, the source of the restated amounts or the means by which Mr. DeBruyn determined the adjustments for the restated amounts.

15.    Defendants on August 6 and 7, 2002 requested that plaintiff produce Mr. Debruyn's work papers so defendants could ascertain the basis for the restated financials set forth in Mr. Debruyn's work papers.  Copies of those letters are attached hereto at Exhibit F.

16.    Plaintiff refused to produce Mr. Debruyn's work papers.

17.    Defendants, in their motion for summary judgment, which was filed on

5

September 1, 2002, raised the issue that the Debruyn report did not comply with F.R.C.P. 26 in that it did not provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions.

18.    After defendants produced their expert witness reports on August 21, 2002, and after receiving defendants' summary judgment motion, plaintiff, on or about September 20, 2002, submitted a Supplemental Report of Mr. Debruyn.  The Supplemental Report purported to explain the basis for the restated financials. A copy of the supplemental report is attached hereto as Exhibit G.

19.    The supplemental report was not submitted in rebuttal to any expert report submitted by defendants on a defense on which they would bear the burden at trial which was the basis upon which plaintiff requested and was granted leave to submit such reports.

20.    Rather, the supplemental report included the detail which should have been included in Mr. DeBruyn's original report.

21.    The information contained in the supplemental report should have been submitted in Mr. DeBruyn's initial report which was due on July 22, 2002  two months prior to the date on which the supplemental report was submitted to defendants.[2]  As such it is untimely, submitted without leave of court and should  be

---

[2]Magistrate Smyser in his report and recommendation with regard to the motion for summary judgment agreed that the original report was deficient because it did not explain how the expert arrived at the specific figures set forth in the restated balance sheets and income statements for 1997 and 1998. He further found that the methodology used by the expert to arrive at his restated figures should have been set forth in his original report.

6

stricken.

22.    On or about October 9, 2002, in support of its opposition to defendants summary judgment motion, plaintiff submitted an affidavit from Mr. DeBruyn which contained even more information with regard to how Mr. DeBruyn arrived at his restated financials and, for the first time, by way of exhibits, provided specific information on a job by job basis. A copy of the DeBruyn Affidavit is attached hereto as Exhibit H.

23.    By letter dated October 16, 2002, Plaintiff purported to formally designate this affidavit as yet a further supplemental expert report, long after the initial deadline for expert reports and the deadline for submission of expert reports in rebuttal to those submitted by defendants. A copy of plaintiff's letter is attached hereto as Exhibit I.

24.    While the Case Management Order also contained a date for "supplementations" Mr. DeBruyn did not *supplement* his expert report on September 20, 2002 or again on October 16, 2003. His opinion was not amended or amplified based information that was not previously available to him. He merely disclosed that which should have been disclosed on July 22, 2002 when the report was due.

25.    The deadline in the case management order for supplementations was not intended to allow plaintiff three additional months to disclose that which was necessary in the first instance to comply with the applicable rules and Case Management Order.

7

26.     The Affidavit of Stephen DeBruyn which plaintiff purports to designate as yet another report from this expert is also untimely and, as such, should also be stricken.

27.     Rule 37(c)(1) provides that

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(2) is not, unless the failure is harmless, permitted to use as evidence at a trial, at a hearing or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court on motion and after affording an opportunity to be heard may impose other appropriate sanctions.

28.     The non-producing party shoulders the burden of proving substantial justification for its conduct or that the failure to produce was harmless. *See Stallworth v. E.Z. Serve Convenience Stores*, 199 F.R.D. 366, 368 (M.D. Ala. 2001). Plaintiff cannot establish either of these conditions.

29.     "Substantial justification" for the failure to make a required disclosure has been regarded as "justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request." *United States v. Dentsply Intern., Inc.*, 2000 U.S. Dist. LEXIS 6994, No. Civ. A. 99-5, 2000 WL 654378, *7 (D. Del. May 10, 2000). "The test of substantial justification is satisfied if 'there exists a  genuine dispute concerning compliance. '" *Henrietta D. v. Giuliani*, 2001 U.S. Dist. LEXIS 21848, No. 95- CV-0641, 2001 WL 16021114, *5 (E.D.N.Y. Dec. 11, 2001).

30.     No substantial justification exists for plaintiff's failure to disclose the

SWARTZ, CAMPBELL & DETWEILER
ATTORNEYS AT LAW •1601 MARKET STREET •34TH FLOOR • PHILADELPHIA, PA 19103-2316

basis for the restated balance sheet and income statements when they were due on July 22, 2002. Rule 26(a)(2)(A) requires that an expert report "provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions. It must explain factually why and how the witness reached them." *Dunkin Donuts, Inc. v. Patel,* 174 F. Supp. 202, 211 (D.N.J. 2001). There is no question but that the information set forth in the Supplemental Report and Affidavit was required for compliance with Rule 26.

31.     There also can be no dispute that plaintiff's expert, having provided the restated financials in his initial report, had the ability to explain how he arrived at his restated balance sheets and income statements at the time he submitted his initial report. Further, plaintiff could have provided the information when defendants' requested Mr. DeBruyn's work papers in an attempt to ascertain how DeBruyn arrived at his restated financials. Plaintiff refused to do so. As a result, plaintiff cannot establish substantial justification for its conduct and, pursuant to Rule 37, should not be permitted to use as evidence at trial the information contained in the Supplemental DeBruyn Report or the DeBruyn Affidavit.

32.     Plaintiff also cannot establish its conduct was harmless. A party's misconduct is harmless if it involves an honest mistake, coupled with sufficient knowledge by the other party of the material that has not been produced. *Stallworth,* 199 F.R.D. at 369. This connotation of the term "harmless" is derived from the Committee Note to the 1993 amendments to Rule 37(c), which offers as examples of

9

"harmless" violations of Rule 26(a), the inadvertent failure to disclose the name of a

potential witness known to all parties, or the failure to list as a trial witness a person

listed by another party. As the Committee Notes state:

> Paragraph (1) prevents a party from using as evidence any witnesses or
> information that, without substantial justification, has not been disclosed as
> required by Rule 26(a) and 26(e)(1). This automatic sanction provides a strong
> inducement for disclosure of material that the disclosing party would expect to
> use as evidence, whether at trial, or on a motion, such as one under Rule 56. . .
> .
>
> Limiting the automatic sanction to violations "without substantial
> justification" coupled with the exception for violations that are "harmless" is
> needed to avoid unduly harsh penalties in a variety of situations: e.g., the
> inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a
> potential witness known to all parties; the failure to list as a trial witness a
> person so listed by another party; or the lack of knowledge of a pro se litigant
> of the requirement to make disclosures. In the latter situation, however,
> exclusion would be proper if the requirement for disclosure had been called to
> the litigant's attention by either the court or another party.

Advisory Committee Notes, 1993 Amendments.

33.     Plaintiff bears the burden on the question of whether Brown Schultz

negligently performed the audits of CCI which resulted in the financial statements

misrepresenting the financial condition of CCI in some material way.

34.     This is not a situation similar to the examples given in the notes to Rule

37 such as the failure to list as a trial witness a person so listed by another party.

Plaintiff's nondisclosure of the information contained in the Supplemental DeBruyn

Report and Affidavit was done with a total disregard for the requirements of F.R.C.P.

26 and the Case Management Order.

35.     Even if plaintiff could establish that its non-disclosure was an "honest"

10

mistake, plaintiff cannot show that defendants had sufficient knowledge of the material that has not been produced. See *Stallworth*, 199 F.R.D. at 369.

36.    Plaintiff did not produce the information contained in Mr. DeBruyn's initial report, supplemental report or affidavit in the course of discovery. Plaintiff did not identify the restated financial information in discovery notwithstanding the fact it had been asked to state the manner is which the audited financials for the years at issue misrepresented the financial condition of the CCI. Plaintiff did not indicate the problems with the financial statements identified by DeBruyn in his Supplemental Report and Affidavit.

37.    Defendants had no opportunity to examine plaintiff's underwriters with regard to the effect those restated financials would have had on their underwriting decisions. While the underwriters were questioned at length concerning the impact of the problems with the financial statements as indicated in the answers to interrogatories, the underwriters were unable to conclude as to the underwriting impact of the problems with the financial statements as indicated in plaintiff's answers to interrogatories. Indeed, plaintiff's underwriters testified that they could not determine to what extent a change in the audited financial statements would have effected their underwriting of payment and performance bonds for CCI. *See, e.g.*, Excerpts of Depositions of James Dailey, Anthony Phillips and Steve Salazar attached hereto as Exhibit J.

38.    The last possible moment for this information to be disclosed was at the

11

time plaintiff's expert reports were due on July 22, 2002. After this point, defendants should be able to rely on the factual record as it existed at in pursuing summary judgment and in having its own experts prepare their reports. This is particularly true where, as here, defendants put plaintiff on notice of the deficiency of their expert report and requested Mr. DeBruyn's workpapers to make their determination with regard to the basis for the restated financials proposed by Mr. DeBruyn. As such, exclusion of the Supplemental Report and the Affidavit is proper under Rule 37.

39.     This failure to fully disclose the basis for plaintiff's expert opinion at the time it was due and then again after Plaintiff was requested to provide documentation to explain how it arrived at the restated balance sheets and income statements has prejudiced defendants. At a minimum, defendants should be permitted to file summary judgment with the knowledge that those experts necessary to plaintiff's case in chief, their opinions, and the basis for those opinions have been fully disclosed. In addition, defendants at that point should be permitted to rely on the factual record as it then exists in submitting information to its own experts.

40.     Given that the Supplemental Expert Report and the Affidavit of Stephen DeBruyn were not submitted until long after they were due and without leave of court they should be stricken. In addition, the information contained in the Supplemental DeBruyn Report and Affidavit was required to be disclosed, at the latest in Mr. DeBruyn's initial report and was not. The non-disclosure was without substantial justification and was not harmless. Accordingly, plaintiff should be

SWARTZ, CAMPBELL & DETWEILER
ATTORNEYS AT LAW •1601 MARKET STREET •34TH FLOOR •PHILADELPHIA, PA 19103-2316

precluded from using as evidence at trial the information in the Supplemental Report of Mr. DeBruyn and his Affidavit.

WHEREFORE, defendants request that the Court to grant their motion to strike the Supplemental Report of Stephen DeBruyn, CPA and his Affidavit.

SWARTZ, CAMPBELL & DETWEILER

BY: _Kathleen M. Carson_
Jeffrey B. McCarron
Kathleen M. Carson
1601 Market Street
Philadelphia, PA 19103
Attorneys for Defendants

Dated: January 23, 2003

13

## CERTIFICATE OF SERVICE

I, Kathleen M. Carson, Esquire, counsel for defendants, Bruce J. Brown and Brown, Schultz Sheridan & Fritz, hereby certify that a copy of Defendants' Motion to Strike Supplemental Expert Report and Affidavit of Stephen Debruyn, CPA, was served upon all counsel listed below by first class U.S. mail, postage prepaid on January 23, 2003

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA 17101

Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA 02110

*Kathleen M. Carson*
Kathleen M. Carson

Date: January 23, 2003

A

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY,<br>Plaintiff<br><br>v.<br><br>BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 1:01-CV-00813<br><br>JUDGE KANE |

## UNITED STATES FIDELITY AND GUARANTY COMPANY'S ANSWERS TO DEFENDANTS' SET OF INTERROGATORIES

Plaintiff, United States Fidelity & Guaranty Company (the "USF&G") responds to Defendants' First Set of Interrogatories as follows:

### I.   STATEMENT AND GENERAL OBJECTIONS

1.     USF&G objects to Defendants' interrogatories and instructions to the extent that they exceed the scope of both Fed.R.Civ.P. 33 and the Local Rules of the United States District Courts for the District of Pennsylvania.

2.     Defendants' requests are extremely broad in scope and include information subject to the attorney-client privilege or the work produce doctrine.  Accordingly, USF&G will answer all interrogatories as indicated below only to the extent that they are not subject to the attorney-client privilege or work product doctrine.

3.     USF&G reserves the right to supplement its responses in the event that additional documents or information become available.

*December 11th 2001*

4.      All documents proffered pursuant to Fed.R.Civ.P. 33(c) will be produced as required by the Federal Rules of Civil Procedure or as the parties may otherwise agree.

5.      To the extent that any definition, instruction or interrogatory may be construed as calling for the identification of documents reflecting, referring or relating to a particular subject or subjects, USF&G construes such interrogatory as calling for the identification of documents which refer to the designated subject on the face of the documents.  If, however, the interrogatory is to be construed otherwise, it would be impossible for USF&G to identify documents on the grounds that the definition, instruction or interrogatory is vague, ambiguous, overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence.

6.      USF&G hereby incorporates by reference each and every one of the general objections in to all of the following interrogatory responses.

## II.      ANSWERS

### INTERROGATORY NO. 1

Identify all persons who participated in the preparation of your responses to Defendants' First Set of Interrogatories to Plaintiff.

### ANSWER NO. 1

Without waiver of the general objections, USF&G states that the responses were prepared by Anthony Phillips, with the assistance of counsel.

### INTERROGATORY NO. 2

Identify all persons, including but not limited to your present or former employees, who participated in the underwriting of payment and performance bonds issued to CCI.

**ANSWER NO. 2**

Without waiver of the general objections, and further objecting that "participated" is vague and ambiguous, USF&G states that the following individuals either worked for USF&G regarding the decision to create a bonding program for CCI or provided USF&G with material information, other than audit information, used to make that decision:

Stephen H. Salazar
Senior Underwriting Manager
St. Paul Surety Co.
2605 Interstate Drive
Harrisburg, PA  17110-9364

Jim Dailey
H.O. Surety, National Accounts
St. Paul Surety Co.
2605 Interstate Drive
Harrisburg, PA  17110-9464

Anthony Phillips
Bond Underwriter
St. Paul Surety Co.
2605 Interstate Drive
Harrisburg, PA  17110-9464

John Ortenzio, President
CCI Construction Co., Inc.
2500 Old Gettysburg Road
Camp Hill, PA  17011-7307

Shane Miller
Chief Operating Officer
CCI Construction Co., Inc.
2500 Old Gettysburg Road
Camp Hill, PA  17011-7307

David Barber
Chief Financial Officer
CCI Construction Co., Inc.
2500 Old Gettysburg Road
Camp Hill, PA  17011-7307

James C. Byerly, President
Byerly Insurance
525 North 12th Street
P.O. Box 525
Lemoyne, PA  17043-0525

Dave Dominiani
Vice President/Contract Bond Division
Byerly Insurance
525 North 12th Street
P.O. Box 525
Lemoyne, PA  17043-0525

## INTERROGATORY NO. 3

Identify all persons, including but not limited to your present or former employees, who participated in the establishment of a bonding program for CCI.

## ANSWER NO. 3

Without waiver of the general objections, and further objecting that "participated" is

vague and ambiguous, USF&G states that the following individuals either worked for USF&G

regarding the decision to create a bonding program for CCI or provided USF&G with material

information, other than audit information, used to make that decision:

Stephen H. Salazar
Senior Underwriting Manager
St. Paul Surety Co.
2605 Interstate Drive
Harrisburg, PA  17110-9364

Jim Dailey
H.O. Surety, National Accounts
St. Paul Surety Co.
2605 Interstate Drive
Harrisburg, PA  17110-9464

Anthony Phillips
Bond Underwriter
St. Paul Surety Co.
2605 Interstate Drive
Harrisburg, PA  17110-9464

John Ortenzio, President
CCI Construction Co., Inc.
2500 Old Gettysburg Road
Camp Hill, PA  17011-7307

Shane Miller
Chief Operating Officer
CCI Construction Co., Inc.
2500 Old Gettysburg Road
Camp Hill, PA  17011-7307

David Barber
Chief Financial Officer
CCI Construction Co., Inc.
2500 Old Gettysburg Road
Camp Hill, PA  17011-7307

James C. Byerly, President
Byerly Insurance
525 North 12th Street
P.O. Box 525
Lemoyne, PA  17043-0525

Dave Dominiani
Vice President/Contract Bond Division
Byerly Insurance
525 North 12th Street
P.O. Box 525
Lemoyne, PA  17043-0525

## INTERROGATORY NO. 4

State the factual basis for your contention that Brown Schultz's Audit Report for the year ended December 31, 1996 was inaccurate, contained omissions and/or was misleading, including but not limited to:

    a.      The nature of each inaccuracy and/or omission contained in the 1996 Audit Report; and

    b.      The manner in which the 1996 Audit Report was misleading.

**ANSWER NO. 4**

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. USF&G also states that the interrogatory is duplicative of information to be provided in expert reports which, pursuant to the Case Management Order dated August 17, 2001, are due on July 1, 2002. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery and USF&G reserves the right to amend its responses to reflect such information. Additionally, the instant response focuses on major inadequacies of the audited financial statements for CCI for the year ended December 31, 1996 (the "1996 Audit Report") and is not intended to be a complete recitation of all inaccuracies, omissions and representations contained therein.

USF&G further states that some of the inaccuracies and omissions are relevant only when viewed in the context of other audits of CCI performed by Brown Schultz. Accordingly, USF&G incorporates herein by reference the responses to interrogatories nos. 8 and 12 as if fully set forth herein.

Several aspects of the planning stage of the 1996 Audit Report indicate that Brown Schultz did not perform to professional standards regarding the 1996 Audit Report. During the

planning stage of the audit, significantly greater consideration should have been given to the use of more expansive procedures in regards to management's representations, especially in relation to anticipated gross profit and estimated costs to complete on work-in-progress as of December 31, 1996.

On Form B-2, Part IV, "Evaluating and Considering the Effects of Overall Inherent Risk Factors," the auditor is instructed to consider the effect, individually and in the aggregate, on the audit scope of all significant risk factors identified in Part I of Form B-2.  Further, the auditor is instructed to describe the various risk factors and reasons for its significance, any mitigating circumstances, the cycle/assertion most likely affected, and the effect on scope.  Brown Schultz identified the following two separate risk factors:  (1) that management personnel were awarded bonuses based on company's performance, and that (2) significant creditors were intended financial statement users.

For each of these risk factors, Brown Schultz documented as a mitigating circumstance that "[m]anagement team has high integrity; no problems in the past and none are anticipated." Brown Schultz also commented that these risk factors were likely to effect the "revenue/existence" cycle in regards to the first factor and the "expenditure/completeness" cycle in regards to the second factor.  Finally, Brown Schultz documented that these risk factors would have no effect on the audit scope.  This was due to audit procedures already in place which, purportedly, "usually result[s] in examining revenue 90%-100."  Brown Schultz also noted that "search for unrecorded liabilities is performed."  However, the risk factors during the planning stage of the audit were of such significance that Brown Schultz should have been aware that management personnel had an incentive to inflate earnings and net income and, accordingly, should have subjected CCI's financials to markedly greater scrutiny.

In addition to the two risk factors detailed above, Brown Schultz should have also considered the following factors in its audit work:

(1)    Accounting issues such as the complexity and contentiousness of accounting issues affecting the account (i.e. the various difficulties associated with auditing a construction company);

(2)    Auditing difficulties including the frequency or significance of difficult-to-audit transactions affecting the account (i.e. difficulties associated with auditing estimated costs-to-complete;

(3)    The complexity of calculations affecting the account; and

(4)    The extent of judgment involved in determining the account balance.

Despite the foregoing, on the Confirmation Control Sheet, it appears that only Accounts Receivable confirmations and legal representation letters were sent.  The following do not appear to have been used or even considered:

-    Confirmation of the various cash accounts;

-    Confirmation of the Company's line of credit;

-    Confirmation of significant subcontractor agreements; and

-    Confirmation of the Company's investments.

In relation to indirect costs, the presentation of the financial statements appear not to be in accordance with GAAP.  For example, it appears that costs of contracts for each individual contract as represented on the "Earnings from Contracts," "Completed Contracts" and "Contracts-in-Progress" schedules included only direct costs; indirect costs and general and administrative expenses are charged to expense as incurred.  (See Note 1 to the financial statements).  However, GAAP requires all indirect costs to be allocated to individual contracts

using a reasonable method. Therefore, GAAP does not allow a line item "Indirect Costs" to appear on the financial statements. The result of this departure from GAAP is that actual/estimated gross profit of each individual contract represented on the "Completed Contracts" and "Contracts-in-Progress" was overstated by the amount of indirect costs that should have been allocated to that job.

A comparison of the summary portion of the income statement between the years ended December 31, 1997 and December 31, 1996 also indicates serious inaccuracies. Brown Schultz analytically identified a potential error in the financial statements by performing an analytical review of the overall income statement. It identified an increase in the gross profit from 2.02% in 1995 to 5.39% in 1996. Although this represented an increase of only 3.37%, the 1996 percentage was 166% greater than the 1995 amount. Brown Schultz noted on the workpaper that the increase was the result of higher gross profit recognized from "capital" jobs in 1996.

In Brown Schultz' audit program concerning completed contracts, the procedure used, as described by Brown Schultz, was as follows: "[s]elected two jobs included in the completed contract listing . . . which were around 80% complete in the prior year, in order to get a good test of the client's estimating procedures." This testing was inadequate.

In the audit program dealing with completed contracts, only two contracts were "tested." These contracts represented less than 25% of the total amount of contracts completed during 1996. Therefore, the two contracts were not a representative sample.

In relation to the testing of CCI's job cost system, it appears that 25 job cost items were "haphazardly" selected and tested. This testing included, among other things, payroll costs. To test these costs, weekly transaction distribution reports were obtained. "Haphazardly," one line item for every month plus one additional line item for the fifth and seventh months were selected.

To verify that the transaction distribution represented the total weekly payroll, Brown Schultz agreed the gross payroll report total to the transaction distribution reports to the weekly payroll register total. As for other costs, Brown Schultz merely obtained the monthly purchase journals. Brown Schultz then haphazardly selected one line item that included a job cost and phase number from each month.

Brown Schultz noted that "[a]ll 25 cost items were traced to client source documentation to verify that the cost was coded to the correct job. Also, all cost items were agreed to the job cost history reports to verify proper posting." Brown Schultz also noted that "All invoice and payroll account coding relating to contracts is completed and approved by someone outside of the accounting department . . . [d]ue to this control, only 25 items needed to be selected for testing."

Brown Schultz did not document why a sample of only 25 items was considered a reasonable, representative sample.

It does not appear that job site visits were performed or even considered when the audit was planned. Since this procedure was not performed (nor were confirmation letters sent to subcontractors), there was virtually no independent confirmation or other verification of management's representations concerning the percentage of completion and the estimated costs to complete as of the balance sheet date. Nor was Brown Schultz able to obtain any independent verification of problems on the jobs that might not have been disclosed by management (with the exception of the confirmations received from the owners).

Several errors appear to have been made as to the "Disclosure Requirements" checklist. Question 2 under the section "Notes and Accounts Receivable" concerns amounts due from affiliates or subsidiaries. The preparer noted that this item was "insignificant." However, on the December 31, 1996 balance sheet, it was represented that $268,583 was due from a shareholder.

At the same time, it had previously been documented that the Acceptable Projected Misstatement was $100,000.00. Accordingly, the description of "insignificant" is inaccurate. Moreover, the allowance of doubtful accounts does not appear to have been disclosed, as is required under GAAP.

Summarily, in relation to the testing of contract billing and cost-related accounts, it appears that Brown Schultz performed little, if any, of the above-detailed procedures. It also appears that limited inquiries were made solely to Sherri Phillips, CCI's chief accounting person. There appears to be little, if any, documentation concerning inquiries and discussions made with the construction manager, the project manager of each individual significant job and other key field employees. In addition, there appears to have been little, if any, analytical review performed on the jobs-in-progress, material departures from GAAP demonstrated by management (in regard to indirect costs), and little, if any, testing performed on the individual components of job costs (direct and indirect costs).

**INTERROGATORY NO. 5**

Identify all documents which support your contention that Brown Schultz's Audit Report for the year ended December 31, 1996 was inaccurate, contained omissions and/or was misleading.

**ANSWER NO. 5**

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the

Federal Rules of Civil Procedure.  USF&G also states that the interrogatory is duplicative of

information to be provided in expert reports which, pursuant to the Case Management Order

dated August 17, 2001, are due on July 1, 2002.  However, USF&G is providing responses to this

interrogatory based, for the most part, on information known or available to them at this time.

These responses do not include or incorporate information that will be obtained in the course of

discovery.

Without waiver of the general and foregoing objections, USF&G will make such

documents available for inspection and copying at a reasonable time and place pursuant to Fed.

R. Civ. P. 33(d).  Such documents consist, in the main, of Brown Schultz' working papers, the

audit and tax file, correspondence and the appropriate audit report, all of which were previously

produced by Brown Schultz.

## INTERROGATORY NO. 6

For each inaccuracy and/or omission identified in response to interrogatory no. 4, is it
your contention that it was material to the issuance of the payment and performance bonds
identified in Paragraph 16 of the Complaint?  If so, state the factual basis for your contention and
the sources of proof for the facts which support your contention.

## ANSWER NO. 6

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage

of this legally and factually complex litigation to state in full detail the basis for any contention

for which some, if not much, of the factual support lies in the hands of persons other than

USF&G.  In essence, this and the following contention interrogatories call upon USF&G to recite

each and every fact, including each communication and document that would support each and

every assertion in the Complaint.  As such, they are an improper use of interrogatories under the

Federal Rules of Civil Procedure.  USF&G also states that the interrogatory is duplicative of

information to be provided in expert reports which, pursuant to the Case Management Order

dated August 17, 2001, are due on July 1, 2002. However, USF&G is providing responses to this

interrogatory based, for the most part, on information known or available to them at this time.

