# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

United States Fidelity and
Guaranty Company

       v.

Bruce J. Brown and Brown, Schultz
Sheridan & Fritz

:
:
:
:
:      Judge Christopher Connor
:
:      No: 01-CIV-813

## MOTION TO STRIKE THE EXPERT REPORT AND AFFIDAVIT OF RICHARD FARNSWORTH

Defendants, Bruce J. Brown and Brown, Schultz, Sheridan & Fritz, by and through their attorneys, Swartz, Campbell & Detweiler, move this court for an order striking the Expert Report of Richard Farnsworth and his Affidavit submitted in support of Plaintiff's opposition to defendants' motion for summary judgment and which plaintiff now seeks to designate as a supplemental report. In support of its motion, defendants state as follows:

1.    This action involves a claim for negligent misrepresentation against an accountant and his accounting firm.

2.    Defendants audited the financial statements for CCI Construction Company for a number of years including the years ended December 31, 1996, 1997 and 1998.

3.    Plaintiff is a company that issued surety bonds on CCI's behalf during the period from 1993 to 1999.

4.      CCI, in the winter of 2000, defaulted on those projects in process as of that time and filed for bankruptcy in May of 2000 requiring USF&G to fulfill its obligations under the payment and performance bonds issued on CCI's behalf.

5.      USF&G contends that it would not have issued 19 sets of payment and performance bonds had the audited financials for the years ended 12/31/96, 12/31/97 and 12/31/98 not negligently misrepresented the financial condition of the CCI. Plaintiff seeks to recover the approximately $31,000,000 it contends it has spent or will spend in performing its obligations under the payment and performance bonds issued on CCI's behalf.

6.      Pursuant to the Case Management Order dated August 17, 2001, as amended by order dated May 8, 2002, plaintiff's expert reports were due on July 22, 2002 and defendants' expert reports were due on August 21, 2002.

7.      By letter dated June 5, 2002, plaintiff requested defendants' concurrence in a proposal whereby plaintiff would be permitted to submit expert reports in rebuttal to reports received from defendants.  Specifically plaintiff stated

> Based on various exchanges during the discovery process, it appears that you [sic] client may assert as defenses certain issues possibly requiring the submission of expert testimony.  Because the exact topics for which your client may introduce expert testimony will be unknown by my client until approximately August 21, 2002, it will be difficult, if not impossible, for my client to produce reports or to designate topics for which it is currently unaware.  Accordingly my client is considering filing a motion that would provide it with 30 days from receipt of Brown Schultz' expert reports to file expert report (and designate experts) in rebuttal to the reports received from your client.

A copy of the letter is attached hereto as Exhibit A.

2

8.    On June 10, 2002, prior to receiving a response from defendants regarding the proposal, USF&G requested leave of court to file expert reports in rebuttal to designations made by Brown Schultz by September 20, 2002.  With regard to that motion USF&G advised the court that it intended to submit an expert report as to "what it avers are the various accounting errors by Brown Schultz no later than July 22, 2002.  This USF&G believes will be the only expert necessary for USF&G to prove its prima facie case. . . ."

> Plaintiff indicated that the relief sought was justified because
>
> It is difficult, if not impossible, for a party to determine the nature of all expert testimony it may need until the other party has fully made known the detailed nature of its claims (or, as applicable to Brown Schultz, its defenses).  During the course of discovery, it has become apparent that Brown Schultz may rely upon various affirmative defenses–such as failure to mitigate–for which it will bear the burden of proof.  Unless and until expert reports are provided by Brown Schultz, USF&G is unable to submit any expert reports to rebut or respond to such defendants.

A copy of plaintiff's motion is attached hereto as Exhibit B.

9.    Magistrate Smyser, by order dated June 14, 2002, prior to any response to the motion being due, granted plaintiff's motion to amend case management order regarding expert reports to permit the filing of rebuttal expert reports.  A copy of the June 14, Order is attached hereto as Exhibit C.

10.    On July 22, 2002, the only expert report submitted by Plaintiff was the Expert Report of Stephen DeBruyn, CPA.

11.    On August 21, 2002, Defendants produced the reports of their experts including the report of Rolf Neuschaefer, a surety bond underwriter.

3

12.     On September 20, 2002, plaintiff produced the expert of report of Richard D. Farnsworth, a surety underwriter. A copy of Mr. Farnsworth's report is attached hereto as Exhibit D.

13.     Mr. Farnsworth, in that report, offers the opinion that "it was reasonable and justifiable for USF&G's underwriters to rely on the audited financial statements prepared by Brown Schultz Sheridan & Fritz in reaching their underwriting decisions concerning CCI."[1] Farnsworth Report at p. 2.

14.     On October 9, 2002, Plaintiff submitted the Affidavit of Richard Farnsworth in opposition to defendants' motion for summary judgment. A copy of the Farnsworth Affidavit is attached hereto as Exhibit E.

15.     By letter dated October 16, 2002, Plaintiff purported to designate the Farnsworth Affidavit as constituting an expert report.  A copy of the October 16, 2002 letter is attached hereto as Exhibit F.

16.     The Farnsworth Report and affidavit were submitted months after the July 22, 2002 deadline in the case management order for the submission of expert reports by plaintiff.

17.     The Farnsworth Report and affidavit are  being offered, at least in part, to prove an element of plaintiff's case in chief, i.e., reasonable reliance and, as such, do not constitute rebuttal reports to which the September 20, 2002 deadline would

_____

[1]Mr. Farnsworth only other opinion is that USF&G's underwriting of the CCI account generally conformed to applicable standards of care of the surety industry that were in effect during 1994-1999.

4

apply.  Nor are they "supplementations" to which the "supplementations" deadline

in the case management order would apply.

18.    Accordingly, the Farnsworth Report and Affidavit are untimely

pursuant to the Case Management Order and should be stricken for that reason.

19.    Further, pursuant to F.R.C.P. 37(c)(1), plaintiff should also not be

permitted to use the information contained in Mr. Farnsworth's report and affidavit.

> A party that without substantial justification fails to disclose
> information required by Rule 26(a) or 26(e)(2) is not, unless the
> failure is harmless, permitted to use as evidence at a trial, at a
> hearing or on a motion any witness or information not so disclosed.
> In addition to or in lieu of this sanction, the court on motion and
> after affording an opportunity to be heard may impose other
> appropriate sanctions.

20.    The non-producing party shoulders the burden of proving substantial

justification for its conduct or that the failure to produce was harmless. *See*

*Stallworth v. E.Z. Serve Convenience Stores*, 199 F.R.D. 366, 368 (M.D. Ala. 2001).

Plaintiff cannot establish either of these conditions.

21.    There was no substantial justification for plaintiff's failure to produce

the Farnsworth Report in accordance with the dates set forth in the Case

Management Order.  It is clear from plaintiff's own correspondence that it was fully

aware of the fact that, to the extent it would be using expert testimony to establish

an element of its prima facie case, it was required to make the disclosures required by

F.R.C.P. 26 on July 22, 2002.

22.    The failure to produce the required information was not harmless.

5

Defendants submitted their expert reports without the knowledge that plaintiff would be attempting to use expert testimony to establish the element of reasonable reliance and without the opportunity to address Mr. Farnsworth's contentions in this regard. In addition, defendants submitted their summary judgment motion based on the record as it existed at the close of discovery and subsequent to time plaintiff was required to produce its expert disclosures under F.R.C.P. 26. It was not until after defendants had moved for summary judgment that plaintiff produced Mr. Farnsworth's report.

23.    The Farnsworth Report and Affidavit should be stricken because it was not produced in accordance with the Case Management Order and F.R.C.P. 37. Alternatively, plaintiff should not be permitted to use the information contained in the Farnsworth Report and Affidavit in its own case but should be limited to using the information, if at all, in rebuttal to expert testimony submitted by defendants.

WHEREFORE, defendants respectfully request that this court grant defendants motion and strike the Farnsworth Report and Affidavit or, alternatively, to preclude its use by plaintiff to establish an element of its prima facie case.

