UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff | ) ) ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 1:01-CV-00813 JUDGE CONNER |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | ) ) ) ) ) | |

FILED
HARRISBURG, PA
FEB 1 0 2003
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

**UNITED STATES FIDELITY AND GUARANTY COMPANY'S
OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE
EXPERT REPORT AND AFFIDAVIT OF RICHARD FARNSWORTH**

United States Fidelity and Guaranty Company ("USF&G") hereby opposes Defendants'

Motion to Strike the Expert Report and Affidavit of Richard Farnsworth (the "Motion to Strike").

The Motion to Strike should be denied for the same reasons that the nearly identical arguments

raised by the Defendants have previously failed; namely, the Motion to Strike is based on an

erroneous interpretation (or a total disregard) of several of the Court's orders, many of the factual

averments made by Brown Schultz are false, and Brown Schultz fails to advance any cogent

equitable grounds for the relief sought.  Moreover, the Motion to Strike is untimely and barred by

the "law of the case" doctrine.

In further support of its Opposition, USF&G avers and asserts as follows:

1.      According to the Case Management Order dated August 17, 2001, as amended by

Order dated May 8, 2002, the deadline for submission of expert reports by USF&G was July 22,

2002, the deadline for submission of expert reports by the Defendants was August 21, 2002 and

the deadline for supplemental reports was October 18, 2002. True and complete copies of the Case Management Order and the amendment are attached hereto and incorporated herein as Exhibit "A" and "B" respectively. On or about June 10, 2002, USF&G filed a Motion to Amend Case Management Order Regarding Expert Reports ("Motion to Amend"). In the Motion to Amend, USF&G states that it intends to timely submit "an expert report as to what it avers are various auditing and accounting errors by Brown Schultz . . . ." Motion to Amend, ¶3. USF&G further states that it believes that the expert it will designate to "be the only expert necessary for USF&G to prove its *prima facie* case . . ." and, accordingly, seeks leave to designate an additional expert "[i]n the event that Brown Schultz seeks to designate any experts *other than its rebuttal expert on accounting* . . . ." (emphasis supplied). Motion to Amend, ¶3 and 4. By Order dated June 14, 2002, Magistrate Judge Smyser allowed the Motion to Amend, providing a date of September 20, 2002 for "submission of rebuttal expert reports." A true and complete copy of the Order allowing the Motion to Amend is attached hereto as Exhibit "C."

2.    On July 20, 2002, USF&G submitted the DeBruyn Report, USF&G's sole expert report concerning accounting issues. On or about August 21, 2002, Brown Schultz not only served the reports of two accountants, Donald Brenner and Daniel Coffey, in apparent rebuttal to the DeBruyn Report, but also submitted a report of Rolf Neuschaefer, a purported expert on surety bond underwriting. In the main, the report of Mr. Neuschaefer concerns *underwriting issues* and, in essence, criticizes the performance of USF&G's underwriters. Mr. Neuschaefer claims he was retained to "render certain opinions regarding whether USF&G's underwriting . . . conformed to the standard of care of a reasonably prudent contract surety underwriter and whether [the audit reports] were adequate for underwriting purposes." Presumably, this report was submitted to support one of Brown Schultz' affirmative defenses. Certainly, this opens the

door to testimony concerning, *inter alia*, the standard of underwriting performed and the reliability of the audit reports. Accordingly, as expressly permitted by Judge Smyser's Order dated June 14, 2002, granting the Motion to Amend, USF&G served on Brown Schultz an expert report of Richard Farnsworth ("Farnsworth"), a surety bond underwriting expert, on or about September 20, 2002 (the "Farnsworth Report"). A true and complete copy of the Farnsworth Report is attached hereto as Exhibit "D." By the express terms of the Case Management Order, as amended, which provides a deadline of September 20, 2002 for "submission of rebuttal expert report," the Farnsworth Report was timely served on Brown Schultz.

3.    The decision to permit rebuttal testimony is committed to the sound discretion of the trial court. *Maylie v. National Railroad Passenger Corporation*, 791 F.Supp. 477 (E.D. Pa. 1992). In *Maylie*, ruling that rebuttal testimony from a physician was proper, the court held that although the rebuttal witness' testimony could have been presented as part of the case-in-chief, the witness' testimony as a rebuttal witness was admissible. *Id.*, at 486. In *Callahan, et al v. A.E.V., Inc., et al.*, 182 F.3d 237 (3d Cir. 1999), the defendant challenged the plaintiffs' expert report on the grounds that since it was submitted as rebuttal evidence it could not be used to support the plaintiffs' substantive case-in-chief. In rejecting the defendant's challenge the court ruled that Fed. R. Civ. P. 26(a)(2) makes no distinction between the permissible uses of "regular" experts and "rebuttal" experts. The court saw "no reason to prevent the plaintiffs from using [the rebuttal] expert in their case-in-chief at trial." *Id.* at 259. In the instant case, Magistrate Judge Smyser set a specific deadline for service of rebuttal expert reports. USF&G served the Farnsworth Report prior to expiration of that deadline.

