UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, | ) ) ) | |
| Plaintiff | ) ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| v. | ) ) | JUDGE CONNER |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, | ) ) ) | |
| Defendants. | ) ) ) | |

FILED
HARRISBURG, PA

FEB 1 0 2003

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

**UNITED STATES FIDELITY AND GUARANTY COMPANY'S
OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE SUPPLEMENTAL
EXPERT REPORT AND AFFIDAVIT OF STEPHEN J. DEBRUYN, CPA**

United States Fidelity and Guaranty Company ("USF&G") hereby opposes Defendants'

Motion to Strike the Supplemental Expert Report and Affidavit of Stephen J. DeBruyn, CPA (the

"Motion to Strike").  The Motion to Strike should be denied for the same reasons that the nearly

identical arguments raised by Bruce J. Brown and Brown Schultz Sheridan & Fritz (collectively,

"Brown Schultz") have previously failed; namely, the Motion to Strike is based on an erroneous

interpretation of the Court's orders, many of the factual averments relied upon by Brown Schultz

are false, and Brown Schultz fails to advance any cogent equitable grounds for the relief sought.

Moreover, the Motion to Strike is untimely and barred by the "law of the case" doctrine.

In further support of its Opposition, USF&G avers and asserts as follows:

1.    According to the Case Management Order dated August 17, 2001, as amended by Order dated May 8, 2002, the deadline for submission of expert reports by USF&G was July 22, 2002, the deadline for submission of expert reports by Brown Schultz was August 21, 2002 and the deadline for supplements was October 18, 2002.  True and complete copies of the Case Management Order and the amendment are attached hereto as Exhibits "A" and "B," respectively.

2.    On July 22, 2002, USF&G timely served the Expert Report of Steve J. DeBruyn ("DeBruyn Report") on Brown Schultz' counsel.  A true and complete copy of the DeBruyn Report is attached hereto and incorporated herein as Exhibit "C."  After receiving expert reports from Brown Schultz on August 20, 2002, USF&G served the Supplemental Expert Report of Steve J. DeBruyn ("Supplemental Report") on September 20, 2002, *as was expressly allowed under the Court's Case Management Order, as amended*.  A true and complete copy of the Supplemental Report is attached hereto as Exhibit "D."  The Case Management Order, as amended, provided a deadline of October 18, 2002 for submission of "[a]ny *supplements* to [expert] reports . . . ."  (emphasis supplied).  Thus, "supplementation" of expert reports was not only allowed, but such supplementation was specifically contemplated by the Court.  Moreover, by implication, the supplementation requirements of Fed. R. Civ. P. 26(e) indicate that supplementation is neither unusual, unexpected, nor invidious.  The Defendants' attempt in the Motion to Strike to draw a distinction between "supplementation." "amplifi[cations]" and "amend[ments]" is devoid of authority or precedent.  *See,* Motion to Strike, ¶24.  USF&G also filed contemporaneously with its opposition to Brown Schultz' summary judgment motion the Affidavit of Steve J. DeBruyn in Opposition to the Defendants' Motion for Summary Judgment

(the "DeBruyn Affidavit"). The timely filed DeBruyn Affidavit is, in all material aspects, identical in content to the DeBruyn Report and the Supplemental Report.

3.      USF&G avers that the DeBruyn Report meets the test for compliance with Fed. R. Civ. P. 26(a)(2). The DeBruyn Report delineates the documents and professional standards "reviewed and relied upon," by Stephen J. DeBruyn, C.P.A., in rendering his opinions thereon. DeBruyn Report, p. 2-3. The DeBruyn Report also identifies material misstatements and indicates the "primary causes of the material misstatements" in three enumerated sections. DeBruyn Report, p. 3-6. Finally, the DeBruyn Report appends as exhibits "comparisons of CCI's Balance Sheets and Income Statements containing those adjustments warranted as a result of the defects and deficiencies" in the Audit Report. Summarily, the DeBruyn Report identifies what is wrong, discusses the basis upon which such acts and omissions were determined to be wrong and then not only indicates what adjustments are warranted but shows such adjustments in the appended restated financials.

4.      In the Report and Recommendations Regarding Defendants' Motion for Summary Judgment dated November 5, 2002 (the "Report"), Magistrate Judge Smyser found the DeBruyn Report – on its own – to be inadequate. Report, p. 28. However, Magistrate Judge Smyser also found that although the DeBruyn Report, alone, was insufficient, the Supplemental Report provided a more than adequate explanation of the basis and reasons contained therein. Report, p. 28. In addition to rebutting various assertions advanced by Brown Schultz' experts, the Supplemental Report discusses in depth the methodology utilized in creating the restated financials. Supplemental Report, p. 1-2. By any standard, the Supplemental Report, taken in conjunction with the DeBruyn Report, is more than sufficient to ensure that "surprise is eliminated." *Dunkin' Donuts, Inc. v. Patel*, 174 F. Supp. 2d 202, 212 (D. Md. 2001). Thus,

Magistrate Judge Smyser acted well within his discretion in considering the DeBruyn Report in conjunction with the Supplemental Report and the DeBruyn Affidavit. *Id.* By means of the Order dated January 30, 2003, the Court adopted the Report, thereby recognizing the appropriateness of Magistrate Judge Smyser's conclusions regarding the DeBruyn Report, the Supplemental Report and the DeBruyn Affidavit.

5.    "The law of the case doctrine applies to issues expressly decided by a court in prior rulings and to issues decided by necessary implication." *Bolden v. Southeastern Pennsylvania Transportation Authority*, 21 F.3d 29 (3d Cir. 1994). Under the law of the case doctrine, "when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation." *Diesler v. McCormack Aggregates Co.*, 54 F.3d 1074, 1087 (3d Cir. 1995). Brown Schultz raised objections to the DeBruyn Report and the Farnsworth Report in Defendants' Objections to Magistrate's [sic] Smyser's Report and Recommendations Regarding Defendants' Motion for Summary Judgment filed on or about November 20, 2002 (the "Objection"). Brown Schultz also previously raised objections to the DeBruyn Report and Supplement Report in a reply brief filed on behalf of its summary judgment motion (the "Reply"). Although Magistrate Judge Smyser found that the Reply was not timely filed, he considered it relative to the Report. Report, p. 4, n.1. The Report contains specific findings as to the adequacy of the DeBruyn Report and the Supplemental Report. Report, pp. 28-31. On or about January 31, 2002, the Court issued an Order which adopted the Report in its entirety. Accordingly, Brown Schultz' objections to the DeBruyn Report and Supplemental Report have been previously raised, considered by the Court and found lacking. The "law of the case" doctrine does not give Brown Schultz another bite at the apple.

6.      Apparently to bolster the Defendants' claim for the unmerited relief it seeks, the Motion to Strike also unfairly and incorrectly attempts to paint USF&G as intransigent in providing discovery materials to the Defendants. The true facts belie such claim by the Defendants. The Motion to Strike provides, in pertinent part, that Brown Schultz "on August 6 and 7, 2002 requested that plaintiff produce Mr. DeBruyn's work papers . . . [and] Plaintiff refused . . . ." Motion to Strike, p. 5, ¶15 and 16. Two self-serving letters from Brown Schultz' counsel are attached as an exhibit. Curiously, Brown Schultz has neglected to include USF&G's response – by means of a letter dated August 8, 2002 – to Brown Schultz' overbroad and improper requests. A true and complete copy of a letter from Bruce D. Levin to Kathleen Carson dated August 8, 2002 is attached hereto as Exhibit "E." The letter not only offers to produce certain documents but explains in detail several legal and practical problems raised by Brown Schultz' request. The letter invites Brown Schultz to provide further necessary information and to discuss any unresolved issues. *Brown Schultz never replied to that letter.*

7.      Undoubtedly, courts may preclude testimony for parties who have failed to obey a scheduling order. Although USF&G fully complied with all scheduling orders, excluding critical evidence would be an extreme and unmerited sanction even if, *arguendo*, the DeBruyn Report and the Supplemental Report had not been timely served. *Kotes v. Super Fresh Food Markets, Inc.*, 157 F.R.D. 18 (E.D. Pa. 1994). The Third Circuit has determined that four factors must be considered in deciding to exclude or permit a witness's testimony: the prejudice to the party against whom the excluded witness is to testify; the ability of that party to cure the prejudice; the extent to which the witness would disrupt the orderly and efficient trial of the case; and the party's bad faith or willfulness in failing to comply with the court's order. *Id.* at 20; *Tolerico v. Home Depot,* 205 F.R.D. 169 (M.D. Pa. 2002). In *Perkasie Industries Corp. v. Advance*

*Transformer, Inc.,* 143 F.R.D. 73 (E.D. Pa. 1992), the court applied these four factors to determine whether or not untimely expert reports would be admitted.  The court determined that the additional expert reports would be stricken because three additional expert witnesses were identified months after the deadline.  The new expert witnesses were also proposing a different analysis of damages than a previously identified expert witness.  Additionally, the court held that the new experts would be stricken because the opposing party would undoubtedly be prejudiced and would not have the opportunity to rebut the new expert testimony.  *Id.* at 76-77.  Here, none of the four factors applies.  USF&G *timely* provided both the DeBruyn Report and the Supplemental Report.  Brown Schultz has not been prejudiced by USF&G's timely service of the DeBruyn Report and the Supplement Report and will have the opportunity to depose Mr. DeBruyn.  In fact, the parties have agreed that Mr. DeBruyn will be deposed by Brown Schultz but have not yet fixed a date for that deposition.  Simply, even if, *arguendo*, the DeBruyn Report and Supplemental Report were not timely, there are no circumstances in the case that would warrant the "extreme" measure of striking those expert reports.

