# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, <br> Plaintiff <br><br> v. <br><br> BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, <br> Defendants. | CIVIL ACTION NO. 1:01-CV-00813 <br><br> JUDGE CONNOR |

### AFFIDAVIT OF RICHARD D. FARNSWORTH IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Richard D. Farnsworth, on oath, deposes and says as follows:

1. I am a former senior vice president of Fireman's Fund Insurance Company ("Fireman's Fund") and was in charge of Fireman's nationwide surety operations. A copy of my resumé is attached hereto as Exhibit "A".

2. I have been engaged by counsel for the plaintiff, United States Fidelity and Guaranty Company ("USF&G"), to provide litigation consulting and forensic services relating to USF&G's bond underwriting for CCI Construction Company, Inc. ("CCI") in connection with the above-referenced litigation. I have been asked to determine if I could render certain opinions on USF&G's underwriting practices, conduct and decisions as surety for CCI. I have concluded that I am able to render such opinions.

3. In connection with my engagement, I considered the following documents and information:

FARNSWORTH
000137

- USF&G'S Complaint against Brown Schultz Sheridan & Fritz.

- Answer of Brown Schultz to Complaint.

- Brown Schultz Responses and Objections to USF&G's First Set of Interrogatories.

- Correspondence between Byerly Insurance and DJL Associates, and USF&G.

- Deposition transcript of Stephen Salazar, dated May 22, 2002.

- Deposition transcripts of Tony Phillips, dated April 17 and May 29, 2002.

- Deposition transcript of David Hussey, dated May 28, 2002.

- Deposition transcript of James Daily, dated April 18, 2002.

- Copies of USF&G's "gray letters".

- Copy of USF&G's Contract Underwriting Manual.

- Copy of St. Paul Surety Group Training and Reference Guide (8-99).

- AICPA Audit and Accounting Guide for Construction Contractors, 1981.

- Welch, John W. et al. Contract Surety, Volume 1 and 2, Insurance Institute of America, 1992.

- Conversations with James Daily and Tony Phillips.

4. For reasons explained below, it is my opinion that (1) USF&G's underwriting of the CCI account generally conformed to applicable standards of care of the surety industry that were in effect during 1994-1999; and (2) it was reasonable and justifiable for USF&G's underwriters to rely on the audited financial statements prepared by Brown, Schultz, Sheridan & Fritz in reaching their underwriting decisions concerning CCI.

5. In reaching the foregoing opinions, I considered, among other things, the surety industry environment during the period of 1993-1999. As the senior bonding executive of a major

FARNSWORTH
000138

surety, Fireman's Fund, I was and am familiar with the underwriting customs and practices of Fireman's Fund and its competitors, including USF&G and St. Paul Fire and Marine Insurance Company. I also have personal knowledge of Fireman's Fund's surety underwriting guidelines and the surety underwriting principles and practices taught by surety industry practitioners. I have validated this knowledge by reviewing the Insurance Institute of America Contract Surety textbook and the AICPA Audit Guide referenced above.

6. In general, the state of the surety industry during the period of 1993-1999 was very competitive. The surety industry was a profitable, mature industry during that time and one surety's growth came at the expense of another surety's business. Most major sureties' lines of business formed a part of a large multiple line property and casualty insurance company. The senior management in these companies expected growth from the companies' profitable specialty lines, such as the surety business. As the competition intensified, pricing levels dropped and historical underwriting standards were relaxed. This was the environment in which USF&G, Fireman's Fund and the other major sureties were conducting surety business when underwriting for CCI.

7. Underwriting is the process of gathering facts relevant to the risk of bonding a contractor. The process includes evaluating the pertinent data, determining the strengths and weaknesses of the account and deciding upon a course of action. The primary function of the surety in the contract bond underwriting process is the prequalification of the contractor. When the surety executes a bond it is in effect saying to the owner that it has made a detailed analysis of the contractor's management and technical skills; that it has studied the contractors financial condition; and that it believes the contractor is fully qualified in all respects to perform the contract in question. The surety is prepared to back this judgment by committing the assets of its

FARNSWORTH
000139

company in support of this decision. Before the surety can make such a commitment, it must first underwrite the account to satisfy itself that this is a company that it can support and that it is a company that possesses the ability to meet current and future obligations. If the surety's analysis is that it is an acceptable account, the surety then makes a decision on the amount of bonding capacity they are willing to provide to the contractor.

8. Contract bond underwriting involves both objective and subjective evaluations by the underwriter. Therefore, reducing surety underwriting to quantitative terms is very difficult, if not impossible, in most cases. The underwriter evaluates the contractor through three primary categories: Character, Capacity, and Capital. From information provided to him by the contractor, such as financial statements, references, company history, management procedures, resumes of key personnel, prior job experience and from information provided by outside sources, the underwriter analyzes, interprets and applies financial data. He also assesses the history, organization, and management capabilities of the contractor (the "Principal"), the contractor's capacity to perform each new project and the backlog of projects undertaken by the contractor. The underwriter also assesses the organization and contractor owner's reputation for fair dealing with project owners, subcontractors, suppliers, lenders, and other creditors, as well as the contractor's general reputation within the industry.

