# EXHIBIT D

1

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

UNITED STATES FIDELITY AND    )
GUARANTY COMPANY,              )
                              )
          Plaintiff,           )
                              )   Civil Action No.
     -vs-                      )   1:01-CV-00813
                              )
BRUCE J. BROWN AND BROWN       )
SCHULTZ SHERIDAN & FRITZ,      )
                              )
          Defendants.          )

        Deposition of STEPHEN J. DEBRUYN taken before

DONNA L. POLICICCHIO, C.S.R., and Notary Public,

pursuant to the Federal Rules of Civil Procedure for the

United States District Courts pertaining to the taking

of depositions, at Suite 1800, 333 West Wacker Drive, in

the City of Chicago, Cook County, Illinois, commencing

at 10:05 a.m. on the 7th day of May, A.D. 2003.

1    of Ms. Phillips as an accountant during the period of

2    time she worked with or for CCI Construction?

3         A    I did not form any specific opinions, no.

4         Q    Wouldn't it be important to you in reviewing the

5    audit information to know or form an opinion about the

6    competence of the internal chief financial officer?

7         A    She was one of several key members of

8    management.  Through a deposition and not knowing this

9    individual, it's difficult to opine on the quality of

10   the work she did or did not do.

11        Q    Did you learn any information from your review

12   which led you to believe Ms. Phillips was other than

13   competent --

14        A    No.

15        Q    -- as an accountant?

16        A    No.

17        Q    Do you have any reason to doubt Ms. Phillips had

18   an understanding about construction industry accounting?

19        A    No.

20        Q    Did you form any opinions about the capability

21   of CCI management?

22        A    I didn't form any specific opinions, no.

23        Q    Did you learn any information which caused you

24   concern about the capability of CCI management?

1  in accordance with AICPA peer review guidelines?

2      A    Yes.

3      Q    Do you have any reason to doubt that the peer

4  reviewers in Pennsylvania are required to receive AICPA

5  training?

6      A    As I indicated, I don't know who served on the

7  team of peer reviewers.

8      Q    Do you have any reason to think that the peer

9  reviewers for the -- who performed the peer review of

10 the Brown, Schultz audit report for the 1997 financial

11 statement of CCI Construction were other than

12 qualified --

13     A    No.

14     Q    -- and competent?

15     A    No.

16     Q    Did you -- sorry.  Did you perform -- let me

17 start over.

18          Did you select the materials you wanted to

19 review in connection with your engagement for this

20 matter?

21     A    Yes.

22     Q    And what process did you use to select

23 materials?

24     A    I used the materials that were available and

94

1    concept, which I just read to you, in mind?

2        A    Yes.

3        MR. MCGLYNN:  Objection.

4        MR. MCCARRON:   Q    And did you apply that concept in

5    connection with the work you performed for the

6    engagement in this case?

7        A    Could you ask that again?

8        Q    Did you apply the concept, which I just asked

9    you -- read to you and asked you about, to your

10   engagement for this case?

11       A    Yes.

12       Q    Do you agree with this statement --

13       MR. MCGLYNN:  Slowly now.

14       MR. MCCARRON:   Q    -- that the statement of position

15   on percentage of completion method states a presumption

16   that contractors generally have the ability to produce

17   estimates that are sufficiently dependable to justify

18   the use of the percentage of completion method of

19   accounting.  It also states that percentage of

20   completion -- let me start over.

21           It also states that persuasive evidence to the

22   contrary is necessary to overcome that perception --

23       A    May I read that?

24       Q    -- presumption.

95

1            Do you want me to read it again?

2       A   Or you could read it again.

3       Q   Do you agree with the statement that the

4  statement of position concerning percentage of

5  completion method of accounting states a presumption

6  that contractors generally have the ability to produce

7  estimates that are sufficiently dependable to justify

8  the use of the percentage of completion method of

9  accounting.  It also states that persuasive evidence to

10 the contrary is necessary to overcome that presumption.

11      A   Could you read it back to me?

12           (Record read.)

13 THE WITNESS:  Yes.

14      Q   Did you apply that concept in connection with

15 the work you performed for this engagement in this

16 action?

17      A   Yes, I did.

18      Q   Do you agree, sir, that the previous reliability

19 of a contractor's estimating process is usually an

20 indication of continuing reliability, particularly if

21 the present circumstances are similar to those that

22 prevailed in the past?

23      A   Yes, that would be one method.

24      Q   So yes, you would agree with that statement?

96

1      A    That -- You're reading a portion of it.  Yes, I

2    agree with that statement.

3      Q    Did you apply that concept to the engagement you

4    performed in connection with this case?

5      A    Yes, I did.

6      Q    Did you review the audit work by Brown, Schultz

7    for any years earlier than 1996?

8      A    I had the 1994 and 1995 work papers and

9    financial statements.

10      Q    But you did not review those materials?

11      A    I reviewed the materials.  I was not opining on

12    those years and did not include them in my information,

13    but I used them to form a basis for what I was going

14    forward with was 1996, '97, and '98.

15      Q    Did you reflect or indicate in any of the

16    reports or the affidavit, which you signed, that you had

17    reviewed work performed by Brown, Schultz for the audit

18    for the years 1994 and 1995?

19      A    I don't have the other reports in front of me.

20      Q    Here is one.

21      A    This is the first one?

22          (Discussion had off the record.)

23    THE WITNESS:  Could you please restate the question?

24    I've looked through the documents.

107

1   before.

2       Q   Did you have an understanding -- let me start

3   over.

4           Were you aware there was a long-standing

5   relationship for audits between CCI Construction and

6   Brown, Schultz prior to 1997?

7       MR. McGLYNN:  Jeff, can you just increase the volume

8   a little bit?  I'm having trouble hearing.  I got the

9   background noise out of the window here.

10      MR. McCARRON:  Q   Did you -- were you -- let me

11  start over.

12          Are you aware that Brown, Schultz had performed

13  audit services for CCI Construction for many years prior

14  to 1997?

15      A   Yes.

16      Q   Did you know how long that relationship existed

17  prior to 1997 or do you know how long that relationship

18  existed prior to 1997?

19      A   If I recall from the information reviewed in the

20  depositions, I believe the relationship started in 1992.

21      Q   Did it matter to you in forming your opinion

22  about the work performed by Brown, Schultz that Brown,

23  Schultz had many years of experience with auditing CCI

24  Construction?

108

1    A    I took it into consideration, yes.

2    Q    Does it matter to you -- let me start over.

3         Does it matter -- Can an auditor properly take

4    into account the experience the auditor has with a

5    particular client in performing an audit?

6    A    Yes.

7    Q    Was it proper for Brown, Schultz to take into

8    account its experience with CCI Construction?

9    A    Yes.

10   Q    Why does profit fade mean estimates for the cost

11   to complete were wrong or inaccurately reported?

12   A    The profit fade analysis is the review of

13   completed contracts compared to the work in process of a

14   previous year, and as part of an audit procedure, you

15   review the profit fade analysis to determine the

16   reliability of management's ability to estimate cost to

17   complete on a particular contract.

18   Q    Can't you have profit fade even if the estimated

19   cost to complete is accurately reported?

20   A    Yes.

21   Q    So it's not necessarily the case that profit

22   fade indicates that estimated cost to complete was

23   unreliably reported by management, is that right?

24   A    That's correct.  In most audits, you need to

109

1   look at a lot of different information.

