## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

United States Fidelity and          :
Guaranty Company                    :
                                    :          Hon. Christopher J. Conner
                    v.              :
                                    :
Bruce J. Brown and Brown, Schultz   :
Sheridan & Fritz                    :          No: 01-CIV-813

## PRETRIAL MEMORANDUM
## OF DEFENDANTS BRUCE J. BROWN AND
## BROWN SCHULTZ SHERIDAN & FRITZ

Defendants, Bruce J. Brown and Brown Schultz Sheridan & Fritz, by and through their attorneys, hereby submit their pre-trial memorandum.

**Date conference was held by counsel:**     October 3, 2003.

**A.     Statement as to federal court jurisdiction.**

Jurisdiction is based on 28 U.S.C. § 1332(a)(1).

**B.     Summary Statement of Facts and Contentions as to Liability.**

**1.     Summary Statement of Facts**

Plaintiff, United States Fidelity & Guaranty Company ("USF&G"), brought this action against Bruce J. Brown and Brown Schultz Sheridan & Fritz (collectively "Brown Schultz") for alleged negligent misrepresentations contained in financial statements audited by Brown Schultz for CCI Construction Company for the years ended December 31, 1997 and 1998.  The action is based on the contention that Plaintiff issued certain payment and performance bonds for CCI based on the

financial statements.  The bonds which USF&G contends it issued in reliance on the

December 31, 1997 audit report are:

| Project | Bond No. |
| --- | --- |
| Scott Air Force Base - Air Craft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 |
| Germplasm Center | 26-0120-28306-98-1 |
| PA Turnpike-Kost Road Central Administration Bldg. Renovation | 26-0120-40371-99-1 |
| Outlook Point at Chesterfield | 26-0120-28307-98-8 |
| Outlook Point at Westerville | 26-0120-28312-98-1 |
| James River Juvenile Detention Center | 26-0120-08946-99-2 |
| Va. Commonwealth Univ. Life Sciences Building | 26-0120-08953-99-9 |

The bonds which USF&G contends it issued in reliance on the December 31, 1998

audit report are:

| Project | Bond No. |
| --- | --- |
| SR II Perry County- Excavation, Presplit Blasting | 26-0120-08953-99-9 |
| Cambria County State Route 22 | 26-0120-08959-99-7 |
| Bedford County State Route 30 | 26-0120-08963-99-4 |
| Summerdale Sitework Laboratory Centers for Excellence | 26-0120-08958-99-1 |
| Cool & Cold Aquaculture | 26-0120-08961-99-1 |

2

Cool & Cold Aquaculture-        26-0120-40396-99-3
Buried Process Water Lines

USF&G began its bonding program with CCI in late 1993.   The relationship between CCI and USFG was formed after Fireman's Fund Insurance Company would not underwrite a bond for CCI. The CCI bond account came to USF&G through the Byerly Agency, an independent agency through whom USF&G marketed its business. Dave Dominiani of the Byerly Agency was agent for the CCI account. When Mr. Dominiani left the Byerly Agency in or around 1998 to form DJL Associates, he continued as the agent for the CCI bond program.

The individuals from USF&G involved in the underwriting of the CCI account included: Tony Phillips, the bond  manager of USF&G's Harrisburg field office; Steve Salazar, senior underwriter in the Harrisburg field office; Jim Daily, manager of the Northeast Surety Division for USF&G; and David Hussey, the Director of the Northern Division of USF&G's Surety Department.

Mr. Salazar, the senior underwriter in the Harrisburg field office, had the authority to approve bonds up to $2,000,000.  Above that amount, he needed the approval of Tony Phillips.  Above Mr. Phillips' level of authority, bonds would be approved by Mr. Daily of USF&G's home office. David Hussey had final approval of USF&G's bond program for CCI.

At the time USF&G began its bonding program for CCI, the majority of CCI's revenues and receivables were the result of contracts entered into with Continental Medical Systems for the construction of rehabilitation hospitals throughout the

3

United States. Continental Medical Systems was controlled by John Ortenzio's father, Rocco Ortenzio. When the USF&G bonding program started, CCI was beginning to enter the hard bid market.

During the period from 1994 through 1998, in addition to the audited year end financial statements for CCI, USF&G received interim financial statements from CCI, work in process information prepared by CCI, Dun & Bradstreet reports on CCI, information on jobs CCI was considering bidding on, and various other information regarding CCI provided to USF&G by its bond agent Dave Dominiani.

USF&G agreed to a $100,000,000 bonding program for CCI. The Harrisburg Branch office had "specific discretionary authority" to issue bonds for CCI up to $15,000,000 per project and $75,000,000 total work program. Above those levels the approval of USF&G's home office underwriting department in Baltimore was required.

Early in the bonding relationship between CCI and USF&G, Dominiani advised Tony Phillips of USF&G of the existence and purpose of Pennsylvania Contractors Insurance Company (PCIC) and from 1993 on, the year end audited financials for CCI disclosed that PCIC and CCI were corporations under common control ownership as well as the transactions between CCI and PCIC.

Throughout the bonding relationship with CCI, USF&G was aware of significant profit fades on jobs in progress, thin margins, frequent operating losses and mid-year and year end losses sustained by CCI.

Mr. Phillips stated that in the course of underwriting the CCI bond program, he did not fully review and evaluate the audited financial statements for CCI Construction.  Mr. Hussey, the individual with ultimate authority over the account, testified that he did not review any of the Brown Schultz audited financials.

USF&G was advised by CCI that as of June 30, 1994, CCI sustained a loss of $500,000 for the first half of 1994.  At year end, prior to receiving the audited financial statements, USF&G was advised that the loss for year end would be in the $400,000-500,000 range.  In January 1995, prior to receiving CCI's year end audited financial statements, USF&G agreed to hold to its $100,000,000 program level.

On April 19, 1995, USF&G's home office received the Brown Schultz audited financials for the year ended December 31, 1994.  The 1994 financials indicated a net loss of $317,000 and an operating loss of $864,663.  Working capital was $2,384,192 and equity was $4,290,336.

Each year, after receiving the audited financials for CCI,  Steve Salazar prepared an "annual review" describing CCI's results for the year and making a recommendation as to a bonding program for the following year.   In his annual review of the December 31, 1994 audited financials, even though the company sustained a $300,000 net loss for the year and an operating loss of over $800,000, Salazar recommended continuing with the bond program for CCI.

In March 1996,  USF&G received the audited financial statement for the year ended December 31, 1995.  The financial statement showed a small profit of $103,210

but a loss from operations of $308,362. Working capital was $4,183,681 and equity was $4,820,675. Mr. Salazar's annual review of the CCI financial statement is dated May 3, 1996 and showed a Yellow Stress Score and a "Bear Flag F1 -Net Worth less than 10% of work program." Notwithstanding the loss from operations, the yellow stress score and bear flag, Salazar again recommended continuing the CCI bond program.

On May 1, 1997, USF&G received a copy of the audit report for the year ended December 31, 1996. The financial statement reflected net income of $363,124, and for the first time since 1993, an operating profit of $139,097, working capital in the amount of $4,641,702, and equity of $4,802,675. Salazar's annual review of CCI dated May 1, 1997, again showed a yellow stress score as of March, 1997 and the following bear flags: A20-gross profit fade factor is greater than 20% and M01-Equity less that 10% of total program. Even with the foregoing warning signs, Mr. Salazar recommended that the bonding program be continued.

