UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | |
|---|---|
| _____ <br> ) <br> UNITED STATES FIDELITY AND ) <br> GUARANTY COMPANY, ) <br> ) <br> Plaintiff ) <br> ) <br> v. ) <br> ) <br> BRUCE J. BROWN and BROWN ) <br> SCHULTZ SHERIDAN & FRITZ, ) <br> ) <br> Defendants. ) <br> _____) | CIVIL ACTION NO. 1:01-CV-00813 <br><br> JUDGE CONNER |

**UNITED STATES FIDELITY & GUARANTY
COMPANY'S PRETRIAL MEMORANDUM**

Pursuant to Local Rule 16.6, United States Fidelity & Guaranty Company ("USF&G")

submits the following as its mandatory pretrial memorandum:

Date conference was held by counsel: October 3, 2003.

**A.      Jurisdictional Statement**

Jurisdiction obtains pursuant to 28 USC §1332, as the plaintiff, USF&G, and defendants,

Bruce J. Brown and Brown Schultz Sheridan & Fritz (collectively, "Brown Schultz"), are

citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00.

Venue obtains pursuant to 28 USC §1391(a) as Bruce J. Brown and Brown Schultz have a

principal place of business in the Middle District of Pennsylvania.

**B.      Summary of Facts and Contentions as to Liability**

USF&G, a performance and payment bond surety to CCI Construction Co. ("CCI"), seeks to recover damages which it has sustained as a result of its extension of surety credit and the issuance of construction surety bonds to CCI in reliance upon audited financial statements prepared by Brown Schultz that contain misrepresentations, omissions and/or inaccurate information.

In preparing certain unqualified audit reports, Brown Schultz fell far short of the level of care and diligence expected of a certified public accountant and that such lack of due care resulted in material misstatements in the audited financial statements prepared by Brown Schultz for CCI for the years ended December 31, 1997 and December 31, 1998. The expected evidence will show that the financial statement for the year ended December 31, 1997 incorrectly represented that CCI produced a net profit of $706,879.00 when, in fact, *CCI actually lost $109,801.00*. In a similar, but more significant vein, the expected evidence will show Brown Schultz' audited financial statement for CCI for the year ended December 31, 1998 incorrectly showed that CCI produced a profit of $59,041.00 *when it actually lost $3,067,467.00*.

<u>USF&G Establishes A Bonding Program For CCI</u>

CCI became a USF&G account in late 1993. At that time, CCI and its management team enjoyed a very good reputation and had previously been bonded with Fireman's Fund Insurance Company, a large top-tier national surety company. CCI's net worth as of December 31, 1998 was $4.1 million.

As a condition of the establishment and the annual renewal of CCI's bonding program and the issuance of the payment and performance bonds to CCI, USF&G required that CCI furnish to it annually an audit report prepared by an independent certified public accountant

consisting of, *inter alia*, an audit of CCI's balance sheet and income statement and the financial status of the contractor's completed contracts and its work in progress.

CCI's bonding program consisted of a $15 million per project limit and a $75 million aggregate limit. CCI had a total annual revenue of approximately $48.2 million when the bonding program was established in 1993. This bonding program remained in effect until approximately early October 1999, when USF&G ceased writing bonds for CCI.

<u>Brown Schultz Knew That USF&G Would Receive And Rely Upon Its Audit Reports</u>

As the long time auditor of CCI – as well as other entities owned by CCI's President, John Ortenzio ("Ortenzio"), and his family – Brown Schultz was familiar with CCI's business operations and its financial condition. Brown Schultz also knew that the audited financial statements it prepared for CCI would be provided to CCI's bonding company, which at the times material and relevant to this action, Brown Schultz knew to be USF&G and St. Paul. Brown Schultz' working papers show that the audits were done for the benefit of CCI's "bonding company," which they identify as USF&G and St. Paul.

Brown Schultz also knew that USF&G would rely upon its audited financial statements to determine whether to extend, suspend, cancel or modify the bonding program which USF&G established for CCI and to issue payment and performance bonds to CCI.

Not only did Brown Schultz know that USF&G would receive and rely on its audited financial statements, Brown Schultz also considered USF&G's intended use of the financial statements in designing its audit plan for CCI. Brown Schultz' working papers show that Brown Schultz was aware that because the audited financials would be used by USF&G, there was a risk of an "overstatement" of the financials by CCI's management. Brown Schultz' working papers also indicate that bonding companies "expect favorable financial statements."

- 3 -

The evidence adduced at trial will demonstrate that USF&G has standing to sue Brown Schultz pursuant to the requirements of Restatement (Second) of Torts §552.

<u>Relying Upon The Audits Prepared By Brown Schultz, USF&G Issues Bonds To CCI</u>

Brown and Brown Schultz prepared audited financial statements for CCI since at least 1992, including audited statements for the years ended December 31, 1997 (the "1997 Audit Report") and December 31, 1998 (the "1998 Audit Report") (collectively, the "Audited Financial Statements").

On March 3, 1998, USF&G received a copy of the 1997 Audit Report.  In reliance upon that audit, USF&G agreed to continue the $15 million/$75 million bonding program for CCI.  Thereafter, USF&G issued payment and performance bonds to CCI for numerous projects, including the following:

|   | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---------|-------------|----------|-----------|--------------|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $15,647,035.00 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $7,220,942.00 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $3,919,156.00 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $5,591,730.00 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $18,880,298.00 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $21,927,111.00 |

On March 2, 1999, USF&G received a copy of the 1998 Audit Report and in reliance upon that audit, USF&G agreed to continue the $15 million/$75 million bonding program for CCI.  Thereafter, USF&G issued payment and performance bonds to CCI for numerous projects, including the following:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $514,976.00 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $835,299.00 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $1,688,139.00 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $191,083.00 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $12,191,000.00 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $4,126,478.00 |
| E. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $28,231,945.00 |

*Based upon the Brown Schultz audited financial statements for 1997 and 1998*, CCI's equity levels were well in excess of $4.8 million; in 1997, CCI's net equity was approximately $5,455,000.00 and in 1998 it was approximately $5,250,000.00. The financial condition of CCI as represented in the Audited Financial Statements was more than adequate to support continuation of the established bonding program. The real financial picture, unfortunately, was markedly different. Had CCI's true financial condition been revealed in those audit reports, USF&G would not have issued bonds for the delineated 13 projects.

