# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| _____ | ) | |
| UNITED STATES FIDELITY AND | ) | |
| GUARANTY COMPANY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | CIVIL ACTION NO. 1:01-CV-00813 |
| v. | ) | |
| | ) | JUDGE CONNER |
| BRUCE J. BROWN and BROWN | ) | |
| SCHULTZ SHERIDAN & FRITZ, | ) | |
| | ) | |
| Defendants. | ) | |
| _____) | | |

**UNITED STATES FIDELITY & GUARANTY COMPANY'S**
**REQUEST FOR FINDINGS OF FACT AND RULINGS OF LAW**

Pursuant to Fed. R. Civ. P. 52 and Local Rule 16.6, United States Fidelity & Guaranty

Company ("USF&G") submits the following proposed Findings of Fact and Rulings of Law:

I.  Findings of Fact

Background

1.      USF&G issues payment and performance bonds on behalf of contractor and

subcontractor principals engaged in the performance of work on public and private construction

projects.

2.      In 1998, USF&G merged with St. Paul Fire and Marine Insurance Co. ("St.

Paul").  St. Paul and USF&G have both been in the surety bond business for over 100 years.

USF&G and St. Paul serve as the bonding company for thousands of construction contractors

and subcontractors, including some of the largest construction contractors in the United States.

3.      CCI Construction Co., Inc. ("CCI") was a contractor engaged in construction work on public and private construction projects and maintained principal offices in Camp Hill, Pennsylvania.

4.      John Ortenzio ("Ortenzio") formed CCI, formerly known as Commercial Construction Company, in 1983.  Ortenzio had worked in the construction industry since 1979.

5.      Incidental to the underwriting process, Ortenzio provided USF&G with an organization chart and resumes of the key officers and employees. Personal acquaintances of the individuals and the company concluded all to be of good character and well qualified for their respective corporate duties. There was a good balance of business, engineering and field production capabilities.

6.      CCI's job experience from its inception up to 1993-1994 was primarily in private, negotiated construction of medical and healthcare buildings, predominately for one owner, a large publicly traded corporation headed by Ortenzio's father, Rocco Ortenzio.

7.      CCI's net worth as of December 31, 1993 was $4.1 million. Its business plan included entry into the public bid market. Although this represented a change in the type of market in which CCI had historically operated, by all objective standards, CCI possessed the management and financial capabilities to undertake this new direction.

8.      At all times material and relevant to this action, Brown Schultz and its staff have been engaged in business as independent Certified Public Accountants.  Also, according to its website, Brown Schultz "is one of the largest regional firms in central Pennsylvania with offices in Harrisburg and Lancaster" and claims to have "extensive experience in," among other fields, "construction."

9.    Brown Schultz has approximately thirty-two (32) principals and managers, including Bruce J. Brown ("Brown"), who, according to its website, "is one of the founding principals, Chief Executive Officer and Shareholder of Brown Schultz Sheridan & Fritz, 1990 to present."

10.    Pennsylvania Contractors Insurance Co. ("PCIC") is a captive insurance company formed for tax planning purposes and to fund the cost of performing warranty work on rehabilitation hospitals which CCI had previously constructed.

11.    PCIC is wholly owned by CCI's sole stockholder, Ortenzio.  Ortenzio is also President of both PCIC and CCI.  Although incorporated in the Turks & Caicos Islands, PCIC shared a business address with CCI in Pennsylvania.  PCIC is no longer operational and is in the process of being liquidated.

12.    Since its inception, Brown Schultz prepared tax returns and audited financial statements for PCIC.

Surety Bonds And The Underwriting Process

13.    Unlike an insurance policy, which is a  two-party contract between the insured and the insurance company, a construction surety bond is a three-party instrument between and among the "Surety," the "Principal," and the "Obligee."  Construction surety performance bonds are binding commitments by the "Surety" (USF&G in this instance) by which the surety guarantees the performance of a construction contract by the contractor procuring the surety bond.  The contractor procuring the bond is referred to as the "Principal" and the beneficiary of the bond – usually the project owner – is referred to as the "Obligee."

14. In this action, CCI was the Principal and the various project owners – including the Commonwealth of Pennsylvania – were the obligees as to all performance bonds issued by USF&G.

15. The surety's obligations to the obligee arise only if there has been a default by the Principal. In such a case, the obligee makes demand upon the Surety to perform the work that should have been performed by the Principal or, in the case of payment bonds, to pay the claims of various unpaid supplies of labor and material.

16. Additionally, the surety's liability under the bond is usually capped by a penal sum set forth in the bond. The penal sum is usually the price stipulated in the bonded construction contract.

17. Insurance policies and surety bonds also differ in how they are underwritten. Insurance policies are usually written for a term of months or years and premiums are based on the allocation of the insurance risk over thousands of insureds. No credit is issued or extended by the insurance company to its insured with respect to insurance policies. In contrast, surety bonds are issued and the allocation of risk is determined on an individual basis.

18. Pennsylvania, most other states and the United States have statutes which require all contractors working on public projects to provide payment and performance bonds. *See*, 8 P.S. §191, *et seq.*; 40 U.S.C. §270 *et seq.* Thus, a bonding program is crucial to any contractor seeking to perform public construction work.

19. Underwriting is the process of gathering facts relevant to the risk of bonding a contractor. The process includes evaluating the pertinent data, determining the strengths and weaknesses of the account and deciding upon a course of action. The primary function of the surety in the contract bond underwriting process is the prequalification of the contractor. When

the surety executes a bond it is, in effect, saying to the obligee that it has performed an analysis of the contractor's management and technical skills; that it has studied the contractor's financial condition; and that it believes the contractor is fully qualified in all respects to perform the contract in question. The surety is prepared to back this judgment by committing the assets of its company in support of this decision.  Before the surety can make such a commitment, it must first underwrite the account to satisfy itself that this is a company that it can support and that it is a company that possesses the ability to meet current and future obligations. If the surety's analysis is that it is an acceptable account, the surety then makes a decision on the amount of bonding capacity they are willing to provide to the contractor.

20.     Contract bond underwriting involves both objective and subjective evaluations by the underwriter and is considered more "art" than "science."  Therefore, reducing surety underwriting to quantitative terms is very difficult, if not impossible, in most cases.

21.     The underwriter evaluates the contractor through three primary categories: Character, Capacity, and Capital.  These are colloquially referred to as the "three C's" of surety bond underwriting.  The underwriter analyzes and interprets the information provided to him by the contractor, such as, for example, financial statements, references, company history, management procedures, resumes of key personnel, prior job experience and from information provided by outside sources, the underwriter analyzes, interprets and applies financial data.  He also assesses the history, organization, and management capabilities of the contractor, the contractor's capacity to perform each new project and the backlog of projects undertaken by the contractor.

22.    The underwriter also assesses the organization and contractor owner's reputation for fair dealing with project owners, subcontractors, suppliers, lenders, and other creditors, as well as the contractor's general reputation within the industry.

23.    The process of underwriting a construction contractor involves establishing and then reviewing each year the contractor's "bonding program," also known as his "bonding capacity."  Based on its assessment of the contractor, a surety will "prequalify" the contractor and create a line of credit that establishes both the maximum penal sum it will write for the contractor on a single bond and the maximum aggregate limit for all bonds combined.  This amount is expressed in terms of a single job dollar amount (contract price) and the aggregate dollar amount of work to be performed on uncompleted contracts (backlog or work on hand) and is often referred to as the "bonding program."

24.    The bonding program may be expressed both as a single job and as an aggregate backlog limitation.  This aggregate limit is computed based upon the amount of backlog a contractor has and not on the total penal sum of all bonds issued by the surety.  The reason for this is that the contractor works off his backlog daily, thereby reducing the surety's exposure on existing bonds and enabling the contractor to obtain new bonded work within the parameters of the bonding program.

25.    For bonds written within the bonding program, the amount of underwriting on a bond is usually minimal.  The program is normally conditioned on there being no material adverse changes in the contractor's finances and management and is limited to jobs that are within the contractor's normal type of work and geography, subject to standard contract terms and conditions.  The program normally stays in place for one year.

26.     It is necessary to establish a bonding program, because it is almost always impossible to predict the identity and size of the projects on which a contractor will be successful in obtaining throughout the year.  Thus, the bonding program allows a contractor to bid jobs knowing that, absent an adverse change in his business or finances, he is eligible to receive bonding within the bonding program's parameters.  This is especially true of public work where initial bid advertisements may not be published until after the annual underwriting review and after the determination as to whether the establishment or continuation of the bonding program has been made.

27.     The surety reviews the bonding program on an annual basis, normally after the surety receives the contractor's audited financial statement.  A meeting is held between the contractor, agent and underwriter at that time to review the contractor's business plan for the remainder of the year. Sometimes, no meeting will be required. The underwriter determines the level of bonding support the contractor needs in order to meet his business plan and, if acceptable to the underwriter, an understanding is reached between the contractor, agent and surety as to the size of the bonding program.

28.     From USF&G's (and most other sureties') perspective, the bonding program is determined based on the volume of business which the contractor expects to perform in the coming year and not the issuance of specific bonds.

29.     In CCI's case, once its bonding program was approved each year, CCI's request for bonds within the parameters of that program would  normally be granted.

