UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY,<br><br>　　　　Plaintiff<br><br>v.<br><br>BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ,<br><br>　　　　Defendants. | CIVIL ACTION NO. 1:01-CV-00813<br><br>JUDGE CONNER |

**UNITED STATES FIDELITY & GUARANTY COMPANY'S
OPPOSITION TO BROWN SCHULTZ' MOTION-IN-LIMINE TO
PRECLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT STEVE J. DEBRUYN**

**I.    INTRODUCTION**

United States Fidelity & Guaranty Company ("USF&G") hereby opposes Defendants' Motion in Limine to Preclude the Testimony of Plaintiff's Expert Steve J. DeBruyn (the "Motion in Limine"). The Motion in Limine seeks to bar *all* testimony concerning Steve J. DeBruyn's ("DeBruyn") expert opinions on the apparent grounds that part of DeBruyn's testimony is allegedly inadmissible because of his use of what is termed the "look back" method in his analysis of the audited financial statements of CCI Construction, Inc. ("CCI") prepared by Brown Schultz Sheridan & Fritz ("Brown Schultz") for the years ending December 31, 1997 and 1998 (the "Audited Financial Statements"). Although it presents absolutely no expert testimony critical of DeBruyn's methodology, Brown Schultz boldly avers that such testimony is barred by Fed. R. Evid. 702 and the *Daubert* standard. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). However, there is nothing radical, novel or unreliable about the methodology utilized by

DeBruyn to restate the Audited Financial Statements nor to opine, *inter alia*, that Brown Schultz failed to comply with Generally Accepted Auditing Standards ("GAAS") and that the Audited Financial Statements materially misstate CCI's financial condition. In fact, the methodology utilized by DeBruyn is based on common sense, logic, a doctrine analogous to the "look back" method – utilized to determine tax liability and other issues relating to contractual obligations performed over a period of time – and the GAAS sanctioned accounting procedure of subsequent events testing. Additionally, even without utilization of the look back method, the "book of wisdom" allows the use of experience to analyze the reasonableness of prior judgment. Accordingly, the Motion in Limine should be denied.

## II.     PROCEDURAL HISTORY

On August 30, 2002, Brown Schultz filed a motion for summary judgment. A significant portion of its memorandum of law was devoted to an attack on DeBruyn and the putative inadmissibility of his opinions. Brown Schultz subsequently filed a 17 page reply memorandum that specifically challenged the look back methodology utilized by DeBruyn. Magistrate Judge Smyser issued the Report and Recommendation dated November 5, 2002 which, *inter alia*, denied Brown Schultz's motion for summary judgment.[1] Brown Schultz filed an approximately 40 page brief in support of its objections to the Report and Recommendation, including an objection to the Court's analysis of the sufficiency of DeBruyn's opinion and the look back methodology. On December 16, 2002, Brown Schultz filed a reply brief dedicated entirely to attacking the admissibility of the opinions of USF&G's designated experts. On January 23, 2003 Brown Schultz filed the Motion to Strike Supplemental Expert Report and Affidavit of Stephyn

---

[1] Summary judgment was only allowed to the extent that USF&G wished to recover for damages allegedly based upon the 1996 audit report. All other arguments raised by Brown Schultz were rebutted and denied.

[sic] DeBruyn, CPA (the "Motion to Strike").[2] On January 31, 2003, the Court denied Brown Schultz' objection to the Report and Recommendation and adopted the entirety of the recommendations of Magistrate Judge Smyser. Not content to let the Court's rejection of their attempts to have DeBruyn's reports and affidavits ruled inadmissible by means of a summary judgment motion and motions to strike pass quietly, Brown Schultz filed a reply brief in further support of its motions to strike on February 24, 2003. On March 7, 2003, the Court issued a Memorandum on the Motions to Strike and an Order denying them entirely.

