# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

|  |  |  |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff | ) ) ) ) ) | CIVIL ACTION NO. 1:01-CV-00813 |
| v. | ) ) | JUDGE CONNOR |
| BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | ) ) ) ) |  |

## SUPPLEMENTAL AND REBUTTAL EXPERT REPORT OF STEVE J. DEBRUYN, CPA

This report supplements my report dated July 22, 2002 and also addresses certain issues contained in the reports of Miller Coffey Tate LLP and The Brenner Group.

### THE RESTATEMENTS IN GENERAL

My original report discloses numerous deficiencies in the audit procedures regarding the contracts in process. Therefore, to determine the potential effect on the financial statements for the respective years, I started with the contracts-in-process schedules from the supplemental financial statements of CCI Construction Company, Inc. "(CCI)" prepared by Brown Schultz. The restatements for both 1997 and 1998 are a result of recasting the contracts-in-process schedules for the those years. Exhibits I and III attached hereto are the recast schedules of CCI's contract-in-process. Exhibits II and IV attached hereto are the original schedules reproduced from the audited financial statements of CCI for the respective years. Exhibit V attached hereto is the actual contracts-in-process schedule for the year ended December 31, 1999. The recast methodology used was similar to the "look back" method utilized by the Internal Revenue Service. The method involves recasting contracts-in-process in a given year from information obtained in a subsequent year. For example, if a contract was in process at the end of 1997 and subsequently completed in 1998, we recalculated, among other things, the 1997 percentage complete, revenue recognized and the profit and loss utilizing the actual numbers from the completed contract. As noted on the attached Exhibits I and III, there are a few exceptions. However, the methodology was consistently used to recast both 1997 and 1998 contracts-in-process schedule.

## THE RESTATEMENT OF THE 1997 BROWN SCHULTZ AUDIT REPORT

I calculated the total estimated cost by using the "actual" gross profit percentage of the job when it was completed. There were two exceptions to this method. Job 439 was calculated estimating the loss as determined or estimated at December 31, 1997 by CCI. Job 451 was calculated using the original gross profit estimated by CCI. I then recalculated the percentage complete, which changed the over/under billings. For the 1997-year end, the effect on over/under billings and on the net income of CCI was $815,960. Exhibit I details the revised calculations as well as reporting the differences between the recast and originally reported balances. The differences arose mainly due to the change in gross profit percentages from the 1997 estimates to the actual completed contracts. One job in particular (job 445), was reported as a projected loss on the original schedule of $82, 956. When the job was completed in 1998, the actual loss was $436,063. Brown Schultz' workpapers document that there were significant problems on the job with subcontractor defaults, although it is not evident that they substantiated management's representations by vouching to subcontractor agreements or reviewing subsequent costs. The job was 38% complete and because this showed a loss it should have alerted Brown Schultz that it was necessary to do some additional inquiry and audit testing. This also relates back to my comments made in my original report regarding Brown Schultz' undue reliance placed on management's assertions, their conscious decision not to include job costs in the review of subsequent disbursements and their decision to not test subcontractor costs.

## THE RESTATEMENT OF THE 1998 BROWN SCHULTZ AUDIT REPORT

The same methodology was used as the 1997 approach by utilizing the "actual" or "revised" gross profit percentage from the completed contract schedule and contracts-in-process schedule prepared as of December 31, 1999. The 1998-year resulted in overstating income by $3,126,508.

The two year cumulative effect on net income was $3,942,467.

I chose to use the foregoing methodology for the following reasons:

- My contention is that due to lack of audit work, specifically with the testing of subcontractors, accumulated costs to complete and subsequent job costs, Brown Schultz did not have the opportunity to correctly ascertain the profit fade on the individual contracts.

- Brown Schultz should have taken into account the material profit fade from the 1997 jobs in connection with the 1998 audit work. However, the facts are that gross profit

percentages on several jobs were in excess of any historical amounts and well above the amounts originally estimated in the contracts by the contractor (CCI).

The process used to recast the earnings and estimate the misstatement in the 1997 and 1998 audited financial statements was, in my opinion, a conservative approach. The results using the above approach yielded material exceptions. The lack of audit procedures employed by Brown Schultz did not allow them the opportunity to ascertain the misstatements regardless of the amount. Even though I took a conservative approach by using actual results, the resulting differences were significant enough such that they have to relate back to the lack of effective audit procedures employed by Brown Schultz.

## PCIC RECEIVABLE

To clarify my position and opinion on the PCIC transaction recorded in the 1998 financial statements in the amount of $1,162,460, I believe that the amount should not have been recorded and disclosed as additional contract revenue and contract overbillings. In my 1998 recast contracts-in-process schedule I did not include the total contract amount for that specific job. In my opinion, the transaction did not meet the standards to be recorded as contract revenue. In addition, a more useful disclosure would have been to report the transaction as a separate line on the balance sheet of CCI indicating that it was a guarantee by the stockholder.

## PROFESSIONAL STANDARDS ISSUES

My original report noted that the audit work for Brown Schultz for the years 1997 and 1998 did not conform to applicable standards of care of a Certified Public Accountant. For example, Generally Accepted Accounting Standards (GAAS) require "Due professional care is to be exercised in the performance of the audit and the preparation of the report" (source: SAS no.1, AU section 230). Included in this section is the fact that due professional care requires the auditor to exercise professional skepticism. Based on my review of the audit workpapers for the years 1996, 1997 and 1998, Brown Schultz failed to act with sufficient professional skepticism and was not diligent in evaluating the audit evidence. Furthermore, the first standard of fieldwork requires that the work "is adequately planned and properly supervised" (source: SAS no.22, AU section 311). As noted in my earlier report, Brown Schultz's planning documentation was virtually unchanged between 1996 – 1998. Brown Schultz failed to properly address the risk involved in the audit of CCI and, therefore, did not allow the firm to modify or change the audit procedures or approach. In addition, the third standard of fieldwork requires "sufficient competent evidential matter is to be obtained ..." (source: SAS no. 31, AU section 326). As a result of Brown Schultz' limiting the testing of accumulated job costs, subcontractor costs and subsequent

disbursement of job costs, Brown Schultz denied itself the opportunity to obtain all possible evidential matter available to properly perform the audit.


Dated:  September 20, 2002                    _____

                                              Steve J. DeBruyn, CPA

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(HARRISBURG DIVISION)

UNITED STATES FIDELITY : 
AND GUARANTY COMPANY, : 
       PLAINTIFF :     NO. 1:01 CV 00813
:     (JUDGE KANE)
       v. : 
: 
BRUCE J. BROWN AND BROWN, : 
SCHULTZ, SHERIDAN & FRITZ : 
       DEFENDANTS : 

## EXPERT REPORT OF STEVE J. DeBRUYN, CPA

I am a Certified Public Accountant and am a Partner in the firm of Clifton Gunderson

LLP. I also serve as the Construction Contractor Industry Group Leader for Clifton Gunderson

LLP. A copy of my *Curriculum Vitae* is attached hereto as Exhibit "A." I am being

compensated for my professional services at the rate of $250 per hour.

I have been engaged by Bernkopf, Goodman & Baseman LLP to determine if I could

render certain opinions concerning the audit procedures performed by and conclusions reached

with respect to the audited financial statements prepared by Brown, Schultz, Sheridan & Fritz

("Brown Schultz") for CCI Construction Company, Inc. ("CCI") for the fiscal years ended

December 31, 1996, 1997 and 1998. I have determined that I am able to render such opinions.

In connection with my engagement, I have reviewed the audit procedures and conclusions

reached by Brown Schultz as they relate to that firm's audits of CCI for the calendar years ended

in 1996, 1997 and 1998 (the "Audit Reports"). In particular, I analyzed whether the audit

procedures and conclusions conformed to Generally Accepted Accounting Principles (GAAP)

and Generally Accepted Auditing Standards (GAAS).

In analyzing the Audit Reports, I have reviewed and relied upon the following documents:

- Brown Schultz' audit workpapers for CCI for the fiscal years ended December 31, 1996, 1997, & 1998.

- Brown Schultz' "Permanent File" for CCI.

- AICPA TECHNICAL PRACTICE AIDS, Statement of Position 81-1, Accounting for Performance of Construction - Type and Certain Production-Type Contracts, July 15, 1981;

- AICPA AUDIT AND ACCOUNTING GUIDE FOR CONSTRUCTION CONTRACTORS, May 1, 1997

- Statement on Auditing Standards No. 47, Audit Risk & Materiality In Conducting An Audit (American Institute of Certified Public Accountants, 1983);

- Statement on Auditing Standards No. 57. Auditing Accounting Estimates (American Institute of Certified Public Accountants, 1988);

- FAS No. 5, Accounting for Contingencies; March 1975

- FAS No. 57, Related Party Disclosures; March 1982.