These responses do not include or incorporate information that will be obtained in the course of

discovery and USF&G reserves the right to amend its responses to reflect such information.

USF&G relied upon the unqualified opinion contained in the audit report in its decision

as to the nature and extent of the bonding program it gave to CCI. The errors or omissions

discussed in the response to interrogatory 4 resulted in the audit report inaccurately reflecting

CCI's true financial condition and numerous risks inherent in the maintenance of a bonding

program. Since USF&G would not have issued the bonding program to CCI which it did if the

inaccuracies contained in the 1996 Audit Report were known by USF&G, all inaccuracies

referred to in the response to interrogatory no. 4 are material because of the cumulative effect

they had on the accuracy of the audit.

## INTERROGATORY NO. 7

Is it your contention that defendants should have known of each of the inaccuracies
and/or omissions identified in response to interrogatory no. 4 above? If so, state the factual basis
for your contention and the sources of proof for the facts which support your contention.

## ANSWER NO. 7

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage

of this legally and factually complex litigation to state in full detail the basis for any contention

for which some, if not much, of the factual support lies in the hands of persons other than

USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite

each and every fact, including each communication and document that would support each and

every assertion in the Complaint. As such, they are an improper use of interrogatories under the

Federal Rules of Civil Procedure.  However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time.  These responses do not include or incorporate information that will be obtained in the course of discovery and USF&G reserves the right to amend its responses to reflect such information.

In that, *inter alia*, the errors and omissions identified in response to interrogatory 4 were apparent to USF&G upon review of the working papers and could likely have been either eliminated or avoided by the implementation of procedural and substantive steps mandated by GAAS and GAAP, as well as reasonable professional standards of practice, Brown Schultz either knew or should reasonably have known of such inaccuracies and omissions.

### INTERROGATORY NO. 8

State the factual basis for your contention that Brown Schultz's Audit Report for the year ended December 31, 1997 was inaccurate, contained omissions and/or was misleading including but not limited to:

    a.    The nature of each inaccuracy and/or omission contained in the 1997 Audit Report; and

    b.    The manner in which the 1997 Audit Report was misleading.

### ANSWER NO. 8

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G.  In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint.  As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure.  USF&G also states that the interrogatory is duplicative of

information to be provided in expert reports which, pursuant to the Case Management Order dated August 17, 2001, are due on July 1, 2002. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery and USF&G reserves the right to amend its responses to reflect such information. Additionally, the instant response focuses on major inadequacies of the audited financial statements for CCI for the year ended December 31, 1997 (the "1997 Audit Report") and is not intended to be a complete recitation of all inaccuracies, omissions and representations contained therein.

USF&G further states that some of the inaccuracies and omissions are relevant only when viewed in the context of other audits of CCI performed by Brown Schultz. Accordingly, USF&G incorporates herein by reference the responses to interrogatories nos. 4 and 12 as if fully set forth herein.

As a part of the statements that were issued for the year ended December 31, 1997, the statement, as originally reported, contained current assets of $15.3 million, other assets of $1.4 million, total current liabilities of $11.3 million and equity of $5.4 million. As restated, the current assets were $14.1 million, other assets were $1.4 million, current liabilities were $13.2 million and equity was $2.3 million. The net effect of this is that retained earnings as originally reported were overstated by $3.1 million dollars.

There was profit fade of $2.8 million on the work in process as of December 31, 1997. By overstating the estimated profit on these jobs, Brown Schultz had materially overstated overbillings and net income for 1997. Brown Schultz did not properly allocate indirect costs and did not properly perform an audit of construction contracts in accordance with GAAS.

Moreover, significant profit increases and slippage were recognized from the represented work-in-progress as of December 31, 1997.

On Form B-2, Part IV, "Evaluating and Considering the Effects of Overall Inherent Risk Factors," the auditor is instructed to consider the effect, individually and in the aggregate, on audit scope of all significant risk factors identified in Part I of Form B-2. The auditor is further instructed to describe the various risk factors and reason for its significance, any mitigating circumstances, the cycle/assertion most likely affected, and the effect on scope. Brown Schultz identified the following four separate risk factors: (1) significant creditors who are financial statement users; (2) significant related party transactions; (3) competitive industry; and (4) management bonuses based on financial results.

For each of these risk factors, Brown Schultz documented as a mitigating circumstance that "[m]anagement team has high integrity; no problems in the past and none are anticipated." Brown Schultz also commented that these risk factors were not likely to effect any specific cycles. Finally, Brown Schultz documented that these risk factors would have no effect on the audit scope. This was due to audit procedures already in place, which, purportedly, "usually result[s] in examining revenue 90%-100%." Brown Schultz also noted that "search of unrecorded liabilities is performed." However, the risk factors during the planning stage of the audit were of such significance that Brown Schultz should have been aware that management (in particular, Shane Miller, CCI's Executive Vice-President, and the individual ultimately responsible for the compilation of the work-in-progress schedule, and Sherri Phillips, the individual responsible for the preparation of the financial statements) had an incentive to inflate earnings and net income and, accordingly, should have subjected CCI's financials to markedly greater scrutiny.

In addition to the four risk factors detailed above, Brown Schultz should have also considered the following factors in its audit work:

(1)    Accounting issues such as the complexity and contentiousness of accounting issues affecting the account (i.e. the various difficulties associated with auditing a construction company);

(2)    Auditing difficulties including the frequency or significance of difficult-to-audit transactions affecting the account (i.e. difficulties associated with auditing estimated costs-to-complete);

(3)    The complexity of calculations affecting the account; and

(4)    The extent of judgment involved in determining the account balance.

Therefore, during this planning stage, consideration should have been made of expanding procedures in regards to management's representations, especially in relation to anticipated gross profit and estimated costs to complete on work-in-progress.

On the "Disclosure Requirements Checklist," Item 2 under cash deals with material bank overdrafts presented as a separate caption amount current liabilities. Per review of the trial balance, it appears that CCI had an operating account and a payroll account with overdrawn balances as of December 31, 1997, and a cash management account with a balance that exceeded the two overdrawn cash accounts. Therefore, the possibility exists that the proper financial statement presentation would be to show the cash management account as an asset and the two overdrawn accounts as a current liability. Or, if in fact the overdrawn balance was caused by held checks, Brown Schultz should have considered adding back the held checks to cash and increasing accounts payable by that same amount. Brown Schultz noted that this issue was "N/A" with a handwritten statement that the material bank overdrafts were netted with the cash

management account. Although this presentation issue would not effect the "bottom line"; net income and retained earnings, it would effect such critical items as current assets, total assets, and the current ratio. Therefore, Brown Schultz should have checked this issue as "Yes" and considered presenting it as an asset and a current liability.

There appear to be significant errors regarding the confirmation of receivables and treatment of the results obtained. For example, there appears to have been a material difference noted on the "DGS 373-1.1" job (Job #439, Mahonoy Prison) between what was represented on CCI's books and what the owner confirmed. CCI's books overstated the revised contract amount by $10,623. (This appears to have related to change orders as CCI recognized $183,782 of change orders while only $173,159 was confirmed by the owner; a difference of $10,623). CCI's books overstated totaled billings to date by $586,467. CCI's books also overstated accounts receivable ("current") by $176,476. (This appears to have been offset by CCI's understatement of retention by approximately the same amount). On their working papers analyzing the response from the owner, it appears that Brown Schultz incorrectly attempted to reconcile the above-detailed variances.

In regards to the $586,467 variance in regards to billings, it was noted by Brown Schultz that the amount confirmed by the owner excluded retention in the amount of $366,592. However, nowhere was it documented how this assertion was determined. In addition, assuming that Brown Schultz' assertion was accurate concerning retention, there still existed a difference in the amount of $219,875.

In regards to the variance in current receivables, Brown Schultz documented that the $219,875 variance noted in regards to billings was the same variance noted in regards to the receivables. However, Brown Schultz went on to conclude that these two variances would have

no income statement effect.  Rather, it would simply be a debit to the overbillings account (liability) and a credit to the receivables account (asset) in the amount of $219,875.  Therefore, no adjustment was made.  There are a number of issues raised by this conclusion.  Assuming Brown Schultz was correct in simply offsetting the two accounts, it appears that the entry should have been booked since the decrease of assets and liabilities may have effected such items as total assets, total current assets, and the current ratio.  This, in turn, may have had an impact on bank and surety underwriting decisions.  Moreover, this variance may have been an indication of weaknesses within CCI's internal financial reporting.  Nowhere is the reason for the variance documented.  In addition, nowhere is it documented why Brown Schultz felt it was not necessary to expand their audit procedures in regards to the billing and receivable functions.

Regarding the confirming of receivables, there also appears to have been a material difference noted on the "DGS 579-3.1" job (Job #445, Houtzdale Prison) between what was represented on CCI's books and what the owner confirmed.  CCI's books overstated totaled billings to date by $357,706.  CCI's books overstated accounts receivable ("current") by $94,726.  CCI's books overstated retention by $6,174.  On the working papers analyzing the response from the owner, it appears that Brown Schultz incorrectly attempted to reconcile the above-detailed variances.

In regards to the $357,706 difference in regards to billings, Brown Schultz noted that the amount confirmed by the owner excluded retention in the amount of $254,806.  However, nowhere was it documented how this assertion was determined.  In addition, assuming that Brown Schultz' assertion was accurate concerning retention, there still existed a difference in the amount of $102,900.

In regards to the variance in current receivables, Brown Schultz noted that the $102,900 variance noted in regards to billings was the same variance noted in regards to the receivables. However, Brown Schultz went on to conclude that these variances would have no income statement effect. Rather, it would simply be a debit to the overbillings account (liability) and a credit to the receivables account (asset) in the amount of $102,900. Therefore, no adjustment was made. There are a number of issues raised by this conclusion. Assuming Brown Schultz was correct in simply offsetting the two accounts, it appears that the entry should have been booked since the decrease of assets and liabilities may have effected such items as total assets, total current assets, and the current ratio. This, in turn, may have had an impact on bank and surety underwriting decisions. Moreover, this variance may have been an indication of weaknesses within CCI's internal financial reporting. Nowhere is this fact documented and nowhere is it documented why Brown Schultz felt it was not necessary to expand their audit procedures in regards to the billing and receivable functions.

It should be noted that there were significant errors based upon the receipt of the confirmations (together, totaling in excess of $320,000), that should have been an indication to Brown Schultz that there were significant deficiencies in CCI's financial cost systems for recording, among other things, job-related receivables, retention and overbillings.

Brown Schultz also erred in the treatment of indirect costs; namely, the presentation of the financial statements in relation to indirect costs appears not to be in accordance with GAAP. It appears that costs of contracts for each individual contract as represented on the "Earnings from Contracts," "Completed Contracts" and "Contracts-in-Progress" schedules included only direct costs (direct material, labor, subcontracting, and other direct costs); indirect costs and general and administrative expenses are charged to expense as incurred. (See Note 1 to the

financial statements.)  However, GAAP (see SOP 81-1) requires all indirect costs to be allocated

to individual contacts using a reasonable method.  Therefore, GAAP does not allow a line item

"Indirect Costs" to appear on the financial statements.  The result of this departure from GAAP is

that actual/estimated gross profit of each individual contract represented on the "Completed

Contracts" and "Contracts-in-Progress" was overstated by the amount of indirect cost that should

have been allocated to that job.

It does not appear that job site visits were performed or even considered when the audit

was planned.  Since this procedure was not performed (nor were confirmation letters set to

subcontractors), there was virtually no independent confirmation or other verification of

management's representations concerning the percentage of completion, the estimated costs to

complete as of the balance sheet date, and the status of pending (unapproved) change orders.  Nor

was Brown Schultz able to obtain any independent verification of problems on the jobs that

might not have been disclosed by management (with the exception of the confirmations received

from the owners).  It would also appear that in the particular situation of CCI, with jobs located

in many different states, there is little question that Brown Schultz would have gained a much

better knowledge of CCI's operations if job site visits were in fact performed.  This would be

especially critical since the compensation of CCI's key personnel (Shane Miller and Sherri

Phillips) was affected by the amount of gross profit on jobs and net income recognized.

## INTERROGATORY NO. 9

Identify all documents which support your contention that Brown Schultz's Audit Report
for the year ended December 31, 1997 was inaccurate, contained omissions and/or was
misleading.

**ANSWER NO. 9**

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage

of this legally and factually complex litigation to state in full detail the basis for any contention

for which some, if not much, of the factual support lies in the hands of persons other than

USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite

each and every fact, including each communication and document that would support each and

every assertion in the Complaint. As such, they are an improper use of interrogatories under the

Federal Rules of Civil Procedure. However, USF&G is providing responses to this interrogatory

based, for the most part, on information known or available to them at this time. These

responses do not include or incorporate information that will be obtained in the course of

discovery.

Without waiver of the general and foregoing objections, USF&G will make such

documents available for inspection and copying at a reasonable time and place pursuant to Fed.

R. Civ. P. 33(d). Such documents consist, in the main, of Brown Schultz' working papers, the

audit and tax file, correspondence and the appropriate audit reports, all of which were previously

produced by Brown Schultz.

**INTERROGATORY NO. 10**

For each inaccuracy and/or omission identified in response to interrogatory No. 8, is it
your contention that it was material to the issuance of the payment and performance bonds
identified in Paragraph 18 of the Complaint? If so, state the factual basis for your contention and
the sources of proof for the facts which support your contention.

**ANSWER NO. 10**

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage

of this legally and factually complex litigation to state in full detail the basis for any contention

for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. USF&G also states that the interrogatory is duplicative of information to be provided in expert reports which, pursuant to the Case Management Order dated August 17, 2001, are due on July 1, 2002. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery and USF&G reserves the right to amend its responses to reflect such information.

USF&G relied upon the unqualified opinion contained in the audit report in its decision as to the nature and extent of the bonding program it gave to CCI. The errors or omissions discussed in interrogatory 8 resulted in the audit report inaccurately reflecting CCI's true financial condition and numerous risks inherent in the maintenance of a bonding program. Since USF&G would not have issued the bonding program to CCI which it did if the inaccuracies contained in the 1996 Audit Report were known by USF&G, all inaccuracies referred to in the response to interrogatory no. 8 are material because of the cumulative effect they had on the accuracy of the audit.

## INTERROGATORY NO. 11

Is it your contention that defendants should have known of each of the inaccuracies and/or omissions identified in response to interrogatory no. 8 above? If so, state the factual basis for your contention and the sources of proof for the facts which support your contention.

## ANSWER NO. 11

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery and USF&G reserves the right to amend its responses to reflect such information.

In that, *inter alia*, the errors and omissions identified in response to interrogatory 4 were apparent to USF&G upon review of the working papers and could likely have been either eliminated or avoided by the implementation of procedural and substantive steps mandated by GAAP and reasonable professional standards of practice, Brown Schultz either knew or should reasonably have known of such inaccuracies and omissions.

## INTERROGATORY NO. 12

State the factual basis for your contention that Brown Schultz's Audit Report for the year ended December 31, 1998 was inaccurate, contained omissions and/or was misleading including but not limited to:

    a.    The nature of each inaccuracy and/or omission contained in the 1998 Audit Report; and

    b.    The manner in which the 1998 Audit Report was misleading.

## ANSWER NO. 12

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage

of this legally and factually complex litigation to state in full detail the basis for any contention

for which some, if not much, of the factual support lies in the hands of persons other than

USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite

each and every fact, including each communication and document that would support each and

every assertion in the Complaint. As such, they are an improper use of interrogatories under the

Federal Rules of Civil Procedure. USF&G also states that the interrogatory is duplicative of

information to be provided in expert reports which, pursuant to the Case Management Order

dated August 17, 2001, are due on July 1, 2002. However, USF&G is providing responses to this

interrogatory based, for the most part, on information known or available to them at this time.

These responses do not include or incorporate information that will be obtained in the course of

discovery and USF&G reserves the right to amend its responses to reflect such information.

Additionally, the instant response focuses on major inadequacies of the audited financial

statements for CCI for the year ended December 31, 1998 (the "1998 Audit Report") and is not

intended to be a complete recitation of all inaccuracies, omissions and representations contained

therein.

USF&G further states that some of the inaccuracies and omissions are relevant only when

viewed in the context of other audits of CCI performed by Brown Schultz. Accordingly, USF&G

incorporates herein by reference the responses to interrogatories nos. 4 and 8 as if fully set forth

herein.

As part of the statements that were issued for the year ended December 31, 1998, the

statement, as originally reported, contained current assets of $17.8 million, other assets of $6.8

million, total liabilities of $19.3 million and equity of $5.3 million. As restated, the current assets were $13.0 million, other assets were $6.8 million, liabilities were $20.1 million and equity was a negative $.3 million. The net effect of this is that retained earnings as originally reported were overstated by $5.6 million.

There was profit fade of $5.0 million on the work in process as of December 31, 1998. By overstating the estimated profit on these jobs Brown Schultz had materially overstated overbillings and net income for 1998. Brown Schultz did not properly allocate indirect costs and did not properly perform an audit of construction contracts in accordance with GAAS.

Form B-2; Part 1, "Checklist for Evaluating Business Risk and Overall Inherent and Audit Risk"; question 25 dealing with the safeguarding of assets, segregation of duties, management approvals and the oversight function, it appears that Brown Schultz improperly checked this off as "N/A." The fact that CCI was working in many different states where centralized management and strong central control over assets was not as strong as if all the work was performed near their Harrisburg office, Brown Schultz should have checked this questions as "YES" and considered this issue when planning the audit. This should have been a significant factor to be considered by Brown Schultz when planning the audit.

Included in Brown Schultz' working papers was the Guaranty Agreement dated December 1, 1998 between the Company and PCIC. Included in the agreement was the following: "PCIC will guarantee the claim that was filed by CCI in the amount of . . . $1,200,000 with the Department of General Services, Commonwealth of Pennsylvania, for the project known as Mahanoy State Correctional Institution . . . . If the Department of General Services, Commonwealth of Pennsylvania, fails to pay all of any part of the subject claim, PCIC will pay the difference owing or the full amount of the claim if no part of the claim is paid." The

following are observations concerning this agreement and its impact on the 1998 financial statements:

(a)    Although it was disclosed in the financial statements (under related party transactions) that PCIC is an entity owned by the sole shareholder of CCI, John Ortenzio, this fact was not documented in the working papers.

(b)    Nowhere was it documented, either in the planning phase or in any of the audit programs if consideration should have been made in determining if PCIC had the financial resources to pay this claim to CCI.

Assuming, *arguendo*, that Brown Schultz was correct in recognizing the claim as income in 1998, there appears to have been significant disclosure issues. These include that the amount of the claim was included as an "underbilling" (costs and estimated earnings in excess of billings). GAAP requires that this amount be disclosed as a "claim receivable."

Additionally, the following should have been disclosed in regards to this receivable (see AICPA Guide, para. 6.24 and SOP 81-1, para. 65):

(a)    The total receivable;

(b)    A description of the nature of the status of the principal items comprising the amount;

(c)    The portion, if any, expected to be collected after one year; and

(d)    Revenues from claims recognized.

It should be noted that property and equipment was a much more significant asset in 1998 than in 1997. In 1997, net property comprised approximately 8.7% of total assets, while in 1998, this percentage increased to approximately 27.5%. However, nowhere is it documented that

Brown Schultz expanded its audit testing in this area as the result of the increased significance of these assets.

Included in the Permanent File was an employment agreement dated October 3, 1997 between the Company and Shane A. Miller, CCI's Executive Vice-President and the individual responsible for field operations. This agreement provided for bonus incentives to be paid to Mr. Miller based upon CCI's net operating income. Essentially, the higher CCI's net income the higher Mr. Miller's bonus would be. Therefore, Brown Schultz should have planned the audit with the expectation that CCI's management would tend to overstate net income in order to realize the bonus. Moreover, this may be a possible explanation for the profit fade recognized by CCI subsequent to December 31, 1998 from represented amounts previously recognized.

Brown Schultz also erred relative to its treatment of the inclusion of at least a significant portion of unapproved (pending) change orders. There did not appear to be proper documentation for the inclusion of approximately $500,000 of this amount, according to GAAP. In addition, assuming, *arguendo*, that Brown Schultz was correct in recognizing the unapproved change orders, there was not proper disclosure of the approximately $600,000 of unapproved change orders included in the 1998 statements. Rather, it appears Brown Schultz simply "buried" these unapproved change orders together with underbillings and overbillings without proper disclosure.

In general, virtually no audit testing was performed in regards to verifying management's representations of costs to complete.

GAAP (SOP-81-1, para. 88) requires that provisions for losses on contracts be shown separately as liabilities on the balance sheet. Per the 1998 financial statements, included in the work-in-progress schedule, one job-in-progress (job #451, Lord Fairfax) was projected to incur a

loss of approximately $218,000. However, nowhere in the liability section of the balance sheet is this reflected. Rather, Brown Schultz noted on page 5 of the "Supplemental Disclosure Requirement-Construction" checklist indicates that the loss was included in the work-in-progress adjustment.

The 1998 financial statements ("Contracts-in-Progress" schedule) reflects an underbilling amount (Costs and estimated earnings in excess of billings) in excess of $6,300,000. Most of these underbillings relate to the following jobs:

| Job # | Job Name | Amount |
|-------|----------|--------|
| 439 | Mahonoy Prison | $1,216,401 |
| 450 | Johnstown | $ 449,818 |
| 454 | Albermarle Prison | $ 717,560 |
| 455 | Perry Point | $2,234,503 |
| 460 | Germ Plasma Center | $ 831,756 |
| 461 | Outlook-Chesterfield | $ 509,709 |

However, nowhere in the working papers was it documented that these significant underbillings were analyzed for reasonableness and the likelihood that CCI would eventually be able to bill the applicable owner these amounts.

In regards to the confirming of receivables, there appears to have a significant amount of unapproved (pending) change orders recorded as income in regards to the Lord Fairfax job (Job # 451) in the amount of $108,653.

In summary, CCI booked the following unapproved (pending) change orders as of December 31, 1998:

| Job # | Job Name | Amount |
|-------|----------|--------|
| 454 | Albemarle | $279,334 |
| 455 | Perry Point | 107,846 |
| 426 | U.E.P.H. Complex | 88,731 |
| 449 | U.E.P.H. Headquarters | 21,086 |
| 460 | Germ Plasma Center | 65,000 |
| 459 | Scott Air Force Base | 17,993 |
| 451 | Lord Fairfax | 108,653 |
| TOTAL | | $688,643 |

Brown Schultz documented its research into unapproved change orders as follows (from a "review" of the AICPA Audit and Accounting Guide for Construction Contractors):

"For all unpriced change orders, recovery should be deemed probable if the future event or events necessary for recovery are likely to occur. Some of the factors to consider in evaluating whether recover is probable are the customer's written approval of the scope of the change order, separate documentation for change order costs that are identifiable and reasonable, and the entity's favorable experience in negotiating change orders, especially as it relates to the specific type of contract and the change order being evaluated."

"If it is probable that the contract price will be adjusted by an amount that exceeds the costs attributable to the change order and the amount of the excess can be reliably estimated, the original contract price should also be adjusted for that amount when the costs are recognized as costs of contract performance if its realization is probable. Revenue in excess of the costs attributable to unpriced change orders should only be recorded in which realization is assured beyond a reasonable doubt, such as circumstances in which realization is assured beyond a reasonable doubt, such as circumstances in which an entity's historical experience provides such

assurance or in which an entity has received a bona fide pricing offer from a customer and records only the amount of the offer as revenue."

Brown Schultz went on to document that, "[p]er discussion with Stan Sechrist, V.P. of Operations, CCI is very conservative and will only add pending (unapproved) change orders to the contract amount if they are certain they will be approved.  In the past, CCI has not had any significant problems payment for any change orders (approved or unapproved)."

Finally, Brown Schultz documented that, "[p]er review of the prior year workpapers, the *majority* (emphasis added) of pending change orders recorded as of 12/31/97 had been authorized by the owner subsequent to the year end."

The following indicate possible errors in the booking of unapproved change orders by CCI as of and for the year ended December 31, 1998:

(1)      In prior years, it had not been CCI's practice to book and recognize unapproved change orders.  This, in turn, assuming, *arguendo*, that CCI was correct in recognizing these unapproved change orders, and assuming there were unapproved/pending change orders in prior years which were not recognized until 1998, probably caused a distortion of 1998 income.

(2)      It is not clear what Brown Schultz intended to document by stating that "the *majority* of pending change orders recorded as of 12/31/97 had been authorized by the owner subsequent to the year end."  (emphasis added).  If the amount ultimately authorized was only 51% of the total population (majority), then Brown Schultz may have had to modify this representation.  In addition, it is not clear what audit procedures (if any) were performed on prior year pending change orders in order to formulate this conclusion (with the exception of "reviewing prior year workpapers" and inquiries of some members of management).

(3)    To be able to book an unapproved change order, consideration must be made of whether the change order has been priced and whether the price and scope have been approved by the owner.

Summarily, based solely on documentation provided by Brown Schultz, the following pending change orders appear to not have been recorded in accordance with GAAP:

| Job # | Job Name | Amount |
|-------|----------|--------|
| 454 | Albemarle | $279,334 |
| 455 | Perry Point | 107,846 |
| 460 | Germ Plasma Center | 65,000 |
| 459 | Scott Air Force Base | 17,993 |
| 451 | Lord Fairfax | 31,742 |
| TOTAL | | $501,915 |

Accordingly, it appears that Brown Schultz may have overstated revenues and net income by approximately $501,915. (This would give Brown Schultz "credit" for U.E.P.H. Complex in the amount of $88,731, U.E.P.H. Headquarters in the amount of $21,086, and a portion of Lord Fairfax in the amount of $76,944.) However, even under the assumption that GAAP would have permitted recognizing these pending change orders as of and for the year ended December 31, 1998, the following were required to be disclosed in the 1998 financial statements:

(1)    The total receivable;

(2)    A description of the nature and status of the principal items comprising the amount;

(3)    The portion, if any, expected to be collected after one year; and

(4)    Revenues from claims recognized.