SWARTZ, CAMPBELL & DETWEILER

BY: _____
JEFFREY B. MC CARRON
KATHLEEN M. CARSON

Dated: January 24, 2003

6

## CERTIFICATE OF SERVICE

I, Kathleen M. Carson, Esquire, counsel for defendants, Bruce J. Brown and

Brown, Schultz Sheridan & Fritz, hereby certify that a copy of Defendants' Motion to

Strike the Expert Report and Affidavit of Richard Farnsworth, was served upon all

counsel listed below by first class U.S. mail, postage prepaid on January 24,2003

Peter Speaker,Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA 17101

Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA 02110

Kathleen M. Carson

Date: January 24, 2003

06/05/2002 17:15 FAX                    Bernkopf  Goodman                          ☒002

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

June 5, 2002

Bruce D. Levin
DIRECT DIAL: (617) 790-3314
e-mail: blevin@bgblaw.com

_VIA FACSIMILE_

Kathleen Carson, Esquire
Swartz Campbell Detweiler
1601 Market Street
Philadelphia, PA  19103-2316

Re:    United States Fidelity & Guaranty Company v. Brown Schultz Sheridan & Fritz

Dear Kathleen:

I am writing pursuant to Local Rule 7.1 to solicit your views regarding an amendment to the Case Management Order regarding expert disclosures.

As you know, the latest scheduling order provides for my client to submit expert reports no later than July 22, 2002.  Your client is required to submit expert reports no later than August 21, 2002.  Any supplement to those reports should be submitted by October 18, 2002.

No later than July 22, 2002, my client intends to submit a report concerning an expert that will discuss whether Brown Schultz complied with pertinent accounting and auditing standards of practice.  Based upon the information contained therein, your client will be able to respond to the issues raised in that expert report prior to August 21, 2002.

Based on various exchanges during the discovery process, it appears that you client may assert as defenses certain issues possibly requiring the introduction of expert testimony.  Because the exact topics for which your client may introduce expert testimony will be unknown by my client until approximately August 21, 2002, it will be difficult, if not impossible, for my client to produce reports or to designate experts as to topics for which it is currently unaware. Accordingly, my client is considering filing a motion that would provide it with 30 days from receipt of Brown Schultz' expert reports to file expert reports (and designate experts) in rebuttal to the reports received from your client.

Please let me know if your client is amenable to such an amendment or if it will be necessary to file a motion with the Court.

BERNKOPF, GOODMAN & BASEMAN LLP

Kathleen Carson, Esquire
June 5, 2002
Page 2


Please feel free to call me if you have any questions or comments.

Very truly yours,

Bruce D. Levin

cc:    Peter B. McGlynn, Esquire
       Mark Holtschneider, Esquire
BDL/mlb
#246729 v1/36432/87

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff | ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | ) ) ) ) ) | JUDGE KANE |

**[PROPOSED] ORDER REGARDING MOTION TO AMEND**
**CASE MANAGEMENT ORDER REGARDING EXPERT REPORTS**

AND NOW, this _____ day of _____, 2002, upon consideration of United

States Fidelity & Guaranty Company's Motion to Amend Case Management Order Regarding

Expert Reports, it is hereby ORDERED that the motion is GRANTED and the deadlines in the

August 17, 2001 Case Management Order, as modified by the Order dated May 8, 2002, are

modified as set forth below:

        Submission of Rebuttal Expert Reports

                USF&G                                    9/20/02

All other dates and/or deadlines in the August 17, 2001 Case Management Order, as

modified by the Order dated May 8, 2002, remain in effect.

                                By the Court:


                                _____


Dated: _____, 2002
#246993 v1/36432/87

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | | |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, | ) ) ) | |
| Plaintiff | ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| v. | ) ) | JUDGE KANE |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, | ) ) ) | |
| Defendants. | ) ) | |

## MOTION TO AMEND CASE MANAGEMENT
## ORDER REGARDING EXPERT REPORTS

United States Fidelity & Guaranty Company ("USF&G") hereby moves to amend the

Case Management Order to provide that USF&G have the opportunity to submit expert reports

and designate experts that may be needed in response to experts designated by Brown Schultz

Sheridan & Fritz and Bruce J. Brown (collectively, "Brown Schultz").

In support of this Motion, USF&G avers and asserts as follows:

1.      By this action, USF&G has asserted a cause of action of negligent

misrepresentation by which it seeks to recover from Brown Schultz damages incurred by USF&G

relative to performance and payment bonds underwritten by USF&G on behalf of CCI

Construction ("CCI") based on audits of CCI prepared by Brown Schultz.

2.      According to the Case Management Order dated August 17, 2001, as amended by

Order dated May 8, 2002, the deadline for submission of expert reports by USF&G is July 22,

2002.  The deadline for submission of expert reports by Brown Schultz is August 21, 2002.  Any

supplements to reports shall be submitted on or before October 18, 2002.

3.       USF&G intends to submit an expert report as to what it avers are various auditing

and accounting errors by Brown Schultz no later than July 22, 2002.  This USF&G believes will

be the only expert necessary for USF&G to prove its *prima facie* case – which requires, *inter*

*alia*, that USF&G prove that Brown Schultz did not exercise the skill and knowledge normally

possessed by accountants in the community relative to audit reports prepared by Brown Schultz.

*See, Robert Wooler Co. v. Fidelity Bank*, 370 Pa. Super. 523, 479 A. 2d 1027 (1984);

Restatement (Second) of Torts §299A.  Possessed of this expert's report no later than July 22,

2002, Brown Schultz will have the opportunity to retain an expert and submit expert reports in

support of its position on the issues raised by USF&G.

4.       USF&G proposes that no later than July 22, 2002 that USF&G submit the report

of its expert on accounting standards and practices.  No later than August 21, 2002, Brown

Schultz may submit its rebuttal expert.  In the event that Brown Schultz seeks to designate any

experts other than its rebuttal expert on accounting, Brown Schultz shall also file the appropriate

expert reports by that date.  USF&G will then have thirty (30) days after Brown Schultz' deadline

– until September 20, 2002 – to file expert reports in rebuttal to the designations made by Brown

Schultz.

5.       In essence, the relief sought by USF&G is justified for the same reason that

Brown Schultz' expert reports need not be submitted until 30 days after USF&G has done so; to

wit, it is difficult, if not impossible, for a party to determine the nature of all expert testimony it

may need until the other party has fully made known the detailed nature of its claims (or, as

applicable to Brown Schultz, its defenses).  During the course of discovery, it has become

apparent that Brown Schultz may rely upon various affirmative defenses – such as failure to mitigate – for which it will bear the burden of proof.  Unless and until expert reports are provided by Brown Schultz, USF&G is unable to submit any expert reports to rebut or respond to such defenses.

6.    The relief sought by USF&G is not prejudicial to Brown Schultz.  Brown Schultz will be in possession of USF&G's expert reports prior to the date Brown Schultz must submit its own such reports.  Brown Schultz will be given full opportunity to respond to issues and topics raised by USF&G.  Moreover, if Brown Schultz believes further issues and topics require expert testimony, it will be fully able to submit appropriate expert reports; USF&G merely seeks the ability to timely respond to any such expert reports.  Moreover, the approach suggested by USF&G will likely result in considerable savings for both sides.  In addition to being highly speculative, it would be expensive and wasteful for USF&G to retain experts and to provide expert reports on topics that may never be raised at trial.  If USF&G submits expert reports on speculative topics solely to preserve its rights, Brown Schultz may have to retain experts and submit expert reports to rebut testimony and topics that it might not otherwise present at trial.

WHEREFORE, USF&G respectfully requests that the Court issue an order:

1.    Allowing USF&G a period of 30 days in which to file expert reports in rebuttal to expert reports submitted by Brown Schultz, other than those submitted by Brown Schultz in rebuttal to USF&G's expert reports; and

2.    Providing such other and further relief as is just and proper.

UNITED STATES FIDELITY
& GUARANTY COMPANY,
By its attorneys,

Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA  02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

and

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:    (717) 237-7100
Facsimile:    (717) 237-7105

Dated: June 10, 2002
#246749 v1/36432/87

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above
document was served upon (each party appearing
pro se and) the attorney of record for each other party
by mail (by hand) 6/10/0 2

-4-

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff<br><br>v.<br><br>BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | CIVIL ACTION NO. 1:01-CV-00813<br><br>JUDGE KANE |

## STATEMENT REGARDING COMPLIANCE WITH LOCAL RULE 7.1

Pursuant to Local Rule 7.1, counsel for United States Fidelity & Guaranty Company ("USF&G") states that prior to filing the Motion to Amend Case Management Order Regarding Expert Reports it attempted in good faith to resolve relevant issues. On or about June 5, 2002, counsel sent a letter seeking concurrence with that Motion or, in the alternative, suggestions for any possible compromise. No response was received. On June 7, 2002, an e-mail message was sent to Kathleen Carson, Esquire, counsel for Bruce J. Brown and Brown Schultz Sheridan & Fritz seeking, again, to solicit counsel's views on this matter. No response was received.