4.    "The law of the case doctrine applies to issues expressly decided by a court in prior rulings and to issues decided by necessary implication." *Bolden v. Southeastern*

*Pennsylvania Transportation Authority*, 21 F.3d 29 (3d Cir. 1994). Under the law of the case doctrine, "when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation." *Diesler v. McCormack Aggregates Co.*, 54 F.3d 1074, 1087 (3d Cir. 1995). As discussed, *supra*, the Defendants raised objections to the Farnsworth Report in Defendants' Objections to Magistrate's [sic] Smyser's Report and Recommendations Regarding Defendants' Motion for Summary Judgment filed on or about November 20, 2002 (the "Objection"). The Defendants also previously raised objections to the Farnsworth Report in a reply brief filed in support of its summary judgment motion (the "Reply"). Although Magistrate Judge Smyser found that the Reply was not timely filed, he considered it relative to his Report and Recommendation dated November 5, 2002, p.4, n.1 (the "Report"). On or about January 31, 2002, the Court issued an Order which adopted the Report in its entirety. Accordingly, the Defendants objections to the Farnsworth Report have been previously raised, considered by the Court and found lacking. The "law of the case" doctrine does not allow Brown Schultz another bite at the apple.

5.      Undoubtedly, courts may preclude testimony for parties who have failed to obey a scheduling order. Although USF&G fully complied with all scheduling orders, excluding critical evidence would be an extreme sanction even if, *arguendo*, the Farnsworth Report was not timely served. *Kotes v. Super Fresh Food Markets, Inc.*, 157 F.R.D. 18 (E.D. Pa. 1994). The Third Circuit has determined that four factors must be considered in deciding to exclude or permit a witness's testimony: the prejudice to the party against whom the excluded witness is to testify; the ability of that party to cure the prejudice; the extent to which the witness would disrupt the orderly and efficient trial of the case; and the party's bad faith or willfulness in failing to comply with the court's order. *Id.* at 20. In *Perkasie Industries Corp. v. Advance Transformer, Inc.*, 143

F.R.D. 73 (E.D. Pa. 1992), the court applied these four factors to determine whether or not untimely expert reports would be admitted. The court determined that the additional expert reports would be stricken because three additional expert witnesses were identified months after the deadline. The new expert witnesses were proposing a different analysis of damages than a previously identified expert witness. The court held that the new experts would be stricken because the opposing party would undoubtedly be prejudiced and would not have the opportunity to rebut the new expert testimony. *Id.* at 76-77. Here, none of the four factors applies. USF&G timely provided its expert and supplemental expert reports. The Defendants have not been prejudiced by USF&G's timely service of the Farnsworth Report and will have the opportunity to depose Mr. Farnsworth. In fact, Mr. Farnsworth is scheduled to be deposed by the Defendants on March 11, 2003. Simply, even if, *arguendo*, the Farnsworth Report were not timely, there are no circumstances in the instant case that would warrant the "extreme" measure of striking the expert reports.

6.      Even if, *arguendo*, the Court were inclined to find any of Brown Schultz' averments meritorious, Brown Schultz has failed to preserve its right to raise them. No motions to strike any expert reports, affidavits or testimony, including that of Mr. DeBruyn, were timely filed by the Defendants. The Motion to Strike was filed approximately four (4) months subsequent to service of the Farnsworth Report. The Motion to Strike – filed prior to the issuance of the Court's Order dated January 31, 2003 adopting the Report – is really nothing more than a last ditch effort to file a *second* reply brief in support of the Defendants' objections to the Report. It is moot, untimely and repetitive.

WHEREFORE, USF&G respectfully requests that the Court enter an order:

1.      Denying the Motion to Strike; and

2.      Providing such other and further relief as is just and proper.

UNITED STATES FIDELITY & GUARANTY
COMPANY,
By its attorneys,

_____
Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA  02110
Telephone:     (617) 790-3000
Facsimile:     (617) 790-3300

and

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:     (717) 237-7100
Facsimile:     (717) 237-7105

Dated: February 10, 2003
#262543 v1/36432/87

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES FIDELITY AND    :     **CIVIL NO. 1:01-CV-0813**
GUARANTY COMPANY,            :

                      :

            Plaintiff       :      (Judge Kane)

                      :

          v.             :      (Magistrate Judge Smyser)

                      :

BRUCE J. BROWN and          :
BROWN SCHULTZ SHERIDAN &   :
FRITZ,                  :

                      :

         Defendants      :

**FILED**
**HARRISBURG, PA**

AUG 1 7 2001

MARY E. D'ANDREA, CLERK
PER _____ DEPUTY CLERK

<u>**CASE MANAGEMENT ORDER**</u>

Pursuant to a case management conference held on August 17, 2001, **IT IS ORDERED** that:

     1.    <u>**Amended Pleadings**</u>.    Plaintiff shall file any amended pleadings on or before **January 2, 2002**. Defendants shall file any amended pleadings on or before **February 4, 2002**.

     2.    <u>**Expert Reports**</u>.    Plaintiff shall submit expert reports to defendants on or before **July 1, 2002**. Defendants shall submit expert reports to plaintiff on or before **August 1, 2002**. Any supplements to reports shall be submitted to opposing parties on or before **October 18, 2002**.

AO 72A
(Rev.8/82)

3.   **Discovery Deadline**.  All discovery shall be planned and commenced so as to be completed by **May 15, 2002**.

The maximum number of depositions per side shall be fifteen (15); the maximum number of interrogatories per side shall be fifty (50); and the maximum number of requests for admissions per side shall be fifty (50).