　　　8.　　In the Memorandum of Law in Support of Defendants' Motion to Strike Supplemental Expert Report and Affidavit of Stephen DeBruyn, CPA ("Memorandum"), the Defendants aver that they have "had no opportunity to examine plaintiff's underwriters with regard to the effect those restate financials would have had on their underwriting decisions." Memorandum, p.10.  Defendants then assert that according to their interpretation of the Court's orders, the "last possible moment for this information to he disclosed was at the time plaintiff's expert reports were due on July 22, 2002.  *Id.*  Assuming, *arguendo*, that the dates set by the Court for "supplementation" are meaningless and that July 22, 2002, was, in fact, the ultimate and only deadline, the Defendants' averment of prejudice by any putative failing by USF&G

- 6 -

rings hollow. The depositions of the four underwriters knowledgeable about this case were all completed prior to July 27, 2002! The deposition of James Daily was completed on June 27, 2002. The deposition of David Hussey was completed on May 28, 2002. The deposition of Anthony Phillips was competed on June 20, 2002. The deposition of Stephen Salazar was completed on May 22, 2002. Copies of the first pages of each deposition of the delineated underwriters are attached hereto and incorporated herein as Exhibit "F". Thus, even if, *arguendo*, the Supplemental Report were due no later than July 22, 2002, Defendants would have had no right to depose the underwriters as to this purportedly crucial issue. Moreover, to the extent the depositions were not completed or that Defendants may have wished to seek judicial leave to re-open such depositions, it should be noted that Defendants have not attempted to do so in the approximately six (6) months since the Supplemental Report was served on them.

9.    Even if, *arguendo*, Brown Schultz' factual and legal averments were meritorious, Brown Schultz has waived its right to have any untimely or otherwise defective filing stricken. The Motion to Strike was filed approximately four (4) months subsequent to the filing of the Supplemental Report and six (6) months subsequent to the filing of the DeBruyn Report. The Motion to Strike – filed prior to the issuance of the Court's Order dated January 31, 2003 adopting the Report – is really nothing more than a last ditch effort to file a *second* reply brief in support of Brown Schultz' objections to the Report. It is moot, old and repetitive.

WHEREFORE, USF&G respectfully requests that the Court enter an order:

1.    Denying the Motion to Strike; and

2.      Providing such other and further relief as is just and proper.

UNITED STATES FIDELITY & GUARANTY
COMPANY,
By its attorneys,

Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA  02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

and

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:    (717) 237-7100
Facsimile:    (717) 237-7105

Dated: February 10, 2003
#262542 v1/36432/87

- 8 -

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES FIDELITY AND   :   **CIVIL NO. 1:01-CV-0813**
GUARANTY COMPANY,   :
   :
           Plaintiff   :   (Judge Kane)
   :
        v.   :   (Magistrate Judge Smyser)
   :
BRUCE J. BROWN and   :
BROWN SCHULTZ SHERIDAN &   :
FRITZ,   :
   :
          Defendants   :

**FILED**
**HARRISBURG, PA**

AUG 1 7 2001



MARY E. D'ANDREA, CLERK
PER _____ DEPUTY CLERK

**CASE MANAGEMENT ORDER**

     Pursuant to a case management conference held on
August 17, 2001, **IT IS ORDERED** that:

     1.  **Amended Pleadings**.  Plaintiff shall file any
amended pleadings on or before **January 2, 2002**.  Defendants
shall file any amended pleadings on or before **February 4, 2002**.

     2.  **Expert Reports**.  Plaintiff shall submit expert
reports to defendants on or before **July 1, 2002**.  Defendants
shall submit expert reports to plaintiff on or before **August 1,
2002**.  Any supplements to reports shall be submitted to
opposing parties on or before **October 18, 2002**.

3. **Discovery Deadline**. All discovery shall be planned and commenced so as to be completed by **May 15, 2002**.

The maximum number of depositions per side shall be fifteen (15); the maximum number of interrogatories per side shall be fifty (50); and the maximum number of requests for admissions per side shall be fifty (50).

4. **Consent**. On or before **May 15, 2002**, counsel for the plaintiff shall file either a consent form, signed by both counsel, consenting to proceed under 28 U.S.C. § 636(c) before the magistrate judge, or a statement that there is not mutual consent to proceed before the magistrate judge to trial. In the latter case, the pretrial conference date and trial date established herein shall not apply unless adopted by Judge Kane. The case in said event shall be listed for trial before Judge Kane.

5. **Dispositive Motions**. Any dispositive motion shall be filed, as well as the supporting brief, on or before **August 15, 2002**.

2

6. **Motions in Limine**.  No motions in limine shall be filed after **November 1, 2002** without leave of court, a supporting brief and a proposal for a briefing schedule that will permit the party opposing the motion to fully and fairly address the issues presented and will permit the court to fully consider and decide the motion.

7. **Settlement Conference and Pretrial Conference**.

(a)  At least ten days prior to the date scheduled for the final pretrial conference, counsel for the parties shall hold the attorneys' conference required by Local Rule 16.3.  An attorney who has not entered an appearance as of the date of the LR 16.3(b) conference of attorneys, or who does not attend the LR 16.3(b) conference of attorneys, may not serve as trial counsel, unless extraordinary circumstances are shown to warrant an exception.

(b)  This conference shall be face-to-face unless the court, upon written request, approves another arrangement. Failure of the plaintiff to initiate the holding of the conference or of the defendants to respond to such initiative in an appropriate manner may result in the imposition of sanctions, including possible dismissal of the action.

3

AO 72A
(Rev.8/82)

(c)  Each party shall file a pretrial memorandum in conformity with the Rules of Court, M.D.Pa.  Failure to timely file pretrial memoranda will result in an appropriate sanction.  Fed.R.Civ.P. 16(f).

(d)  A final pretrial conference and settlement conference shall be held on **November 21, 2002, at 9:00 a.m.**, in Chambers, Room 1110, Eleventh Floor, Federal Building, Third and Walnut Streets, Harrisburg, Pennsylvania.  Counsel who will try the case shall attend the pretrial conference unless the court, upon written request, approves the substitution of another attorney who is fully familiar with the case and has the settlement authority required by Local Rule 16.2.  A copy of the local rules may be obtained from the Clerk of the Court by writing:  Clerk of Court, Federal Building, P.O. Box 983, Harrisburg, Pennsylvania 17108-0983.  At the pretrial conference, counsel for the plaintiff shall be required to set forth the elements of the particular type of claim (or claims) being made.  Counsel for the defendants shall be required to identify any legal defenses they expect to make.  It should be noted that the court expects to hold counsel for both sides to the claims and defenses they outline here unless good cause is shown for allowing additional legal theories, claims and/or defenses in sufficient time to consider and evaluate them

4

before trial.  Settlement will also be discussed at the
pretrial conference.  A separate settlement conference will be
set upon the request of a party.

8.  <u>Jury Selection and Trial</u>.  If the parties consent
to proceed before a magistrate judge, the trial of this case
shall begin with jury selection at **9:30 a.m., on December 2,
2002,** in Courtroom No. 5, Eleventh Floor, Federal Building,
Third and Walnut Streets, Harrisburg, Pennsylvania.

Counsel shall file proposed jury instructions in
conformity with Local Rule 51.  If the parties intend to use
depositions at trial in place of live testimony, they shall
review the depositions prior to the time of trial.  If there
are objections which cannot be resolved among counsel, said
objections and copies of the relevant depositions shall be
submitted to the court at least fifteen (15) days prior to
trial.  Where counsel have failed to meet the time requirement
in this paragraph, the court may, in its discretion, deem the
objections withdrawn.  If the depositions to be used are
videotaped, a transcript must be provided to the court in
advance of trial.  Videotape equipment shall be set up in the
courtroom prior to the commencement of trial in the morning, if
its use is anticipated in the morning, or during the lunch

5

break, if its use is anticipated in the afternoon.  Whenever any civil action scheduled for jury trial is settled or otherwise disposed of in advance of the actual trial, jurors' costs, including mileage and per diem, shall be assessed equally against the parties unless the Clerk's Office at the place the trial is to be held is notified of the settlement in sufficient time to permit the Clerk to advise the jurors that their attendance will not be necessary.  Notice to such Clerk's Office before 2:00 p.m. on the last business day preceding the day on which the trial of the action is to start shall be adequate for such purpose.

9.  **Case Management Track.**  This case is on the complex track.

The court will, in the absence of extraordinary circumstances, adhere to the schedule hereby established. Continuances of trial and extensions of the discovery period will be granted only when extraordinary circumstances arise and application is timely made.

J. Andrew Smyser
Magistrate Judge

Dated: August __17__, 2001.

6

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| United States Fidelity and Guaranty Company, Plaintiff | : : : : | Civil No. 1:01-CV-0813 |
| v. | : : | (Judge Kane) |
| Bruce J. Brown and Brown, Schultz, Sheridan & Fritz, Defendants | : : : | (Magistrate Judge Smyser) |

FILED
HARRISBURG, P

MAY 0 9 2002

MARY E. D'ANDREA, C
Per_____
Deputy Clerk

**ORDER**

AND NOW, this *8TH* day of *MAY*, 2002, upon consideration of

the parties' Joint Motion for Limited Modification of the Case Management Order, it

*(DOC. 20)*

is hereby ORDERED that the motion is GRANTED and the deadlines in the August

17, 2001 Case Management Order are modified as set forth below:

Discovery Deadline:            June 22, 2002

Submission of Expert Reports
    Plaintiff                  July 22, 2002
    Defendants                 August 21, 2002

Dispositive Motions            August 30, 2002

All other dates and/or deadlines in the August 17, 2002 Case Management

Order remain in effect.