9. Once the contractor passes the surety's underwriting analysis, a decision must be made as to the amount of bonding capacity the surety is willing to extend to the contractor. The contractor usually advises the surety of its general plans for the year and the level of bonding support it believes will be needed to support the construction work program. The surety then decides if it can meet those needs. This amount is expressed in terms of a single job dollar amount (contract price) and the aggregate dollar amount of work to be performed on

4

FARNSWORTH
000140

uncompleted contracts (backlog or work on hand). This is often referred to as the "bonding program." It is necessary to establish such a bonding program because it is impossible to predict the identity and size of the projects on which a contractor will be successful in obtaining throughout the year. A bonding program allows a contractor to bid jobs knowing that almost absent an adverse change in the contractor's business or finances, he is eligible to receive bonding within the parameters set in the bonding program. In suretyship, the risk of loss remains with the Principal, while the surety merely extends surety credit so as to guarantee performance in the event that the Principal defaults.

10. The surety, on an annual basis, reviews the bonding program usually after it receives the contractor's audited financial report. Normally, a meeting is held between the contractor, agent and underwriter at that time to review the contractor's business plan for the remainder of the year. Sometimes, no meeting will be required. The underwriter determines the level of bonding support the contractor needs in order to meet his business plan and, if acceptable to the underwriter, an understanding is reached between the contractor, agent and surety as to the size of the bonding program. As noted above, the contractor at this point in time does not normally know what specific jobs he will be bidding during the year, but the bonding program parameters allow him to pick specific projects in the future that will be within the established bonding program. This is especially true of public work where initial bid advertisements may not be published until after the annual underwriting review and after the determination as to whether the establishment or continuation of the bonding program has been made. From the sureties' perspective, the bonding program is extended in connection with the support of the total work program (which in the case of CCI was, as noted below, $15 million single/$75 million aggregate) and not the issuance of specific bonds. Once the bonding program is approved each year, a

contractor's request for bonds within the parameters of that program may normally be granted so long as the surety has not received adverse information concerning the contractor, and the surety is satisfied with the contract terms and provisions. Therefore, although each job must be submitted to the surety for specific approval prior to bidding, a new annual audit is not required each time a bond is requested as long as the new request is within the parameters of the bonding program. Indeed, it would be extremely expensive and impractical (if not impossible) to require the contractor to provide the surety with an audit report every time the contractor obtains a new contract. Each bond is underwritten using the most recent annual audit report as the basis for evaluating the contractor's financial condition and financial progress throughout the accounting year. It should also be noted that once a bond has been issued, it is normally impossible for that existing bond to be revoked.

11. A significant form of security for the establishment or continuation of the bonding program is the "Net Quick" (working capital) and "Net Worth" (shareholders' equity) of the Principal. The term "working capital" as used in the surety business is commonly known as "Net Quick" and is defined as the excess of current assets over current liabilities. It is a measure of a Principal's liquidity and solvency. The term "stockholders' equity" as used in the surety business is commonly termed "Net Worth" and is defined as the excess of total assets over total liabilities. It represents the basic risk capital of the business. Sureties relate the contractor's backlog to his finances in their decision-making process. Two key ratios are used to measure this relationship: backlog- to- net quick and backlog- to- net worth. A major risk to the contractor's financial success is the adequacy of his cost estimates on his work in progress. If the contractor encounters unexpected cost overruns, he often has to finance the additional costs from his own financial resources. There is no generally accepted or well-proven formula for relating the Net Quick and

FARNSWORTH
000142

Net Worth of a principal to its work on hand. There are factors and there are influences such as a surety company's own guideline, the contractors size and type, qualitative analysis of the, contractors finances, risk assessment of the contractors backlog. But there is no simple mathematical system that pulls it all together. Many sureties have some guidelines, but they consider it an art form and are used accordingly taking into consideration the underwriter's assessment of management skills, cash flow, job conditions, economic conditions, etc. Observation of many surety's practices establishes the industry custom and practice and what is a reasonable level of bonding capacity for a particular risk.

12. Based on USF&G's underwriting file, John Ortenzio started CCI, formerly known as Commercial Construction Company in 1983. Prior to this time, he obtained a BS degree in Business Management and has worked in the construction industry since 1979. The underwriting file contains an organization chart and resumes of the key officers and employees. Personal acquaintances of the individuals and the company conclude all to be of good character and well qualified for their respective corporate duties. There was good balance of business, engineering and field production capabilities.

13. CCI's job experience from its inception up to 1993-1994 was primarily in private, negotiated construction of medical and healthcare buildings, predominately for one owner. CCI's financial results since inception were impressive. Its net worth as of December 31, 1993 was $4.1 million. Its business plan included entry into the public bid market. Although this represented a change in the type of market that CCI had historically operated, in USF&G's opinion CCI possessed the management and financial capabilities to undertake this new direction.