2      Q  Do you agree, sir, that estimating is an

3   integral part of a contractor's business activities and

4   there is a necessity to revise estimates on contracts

5   continually as the work progresses.  The fact that

6   circumstances may necessitate frequent revision of

7   estimates does not indicate that the estimates are

8   unreliable for the purpose for which they are used,

9   although results may differ widely from original

10   estimates.  Because of the nature of the business, the

11   contractor in the conduct of his business may still find

12   the estimates reasonably dependable.  Despite these

13   widely recognized conditions, a contractor's estimates

14   of total contract revenue and total contract costs

15   should be regarded as reasonably dependable if the

16   minimum total revenue and the maximum total cost can be

17   estimated with a sufficient degree of confidence to

18   justify the contractor's bids on contracts.

19      A  Could I read that?

20      Q  On this occasion I'll let you read it so I don't

21   have to read it back.

22      A  Can you just tell me where you started?

23      Q  (Pointing.)

24      A  Number 27.

110

1        I'm done reading it.

2    Q    Do you agree with that statement?

3    A    Yes.

4    Q    Do you agree with all of the statements in the

5    Audit Guide for the contracting industry or the

6    construction industry?

7    A    Yes.

8    Q    Do you agree, business enterprises engaged in

9    contracting, like all business enterprises, are exposed

10   to numerous business risks that vary from contract to

11   contract.  The reliability of the estimating process in

12   contract accounting does not depend on the absence of

13   such risks.  Assessing business risks is a function of

14   users of financial statements.

15   A    Yes.

16   Q    Did you form any opinions, sir, about the audit

17   conducted by Brown, Schultz for the year 1997?

18   A    Yes.

19   Q    Did you form any opinion that -- about whether

20   Brown, Schultz in its audit for CCI for the year 1997

21   acted in conformity with Generally Accepted Auditing

22   Standards?

23   A    I did form an opinion.

24   Q    Did you form an opinion that Brown, Schultz

1    audit work papers reflected more information for the

2    year 1997 that the opinion for the 1997 financial

3    statements by Brown, Schultz would have been different?

4        MR. McGLYNN:  Objection.

5        A    Could you restate the question?

6        MR. McCARRON:  Q    Do you have any reason to believe

7    that if the audit work papers were more complete for the

8    year 1997 that the Brown, Schultz audit opinion of the

9    1997 financial statements for CCI Construction would

10   have been different?

11       A    No.

12       MR. McGLYNN:  Objection.

13       MR. McCARRON:  Q    Do you have any reason to believe

14   that if greater skepticism had been used by the auditing

15   staff of Brown, Schultz in connection with the 1997

16   audit of the 1997 financial statements for CCI

17   Construction that the opinion by Brown, Schultz of that

18   1997 financial statement would have been different?

19       A    No.

20       Q    Did you find an indication in the testimony by

21   the auditors which supplemented the information included

22   on the work papers for the 1997 audit?

23       MR. McGLYNN:  Objection.

24       A    There was information documented by Bruce Brown

1    intended users of the financial statement, which they

2    identified but failed to adjust their audit for.

3         The second item is what I referred to as the

4    skepticism, not taking management's representations

5    verbatim.  It seemed like there is a conversational

6    audit going on between the audit staff and CCI

7    management where they accepted whatever was told to them

8    and didn't go beyond that or did not document that they

9    went beyond that to substantiate any of the evidence or

10   corroborate any of the statements made by management.

11        Q    What is it that you believe should have been

12   done to resolve the due professional care issue for the

13   1997 audit?

14        A    I think the testing of estimated costs to

15   complete, the testing of job costs, accumulated job

16   costs, both of which are inherent in the percentage

17   completion method of accounting, the additional testing

18   of subcontractors, the inclusion in subsequent

19   disbursements testing for payables of job costs to

20   determine that all of the job costs to date were

21   accumulated, to review subcontractor agreements and all

22   contracts, to document subcontractor buy-outs and

23   changes in subcontractor agreements, and to build a

24   correlation between the estimated gross profit of an

115

1    individual contract with historical gross profits that
2    were used.

3        Q    Have you finished your answer?

4        A    Yes.

5        Q    And that's the complete list of additional work
6    you believe should have been done in connection with the
7    1997 audit to resolve the due professional care issue
8    you identified, is that right?

9        A    Whether it's complete or not, that's part of
10   what I would have done, yes.

11       Q    Are you able to tell us what the result -- that
12   the result of the audit would have been different if
13   those additional procedures had been performed as you
14   just listed?

15       A    It's my opinion that they would have had a
16   different reporting of the results of operation as I've
17   restated in my report.

18       Q    Based on doing these additional procedures, is
19   that right?

20       A    We talked about procedures for due professional
21   care and have not talked about the sufficient competent
22   evidential matters.

23       Q    I'm asking, sir, if the additional procedures
24   had been performed, as you just listed, to resolve the

116

1    due professional care issue, are you able to tell us

2    that the results of the audit would have been different

3    and that the opinion for the 1997 financial statements

4    of CCI Construction for 1997 would have been different?

5        A    No, I can't tell you.

6        Q    Did you go back and do -- let me start over.

7            Did you do all those procedures which you just

8    described should have been done by Brown, Schultz in

9    connection with the 1997 audit concerning due

10   professional care?

11       A    Interviews with management, no, I did not.

12       Q    All the things that you just told us about,

13   testing for job costs, additional review of

14   subcontractor agreements --

15       A    No, I did not.

16       Q    -- all the stuff you just gave us a long list

17   about to resolve due professional care, did you perform

18   those procedures, which you contend should have been

19   done by Brown, Schultz, to resolve the issue you raised

20   about due professional care for the 1997 audit?

21       A    Those records were not available, no.

22       Q    Do you know whether those records were available

23   in order to do that review?

24       A    The CCI records --

118

1  firm should have done for the 1997 audit?

2      A    Yes.  If they were available, I would have

3  reviewed them.

4      Q    Who told you that they were not available -- let

5  me start over.

6          Who told you that the CCI Construction records

7  were not available?

8      A    There was, from what I recall, an individual at

9  the USF&G office that communicated that to us prior to

10  my arrival out in Baltimore to review the work and

11  prepare my expert report, and then while I was there, we

12  talked to somebody on the phone that I mentioned that we

13  thought maybe would have access to their old computer

14  files in an attempt to get those and recreate those

15  records.

16      Q    Sir, were you ever made aware that those records

17  exist in the hands of the accountants for CCI?  Did you

18  know that?

19      A    Records exist that detailed records for CCI --

20      Q    Did you know CCI went through bankruptcy?

21      A    Yes.

22      Q    Were you aware there were accountants employed

23  in connection with the bankruptcy?

24      A    No, I was not aware.

120

1    not available.

2        Q    Would you still have an interest in reviewing

3    those records if you could gain access to them?

4        A    If I could get access to all the records?

5        Q    For CCI Construction.

6        A    For their detailed records?

7        Q    That would be of interest to you?

8        A    Yes.

9        MR. McGLYNN:   Is this a good time to take a break?

10   Five after 1:00.

11       MR. McCARRON:   Let me just finish up with 1997,

12   which relates to this other area he talked about.

13       MR. McGLYNN:   What do you estimate?

14       MR. McCARRON:   More than a couple minutes.

15       MR. McGLYNN:   All right.

16       MR. McCARRON:   Q   Sir, what is it you contend

17   should have been done by the Brown, Schultz auditors for

18   the 1997 audit in order to satisfy your issue and

19   concern about the insufficiency or sufficiency of

20   competent evidential material?