In August of 1997, Dominiani advised Tony Phillips of USF&G that John Ortenzio, CCI's sole stockholder, wanted his personal indemnity on the Master Surety Agreement removed. Jim Daily of USF&G home office underwriting department agreed to the removal of the indemnity.

On March 5, 1998, USF&G received the audited financials for the year ended December 31, 1997. Income from operations was $350,000. On April 15, 1998, Steve Salazar prepared his annual review of the audited financials for 1997. The annual

6

review again showed a yellow stress score and bear flags "A20-gross profit fade factor is greater than 20%" and "M01-Equity less than 10% of total program. Mr. Salazar recommended continuing the bonding program for CCI.

On August 17, 1998, Dave Dominiani advised Tony Phillips that CCI was reflecting a $1,600,000 loss through June 30, 1998.  He also advised that PCIC was available to use as a buffer to offset losses or profit fades on certain jobs during any given year.

In spite of the significant mid-year loss, USF&G continued with its bonding program.  In late December, 1998, Dominiani  wrote Tony Phillips wrote outlining CCI's desire to bid on any upcoming $40,000,000 heavy highway project in joint venture with Fulkroad Construction. On, January 5, 1999, prior to receipt of the audited financials for December 31, 1998, USF&G met with CCI and Dominiani to discuss the joint venture project. Daily recommended to Dave Hussey, Daily's superior, that USF&G not approve bonds for the Fulkroad project because the project was a different kind of work than previously performed by CCI, and because CCI planned to self perform work it previously subcontracted.  Ignoring Mr. Daily's concerns, Dave Hussey approved the bonds for the Fulkroad joint venture.

Without having the benefit of the December 31, 1998 audited financial statement, USF&G agreed to support the joint venture bid with CCI's portion of the bid being about $22,000,000.  Moreover, in committing to bonding for CCI in January of 1999, USF&G relied on representations from CCI as to its financial condition for

the coming year.

On March 1, 1999, Dominiani submitted the December 31, 1998 audited financials to Tony Phillips.   The audited financials showed that while  CCI had made a small profit of $59,015, working capitol decreased to $2.5 million and the company had an operating loss of $116,629.  The 1998 audited financial statement also showed underbillings of $6,341,726 representing 36% of total current assets.  This was a significant increase from prior years.  In 1997, underbillings were $1,072,281 and in 1996 underbillings were $37,663. This increase in underbillings prompted no comment or investigation by USF&G.

The related party transactions footnote in the 1998 audited financials also indicated that PCIC had guaranteed a claim of $1,162,460.  No inquiry was made by USF&G with regard to this transaction.

Notwithstanding the significant increase in underbillings and yet another loss from operations, USF&G continued with the CCI bonding program.  In 1999 after receipt of the 1998 audited financials but prior to any analysis of the 1998 year end audited financials, USF&G issued final bonds on the Phase 1 Laboratory Center (Summerdale) and Cambria County, Bedford County and Cool and Cold Aquaculture projects.  In fact, the first analysis of the 1998 financial statements that appears in USF&G's underwriting files is dated August 20, 1999. That analysis titled "Folder Exceptions Report" noted the account's status as "red" because of the following reasons: underbillings were greater than 50% of equity; the folder had five open claim

8

files; equity was less than 10% of the total program; net quick was less than 5% of the total program; the debt to equity ratio was greater that 3 to 1; underbillings were 120% of equity; notes payable were 104.9% of equity; and the indemnity agreement did not include the owner/principal.  On the very same day the Folder Exceptions Report was generated, Steve Salazar recommended to and received approval from Jim Daily for a bid bond on a $20,000,000 road construction project.

On August 30, 1999, Dave Dominiani reported that CCI had a loss of $900,000 through the first six months of 1999.  Notwithstanding that advice, on September 30, 1999, a performance bond was issued in the amount of $191,083 on the Cool and Cold Aquaculture project.

In late 1999 or early 2000, CCI advised USF&G that it lacked the financial resources to continue its operations and, as a result, would not be able to complete its work and pay its suppliers and subcontractors.  On May 19, 2000, CCI filed for bankruptcy. USF&G alleges that as surety for the payment and performance bonds, it was required to expend substantial sums to satisfy claims of CCI's unpaid vendors, employees and subcontractors in completing the projects.

### 2.    Contentions as to Liability

There is no basis for a duty owed by Brown Schultz to USF&G. Brown Schultz is not in privity with USF&G and had no pecuniary interest in the bond transactions which are the basis for this lawsuit.  Moreover, even if plaintiff could satisfy either of the foregoing requirements, USF&G cannot establish the requirements of

9

Restatement (Second) § 552(2).  There was no contact or communication between USF&G and Brown Schultz.  There is no evidence that Brown Schultz knew the specific purpose for which USF&G intended to use the financial statements or had knowledge of the specific bonds underwritten by USF&G on CCI's behalf.  There is no evidence that Brown Schultz, prior to releasing its audit report in the years at issue, was aware of the specific bonds to be issued by USF&G during the coming year or that Brown Schultz released its audit reports with the intention of influencing those transactions.

The 1997 and 1998 financial statements did not misrepresent the financial condition of CCI.  Nor is there any evidence that defendants knew or should have known that CCI's financial statements were, in some way, inaccurate or misleading. Plaintiff, through its auditor expert, contends that income and equity were overstated in specific amounts supposedly due to the failure of defendants to perform sufficient audit procedures and adequate testing. However, plaintiff's auditor expert made these adjustments to the 1997 and 1998 financial statements on the basis of subsequent information which was not available to the defendants at the time they were conducting their audits of CCI. In addition, Plaintiff's auditor expert did not perform the additional procedures and/or tests that he indicated ought to have been performed by the defendants during the course of the audits. He did not and cannot make a determination that, if those procedures had been performed, they would have affected the outcome of the audits. Plaintiff's auditor expert's proposed adjustments

are based on speculation or conjecture and do not establish the existence of a
misrepresentation regarding CCI's financial condition about which defendants, as
CCI's auditor, should have known.

Defendants also contend that plaintiff's auditor expert's opinion and testimony
regarding the adjustments he proposes to CCI's financial statements would be
inadmissible at trial.  The proposed adjustments are not based on an accepted
methodology or a reliable test of the proficiency employed by defendants under the
circumstances presented at the time the audit was performed. Without the testimony
of an expert concerning the existence of misrepresentations in the financial
statements about which defendants ought to known, plaintiff cannot succeed with its
negligent misrepresentation claim.

With regard to Plaintiff's contention that the failure to allocate indirect costs
to specific contracts resulted in the CCI's financial statements being inaccurate or
misleading, plaintiff's auditor expert cannot not say that the failure to allocate those
costs was material. In addition, both he and plaintiff's underwriting expert concede
that manner in which indirect costs were presented in CCI's financial statements was
not misleading and was sufficient for underwriting purposes.

Plaintiff also contends that $1,162,000 should not have been recognized as
revenue by CCI in the 1998 financial statement.  The $1,162,000 represented an
amount that had been guaranteed by Pennsylvania Contractor's Insurance Company
("PCIC") on a claim relating to the Mahanoy Prison Project in the event some or all

of that amount was not paid by the contract owner. Plaintiff contends that this amount should not have been recorded as revenue and that the disclosures in the financial statements regarding its inclusion as revenue were inadequate. However, PCIC pursuant to a guarantee promised to pay the amount of the claim not paid by the contract owner and, in fact, the full $1,162,000 was paid by to CCI. The contract owner paid approximately $220,000 and the remainder was paid by PCIC in 1999.