## USF&G's Underwriting Of The CCI Account

Following USF&G's receipt of the Audited Financial Statements each year, USF&G's underwriters began the task of reviewing and analyzing each statement. From 1993 through 1998, Anthony S. Phillips ("Phillips"), a 32 year veteran underwriter handling several of St. Paul's major accounts, personally read each statement and performed a basic analysis of each statement relative to CCI. Phillips served as USF&G's and then St. Paul's surety bond underwriting manager in charge of USF&G/St. Paul's Harrisburg, Pennsylvania office. However, it was the job of Steven Salazar's ("Salazar"), the other underwriter in the Harrisburg office, to perform a more detailed analysis, which would then be reviewed by Phillips and James

Daily ("Daily"), the senior bond underwriter for USF&G and St. Paul in Baltimore, Maryland. As CCI was a "Home Office" account, Daily had the final authority regarding underwriting decisions. Daily has been a surety bond underwriter for approximately 38 years. He has been employed by USF&G and St. Paul for approximately 23 of those years.

Salazar's overall analysis of CCI, including his analysis of the Brown Schultz audited financial statements, was memorialized annually in a document entitled "USF&G Interoffice Correspondence" ("Interoffice Correspondence"), which detailed the information contained in the Brown Schultz audited financial statements as well as other information, such as CCI's banking relations, insurance coverages, and recommendations concerning CCI's bonding program. No Interoffice Correspondence was prepared by Salazar for 1998 as the financial information obtained from the Brown Schultz audit report was entered for that year into a relatively new software program at USF&G known as the Electronic Credit File ("ECF"). Salazar, Phillips and Daily reviewed and analyzed the 1998 Audit Report shortly after receipt on March 2, 1999.

The Audited Financial Statements appeared to be well-presented and, on their face, they did not reveal any defects in the manner in which Brown Schultz audited CCI's balance sheet. During the time when USF&G was issuing bonds for CCI, Daily received no information from any sources that would have led him to conclude that the financial information contained in the Audited Financial Statements was inaccurate or misleading.

As each Interoffice Correspondence demonstrates, USF&G's Harrisburg, Pennsylvania office recommended a continuation of the $15 million/$75 million bonding program for CCI. Indeed, throughout CCI's bonding relationship with USF&G, those bonding capacity limits continued year-to-year although, on a few occasions, USF&G approved bonds which temporarily

increased CCI's bonding capacity beyond $75 million. Those "spikes" (as they are known in the surety industry) in CCI's bonding program were short-lived since CCI worked off its backlog, thereby reducing the aggregate limit of the bonding program to approximately $60 million. Also, on a very few occasions, USF&G approved a spike in CCI's single limit bonding program to allow CCI to accept a project larger than $15 million. This was only done after considering both the facts and circumstances of the project and the financial position of CCI. The analysis of CCI's financial position was based, in large part, on the Audited Financial Statements. During the period from 1997 until USF&G/St. Paul ceased writing bonds for CCI in early October 1999, USF&G only approved four jobs that were larger than the $15 million single limit portion of the bonding program.

During the time when USF&G was writing bonds for CCI, USF&G did not have any specific, formal, underwriting guidelines for its bonding accounts. Rather, USF&G relied upon a series of documents issued by USF&G's home office known as "gray letters," as well as an underwriting training manual. The "gray letters" and the manual provided general guidance on the types of information USF&G should be obtaining from its contractors (such as, for example, obtaining an audited financial statement each year) and general guidance on underwriting methods and procedures. However, with respect to CCI and other USF&G accounts of a size similar to CCI, USF&G generally wanted the accounts to maintain a working capital-to-bonding capacity ratio of 3% or better and a net worth-to-bonding capacity ratio of 5% or better. "Working capital" is the dollar amount obtained when current liabilities are subtracted from current assets and "net worth" is determined by subtracting all liabilities from all assets. Based upon the Audited Financial Statements, CCI maintained the 3%-5% ratios described above,

except on limited occasions when USF&G approved a bond which temporarily increased CCI's bonding capacity beyond $75 million.

USF&G would also receive an unaudited interim financial statement prepared internally by CCI (generally for the first six months of each year), as well as certain internally prepared work-in-progress schedules which were received quarterly. These work-in-progress schedules detailed how CCI's incomplete construction projects were performing. Although these interim reports from CCI were important, they were not nearly as important as the audited financial statements prepared by Brown Schultz each year. USF&G would compare the interim financial statements with the Audited Financial Statements issued before the interim statements, as well as the Audited Financial Statements issued after the interim financial information had been received. This comparison was important when CCI experienced profit fades or losses on any of its projects. In those circumstances, USF&G reexamined the Audited Financial Statements issued before the interim financial statement to determine among other things whether the profit fades or losses were new occurrences or represented continuing losses on contracts in progress. USF&G also used the prior Audited Financial Statements to compute what CCI's cash and equity positions would be if such profit fades or losses continued. Almost every aspect of USF&G's underwriting process relied upon the then most recently issued Audited Financial Statement as a basis for comparing CCI's profitability, net worth, and ability to perform work. The information gleaned from the Audited Financial Statements was an integral part of USF&G's underwriting analysis for CCI. It also served as an indicator of the credibility of internally prepared information being received from CCI and its management. Evidence to be adduced at trial will demonstrate not only that USF&G's underwriters actually and substantially

relied upon the Audited Financial Statements, but that such reliance is the common and accepted industry practice.

## USF&G Issues CCI's Last Bond

On or about August 30, 1999, Phillips received a letter from Dominiani reporting that CCI had sustained a loss of approximately $900,000.00 during the first six months of 1999 due to certain problem projects. In that letter, Dominiani advised Phillips that CCI anticipated losing approximately $1 million in 1999.

Upon Phillips' receipt of the foregoing information from Dominiani, he requested a meeting with CCI management to ascertain exactly what problems CCI was experiencing. The only bond issued by USF&G thereafter was a very small bond in the penal sum of $191,083.00 for the Cool & Cold Aqua project. This was a bond related to the same project as to which USF&G issued a $12 million bond on or about July 12, 1999. In early October 1999, all further bonding by USF&G of CCI was suspended. No further bonds were ever issued to CCI by USF&G.