30.     Although each job must be submitted to the surety for specific approval prior to bidding, a new annual audit is not required each time a bond is requested as long as the new request is within the parameters of the bonding program.  Indeed, it would be extremely

expensive and impractical (if not impossible) to require the contractor to provide the surety with an audit report every time the contractor obtains a new contract. Once a bond has been issued, it is nearly impossible for that bond to be revoked.

### In Reliance Upon Audited Financials Prepared
### By Brown Schultz, USF&G Issued Bonds To CCI

31.    CCI became a USF&G account in late 1993. At that time, CCI and its management team enjoyed a very good reputation and had previously been bonded with a large top-tier national surety company.

32.    As a condition of the establishment and the annual extension of CCI's bonding program and the issuance of the payment and performance bonds to CCI, USF&G required that CCI furnish to it annually an audit report prepared by an independent certified public accountant consisting of, *inter alia*, an audit of CCI's balance sheet, income statement and the financial status of CCI's completed contracts and work in progress.

33.    USF&G also required that CCI, as well as Ortenzio, execute the Master Surety Agreement by which they agreed to, *inter alia*, indemnify and hold harmless USF&G for any losses USF&G might incur relative to its issuance of bonds on behalf of CCI.

34.    CCI's bonding program consisted of a $15 million per project limit and a $75 million aggregate limit. CCI had a total annual revenue of approximately $48.2 when the bonding program was established in 1993. This bonding program remained in effect until approximately early October 1999 when USF&G ceased writing bonds for CCI.

### Brown Schultz Was Aware Of Both USF&G's
### Reliance And The Parameters Of The Bonding Program

35.     As the long term auditor of CCI – as well as other entities owned by Ortenzio and his family – Brown Schultz was familiar with CCI's business operations and its financial condition.

36.     Brown Schultz also knew that the audited financial statements it prepared for CCI would be provided to CCI's bonding company, which at the times material and relevant to this action, Brown Schultz knew to be USF&G and St. Paul.

37.     Brown Schultz' working papers show that the audits were done for the benefit of CCI's "bonding company," which they identify as USF&G and St. Paul.

38.     Brown Schultz also knew that USF&G would rely upon its audited financial statements to determine whether to extend, suspend, cancel or modify the bonding program which USF&G established for CCI and to issue payment and performance bonds to CCI.

39.     Brown Schultz's principal, Brown, knew that bonding companies use financial statements to determine how they give bonds.

40.     Not only did Brown Schultz know that USF&G would receive and rely upon its audited financial statements, Brown Schultz also considered USF&G's intended use of the financial statements in designing its audit plan for CCI.

41.     Brown Schultz' working papers indicate that Brown Schultz knew that because the audited financials would be used by USF&G there was a risk of an "overstatement" of the financials by CCI's management.

42.     Brown Schultz' working papers also indicate that bonding companies "expect favorable financial statements."

43.     Brown Schultz' working papers also contain several documents which show that Brown Schultz was aware of the size of CCI's bonding program.

44.    A document contained in Brown Schultz' "Permanent File" entitled "Written Consent of Shareholder in Lieu of Special Meeting" ("Written Consent") dated August 27, 1997 states, in pertinent part, that Ortenzio "has agreed to maintain the equity level of [CCI] no less than $4,800,000 and require an aggregate work [bonding] program no higher than $60,000,000 . . . ."

45.    Another document bearing the same title and date contains an excerpt from Brown Schultz' working papers showing that for the year ended "12/31/97" CCI had equity greater than $4,800,000 and its sales were less than $60,000,000.00 (with actual sales being listed as "$35,000,000").  The working paper was prepared by "CPR," the initials of Brown Schultz' former employee Corinne Rebinski.

46.    Two months later, in a letter dated November 7, 1997, CCI's bonding agent, David Dominiani ("Dominiani") wrote to Ortenzio concerning "[CCI's] current bonding program" and reminded Ortenzio about CCI's earlier agreement reflected in the Written Consent that "USF&G requires your corporate balance sheet to maintain an equity level of no less than $4,800,000.00."  Brown is an indicated recipient of a copy of Dominiani's letter.

47.    Brown Schultz was not only CCI's longtime auditor, but intended to continue in that capacity.

48.    Brown Schultz charged CCI annual audit fees oftentimes with a planned loss of $2,000-$3,000 on the audit assignment, likely as an inducement not only for future business from CCI, but in the hope of obtaining business from other entities with which Ortenzio was affiliated.

49.    Brown Schultz also knew that CCI intended to self-perform various tasks that it formerly subcontracted out and that CCI intended to engage in increased amount of heavy construction and highway work.

50.    Further, Brown Schultz knew of the type of work engaged in by CCI, including – at least from 1993 onwards – a considerable amount of public construction work that, as a matter of Pennsylvania and federal law, would require that Brown Schultz be able to procure payment and performance bonds.

51.    Brown Schultz was also familiar with the scope and parameters of the total amount of work which CCI performed each year, as well as the anticipated amount of work it would perform in subsequent years.  In fact, the range and type of work performed by CCI in the years pertinent to this action were remarkably similar.

52.    Brown Schultz' familiarity with the scope and parameters of the total amount of work which CCI performed each year, as well as the anticipated amount of work it would perform in subsequent years can be seen in the schedule labeled "Contracts-in-Progress" which is part of Brown Schultz' audited financial statements for the years ended December 31, 1995 through 1998.  This schedule identifies the projects which remained incomplete in each year; a good indicator of the outstanding work which CCI had to complete and a close approximation of the extent to which CCI had used the aggregate limit portion of its bonding program.  It also showed that the size of CCI's projects did not materially change from year to year.

53.    The "Contracts-in-Progress" chart incorporated into the 1995 Audit Report shows that CCI was engaged in 9 projects ranging in total contract price from approximately $3 million to $15.3 million (contracts showing a total contract price of less than $300,000 are excluded because they likely represent repair work).

54.    The "Contracts-in-Progress" chart incorporated into the 1996 Audit Report shows that CCI was engaged in 4 significant projects ranging from approximately $2 million to $16.4 million.

55. The "Contracts-in-Progress" chart incorporated into the 1998 Audit Report shows that CCI was engaged in 11 significant projects ranging from approximately $1.5 million to $15.5 million.

56. Accordingly, the mix and size of projects – heavily tilted to the public sector – shows that Brown Schultz was aware of the type and scale of the work being performed by CCI and the approximate amount of bonding capacity that would be needed by CCI to do such work.

57. I find that Brown Schultz provided false information in the course of its business and that it knew would be provided to USF&G

58. I find that Brown Schultz knew that USF&G intended to rely upon the Audited Financial Statements relative to the issuance of payment and performance bonds.

59. I find that Brown Schultz knew of the transaction or substantially similar transactions for which USF&G would rely upon the Audited Financial Statements.

60. I find that USF&G has standing to sue Brown Schultz pursuant to Restatement (Second) of Torts §552.

<u>USF&G Continues To Issue Bonds In Reliance On The Audited Financial Statements</u>

61. Brown and Brown Schultz prepared audited financial statements for CCI for several years beginning on or before 1993 including audited statements for the years ended December 31, 1996 (the "1996 Audit Report"), December 31, 1997 (the "1997 Audit Report") and December 31, 1998 (the "1998 Audit Report") (collectively, the "Audited Financial Statements").

62. On May 2, 1997, USF&G received a copy of the 1996 Audit Report and in reliance, USF&G agreed to continue its $15 million/$75 million bonding program for CCI and, thereafter, USF&G issued payment and performance bonds to CCI for certain projects.

63.     In August 1997, USF&G received notification from CCI's president, Ortenzio, that he wanted to have his personal indemnity agreement with USF&G terminated.  Ortenzio had the right to terminate his indemnity agreement upon giving proper notice to USF&G.  Ortenzio did agree, however, that if CCI's equity level fell below $4.8 million and/or CCI's bonding program consistently went above $60 million, Ortenzio understood that USF&G reserved the right to discuss the need for reinstatement of his personal indemnity.

64.     Based upon the Brown Schultz audited financial statements for 1997 and 1998, CCI's equity levels were well in excess of $4.8 million; in 1997, CCI's net equity was approximately $5,455,000 and in 1998 it was approximately $5,250,000.  This would support at least a $60 million bonding program.

65.     On March 3, 1998, USF&G received a copy of the 1997 Audit Report and in reliance, USF&G agreed to continue the $15 million/$75 million bonding program for CCI, thereafter, USF&G issued payment and performance bonds to CCI for, *inter alia*, the following projects:

|    | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|----|---------|-------------|----------|-----------|--------------|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $15,647,035 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $7,220,942 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $3,919,156 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $5,591,730 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $18,880,298 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $21,927,111 |

66.     I find that USF&G issued the bonds described in paragraph _____, *supra*, in reliance on the 1997 Audit Report.

67.     I find that USF&G's reliance on the 1997 Audit Report was justifiable.

- 14 -

68.     On March 2, 1999, USF&G received a copy of the 1998 Audit Report and in reliance, USF&G agreed to continue the $15 million/$75 million bonding program for CCI and it issued payment and performance bonds to CCI for, *inter alia*, the following projects:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $514,976 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $835,299 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $1,688,139 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $191,083 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $12,191,000 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $4,126,478 |
| E. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $28,231,945 |

69.     I find that USF&G issued the bonds described in paragraph _____, *supra*, in reliance on the 1998 Audit Report.

70.     I find that USF&G's reliance on the 1998 Audit Report was justifiable.

<u>USF&G's Underwriters Relied Heavily On The Audited Financial Statements</u>

71.     Following USF&G's receipt of the Audited Financial Statements each year, USF&G's underwriters began the task of reviewing and analyzing each statement.