Notwithstanding the Court's March 7, 2003 Memorandum and Order, Brown Schultz filed the Supplemental Summary Judgment Motion of Defendants on September 12, 2003, asserting that purportedly "new" information had become available as a result of DeBruyn's deposition on May 7, 2003. The Supplemental Summary Judgment Motion contained an extensive argument that DeBruyn's testimony is inadmissible under Fed. R. Civ. P. 702 and the factors set forth in *Daubert*. By order dated September 24, 2003, the Court denied Brown Schultz' Supplemental Summary Judgment Motion.

Several arguments raised in both the Motion to Strike and the Supplemental Summary Judgment Motion of Defendants are now resurrected in the Motion in Limine. The "law of the case" doctrine – as well as any healthy distaste for useless repetition of rejected arguments – mandates the denial of Brown Schultz' resurrection of its oft raised (and oft denied) legal theory. *Bolden v. Southeastern Pennsylvania Transportation Authority*, 21 F.3d 29 (3rd Cir. 1994).

---

[2] On January 24, 2003, Brown Schultz also filed a motion to strike the expert report by Richard D. Farnsworth, USF&G's designated expert on underwriting issues.

### III.  ARGUMENT

Fed. R. Evid. 702 and the *Daubert* Standard.

As a general rule, an expert witness may testify in the form of opinion or otherwise, if scientific, technical or other specialized knowledge possessed by the expert will assist the trier of fact in understanding the evidence or in determining a fact in issue.  Fed. R. Evid. 702.  An exception to the need for expert testimony is where issues regarding the standard of care are within the realm of ordinary lay knowledge.  *Wagenheim v. Alexander Grant & Co.*, 482 N.E.2d 955, 969 (Ohio Ct. App. 1983).  Needless to say, this is not likely in most accounting cases.  *Seward International v. Price Waterhouse*, 391 S.E.2d 283 (Va. 1990).  While recognizing the need for expert testimony in certain areas of litigation, *Daubert* appointed the trial judge as a "gate keeper" invested with the responsibility of determining whether an expert's testimony is based on sound methodology or whether the testimony is mere conjecture.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. at 593.  The gate keeper function of the court is intended to prevent a jury from being swayed by evidence that is irrelevant or non-reliable.  *Id.* at 590.

For purposes of evaluating whether or not an expert witness may rely on a certain methodology as a basis for his testimony, various factors set out in *Daubert* are applied.  The *Daubert* factors governing the reliability of expert testimony are as follows:  (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of the standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to the methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been has been put.  *Id.; Protocomm Corp. v. Novell Advanced*

*Services, Inc.*, 171 F.Supp. 2d 473 (E.D. Pa. 2001) (applying *Daubert t*o accountants). As discussed, *infra*, the *Daubert* factors are designed to eliminate "junk science" and possess significantly less utility in vetting other areas of expert testimony.

<u>The Third Circuit Has Adopted a Liberal Qualification Standard.</u>

The Third Circuit has adopted the factors laid out in *Daubert, with the qualification that the reliability requirements not be applied too strictly, and that they "not be used as a tool by which the court excludes all questionably reliable evidence."* In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 742 (3rd Cir. 1994); *see also I.D. Security Systems Canada, Inc. v. Checkpoint Systems Inc.*, 249 F.Supp.2d 622, 690 (E.D. Mich. 2003) (trial judge "should consider specific *Daubert* factors only to the extent they are reasonable measures of such reliability"). Both the Third Circuit and Pennsylvania courts apply a "liberal standard" for assessing the qualification of an expert and the reliability of expert testimony. *Paoli*, 35 F.3d at 742; *In re Glosser Bros. Inc.*, 382 Pa. Super. 177 (1989). As a general proposition, rather than exclude proffered expert testimony there, is a *presumption of admissibility with it then left to the fact finder to determine how much weight to give to the testimony. LePage's Inc. v. 3M*, 324 F.3d 141, 165 (3rd Cir. 2003) ("The credibility of LePage's and 3M's experts was for the jury to determine."); *Paoli*, 35 F.3d at 744 ("The ultimate touchstone [of admissibility] is helpfulness to the trier of fact."); *Commonwealth v. Gonzalez*, 519 Pa. 116 (1988); *Kuiss v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 338 (1974); *Davis v. Steigerwalt*, 822 A.2d 22 (Pa. Super. 2003).