- Statement on Auditing Standards No. 22, Planning and Supervision, (American Institute of Certified Public Accountants 1978).

- Statement on Auditing Standards No 31, Evidential Matter, (American Institute of Certified Public Accountants 1980).

- Depositions of Bruce J. Brown dated January 17, 2002 and a preliminary draft of

the deposition of July 19, 2002; I have also reviewed portions of the deposition of Sherri Phillips, taken on July 10, 2002, and portions of the deposition of Deborah Bowman dated May 21, 2002.

- Various pleadings filed in the above-captioned action;

- 1998 Audited Financial Statements prepared by Brown Schultz for Pennsylvania Contractors Insurance Co., Inc. ("PCIC");

- Brown Schultz' work papers for the audit of "PCIC" for the fiscal year ended December 31, 1998;

- Work in process schedule as of December 31, 1999 prepared by CCI personnel.

In general, for reasons explained below, it is my opinion that the audit work performed by Brown Schultz for CCI for the fiscal years ended December 31, 1997 and 1998 did not conform to applicable standards of care of a Certified Public Accountant and this resulted in material misstatements and omissions in Brown Schultz' 1997 and 1998 Audit Reports. Specifically, the negligent audit work performed by Brown Schultz resulted in an overstatement of both income and equity in the amount of $815,960 for 1997 and $3,126,508 for 1998. It is also my opinion that these misstatements were material to the financial position of CCI.

The primary causes of the material misstatements in the 1997 and 1998 Audit Reports include, but are not limited to, the following:

Brown Schultz' workpapers demonstrate Brown Schultz' failure to properly assess the risk involved with the audit of CCI from 1996 through 1998. Because of this failure to properly identify the risks associated with CCI, Brown Schultz' audit programs and its audit fieldwork were inadequate to provide the required assurance that the Audit Reports were fairly presented in accordance with GAAP. A primary objective of an audit is to identify high-risk

audit areas and plan the audit procedures accordingly.   Brown Schultz' workpapers identified

high-risk characteristics in both CCI and CCI's individual contracts.  Brown Schultz' audit

planning work papers for 1996, 1997 and 1998 were virtually identical to each other and did not

reflect any of the increasing audit risks inherent in the CCI audit engagement.  Further, the audit

work performed by Brown Schultz for the fiscal years ended December 31, 1996, 1997 and 1998

did not change materially from year to year.  This is significant in light of the fact that the audit

risk profile of CCI was increasing in each successive year due to the following:

- A significant dollar volume of work was being performed by CCI's

    subcontractors.

- Brown Schultz' knowledge of and its documentation of past and present claims

    and defaults with respect to CCI's subcontractors;

- CCI's expansion in new geographical areas;

- The profit fades noted by Brown Schultz on contracts completed in subsequent

    years required Brown Schultz to question the reliability of CCI's management's

    ability to estimate costs-to-complete;

- At the end of 1997 and throughout 1998, CCI was self-performing some of the

    work which it previously subcontracted to others and purchased a substantial

    amount (approximately $7 million) of construction equipment;

- CCI was not properly allocating indirect costs to individual contracts;

- The presence of significant related-party transactions.

2.      There were inadequate audit procedures performed by Brown Schultz in the areas

of contracts-in-progress; specifically, the design and implementation of substantive procedures in

connection with accumulated costs and estimated costs to complete. In my opinion, undue reliance was placed by Brown Schultz on CCI management's assertions with respect to costs to complete and estimated profits. The determination of the accuracy of the accumulated costs to date and the estimated costs-to-complete is critical to contractors like CCI using the percentage of completion method of accounting.

Brown Schultz acknowledged that its testing of contract costs was a test of CCI's cost controls only. This was inappropriate under the circumstances extant here. The testing of 25 costs was a test of transactions which an auditor can use to make qualitative assessments from the results. However, such testing does not replace the need to perform substantive procedures, such as vouching significant contract costs and analytical review. CCI had significant direct costs related to subcontractors and there was documentation contained in Brown Schultz' workpapers relating to past and present claims with subcontractors as well as evidence of subcontractor defaults. Nonetheless, Brown Schultz did not send out any subcontractor confirmations, nor does Brown Schultz' "Permanent Files" or its work papers demonstrate that it read any subcontracts and other similar construction agreements. In addition, Brown Schultz specifically excluded any testing of unrecorded liabilities for any job related expenses. Instead, as noted above, Brown Schultz relied on a test of 25 "haphazardly" selected costs throughout each year and there was no evidence that Brown Schultz performed any analytical procedures related to accumulated job costs.

The estimated costs-to-complete contained in the 1996, 1997 and 1998 Audit Reports were deficient in that they relied on CCI's representations with no documentation substantiating CCI's management estimates other than they had allegedly been verified by Sherri Phillips, CCI's chief financial officer and/or Stan Sechrist, CCI's Vice President - Construction

Operations. In 1998, CCI was estimating gross profits on several contracts-in-progress that were materially higher than the historical or originally projected amounts. Subsequent review revealed that these contracts had significant profit fades and one job - no. 454 - had a loss of $957,000.00, and profit fade from the 1998 workpaper of approximately $2,600,000. Also, Brown Schultz' 1998 workpaper files contained no evidence of any consideration of the allocation of indirect costs to estimated costs to complete despite Brown Schultz' knowledge that CCI was self performing more of its subcontract work than in the past. In addition, there was no follow - up between the documented preliminary analytical review work and the final work, despite a material increase in the net over/underbillings. Brown Schultz also failed to document the reasons for the significant underbillings reported at the end of the 1998 year.

There was no evidence in Brown Schultz' workpapers for the 1996, 1997 and 1998 Audit Reports that Brown Schultz read one or more of the contracts for guarantees, penalty and incentive provisions or cancellation and postponement provisions.

3.     There was inappropriate recording and inadequate disclosure of related-party transactions between PCIC and CCI. It is my opinion that Brown Schultz sanctioned the recording of $1,162,460 of revenue in 1998 from PCIC, a related-party to CCI. The transaction involved the guarantee or insurance of a third party contract claim by PCIC; a company owned by the sole owner of CCI. Brown Schultz also performed the audit work on PCIC. The third party contract claim did not meet the recognition standards set forth in SOP 81-1, and in my opinion the guarantee by the related party did not support the recognition of revenue. In addition, the recording and disclosure of the third party transaction was misleading to the user of the 1998 Audit Report. Further, the related-party transaction was recorded as an underbilling instead as a separate line item on the balance sheet. The result was a material misstatement to

- 6 -

the 1998 Audit Report of $1,162,460.

In summary, Brown Schultz' workpapers demonstrated that undue reliance was placed on CCI management's assertions; the workpapers fail to demonstrate adequate independent verification, and do not support the conclusions reached by Brown Schultz as they relate to the Audit Reports for calendar years 1997 and 1998. In addition, Brown Schultz' workpapers have numerous other deficiencies including, without limitation, the following:

- Lack of documentation of time to indicate the partner in charge participated in the audit planning in 1998;

- The financial disclosure checklist included in the audit workpapers does not appear to be reviewed;

- Job site visits were not done and considerations not documented; and

- 1998 search for unrecorded liabilities did not go through the last day of fieldwork.

Attached hereto as Exhibit B-1 and B-2 are comparisons of CCI's Balance Sheets and Income Statements containing those adjustments warranted as a result of the defects and deficiencies in the procedures for and preparation of the Audit Reports for CCI for the fiscal years ended December 31, 1997 and 1998.

During my review of the 1996 audit workpapers, I noted that the audit procedures performed were similar to the 1997 and 1998 audits.

This report is subject to revisions based upon any other information which is obtained during discovery in the above-captioned action.

Steve J. DeBruyn, CPA

Dated: July 22, 2002
#249885 v1/36432/87

# EXHIBIT A

# CURRICULUM VITAE

## STEPHEN J. DEBRUYN, CPA

**POSITION**            **Partner**

**EDUCATION**           B.S. in Accounting
                        Southern Illinois University, 1982

**PROFESSIONAL
DESIGNATIONS**          Certified Public Accountant, 1984
                        American Institute of Certified Public Accountants
                        Illinois CPA Society

**LICENSES**            Licensed CPA - Illinois

**YEARS OF
EXPERIENCE**            20

**PRIOR EXPERIENCE**    7 years with audit staff of large regional firm. Promoted to
                        manager in 1986, joined Clifton Gunderson June, 1989,
                        promoted to Partner in 1993.