It appears that Brown Schultz did not disclose any of the above, but simply "buried" the amounts of the pending change orders together with underbillings and overbillings reported on other jobs.

In Brown Schultz' audit program concerning completed contracts, the procedure used was as follows: "Selected two jobs included in the completed contract listing . . . which were between 40% and 80% complete in the prior year, in order to get a good test of the client's estimating procedures." It was not documented why Brown Schultz did not choose jobs that were less than 40% or greater than 80% complete of December 31, 1997. It appears that this test should have been expanded to include jobs in various stages of completion as of December 31, 1997 in order to analyze CCI's estimating ability in regards to location, project manager, type of work, etc. This analysis should then have been used for determining the reasonableness of management's representations as of December 31, 1998. Therefore, Brown Schultz' conclusions that based on analyzing two jobs completed in 1997 that were between 40% and 80% complete as of December 31, 1997, the client's estimating procedures were consistent with the prior years may have been flawed.

In relation to the testing of CCI's job cost system, it appears that only the following procedures were performed:

-    25 job cost items (12 related to payroll and 13 related to other costs) were "haphazardly" selected and testing. This testing included:

(a)    Obtaining the purchase and payroll journals for the year;

(b)    Requesting the Company provide the appropriate documentation for the job costs "haphazardly" selected (i.e., purchase order and invoice), subcontract agreement, timesheet, etc.; and

(c)    Ascertaining that the cost was coded to the correct job by review of source documentation and job cost history reports.

Brown Schultz did not document why testing only 25 items was adequate in expressing their opinion.  In addition, nowhere was the definition of a "haphazard" sample documented nor is there documentation concerning what procedures were employed by Brown Schultz to determine which individual items of the population were sampled.)

The obtaining of the summary of contracts as of December 31, 1998 also appears flawed. This schedule should include what would normally be found on a contractor's work-in-progress schedule.  However, the audit program did not detail any audit procedures Brown Schultz was to perform on this schedule.

There also appears to be error regarding obtaining of the contracts in progress at the balance sheet date.  From this schedule, the auditor was to perform the following tasks:

(1)     Determine which jobs were in process at year-end based upon percentage of completion and discussion with the client.  The program instructed the auditor to exclude contracts greater than 97% complete or les than 3% started.

(2)     For substantially completed contracts, the program instructed the auditor to verify that no significant costs were recorded after year-end.  Also the auditor was instructed to verify with the client that the job was substantially complete.  It should be noted that Brown Schultz documented that "[a]ll necessary costs were accrued as 12/31/98 and the jobs were listed in the completed contract listings."  However, nowhere was it documented what testing was performed by Brown Schultz to reach this conclusion.

There was also error regarding obtaining of signed contract and change orders in that there was a failure to note agreement as to job number, job name and contract amount.

CCI was improperly omitting some of the indirect costs from the cost of each individual contract in 1998.  This omission had the effect of overstating gross profit for each individual

contract in progress and completed by the amount of allocable indirect costs that should have been allocated.

In addition, it does not appear that projected indirect costs needed to complete the jobs were included in management's estimated costs to complete as of December 31, 1998.

Both GAAP and tax rules require that indirect costs be allocated to contracts, regardless of whether the percentage-of-completion or completed-contract method is used. Moreover, a significant error in the allocation of indirect costs could indicate a major problem with the company's bidding procedures (management may be bidding contracts at a loss). Also, Brown Schultz should have noted that indirect costs must also have been allocated to estimated costs to complete for all contracts still in progress as of December 31, 1998, 1997, and 1996.

It appears that Brown Schultz performed limited testing on the adequacy of management's estimate of costs to complete included on the work in progress. These procedures included comparing actual costs incurred subsequent to year-end and estimated costs to complete as of December 31, 1998 and comparing original estimates and total estimated costs to complete the job. In regards to the second procedure detailed above (comparing original estimates and total estimated costs to complete the job), it appears that Brown Schultz tested all ten jobs-in-progress. This test produced the following results in regards to the gross profit percentage as originally estimated, the gross profit percentage as of December 31, 1998 ("WIP"), and the amount of profit increase (slippage) recognized between the time the job was originally bid and as of December 31, 1998:

| Job # | Original Projection % | "WIP" @12/31/98 % | Dollar amount of Increase (Slippage) |
|---|---|---|---|
| 454 | 6.63% | 11.35% | $764,754 |
| 460 | 2.78% | 5.77% | $466,976 |
| 450 | 1.46% | .66% | ($26,064) |
| 451 | 10.11% | (3.08%) | ($914,055) |
| 461 | 6.24% | 5.53% | ($27,840) |
| 456 | 10.98% | 10.77% | ($4,776) |
| 462 | 6.73% | 6.65% | ($4,310) |
| 455 | 9.09% | 11.39% | $313,189 |
| 459 | 7.43% | 6.33% | ($76,784) |
| 439 (A) | (.41%) | (4.06%) | ($374,578) |

On each page of the analysis, Brown Schultz attempted to explain these significant "swings" (which appear to have gone "both ways" in regards to gross profit). However, none of the explanations provided documentation that inquiries were made of project managers associated with each job.

In addition, the fact that large variances between original projections and current represented results (while the job was still in progress) should have been an indication to Brown Schultz that further inquiries and audit procedures should have been performed.

Included in the 1998 working papers was one titled "CCI Construction Management Work-in-Progress" (BSSF 2075). Detailed on this schedule were billings and costs incurred in 1998 in regards to contracts that were considered completed during 1997. This schedule documents that overstated costs were understated. The 1998 income statement impact of these billings and cost errors are as follows:

| | |
|---|---|
| Overstated revenue | $111,935 |
| Understated costs | $148,743 |
| Total overstatement of 1997 net income | $260,678 |

On the "Disclosure Requirement" checklist, page -23-, question 8 deals with the inclusion of a "Going Concern" disclosure in the financial statements.  SAS No. 59 (AU 341.02) requires the auditor to "evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited."  A contractor's inability to complete contracts or obtain required performance bonds would be a serious indication of a going concern problem.  The auditor should consider whether information obtained from audit procedures applied during the audit identifies conditions and events that indicate there could be substantial doubt about the contractor's ability to continue as a going concern for a reasonable period of time.  Examples of conditions and events which may have applied to the Company as of December 31, 1998 indicating a possible substantial doubt about CCI's ability to continue as a going concern include, without limitation, the following:

(1)     Negative trends such as recurring operating losses, working capital deficiencies, and declining backlog levels;

(2)     Internal matters such as labor difficulties, substantial dependence on the success of a particular contract, and loss of key people;

(3)     External matters such as denial of a surety bond, significant legal proceedings, and environmental legislation with potential adverse effects; and

(4)     Projected negative cash flow on the Company's jobs-in-progress as of the balance sheet date.

Generally, if a contractor incurs substantial losses on contracts that have been front-end loaded (thereby creating significant "overbillings"), a cash deficiency toward the end of those contracts may be experienced.  The deficiency may prevent the contractor from meeting current

obligations, and the contractor may have to front-end load new contract in order to generate funds to meet those obligations. The necessity to generate cash may cause the contractor to accept jobs that are only marginally profitable. This issue is specifically discussed in the AICPA Guide at Paragraph 11.11. It appears that Brown Schultz took none of the foregoing into account in planning or conducting its audit, particularly as regards going-concern disclosures.

It does not appear that job site visits were performed or even considered when the audit was planned. Since this procedure was not performed (nor were confirmation letters sent to subcontractors), there was virtually no independent confirmation or other verification of management's representations concerning the percentage of completion and the estimated costs to complete as of the balance sheet date. Nor was Brown Schultz able to obtain any independent verification of problems on the jobs that might not have been disclosed by management (with the exception of the confirmations received from the owners).

Brown Schultz also erred in the treatment of indirect costs; namely, the presentation of the financial statements in relation to indirect costs appears not to be in accordance with GAAP. It appears that costs of contracts for each individual contract as represented on the "Earnings from Contracts," "Completed Contracts" and "Contracts-in-Progress" schedules included only direct costs (direct material, labor, subcontracting, and other direct costs); indirect costs and general and administrative expenses are charged to expense as incurred. (See Note 1 to the financial statements.) However, GAAP (see SOP 81-1) requires all indirect costs to be allocated to individual contacts using a reasonable method. Therefore, GAAP does not allow a line item "Indirect Costs" to appear on the financial statements. The result of this departure from GAAP is that actual/estimated gross profit of each individual contract represented on the "Completed

Contracts" and "Contracts-in-Progress" was overstated by the amount of indirect cost that should have been allocated to that job.

## INTERROGATORY NO. 13

Identify all documents which support your contention that Brown Schultz's Auditor's Report for the year ended December 31, 1998 was inaccurate, contained omissions and/or was misleading.

## ANSWER NO. 13

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatory call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery.

Without waiver of the general and foregoing objections, USF&G will make such documents available for inspection and copying at a reasonable time and place pursuant to Fed. R. Civ. P. 33(d). Such documents consist, in the main, of Brown Schultz' working papers, the audit and tax file, correspondence and the appropriate audit reports, all of which were previously produced by Brown Schultz.

## INTERROGATORY NO. 14

For each inaccuracy and/or omission identified in response to interrogatory No. 12, is it your contention that it was material to the issuance of the payment and performance bonds identified in Paragraph 20 of the Complaint? If so, state the factual basis for your contention and the sources of proof for the facts which support your contention.

## ANSWER NO. 14

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. USF&G also states that the interrogatory is duplicative of information to be provided in expert reports which, pursuant to the Case Management Order dated August 17, 2001, are due on July 1, 2002. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time and USF&G reserves the right to amend its responses to reflect such information. These responses do not include or incorporate information that will be obtained in the course of discovery.

USF&G relied upon the unqualified opinion contained in the audit report in its decision as to the nature and extent of the bonding program it gave to CCI. The errors or omissions discussed in interrogatory 4 resulted in the audit report inaccurately reflecting CCI's true financial condition and numerous risks inherent in the maintenance of a bonding program. Since USF&G would not have issued the bonding program to CCI which it did if the inaccuracies contained in the 1996 Audit Report were known by USF&G, all inaccuracies referred to in the

response to interrogatory no. 12 are material because of the cumulative effect they had on the accuracy of the audit.

## INTERROGATORY NO. 15

Is it your contention that defendants should have known of each of the inaccuracies and/or omissions identified in response to interrogatory no. 12 above? If so, state the factual basis for your contention and the sources of proof for the facts which support your contention.

## ANSWER NO. 15

USF&G objects to this interrogatory on the grounds that it is impossible at this early stage of this legally and factually complex litigation to state in full detail the basis for any contention for which some, if not much, of the factual support lies in the hands of persons other than USF&G. In essence, this and the following contention interrogatories call upon USF&G to recite each and every fact, including each communication and document that would support each and every assertion in the Complaint. As such, they are an improper use of interrogatories under the Federal Rules of Civil Procedure. However, USF&G is providing responses to this interrogatory based, for the most part, on information known or available to them at this time. These responses do not include or incorporate information that will be obtained in the course of discovery and USF&G reserves the right to amend its responses to reflect such information.

In that, *inter alia*, the errors and omissions identified in response to interrogatory 4 were apparent to USF&G upon review of the working papers and could likely have been either eliminated or avoided by the implementation of procedural and substantive steps mandated by GAAP and reasonable professional standards of practice, Brown Schultz either knew or should reasonably have known of such inaccuracies and omissions.

## INTERROGATORY NO. 16

Identify all persons whom USF&G expects to call as expert witnesses at the trial of this action and describe their training, experience, employments history, educational background and fields of expertise.

## ANSWER NO. 16

Without waiver of the general objections, USF&G states that it has not yet decided whom it will call as expert witnesses at the trial of this action. USF&G will identify such individuals in accordance with the appropriate provisions of the Case Management Order.

## INTERROGATORY NO. 17

With regard to each person listed in response to the preceding interrogatory describe with specificity:

      a.     the subject matter upon which each expert is expected to testify at the time of trial;

      b.     the substance of the facts and opinions to which the expert is expected to testify; and

      c.     a summary of the grounds of each opinion.

## ANSWER NO. 17

Without waiver of the general objections, USF&G states that it has not yet decided whom it will call as expert witnesses at the trial of this action. USF&G will identify such individuals in accordance with the appropriate provisions of the Case Management Order.

Anthony Phillips, being first duly sworn, deposes and says that he is authorized by

USF&G to respond to the foregoing Interrogatories; that while he does not have personal

knowledge of all of the facts recited in the foregoing responses, the information contained therein

has been collected and made available to him by others, and the responses to the interrogatories

are true to the best of his knowledge and belief based upon the information made available to

him.

UNITED STATES FIDELITY &
GUARANTY COMPANY,

*Anthony P. Phillips*

By:

Its duly authorized:

COMMONWEALTH OF PENNSYLVANIA

_____, ss.                    *December 11*, 2001

Then personally appeared the above-named Anthony Phillips, duly authorized
representative of United States Fidelity & Guaranty Company and acknowledged the foregoing
instrument to be the free act and deed of said corporation, before me.

*J. M. Violante*

NOTARY PUBLIC
Print Name:_____
My Commission expires:_____

Notarial Seal
Joan M. Violante, Notary Public
Whitpain Twp., Montgomery County
My Commission Expires Nov. 22, 2003

-43-

AS TO OBJECTIONS:

UNITED STATES FIDELITY
 & GUARANTY COMPANY,
By its attorneys,

_____
Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA  02110
Telephone:    (617) 790-3000

and

Jeffrey Rettig, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:    (717) 237-7100

Dated: December  7 , 2001
#233259 v1/36432/87

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

June 5, 2002

Bruce D. Levin
DIRECT DIAL: (617) 790-3314
e-mail: blevin@bgblaw.com

*VIA FACSIMILE*

Kathleen Carson, Esquire
Swartz Campbell Detweiler
1601 Market Street
Philadelphia, PA  19103-2316

Re:     United States Fidelity & Guaranty Company v. Brown Schultz Sheridan & Fritz

Dear Kathleen:

I am writing pursuant to Local Rule 7.1 to solicit your views regarding an amendment to the Case Management Order regarding expert disclosures.

As you know, the latest scheduling order provides for my client to submit expert reports no later than July 22, 2002.  Your client is required to submit expert reports no later than August 21, 2002.  Any supplement to those reports should be submitted by October 18, 2002.

No later than July 22, 2002, my client intends to submit a report concerning an expert that will discuss whether Brown Schultz complied with pertinent accounting and auditing standards of practice.  Based upon the information contained therein, your client will be able to respond to the issues raised in that expert report prior to August 21, 2002.

Based on various exchanges during the discovery process, it appears that you client may assert as defenses certain issues possibly requiring the introduction of expert testimony.  Because the exact topics for which your client may introduce expert testimony will be unknown by my client until approximately August 21, 2002, it will be difficult, if not impossible, for my client to produce reports or to designate experts as to topics for which it is currently unaware. Accordingly, my client is considering filing a motion that would provide it with 30 days from receipt of Brown Schultz' expert reports to file expert reports (and designate experts) in rebuttal to the reports received from your client.

Please let me know if your client is amenable to such an amendment or if it will be necessary to file a motion with the Court.

**BERNKOPF, GOODMAN & BASEMAN LLP**

Kathleen Carson, Esquire
June 5, 2002
Page 2

Please feel free to call me if you have any questions or comments.

Very truly yours,

Bruce D. Levin

cc:    Peter B. McGlynn, Esquire
       Mark Holtschneider, Esquire
BDL/mlb
#246729 v1/36432/87

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | | |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff | ) ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | ) ) ) ) ) | JUDGE KANE |

## [PROPOSED] ORDER REGARDING MOTION TO AMEND
## CASE MANAGEMENT ORDER REGARDING EXPERT REPORTS

AND NOW, this _____ day of _____, 2002, upon consideration of United

States Fidelity & Guaranty Company's Motion to Amend Case Management Order Regarding

Expert Reports, it is hereby ORDERED that the motion is GRANTED and the deadlines in the

August 17, 2001 Case Management Order, as modified by the Order dated May 8, 2002, are

modified as set forth below:

    Submission of Rebuttal Expert Reports

        USF&G                      9/20/02

All other dates and/or deadlines in the August 17, 2001 Case Management Order, as

modified by the Order dated May 8, 2002, remain in effect.

               By the Court:

_____

Dated: _____, 2002
#246993 v1/36432/87

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | | |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, | ) ) ) | |
| Plaintiff | ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| v. | ) ) | JUDGE KANE |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, | ) ) ) | |
| Defendants. | ) ) | |

## MOTION TO AMEND CASE MANAGEMENT
## <u>ORDER REGARDING EXPERT REPORTS</u>

United States Fidelity & Guaranty Company ("USF&G") hereby moves to amend the

Case Management Order to provide that USF&G have the opportunity to submit expert reports

and designate experts that may be needed in response to experts designated by Brown Schultz

Sheridan & Fritz and Bruce J. Brown (collectively, "Brown Schultz").

In support of this Motion, USF&G avers and asserts as follows:

1.      By this action, USF&G has asserted a cause of action of negligent

misrepresentation by which it seeks to recover from Brown Schultz damages incurred by USF&G

relative to performance and payment bonds underwritten by USF&G on behalf of CCI

Construction ("CCI") based on audits of CCI prepared by Brown Schultz.

2.      According to the Case Management Order dated August 17, 2001, as amended by

Order dated May 8, 2002, the deadline for submission of expert reports by USF&G is July 22,

2002. The deadline for submission of expert reports by Brown Schultz is August 21, 2002. Any supplements to reports shall be submitted on or before October 18, 2002.

3.      USF&G intends to submit an expert report as to what it avers are various auditing and accounting errors by Brown Schultz no later than July 22, 2002. This USF&G believes will be the only expert necessary for USF&G to prove its *prima facie* case – which requires, *inter alia*, that USF&G prove that Brown Schultz did not exercise the skill and knowledge normally possessed by accountants in the community relative to audit reports prepared by Brown Schultz. *See, Robert Wooler Co. v. Fidelity Bank*, 370 Pa. Super. 523, 479 A. 2d 1027 (1984); Restatement (Second) of Torts §299A. Possessed of this expert's report no later than July 22, 2002, Brown Schultz will have the opportunity to retain an expert and submit expert reports in support of its position on the issues raised by USF&G.

4.      USF&G proposes that no later than July 22, 2002 that USF&G submit the report of its expert on accounting standards and practices. No later than August 21, 2002, Brown Schultz may submit its rebuttal expert. In the event that Brown Schultz seeks to designate any experts other than its rebuttal expert on accounting, Brown Schultz shall also file the appropriate expert reports by that date. USF&G will then have thirty (30) days after Brown Schultz' deadline – until September 20, 2002 – to file expert reports in rebuttal to the designations made by Brown Schultz.

5.      In essence, the relief sought by USF&G is justified for the same reason that Brown Schultz' expert reports need not be submitted until 30 days after USF&G has done so; to wit, it is difficult, if not impossible, for a party to determine the nature of all expert testimony it may need until the other party has fully made known the detailed nature of its claims (or, as applicable to Brown Schultz, its defenses). During the course of discovery, it has become

apparent that Brown Schultz may rely upon various affirmative defenses – such as failure to mitigate – for which it will bear the burden of proof.  Unless and until expert reports are provided by Brown Schultz, USF&G is unable to submit any expert reports to rebut or respond to such defenses.

6.    The relief sought by USF&G is not prejudicial to Brown Schultz.  Brown Schultz will be in possession of USF&G's expert reports prior to the date Brown Schultz must submit its own such reports.  Brown Schultz will be given full opportunity to respond to issues and topics raised by USF&G.  Moreover, if Brown Schultz believes further issues and topics require expert testimony, it will be fully able to submit appropriate expert reports; USF&G merely seeks the ability to timely respond to any such expert reports.  Moreover, the approach suggested by USF&G will likely result in considerable savings for both sides.  In addition to being highly speculative, it would be expensive and wasteful for USF&G to retain experts and to provide expert reports on topics that may never be raised at trial.  If USF&G submits expert reports on speculative topics solely to preserve its rights, Brown Schultz may have to retain experts and submit expert reports to rebut testimony and topics that it might not otherwise present at trial.

WHEREFORE, USF&G respectfully requests that the Court issue an order:

1.    Allowing USF&G a period of 30 days in which to file expert reports in rebuttal to expert reports submitted by Brown Schultz, other than those submitted by Brown Schultz in rebuttal to USF&G's expert reports; and

2.    Providing such other and further relief as is just and proper.

UNITED STATES FIDELITY
& GUARANTY COMPANY,
By its attorneys,

Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA  02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

and

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:    (717) 237-7100
Facsimile:    (717) 237-7105

Dated: June 10, 2002
#246749 v1/36432/87

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above
document was served upon (each party appearing
pro se and) the attorney of record for each other party
by mail (by hand) 6/10/0 2

-4-

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | | |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff | ) ) ) ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| v. | ) ) | JUDGE KANE |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | ) ) ) ) | |

## STATEMENT REGARDING COMPLIANCE WITH LOCAL RULE 7.1

Pursuant to Local Rule 7.1, counsel for United States Fidelity & Guaranty Company ("USF&G") states that prior to filing the Motion to Amend Case Management Order Regarding Expert Reports it attempted in good faith to resolve relevant issues. On or about June 5, 2002, counsel sent a letter seeking concurrence with that Motion or, in the alternative, suggestions for any possible compromise. No response was received. On June 7, 2002, an e-mail message was sent to Kathleen Carson, Esquire, counsel for Bruce J. Brown and Brown Schultz Sheridan & Fritz seeking, again, to solicit counsel's views on this matter. No response was received.

USF&G files herewith and incorporates herein the Motion to Amend Case Management Order Regarding Expert Reports.

UNITED STATES FIDELITY
& GUARANTY COMPANY,
By its attorneys,

_____

Peter D. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA  02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

and

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:    (717) 237-7100
Facsimile:    (717) 237-7105

Dated: June 10, 2002
#247038 v1/36432/87

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each other party by mail (by hand) 6/10/02

-2-

12:46 JUN 14, 2002  TO: JEFFREY B. MCCARRON  FR: SCAN31                    #11915  PAGE: 2/2

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, <br> Plaintiff <br><br> v. <br><br> BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, <br> Defendants. | CIVIL ACTION NO. 1:01-CV-00813 <br><br> **FILED** <br> JUDGE KANE    HARRISBURG, PA <br><br> JUN 1 4 2002 <br><br> MARY E. D'ANDREA CLERK <br> Per _____ |

### [PROPOSED] ORDER REGARDING MOTION TO AMEND
### CASE MANAGEMENT ORDER REGARDING EXPERT REPORTS

AND NOW, this 14TH day of ___June___, 2002, upon consideration of United

States Fidelity & Guaranty Company's Motion to Amend Case Management Order Regarding

*(Doc. 29)*

Expert Reports, it is hereby ORDERED that the motion is GRANTED and the deadlines in the

August 17, 2001 Case Management Order, as modified by the Order dated May 8, 2002, are

modified as set forth below:

Submission of Rebuttal Expert Reports

USF&G                                        9/20/02

All other dates and/or deadlines in the August 17, 2001 Case Management Order, as

modified by the Order dated May 8, 2002, remain in effect.

By the Court:

_J. Andrew Smyser_

Dated: ___June 14___, 2002
#246993 v1/36432/87

06/14/02  FRI 12:41  [TX/RX NO 9273]

E

☒003

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(HARRISBURG DIVISION)

UNITED STATES FIDELITY
AND GUARANTY COMPANY,
      PLAINTIFF

v.

BRUCE J. BROWN AND BROWN,
SCHULTZ, SHERIDAN & FRITZ
      DEFENDANTS

:
:
:
:
:
:
:
:
:
:
:

NO. 1:01 CV 00813
(JUDGE KANE)

## EXPERT REPORT OF STEVE J. DeBRUYN, CPA

      I am a Certified Public Accountant and am a Partner in the firm of Clifton Gunderson

LLP. I also serve as the Construction Contractor Industry Group Leader for Clifton Gunderson

LLP. A copy of my *Curriculum Vitae* is attached hereto as Exhibit "A." I am being

compensated for my professional services at the rate of $250 per hour.

      I have been engaged by Bernkopf, Goodman & Baseman LLP to determine if I could

render certain opinions concerning the audit procedures performed by and conclusions reached

with respect to the audited financial statements prepared by Brown, Schultz, Sheridan & Fritz

("Brown Schultz") for CCI Construction Company, Inc. ("CCI") for the fiscal years ended

December 31, 1996, 1997 and 1998. I have determined that I am able to render such opinions.

      In connection with my engagement, I have reviewed the audit procedures and

conclusions reached by Brown Schultz as they relate to that firm's audits of CCI for the calendar

years ended in 1996, 1997 and 1998 (the "Audit Reports"). In particular, I analyzed whether the

audit procedures and conclusions conformed to Generally Accepted Accounting Principles (GAAP) and Generally Accepted Auditing Standards (GAAS).

In analyzing the Audit Reports, I have reviewed and relied upon the following documents:

- Brown Schultz' audit workpapers for CCI for the fiscal years ended December 31, 1996, 1997, & 1998.