USF&G files herewith and incorporates herein the Motion to Amend Case Management

Order Regarding Expert Reports.

UNITED STATES FIDELITY
& GUARANTY COMPANY,
By its attorneys,

Peter D. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA  02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

and

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:    (717) 237-7100
Facsimile:    (717) 237-7105

Dated: June  10 , 2002
#247038 v1/36432/87

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above
document was served upon (each party appearing
pro se and) the attorney of record for each other party
by mail (by hand)  6/10/0—

12:46 JUN 14, 2002  TO: JEFFREY B. MCCARRON  FR: SCAN31                    #11915  PAGE: 2/2

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | | |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff | ) ) ) ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | ) ) ) ) ) | JUDGE KANE |

**FILED**
HARRISBURG, PA

JUN 1 4 2002

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

**[PROPOSED] ORDER REGARDING MOTION TO AMEND
CASE MANAGEMENT ORDER REGARDING EXPERT REPORTS**

AND NOW, this 14TH day of ___June___, 2002, upon consideration of United

States Fidelity & Guaranty Company's Motion to Amend Case Management Order Regarding

(Doc. 29)

Expert Reports, it is hereby ORDERED that the motion is GRANTED and the deadlines in the

August 17, 2001 Case Management Order, as modified by the Order dated May 8, 2002, are

modified as set forth below:

　　　　Submission of Rebuttal Expert Reports

　　　　　USF&G                              9/20/02

All other dates and/or deadlines in the August 17, 2001 Case Management Order, as

modified by the Order dated May 8, 2002, remain in effect.

　　　　　By the Court:

　　　　　_____

Dated: _June 14_, 2002
#246993 v1/36432/87

## EXPERT REPORT OF RICHARD D. FARNSWORTH

I am a former Senior Vice President of Fireman's Fund Insurance Company in charge of their nationwide surety operations. I retired from Fireman's Fund January 1, 1999. My 35 years of experience in surety underwriting included work as a field office underwriter/manger and a home office underwriter/officer. My executive responsibilities included serving as the Surety Chief Underwriter, authoring underwriting standards and developing marketing strategies. Since my retirement, I have been engaged as a consultant/expert witness on surety underwriting issues in 10 cases. I have given deposition testimony in two cases and testified at one arbitration hearing. My Curriculum Vitae is attached as Exhibit A. I am being compensated for my services at the rate of $160.00 per hour.

I have been engaged by Bernkopf, Goodman, & Baseman LLP to provide litigation consulting and forensic services relating to USF&G's bond underwriting of CCI Construction Company, Inc. (CCI) in connection with the above referenced litigation. I have been asked to determine if I could render certain opinions on USF&G'S underwriting practices, conduct and decisions as surety for CCI. I have concluded that I am able to render such opinions.

In connection with my engagement, I relied on the following documents and information:

- USF&G'S Complaint against Brown Schultz Sheridan & Fritz.

- Answer of Brown Schultz to Complaint.

- Brown Schultz Responses and Objections to USF&G's First Set of Interrogatories.

- Correspondence between Byerly Insurance and DJL Associates, and USF&G.

- Deposition transcript of Stephen Salazar, dated May 22, 2002.

- Deposition transcripts of Tony Phillips, dated April 17 and May 29, 2002.

- Deposition transcript of David Hussey, dated May 28, 2002.

- Deposition transcript of James Daily, dated April 18, 2002.

- Copies of USF&G's "gray letters".

- Copy of USF&G's Contract Underwriting Manual.

- Copy of St. Paul Surety Group Training and Reference Guide (8-99).

- AICPA Audit and Accounting Guide for Construction Contractors, 1981.

- Welch, John W. et al. Contract Surety, Volume 1 and 2, Insurance Institute of America, 1992.

- Conversations with James Daily and Tony Phillips.

For reasons explained below, it is my opinion that (1) USF&G's underwriting of the CCI account generally conformed to applicable standards of care of the surety industry that were in effect during 1994-1999; and (2) it was reasonable and justifiable for USF&G's underwriters to rely on the audited financial statements prepared by Brown, Schultz, Sheridan & Fritz in reaching their underwriting decisions concerning CCI.

In reaching the foregoing opinions, I considered, among other things, the surety industry environment during the period of 1994-1999. As the senior bonding executive of a major surety-Fireman's Fund- I was and am familiar with the underwriting customs and practices of our competitors, including USF&G and St. Paul. I also have personal knowledge of Fireman's Fund's surety underwriting guidelines and the surety underwriting principles and practices taught by surety industry practitioners. I have validated this knowledge by reviewing the IIA Contract Surety textbooks and the AICPA Audit Guide referenced above.

In general, the state of the surety industry during the period of 1994-1999 was very competitive. The surety industry was a profitable, mature industry during that time and one surety's growth came at the expense of another surety's business. Most major sureties' lines of business formed a part of a large multiple line property and casualty insurance company. The senior management in these companies expected growth from the companies' profitable specialty lines, such as the surety business. As the competition intensified, pricing levels dropped and historical underwriting standards were relaxed. This was the environment in which USF&G and the other major sureties were conducting surety business when underwriting for CCI.

Underwriting is the process of gathering facts relevant to the risk, of bonding a contractor. The process includes, evaluating the pertinent data, determining the strengths and weaknesses of the account and deciding upon a course of action. The primary function of the surety in the contract bond underwriting process is the prequalification of the contractor. When the surety executes a bond it is in effect saying to the owner that it has made a detailed analysis of the contractor's management and technical skills; that it has studied the contractors financial condition; that it believes the contractor is fully qualified in all respects to perform the contract in question. The surety is prepared to back this judgment by committing the assets of its company in support of this decision. Before the surety can make such a commitment it must first underwrite the account to satisfy itself that this is a company that it can support and that it is a company that possesses the ability to meet current and future obligations. If the surety's analysis is that it is an acceptable account, the surety then makes a decision on the amount of bonding capacity they are willing to provide to the contractor.

Contract bond underwriting involves both objective and subjective evaluations by the underwriter. Therefore, reducing surety underwriting to quantitative terms is very difficult, if not impossible, in most cases. The underwriter evaluates the contractor through three primary categories: Character, Capacity, and Capital. From information provided to him by the contractor, such as financial statements, references, company history, management procedures, resumes of key personnel, prior job experience and from information provided by outside sources, the underwriter analyzes, interprets and applies financial data. He also assesses the history, organization, and management capabilities of the contractor (the "Principal"), the contractor's capacity to perform each new project and the backlog of projects undertaken by the contractor. The underwriter also assesses the organization and contractor owner's reputation for fair dealing with project owners, subcontractors, suppliers, lenders, and other creditors, as well as the contractor's general reputation within the industry.

Once the contractor passes the surety's underwriting analysis, a decision must be made as to the amount of bonding capacity the surety is willing to extend to the contractor. The contractor usually advises the surety of its general plans for the year and the level of bonding support it believes will be needed to support the construction work program. The surety then decides if it can meet those needs. This amount is expressed in terms of a single job dollar amount (contract price) and the aggregate dollar amount of work to be performed on uncompleted contracts (backlog or work on hand). This is often referred to as the "bonding program." It is necessary to establish such a bonding program because it is impossible to predict the identity and size of the projects on which a contractor will be successful in obtaining throughout the year. A bonding program allows a contractor to bid jobs knowing that almost absent an adverse change in the contractor's business or finances, he is eligible to receive bonding within the parameters set in the bonding program. In suretyship, the risk of loss remains with the Principal, while the surety merely extends surety credit so as to guarantee performance in the event that the Principal defaults.