4.   **Consent**.  On or before **May 15, 2002**, counsel for the plaintiff shall file either a consent form, signed by both counsel, consenting to proceed under 28 U.S.C. § 636(c) before the magistrate judge, or a statement that there is not mutual consent to proceed before the magistrate judge to trial.  In the latter case, the pretrial conference date and trial date established herein shall not apply unless adopted by Judge Kane.  The case in said event shall be listed for trial before Judge Kane.

5.   **Dispositive Motions**.  Any dispositive motion shall be filed, as well as the supporting brief, on or before **August 15, 2002**.

2

6.  **Motions in Limine**.  No motions in limine shall be filed after **November 1, 2002** without leave of court, a supporting brief and a proposal for a briefing schedule that will permit the party opposing the motion to fully and fairly address the issues presented and will permit the court to fully consider and decide the motion.

7.  **Settlement Conference and Pretrial Conference**.

(a)  At least ten days prior to the date scheduled for the final pretrial conference, counsel for the parties shall hold the attorneys' conference required by Local Rule 16.3.  An attorney who has not entered an appearance as of the date of the LR 16.3(b) conference of attorneys, or who does not attend the LR 16.3(b) conference of attorneys, may not serve as trial counsel, unless extraordinary circumstances are shown to warrant an exception.

(b)  This conference shall be face-to-face unless the court, upon written request, approves another arrangement. Failure of the plaintiff to initiate the holding of the conference or of the defendants to respond to such initiative in an appropriate manner may result in the imposition of sanctions, including possible dismissal of the action.

3

(c)   Each party shall file a pretrial memorandum in conformity with the Rules of Court, M.D.Pa.  Failure to timely file pretrial memoranda will result in an appropriate sanction.  Fed.R.Civ.P. 16(f).

(d)   A final pretrial conference and settlement conference shall be held on **November 21, 2002, at 9:00 a.m.**, in Chambers, Room 1110, Eleventh Floor, Federal Building, Third and Walnut Streets, Harrisburg, Pennsylvania.  Counsel who will try the case shall attend the pretrial conference unless the court, upon written request, approves the substitution of another attorney who is fully familiar with the case and has the settlement authority required by Local Rule 16.2.   A copy of the local rules may be obtained from the Clerk of the Court by writing:  Clerk of Court, Federal Building, P.O. Box 983, Harrisburg, Pennsylvania 17108-0983.  At the pretrial conference, counsel for the plaintiff shall be required to set forth the elements of the particular type of claim (or claims) being made.  Counsel for the defendants shall be required to identify any legal defenses they expect to make.  It should be noted that the court expects to hold counsel for both sides to the claims and defenses they outline here unless good cause is shown for allowing additional legal theories, claims and/or defenses in sufficient time to consider and evaluate them

4

before trial.  Settlement will also be discussed at the
pretrial conference.  A separate settlement conference will be
set upon the request of a party.

       8.  **Jury Selection and Trial**.  If the parties consent
to proceed before a magistrate judge, the trial of this case
shall begin with jury selection at **9:30 a.m., on December 2,
2002**, in Courtroom No. 5, Eleventh Floor, Federal Building,
Third and Walnut Streets, Harrisburg, Pennsylvania.

       Counsel shall file proposed jury instructions in
conformity with Local Rule 51.  If the parties intend to use
depositions at trial in place of live testimony, they shall
review the depositions prior to the time of trial.  If there
are objections which cannot be resolved among counsel, said
objections and copies of the relevant depositions shall be
submitted to the court at least fifteen (15) days prior to
trial.  Where counsel have failed to meet the time requirement
in this paragraph, the court may, in its discretion, deem the
objections withdrawn.  If the depositions to be used are
videotaped, a transcript must be provided to the court in
advance of trial.  Videotape equipment shall be set up in the
courtroom prior to the commencement of trial in the morning, if
its use is anticipated in the morning, or during the lunch

AO 72A
(Rev.8/82)

break, if its use is anticipated in the afternoon.  Whenever
any civil action scheduled for jury trial is settled or
otherwise disposed of in advance of the actual trial, jurors'
costs, including mileage and per diem, shall be assessed
equally against the parties unless the Clerk's Office at the
place the trial is to be held is notified of the settlement in
sufficient time to permit the Clerk to advise the jurors that
their attendance will not be necessary.  Notice to such Clerk's
Office before 2:00 p.m. on the last business day preceding the
day on which the trial of the action is to start shall be
adequate for such purpose.

        9.  **Case Management Track**.  This case is on the complex
track.

        The court will, in the absence of extraordinary
circumstances, adhere to the schedule hereby established.
Continuances of trial and extensions of the discovery period
will be granted only when extraordinary circumstances arise and
application is timely made.

                                    J. Andrew Smyser
                                    Magistrate Judge

Dated:  August __17__, 2001.