BY THE COURT:

*J. Anchun Smyser*

M. J.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(HARRISBURG DIVISION)

UNITED STATES FIDELITY :
AND GUARANTY COMPANY, :
           PLAINTIFF :     NO. 1:01 CV 00813
                   :     (JUDGE KANE)
                   :
         v. :
                   :
BRUCE J. BROWN AND BROWN, :
SCHULTZ, SHERIDAN & FRITZ :
           DEFENDANTS :

## EXPERT REPORT OF STEVE J. DeBRUYN, CPA

     I am a Certified Public Accountant and am a Partner in the firm of Clifton Gunderson

LLP. I also serve as the Construction Contractor Industry Group Leader for Clifton Gunderson

LLP. A copy of my *Curriculum Vitae* is attached hereto as Exhibit "A." I am being

compensated for my professional services at the rate of $250 per hour.

     I have been engaged by Bernkopf, Goodman & Baseman LLP to determine if I could

render certain opinions concerning the audit procedures performed by and conclusions reached

with respect to the audited financial statements prepared by Brown, Schultz, Sheridan & Fritz

("Brown Schultz") for CCI Construction Company, Inc. ("CCI") for the fiscal years ended

December 31, 1996, 1997 and 1998. I have determined that I am able to render such opinions.

     In connection with my engagement, I have reviewed the audit procedures and conclusions

reached by Brown Schultz as they relate to that firm's audits of CCI for the calendar years ended

in 1996, 1997 and 1998 (the "Audit Reports"). In particular, I analyzed whether the audit

procedures and conclusions conformed to Generally Accepted Accounting Principles (GAAP)

and Generally Accepted Auditing Standards (GAAS).

In analyzing the Audit Reports, I have reviewed and relied upon the following

documents:

- Brown Schultz' audit workpapers for CCI for the fiscal years ended December 31, 1996, 1997, & 1998.

- Brown Schultz' "Permanent File" for CCI.

- AICPA TECHNICAL PRACTICE AIDS, Statement of Position 81-1, Accounting for Performance of Construction - Type and Certain Production-Type Contracts, July 15, 1981;

- AICPA AUDIT AND ACCOUNTING GUIDE FOR CONSTRUCTION CONTRACTORS, May 1, 1997

- Statement on Auditing Standards No. 47, Audit Risk & Materiality In Conducting An Audit (American Institute of Certified Public Accountants, 1983);

- Statement on Auditing Standards No. 57. Auditing Accounting Estimates (American Institute of Certified Public Accountants, 1988);

- FAS No. 5, Accounting for Contingencies; March 1975

- FAS No. 57, Related Party Disclosures; March 1982.

- Statement on Auditing Standards No. 22, Planning and Supervision, (American Institute of Certified Public Accountants 1978).

- Statement on Auditing Standards No 31, Evidential Matter, (American Institute of Certified Public Accountants 1980).

- Depositions of Bruce J. Brown dated January 17, 2002 and a preliminary draft of

- 2 -

the deposition of July 19, 2002;   I have also reviewed portions of the deposition

of Sherri Phillips, taken on July 10, 2002, and portions of the deposition of

Deborah Bowman dated May 21, 2002.

- Various pleadings filed in the above-captioned action;

- 1998 Audited Financial Statements prepared by Brown Schultz for Pennsylvania

  Contractors Insurance Co., Inc. ("PCIC");

- Brown Schultz' work papers for the audit of "PCIC" for the fiscal year ended

  December 31, 1998;

- Work in process schedule as of December 31, 1999 prepared by CCI personnel.

In general, for reasons explained below, it is my opinion that the audit work performed by

Brown Schultz for CCI for the fiscal years ended December 31, 1997 and 1998 did not conform

to applicable standards of care of a Certified Public Accountant and this resulted in material

misstatements and omissions in Brown Schultz' 1997 and 1998 Audit Reports.  Specifically, the

negligent audit work performed by Brown Schultz resulted in an overstatement of both income

and equity in the amount of $815,960 for 1997 and $3,126,508 for 1998.   It is also my opinion

that these misstatements were material to the financial position of CCI.

The primary causes of the material misstatements in the 1997 and 1998 Audit Reports

include, but are not limited to, the following:

Brown Schultz' workpapers demonstrate Brown Schultz' failure to properly

assess the risk involved with the audit of CCI from 1996 through 1998. Because of this failure to

properly identify the risks associated with CCI, Brown Schultz' audit programs and its audit

fieldwork were inadequate to provide the required assurance that the Audit Reports were fairly

presented in accordance with GAAP.  A primary objective of an audit is to identify high-risk

audit areas and plan the audit procedures accordingly.   Brown Schultz' workpapers identified

high-risk characteristics in both CCI and CCI's individual contracts.  Brown Schultz' audit

planning work papers for 1996, 1997 and 1998 were virtually identical to each other and did not

reflect any of the increasing audit risks inherent in the CCI audit engagement.  Further, the audit

work performed by Brown Schultz for the fiscal years ended December 31, 1996, 1997 and 1998

did not change materially from year to year.  This is significant in light of the fact that the audit

risk profile of CCI was increasing in each successive year due to the following:

- A significant dollar volume of work was being performed by CCI's subcontractors.

- Brown Schultz' knowledge of and its documentation of past and present claims and defaults with respect to CCI's subcontractors;

- CCI's expansion in new geographical areas;

- The profit fades noted by Brown Schultz on contracts completed in subsequent years required Brown Schultz to question the reliability of CCI's management's ability to estimate costs-to-complete;

- At the end of 1997 and throughout 1998, CCI was self-performing some of the work which it previously subcontracted to others and purchased a substantial amount (approximately $7 million) of construction equipment;

- CCI was not properly allocating indirect costs to individual contracts;

- The presence of significant related-party transactions.

2.     There were inadequate audit procedures performed by Brown Schultz in the areas

of contracts-in-progress; specifically, the design and implementation of substantive procedures in

connection with accumulated costs and estimated costs to complete. In my opinion, undue reliance was placed by Brown Schultz on CCI management's assertions with respect to costs to complete and estimated profits. The determination of the accuracy of the accumulated costs to date and the estimated costs-to-complete is critical to contractors like CCI using the percentage of completion method of accounting.

Brown Schultz acknowledged that its testing of contract costs was a test of CCI's cost controls only. This was inappropriate under the circumstances extant here. The testing of 25 costs was a test of transactions which an auditor can use to make qualitative assessments from the results. However, such testing does not replace the need to perform substantive procedures, such as vouching significant contract costs and analytical review. CCI had significant direct costs related to subcontractors and there was documentation contained in Brown Schultz' workpapers relating to past and present claims with subcontractors as well as evidence of subcontractor defaults. Nonetheless, Brown Schultz did not send out any subcontractor confirmations, nor does Brown Schultz' "Permanent Files" or its work papers demonstrate that it read any subcontracts and other similar construction agreements. In addition, Brown Schultz specifically excluded any testing of unrecorded liabilities for any job related expenses. Instead, as noted above, Brown Schultz relied on a test of 25 "haphazardly" selected costs throughout each year and there was no evidence that Brown Schultz performed any analytical procedures related to accumulated job costs.

The estimated costs-to-complete contained in the 1996, 1997 and 1998 Audit Reports were deficient in that they relied on CCI's representations with no documentation substantiating CCI's management estimates other than they had allegedly been verified by Sherri Phillips, CCI's chief financial officer and/or Stan Sechrist, CCI's Vice President - Construction

Operations. In 1998, CCI was estimating gross profits on several contracts-in-progress that were materially higher than the historical or originally projected amounts. Subsequent review revealed that these contracts had significant profit fades and one job - no. 454 - had a loss of $957,000.00, and profit fade from the 1998 workpaper of approximately $2,600,000. Also, Brown Schultz' 1998 workpaper files contained no evidence of any consideration of the allocation of indirect costs to estimated costs to complete despite Brown Schultz' knowledge that CCI was self performing more of its subcontract work than in the past. In addition, there was no follow - up between the documented preliminary analytical review work and the final work, despite a material increase in the net over/underbillings. Brown Schultz also failed to document the reasons for the significant underbillings reported at the end of the 1998 year.

There was no evidence in Brown Schultz' workpapers for the 1996, 1997 and 1998 Audit Reports that Brown Schultz read one or more of the contracts for guarantees, penalty and incentive provisions or cancellation and postponement provisions.

3.     There was inappropriate recording and inadequate disclosure of related-party transactions between PCIC and CCI. It is my opinion that Brown Schultz sanctioned the recording of $1,162,460 of revenue in 1998 from PCIC, a related-party to CCI. The transaction involved the guarantee or insurance of a third party contract claim by PCIC; a company owned by the sole owner of CCI. Brown Schultz also performed the audit work on PCIC. The third party contract claim did not meet the recognition standards set forth in SOP 81-1, and in my opinion the guarantee by the related party did not support the recognition of revenue. In addition, the recording and disclosure of the third party transaction was misleading to the user of the 1998 Audit Report. Further, the related-party transaction was recorded as an underbilling instead as a separate line item on the balance sheet. The result was a material misstatement to

- 6 -

the 1998 Audit Report of $1,162,460.