14. Annual CPA audited financial reports on CCI were prepared by Brown Schultz Sheridan & Fritz ("Brown Schultz"), an independent Certified Public Accountant. These reports

7

were provided to USF&G for use in underwriting the CCI account. Evaluating the financial condition of the principal is an integral part of contract bond underwriting. Suretyship is a form of credit and the surety's primary source of collateral for the extension of credit is the creditworthiness and overall financial strength of the principal. In the event of cost overruns on bonded projects, the Principal's financial resources stand between the Principal and a surety's loss. Also, the surety's evaluation of the company's financial results over time serves to validate the underwriter's subjective judgments on the quality of management and their strategic decisions. For these reasons, with accounts the size of CCI, it is the custom and practice for sureties to require an annual audit report prepared in accordance with the AICPA audit guidelines by an independent Certified Public Accountant. An audit provides the surety with one of the few independent, objective tests of the Principal's financial condition and an independent, objective assessment of the adequacy of the Principal's accounting system. The audit also provides the determination as to whether the estimates of revenue and costs on uncompleted contracts are reasonable and accurate. Based on the auditor's opinion letter, the surety underwriter can justifiably rely on the credibility of the Principal's financial reporting and financial integrity. An independent audit also leads to a more reliable analysis. Such reliance by the underwriter is very important when extending surety credit at the levels requested by CCI. Consequently, independent audit reports are given substantial weight by surety underwriters.

15. The overall physical appearance of the Brown Schultz audit reports was good. They were a full report with supporting schedules, including schedules of completed contracts and work-in-progress. From a surety underwriter's perspective, these audit reports appeared to be professional and lent itself to a high degree of reliance by USF&G.

8

16. USF&G's financial statement analysis practices were consistent with the custom and practice of the surety industry. Such practices included an analysis of CCI's balance sheet, income statement and work in progress. USF&G underwriters performed a trend analysis and ratio analysis that included a comparison of CCI's various financial ratios with the industry averages published by Dun and Bradstreet. Dun and Bradstreet had a software package which calculated various financial ratios for construction contractors and then compared those ratios with the financial statements of other contractors which it had surveyed. Dun and Bradstreet employed a series of numeric and color codes (green, yellow, red) which the software automatically applied to these ratios. As appears in the USF&G underwriting file, USF&G subscribed to the Dun and Bradstreet software at least during a portion of the time period when it issued bonds for CCI. Firemans Fund was also a Dun and Bradstreet subscriber during a portion of the time I was employed by Firemans Fund. In my opinion, application of the Dun and Bradstreet software to large accounts like CCI was not meaningful since the Dun and Bradstreet surveys were directed to smaller sized contractors; the largest "Revenue Range" in the Dun and Bradstreet software package was "over $5 million." To be meaningful, CCI's ratios should be compared to a contractor peer group where contractors had revenues in the range of $25 million to $50 million.

17. I would characterize CCI's financial history, starting with December 31, 1994, as being modestly profitable in 1995, 1996, 1997 and 1998. Operating losses were reported in 1995 and 1998, but were offset by investment income. During the period of 1994-1997, CCI showed a sound financial condition. Net Quick was in the $4 million to $5 million range, with cash and marketable securities of $4 million to $5 million. Construction is a service business and a contractor's main asset is its ability to generate cash as a going concern. During the relevant time

9

FARNSWORTH
000145

borrowing facility from $1 million to $2 million and the full amount was available to CCI as of June 30, 1998.

20. Since CCI appeared to be a viable going concern, abruptly terminating bonding would sharply curtail CCI's ability to acquire new work and generate cash. This was not justified based on its reported financial condition. A surety normally does not stop writing bonds at the first sign of bad news. The underwriter analyzes and evaluates the current financial condition of the contractor using the most current interim financial statement as a benchmark to measure the contractor's progress since the last audit report.

21. USF&G agreed to support CCI in a joint venture with Fulkrod Construction on a January 7, 1999 bid to PennDot in the amount of $40 million. CCI's share of the joint venture was approximately $22 million. The bond would be a co-surety obligation with Reliance Insurance Company, who was Fulkrod's surety. This contract for highway construction work on Routes 11 & 15 was close to CCI's offices and the key civil construction employees that CCI had recently hired to run their civil division had worked on the first two phases of this project while employed by another road contractor. CCI would be responsible for the excavation and paving. During the previous year, CCI had purchased the necessary equipment to perform this type of work. If low, CCI's aggregate work-on-hand would be approximately $92 million at its peak, but it would have reduced its backing by as much as $6 million per month as CCI continued working on its construction backlog. In a meeting on January 5, 1999 with CCI, USF&G was advised by CCI that CCI's December 31, 1998 year-end would show a break-even result, with working capital of $2.5 million and stockholders equity of $5.4 million. USF&G reasonably concluded that CCI was a solvent, viable going concern with capable management and qualified civil construction employees to perform this contract.

FARNSWORTH
000146

progress schedules. When exceptions were made by the underwriters to a specific underwriting element covered by the guidelines the concerns recited in the guidelines were considered by the underwriters and an informed decision was reached.

Signed under the pains and penalties of perjury this 27th day of September, 2002.

_____
Richard D. Farnsworth

FARNSWORTH
000147