21       A    They should have obtained -- The underlying

22   documentation in your work papers is your basis for the

23   opinion.  They did not obtain enough information on

24   estimated costs to complete to review the estimates in

1    accordance with Statement on Auditing Standards No. 57,

2    which is auditing accounting estimates.  They took

3    management's representations and have no documentation

4    in the file that they did anything beyond that, besides

5    relying upon, despite the fact that there was numerous

6    indications on the work papers that there were

7    subcontractor default, subcontractor buy-outs, nothing

8    that indicated that they reviewed the subcontractor

9    records or the new subcontractor taking over.

10          In addition, the testing of job costs was merely

11   a test of 25 -- and it was supposedly a haphazard

12   selection of 25 items, which turned out to be 13 payroll

13   and 12 non-payroll items.  No vouching of job costs.

14          Thirdly, in their testing of payables and

15   subsequent disbursements, they specifically excluded job

16   cost from their scope of testing and subsequent

17   disbursements.

18       Q    Were there any problems with the cost recording

19   system at CCI Construction for job costs?

20       A    I don't know.

21       Q    Do you know what the result would have been for

22   the 1997 audit if the additional procedures or work had

23   been done correctly as you just described in your list?

24       A    Could you ask that again?

122

1      Q    Do you know whether the results for the 1997

2    audit by Brown, Schultz of the 1997 CCI financial

3    statements would have been different if the correct

4    procedures and additional procedures you just listed had

5    been done by Brown, Schultz?

6      A    No, I don't.

7      Q    The only way you could determine that is if you

8    looked at the CCI records, is that right?

9      A    That's correct.

10     Q    And, again, you haven't looked at those records

11   from CCI in order to be able to make a determination

12   about whether it would have mattered to the audit

13   opinion of Brown, Schultz if those additional or correct

14   procedures had been performed to resolve the issue you

15   identified concerning sufficient competent evidential

16   material, is that right?

17     A    Correct.

18   MR. McCARRON:  Do you want to break, Mr. McGlynn?

19   MR. McGLYNN:  Happy to do so.

20   MR. McCARRON:  No, no.  I'm offering to you.  You're

21   the one who asked.

22         (Off the record at 1:08 p.m.)

23         (On the record at 1:49 p.m.)

24     Q    Did you put your request for the CCI records in

124

1       A    I wanted to review the records of CCI for

2   subsequent events for what happened subsequent to the

3   end of the year when payments were made, match up their

4   original accounting records with invoices and other

5   documents as considered necessary.  It was the best

6   source of information available.

7       Q    Didn't you want the CCI records in order to

8   determine the accuracy of the 1997 and 1998 financial

9   statements for CCI?

10      A    Yes.

11      Q    Do you have an opinion about whether the 1997

12  financial statements are wrong?

13      A    Yes.

14      Q    Well, the 1997 financial statement for CCI is

15  the financial statement prepared by management, is that

16  true?

17      A    I'm sorry.  I thought you meant the audit.

18  Audited financial statements?

19      Q    The financial statements themselves, that actual

20  financial statement, is a representation of management,

21  is it not?

22      A    Yes, issued by Brown, Schultz.

23      Q    The financial statement isn't issued by Brown,

24  Schultz, is it?  The financial statement itself is not

125

1    issued by Brown, Schultz, is it?

2        A    They performed the audit of the financial

3    statement, which is, yes, a representation of

4    management.

5        Q    Just to be clear, the financial statement, the

6    actual financial statement is the representation of

7    management for CCI, is that true?

8        A    Yes.  It's been verified by Brown, Schultz.

9        Q    But the financial statement itself is not a

10   representation by Brown, Schultz, is it?

11       A    The financial statement with part of an audit

12   opinion indicates that a certain amount of work has been

13   done by Brown, Schultz on those particular financial

14   statements.

15       Q    Sir, that's a separate part, not the financial

16   statement.  Aren't you talking about an audit report?

17       A    In connection with the financial statement.

18       Q    But an audit report --

19   MR. MCGLYNN:  Let him finish his answer, Jeff,

20   please.

21   MR. MCCARRON:  I thought he was finished.

22       A    The financial statement includes the audit

23   report, supplementary information, and footnotes.

24       Q    There is a thing called a financial statement,

126

1   which is different than the audit report.  Isn't the

2   audit report different than the financial statement?

3        A    Yes.

4        MR. McGLYNN:  I'm glad we cleared that up.

5        MR. McCARRON:  Sorry.  Do you have some commentary

6   you want to interject or what?

7        MR. McGLYNN:  I just made it.

8        MR. McCARRON:  Apparently you don't realize that,

9   because if you did realize that, there wouldn't be this

10  whole case.

11       MR. McGLYNN:  I prefer to do my arguing in court,

12  Jeff.

13       MR. McCARRON:  You'll get your chance, maybe.

14       MR. McGLYNN:  Definitely.

15       MR. McCARRON:  Q    In what respect is the 1997

16  financial statement of CCI Construction wrong?

17       A    It was not done in accordance with GAAS, as I

18  had previously indicated and we had gone through.

19       Q    Are there any amounts reflected on the 1997 CCI

20  financial statement which are wrong?

21       A    The amounts that I have shown in my restatement.

22       Q    Are you talking about adjustments you made?

23       A    The adjustments I made in connection with my

24  restatement of the 1997 financial statements as a result

130

1     A    There is a date on the schedule of 2/12/2000,
2   4:37 p.m.
3     Q    Do you have any reason to believe that the work
4   in progress schedule for 1999 existed any time before
5   February 2000?
6     A    No.
7     Q    Do you have any reason to believe that the work
8   in progress schedule for 1999 existed when Brown,
9   Schultz did an audit for 1997?
10     A    No.
11     Q    Working backwards again, the completed audit --
12   let me start over.
13         The completed contracts schedule for 1998 was
14   generated sometime during 1999, is that right?
15     A    That I do not know.  I do not know when the
16   completed contracts -- I assume it would have been
17   completed as the contracts were completed.
18     Q    But the completed -- let's be clear.
19         You refer to and you relied on completed
20   contracts schedule for 1998, is that right?
21     A    Correct.
22     Q    So that schedule reflects contracts which were
23   completed during 1998, is that right?
24     A    That's correct.

131

1     Q    That schedule of completed contracts for 1998

2  would not have been available any earlier than the end

3  of 1998, is that right?

4     A    Correct.

5     Q    So that the completed contracts schedule for

6  1998 was not in existence when Brown Schultz did its

7  audit for 1997, is that right?

8     A    Not the schedule that I referred to in the

9  financial statements.

10    Q    Now, you're not able to determine -- you did not

11 base your proposed adjustments for the 1997 financial

12 statement on the schedule of contracts in progress for

13 1997, is that true?

14    A    I use that as my starting point for the

15 restatement.

16    Q    But you need the additional information provided

17 by the completed contracts schedule and the work in

18 progress schedule from 1998 and 1999 to make your

19 determination that adjustments were warranted for the

20 1997 financial statement?

21    A    Correct.

22    Q    Do you have any reason to believe that the

23 information, which was reflected on the completed

24 contracts for 1998 schedule, was known to or available

132

1    to Brown, Schultz when it performed its audit during --

2    for the period 1997?

3        A    I don't know when it became available to Brown,

4    Schultz.

5        Q    Wouldn't it be important to you to know?

6        A    Yes.

7        Q    Do you have any reason to think that the

8    information reflected on the work in progress schedule

9    for 1999 was available -- that that information was

10   available or known to Brown, Schultz when it did its

11   audit for the period ending 1997?