In addition, Plaintiff's underwriting expert testified based on the "related party transactions" footnote in the 1998 financials that a reader would understand that the amount of the guarantee had been included in revenue and that whatever concern existed from an underwriting standpoint concerning the inclusion of the PCIC guaranty in revenue was not a problem if the amount was paid in full, which it was. Based on plaintiff's experts' testimony, plaintiff cannot establish a misrepresentation of material fact in the 1998 financial statement based on the $1,162,000 guaranteed by PCIC.

Plaintiff cannot establish that the proposed adjustments to the 1997 or 1998 financial statements would have made been material to USF&G's underwriters. None of the underwriters could state at their depositions whether and to what extent "correct" financial information would have changed their decision to continue bonding CCI. In addition, USF&G bonded CCI when it was aware that CCI had sustained significant losses and in circumstances when CCI had less working capitol and less equity than portrayed in the restated financials for 1997. Accordingly,

plaintiff cannot establish that the purported misrepresentations were material to its decisions to issue the bonds that are the subject matter of this litigation.

Plaintiff cannot establish that it justifiably relied on the Brown Schultz audited financials in making its underwriting decisions. USF&G was aware that the audited financials were only current as of the closing date of the statement and received interim financial information to see how the company was doing during the year. To the extent USF&G issued bonds on audited financial statements that were considerably out of date and had received more current interim information indicating that the financial condition of had changed, the reliance on the year end financials was not justifiable.

In addition, Phillips did not fully review and analyze the financial statements and Hussey did not review them at all.  Nor is there evidence of any analysis of the 1998 financial statement by USF&G until late August of 1999 after USF&G had issued all but one of the bonds it claim it issued in reliance upon the 1998 financial statement.

The existence and nature of the relationship between Pennsylvania Contractors Insurance Company ("PCIC"), a company owned by the owner of CCI, and CCI was disclosed in the related party transaction footnotes over the years and USF&G had sufficient information both from the financials and its own bonding agent to determine the circumstances surrounding the related party transaction complained of in connection with the 1998 audited financials.

**C.     Statement of Undisputed Facts as Agreed to By Counsel at the Local Rule 16.3 Conference of Attorneys**

*See* Plaintiff's Pre-trial Memorandum.  In addition, the parties are continuing to attempt to reach agreement as to additional undisputed facts and will submit those additional undisputed facts agreed upon at the final pre-trial conference.

**D.     Description of Damages**

Plaintiff seeks to recover the amounts it contends it paid, net of any contract money received, under the payment and performance bonds it allegedly issued in reliance upon the 1997 and 1998 audited financial statements of CCI Construction Company.  Plaintiff claims that amount is $25,927,054.76.  Plaintiff claims that its losses break down by project as follows:

| Project | Net Incurred Loss |
|---|---|
| Bedford County | $   235,002.59 |
| Cambria County | 79,529.64 |
| Cool & Cold Aqua (national center) | 4,715,372.83 |
| Cool & Cold Aqua (water lines) | 228,201.80 |
| James River Juvenile Det. Center | 2,532,447.20 |
| National Germplasm | 4,049,491.71 |
| Outlook Chesterfield | 307,758.53 |
| Outlook Westerville | 2,869,808.49 |
| PA Turnpike Commission Bldg. | 2,728,805.57 |
| Perry County SR II | 1,369,904.72 |

14

| | |
|---|---|
| Scott Air Force Base | 1,449,469.53 |
| Summerdale Centers for Excellence | 411,878.12 |
| VCU | 4,949,384.03 |

**E.    Names and Addresses of Witnesses**

Bruce Brown
Brown Sheridan Schultz & Fritz
210 Grand Avenue
Camp Hill, PA 17011

James Byerly
525 North 12th Street
Lemoyne, PA  17043-0525

Rick Conner
Brown Sheridan Schultz & Fritz
210 Grand Avenue
Camp Hill, PA 17011

Greg Daily
The St. Paul Companies
5801 Smith Avenue
Baltimore, MD 21209

James Daily
The St. Paul Companies
5801 Smith Avenue
Baltimore, MD 21209

Dave Dominiani
P.O. Box 2247
Lincoln Nebraska

William I. Eskin
6522 Gardenwick Road
Baltimore, Md 21209

Mark Holtschneider
The St. Paul Companies

5801 Smith Avenue
Baltimore, MD 21209


David Hussey
14110 Greencroft Lane
Cockeysville, MD 21030

Shane Miller
San Diego, California

John Ortenzio
510 Orchard Drive
Lemoyne, PA 17043

Anthony Phillips
2259 Forest Hills Drive
Harrisburg, PA 17112-1062

Sheri Phillips
2837 North Front Street, Apt. 302
Harrisburg, PA 17110

Steve Salazar
5866 Shope Place
Harrisburg, PA 17109-5646

Matthew Silverstein
The St. Paul Companies
5801 Smith Avenue
Baltimore, MD 21209

Michael Walter
Atlantic Risk Management
5850 Waterloo Road, Suite 240
Columbia, MD 21045

**Expert Witnesses**

Donald Brenner
The Brenner Group
345 North Canal Street

Suite 803
Chicago, IL 60606

A copy of Mr. Brenner's curriculum vitae which sets forth his area of expertise

and qualifications is attached hereto as Exhibit B.

Rolf Neuschaefer, CPCU, AFSB
50 Corniche Drive
Unit I
Dana Point, CA 92629-4033

A copy of Mr. Neuschaefer's curriculum vitae setting forth his area of expertise

and qualifications is attache hereto as Exhibit C.

Daniel Coffey
Miller, Tate & Coffey
8 Penn Center, Suite 950
Philadelphia, PA 19103

A copy of Mr. Coffey's curriculum vitae setting forth his area of expertise and

qualifications is attached hereto as Exhibit D.

Defendants reserve the right to supplement this list and further reserve the

right to call any witness listed by plaintiff.

**F.    Summary of Testimony of Expert Witnesses**

1.    Donald Brenner, CPA, CMC, CVA and CFE - Mr. Brenner will testify:

that Brown Schultz's audits of the 1997 and 1998 financial statements

were in compliance with Generally Accepted Auditing Standards; that

there is no evidence or data that CCI's 1997 and 1998 financial

statements are not in compliance with Generally Accepted Accounting

Principles (GAAP); that the work performed by plaintiff's expert, Steve

DeBruyn, does not comply with the AICPA Standards for Consulting

Services applicable to litigation services engagements; that the

adjustments proposed by DeBruyn have not been properly

determined/calculated to comply with GAAP or with GAAS and that,

therefore those restatements of certain balances in the 1997 and 1998

CCI financial statements as originally published are wrong; and that the

methodology used by DeBruyn for his restatements does not comply

with GAAP or GAAS.

2.    Rolf E. Neuschaefer, CPCU, AFSB - Mr. Neushchaefer, a surety

underwriter, will testify that USF&G failed to use reasonable care that

a person in like circumstances would have exercised in obtaining

underwriting information with sufficient detail or explanation to form a

considered opinion on the acceptability of the CCI account for the size

and type of bond program that USF&G approved and that the Brown

Schultz audited financial statements were adequate for purposes of

properly underwriting the CCI bond program. USF&G failed to perform

account reviews or underwrite bond requests to industry and its own

published standards.

3.    Daniel Coffey, CPA, CFE - Mr. Coffey will testify to the financial

condition of CCI Construction Company from the inception of USF&G's

bonding program for CCI in late 1993 through the Fall of 1999 when

USF&G ceased writing bonds for CCI.  Mr. Coffey will also testify as to

the information that could have been derived CCI's audited financial

statements by a user of those financial statements.