## CCI Defaults And USF&G Incurs Heavy Losses Under The Bonds Issued To CCI

On or about October 1999, CCI advised USF&G that it lacked the financial resources to continue its operations and, consequently, would not be able to complete its work and pay its suppliers and subcontractors relative to the projects bonded by USF&G. This came as a shock to USF&G. *The Audited Financial Statements gave no indication of CCI's financial troubles.* Likewise, USF&G underwriters knew of no serious problems that would have indicated CCI's financial collapse in the fall of 1999. Subsequent financial information provided by CCI and the

testimony of knowledgeable individuals will also prove that CCI's eventual collapse cannot be blamed on any single catastrophic or intervening event.

Subsequently, USF&G, as the surety for the payment and performance bonds which it issued for the Projects, was required to and did expend substantial sums satisfying the claims of CCI's unpaid vendors, employees and subcontractors, and in completing the projects USF&G bonded on behalf of CCI.  The evidence adduced at trial will show that in light of the conditions extant, USF&G acted with reasonable business judgment to mitigate the extent of its losses by satisfying claims and completing projects in a professional and rational manner.  In that the only agreement of indemnification which USF&G had relative to the bonds issued on behalf of CCI was one obtained from CCI – a bankrupt company – USF&G was particularly motivated to pay claimants and complete projects in as efficient and economical a manner as it could consistent with its obligations as a surety.

In February 2000, CCI closed business operations and in May 2000, it filed for bankruptcy protection.

<u>The Audit Reports Were Inaccurate and Contained Material Misinformation</u>

<u>The Audited Financial Statements</u>

Generally Accepted Auditing Standards ("GAAS") comprises the standards and procedures which must be followed in the planning, preparation and issuance of an audit report by a Certified Public Accountant.  One of the primary objectives of an audit is to identify high-risk audit areas and to plan the audit procedures accordingly.

As noted below, Brown Schultz' workpapers identified high-risk characteristics in CCI and in CCI's individual construction contracts.  *However, Brown Schultz' audit plan working papers for 1996, 1997 and 1998 were virtually identical to each other and did not reflect any*

*consideration or additional testing procedures for any of the increased audit risks inherent in the CCI audit engagement.* Further, the actual audit work performed by Brown Schultz for the fiscal years ended December 31, 1996, 1997 and 1998 did not change significantly from year to year.

The primary objective of the construction contractor auditor is to determine the level of reliance that can be placed on the contractor's estimated costs to complete the project. It is the auditor's job to perform sufficient testing and analysis to determine whether the contractor's estimates of its costs and profits is sound and reasonable. In light of the profit fades on a number of CCI projects from 1996 to 1997 and 1997 to 1998, Brown Schultz was required under GAAS to, at minimum, test the reliability of CCI's estimates and its costs to complete contracts in progress and estimated profits thereon. Brown Schultz utterly failed to do so. Rather, Brown Schultz engaged in the practice of "conversational auditing;" to wit, if management said the estimates were good, no further inquiry was made. Needless to say, such practices are antithetical to the professional responsibilities of an auditor and utterly negate the role of auditors as "public watchdogs." *See, United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984).

There were inadequate audit procedures performed by Brown Schultz in such important areas as CCI's contracts-in-progress generally and, specifically, the design and implementation (or the lack) of substantive audit procedures in connection with accumulated costs and estimated costs to complete of CCI's contracts. Despite the existence of numerous risk factors, Brown Schultz placed undue reliance on CCI management's verbal assertions with respect to costs-to-complete, estimated profits on the CCI contracts and the expected turnaround of problem projects. The determination of the accuracy of the accumulated costs to date and the estimated costs-to-complete is critical to contractors like CCI using the percentage of completion method of accounting.

In general, Brown Schultz' audit planning and its audit procedures fell below those applicable standards of care of a certified public accountant performing an audit of CCI's financial statements.  In particular, some of the material ways in which Brown Schultz failed to conform its audit work for CCI are as follows:

- GAAS requires all auditors to exercise "due professional care…in the performance of the audit and the preparation of the report."  SAS No. 1, AU Section 230.  Included in the foregoing section is a requirement that the auditor exercise professional skepticism.  Based upon a review of Brown Schultz audit working papers for the years 1997 and 1998 and the audit reports for those years, Brown Schultz failed to act with sufficient professional skepticism and was not diligent in evaluating audit evidence;

- GAAS also requires that audit field work must be "adequately planned and properly supervised."  SAS No. 22, AU Section 311.  As noted above, Brown Schultz' planning documentation for the audit reports for 1997 and 1998 remain virtually *unchanged*, despite the fact that CCI had experienced significant growth in those years, was self-performing more work and had exhibited significant profit fades on a number of jobs;

- Brown Schultz also failed to properly address the risks involved in the audit of CCI and, consequently, Brown Schultz did not modify or change its audit procedures or its approach to the audit work for CCI.  SAS No. 1, AU Section 230 and SAS No. 22, AU Section 311; and,

- Brown Schultz limited its testing of, among other things, accumulated job costs, subcontractor costs and subsequent disbursement of job costs.  Accordingly, Brown Schultz failed to insure during its performance of audit field work for CCI that "sufficient

competent evidential matter . . . was obtained . . . ."  SAS No. 31, AU Section 326.

Additionally, it is worth noting that leading commentators have stated an auditor is well

advised when auditing a construction firm to perform adequate job-cost testing and

percentage – of – completion estimates.  O'Reilly, Hirsch, Defliese & Jaenicke,

*Montgomery's Auditing*, p. 821 (Wiley, 11th ed. 1990).]

Brown Schultz' Inappropriate Recording And Inadequate
Disclosure Of Related-Party Transactions Between PCIC And CCI

PCIC was a captive insurance company owned by Ortenzio registered in the Turks and

Caicos Islands, British West Indies.  Brown Schultz performed the audit and tax work for PCIC

since its formation on or about 1992.  According to applicable accounting standards, PCIC was a

related party to CCI.  *See* SAS No. 57, Related Party Disclosures, March 1982.