72.     From 1993 through 1998, Anthony S. Phillips ("Phillips"), a 32 year veteran underwriter currently serving as a St. Paul Surety Underwriting Specialist handling several of St. Paul's major accounts, personally read each statement and performed a basic analysis of each statement relative to CCI.

73.     Phillips served as USF&G's and then St. Paul's surety bond underwriting manager in charge of USF&G/St. Paul's Harrisburg, Pennsylvania office.  However, it was Steven Salazar's ("Salazar"), the other underwriter in the Harrisburg office, job to perform a

more detailed analysis, which would then be reviewed by Phillips and James Daily ("Daily"), the senior bond underwriter for USF&G and St. Paul in Baltimore, Maryland.

74.     As CCI was a "Home Office" account, Daily had the final authority regarding underwriting decisions.

75.     Daily had been a surety bond underwriter for approximately 38 years and has been employed by USF&G and St. Paul for approximately 23 of those years.

76.     Salazar's overall analysis of CCI, including his analysis of the Brown Schultz audited financial statements, was memorialized annually in a document entitled "USF&G Interoffice Correspondence" ("Interoffice Correspondence"), which detailed the information contained in the Brown Schultz audited financial statements as well as other information, such as CCI's banking relations, insurance coverages, and recommendations concerning CCI's bonding program.

77.     No Interoffice Correspondence was prepared by Salazar for 1998 as the financial information obtained from the Brown Schultz audit report was entered for that year into a relatively new software program at USF&G known as the Electronic Credit File ("ECF").

78.     Salazar, Phillips and Daily reviewed and analyzed the 1998 Audit Report shortly after receipt on March 2, 1999.

79.     The Audited Financial Statements appeared to be well-presented and, on their face, they did not reveal any defects in the manner in which Brown Schultz audited CCI's balance sheet.

80.     Moreover, Phillips believed Brown Schultz enjoyed a good reputation in the Harrisburg, Pennsylvania area and claimed to have specific expertise in the auditing of construction contractors.

81.     The Audited Financial Statements contained the following representations:

(1)     "[Brown Schultz] conducted [its] audits in accordance with generally accepted auditing standards";

(2)     the "audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements";

(3)     an audit "includes assessing the accounting principles used and significant estimates made by management . . ."; and

(4)     That the financial statements . . . present fairly, in all material respects the financial position of CCI . . . ."

82.     During the time when USF&G was issuing bonds for CCI, Phillips received no information from any sources that would have led him to conclude that the financial information contained in the Brown Schultz audited financial statements was inaccurate or misleading.

83.     As each Interoffice Correspondence demonstrates, USF&G's Harrisburg, Pennsylvania office recommended a continuation of the $15 million/$75 million bonding program for CCI.  Indeed, throughout CCI's bonding relationship with USF&G, those bonding capacity limits continued year-to-year although, on a few occasions, USF&G approved bonds which temporarily increased CCI's bonding capacity beyond $75 million.

84.     Those "spikes" (as they are known in the surety industry) in CCI's bonding program were short-lived since CCI worked off its backlog, thereby reducing the aggregate limit of the bonding program to $75 million or below.

85.     Also, on a very few occasions, USF&G approved a spike in CCI's single limit bonding program to allow CCI to accept a project larger than $15 million.  This was only done

after considering both the facts and circumstances of the project and the financial position of CCI.

86.     The analysis of CCI's financial position was based, in large part, on the Audited Financial Statements.

87.     During the period from 1997 until USF&G/St. Paul ceased writing bonds for CCI in early October 1999, USF&G only approved four jobs that were larger than the $15 million single limit portion of the bonding program.

88.     During the time when USF&G was writing bonds for CCI, USF&G did not have any specific, formal, underwriting guidelines for its bonding accounts.  Rather, USF&G relied upon a series of documents issued by USF&G's home office known as "gray letters," as well as an unofficial underwriting training manual.

89.     The "gray letters" and the manual provided general guidance on the types of information USF&G should be obtaining from its contractors (such as, for example, obtaining an audited financial statement each year) and general guidance on underwriting methods and procedures.

90.     However, with respect to CCI and other USF&G accounts of a size similar to CCI, USF&G generally wanted the accounts to maintain a working capital-to-bonding capacity ratio of 3% or better and a net worth-to-bonding capacity ratio of 5% or better.

91.     "Working capital" is the dollar amount obtained when current liabilities are subtracted from current assets and "net worth" is determined by subtracting all liabilities from all assets.

92.     Based upon the Audited Financial Statements, CCI maintained the 3%-5% ratios described above except on limited occasions when USF&G approved a bond which temporarily increased CCI's bonding capacity beyond $75 million.

93.     USF&G would also receive an unaudited interim financial statement prepared internally by CCI (generally for the first six months of each year), as well as certain internally prepared work-in-progress schedules which were received quarterly.

94.     These work-in-progress schedules detailed how CCI's incomplete construction projects were performing.  Although these interim reports from CCI were important, they were not nearly as important as the audited financial statements prepared by Brown Schultz each year.

95.     Accordingly, USF&G would compare the interim financial statements with the Audited Financial Statements issued before the interim statements, as well as the Audited Financial Statements issued after the interim financial information had been received.

96.     This comparison was important when CCI experienced profit fades or losses on some of its projects.  In those circumstances, USF&G reexamined the Audited Financial Statements issued before the interim financial statement to determine whether the profit fades or losses were new occurrences or represented continuing losses on contracts in progress.  USF&G also used the prior Audited Financial Statements to compute what CCI's cash and equity positions would be if such profit fades or losses continued.

97.     Almost every aspect of USF&G's underwriting process relied upon the then most recently issued audited financial statement as a basis for comparing CCI's profitability, net worth, and ability to perform work.  The information gleaned from the Audited Financial Statements was an integral part of USF&G's underwriting analysis for CCI.  It also served as an indicator of the credibility of information being received from CCI and its management.

98.     On or about August 17, 1998, Dominiani reported that CCI had posted a net loss of $1.6 million for the first six months of 1998.  Dominiani reported that this loss was attributable to certain problem jobs which had been rectified.

99.     In fact, according to Dominiani, CCI expected to show a small loss or break even by December 31, 1998.  Dominiani's statements and the corrective action allegedly implemented by CCI proved, based on the 1998 Audit Report, to be true.

100.     Thus, the decision was again made by USF&G to continue CCI's bonding program at the $15 million/$75 million levels, at least until USF&G could verify and review the year end results for 1998.

101.     USF&G's Harrisburg, Pennsylvania office received a copy of the 1998 Audit Report on March 2, 1999.

102.     The Audit Report confirmed what Dominiani had represented to Phillips; namely, that CCI had its problem jobs under control and that CCI expected a break-even or slightly profitable year.

103.     In fact, as reported in the 1998 Audit Report, CCI produced a profit of $59,041.00 and reduced its operating loss to $116,629.00.  CCI also maintained a comparatively strong net worth – $5,254,834.00 – and had, according to Brown Schultz, cash and cash equivalents of at least $2,429,866.00 and marketable securities of $631,481.00.

Upon Learning Of CCI's True Financial Status, USF&G Ceased To Issue Bonds To CCI

104.     During the years 1997, 1998 and at least until October 1, 1999, Phillips or Daily was not aware of any serious problems that CCI had suffered such as labor strikes, uninsured losses, or project defaults.

105.    On or about August 30, 1999, Phillips received a letter from Dominiani reporting that CCI had sustained a loss of approximately $900,000.00 during the first six months of 1999 due to certain problem projects.  In that letter, Dominiani advised Phillips that CCI anticipated losing approximately $1 million in 1999.

106.    Upon Phillips' receipt of the foregoing information from Dominiani, he requested a meeting with CCI management to ascertain exactly what problems CCI was experiencing.  The only bond issued by USF&G thereafter was a very small bond in the penal sum of $191,083 for the Cool & Cold Aqua project.  This was a bond related to the same project as to which USF&G issued a $12 million bond on or about July 12, 1999.

107.    Thereafter, in early October 1999, further bonding by USF&G of CCI was suspended.  No further bonds were ever issued to CCI by USF&G.

<u>The Audited Financial Statements Were Violative Of GAAS</u>

108.    Generally Accepted Auditing Standards ("GAAS") comprises the standards and procedures which must be followed in the planning, preparation and issuance of an audit report by a Certified Public Accountant.  One of the primary objectives of an audit is to identify high-risk audit areas and to plan the audit procedures accordingly.

109.    The AICPA Professional Standards Vol. I at AU §326, third standard of field work states:  "[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."

110.    Moreover, the AICPA Professional Standards Vol. I at AU §339, states in section .01: "The auditor should prepare and maintain working papers . . . .  The information contained in working papers constitutes the principal record of the work that the auditor has done and the

conclusions that he has reached concerning significant matters." AU §339 further states in

section .02 that the function and nature of working papers serve mainly to:

> a.    Provide the principal support for the auditor's report, including his representation regarding observance of the standards of fieldwork, which is implicit in the reference in his report to generally accepted auditing standards.
>
> b.    Aid the auditor in the conduct and supervision of the audit.