*When dealing with non-scientific expert testimony, the Third Circuit evidences an even more generous standard favoring admissibility. See e.g. In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 157 (3d Cir. 1999) (testimony concerning investigation methods for determining financial health should not be evaluated "by the particular standards required for testimony based on a

particular scientific ethic"); *ProtoComm Corp. v. Novell Adv. Servs., Inc.*, 171 F.Supp.2d at 477 ("[The *Daubert* factors] do not so readily and easily apply in the context of testing the reliability of opinions concerning the characterization of complicated business transactions."). In *Main Street Mortgage, Inc. v. Main Street Bancorp.*, 158 F.Supp.2d 510 (E.D.Pa. 2001), the Court held that the testimony of an accounting expert is "non-scientific" and reiterates that a more relaxed standard should apply to such testimony.

In the Motion in Limine, Brown Schultz *never* informs the Court of the proper standard of evaluating non-scientific expert testimony in the Third Circuit, although the very cases cited by Brown Schultz (addressed to other points of law) recognize the more liberal standard. *See Elock v. Kmart Corp.*, 233 F.3d 734, 742 (2000) (affirming District Court's decision to qualify psychologist as an expert and stating that "this court has had, for some time, a generally liberal standard of qualifying experts"); *Robert Billet Promotions, Inc. v. IMI Cornelius, Inc.*, 1998 WL 151806, *3 (E.D. Pa. 1998) (given the "Third Circuit's liberal qualification standards, the Court has no difficulty finding that [the accountant] is qualified to testify as an expert on damages). Rather than citing the proper standard for evaluating expert testimony, Brown Schultz chooses to rely upon cases that are completely inapplicable. *See U.S. v. Mathis*, 264 F.3d 321 (3rd Cir. 2001) (court should not have excluded testimony of "witness identification" expert in criminal matter); *Oddi v. Ford Motor Co.*, 234 F.3d 136 (3rd Cir. 2000) (testimony of "accident reconstruction expert" properly excluded because expert conducted no tests and used no methodology other than intuition to opine that bumper had design defect that caused accident). The analysis of the expert opinions in both *Mathis* and *Oddi* are not even remotely applicable to the evaluation of the non-scientific testimony of an accountant.

Moreover, in terms of the actual methodology used by the expert, any challenges to the methodology must explain why the calculations are improper. *Davis,* 822 A.2d at 26. The mere fact that an expert's method differs from other possible methods does not raise any presumption that the expert's approach is improper. *Id.*; *see also Allegheny Ludlum Corp. v. Municipal Authority of Westmoreland County,* 659 A.2d. 20, 30 (Pa. Cmwlth. Ct. 1995); Fed. R. Evid. 702. In fact, in the context of financial analysis, Pennsylvania courts have been receptive to new methodologies on the rationale that "[n]ew methods of valuing instruments have been developed and are generally accepted in the financial community as being reliable." *Glosser Bros.*, 382 Pa.Super. at 187 (court allowed new valuation methodology despite case law that formerly recognized three different methods of valuation). Brown Schultz has provided no cogent criticisms of DeBruyn's testimony and, more importantly, has not introduced as part of the Motion in Limine *any* expert testimony critical of either DeBruyn's analysis or methodology.