**SUPERVISORY
EXPERIENCE**            Partner in charge of various audit, review and compilation
                        engagements servicing manufacturers, contractor, retail and
                        wholesale industries as well as employee benefit plans.

                        Supervision of staff on multiple concurrent engagements.

**AREAS OF
SPECIALIZATION**        Firm-wide Construction Industry Group Leader

                        Audit, accounting and consulting services for various
                        industries and employee benefit plans.

                        Corporate finance; merger and acquisition services.

                        Peer reviews and internal inspection programs.

                        Consulting services in connection with prospective financial
                        statements, executive search, interpretation of financial
                        results, succession of ownership and business valuations.

**Stephen J. DeBruyn** (continued)

Income tax planning and preparation for corporations, S-corporations, partnerships and L.L.C.s.

**OTHER SIGNIFICANT
EXPERIENCES IN
PUBLIC ACCOUNTING**

Advanced training through experience with previous employer in areas of audit efficiencies, documentation of accounting systems in manual or automated environments.

Speaker at annual audit and accounting conference.

Selected to the firms Leadership Career Program class of 1994.

1997 Clifton Gunderson Outstanding Performance Award.

**PUBLICATIONS**

Speaker at the Clifton Gunderson Annual Audit & Accounting Conference. Sessions on Construction Contractors.
    October, 2000
    October, 1999
    October, 1998

Improved Software Keeps Construction Companies Ahead of Competitors, Clifton Gunderson LLP Relationships , Magazine, Issue 6 Summer 2002.

**PREVIOUS TRIAL
EXPERIENCE**

IN RE: Marriage of Lawrence Edward Kuchefski, Petitioner and Sherri Marie Kuchefski, Respondent, Cause #99D284 Circuit Court for the 5th Judicial Circuit of Illinois located in Danville, Illinois, March 2002.

# EXHIBIT B-1

# CCI CONSTRUCTION COMPANY, INC.
## BALANCE SHEET – DECEMBER 31, 1997

### ASSETS

| | As Reported | Adjustments | As Restated |
|---|---|---|---|
| **Current assets:** | | | |
| Cash and cash equivalents | $ 1,128,337 | $ - | $ 1,128,337 |
| Investments in marketable securities | 3,702,992 | - | 3,702,992 |
| Accounts receivable, trade: | | | |
| Customers: | | | |
| Current | 8,230,674 | - | 8,230,674 |
| Retained | 1,121,610 | - | 1,121,610 |
| Shareholder | - | - | - |
| Affiliates | 3,485 | - | 3,485 |
| Note receivable | 22,569 | - | 22,569 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 1,072,281 | (429,978) | 642,303 |
| Prepaid expenses | 6,185 | - | 6,185 |
| Shop inventory | 639 | - | 639 |
| Total current assets | 15,288,772 | (429,978) | 14,858,794 |
| **Property and equipment:** | | | |
| Automobiles and trucks | 427,342 | - | 427,342 |
| Furniture | 553,587 | - | 553,587 |
| Machinery and equipment | 1,323,233 | - | 1,323,233 |
| Other | 72,453 | - | |
| | 2,376,615 | - | 2,376,615 |
| Less accumulated depreciation | 920,919 | - | 920,919 |
| | 1,455,696 | - | 1,455,696 |
| | $ 16,744,468 | $ (429,978) | $16,314,490 |

## LIABILITIES AND SHAREHOLDER'S EQUITY

|  | As Reported | Adjustments | As Restated |
|---|---|---|---|
| **Current liabilities:** | | | |
| Accounts payable, trade: | | | |
| Vendors: | | | |
| Current | $   7,846,395 | $          - | $   7,846,395 |
| Retained | 1,078,950 | - | 1,078,950 |
| Notes payable | 815,781 | - | 815,781 |
| Accrued loss on jobs | - | 732,685 | 732,685 |
| Accrued expenses | 808,601 | - | 808,601 |
| Taxes withheld and accrued | 58,023 | - | 58,023 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 681,924 | (346,703) | 335,221 |
| Total current liabilities (all current) | 11,278,674 | 385,982 | 11,675,656 |
| | | | |
| **Shareholder's equity:** | | | |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | - | 39 |
| Capital in excess of par | 9,758 | - | 9,758 |
| Retained earnings | 5,208,489 | (815,960) | 4,392,529 |
| Unrealized gain on marketable securities | 236,508 | - | 236,508 |
| | 5,454,794 | (815,960) | 4,638,834 |
| | $   16,744,468 | $   (429,978) | $16,314,490 |

**CCI CONSTRUCTION COMPANY, INC.**
**STATEMENT OF INCOME**
**Year Ended December 31, 1997**

|  | Original | Adjustments | As Restated |
|---|---|---|---|
| Revenue | $  34,921,676 | $     (815,960) | $34,105,716 |
| Cost of contracts | 32,617,473 | - | 32,617,473 |
| Gross profit | 2,304,203 | (815,960) | 1,488,243 |
| General and administrative expenses | 1,954,380 | - | 1,954,380 |
| Income from operations | 349,823 | (815,960) | (466,137) |
| Other income | 357,056 | - | 357,056 |
| Net income (loss) | $      706,879 | $     (815,960) | $   (109,081) |

# EXHIBIT B-2

## CCI CONSTRUCTION COMPANY, INC.
## BALANCE SHEET – DECEMBER 31, 1998

### ASSETS

| | As Reported | Adjustments | As Restated |
|---|---|---|---|
| **Current assets:** | | | |
| Cash and cash equivalents | $ 2,429,866 | $ - | $ 2,429,866 |
| Investments in marketable securities | 631,481 | - | 631,481 |
| Accounts receivable, trade: | | | |
| Customers: | | | |
| Current | 5,964,311 | - | 5,964,311 |
| Retained | 1,822,224 | - | 1,822,224 |
| Affiliates | 365,756 | - | 365,756 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 6,341,726 | (2,379,122) | 3,962,604 |
| Prepaid expenses | 170,232 | - | 170,232 |
| Shop inventory | 38,161 | - | 38,161 |
| Total current assets | 17,763,757 | (2,379,122) | 15,384,635 |
| **Property and equipment:** | | | |
| Automobiles and trucks | 1,269,567 | - | 1,269,567 |
| Furniture | 851,738 | - | 851,738 |
| Machinery and equipment | 5,947,290 | - | 5,947,290 |
| Other | 344,128 | - | 344,128 |
| | 8,412,723 | - | 8,412,723 |
| Less accumulated depreciation | 1,651,485 | - | 1,651,485 |
| | 6,761,238 | - | 6,761,238 |
| **Other assets:** | | | |
| Cash surrender value of officer's life insurance | 55,453 | - | 55,453 |
| Investments | 34,000 | - | 34,000 |
| | 89,453 | - | 89,453 |
| | $ 24,614,448 | $ (2,379,122) | $22,235,326 |

## LIABILITIES AND SHAREHOLDER'S EQUITY

| | As Reported | Adjustments | As Restated |
|---|---|---|---|
| Current liabilities: | | | |
| Accounts payable, trade: | | | |
| Current | $ 10,974,274 | $ - | $ 10,974,274 |
| Retained | 2,180,967 | - | 2,180,967 |
| Current portion of long-term debt | 1,338,280 | - | 1,338,280 |
| Accrued loss on jobs | - | 1,826,956 | 1,826,956 |
| Accrued expenses | 333,060 | - | 333,060 |
| Taxes withheld and accrued | 91,601 | - | 91,601 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 288,208 | (263,610) | 24,598 |
| Total current liabilities | 15,206,390 | 1,563,346 | 16,769,736 |
| Long-term debt, net of current portion | 4,164,375 | - | 4,164,375 |
| Total liabilities | 19,370,765 | 1,563,346 | 20,934,111 |
| Shareholder's equity: | | | |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | - | 39 |
| Capital in excess of par | 9,758 | - | 9,758 |
| Retained earnings | 5,254,834 | (3,942,468) | 1,312,366 |
| Accumulated other comprehensive income (loss), unrealized gain (loss) on marketable securities | (20,948) | - | (20,948) |
| | 5,243,683 | (3,942,468) | 1,301,215 |
| | $ 24,614,448 | $ (2,379,122) | $ 22,235,326 |

**CCI CONSTRUCTION COMPANY, INC.**
**STATEMENT OF INCOME**
**Year Ended December 31, 1998**

|  | Original | Adjustments | As Restated |
|---|---|---|---|
| Revenue | $  52,534,453 | $     (3,126,508) | $49,407,945 |
| Cost of contracts | 51,145,382 | - | 51,145,382 |
| Gross profit | 1,389,071 | (3,126,508) | (1,737,437) |
| General and administrative expenses | 1,505,700 | - | 1,505,700 |
| Income (loss) from operations | (116,629) | (3,126,508) | (3,238,137) |
| Other income | 175,670 | - | 175,670 |
| Net income (loss) | $        59,041 | $     (3,126,508) | $(3,067,467) |

# EXHIBIT C

1
UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2
(Harrisburg Division)

3

UNITED STATES FIDELITY AND    )

4
GUARANTY COMPANY,             )

                              )

5
        Plaintiff,            )

                              )    Civil Action No.