- Brown Schultz' "Permanent File" for CCI.

- AICPA TECHNICAL PRACTICE AIDS, Statement of Position 81-1, Accounting for Performance of Construction – Type and Certain Production-Type Contracts, July 15, 1981;

- AICPA AUDIT AND ACCOUNTING GUIDE FOR CONSTRUCTION CONTRACTORS, May 1, 1997

- Statement on Auditing Standards No. 47, Audit Risk & Materiality In Conducting An Audit (American Institute of Certified Public Accountants, 1983);

- Statement on Auditing Standards No. 57, Auditing Accounting Estimates (American Institute of Certified Public Accountants, 1988);

- FAS No. 5, Accounting for Contingencies; March 1975

- FAS No. 57, Related Party Disclosures; March 1982.

- Statement on Auditing Standards No. 22, Planning and Supervision, (American Institute of Certified Public Accountants 1978).

- Statement on Auditing Standards No 31, Evidential Matter, (American Institute of Certified Public Accountants 1980).

- Depositions of Bruce J. Brown dated January 17, 2002 and a preliminary draft of

the deposition of July 19, 2002;  I have also reviewed portions of the deposition of Sherri Phillips, taken on July 10, 2002, and portions of the deposition of Deborah Bowman dated May 21, 2002.

- Various pleadings filed in the above-captioned action;

- 1998 Audited Financial Statements prepared by Brown Schultz for Pennsylvania Contractors Insurance Co., Inc. ("PCIC");

- Brown Schultz' work papers for the audit of "PCIC" for the fiscal year ended December 31, 1998; ·

- Work in process schedule as of December 31, 1999 prepared by CCI personnel.

In general, for reasons explained below, it is my opinion that the audit work performed by Brown Schultz for CCI for the fiscal years ended December 31, 1997 and 1998 did not conform to applicable standards of care of a Certified Public Accountant and this resulted in material misstatements and omissions in Brown Schultz' 1997 and 1998 Audit Reports. Specifically, the negligent audit work performed by Brown Schultz resulted in an overstatement of both income and equity in the amount of $815,960 for 1997 and $3,126,508 for 1998.  It is also my opinion that these misstatements were material to the financial position of CCI.

The primary causes of the material misstatements in the 1997 and 1998 Audit Reports include, but are not limited to, the following:

1.     Brown Schultz' workpapers demonstrate Brown Schultz' failure to properly assess the risk involved with the audit of CCI from 1996 through 1998. Because of this failure to properly identify the risks associated with CCI, Brown Schultz' audit programs and its audit fieldwork were inadequate to provide the required assurance that the Audit Reports were fairly presented in accordance with GAAP.  A primary objective of an audit is to identify high-risk

audit areas and plan the audit procedures accordingly.  Brown Schultz' workpapers identified high-risk characteristics in both CCI and CCI's individual contracts.  Brown Schultz' audit planning work papers for 1996, 1997 and 1998 were virtually identical to each other and did not reflect any of the increasing audit risks inherent in the CCI audit engagement.  Further, the audit work performed by Brown Schultz for the fiscal years ended December 31, 1996, 1997 and 1998 did not change materially from year to year.  This is significant in light of the fact that the audit risk profile of CCI was increasing in each successive year due to the following:

- A significant dollar volume of work was being performed by CCI's subcontractors.

- Brown Schultz' knowledge of and its documentation of past and present claims and defaults with respect to CCI's subcontractors;

- CCI's expansion in new geographical areas;

- The profit fades noted by Brown Schultz on contracts completed in subsequent years required Brown Schultz to question the reliability of CCI's management's ability to estimate costs-to-complete;

- At the end of 1997 and throughout 1998, CCI was self-performing some of the work which it previously subcontracted to others and purchased a substantial amount (approximately $7 million) of construction equipment;

- CCI was not properly allocating indirect costs to individual contracts;

- The presence of significant related-party transactions.

2.    There were inadequate audit procedures performed by Brown Schultz in the areas of contracts-in-progress; specifically, the design and implementation of substantive procedures in connection with accumulated costs and estimated costs to complete.  In my opinion, undue

- 4 -

reliance was placed by Brown Schultz on CCI management's assertions with respect to costs to complete and estimated profits. The determination of the accuracy of the accumulated costs to date and the estimated costs-to-complete is critical to contractors like CCI using the percentage of completion method of accounting.

Brown Schultz acknowledged that its testing of contract costs was a test of CCI's cost controls only. This was inappropriate under the circumstances extant here. The testing of 25 costs was a test of transactions which an auditor can use to make qualitative assessments from the results. However, such testing does not replace the need to perform substantive procedures, such as vouching significant contract costs and analytical review. CCI had significant direct costs related to subcontractors and there was documentation contained in Brown Schultz' workpapers relating to past and present claims with subcontractors as well as evidence of subcontractor defaults. Nonetheless, Brown Schultz did not send out any subcontractor confirmations, nor does Brown Schultz' "Permanent Files" or its work papers demonstrate that it read any subcontracts and other similar construction agreements. In addition, Brown Schultz specifically excluded any testing of unrecorded liabilities for any job related expenses. Instead, as noted above, Brown Schultz relied on a test of 25 "haphazardly" selected costs throughout each year and there was no evidence that Brown Schultz performed any analytical procedures related to accumulated job costs.

The estimated costs-to-complete contained in the 1996, 1997 and 1998 Audit Reports were deficient in that they relied on CCI's representations with no documentation substantiating CCI's management estimates other than they had allegedly been verified by Sherri Phillips, CCI's chief financial officer and/or Stan Sechrist, CCI's Vice President - Construction Operations. In 1998, CCI was estimating gross profits on several contracts-in-progress that were

materially higher than the historical or originally projected amounts. Subsequent review revealed that these contracts had significant profit fades and one job - no. 454 - had a loss of $957,000.00, and profit fade from the 1998 workpaper of approximately $2,600,000. Also, Brown Schultz' 1998 workpaper files contained no evidence of any consideration of the allocation of indirect costs to estimated costs to complete despite Brown Schultz' knowledge that CCI was self performing more of its subcontract work than in the past. In addition, there was no follow - up between the documented preliminary analytical review work and the final work, despite a material increase in the net over/underbillings. Brown Schultz also failed to document the reasons for the significant underbillings reported at the end of the 1998 year.

There was no evidence in Brown Schultz' workpapers for the 1996, 1997 and 1998 Audit Reports that Brown Schultz read one or more of the contracts for guarantees, penalty and incentive provisions or cancellation and postponement provisions.

3.        There was inappropriate recording and inadequate disclosure of related-party transactions between PCIC and CCI. It is my opinion that Brown Schultz sanctioned the recording of $1,162,460 of revenue in 1998 from PCIC, a related-party to CCI. The transaction involved the guarantee or insurance of a third party contract claim by PCIC; a company owned by the sole owner of CCI. Brown Schultz also performed the audit work on PCIC. The third party contract claim did not meet the recognition standards set forth in SOP 81-1, and in my opinion the guarantee by the related party did not support the recognition of revenue. In addition, the recording and disclosure of the third party transaction was misleading to the user of the 1998 Audit Report. Further, the related-party transaction was recorded as an underbilling instead as a separate line item on the balance sheet. The result was a material misstatement to the 1998 Audit Report of $1,162,460.

In summary, Brown Schultz' workpapers demonstrated that undue reliance was placed on CCI management's assertions; the workpapers fail to demonstrate adequate independent verification, and do not support the conclusions reached by Brown Schultz as they relate to the Audit Reports for calendar years 1997 and 1998. In addition, Brown Schultz' workpapers have numerous other deficiencies including, without limitation, the following:

- Lack of documentation of time to indicate the partner in charge participated in the audit planning in 1998;

- The financial disclosure checklist included in the audit workpapers does not appear to be reviewed;

- Job site visits were not done and considerations not documented; and

- 1998 search for unrecorded liabilities did not go through the last day of fieldwork.

Attached hereto as Exhibit B-1 and B-2 are comparisons of CCI's Balance Sheets and Income Statements containing those adjustments warranted as a result of the defects and deficiencies in the procedures for and preparation of the Audit Reports for CCI for the fiscal years ended December 31, 1997 and 1998.

During my review of the 1996 audit workpapers, I noted that the audit procedures performed were similar to the 1997 and 1998 audits.

This report is subject to revisions based upon any other information which is obtained during discovery in the above-captioned action.

Dated: July 22, 2002                          Steve J. DeBrun, CPA
#340855 v1/J6432/37

- 7 -

JUL-30-02  05:10PM    FROM-BROWN SCHULTZ SHERIDAN & FRITZ        717-737-6655        T-505   P.19/49   F-308

07/22/02  MON 17:10 FAX                                                                    ☑010

# EXHIBIT A

JUL-30-02  05:11PM   FROM-BROWN SCHULTZ SHERIDAN & FRITZ        717-737-6655          T-505  P.20/49  F-308
07/22/02  MON 17:10 FAX                                                                        011

# CURRICULUM VITAE

## STEPHEN J. DEBRUYN, CPA

**POSITION**              Partner

**EDUCATION**             B.S. in Accounting
                          Southern Illinois University, 1982

**PROFESSIONAL**
**DESIGNATIONS**          Certified Public Accountant, 1984
                          American Institute of Certified Public Accountants
                          Illinois CPA Society

**LICENSES**              Licensed CPA - Illinois

**YEARS OF**
**EXPERIENCE**            20

**PRIOR EXPERIENCE**      7 years with audit staff of large regional firm. Promoted to
                          manager in 1986, joined Clifton Gunderson June, 1989,
                          promoted to Partner in 1993.

**SUPERVISORY**
**EXPERIENCE**            Partner in charge of various audit, review and compilation
                          engagements servicing manufacturers, contractor, retail and
                          wholesale industries as well as employee benefit plans.

                          Supervision of staff on multiple concurrent engagements.

**AREAS OF**
**SPECIALIZATION**        Firm-wide Construction Industry Group Leader

                          Audit, accounting and consulting services for various
                          industries and employee benefit plans.

                          Corporate finance; merger and acquisition services.

                          Peer reviews and internal inspection programs.

                          Consulting services in connection with prospective financial
                          statements, executive search, interpretation of financial
                          results, succession of ownership and business valuations.

JUL-30-02 05:11PM    FROM-BROWN SCHULTZ SHERIDAN & FRITZ         717-737-6655         T-505   P.21/49   F-308
07/22/02  MON 17:10 FAX                                                                              ☒012

Stephen J. DeBruyn (continued)

Income tax planning and preparation for corporations, S-corporations, partnerships and L.L.C.s.

**OTHER SIGNIFICANT EXPERIENCES IN PUBLIC ACCOUNTING**

Advanced training through experience with previous employer in areas of audit efficiencies, documentation of accounting systems in manual or automated environments.

Speaker at annual audit and accounting conference.

Selected to the firms Leadership Career Program class of 1994.

1997 Clifton Gunderson Outstanding Performance Award.

**PUBLICATIONS**

Speaker at the Clifton Gunderson Annual Audit & Accounting Conference. Sessions on Construction Contractors.
> October, 2000
> October, 1999
> October, 1998

Improved Software Keeps Construction Companies Ahead of Competitors, Clifton Gunderson LLP Relationships Magazine, Issue 6 Summer 2002.

**PREVIOUS TRIAL EXPERIENCE**

IN RE: Marriage of Lawrence Edward Kuchefski, Petitioner and Sherri Marie Kuchefski, Respondent, Cause #99D284 Circuit Court for the 5th Judicial Circuit of Illinois located in Danville, Illinois, March 2002.

# EXHIBIT B-1

JUL-30-02  05:11PM    FROM-BROWN SCHULTZ SHERIDAN & FRITZ        717-737-6655        T-505  P.23/49  F-308
07/22/02  MON 17:11 FAX                                                                        Ø017

## CCI CONSTRUCTION COMPANY, INC.
### BALANCE SHEET – DECEMBER 31, 1997

### ASSETS

|  | As Reported | Adjustments | As Restated |
|---|---|---|---|
| **Current assets:** | | | |
| Cash and cash equivalents | $ 1,128,337 | $ - | $ 1,128,337 |
| Investments in marketable securities | 3,702,992 | - | 3,702,992 |
| Accounts receivable, trade: | | | |
| Customers: | | | |
| Current | 8,230,674 | - | 8,230,674 |
| Retained | 1,121,610 | - | 1,121,610 |
| Shareholder | - | - | - |
| Affiliates | 3,485 | - | 3,485 |
| Note receivable | 22,569 | - | 22,569 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 1,072,281 | (429,978) | 642,303 |
| Prepaid expenses | 6,185 | - | 6,185 |
| Shop inventory | 639 | - | 639 |
| Total current assets | 15,288,772 | (429,978) | 14,858,794 |
| **Property and equipment:** | | | |
| Automobiles and trucks | 427,342 | - | 427,342 |
| Furniture | 553,587 | - | 553,587 |
| Machinery and equipment | 1,323,233 | - | 1,323,233 |
| Other | 72,453 | - | |
| | 2,376,615 | - | 2,376,615 |
| Less accumulated depreciation | 920,919 | | 920,919 |
| | 1,455,696 | - | 1,455,696 |
| | $ 16,744,468 | $ (429,978) | $ 16,314,490 |

## LIABILITIES AND SHAREHOLDER'S EQUITY

|  | As Reported | Adjustments | As Restated |
|---|---|---|---|
| **Current liabilities:** | | | |
| Accounts payable, trade: | | | |
| Vendors: | | | |
| Current | $  7,846,395 | $          - | $  7,846,395 |
| Retained | 1,078,950 | - | 1,078,950 |
| Notes payable | 815,781 | - | 815,781 |
| Accrued loss on jobs | - | 732,685 | 732,685 |
| Accrued expenses | 808,601 | - | 808,601 |
| Taxes withheld and accrued | 58,023 | - | 58,023 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 681,924 | (346,703) | 335,221 |
| Total current liabilities (all current) | 11,278,674 | 385,982 | 11,675,656 |
| | | | |
| **Shareholder's equity:** | | | |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | - | 39 |
| Capital in excess of par | 9,758 | - | 9,758 |
| Retained earnings | 5,208,489 | (815,960) | 4,392,529 |
| Unrealized gain on marketable securities | 236,508 | - | 236,508 |
| | 5,454,794 | (815,960) | 4,638,834 |
| | $  16,744,468 | $  (429,978) | $16,314,490 |

JUL-30-02  05:11PM   FROM-BROWN SCHULTZ SHERIDAN & FRITZ       717-737-6655      T-505   P.25/49   F-308
07/22/02  MON 17:11 FAX                                                                        016

# CCI CONSTRUCTION COMPANY, INC.
## STATEMENT OF INCOME
### Year Ended December 31, 1997

|  | Original | Adjustments | As Restated |
|---|---|---|---|
| Revenue | $  34,921,676 | $   (815,960) | $34,105,716 |
| Cost of contracts | 32,617,473 | - | 32,617,473 |
| Gross profit | 2,304,203 | (815,960) | 1,488,243 |
| General and administrative expenses | 1,954,380 | - | 1,954,380 |
| Income from operations | 349,823 | (815,960) | (466,137) |
| Other income | 357,056 | - | 357,056 |
| Net income (loss) | $     706,879 | $   (815,960) | $   (109,081) |

JUL-30-02 05:12PM  FROM-BROWN SCHULTZ SHERIDAN & FRITZ      717-737-6655      T-505  P.26/49  F-308
07/22/02  MON 17:11 FAX                                                              ☒017

# EXHIBIT B-2

JUL-30-02  05:12PM  FROM-BROWN SCHULTZ SHERIDAN & FRITZ    717-737-6665    T-505  P.27/49  F-308

07/22/02  MON 17:11 FAX                                                    ☑018

# CCI CONSTRUCTION COMPANY, INC.
## BALANCE SHEET -- DECEMBER 31, 1998

### ASSETS

|  | As Reported | Adjustments | As Restated |
|---|---|---|---|
| Current assets: |  |  |  |
| Cash and cash equivalents | $ 2,429,866 | $ - | $ 2,429,866 |
| Investments in marketable securities | 631,481 | - | 631,481 |
| Accounts receivable, trade: |  |  |  |
| Customers: |  |  |  |
| Current | 5,964,311 | - | 5,964,311 |
| Retained | 1,822,224 | - | 1,822,224 |
| Affiliates | 365,756 | - | 365,756 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 6,341,726 | (2,379,122) | 3,962,604 |
| Prepaid expenses | 170,232 | - | 170,232 |
| Shop inventory | 38,161 | - | 38,161 |
| Total current assets | 17,763,757 | (2,379,122) | 15,384,635 |
| Property and equipment: |  |  |  |
| Automobiles and trucks | 1,269,567 | - | 1,269,567 |
| Furniture | 851,738 | - | 851,738 |
| Machinery and equipment | 5,947,290 | - | 5,947,290 |
| Other | 344,128 | - | 344,128 |
|  | 8,412,723 | - | 8,412,723 |
| Less accumulated depreciation | 1,651,485 | - | 1,651,485 |
|  | 6,761,238 | - | 6,761,238 |
| Other assets: |  |  |  |
| Cash surrender value of officer's life insurance | 55,453 | - | 55,453 |
| Investments | 34,000 | - | 34,000 |
|  | 89,453 | - | 89,453 |
|  | $ 24,614,448 | $ (2,379,122) | $22,235,326 |

JUL-30-02 '05:12PM    FROM-BROWN SCHULTZ SHERIDAN & FRITZ              717-737-6655              T-505  P.28/49  F-308

07/22/02  MON 17:11 FAX                                                                                                    ☑019

## LIABILITIES AND SHAREHOLDER'S EQUITY

|  | As Reported | Adjustments | As Restated |
|---|---|---|---|
| Current liabilities: |  |  |  |
| Accounts payable, trade: |  |  |  |
| Current | $  10,974,274 | $        - | $10,974,274 |
| Retained | 2,180,967 | - | 2,180,967 |
| Current portion of long-term debt | 1,338,280 | - | 1,338,280 |
| Accrued loss on jobs | - | 1,826,956 | 1,826,956 |
| Accrued expenses | 333,060 | - | 333,060 |
| Taxes withheld and accrued | 91,601 | - | 91,601 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 288,208 | (263,610) | 24,598 |
| Total current liabilities | 15,206,390 | 1,563,346 | 16,769,736 |
| Long-term debt, net of current portion | 4,164,375 | - | 4,164,375 |
| Total liabilities | 19,370,765 | 1,563,346 | 20,934,111 |
| Shareholder's equity: |  |  |  |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | - | 39 |
| Capital in excess of par | 9,758 | - | 9,758 |
| Retained earnings | 5,254,834 | (3,942,468) | 1,312,366 |
| Accumulated other comprehensive income (loss), unrealized gain (loss) on marketable securities | (20,948) | - | (20,948) |
|  | 5,243,683 | (3,942,468) | 1,301,215 |
|  | $   24,614,448 | $ (2,379,122) | $22,235,326 |

JUL-30-02  05:12PM  FROM-BROWN SCHULTZ SHERIDAN & FRITZ         717-737-6655        T-505  P.29/49  F-308

07/22/02  MON 17:12 FAX                                                                 ☒020

## CCI CONSTRUCTION COMPANY, INC.
### STATEMENT OF INCOME
#### Year Ended December 31, 1998

|  | Original | Adjustments | As Restated |
|---|---|---|---|
| Revenue | $ 52,534,453 | $  (3,126,508) | $49,407,945 |
| Cost of contracts | 51,145,382 | - | 51,145,382 |
| Gross profit | 1,389,071 | (3,126,508) | (1,737,437) |
| General and administrative expenses | 1,505,700 | - | 1,505,700 |
| Income (loss) from operations | (116,629) | (3,126,508) | (3,238,137) |
| Other income | 175,670 | - | 175,670 |
| Net income (loss) | $      59,041 | $   (3,126,508) | $(3,067,467) |

*Swartz* | *Campbell* | *Detweiler*

**Kathleen M. Carson**
*Attorney at Law*

Swartz, Campbell & Detweiler
1601 Market Street
34th Floor
Philadelphia, PA 19103-2316

phone  215-299-4272
fax     215-299-4301
e-mail  kcarson@scdlaw.com
web     www.scdlaw.com

August 6, 2002

**VIA FACSIMILE**
Bruce J. Levin, Esquire
Bernkopf, Goodman & Baseman, LLP
125 Summer Street
Boston, MA 02110

    **Re:**   **USF&G v. Brown Schultz Sheridan & Fritz**

Dear Bruce:

    We request that you immediately produce Mr. DeBruyn's working paper files with regard to his opinions and report, including the restated financials attached as exhibits to his expert. Please advise us by close of business today if and when you will produce that information.

        Very truly yours,

        SWARTZ, CAMPBELL & DETWEILER

    BY: *Kathleen M Carson*
        JEFFREY B. MC CARRON
        KATHLEEN M. CARSON

KMC/kc

*Swartz* | *Campbell* | *Detweiler*

**Kathleen M. Carson**
*Attorney at Law*

Swartz, Campbell & Detweiler
1601 Market Street
34th Floor
Philadelphia, PA 19103-2316

phone   215-299-4272
fax       215-299-4301
e-mail  kcarson@scdlaw.com
web     www.scdlaw.com

August 7, 2002

**VIA FACSIMILE**
Bruce Levin, Esquire
Bernkopf, Goodman & Baseman, LLP
125 Summer Street
Boston, MA 02110

   **Re: USF&G v. Brown Schultz Sheridan & Fritz**

Dear Bruce:

   I write pursuant to Local Rule 7.1 and 26.3 to determine when Mr. DeBruyn's workpapers will be produced. In addition, I write to determine if you will agree to an amendment of the case management order regarding the timing of defendants' expert disclosures in light of the fact that Mr. DeBruyn's workpapers have yet to be produced.

   First, Mr. DeBruyn's workpapers should have been produced with your expert disclosures on July 22, 2002 pursuant to F.R.C.P. 26. In addition, we also requested that this information in our last set requests for production directed to USF&G. We requested that USF&G

   Produce any restated financial statements prepared by you or on your behalf with regard to CCI and any and all documents relied upon by you in connection with the preparation of those restated financials.

UFS&G's response was that the restated financials and all discoverable materials related thereto would be produced. However, to date we have not received Mr. DeBruyn's working papers or any other documents responsive to this request.

   When we spoke at the depositions of Messrs. Daily and Silverstein on July 30, 2002, I

Bruce Levin
August 7, 2002
Page 2

requested that the working papers be produced.   I did not receive a response to my request.  I called you yesterday to discuss the production of this information and again today and have received no response from you. In addition, by letter dated August 6, 2002, I requested that you advise whether and when the work papers would be produced.  Please advise us when we may expect to receive them as they are necessary for our expert's preparation of his report.

Finally, in light of USF&G's failure to timely produce the working papers, we request that USF&G stipulate to a thirty day extension of the deadline for production of defendants' expert reports.  We would, of course, be willing to stipulate to a similar extension of the date for USF&G's disclosures with regard to its rebuttal experts.

Please advise us whether and when the working papers will be produced and whether you will agree to the proposed extension or if it will be necessary to file a motion with the Court.

Very truly yours,

SWARTZ, CAMPBELL & DETWEILER

BY: _____
JEFFREY B. MC CARRON
KATHLEEN M. CARSON

kmc/kc

JAN 23 2003   5:44 PM FR FOX ROTHSCHILD          TO 368#27275#00001# P.02/02

# FOX • ROTHSCHILD
## O'BRIEN & FRANKEL LLP
### ATTORNEYS AT LAW

2000 MARKET STREET • TENTH FLOOR • PHILADELPHIA, PA 19103-3291
215-299-2000 • Fax 215-299-2150 • www.frof.com

Thomas D. Paradise
Direct Dial: (215) 299-2774
Internet Address: tparadise@frof.com

January 23, 2003

**VIA FAX (215-299-4301)**

Kathleen M. Carson, Esquire
Swartz Campbell Detweiler
1601 Market Street, 34th Floor
Philadelphia, PA 19103-2316

     Re:    Insured:  Fox, Rothschild, O'Brien & Frankel, LLP
               Claimant:  Stephen Dudreck Lewis
               Claim No.:  503400
               Your File No.: 78977

Dear Ms. Carson:

     I am writing as a follow up to my December 31, 2002 correspondence.  I have not heard from you with responses to the questions I set forth in that letter.  I am enclosing another copy for your convenience.

     Has Mr. Lewis' deposition been noticed?  Is anything happening to push this matter forward?  I would truly appreciate hearing from you soon.

                  Very truly yours,

                  Thomas D. Paradise

TDP:deg
cc:   Jeffrey B. McCarron, Esquire (via fax)
      Janice Neems (via fax)

PENNSYLVANIA • NEW JERSEY • DELAWARE

G

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY,<br>Plaintiff<br><br>v.<br><br>BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ,<br>Defendants. | CIVIL ACTION NO. 1:01-CV-00813<br><br>JUDGE CONNOR |

## SUPPLEMENTAL AND REBUTTAL EXPERT REPORT OF STEVE J. DEBRUYN, CPA

This report supplements my report dated July 22, 2002 and also addresses certain issues contained in the reports of Miller Coffey Tate LLP and The Brenner Group.