The surety, on an annual basis, reviews the bonding program usually after it receives the contractor's audited financial report. Normally, a meeting is held between the contractor, agent and underwriter at that time to review the contractor's business plan for the remainder of the year. Sometimes, no meeting will be required. The underwriter determines the level of bonding support the contractor needs in order to meet his business plan and. if acceptable to the underwriter, an understanding is reached between the contractor, agent and surety as to the size of the bonding program. As noted above, the contractor at this point in time does not normally know what specific jobs he will be bidding during the year, but the bonding program parameters allow him to pick specific projects in the future that will be within the established bonding program. This is especially true of public work where initial bid advertisements may not be published until after the annual underwriting review and after the determination as to whether the establishment or continuation of the bonding program has been made. From the sureties' perspective, the surety's bonding program is extended in connection with the support of the total work program (which in the case of CCI was, as noted below, $15 million single/$75 million aggregate) and not the issuance of specific bonds. Once the bonding program is approved each year, a contractor's request for bonds within the parameters of that program may normally be granted so long as the surety has not received adverse information concerning the contractor, and the surety is satisfied with the contract terms and provisions. Therefore, although each job must be submitted to the surety for specific approval prior to bidding, a new annual audit is not required each time a bond is requested as long as the new request is within the parameters of the bonding program. Indeed, it would be extremely expensive and impractical (if not impossible) to require the contractor to provide the surety with an audit report every time the contractor obtains a new contract. Each bond is underwritten using the most recent annual audit report as the basis for evaluating the contractor's financial condition and financial progress throughout the accounting year.

A significant form of security for the establishment or continuation of the bonding program is the "Net Quick" (working capital) and "Net Worth" (shareholders' equity) of the Principal. The term "working capital" as used in the surety business is commonly known as "Net Quick" and is defined as the excess of current assets over current liabilities. It is a measure of a Principal's liquidity and solvency. The term "stockholders' equity" as used in the surety business is commonly termed "Net Worth" and is defined as the excess of total assets over total liabilities. It represents the basic risk capital of the business. Sureties relate the contractor's backlog to his finances in their decision-making process. Two key ratios are used to measure this relationship: backlog- to- net quick and backlog- to- net worth. A major risk to the contractor's financial success is the adequacy of his cost estimates on his work in progress. If the contractor encounters unexpected cost overruns, he often has to finance the additional costs from his own financial resources. There is no generally accepted or well-proven formula for relating the Net Quick and Net Worth of a principal to its work on hand.

3

There are factors and there are influences such as a surety company's own guideline, the contractors size and type, qualitative analysis of the, contractors finances, risk assessment of the contractors backlog. But there is no simple mathematical system that pulls it all together. Many sureties have some guidelines, but they consider it an art form and are used accordingly taking into consideration the underwriter's assessment of management skills, cash flow, job conditions, economic conditions, etc. Observation of many surety's practices establishes the industry custom and practice and what is a reasonable level of bonding capacity for a particular risk.

John Ortenzio started CCI in 1990. Prior to this time, John Ortenzio was the President of Commercial Construction Company from 1983-1990. He has a BS degree in Business Management and has worked in the construction industry since 1979. The underwriting file contains an organization chart and resumes of the key officers and employees. Personal antecedents of the individuals and the company conclude all to be of good character and well qualified for their respective corporate duties. There was good balance of business, engineering and field production capabilities.

CCI's job experience from its inception up to 1993-1994 was primarily in private, negotiated construction of medical and healthcare buildings, predominately for one owner. CCI's financial results since inception were impressive. Its net worth as of December 31,1993 was $4.1 million. It's business plan included entry into the public bid market. Although this represented a change in the type of market that CCI had historically operated, in USF&G's opinion CCI possessed the management and financial capabilities to undertake this new direction.

Annual CPA audited financial reports on CCI were prepared by Brown Schultz Sheridan & Fritz (Brown Schultz), an independent CPA. These were provided to USF&G for use in underwriting the account. Evaluating the financial condition of the principal is an integral part of contract bond underwriting. Suretyship is a form of credit and the surety's primary source of collateral for the extension of credit is the creditworthiness and overall financial strength of the principal. In the event of cost overrruns on bonded projects the principal's financial resources stand between the principal and a surety's loss. Also, the surety's evaluation of the company's financial results over time serve to validate the underwriter's subjective judgments on the quality of management and their strategic decisions. For these reasons, with accounts the size of CCI, it is the custom and practice for sureties to require an annual CPA audit report prepared in accordance with the AICPA audit guidelines. A CPA audit provides the surety with one of the few independent, objective tests of the Principal's financial condition and an independent, objective assessment of the adequacy of the Principal's accounting system. The audit also provides the determination as to whether the estimates of revenue and costs on uncompleted contracts are reasonable and accurate. Based on the auditor's opinion letter, the surety underwriter can justifiably rely on the credibility of the Principal's financial reporting and financial integrity. An independent audit also leads to a more reliable analysis. Such reliance by the underwriter is very important when extending surety credit at the levels requested by CCI. Consequently, independent audit reports are given substantial weight by surety underwriters.

The overall physical appearance of the Brown Schultz annual reports was good. It was a full report with supporting schedules, including schedules of completed contracts and work- in- progress. From a surety underwriter's perspective, the report appeared to be professional and lent itself to a high degree of reliance.

USF&G's financial statement analysis practices were consistent with the custom and practice of the surety industry. Such practices included an analysis of CCI's balance sheet, income statement and work in progress. USF&G underwriters performed a trend analysis and ratio analysis that included a

4

comparison of CCI's various financial ratios with the industry averages published by Dun and Bradstreet. Dun and Bradstreet had a software package which calculated various financial ratios for construction contractors and then compared those ratios with the financial statements of other contractors which it had surveyed. Dun and Bradstreet employed a series of numeric and color codes (green, yellow, red) which the software automatically applied to these ratios. As appears in the USF&G underwriting file, USF&G subscribed for the Dun and Bradstreet software at least during a portion of the time period when it issued bonds for CCI. Fireman's Fund was also a Dun and Bradstreet subscriber during a portion of the time I was employed by Fireman's Fund. In my opinion, application of the Dun and Bradstreet software to large accounts like CCI was not meaningful since the Dun and Bradstreet surveys were directed to smaller sized contractors; the largest "Revenue Range" in the Dun and Bradstreet software package was "over $5 million." To be meaningful, CCI's ratios should be compared to a contractor peer group where contractors had revenues in the range of $25 million to $50 million.

I would characterize CCI's financial history, starting with December 31, 1994 as being modestly profitable in 1995, 1996, 1997 and 1998. Operating losses were reported in 1995 and 1998, but were offset by investment income. During the period of 1994-1997, CCI showed a sound financial condition. Net Quick was in the $4 million to $5 million range, with cash and marketable securities of $4 million to $5 million. Construction is a service business and a contractor's main asset is its ability to generate cash as a going concern. During the relevant time period, CCI's maintained cash balances consistently in an amount that allowed them to pay their bills when due, finance the start-up of new work, and provided cash reserve to fund unexpected cost overruns on work in progress. The accounts receivables turnover was excellent. CCI's capital structure was well in line with their annual revenue levels resulting in no short-term bank debt. Key solvency and leverage ratios were in line with similar companies.

USF&G noted in their analysis that CCI had developed a trend of profit fades on individual contracts from the initial estimate of gross profit to the final result. The underwriters raised the concern to the Principal, and the reasons for the profits fades were satisfactory to them. Generally, CCI was experiencing a learning curve in its change from private to hard bid, public work. This was disclosed to USF&G and CCI provided reasonable and plausible explanations for the changes and the learning curve.

USF&G was also receiving interim financial statements and work- in- progress schedules from CCI prepared by CCI's controller. These statements were analyzed by the underwriters and served as a tool for them to monitor the financial progress of their principal during the year. The June 30, 1998 income statement reflected a $1.6 million loss to date. However, CCI provided USF&G with an explanation of the cause of the loss and told USF&G that the problem jobs were behind it and that it would show at least a breakeven result at December 31, 1998. Based on its confidence in CCI's management's capabilities and the logical explanation of the losses, USF&G continued to provide surety support to CCI. CCI's Balance Sheet as of June 30, 1998 indicated it was solvent with a Net Quick of $1.1 million. Cash and marketable securities totaled $964,000. Accounts receivables of $6.6 million were showing an average collection period of 70 days. In addition, at least one other financial institution also expressed confidence in CCI during this period. CCI's bank had increased the short term borrowing facility for $1 million to $2 million and the full amount was available to CCI as of June 30, 1998. Since CCI appeared to be a viable going concern, abruptly terminating bonding would sharply curtail its ability to acquire new work and generate cash. This was not justified based on its reported financial condition. A surety usually does not stop writing bonds at the first sign of bad news. The underwriter analyzes and evaluates the current financial condition of the contractor using the most current interim financial statement as a benchmark to measure the contractor's progress since the last audit report.