                        6

215 299 4301       SWARTZ CAMPBELL&DETWEILR

2002   TO: JEFF   B. MCCARRON  FR: SCAN31                    #7451  PAGE: 2/2

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

United States Fidelity and            :     Civil No. 1:01-CV-0813
Guaranty Company,
                Plaintiff             :
                                      :
        v.                            :
                                      :     (Judge Kane)
Bruce J. Brown and Brown,             :
Schultz, Sheridan & Fritz,            :     (Magistrate Judge Smyser)
                Defendants            :

FILED
HARRISBURG, P

MAY 09 2002

MARY E. D'ANDREA, C
Per_____
        Deputy Clerk

## ORDER

AND NOW, this  *8TH*  day of  *MAY*  , 2002, upon consideration of

the parties' Joint Motion for Limited Modification of the Case Management Order, it

*(DOC. 20)*

is hereby ORDERED that the motion is GRANTED and the deadlines in the August

17, 2001 Case Management Order are modified as set forth below:

> Discovery Deadline:          June 22, 2002
>
> Submission of Expert Reports
>     Plaintiff                July 22, 2002
>     Defendants               August 21, 2002
>
> Dispositive Motions          August 30, 2002

All other dates and/or deadlines in the August 17, 2002 Case Management

Order remain in effect.

BY THE COURT:

_____  M. J.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff ) ) ) ) v. ) BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. ) ) ) ) ) ) | CIVIL ACTION NO. 1:01-CV-00813 JUDGE KANE |

CIVIL ACTION NO. 1:01-CV-00813

JUDGE KANE

**FILED**
HARRISBURG, PA

JUN 1 4 2002

MARY E. D'ANDREA, CLERK
Per _____

### [PROPOSED] ORDER REGARDING MOTION TO AMEND
### CASE MANAGEMENT ORDER REGARDING EXPERT REPORTS

AND NOW, this 14TH day of June, 2002, upon consideration of United

States Fidelity & Guaranty Company's Motion to Amend Case Management Order Regarding
(Doc. 29)
Expert Reports, it is hereby ORDERED that the motion is GRANTED and the deadlines in the

August 17, 2001 Case Management Order, as modified by the Order dated May 8, 2002, are

modified as set forth below:

Submission of Rebuttal Expert Reports

USF&G                                9/20/02

All other dates and/or deadlines in the August 17, 2001 Case Management Order, as

modified by the Order dated May 8, 2002, remain in effect.

By the Court:

_____

Dated: June 14, 2002
#246993 v1/36432/87

## EXPERT REPORT OF RICHARD D. FARNSWORTH

I am a former Senior Vice President of Fireman's Fund Insurance Company in charge of their nationwide surety operations. I retired from Fireman's Fund January 1, 1999. My 35 years of experience in surety underwriting included work as a field office underwriter/manger and a home office underwriter/officer. My executive responsibilities included serving as the Surety Chief Underwriter, authoring underwriting standards and developing marketing strategies. Since my retirement, I have been engaged as a consultant/expert witness on surety underwriting issues in 10 cases. I have given deposition testimony in two cases and testified at one arbitration hearing. My Curriculum Vitae is attached as Exhibit A. I am being compensated for my services at the rate of $160.00 per hour.

I have been engaged by Bernkopf, Goodman, & Baseman LLP to provide litigation consulting and forensic services relating to USF&G's bond underwriting of CCI Construction Company, Inc. (CCI) in connection with the above referenced litigation. I have been asked to determine if I could render certain opinions on USF&G'S underwriting practices, conduct and decisions as surety for CCI. I have concluded that I am able to render such opinions.

In connection with my engagement, I relied on the following documents and information:

- USF&G'S Complaint against Brown Schultz Sheridan & Fritz.

- Answer of Brown Schultz to Complaint.

- Brown Schultz Responses and Objections to USF&G's First Set of Interrogatories.

- Correspondence between Byerly Insurance and DJL Associates, and USF&G.

- Deposition transcript of Stephen Salazar, dated May 22, 2002.

- Deposition transcripts of Tony Phillips, dated April 17 and May 29, 2002.

- Deposition transcript of David Hussey, dated May 28, 2002.

- Deposition transcript of James Daily, dated April 18, 2002.

- Copies of USF&G's "gray letters".

- Copy of USF&G's Contract Underwriting Manual.

- Copy of St. Paul Surety Group Training and Reference Guide (8-99).

- AICPA Audit and Accounting Guide for Construction Contractors, 1981.

- Welch, John W. et al. Contract Surety, Volume 1 and 2, Insurance Institute of America, 1992.

- Conversations with James Daily and Tony Phillips.

For reasons explained below, it is my opinion that (1) USF&G's underwriting of the CCI account generally conformed to applicable standards of care of the surety industry that were in effect during 1994-1999; and (2) it was reasonable and justifiable for USF&G's underwriters to rely on the audited financial statements prepared by Brown, Schultz, Sheridan & Fritz in reaching their underwriting decisions concerning CCI.

In reaching the foregoing opinions, I considered, among other things, the surety industry environment during the period of 1994-1999. As the senior bonding executive of a major surety-Fireman's Fund- I was and am familiar with the underwriting customs and practices of our competitors, including USF&G and St. Paul. I also have personal knowledge of Fireman's Fund's surety underwriting guidelines and the surety underwriting principles and practices taught by surety industry practitioners. I have validated this knowledge by reviewing the IIA Contract Surety textbooks and the AICPA Audit Guide referenced above.