In summary, Brown Schultz' workpapers demonstrated that undue reliance was placed on CCI management's assertions; the workpapers fail to demonstrate adequate independent verification, and do not support the conclusions reached by Brown Schultz as they relate to the Audit Reports for calendar years 1997 and 1998. In addition, Brown Schultz' workpapers have numerous other deficiencies including, without limitation, the following:

- Lack of documentation of time to indicate the partner in charge participated in the audit planning in 1998;

- The financial disclosure checklist included in the audit workpapers does not appear to be reviewed;

- Job site visits were not done and considerations not documented; and

- 1998 search for unrecorded liabilities did not go through the last day of fieldwork.

Attached hereto as Exhibit B-1 and B-2 are comparisons of CCI's Balance Sheets and Income Statements containing those adjustments warranted as a result of the defects and deficiencies in the procedures for and preparation of the Audit Reports for CCI for the fiscal years ended December 31, 1997 and 1998.

During my review of the 1996 audit workpapers, I noted that the audit procedures performed were similar to the 1997 and 1998 audits.

This report is subject to revisions based upon any other information which is obtained during discovery in the above-captioned action.

Steve J. DeBruyn, CPA

Dated: July 22, 2002
#249885 v1/36432/87

# EXHIBIT A

# CURRICULUM VITAE

**STEPHEN J. DEBRUYN, CPA**

| | |
|---|---|
| **POSITION** | **Partner** |
| **EDUCATION** | B.S. in Accounting<br>Southern Illinois University, 1982 |
| **PROFESSIONAL DESIGNATIONS** | Certified Public Accountant, 1984<br>American Institute of Certified Public Accountants<br>Illinois CPA Society |
| **LICENSES** | Licensed CPA - Illinois |
| **YEARS OF EXPERIENCE** | 20 |
| **PRIOR EXPERIENCE** | 7 years with audit staff of large regional firm.  Promoted to manager in 1986, joined Clifton Gunderson June, 1989, promoted to Partner in 1993. |
| **SUPERVISORY EXPERIENCE** | Partner in charge of various audit, review and compilation engagements servicing manufacturers, contractor, retail and wholesale industries as well as employee benefit plans.<br><br>Supervision of staff on multiple concurrent engagements. |
| **AREAS OF SPECIALIZATION** | Firm-wide Construction Industry Group Leader<br><br>Audit, accounting and consulting services for various industries and employee benefit plans.<br><br>Corporate finance; merger and acquisition services.<br><br>Peer reviews and internal inspection programs.<br><br>Consulting services in connection with prospective financial statements, executive search, interpretation of financial results, succession of ownership and business valuations. |

**Stephen J. DeBruyn** (continued)

Income tax planning and preparation for corporations, S-corporations, partnerships and L.L.C.s.

**OTHER SIGNIFICANT EXPERIENCES IN PUBLIC ACCOUNTING**

Advanced training through experience with previous employer in areas of audit efficiencies, documentation of accounting systems in manual or automated environments.

Speaker at annual audit and accounting conference.

Selected to the firms Leadership Career Program class of 1994.

1997 Clifton Gunderson Outstanding Performance Award.

**PUBLICATIONS**

Speaker at the Clifton Gunderson Annual Audit & Accounting Conference. Sessions on Construction Contractors.
October, 2000
October, 1999
October, 1998

Improved Software Keeps Construction Companies Ahead of Competitors, Clifton Gunderson LLP Relationships , Magazine, Issue 6 Summer 2002.

**PREVIOUS TRIAL EXPERIENCE**

IN RE: Marriage of Lawrence Edward Kuchefski, Petitioner and Sherri Marie Kuchefski, Respondent, Cause #99D284 Circuit Court for the 5th Judicial Circuit of Illinois located in Danville, Illinois, March 2002.

# EXHIBIT B-1



## CCI CONSTRUCTION COMPANY, INC.
### BALANCE SHEET – DECEMBER 31, 1997

### ASSETS

|  | As Reported | Adjustments | As Restated |
|---|---|---|---|
| Current assets: |  |  |  |
| Cash and cash equivalents | $   1,128,337 | $        - | $  1,128,337 |
| Investments in marketable securities | 3,702,992 | - | 3,702,992 |
| Accounts receivable, trade: |  |  |  |
| Customers: |  |  |  |
| Current | 8,230,674 | - | 8,230,674 |
| Retained | 1,121,610 | - | 1,121,610 |
| Shareholder | - | - | - |
| Affiliates | 3,485 | - | 3,485 |
| Note receivable | 22,569 | - | 22,569 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 1,072,281 | (429,978) | 642,303 |
| Prepaid expenses | 6,185 | - | 6,185 |
| Shop inventory | 639 | - | 639 |
| Total current assets | 15,288,772 | (429,978) | 14,858,794 |
| Property and equipment: |  |  |  |
| Automobiles and trucks | 427,342 | - | 427,342 |
| Furniture | 553,587 | - | 553,587 |
| Machinery and equipment | 1,323,233 | - | 1,323,233 |
| Other | 72,453 | - |  |
|  | 2,376,615 | - | 2,376,615 |
| Less accumulated depreciation | 920,919 | - | 920,919 |
|  | 1,455,696 | - | 1,455,696 |
|  | $   16,744,468 | $   (429,978) | $16,314,490 |

## LIABILITIES AND SHAREHOLDER'S EQUITY

|  | As Reported | Adjustments | As Restated |
|---|---|---|---|
| Current liabilities: | | | |
| Accounts payable, trade: | | | |
| Vendors: | | | |
| Current | $ 7,846,395 | $ - | $ 7,846,395 |
| Retained | 1,078,950 | - | 1,078,950 |
| Notes payable | 815,781 | - | 815,781 |
| Accrued loss on jobs | - | 732,685 | 732,685 |
| Accrued expenses | 808,601 | - | 808,601 |
| Taxes withheld and accrued | 58,023 | - | 58,023 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 681,924 | (346,703) | 335,221 |
| Total current liabilities (all current) | 11,278,674 | 385,982 | 11,675,656 |
| | | | |
| Shareholder's equity: | | | |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | - | 39 |
| Capital in excess of par | 9,758 | - | 9,758 |
| Retained earnings | 5,208,489 | (815,960) | 4,392,529 |
| Unrealized gain on marketable securities | 236,508 | - | 236,508 |
| | 5,454,794 | (815,960) | 4,638,834 |
| | $ 16,744,468 | $ (429,978) | $16,314,490 |

**CCI CONSTRUCTION COMPANY, INC.**
**STATEMENT OF INCOME**
**Year Ended December 31, 1997**

|  | Original | Adjustments | As Restated |
|---|---|---|---|
| Revenue | $ 34,921,676 | $ (815,960) | $34,105,716 |
| Cost of contracts | 32,617,473 | - | 32,617,473 |
| Gross profit | 2,304,203 | (815,960) | 1,488,243 |
| General and administrative expenses | 1,954,380 | - | 1,954,380 |
| Income from operations | 349,823 | (815,960) | (466,137) |
| Other income | 357,056 | - | 357,056 |
| Net income (loss) | $ 706,879 | $ (815,960) | $ (109,081) |

# EXHIBIT B-2

## CCI CONSTRUCTION COMPANY, INC.
## BALANCE SHEET – DECEMBER 31, 1998

### ASSETS

| | As Reported | Adjustments | As Restated |
|---|---|---|---|
| Current assets: | | | |
| Cash and cash equivalents | $ 2,429,866 | $ - | $ 2,429,866 |
| Investments in marketable securities | 631,481 | - | 631,481 |
| Accounts receivable, trade: | | | |
| Customers: | | | |
| Current | 5,964,311 | - | 5,964,311 |
| Retained | 1,822,224 | - | 1,822,224 |
| Affiliates | 365,756 | - | 365,756 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 6,341,726 | (2,379,122) | 3,962,604 |
| Prepaid expenses | 170,232 | - | 170,232 |
| Shop inventory | 38,161 | | 38,161 |
| Total current assets | 17,763,757 | (2,379,122) | 15,384,635 |
| Property and equipment: | | | |
| Automobiles and trucks | 1,269,567 | - | 1,269,567 |
| Furniture | 851,738 | - | 851,738 |
| Machinery and equipment | 5,947,290 | - | 5,947,290 |
| Other | 344,128 | - | 344,128 |
| | 8,412,723 | - | 8,412,723 |
| Less accumulated depreciation | 1,651,485 | - | 1,651,485 |
| | 6,761,238 | - | 6,761,238 |
| Other assets: | | | |
| Cash surrender value of officer's life insurance | 55,453 | - | 55,453 |
| Investments | 34,000 | - | 34,000 |
| | 89,453 | - | 89,453 |
| | $ 24,614,448 | $ (2,379,122) | $22,235,326 |

## LIABILITIES AND SHAREHOLDER'S EQUITY

|  | As Reported | Adjustments | As Restated |
|---|---|---|---|
| **Current liabilities:** | | | |
| Accounts payable, trade: | | | |
| Current | $   10,974,274 | $          - | $ 10,974,274 |
| Retained | 2,180,967 | - | 2,180,967 |
| Current portion of long-term debt | 1,338,280 | - | 1,338,280 |
| Accrued loss on jobs | - | 1,826,956 | 1,826,956 |
| Accrued expenses | 333,060 | - | 333,060 |
| Taxes withheld and accrued | 91,601 | - | 91,601 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 288,208 | (263,610) | 24,598 |
| Total current liabilities | 15,206,390 | 1,563,346 | 16,769,736 |
| Long-term debt, net of current portion | 4,164,375 | - | 4,164,375 |
| Total liabilities | 19,370,765 | 1,563,346 | 20,934,111 |
| **Shareholder's equity:** | | | |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | - | 39 |
| Capital in excess of par | 9,758 | - | 9,758 |
| Retained earnings | 5,254,834 | (3,942,468) | 1,312,366 |
| Accumulated other comprehensive income (loss), unrealized gain (loss) on marketable securities | (20,948) | - | (20,948) |
|  | 5,243,683 | (3,942,468) | 1,301,215 |
|  | $   24,614,448 | $ (2,379,122) | $22,235,326 |