12       A    It's my opinion had they done the additional

13   audit procedures that I enumerated previously that some

14   of the information would have been available to them

15   with regards to estimated costs to complete that were

16   inherent in the construction in progress schedule that

17   we're referring to at December 31, 1997.

18       Q    What specific information would have been

19   available and learned by Brown, Schultz, which is --

20       A    Contract --

21       Q    -- which is reflected on the work in progress

22   schedule for 1999, which they would have learned if they

23   had done additional audit procedures during the period

24   ending 1997?

137

1    Q   And for each of the calculations, adjustments

2  you proposed were based on information about the

3  amount -- the actual amount of the cost to complete the

4  contract, is that right?

5    A   Correct.  Total estimated cost and estimated

6  cost to complete.

7    Q   Didn't you use the actual cost to complete the

8  contract from which to derive your determinations about

9  proposed adjustments to the 1997 and the 1998 financial

10  statement?

11    A   That is correct.  In 1997 and 1998 I used the

12  best available information from the 1999 work in process

13  schedule that I referred to earlier.

14    Q   That was a work in process schedule which was

15  generated by CCI management?

16    A   I don't know who generated the work paper.

17    Q   It wasn't from Brown, Schultz, was it?

18    A   I don't know who generated this work paper.  The

19  note on it said picked up at USF&G offices.

20    Q   In 2000, you're not aware -- let me start over.

21         You're not aware that Brown, Schultz had any

22  involvement with CCI during 2000, are you?

23    A   I'm not aware of any.

24    Q   In order -- let's stay with 1997, sir.  All the

138

1    proposed adjustments you made were based on actual cost

2    for the contract?

3        A    That's correct.

4        Q    Did you perform any investigation or analysis to

5    determine -- let me start over.

6            The actual cost to complete the contract was not

7    known until the contracts were actually completed, is

8    that right?

9        A    Yes.

10       Q    And for a contract which was not completed

11   during 1997 or had not been completed prior to the audit

12   work, the actual cost to complete that -- those

13   contracts would not be known to the auditors during the

14   audit work period, is that right?

15       A    That is correct.

16       Q    So in deriving or determining the proposed

17   adjustments for the 1997 financial statement, you used

18   information about the actual cost to complete the

19   contracts, which had not been completed during 1997,

20   which was not available to Brown, Schultz during its

21   audit work?

22       A    The completed contract schedule that I used was

23   not available to them, no.

24       Q    Nor was the information included on the

139

1    completed contract schedule available to Brown, Schultz

2    when it performed its audit work?

3    A    I disagree.  I think some of the costs would

4    have been available had they done the additional work

5    that was required under Generally Accepted Auditing

6    Standards, and that's to do more than accept

7    management's representation as to what the gross profit

8    on the job was going to turn out to be.

9    Q    Are you telling us that there were actual

10    completed contract costs for contracts which had not

11    been completed during 1997 which were available to

12    Brown, Schultz during its audit work?

13    A    As I indicated, I think information was

14    available.

15    Q    Sir, you're not answering the question.

16    MR. McGLYNN:  Objection.

17    MR. McCARRON:  Q    Was there -- let me start over.

18        Was the information about completed -- let me

19    start over.

20        Was the information concerning the actual cost

21    to complete contracts, which had not been completed by

22    the end of 1997, available to Brown, Schultz when it

23    performed its audit work for the period ending 1997?

24    A    I don't know because I do not know when the

140

1   contracts were completed, the exact dates.

2       Q    Did you perform any investigation to determine

3   the events which triggered or caused the increased

4   contract cost?

5       A    Could you read that back?

6            (Record read.)

7   THE WITNESS:  No.

8       Q    Did you do any investigation or determine the

9   date on which the events occurred, which triggered or

10  caused the additional cost to complete the contract over

11  and above the estimated cost to complete?

12      A    Not outside of reviewing the Brown, Schultz work

13  papers.

14      Q    Were you able to determine the date on which the

15  event or occurrence -- let me start over.

16           Were you able to determine the date or

17  approximate date the event which caused the increased

18  cost over the estimated cost to complete occurred?

19      A    Could you read that back?

20           (Record read.)

21  THE WITNESS:  No.  Those records would have been

22  available through the CCI documents.

23      Q    So if you had -- let me start over.

24           You would need the CCI documents in order to

148

1    specific source of the increased costs for Job 426?

2        A    We did not have it available.

3    MR. McGLYNN:  Objection.

4    MR. McCARRON:  Q    Will you answer?  Does it mean

5    you did not determine the specific costs for the

6    specific -- let me start again.

7        Did you determine the specific source for the

8    increased costs experienced on Job 426?

9        A    Absent the records, no, we didn't.

10       Q    That information would be available in the CCI

11   records?

12       A    That information should be available in the CCI

13   records.  I can't speculate what is in the CCI records.

14       Q    Was there any job for which you proposed an

15   adjustment for the -- where you determined the specific

16   source of increased cost?

17       A    As I indicated previously, we did not have a

18   breakdown of costs by source and use total estimated

19   cost by contract.

20       Q    Does that mean yes, you never determined the

21   specific source of increased costs for any job for which

22   you proposed an adjustment?

23       A    I determined it on a total contract -- total

24   estimated cost per contract basis.

1    Q    You did not determine the specific source of

2    increased costs for any job for which you proposed an

3    adjustment to estimated cost to complete?

4    A    No.  It was not available.

5    Q    Sir, when you say the information is not

6    available, you mean that since -- you did not get it

7    because you did not get access to the CCI documents, is

8    that it?

9    A    The access to the CCI documents -- what I relied

10   upon from CCI is what's included in my file and what I

11   referred to.

12   Q    You don't -- All you're saying about the -- that

13   you did not have access to the information means you

14   didn't get the records which would give you the

15   information about the specific source of increased

16   costs, is that right?

17   A    That's right.  It was not available.

18   Q    When you say it's not available, you mean you

19   just haven't gained access to the information, right?

20   A    We were told it was not available.

21   Q    Who specifically told you that the CCI materials

22   or whatever records you needed to determine the source

23   and the date for the increased cost for the jobs for

24   which you proposed adjustments to the financial

150

1    statements --

2       A    There --

3       Q    -- related to increased -- I'm sorry, the

4    estimated cost to complete?

5       A    Could you read that question back?

6       Q    Who specifically told you that the records which

7    you needed to determine the source and the date of the

8    increased cost for those jobs for which you proposed

9    adjustments to the estimated costs to complete did not

10   exist?

11      A    The specific person would have been an

12   individual from our Baltimore office who did the initial

13   work on the engagement and discussed with USF&G and

14   Mr. McGlynn's firm over what records were available,

15   that it looked at what records were available, and

16   compiled the necessary records that were left available

17   from CCI.  On the other hand, the source of the total

18   cost I wouldn't have looked at necessarily anyway in my

19   computation of total estimated cost.

20      Q    You wanted -- You would want to look at the

21   source of the increased cost --

22      A    Total cost, absolutely.

23      Q    -- to determine the nature of the source for the

24   increased cost for each job?

151

1      A    Right.

2      Q    Along with the date on which the increased cost

3   occurred for each of those items, is that right?

4      A    Correct.

5      Q    And that would be to verify and confirm that

6   your proposed adjustments were warranted?

7      A    You would need to take it beyond that.  When the

8   costs were incurred and when they were available are two

9   different things.  I would have used it to substantiate

10  when the actual costs were incurred subsequent to the

11  end of the year.