**G.    Special Comment About Pleadings and Discovery, Including Depositions and the Exchange of Medical Reports.**

None.

**H.    Summary of Legal Issues Involved and Legal Authorities Relied Upon.**

Plaintiff seeks to recover under a theory of negligent misrepresentation.  A

negligent misrepresentation claim requires proof of: 1) a misrepresentation of

material fact; 2) made under circumstances in which the person who represented the

information should have known, in the exercise of appropriate care, was false; (3)

with an intent to induce another to act on the misrepresentation; (4) which results in

injury to a party acting in justifiable reliance on the misrepresentation.  *Bortz v.*

*Noon*, 729 A.2d 555, 561 Pa. 1999); *see also Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa.

1994) *citing* Page Keaton, Prosser and Keaton on the Law of Torts § 105 (5th ed.

1984).  Furthermore, "like any action in negligence, there must be an existence of a

duty owed by one party to another."  *Kramer v. Dunn*, 749 A.2d 984 (Pa. Super. 2000)

*citing, Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999); *Gibbs*, 647 A.2d at 890.

In the absence of privity, a negligent misrepresentation claim can be

established only if plaintiff can establish the elements of Restatement (Second) of

Torts Section 552.  Section 552 provides:

> (1) One who, in the course of his business, profession or
> employment, or in any other transaction in which he has a
> pecuniary interest, supplies false information for the
> guidance of others in their business transactions, is subject
> to liability for pecuniary loss caused to them by their
> justifiable reliance upon the information, if he fails to
> exercise reasonable care or competence in obtaining or
> communicating the information.

> (2) . . . . The liability stated in Subsection (1) is limited to loss suffered

> (a) by the person or one of a limited group of persons for whose benefit
> and guidance he intends to supply the information or knows that the
> recipient intends to supply it; and
> (b) through reliance upon it in a transaction that he intends the
> information to influence or knows that the recipient so intends or in a
> substantially similar transaction.

Restatement (Second) Torts § 552.

Under § 552, a duty arises only if there was privity between plaintiff and

defendant, or the defendant had a pecuniary interest in the transaction.  *First*

*Options of Chicago, Inc. v. Wallenstein*,  1994 WL 229554 at * 4 (E.D. Pa.1994).

"[T]he Pennsylvania Supreme Court, in adopting section 552 of the Restatement, did

not intend to eliminate the privity requirement for the maintenance of negligence

claims ...."  *In re Phar-Mor, Inc. Securities Litigation*, 892 F. Supp. 676, 693 (W.D.

Pa. 1995).  The negligent misrepresentation claim cannot serve as a basis for a third-

party to avoid the privity requirement of a negligence claim:

> In sum, we conclude that the negligent misrepresentation claims
> of plaintiffs are merely cloaked professional malpractice claims
> and that, under Pennsylvania law, privity is a requisite element
> to such claims.

*Phar-Mor*, 892 F. Supp. at 694.  "Pennsylvania's strict adherence to the privity rule would result in a ruling that negligent misrepresentation may not be used to plead professional negligence claims by persons not in privity with the professional defendant."  *PNC Bank, Kentucky, Inc.  v. Housing Mortgage Corp.*,  899 F. Supp. 1399, 1408 (W.D. Pa. 1994).

Even if privity is not a requirement under Section 552, the Restatement still limits an accountant's liability for negligent misrepresentation to those third parties who the accountant actually knows will receive the information, and then, only for transactions that are the same as, or substantially similar to, the ones the accountant actually knows will be influenced by the supplied information.  *Restatement (Second) of Torts* at § 552(2); *North American Specialty Insurance Company v. Lapalme*, 258 F.3d 35 (1st Cir. 2001).  "An accountant remains potentially liable in situations in which he actually knows that a third party recipient of his information will rely on that information in the course of a specific transaction, even though the transaction itself does not transpire as long as it is supplanted by a substantially similar transaction." *Id.* at 40.

In the *Lapalme* case the court required that the accountant have actual knowledge of the critical transactions, i.e., the issuance of the surety bonds on which the contractor defaulted.  The court also found that defaulted bonds were not transactions which were substantially similar to those that the accountants intended to influence.  The court found that without some evidence that the accountants knew

21

that they were undertaking "additional, open ended liability with respect to future

bonds by releasing the financial statement" there was no basis for liability under

Section 552.

> Simply because transactions are of the same general nature (e.g. "bonds") is
> not enough to render them substantially similar for purposes of the
> Restatement rule.  Any other conclusion would make a mockery of the basic
> premise that underbraces the Restatement rule: that an acquiescent
> accountant is only deemed to accept the risks of specific transactions that
> were made known to him in advance (or substantially similar ones).

*Id.* at 44.

Cases applying Pennsylvania law, in which liability has been imposed against

an accountant, have involved a situations where the accountant knew that the

information he was providing would be used for a specific transaction.  See *Williams

Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F. Supp. 2d 517,

(M.D. Pa. 1999).

A person is not a guarantor of the correctness of the statements he provides.

Rather, a person is liable for negligent misrepresentation only if "he has failed to

exercise the care or competence of a reasonable man in obtaining or communicating

the information."  Restatement (Second) of Torts § 552, comment on § 1 (e).  An

audit

> does not guarantee that a client's accounts and financial statements are correct
> any more than a sanguine medical diagnosis guarantees well-being; indeed,
> even an audit conducted in strict accordance with professional standards
> countenances some degree of calibration for tolerable error which, on occasion,
> may result in a failure to detect a material omission or misstatement.  Rather,
> the "objective of the ordinary examination of financial statements by the
> independent auditor is the expression of an opinion on the fairness with which

they present financial position, results of operations, and changes in financial position in conformity with generally accepted accounting principles." In other words, in issuing an opinion, the auditor certifies only that it exercised appropriate, not flawless, levels of professional care and judgment.

*In re IKON Office Solutions, Inc.*, 277 F.3d 658 (3d Cir. 2002)(citations omitted).

Proof of negligent misrepresentation depends on expert testimony or other evidence of a failure to exercise ordinary care. *Bortz v. Noon*, 729 A.2d at 563 (expert testimony or other competent evidence of appropriate care required to establish a breach of duty for a negligent misrepresentation claim). The standard of care in Pennsylvania malpractice cases is measured by the skill generally possessed and employed by practitioners of the profession. See *Incollingo v. Ewing*, 444 Pa. 263, 276 n. 6, 282 A.2d 206, 214, 444 Pa. 299 n. 5a (1971); *Smith v. Yohe*, 412 Pa. 94, 99, 194 A.2d 167, 170 (1963); *National Cash Register v. Haak*, 233 Pa. Super. 562, 335 A.2d 407 (1975). Expert testimony is required to establish the relevant standard and whether the defendant complied with that standard. *Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474 (3d Cir. 1979).   The plaintiff has the burden to present expert testimony to establish that the defendant's actions failed to meet the appropriate standard of care. *Gans v. Mundy,* 762 F.2d 338, 343 (3d Cir. 1985) (interpreting Pennsylvania law) *cert. denied* 474 U.S. 1010, 88 L. Ed. 2d 467, 106 S. Ct. 537 (1985); *Freeman v. Murray*, 163 F. Supp. 2d 478 (M.D. Pa. 2001). The requirement of expert testimony applies to malpractice actions against members of all professions. See *Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474 (3d Cir. 1979); *Powell v. Risser*, 375 Pa. 60, 65, 99 A.2d 454, 456 (1953).