The Mahanoy Prison Claim was, in the main, a claim for increased expenses and costs

allegedly incurred by CCI attributable to *owner-caused delays and unusually severe winter*

*conditions*.  The written claim filed by CCI with the Commonwealth of Pennsylvania for

$1,162,460.00 states that it is for the following 3 "impacts":  (1) "extensions of time"; (2)

"acceleration, lost productivity and other delays"; and (3) "unforeseen winter construction."

None of the delineated "impacts" are normally considered remedial or warranty work.

The Mahanoy Prison Claim was purportedly covered by an insurance policy issued by

PCIC.  However, *the insurance policy issued by PCIC is limited to remedial work claims*.  In

fact, it is entitled "Remedial Work Insurance Policy."  The PCIC policy also contains a detailed

set of procedures which must be followed as part of the insurance claims resolution process.

Additionally, it is worth noting that in 1998, PCIC paid CCI $900,000.00 on two "remedial work

claims" related to the Mahanoy Prison Project.  $448,000.00 was paid purportedly because CCI's

masonry subcontractor – Johnson Masonry, Inc. – defaulted.  $452,000.00 was paid purportedly

because CCI's mechanical work "was impacted as a result of union issues and default of [its] sheet metal fabricator."

As appears in Brown Schultz' working papers, PCIC issued a Guaranty Agreement dated December 1, 1998 in the amount of $1,200,000.00, which purports to guarantee full payment of a claim in the amount of $1,161,448.63 which CCI had asserted against the Commonwealth of Pennsylvania on Job Number 439, Mahanoy Prison (the "Mahanoy Prison Claim"). Sometime thereafter, a new Guaranty Agreement, backdated December 1, 1998 was executed in the amount of $1,162,460.00, the exact amount of the Mahanoy Prison Claim submitted to the Commonwealth of Pennsylvania. Why the Guaranties were needed – particularly in light of the existence of a putatively valid insurance policy – has never been adequately explained by Brown Schultz. Additionally, the harried creation of the two Guaranties so close to the end of the fiscal year is, as will be seen at trial, more than a little curious.

Furthermore, Footnote 8 to the 1998 Audit Report provides that the Mahanoy Prison claim had been guaranteed by PCIC. However, *neither Footnote 8 nor anything else in the 1998 Audit Report contained any information indicating that the Mahanoy Prison claim had already been* <u>*included as revenue*</u> *for CCI in 1998.* Unfortunately, USF&G learned only *after* CCI's bankruptcy filing that the full amount of CCI's Mahanoy Prison claim had been included as revenue and as an underbilling in the 1998 Audit Report.

The CCI claim of $1,162,460.00 did not meet the recognition standards for *revenue* set forth in AICPA Technical Aids, Statement of Position ("SOP") 81-1, Accounting for Performance of Construction-Type and Certain Production-Type Contracts, July 15, 1981. SOP 81-1, par. 65 states that recognition of additional contract revenue relating to claims is appropriate only when it is "probable" the claim will result in additional revenue and the amount

can be reliably estimated.  However, in purportedly satisfying those requirements, Brown
Schultz failed to document any evidence that:

      1)    There was a legal basis for the claim or a legal opinion had been obtained (SOP
81-1 par. 65 a); and

      2)    The evidence supporting the claim was objective and verifiable and not based
upon management's "feel" for the situation or on unsupported representations (SOP 81-1 par. 65
d).

      *The working papers for the 1998 Audit Report utterly failed to provide any support for
contention that there was a "legal basis for the claim or a legal opinion had been obtained," a
necessary prerequisite to the inclusion of such sum as revenue*.  There is no indication that
Brown Schultz obtained any expert opinions that, *inter alia*, the claim asserted against the
Commonwealth of Pennsylvania for various delays was covered by the Remedial Work
Insurance Policy or that even if, *arguendo*, the coverage issue was determined in CCI's favor,
that all other pertinent terms and conditions of the Remedial Work Insurance Policy or the
Guaranty had been met.

      Further, even if, *arguendo*, a rational reason for guaranteeing a claim already purportedly
covered by an insurance policy exists – and none has been proffered by Brown Schultz – the
Guaranty Agreement executed by PCIC in favor of CCI and suspiciously dated less than a month
before the close of CCI's books for the year ended December 31, 1998 simply does not support
the recognition of $1,162,460.00 in revenue for CCI for the year ended December 31, 1998, as
recorded in the 1998 Audit Report.

      Because the PCIC Guaranty was recorded by Brown Schultz as revenue, the recording
and disclosure of the third-party transaction involving PCIC and CCI in the 1998 Audit Report

was materially misleading to users of that report.  Further, the PCIC transaction was recorded as an "underbilling" instead of as a separate line item on the balance sheet clearly denoted as being a related party transaction.  *The result was a material misstatement in the 1998 Audit Report as $1,162,460.00 was incorrectly reported as revenue in 1998 and its disclosure in Footnote 8 failed to clearly point that out.*  The removal of this misplaced sum from revenue would turn a company that otherwise appeared to be a healthy company into what any competent reviewer of the 1998 Audit Report would characterize as "dead man walking."  Had USF&G's underwriters known of this deception, the bonding program would have been promptly terminated.

USF&G will introduce testimony that its underwriters believed that Footnote 8 in the 1998 Audit Report merely meant that if CCI did not receive a payment of all or a portion of the claim asserted by CCI relative to the Mahanoy Prison, PCIC would guaranty payment of the unpaid portion at some indeterminate time in the future.  USF&G never understood that the full amount of the Mahanoy Prison Claim was included as *revenue* in the 1998 Audit Report.  Additionally, USF&G will introduce testimony both from an underwriter and its expert as to the importance of the revenue and underbilling sections of a financial statement.  A more appropriate disclosure – which would have eliminated any confusion and comported with GAAS – would have been for CCI to report the transaction as a separate line item on the balance sheet of CCI, indicating that it was specifically guaranteed by a company owned by the sole stockholder of CCI.  This is particularly true in light of the same Footnote 8 providing, *inter alia*, that "[d]uring 1998, two insurance claims for contract losses incurred of $900,000.00 were *paid by* [PCIC]. These claims were covered under the terms of a remedial work period insurance policy."