111.    With respect to the content of an auditor's working papers, AU §339 gives the

following guidance:

> .05    The quantity, type, and content of working papers vary . . . , but they should be sufficient to show that the accounting records agree or reconcile with the financial statements or other information reported on and that the applicable standards of fieldwork have been observed. Working papers ordinarily should include documentation showing that –
>
> a.    The work has been adequately planned and supervised.
>
> b.    A sufficient understanding of the internal control structure has been obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.
>
> c.    The audit evidence obtained, the auditing procedures applied, and the testing performed have provided sufficient competent evidential matter to afford a reasonable basis for an opinion, including observance of the third standard of field work.

112.    When evaluating the contents (or lack thereof) of Brown Schultz' working papers,

the Court should do so cognizant that "[p]rofessional standards require an auditor to obtain

sufficient audit evidence to afford a reasonable basis for his audit opinion." AICPA SAS no. 31,

"Evidential Matter" (1980).

113.    Brown Schultz' workpapers identified high-risk characteristics in CCI and in

CCI's individual construction contracts. However, Brown Schultz' audit plan working papers

for 1996, 1997 and 1998 were virtually identical to each other and did not reflect any

consideration or additional testing procedures for any of the increased audit risks inherent in the CCI audit engagement.

114.     Further, the actual audit work performed by Brown Schultz for the fiscal years ended December 31, 1996, 1997 and 1998 did not change significantly from year to year.

115.     This is significant in light of the fact that CCI's audit risk profile increased for 1996 through 1998 due to, among other things, the following:

•     A significant dollar volume of work was being performed by CCI's subcontractors.  This should have led the auditor to consider audit procedures directed at testing subcontract costs.  For example, review of subcontractor agreements; confirmation

with subcontractors; review and testing of significant subcontractor costs accumulated to date and estimated costs to complete;

•     Brown Schultz' knowledge of and its documentation in its audit work papers of past and present claims and defaults with respect to CCI's subcontractors;

•     CCI's expansion in new, non-contiguous states;

•     Profit fades as acknowledged by Brown Schultz in its working papers on CCI's contracts completed in subsequent years.

116.     Profit fades are declines in the estimated or the interim profits (or losses) at the end of the preceding year to the project's actual performance at its completion.  Profit fades can be due to a number of factors ranging from the contractor's performance to the default or insolvency of its subcontractors or suppliers.  It can also signify that the contractor's original estimate of its costs to perform the work and its profits were inaccurate.

117.    The primary objective of the auditor is to determine the level of reliance that can be placed on the contractor's estimated costs to complete the project.  It is the auditor's job to perform sufficient testing and analysis to determine whether the contractor's estimates of its costs and profits is sound and reasonable.

118.    In light of the profit fades on a number of CCI projects from 1996 to 1997 and 1997 to 1998, Brown Schultz was required under GAAS to, at minimum, test the reliability of CCI's estimates and its costs to complete contracts in progress and estimated profits thereon because of, without limitation, the following factors:

- By the end of 1997 and throughout 1998, CCI was self-performing some contract work which had previously subcontracted out to others and it also purchased approximately $6-7 million worth of new construction equipment in connection with its new self-performing work;

- CCI was not properly allocating indirect costs to individual contracts. This had the effect of artificially inflating CCI's profits (or reducing losses) on individual projects.  This is important for any user of CCI's audit reports who is interested to see how profitable CCI's contract work was or, alternatively, how much CCI was losing on individual contracts; and,

- The presence of significant-related party transactions including, CCI's relationship with PCIC.

119.    There were inadequate audit procedures performed by Brown Schultz in such important areas as CCI's contracts-in-progress generally and, specifically, the design and implementation (or the lack of) substantive audit procedures in connection with accumulated costs and estimated costs to complete of CCI's contracts.

120.    Undue reliance was placed by Brown Schultz on CCI management's assertions with respect to costs-to-complete and estimated profits on the CCI contracts. The determination of the accuracy of the accumulated costs to date and the estimated costs-to-complete is critical to contractors like CCI using the percentage of completion method of accounting.

121.    The percentage of completion method recognizes revenue based on costs incurred to date divided by total estimated costs on the job, multiplied by the contract amount.

122.    In its CCI audit working papers, Brown Schultz acknowledged that its testing of 25 of CCI's cost transactions was only a test of CCI's cost controls. That is to say, no specific testing of CCI's contract costs was performed. This was incorrect under the circumstances extant.

123.    The testing of 25 costs allows the auditor to make qualitative assessments about a contractor's cost controls. However, such testing does not replace the need to perform substantive procedures, such as vouching (ascertaining the truth of ) significant contract costs and an analytical review.

124.    CCI had substantial direct costs related to its subcontractors and there was documentation in Brown Schultz' working papers relating to past and present claims between CCI and its subcontractors, as well as evidence of subcontractor defaults.

125.    In the December 31, 1996 financial statements of CCI, Brown Schultz footnoted that the reason for losses on certain projects was "caused by additional costs associated with subcontractor defaults and the related legal expenses to defend those cases." Nonetheless, Brown Schultz did not send out any confirmations of amounts owed by CCI to CCI's subcontractors, nor did Brown Schultz' "Permanent Files" or its other work papers document that it reviewed CCI's subcontracts and other similar construction agreements.

126.    In addition, Brown Schultz specifically excluded any job related expenses in its testing of unrecorded liabilities.  Instead, as noted above, Brown Schultz relied on a test of 25 selected costs throughout each year - for contract testing purposes only - and there was no evidence in Brown Schultz' working papers that it performed any analytical procedures related to accumulated job costs.

127.    The estimated costs-to-complete CCI's contracts schedule contained in the Audited Financial Statements were also deficient because Brown Schultz relied on CCI's representations as to such costs with no documentation substantiating the fact that CCI's management estimates were reasonable other than the fact that they had allegedly been verified by Sherri Phillips, CCI's Chief Financial Officer and/or Stan Sechrist, CCI's Vice President - Construction Operations.

128.    Brown Schultz misunderstood the requirements of SAS No. 57, Auditing Accounting Estimates (Professional Standards, AU Section 342), and did not follow the guidelines to properly assess the reasonableness of CCI's management estimates.

129.    In addition, it does not appear that Brown Schultz followed the *Horwath International Audit Manual* – the audit procedures manual it claims to have utilized – with respect to "basic" approaches to evaluate accounting estimates.  The requirements include:

•      Reviewing and testing management's process used to develop the estimates;

•      Developing an independent expectation to corroborate management's estimates; and,

•      Reviewing subsequent events and transactions.

130.    To the contrary, Brown Schultz' working papers show that in 1998, CCI was estimating gross profits on several contracts-in-progress that were materially higher than the historical or originally projected amounts.  Subsequent review of these projects revealed that

these contracts had significant profit fades and one job - no. 454, Albemarle Prison - had a loss of $957,000.00, and profit fade based on Brown Schultz' 1998 workpapers of approximately $2,600,000.

131.    Also, the files in Brown Schultz' 1998 working papers contained no evidence of any consideration by it of the allocation of indirect costs to estimated costs-to-complete, despite Brown Schultz' knowledge that CCI was self-performing more of its subcontract work than in the past.

132.    In addition, there was no follow up between the documented preliminary analytical review work and the final work, despite a material increase in the contracts in process schedule.

133.    Brown Schultz also failed to document the reasons for the significant underbillings reported at the end of the 1998 year.

134.    The *Horwath International Audit Manual* in section 12.049, specifically addresses the procedures to follow if unbilled construction receivables are significant, including the physical inspection of construction sites and architects' or engineers' reports, and, possibly, obtaining assistance from outside specialist.

135.    Job site visits were never conducted by Brown Schultz and the reasons therefor were not documented in Brown Schultz' work papers.

136.    In general, Brown Schultz' audit planning and its audit procedures fell below those applicable standards of care of a certified public accountant performing the audit of CCI's financial statements.

137.    In particular, Brown Schultz failed to conform its audit work for CCI is as follows:

- GAAS requires all auditors to exercise "due professional care…in the performance of the audit and the preparation of the report." SAS No. 1, AU Section 230. Included in the foregoing section, is the fact that due professional care requires the auditor to exercise professional skepticism. Brown Schultz failed to act with sufficient professional skepticism and was not diligent in evaluating audit evidence;

- GAAS also requires that audit field work must be "adequately planned and properly supervised." SAS No. 22, AU Section 311. Brown Schultz' planning documentation for the audit reports for 1996, 1997 and 1998 remain virtually unchanged despite the fact that CCI had experienced significant growth in those years, was self-performing more work and had exhibited significant profit fades on a number of jobs;

- Brown Schultz also failed to properly address the risks involved in the audit of CCI and, consequently, Brown Schultz did not modify or change its audit procedures or its approach to the audit work for CCI. SAS No. 1, AU Section 230 and SAS No. 22, AU Section 311; and,

- Further, Brown Schultz' limited its testing of, among other things, accumulated job costs, subcontractor costs and subsequent disbursement of job costs. Accordingly, Brown Schultz failed to insure during its performance of audit field work for CCI that "sufficient competent evidential matter . . . was obtained . . . ." SAS No. 31, AU Section 326.