### The "Look Back" Method

In restating the Audited Financial Statements, DeBruyn recast CCI's contracts-in-progress schedule by utilizing the actual data, including percentage complete, revenue recognized, profit, loss and other financial information, that was available after the contracts were completed. Supplemental and Rebuttal Expert Report of Steve J. DeBruyn, CPA and Expert Report of Steve J. DeBruyn, attached hereto and incorporated herein as Exhibits "A" and "B," respectively. The method relied upon by DeBruyn of recasting contracts-in-progress in a given year from information obtained in a subsequent year is analogous to the "look-back" method recognized and relied upon by the Internal Revenue Service. *See* USC 26 §460(b).

The "look-back" method involves the process of "looking back" to prior years when a contract was in progress and recalculating profits, losses, and other financial data based upon the

actual data that becomes available when the contract is completed. *Id.*; *see also Tutor-Saliba Corp. v. Commissioner of Internal Revenue*, 115 T.C. 1 (2000); *Chilton Ins. Co. v. Pate & Pate Enterprises, Inc.*, 930 S.W. 2d 877 (Tex. 1996). Section 460(b) of the IRS Code introduced the "look-back" method to the calculation of taxes on long-term contracts. After the taxes are filed based upon estimates of the contract price and costs, the taxes are later recalculated when the contract is complete in order to compare the initial estimates to the actual results. *Id.*

The first step in the look-back calculation involves the re-determination of the prior year's gross profit on any contracts completed during the current year. This re-determination is also analogous to the subsequent events procedures performed by accountants, requiring accountants to be concerned with events that occur in a subsequent period that affect estimated gross profit reported in financial statements. In fact, the *Horwath International Audit Manual* – the manual which Brown Schultz claims to have utilized in its conduct of the audits of CCI – provides that in appropriate circumstances the auditor should "review subsequent events and transactions" as part of the audit plan. *Horwath International Audit Manual*, Section 11.120 (2000 Edition). DeBruyn's method of recasting CCI's contracts-in-progress is an established method of evaluating profits, losses, and other financial data, which is recognized by accountants in auditing construction companies and in calculating taxes on profits for long-term contracts and on restating a prior year's financial results. Deposition of DeBruyn ("DeBruyn Deposition") at pp. 228-229. All pages of the DeBruyn Deposition cited herein are attached hereto and incorporated herein as Exhibit "C."

Brown Schultz' objection to DeBruyn's testimony appears to focus on the fact that – as one part of his analysis – he created restated financial statements based on actual numbers obtained from contracts completed subsequent to the years represented in the Audited Financial

Statements that are being recast or restated.[3]  By restating the Audited Financial Statements based on actual figures obtained in subsequent years, DeBruyn is neither directly stating nor implying that Brown Schultz was negligent merely because the estimates used in the Audited Financial Statements were – when compared to the actual results – inaccurate.  Nor for that matter, is Brown Schultz being held to a standard of perfection or being penalized for not being able to see into the future.  On the other hand, why wouldn't the use of actual figures (when available) be the most rational starting point for DeBruyn's analysis?

There is nothing hidden, nefarious or deceptive in DeBruyn's methodology.  If nothing else, the methodology has been described in detail and Brown Schultz remains free to criticize and probe it by means of cross-examination.  DeBruyn's methodology is logical and rational.  While reasonable people can, perhaps, differ as to how the restated financial should be interpreted, there can be no legitimate criticism of the methodology used.  Moreover, Brown Schultz has been unable to find an expert willing to testify to that effect in support of the Motion in Limine.  Additionally, while Brown Schultz feigns indignation that DeBruyn utilizes "actual numbers" – apparently, as opposed to fictional or make-believe numbers – there appears to be no disputes about the authenticity and accuracy of the facts and figures utilized to create the restated financials.  In the business world, financial statements are recast for a variety of reasons.  When they are recast, a methodology substantially similar to that utilized by DeBruyn is used.  As