6
    -vs-                      )    1:01-CV-00813

                              )

7
BRUCE J. BROWN AND BROWN      )

SCHULTZ SHERIDAN & FRITZ,     )

8
                              )

        Defendants.           )

9

10        Deposition of STEPHEN J. DEBRUYN taken before

11  DONNA L. POLICICCHIO, C.S.R., and Notary Public,

12  pursuant to the Federal Rules of Civil Procedure for the

13  United States District Courts pertaining to the taking

14  of depositions, at Suite 1800, 333 West Wacker Drive, in

15  the City of Chicago, Cook County, Illinois, commencing

16  at 10:05 a.m. on the 7th day of May, A.D. 2003.

17

18

19

20

21

22

23

24

Page 118

1 firm should have done for the 1997 audit?
2     A   Yes.  If they were available, I would have
3 reviewed them.
4     Q   Who told you that they were not available -- let
5 me start over.
6         Who told you that the CCI Construction records
7 were not available?
8     A   There was, from what I recall, an individual at
9 the USF&G office that communicated that to us prior to
10 my arrival out in Baltimore to review the work and
11 prepare my expert report, and then while I was there, we
12 talked to somebody on the phone that I mentioned that we
13 thought maybe would have access to their old computer
14 files in an attempt to get those and recreate those
15 records.
16     Q   Sir, were you ever made aware that those records
17 exist in the hands of the accountants for CCI?  Did you
18 know that?
19     A   Records exist that detailed records for CCI --
20     Q   Did you know CCI went through bankruptcy?
21     A   Yes.
22     Q   Were you aware there were accountants employed
23 in connection with the bankruptcy?
24     A   No, I was not aware.

Page 119

1     Q   Do you know anything about bankruptcy?
2     A   Yes.
3     Q   Isn't it the situation that typically an
4 accountant or accountants are employed for the
5 bankruptcy?
6     A   Yes.
7     Q   Did you ever ask whether the records were in the
8 hands of or controlled by the accountants for the
9 bankruptcy?
10     A   We felt we were going through the appropriate
11 channels asking the USF&G representative.
12     Q   Did you ever ask whether the CCI records might
13 be in the possession of the accountants for the
14 bankruptcy?
15     A   No, I did not ask if they were in the records of
16 the accountants for the bankruptcy.
17     Q   What was your understanding of the reason the
18 records were not available?
19     A   We were given the disk.  Like I said, the
20 computer system, that was supposed to be left over from
21 CCI, and apparently it was several versions old and had
22 been faulty, and for some reason we were unable to
23 recreate it.  Nobody gave us specific indications of
24 what happened to the records.  We were told they were

Page 120

1 not available.
2     Q   Would you still have an interest in reviewing
3 those records if you could gain access to them?
4     A   If I could get access to all the records?
5     Q   For CCI Construction.
6     A   For their detailed records?
7     Q   That would be of interest to you?
8     A   Yes.
9     MR. McGLYNN:  Is this a good time to take a break?
10 Five after 1:00.
11     MR. McCARRON:  Let me just finish up with 1997,
12 which relates to this other area he talked about.
13     MR. McGLYNN:  What do you estimate?
14     MR. McCARRON:  More than a couple minutes.
15     MR. McGLYNN:  All right.
16     MR. McCARRON:  Q   Sir, what is it you contend
17 should have been done by the Brown, Schultz auditors for
18 the 1997 audit in order to satisfy your issue and
19 concern about the insufficiency or sufficiency of
20 competent evidential material?
21     A   They should have obtained -- The underlying
22 documentation in your work papers is your basis for the
23 opinion.  They did not obtain enough information on
24 estimated costs to complete to review the estimates in

Page 121

1 accordance with Statement on Auditing Standards No. 57,
2 which is auditing accounting estimates.  They took
3 management's representations and have no documentation
4 in the file that they did anything beyond that, besides
5 relying upon, despite the fact that there was numerous
6 indications on the work papers that there were
7 subcontractor default, subcontractor buy-outs, nothing
8 that indicated that they reviewed the subcontractor
9 records or the new subcontractor taking over.
10         In addition, the testing of job costs was merely
11 a test of 25 -- and it was supposedly a haphazard
12 selection of 25 items, which turned out to be 13 payroll
13 and 12 non-payroll items.  No vouching of job costs.
14         Thirdly, in their testing of payables and
15 subsequent disbursements, they specifically excluded job
16 cost from their scope of testing and subsequent
17 disbursements.
18     Q   Were there any problems with the cost recording
19 system at CCI Construction for job costs?
20     A   I don't know.
21     Q   Do you know what the result would have been for
22 the 1997 audit if the additional procedures or work had
23 been done correctly as you just described in your list?
24     A   Could you ask that again?

31 (Pages 118 to 121)

Page 130

1    A   There is a date on the schedule of 2/12/2000,
2  4:37 p.m.
3    Q  Do you have any reason to believe that the work
4  in progress schedule for 1999 existed any time before
5  February 2000?
6    A  No.
7    Q  Do you have any reason to believe that the work
8  in progress schedule for 1999 existed when Brown,
9  Schultz did an audit for 1997?
10    A  No.
11    Q  Working backwards again, the completed audit --
12  let me start over.
13     The completed contracts schedule for 1998 was
14  generated sometime during 1999, is that right?
15    A  That I do not know. I do not know when the
16  completed contracts -- I assume it would have been
17  completed as the contracts were completed.
18    Q  But the completed -- let's be clear.
19     You refer to and you relied on completed
20  contracts schedule for 1998, is that right?
21    A  Correct.
22    Q  So that schedule reflects contracts which were
23  completed during 1998, is that right?
24    A  That's correct.

Page 131

1    Q  That schedule of completed contracts for 1998
2  would not have been available any earlier than the end
3  of 1998, is that right?
4    A  Correct.
5    Q  So that the completed contracts schedule for
6  1998 was not in existence when Brown Schultz did its
7  audit for 1997, is that right?
8    A  Not the schedule that I referred to in the
9  financial statements.
10    Q  Now, you're not able to determine -- you did not
11  base your proposed adjustments for the 1997 financial
12  statement on the schedule of contracts in progress for
13  1997, is that true?
14    A  I use that as my starting point for the
15  restatement.
16    Q  But you need the additional information provided
17  by the completed contracts schedule and the work in
18  progress schedule from 1998 and 1999 to make your
19  determination that adjustments were warranted for the
20  1997 financial statement?
21    A  Correct.
22    Q  Do you have any reason to believe that the
23  information, which was reflected on the completed
24  contracts for 1998 schedule, was known to or available

Page 132

1  to Brown, Schultz when it performed its audit during --
2  for the period 1997?
3    A  I don't know when it became available to Brown,
4  Schultz.
5    Q  Wouldn't it be important to you to know?
6    A  Yes.
7    Q  Do you have any reason to think that the
8  information reflected on the work in progress schedule
9  for 1999 was available -- that that information was
10  available or known to Brown, Schultz when it did its
11  audit for the period ending 1997?
12    A  It's my opinion had they done the additional
13  audit procedures that I enumerated previously that some
14  of the information would have been available to them
15  with regards to estimated costs to complete that were
16  inherent in the construction in progress schedule that
17  we're referring to at December 31, 1997.
18    Q  What specific information would have been
19  available and learned by Brown, Schultz, which is --
20    A  Contract --
21    Q  -- which is reflected on the work in progress
22  schedule for 1999, which they would have learned if they
23  had done additional audit procedures during the period
24  ending 1997?