### THE RESTATEMENTS IN GENERAL

My original report discloses numerous deficiencies in the audit procedures regarding the contracts in process. Therefore, to determine the potential effect on the financial statements for the respective years, I started with the contracts-in-process schedules from the supplemental financial statements of CCI Construction Company, Inc. "(CCI)" prepared by Brown Schultz. The restatements for both 1997 and 1998 are a result of recasting the contracts-in-process schedules for the those years. Exhibits I and III attached hereto are the recast schedules of CCI's contract-in-process. Exhibits II and IV attached hereto are the original schedules reproduced from the audited financial statements of CCI for the respective years. Exhibit V attached hereto is the actual contracts-in-process schedule for the year ended December 31, 1999. The recast methodology used was similar to the "look back" method utilized by the Internal Revenue Service. The method involves recasting contracts-in-process in a given year from information obtained in a subsequent year. For example, if a contract was in process at the end of 1997 and subsequently completed in 1998, we recalculated, among other things, the 1997 percentage complete, revenue recognized and the profit and loss utilizing the actual numbers from the completed contract. As noted on the attached Exhibits I and III, there are a few exceptions. However, the methodology was consistently used to recast both 1997 and 1998 contracts-in-process schedule.

## THE RESTATEMENT OF THE 1997 BROWN SCHULTZ AUDIT REPORT

I calculated the total estimated cost by using the "actual" gross profit percentage of the job when it was completed. There were two exceptions to this method. Job 439 was calculated estimating the loss as determined or estimated at December 31, 1997 by CCI. Job 451 was calculated using the original gross profit estimated by CCI. I then recalculated the percentage complete, which changed the over/under billings. For the 1997-year end, the effect on over/under billings and on the net income of CCI was $815,960. Exhibit I details the revised calculations as well as reporting the differences between the recast and originally reported balances. The differences arose mainly due to the change in gross profit percentages from the 1997 estimates to the actual completed contracts. One job in particular (job 445), was reported as a projected loss on the original schedule of $82,956. When the job was completed in 1998, the actual loss was $436,063. Brown Schultz' workpapers document that there were significant problems on the job with subcontractor defaults, although it is not evident that they substantiated management's representations by vouching to subcontractor agreements or reviewing subsequent costs. The job was 38% complete and because this showed a loss it should have alerted Brown Schultz that it was necessary to do some additional inquiry and audit testing. This also relates back to my comments made in my original report regarding Brown Schultz' undue reliance placed on management's assertions, their conscious decision not to include job costs in the review of subsequent disbursements and their decision to not test subcontractor costs.

## THE RESTATEMENT OF THE 1998 BROWN SCHULTZ AUDIT REPORT

The same methodology was used as the 1997 approach by utilizing the "actual" or "revised" gross profit percentage from the completed contract schedule and contracts-in-process schedule prepared as of December 31, 1999. The 1998-year resulted in overstating income by $3,126,508.

The two year cumulative effect on net income was $3,942,467.

I chose to use the foregoing methodology for the following reasons:

- My contention is that due to lack of audit work, specifically with the testing of subcontractors, accumulated costs to complete and subsequent job costs, Brown Schultz did not have the opportunity to correctly ascertain the profit fade on the individual contracts.

- Brown Schultz should have taken into account the material profit fade from the 1997 jobs in connection with the 1998 audit work. However, the facts are that gross profit

percentages on several jobs were in excess of any historical amounts and well above the amounts originally estimated in the contracts by the contractor (CCI).

The process used to recast the earnings and estimate the misstatement in the 1997 and 1998 audited financial statements was, in my opinion, a conservative approach. The results using the above approach yielded material exceptions. The lack of audit procedures employed by Brown Schultz did not allow them the opportunity to ascertain the misstatements regardless of the amount. Even though I took a conservative approach by using actual results, the resulting differences were significant enough such that they have to relate back to the lack of effective audit procedures employed by Brown Schultz.

## PCIC RECEIVABLE

To clarify my position and opinion on the PCIC transaction recorded in the 1998 financial statements in the amount of $1,162,460, I believe that the amount should not have been recorded and disclosed as additional contract revenue and contract overbillings. In my 1998 recast contracts-in-process schedule I did not include the total contract amount for that specific job. In my opinion, the transaction did not meet the standards to be recorded as contract revenue. In addition, a more useful disclosure would have been to report the transaction as a separate line on the balance sheet of CCI indicating that it was a guarantee by the stockholder.

## PROFESSIONAL STANDARDS ISSUES

My original report noted that the audit work for Brown Schultz for the years 1997 and 1998 did not conform to applicable standards of care of a Certified Public Accountant. For example, Generally Accepted Accounting Standards (GAAS) require "Due professional care is to be exercised in the performance of the audit and the preparation of the report" (source: SAS no.1, AU section 230). Included in this section is the fact that due professional care requires the auditor to exercise professional skepticism. Based on my review of the audit workpapers for the years 1996, 1997 and 1998, Brown Schultz failed to act with sufficient professional skepticism and was not diligent in evaluating the audit evidence. Furthermore, the first standard of fieldwork requires that the work "is adequately planned and properly supervised" (source: SAS no.22, AU section 311). As noted in my earlier report, Brown Schultz's planning documentation was virtually unchanged between 1996 – 1998. Brown Schultz failed to properly address the risk involved in the audit of CCI and, therefore, did not allow the firm to modify or change the audit procedures or approach. In addition, the third standard of fieldwork requires "sufficient competent evidential matter is to be obtained …" (source: SAS no. 31, AU section 326). As a result of Brown Schultz' limiting the testing of accumulated job costs, subcontractor costs and subsequent

disbursement of job costs, Brown Schultz denied itself the opportunity to obtain all possible evidential matter available to properly perform the audit.


Dated:   September 20, 2002

Steve J. DeBruyn, CPA

EXHIBIT I

## SCHEDULE OF CONTRACTS IN PROGRESS - REVISED
### 31-Dec-97

| Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Earnings Recog | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Billings Over Cost and Earnings | GP % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 426 | | $ 15,878,479 | $ 1,430,469 | $ 17,308,948 | 91.74% | $ 18,961,022 | $ 1,652,074 | $ 1,515,541 | $ 17,394,020 | $ 16,899,942 | $ 494,078 | $ - | 8.71% |
| 439 | | $ 6,309,222 | $ 4,214,516 | $ 10,523,738 | 59.95% | $ 10,289,145 | $ (234,593) | $ (234,593) | $ 6,074,629 | $ 6,337,295 | $ - | 262,566 | -2.28% |
| 445 | | $ 4,169,371 | $ 6,624,479 | $ 10,793,850 | 38.63% | $ 10,357,787 | $ (436,063) | $ (436,063) | $ 3,733,308 | $ 4,349,670 | $ - | 616,362 | -4.21% |
| 448 | | $ 521,254 | $ 3,913,779 | $ 4,435,033 | 11.75% | $ 4,604,000 | $ 168,967 | $ 19,859 | $ 541,113 | $ 509,198 | 31,915 | - | 3.67% |
| 449 | | $ 515,339 | $ 934,356 | $ 1,449,695 | 35.55% | $ 1,387,666 | $ (62,029) | $ (62,029) | $ 453,310 | $ 473,383 | 20,073 | - | -4.47% |
| 450 | | $ 115,461 | $ 3,127,293 | $ 3,242,754 | 3.56% | $ 3,266,600 | $ 23,846 | $ 849 | $ 116,310 | $ - | 116,310 | - | 0.73% |
| 451 | | $ 411,608 | $ 6,170,750 | $ 6,582,358 | 6.25% | $ 6,880,993 | $ 298,635 | $ 18,674 | $ 430,282 | $ 599,088 | - | 168,806 | 4.34% |
| TOTALS | | $ 27,920,734 | $ 26,415,641 | $ 54,336,375 | 51.38% | $ 55,747,213 | $ 1,410,838 | $ 822,239 | $ 28,742,973 | $ 29,168,576 | 642,303 | 1,067,996 | |

2.53%

| | Difference | | Net $ (429,978) | $ (385,982) | $ (815,960) |
|---|---|---|---|---|---|
| | Previously reported | | $ 1,072,281 | $ 681,924 | |
| | | | $ (425,603) | | |

*Critical Assumptions:*

1> Column C, G & K from the supplemental schedules of the audited statements.

2> Column E calculated from Gross Profit % in column N.

3> Gross Profit %'s are based on actual from schedule prepared as of 12/31/99 with exception of Job's #439 &451 as explained below.

4> Gross Profit % used is the 1997 estimated loss as documented in the workpapers. The job performed better and the income realized in 1998 & 1999.

5> Gross Profit % used was based on clients original estimate as documented in 1997 workpaper file since the job had just started and auditors knowledge of the loss is probably not reasonable.

6> Job completed in 1998

SCHEDULE OF CONTRACTS IN PROGRESS
31-Dec-97

| Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Earnings Recog. | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Excess Billings Over Cost and Earnings | GP % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 426 | | $ 15,878,479 | $ 1,070,222 | $ 16,948,701 | 93.69% | $ 18,961,022 | $ 2,012,321 | $ 1,885,253 | $ 17,763,732 | $ 16,899,942 | $ 863,790 | $ - | 10.61% |
| 439 | | $ 6,309,222 | $ 4,214,542 | $ 10,523,764 | 59.95% | $ 10,289,145 | $ (234,619) | $ (234,619) | $ 6,074,603 | $ 6,337,295 | $ - | $ 262,692 | -2.28% |
| 445 | | $ 4,169,371 | $ 6,271,372 | $ 10,440,743 | 39.93% | $ 10,357,787 | $ (82,956) | $ (82,956) | $ 4,086,415 | $ 4,349,670 | $ - | $ 262,255 | -0.80% |
| 448 | | $ 521,254 | $ 3,807,336 | $ 4,328,590 | 12.04% | $ 4,604,000 | $ 275,410 | $ 33,165 | $ 554,419 | $ 509,198 | $ 45,221 | $ - | 5.98% |
| 449 | | $ 515,339 | $ 859,520 | $ 1,374,859 | 37.48% | $ 1,387,666 | $ 12,807 | $ 4,800 | $ 520,139 | $ 473,383 | $ 46,756 | $ - | 0.92% |
| 450 | | $ 115,461 | $ 3,121,650 | $ 3,237,111 | 3.57% | $ 3,266,600 | $ 29,489 | $ 1,052 | $ 116,513 | $ - | $ 116,513 | $ - | 0.90% |
| 451 | | $ 411,608 | $ 5,980,177 | $ 6,391,785 | 6.44% | $ 6,880,993 | $ 489,208 | $ 31,503 | $ 443,111 | $ 599,088 | $ - | $ 155,977 | 7.11% |
| TOTALS | | $ 27,920,734 | $ 25,324,819 | $ 53,245,553 | 52.44% | $ 55,747,213 | $ 2,501,660 | $ 1,638,199 | $ 29,558,933 | $ 29,168,576 | $ 1,072,281 | $ 681,924 | |
| | | | | | | | 4.49% | | | | Net | $ 390,357 | |

EXHIBIT II

EXHIBIT III

## SCHEDULE OF CONTRACTS IN PROGRESS - REVISED
### 31-Dec-98

| | Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Earnings Recog | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Excess Billings Over Cost and Earnings | GP % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | 439 | 4> | $ 10,666,808 | $ 1,164 | $ 10,667,972 | 99.99% | $ 10,536,958 | $ (131,014) | $ (131,014) | $ 10,535,794 | $ 10,481,740 | $ 54,054 | $ - | -1.2% |
| 13 | 450 | | $ 1,172,766 | $ 2,069,988 | $ 3,242,754 | 36.17% | $ 3,266,600 | $ 23,846 | $ 8,624 | $ 1,181,390 | $ 730,724 | $ 450,666 | $ - | 0.7% |
| 14 | 451 | | $ 6,659,984 | $ 1,161,755 | $ 7,821,739 | 85.15% | $ 7,082,984 | $ (738,755) | $ (738,755) | $ 5,921,229 | $ 6,570,468 | $ - | $ 649,239 | 10.43% |
| 15 | 454 | | $ 4,819,694 | $ 10,662,333 | $ 15,482,027 | 31.13% | $ 14,524,840 | $ (957,187) | $ (957,187) | $ 3,862,507 | $ 4,719,426 | $ - | $ 856,919 | -6.59% |
| 16 | 455 | | $ 4,734,492 | $ 7,222,199 | $ 11,956,691 | 39.60% | $ 12,937,341 | $ 980,650 | $ 388,308 | $ 5,122,800 | $ 3,108,536 | $ 2,014,264 | | 7.58% |
| 17 | 456 | | $ 2,715,193 | $ 2,166,757 | $ 4,881,950 | 55.62% | $ 5,380,745 | $ 498,795 | $ 277,415 | $ 2,992,608 | $ 2,732,602 | $ 260,006 | | 9.2% |
| 18 | 457 | | $ 541,295 | $ 898,978 | $ 1,446,273 | 37.84% | $ 1,495,629 | $ 49,356 | $ 18,677 | $ 565,972 | $ 617,799 | $ - | $ 51,827 | 3.3% |
| 19 | 459 | | $ 6,026,575 | $ 8,247,282 | $ 14,273,857 | 42.22% | $ 14,870,150 | $ 596,293 | $ 251,761 | $ 6,278,336 | $ 6,571,905 | $ - | $ 293,569 | 4.0% |
| 20 | 460 | | $ 2,905,995 | $ 12,433,313 | $ 15,339,308 | 18.94% | $ 13,565,000 | $ 225,693 | $ 42,757 | $ 2,948,752 | $ 2,252,156 | $ 696,596 | $ - | 1.43% |
| 21 | 461 | | $ 1,518,251 | $ 2,274,170 | $ 3,792,421 | 40.03% | $ 3,842,372 | $ 49,951 | $ 19,997 | $ 1,538,248 | $ 1,097,444 | $ 440,804 | | 1.30% |
| 22 | 462 | | $ 458,553 | $ 5,045,263 | $ 5,503,816 | 8.33% | $ 5,589,900 | $ 86,084 | $ 7,172 | $ 465,725 | $ 419,511 | $ 46,214 | $ - | 1.5% |
| 23 | TOTALS | | $ 42,225,606 | $ 52,183,201 | $ 94,408,807 | 44.73% | $ 95,092,519 | $ 683,712 | $ (812,244) | $ 41,413,362 | $ 39,302,311 | $ 3,962,604 | $ 1,851,554 | |

0.72%

Net $ 2,111,051

| | Previously reported | Difference |
|---|---|---|
| | $ 6,341,726 | $ (2,379,122) |
| | $ 288,208 | $ (1,563,346) |
| | $ 3,942,467 | |

*Critical Assumptions:*

1> Column C, G & K from the supplemental schedules of the audited statements.

2> Column E calculated from Gross Profit % in column N.

3> Gross Profit %'s are based on actual from schedule prepared as of 12/31/99 with exception of Job #439 as explained below.

4> Gross Profit % is the 1998 amount based on total estimated cost to date and contract income reduced for $1,162,460
in revenue recorded by the auditor incorrectly. A claim amount was recived and recognized in 1999

## SCHEDULE OF CONTRACTS IN PROGRESS
### 31-Dec-98

EXHIBIT IV

| Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Earnings Recog. | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Excess Billings Over Cost and Earnings | GP % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 439 | | $10,666,808 | 1,164 | $10,667,972 | 99.99% | $11,699,418 | $1,031,446 | $1,031,333 | $11,698,141 | $10,481,740 | $1,216,401 | - | 8.82% |
| 450 | | $1,172,766 | $2,072,316 | $3,245,082 | 36.14% | $3,266,600 | 21,518 | 7,777 | $1,180,543 | 730,724 | 449,819 | | 0.65% |
| 451 | | $6,659,984 | 641,127 | $7,301,111 | 91.22% | $7,082,984 | (218,127) | (218,127) | $6,441,857 | 6,570,468 | - | 128,611 | 3.08% |
| 454 | | $4,819,694 | $8,056,057 | $12,875,751 | 37.43% | $14,524,840 | $1,649,089 | 617,292 | $5,436,986 | 4,719,426 | 717,560 | | 11.35% |
| 455 | | $4,734,492 | $6,729,348 | $11,463,840 | 41.30% | $12,937,341 | $1,473,501 | 608,546 | $5,343,038 | 3,108,536 | $2,234,502 | - | 11.39% |
| 456 | | $2,715,193 | $2,086,117 | $4,801,310 | 56.55% | $5,380,745 | 579,435 | 327,677 | $3,042,870 | 2,732,602 | 310,268 | | 10.77% |
| 457 | | 547,295 | 824,978 | $1,372,273 | 39.88% | $1,495,629 | 123,356 | 49,197 | 596,492 | 617,799 | | 21,307 | 8.25% |
| 459 | | 6,026,575 | $7,902,775 | $13,929,350 | 43.27% | $14,870,150 | 940,800 | 407,040 | $6,433,615 | 6,571,905 | - | 138,290 | 6.33% |
| 460 | | 2,905,995 | $11,761,029 | $14,667,024 | 19.81% | $15,565,000 | 897,976 | 177,917 | $3,083,912 | 2,252,156 | 831,756 | | 5.77% |
| 461 | | 1,518,251 | $2,111,573 | $3,629,824 | 41.83% | $3,842,372 | 212,548 | 88,903 | $1,607,154 | 1,097,444 | 509,710 | - | 5.53% |
| 462 | | 458,553 | $4,759,587 | $5,218,140 | 8.79% | $5,589,900 | 371,760 | 32,669 | 491,222 | 419,511 | 71,711 | - | 6.65% |
| TOTALS | | $42,225,606 | $46,946,071 | $89,171,677 | 47.35% | $96,254,979 | $7,083,902 | $3,130,225 | $45,355,831 | $39,302,311 | $6,341,728 | 288,208 | |

7.36%

Net $6,053,520

**SCHEDULE OF CONTRACTS IN PROGRESS**

**31-Dec-99**

| Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Earnings Recog. | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Excess Billings Over Cost and Earnings | GP % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 439 | | $ 10,704,600 | $ - | $ 10,704,600 | 100.00% | $ 10,787,727 | $ 83,127 | $ 83,127 | $ 10,787,727 | $ 10,787,727 | $ - | $ - | 0.77% |
| 450 | | $ 3,705,315 | $ - | $ 3,705,315 | 100.00% | $ 3,732,569 | $ 27,254 | $ 27,254 | $ 3,732,569 | $ 3,732,569 | $ - | $ - | 0.73% |
| 451 | | $ 7,963,660 | $ 21,222 | $ 7,984,882 | 99.73% | $ 7,230,740 | $ (754,142) | $ (754,142) | $ 7,209,518 | $ 7,220,117 | $ - | $ 10,599 | -10.43% |
| 454 | | $ 12,681,811 | $ 2,862,660 | $ 15,544,471 | 81.58% | $ 14,582,917 | $ (961,554) | $ (961,554) | $ 11,720,257 | $ 12,014,911 | $ - | $ 294,654 | -6.59% |
| 455 | | $ 11,214,162 | $ 799,792 | $ 12,013,954 | 93.34% | $ 12,999,654 | $ 985,700 | $ 985,700 | $ 12,134,242 | $ 12,592,012 | $ - | $ 457,770 | 7.58% |
| 456 | | $ 5,081,715 | $ - | $ 5,081,715 | 100.00% | $ 5,600,748 | $ 519,033 | $ 519,033 | $ 5,600,748 | $ 5,600,748 | $ - | $ - | 9.27% |
| 457 | | $ 1,446,265 | $ - | $ 1,446,265 | 100.00% | $ 1,495,629 | $ 49,364 | $ 49,364 | $ 1,495,629 | $ 1,495,629 | $ - | $ - | 3.30% |
| 459 | | $ 18,700,567 | $ 278,916 | $ 18,979,483 | 98.53% | $ 19,772,015 | $ 792,532 | $ 780,885 | $ 19,481,452 | $ 15,332,896 | $ 4,148,556 | $ - | 4.01% |
| 460 | | $ 9,850,590 | $ 6,071,422 | $ 15,922,012 | 61.87% | $ 16,155,581 | $ 233,569 | $ 144,504 | $ 9,995,094 | $ 10,055,938 | $ - | $ 60,844 | 1.45% |
| 461 | | $ 3,940,304 | $ 121,249 | $ 4,061,553 | 97.01% | $ 4,115,065 | $ 53,512 | $ 51,915 | $ 3,992,219 | $ 4,053,770 | $ - | $ 61,551 | 1.30% |
| 462 | | $ 3,601,849 | $ 2,077,590 | $ 5,679,439 | 63.42% | $ 5,767,995 | $ 88,556 | $ 56,161 | $ 3,658,010 | $ 3,667,008 | $ - | $ 8,998 | 1.54% |
| | TOTALS | $ 88,890,838 | $ 12,232,851 | $ 101,123,689 | 87.90% | $ 102,240,640 | $ 1,116,951 | $ 916,627 | $ 89,807,465 | $ 86,553,525 | $ 4,148,556 | $ 894,416 | 1.09% |

Net $ 3,254,140

EXHIBIT V

H

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY,<br>Plaintiff<br><br>v.<br><br>BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ,<br>Defendants. | CIVIL ACTION NO. 1:01-CV-00813<br><br>JUDGE CONNOR |

## AFFIDAVIT OF STEVE J. DEBRUYN, CPA IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Steve J. DeBruyn, on oath, deposes and says as follows:

1.      I am a Certified Public Accountant and a partner in the firm of Clifton, Gunderson LLP ("Clifton Gunderson"). I also serve as Clifton Gunderson's Construction Contractor Industry Group Leader. A copy of my resumé is attached hereto as Exhibit "A".

2.      I have been engaged by counsel for the plaintiff, United States Fidelity and Guaranty Company ("USF&G"), to determine if I could render certain opinions concerning the audit procedures performed by, and the conclusions reached with respect to, the audited financial statements prepared by the Defendants for CCI Construction Company, Inc. for the fiscal years ended December 31, 1996, 1997 and 1998. I have previously determined that I was able to render such opinions.

Facts and Other Materials Relied Upon

3.      I am making this affidavit in opposition to the Defendants' Motion for Summary Judgment. The facts upon which I relied upon in connection with my opinions are as follows:

- Brown Schultz Sheridan & Fritz ("Brown Schultz") audit work papers for CCI for the fiscal years ended December 31, 1996, 1997 and 1998;

- Brown Schultz' "Permanent File" for CCI.

- The depositions of Bruce J. Brown, Sherri Phillips and Deborah Bowman;

- Various pleadings filed in the above-captioned action;

- 1998 Audited Financial Statements prepared by Brown Schultz for a company known as Pennsylvania Contractors Insurance Co. Inc. ("PCIC");

- Brown Schultz' work papers for the audit of PCIC for the fiscal year ended December 31, 1998; and,

- Work-in-process schedule as of December 31, 1999 prepared by CCI.

- <u>Horwath International Audit Manual</u> (2000 Edition)

4.     In addition to my knowledge and expertise in the fields of construction, accounting and auditing, I also considered the following standards, rules and treatises with respect to which accountants are required to follow in the performance of accounting and auditing work or materials reasonably relied upon by auditors in connection with audit and accounting services:

- Accounting Research Bulletin No.45 (ARB 45), Long-Term Construction Type Contracts

- AICPA Technical Practice Aids - Statement of Position 81-1, Accounting for Performance of Construction-Type in Certain Production-Type Contracts, July 15, 1981;

2

- AICPA Audit and Accounting Guide for Construction Contractors, May 1, 1997;

- Statement on Auditing Standards No. 47, Audit Risk & Materiality in conducting an audit (American Institute of Certified Public Accountants, 1983);

- Statement on Auditing Standards No. 57, Auditing Accounting Estimates (American Institute of Certified Public Accountants, 1988);

- FAS No. 5, Accounting for Contingencies, March 1975;

- FAS No. 57, Related Party Disclosures, March 1982;

- Statement of Auditing Standards No. 22, Planning and Supervision (American Institute of Certified Public Accountants (1978); and,

- Statement of Auditing Standards No. 31, Evidential Matter (American Institute of Certified Public Accountants (1980).

- AICPA Audit Risk Alert, Construction Industry Developments – 1998/99 (Issued November, 1998).

- Other standards and regulations promulgated by the American Institute of Certified Public Accountants.

5.    Independent auditors performing audit work for construction contractors are required to perform this audit work in accordance with the AICPA Audit and Accounting Guide for Construction Contractors (the "Audit Guide").  Section 1.12 – 1.17 of the Audit Guide includes a primer on construction surety bonding and the pre-qualification process which most sureties employ.  The Glossary part of the Audit Guide includes a description of "Bonding Capacity" which reads as follows:

3

"The total dollar value of construction bonds that a surety will underwrite for a contractor, based on the surety's predetermination of the overall volume of work that the contractor can handle."

<u>My Opinion</u>

6.    For reasons explained below, it is my opinion that the audit work performed by Brown Schultz for CCI for the fiscal years ended December 31, 1997 and 1998 did not conform to the applicable standards of care of a certified public accountant and such non-conformance resulted in material misstatements and omissions in the 1997 and 1998 audit reports for CCI prepared by Brown Schultz. It is also my opinion that the misstatements and omissions were material to the financial position of CCI.

<u>Basis for My Opinions</u>

7.    Brown Schultz' workpapers demonstrate Brown Schultz' failure to properly address the risk involved with its audits of CCI for the years ending December 31, 1996, 1997 and 1998. Because of this failure to properly address the risks associated with CCI, Brown Schultz' audit programs and its audit fieldwork were inadequate to provide the required assurance that the 1996, 1997 and 1998 audit reports (the "Audit Reports") were conducted in accordance with Generally Accepted Auditing Standards ("GAAS"). These procedures are required to be followed by Certified Public Accountants, such as Brown Schultz, in the performance of audit work.