USF&G agreed to support CCI in a joint venture with Fulkrod Construction on a January 7, 1999 bid to Penndot in the amount of $40 million. CCI's share of the joint venture was approximately $22 million. The bond would be a co-surety obligation with Reliance Insurance Company, who was Fulkrod's surety. This contract for highway construction work on Routes 11 & 15 was close to CCI's offices and the key civil construction employees that CCI had recently hired to run their civil division had worked on the first two phases of this project while employed by another road contractor. CCI would be responsible for the excavation and paving. During the previous year, CCI had purchased the necessary equipment to perform this type of work. If low, CCI's aggregate work-on-hand would be approximately $92 million at its peak, but it would have reduced its backlog by as much as $6 million per month as CCI continued working on its construction backlog. In a meeting on January 5, 1999 with CCI, USF&G was advised by CCI that CCI's December 31, 1998 year-end would show a break-even result, with working capital of $2.5 million and stockholders equity of $5.4 million. USF&G reasonably concluded that CCI was a solvent, viable going concern with capable management and qualified civil construction employees to perform this contract.

The December 31, 1998 year-end audit report reflected an operating loss of $117,000 and net income of $59,000. The Net Quick had been reduced to $2.4 million due to CCI's financing of additional equipment. Cash and marketable securities were $3 million. There was no short-term bank debt. The work in progress schedule was showing an estimated gross profit margin of 7.3% on $47 million of work left to build. The Net Quick included $6.3 million in under billings. CCI advised the USF&G underwriter that this amount had been reduced to approximately $3 million by February 28,1999. Based on the projected results of its present backlog and the addition of a normal level of new work, CCI was forecasting a $1.0 million net profit for 1999.

The fact that CCI had an operating loss of only $117,000- less than 1 % of its total volume in 1998- in comparison to a mid-year loss of $1.6 million, amply demonstrated, in my opinion, that CCI's management had control of the situation and backed its promises with positive and successful actions. The fact that CCI was able to demonstrate, based on the Brown Schultz 1998 audit report, overall net income of $59,000, principally derived from gains realized on the sale of marketable securities and cash equivalents, also shows that CCI could draw on other liquid assets to manage its cash flow. This is what a surety wants to see when the contractor encounters financial difficulties; an equity cushion to fall back on.

On August 30, 1999 USF&G was advised by CCI that it was incurring a loss of $900,000 through June 30, 1999. The projected loss as of December 31,1999 was $1 million. The August 31, 1999 in-house financial statements reflected a net loss of $1.2 million. Net Quick was $787,000. CCI had a zero cash balance and short- term bank debt was $2.3 million. CCI's under billings totaled $4.5 million. USF&G ceased providing surety support to CCI. The last final bond written was effective 9/30/99.

As noted earlier, CCI maintained an unsecured bank line of credit of $1 million. This was increased to $2 million in April 1998 and then to $4 million in April 1999. CCI also had a "3A2" Dun and Bradstreet rating with a generally prompt pay record (paying within the terms granted by the creditor).

USF&G established a work program of $15 million single/$75 million aggregate (for its Harrisburg branch ). Initially, USF&G indicated a willingness to go beyond these levels. Its first opportunity to become CCI's surety was in November 1993 when they issued the bid bond on the Houtzdale prison project with an estimated contract price of $62 million. The projected work on hand with this job was $117 million. Considering CCI's single job experience and relatively newness to the public

6

sector, this appears, at first blush, to be a questionable decision of USF&G. However, USF&G underwriters previously met with CCI's key management people and were very impressed with their management sophistication. Further, USF&G believed this project had been well thought out and that CCI was capable of building this job and managing the cash flow requirements. Further, in 1993 and 1994, CCI showed a strong balance sheet. Furthermore, John Ortenzio had demonstrated 12 years of success in running his business. CCI did not get this job.

The actual aggregate capacity extended by USF&G was well within the $75 million aggregate parameters. Based on the work-in-progress schedules submitted by CCI, the highest cost to complete amount prior to 1999 was $73 million at September 30, 1994. This represented an average 5% case on Net Quick and 6% case on Net Worth. The reduction in Net Quick at December 31, 1998 made it a 3% case on Net Quick, but the bank line was increased and the work in progress appeared to be profitable based on the audited financial statements. Based on my personal experience and knowledge of the custom and practice of the industry during the time period in question this level of surety credit conformed to the industry standard of care. At trial I may employ certain charts to aid the trier of fact in connection with my trial testimony.

During the time when USF&G was bonding CCI, USF&G did not have a formal underwriting manual. Rather, USF&G's surety management issued circulars on specific underwriting subjects. These have been referred to by USF&G's underwriters as the "gray pages". More recently, a Contract Underwriting Manual was drafted by USF&G and distributed to their surety underwriting staff. This manual was not formally adopted by USF&G. The gray pages contained very little guidance on contract bond underwriting practices. They primarily addressed underwriting information requirements. USF&G surety underwriters met these requirements in their underwriting of the CCI account. The Contract Underwriting Manual was an educational document as well as an underwriting guideline. USF&G surety underwriters also complied with the submission guidelines and the analysis of financial statements and analysis of work-in-progress schedules. When exceptions were made by the underwriters to a specific underwriting element covered by the guidelines the concerns recited in the guidelines were considered by the underwriters and an informed decision was reached.

In summary, after considering all the relevant elements to the underwriting of a contract bonding program, the underwriter makes an overall evaluation of the contractor's character, capacity and capital. The underwriter also assesses the contractor's potential success to complete the project being considered and the completion of the backlog. Most of the factors can be quantified, but there are some subjective judgments that cannot be quantified such as assessment of management's capabilities. In the case of CCI, USF&G may, in retrospect, have been mistaken in its assessment of CCI's management's expertise to successfully manage the change in the type of work they undertook, which assessment included the review and analysis of Brown Schultz' audit reports. However, this does not necessarily make USF&G negligent in performing its underwriting duties. USF&G's underwriting process and practice conformed to the applicable standards of care of the surety industry that were in place during the time USF&G was CCI's surety.

Richard D. Farnsworth
Dated: September 20, 2002

7

**EXHIBIT A**

**CURRICULUM VITAE**

Richard D. Farnsworth

**EXPERTISE**

35 years experience in surety underwriting, marketing, financial and administrative duties. Work included developing an international surety facility. Broad-based experience in all aspects of managing a nationwide surety operation including authoring underwriting standards and guidelines, managing producer relationships, development of marketing strategies, preparation of business plans, reinsurance negotiations, development of training programs for underwriters, and administrative responsibilities for the Surety Claims unit.

**EDUCATION**

BS Finance, University of Idaho
The Executive Program, University of Wisconsin

**EMPLOYMENT**

1999-Present
Surety consultant/expert witness. Have given depositions in two cases and testified at one arbitration hearing.

1986-1999
*Fireman's Fund Insurance Company, Novato, CA*
Returned to Fireman's Fund in January 1986 as Assistant Vice President/Territorial Executive. In 1987 promoted to Vice President responsible for the nationwide Surety underwriting and marketing activities. In 1992 elected Senior Vice President responsible for the company's nationwide Surety Operations. During my tenure, business grew to a very profitable $100 million Surety Operation with full international capabilities. Retired January 1, 1999.

1973-1986
*Wausau Insurance Companies, Wausau, WI*
Joined company's start-up Surety Operation as Assistant Manager. Responsibilities included hiring and training of underwriting and sales staff; development and implementation of underwriting standards and guidelines; developing and managing underwriting authorities of staff; underwriting major accounts. In 1982 promoted to Vice President with responsibility for the nationwide Surety Underwriting and Claims Operation.

1963-1973
*Fireman's Fund Insurance Company*
Began career as a Surety Underwriting Trainee in the Western Regional Office, San Francisco. Two years later was transferred to Albuquerque Branch Office as a Surety Field Representative. Promoted to Fidelity and Surety Manager, Salt Lake City Branch Office in 1967.

**BUSINESS AFFILIATIONS**

Surety Association of America. Member, Board of Directors, 1988-1999.
National Association of Independent Sureties. Chairman, 1983.
The Dutra Group, San Rafael, CA., Board of Directors, 2002.

**SPEAKING ENGAGEMENTS**

E.I.C. Workshop "Contract Bonds" Zurich, Switzerland, October 1998.