In general, the state of the surety industry during the period of 1994-1999 was very competitive. The surety industry was a profitable, mature industry during that time and one surety's growth came at the expense of another surety's business. Most major sureties' lines of business formed a part of a large multiple line property and casualty insurance company. The senior management in these companies expected growth from the companies' profitable specialty lines, such as the surety business. As the competition intensified, pricing levels dropped and historical underwriting standards were relaxed. This was the environment in which USF&G and the other major sureties were conducting surety business when underwriting for CCI.

Underwriting is the process of gathering facts relevant to the risk, of bonding a contractor.  The process includes, evaluating the pertinent data, determining the strengths and weaknesses of the account and deciding upon a course of action. The primary function of the surety in the contract bond underwriting process is the prequalification of the contractor. When the surety executes a bond it is in effect saying to the owner that it has made a detailed analysis of the contractor's management and technical skills; that it has studied the contractors financial condition; that it believes the contractor is fully qualified in all respects to perform the contract in question. The surety is prepared to back this judgment by committing the assets of its company in support of this decision.  Before the surety can make such a commitment it must first underwrite the account to satisfy itself that this is a company that it can support and that it is a company that possesses the ability to meet current and future obligations. If the surety's analysis is that it is an acceptable account, the surety then makes a decision on the amount of bonding capacity they are willing to provide to the contractor.

Contract bond underwriting involves both objective and subjective evaluations by the underwriter. Therefore, reducing surety underwriting to quantitative terms is very difficult, if not impossible, in most cases. The underwriter evaluates the contractor through three primary categories: Character, Capacity, and Capital. From information provided to him by the contractor, such as financial statements, references, company history, management procedures, resumes of key personnel, prior job experience and from information provided by outside sources, the underwriter analyzes, interprets and applies financial data. He also assesses the history, organization, and management capabilities of the contractor (the "Principal"), the contractor's capacity to perform each new project and the backlog of projects undertaken by the contractor. The underwriter also assesses the organization and contractor owner's reputation for fair dealing with project owners, subcontractors, suppliers, lenders, and other creditors, as well as the contractor's general reputation within the industry.

Once the contractor passes the surety's underwriting analysis, a decision must be made as to the amount of bonding capacity the surety is willing to extend to the contractor. The contractor usually advises the surety of its general plans for the year and the level of bonding support it believes will be needed to support the construction work program. The surety then decides if it can meet those needs. This amount is expressed in terms of a single job dollar amount (contract price) and the aggregate dollar amount of work to be performed on uncompleted contracts (backlog or work on hand). This is often referred to as the "bonding program." It is necessary to establish such a bonding program because it is impossible to predict the identity and size of the projects on which a contractor will be successful in obtaining throughout the year. A bonding program allows a contractor to bid jobs knowing that almost absent an adverse change in the contractor's business or finances, he is eligible to receive bonding within the parameters set in the bonding program. In suretyship, the risk of loss remains with the Principal, while the surety merely extends surety credit so as to guarantee performance in the event that the Principal defaults.

The surety, on an annual basis, reviews the bonding program usually after it receives the contractor's audited financial report. Normally, a meeting is held between the contractor, agent and underwriter at that time to review the contractor's business plan for the remainder of the year. Sometimes, no meeting will be required. The underwriter determines the level of bonding support the contractor needs in order to meet his business plan and. if acceptable to the underwriter, an understanding is reached between the contractor, agent and surety as to the size of the bonding program. As noted above, the contractor at this point in time does not normally know what specific jobs he will be bidding during the year, but the bonding program parameters allow him to pick specific projects in the future that will be within the established bonding program. This is especially true of public work where initial bid advertisements may not be published until after the annual underwriting review and after the determination as to whether the establishment or continuation of the bonding program has been made. From the sureties' perspective, the surety's bonding program is extended in connection with the support of the total work program (which in the case of CCI was, as noted below, $15 million single/$75 million aggregate) and not the issuance of specific bonds. Once the bonding program is approved each year, a contractor's request for bonds within the parameters of that program may normally be granted so long as the surety has not received adverse information concerning the contractor, and the surety is satisfied with the contract terms and provisions. Therefore, although each job must be submitted to the surety for specific approval prior to bidding, a new annual audit is not required each time a bond is requested as long as the new request is within the parameters of the bonding program. Indeed, it would be extremely expensive and impractical (if not impossible) to require the contractor to provide the surety with an audit report every time the contractor obtains a new contract. Each bond is underwritten using the most recent annual audit report as the basis for evaluating the contractor's financial condition and financial progress throughout the accounting year.

A significant form of security for the establishment or continuation of the bonding program is the "Net Quick" (working capital) and "Net Worth" (shareholders' equity) of the Principal. The term "working capital" as used in the surety business is commonly known as "Net Quick" and is defined as the excess of current assets over current liabilities. It is a measure of a Principal's liquidity and solvency. The term "stockholders' equity" as used in the surety business is commonly termed "Net Worth" and is defined as the excess of total assets over total liabilities. It represents the basic risk capital of the business. Sureties relate the contractor's backlog to his finances in their decision-making process. Two key ratios are used to measure this relationship: backlog- to- net quick and backlog- to- net worth. A major risk to the contractor's financial success is the adequacy of his cost estimates on his work in progress. If the contractor encounters unexpected cost overruns, he often has to finance the additional costs from his own financial resources. There is no generally accepted or well-proven formula for relating the Net Quick and Net Worth of a principal to its work on hand.