# CCI CONSTRUCTION COMPANY, INC.
## STATEMENT OF INCOME
### Year Ended December 31, 1998

|  | Original | Adjustments | As Restated |
|---|---|---|---|
| Revenue | $  52,534,453 | $    (3,126,508) | $49,407,945 |
| Cost of contracts | 51,145,382 | - | 51,145,382 |
| Gross profit | 1,389,071 | (3,126,508) | (1,737,437) |
| General and administrative expenses | 1,505,700 | - | 1,505,700 |
| Income (loss) from operations | (116,629) | (3,126,508) | (3,238,137) |
| Other income | 175,670 | - | 175,670 |
| Net income (loss) | $        59,041 | $    (3,126,508) | $(3,067,467) |

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff | ) ) ) ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| v. | ) ) ) | JUDGE CONNOR |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | ) ) ) ) ) | |

## SUPPLEMENTAL AND REBUTTAL EXPERT REPORT OF STEVE J. DEBRUYN, CPA

This report supplements my report dated July 22, 2002 and also addresses certain issues contained in the reports of Miller Coffey Tate LLP and The Brenner Group.

**THE RESTATEMENTS IN GENERAL**

My original report discloses numerous deficiencies in the audit procedures regarding the contracts in process. Therefore, to determine the potential effect on the financial statements for the respective years, I started with the contracts-in-process schedules from the supplemental financial statements of CCI Construction Company, Inc. "(CCI)" prepared by Brown Schultz. The restatements for both 1997 and 1998 are a result of recasting the contracts-in-process schedules for the those years. Exhibits I and III attached hereto are the recast schedules of CCI's contract-in-process. Exhibits II and IV attached hereto are the original schedules reproduced from the audited financial statements of CCI for the respective years. Exhibit V attached hereto is the actual contracts-in-process schedule for the year ended December 31, 1999. The recast methodology used was similar to the "look back" method utilized by the Internal Revenue Service. The method involves recasting contracts-in-process in a given year from information obtained in a subsequent year. For example, if a contract was in process at the end of 1997 and subsequently completed in 1998, we recalculated, among other things, the 1997 percentage complete, revenue recognized and the profit and loss utilizing the actual numbers from the completed contract. As noted on the attached Exhibits I and III, there are a few exceptions. However, the methodology was consistently used to recast both 1997 and 1998 contracts-in-process schedule.

## THE RESTATEMENT OF THE 1997 BROWN SCHULTZ AUDIT REPORT

I calculated the total estimated cost by using the "actual" gross profit percentage of the job when it was completed. There were two exceptions to this method. Job 439 was calculated estimating the loss as determined or estimated at December 31, 1997 by CCI. Job 451 was calculated using the original gross profit estimated by CCI. I then recalculated the percentage complete, which changed the over/under billings. For the 1997-year end, the effect on over/under billings and on the net income of CCI was $815,960. Exhibit I details the revised calculations as well as reporting the differences between the recast and originally reported balances. The differences arose mainly due to the change in gross profit percentages from the 1997 estimates to the actual completed contracts. One job in particular (job 445), was reported as a projected loss on the original schedule of $82,956. When the job was completed in 1998, the actual loss was $436,063. Brown Schultz' workpapers document that there were significant problems on the job with subcontractor defaults, although it is not evident that they substantiated management's representations by vouching to subcontractor agreements or reviewing subsequent costs. The job was 38% complete and because this showed a loss it should have alerted Brown Schultz that it was necessary to do some additional inquiry and audit testing. This also relates back to my comments made in my original report regarding Brown Schultz' undue reliance placed on management's assertions, their conscious decision not to include job costs in the review of subsequent disbursements and their decision to not test subcontractor costs.

## THE RESTATEMENT OF THE 1998 BROWN SCHULTZ AUDIT REPORT

The same methodology was used as the 1997 approach by utilizing the "actual" or "revised" gross profit percentage from the completed contract schedule and contracts-in-process schedule prepared as of December 31, 1999. The 1998-year resulted in overstating income by $3,126,508.

The two year cumulative effect on net income was $3,942,467.

I chose to use the foregoing methodology for the following reasons:

- My contention is that due to lack of audit work, specifically with the testing of subcontractors, accumulated costs to complete and subsequent job costs, Brown Schultz did not have the opportunity to correctly ascertain the profit fade on the individual contracts.

- Brown Schultz should have taken into account the material profit fade from the 1997 jobs in connection with the 1998 audit work. However, the facts are that gross profit

percentages on several jobs were in excess of any historical amounts and well above the amounts originally estimated in the contracts by the contractor (CCI).

The process used to recast the earnings and estimate the misstatement in the 1997 and 1998 audited financial statements was, in my opinion, a conservative approach. The results using the above approach yielded material exceptions. The lack of audit procedures employed by Brown Schultz did not allow them the opportunity to ascertain the misstatements regardless of the amount. Even though I took a conservative approach by using actual results, the resulting differences were significant enough such that they have to relate back to the lack of effective audit procedures employed by Brown Schultz.

## PCIC RECEIVABLE

To clarify my position and opinion on the PCIC transaction recorded in the 1998 financial statements in the amount of $1,162,460, I believe that the amount should not have been recorded and disclosed as additional contract revenue and contract overbillings. In my 1998 recast contracts-in-process schedule I did not include the total contract amount for that specific job. In my opinion, the transaction did not meet the standards to be recorded as contract revenue. In addition, a more useful disclosure would have been to report the transaction as a separate line on the balance sheet of CCI indicating that it was a guarantee by the stockholder.

## PROFESSIONAL STANDARDS ISSUES

My original report noted that the audit work for Brown Schultz for the years 1997 and 1998 did not conform to applicable standards of care of a Certified Public Accountant. For example, Generally Accepted Accounting Standards (GAAS) require "Due professional care is to be exercised in the performance of the audit and the preparation of the report" (source: SAS no.1, AU section 230). Included in this section is the fact that due professional care requires the auditor to exercise professional skepticism. Based on my review of the audit workpapers for the years 1996, 1997 and 1998, Brown Schultz failed to act with sufficient professional skepticism and was not diligent in evaluating the audit evidence. Furthermore, the first standard of fieldwork requires that the work "is adequately planned and properly supervised" (source: SAS no.22, AU section 311). As noted in my earlier report, Brown Schultz's planning documentation was virtually unchanged between 1996 – 1998. Brown Schultz failed to properly address the risk involved in the audit of CCI and, therefore, did not allow the firm to modify or change the audit procedures or approach. In addition, the third standard of fieldwork requires "sufficient competent evidential matter is to be obtained ..." (source: SAS no. 31, AU section 326). As a result of Brown Schultz' limiting the testing of accumulated job costs, subcontractor costs and subsequent

3

disbursement of job costs, Brown Schultz denied itself the opportunity to obtain all possible evidential matter available to properly perform the audit.

Dated:  September 20, 2002

Steve J. DeBruyn, CPA

EXHIBIT I

## SCHEDULE OF CONTRACTS IN PROGRESS - REVISED
### 31-Dec-97

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Gross Earnings Recog. | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Billings Over Cost and Earnings | GP % |
| 1 | Job # | Job Name | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | |
| 12 | 426 | | $ 15,878,479 | $ 1,430,469 | $ 17,308,948 | 91.74% | $ 18,961,022 | $ 1,652,074 | $ 1,515,541 | $ 17,394,020 | $ 16,899,942 | $ 494,078 | $ - | 8.71% |
| 13 | 439 | | $ 6,309,222 | $ 4,214,516 | $ 10,523,738 | 59.95% | $ 10,289,145 | $ (234,593) | $ (234,593) | $ 6,074,629 | $ 6,337,295 | $ - | $ 262,666 | -2.28% |
| 14 | 445 | | $ 4,169,371 | $ 6,624,479 | $ 10,793,850 | 38.63% | $ 10,357,787 | $ (436,063) | $ (436,063) | $ 3,733,308 | $ 4,349,670 | $ - | $ 616,362 | -4.21% |
| 16 | 448 | | $ 521,254 | $ 3,913,779 | $ 4,435,033 | 11.75% | $ 4,604,000 | $ 168,967 | $ 19,859 | $ 541,113 | $ 509,198 | $ 31,915 | | 3.67% |
| 17 | 449 | | $ 515,339 | $ 934,356 | $ 1,449,695 | 35.55% | $ 1,387,666 | $ (62,029) | $ (62,029) | $ 453,310 | $ 473,383 | $ 20,073 | | -4.47% |
| 18 | 450 | | $ 115,461 | $ 3,127,293 | $ 3,242,754 | 3.56% | $ 3,266,600 | $ 23,846 | $ 849 | $ 116,310 | $ 116,310 | $ 116,310 | | 0.73% |
| 19 | 451 | | $ 411,608 | $ 6,170,750 | $ 6,582,358 | 6.25% | $ 6,880,993 | $ 298,635 | $ 18,674 | $ 430,282 | $ 599,088 | | $ 168,806 | 4.34% |
| 20 | | TOTALS | $ 27,920,734 | $ 26,415,641 | $ 54,336,375 | 51.38% | $ 55,747,213 | $ 1,410,838 | $ 822,239 | $ 28,742,973 | $ 29,168,576 | $ 642,303 | $ 1,067,906 | |
| 21 | | | | | | | | 2.53% | | | | | | |
| 22 | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | Difference | | | | |
| 25 | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | Previously reported | | $ 1,072,281 | $ 681,924 | |
| 27 | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | $ (429,978) | | $ (385,982) | $ (815,960) | |
| 29 | | | | | | | | | | Net $ | | (425,603) | | |
| 30 | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | |

**Critical Assumptions:**

1> Column C, G & K from the supplemental schedules of the audited statements.