12     Q    Who is it that told you that CCI or other

13  records from which you could have derived the increased

14  cost information were not available?

15     A    It would have been George Sonnefeld.

16     Q    And do you know the source of Mr. Sonnefeld's

17  information that the records were not available?

18     A    Inquiry with a representative from USF&G and

19  Mr. McGlynn's office.

20     Q    Do you know who specifically Mr. Sonnefeld had

21  contact with to obtain the CCI records or other records

22  relating to the source of increased costs?

23     A    I'm not sure of specific names, no.

24     Q    You're not able to -- let me start over.

155

1   information was available.

2       Q    But without regard for when the information was

3   available, you're not able to tell us how much different

4   the accumulated job costs would have been if the

5   additional procedures had been employed?

6       A    No.

7       Q    For any period, is that right?

8       A    Fortunately the timing of when that information

9   is available is pretty critical.

10      Q    But let's answer the first question.  You're not

11  able --

12      MR. MCGLYNN:  Objection.

13      MR. MCCARRON:  Q   -- to tell us the amount by which

14  the accumulated job costs would have been different if

15  additional auditing procedures -- different procedures

16  had been performed by Brown, Schultz --

17      A    No.

18      Q    -- for either the 1997 or 1998 period, is that

19  right?

20      A    That's correct.

21      Q    Now, the timing of those additional accumulated

22  costs, it was important to know whether it was

23  information available to the auditors at the time they

24  performed their audit, is that right?

156

1    A    That's correct.

2    Q    You needed -- You would need that information in

3    order to assess whether the auditors would have had

4    different results if they had performed additional or

5    different audit procedures during their work, is that

6    right?

7    A    That would have been one of the steps, as I

8    indicated.

9    Q    So that if the information concerning additional

10   accumulated job costs did not become available until

11   after the audit period, then that would not be

12   information which would have been learned by the

13   auditors during their audit work, is that right?

14   A    That would have prompted them to not conclude

15   their audit work until that information was available.

16   Q    But, sir, if the information did not become

17   available in the sense that the accumulated --

18   additional accumulated costs did not occur until after

19   the audit work was completed, then that would be

20   information that would not be available to the auditors

21   during their audit work, is that right?

22   A    Okay.  Maybe I'm misunderstanding your question.

23   The accumulation of cost includes those both incurred to

24   date and those that are going to be incurred.  Job cost

166

1    detail.

2        Q    Do you believe that job costs reflected in the

3    financial statements for 1997 for CCI Construction as of

4    December 31, 1997, are wrong?

5        A    No.

6        Q    Do you believe the job costs reflected on the

7    1998 financial statement of CCI Construction as of

8    December 31, 1998, are wrong?

9        A    I'm unable to make that determination based on

10    before there was not enough work done, enough audit

11    procedures performed in connection with the accumulated

12    costs to date.  They relied upon 25 job costs.

13        Q    So the answer is you have no reason to believe

14    that the job costs for 1998, as of December 31, 1998, as

15    reflected on the 1998 financial statement is wrong?

16        A    I cannot opine on the job costs as presented on

17    the financial statements.

18        Q    But can we confirm you don't have any reason to

19    believe that the job costs reflected on the 1998

20    financial statement for the period ending December 31,

21    1998, are wrong?

22        A    I indicated why I felt they were wrong.  There

23    wasn't enough work done.  Their work was limited to a

24    selection of 25 random job costs.  If that's the work

1    MR. McCARRON:   Q    I'm asking, though, do you know

2    of information which leads you to believe that the 1998

3    job costs are actually incorrectly reflected on the 1998

4    financial statement?

5    MR. McGLYNN:   Objection.

6    A    I know subsequent to the end of the year there

7    were significant losses incurred on jobs in progress in

8    1998, jobs that they did very little work for or

9    obtained very little audit evidence for to substantiate

10   the work in process at 12/31/98.

11   MR. McCARRON:   Q    Do you know whether -- Do you

12   have any reason to know of any information which leads

13   you to believe the job costs for 1998 are wrong on the

14   1998 financial statement?

15   A    The information I referred to were subsequent

16   schedules prepared by CCI management, total estimated

17   cost.

18   Q    Sir, estimated cost is not a job cost at the

19   time, is it?

20   A    It could be.  It's either going to be an

21   accumulated job cost or estimated cost to complete.

22   Q    Sir, do you have any reason to believe that the

23   actual job costs actually incurred during 1998 is

24   inaccurately or incorrectly reflected on the financial

172

1    statement?

2        MR. McGLYNN:   Objection.

3        A    I don't have a reason to believe that it was or

4    was not.

5        MR. McCARRON:   Q    Do you have any reason to believe

6    that additional audit procedures by Brown, Schultz in

7    connection with the work they performed for the 1998

8    audit on the financial statement of CCI Construction

9    would have led to a different result?

10       A    Yes.

11       Q    To what extent would additional procedures have

12   led to a different result performed in the audit by

13   Brown, Schultz for the 1998 time period?

14       A    As I had described previously, their testing of

15   accumulated job costs relied upon a random sample of 25

16   job costs.  In 1998, they relied upon estimated costs to

17   complete as represented by management for gross profits

18   on two individual jobs that they had never historically

19   met.  They unduly accepted management's representation.

20   There is no documentation in the file that anything was

21   done to corroborate that information that management

22   represented were the estimated costs to complete.

23           In addition, also in 1998 they specifically

24   excluded from their job costs testing the job -- I'm

177

1    it the same as your criticism of the audit by Brown,

2    Schultz for 1997 in those respects?

3        A    Yes, it is.

4        Q    What is your criticism -- let me start over.

5            In what respect concerning PCIC did Brown,

6    Schultz not act in conformity with Generally Accepted

7    Auditing Standards?

8        A    In the recording of the guaranty as are evident

9    by PCIC.

10        Q    What was it about the recording of the guaranty

11    by PCIC which was not in accordance with Generally

12    Accepted Auditing Standards?

13        A    It was not proper.  There is no basis for it.

14        Q    What was not proper?

15        A    The recording of the guaranty as revenue.

16        Q    So the recording or including in revenue the

17    amount of the guaranty by PCIC for the Mahanoy Prison

18    claim was not proper?

19        A    That's correct.

20        Q    Why was it not proper to include in revenue --

21    is that what you mean by recording, including in

22    revenue?

23        A    Correct.

24        Q    Why was it not proper to include in revenue the

179

1    certain results desired by the related parties, the

2    resulting accounting measures may not represent what

3    they usually would be expected to represent.

4        Q    So what specific GAAP procedure was violated by

5    including the PCIC guaranty amount in revenue for the

6    1998 financial statement?

7        A    There is no basis for recording it as revenue.

8    How does it relate to revenue?  It wasn't done in the

9    ordinary course of business.  It was merely a guaranty

10   by a related party that --

11       Q    What?

12       A    -- I'll pay it if the customer doesn't.

13       Q    Isn't it guaranteed income, sir?

14       A    No.

15       Q    Why is it not guaranteed income?

16       A    A guaranty did not relate to that claim.

17       Q    Are you telling me that the guaranty was no

18   good?

19       A    The guaranty was just that.  It was a guaranty

20   by a related party that I will deposit the difference

21   between what you collect on a claim and the difference

22   I'll put in, but it doesn't get recognized as revenue.

23       Q    Was the guaranty valid?

24       A    I assume that it was, yes.  I reviewed the

180

1   guaranty.