23

Plaintiff must show that it justifiably relied on the 1997 and 1998 financial statements in order to establish its claim for negligent misrepresentation. *Bortz v. Noon,* 729 A.2d at 561. Justifiable reliance requires consideration of the relationship of the parties involved and the nature of the transaction.  See *Rempel v. Nationwide Life Ins. Co., Inc.*, 471 Pa. 404, 409, 370 A.2d 366 (1977).

**I.      Stipulations desired**.

None at this time.

**J.      Estimated number of trial days.**

Twelve.

**K.      Any other matter pertinent to the case to be tried.**

Defendants' have subpoenaed John Ortenzio for trial.  He has advised that he will be out of the country from October 13, 2003 through October 28, 2003.

**L.      Exhibit List**

Defendants' Exhibit List attached hereto as Exhibit A.  Defendants reserve the right to use any exhibit contained on plaintiff's exhibit list.

The parties have agreed as to the authenticity of the following categories of documents: Brown Schultz working papers for CCI; Brown Scultz Permanent and correspondence files for CCI; Audit Reports for CCI; Brwon Schultz working papers for PCIC; Brown Schultz Permanent File for PCIC; USF&G's underwriting files for CCI; Byerly Insurance Company Documents; Performance Evaluations of USF&G Personnel; Performance Evaluations of Brown Schultz Personnel; USF&G

Underwriting Manuals; St. Paul Underwriting Manuals; USF&G "Gray Letters";

USF&G Payment and Performance Bonds for CCI;  and Brown Schultz Accounting &

Auditing Quality Control Manual.  The parties are attempting to reach further

stipulations with regard to the exhibits.

**M.    Special Verdict Questions.**

Not applicable.

**N.    Defense Counsel Statement Regarding Local Rule 16.2.**

The individuals with settlement authority for the defendants  have been

notified of the requirements of local rule 16.2 and of the dates of the final pre-trial

conference and trial. Defendants request that those individuals be permitted to be

available by telephone for the pre-trial conference.

**O.    Certificate Under Local Rule 30.10**

Defendants do not anticipate using depositions or videotapes in their case and,

as such, it was unnecessary for the parties review depositions and/or videotapes in to

to eliminate irrelevancies, side comments, or resolve objections.

**P.    Defendants' Requested Findings of Fact and Conclusions of Law
Proposed Findings of Fact**

1.    The bonds which USF&G contends it issued in reliance on the
December 31, 1997 audit report are limited to:

| Project | Bond No. |
|---|---|
| Scott Air Force Base - Air Craft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 |
| Germplasm Center | 26-0120-28306-98-1 |

PA Turnpike-Kost Road 26-0120-40371-99-1
Central Administration Bldg.
Renovation

Outlook Point at Chesterfield 26-0120-28307-98-8

Outlook Point at Westerville 26-0120-28312-98-1

James River Juvenile 26-0120-08946-99-2
Detention Center

Va. Commonwealth Univ. 26-0120-08953-99-9
Life Sciences Building

2. The bonds which USF&G contends it issued in reliance on the December 31, 1998 audit report are limited to:

| Project | Bond No. |
|---|---|
| SR II Perry County-Excavation, Presplit Blasting | 26-0120-08953-99-9 |
| Cambria County State Route 22 | 26-0120-08959-99-7 |
| Bedford County State Route 30 | 26-0120-08963-99-4 |
| Summerdale Sitework Laboratory Centers for Excellence | 26-0120-08958-99-1 |
| Cool & Cold Aquaculture | 26-0120-08961-99-1 |
| Cool & Cold Aquaculture-Buried Process Water Lines | 26-0120-40396-99-3 |

3. Brown Schultz did not know the specific purpose for which USF&G intended to use the financial statements and did not have knowledge of the specific bonds underwritten by USF&G on CCI's behalf.

4. The CCI audited financial statements were not given by Brown Schultz to USF&G.

26

5.    Brown Schultz sent copies of the audited financials to CCI. CCI provided its audited financial statements to the bonding agent. USF&G received the financial statements from its agent.

6.    There was no contact or communication between USF&G and Brown Schultz.

7.    Brown Schultz was not informed about the specific bond transactions before it provided the financial statements.

8.    Brown Schultz did not issue its audit reports on the financial statements of CCI in connection with any specific bond.

9.    The CCI bond account came to USF&G through the Byerly Agency an independent agency through which USF&G marketed its business.

10.   Dave Dominiani of the Byerly Agency was agent for the CCI account.

11.   Dave Dominiani and James Byerly are and were accountants while they were involved with the CCI Construction bond program.

12.   When Mr. Dominiani left the Byerly Agency in or around 1998 to form DJL Associates, he continued as the agent for the CCI bond program.

13.   The relationship between CCI and USFG was formed after Fireman's Fund Insurance Company declined to underwrite a bond for CCI.

14.   At the time USF&G began its bonding program for CCI, the majority of CCI's revenues and receivables were the result of contracts entered into with Continental Medical Systems (CMS) for the construction of rehabilitation hospitals throughout the United States.

15.   During 1993 and 1992, CMS accounted for 71% and 83% of CCI's revenues respectively.

16.   CMS was controlled by John Ortenzio's father, Rocco Ortenzio.

17.   CCI was beginning to enter the hard bid market when USF&G began its bonding program for CCI.

18.   The individuals from USF&G involved in the underwriting of the CCI account included: Tony Phillips, the bond  manager of USF&G's

27

Harrisburg field office; Steve Salazar, senior underwriter in the
Harrisburg field office; Jim Daily, manager of the Northeast Surety
Division for USF&G; and David Hussey, the Director of the Northern
Division of USF&G's Surety Department.

19.   USF&G and its underwriting personnel were sophisticated users of
financial statements.

20.   Mr. Salazar, the senior underwriter in the Harrisburg field office, had
the authority to independently approve bonds up to $2,000,000.

21.   Above that amount, he needed the approval of Tony Phillips.

22.   Above Mr. Phillips' level of authority, bonds would be approved by Mr.
Daily.

23.   Salazar reviewed interim CCI prepared financial statements.

24.   Mr. Salazar reviewed the interim information to monitor the financial
condition of CCI during the year.  Mr. Salazar relied on the interim
financials to make underwriting decisions.

25.   CCI provided USF&G with CCI prepared, interim financial statements
on either a quarterly or bi-annual basis and either monthly or quarterly
work in process information.

26.   USF&G received Dun & Bradstreet reports on CCI.

27.   USF&G had annual meetings with the contractor and the bonding agent
to discuss the bonding program.

28.   The year end audited financial statements only reflected the financial
condition of the company as of the closing date for the statement.

29.   Each contract for which bonds were issued by USF&G was individually
underwritten.

30.   USF&G had no specific underwriting guidelines.

29.   There were no underwriting guidelines used for net worth in the 1990's.

31.   USF&G did not apply any specific underwriting criteria to the CCI bond

28

program.

32.   USF&G did not condition the bond program or the issuance of any bond for CCI on any specific financial condition criteria.

33.   There was no guideline used by USF&G to evaluate a contractor's cash position or profitability in connection with issuance of a bond program in the 1990's.

34.   Steve Salazar used  general underwriting guidelines of five percent (5%) working capitol and ten percent (10%) net worth to total work program.

35.   Tony Phillips was the bond manager for USF&G's Harrisburg field office.

36.   Tony Phillips' responsibilities included the overall underwriting of the CCI account plus supervising Mr. Salazar and was responsible for any recommendation made by Mr. Salazar on any bond liability on the account.