The inappropriateness and misleading nature of the erroneous revenue recognition in the 1998 Audit Report is not assuaged by any payments made by PCIC or by Ortenzio in *subsequent*

fiscal years.  Brown Schultz' averment that the misleading and detrimental effects of the improper recognition of revenue was nullified by payments purportedly made by PCIC in 1999 fails to address the one germane issue; to wit, why was $1,162,460.00 included *in revenue as an underbilling*, contrary to the dictates of SOP 81-1 and SAS 57 and without either an appropriate footnote or other method being used to alert those relying on the 1998 Audit Report?  Likewise, the PCIC Guaranty and the limited disclosures made in Footnote 8 are little more than "red herrings" intended to divert attention from the misleading nature of the revenue and underbilling totals contained in the 1998 Audit Report.

USF&G's Damages

As discussed in greater detail in Section D, *infra,* USF&G avers that it has suffered losses in excess of $25,000,000.00 relative to payment and performance bonds issued in reliance upon faulty audit reports prepared by Brown Schultz.  As discussed, *infra*, USF&G issued bonds for 13 projects based on the rosy financial picture painted by the Audited Financial Statements.  Of course, it is now known that the 1997 Audit Report incorrectly represented that CCI produced a net profit of $706,879.00 when, in fact, it actually lost $109,801.00.  The 1998 Audit Report incorrectly showed that CCI produced a profit of $59,041.00 when it actually lost $3,067,467.00.  USF&G's underwriters unequivocally agree that they would not have continued CCI's bonding program had CCI's true financial condition been known.

The factual basis for USF&G's claims and its contentions as to liability will be addressed in greater detail in United States Fidelity & Guaranty Company's Trial Memorandum to be filed in accordance with Local Rule 39.7.

**C.     Statement of Undisputed Facts As Agreed To By Counsel[1]**

1.     At all times material and relevant to this action, USF&G was in the business of issuing payment and performance bonds on behalf of contractor and subcontractor principals engaged in the performance of work on public and private construction projects.

2.     CCI was a contractor engaged in construction work on public and private construction projects and maintained principal offices in Camp Hill, Pennsylvania.

3.     John Ortenzio ("Ortenzio") formed CCI, formerly known as Commercial Construction Company, in 1983.  Prior to CCI's formation, Ortenzio had obtained a BS degree in Business Management and had worked in the construction industry since 1979.

4.     Incidental to the underwriting process, Ortenzio provided USF&G with an organization chart and resumes of the key officers and employees.

5.     CCI's job experience from its inception up to 1993-1994 was primarily in private, negotiated construction of medical and healthcare buildings, predominately for one owner, a large publicly traded corporation headed by Ortenzio's father, Rocco Ortenzio.

6.     At the time USF&G began its bonding program for CCI, the majority of CCI's revenues and receivables were the result of contracts entered into with Continental Medical Systems for the construction of rehabilitation hospitals throughout the United States.

7.     Continental Medical Systems was controlled by John Ortenzio's father, Rocco Ortenzio.

---

[1] USF&G notes that it sent approximately 62 proposed stipulations to Brown Schultz' counsel on September 26, 2003 in the hope that this matter could be addressed prior to the meeting of counsel scheduled for October 3, 2003. USF&G not only sought comment on its proposed stipulations but requested that Brown Schultz promptly deliver any proposed stipulations it wanted to discuss.  No response to this issue was received from Brown Schultz until the meeting of counsel on October 3, 2003.  At that meeting, USF&G was presented with 154 proposed stipulations from Brown Schultz.  That afternoon, Brown Schultz & USF&G e-mailed to each other the proposed stipulations so that it would be easier to make edits.  On October 7, 2003, USF&G sent a letter to Brown Schultz regarding which of the stipulations on Brown Schultz' list were acceptable.  USF&G did not receive any response to its stipulations until the morning of October 8, 2003.  Regardless of Brown Schultz' actions, USF&G remains amenable to discussing the possibility of further stipulations.

8.      Its business plan included entry into the public bid market.

9.      In 1994, Ortenzio was named "Entrepreneur of the Year" by the Central Pennsylvania Business Journal.

10.     At all times material and relevant to this action, Brown Schultz and its staff have been engaged in business as independent Certified Public Accountants.

11.     Brown Schultz is one of the largest regional firms in central Pennsylvania with offices in Harrisburg and Lancaster and claims to have extensive experience in, among other fields, construction and insurance.

12.     Bruce J. Brown is one of the founding principals and is Chief Executive Officer of Brown Schultz Sheridan & Fritz.

13.     Pennsylvania Contractors Insurance Co. ("PCIC") is a captive insurance company formed, in part, for tax planning purposes and to fund the cost of performing warranty work on construction projects in accordance with the policies of insurance it issued.

14.     PCIC is wholly owned by CCI's sole stockholder, Ortenzio.  Ortenzio is also President of both PCIC and CCI.  PCIC was incorporated in the Turks & Caicos Islands and PCIC shared a business address with CCI in Pennsylvania.  PCIC is no longer operational and is in the process of being liquidated.

15.     Since the inception of PCIC, Brown Schultz prepared tax returns and audited financial statements for PCIC.

16.     Many owners of public construction projects require their contractors to provide payment and performance bonds.

17.     CCI became a USF&G account in late 1993.  CCI had previously been bonded by Fireman's Fund.

18.     The individuals from USF&G involved in the underwriting of the CCI account included: Tony Phillips, the bond manager of USF&G=s Harrisburg field office; Steve Salazar, senior underwriter in the Harrisburg field office; Jim Daily, manager of the Northeast Surety Division for USF&G; and David Hussey, the Director of the Northern Division of USF&G=s Surety Department.

19.     In connection with the establishment and the annual extension of CCI's bonding program and the issuance of the payment and performance bonds to CCI, USF&G received annually an audit report regarding CCI's financial statement.

20.     CCI provided USF&G with CCI prepared, interim financial statements on either a quarterly or bi-annual basis and either monthly or quarterly work in process information.

21.     USF&G received Dun & Bradstreet reports on CCI.

22.     USF&G had annual meetings with the contractor and the bonding agent to discuss the bonding program.

23.     It was significant in the underwriting process to know whether the source of a contractor=s profit was from construction operations or from other sources.

24.     Ortenzio executed the Master Surety Agreement dated August 29, 1995.

25.     In August of 1997, Dominiani wrote to Tony Phillips advising that John Ortenzio wanted his personal indemnity on the Master Surety Agreement removed.