138.    PCIC was a captive insurance company owned by CCI's sole stockholder, Ortenzio. Brown Schultz also performed the audit and tax work for PCIC.

139.     According to applicable accounting standards, PCIC was a related party to CCI. *See* SAS No. 57, Related Party Disclosures, March 1982.

140.     On December 1, 1998, PCIC issued a Guaranty Agreement guaranteeing full payment of a CCI claim in the amount of $1,161,448.63 against the Commonwealth of Pennsylvania on Job Number 439, Mahanoy Prison.

141.     Sometime thereafter, a new Guaranty Agreement, also dated December 1, 1998 was executed in the amount of $1,162,460.00.

142.     The CCI claim of $1,162,460.00 did not meet the recognition standards set forth in AICPA Technical Aids, Statement of Position ("SOP") 81-1, Accounting for Performance of Construction-Type and Certain Production-Type Contracts, July 15, 1981.

143.     Further, the Guaranty Agreement executed by PCIC in favor of CCI and dated less than a month before the close of CCI's books for the year ended December 31, 1998 did not support the recognition of $1,162,460.00 in revenue for CCI for the year ended December 31, 1998 as recorded in the 1998 Audit Report.

144.     SOP 81-1, par. 65 states, in pertinent part, that recognition of additional contract revenue relating to claims is appropriate when it is "probable" the claim will result in additional revenue and the amount can be reliably estimated.

145.     In satisfying those requirements, Brown Schultz failed to document evidence that:

(a)     There was a legal basis for the claim or a legal opinion had been obtained (SOP 81-1 par. 65 a); and

(b)     The evidence supporting the claim was objective and verifiable and not based upon management's "feel" for the situation or on unsupported representations (SOP 81-1 par. 65 d).

146.    In addition, the recording and disclosure of the third-party transaction involving PCIC and CCI in the 1998 Audit Report was misleading to the user of that report since the PCIC Guaranty was recorded by Brown Schultz as revenue.

147.    Further, the PCIC transaction was recorded as an underbilling instead of as a separate line item on the balance sheet clearly denoted as being a related party transaction.  The result was a material misstatement in the 1998 Audit Report of $1,162,460.00 incorrectly reported as revenue.

148.    A more appropriate disclosure would have been to report the transaction as a separate line item on the balance sheet of CCI indicating that it was specifically guaranteed by a company owned by the sole stockholder of CCI.

149.    The delineated errors, omissions and violations of professional standards resulted in the Audited Financial Statements presenting a skewed and highly inaccurate portrait of CCI's true financial conditions.

<u>The Restated Financials</u>

150.    Restated financial statements prepared by Stephen J. DeBruyn, C.P.A., an expert retained by USF&G, reveal the magnitude of the effect Brown Schultz' errors had on CCI's financial picture and, consequently the underwriting process.

151.    According to the restated balance sheet for CCI for the year ended December 31, 1997 prepared by Stephen J. DeBruyn, C.P.A., CCI's reported net income of $706,879.00 turned into a net *loss* of **$**109,081 and its retained earnings dropped from $5,208,489.00 to $4,392,529.00.

152.    As restated, the net loss for the fiscal year ended December 31, 1997 was in stark contrast to the June 30 and September 30, 1997 interim financial statements which reported that CCI had made profits as of each of those dates of $283,339.31 and $807,000.00 respectively.

153.    In addition, CCI's restated net worth of $4,638,834.00 represented a 15% drop from the $5,454,794.00 reported in the 1997 Brown Schultz Audit Report.

154.    Based upon the foregoing, and assuming that Ortenzio was unwilling to inject additional capital into CCI and was also unwilling to reinstate his personal indemnity, USF&G's underwriters were unequivocal that USF&G would not have approved any of the bonds for the following projects:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $15,647,035 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $7,220,942 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $3,919,156 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $5,591,730 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $18,880,298 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $21,927,111 |

155.    The 1998 Audit Report did not disclose that a CCI claim for delay damages and winter conditions in the amount of $1,162,460.00 for the Mahanoy Prison project had been booked as revenue.  Footnote number 8 contained in the Brown Schultz 1998 audit report merely shows that that Mahanoy Prison claim had been guaranteed by PCIC.

156.    USF&G's underwriters interpreted this footnote as meaning that if CCI did not receive payment of all or a portion of the claim asserted by CCI relative to the Mahanoy Prison, PCIC would guaranty payment of the unpaid portion sometime in the future.

157.    Neither the footnote nor the Audit Report contained any information indicating that the Mahanoy Prison claim had already been included as revenue for CCI in 1998.

158.    Taking that claim out of revenue would have, standing alone, caused CCI to suffer a net loss of over $1 million.  That information, standing alone, would have caused USF&G to suspend CCI's bonding program as of March 2, 1999.

159.    With respect to the restated financial statement for CCI for the year ended December 31, 1998, USF&G underwriters are unequivocal that none of the following bonds issued after USF&G's receipt of the 1998 Audit Report on March 2, 1999 would have been issued had that 1998 Audit Report contained the information in restated financials:

|    | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|----|---------|-------------|----------|-----------|--------------|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $514,976 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $835,299 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $1,688,139 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $191,083 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $12,191,000 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $4,126,478 |
| G. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $28,231,945 |

160.    In September 1999, CCI advised USF&G that it lacked the financial resources to continue its operations and, consequently, would not be able to complete its work and pay its

suppliers and subcontractors relative to the projects bonded by USF&G.  This was shocking to USF&G.

161.     The Audit Reports gave no indication of CCI's financial troubles.  Likewise, Phillips knew of no serious problems that would have indicated CCI's financial collapse in the fall of 1999.

162.     Subsequently, USF&G, as the surety for the payment and performance bonds which it issued for the Projects, was required to and did expend substantial sums satisfying the claims of CCI's unpaid vendors, employees and subcontractors, and in completing the projects USF&G bonded on behalf of CCI.

163.     In February 2000, CCI closed business operations and in May 2000, it filed for bankruptcy protection.

164.     To date, USF&G has incurred losses of approximately $25,926,984.00 in connection with the bonds issued in reliance upon the Audited Financial Statements.  The breakdown of these losses is illustrated on the following schedules:

     a.     <u>The 1997 Brown Schultz Audit Report</u>:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $4,049,491.71 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $2,532,447.20 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $307,758.53 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $2,869,808.49 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $1,449,469.53 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | <u>$4,949,384.03</u> |

Subtotal:     $16,158,359.49

b.     The 1998 Brown Schultz Audit Report:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $235,002.59 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $79,529.64 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $411,807.72 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $228,201.80 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $4,715,372.83 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $1,369,904.72 |
| G. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $2,728,805.57 |

Subtotal:     $9,768,624.87

Total:  25,926,984.36

## II.  Rulings of Law

## Negligent Misrepresentation

1.     "Under Pennsylvania law, the tort of negligent misrepresentation has been interpreted to require a plaintiff to prove: (1) a misrepresentation of material fact, (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation."  *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F.Supp. at 526; *Borough of Landsdowne, Penn. v. Sevenson Environmental Services, Inc.*,

2000 WL 1886578*3; *Burland v. Manor Care Health Servs., Inc.*, 1999 WL58580*3 (E.D. Pa.);

*Weisblatt v. Minnesota Mutual Life Ins.*, 4 F.Supp. 2d 371, 377 (E.D. Pa. 1998).

2.      To prove negligent misrepresentation, a party is only required to show by a

preponderance of the evidence that there was a failure to "exercise reasonable care or

competence in obtaining or communicating the information." *Fort Washington Resources, Inc.*

*v. Tannen*, 858 F. Supp. 455,461 (E.D. Pa. 1994); *Robert Wooler Co. v. Fidelity Bank*, 330 Pa.

Super. 523 (1984) (accounting firm has duty to exercise care and skill customarily exercised by

an accountant); Restatement (Second) of Torts §229A, comment c.  The speaker need not know

that his words are untrue, but must have failed to make reasonable investigation of the truth of

the words.  *Bortz v Noon*, 556 Pa. at 500.

3.      It is sufficient for purposes of establishing negligent misrepresentation that "the

representor must make the misrepresentation without knowledge as to its truth or falsity *or must*

*make the representation under circumstances in which he ought to have known of its falsity. . . ."*

*Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F.Supp. at 526

(emphasis supplied).

4.      "The elements of negligent misrepresentation differ from intentional

misrepresentation in that the misrepresentation must concern a material fact and *the speaker need*

*not know his or her words are untrue*…."  *Bortz v. Noon*, 556 Pa. at 500. (emphasis supplied).  A

party alleging negligent misrepresentation need only show that there was a failure to "exercise

reasonable care or competence in obtaining or communicating the information." *Fort*

*Washington Resources, Inc. v. Tannen*, 858 F.Supp. at 459.

5.      The word "intent" is not limited to the subjective state of wishing to bring about a

certain result.  Rather, the word "intent" means that the actor merely desires to cause

consequences of his act or *that he believes that the consequences are substantially certain to result from it*." Restatement (Second) of Torts §8A (1964) (emphasis supplied).

6.      To recover damages for an accountant's negligence in rendering an unqualified audit opinion, a plaintiff must prove that the accountant's negligence was the proximate or legal cause of its injury.  *See, Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F.Supp. 557, 563 (W.D. Pa. 1996); *Gibbs v. Ernst*, 538 Pa. at 212.