---

[3] It is likely not mere happenstance that Brown Schultz feels the need to repeatedly attempt to bar DeBruyn's testimony.  The restated financials are not complimentary of Brown Schultz' performance.  For example, the 1997 work-in-progress scheduled prepared by Brown Schultz showed a gross profit on all contracts-in-progress of $1,587,367.00 on total revenue of $29,051,753.00.  In contrast, the restatements show that CCI's contracts-in-progress for 1997 result in a *decrease* in revenue and gross profits of $815,960.00.  According to the restatement of the 1997 Audit Report, the net profit of $706,879.00 reported by Brown Schultz becomes, in actuality, a *loss* of $109,801.00.  The 1998 Audit Report reported a profit of $59,014.00 when, in actuality, CCI *lost* $3,067,467.00.

discussed in greater detail, *supra*, the use of actual results to look back and recast financial statements is an accepted technique in the accounting community.

Brown Schultz Intentionally Misleads the Court and Distorts<br>DeBruyn's Testimony On the Look Back Method

In its Motion in Limine, Brown Schultz misquotes and distorts DeBruyn's deposition testimony with respect to the look back method. In addition, in relying upon the deposition testimony of DeBruyn, *Brown Schultz intentionally misleads the Court by not acknowledging DeBruyn's errata sheet*, which, in some instances, clarifies his prior testimony. Fed. R. Civ. P. 30(e). The errata sheet to the DeBruyn Deposition is attached hereto and incorporated herein as Exhibit "D." Contrary to Brown Schultz' assertions, DeBruyn *never* stated that he relied upon information not known to Brown Schultz in restating the financial statements. In actuality, DeBruyn testified that some of the information would have been available to Brown Schultz had it performed the additional work required under the Generally Accepted Auditing Standards ("GAAS"). DeBruyn stated, "as I indicated, I think the information was available." DeBruyn Deposition at p. 139, lines 13-14, attached as Exhibit "C." "[The] information regarding the completed contracts would have become available from CCI in 1998, as the contracts were completed in the subsequent year. I simply used the information that was available and the audited financial statements of completed contracts." DeBruyn Deposition, p. 131, line 4, errata sheet, attached as Exhibit "D." Moreover, although DeBruyn relied upon information obtained subsequent to the audits in some instances, in the Motion in Limine, Brown Schultz takes DeBruyn's testimony out of context by failing to acknowledge that DeBruyn relied upon the numerous sources described in detail, *infra*.

DeBruyn also *never* testified that there is no support for the look back method in accounting resources or outside the context of tax-related issues. The representation in the

Motion in Limine that he did so is demonstrably false. Motion in Limine, p. 4. Brown Schultz has, again, misstated the substance of DeBruyn's testimony. DeBruyn testified that the *term* "look back" is used in connection with tax related issues. However, DeBruyn unequivocally did not testify that the application of the look back *method* was *only* for tax related issues. DeBruyn Deposition at p. 228, lines 19-22, attached as Exhibit "C." Curiously, Brown Schultz fails to note that DeBruyn later described in detail the methodology he used to create the restatement of CCI's financial statements. DeBruyn Deposition at p. 231, attached as Exhibit "C." Brown Schultz also ignores DeBruyn's testimony that he was "aware of individuals in [his] firm that have used a similar method to what [he has] employed to determine the effect of an accounting issue." DeBruyn Deposition at p. 263, lines 17 – 19, attached as Exhibit "C."

DeBruyn Reviewed Material Sufficient to Form Opinion as to the
<u>Material Misstatements in the Audited Financial Statements.</u>