Page 133

1    A  Total estimated cost.
2    Q  For which -- what specific amounts, sir, and
3  what specific job would they have learned that
4  information --
5    A  I would have --
6    Q  -- which is not reflected until the work in
7  progress schedule in 1999, which was not available
8  during -- when they did their audit work in 1997?
9    MR. McGLYNN:  Objection.
10    A  Do you want me to go through each individual
11  contract?
12    MR. McCARRON:  Q  Absolutely.
13    A  The contract -- Job No. 426, and I don't have
14  job names, was completed in 1998.
15    Q  What about Job 426 led you to believe that an
16  adjustment to the 1997 financial statement would have
17  been made if Brown, Schultz had done additional audit
18  procedures in connection with its work for the period
19  ending 1997?
20    A  There would have been a change in total
21  estimated cost.
22    Q  And that information is reflected on -- let me
23  start over.
24     How is it that Brown, Schultz's additional audit

34 (Pages 130 to 133)

Page 138

1   proposed adjustments you made were based on actual cost
2   for the contract?
3       A   That's correct.
4       Q   Did you perform any investigation or analysis to
5   determine -- let me start over.
6           The actual cost to complete the contract was not
7   known until the contracts were actually completed, is
8   that right?
9       A   Yes.
10      Q   And for a contract which was not completed
11  during 1997 or had not been completed prior to the audit
12  work, the actual cost to complete that -- those
13  contracts would not be known to the auditors during the
14  audit work period, is that right?
15      A   That is correct.
16      Q   So in deriving or determining the proposed
17  adjustments for the 1997 financial statement, you used
18  information about the actual cost to complete the
19  contracts, which had not been completed during 1997,
20  which was not available to Brown, Schultz during its
21  audit work?
22      A   The completed contract schedule that I used was
23  not available to them, no.
24      Q   Nor was the information included on the

Page 139

1   completed contract schedule available to Brown, Schultz
2   when it performed its audit work?
3       A   I disagree.  I think some of the costs would
4   have been available had they done the additional work
5   that was required under Generally Accepted Auditing
6   Standards, and that's to do more than accept
7   management's representation as to what the gross profit
8   on the job was going to turn out to be.
9       Q   Are you telling us that there were actual
10  completed contract costs for contracts which had not
11  been completed during 1997 which were available to
12  Brown, Schultz during its audit work?
13      A   As I indicated, I think information was
14  available.
15      Q   Sir, you're not answering the question.
16      MR. McGLYNN:  Objection.
17      MR. McCARRON:  Q   Was there -- let me start over.
18          Was the information about completed -- let me
19  start over.
20          Was the information concerning the actual cost
21  to complete contracts, which had not been completed by
22  the end of 1997, available to Brown, Schultz when it
23  performed its audit work for the period ending 1997?
24      A   I don't know because I do not know when the

Page 140

1   contracts were completed, the exact dates.
2       Q   Did you perform any investigation to determine
3   the events which triggered or caused the increased
4   contract cost?
5       A   Could you read that back?
6           (Record read.)
7       THE WITNESS:  No.
8       Q   Did you do any investigation or determine the
9   date on which the events occurred, which triggered or
10  caused the additional cost to complete the contract over
11  and above the estimated cost to complete?
12      A   Not outside of reviewing the Brown, Schultz work
13  papers.
14      Q   Were you able to determine the date on which the
15  event or occurrence -- let me start over.
16          Were you able to determine the date or
17  approximate date the event which caused the increased
18  cost over the estimated cost to complete occurred?
19      A   Could you read that back?
20          (Record read.)
21      THE WITNESS:  No.  Those records would have been
22  available through the CCI documents.
23      Q   So if you had -- let me start over.
24          You would need the CCI documents in order to

Page 141

1   determine what event and the date of the occurrence of
2   the event which caused the increased cost to complete
3   the contract, is that right?
4       A   And inquiry to management to give an explanation
5   for the increase in costs.
6       Q   So without the CCI records you're not able to
7   determine whether the information which indicated an
8   increased cost to complete contracts was or would have
9   been available to Brown, Schultz during the period in
10  which it performed its audit work?
11      A   That's correct.  I'm not sure of the timing of
12  the availability of the information.
13      Q   Now, if the event which triggered the increased
14  cost for the -- to complete the contract occurred after
15  the audit work by Brown, Schultz, then that would be an
16  event for which the auditor was not responsible for
17  knowing?
18      A   It depends on the inquiry he did with management
19  and what exactly the event was that caused the
20  additional cost to increase.
21      Q   So, sir, if there was a contract which at the
22  end of 1997, which had not been completed, and was not
23  completed until sometime late in 1998 and the increased
24  cost to complete the contract was triggered by a

36 (Pages 138 to 141)

Page 226

1  method is used -- reflected in the tax regulations, is
2  that right?
3      A  Not necessarily. I didn't dream up the idea of
4  doing this and consulted with people that -- if I was
5  going to restate --
6      Q  I think you're misunderstanding.
7      MR. McGLYNN: Have you finished your answer?
8      MR. McCARRON: Q  Isn't it the situation that tax
9  regulations provide and discuss the look back method as
10  a process used in connection with tax related issues?
11     A  Under the strict terms of look back, yes.
12     Q  Are you aware of any audit principle -- sorry,
13  audit -- accounting principle, audit standard, or
14  statement of pronouncement concerning accountants and
15  auditors, which provides for either the look back method
16  or some modified version of the look back method you
17  employed in arriving at your adjustments for the 1997
18  and 1998 audit statements?
19     A  I believe it's applicable in the restatement of
20  the financial statements from the best available
21  information that's known, subsequent events.
22     Q  Does GAAP, GAAS, or any accounting pronouncement
23  provide for the use of the look back method or a similar
24  method?

Page 227

1      A  It provides the use of subsequent events. Does
2  it use the terminology look back? No.
3      Q  Without regard for whether the principles or the
4  standards or the pronouncements used the terminology
5  look back, do they provide for the method you used as
6  nearly equivalent to or actually the look back method?
7      A  I would imagine they could in the case of a
8  correction of an error to a financial statement or
9  restatement of the financial statement. That would be
10  one method you would consider to go back and restate the
11  financial statements.
12     Q  Does GAAP -- let me start over.
13         Is the look back method or its modified version,
14  which you used to derive the proposed adjustments for
15  the 1997 and 1998 financial statements, in accordance
16  with GAAP, GAAS, or any pronouncement on accounting
17  standards?
18     A  Could you read that back?
19     MR. McGLYNN: Objection.
20     MR. McCARRON: I'll ask it again.
21     MR. McGLYNN: That would be helpful.
22     MR. McCARRON: Q  Does the look back method you
23  used in the strict form or its modified form comply with
24  GAAP?

Page 228

1      MR. McGLYNN: Objection. Asked and answered.
2      A  As I indicated, it could. If you were restating
3  the financial statements for correction of an error,
4  it's not precluded from being used.
5      MR. McCARRON: Q  Is there an audit -- I'm sorry.
6         Is there an accounting principle or an audit
7  standard or pronouncement of accounting or auditing
8  principles or standards on which you relied to support
9  your idea that the look back method or the modified
10  version of the look back method you used is appropriate?
11     A  That would be combining everything I said
12  earlier with respect to use the best available
13  information that I have, absent of records to review and
14  absence of the audit procedures done not in accordance
15  with GAAS, everything else considered in connection with
16  review of Brown, Schultz's work papers, I felt this was
17  the best method available to me to restate the financial
18  statements for 1998 and 1997.
19     Q  Are you aware of any instance in which the look
20  back method is used other than in connection with
21  tax-related issues?
22     A  Under the term look back, no.
23     Q  Where in the accounting literature is there
24  support for the use of the look back method or the

Page 229

1  modified version of the look back method you used to
2  derive your proposed adjustments for the 1997 and 1998
3  financial statements?
4      A  Not specifically.
5      Q  Could an accountant performing an audit use the
6  look back method under GAAS in expressing an opinion
7  about the financial statements?
8      A  If it was in connection with the correction of
9  an error and he was restating the financial statements,
10  yes.
11     Q  Could an accountant use the look back method in
12  performing an audit to express an opinion about
13  financial statements in accordance with GAAS?
14     A  I just answered that.
15     Q  No, you didn't.
16     A  I did.
17     Q  No, you didn't. You told me --
18     MR. McGLYNN: Let's not argue. Go on to the next
19  question.
20     MR. McCARRON: No, I'm not going on to the next
21  question. The next question is going to be exactly the
22  same.
23     MR. McGLYNN: Then he's going to stand --
24     MR. McCARRON: Do you want to argue with me, is that

58 (Pages 226 to 229)