8.    GAAS comprises the standards and procedures which must be followed in the planning, preparation and issuance of an audit report by a Certified Public Accountant. One of GAAS' requirement is that audit fieldwork must be "adequately planned and properly supervised." SAS No. 22, AU Section 311. The basis for an adequately planned audit is the assessment of risk. While Brown Schultz' workpapers identified high-risk characteristics in CCI

4

and in CCI's individual construction contracts as noted below including the fact that USF&G was a "significant creditor" and user of the financial statements, Brown Schultz' audit plan work papers for 1996, 1997 and 1998 were virtually identical to each other and did not reflect any consideration of or additional testing procedures for any of the increased audit risks inherent in the CCI audit engagement. Further, not only did the audit plan remain intact during this period, the actual audit work performed by Brown Schultz for the fiscal years ended December 31, 1996, 1997 and 1998 did not change significantly from year to year either. This is significant, in my opinion, in light of the fact that CCI's audit risk profile increased for 1996 through 1998 due to, among other things, the following:

- A significant dollar volume of work was being performed by CCI's subcontractors. This should have led the auditor to consider audit procedures directed at testing subcontract costs. For example consideration should have been given to a review of CCI's subcontractor agreements, confirmations with subcontractors, review and testing of significant subcontractor costs accumulated to date and estimated costs to complete;

- Brown Schultz' knowledge of and its documentation in its audit work papers of past and present claims and defaults with respect to CCI's subcontractors;

- CCI's expansion in new, non-contiguous states;

- Profit fades as acknowledged by Brown Schultz in its audit work papers on CCI's contracts completed in subsequent years. [Profit fades are declines in the estimated or the interim profits (or losses) at the end of the preceding year to the project's actual performance at its completion. Profit fades can be due to a number of factors ranging from the contractor's performance to the default or insolvency of its subcontractors or suppliers. It can also signify that the contractor's original estimate of

5

its costs to perform the work and its profits were inaccurate.] The primary objective of the auditor is to determine the level of reliance that can be placed by the auditor on the contractor's estimated costs to complete the project. It is the auditor's job to perform sufficient testing and analysis to determine whether the contractor's estimates of its costs and profits is sound and reasonable. In light of the profit fades on a number of CCI projects , Brown Schultz was required under GAAS, in my opinion, to question the reliability of CCI's estimates and its costs to complete contracts in progress and estimated profits thereon;

- By the end of 1997 and throughout 1998, CCI was self-performing some contract work which had previously subcontracted out to others and it also purchased approximately $6-7 million worth of new construction equipment in connection with its new self-performing work;

- CCI was not properly allocating all indirect costs to individual contracts. This had the effect of artificially inflating CCI's profits (or reducing losses) on individual projects. This is important for any user of CCI's audit reports who is interested to see how profitable CCI's contract work was or, alternatively, how much CCI was losing on individual contracts; and,

- The presence of significant-related party transactions including, CCI's relationship with Pennsylvania Contractors Insurance Co., Inc. ("PCIC"). The significance of the CCI/PCIC transactions is discussed in greater detail, *infra*.

9.     It is my further opinion that there were inadequate audit procedures performed by Brown Schultz in such important areas as CCI's contracts-in-progress generally and, specifically, the design and implementation (or the lack of) substantive audit procedures in connection with

accumulated costs and estimated costs to complete of CCI's contracts.  Section 10.33 of the AICPA Audit Guide For Construction Contractors states "One of the most important phases of the audit of a construction contractor relates to estimated costs to complete contracts in process, since that information is used in determining the estimated final gross profit or loss on contracts." In particular, Section 10.33 states "Because of the direct effect on the estimated interim and final gross profit or loss on the contract, the auditor should evaluate whether the contractor's estimate of costs to complete is reasonable."  The audit guide further states that to achieve this, the auditor should "1) critically review representations of management, 2) obtain explanations of apparent disparities between estimated and past performance on contracts, experience on other contracts, and information gained in all other phases of the audit, and 3) document the results of work in these areas."  In my opinion,  Brown Schultz, in violation of the AICPA Audit Guide For Construction Contractors, unduly relied  on CCI management's assertions with respect to costs-to-complete and estimated profits on the CCI contracts.  The determination of the accuracy of the accumulated costs to date and the estimated costs-to-complete is critical to contractors like CCI using the percentage of completion method of accounting.    The percentage of completion method recognizes revenue based on costs incurred to date divided by total estimated costs on the job, multiplied by the contract amount.

10.    It is also my opinion that Brown Schultz placed undue reliance on CCI's management to substantiate significant estimates in the  estimated costs-to-complete  in  the 1996, 1997 and 1998 Audit Reports.  Brown Schultz relied on CCI's representations as to such costs with no documentation substantiating the fact that CCI's management estimates were reasonable other than the fact that they had allegedly been verified by Sherri Phillips, CCI's Chief Financial Officer and/or Stan Sechrist, CCI's Vice President - Construction Operations.  It

7

does not appear that Brown Schultz understood the requirements of SAS No. 57, Auditing Accounting Estimates (Professional Standards, AU Section 342), and did not follow the guidelines to properly assess the reasonableness of CCI's management estimates. In addition, it does not appear that Brown Schultz followed the Horwath International Audit Manual with respect to "basic" approaches to evaluate accounting estimates. The requirements include;

- Reviewing and testing management's process used to develop the estimates;

- Developing an independent expectation to corroborate management's estimates;

and,

- Reviewing subsequent events and transactions.

11.    To the contrary, Brown Schultz' work papers show that in 1998, CCI was estimating gross profits on several contracts-in-progress that were materially higher than the historical or originally projected amounts. Subsequent review of these projects revealed that these contracts had significant profit fades, and one job - no. 454, Albemarle Prison - had a loss of approximately $957,000.00, and profit fade based on Brown Schultz' 1998 workpapers of approximately $2,600,000. Also, Brown Schultz' 1998 workpapers' files contained no evidence of any consideration by it of the allocation of indirect costs to estimated costs-to-complete, other then two projects, despite Brown Schultz' knowledge that CCI was self-performing more of its subcontract work than in the past. In addition, there was no follow up between the documented preliminary analytical review work and the final work, despite a material increase in the contracts in progress schedule. Brown Schultz also failed to document the reasons for the significant underbillings reported at the end of the 1998 year. The Horwath International Audit Manual, a manual which, on information and belief, Brown Schultz used as an audit guide for its CCI audits, in section 12.049, specifically addresses the procedures to follow if unbilled construction

8

receivables are significant, including the physical inspection of construction sites and architects' or engineers' reports, and, possibly, obtaining assistance from outside specialist. Job site visits were never conducted by Brown Schultz and the reasons therefor were not documented in Brown Schultz' work papers.

12.    Also, in my opinion, Brown Schultz testing of accumulated job costs was incomplete. In its CCI audit workpapers, Brown Schultz acknowledged that its testing of 25 of CCI's cost transactions was only a test of CCI's cost controls. That is to say, no specific testing of CCI's contract costs was done. This was incorrect under the circumstances extant. The testing of 25 costs allows the auditor to make qualitative assessments about a contractor's cost controls. However, such testing does not replace the need to perform substantive procedures, such as vouching (ascertaining the truth of) significant contract costs and analytical review.

13.    In my opinion, Brown Schultz failed to properly test the direct cost related to subcontractors. CCI had significant and substantiated direct costs related to subcontractors and there was documentation in Brown Schultz' workpapers relating to past and present claims between CCI and its subcontractors as well as evidence of subcontractor defaults. In fact, in the December 31, 1996 financial statements of CCI, Brown Schultz footnoted that the reason for losses on certain projects was "caused by additional costs associated with subcontractor defaults and the related legal expenses to defend those cases ...." Nonetheless, Brown Schultz did not send out any confirmations of amounts owed by CCI to CCI's subcontractors, nor did Brown Schultz' "Permanent Files" or its other work papers document that it reviewed CCI's subcontracts and other, similar construction agreements. In addition, Brown Schultz specifically excluded any job related expenses in its testing of unrecorded liabilities. Instead, as noted above,

9

Brown Schultz relied on a test of 25 selected costs throughout each year - for contract testing purposes only - and there was no evidence in Brown Schultz' workpapers that it performed any analytical procedures related to accumulated job costs.

14.    There was also no evidence in Brown Schultz' workpapers for the 1996, 1997 and 1998 Audit Reports that Brown Schultz read one or more of the contracts for guarantees or any penalty and/or incentive provisions or cancellation and postponement provisions.  Paragraph 10.16 of the AICPA Audit Guide For Construction Contractors states in part "A careful reading of the contract is required to identify guarantees or contingencies associated with a project."

15.    Brown Schultz' audit planning and its audit procedures fell below those which applicable standards of care of a certified public accountant performing in the audit of CCI's financial statements.  In particular, Brown Schultz failed to conform its audit work for CCI to the following standards:

- GAAS requires all auditors to exercise "due professional care...in the performance of the audit and the preparation of the report." SAS No. 1, AU Section 230. Included in the foregoing section, is the fact that due professional care requires the auditor to exercise professional skepticism.  Based upon my review of Brown Schultz audit work papers for the years 1996, 1997 and 1998 and its Audit Reports for those years, it is my opinion that Brown Schultz failed to act with sufficient professional skepticism and was not diligent in evaluating audit evidence;

- GAAS also requires that audit field work must be "adequately planned and properly supervised." SAS No. 22, AU Section 311.  As noted above, Brown Schultz' planning documentation for the audit reports for 1996, 1997 and 1998 remain virtually

10

unchanged despite the fact that CCI had experienced significant growth in those years, was self-performing more work, CCI had experienced significant profit fades on a number of jobs, that CCI had begun to expand geographically and the presence and reliance of third party users of the financial statements;

•  Brown Schultz also failed to properly address the risks involved in the audit of CCI and, consequently, Brown Schultz did not modify or change its audit procedures or its approach to the audit work for CCI.  SAS No. 1, AU Section 230 and SAS No. 22, AU Section 311; and

•  Further, Brown Schultz' limited its testing of, among other things, accumulated job costs, subcontractor costs and subsequent disbursement of job costs. Accordingly, in my opinion, Brown Schultz failed to insure during its performance of audit field work for CCI that "sufficient competent evidential matter...was obtained...." SAS No. 31, AU Section 326.

### Brown Schultz' Inappropriate Recording and Inadequate Disclosure of Related Party Transactions Between PCIC and CCI

16.    PCIC was owned by CCI's sole stockholder, John Ortenzio.  PCIC was a related party to CCI.  *See* FAS No. 57, Related Party Disclosures, March 1982.  Based upon my review of Brown Schultz' 1998 audit work papers, PCIC issued a Guaranty Agreement guaranteeing full payment of a CCI claim in the amount of $1,162,460.00 against the Commonwealth of Pennslyvania on Job Number 439, Mahanoy Prision.  Brown Schultz also performed the audit work for PCIC for a number of years.  The CCI claim of $1,162,460.00 did not meet the recognition standards set forth in AICPA Technical Aids, Statement of Position 81-1, Accounting for Performance of Construction-Type and Certain Production-Type Contracts, July

11

15, 1981.  Further, in my opinion, the Guaranty Agreement executed by PCIC in favor of CCI and dated less than a month before the close of CCI's books for the year ended December 31, 1998 did not support the recognition of $1,162,460.00 in revenue for CCI for the year ended December 31, 1998 as recorded in the 1998 audited financial statements.  SOP 81-1, para. 65 states that recognition of additional contract revenue relating to claims is appropriate when it is "probable" the claim will result in additional revenue and the amount can be reliably estimated. In satisfying those requirements, Brown Schultz failed to document or provide evidence that:

- There was a legal basis for the claim or a legal opinion had been obtained.  SOP 81-1 (par. 65 a.).

- The evidence supporting the claim was objective and verifiable and not based upon management's "feel" for the situation or on unsupported representations.  SOP 81-1 (par. 65 d.).

17.    In addition, the recording and disclosure of the related-party transaction involving PCIC and CCI in the 1998 financial statements was misleading to the user of that report since the PCIC Guaranty was recorded by Brown Schultz as contract revenue and therefore recorded as an underbilling (buried in the contracts-in-progress schedule) as opposed to a separate line item on the balance sheet clearly denoted as being a related-party transaction.  The result was a material misstatement in the 1998 Audit Report of $1,162,460.00 incorrectly reported as revenue. An appropriate disclosure would have been to report the transaction as a separate line item on the balance sheet of CCI indicating that it was specifically guaranteed by a company owned by the sole stockholder of CCI.

18.    In addition, Brown Schultz' workpapers demonstrate that Brown Schultz' work was also deficient in the following areas:

12

- Lack of documentation of time to indicate that the partner-in-charge of the audit participated in audit planning in 1998;

- The financial statement disclosure checklist included in the Brown Schultz audit workpapers do not appear to have been reviewed;

- The search for Unrecorded Liabilities in the 1998 Brown Schultz workpapers did not go through the last day of Brown Schultz' fieldwork performed in connection with the audit.

### The Audit Reports as Restated

19.    Based upon my analysis of the facts and other materials enumerated previously in this Affidavit, the 1997 and 1998 Audit Reports required substantial restatements as a result of the inadequate audit work performed by Brown Schultz.  Although I also found that the audit work performed in connection with the 1996 Audit Report was deficient, it did not result in any material misstatements in my opinion.

20.    Attached hereto as Exhibits B-1 and B-2 are the original and restated schedules of CCI's contracts-in-progress for the year ended December 31, 1997.  In general, as shown on Exhibit B-1, the 1997 work-in-progress schedule prepared by Brown Schultz showed a gross profit on all contracts-in-progress of $1,587,367.00 on total revenue of $29,051,753.00.  In contrapoise, Exhibit "B-2" shows that, as restated by me, CCI's contracts-in-progress for 1997 result in a **decrease** in revenue and gross profits of $815,960.00.

21.    Among other things, the methodology employed by me in preparing Exhibits B-1 and B-2 consisted of utilizing financial data contained in Brown Schultz' work papers, comparing it to the original profit (or loss) estimates for contracts-in-progress as reported in the

13

Brown Schultz audited financial statements when each project began and also comparing it to the profit or loss for each of the projects upon completion. Exhibits C-1 through C-7 attached hereto contain each of the contracts-in-progress which I analyzed and restated with respect to the 1997 Brown Schultz audited financial statement. For example, Exhibit C-1 contains a spreadsheet for CCI project number 426, the U.E.P.H. Complex project ("U.E.P.H."). The original profit estimate for U.E.P.H. as reported by Brown Schultz in its 1997 audit work papers was 3.52%. As reported in Brown Schultz' audit reports for the years ended December 31, 1996, 1997 and 1998, U.E.P.H. purportedly had a gross profit in each of those years of 10.02%, 10.61% and 9.30% respectively or roughly three times the original profit estimate. Upon completion, U.E.P.H. had an 8.7% profit. The Brown Schultz work papers for U.E.P.H. failed to document, in accordance with GAAS standards, sufficient evidential material to support the reported gross profits (ranging from 9.30% to 10.61%) in the years 1996 through 1998. Thus, I employed the gross profit percentage earned at the completion of U.E.P.H. - 8.71%. . The methodology used is reasonable in light of the following:

- This method avoids the abuse or intentional misstating of profits that is inherent in the use of the percentage of completion method of accounting;

- This method is conservative in its approach since it used the profit or loss amounts reported by CCI upon project completion. In fact, on some contracts employing CCI's original profit estimates as documented in Brown Schultz' audit workpapers would have resulted in an even larger difference between the audit reports and my restatements. Due to the deficient auditing procedures employed by Brown Schultz, they did not give themselves an opportunity to determine possible problems in the individual contracts; and,

14

- This method also recognizes profits (or losses) on the contracts based on actual events and transactions in the appropriate year to gain an understanding of the effect of CCI's representation in the estimated costs to complete.

22.    Attached hereto as Exhibits D-1 and D-2 are, respectively, the original and the restated contracts-in-progress schedules for CCI for the year ended December 31, 1998. Exhibit D-1 is the contract-in-progress schedule prepared by Brown Schultz for the period ending December 31, 1998 and it shows a gross profit of $3,332,292.00 on total revenues of $38,721,607.00. In contrapoise, the restated contracts-in-progress - Exhibit D-2 - for the period ended December 31, 1998 shows a decrease in revenues and gross profit of $3,126,508.00. This represents a difference over the years 1997 and 1998 of $3,942,467.00.

23.    Exhibits E-1 through E-10 attached hereto contain each of the contracts-in-progress which I analyzed and restated with respect to the 1998 Brown Schultz audited financial statement.    Exhibit E-4, for example, contains a spreadsheet for CCI project no. 454, the Abermarle Prison project ("Abermarle"). The original profit estimate for Abermarle as reported by Brown Schultz in its work papers was 6.63%. As reported in Brown Schultz' audit reports for the years ended December 31, 1998, Abermarle purportedly had a 11.35% profit in 1998. As of December 31, 1999, Abermarle had a reported −6.59% loss. The Brown Schultz work papers for Abermarle failed to document, in accordance with GAAS standards, sufficient evidential material to support the reported gross profit in 1998 of 11.35%. In addition, the workpapers documented problems with the design and the architect on the project.

24.    I took the information concerning contracts-in-progress as well as other adjustments and prepared for CCI a balance sheet and statement of income for the years ended December 31, 1997 and 1998 and compared that information to the information contained in the

1997 and 1998 Audit Reports. Those comparison reports are attached hereto as Exhibits F-1 and F-2. In summary, the 1997 Audit Report prepared by Brown Schultz had the following line item entries relevant to this analysis:

- Income from Operations      $349,823.00
- Other Income:      $357,056.00
- Net Income (Loss):      $706,879.00

25.      As restated, the foregoing line items reveal the following:

- Income (Loss) from Operations      ($466,137.00)
- Other Income      $ 357,056.00
- Net Income (Loss)      ($109,081.00)

26.      Thus, the difference between the above-referenced line items in the 1997 Audit Report and in the Restated report shows that CCI's profit of $706,879.00 was actually a *loss* of $109,081.00.

27.      Similarly, the 1998 Audit Report prepared by Brown Schultz showed the following:

- Loss from Operations      ($116,629.00)
- Other Income      $ 175,670.00
- Net Income (Loss)      $ 59,041.00

28.      As restated, however, the foregoing line items reveal the following:

- Income (Loss) from Operations      ($ 3,238,137.00)
- Other Income      $ 175,670.00
- Net Income (Loss)      ($ 3,067,467.00)

29.      The difference between the 1998 Audit Report and the restated report for 1998 shows that CCI's profit of $59,041.00 was actually a *loss* of $3,067,467.00.

# EXHIBIT A

# CURRICULUM VITAE

## STEPHEN J. DEBRUYN, CPA

**POSITION**           Partner

**EDUCATION**        B.S. in Accounting
Southern Illinois University, 1982

**PROFESSIONAL
DESIGNATIONS**      Certified Public Accountant, 1984
American Institute of Certified Public Accountants
Illinois CPA Society

**LICENSES**         Licensed CPA - Illinois

**YEARS OF
EXPERIENCE**       20

**PRIOR EXPERIENCE**   7 years with audit staff of large regional firm. Promoted to manager in 1986, joined Clifton Gunderson June, 1989, promoted to Partner in 1993.

**SUPERVISORY
EXPERIENCE**      Partner in charge of various audit, review and compilation engagements servicing manufacturers, contractor, retail and wholesale industries as well as employee benefit plans.

Supervision of staff on multiple concurrent engagements.

**AREAS OF
SPECIALIZATION**    Firm-wide Construction Industry Group Leader

Audit, accounting and consulting services for various industries and employee benefit plans.

Corporate finance; merger and acquisition services.

Peer reviews and internal inspection programs.

Consulting services in connection with prospective financial statements, executive search, interpretation of financial results, succession of ownership and business valuations.

**Stephen J. DeBruyn** (continued)

Income tax planning and preparation for corporations, S-corporations, partnerships and L.L.C.s.

**OTHER SIGNIFICANT EXPERIENCES IN PUBLIC ACCOUNTING**

Advanced training through experience with previous employer in areas of audit efficiencies, documentation of accounting systems in manual or automated environments.

Speaker at annual audit and accounting conference.

Selected to the firms Leadership Career Program class of 1994.

1997 Clifton Gunderson Outstanding Performance Award.

**PUBLICATIONS**

Speaker at the Clifton Gunderson Annual Audit & Accounting Conference. Sessions on Construction Contractors.
October, 2000
October, 1999
October, 1998

Improved Software Keeps Construction Companies Ahead of Competitors, Clifton Gunderson LLP Relationships Magazine, Issue 6 Summer 2002.

**PREVIOUS TRIAL EXPERIENCE**

IN RE: Marriage of Lawrence Edward Kuchefski, Petitioner and Sherri Marie Kuchefski, Respondent, Cause #99D284 Circuit Court for the 5th Judicial Circuit of Illinois located in Danville, Illinois, March 2002.

EXHIBIT B-1

## CCI CONSTRUCTION COMPANY, INC.

### CONTRACTS-IN-PROGRESS

### DECEMBER 31, 1997

| Job number | Project | Total contract price | Estimated total direct contract costs | Estimated total contract earnings (loss) before indirect costs | Inception to December 31, 1997 — Direct contract costs to December 31, 1997 | Contract earnings (loss) accrued to December 31, 1997 before indirect costs | Billings to December 31, 1997 | December 31, 1997 — Costs and estimated earnings in excess of billings | Billings in excess of costs and estimated earnings | Year ended December 31, 1997 — Revenues earned | Direct cost of revenues earned | Gross profit (loss) before indirect costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 428 | U.E.P.H. Complex | $ 18,961,022 | $ 16,948,701 | $ 2,012,321 | $ 15,878,479 | $ 1,895,254 | $ 16,899,942 | $ 863,791 | | $ 17,256,553 | $ 15,422,131 | $ 1,834,422 |
| 439 | Mahanoy Prison | 10,289,145 | 10,523,764 | ( 234,619) | 6,309,222 | ( 234,619) | 6,337,295 | | $ 262,692 | 6,074,603 | 6,309,222 | 234,619 |
| 445 | Houtzdale Prison | 10,357,787 | 10,440,743 | ( 82,956) | 4,169,371 | ( 82,956) | 4,349,670 | | 263,255 | 4,086,415 | 4,169,371 | 82,956 |
| 448 | Outlook Pointe | 4,604,000 | 4,328,590 | 275,410 | 521,254 | 33,165 | 509,198 | 45,221 | | 554,419 | 521,254 | 33,165 |
| 449 | U.E.P.H. Headquarters | 1,387,666 | 1,374,859 | 12,807 | 515,339 | 4,800 | 473,383 | 46,756 | | 520,139 | 515,339 | 4,800 |
| 450 | Johnstown | 3,266,600 | 3,237,111 | 29,489 | 115,461 | 1,052 | | 116,513 | | 116,513 | 115,461 | 1,052 |
| 451 | Lord Fairfax | 6,880,993 | 6,391,785 | 489,208 | 411,608 | 31,503 | 569,088 | | 155,977 | 443,111 | 411,608 | 31,503 |
| | | $ 55,747,213 | $ 53,245,553 | $ 2,501,660 | $ 27,920,734 | $ 1,638,199 | $ 29,168,576 | $ 1,072,281 | $ 681,924 | $ 29,051,753 | $ 27,464,386 | $ 1,587,367 |

17

# EXHIBIT B-2

EXHIBIT B-2

## SCHEDULE OF CONTRACTS IN PROGRESS - REVISED
### 31-Dec-97

| | | C | D | E | F | G | H | I | J | K | Excess | | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | B | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Earnings Recog. | Cost and Earnings | Billings To Date | L — Cost and Earnings Over Billings | M — Billings Over Cost and Earnings | GP % |
| Job # | Job Name | | | | | | | | | | | | |
| 426 | 6> | $ 15,878,479 | $ 1,430,469 | $ 17,308,948 | 91.74% | $ 18,961,022 | $ 1,652,074 | $ 1,515,541 | $ 17,394,020 | $ 16,899,942 | $ 494,078 | $ - | 8.71 |
| 439 | 4> | $ 6,309,222 | $ 4,214,516 | $ 10,523,738 | 59.95% | $ 10,289,145 | $ (234,593) | $ (234,593) | $ 6,074,629 | $ 6,337,295 | $ - | $ 262,666 | -2.28 |
| 445 | 4> | $ 4,169,371 | $ 6,624,479 | $ 10,793,850 | 38.63% | $ 10,357,787 | $ (436,063) | $ (436,063) | $ 3,733,308 | $ 4,349,670 | $ - | $ 616,362 | -4.21 |
| 448 | 6> | $ 521,254 | $ 3,913,779 | $ 4,435,033 | 11.75% | $ 4,604,000 | $ 168,967 | $ 19,859 | $ 541,113 | $ 509,198 | $ 31,915 | $ - | 3.6 |
| 449 | 4> | $ 515,339 | $ 934,356 | $ 1,449,695 | 35.55% | $ 1,387,666 | $ (62,029) | $ (62,029) | $ 453,310 | $ 473,383 | $ - | $ 20,073 | -4.4 |
| 450 | | $ 115,461 | $ 3,127,293 | $ 3,242,754 | 3.56% | $ 3,266,600 | $ 23,846 | $ 849 | $ 116,310 | $ - | $ 116,310 | $ - | 0.7 |
| 451 | 5> | $ 411,608 | $ 6,170,750 | $ 6,582,358 | 6.25% | $ 6,880,993 | $ 298,635 | $ 18,674 | $ 430,282 | $ 599,088 | $ - | $ 168,806 | 4.3 |
| TOTALS | | $ 27,920,734 | $ 26,415,641 | $ 54,336,375 | 51.38% | $ 55,747,213 | $ 1,410,838 | $ 822,239 | $ 28,742,973 | $ 29,168,576 | $ 642,303 | $ 1,067,906 | |
| | | | | | | | 2.53% | | | | Net $ (425,603) | | |
| | | | | | | | | | Previously reported | | $ 1,072,281 | $ 681,924 | |
| | | | | | | | | | Difference | | $ (429,978) | $ (385,982) | $ (815,9 |

**Critical Assumptions:**

1> Column C, G & K from the supplemental schedules of the audited statements.