Participated in several panel discussions sponsored by the National Association of Surety Bond Producers and by the Associated General Contractors of America, 1986-1999.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff | ) ) ) ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| v. | ) ) | JUDGE CONNOR |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | ) ) ) ) | |

## AFFIDAVIT OF RICHARD D. FARNSWORTH IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Richard D. Farnsworth, on oath, deposes and says as follows:

1.     I am a former senior vice president of Fireman's Fund Insurance Company ("Fireman's Fund") and was in charge of Fireman's nationwide surety operations.  A copy of my resumé is attached hereto as Exhibit "A".

2.     I have been engaged by counsel for the plaintiff, United States Fidelity and Guaranty Company ("USF&G"), to provide litigation consulting and forensic services relating to USF&G's bond underwriting for CCI Construction Company, Inc. ("CCI") in connection with the above-referenced litigation.  I have been asked to determine if I could render certain opinions on USF&G's underwriting practices, conduct and decisions as surety for CCI.  I have concluded that I am able to render such opinions.

3.     In connection with my engagement, I considered the following documents and information:

- USF&G'S Complaint against Brown Schultz Sheridan & Fritz.

- Answer of Brown Schultz to Complaint.

- Brown Schultz Responses and Objections to USF&G's First Set of Interrogatories.

- Correspondence between Byerly Insurance and DJL Associates, and USF&G.

- Deposition transcript of Stephen Salazar, dated May 22, 2002.

- Deposition transcripts of Tony Phillips, dated April 17 and May 29, 2002.

- Deposition transcript of David Hussey, dated May 28, 2002.

- Deposition transcript of James Daily, dated April 18, 2002.

- Copies of USF&G's "gray letters".

- Copy of USF&G's Contract Underwriting Manual.

- Copy of St. Paul Surety Group Training and Reference Guide (8-99).

- AICPA Audit and Accounting Guide for Construction Contractors, 1981.

- Welch, John W. et al. Contract Surety, Volume 1 and 2, Insurance Institute of America, 1992.

- Conversations with James Daily and Tony Phillips.

4.      For reasons explained below, it is my opinion that (1) USF&G's underwriting of the CCI account generally conformed to applicable standards of care of the surety industry that were in effect during 1994-1999; and (2) it was reasonable and justifiable for USF&G's underwriters to rely on the audited financial statements prepared by Brown, Schultz, Sheridan & Fritz in reaching their underwriting decisions concerning CCI.

5.      In reaching the foregoing opinions, I considered, among other things, the surety industry environment during the period of 1993-1999. As the senior bonding executive of a major surety, Fireman's Fund, I was and am familiar with the underwriting customs and practices of Fireman's Fund and its competitors, including USF&G and St. Paul Fire and Marine Insurance

2

Company. I also have personal knowledge of Fireman's Fund's surety underwriting guidelines and the surety underwriting principles and practices taught by surety industry practitioners. I have validated this knowledge by reviewing the Insurance Institute of America Contract Surety textbook and the AICPA Audit Guide referenced above.

6.      In general, the state of the surety industry during the period of 1993-1999 was very competitive. The surety industry was a profitable, mature industry during that time and one surety's growth came at the expense of another surety's business. Most major sureties' lines of business formed a part of a large multiple line property and casualty insurance company. The senior management in these companies expected growth from the companies' profitable specialty lines, such as the surety business. As the competition intensified, pricing levels dropped and historical underwriting standards were relaxed. This was the environment in which USF&G, Fireman's Fund and the other major sureties were conducting surety business when underwriting for CCI.

7.      Underwriting is the process of gathering facts relevant to the risk of bonding a contractor. The process includes evaluating the pertinent data, determining the strengths and weaknesses of the account and deciding upon a course of action. The primary function of the surety in the contract bond underwriting process is the prequalification of the contractor. When the surety executes a bond it is in effect saying to the owner that it has made a detailed analysis of the contractor's management and technical skills; that it has studied the contractors financial condition; and that it believes the contractor is fully qualified in all respects to perform the contract in question. The surety is prepared to back this judgment by committing the assets of its company in support of this decision. Before the surety can make such a commitment, it must first underwrite the account to satisfy itself that this is a company that it can support and that it is

3

a company that possesses the ability to meet current and future obligations. If the surety's analysis is that it is an acceptable account, the surety then makes a decision on the amount of bonding capacity they are willing to provide to the contractor.

8.    Contract bond underwriting involves both objective and subjective evaluations by the underwriter. Therefore, reducing surety underwriting to quantitative terms is very difficult, if not impossible, in most cases. The underwriter evaluates the contractor through three primary categories: Character, Capacity, and Capital. From information provided to him by the contractor, such as financial statements, references, company history, management procedures, resumes of key personnel, prior job experience and from information provided by outside sources, the underwriter analyzes, interprets and applies financial data. He also assesses the history, organization, and management capabilities of the contractor (the "Principal"), the contractor's capacity to perform each new project and the backlog of projects undertaken by the contractor. The underwriter also assesses the organization and contractor owner's reputation for fair dealing with project owners, subcontractors, suppliers, lenders, and other creditors, as well as the contractor's general reputation within the industry.

9.    Once the contractor passes the surety's underwriting analysis, a decision must be made as to the amount of bonding capacity the surety is willing to extend to the contractor. The contractor usually advises the surety of its general plans for the year and the level of bonding support it believes will be needed to support the construction work program. The surety then decides if it can meet those needs. This amount is expressed in terms of a single job dollar amount (contract price) and the aggregate dollar amount of work to be performed on uncompleted contracts (backlog or work on hand). This is often referred to as the "bonding program." It is necessary to establish such a bonding program because it is impossible to predict

4

the identity and size of the projects on which a contractor will be successful in obtaining

throughout the year. A bonding program allows a contractor to bid jobs knowing that almost

absent an adverse change in the contractor's business or finances, he is eligible to receive

bonding within the parameters set in the bonding program. In suretyship, the risk of loss remains

with the Principal, while the surety merely extends surety credit so as to guarantee performance

in the event that the Principal defaults.

10.    The surety, on an annual basis, reviews the bonding program usually after it

receives the contractor's audited financial report. Normally, a meeting is held between the

contractor, agent and underwriter at that time to review the contractor's business plan for the

remainder of the year. Sometimes, no meeting will be required. The underwriter determines the

level of bonding support the contractor needs in order to meet his business plan and, if acceptable

to the underwriter, an understanding is reached between the contractor, agent and surety as to the

size of the bonding program. As noted above, the contractor at this point in time does not

normally know what specific jobs he will be bidding during the year, but the bonding program

parameters allow him to pick specific projects in the future that will be within the established

bonding program. This is especially true of public work where initial bid advertisements may not

be published until after the annual underwriting review and after the determination as to whether

the establishment or continuation of the bonding program has been made. From the sureties'

perspective, the bonding program is extended in connection with the support of the total work

program (which in the case of CCI was, as noted below, $15 million single/$75 million

aggregate) and not the issuance of specific bonds. Once the bonding program is approved each

year, a contractor's request for bonds within the parameters of that program may normally be

granted so long as the surety has not received adverse information concerning the contractor, and

5

the surety is satisfied with the contract terms and provisions. Therefore, although each job must be submitted to the surety for specific approval prior to bidding, a new annual audit is not required each time a bond is requested as long as the new request is within the parameters of the bonding program. Indeed, it would be extremely expensive and impractical (if not impossible) to require the contractor to provide the surety with an audit report every time the contractor obtains a new contract. Each bond is underwritten using the most recent annual audit report as the basis for evaluating the contractor's financial condition and financial progress throughout the accounting year. It should also be noted that once a bond has been issued, it is normally impossible for that existing bond to be revoked.