3

There are factors and there are influences such as a surety company's own guideline, the contractors size and type, qualitative analysis of the, contractors finances, risk assessment of the contractors backlog. But there is no simple mathematical system that pulls it all together. Many sureties have some guidelines, but they consider it an art form and are used accordingly taking into consideration the underwriter's assessment of management skills, cash flow, job conditions, economic conditions, etc. Observation of many surety's practices establishes the industry custom and practice and what is a reasonable level of bonding capacity for a particular risk.

John Ortenzio started CCI in 1990. Prior to this time, John Ortenzio was the President of Commercial Construction Company from 1983-1990. He has a BS degree in Business Management and has worked in the construction industry since 1979.  The underwriting file contains an organization chart and resumes of the key officers and employees. Personal antecedents of the individuals and the company conclude all to be of good character and well qualified for their respective corporate duties. There was good balance of business, engineering and field production capabilities.

CCI's job experience from its inception up to 1993-1994 was primarily in private, negotiated construction of medical and healthcare buildings, predominately for one owner. CCI's financial results since inception were impressive. Its net worth as of December 31,1993 was $4.1 million. It's business plan included entry into the public bid market. Although this represented a change in the type of market that CCI had historically operated, in USF&G's opinion CCI possessed the management and financial capabilities to undertake this new direction.

Annual CPA audited financial reports on CCI were prepared by Brown Schultz Sheridan & Fritz (Brown Schultz), an independent CPA. These were provided to USF&G for use in underwriting the account. Evaluating the financial condition of the principal is an integral part of contract bond underwriting. Suretyship is a form of credit and the surety's primary source of collateral for the extension of credit is the creditworthiness and overall financial strength of the principal. In the event of cost overrruns on bonded projects the principal's financial resources stand between the principal and a surety's loss. Also, the surety's evaluation of the company's financial results over time serve to validate the underwriter's subjective judgments on the quality of management and their strategic decisions. For these reasons, with accounts the size of CCI, it is the custom and practice for sureties to require an annual CPA audit report prepared in accordance with the AICPA audit guidelines. A CPA audit provides the surety with one of the few independent, objective tests of the Principal's financial condition and an independent, objective assessment of the adequacy of the Principal's accounting system. The audit also provides the determination as to whether the estimates of revenue and costs on uncompleted contracts are reasonable and accurate. Based on the auditor's opinion letter, the surety underwriter can justifiably rely on the credibility of the Principal's financial reporting and financial integrity. An independent audit also leads to a more reliable analysis. Such reliance by the underwriter is very important when extending surety credit at the levels requested by CCI. Consequently, independent audit reports are given substantial weight by surety underwriters.

The overall physical appearance of the Brown Schultz annual reports was good. It was a full report with supporting schedules, including schedules of completed contracts and work- in- progress. From a surety underwriter's perspective, the report appeared to be professional and lent itself to a high degree of reliance.

USF&G's financial statement analysis practices were consistent with the custom and practice of the surety industry. Such practices included an analysis of CCI's balance sheet, income statement and work in progress. USF&G underwriters performed a trend analysis and ratio analysis that included a

4

comparison of CCI's various financial ratios with the industry averages published by Dun and Bradstreet. Dun and Bradstreet had a software package which calculated various financial ratios for construction contractors and then compared those ratios with the financial statements of other contractors which it had surveyed. Dun and Bradstreet employed a series of numeric and color codes (green, yellow, red) which the software automatically applied to these ratios. As appears in the USF&G underwriting file, USF&G subscribed for the Dun and Bradstreet software at least during a portion of the time period when it issued bonds for CCI. Fireman's Fund was also a Dun and Bradstreet subscriber during a portion of the time I was employed by Fireman's Fund. In my opinion, application of the Dun and Bradstreet software to large accounts like CCI was not meaningful since the Dun and Bradstreet surveys were directed to smaller sized contractors; the largest "Revenue Range" in the Dun and Bradstreet software package was "over $5 million." To be meaningful, CCI's ratios should be compared to a contractor peer group where contractors had revenues in the range of $25 million to $50 million.

I would characterize CCI's financial history, starting with December 31, 1994 as being modestly profitable in 1995, 1996, 1997 and 1998. Operating losses were reported in 1995 and 1998, but were offset by investment income. During the period of 1994-1997, CCI showed a sound financial condition. Net Quick was in the $4 million to $5 million range, with cash and marketable securities of $4 million to $5 million. Construction is a service business and a contractor's main asset is its ability to generate cash as a going concern. During the relevant time period, CCI's maintained cash balances consistently in an amount that allowed them to pay their bills when due, finance the start-up of new work, and provided cash reserve to fund unexpected cost overruns on work in progress. The accounts receivables turnover was excellent. CCI's capital structure was well in line with their annual revenue levels resulting in no short-term bank debt. Key solvency and leverage ratios were in line with similar companies.

USF&G noted in their analysis that CCI had developed a trend of profit fades on individual contracts from the initial estimate of gross profit to the final result. The underwriters raised the concern to the Principal, and the reasons for the profits fades were satisfactory to them. Generally, CCI was experiencing a learning curve in its change from private to hard bid, public work. This was disclosed to USF&G and CCI provided reasonable and plausible explanations for the changes and the learning curve.