2> Column E calculated from Gross Profit % in column N.

3> Gross Profit %'s are based on actual from schedule prepared at 12/31/99 with exception of Job's #439 &451 as explained below.

4> Gross Profit % used is the 1997 estimated loss as documented in the workpapers. The job performed better and the income realized in 1998 & 1999.

5> Gross Profit % used was based on clients original estimate as documented in 1997 workpaper file since the job had just started and auditors knowledge of the loss is probably not reasonable.

6> Job completed in 1998.

EXHIBIT II

## SCHEDULE OF CONTRACTS IN PROGRESS
### 31-Dec-97

| Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Gross Earnings Recog. | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Excess Billings Over Cost and Earnings | GP % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 426 | | $ 15,878,479 | $ 1,070,222 | $ 16,948,701 | 93.69% | $ 18,961,022 | $ 2,012,321 | $ 1,885,253 | $ 17,763,732 | $ 16,899,942 | $ 863,790 | $ - | |
| 439 | | $ 6,309,222 | $ 4,214,542 | $ 10,523,764 | 59.95% | $ 10,289,145 | $ (234,619) | $ (234,619) | $ 6,074,603 | $ 6,337,295 | $ - | $ 262,692 | |
| 445 | | $ 4,169,371 | $ 6,271,372 | $ 10,440,743 | 39.93% | $ 10,357,787 | $ (82,956) | $ (82,956) | $ 4,086,415 | $ 4,349,670 | $ - | $ 263,255 | |
| 448 | | $ 521,254 | $ 3,807,336 | $ 4,328,590 | 12.04% | $ 4,604,000 | $ 275,410 | $ 33,165 | $ 554,419 | $ 509,198 | $ 45,221 | $ - | |
| 449 | | $ 515,339 | $ 859,520 | $ 1,374,859 | 37.48% | $ 1,387,666 | $ 12,807 | $ 4,800 | $ 520,139 | $ 473,383 | $ 46,756 | $ - | |
| 450 | | $ 115,461 | $ 3,121,650 | $ 3,237,111 | 3.57% | $ 3,266,600 | $ 29,489 | $ 1,052 | $ 116,513 | $ - | $ 116,513 | $ - | |
| 451 | | $ 411,608 | $ 5,980,177 | $ 6,391,785 | 6.44% | $ 6,880,993 | $ 489,208 | $ 31,503 | $ 443,111 | $ 599,088 | $ - | $ 155,977 | |
| TOTALS | | $ 27,920,734 | $ 23,324,819 | $ 53,245,553 | 52.44% | $ 55,747,213 | $ 2,501,660 | $ 1,638,199 | $ 29,558,933 | $ 29,168,576 | $ 1,072,281 | $ 681,924 | |
| | | | | | 4.49% | | | | | | Net $ | 390,357 | |

**SCHEDULE OF CONTRACTS IN PROGRESS - REVISED**

**31-Dec-98**

| Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Earnings Recog. | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Billings Over Cost and Earnings | GP % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 439 | ⟵ | $ 10,666,808 | $ 1,164 | $ 10,667,972 | 99.99% | $ 10,536,958 | $ (131,014) | $ (131,014) | $ 10,535,794 | $ 10,481,740 | $ 54,054 | $ - | 1.24% |
| 450 | | $ 1,172,766 | $ 2,069,988 | $ 3,242,754 | 36.17% | $ 3,266,600 | $ 23,846 | $ 8,624 | $ 1,181,390 | $ 730,724 | $ 450,666 | $ - | 0.73% |
| 451 | | $ 6,659,984 | $ 1,161,755 | $ 7,821,739 | 85.15% | $ 7,082,984 | $ (738,755) | $ (738,755) | $ 5,921,229 | $ 6,570,468 | $ - | $ 649,239 | -10.43% |
| 454 | | $ 4,819,694 | $ 10,662,333 | $ 15,482,027 | 31.13% | $ 14,524,840 | $ (957,187) | $ (957,187) | $ 3,862,507 | $ 4,719,426 | $ - | $ 856,919 | -6.59% |
| 455 | | $ 4,734,492 | $ 7,222,199 | $ 11,956,691 | 39.60% | $ 12,937,341 | $ 980,650 | $ 388,308 | $ 5,122,800 | $ 3,108,536 | $ 2,014,264 | $ - | 7.58% |
| 456 | | $ 2,715,193 | $ 2,166,757 | $ 4,881,950 | 55.62% | $ 5,380,745 | $ 498,795 | $ 277,415 | $ 2,992,608 | $ 2,732,602 | $ 260,006 | $ - | 9.27% |
| 457 | | $ 547,295 | $ 898,978 | $ 1,446,273 | 37.84% | $ 1,495,629 | $ 49,356 | $ 18,677 | $ 565,972 | $ 617,799 | $ - | $ 51,827 | 3.30% |
| 459 | | $ 6,026,575 | $ 8,247,282 | $ 14,273,857 | 42.22% | $ 14,870,150 | $ 596,293 | $ 251,761 | $ 6,278,336 | $ 6,571,905 | $ - | $ 293,569 | 4.01% |
| 460 | | $ 2,905,995 | $ 12,433,313 | $ 15,339,308 | 18.94% | $ 15,565,000 | $ 225,693 | $ 42,757 | $ 2,948,752 | $ 2,252,156 | $ 696,596 | $ - | 1.45% |
| 461 | | $ 1,518,251 | $ 2,274,170 | $ 3,792,421 | 40.03% | $ 3,842,372 | $ 49,951 | $ 19,997 | $ 1,538,248 | $ 1,097,444 | $ 440,804 | $ - | 1.30% |
| 462 | | $ 458,553 | $ 5,045,263 | $ 5,503,816 | 8.33% | $ 5,589,900 | $ 86,084 | $ 7,172 | $ 465,725 | $ 419,511 | $ 46,214 | $ - | 1.54% |
| | | | | | | | | | | | | | |
| **TOTALS** | | $ 42,225,606 | $ 52,183,201 | $ 94,408,807 | 44.73% | $ 95,092,519 | $ 683,712 | $ (812,244) | $ 41,413,362 | $ 39,302,311 | | | |
| | | | | | | | 0.72% | | | | | | |
| | | | | | | | | | | Net | $ (2,379,122) | $ 2,111,051 | |
| Previously reported | | | | | | | | | | | $ 6,341,726 | $ 288,208 | |
| Difference | | | | | | | | | | | $ (1,563,346) | $ (3,942,467) | |

**Critical Assumptions:**

1> Column C, G & K from the supplemental schedules of the audited statements.

2> Column E calculated from Gross Profit % in column N.

3> Gross Profit %'s are based on actual from schedule prepared as of 12/31/99 with exception of Job #439 as explained below.

4> Gross Profit % is the 1998 amount based on total estimated cost to date and contract income reduced for $1,162,460
In revenue recorded by the auditor incorrectly. A claim amount was recieved and recognized in 1999

**EXHIBIT III**

EXHIBIT IV

## SCHEDULE OF CONTRACTS IN PROGRESS
### 31-Dec-98

| Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Earnings Recog. | Cost and Earnings | Billings To Date | Excess Cost and Earnings Over Billings | Excess Billings Over Cost and Earnings |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 439 | | $10,666,808 | $ 1,164 | $10,667,972 | 99.99% | $11,699,418 | $1,031,446 | $1,031,333 | $11,698,141 | $10,481,740 | $1,216,401 | |
| 450 | | $1,172,766 | $2,072,316 | $3,245,082 | 36.14% | $3,266,600 | $21,518 | $7,777 | $1,180,543 | $730,724 | $449,819 | |
| 451 | | $6,659,984 | $641,127 | $7,301,111 | 91.22% | $7,082,984 | $(218,127) | $(218,127) | $6,441,857 | $6,570,468 | | $128,611 |
| 454 | | $4,819,694 | $8,056,057 | $12,875,751 | 37.43% | $14,524,840 | $1,649,089 | $617,292 | $5,436,986 | $4,719,426 | $717,560 | |
| 455 | | $4,734,492 | $6,729,348 | $11,463,840 | 41.30% | $12,937,341 | $1,473,501 | $608,546 | $5,343,038 | $3,108,536 | $2,234,502 | |
| 456 | | $2,715,193 | $2,086,117 | $4,801,310 | 56.55% | $5,380,745 | $579,435 | $327,677 | $3,042,870 | $2,732,602 | $310,268 | |
| 457 | | $547,295 | $824,978 | $1,372,273 | 39.88% | $1,495,629 | $123,356 | $49,197 | $596,492 | $617,799 | | $21,307 |
| 459 | | $6,026,575 | $7,902,775 | $13,929,350 | 43.27% | $14,870,150 | $940,800 | $407,040 | $6,433,615 | $6,571,905 | | $138,290 |
| 460 | | $2,905,995 | $11,761,029 | $14,667,024 | 19.81% | $15,565,000 | $897,976 | $177,917 | $3,083,912 | $2,252,156 | $831,756 | |
| 461 | | $1,518,251 | $2,111,573 | $3,629,824 | 41.83% | $3,842,372 | $212,548 | $88,903 | $1,607,154 | $1,697,444 | | $509,710 |
| 462 | | $458,553 | $4,759,587 | $5,218,140 | 8.79% | $5,589,900 | $371,760 | $32,669 | $491,222 | $419,511 | $71,711 | |
| TOTALS | | $42,225,606 | $46,946,071 | $89,171,677 | 47.35% | $96,254,979 | $7,083,302 | $3,130,225 | $45,335,831 | $39,302,311 | $6,341,728 | $288,208 |