2       Q   Was the guaranty made up?

3       MR. McGLYNN:  Objection.

4       A   I don't know.

5       MR. McCARRON:  Q   Was it a contrived guaranty?

6       A   I don't know.

7       Q   Was there an insurance policy issued by PCIC to

8   CCI Construction?

9       A   Yes.

10      Q   Did the insurance policy cover the Mahanoy

11  Prison job?

12      A   Yes.

13      Q   Was the claim for which the PCIC guaranty was

14  provided for the claim by CCI arising out of the Mahanoy

15  Prison Project?

16      A   The claim --

17      MR. McGLYNN:  Objection.

18      THE WITNESS:  The claim was related to the Mahanoy

19  Prison job.

20      MR. McCARRON:  Q   So there existed an insurance

21  policy issued by PCIC for which conceivably may cover or

22  could have covered the claim by CCI for the Mahanoy

23  Prison Project, is that right?

24      MR. McGLYNN:  Objection.

181

1      A    The claim --

2      MR. McCARRON:  Q   Is that right?

3      A    -- had to do for extended costs that in my

4    opinion are not remedial costs, which was the insurance

5    policy that was issued by PCIC, in addition, what was

6    disclosed in PCIC's financial statements.

7      Q    So is your problem with including the PCIC

8    guaranty in revenue your determination or belief that

9    the PCIC insurance policy did not cover the Mahanoy

10   Prison claim?

11     A    I have two problems with the recording of it.

12     Q    Is it true that one of the issues you have with

13   the PCIC guaranty being reflected in revenue is that

14   it's your opinion the PCIC insurance policy did not

15   cover the CCI claim concerning the Mahanoy Prison

16   Project?

17     A    That's correct.

18     Q    So that if you're wrong about the interpretation

19   of the insurance policy and it did provide coverage for

20   the claim by CCI concerning the Mahanoy Prison Project,

21   then the concern of yours, including the PCIC guaranty,

22   would be eliminated?

23     A    No, it would not be eliminated.  The PCIC

24   guaranty -- as I said, I had two problems with it -- is

182

1    a separate issue.

2        Q    But at least one of your two concerns would be

3    eliminated.

4        MR. McGLYNN:  Have you finished your answer?

5        THE WITNESS:  No, I haven't.

6        MR. McCARRON:  Q    Isn't it the situation -- if I

7    could --

8        MR. McGLYNN:  He hasn't finished his answer.  Maybe

9    he'll answer this concern when he finishes the answer.

10    Go ahead, please.

11        A    The issue with the claim, and as I opined on

12    earlier, in my opinion was not covered under a remedial

13    insurance contract issued by PCIC.

14            The second issue related to the guaranty by the

15    stockholder, if you will -- the stockholder of PCIC

16    happened to be the stockholder of CCI -- was a

17    contingent gain.  If the -- If you do not collect from

18    the Commonwealth of Pennsylvania or from the owner, I'll

19    pay the difference.  Simply that, a guaranty that if

20    something doesn't happen in the future, I will do

21    something.

22        MR. McCARRON:  Q    What is it about that that

23    violates GAAP?

24        A    As I just read in FAS 57.

1  stockholder owned one hundred percent of and in his own

2  deposition said I determined what gets paid and what

3  doesn't get paid.

4      Q    Was the PCIC guaranty a guaranty by a

5  stockholder of CCI?

6      A    It was a guaranty by a company under common

7  control.

8      Q    Was the PCIC guaranty a guaranty by a

9  stockholder of CCI?

10     A    No.

11     Q    Sir, in paragraph 15, does it not indicate that

12  you could include in revenue the amount of the related

13  party transaction if there is disclosure?

14     MR. MCGLYNN:   Objection as to the form.

15     A    Where are you referring to that?

16     MR. MCCARRON:   Q   I'm asking, sir, doesn't it

17  reflect the concept in paragraph 15 of FAS 57 that if a

18  related party transaction is disclosed, then it can be

19  included in revenue?

20     A    No.

21     Q    You don't understand that that's what that

22  means?

23     A    No, I don't read that out of there.

24     Q    Let me ask you, does -- are you familiar with

191

1    the treatment of insurance claims under Generally

2    Accepted Accounting Principles?

3       A   I do not audit any insurance companies, no.

4       Q   Are you aware of the treatment of insurance

5    claims which a client may have?

6       A   I've had cases where clients have had claims

7    against insurance companies, yes.

8       Q   And are you aware that if the -- that there are

9    instances -- let me start over.

10       Are there instances in which insurance claims --

11   the amount of insurance claims can be properly included

12   in revenue under accrual accounting methods?

13      A   If there is a legal basis --

14      Q   Is that a yes?

15      A   Can I finish my response?

16      Q   It either is or it isn't.

17      A   Yes, if there's a legal basis for the claim,

18   which there wasn't in this case.

19      Q   And you've decided that there was not a legal

20   basis for the claim -- let me start over.

21      Did you consult an attorney about whether there

22   was a legal basis for the PCIC claim?

23      A   I did not.

24      Q   So you, independent of an attorney, decided

192

1  there was not a legal basis for the PCIC claim by CCI

2  Construction, is that true?  Is that true?

3      A    Ask it again.

4      Q    You determined, independent of a lawyer, that

5  the PCIC claim against the PCIC policy -- let me start

6  again.

7          You determined without consulting an attorney

8  that the CCI claim against the PCIC policy was not a

9  covered claim and there was no legal obligation for PCIC

10  to pay it, is that right?

11      A    I did that on my own based on the remedial work.

12      Q    Did you have law training?

13      A    No.

14      Q    Are you an attorney?

15      A    No.

16      Q    Are you qualified to interpret the provisions of

17  an insurance policy?

18      A    From my understanding of reading it, I felt

19  qualified that I can make a judgment as to whether a

20  claim for delayed work fell under a remedial work claim

21  as disclosed in the PCIC financial statement.

22      Q    Do you have any reason to believe that Bruce

23  Brown or the other folks at Brown, Schultz were less

24  qualified than you to determine whether the PCIC policy

1    covered the CCI claim arising out of the Mahanoy Prison

2    Project?

3        A    I don't know what their qualifications were, no.

4        Q    You have no reason to believe that you're more

5    qualified than Bruce Brown to make a judgment about the

6    application of an insurance policy, do you?

7        A    That's correct, from an insurance policy claim.

8        Q    Would it be a violation of Generally Accepted

9    Accounting Principles for an accountant to make a

10   reasonable professional judgment about whether an

11   insurance policy covered a claim but happened to be

12   wrong?

13       A    If we're now talking about the 1,162,000 claim

14   and whether that is going to fall under recognition

15   standards, guaranteed aside --

16       Q    Why don't we stick with my question.

17       A    Can I finish my question?

18       Q    See, you're not allowed to ask questions.

19   That's part of the problem.

20       MR. MCGLYNN:  Do you want to finish your answer?

21   Finish your answer.

22       MR. MCCARRON:  He's not giving me an answer.  He's

23   giving me a speech.

24       MR. MCGLYNN:  Do you want to take another two-minute

196

1      A    FAS 57 for one.

2      Q    Anything else?

3      A    APB No. 4, which deals with conservatism.  FAS

4    No. 5, gain contingencies.

5      Q    Any doubt in your mind that the information

6    presented to -- available to Brown, Schultz when it

7    performed its audit work concerning the 1998 period that

8    the amount would be paid by PCIC to CCI Construction?

9      MR. MCGLYNN:  Objection.

10     A    There is nothing in the work paper that I

11   reviewed that indicated they had reviewed whether that

12   claim was paid.