37.   It was significant in the underwriting process to know whether the source of a contractor's profit was from construction operations or from other sources.

38.   Mr. Phillips never fully reviewed and never analyzed the audited financial statements for CCI.

39.   Jim Daily's responsibilities in the 1990's included, among other things, the supervision of underwriting in the field offices.  In connection with that supervisory role, Mr. Daily would handle new account submissions and bond requests up to a certain limit of authority.

40.   With regard to bond requests over his limit of authority, Mr. Daily had to seek approval from his boss, David Hussey, to whom Mr. Daily reported.

41.   Mr. Hussey had final approval of USF&G's bond program for CCI.

42.   Mr. Hussey did not review any of the CCI year end financial statements audited by Brown Schultz.

43.   USF&G relied on representations from CCI management regarding

CCI's financial condition for the coming year in committing to bonding for CCI in January of 1999.

44.   By letter dated November 16, 1993, in response to questions raised by USF&G's reinsurers, Dave Dominiani, the bond agent, advised Tony Phillips of the following:

Footnote 9 specifies that in 1992 the company [CCI] incurred warranty insurance expense of $1,000,000 with Pennsylvania Contractors Insurance company (PCIC). Per Dave Barber, CFO, CCI took $1,000,000 from a very successful completed project, Wesley and funded their future warranty expense under PCIC. They did this primarily for tax planning purposes, but also to fund those future warranty expenses with current profits from a very successful project.

45.   The December 31, 1993 audited financials for CCI disclosed that PCIC was a corporation under common control and that CCI had incurred warranty insurance expense of $335,317 and $1,000,000 with PCIC for 1992 and 1993 respectively.

46.   On July 14, 1994, Steve Salazar requested information from the bond agent regarding significant profit fades on four jobs then in progress and thin margins on 8 of CCI's projects.

47.   On July 21, 1994 Dave Dominiani advised Steve Salazar that as of June 30, 1994, CCI would be showing a loss.

48.   Dominiani acknowledged that the gross margin on many of CCI's projects was "very thin."

49.   USF&G was aware in November, 1994, that interim financial statements prepared by CCI showed that CCI sustained a $500,000 loss for the first half of 1994.

50.   USF&G was also aware in November 1994 that CCI was projecting a loss of approximately $400,000 to $500,000 at year end.

51.   On December 28, 1994, Jim Daily expressed concern that CCI's liquid position was less than half of what it had been as of December 31, 1993 and that there were continuing profit fades on jobs.

52.   In late January, 1995, notwithstanding the loss sustained at mid-year and the projected loss at year end, USF&G issued bid bonds for the Altoona Railroad Memorial Museum, Shady Grove and Andrews Air Force Base Projects without having received the 12/31/94 financial statements audited by Brown Schultz.

53.   USF&G agreed at a 1/31/95 meeting with CCI to hold to a $100,000,000 program level.

54.   On April 19, 1995, USF&G's home office received the Brown Schultz audited financials for the year ended December 31, 1994.  The 1994 financials indicated a net loss of $317,000 and an operating loss of $864,663.  Working capital was $2,384,192 and equity was $4,290,336.

55.   In the Related Party Transactions footnote in the 1994 audited financial statements, it was disclosed that PCIC was a corporation under common control and that there were no warranty insurance costs incurred for 1994.  The footnote also disclosed that CCI had submitted a claim to PCIC of $397,800 in 1994 and that the claim was pending as of December 31, 1994.

56.   The 1994 audited financial statement and all of the audited financial statements thereafter through 1998, showed earnings from contracts before allocation of indirect costs. The amount of unallocated indirect costs was reflected in the financial statements and was used to determine the cumulative net profit from contracts.  The completed contracts and contracts in progress schedules show "gross profit before indirect costs" and contract earnings (accrued or earned) before indirect costs.

57.   USF&G never raised an issue about the presentation of earnings on contracts.

58.   The presentation of earnings on contracts without the specific allocation of indirect costs had no effect to the net profit on contracts amount reflected in the financial statements or any other amount important to USF&G in its underwriting for CCI bonds.

59.   In March 1996,  USF&G received the audited financial statements for the year ended December 31, 1995. The financial statement showed a small profit of $103,210 but a loss from operations of $308,362. Working capital was $4,183,681 and equity was $4,820,675.

60.   The related party transactions footnote disclosed that during 1994, CCI submitted a warranty insurance claim of $397,800 to PCIC, "a company owned by the sole shareholder. This claim was paid during 1995."

61.   The footnotes to the 1995 audited financials states:

Use of Estimates:

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Revenue and costs recognition:

. . . Because of inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates used will change in the near term.

. . . An amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.

62.   The May 3, 1996 Annual Review of CCI Construction prepared by Steve Salazar showed a Yellow Stress Score and a "Bear Flag F1 -Net Worth less than 10% of work program.

63.   On May 1, 1997, USF&G received a copy of the audit report for the year ended December 31, 1996.  The financial statement reflected net income of $363,124, and for the first time since 1993, an operating profit of $139,097, working capital in the amount of $4,641,702, and equity of $4,802,675.

64.   Steve Salazar's annual review of CCI dated May 1, 1997, again showed a yellow stress score as of March 1997 and the following bear flags: A20-gross profit fade factor is greater that 20% and M01-Equity less that 10% of total program.

65.    In August of 1997, Dominiani wrote to Tony Phillips advising that John
       Ortenzio wanted his personal indemnity on the Master Surety
       Agreement removed.

66.    Jim Daily agreed to the removal of the indemnity.

67.    On March 5, 1998, USF&G received the audited financials for the year
       ended December 31, 1997.  Income from operations was $350,000.

68.    The related party transaction footnote in the 1997 year end financial
       statement disclosed that PCIC was a corporation under common control
       and that CCI had incurred warranty expense of $825,000 with PCIC.

69.    On April 15, 1998, Steve Salazar prepared his annual review of the
       audited financial statement for 1997.  The annual review showed a
       yellow stress score and bear flags "A20-gross profit fade factor is greater
       than 20%" and "M01-Equity less than 10% of total program."

70.    On May 18, 1998 USF&G issued payment and performance bonds on
       the Scott Air Force Base project in the amount of $13,698,278.

71.    On June 16, 1998 USF&G issued payment and performance bonds on
       the Germplasm Center in the amount of $15,500,000.

72.    On June 24, 1998 USF&G issued payment and performance bonds on
       the Outlook Pointe at Chesterfield Project in the amount of $3,850,000.

73.    USF&G was advised on August 17, 1998, that  CCI sustained a
       $1,600,000 loss through June 30, 1998 and that CCI was projecting a
       $200,000 loss from operations at year end.

74.    USF&G was also advised by Dominiani that CCI could use PCIC as a
       buffer to offset losses or profit fades on certain jobs during any given
       year.

75.    On September 27, 1998 USF&G issued payment and performance bonds
       for the Outlook Pointe at Westerville project.

76.    On December 23, 1998,USF&G was advised of CCI's desire to bid on an
       upcoming $40,000,000 heavy highway project in joint venture with
       Fulkroad Construction.

77. On, January 5, 1999, prior to receipt of the audited financials for December 31, 1998, USF&G met with CCI and Dominiani to discuss the joint venture project.

78. Hussey, Dailey and Phillips were aware in 1998 that CCI was self-performing work it had previously subcontracted.

79. Daily believed that the change by CCI to self-performing work it had previously subcontracted was not a good idea.

80. CCI's change in business to self perform work which it had previously subcontracted was a genuine risk which concerned Daily.