26.      Jim Daily agreed to the removal of the indemnity.

27.     As the long term auditor of CCI – as well as other entities owned by Ortenzio and his family – Brown Schultz was familiar with CCI's business operations and its financial condition.

28.     Brown Schultz was aware of the bonding program by USF&G and that CCI may provide its audit reports concerning the financial statements of CCI to USF&G.

29.     On September 27, 1998 USF&G issued payment and performance bonds for the Outlook Pointe at Westerville project.

30.     On January 15, 1999 USF&G issued payment and performance bonds on the VCU Life Sciences Building in the amount of $21,480,250.00.

31.     On March 2, 1999 USF&G issued payment and performance bonds on SR II Perry County-Excavation, Presplit Blasting in the amount of $4,107,051.00.

32.     On June 14, 1999, USF&G issued payment and performance bonds for the Phase I Laboratory Center in the amount of $1,688,000.00.

33.     On June 15, 1999 USF&G issued payment and performance bonds on the Pennsylvania Turnpike Administration Building in the amount of $24,612,843.00.

34.     On June 24, 1999 USF&G issued payment and performance bonds on the Cambria County project in the amount of $835,299.00.

35.     On July 12, 1999, USF&G issued payment and performance bonds on the Cool & Cold Aquaculture project in the amount of $12,191,000.00.

36.     On July 27, 1999, USF&G issued payment and performance bonds on Contract #091091 - Bedford County in the amount of $514,976.00.

37.     On December 1, 1998, PCIC issued a Guaranty Agreement guaranteeing full payment of a CCI claim in the amount of $1,162,460.00 against the Commonwealth of Pennsylvania on Job No. 439, Mahanoy Prison.

38.     CCI made a claim under a Remedial Work Period Insurance Policy issued by PCIC to CCI with regard to the Mahanoy Prison Project.

### D.     Damages

In the main, USF&G's damages consist of its losses incurred honoring obligations incurred pursuant to payment and performance bonds underwritten by USF&G in reliance upon the 1997 Audit Report and the 1998 Audit Report.  The "damages recoverable for negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause."  Restatement (Second) of Torts §552B(1); *Medical Consultants Network, Inc. v. Cantor & Johnston P.C.*, 2001 WL 10788 (E.D. Pa.).  The breakdown of the losses is illustrated on the following schedules:

1.     The 1997 Brown Schultz Audit Report:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $4,049,491.71 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $2,532,447.20 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $307,758.53 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $2,869,808.49 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $1,449,469.53 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $4,949,384.03 |
| | | | | Subtotal: | $16,158,359.49 |

2.     The 1998 Brown Schultz Audit Report:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $235,002.59 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $79,529.64 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $411,878.12 |

| | | | | | |
|---|---|---|---|---|---|
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $228,201.80 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $4,715,372.83 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $1,369,904.72 |
| G. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | <u>$2,728,805.57</u> |

Subtotal:     $9,768,695.27

**Total: $25,927,054.76**

### E.     Witnesses

USF&G may introduce the following witnesses in support of its case-in-chief:

1. Steve J. DeBruyn
Clifton Gunderson LLP
2 East Main Street
Danville, IL  61832

2. Richard Farnsworth
619 Rinaldo Street
Santa Rosa, CA  95409-2823

3. Susanne Ehgartner
715 Hilltop Avenue
New Cumberland, PA
17070-1723

4. Corinne P. Rebinski
Brown Schultz Sheridan
 & Fritz
210 Grandview Avenue
Camp Hill, PA  17011

5. Bruce J. Brown
Brown Schultz Sheridan
 & Fritz
210 Grandview Avenue
Camp Hill, PA  17011

6. Anthony Phillips
2259 Forest Hill Drive
Harrisburg, PA  17112-1062

7. Gregory Daily
St. Paul Companies
P.O. Box 1138
Baltimore, MD  21203-1138

8. James Daily
St. Paul Companies
P.O. Box 1138
Baltimore, MD  21203-1138

9. David Hussey
14110 Greencraft Lane
Cockeysville, MD  21030

10. Stephen Salazar
Ohio Casualty Co.
2605 Interstate Drive
Suite 200
Harrisburg, PA  17104

11. Matthew Silverstein
St. Paul Companies
P.O. Box 1138
Baltimore, MD  21203-1138

12. Sherri Philips
2837 N. Front Street
Harrisburg, PA  17110

13. Robert Schumaker
St. Paul Companies
P.O. Box 1138
Baltimore, MD  21203-1138

14. John Ortenzio
510 Orchard Drive
Lemoyne, PA  17043-1214

15. Deborah Bowman
c/o Hemlock Counsel for Girl
Scouts
350 Hale Drive
Harrisburg, PA  17104-1518

16. James Byerly
c/o Byerly Insurance
525 North 12th Street
P.O. Box 525
Lemoyne, PA  17043

17. Keeper of the Records
Byerly Insurance
525 North 12th Street
P.O. Box 525
Lemoyne, PA  17043

18. Keeper of the Records
PCIC
2500 Old Gettysburg Road
Camp Hill, PA  17011

19. Keeper of the Records
CCI
2500 Old Gettysburg Road
Camp Hill, PA  17011

20. Mark Greenberg
765 Poplar Church Road
P.O. Box 1244
Camp Hill, PA  17011

USF&G reserves the right to call additional witnesses as may be necessary for rebuttal or impeachment.

### F.     Summary of Expert Testimony

USF&G's intends to introduce testimony of the following expert witnesses:

1.     Steve J. DeBruyn, CPA

Mr. DeBruyn is expected to opine that the audit work performed by Brown Schultz for CCI for the fiscal years ended December 31, 1997 and 1998 did not conform to the applicable standard of care of a certified public accountant and such non-conformance resulted in material misstatement and omissions in the 1997 and 1998 audit reports for CCI prepared by Brown Schultz.  He is also expected to opine that the misstatements and omissions were material to the financial position of CCI.