7.      Cause in fact or "but for" causation provides that if the harmful result would not have come about but for the negligent conduct, then there is a divert causal connection between the negligence and the injury.  *Commonwealth of Pennsylvania v. United States Mineral Products Co.*, 2002 WL 31454023*2 (Pa. Cmwlth); Restatement (Second) of Torts, §548A (a misrepresentation is the proximate cause of the plaintiff's loss, "if but only if, the loss might reasonably be expected to result from reliance.").

8.      Legal or proximate cause exists "where a defendant's wrongful conduct is a substantial factor in bringing about plaintiff's harm."  *Id.*, citing *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643 (Pa. Super. 2002).

9.      To establish the required legal nexus, a plaintiff must show that the loss was a foreseeable result of the fact or condition that the financial statements misrepresented or concealed.  *See*, Restatement (Second) of Torts, §548A, comment b; *Bily v. Arthur Young & Co.*, 271 Cal. Rptr. 470, 485 (Cal. Ct. App. 1990) ("[a] legal cause of loss is a cause which is a substantial factor in bringing about the loss").  A cause can be found to be a substantial factor so long as it is significant or recognizable; it need not be quantified as considerable.  *Jeter v. Owens-Corning Fiberglass Corp.*, 716 A.2d 633 (Pa. Super. 1998).

10.     A plaintiff is not bound to exclude the possibility that the event might have happened in some other way. *World Radio Laboratories, Inc. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d1 (1996); *Thayer v. Hicks*, 243 Mont. 138, 793 P.2d 784 (1990). Rather, the plaintiff is only required to satisfy the trier of fact, by a preponderance of the evidence, that the injury occurred in the manner claims. *Id.*

11.     It is axiomatic that "a defendant is not relieved from liability because another concurring cause may also be responsible for producing injury. *Powell v. Drumheller*, 539 Pa. 484 (1995).

12.     Further, an intervening cause is not a superseding cause where the negligence of the accountant creates or increases the foreseeable risk of harm. Restatement (Second) of Torts §§440 and 442A.

13.     An intervening force which is the normal consequence of the situation created by the accountant's negligence is not a superseding cause. Restatement (Second) of Torts §443.

14.     Likewise, an intervening force is not a superseding cause of a loss when the force is of little consequence in causing the loss. *Thayer v. Hicks*, 793 P.2d 784 at 155 (Mont. 1990).

15.     I find that there were no intervening or superseding causes.

16.     In a negligent misrepresentation claim against an accountant, the plaintiff's reliance on the misrepresentation provides the requisite causal connection between the misrepresentation and the plaintiff's injury. *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 683 N.Y.S.2d 179 (1st Dept. 1998).

17.     I find that Brown Schultz misrepresented material facts in the 1997 Audit Report.

18.     I find that Brown Schultz misrepresented material facts in the 1998 Audit Report.

19.     I find that Brown Schultz either knew of the misrepresentations, made the misrepresentations without knowledge as to its truth or falsity or ought to have know of its falsity.

20.     I find that Brown Schultz intended the representation to induce action by USF&G.

21.     I find that USF&G was injured by acting in justifiable reliance on the misrepresentations.

Privity Is Not Required Because Pennsylvania Has Adopted Restatement (Second) Of Torts §552

22.     *"[U]nder Pennsylvania law, privity is not a requirement of a claim for negligent misrepresentation."*  Report and Recommendation dated August 10, 2001 (the "Report"), p. 9. (emphasis supplied), citing *Williams Controls v. Parente, Randolph, Orlando, Carey & Assoc.*, 39 F.Supp. 2d 517 (M.D. Pa. 1999) (Vanaskie, J.); *Borough of Landsdowne v. Sevenson Envir. Serv., Inc.*, 99-3781, 2000 WL 1886578 (E.D. Pa. Dec. 12, 2000).

23.     Further, "the Pennsylvania Supreme Court has adopted the Restatement (Second) of Torts §552 . . . ."  Report, p. 7.

24.     The standard for an accountant's liability to non-clients for negligent misrepresentation is governed by Pennsylvania's adoption of the Restatement (Second) of Torts §552.  *Bortz v. Noon*, 729 A.2d 555 (Pa. 1999); *Rempel v. Nationwide Life Insurance Co., Inc.*, 370 A.2d 366 (Pa. 1977) (adopting the first Restatement of Torts §552, which is held to be substantially the same as the Restatement (Second) of Torts §552).

25.     The Restatement provides, in relevant part, that:

> (1)     One who, *in the course of his business, profession or employment*, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability of pecuniary loss caused to them by their justifiable reliance upon the

information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2)    . . . [T]he liability stated in Subsection (1) is limited to loss suffered

(a)    by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or *knows that the recipient intends to supply it*; and

(b)    through reliance upon it *in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.*

Restatement (Second) of Torts §552 (1977) (emphasis supplied).

26.    In adopting this standard, Pennsylvania joined the majority of states that have chosen this moderate test to determine the liability of accountants to non-clients in lieu of the more restrictive "near-privity" test  and the broader "foreseeability" test.  *See*, *Bily v. Arthur Young & Co.*, 11 Cal. Rptr. 2d 51, 64-67 (1992) (detailed discussion of the differing standards utilized to define the scope of liability of accountants to non-clients, including citation to the 17 states that had adopted Restatement (Second) of Torts §552 to that date).

27.    Courts adopting the Restatement have recognized that, when properly interpreted, §552(2) limits potential liability of an accountant to a select group of non-client third parties who can demonstrate knowledge on the part of accountants of the limited-though unnamed-group of potential third parties that will rely upon the accountant's report, as well as knowledge of the particular financial transaction that such information is designed to influence, or a substantially similar transaction.  *Id.*; *see Industrial Indemnity Co. v. Touche Ross & Co.,* 13 Cal. App. 4th 1086, 1095 (1993).

28.    Although, under the Restatement, an accountant is liable only where he or she "intends" certain things, it is important to note that the word "intent," as defined in the Restatement, is not limited to the subjective state of wishing to bring about a certain result. Thus, the Restatement provides that the word "intent" means "that the actor desires to cause

consequences of his act, *or that he believes that the consequences are substantially certain to result from it."* Restatement (Second) of Torts §8A (1964) (emphasis supplied).

29.    One of the key legal precepts concerning the interpretation of §552 is that courts are hesitant to impose liability on a professional that greatly exceeds that professional's understanding of the risks undertaken in accepting a particular assignment. *See, Briggs v. Sterner*, 529 F.Supp. 1155, 1177 (S.D. Iowa 1981) (The Restatement is a compromise between the harshness of strict privity requirements and the "specter of unlimited liability.")

30.    Section 552 of the Restatement provides, in pertinent part, that:

> One who, in the ordinary course of his business, profession or employment, *or* in any other transaction in which he has a pecuniary interest, supplies false information . . . is subject to liability . . . if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts §552 (emphasis supplied).  The word "or" in §552 indicates the existence of a disjunctive requirement; namely, the pertinent section of the Restatement is applicable *either* to one who is rendering advice in the "ordinary course of his business, profession or employment *or* to one that is doing so in a transaction in which he has a pecuniary interest."  *Sain v. Cedar Rapids Community School District*, 626 N.W.2d 115 (Iowa 2001) (§552 of the Restatement provides that a duty arises when information is provided by persons in the business or profession of supplying information to others).

<u>Standard Of Care</u>

31.    The standard of care for accountants has been expressed as follows:

> "Accountants and auditors have the duty to exercise that degree of care, skill and competence exercised by reasonably competent members of their profession under the circumstances . . . .

*Matter of Hawaii Corp.*, 567 F.Supp. 609 617 (D. Hawaii 1983).

32.     Compliance with GAAP and GAAS will not immunize an accountant when he consciously chooses not to disclose on a financial statement a known material fact. *Matter of Hawaii Corp., supra; Halwrson v. Sooy*, 782 P.2d 161 (Or. Ct. App. 1989).

33.     Accountants must meet those standards of expertise and diligence appropriate under the facts and circumstances of the particular case, as established by the testimony of an appropriately qualified expert witness. *Bily v. Arthur Young & Co.*, 11 Cal. Rptr. 2nd at 76; *Maduff Mortgage Corp. v. Deloitte, Haskins & Sells*, 779 P.2d 1083 (Or. Ct. App. 1989).

34.     A breach of duty is found when an accountant does not adhere to the rules and standards of his profession. *Rhode Island Hospital Trust National Bank v. Swartz, Bresenoff, Yavner & Jacobs*, 455 F.2d 847 (4th Cir. 1972); *MacNerland v. Barnes*, 129 Ga. App. 367, 199 S.E.2d 564 (1973).

35.     Pennsylvania law regards a violation of a professional standard as evidence of negligence but not negligence *per se*. *Edwards v. Brandywine Hospital*, 438 Pa. Super. 673 (1975).

36.     In evaluating whether an accountant complied with the requisite standard of care, most courts will consider whether the accountants complied with their own internal accounting manuals and other procedures. *Bily v. Arthur Young & Co.*, 271 Cal. Rptr. 470, 476 (Cal. Ct. App. 1990) (internal manuals can properly be deemed relevant to the broader standard of care).