In forming his opinions, DeBruyn relied on many different sources. These include, without limitation, a review of the pertinent audit work papers, a review of Brown Schultz' "Permanent File" for CCI, a review of pleadings and depositions in the instant action and the review of various work-in-progress schedules. Based on the delineated sources, he formed an opinion as to Brown Schultz' standard of care in the preparation of the Audited Financial Statements. Although in its Motion in Limine Brown Schultz states that DeBruyn did not review the CCI records, Brown Schultz takes DeBruyn's deposition testimony out of context. In addition, in a footnote on page 6 of the memorandum in support of the Motion in Limine, Brown Schultz also cites the deposition testimony of Matthew Silverstein ("Silverstein"), which is also taken out of context. Brown Schultz' assertions are highly misleading because Brown Schultz fails to point out that DeBruyn reviewed all records he had available to him and that the CCI construction records that Brown Schultz refers to were either never available or were determined

to be irrelevant. DeBruyn also testified that the material he reviewed was sufficient for him to form an opinion as to the existence of material misstatements in the Audited Financial Statements. Affidavit of Steve J. DeBruyn, CPA in Opposition to the Defendants' Motion for Summary Judgment, ¶3.[4] DeBruyn specifically testified that CCI's financial records that were allegedly available on a certain computer program could not be accessed because it had been previously corrupted. DeBruyn Deposition at p. 119, lines 19-24, attached hereto as Exhibit "C." During the deposition of Silverstein, Silverstein provided testimony on how USF&G maintained its payment bond files. Contrary to the misquotation in the Motion in Limine, Silverstein never stated that all CCI records were provided to and were in USF&G's possession. When asked if USF&G obtained "CCI's project files," Silverstein replied, "I believe it obtained most of them, but I don't know if we got all of them." Deposition of Matthew Silverstein at p. 28, lines 17 - 19, attached hereto and incorporated herein as Exhibit "E." The project files are quite different than CCI's financial records. Moreover, USF&G is unaware of the basis - and no such basis is provided by an expert retained by Brown Schultz - that supports Brown Schultz' implicit contention that in order to render his opinions DeBruyn was required to review every scrap of paper, every plan, every "as built" drawing, every invoice or every environmental survey remotely related to any of CCI's projects bonded by USF&G. Certainly, Brown Schultz would not contend that it did so relative to its creation of the Audited Financial Statements.

DeBruyn prepared restated audit reports utilizing financial data contained in Brown Schultz' work papers, comparing it to the original profit (or loss) estimates for contracts-in-progress as reported in the Brown Schultz audited financial statements when each project began

---

[4] The DeBruyn Affidavit was previously filed with the Court with USF&G's Opposition to the Defendants' Motion for Summary Judgment on October 8, 2002. It is incorporated by reference as if fully set forth herein.

and also comparing it to the profit or loss for each of the projects upon completion. This method, *inter alia*, avoids the abuse or intentional misstating of profits that is inherent in the use of the percentage of completion method of accounting and is conservative in its approach since it uses the profit or loss amounts reported by CCI upon project completion. The method used also recognizes profits (or losses) on the contracts based on *actual events and transactions* in the appropriate year to gain an understanding of the effect of CCI's representation in the estimated costs to complete. Utilizing the above-described method, DeBruyn then took the information concerning contracts-in-progress as well as other adjustments and prepared for CCI a balance sheet and statement of income for the years ended December 31, 1997 and 1998 and compared that information to the information contained in the Audited Financial Statements.

Brown Schultz contends in the Motion in Limine that DeBruyn should have "re-audited" the Audited Financial Statements. Although DeBruyn did not perform a "re-audit" of the CCI statements, Brown Schultz' statement is highly misleading in that assumes, *arguendo*, that it was possible to conduct a re-audit, that it was necessary for DeBruyn to do so in order to render his opinions or that it would have been prudent for DeBruyn to have done so. Brown Schultz has introduced no expert testimony that it was necessary or desirable that a re-audit have been performed as part of DeBruyn's analysis. In addition, Brown Schultz' own accounting expert, Donald Brenner ("Brenner"), testified at his deposition that although he suggested to Brown Schultz that an accounting expert conduct a re-audit, *Brown Schultz' counsel did not give him permission for any re-audit to be conducted.* Deposition of Donald Brenner ("Brenner Deposition") at p. 75 – 78. The excerpt of the Brenner Deposition cited herein is attached hereto and incorporated herein as Exhibit "F." Moreover, when asked if a re-audit was necessary to

form the opinions in his expert report, Brenner curtly responded, "No." Brenner Deposition, p. 78 at line 13, attached as Exhibit "F."