Page 230

1  what you want to do?
2      THE WITNESS: No, I don't.
3      MR. McGLYNN: You have to argue with me.
4      MR. McCARRON: You want to argue with me, too?
5      MR. McGLYNN: Sure.
6      MR. McCARRON: Okay. What do you want to argue
7  about, Peter, the same old crap you always want to argue
8  about? You want your witness not to answer the question
9  because he's afraid to answer the question, and that's a
10 classic situation. Obviously you walk off out of the
11 room all the time.
12     MR. McGLYNN: The fact that you want to just level
13 insults never ceases.
14     MR. McCARRON: Let the record reflect --
15     Q  Sir, what is it that Mr. McGlynn just told you?
16     MR. McGLYNN: I'm instructing the witness not to
17 answer. There was no question pending. I'm instructing
18 the witness not to answer.
19     MR. McCARRON: Q  What is it that he just told you?
20     MR. McGLYNN: I am instructing you not to answer.
21     MR. McCARRON: Q  You're going to follow that
22 instruction?
23     A  I am.
24     Q  Sir, are you saying -- would an auditor be

Page 231

1  acting in accordance with GAAS in performing an audit
2  using the look back method?
3      A  As I indicated previously, it would be a method
4  that he may consider in the restatement of financial
5  statements in connection with his engagement if -- and
6  maybe an example would help explain it. If you were
7  restating a financial statement and there is an error
8  because of misuse of information in connection with a
9  prior year, you would restate the financial information.
10     Q  Did Brown, Schultz restate financial statements,
11 sir?
12     A  Did they restate financial statements?
13     Q  Yes.
14     A  No.
15     Q  Weren't you testing the work done by Brown,
16 Schultz?
17     A  I was testing their audit work.
18     Q  Wouldn't you be required to use the same
19 procedures that -- which Brown, Schultz should use in
20 determining its audit?
21     A  I determined their procedures weren't adequate.
22     Q  Sir, I didn't ask you that. Wouldn't you be
23 required in testing the quality of the work by Brown,
24 Schultz to use the same procedures which applied or

Page 232

1  should have been used by Brown, Schultz in performing
2  their audit?
3      A  Yes.
4      Q  Is the look back method a method which Brown,
5  Schultz could properly have used in conducting their
6  audit during 1997 and 1998?
7      A  In connection with review of completed
8  contracts, yes, they did.
9      Q  In performing the audit of the 1997 and 1998
10 financial statements for CCI, would Brown, Schultz have
11 acted in accordance with Generally Accepted Auditing
12 Standards to have used the look back method?
13     A  A method similar to the look back by reviewing
14 completed contracts, which is documented in their work
15 papers that they did.
16     Q  Would Brown, Schultz have been justified in its
17 audit procedures in using the look back method in its
18 audit of estimated costs to complete contracts?
19     A  Yes. They would have reviewed, which they did.
20 They reviewed two completed contracts during the year,
21 which in effect is using a method similar to what I used
22 based on our work in process in prior years, how did
23 these contracts actually finish up. For instance, in
24 1998 they looked at the 1997 -- two work in process jobs

Page 233

1  in 1997 and they looked at them under a method very
2  similar to the look back method in determining the
3  validity of management's estimates.
4      MR. McCARRON: Mr. McGlynn, if this continues, we're
5  going to be here for a long time.
6      MR. McGLYNN: I'm telling you now, I have to leave
7  to go to the airport at 6:00 o'clock.
8      MR. McCARRON: Not a chance.
9      MR. McGLYNN: Then, you know, you will have to get
10 an appropriate court order.
11     MR. McCARRON: You may leave. I'm alerting you to
12 this now, because it's quarter to 5:00, and if the
13 witness thinks that this way of going on --
14     MR. McGLYNN: Excuse me. Can we go off the record
15 for a second?
16         (Discussion had off the record.)
17     MR. McCARRON: Q  Did Brown Schultz use the look
18 back method in performing its audit procedures of the
19 1997 and 1998 financial statements?
20     A  Yes.
21     MR. McGLYNN: Objection. Asked and answered.
22     MR. McCARRON: Q  In what respect did Brown,
23 Schultz use the look back method in performing their
24 audit procedures for estimating cost to complete

59 (Pages 230 to 233)

Page 262

1  Ortenzio's indemnification other than it existed?
2      A  Not that I recall.  I didn't include anything in
3  any of my reports.
4      Q  Did you make a determination about whether the
5  work done by Bruce Brown or Brown, Schultz for its
6  audits of CCI financial statements had any effect or
7  played any role with respect to the Ortenzio
8  indemnification?
9      A  I don't think I addressed that either.
10     Q  Your next item is identified as look back --
11  number 2, you wrote look back method, period, right?
12     A  Right.
13     Q  And then you wrote what, reasonable?
14     A  Reasonable and used.
15     Q  What do those words mean?
16     A  As I explained before, I was concerned, as you
17  individuals have expressed, of using a look back method
18  based on actual cost to complete.  Absent any accounting
19  records, I knew that that was the only method I was
20  going to be able to use to get the magnitude of what the
21  potential error was in any given year.  I wanted to
22  check with firm-wide resources to see if I was out of
23  line in connection with using a method similar to that
24  with regards to what I was reporting on in connection

Page 263

1  with this litigation as an expert witness.
2      Q  Did you find any support for your use of the
3  look back method to evaluate the propriety of the work
4  done by auditors?
5      A  Yes, I did.  I had determined that the look back
6  method was reasonable and had been used in damage
7  evaluation cases in connection with litigation support
8  engagements.
9      Q  Are you aware of any instance in which the look
10  back method was used to evaluate the propriety of the
11  accounting work done by auditors?
12     A  I don't have any specific cases, no.
13     Q  Are you aware of any other accountant who has
14  ever used the look back method to evaluate the propriety
15  of work done by auditors in performing audits of
16  financial statements?
17     A  I'm aware of individuals in our firm that have
18  used a method similar to what I have employed to
19  determine the effect of an accounting issue.
20     Q  Sir, are you aware of any other instance in this
21  case when an accountant has employed the look back
22  method to evaluate the propriety of the work done by
23  auditors in performing audits of financial statements?
24     A  No.

Page 264

1      Q  The instances in which you are aware the look
2  book method was used was limited to damage evaluations.
3      A  Not just damage evaluations.
4      Q  Damage evaluations and tax-related issues?
5      A  Not necessarily.
6      Q  What other instances are you aware in which
7  accountants have used the look back method?
8      A  I reviewed with people that have experience in
9  litigation in our firm the method that I used and the
10  reason that I was using this method, which is what this
11  documents.  They indicated it was not an unreasonable
12  method to use.
13     Q  What other instances are you aware of where the
14  look back method has been an accepted methodology used
15  by accountants?
16     A  I am not specifically aware of a case that
17  refers exactly to the look back method I use.
18     Q  Are you aware of any instance in which
19  accountants applying principles, concepts, standards,
20  and pronouncements regularly used by experts in your
21  field have used the look back method to determine the
22  propriety of accounting work done by auditors in
23  connection with audits of financial statements?
24     A  I can only go upon what we've done at Clifton

Page 265

1  Gunderson.  I don't know whether it's been used by
2  anybody else in the profession.
3      Q  Did anyone at Clifton Gunderson ever employ the
4  look book method to assess the propriety of the work
5  done by accountants in performing audits of financial
6  statements?
7      A  I don't know.
8      Q  Who at Clifton Gunderson told you that the look
9  back method seemed reasonable?
10     A  There is several people that I consulted.
11     Q  Who are they?
12     A  I reviewed Robert Kleeman, K-L-E-E-M-A-N.
13     Q  Had Mr. -- What did Mr. Kleeman tell you about
14  the use of the look back method?
15     A  He indicated it was reasonable to him.
16     Q  Who first had the idea to use the look back
17  method?
18     A  I did.
19     Q  Did Mr. Kleeman indicate that he had ever used
20  the look back method?
21     A  I don't recall whether he had indicated he had
22  ever used it before.
23     Q  Who else?
24     A  Jim Alerding, A-L-E-R-D-I-N-G.