2> Column E calculated from Gross Profit % in column N.

3> Gross Profit %'s are based on actual from schedule prepared as of 12/31/99 with exception of Job's #439 &451 as explained below.

4> Gross Profit % used is the 1997 estimated loss as documented in the workpapers.  The job performed better and the income realized in 1998 & 1999.

5> Gross Profit % used was based on clients original estimate as documented in 1997 workpaper file since the job had just started and auditors knowledge of the loss is probably not reasonable.

6> Job completed in 1998

# EXHIBIT C-1

EXHIBIT C-1

Job #: 426
Job Name: U.E.P.H. Complex
Year Started: 1996

| | Inception | As reported 12/31/96 | As reported 12/31/97 | Recast 12/31/97 | As reported 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|---|
| Original Contract | 16,419,918 | 16,419,918 | 16,419,918 | 16,419,918 | 16,419,918 | 16,419,918 |
| Modifications | | 10,845 | 2,541,104 | 2,541,104 | 2,852,338 | 2,852,338 |
| Contract Amount | 16,419,918 | 16,430,763 | 18,961,022 | 18,961,022 | 19,272,256 | 19,272,256 |
| Estimated Costs | 15,842,225 | 14,783,976 | 16,948,701 | 17,308,948 | 17,479,889 | 17,593,112 |
| Gross Profit | 577,693 | 1,646,787 | 2,012,321 | 1,652,074 | 1,792,367 | 1,679,144 |
| Gross Profit % | 3.52% | 10.02% | 10.61% | 8.71% | 9.30% | 8.71% |
| Percent complete | | 3.08% | 93.69% | 91.74% | 100.00% | 100.00% |

Effect on gross profit     (369,731)

Notes:
The job was recast using the final gross profit percentage of 8.71%. Brown Schultz accepted the gross profit %'s in 1996 and 1997 which were above historical %'s and greater then CCI's original estimate. There was no support in the workpapers to substantiate the increase in gross profit from the clients original estimate. Historical gross profits on contracts for CCI ranged from .16% to 6.48% for the years 1994 - 1998.

Legend:
Inception        From the 1997 Brown Schultz workpaper file, column labeled "original contract".
As reported      From the audited financial statement for the respective year prepared by Brown Schultz.
                 Also agrees with audit workpaper file.
Recast           As recast in the expert's revised contracts in progress schedule.
Contract         As reported on the schedules prepared by CCI as of 12/31/99.

J:\028780\tcg\blaw\contract analysis_ 1997.xls

# EXHIBIT C-2

**EXHIBIT C-2**

Job #: 439
Job Name: Mahanoy Prison
Year Started: 1997

| | Inception 12/31/96 | As reported 12/31/97 | Recast 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|---|
| **Original Contract** | 10,066,600 | 10,066,600 | 10,066,600 | 10,066,600 | 10,066,600 | 10,066,600 |
| **Modifications** | - | 222,545 | 222,545 | 1,632,908 | 470,358 | 721,127 |
| **Contract Amount** | 10,066,600 | 10,289,145 | 10,289,145 | 11,699,508 | 10,536,958 | 10,787,727 |
| **Estimated Costs** | 10,107,709 | 10,523,764 | 10,523,738 | 10,667,972 | 10,667,972 | 10,704,600 |
| **Gross Profit** | (41,109) | (234,619) | (234,593) | 1,031,536 | (131,014) | 83,127 |
| **Gross Profit %** | -0.41% | -2.28% | -2.28% | 8.82% | -1.24% | 0.77% |
| **Percent complete** | #DIV/0! | 59.95% | 59.95% | 99.99% | 99.99% | 100.00% |

Effect on Gross Profit

16          (1,162,434)

**Notes:**

For 1997 we used the same amount as estimated CCI management and by Brown Schultz.

For 1998, the difference is in the total contract amount because we did not record the contingent gain of $1,162K.

**Legend:**

| | |
|---|---|
| Inception | From the 1997 Brown Schultz workpaper file, column labeled "original contract". |
| As reported | From the audited financial statement for the respective year prepared by Brown Schultz. |
| | Also agrees with audit workpaper file. |
| Recast | As recast in the expert's revised contracts in progress schedule. |
| Contract | As reported on the schedules prepared by CCI as of 12/31/99. |

j:\02878\bg\law\contract analysis_1997.xls

# EXHIBIT C-3

**EXHIBIT C-3**

Job #: 445
Job Name: Houtzdale Prison
Year Started: 1997

| | Inception | As reported 12/31/96 | As reported 12/31/97 | Recast 12/31/97 | As reported 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|---|
| Original Contract | 10,286,000 | - | 10,286,000 | 10,286,000 | 10,286,000 | - |
| Modifications | - | - | 71,787 | 71,787 | 651,202 | - |
| Contract Amount | 10,286,000 | - | 10,357,787 | 10,357,787 | 10,937,202 | - |
| Estimated Costs | 10,086,304 | - | 10,440,743 | 10,793,850 | 11,397,234 | - |
| Gross Profit | 199,696 | - | (82,956) | (436,063) | (460,032) | - |
| Gross Profit % | 1.94% | #DIV/0! | -0.80% | -4.21% | -4.21% | #DIV/0! |
| Percent complete | | | 39.93% | 38.63% | 100.00% | |

Effect on gross profit            (353,107)

**Notes:**
The job was estimated as a loss as of 12/31/97. We recast using the total loss on the contract at completion. There was nothing in the workpapers to support that Brown Schultz did any work to determine how significant the loss would be. Once a loss is determined it would have been prudent to challenge management's estimates to determine that the entire loss was accrued at 12/31/97.

**Legend:**
| | |
|---|---|
| Inception | From the 1997 Brown Schultz workpaper file, column labeled "original contract". |
| As reported | From the audited financial statement for the respective year prepared by Brown Schultz. |
| | Also agrees with audit workpaper file. |
| Recast | As recast in the expert's revised contracts in progress schedule. |
| Contract | As reported on the schedules prepared by CCI as of 12/31/99. |

j:\0287\bls\plaw\contract analysis_1997.xls

# EXHIBIT C-4

EXHIBIT C-4

**Job #:** 448
**Job Name:** Outlook Pointe
**Year Started:** 1997

| | Inception 12/31/96 | As reported 12/31/97 | Recast 12/31/97 | As reported 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|
| Original Contract | 4,606,000 | 4,606,000 | 4,606,000 | 4,606,000 | 4,606,000 |
| Modifications | - | (2,000) | (2,000) | 194,644 | 250,021 |
| Contract Amount | 4,606,000 | 4,604,000 | 4,604,000 | 4,800,644 | 4,856,021 |
| Estimated Costs | 4,472,288 | 4,328,590 | 4,435,033 | 4,655,443 | 4,677,876 |
| Gross Profit | 133,712 | 275,410 | 168,967 | 145,201 | 178,145 |
| Gross Profit % | 2.90% | 5.98% | 3.67% | 3.02% | 3.67% |
| Percent complete | #DIV/0! | 12.04% | 11.75% | 100.00% | 100.00% |

Effect on gross Profit    (13,306)

**Notes:**
The job was recast using the final gross profit percentage of 3.67%. As of 12/31/97 the job was only 12% complete and the original estimate was 2.90%. Management and Brown Schultz supported the higher gross profit without any additional work.

**Legend:**

| | |
|---|---|
| Inception | From the 1997 Brown Schultz workpaper file, column labeled "original contract". |
| As reported | From the audited financial statement for the respective year prepared by Brown Schultz. |
| | Also agrees with audit workpaper file. |
| Recast | As recast in the expert's revised contracts in progress schedule. |
| Contract | As reported on the schedules prepared by CCI as of 12/31/99. |

j:\02870\log\law\contract analysis, 1997.xls

# EXHIBIT C-5

**EXHIBIT C-5**

Job #: 449
Job Name: U.E.P.H. Headq.
Year Started: 1997

| | Inception | 12/31/96 | As reported 12/31/97 | Recast 12/31/97 | As reported 12/31/98 |
|---|---|---|---|---|---|
| Original Contract | 1,387,666 | | 1,387,666 | 1,387,666 | 1,387,666 |
| Modifications | - | | - | - | 68,892 |
| **Contract Amount** | 1,387,666 | | 1,387,666 | 1,387,666 | 1,456,558 |
| **Estimated Costs** | 1,326,311 | | 1,374,859 | 1,449,695 | 1,521,701 |
| **Gross Profit** | 61,355 | - | 12,807 | (62,029) | (65,143) |
| **Gross Profit %** | 4.42% | #DIV/0! | 0.92% | -4.47% | -4.47% |
| **Percent complete** | | | 37.48% | 35.50% | 100.00% |

Effect on gross profit          (66,829)

**Notes:**
The job was recast using the actual gross profit/(loss) % at completion of the job. Since the job was a loss,
the entire loss would have been accrued at 12/31/97. The workpapers of Brown Schultz indicate problems with
the job however there is no evidence of additional procedures to determine if a loss was probable.

**Legend:**

| Inception | As reported | From the 1997 Brown Schultz workpaper file, column labeled "original contract". |
|---|---|---|
| | As reported | From the audited financial statement for the respective year prepared by Brown Schultz. |
| | | Also agrees with audit workpaper file. |
| Recast | As recast | As recast in the expert's revised contracts in progress schedule. |
| Contract | | As reported on the schedules prepared by CCI as of 12/31/99. |

# EXHIBIT C-6

EXHIBIT C-6

Job #: 450
Job Name: Johnstown
Year Started: 1997

| | Inception 12/31/96 | As reported 12/31/97 | Recast 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|---|
| Contract Amount | 3,266,600 | 3,266,600 | 3,266,600 | 3,266,600 | 3,266,600 | 3,266,600 |
| Modifications | - | - | - | - | - | 465,969 |
| | 3,266,600 | 3,266,600 | 3,266,600 | 3,266,600 | 3,266,600 | 3,732,569 |
| Estimated Costs | 3,219,018 | 3,237,111 | 3,242,754 | 3,245,082 | 3,242,754 | 3,705,315 |
| Gross Profit | 47,582 | 29,489 | 23,846 | 21,518 | 23,846 | 27,254 |
| Gross Profit % | 1.46% | 0.90% | 0.73% | 0.66% | 0.73% | 0.73% |
| Percent complete | #DIV/0! | 3.57% | 3.56% | 36.14% | 36.17% | 100.00% |

Effect on gross Profit          (204)                               848

**Notes:**
For both 1997 and 1998 the job was recast using the actual gross profit % at completion of the job.

**Legend:**

| | |
|---|---|
| Inception | From the 1997 Brown Schultz workpaper file, column labeled "original contract". |
| As reported | From the audited financial statement for the respective year prepared by Brown Schultz. |
| | Also agrees with audit workpaper file. |
| Recast | As recast in the expert's revised contracts in progress schedule. |
| Contract | As reported on the schedules prepared by CCI as of 12/31/99. |

j:\02878\bgplaw\contract analysis\_1997.xls

# EXHIBIT C-7

**EXHIBIT C-7**

Job #: 451
Job Name: Lord Fairfax
Year Started: 1997

| | Inception 12/31/96 | As reported 12/31/97 | Recast 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|---|
| **Contract Amount** | 6,880,993 | 6,880,993 | 6,880,993 | 6,880,993 | 6,880,993 | 6,880,993 |
| **Modifications** | - | - | - | 201,991 | 201,991 | 349,747 |
| | | | | 7,062,984 | 7,062,984 | 7,230,740 |
| **Estimated Costs** | 6,582,039 | 6,391,785 | 6,582,358 | 7,301,111 | 7,821,739 | 7,984,882 |
| **Gross Profit** | 298,954 | 489,208 | 298,635 | (218,127) | (738,755) | (754,142) |
| **Gross Profit %** | 4.34% | 7.11% | 4.34% | -3.09% | -10.43% | -10.43% |
| **Percent complete** | #DIV/0! | 6.44% | 6.25% | 91.22% | 36.17% | 99.73% |
| Effect on gross profit | | | (12,840) | | (520,628) | |

**Notes:**

For 1997 we recast using CCI's original gross profit estimate of 4.34%. We used this because the job was just started and it would have been difficult to determine the entire loss. However, there was also no justification to increase the GP% to the 7.11% accepted by Brown Schultz based on the job just starting and the historical gross profit on contracts for CCI.

For 1998, we recast using the actual gross profit/(loss) incurred at job completion. The 1998 year showed a loss but there was no evidence to support that Brown Schultz extended audit procedures to determined the magnitude of the loss.

**Legend:**

| | |
|---|---|
| Inception | From the 1997 Brown Schultz workpaper file, column labeled "original contract". |
| As reported | From the audited financial statement for the respective year prepared by Brown Schultz. |
| | Also agrees with audit workpaper file. |
| Recast | As recast in the expert's revised contracts in progress schedule. |
| Contract | As reported on the schedules prepared by CCI as of 12/31/99. |

# EXHIBIT D-1

EXHIBIT D-1

# CCI CONSTRUCTION COMPANY, INC.

## CONTRACTS-IN-PROGRESS

### DECEMBER 31, 1998

| Job Number | Project | Total contract price | Estimated total direct contract costs | Estimated total contract earnings (loss) before indirect costs | Direct contract costs to December 31, 1998 | Contract earnings (loss) issued to December 31, 1998 indirect costs | Billings to December 31, 1998 | Costs and estimated earnings in excess of billings | Billings in excess of costs and estimated earnings | Revenues earned | Direct cost of revenues earned | Gross profit (loss) before indirect costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 448-449 | Mahanoy Prison | $ 11,699,418 | $ 10,667,972 | $ 1,031,446 | $ 10,666,808 | $ 1,031,333 | $ 10,481,740 | $ 1,216,401 | | $ 5,623,543 | $ 4,357,586 | $ 1,265,957 |
| 450 | Johnstown | 3,266,600 | 3,245,082 | 21,518 | 1,172,766 | 7,776 | 730,724 | 449,818 | | 1,064,029 | 1,057,305 | 6,724 |
| 451 | Lord Fairfax | 7,082,884 | 7,301,111 | ( 218,127) | 6,659,984 | ( 218,127) | 6,570,488 | | $ 128,611 | 5,698,746 | 6,248,376 | ( 249,630) |
| 454 | Albemarle Prison | 14,524,840 | 12,875,751 | 1,649,089 | 4,819,694 | 617,292 | 4,719,426 | 717,560 | | 5,436,986 | 4,819,694 | 617,292 |
| 456 | Perry Point | 12,937,341 | 11,463,840 | 1,473,501 | 4,734,492 | 608,547 | 3,108,536 | 2,234,503 | | 5,343,039 | 4,734,492 | 608,547 |
| 458 | Outlook - Hilliard | 5,380,745 | 4,801,310 | 579,435 | 2,715,193 | 327,677 | 2,732,602 | 310,268 | | 3,042,870 | 2,715,193 | 327,677 |
| 457 | Camp Hill | 1,495,629 | 1,372,273 | 123,356 | 547,295 | 49,197 | 617,799 | | 21,307 | 596,492 | 547,295 | 49,197 |
| 459 | Scott Air Force Base | 14,970,150 | 13,929,350 | 940,800 | 6,028,575 | 407,040 | 6,571,905 | | 138,290 | 6,433,615 | 6,028,575 | 407,040 |
| 460 | Gem Plasma Center | 15,565,000 | 14,667,024 | 897,976 | 2,905,995 | 177,917 | 2,252,155 | 831,756 | | 3,083,912 | 2,905,995 | 177,917 |
| 461 | Outlook - Chesterfield | 3,842,372 | 3,629,824 | 212,548 | 1,518,251 | 88,902 | 1,097,444 | 509,709 | | 1,607,153 | 1,518,251 | 88,902 |
| 462 | Outlook - Westerville | 5,589,900 | 5,218,140 | 371,760 | 458,553 | 32,669 | 419,511 | 71,711 | | 491,222 | 458,553 | 32,669 |
| | | $ 96,254,979 | $ 89,171,677 | $ 7,083,302 | $ 42,225,608 | $ 3,130,223 | $ 39,302,311 | $ 6,341,726 | $ 288,208 | $ 38,721,607 | $ 35,389,315 | $ 3,332,292 |

Inception to December 31, 1998

December 31, 1998

Year ended December 31, 1998

EXHIBIT D-2

## SCHEDULE OF CONTRACTS IN PROGRESS - REVISED
### 31-Dec-98

| # | Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Total Estimated Gross Earnings | Earnings Recog. | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Excess Billings Over Cost and Earnings | GP % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | 439 | 4> | $ 10,666,808 | $ 1,164 | $ 10,667,972 | 99.99% | $ 10,536,958 | $ (131,014) | $ (131,014) | $ 10,535,794 | $ 10,481,740 | $ 54,054 | $ - | -1.24% |
| 13 | 450 | | $ 1,172,766 | $ 2,069,988 | $ 3,242,754 | 36.17% | $ 3,266,600 | $ 23,846 | $ 8,624 | $ 1,181,390 | $ 730,724 | $ 450,666 | $ - | 0.73% |
| 14 | 451 | | $ 6,659,984 | $ 1,161,755 | $ 7,821,739 | 85.15% | $ 7,082,984 | $ (738,755) | $ (738,755) | $ 5,921,229 | $ 6,570,468 | $ - | $ 649,239 | -10.43% |
| 15 | 454 | | $ 4,819,694 | $ 10,662,333 | $ 15,482,027 | 31.13% | $ 14,524,840 | $ (957,187) | $ (957,187) | $ 3,862,507 | $ 4,719,426 | $ - | $ 856,919 | -6.59% |
| 16 | 455 | | $ 4,734,492 | $ 7,222,199 | $ 11,956,691 | 39.60% | $ 12,937,341 | $ 980,650 | $ 388,308 | $ 5,122,800 | $ 3,108,536 | $ 2,014,264 | $ - | 7.58% |
| 17 | 456 | | $ 2,715,193 | $ 2,166,757 | $ 4,881,950 | 55.62% | $ 5,380,745 | $ 498,795 | $ 277,415 | $ 2,992,608 | $ 2,732,602 | $ 260,006 | $ - | 9.27% |
| 18 | 457 | | $ 547,295 | $ 898,978 | $ 1,446,273 | 37.84% | $ 1,495,629 | $ 49,356 | $ 18,677 | $ 565,972 | $ 617,799 | $ - | $ 51,827 | 3.30% |
| 19 | 459 | | $ 6,026,575 | $ 8,247,282 | $ 14,273,857 | 42.22% | $ 14,870,150 | $ 596,293 | $ 251,761 | $ 6,278,336 | $ 6,571,905 | $ - | $ 293,569 | 4.01% |
| 20 | 460 | | $ 2,905,995 | $ 12,433,313 | $ 15,339,308 | 18.94% | $ 15,565,000 | $ 225,693 | $ 42,757 | $ 2,948,752 | $ 2,252,156 | $ 696,596 | $ - | 1.45% |
| 21 | 461 | | $ 1,518,251 | $ 2,274,170 | $ 3,792,421 | 40.03% | $ 3,842,372 | $ 49,951 | $ 19,997 | $ 1,538,248 | $ 1,097,444 | $ 440,804 | $ - | 1.43% |
| 22 | 462 | | $ 458,553 | $ 5,045,263 | $ 5,503,816 | 8.33% | $ 5,589,900 | $ 86,084 | $ 7,172 | $ 465,725 | $ 419,511 | $ 46,214 | $ - | 1.54% |
| 23 | | TOTALS | $ 42,225,606 | $ 52,183,201 | $ 94,408,807 | 44.73% | $ 95,092,519 | $ 683,712 | $ (812,244) | $ 41,413,362 | $ 39,302,311 | $ 3,962,604 | $ 1,851,554 | 0.72% |

0.72%

| | Difference | Previously reported | | Net | $ 2,111,051 | |
|---|---|---|---|---|---|---|
| | | | $ (2,379,122) | $ 288,208 | | |
| | $ 6,341,726 | | $ (1,563,346) | | $ (3,942,467) | |

### Critical Assumptions:

1> Column C, G & K from the supplemental schedules of the audited statements.

2> Column E calculated from Gross Profit % in column N.

3> Gross Profit %'s are based on actual from schedule prepared as of 12/31/99 with exception of Job #439 as explained below.

4> Gross Profit % is the 1998 amount based on total estimated cost to date and contract income reduced for $1,162,460 in revenue recorded by the auditor incorrectly. A claim amount was recived and recognized in 1999.

# EXHIBIT E-1

**EXHIBIT E-1**

Job #: 439
Job Name: Mahanoy Prison
Year Started: 1997

| | Inception | 12/31/96 | As reported 12/31/97 | Recast 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|---|---|
| Original Contract | 10,066,600 | - | 10,066,600 | 10,066,600 | 10,066,600 | 10,066,600 | 10,066,600 |
| Modifications | - | - | 222,545 | 222,545 | 1,632,908 | 470,358 | 721,127 |
| Contract Amount | 10,066,600 | - | 10,289,145 | 10,289,145 | 11,699,508 | 10,536,958 | 10,787,727 |
| Estimated Costs | 10,107,709 | - | 10,523,764 | 10,523,738 | 10,667,972 | 10,667,972 | 10,704,600 |
| Gross Profit | (41,109) | - | (234,619) | (234,593) | 1,031,536 | (131,014) | 83,127 |
| Gross Profit % | -0.41% | #DIV/0! | -2.28% | -2.28% | 8.82% | -1.24% | 0.77% |
| Percent complete | | | 59.95% | 59.95% | 99.99% | 99.99% | 100.00% |

16   Effect on gross Profit   (1,162,434)

**Notes:**
For 1997 we used the same amount as estimated by Brown Schultz since they were estimating a loss with the best information available at that time.
For 1998, the difference is in the total contract amount because we did not record the contingent gain of $1,162K.

**Legend:**
| | |
|---|---|
| Inception | From the 1997 Brown Schultz workpaper file, column labeled "original contract". |
| As reported | From the audited financial statement for the respective year prepared by Brown Schultz. Also agrees with audit wokpaper file. |
| Recast | As recast in the expert's revised contracts in progress schedule. |
| Contract | As reported on the schedules prepared by CCI as of 12/31/99. |

j\02878\bg\law\contract analysis_1998.xls

# EXHIBIT E-2

EXHIBIT E-2

Job #:  450 [Johnstown]
Job Name:  Johnstown
Year Started:  1997

| | Inception | 12/31/96 | As reported 12/31/97 | Recast 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|---|---|
| | 3,266,600 | - | 3,266,600 | 3,266,600 | 3,266,600 | 3,266,600 | 3,266,600 |
| Modifications | - | - | - | | | | 465,969 |
| Contract Amount | 3,266,600 | - | 3,266,600 | 3,266,600 | 3,266,600 | 3,266,600 | 3,732,569 |
| Estimated Costs | 3,219,018 | | 3,237,111 | 3,242,754 | 3,245,082 | 3,242,754 | 3,705,315 |
| Gross Profit | 47,582 | - | 29,489 | 23,846 | 21,518 | 23,846 | 27,254 |
| Gross Profit % | 1.46% | #DIV/0! | 0.90% | 0.73% | 0.66% | 0.73% | 0.73% |
| Percent complete | | | 3.57% | 3.56% | 36.14% | 36.17% | 100.00% |

Effect on gross Profit    (204)    848

Notes:
For both 1997 and 1998 the job was recast using the actual gross profit % at completion of the job.

J:\02878\bgblaw\contract analysis_ 1998.xls

# EXHIBIT E-3

**EXHIBIT E-3**

**Job #:** 451
**Job Name:** Lord Fairfax
**Year Started:** 1997

| | Inception | 12/31/96 | As reported 12/31/97 | Recast 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|---|---|
| | 6,880,993 | | 6,880,993 | 6,880,993 | 6,880,993 | 6,880,993 | 6,880,993 |
| **Modifications** | | - | - | - | 201,991 | 201,991 | 349,747 |
| **Contract Amount** | 6,880,993 | - | 6,880,993 | 6,880,993 | 7,082,984 | 7,082,984 | 7,230,740 |
| **Estimated Costs** | 6,582,039 | - | 6,391,785 | 6,582,358 | 7,301,111 | 7,821,739 | 7,984,882 |
| **Gross Profit** | 298,954 | - | 489,208 | 298,635 | (218,127) | (738,755) | (754,142) |
| **Gross Profit %** | 4.34% | #DIV/0! | 7.11% | 4.34% | -3.08% | -10.43% | -10.43% |
| **Percent complete** | | | 8.44% | 6.25% | 91.22% | 36.17% | 99.73% |

(12,840) Effect on gross Profit     (520,628)

**Notes:**
For 1997 we recast using CCI's original gross profit estimate of 4.34%. We used this because the job was just started and it would have been difficult to determine the entire loss. However, there was also no justification to increase the GP% to the 7.11% accepted by Brown Schultz based on the job just starting and the historical gross profit on contracts for CCI.