11.    A significant form of security for the establishment or continuation of the bonding program is the "Net Quick" (working capital) and "Net Worth" (shareholders' equity) of the Principal. The term "working capital" as used in the surety business is commonly known as "Net Quick" and is defined as the excess of current assets over current liabilities. It is a measure of a Principal's liquidity and solvency. The term "stockholders' equity" as used in the surety business is commonly termed "Net Worth" and is defined as the excess of total assets over total liabilities. It represents the basic risk capital of the business. Sureties relate the contractor's backlog to his finances in their decision-making process. Two key ratios are used to measure this relationship: backlog- to- net quick and backlog- to- net worth. A major risk to the contractor's financial success is the adequacy of his cost estimates on his work in progress. If the contractor encounters unexpected cost overruns, he often has to finance the additional costs from his own financial resources. There is no generally accepted or well-proven formula for relating the Net Quick and Net Worth of a principal to its work on hand. There are factors and there are influences such as a surety company's own guideline, the contractors size and type, qualitative analysis of the,

6

contractors finances, risk assessment of the contractors backlog. But there is no simple mathematical system that pulls it all together. Many sureties have some guidelines, but they consider it an art form and are used accordingly taking into consideration the underwriter's assessment of management skills, cash flow, job conditions, economic conditions, etc. Observation of many surety's practices establishes the industry custom and practice and what is a reasonable level of bonding capacity for a particular risk.

12.    Based on USF&G's underwriting file, John Ortenzio started CCI, formerly known as Commercial Construction Company in 1983. Prior to this time, he obtained a BS degree in Business Management and has worked in the construction industry since 1979. The underwriting file contains an organization chart and resumes of the key officers and employees. Personal acquaintances of the individuals and the company conclude all to be of good character and well qualified for their respective corporate duties. There was good balance of business, engineering and field production capabilities.

13.    CCI's job experience from its inception up to 1993-1994 was primarily in private, negotiated construction of medical and healthcare buildings, predominately for one owner. CCI's financial results since inception were impressive. Its net worth as of December 31, 1993 was $4.1 million. Its business plan included entry into the public bid market. Although this represented a change in the type of market that CCI had historically operated, in USF&G's opinion CCI possessed the management and financial capabilities to undertake this new direction.

14.    Annual CPA audited financial reports on CCI were prepared by Brown Schultz Sheridan & Fritz ("Brown Schultz"), an independent Certified Public Accountant. These reports were provided to USF&G for use in underwriting the CCI account. Evaluating the financial condition of the principal is an integral part of contract bond underwriting. Suretyship is a form

7

of credit and the surety's primary source of collateral for the extension of credit is the

creditworthiness and overall financial strength of the principal. In the event of cost overruns on

bonded projects, the Principal's financial resources stand between the Principal and a surety's

loss. Also, the surety's evaluation of the company's financial results over time serves to validate

the underwriter's subjective judgments on the quality of management and their strategic

decisions.  For these reasons, with accounts the size of CCI, it is the custom and practice for

sureties to require an annual audit report prepared in accordance with the AICPA audit guidelines

by an independent Certified Public Accountant.  An audit provides the surety with one of the few

independent, objective tests of the Principal's financial condition and an independent, objective

assessment of the adequacy of the Principal's accounting system. The audit also provides the

determination as to whether the estimates of revenue and costs on uncompleted contracts are

reasonable and accurate. Based on the auditor's opinion letter, the surety underwriter can

justifiably rely on the credibility of the Principal's financial reporting and financial integrity. An

independent audit also leads to a more reliable analysis. Such reliance by the underwriter is very

important when extending surety credit at the levels requested by CCI. Consequently,

independent audit reports are given substantial weight by surety underwriters.

     15.     The overall physical appearance of the Brown Schultz audit reports was good.

They were a full report with supporting schedules, including schedules of completed contracts

and work- in- progress. From a surety underwriter's perspective, these audit reports appeared to

be professional and lent itself to a high degree of reliance by USF&G.

     16.     USF&G's financial statement analysis practices were consistent with the custom

and practice of the surety industry. Such practices included an analysis of CCI's balance sheet,

income statement and work in progress. USF&G underwriters performed a trend analysis and

8

ratio analysis that included a comparison of CCI's various financial ratios with the industry

averages published by Dun and Bradstreet. Dun and Bradstreet had a software package which

calculated various financial ratios for construction contractors and then compared those ratios

with the financial statements of other contractors which it had surveyed. Dun and Bradstreet

employed a series of numeric and color codes (green, yellow, red) which the software

automatically applied to these ratios. As appears in the USF&G underwriting file, USF&G

subscribed to the Dun and Bradstreet software at least during a portion of the time period when it

issued bonds for CCI. Firemans Fund was also a Dun and Bradstreet subscriber during a portion

of the time I was employed by Firemans Fund. In my opinion, application of the Dun and

Bradstreet software to large accounts like CCI was not meaningful since the Dun and Bradstreet

surveys were directed to smaller sized contractors; the largest "Revenue Range" in the Dun and

Bradstreet software package was "over $5 million." To be meaningful, CCI's ratios should be

compared to a contractor peer group where contractors had revenues in the range of $25 million

to $50 million.

17.     I would characterize CCI's financial history, starting with December 31, 1994, as

being modestly profitable in 1995, 1996, 1997 and 1998. Operating losses were reported in 1995

and 1998, but were offset by investment income. During the period of 1994-1997, CCI showed a

sound financial condition. Net Quick was in the $4 million to $5 million range, with cash and

marketable securities of $4 million to $5 million. Construction is a service business and a

contractor's main asset is its ability to generate cash as a going concern. During the relevant time

period, CCI's maintained cash balances consistently in an amount that allowed them to pay their

bills when due, finance the start-up of new work, and provided cash reserve to fund unexpected

cost overruns on work in progress. The accounts receivables turnover was excellent. CCI's

capital structure was well in line with their annual revenue levels resulting in no short-term bank debt. Key solvency and leverage ratios were in line with similar companies.

18.    USF&G noted in its analysis that CCI had developed a trend of profit fades on individual contracts from the initial estimate of gross profit to the final result. The underwriters raised the concern to CCI, and the reasons for the profits fades were satisfactory to USF&G. Generally, CCI was experiencing a learning curve in its change from private to hard bid, public work. This was disclosed to USF&G and CCI provided reasonable and plausible explanations for the changes and the learning curve.

19.    USF&G was also receiving interim financial statements and work- in- progress schedules from CCI prepared by CCI's controller. These statements were analyzed by the USF&G underwriters and served as a tool for them to monitor the financial progress of their principal during the year. The June 30, 1998 income statement reflected a $1.6 million loss to date. However, CCI provided USF&G with an explanation of the cause of the loss and advised USF&G that the problem jobs were behind it and that it would show at least a breakeven result at December 31, 1998. Based on its confidence in CCI's management's capabilities and the logical explanation of the losses, USF&G continued to provide surety support to CCI. CCI's Balance Sheet as of June 30, 1998 indicated it was solvent with a Net Quick of $1.1 million.  Cash and marketable securities totaled $964,000. Accounts receivables of $6.6 million were showing an average collection period of 70 days.  In addition, at least one other financial institution also expressed confidence in CCI during this period.  CCI's bank had increased the short term borrowing facility from $1 million to $2 million and the full amount was available to CCI as of June 30, 1998.

10

20.     Since CCI appeared to be a viable going concern, abruptly terminating bonding would sharply curtail CCI's ability to acquire new work and generate cash. This was not justified based on its reported financial condition. A surety normally does not stop writing bonds at the first sign of bad news. The underwriter analyzes and evaluates the current financial condition of the contractor using the most current interim financial statement as a benchmark to measure the contractor's progress since the last audit report.

21.     USF&G agreed to support CCI in a joint venture with Fulkrod Construction on a January 7, 1999 bid to PennDot in the amount of $40 million. CCI's share of the joint venture was approximately $22 million. The bond would be a co-surety obligation with Reliance Insurance Company, who was Fulkrod's surety. This contract for highway construction work on Routes 11 & 15 was close to CCI's offices and the key civil construction employees that CCI had recently hired to run their civil division had worked on the first two phases of this project while employed by another road contractor. CCI would be responsible for the excavation and paving. During the previous year, CCI had purchased the necessary equipment to perform this type of work. If low, CCI's aggregate work-on-hand would be approximately $92 million at its peak, but it would have reduced its backing by as much as $6 million per month as CCI continued working on its construction backlog. In a meeting on January 5, 1999 with CCI, USF&G was advised by CCI that CCI's December 31, 1998 year-end would show a break-even result, with working capital of $2.5 million and stockholders equity of $5.4 million. USF&G reasonably concluded that CCI was a solvent, viable going concern with capable management and qualified civil construction employees to perform this contract.