USF&G was also receiving interim financial statements and work-in-progress schedules from CCI prepared by CCI's controller. These statements were analyzed by the underwriters and served as a tool for them to monitor the financial progress of their principal during the year. The June 30, 1998 income statement reflected a $1.6 million loss to date. However, CCI provided USF&G with an explanation of the cause of the loss and told USF&G that the problem jobs were behind it and that it would show at least a breakeven result at December 31, 1998. Based on its confidence in CCI's management's capabilities and the logical explanation of the losses, USF&G continued to provide surety support to CCI. CCI's Balance Sheet as of June 30, 1998 indicated it was solvent with a Net Quick of $1.1 million. Cash and marketable securities totaled $964,000. Accounts receivables of $6.6 million were showing an average collection period of 70 days. In addition, at least one other financial institution also expressed confidence in CCI during this period. CCI's bank had increased the short term borrowing facility for $1 million to $2 million and the full amount was available to CCI as of June 30, 1998. Since CCI appeared to be a viable going concern, abruptly terminating bonding would sharply curtail its ability to acquire new work and generate cash. This was not justified based on its reported financial condition. A surety usually does not stop writing bonds at the first sign of bad news. The underwriter analyzes and evaluates the current financial condition of the contractor using the most current interim financial statement as a benchmark to measure the contractor's progress since the last audit report.

5

USF&G agreed to support CCI in a joint venture with Fulkrod Construction on a January 7, 1999 bid to Penndot in the amount of $40 million. CCI's share of the joint venture was approximately $22 million. The bond would be a co-surety obligation with Reliance Insurance Company, who was Fulkrod's surety. This contract for highway construction work on Routes 11 & 15 was close to CCI's offices and the key civil construction employees that CCI had recently hired to run their civil division had worked on the first two phases of this project while employed by another road contractor. CCI would be responsible for the excavation and paving. During the previous year, CCI had purchased the necessary equipment to perform this type of work. If low, CCI's aggregate work-on-hand would be approximately $92 million at its peak, but it would have reduced its backlog by as much as $6 million per month as CCI continued working on its construction backlog.  In a meeting on January 5, 1999 with CCI, USF&G was advised by CCI that CCI's December 31, 1998 year-end would show a break-even result, with working capital of $2.5 million and stockholders equity of $5.4 million. USF&G reasonably concluded that CCI was a solvent, viable going concern with capable management and qualified civil construction employees to perform this contract.

The December 31, 1998 year-end audit report reflected an operating loss of $117,000 and net income of $59,000. The Net Quick had been reduced to $2.4 million due to CCI's financing of additional equipment. Cash and marketable securities were $3 million. There was no short-term bank debt. The work in progress schedule was showing an estimated gross profit margin of 7.3% on $47 million of work left to build. The Net Quick included $6.3 million in under billings. CCI advised the USF&G underwriter that this amount had been reduced to approximately $3 million by February 28,1999. Based on the projected results of its present backlog and the addition of a normal level of new work, CCI was forecasting a $1.0 million net profit for 1999.

The fact that CCI had an operating loss of only $117,000- less than 1 % of its total volume in 1998- in comparison to a mid-year loss of $1.6 million, amply demonstrated, in my opinion, that CCI's management had control of the situation and backed its promises with positive and successful actions.  The fact that CCI was able to demonstrate, based on the Brown Schultz 1998 audit report, overall net income of $59,000, principally derived from gains realized on the sale of marketable securities and cash equivalents, also shows that CCI could draw on other liquid assets to manage its cash flow.  This is what a surety wants to see when the contractor encounters financial difficulties; an equity cushion to fall back on.

On August 30, 1999 USF&G was advised by CCI that it was incurring a loss of $900,000 through June 30, 1999. The projected loss as of December 31,1999 was $1 million. The August 31, 1999 in-house financial statements reflected a net loss of $1.2 million. Net Quick was $787,000. CCI had a zero cash balance and short- term bank debt was $2.3 million. CCI's under billings totaled $4.5 million. USF&G ceased providing surety support to CCI. The last final bond written was effective 9/30/99.

As noted earlier, CCI maintained an unsecured bank line of credit of $1 million. This was increased to $2 million in April 1998 and then to $4 million in April 1999. CCI also had a "3A2" Dun and Bradstreet rating with a generally prompt pay record (paying within the terms granted by the creditor).

USF&G established a work program of $15 million single/$75 million aggregate (for its Harrisburg branch ). Initially, USF&G indicated a willingness to go beyond these levels. Its first opportunity to become CCI's surety was in November 1993 when they issued the bid bond on the Houtzdale prison project with an estimated contract price of $62 million. The projected work on hand with this job was $117 million. Considering CCI's single job experience and relatively newness to the public

6

sector, this appears, at first blush, to be a questionable decision of USF&G. However, USF&G underwriters previously met with CCI's key management people and were very impressed with their management sophistication. Further, USF&G believed this project had been well thought out and that CCI was capable of building this job and managing the cash flow requirements. Further, in 1993 and 1994, CCI showed a strong balance sheet. Furthermore, John Ortenzio had demonstrated 12 years of success in running his business. CCI did not get this job.