GP %: 7.36%

Net  $6,053,520

SCHEDULE OF CONTRACTS IN PROGRESS
31-Dec-99

| Job # | Job Name | Cost Incurred to Date | Estimated Cost to Complete | Total Estimated Cost | Percent Complete | Contract Price | Estimated Total Gross Earnings | Earnings Recog. | Cost and Earnings | Cost and Earnings Billings To Date | Excess – Cost and Earnings Over Billings | Excess – Billings Over Cost and Earnings | GP % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 439 | | $10,704,600 | $ - | $10,704,600 | 100.00% | $10,787,727 | $83,127 | $83,127 | $10,787,727 | $10,787,727 | $ - | $ - | |
| 450 | | $3,705,315 | $ - | $3,705,315 | 100.00% | $3,732,569 | $27,254 | $27,254 | $3,732,569 | $3,732,569 | $ - | $ - | |
| 451 | | $7,963,660 | $21,222 | $7,984,882 | ▓▓% | $7,230,740 | $(754,142) | $(754,142) | $7,209,518 | $7,220,117 | $ - | $10,599 | ▓ |
| 454 | | $12,681,811 | $2,862,660 | $15,544,471 | ▓▓% | $14,582,917 | $(961,554) | $(961,554) | $11,720,257 | $12,014,911 | $ - | $294,654 | ▓ |
| 455 | | $11,214,162 | $799,792 | $12,013,954 | ▓▓% | $12,999,654 | $985,700 | $920,080 | $12,134,242 | $12,592,012 | $ - | $457,770 | ▓ |
| 456 | | $5,081,715 | $ - | $5,081,715 | 100.00% | $5,600,748 | $519,033 | $519,033 | $5,600,748 | $5,600,748 | $ - | $ - | |
| 457 | | $1,446,265 | $ - | $1,446,265 | 100.00% | $1,495,629 | $49,364 | $49,364 | $1,495,629 | $1,495,629 | $ - | $ - | |
| 459 | | $18,700,567 | $278,916 | $18,979,483 | ▓▓% | $19,772,015 | $792,532 | $780,885 | $19,481,452 | $15,332,896 | $4,148,556 | $ - | ▓ |
| 460 | | $9,850,590 | $6,071,422 | $15,922,012 | ▓▓% | $16,155,581 | $233,569 | $144,504 | $9,995,094 | $10,055,938 | $ - | $60,844 | ▓ |
| 461 | | $3,940,304 | $121,249 | $4,061,553 | ▓▓% | $4,115,065 | $53,512 | $51,915 | $3,992,219 | $4,053,770 | $ - | $61,551 | ▓ |
| 462 | | $3,601,849 | $2,077,590 | $5,679,439 | ▓▓% | $5,767,995 | $88,556 | $56,161 | $3,658,010 | $3,667,008 | $ - | $8,998 | ▓ |
| TOTALS | | $88,890,838 | $12,232,851 | $101,123,689 | 87.90% | $102,240,640 | $1,116,951 | $916,627 | $89,807,465 | $86,553,325 | $4,148,556 | $894,416 | |
| | | | | | | | 1.09% | | | | | Net $3,254,140 | |

EXHIBIT V

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW

125 SUMMER STREET

BOSTON, MASSACHUSETTS 02110-1621

TELEPHONE (617) 790-3000

TELECOPIER (617) 790-3300

August 8, 2002

Bruce D. Levin
DIRECT DIAL: (617) 790-3314
e-mail: blevin@bgblaw.com

*VIA FACSIMILE*

Kathleen Carson, Esquire
Swartz Campbell Detweiler
1601 Market Street
Philadelphia, PA 19103-2316

　　　　Re:　　United States Fidelity & Guaranty Company v. Brown Schultz Sheridan & Fritz

Dear Kathy:

　　　　I am writing in response to your letters dated August 6 and 7, 2002 in which you demand immediate production of "Mr. DeBruyn's working paper files . . . ." I have reviewed the Case Management Order, the pertinent discovery rules and other documents relating to discovery matters and am unaware of the legal and procedural basis for your demand. It would be appreciated if you could indicate to me where the parties have agreed to such production, such production has been mandated by the Court or such production is otherwise required under the terms and conditions you present. If so – and I note that your letters are practically devoid of references that support the demands you are making – I will give the matter my immediate attention.

　　　　Fed. R. Civ. P. 26(a)(2)(B) provides that an expert "report shall contain . . . the data or other information considered by the witness in forming the opinions." The Expert Report of Steve J. DeBruyn, CPA (the "Expert Report") provides a list of the documents, guidelines and standards that Mr. DeBruyn reviewed and relied upon relative to this analysis of the audits performed by Brown Schultz Sheridan & Fritz. Expert Report, p. 2-3. I believe that all of the documents referenced in the Expert Report have previously been produced, are otherwise in your possession or are publicly available accounting guidelines and standards. If so desired, however, I will make additional copies of the documents enumerated in the Expert Report available to you. As all of the documents were timely made available to you, we believe that our client has fully complied with the disclosure requirements of Fed. R. Civ. P. 26.

BERNKOPF, GOODMAN & BASEMAN LLP

Kathleen Carson, Esquire
August 8, 2002
Page 2


I also note that the Case Management Order dated August 17, 2001 merely provides that each party "shall submit expert reports" to the other no later than the specified dates. I am unaware of any requirement that other documents be produced outside of the normal course of discovery.

My client has also fully complied with your requests for the production of documents. Request No. 1 of your last document requests seeks, in pertinent part, "any and all documents *relied upon by you* in connection with the preparation of those restated financials." (emphasis supplied). Assuming, *arguendo*, that "you" refers to experts retained by our client, I note that the Expert Report identifies all documents "reviewed and relied upon" by Mr. DeBruyn and that all such documents listed have been and remain available for your inspection. Simply, the request seeks documents "relied upon by you" and such documents have been identified and produced or made available.

Without wavier of any contention that the material sought in your August 6 and 7, 2002 letters may be privileged or otherwise immune from discovery, the meaning of "working paper files," "workpapers" and "working papers" in your letters is unclear. Such terms have a specific meaning in the context of an audit and, accordingly, it is less than clear exactly what you are seeking. *See, e.g.*, AICPA Professional Standards at AU§339.01. Our client's expert did not perform an audit of CCI Construction Company, Inc. and, accordingly, has not maintained "working papers" relative to an audit it did not perform. Moreover, I am unaware of any requests served by your client for "working papers," "workpapers," or other documents other than those "documents relied upon . . . in connection with the preparation of those related financials."

Because it is unclear exactly what you are seeking, I note that the work product doctrine and/or attorney client privilege may be applicable to your request. However, because our client has fully complied with the scope of discovery, both as to mandatory disclosures and requests propounded by your clients, a detailed examination of the discoverability of what you may be seeking is, at present, unnecessary.

Finally, we have produced as part of the Expert report the restated financial statements which were prepared by Mr. DeBruyn.

My client remains open to the possibility of the parties mutually agreeing to terms and conditions concerning expert discovery matters. However, absent, at minimum, the information I request in the preceding paragraphs, my client is unwilling to either produce documents beyond the scope required of it by the pertinent rules nor can it consent to any extensions of time regarding expert reports. Moreover, because all documents required to be produced pursuant to both Fed. R. Civ. P. 26(a)(2)(B) and discovery requests propounded by your client have already

**BERNKOPF, GOODMAN & BASEMAN LLP**

Kathleen Carson, Esquire
August 8, 2002
Page 3


been produced, any motion to compel their production would be frivolous.  As such, my client would seek to recover all costs, including reasonable attorneys' fees, incurred in opposing any such motion.

Please feel free to call me if you have any questions or comments.

Very truly yours,

Bruce D. Levin

cc:    Peter B. McGlynn, Esquire
       Mark Holtschneider, Esquire
BDL/mlb
#250969 v1/36432/87

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

August 8, 2002

Bruce D. Levin
DIRECT DIAL: (617) 790-3314
e-mail: blevin@bgblaw.com

## TELECOMMUNICATION TRANSMITTAL

TO:                              KATHLEEN CARSON, ESQUIRE

COMPANY:                   SWARTZ CAMPBELL DETWEILER

TELECOPIER NUMBER:     (215) 299-4301

FROM:                          BRUCE D. LEVIN, ESQ.        ATTORNEY #:   57

TOTAL NUMBER OF PAGES ____4____ INCLUDING THIS COVER SHEET

*IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL BACK AS SOON AS POSSIBLE.*

PHONE:                         (617) 790-3000

TELECOMMUNICATOR:     MLB

CLIENT/MATTER NO:        36432/87

MESSAGE:

FAXED

Please Note:  The information contained in this facsimile message is privileged and confidential, intended only for the use of the individual named above and others who have been specifically authorized to receive such.  If the recipient is not the intended recipient, you are hereby notified that dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, or if any problems occur with transmission, please notify us immediately by telephone at (617) 790-3000.  Thank you.            #230473 v1/36432/87

08/08/2002 17:10 FAX                                                      ☒001

```
                        *********************
                        ***   TX REPORT   ***
                        *********************

        TRANSMISSION OK

        TX/RX NO              1912
        CONNECTION TEL        9*00001#12152994301#
        SUBADDRESS
        CONNECTION ID
        ST. TIME              08/08 17:09
        USAGE T               01'14
        PGS. SENT                  4
        RESULT                OK
```

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

August 8, 2002

Bruce D. Levin
DIRECT DIAL: (617) 790-3314
e-mail: blevin@bgblaw.com

## TELECOMMUNICATION TRANSMITTAL

TO:                    KATHLEEN CARSON, ESQUIRE

COMPANY:               SWARTZ CAMPBELL DETWEILER

TELECOPIER NUMBER:     (215) 299-4301

FROM:                  BRUCE D. LEVIN, ESQ.      ATTORNEY #:  57

TOTAL NUMBER OF PAGES ____4____ INCLUDING THIS COVER SHEET

*IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL BACK AS SOON AS POSSIBLE.*

PHONE:                 (617) 790-3000

TELECOMMUNICATOR:      MLB

CLIENT/MATTER NO:      36432/87

MESSAGE:

1

115 W. Mulberry Street • Baltimore, MD 21201
(24 Hrs./7 Days) 410-837-3027 • 800-734-5292
Towson Reporting Co. ✦ Baltimore Video/Conferencing Center, Inc.