13     MR. MCCARRON:  Q   Sir, revenue doesn't depend on

14   whether it was actually paid during the period of the

15   financial statements, does it?

16     A    Or subsequent review.

17     Q    Sir, to recognize revenue for accrual

18   accounting, it is not necessary that the revenue

19   actually be received by the company during the period

20   under -- for which the financial statement is issued,

21   isn't that right?

22     A    I agree.

23     Q    So it was not important to your consideration

24   about whether or not to include the PCIC guaranty in

1    revenue about whether the revenue was received or the

2    PCIC claim was paid prior to December 31, 1998, is that

3    right?

4         A    No, I disagree.  You need to look -- If you're

5    going to -- and, number one, the guaranty never should

6    have been recorded as revenue.  There is going to be a

7    collectibility issue on whether PCIC had the ability to

8    make that guaranty good.

9         Q    Have you learned any information which leads you

10    to believe the guaranty by PCIC was not valid?

11        A    At this point in time I know that the guaranty

12    was paid in June and October of 1999.

13        Q    So is there any reason -- do you have any

14    information which leads you to believe that as of the

15    audit work by Brown, Schultz for the period 1998 that

16    there was reason to doubt the collectibility of the PCIC

17    guaranty?

18        A    Only by reference to the PCIC qualified report

19    on the audited financial statements of PCIC.

20        Q    So you have reason to doubt about whether the

21    PCIC guaranty was collectible as of the period of time

22    when Brown, Schultz was performing its audit work?

23        A    As of the field work date, yes.

24        Q    What information do you base your belief that

223

1    Q    Now, in arriving at your adjustments to the
2    estimated costs to complete for 1997 and 1998 to the
3    financial statements, you used a method called the look
4    back method, is that right?

5    A    A method similar to the look back method.

6    Q    How does the method you used in deriving the
7    adjustments you proposed in the 1997 and 1998 financial
8    statements differ from the look back method?

9    A    The look back method is a method predominantly
10   used by the IRS in calculating the difference between
11   construction in progress at a given date and the final
12   completion date.  They compute an interest portion on
13   that, and it's related to that.

14         I used a method what I call similar to look back
15   method where I looked at the best information available,
16   the best cost to complete information available, and
17   applied that to what should have been as of a given
18   date.

19         Now, as we go through the individual contracts,
20   you'll see that on several contracts I varied from that,
21   and I varied from it, as I documented on the work
22   papers, because the job had just started and Brown,
23   Schultz would not have known -- may not have known all
24   the available information.

226

1    method is used -- reflected in the tax regulations, is

2    that right?

3        A    Not necessarily.  I didn't dream up the idea of

4    doing this and consulted with people that -- if I was

5    going to restate --

6        Q    I think you're misunderstanding.

7    MR. McGLYNN:  Have you finished your answer?

8    MR. McCARRON:   Q    Isn't it the situation that tax

9    regulations provide and discuss the look back method as

10   a process used in connection with tax related issues?

11       A    Under the strict terms of look back, yes.

12       Q    Are you aware of any audit principle -- sorry,

13   audit -- accounting principle, audit standard, or

14   statement of pronouncement concerning accountants and

15   auditors, which provides for either the look back method

16   or some modified version of the look back method you

17   employed in arriving at your adjustments for the 1997

18   and 1998 audit statements?

19       A    I believe it's applicable in the restatement of

20   the financial statements from the best available

21   information that's known, subsequent events.

22       Q    Does GAAP, GAAS, or any accounting pronouncement

23   provide for the use of the look back method or a similar

24   method?

228

1        MR. MCGLYNN:  Objection.  Asked and answered.

2        A    As I indicated, it could.  If you were restating

3    the financial statements for correction of an error,

4    it's not precluded from being used.

5        MR. MCCARRON:  Q    Is there an audit -- I'm sorry.

6            Is there an accounting principle or an audit

7    standard or pronouncement of accounting or auditing

8    principles or standards on which you relied to support

9    your idea that the look back method or the modified

10   version of the look back method you used is appropriate?

11       A    That would be combining everything I said

12   earlier with respect to use the best available

13   information that I have, absent of records to review and

14   absence of the audit procedures done not in accordance

15   with GAAS, everything else considered in connection with

16   review of Brown, Schultz's work papers, I felt this was

17   the best method available to me to restate the financial

18   statements for 1998 and 1997.

19       Q    Are you aware of any instance in which the look

20   back method is used other than in connection with

21   tax-related issues?

22       A    Under the term look back, no.

23       Q    Where in the accounting literature is there

24   support for the use of the look back method or the

229

1   modified version of the look back method you used to

2   derive your proposed adjustments for the 1997 and 1998

3   financial statements?

4       A    Not specifically.

5       Q    Could an accountant performing an audit use the

6   look back method under GAAS in expressing an opinion

7   about the financial statements?

8       A    If it was in connection with the correction of

9   an error and he was restating the financial statements,

10  yes.

11      Q    Could an accountant use the look back method in

12  performing an audit to express an opinion about

13  financial statements in accordance with GAAS?

14      A    I just answered that.

15      Q    No, you didn't.

16      A    I did.

17      Q    No, you didn't.  You told me --

18      MR. MCGLYNN:  Let's not argue.  Go on to the next

19  question.

20      MR. MCCARRON:  No, I'm not going on to the next

21  question.  The next question is going to be exactly the

22  same.

23      MR. MCGLYNN:  Then he's going to stand --

24      MR. MCCARRON:  Do you want to argue with me, is that

231

1    acting in accordance with GAAS in performing an audit

2    using the look back method?

3        A    As I indicated previously, it would be a method

4    that he may consider in the restatement of financial

5    statements in connection with his engagement if -- and

6    maybe an example would help explain it.  If you were

7    restating a financial statement and there is an error

8    because of misuse of information in connection with a

9    prior year, you would restate the financial information.

10       Q    Did Brown, Schultz restate financial statements,

11   sir?

12       A    Did they restate financial statements?

13       Q    Yes.

14       A    No.

15       Q    Weren't you testing the work done by Brown,

16   Schultz?

17       A    I was testing their audit work.

18       Q    Wouldn't you be required to use the same

19   procedures that -- which Brown, Schultz should use in

20   determining its audit?

21       A    I determined their procedures weren't adequate.

22       Q    Sir, I didn't ask you that.  Wouldn't you be

23   required in testing the quality of the work by Brown,

24   Schultz to use the same procedures which applied or

232

1   should have been used by Brown, Schultz in performing

2   their audit?

3       A    Yes.

4       Q    Is the look back method a method which Brown,

5   Schultz could properly have used in conducting their

6   audit during 1997 and 1998?

7       A    In connection with review of completed

8   contracts, yes, they did.

9       Q    In performing the audit of the 1997 and 1998

10  financial statements for CCI, would Brown, Schultz have

11  acted in accordance with Generally Accepted Auditing

12  Standards to have used the look back method?

13      A    A method similar to the look back by reviewing

14  completed contracts, which is documented in their work

15  papers that they did.

16      Q    Would Brown, Schultz have been justified in its

17  audit procedures in using the look back method in its

18  audit of estimated costs to complete contracts?

19      A    Yes.   They would have reviewed, which they did.

20  They reviewed two completed contracts during the year,

21  which in effect is using a method similar to what I used

22  based on our work in process in prior years, how did

23  these contracts actually finish up.  For instance, in

24  1998 they looked at the 1997 -- two work in process jobs

234

1    contracts?

2        MR. McGLYNN:  Objection.  Asked and answered.

3        A    In connection with their review of completed

4    contracts.