81. Daily recommended to Hussey that USF&G not approve bonds for the Fulkroad project.

82. Hussey approved the bonds for the Fulkroad joint venture over Jim Daily's recommendation not to approve bonds for the project.

83. USF&G agreed to support the joint venture bid with CCI's portion of the bid being about $22,000,000.

84. In January 1999, USF&G agreed to handle the CCI account on a 3% working capitol and 5% net worth basis.

85. On January 7, 1999, USF&G issued payment and performance bonds for the James River Juvenile Detention Center in the amount of $5,589,900.

86. On January 15, 1999 USF&G issued payment and performance bonds on the VCU Life Sciences Building in the amount of $21,480,250.

87. By letter dated  March 1, 1999, Dominiani submitted the December 31, 1998 audited financial statement to Tony Phillips.  The audited financial statement showed that while  CCI had made a small profit of $59,015, working capitol decreased to $2.5 million and the company had an operating loss of $116,629.

88. The financial statement also showed underbillings had increased to $6,341,726 representing 36% of total current assets.

89. In 1997, underbillings were $1,072,281 and in 1996 underbillings were $37,663.

90.   This increase in underbillings reflected in the 1998 audited financial statement prompted no comment or investigation by USF&G.

91.   The 1998 audited financial statement indicated that PCIC had guaranteed a claim of $1,162,460.

92.   No inquiry was made by USF&G with regard to the claim guaranteed by PCIC.

93.   No Annual Review of the 12/31/98 financial statement was prepared as there had been for every prior year.

94.   On March 2, 1999 USF&G issued payment and performance bonds on SR II Perry County-Excavation, Presplit Blasting in the amount of $4,107,051.

95.   On June 14, 1999, USF&G issued payment and performance bonds for the Phase I Laboratory Center in the amount of $1,688,000.

96.   On June 15, 1999 USF&G issued payment and performance bonds on the Pennsylvania Turnpike Administration Building in the amount of $24,612,843.

97.   On June 24, 1999 USF&G issued payment and performance bonds on the Cambria County project in the amount of $835,299.

98.   On July 12, 1999, USF&G issued payment and performance bonds on the Cool & Cold Aquaculture project in the amount of $12,191,000.

99.   On July 27, 1999, USF&G issued payment and performance bonds on Contract #091091 - Bedford County in the amount of $514,976.

100.  The first analysis of the 1998 financial statements done by USF&G is dated August 20, 1999.

101.  The August 20, 1999 "Folder Exceptions Report" on the 1998 financials noted the account's status as "red" because of the following reasons: underbillings were greater than 50% of equity; the folder had five open claim files; equity was less than 10% of the total program; net quick assets was less than 5% of the total program, the debt to equity was greater that 3 to 1; underbillings were 120% of equity; notes payable were 104.9% of equity; and the indemnity agreement did not include the

owner/principal.

103.    On August 20, 1999 Steve Salazar recommended to and received approval from Jim Daily for a bid bond on a $20,000,000 road construction project.

104.    On August 30, 1999, Dave Dominiani reported that CCI reported that CCI had a loss of $900,000 through the first six months of 1999.

104.    On September 30, 1999, USF&G issued payment and performance bonds in the amount of $191,083 on the Cool and Cold Aquaculture project.

106.    On October 15, 1999, Tony Phillips reported that CCI was projecting a loss from operations of approximately $1.2 million.

107.    Plaintiff's auditor expert witness, Steve J. DeBruyn, is unable to determine or express an opinion about whether the results of the audit by defendants of the financial statement of CCI Construction for 1997 would have been different if additional audit procedures had been performed by defendants.

108    DeBruyn did not perform the additional audit procedures he suggest in his reports to determine whether such additional procedures would have altered the outcome of the audits by Brown Schultz.

109.    DeBruyn did not perform a re-audit of the CCI financial statements.

110.    Without a review or re-audit of the CCI records, it cannot be determined whether the additional procedures DeBruyn suggests should have been performed during the audit conducted by Brown Schultz would have altered the outcome of the audits.

111.    DeBruyn requested the CCI Construction records to perform the audit procedures to determine whether additional procedures would have altered the outcome of the audit and was told by USF&G the records were not available.

112.    The CCI Construction records were provided to and were in the possession of plaintiff.

113.    DeBruyn has no reason to believe the documents from which he derived

information used to develop adjustments to the financial statements existed when defendants performed the audit of the 1997 financial statements, or that the information reflected in those documents was known or available to defendants when they performed their audit of the 1997 CCI financial statement.

114. The proposed adjustments to the financial statements by DeBruyn were entirely based on information developed after the audits were completed and not information without regard for whether the information was known or available to defendants when defendants performed the audits.

115. DeBruyn did not determine the reason for the increased cost to complete for each contract in excess of the estimated cost to complete.

116. The reason for the difference between the estimated cost to complete reflected on the CCI financial statements and the actual cost to complete should be reflected in the CCI records.

117. Plaintiff's auditor expert witness did not review the CCI records.

118. Without the CCI records, DeBruyn is unable to determine the reason for the increased contract costs and whether the increased costs are attributable to conditions of which defendants were or should have been aware when they conducted the audit.

119. The financial statement is the representation of management of the company about the financial condition of the company and the audit report is the auditor's report about the results of the audit of the financial statements.

120. DeBruyn used information obtained subsequent to the audits by defendants to develop the proposed adjustments to the financial statements.

121. An auditor's report is issued in connection with historical financial statements that purport to present a financial position at a stated date and results of operations and cash flows for a period ended on that date.

122. The percentage of completion method of accounting requires a presumption that contractors generally have the ability to produce estimates that are sufficiently dependable to justify the use of the

percentage of completion method of accounting and that persuasive evidence to the contrary is necessary to overcome that presumption.

123.     The previous reliability of a contractor's estimating process is usually an indication of continuing reliability, particularly, if the present circumstances are similar to those that prevailed in the past.

124.     A profit fade (reduction in profit from the amount of profit previously predicted) is not, alone, indicative of a problem with job cost estimates or financial reporting by the contractor.

125.     Estimating is an integral part of a contractor's business activities and there is a necessity to revise estimates on contracts continually as the work progresses.  The fact that circumstances may necessitate frequent revision of estimates does not indicate that the estimates are unreliable for the purpose for which they are used, although results may differ widely from original estimates.  Because of the nature of the business, the contractor in the conduct of his business, may still find the estimates reasonably dependable.  Despite these widely recognized conditions, a contractor's estimates of total contract revenue and total contract costs should be regarded as reasonably dependable if the minimum total revenue and the maximum total cost can be estimated with a sufficient degree of confidence to justify the contractor's bids on contracts.

126.     Contractors, like all business enterprises, are exposed to numerous business risks that vary from contract to contract.  The reliability of the estimating process in contract accounting does not depend on the absence of such risks.  Assessing business risks is a function of users of financial statements.

127.     The audit relationship between Brown Schultz and CCI existed since at least as early as 1992.

128.     Defendants properly considered their experience with CCI Construction when performing their audit work.

129.     Sheri Phillips, the Chief Financial Officer of CCI Construction during the time at issue, was a competent accountant who understood construction industry accounting.

130.     The audit report of the CCI 1997 financial statement prepared by

defendants was peer reviewed.

131.    There were no criticisms by the peer reviewers about the audit by defendants of the CCI 1997 financial statement.

132.    The information relied upon by DeBruyn for his adjustments to the 1997 and 1998 financial statements was from CCI and was not audited, reviewed, or otherwise evaluated to determine the validity of the information.