Greater detail as to the materials relied upon by Mr. DeBruyn, the basis for his opinion and his professional resume are contained in the Affidavit of Steve J. DeBruyn, CPA in Opposition to the Defendant's Motion for Summary Judgment, which was filed with the court on or about October 8, 2003, and is incorporated herein by reference.  USF&G also incorporates herein by reference the Expert Report of Stephen J. DeBruyn, CPA and the Supplemental Expert Report of Stephen J. DeBruyn, CPA.  Both expert reports were filed with the Court on or about

February 10, 2003 as Exhibits "C" and "D" to United States Fidelity and Guaranty Company's

Opposition to Defendants' Motion to Strike the Supplemental Expert Report and Affidavit of

Stephen J. DeBruyn, CPA.

> 2.    Richard D. Farnsworth

Mr. Farnsworth is expected to opine that (1) USF&G's underwriting of the CCI account

generally conformed to applicable standards of care of the surety industry that were in effect

during 1994-1999; and (2) it was reasonable and justifiable for USF&G's underwriters to rely on

the audited financial statements prepared by Brown Schultz in reaching their underwriting

decisions concerning CCI.

Greater detail as to the materials relied upon by Mr. Farnsworth, the basis for his opinion

and his professional resume are contained in the Affidavit of Richard D. Farnsworth in

Opposition to the Defendants' Motion for Summary Judgment, which was filed with the court on

or about October 8, 2003 and is incorporated herein by reference.  USF&G also incorporates

herein by reference the Expert Report of Richard Farnsworth.  The expert report was filed with

the Court on or about February 10, 2003 as Exhibit "D" to United States Fidelity & Guaranty

Company's Opposition to Defendants Motion to Strike the Expert Report and Affidavit of

Richard Farnsworth.

## G.    Special Comments

USF&G is unaware of any special issues needing to be addressed by the Court.

## H.    Statement of Legal Issues

USF&G's sole cause of action is one for negligent misrepresentation.  As recognized by

the Court in several of its Orders, the tort of negligent misrepresentation is well established under

Pennsylvania law and a plaintiff asserting such cause of action need not prove privity with the

defendants.  Report and Recommendation dated August 10, 2001, p. 9-10 (relative to Brown

Schultz' Motion to Dismiss) (not appealed; adopted per 28 U.S.C. §636(b)(1)(B)); Report and

Recommendation dated November 5, 2002, p. 13-19 (relative to Brown Schultz' Motion for

Summary Judgment) (appealed by Brown Schultz and adopted by Order dated January 31,

2003).  As discussed in Section IV(c)(1) and (2), *infra*, Pennsylvania has adopted Restatement

(Second) of Torts §552 in its entirety.

To succeed on a claim of negligent misrepresentation, a plaintiff must prove by a

preponderance of the evidence:  (1) a misrepresentation of a material fact; (2) the representor

must either know of the misrepresentation, must make the misrepresentation without knowledge

as to its truth or falsity, or must make the representation under circumstances in which he ought

to have known of its falsity; (3) the representor must intend the representation to induce another

to act on it; and (4) injury must result to the party acting in justifiable reliance on the

misrepresentation.  *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*,

39 F.Supp. 577 (M.D. Pa. 1999); *Gibbs v. Ernst*, 538 Pa. 193, 209 (1994) (citing W. Page

Keaton, *Prosser and Keaton on the Law of Torts* §105 (5th ed. 1984)); *see also Fiorentino*, 448

F.Supp. at 1369 (citing *Avondale Cut Rate, Inc. v. Associated Excess Underwriters, Inc.*, 406 Pa.

493, 178 A.2d 758 (1962) and *Aresto v. National-Ben Franklin Fire Ins. Co.*, 184 Pa. Super. 114,

133 A.2d 304 (1957)).  Negligent misrepresentation differs from fraud or intentional

misrepresentation in that the defendant "need not know his or her words are untrue, but must

have failed to make reasonable investigation of the truth of those words.  *Gibbs v. Ernst*, 538 Pa.

at 210.  Essentially, the plaintiff need not prove that the defendant knew of the falsity of the

representation; it is sufficient to prove that the defendant "should have known."  *Id.* at 213.

USF&G will introduce credible evidence demonstrating, *inter alia*, the failure of Brown Schultz to conduct its audits of CCI in accordance with GAAS and, in general, in a competent and professional manner.  USF&G will prove by a preponderance of evidence not only that the 1997 and 1998 Audited Financial Statements materially misrepresented CCI's true financial condition but that, at minimum, the following statements in the introductory letters to Independent Auditors' Report[s] dated February 10, 1998 and February 10, 1999 constitute material misrepresentations:  (1) "[Brown Schultz] conducted [its] audits in accordance with generally accepted auditing standards"; (2) the "audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements"; (3) an audit "includes assessing the accounting principles used and significant estimates made by management…"; and (4) that "the financial statements . . . present fairly, in all material respects the financial position of CCI . . . ."

The evidence adduced at trial will also show that Brown Schultz knew or should have known of the falsity of its representations and that Brown Schultz intended its representations to induce another to act thereon.  The word "intent" is not limited to the subjective state of wishing to bring about a certain result.  Rather, the word "intent" means that the actor merely desires to cause consequences of his act, *or that he believes that the consequences are substantially certain to result from it."*  Restatement (Second) of Torts §8A (1964) (emphasis supplied).

To recover damages for an accountant's negligence in rendering an unqualified audit opinion, a plaintiff must prove that the accountant's negligence was the proximate or legal cause of its injury.  *See, Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F.Supp. 557, 563 (W.D. Pa. 1996); *Gibbs v. Ernst*, 538 Pa. at 212.  Cause in fact or "but for" causation provides that if the harmful result would not have come about but for the negligent conduct, then there is a

divert causal connection between the negligence and the injury. *Commonwealth of Pennsylvania v. United States Mineral Products Co.*, 2002 WL 31454023*2 (Pa. Cmwlth); Restatement (Second) of Torts, §548A (a misrepresentation is the proximate cause of the plaintiff's loss, "if but only if, the loss might reasonably be expected to result from reliance."). Legal or proximate cause exists "where a defendant's wrongful conduct is a substantial factor in bringing about plaintiff's harm." *Id.*, citing *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643 (Pa. Super. 2002). To establish the required legal nexus, a plaintiff must show that the loss was a foreseeable result of the fact or condition that the financial statements misrepresented or concealed. *See*, Restatement (Second) of Torts, §548A, comment b; *Bily v. Arthur Young & Co.*, 271 Cal. Rptr. 470, 485 (Cal. Ct. App. 1990) ("[a] legal cause of loss is a cause which is a substantial factor in bringing about the loss"). A cause can be found to be a substantial factor so long as it is significant or recognizable; it need not be quantified as considerable. *Jeter v. Owens-Corning Fiberglass Corp.*, 716 A.2d 633 (Pa. Super. 1998). A plaintiff is not bound to exclude the possibility that the event might have happened in some other way. *World Radio Laboratories, Inc. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996); *Thayer v. Hicks*, 243 Mont. 138, 793 P.2d 784 (1990). Rather, the plaintiff is only required to satisfy the trier of fact, by a preponderance of the evidence, that the injury occurred in the manner claims. *Id.*