37.     Moreover, where an auditor's engagement is for a particular purpose or the auditor has notice of the special importance of a particular aspect of the auditing work, the auditor may be held to a higher standard of performance than might otherwise be applicable. *Ryan v. Kanne*, 170 N.W.2d 395 (Iowa 1969); *City of East Grand Forks v. Steele*, 121 Minn. 296, 141 N.W. 181 (1913).

38.    I find that Brown Schultz breached the standard of care for accountants.

Justifiable Reliance

39.    The test for justifiable reliance is whether the recipient knew or should have known that the information supplied was false.  *Fort Washington Resources, Inc. v. Tannen*, 858 F. Supp. at 455, citing *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285 (1971).  Where the means of obtaining information is not equal, the "representations of the person believed to possess superior information may be relied upon."  *Id*. at 460, citing *Sisken v. Cohen,* 363 Pa. 580 (1950).

40.    Essentially, a plaintiff can satisfy the reliance element by demonstrating that he actually relied, in part, on an accountant's opinion in taking some action.  *Fine v. American Solar King Corp.*, 919 F.2d 290, 299 (5th Cir. 1990); *In re Sahlen & Associates, Inc.*, 773 F.Supp. 342, 352-53 (S.D. Fla. 1991).

41.    A person claiming justifiable reliance on a misrepresentation does not have to prove that the misrepresentation was the sole inducement.  *Fort Washington Resources, Inc. v. Tannen*, 858 F.Supp. at 460.

42.    USF&G need not prove that any particular audit report was the sole inducement for its decision to issue payment and performance bonds on behalf of CCI.  *Delahanty v. First Pennsylvania Bank*, 318 Pa. Super. 90 (1983).

43.    USF&G can prove justifiable reliance for purposes of the cause of action for negligent misrepresentation by proving that the information in the audit reports was a "substantial factor" in determining its course of conduct.  *Neuman v. Corn Exchange Nat. Bank & Trust Co.*, 356 Pa. 442, 445 (1947); *Blue Bell v. Peat, Marwick*, 715 S.W.2d 408, 415 (Tx. 1986).

44.     The gravamen of the cause of action for negligent misrepresentation is justifiable reliance on the representations contained in the auditor's report.  The rules for determining whether a plaintiff justifiably relied on a material misrepresentation are found in §§540 and 541 of the Restatement (Second) of Torts.  When read together, these rules demonstrate that the party to whom a misrepresentation is made is justified in relying upon the truth of that statement unless he knows it is false or its falsity would be obvious to him upon a cursory inspection.  *See, Silverman v. Bell Savings & Loan Association*, 533 A.2d 110, 115 (Pa. Super. Ct. 1987).

45.     "The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him."  Restatement (Second) of Torts, § 540.  "The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had made an investigation."  Restatement (Second) of Torts, § 541.

46.     As a comment to §541 explains, a person is found not to have justifiably relied on a representation "only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses."  Restatement (Second) of Torts §541 cmt. a (1977). A recipient cannot recover if he *blindly* relies upon a misrepresentation of the *falsity* of which would be *patent* to him if he had utilized his opportunity to make a *cursory* examination or investigation."  *Id*.  (emphasis added).

47.     As a general rule, "one to whom a duty is due has the right to assume that it will be performed and is not required to anticipate the negligence of another."  *KBF Associates L.P. v. Saul Ewing Remick & Saul*, 1998 WL 658557*5, citing *Bortz v. Henne*, 415 Pa. 150 (1964).

48.     As a matter of law, USF&G need not prove that any particular audit report was the sole inducement for its decision to issue payment and performance bonds on behalf of CCI. *Delahanty v. First Pennsylvania Bank*, 318 Pa. Super. 90 (1983).

49.     USF&G can prove justifiable reliance for purposes of the cause of action for negligent misrepresentation merely by proving that the information in the audit reports was a "substantial factor" in determining its course of conduct.  *Neuman v. Corn Exchange Nat. Bank & Trust Co.*, 356 Pa. 442, 445 (1947); *Blue Bell v. Peat, Marwick*, 715 S.W.2d 408, 415 (Tx. 1986).

50.     Even if, *arguendo*, the work of USF&G's underwriters was anything less than stellar, it is axiomatic that "[f]oolhardiness or stupidity does not mitigate in favor of the defendants."  *Bonhiver v. Graff*, 248 N.W.2d at 297.

51.     Accountants are not "immune from the consequences of their negligence because those who employ them have conducted their own business negligently."  *KBF Associates L.P. v. Saul Ewing Remick & Saul*, 1998 WL at *5, citing, *National Surety Corp. v. Lybrand*, 9 N.Y.S. 2d 554, 563 (1939).

### Comparative And Contributory Negligence Are Inapplicable

52.     Under Pennsylvania law, comparative negligence is governed by statute, 42 Pa. C.S.A. §7102.  The statute applies "in all actions brought to recover damages for negligence resulting in death or injury to person or property."  It does not apply to cases involving only financial loss and, accordingly, is inapplicable in this case.  *See Rizzo v. Michener*, 584 A.2d 973 (Pa. Super. 1990).

53.     Pennsylvania upholds the "audit interference rule," which provides that an accountant may only utilize the defense of contributory negligence to the extent that such

contributory negligence consists of actions *by the plaintiff that interfere with the conduct of the audit*. *Jewelcor Jewelers and Distributors, Inc. v. Corr*, 373 Pa. Super. 536, 551-52 (P.A. Super. 1988) (emphasis supplied).

54.    An accounting firm which has been sued for negligently performing an audit may assert the defense of contributory negligence *only* when the plaintiff's conduct interfered with the audit and this interference was a substantial factor in causing the plaintiff's loss. *In re Jack Greenburg, Inc.,* 212 B.R 76 (E.D. Pa. 1997).

55.    Further, the plaintiff must be negligent and the negligence must contribute to the defendant's failure to perform his contract and report the truth. *Id.* The *Greenburg* Court affirmed this two-part test:  did the plaintiff's conduct interfere with the audit; if so, was the interference a substantial factor in causing the plaintiff's loss. *Id.* at 92.

56.    "Under Pennsylvania law, a party's contributory negligence is not a defense to an action against an accountant for professional negligence unless that contributory negligence impeded the accountant from performing its obligations satisfactorily-- the so-called 'audit interference rule'" *Medical Consultants Network, Inc. v. Cantor & Johnston, P.C.,* 2001 WL 10788(E.D. Pa.), citing *Jewelcor Jewelers and Distributors, Inc. v. Corr*, 373 Pa. Super. 536, 551-52 (P.A. Super. 1988).

57.    I find that there is no evidence that USF&G interfered relative to Brown Schultz' preparation of the Audited Financial Statements.

58.    I find that contributory negligence is not a valid defense in this action.

59.    I find that comparative negligence is not a valid defense in this action.

<u>Expert Testimony</u>

60.     As a general rule, an expert witness may testify, in the form of opinion or

otherwise, if scientific, technical or other specialized knowledge possessed by the expert will

assist the trier of fact in understanding the evidence or in determining a fact in issue.  Fed. R.

Evid. 702.  An exception to the need for expert testimony exists where issues regarding the

standard of care are within the realm of ordinary lay knowledge.  *Wagenheim v. Alexander Grant*

*& Co.*, 482 N.E.2d 955, 969 (Ohio Ct. App. 1983).  This is not likely in most accounting cases.

*Seward International v. Price Waterhouse*, 391 S.E.2d 283 (Va. 1990).

61.     While recognizing the need for expert testimony in certain areas of litigation, the

*Daubert* decision appointed the trial judge as a "gate keeper" invested with the responsibility of

determining whether an expert's testimony is based on sound methodology or is mere conjecture.

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. at 593.  The "gate keeper" function of the court

is intended to prevent a jury from being swayed by evidence that is irrelevant or non-reliable.  *Id.*

at 590.

62.     For purposes of evaluating whether or not an expert witness may rely on a certain

methodology as a basis for his testimony, various factors set out in *Daubert* are applied.  The

*Daubert* factors governing the reliability of expert testimony are as follows:  (1) whether a

method consists of a testable hypothesis; (2) whether the method has been subject to peer review;

(3) the known or potential rate of error; (4) the existence and maintenance of the standards

controlling the technique's operation; (5) whether the method is generally accepted; (6) the

relationship of the technique to the methods which have been established to be reliable; (7) the

qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial

uses to which the method has been has been put.  *Id.; Protocomm Corp. v. Novell Advanced*

*Services, Inc.,* 171 F.Supp. 2d 473 (E.D. Pa. 2001) (applying *Daubert t*o accountants).  As

discussed, *infra*, the *Daubert* factors are primarily designed to eliminate "junk science" and possess significantly less utility in vetting other areas of expert testimony.

63.     The Third Circuit has adopted the factors laid out in *Daubert*, *with the qualification that the reliability requirements not be applied too strictly, and that they "not be used as a tool by which the court excludes all questionably reliable evidence." In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3rd Cir. 1994); *see also I.D. Security Systems Canada, Inc. v. Checkpoint Systems Inc.*, 259 F.Supp.2d 622 (E.D. Mich. 2003) (trial judge "should consider specific *Daubert* factors only to the extent they are reasonable measures of such reliability"). Both the Third Circuit and Pennsylvania courts apply a "liberal standard" for assessing the qualification of an expert and the reliability of expert testimony. *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d at 742; *In re Glosser Bros. Inc.*, 382 Pa. Super. 177 (1989).