### "Book of Wisdom"

Although, as discussed, *supra*, there are no valid grounds to criticize - let alone prohibit - testimony utilizing the look back method, the "book of wisdom," in and of itself, is sufficient to support DeBruyn's methodology and to sustain the validity of the restated financials prepared by DeBruyn. In its Motion in Limine, Brown Schultz never objects to DeBruyn's testimony on the basis that the "book of wisdom" is improper.

The "book of wisdom" is a concept which recognizes that the trier of fact should be allowed to hear, consider and take into account facts that happened after the event that is the subject of the litigation even though those facts might not have been known or knowable at the time of the happening of that event. *Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. 689, 698 (1933). Simply, "[t]he reasonableness of estimates may be tested in light of actual experience." *Patsch v. Commissioner*, 19. T.C. 189, 198 (1952). As stated by Justice Cardoza, "[e]xperience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within." *Id.* In essence, the "book of wisdom" is a judicial acknowledgment "that the law should express 'a judgment from experience as against a judgment from speculation.'" *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Price George's County, Maryland*, 1993 WL 524783 (D. Md.), citing *Tanner v. Little*, 240 US 369, 386 (1916). The "book of wisdom" has been utilized in a variety of situations, none of which indicate any judicial proclivity to limit or narrow its uses. *E.g., Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. at 698 (determination of damages for patent infringement); *Washington Metropolitan*

*Area Transit Authority,* 1993 WL at 524785 (eminent domain litigation); *Patsch,* 19 T.C. at 198 (determination of amount of tax deduction).

Any implication that the utilization of the "book of wisdom" in the instant litigation would be tantamount to holding Brown Schultz to a standard of perfection, 20/20 hindsight or prescience is unwarranted. "To correct uncertain prophecies in such circumstances is not to charge the offender with elements of value nonexistent at the time of his offense. It is to bring out and expose of light the elements of value that were there from the beginning." *Sinclair Ref. Co.,* 289 U.S. at 698 (citations omitted). The mere fact that actual figures as determined in the future differ from estimates given in the past is not necessarily, in and of itself, evidence of negligence nor does USF&G advocate such a position. As a practical matter, the "book of wisdom" is no different than the recognized accounting methodology referred to as "subsequent events testing." In fact, as discussed, *supra,* the *Horwath International Audit Manual* provides that in appropriate circumstances the auditor should "review subsequent events and transactions" as part of the audit plan.

### Brown Schultz Has Raised No Issues Concerning DeBruyn's Testimony On The Inappropriate Recording And Inadequate Disclosure Of Related-Party Transactions

Even if, *arguendo,* there was any merit to Brown Schultz' contentions regarding the "look back" method, Brown Schultz has provided no basis to bar DeBruyn's testimony regarding Brown Schultz' inappropriate recording and inadequate disclosure of related-party transactions between CCI and Pennsylvania Contractors Insurance Company ("PCIC"). PCIC is a captive insurance company, registered in the Turks and Caicos Islands, formed to issue Remedial Work Insurance policies to CCI. PCIC is wholly owned by CCI's sole stockholder, John Ortenzio. Since its inception, Brown Schultz prepared tax returns and audited financial statements for PCIC. Summarily, the 1998 Audit Report did not disclose that a CCI claim for delay damages

and winter conditions in the amount of $1,162,460.00 for the Mahanoy Prison project had been booked as revenue. Footnote 8 in the 1998 Audit Report merely shows that the Mahanoy Prison claim had been guaranteed by PCIC. Neither the footnote nor the 1998 Audit Report contained any information indicating that the Mahanoy Prison claim had been included as revenue for CCI in 1998.