67 (Pages 262 to 265)

# EXHIBIT D

Response to DeBruyn Deposition
May 7, 2003

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 5 | 16 | I took the exam in 1982 and 1983, passing the final part of the exam in November 1983. My CPA certificate was awarded in February 1984. | Clarification of dates. |
| 5 | 23 | I first sat for the exam in November 1982. | Clarification of dates. |
| 7 | 11 | The second time I took the exam was May 1983. | Clarification of dates. |
| 9 | 5 | The exam was completed in November 1983. | Clarification of dates. |
| 11 | 10 | It was November 1982 when I first took the exam. I did not sit for the exam in May 1982 because I was in the process of graduating from college and looking for a full time job. | Clarification of dates. |
| 49 | 21 | The course was sponsor through the Missouri Society of CPA's and Nichols Education Corporation prepared the course material. | To clarify my response. |
| 79 | 11 | Should say and "who" was on the peer review team.... | Grammar. |
| 95 | 13 | While I agree with the statement as read and responded "yes", the auditors had evidence that the contractor did not have the ability to produce dependable estimates sufficient to rely on without performing additional audit procedures. | To expand and explain my answer more completely. |
| 108 | 24 | You cannot simply rely on management's representation regarding estimated costs to complete without performing other corroborating audit procedures that then support the reliance of management's estimates. Brown Schultz did not perform this corroborating work. | Did not fully understand the question in the deposition. |
| 112 | 19 | No, the opinion would not have changed but the audit results, i.e financial reports would have been different. | To expand and explain my answer more completely. |

| 115 | 9 | The list of additional work is consistent with the industry audit guide and standards of conducting an audit of a contractor. | To expand and explain my answer more completely. |
|-----|----|---|---|
| 116 | 5 | The opinion would not have changed although the financial results would have been different. Brown Schultz did not perform the necessary procedures under due professional care to determine what adjustments to the clients accounting records would be required. | Did not completely understand the question when asked. The change clarifies and explains my answer. |
| 122 | 6 | Had Brown Schultz employed the correct or additional procedures in their audit work the financial statements would have been different. By not performing some of the recommended audit procedures, Brown Schultz was unable to identify potential misstatements in the financial statements issued under GAAS. | To expand and explain my answer more completely. Did not fully understand the question when asked in the deposition. |
| 131 | 4 | The information regarding the completed contracts would have become available from CCI in 1998 as the contracts were completed in the subsequent year. I simply used the information that was available in the audited financial statements of completed contracts. | To expand and explain my answer more completely. |
| 140 | 7 | Investigation only in the fact that I reviewed depositions and subsequent work which indicated no catastrophic event resulted in the substantial increase in contract costs which were experienced by CCI. | To expand and explain my answer more completely. Did not fully understand the question when asked in the deposition. |
| 154 | 11 | Accumulated costs represent costs to date. I assumed in my restatement that the costs to date numbers were accurate and only adjusted the estimated costs to complete and consequently the total estimated costs. Brown Schultz limited their testing and I could not determine if any adjustments in my restatement would have been to costs to date or | To expand and explain my answer more completely. Did not fully understand the question when asked in the deposition. |

| | | accumulated contract costs. | |
|---|---|---|---|
| 162 | 12 | First word should read "contractor". | Grammar |
| 163 | 16 | Word should be "confidence" versus "competence". | Grammar |
| 166 | 5 | Should have been answered that I adjusted total estimated costs to date by adjusting estimated costs to complete and not the job costs to date. | Did not completely understand the question when asked. The change clarifies and explains my answer. |
| 273 | 1 | Should read "Our audit and accounting director" meaning Clifton Gunderson's. | Grammar |
| 288 | 17 | The request for the bond demonstrates CCI management's unreliability in the construction business. Approximately one month before the date of bankruptcy and CCI management is continuing to bid on large projects. | To expand and explain my answer more completely. |
| 290 | 5 | PCIC guaranteed the payment. The 100% stockholder of PCIC is also the sole 100% stockholder of CCI. | To expand and explain my answer more completely. |

(signed) _Stephen J. D___    Date _06-10-03_

# EXHIBIT E

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2                    (Harrisburg Division)

 3   UNITED STATES FIDELITY
     AND GUARANTY COMPANY
 4
                    Plaintiff          No.:  1:01-CIU-00813
 5
         vs.                           (Judge Kane)
 6
     BRUCE J. BROWN AND                (Magistrate
 7   BROWN, SCHULTZ, SHERIDAN          Judge Smyser)
     & FRITZ
 8                 Defendants
     _____/
 9

10              The deposition of MATTHEW SILVERSTEIN was

11   held on Wednesday, June 12, 2002, commencing at

12   10:00 a.m., at the St. Paul Fire and Marine Insurance

13   Company, 5801 Smith Avenue, Baltimore, Maryland,

14   21209, before Susan M. Wootton, Notary Public.

15

16   APPEARANCES:

17              BRUCE LEVIN, ESQUIRE
                   On behalf of Plaintiff
18
                KATHLEEN CARSON, ESQUIRE
19                 On behalf of Defendants