For 1998, we recast using the actual gross profit/(loss) incurred at job completion. The 1998 year showed a loss but there was no evidence to support that Brown Schultz extended audit procedures to determined the magnitude of the loss.

j:\02878\bgblaw\contract analysis_1998.xls

# EXHIBIT E-4

EXHIBIT E-4

| | Inception | 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|
| **Original Contract** | 13,335,600 | - | 13,335,600 | 13,335,600 | 13,335,600 |
| **Modifications** | - | - | 1,189,240 | 1,189,240 | 1,247,317 |
| **Contract Amount** | 13,335,600 | - | 14,524,840 | 14,524,840 | 14,582,917 |
| **Estimated Costs** | 12,451,265 | - | 12,875,751 | 15,482,027 | 15,544,471 |
| **Gross Profit** | 884,335 | - | 1,649,089 | (957,187) | (961,554) |
| **Gross Profit %** | 6.63% | #DIV/0! | 11.35% | -6.59% | -6.59% |
| **Percent complete** | | | 37.43% | 31.13% | 81.58% |

Job #:         454
Job Name:    Abernathe Prison
Year Started: 1998

Effect on gross Profit    (1,574,441)

**Notes:**
The job was recast using the actual gross profit/(loss) % at 12/31/99. The 11.35% profit margin was grater then any of
the four previous years. In addition, the contract modification of $1,189, 240 only increased cost to complete
by $424,486 (or 64.6% margin). In addition, Brown Schultz workpapers identified a problem with the deisign
and the architect on the job, but still accepted a significantly higher gross profit.
Even if Brown Schultz would have used the original gross profit of 6.63%, the effect on the 1998 profit would have been
a decrease of approximately $275,000.

j:\02878\bgblaw\contract analysis_ 1998.xls

# EXHIBIT E-5

EXHIBIT E-5

Job #:                 455
Job Name:         Perry Point
Year Started:     1998

|  | Inception | 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|
| Original Contract | 12,769,663 | - | 12,769,663 | 12,769,663 | 12,769,663 |
| Modifications |  | - | 167,678 | 167,678 | 229,991 |
| Contract Amount | 12,769,663 | - | 12,937,341 | 12,937,341 | 12,999,654 |
| Estimated Costs | 11,609,351 | - | 11,463,840 | 11,956,691 | 12,013,954 |
| Gross Profit | 1,160,312 | - | 1,473,501 | 980,650 | 985,700 |
| Gross Profit % | 9.09% | #DIV/0! | 11.39% | 7.58% | 7.58% |
| Percent complete |  |  | 41.30% | 39.60% | 93.34% |

Effect on gross Profit =     (220,219)

**Notes:**
The job was recast using the actual gross profit/(loss) % at 12/31/99.  The 11.39% profit margin was
in excess of historical amounts and original estimates.

j:\02878\bgblaw\contract_analysis_1998.xls

# EXHIBIT E-6

EXHIBIT E-6

| Job #: | 456 |
|---|---|
| Job Name: | Outlook Hilliard |
| Year Started: | 1998 |

| | Inception | 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|
| Original Contract | 5,235,000 | - | 5,235,000 | 5,235,000 | 5,235,000 |
| Modifications | | - | 145,745 | 145,745 | 365,748 |
| Contract Amount | 5,235,000 | - | 5,380,745 | 5,380,745 | 5,600,748 |
| | | | | | |
| Estimated Costs | 4,660,341 | - | 4,801,310 | 4,881,950 | 5,081,715 |
| | | | | | |
| Gross Profit | 574,659 | - | 579,435 | 498,795 | 519,033 |
| | | | | | |
| Gross Profit % | 10.98% | #DIV/0! | 10.77% | 9.27% | 9.27% |
| | | | | | |
| Percent complete | | | 56.55% | 55.62% | 100.00% |

Effect on gross Profit    (50,241)

**Notes:**
The job was recast using the actual gross profit/(loss) % at 12/31/99.

j:\02878\bgblaw\contract analysis_1998.xls

# EXHIBIT E-7

EXHIBIT E-7

Job #: 457
Job Name: Camp Hill
Year Started: 1998

| | Inception | 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|
| Original Contract | n/a | - | 1,495,629 | 1,495,629 | 1,495,629 |
| Modifications | - | - | | | |
| Contract Amount | - | - | 1,495,629 | 1,495,629 | 1,495,629 |
| Estimated Costs | n/a | - | 1,372,273 | 1,446,273 | 1,446,265 |
| Gross Profit | #VALUE! | - | 123,356 | 49,356 | 49,364 |
| Gross Profit % | #VALUE! | #DIV/0! | 8.25% | 3.30% | 3.30% |
| Percent complete | | | 39.88% | 37.84% | 100.00% |

Effect on gross Profit $    (30,518)

**Notes:**
The job was recast using the actual gross profit/(loss) % at completion of the job.

j:\02878\bgplaw\contract analysis_1998.xls

# EXHIBIT E-8

EXHIBIT E-8

**Job #:** 459

**Job Name:** Scott AFB

**Year Started:** 1998

| | Inception | 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|
| Original Contract | 13,698,278 | - | 13,698,278 | 13,698,278 | 13,698,278 |
| Modifications | | - | | | 6,073,737 |
| Contract Amount | 13,698,278 | - | 14,870,150 | 14,870,150 | 19,772,015 |
| Estimated Costs | 12,680,694 | - | 13,929,350 | 14,273,857 | 18,979,483 |
| Gross Profit | 1,017,584 | - | 940,800 | 596,293 | 792,532 |
| Gross Profit % | 7.43% | #DIV/0! | 6.33% | 4.01% | 4.01% |
| Percent complete | | | 43.27% | 42.22% | 98.53% |

Effect on gross Profit    (155,329)

**Notes:**
The Job was recast using the actual gross profit/(loss) % at 12/31/99.

j:\02878\bigblew\contract analysis_ 1998.xls

# EXHIBIT E-9

EXHIBIT E-9

| | Inception | 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|
| **Job #:** 460 | | | | | |
| **Job Name:** Germ Plasma | | | | | |
| **Year Started:** 1998 | | | | | |
| **Original Contract** | 15,500,000 | - | 15,500,000 | 15,500,000 | 15,500,000 |
| **Modifications** | - | - | 65,000 | 65,000 | 655,581 |
| **Contract Amount** | 15,500,000 | - | 15,565,000 | 15,565,000 | 16,155,581 |
| **Estimated Costs** | 15,068,940 | - | 14,667,024 | 15,339,308 | 15,922,012 |
| **Gross Profit** | 431,060 | - | 897,976 | 225,692 | 233,569 |
| **Gross Profit %** | 2.78% | #DIV/0! | 5.77% | 1.45% | 1.45% |
| **Percent complete** | | | 19.81% | 18.94% | 61.87% |

Effect on gross Profit (135,143)

**Notes:**
The job was recast using the actual gross profit/(loss) % at 12/31/99.

J:\02878\bg\law\contract analysis_1998.xls

# EXHIBIT E-10

EXHIBIT E-10

Job #:                461
Job Name:       Outlook-Chester
Year Started:   1998

|  | Inception | 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|
| Original Contract | 3,850,000 | - | 3,850,000 | 3,850,000 | 3,850,000 |
| Modifications | | - | (7,628) | (7,628) | 265,065 |
| Contract Amount | 3,850,000 | - | 3,842,372 | 3,842,372 | 4,115,065 |
| Estimated Costs | 3,609,612 | - | 3,629,824 | 3,792,421 | 4,061,553 |
| Gross Profit | 240,388 | - | 212,548 | 49,951 | 53,512 |
| Gross Profit % | 6.24% | #DIV/0! | 5.53% | 1.30% | 1.30% |
| Percent complete | | | 41.83% | 40.03% | 97.01% |

Effect on gross Profit    (68,913)

**Notes:**
The job was recast using the actual gross profit/(loss) % at 12/31/99.

j:\02878\bg\law\contract analysis_1998.xls

# EXHIBIT E-11

EXHIBIT E-11

**Job #:** 462
**Job Name:** Outlook-Westerville
**Year Started:** 1998

| | Inception | 12/31/97 | As reported 12/31/98 | Recast 12/31/98 | Contract 12/31/99 |
|---|---|---|---|---|---|
| **Original Contract** | 5,589,900 | - | 5,589,900 | 5,589,900 | 5,589,900 |
| **Modifications** | - | - | - | - | 178,095 |
| **Contract Amount** | 5,589,900 | - | 5,589,900 | 5,589,900 | 5,767,995 |
| **Estimated Costs** | 5,213,830 | - | 5,218,140 | 5,503,816 | 5,679,439 |
| **Gross Profit** | 376,070 | - | 371,760 | 86,084 | 88,556 |
| **Gross Profit %** | 6.73% | #DIV/0! | 6.65% | 1.54% | 1.54% |
| **Percent complete** | | | 8.79% | 8.33% | 63.42% |

Effect on gross Profit    (25,507)

**Notes:**
The job was recast using the actual gross profit/(loss) % at 12/31/99.

J:\02878\bg\law\contract analysis_1998.xls

# EXHIBIT F-1

EXHIBIT F-1

# CCI CONSTRUCTION COMPANY, INC.
## BALANCE SHEET – DECEMBER 31, 1997

### ASSETS

| | As Reported | Adjustments | As Restated |
|---|---|---|---|
| Current assets: | | | |
| Cash and cash equivalents | $ 1,128,337 | $ - | $ 1,128,337 |
| Investments in marketable securities | 3,702,992 | - | 3,702,992 |
| Accounts receivable, trade: | | | |
| Customers: | | | |
| Current | 8,230,674 | - | 8,230,674 |
| Retained | 1,121,610 | - | 1,121,610 |
| Shareholder | - | - | - |
| Affiliates | 3,485 | - | 3,485 |
| Note receivable | 22,569 | - | 22,569 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 1,072,281 | (429,978) | 642,303 |
| Prepaid expenses | 6,185 | - | 6,185 |
| Shop inventory | 639 | - | 639 |
| Total current assets | 15,288,772 | (429,978) | 14,858,794 |
| Property and equipment: | | | |
| Automobiles and trucks | 427,342 | - | 427,342 |
| Furniture | 553,587 | - | 553,587 |
| Machinery and equipment | 1,323,233 | - | 1,323,233 |
| Other | 72,453 | - | |
| | 2,376,615 | - | 2,376,615 |
| Less accumulated depreciation | 920,919 | - | 920,919 |
| | 1,455,696 | - | 1,455,696 |
| | $ 16,744,468 | $ (429,978) | $ 16,314,490 |

NOTE: Adjustments per "Contracts in Progress – Revised" schedule.

EXHIBIT F-1

## LIABILITIES AND SHAREHOLDER'S EQUITY

|  | As Reported | Adjustments | As Restated |
|---|---|---|---|
| **Current liabilities:** | | | |
| Accounts payable, trade: | | | |
| Vendors: | | | |
| Current | $ 7,846,395 | $ - | $ 7,846,395 |
| Retained | 1,078,950 | - | 1,078,950 |
| Notes payable | 815,781 | - | 815,781 |
| Accrued loss on jobs | - | 732,685 | 732,685 |
| Accrued expenses | 808,601 | - | 808,601 |
| Taxes withheld and accrued | 58,023 | - | 58,023 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 681,924 | (346,703) | 335,221 |
| Total current liabilities (all current) | 11,278,674 | 385,982 | 11,675,656 |
| | | | |
| **Shareholder's equity:** | | | |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | - | 39 |
| Capital in excess of par | 9,758 | - | 9,758 |
| Retained earnings | 5,208,489 | (815,960) | 4,392,529 |
| Unrealized gain on marketable securities | 236,508 | - | 236,508 |
| | 5,454,794 | (815,960) | 4,638,834 |
| | $ 16,744,468 | $ (429,978) | $16,314,490 |

NOTE:  Adjustments per "Contracts in Progress – Revised" schedule.

EXHIBIT F-1

## CCI CONSTRUCTION COMPANY, INC.
## STATEMENT OF INCOME
### Year Ended December 31, 1997

|  | Original | Adjustments | As Restated |
|---|---|---|---|
| Revenue | $  34,921,676 | $   (815,960) | $34,105,716 |
| Cost of contracts | 32,617,473 | - | 32,617,473 |
| Gross profit | 2,304,203 | (815,960) | 1,488,243 |
| General and administrative expenses | 1,954,380 | - | 1,954,380 |
| Income from operations | 349,823 | (815,960) | (466,137) |
| Other income | 357,056 | - | 357,056 |
| Net income (loss) | $      706,879 | $   (815,960) | $   (109,081) |

NOTE:  Adjustments per "Contracts in Progress – Revised" schedule.

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

October 16, 2002

Bruce D. Levin
DIRECT DIAL: (617) 790-3314
e-mail: blevin@bgblaw.com

**VIA TELECOPIER**

Kathleen Carson, Esq.
Swartz Campbell Detweiler
1601 Market Street
Philadelphia, PA  19103-2316

RE:    **United States Fidelity & Guaranty v. Bruce J. Brown et al.**
       **M.D. Pa. No. 01-00813**

Dear Kathleen:

I would like to formerly designate the following as constituting expert reports (and supplements thereto) regardless of whether previously designated as such:

1.    Expert Report of Steve J. DeBruyn, CPA, dated July 22, 2002;
2.    Supplemental and Rebuttal Expert Report of Steve J. DeBruyn, CPA, dated September 20, 2002;
3.    Affidavit of Steve J. DeBruyn, CPA in Opposition to the Defendants' Motion for Summary Judgment, dated October 8, 2002 (served October 9, 2002) ;
4.    Expert Report of Richard D. Farnsworth, dated September 20, 2002; and
5.    Affidavit of Richard D. Farnsworth in Opposition to the Defendants' Motion for Summary Judgment, dated September 27, 2002 (served October 9, 2002).

The designated reports are subject to and without waiver of any rights we have to serve further supplementations of these reports.

Please feel free to contact me if you have any questions.

BERNKOPF, GOODMAN & BASEMAN LLP

Very truly yours,

Bruce D. Levin

BDL:alb
cc:    Peter B. McGlynn, Esq.
        Mark Holtschneider, Esq.

#255189 v1/36432/87

1

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Civil Action No. 1:01-CV-00813
--------------------------------------x
UNITED STATES FIDELITY AND       :
GUARANTY COMPANY,       :
      :
          Plaintiff,       :
      :
     - vs -       :
      :
BRUCE J. BROWN and BROWN, SHUTLZ,    :
SHERIDAN & FRITZ,       :
      :
          Defendants.      :
--------------------------------------x

Deposition Testimony of STEPHEN SALAZAR

1631 North Front Street       May 22, 2002
Harrisburg, PA       10:00 a.m.

    IT IS HEREBY STIPULATED and agreed that the
reading, sealing, and signing of the within
transcript are waived;
    IT IS FURTHER STIPULATED and agreed that all
objections except as to the form of the question
are reserved to the time of trial.

LEARY REPORTING
112 West Main Street, Ste. 200
Mechanicsburg, Pennsylvania 17055

(717) 233-2660     Fax (717) 691-7768

Page 246

1         MR. McGLYNN: Objection.
2     A   You need to repeat that one.
3     Q   To what extent was there a
4  tolerance in the underwriting to modifications
5  to the information included within the
6  description of operations, working capital,
7  balance sheet, and work in progress as reflected
8  on Exhibit 7 for the 1994 annual review before
9  it would be significant to the underwriting
10 process?
11    A   I don't understand what you mean by
12 a tolerance.
13    Q   If the amounts expressed on the
14 1994 review change by $1, you would agree that
15 that would not be significant to underwriting,
16 wouldn't you?
17    A   Yes.
18    Q   So wouldn't you agree that the
19 change in information would have to be --
20 wouldn't just be any change to be significant to
21 underwriting, would it?
22        MR. McGLYNN: Objection.
23    A   It is all relative to what program
24 you are going on. I mean, $10,000 could be
25 significant depending on what size of account or

Page 247

1  what account you are looking at.
2     Q   For CCI Construction, sir, to what
3  extent would a change in amounts and other
4  information be tolerated before it had an impact
5  on underwriting?
6     A   I can't determine that.
7     Q   I am showing you Exhibit 8, which
8  is the 1994 annual review. Is that right?
9     A   Yes.
10    Q   And again, you prepared the      1995
11 annual review just like you prepared the 1994
12 annual review?
13    A   Yes.
14    Q   And incidentally, at the conclusion
15 of the 1994 annual review, you recommended the
16 continuation of approval for the bond program
17 for CCI Construction. Is that true?
18    A   Yes.
19    Q   Now, can you tell us whether any of
20 the information which is included in the annual
21 review you prepared for 1995, which is Exhibit
22 8, changed in any material respect from 1994 in
23 the annual review as expressed in Salazar
24 Exhibit 7?
25    A   Say that again? Did anything

Page 248

1  change?
2     Q   Did any of the information included
3  in Salazar Exhibit 8, which was the annual
4  review you prepared for 1995 --
5         MR. McGLYNN: 1994.
6         MR. McCARRON: No. 8 is 1994.
7         MR. McGLYNN: You just said it was
8     1994 about a minute ago. So it's now
9     1995?
10    Q   Let me start over.
11        Did any of the information which is
12 included in Salazar Exhibit 8, which is the
13 annual review statement or report you prepared
14 for 1995, concerning CCI Construction change in
15 any manner materially significant to
16 underwriting from the 1994 information as
17 reflected in Salazar Exhibit 7?
18    A   I would really have to look at it,
19 please. Repeat the question.
20    Q   Is there any material change from
21 an underwriting standpoint between the
22 information reflected in Exhibit 8, which is the
23 1995 annual review, from the information which
24 you included in the annual review for 1994,
25 which is Exhibit 7?

Page 249

1         MR. McGLYNN: Objection.
2     A   My opinion is there is not a
3  material change, no.
4     Q   Can you tell us the extent to which
5  the information included in Exhibit 8 would have
6  to change in order to be material from an
7  underwriting standpoint?
8         MR. McGLYNN: Objection.
9     A   I can't determine exactly what
10 material is -- what material would be for it to
11 change.
12    Q   So you can't tell us how much the
13 values which are included within Exhibit 8 would
14 have to change before would it become
15 significant from an underwriting standpoint. Is
16 that right?
17        MR. McGLYNN: Objection.
18    A   I would say if it was a change of a
19 couple million dollars or something, that would
20 be a material change. I am not giving you an
21 exact amount because -- comparing the program of
22 the work and the financial capacity of the
23 contractor, what is material and what is not
24 material changes from account to account.
25    Q   With the CCI account, how much

JAMES DAILY

210

1           IN THE UNITED STATES DISTRICT COURT

        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3

UNITED STATES FIDELITY        ) DEPOSITION UPON

4  AND GUARANTY COMPANY

5              Plaintiff    ) ORAL EXAMINATION

6       vs.                  )   OF

7  BRUCE BROWN AND           ) JAMES DAILY

   BROWN SCHULTZ SHERIDAN

8  & FRITZ                    )

9              Defendants    )

10  - - - - - - - - - - - - - - -

11

12

13              TRANSCRIPT OF CONTINUED

14  DEPOSITION, taken by and before MARGIE A. ROMEO,

15  Professional Reporter and Notary Public, at the

16  Law Offices of Swartz, Campbell & Detweiler, 1601

17  Market Street, 34th Floor, Philadelphia, PA on

18  Thursday, June 27, 2002 commencing at 10:20 a.m.

19                   - - -

20

21

22

            REPORTING SERVICE ASSOCIATES (RSA)

23              A Veritext Company

        1845 Walnut Street - 15th Floor

24            Philadelphia, PA  19103

               (215) 241-1000

# JAMES DAILY

275

1  Q.    In what way would correct information
2  have effected the decisions by USF & G to bond or
3  issue bonds for CCI Construction?
4  A.    Well, we probably wouldn't have given
5  them as much credit as they were getting.
6  Q.    And how did you make that determination?
7  A.    We didn't make that determination.
8  Q.    How did you determine that you, that USF
9  & G may not have given CCI Construction as much
10 bond credit as was given to CCI Construction if
11 the financial statements had correctly reflected
12 the financial information relative to CCI
13 Construction?
14 A.    Well, the amount of -- the amount of
15 credit you give is directly related to the
16 financial condition of the customer.
17 Q.    Is that the end of your answer?
18 A.    Yes.
19 Q.    Did you determine or did anyone on behalf
20 of USF & G determine the extent to which the
21 credit for bonding extended by USF & G to CCI
22 Construction might have changed if the financial
23 statements had correctly reflected financial
24 condition of CCI Construction?

276

1  A.    No.
2  Q.    Are you able to tell us the extent to
3  which the bonding credit might have changed by
4  USF & G as extended to CCI Construction, if the
5  financial statements had correctly stated or
6  reflected the financial condition of CCI
7  Construction?
8  A.    No.
9  Q.    Why can't you tell us?
10 A.    I would have to see the restated
11 financial statements first.
12 Q.    If I could just ask a full question.
13 A.    I thought you were through.
14 Q.    I understand.  I'm not blaming you.
15       Why can't you determine the
16 extent to which the credit for bonding extended
17 by USF & G might have changed for the CCI account
18 if the financial statements had correctly
19 reflected the financial condition of CCI
20 Construction.
21       MR. McGLYNN:  Objection.
22       THE WITNESS:  I would have to see
23 the restated information first, but even then I
24 don't think I could give you a definitive answer

277

1  of exactly what would have changed.  I know it
2  would have changed.
3       --
4  BY MR. McCARRON:
5  Q.    When you say you would have to see
6  restated financial information, you mean you
7  would have to see corrected or correct financial
8  statements which accurately reflected the
9  financial condition of CCI Construction during
10 the period involved?
11 A.    Yes.
12 Q.    Would you need to see information or
13 consider information in addition to the restated
14 financial statements in order to evaluate whether
15 and to what extent underwriting decisions would
16 have been effected by correctly presented
17 financial statements in the underwriting for the
18 CCI bond account?
19 A.    Well, we would first have to see the
20 restated financial statements, then if we needed
21 additional information for clarification, we
22 might have asked for something else, but I can't
23 identify what it might have been because we don't
24 have that information.

278

1  Q.    In addition to the restated financial
2  statements, would your evaluation about the,
3  about whether the restated financial statements
4  would have had an impact on underwriting for the
5  CCI bond credited --
6       MR. McGLYNN:  Objection.
7       THE WITNESS:  I'm lost.
8       MR. McCARRON:  I am too.  I'm
9  sorry.
10      ---
11 BY MR. McCARRON:
12 Q.    Would you need to consider information in
13 addition to the restated financial statements in
14 order to determine whether and to what extent the
15 bond credit by USF & G might have been different
16 for CCI Construction?
17      MR. McGLYNN:  Objection.
18      THE WITNESS:  I don't know.
19      ---
20 BY MR. McCARRON:
21 Q.    What I'm trying to understand, sir, is
22 would you have to review other information which
23 was already in the possession, perhaps of USF & G
24 and which had been taken into account during the

Pages 275 to 278

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

U.S. FIDELITY and GUARANTY CO.          :
                                        :
        -VS-                            :      NO. 1-01-CV-00813
                                        :
                                        :
BRUCE BROWN & BROWN, SCHULTZ,           :
SHERIDAN, & FRITZ,                      :


                        Volume III


            DEPOSITION OF:  ANTHONY S. PHILLIPS

                    BEFORE:  Michelle S. Parke,
                             Court Reporter

                     PLACE:  1631 North Front St.
                             Harrisburg, Pa

                 BEGINNING:  June 20, 2002
                             10:10 a.m.

APPEARANCES:

        BERNKOPF, GOODMAN, & BASEMAN, LLP
        BY:  PETER B. McGLYNN, ESQUIRE
        125 Summer Street
        Boston, Massachusetts 02110-1621

                For - Plaintiff

        SWARTZ, CAMPBELL, & DETWEILER
        BY:  JEFFREY McCARRON, ESQUIRE
        1601 Market Street, 34th floor
        Philadelphia, Pennsylvania 19103-2337

                For - Defendants


            Leary Reporting  (717) 233-2660

463

```
 1          A     That's too broad a question.

 2          Q     Can you determine whether a change to a

 3   financial statement would have been significant enough

 4   to have changed your underwriting decision?

 5                MR. McGLYNN:  Can he?

 6                MR. McCARRON:  Yes, can he.

 7                MR. McGLYNN:  Is he capable of doing

 8   that?

 9                MR. McCARRON:  Yes.

10                THE WITNESS:  Yes.

11   BY MR. McCARRON:

12          Q     What would you need to know in order to

13   evaluate and determine whether a change to a financial

14   statement was significant enough to have changed your

15   underwriting decision?

16          A     I would need to know the degree of change

17   upward or downward and the working capital and equity,

18   what effect this had on existing work, how the existing

19   work changed in profitability, how the existing work

20   had receivables that were not to be received, and how

21   all other related information that I previously

22   referred to, like other work-in process, bank credit,

23   the relationship of the change to other jobs and

24   process would effect it.

25          Q     Can you make a determination about
```

1    whether changes to financial statements for CCI

2    Construction would have been material to your

3    underwriting decision without the benefit of restated

4    financial statement?

5         A     I could not.

6         Q     Have you prepared restated or corrected

7    financial statements for CCI Construction?

8         A     No.

9         Q     Do you know whether there exists

10   corrected or restated financial statements for CCI

11   Construction?

12        A     I believe there are.

13        Q     Have you reviewed restated financial

14   statements for CCI Construction?

15        A     No.

16        Q     Who has the restated or corrected

17   statements for CCI Construction?

18             MR. McGLYNN:  If it involves any

19   discussions between counsel, I am instructing the

20   witness not to answer.

21             THE WITNESS:  I think I couldn't say.

22   BY MR. McCARRON:

23        Q     Do you plan to review restated or

24   corrected financial statements for CCI Construction?

25             MR. McGLYNN:  Objection.