22.     The December 31, 1998 year-end audit report reflected an operating loss of $117,000 and net income of $59,000. The Net Quick had been reduced to $2.4 million due to

11

CCI's financing of additional equipment. Cash and marketable securities were $3 million. There was no short-term bank debt. The work in progress schedule was showing an estimated gross profit margin of 7.3% on $47 million of work left to build. The Net Quick included $6.3 million in under billings. CCI advised the USF&G underwriter that this amount had been reduced to approximately $3 million by February 28, 1999. Based on the projected results of its present backlog and the addition of a normal level of new work, CCI was forecasting a $1.0 million net profit for 1999.

23.     That CCI had an operating loss of only $117,000 - less than 1% of its total volume in 1998 - in comparison to a mid-year loss of $1.6 million, amply demonstrated, in my opinion, that CCI's management had control of the situation and backed its promises with positive and successful actions. The fact that CCI was able to demonstrate, based on the Brown Schultz 1998 Audit Report, overall net income of $59,000, principally derived from gains realized on the sale of marketable securities and cash equivalents, also shows that CCI could draw on other liquid assets to manage its cash flow. This is what a surety wants to see when the contractor encounters financial difficulties; an equity cushion to fall back on.

24.     On August 30, 1999 USF&G was advised by CCI that it was incurring a loss of $900,000 through June 30, 1999. The projected loss as of December 31, 1999 was $1 million. The August 31, 1999 in-house financial statements reflected a net loss of $1.2 million. Net Quick was $787,000. CCI had a zero cash balance and short-term bank debt was $2.3 million. CCI's under billings totaled $4.5 million. USF&G ceased providing surety support to CCI. The last "final" bond written was effective September 30, 1999 in the approximate amount of $191,083.00.

25.    As noted earlier, CCI maintained an unsecured bank line of credit of $1 million. This was increased to $2 million in April 1998 and then to $4 million in April 1999. CCI also had a "3A2" Dun and Bradstreet rating with a generally prompt pay record (e.g. within terms granted by creditors).

26.    The actual aggregate capacity extended by USF&G was well within the $75 million aggregate parameters. Based on the work- in- progress schedules submitted by CCI, the highest cost to complete amount prior to 1999 was $73 million at September 30, 1994. This represented an average 5% case on Net Quick and 6% case on Net Worth. The reduction in Net Quick at December 31, 1998 made it a 3% case on Net Quick, but the bank line was increased and the work in progress appeared to be profitable based on the audited financial statements. Based on my personal experience and knowledge of the custom and practice of the industry during the time period in question this level of surety credit conformed to the industry standard of care.

27.    During the time when USF&G was bonding CCI, USF&G did not have a formal underwriting manual. Rather, USF&G's surety management issued circulars on specific underwriting subjects. These have been referred to by USF&G's underwriters as the "gray pages". More recently, a Contract Underwriting Manual was drafted by USF&G and distributed to their surety underwriting staff. This manual was not formally adopted by USF&G. The "gray pages" contained very little guidance on contract bond underwriting practices. They primarily addressed underwriting information requirements. USF&G surety underwriters met these requirements in their underwriting of the CCI account. The Contract Underwriting Manual was an educational document as well as an underwriting guideline. USF&G surety underwriters also complied with the submission guidelines and the analysis of financial statements and analysis of work-in-

13

progress schedules. When exceptions were made by the underwriters to a specific underwriting element covered by the guidelines the concerns recited in the guidelines were considered by the underwriters and an informed decision was reached.

Signed under the pains and penalties of perjury this 27th day of September, 2002.

_Richard D. Farnsworth_

Richard D. Farnsworth

14

A

# EXHIBIT A

CURRICULUM VITAE

Richard D. Farnsworth

### EXPERTISE

35 years experience in surety underwriting, marketing, financial and administrative duties. Work included developing an international surety facility. Broad-based experience in all aspects of managing a nationwide surety operation including authoring underwriting standards and guidelines, managing producer relationships, development of marketing strategies, preparation of business plans, reinsurance negotiations, development of training programs for underwriters, and administrative responsibilities for the Surety Claims unit.

### EDUCATION

BS Finance, University of Idaho
The Executive Program, University of Wisconsin

### EMPLOYMENT

**1999-Present**
Surety consultant/expert witness. Have given depositions in two cases and testified at one arbitration hearing.

**1986-1999**
*Fireman's Fund Insurance Company, Novato, CA*
Returned to Fireman's Fund in January 1986 as Assistant Vice President/Territorial Executive. In 1987 promoted to Vice President responsible for the nationwide Surety underwriting and marketing activities. In 1992 elected Senior Vice President responsible for the company's nationwide Surety Operations. During my tenure, business grew to a very profitable $100 million Surety Operation with full international capabilities. Retired January 1, 1999.

**1973-1986**
*Wausau Insurance Companies, Wausau, WI*
Joined company's start-up Surety Operation as Assistant Manager. Responsibilities included hiring and training of underwriting and sales staff; development and implementation of underwriting standards and guidelines; developing and managing underwriting authorities of staff; underwriting major accounts. In 1982 promoted to Vice President with responsibility for the nationwide Surety Underwriting and Claims Operation.

**1963-1973**
*Fireman's Fund Insurance Company*
Began career as a Surety Underwriting Trainee in the Western Regional Office, San Francisco. Two years later was transferred to Albuquerque Branch Office as a Surety Field Representative. Promoted to Fidelity and Surety Manager, Salt Lake City Branch Office in 1967.

### BUSINESS AFFILIATIONS

Surety Association of America. Member, Board of Directors, 1988-1999.
National Association of Independent Sureties. Chairman, 1983.
The Dutra Group, San Rafael, CA., Board of Directors, 2002.

### SPEAKING ENGAGEMENTS

E.I.C. Workshop "Contract Bonds" Zurich, Switzerland, October 1998.

Participated in several panel discussions sponsored by the National Association
of Surety Bond Producers and by the Associated General Contractors of
America, 1986-1999.

10/16/2002 17:53 FAX                    Bernkopf Goodman                    ☑001

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3000

October 16, 2002

Bruce D. Levin
DIRECT DIAL: (617) 790-3314
e-mail: blevin@bgblaw.com

## TELECOMMUNICATION TRANSMITTAL

TO:                    KATHLEEN CARSON, ESQUIRE

COMPANY:               SWARTZ CAMPBELL DETWEILER

TELECOPIER NUMBER:     (215) 299-4301

FROM:                  BRUCE D. LEVIN, ESQ.        ATTORNEY #: 57

TOTAL NUMBER OF PAGES _____ INCLUDING THIS COVER SHEET

*IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL BACK AS SOON AS POSSIBLE.*

PHONE:                 (617) 790-3000

TELECOMMUNICATOR:      MLB

CLIENT/MATTER NO:      36432/87

MESSAGE:

Please Note: The information contained in this facsimile message is privileged and confidential, intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please notify us immediately by telephone at (617) 790-3000. Thank you.        #230473 v1/36432/87

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

October 16, 2002

Bruce D. Levin
DIRECT DIAL: (617) 790-3314
e-mail: blevin@bgblaw.com

**VIA TELECOPIER**

Kathleen Carson, Esq.
Swartz Campbell Detweiler
1601 Market Street
Philadelphia, PA  19103-2316

RE:    **United States Fidelity & Guaranty v. Bruce J. Brown et al.**
**M.D. Pa. No. 01-00813**

Dear Kathleen:

I would like to formerly designate the following as constituting expert reports (and supplements thereto) regardless of whether previously designated as such:

1.    Expert Report of Steve J. DeBruyn, CPA, dated July 22, 2002;
2.    Supplemental and Rebuttal Expert Report of Steve J. DeBruyn, CPA, dated September 20, 2002;
3.    Affidavit of Steve J. DeBruyn, CPA in Opposition to the Defendants' Motion for Summary Judgment, dated October 8, 2002 (served October 9, 2002);
4.    Expert Report of Richard D. Farnsworth, dated September 20, 2002; and
5.    Affidavit of Richard D. Farnsworth in Opposition to the Defendants' Motion for Summary Judgment, dated September 27, 2002 (served October 9, 2002).

The designated reports are subject to and without waiver of any rights we have to serve further supplementations of these reports.

Please feel free to contact me if you have any questions.

BERNKOPF, GOODMAN & BASEMAN LLP

Very truly yours,

Bruce D. Levin /ksB

Bruce D. Levin

BDL:alb
cc:    Peter B. McGlynn, Esq.
       Mark Holtschneider, Esq.

#255189 v1/36432/87