The actual aggregate capacity extended by USF&G was well within the $75 million aggregate parameters. Based on the work- in- progress schedules submitted by CCI, the highest cost to complete amount prior to 1999 was $73 million at September 30, 1994. This represented an average 5% case on Net Quick and 6% case on Net Worth. The reduction in Net Quick at December 31, 1998 made it a 3% case on Net Quick, but the bank line was increased and the work in progress appeared to be profitable based on the audited financial statements. Based on my personal experience and knowledge of the custom and practice of the industry during the time period in question this level of surety credit conformed to the industry standard of care. At trial I may employ certain charts to aid the trier of fact in connection with my trial testimony.

During the time when USF&G was bonding CCI, USF&G did not have a formal underwriting manual. Rather, USF&G's surety management issued circulars on specific underwriting subjects. These have been referred to by USF&G's underwriters as the "gray pages". More recently, a Contract Underwriting Manual was drafted by USF&G and distributed to their surety underwriting staff. This manual was not formally adopted by USF&G. The gray pages contained very little guidance on contract bond underwriting practices. They primarily addressed underwriting information requirements. USF&G surety underwriters met these requirements in their underwriting of the CCI account. The Contract Underwriting Manual was an educational document as well as an underwriting guideline. USF&G surety underwriters also complied with the submission guidelines and the analysis of financial statements and analysis of work-in- progress schedules. When exceptions were made by the underwriters to a specific underwriting element covered by the guidelines the concerns recited in the guidelines were considered by the underwriters and an informed decision was reached.

In summary, after considering all the relevant elements to the underwriting of a contract bonding program, the underwriter makes an overall evaluation of the contractor's character, capacity and capital. The underwriter also assesses the contractor's potential success to complete the project being considered and the completion of the backlog. Most of the factors can be quantified, but there are some subjective judgments that cannot be quantified such as assessment of management's capabilities. In the case of CCI, USF&G may, in retrospect, have been mistaken in its assessment of CCI's management's expertise to successfully manage the change in the type of work they undertook, which assessment included the review and analysis of Brown Schultz' audit reports. However, this does not necessarily make USF&G negligent in performing its underwriting duties. USF&G's underwriting process and practice conformed to the applicable standards of care of the surety industry that were in place during the time USF&G was CCI's surety.

Richard D. Farnsworth
Dated: September 20, 2002

7

**EXHIBIT A**

# CURRICULUM VITAE

Richard D. Farnsworth

**EXPERTISE**

35 years experience in surety underwriting, marketing, financial and administrative duties. Work included developing an international surety facility. Broad-based experience in all aspects of managing a nationwide surety operation including authoring underwriting standards and guidelines, managing producer relationships, development of marketing strategies, preparation of business plans, reinsurance negotiations, development of training programs for underwriters, and administrative responsibilities for the Surety Claims unit.

**EDUCATION**

BS Finance, University of Idaho
The Executive Program, University of Wisconsin

**EMPLOYMENT**

1999-Present
Surety consultant/expert witness. Have given depositions in two cases and testified at one arbitration hearing.

1986-1999
*Fireman's Fund Insurance Company, Novato, CA*
Returned to Fireman's Fund in January 1986 as Assistant Vice President/Territorial Executive. In 1987 promoted to Vice President responsible for the nationwide Surety underwriting and marketing activities. In 1992 elected Senior Vice President responsible for the company's nationwide Surety Operations. During my tenure, business grew to a very profitable $100 million Surety Operation with full international capabilities. Retired January 1, 1999.

1973-1986
*Wausau Insurance Companies, Wausau, WI*
Joined company's start-up Surety Operation as Assistant Manager. Responsibilities included hiring and training of underwriting and sales staff; development and implementation of underwriting standards and guidelines; developing and managing underwriting authorities of staff; underwriting major accounts. In 1982 promoted to Vice President with responsibility for the nationwide Surety Underwriting and Claims Operation.

1963-1973
*Fireman's Fund Insurance Company*
Began career as a Surety Underwriting Trainee in the Western Regional Office, San Francisco. Two years later was transferred to Albuquerque Branch Office as a Surety Field Representative. Promoted to Fidelity and Surety Manager, Salt Lake City Branch Office in 1967.

**BUSINESS AFFILIATIONS**

Surety Association of America. Member, Board of Directors, 1988-1999.
National Association of Independent Sureties. Chairman, 1983.
The Dutra Group, San Rafael, CA., Board of Directors, 2002.

**SPEAKING ENGAGEMENTS**

E.I.C. Workshop "Contract Bonds" Zurich, Switzerland, October 1998.

Participated in several panel discussions sponsored by the National Association of Surety Bond Producers and by the Associated General Contractors of America, 1986-1999.

## CERTIFICATE OF SERVICE

I, Peter J. Speaker, Esquire, of the law firm of Thomas, Thomas & Hafer, LLP, attorney for Plainitff, hereby certify that a true and correct copy of the foregoing document was sent to the following counsel of record by placing a copy of same in the United States mail, postage prepaid, at Harrisburg, Pennsylvania addressed as follows:

Kathleen Carson, Esquire
Swartz Campbell Detweiler
1601 Market Street
Philadelphia, PA  19103-2316

THOMAS, THOMAS & HAFER, LLP

By _____
Peter J. Speaker, Esquire
I.D. #42834
P.O. Box 999
305 North Front Street
Harrisburg, PA  17108
(717) 255-7644

Dated: 2-10-03
222761.1