GORE BROTHERS
Reporting & Video Company, Inc.
Since 1961 – Serving MD, D.C. & No. VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES FIDELITY
and GUARANTY COMPANY

   Plaintiff

  vs.       CIVIL ACTION NO:
          NO. 1-01-CV-00813

BRUCE BROWN and BROWN,
SCHULTZ, SHERIDAN & FRITZ

   Defendants
_____/

   The deposition of DAVID HUSSEY was held on

Tuesday, May 28, 2002, commencing at 10:00 A.M., at the

Law Offices of The St. Paul Companies, 5801 Smith

Avenue, Baltimore, Maryland 21209, before Ronda J.

Thomas, Notary Public.

APPEARANCES:

    PETER B. MCGLYNN, ESQUIRE
     On behalf of Plaintiff

    JEFFREY B. MCCARRON, ESQUIRE
     On behalf of Defendants

REPORTED BY:  Ronda J. Thomas, RPR

JAMES DAILEY

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

(Harrisburg Division)

- - -

UNITED STATES FIDELITY    :    CIVIL ACTION

and GUARANTY COMPANY      :

                         :

   -vs-             :    JUDGE KANE

                         :

BRUCE BROWN and  BROWN    :

SCHULTZ SHERIDAN &        :

FRITZ                     :    NO. 1:01-CV-00913

- - -

Oral deposition of JAMES
DAILY, taken at the Law Offices of SWARTZ,
CAMPBELL & DETWEILER, 1601 Market Street,
34th Floor, Philadelphia, Pennsylvania
19103, on Thursday, April 18, 2002,
commencing at or about 10:08 a.m., before
Kristy Kupiec, a Certified Court Reporter
and Commissioner of Deeds.

- - -

REPORTING SERVICE ASSOCIATES (RSA)

A Veritext Company

1845 Walnut Street - 15th Floor

Philadelphia, Pennsylvania 19103

(215) 241-1000

JAMES DAILY

210

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES FIDELITY          ) DEPOSITION UPON

AND GUARANTY COMPANY

                Plaintiff        ) ORAL EXAMINATION

    vs.                          )  OF

BRUCE BROWN AND                  ) JAMES DAILY

BROWN SCHULTZ SHERIDAN

& FRITZ                          )

                Defendants       )

— — — — — — — — — — — —


          TRANSCRIPT OF CONTINUED

DEPOSITION, taken by and before MARGIE A. ROMEO,

Professional Reporter and Notary Public, at the

Law Offices of Swartz, Campbell & Detweiler, 1601

Market Street, 34th Floor, Philadelphia, PA on

Thursday, June 27, 2002 commencing at 10:20 a.m.

                — — —


          REPORTING SERVICE ASSOCIATES (RSA)

              A Veritext Company

          1845 Walnut Street - 15th Floor

              Philadelphia, PA  19103

                (215) 241-1000

COPY

ANTHONY S. PHILLIPS

1           IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3
                        NO.  1-01-CV-00813

4

5

   UNITED STATES FIDELITY AND )  DEPOSITION UPON

6  GUARANTY COMPANY,          )
               Plaintiff,     )  ORAL EXAMINATION

7                             )

        - vs -                )         OF

8                             )

   BRUCE BROWN AND BROWN,     )      ANTHONY S.

9  SCHULTZ, SHERIDAN & FRITZ, )       PHILLIPS
                              )

10         Defendants.        )
   - - - - - - - - - - - - - -)

11

12

13

14                  TRANSCRIPT OF DEPOSITION,

15  taken by and before KIMBERLY MUNI,

16  Professional Reporter, at the offices of

17  SWARTZ, CAMPBELL & DETWEILER, 1601 Market

18  Street, 34th Floor, Philadelphia,

19  Pennsylvania, on Wednesday, April 17, 2002,

20  commencing at 10:05 a.m.

21

22

       REPORTING SERVICE ASSOCIATES, (RSA)

23            A Veritext Company
          1845 Walnut Street - 15th Floor

24      Philadelphia, Pennsylvania   19102
               (215) 735-2332

225

115 W. Mulbery Street • Baltimore, MD 21201
(24 Hrs./7 Days) 410-837-3027 • 800-734-5292
Towson Reporting Co. ✦ Baltimore Video/Conferencing Center, Inc.

GORE BROTHERS
Reporting & Video Company, Inc.
Since 1961 – Serving MD, D.C. & No. VA

VOLUME II

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES FIDELITY
and GUARANTY COMPANY

        Plaintiff

    vs.                      CIVIL ACTION NO:
                                 NO. 1-01-CV-00813

BRUCE BROWN and BROWN,
SCHULTZ, SHERIDAN & FRITZ

        Defendants

_____/

The deposition of TONY PHILLIPS was held on Wednesday, May 29, 2002, commencing at 10:20 A.M., at the Law Offices of The St. Paul Companies, 5801 Smith Avenue, Baltimore, Maryland 21209, before Ronda J. Thomas, Notary Public.

APPEARANCES:

        PETER B. MCGLYNN, ESQUIRE
          On behalf of Plaintiff

        JEFFREY B. MCCARRON, ESQUIRE
          On behalf of Defendants

REPORTED BY:  Ronda J. Thomas, RPR

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

U.S. FIDELITY and GUARANTY CO.        :
                                      :
    -VS-                              :    NO. 1-01-CV-00813
                                      :
BRUCE BROWN & BROWN, SCHULTZ,         :
SHERIDAN, & FRITZ,                    :


Volume III


DEPOSITION OF:  ANTHONY S. PHILLIPS

      BEFORE:  Michelle S. Parke,
               Court Reporter

       PLACE:  1631 North Front St.
               Harrisburg, Pa

   BEGINNING:  June 20, 2002
               10:10 a.m.


APPEARANCES:

     BERNKOPF, GOODMAN, & BASEMAN, LLP
     BY:  PETER B. McGLYNN, ESQUIRE
     125 Summer Street
     Boston, Massachusetts 02110-1621

          For - Plaintiff

     SWARTZ, CAMPBELL, & DETWEILER
     BY:  JEFFREY McCARRON, ESQUIRE
     1601 Market Street, 34th floor
     Philadelphia, Pennsylvania 19103-2337

          For - Defendants


          Leary Reporting  (717) 233-2660

(717) 233-2660 ● FAX (717) 691-7768
112 WEST MAIN STREET ● SUITE 200 ● MECHANICSBURG, PA
LEARY REPORTING

1

1    UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2
     Civil Action No. 1:01-CV-00813
3    ----------------------------------------x
     UNITED STATES FIDELITY AND               :
4    GUARANTY COMPANY,                        :
                                              :
5                        Plaintiff,           :
                                              :
6           - vs -                            :
                                              :
7    BRUCE J. BROWN and BROWN, SHUTLZ,        :
     SHERIDAN & FRITZ,                        :
8                                             :
                        Defendants.           :
9    ----------------------------------------x

10

11   _____

       Deposition Testimony of STEPHEN SALAZAR
12   _____

13   1631 North Front Street          May 22, 2002
     Harrisburg, PA                   10:00 a.m.
14

15      IT IS HEREBY STIPULATED and agreed that the
     reading, sealing, and signing of the within
16   transcript are waived;
        IT IS FURTHER STIPULATED and agreed that all
17   objections except as to the form of the question
     are reserved to the time of trial.
18   _____

19   _____

20

21

22

23                     LEARY REPORTING
             112 West Main Street, Ste. 200
24       Mechanicsburg, Pennsylvania  17055

25       (717) 233-2660    Fax (717) 691-7768

## CERTIFICATE OF SERVICE

I, Peter J. Speaker, Esquire, of the law firm of Thomas, Thomas & Hafer, LLP, attorney for Plainitff, hereby certify that a true and correct copy of the foregoing document was sent to the following counsel of record by placing a copy of same in the United States mail, postage prepaid, at Harrisburg, Pennsylvania addressed as follows:

Kathleen Carson, Esquire
Swartz Campbell Detweiler
1601 Market Street
Philadelphia, PA  19103-2316

THOMAS, THOMAS & HAFER, LLP

By_____
Peter J. Speaker, Esquire
I.D. #42834
P. O. Box 999
305 North Front Street
Harrisburg, PA  17108
(717) 255-7644

Dated: 2-10-03
222761.1