5        MR. McCARRON:  Q    Was there -- Did you use the look

6    back method in determining the adjustments you proposed

7    for the 1997 and 1998 financial statements for anything

8    other than completed contracts?

9        A    For contracts in progress.

10       Q    You used it for contracts in progress?

11       A    For contracts in progress.

12       Q    And the adjustments you proposed relate to

13   contracts in progress?

14       A    Correct.

15       Q    Did Brown, Schultz use the look back method in

16   their audit procedures for contracts in progress?

17       A    They used it in connection with review of the

18   completed contracts in developing and relying upon

19   management's estimates which then figure into the

20   construction in progress schedule.

21       Q    But for actually -- In connection with the audit

22   work done by Brown, Schultz specifically with respect to

23   the estimated cost to complete, did it not use the look

24   back method because the data was not yet available,

235

1    isn't that the case?

2        A    Correct.

3        Q    Did you limit your restatement process using the

4    look back method and the modified look back method to

5    data which was -- which you know was actually available

6    to the auditors when it conducted the 19 -- the audit of

7    the 1997 and 1998 financial statements?

8        A    I don't know what audit information was

9    available to the auditors.  As I've explained

10   previously, they didn't extend their audit procedures

11   necessary, that they could have acquired any additional

12   information.  There was obviously problems with the

13   estimated cost to complete.

14       Q    You, therefore, may have relied on and used

15   data, which was not available to the auditors, when they

16   performed their audits of the 1997 and 1998 financial

17   statements, is that true?

18       A    That's true.

19   MR. MCCARRON:  And -- let me get to my other stuff.

20           Peter, I'm going to work from this packet here.

21   I'm not necessarily going to mark them all at once.

22           Throw a tag on that.

23           (Document marked Exhibit No. 38.)

24       Q    Sir, I placed in front of you a document we've

252

1    have been an adjustment.  Had they allocated indirect

2    costs to specific contracts, the total estimated cost

3    and total -- and estimated cost to complete would have

4    been different.

5        Q    Would the amount of the adjustment have been

6    material?

7        A    I did not do that calculation.

8        Q    So you don't know -- you can't tell us that it

9    would have been material if the indirect costs had been

10   treated differently, is that right?

11       A    That's correct.

12       Q    Would the nonallocation of indirect costs be a

13   basis on which an auditor can withhold an opinion?

14       A    If it was material?

15       Q    I'm asking, sir.  If the -- If management --

16   MR. McGLYNN:  He answered your question.

17   MR. McCARRON:  Q    If management did not reflect on

18   their financial statements -- it would not reflect on

19   their financial statements cost to complete, which

20   included indirect costs, would that be enough to

21   withhold your opinion or to qualify your opinion as an

22   auditor?

23       A    If in my opinion the effect of not including

24   indirect costs to jobs in progress was a material

253

1    amount, yes, it would change my opinion.

2        Q    But if the amount was not material; that is --

3    let me start over.

4            If the amount of the nonincluded indirect cost

5    was not material, then that would not be a basis on

6    which to withhold your opinion and to qualify your

7    opinion as an auditor, is that right?

8        A    Just on that given item, no.

9        Q    Do you know whether Bruce Brown calculated the

10   effect of the nonallocation of indirect costs?

11       A    There was a calculation done on two jobs from

12   what I recall each year based on a very simple review of

13   indirect cost.

14       Q    The fact that indirect costs were not allocated

15   was disclosed on the financial statements?

16       A    Yes, it was.

17       Q    And that disclosure was adequate?

18       A    Yes.

19       Q    Is it your opinion that a partner has to sign

20   every piece of work paper in the audit file?

21       A    No.

22       Q    In the last page of Exhibit 41, which is also

23   numbered DeBruyn 609, can you read to us what you wrote

24   in the left-hand margin at the very top?

263

1   with this litigation as an expert witness.

2       Q    Did you find any support for your use of the

3   look back method to evaluate the propriety of the work

4   done by auditors?

5       A    Yes, I did.  I had determined that the look back

6   method was reasonable and had been used in damage

7   evaluation cases in connection with litigation support

8   engagements.

9       Q    Are you aware of any instance in which the look

10  back method was used to evaluate the propriety of the

11  accounting work done by auditors?

12      A    I don't have any specific cases, no.

13      Q    Are you aware of any other accountant who has

14  ever used the look back method to evaluate the propriety

15  of work done by auditors in performing audits of

16  financial statements?

17      A    I'm aware of individuals in our firm that have

18  used a method similar to what I have employed to

19  determine the effect of an accounting issue.

20      Q    Sir, are you aware of any other instance in this

21  case when an accountant has employed the look back

22  method to evaluate the propriety of the work done by

23  auditors in performing audits of financial statements?

24      A    No.

271

1    looked at all the information that was available.

2        Q   As of the time that the audit was conducted?

3        A   No.

4        Q   So you're talking about you looked at

5    information obtained subsequent to the audit, that's

6    what you looked at?

7        MR. McGLYNN:  Let him finish his answer.

8        MR. McCARRON:  Q  Is that right?

9        A   That's correct.

10       Q   Did you determine the reason that CCI went

11   bankrupt?

12       A   No.

13       Q   Did you consider Mr. Ortenzio's explanation for

14   the reasons CCI had financial difficulty and went

15   bankrupt?

16       A   I don't recall what it was in the deposition.

17       Q   Did you receive a document which reflected an

18   explanation about Mr. Ortenzio about the reason that CCI

19   had financial difficulty?

20       A   I received his initial deposition.

21       Q   How about a letter from Mr. Ortenzio which

22   explained the reason that CCI went bankrupt, did you see

23   that?

24       A   I did not.

286

1    Q    So you just took at face value the financial

2   reporting by CCI in determining your adjustments for the

3   financial statements for 1998?

4    A    I didn't take it at face value.  I realized

5   USF&G had now been involved in the wrap-up of the

6   engagements, so I felt there was additional reliance

7   that a third party was reviewing the work in process

8   schedule.

9    Q    Do you know whether USF&G had assured the

10   correctness of the interim financial statements issued

11   by CCI for 1999?

12    A    It came from the USF&G office.

13    Q    I'm asking, do you know whether USF&G did

14   anything to assure that the information included on the

15   financial statements from CCI was correct for 1999?

16    A    No.

17    Q    So you took financial statements from CCI, which

18   you have now determined were inaccurate for 1997 and

19   1998, and you relied on them for making your

20   calculations based on 1999 information, is that true?

21    A    That's true.

22    Q    Sir, on page 10 of Exhibit 45 you make a

23   handwritten note in the left-hand column.  Did you write

24   "ouch"?

293

1    Brown, Schultz included in the 1997 or 1998 audit report

2    which was false?

3        A    Which was false?  No.

4        Q    One second.

5            The work you did would not be characterized as a

6    reaudit?

7        A    No, it would not.

8        Q    Did the work papers -- never mind.

9            Can you tell us what you consider to be remedial

10   work?

11       A    Under the definition in the PCIC significant

12   accounting policies and under my review of the

13   definition of remedial work, it was work that the

14   contractor; in this case, CCI, was obligated to under

15   the original contract, warranty type work that they were

16   called back to do within, I believe, a year period for

17   that contract.

18       Q    That would be remedial work?

19       A    Yes.

20       Q    Including warranty work?

21       A    Yes.

22            (Discussion had off the record.)

23       MR. McCARRON:   I'm done.

24            (Whereupon the deposition concluded