133.    DeBruyn used a "look back" method, or a modification of the "look back" method to arrive at his proposed adjustments to the estimated costs to complete contracts in progress reflected in the 1997 and 1998 financial statements.

134.    The "look back" method utilizes information obtained subsequent to the event to determine the actual situation and is not a test of the reasonableness of the auditor's assessment of the financial information as of the audit.

135.    In arriving at his proposed adjustments to the 1997 and 1998 financial statements, DeBruyn used information obtained subsequent to the defendants' audits.

136.    The look back method is used by the Internal Revenue Service for tax related issues.

137.    There is no support in the accounting literature for the use of the "look back" method used by DeBruyn to derive the proposed adjustments to the 1997 and 1998 financial statements.

138.    DeBruyn is not aware of any instance in which the "look back" method was used to evaluate the propriety of the work performed by auditors of financial statements.

139.    DeBruyn was required to use the same audit procedures employed by, or which should have been employed by, defendants when testing the quality of the work performed by defendants.

140.    Defendants did not use, and were not able to use, the "look back" method during their audit of the estimated costs to complete contracts in progress since the data necessary for the "look back" method was not

available during the audit.

141.    DeBruyn did not limit his use of the "look back" method to data known to be available to defendants when defendants performed their audit work for CCI.

142.    The use of the "look back" method by DeBruyn resulted in proposed adjustments to the 1997 and 1998 financial statements based on data not available to defendants during defendants' audit of the CCI financial statements.

143.    The treatment of indirect costs was adequately disclosed in the financial statements.

144.    Plaintiffs auditor expert  did not determine whether the absence of allocation of the indirect costs to specific contracts was material.

145.    In the absence of a determination that the absence of allocation of the indirect costs to specific contracts was material, the absence of allocation of indirect costs to specific contracts by CCI Construction was not a basis on which an auditor could properly withhold an opinion on the financial statements.

146.    CCI made a claim under a Remedial Work Period Insurance Policy issued by PCIC to CCI with regard to the Mahanoy Prison Project.

147.    Insurance claims can properly be included as revenue on the financial statement if there is a legal basis for the claim.

148.    DeBruyn's belief that the guaranty amount should not have been included in revenue was based on his own lay, non-law trained determination that the insurance policy did not provide coverage for the claim presented.

149.    The insurance contract issued by PCIC to CCI provided coverage for remedial work.

150.    Warranty work is considered remedial work.

151.    The claim by CCI Construction under the PCIC insurance policy was for warranty related work.

152.   The claim by CCI under the PCIC policy was a covered claim.

153.   PCIC issued a guaranty to CCI for the payment of the full $1,162,000.

154.   The PCIC guaranty provided:

PCIC will guarantee the claim that was filed by CCI, in the
amount of One Million Two Hundred Thousand Dollars
($1,200,000), with the Department of General Services,
Commonwealth of Pennsylvania, for the project known as
Mahanoy State Correctional Institution, Frackville,
Pennsylvania. If the Department of General Services,
Commonwealth of Pennsylvania, fails to pay all or any part
of the subject claim, PCIC will pay the difference owing or
the full amount of the claim if no part of the claim is paid.

155.   The guaranty was a legally binding obligation without regard for the
interpretation of the insurance policy.

156.   It was not necessary for the amount to actually be received by the
company during the period for which the financial statement was issued
to properly include the amount in revenue on the financial statement .

157.   PCIC paid CCI Construction on the guaranty in full.

158.   Plaintiff's auditor expert witness, Mr. DeBruyn did not use the look back
method when considering the propriety of including the PCIC guaranty
in revenue on the 1998 financial statement.

159.   Whatever concern might have existed by the inclusion of the PCIC
guaranty in revenue was not a problem for underwriting if the amount
was paid in full to CCI Construction.

160.   The financial statement for 1998 specifically informed the reader in
footnote 8 that:

**8. Related party transactions**:

. . . . During 1997, the Company incurred warranty
insurance expense of $825,000 with Pennsylvania
Contractors Insurance Company, a corporation under
common control. These costs are allocated as a direct cost
of contracts. There were no such costs in 1998. . . .

41

In addition, Pennsylvania Contractors Insurance
Company has guaranteed a claim of $1,162,460 filed by the
Company with a contract owner.  If the owner fails to pay
all or any part of this claim, the insurance company will pay
the unpaid portion.

161.    Richard Farnsworth, plaintiff's underwriting expert, realized from
review of footnote 8 of the CCI 1998 financial statement that the
$1,162,000 was included in revenue on the 1998 financial statement.
Mr. Farnsworth stated:

I believe that the way the disclosure reads it's a guaranteed
claim of $1,162,000.  A reader of the financial report would
reasonably interpret that it was included in revenue.  If it
was not then it should certainly have been disclosed.  But I
believe that the way it's stated one could reasonably
conclude that it was included in revenue.

162.    The audits of CCI's financial statements for the years December 31,
1997 and 1998 performed by Brown Schultz are in compliance with
Generally Accepted Auditing Standards.

163.    CCI's financial statements for the years December 31, 1997 and
December 31, 1998 are in compliance with Generally Accepted
Accounting Principles.

**Proposed Conclusions of Law**

1.      There is: (1) no privity between USF&G and Brown Schultz; (2) Brown

Schultz had no pecuniary interest in the transactions at issue; and (3)

no other basis for a duty owed by Brown Schultz to USF&G.

2.      Brown Schultz did not intend for USF&G to rely on its audit report for

the December 31, 1997 CCI financial statement in connection with any

specific bond.

3.      Brown Schultz did not intend for USF&G to rely on its audit report for

42

the December 31, 1998 CCI financial statement in connection with any specific bond.

4.    The audit report for the December 31, 1997 CCI financial statement contains no misrepresentation of material fact.

5.    The audit report for the December 31, 1997 CCI financial statement contains no misrepresentation of material fact.

6.    Brown Schultz conformed with all applicable professional standards.

7.    USF&G did not rely, justifiably or otherwise, on the audited financial statements in connection with its decision to issue bonds to CCI.

8.    USF&G did not properly review, analyze or make use of the financial statements in its underwriting of the CCI bond program and in issuing specific bonds.

9.    USF&G disregarded the information in CCI's audited financial statements in connection with its underwriting of the bond program and in issuing specific bonds.

10.    USF&G did not properly underwrite CCI's bond program or the specific bonds it issued for CCI which was the proximate cause of USF&G's loss.

11.    USF&G was contributorily negligent.

12.    The adjustments to CCI's audited financial statements are not based on an accepted methodology or a reliable test of the proficiency employed by defendants under the circumstances presented at the time the audit

43

was performed.

Respectfully submitted,

SWARTZ CAMPBELL, LLC


BY:    s/Kathleen M. Carson
       Jeffrey B. McCarron
       Kathleen M. Carson
       I.D. Nos. 49416/47981
       1601 Market Street
       34th Floor
       Philadelphia, PA 19103

Dated: October 8, 2003

## CERTIFICATE OF SERVICE

I, Kathleen M. Carson, Esquire, counsel for defendants, Bruce J. Brown and

Brown, Schultz Sheridan & Fritz, hereby certify that a copy of Defendant's Pre-Trial

Memorandum, was served upon all counsel listed below by U.S. regular mail and

postage prepaid and via overnight mail on October 8, 2003

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA 17101

Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA 02110

s/ Kathleen M. Carson
Kathleen M. Carson

Date: October 8, 2003