Not only do the facts extant fail to demonstrate any intervening or concurring causes that might extricate Brown Schultz from liability, but it is axiomatic that "a defendant is not relieved from liability because another concurring cause may also be responsible for producing injury. *Powell v. Drumheller*, 539 Pa. 484 (1995). Further, an intervening cause is not a superseding cause where the negligence of the accountant creates or increases the foreseeable risk of harm. Restatement (Second) of Torts §§440 and 442A. For example, in one case it was held that the

failure of a state Commissioner of Insurance to challenge the continued operation of an insolvent insurance company was not a superseding cause of losses resulting from its continued operation, because his examiners relied upon the entries the defendant accountant had made in the company's books. *Bonhiver v. Graff*, 311 Minn. 111, 248 N.W.2d 291, 297 (1976). Additionally, an intervening force which is the normal consequence of the situation created by the accountant's negligence is not a superseding cause. Restatement (Second) of Torts §443. In *Bick v. Peat Marwick and Main*, 14 Kan. App. 2d 699, 799 P.2d 94 (1990), accountants who had negligently prepared tax returns argued that the negligence of their client in failing to review the tax returns was an intervening force insulating them from liability. The Court soundly rejected the accountants attempt to insulate themselves from their errors. *Id.* Likewise, an intervening force is not a superseding cause of a loss when the force is of little consequence in causing the loss. For example, in one case the plaintiff alleged that the negligence of the accountant caused it to purchase a company believing it to be profitable when in fact it was insolvent. The accountant argued that other factors including the loss of two key employees, competition from another business, the lack of a market, and the leveraged condition of the business contributed to the plaintiff's loss. The court determined that substantial evidence supported the jury verdict in favor of the plaintiff and that the subsequent events cited by the accountant as the reasons for the company's failure were "of little consequence." *Thayer v. Hicks*, 793 P.2d 784 at 155 (Mont. 1990). In the instant case, there is simply no evidence of any intervening or concurring causes. In fact, the evidence to be adduced at trial will demonstrate that CCI's ultimate demise was almost inevitable – based on the restated financials and not based upon the rosy picture painted by the Audited Financial Statements.

Causation is evident in this case in, *inter alia*, the timing of USF&G's actions in issuing additional bonds based on the underwriters' review of the Audited Financial Statements. USF&G will also introduce unequivocal evidence that its underwriters not only relied upon the Audited Financial Statements as a substantial factor in their underwriting decisions, but that they would not have issued bonds to CCI if they were aware of its true financial condition, as is revealed in, *inter alia*, the restated financial statements. In a negligent misrepresentation claim against an accountant, the plaintiff's reliance on the misrepresentation provides the requisite causal connection between the misrepresentation and the plaintiff's injury. *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 683 N.Y.S.2d 179 (1st Dept. 1998).

Issues concerning, *inter alia*, damages, justifiable reliance are various defenses raised by Brown Schultz will be addressed in United States Fidelity & Guaranty Company's Trial Memorandum to be filed in accordance with Local Rule 39.7.

I.      **Stipulations**

The parties have stipulated that true, legible and complete copies of documents may be introduced in evidence in lieu of originals. The parties have no additional stipulations other than the stipulations of fact in Section C, *supra*, and the stipulations discussed in Section L, *infra*.

J.      **Estimated Number of Trial Days**

USF&G estimates that trial should take approximately 9-12 days.

K.      **Other Matters**

USF&G is unaware of any special issues needing to be addressed by the Court.

### L.    Schedule of Exhibits

USF&G's schedule of exhibits is attached hereto and incorporated herein as Exhibit "A."

USF&G notes that at the meeting of counsel on October 3, 2003 stipulations were reached as to authenticity and admissibility as to several categories of documents.  On October 8, 2003, Brown Schultz back-tracked and informed USF&G that, at the present time, it would only stipulate as to the <u>authenticity</u> of certain categories of documents.  Although USF&G avers that numerous stipulations as to admissibility are merited – and had been agreed upon on October 3, 2003 – it reports that stipulations as to authenticity only have been reached as to the following categories of documents:  CCI's working papers, audit reports, payment and performance bonds, USF&G's underwriting files, PCIC's audit reports and working paper files, documents produced by Byerly, USF&G and St. Paul underwriting manuals and "Grey Papers," Brown Schultz' accounting and quality control manuals and employees performance review for both Brown Schultz and USF&G employees.  USF&G remains amenable, however, to discussing the possibility of entering into additional stipulations.

USF&G reserves the right to introduce such other and further exhibits as may be necessary for rebuttal or impeachment.

### M.    Special Verdict Questions

As trial in the instant case will be a bench trial, USF&G does not have any proposed special verdict questions.

### N.    Statement of Defense Counsel

This section is not applicable to USF&G.

O.    **Certification Pursuant to Local Rule 30.10**

USF&G states that it has no present intention of utilizing any particular oral or video taped deposition testimony at trial as part of its case-in-chief.  As such, there was no need to confer with opposing party regarding irrelevancies, side comments or objections and no certification is necessary.

P.    **Proposed Findings of Facts and Law**

USF&G's proposed findings of fact and law are attached hereto and incorporated herein as Exhibit "B."

USF&G reserves the right to submit additional proposed findings of fact and rulings of law as may be appropriate based on the evidence adduced at trial.

UNITED STATES FIDELITY AND
GUARANTY COMPANY,
By its counsel,


s/ Bruce D. Levin
Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

and

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:    (717) 237-7100
Facsimile:    (717) 237-7105

Dated: October 8, 2003
#274942 v1/36432/87