64.     As a general proposition, rather than exclude proffered expert testimony there is a *presumption of admissibility with it then left to the fact finder to determine how much weight to give to the testimony. LePage's Inc. v. 3M*, 324 F.3d 141, 165 (3d Cir. 2003) ("The credibility of LePage's and 3M's experts was for the jury to determine."); *Paoli*, 35 F.3d at 744 ("The ultimate touchstone [of admissibility] is helpfulness to the trier of fact."); *Commonwealth v. Gonzalez*, 519 Pa. 116 (1988); *Kuiss v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 338 (1974); *Davis v. Steigerwalt*, 822 A.2d 22 (Pa. Super. 2003).

65.     When dealing with non-scientific expert testimony, the Third Circuit evidences an even more generous standard favoring admissibility. *See e.g. In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 157 (3d Cir. 1999) (testimony concerning investigation methods for determining financial health should not be evaluated "by the particular standards required for testimony based on a particular scientific ethic"); *ProtoComm Corp. v. Novell Adv. Servs., Inc.*, 171 F.Supp.2d at

477 ([The *Daubert* factors] do not so readily and easily apply in the context of testing the reliability of opinions concerning the characterization of complicated business transactions."). In *Main Street Mortgage, Inc. v. Main Street Bancorp.*, 158 F.Supp.2d 510 (E.D.Pa. 2001) the Court held that the testimony of an accounting expert is "non-scientific" and reiterates that a more relaxed standard should apply to such testimony.

66.    In terms of actual methodology used by the expert, any challenges to the methodology must explain why the calculations are improper. *Davis v. Steigerwalt*, 822 A.2d at 26. The mere fact that an expert's method differs from other possible methods does not raise any presumption that the expert's approach is improper. *Id.*; *see also Allegheny Ludlum Corp. v. Municipal Authority of Westmoreland County*, 659 A.2d. 20, 30 (Pa. Cmwlth. Ct. 1995); Fed. R. Evid. 702.

67.    In the context of financial analysis, Pennsylvania courts have been receptive to new methodologies on the rationale that "[n]ew methods of valuing instruments have been developed and are generally accepted in the financial community as being reliable." *Glosser Bros.*, 382 Pa.Super. at 187 (court allowed new valuation methodology despite case law that formerly recognized three different methods of valuation).

68.    The "look-back" method involves the process of "looking back" to prior years when a contract was in progress and recalculating profits, losses, and other financial data based upon the actual data that becomes available when the contract is completed. *Id.*; *see also Tutor-Saliba Corp. v. Commissioner of Internal Revenue*, 115 T.C. 1 (2000); *Chilton Ins. Co. v. Pate & Pate Enterprises, Inc.*, 930 S.W. 2d 877 (Tex. 1996). Section 460(b) of the IRS Code introduced the "look-back" method to the calculation of taxes on long-term contracts. After the taxes are

filed based upon estimates of the contract price and costs, the taxes are later recalculated when the contract is complete in order to compare the initial estimates to the actual results. *Id.*

69.    The first step in the look-back calculation involves the re-determination of the prior year's gross profit on any contracts completed during the current year. This re-determination is also analogous to the subsequent events procedures performed by accountants, requiring accountants to be concerned with events that occur in a subsequent period that affect estimated gross profit reported in financial statements. In fact, the *Howarth International Audit Manual*, supposedly utilized by Brown Schultz in its conduct of the audits of CCI, provides that in appropriate circumstances the auditor should "review[ing] subsequent events and transactions" as part of the audit plan. DeBruyn's method of recasting CCI's contracts-in-process is an established method of evaluating profits, losses, and other financial data, which is recognized by accountants in auditing construction companies and in calculating taxes on profits for long-term contracts.

70.    The "book of wisdom" is a concept which recognizes that the trier of fact may be allowed to hear, consider and take into account facts that happened after the event that is the subject of the litigation even though those facts might not have been known or knowable at the time of the happening of that event. *Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. 689, 698 (1933). Simply, "[t]he reasonableness of estimates may be tested in light of actual experience." *Ralph L. Patsch v. Commissioner*, 19. T.C. 189, 198 (1952).

71.    As stated by Justice Cardoza, "[e]xperience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within." *Id.* In essence, the "book of wisdom" is little more than a judicial acknowledgment "that the law should express 'a judgment from

experience as against a judgment from speculation.'"  *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Price George's County, Maryland*, 1993 WL 524783 (D. Md.), citing *Tanner v. Little*, 240 US 369, 386 (1916).

72.     The book of wisdom has been utilized in a variety of situations, none of which indicate any judicial proclivity to limit or narrow its uses.  *E.g., Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. at 698 (determination of damages for patent infringement); *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Prince George's County*, 1993 WL at 524785 (eminent domain litigation); *Ralph L. Patsch v. Commissioner of Internal Revenue*, 19 T.C. at 198 (determination of amount of tax deduction).

73.     "To correct uncertain prophecies in such circumstances is not to charge the offender with elements of value nonexistent at the time of his offense.  It is to bring out and expose to light the elements of value that were there from the beginning."  *Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. at 698 (citations omitted).

74.     Further, any excuses for information omitted from work papers – intentionally or otherwise – should be viewed skeptically in light of the fact that work papers have "a common purpose – to document the work done, and to preserve a body of evidence adequate in amount and quality and so organized as to lean logically to the professional conclusion expressed."  R.J. Gormley, *The Law of Accountants and Auditors*, ¶3.03[1], p. 3-26 (Warren, Gorham & Lamont 1981).

75.     Moreover, an audit that was adequate in fact may be ruled inadequate in law because of a failure of proof through lack of documentation.  *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 435 (6th Cir. 1980) (The "District Judge evidently inferred from

[accountant's] failure to document such testing in its work papers, that the testing did not occur. The record also establishes adequate foundation for this inference.").

<u>Damages</u>

76.     The "damages recoverable for negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause."  Restatement (Second) of Torts, §552B(1); *Medical Consultants Network, Inc. v. Cantor & Johnston, P.C.*, 2001 WL 10788 (E.D. Pa.) (citing §552B of Restatement as correct measure of damages for negligent misrepresentation).  The "out of pocket" loss is the proper measurement for the claim.  *Id.*

77.     Once negligence is proven, the negligent actor is responsible for all the unforeseen consequences thereof – no matter how remote – which follow in a natural sequence of events.  *Comm. v. United States Mineral Products Co.*, 2002 WL 31454023.  (Pa. Comm.); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1376 (S.D.N.Y. 1982). Essentially, a tort-feasor is liable for all damages which "ordinarily and in natural course of things have resulted from the commission of the tort."  *Frank v. Volkswagenwerk, A.G. of West Germany*, 522 F.2d 321 (C.A. Pa. 1975).

78.     In establishing damages, the plaintiff is only required to furnish a reasonable quantity of information from which the trier of fact may estimate the amount of damages. Generally, damages need not be proved with mathematical certainty, but only reasonable certainty.  *Dehanty v. First Pennsylvania Bank*, 464 A.2d 1243 (Pa. Super. 1983); *see, Bostick v. ITT Hartford Group, Inc.*, 82 F.Supp. 2d 376 (E.D. Pa. 2000); *Jameson, Money, Farmer & Co. v. Standeffer*, 678 So.2d 1061 (Ala. 1996).

79.    For example, "[i]f the injured party produces the best evidence available of his damages and if such evidence provides a reasonable basis for determining his loss, he is entitled to recover although the exact amount cannot be ascertained." *Greenstein, Logan & Co. v. Burgess Marketing*, 744 SW2d at 187.

80.    In essence, plaintiff is not required to quantify all damages with precision but merely to produce evidence tending to show the extent of damages as a matter of just and reasonable inference. *Jamison, Money, Farmer & Co. v. Standeffer*, 678 So.2d at 1067.

81.    "It is well-established law in Pennsylvania that a plaintiff has a duty to minimize his harm when possible. . . It is also, however, well-established that the burden of showing that plaintiff could have but did not lessen his harm is that of the defendant." *Muzikar v. National Railroad Passenger Corporation*, 1997 WL 1433780 (Pa. Com. Pl).

82.    The *burden of proving failure to mitigate rests squarely upon the breaching party*. *Advanta Mortgage Conduit Services, Inc. v. MG Investments, Inc.,* 2000 WL 830727 (E.D. Pa); *Koppers Co., Inc. v. Aetna Casualty and Surety Co.*, 98 F.3d. 1440 (3rd Cir. 1996) (mitigation is affirmative defense, so burden of proving failure to mitigate is on defendant).

83.    Mitigation never requires an unreasonable act, and a party is not expected to go through the motions of attempting to avoid damages when it is certain that such efforts will prove of no avail. *Krauss v. Greenberg*, 137 F.2d 569 (3rd Cir. 1943); *Runner v. National Industry Builders, Inc.*, 54 Pa. D.&C. 2d 65 (1972).

USF&G reserves the right to submit additional proposed findings of fact and rulings of law as may be appropriate based on the evidence adduced at trial.

Respectfully submitted,
UNITED STATES FIDELITY AND
GUARANTY COMPANY,
By its counsel,


 _S/  Bruce D. Levin_____
Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

          and

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:    (717) 237-7100
Facsimile:    (717) 237-7105

Dated: October 8, 2003
#275591 v1/36432/87

- 53 -