Relative to PCIC, DeBruyn has opined, *inter alia*, that the CCI claim of $1,162,460.00 did not meet the revenue recognition standards set forth in AICPA Technical Aids, Statement of Position 81-1, Accounting for Performance of Construction – Type and Certain Production – Type Constructs, July 15, 1981. DeBruyn Affidavit, ¶16. He also opined that the Guaranty Agreement executed by PCIC in favor of CCI and dated less than a month before the close of CCI's books for the year ended December 31, 1998 did not support the recognition of $1,162,460.00 in revenue for the year ended December 31, 1998 as recorded in the 1998 Audit Report. Further, he has opined that the recording and disclosure of the related-party transaction involving PCIC and CCI in the 1998 Audit Report was misleading to the user of the report since the PCIC Guaranty was recorded by Brown Schultz as contract revenue and therefore recorded as an underbilling (buried in the contracts-in-progress schedule) as opposed to a separate line item on the balance sheet clearly denoted as a related-party transaction. *Id.* PCIC's erroneous and misleading treatment of the Mahanoy Prison claim resulted in a material misstatement in the 1998 Audit Report of $1,162,460.00 incorrectly reported as revenue. *Id.* According to DeBruyn, an appropriate disclosure would have been to report the transaction as a separate line item on the balance sheet of CCI indicating that it was specifically guaranteed by a company owned by the sole stockholder of CCI. *Id.* DeBruyn has fully revealed the basis for his opinions relative to Brown Schultz' treatment of related-party transactions and the materials he relied upon to

formulate his opinions. Brown Schultz has proffered no reasons why DeBruyn's testimony regarding PCIC and its misleading effect on the 1998 Audit Report should not be admitted. Accordingly, at minimum, the relief sought by Brown Schultz is overbroad.

## IV.    CONCLUSION

This latest attempt by Brown Schultz to preclude DeBruyn's testimony is entirely without merit. In the Motion in Limine, Brown Schultz distorts DeBruyn's deposition testimony, takes his testimony out of context and intentionally refuses to acknowledge clarifications of DeBruyn's deposition testimony contained in his errata sheet. Brown Schultz' legal argument fails to properly analyze the *Daubert* standard under Pennsylvania law and in the Third Circuit law, which has specifically adopted a liberal standard regarding the admissibility of expert testimony. Furthermore, Brown Schultz' attack on DeBruyn's methodology, which is based on common sense, logic and recognized accounting procedures, relies upon both the gross distortion of DeBruyn's deposition testimony and a faulty application of the pertinent law. Brown Schultz fails to address the "book of wisdom," which provides alternate support DeBruyn's methodology and the restated financial statements. Finally, Brown Schultz has failed to proffer any reasons for barring DeBruyn's testimony regarding its improper treatment of related-party transactions. Accordingly, the Motion in Limine to Preclude the Testimony of Plaintiff's Expert Steve J. DeBruyn should be denied.

WHEREFORE, USF&G respectfully requests that the Court enter an order:

1.    Denying Brown Schultz' Motion in Limine to Preclude the Testimony of Plaintiff's Expert Steve J. DeBruyn; and

2. Providing such other and further relief as is just and proper.

          UNITED STATES FIDELITY AND
          GUARANTY COMPANY,
          By its counsel,

          /s/Bruce D. Levin
          Peter B. McGlynn, Esquire
          Bruce D. Levin, Esquire
          Bernkopf, Goodman & Baseman LLP
          125 Summer Street, Suite 1300
          Boston, Massachusetts 02110
          Telephone:   (617) 790-3000
          Facsimile:    (617) 790-3300
          blevin@bgblaw.com
          pmcglynn@bgblaw.com

                  and

          Peter Speaker, Esquire
          Thomas, Thomas & Hafer
          305 North Front Street
          Harrisburg, PA  17101
          Telephone:   (717) 237-7100
          Facsimile:    (717) 237-7105
          pjs@tthlaw.com

Dated: October 13, 2003
#277118 v2/36432/87