20

21   REPORTED BY:  Susan M. Wootton, RPR
```

Matthew Silverstein - 6/12/02

Page 26

1   the format of the bond.
2       Q    Okay. Well, what is the distinction
3   between the payment bond and the performance bond?
4       A    The payment bond is generally for the
5   benefit of labor or material suppliers, for labor or
6   material that was used or incorporated in the project,
7   generally, whereas the performance bond runs to the
8   obligee, generally the owner of the project.
9       Q    When USF&G is required to fulfill its
10  obligations under its performance bonds on a
11  particular job, what happens? Does USF&G rebid the
12  job?
13          MR. LEVIN: Objection.
14          THE WITNESS: It varies with the project.
15  It varies with the analysis we have done. It would be
16  dependent upon our analysis as to what is the best way
17  to mitigate the loss.
18      Q    Well, what are USF&G's options at that
19  point in time?
20      A    It varies with the terms of the bond. The
21  bond, Miller Act bond, a non-Miller Act bond or an AIA

Page 27

1   bond would all provide the surety with different
2   options in the event of a default termination, so it
3   would be dependent upon the terms of the bond.
4       Q    In the case of CCI, do you know what
5   options were available to USF&G?
6       A    There was probably 20 different bonds out
7   there, so it varied with the bonds.
8       Q    Okay. And the payment and performance
9   bonds, well, the payment bonds, are they maintained in
10  the payment bond files of USF&G?
11      A    There is only one bond for each project.
12      Q    Okay.
13      A    There will be multiple payment bond files,
14  one for each claimant. So they are with generally the
15  bond file, but it would not be a separate copy of a
16  payment bond within each claimant's file.
17      Q    I understand.
18      A    Do you follow me?
19      Q    I understand what you're saying. As I
20  understand it, USF&G maintains their payment bond
21  files on a project-by-project basis, and then within

Page 28

1   each project there are folders for claimants. Is that
2   correct?
3       A    Correct.
4       Q    Okay. So, within the project, the payment
5   bond file for a particular project, a copy of the bond
6   would be there; is that correct?
7       A    Yes, a copy of the payment and the
8   performance bond should be with the general file for
9   each particular project.
10      Q    Okay. When you say general file?
11      A    Which encompasses the payment bond files,
12  the, for lack of a better word, performance bond files
13  which would be files relating to completion of the
14  project.
15      Q    When USF&G took over performance of the
16  projects from CCI, did it obtain CCI's project files?
17      A    I believe it obtained most of them, but I
18  don't know if we got all of them.
19      Q    And where --
20      A    I'm sorry, can I clarify that?
21      Q    Sure.

Page 29

1       A    With regard to the projects that we had
2   open bonds on, I think that CCI had some non-bonded
3   projects, and I don't believe we got those files.
4       Q    And for those project files that you did
5   obtain, where are they maintained today?
6       A    It varies with the project. In some
7   instances, those files were turned over to the
8   completion contractor that completed the work. In
9   some instances, they were returned to CCI when the
10  project was completed.
11          In some instances, we still have them,
12  those files either in part here in our offices or with
13  engineers or consultants that worked with us. So it
14  varies with the project.
15      Q    But are those files contained within
16  either the payment bond files or the performance bond
17  files?
18          MR. LEVIN: Objection.
19          THE WITNESS: Geographically the same
20  location or intellectually is it one file?
21      Q    Let's start with the latter.

8 (Pages 26 to 29)

# EXHIBIT F

1               UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2                    (Harrisburg Division)
3

    UNITED STATES FIDELITY AND    )
4   GUARANTY COMPANY,             )
                                  )
5              Plaintiff,         )
                                  )   Civil Action No.
6        -vs-                     )   1:01-CV-00813
                                  )
7   BRUCE J. BROWN AND BROWN      )
    SCHULTZ SHERIDAN & FRITZ,     )
8                                 )
               Defendants.        )
9

10            Deposition of DONALD L. BRENNER taken before
11   DONNA L. POLICICCHIO, C.S.R., and Notary Public,
12   pursuant to the Federal Rules of Civil Procedure for the
13   United States District Courts pertaining to the taking
14   of depositions, at Suite 1800, 333 West Wacker Drive, in
15   the City of Chicago, Cook County, Illinois, commencing
16   at 10:00 o'clock a.m. on the 6th day of May, A.D. 2003.
17
18
19
20
21
22
23
24

Page 74

1  out to you that in terms of the exact wording, I also
2  have not seen Volume 1, and if you have a copy of it, I
3  would like to see it.
4     Q  You can't identify Exhibit 8 as Volume 1?
5     A  I can't tell for sure because Exhibit 8 is
6  entitled Accounting & Auditing Quality Control Manual,
7  whereas Volume 1 is referred to as something much more
8  specific and, at least going by the words, narrow, a
9  more narrow concept, auditing concepts and procedures.
10    MR. McGLYNN:  Can we go off the record for a moment?
11       (Discussion had off the record.)
12    MR. McGLYNN:  Back on the record.  Mr. McCarron has
13  agreed to ascertain whether or not Volumes 1 and 2
14  exist, if indeed they are different from what we've
15  marked as Brenner 8.
16    Q  Mr. Brenner, do you have any specific
17  recollection of reviewing any Brown, Schultz policy
18  manual that deals with or dealt with audit sampling?
19    A  No, sir.
20    Q  Now, sir, can you identify this letter?
21    MR. McCARRON:  Can I have one?
22    MR. McGLYNN:  I'm sorry.
23    A  Yes.  This is a letter that I have seen and
24  apparently dictated.

Page 75

1     MR. McGLYNN:  Can we have that marked as the next
2  exhibit?
3        (Document marked Exhibit No. 9.)
4     Q  This is Brenner Exhibit 9, which is a letter
5  from The Brenner Group to Kathleen M. Carson dated
6  August 13, 2002.
7        In this particular letter, in the second
8  paragraph you write, You either have or will make
9  arrangements for your consulting accounting expert to
10  immediately perform analysis, review of (and
11  documentation of) the accounting and a reaudit of the
12  job accounting (profit recognition) -- I'm not going to
13  read the entire sentence.
14       Do you see that sentence you wrote, sir?
15    A  Yes, I see the sentence you're referring to.
16    Q  And what is it that you are contemplating that
17  somebody -- some consulting accounting expert is going
18  to be performing?
19    A  I had suggested that it might be useful to have
20  an accounting firm in effect determine through a reaudit
21  whether there were any potential adjustments to the jobs
22  included in the reporting by CCI in their December 31,
23  1997, 1998, financial statements.
24    Q  Do you know if any such work was -- reaudit work

Page 76

1  was performed?
2     A  To my understanding it was not.
3     Q  Why did you feel it would be useful to perform
4  this reaudit assignment?
5     A  Well, if you're trying to determine if there is
6  any misstatement of the financial statements, one way to
7  do that is to go back and do a reaudit based on the data
8  that was available at that time to the company in
9  preparing their financial statements.
10    Q  Did you -- And you've never seen any reauditing
11  of any of the projects of CCI Construction?
12    A  That is correct.
13    Q  And The Brenner Group did not perform any
14  reaudit work in connection with the CCI financial
15  statements?
16    A  That is correct.
17    Q  And have you -- strike that.
18       And the second page of this particular letter,
19  Mr. Brenner --
20    A  Yes, sir.
21    Q  -- you identify jobs that you have identified
22  for, quote, unquote, priority treatment?
23    A  Yes, sir.
24    Q  And that would be priority treatment with

Page 77

1  respect to this so-called reaudit exercise?
2     A  Yes, sir.
3     Q  And were any of these projects reaudited to the
4  best of your knowledge?
5     A  To my knowledge they were not.
6     Q  And why did you identify these projects as
7  meriting or warranting priority treatment?
8     A  Size of the jobs, evaluation of the potential
9  significance to the financial statements, if a reaudit
10  were to uncover any additional data that the company had
11  overlooked in preparing their records and their
12  December 31 financial statements.
13    Q  And in this letter, your August 13, 2002,
14  letter, you expected to receive that analysis and
15  reaudit on the above jobs not later than Friday,
16  August 16.  Do you see that?
17    A  I see that comment in there.  I expected at that
18  time to receive it if we went ahead with that
19  recommendation.
20    Q  Where does it say in your letter that you were
21  recommending this reaudit assignment, sir?
22    A  That was the nature of the discussion with
23  Kathleen Carson.
24    Q  Was there a discussion as to why you did not

20 (Pages 74 to 77)

Page 78

1  receive any reaudit report or reaudit --- strike that.
2      A  This was a request of mine at that time that was
3  documented in this letter.
4      Q  And the request was denied?
5      A  No, the request was not denied.  It was neither
6  denied nor accepted by Ms. Carson.  She said that she
7  would review it with Mr. McCarron and they would get
8  back to me.
9      Q  And did you feel that you needed that reaudit
10  work as part of the -- strike that, in order to
11  formulate any of the opinions reflected in your
12  August 2002 report?
13      A  No.
14      Q  What would you have employed the product of this
15  reauditing task for in connection with your August 2002
16  report?
17      A  To evaluate Mr. DeBruyn's work.
18      Q  DeBruyn.
19      A  Sorry.
20      MR. McCARRON:  It's spelled the same, D-E-B-R-Y-N
21      THE WITNESS:  U-Y-N.
22      MR. McCARRON:  U-Y-N.
23      MR. McGLYNN:  You got the spelling right.  It's just
24  the pronunciation.

Page 79

1      MR. McCARRON:  Never mind.
2      MR. McGLYNN:  Q  Now, sir, in connection with your
3  initial report, you had a teleconference call with,
4  among others, Mr. Bruce Brown, correct?
5      A  Yes, sir.
6      Q  And this document was produced by Mr. McCarron's
7  firm and it's identified as Brenner bates stamp 004
8  through 0012.  Can you identify that, sir?
9      A  Yes, sir.
10      Q  Who prepared it?
11      A  Most likely there was an initial draft that
12  Mr. Jefferis put together and I then took that draft and
13  my notes and my memory and worked on what I thought
14  would help clarify the draft and had it typed.
15      Q  Did you prepare notes of the telephonic
16  conference?
17      A  Mr. Jefferis had some notes and I had some
18  notes, rather cryptic, but we had some notes.
19      Q  Did you produce those notes to the McCarron
20  firm?
21      A  No.  They don't exist.
22      Q  You destroyed them?
23      A  Once I expanded and made sure that I had
24  everything from Mr. Jefferis and my notes in the revised

Page 80

1  draft that would become a final work paper document, I
2  didn't need those notes anymore.
3      Q  How long did this teleconference last
4  approximately?
5      A  45 minutes to maybe an hour and 15 minutes,
6  somewhere in that time frame is my recollection.
7      Q  And this teleconference was held on the 20th of
8  August, 2002?
9      A  That's what the document indicates, yes, sir.
10      Q  Is that your recollection of the date --
11      A  I don't have a recollection until I look at the
12  document, and then it gives me a recollection.  I would
13  have made sure I put the right date on it when I
14  finalized it.
15      Q  Your recollection having been refreshed by
16  looking at this document, a conference was held on
17  August 20, 2002?
18      A  Yes, sir.
19      MR. McGLYNN:  Can I have that marked as the next
20  exhibit, please?
21      (Document marked Exhibit No. 10.)
22      Q  And this particular conference occurred the day
23  before you issued your report, Brenner Exhibit 1?
24      A  I'm not sure if it was the day before I issued

Page 81

1  the report.  It's one day before the date on the report.
2      Q  Did you issue this report, Brenner Exhibit 1, on
3  any date other than August 21, 2002?
4      A  I'm not sure.  It probably would have been the
5  21st, but it could have been the next day.  Sometimes
6  you're working on a report and you work into the evening
7  and you've got to do some revisions and drafts and it
8  might be the next day before it gets finalized.
9      Q  All right.  On this Exhibit 10, DLB, I presume,
10  is you, Donald L. Brenner?
11      A  Yes, sir.
12      Q  And did you rely on the information that
13  Mr. Brown provided you during this telephone conference
14  in connection with formulating the opinions reflected in
15  Brenner Exhibit 1?
16      A  Well, as I indicated in my written report, this,
17  along with every other source of data and document that
18  I gave consideration to, formulated the basis for the
19  information upon which I expressed my opinions.
20      Q  What was the -- strike that.
21      Please take a look at page 1 of 9, sir.  Do you
22  have that in front of you?
23      A  Yes, sir.
24      Q  Under Project Review, you asked specifically,

21 (Pages 78 to 81)