UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff

v.

BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants

CIVIL ACTION NO. 1:01-CV-00813
JUDGE CONNER

**UNITED STATES FIDELITY & GUARANTY COMPANY'S TRIAL MEMORANDUM**

TABLE OF CONTENTS

Page

I. Introduction ..... 1

II. Background ..... 2

A. Construction Bonding ..... 2

B. USF&G Establishes A Bonding Program For CCI ..... 5

C. CCI Defaults And USF&G Incurs Heavy Losses Under The Bonds Issued To CCI ..... 12

1. Projects Underwritten In Reliance On The 1997 Brown Schultz Audit Report ..... 13

2. Projects Underwritten In Reliance On The 1998 Brown Schultz Audit Report ..... 14

D. The Audit Reports Were Inaccurate and Contained Material Misinformation ..... 14

E. CCI's Restated Financials Demonstrate That The Losses Incurred By USF&G Are Attributable To Brown Schultz' Failure to Properly Conduct Its Audits And To Issue Accurate Audit Reports ..... 20

III. USF&G's Cause Of Action ..... 21

IV. Legal Argument ..... 24

A. USF&G Will Prove That Brown Schultz' Work Fell Markedly Short Of The Requisite Standard Of Care ..... 24

B. The Defenses Of Contributory Negligence Is Inapplicable To This Case ..... 25

C. USF&G's Justifiable Reliance On The Audited Financial Statements Is Manifest By, *Inter Alia*, Uncontrovertible Evidence That USF&G Would Not Have Issued The Bonds To CCI If It Had Known Of CCI's True Financial Condition ..... 26

D. USF&G Has Standing To Sue Brown Schultz Pursuant To Restatement (Second) Of Torts §552 ..... 28

E. DeBruyn's Testimony Is Admissible, Competent And Based On Reliable Methodology ....28

F. That Which Is Missing From Brown Schultz' Work Papers Will Be As Revealing As The Errors Contained Therein ....29

V. Damages ....31

A. USF&G Is Entitled To Recover All Damages Necessary To Compensate It For Losses For Which The Misrepresentation Is A Legal Cause ....31

B. Brown Schultz Cannot Meet The Burden Of Proving Any Failure By USF&G To Mitigate Its Damages ....32

C. USF&G's Provable Losses Exceed $25,927,054.76 ....32

VI. Conclusion ....34

#278106 v1/36432/87

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff<br><br>v.<br><br>BRUCE J. BROWN and BROWN SCHULTZ SHERIDAN & FRITZ, Defendants. | CIVIL ACTION NO. 1:01-CV-00813<br><br>JUDGE CONNER |

**UNITED STATES FIDELITY & GUARANTY COMPANY'S TRIAL MEMORANDUM**

## I. INTRODUCTION

Based upon audited financial statements prepared by Brown Schultz Sheridan & Fritz ("Brown Schultz"), CCI Construction Co. ("CCI") appeared a paradigm regional construction firm. CCI's audited financial statements for the years ended December 31, 1997 and 1998 show a net profit, a substantial net worth and liquidity. Moreover, its profitable history and its revenue and underbilling figures indicated that CCI was proficient at profitably completing its work in progress. CCI enjoyed smooth sailing – at least according to Brown Schultz – and a promising future. Brown Schultz' audited financial statements were "unqualified" and contained assurances that the numbers were not just management's wishful thinking; in introductory letters accompanying the audited financial statements, Brown Schultz represented, *inter alia*, that it had conducted tests of the evidence purportedly supporting the amounts and disclosures of the financial statements and that such financial statements "present fairly, in all material respects, the financial position of CCI." Between December 31, 1998 and August 1999, CCI suffered no significant calamities nor, for that matter, were there any unusual financial or operational events.

Yet, despite Brown Schultz' forecast of sunny weather and fair winds, by October 1999, CCI's profits and viability as a going concern were "gone with the wind" and by May 2000 CCI filed for

bankruptcy relief – leaving numerous project owners treading water and USF&G responsible for search and rescue. Brown Schultz would have the Court believe a "perfect storm" which appeared without warning was responsible for CCI's "instant" demise. Restated financials, as well as CCI's records and Brown Schultz' working papers, prove otherwise; to wit, no competent accounting firm could have issued the audited financial reports absent a strong storm warning.

The audited financial statement for the year ended December 31, 1997 incorrectly represented that CCI produced a net profit of $706,879.00 when, in fact, CCI actually *lost* $109,801.00. In a similar, but a more significant vein, the audited financial statement for the year ended December 31, 1998 incorrectly showed that CCI produced a profit of $59,041.00 when, in fact, CCI actually *lost* $3,067,467.00. Moreover, the mischaracterization of a related-party transaction as revenue and a misrepresentative disclosure of the transaction in an apparent last minute effort to boost CCI's revenue for the year ended December 31, 1998 – thereby enabling CCI to maintain its bonding program – raises serious questions.

United States Fidelity & Guaranty Company ("USF&G") has suffered losses in excess of $25,927,054.76 relative to bonds issued in reliance on the faulty and materially misleading audited financial statements.

## II. BACKGROUND

A. Construction Bonding.

Construction Surety Bonds

A construction surety bond is a three-party instrument among the "Surety", the "Principal," and the "Obligee." Construction surety performance bonds are binding commitments by the "Surety" (USF&G in this instance) by which the surety guarantees the performance of a construction contract by the contractor procuring the surety bond. The contractor procuring the bond is referred to as the "principal" and the beneficiary of the bond – usually the project owner – is referred to as the "obligee."

John B. Fitzgerald, Ray H. Britt, Daniel D. Waldorf, *Principles of Suretyship*, Vol. I, pp. 14-16 (Insurance Institute of America 1st ed. 1991). In this action, CCI was the principal and the various project owners – including the Commonwealth of Pennsylvania – were the obligees on the performance bonds issued by USF&G.

The surety's obligations to the obligee arise only if there has been a default by the Principal. In such a case, the obligee makes demand upon the Surety to perform the work that should have been performed by the Principal or, in the case of payment bonds, to pay the claims of various unpaid suppliers of labor and material. The surety's liability under the bond is capped by a penal sum, which is usually the price stipulated in the bonded construction contract.

Unlike insurance policies, which are usually written for a term of months or years and are based on the allocation of risk over thousands of insureds, surety bonds are issued and the allocation of risk is determined on an individual basis. *Principles of Suretyship*, Vol. I at p. 13.

Pennsylvania, most other states and the United States have statutes which require all contractors working on public projects to provide payment and performance bonds. *See*, 8 Pa. Stat. Ann. §191, *et seq.*; 40 U.S.C. §270 *et seq.*

<u>Surety Bond Underwriting Criteria</u>

Underwriting is the process of gathering facts relevant to the risk of bonding a contractor and includes evaluating the pertinent data, determining the strengths and weaknesses of the account and deciding upon a specific course of action. The primary function of the underwriting process is the prequalification of the contractor. The surety must satisfy itself that the company possesses the ability to meet current and future obligations and can support a bonding program. If a contractor is an acceptable account, the surety then makes a decision on the amount of bonding capacity it is willing to provide. Jeffrey S. Russell, *Surety Bonds for Construction Contracts*, pp. 57-62 (ASCE Press 2000).

Contract bond underwriting involves both objective and subjective evaluations by the underwriter and is more "art" than "science." Reducing surety underwriting to quantitative terms is difficult, if not impossible. The underwriter evaluates the "three C's" of surety bond underwriting: (1) the contractor's character, (2) his capacity to perform bonded work, and (3) the amount of capital his company possesses. *Principles of Suretyship*, Vol. I at pp. 120-121. Of particular importance are the (1) certified public accountant's opinion, (2) the quality of the contractor's financial statement, and (3) type of accounting method used to recognize revenue earned. *Surety Bonds for Construction Contracts* at p. 73.

<u>Surety Bonds Are Issued As Part Of The Bonding Program</u>

The process of underwriting a construction contractor involves establishing and then reviewing each year the contractor's "bonding program," also known as his "bonding capacity." Based on its assessment of the contractor, a surety will create a line of credit that establishes both the maximum penal sum it will write for the contractor on a single bond and the maximum aggregate limit for all bonds combined. International Risk Management Inst. Inc., *Construction Risk Management, Vol. III* XII.A.10 (2000). This "bonding program," is expressed in terms of a single job dollar amount (contract price) and the aggregate dollar amount of work to be performed on uncompleted contracts (backlog or work on hand). It may be expressed both as a single job and as an aggregate backlog limitation. *Principles of Suretyship, Vol. I* at p. 82.[1] The program, normally in effect for one year, is usually conditioned on there being no material adverse changes in the contractor's finances and management.

---

[1] For example, a contractor's bonding program may be set at $5 million for a single project and $20 million as an aggregate limit. This aggregate limit is computed based upon the amount of backlog a contractor has and not on the total penal sum of all bonds issued by the surety. The reason for this is that the contractor works off his backlog daily, thereby reducing the surety's exposure on existing bonds and enabling the contractor to obtain new bonded work within the parameters of the bonding program.

Establishment of a bonding program is necessary because it is almost always impossible to predict the identity and size of the projects on which a contractor will be successful in obtaining throughout the year. This allows a contractor to bid jobs knowing that, absent an adverse change in his business or finances, he is eligible to receive bonding within the bonding program's parameters. This is particularly true of public work, where initial bid advertisements may not be published until after the annual underwriting review and after the determination as to whether the establishment or continuation of the bonding program has been made.

From the sureties' perspective, the bonding program is based on the volume of business which the contractor expects to perform in the coming year and not the issuance of specific bonds. In CCI's case, once its bonding program was approved each year, CCI's request for bonds within the parameters of that program would normally be granted subject to the conditions and limitations noted previously.

Although each job must be submitted to the surety for specific approval prior to bidding, a new annual audit is not required each time a bond is requested as long as the new request is within the parameters of the bonding program. Indeed, it would be extremely expensive and impractical (if not impossible) to require the contractor to provide the surety with an audit report every time the contractor obtains a new contract.

B. USF&G Establishes A Bonding Program For CCI.

USF&G is in the business of issuing payment and performance bonds on behalf of contractor and subcontractor principals engaged in the performance of work on public and private construction projects.[2]

CCI was a contractor engaged in construction work on public and private construction projects. John Ortenzio ("Ortenzio") formed CCI in 1983.

[2] In 1998, USF&G merged with St. Paul Fire and Marine Insurance Co. ("St. Paul"). St. Paul and USF&G have both been in the surety bond business for over 100 years and write bonds for thousands of contractors and subcontractors worldwide.

CCI became a USF&G account in late 1993. CCI enjoyed a good reputation and had previously been bonded with a large top-tier national surety company. From its inception up to 1993-1994, CCI was primarily involved in the construction of medical and healthcare buildings, predominately for one owner, a large publicly traded corporation headed by Ortenzio's father, Rocco Ortenzio. Based upon the audited financial statements prepared by CCI's long-standing accountant and auditor, Brown Schultz, CCI was financially quite successful. Its business plan contemplated a gradual change from private negotiated contracts to hard bid public and private projects. CCI had assembled a team headed by Ortenzio with well qualified construction executives and engineers that, by all outward appearances, seemed fully capable of continuing CCI's growth and prosperity.

As a condition of the establishment and the annual renewal of CCI's bonding program and the issuance of the payment and performance bonds to CCI, USF&G required that CCI furnish to it annually an audit report prepared by an independent certified public accountant consisting of, *inter alia*, an audit of CCI's balance sheet, income statement and the financial status of the contractor's completed contracts and work in progress. In CCI's case, Brown Schultz prepared the audit reports each year since at least 1990.

Brown Schultz also performed auditing and other accounting work for Ortenzio, personally, as well as for numerous other trusts, partnerships and corporations in which Ortenzio or his family had significant interests.

Among the related entities for which Brown Schultz performed work was Pennsylvania Contractors Insurance Company ("PCIC"), a captive insurance company registered in the Turks and Caicos Islands. It is a wholly owned by CCI's sole stockholder, Ortenzio. PCIC was formed for tax planning purposes and to issue Remedial Work Insurance Policies to CCI. PCIC is no longer operational and is in the process of being liquidated. Brown Schultz prepared tax returns and audited financial statements for PCIC since its inception.

CCI's bonding program consisted of a $15 million per project limit and a $75 million aggregate limit.[3] This bonding program remained in effect until approximately early October 1999, when USF&G ceased writing bonds for CCI.

Brown Schultz Knew That USF&G Would Receive And Rely Upon Its Audit Reports

As the long time auditor of CCI – as well as other entities owned by Ortenzio and his family – Brown Schultz and its principal, Bruce J. Brown ("Brown") were familiar with CCI's business operations and its financial condition.

Brown Schultz' working papers[4] show that the audits were done for the benefit of CCI's "bonding company," identified as USF&G and St. Paul. Brown Schultz also knew that USF&G would rely upon its audited financial statements to determine whether to extend, suspend, cancel or modify CCI's bonding program.

Brown Schultz' working papers contain several documents that prove that Brown Schultz was aware of the size of CCI's bonding program.[5]

Brown Schultz was also familiar with the scope and parameters of the total amount of work which CCI performed each year, as well as the anticipated amount of work it would perform in subsequent years. Further, Brown Schultz also knew that CCI – at least from 1993 onwards –

---

[3] CCI had a total annual revenue of approximately $48.2 million when the bonding program was established in 1993.

[4] Working papers are "records kept by the auditor of the procedures applied, the tests performed, the information obtained, and the pertinent conclusions reached in the engagement." AU §339.03. The importance of working papers are discussed in greater detail in Section IV(F), *infra.*

[5] For example, a document contained in Brown Schultz' "Permanent File" entitled "Written Consent of Shareholder in Lieu of Special Meeting" ("Written Consent") dated August 27, 1997 states, in pertinent part, that Ortenzio "has agreed to maintain the equity level of [CCI] no less than $4,800,000 and require an aggregate work program no higher than $60,000,000 . . . ." Another document in Brown Schultz' working papers bearing the same title and date contains an excerpt from Brown Schultz' working papers showing that for the year ended "12/31/97" CCI had equity greater than $4,800,000.00 and its sales were less than $60,000,000.00 (with actual sales being listed as "$35,000,000"). In a letter dated November 7, 1997, CCI's bonding agent, David Dominiani ("Dominiani"), wrote to Ortenzio concerning "[CCI's] current bonding program" and reminded Ortenzio about CCI's earlier agreement reflected in the Written Consent that "USF&G requires your corporate balance sheet to maintain an equity level of no less than $4,800,000.00." Brown is an indicated recipient of a copy of Dominiani's letter.

performed a considerable amount of public construction work that, as a matter of Pennsylvania and federal law, required that CCI be able to procure payment and performance bonds.

Brown Schultz charged CCI annual audit fees, often times with a *planned loss* of $2,000.00-$3,000.00 on the audit assignment. This was likely as an inducement not only for future business from CCI, but in the hope of obtaining new or continuous business from other entities with which the Ortenzio family was affiliated.

Relying Upon The Audits Prepared By Brown Schultz, USF&G Issues Bonds To CCI

Brown and Brown Schultz prepared audited financial statements for CCI for the years ended December 31, 1997 (the "1997 Audit Report") and December 31, 1998 (the "1998 Audit Report") (collectively, the "Audited Financial Statements").

On March 3, 1998, USF&G received a copy of the 1997 Audit Report. In reliance upon that audit, USF&G agreed to continue the $15 million/$75 million bonding program for CCI. Thereafter, USF&G issued payment and performance bonds to CCI for 6 projects.[6]

On March 2, 1999, USF&G received a copy of the 1998 Audit Report. In reliance upon that audit, USF&G agreed to continue the $15 million/$75 million bonding program for

---

[6] The projects were as follows:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $15,647,035 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $7,220,942 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $3,919,156 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $5,591,730 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $18,880,298 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $21,927,111 |

CCI. Thereafter, USF&G issued payment and performance bonds to CCI for 7 further projects.[7]

USF&G's Underwriting Of The CCI Account

Following USF&G's annual receipt of the Audited Financial Statements, USF&G's underwriters began the task of reviewing and analyzing each statement. From 1993 through 1998, Anthony S. Phillips ("Phillips"), a 32 year veteran underwriter handling several of St. Paul's major accounts, personally read each statement and performed a basic analysis of each statement relative to CCI. Phillips served as surety bond underwriting manager in charge of USF&G/St. Paul's Harrisburg, Pennsylvania office. However, it was the job of Steven Salazar ("Salazar"), the other underwriter in the Harrisburg office, to perform a more detailed analysis, which would then be reviewed by Phillips and James Daily ("Daily"), the senior bond underwriter in Baltimore, Maryland. As CCI was a "Home Office" account, Daily had the final authority regarding underwriting decisions. Daily, a surety bond underwriter for approximately 38 years, has been employed by USF&G and St. Paul for approximately 23 of those years.

Salazar's overall analysis of CCI, including his analysis of the Audited Financial Statements, was memorialized annually in a document entitled "USF&G Interoffice Correspondence" ("Interoffice

---

[7] The projects were as follows:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $514,976 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $835,299 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $1,688,139 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $191,083 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $12,191,000 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $4,126,478 |
| E. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $28,231,945 |

Correspondence"). No Interoffice Correspondence was prepared by Salazar for 1998 as the financial information obtained from the 1998 Audit Report was entered for that year into a relatively new software program at USF&G known as the Electronic Credit File ("ECF"). Salazar, Phillips and Daily reviewed and analyzed the 1998 Audit Report shortly after receipt on March 2, 1999.

The Audited Financial Statements appeared to be well-presented and, on their face, did not reveal any defects in the manner in which Brown Schultz audited CCI's balance sheet. During the time when USF&G was issuing bonds for CCI, Daily received no information from any sources that would have led him to conclude that the financial information contained in the Audited Financial Statements was inaccurate or misleading.

As each Interoffice Correspondence demonstrates, USF&G's Harrisburg, Pennsylvania office recommended a continuation of the $15 million/$75 million bonding program for CCI. Indeed, throughout CCI's bonding relationship with USF&G, those bonding capacity limits continued year-to-year although, on a few occasions, USF&G approved bonds which temporarily increased CCI's bonding capacity beyond $75 million.[8]

While USF&G was writing bonds for CCI, USF&G had no specific, formal, underwriting guidelines for its bonding accounts. Rather, USF&G relied upon a series of documents issued by USF&G's home office known as "gray letters," as well as an underwriting training manual, both of which provided general guidance on underwriting methods and procedures. However, with respect to CCI and other USF&G accounts of a size similar to CCI, USF&G generally wanted the accounts to maintain a working capital-to-bonding capacity ratio of 3% or better and a net worth-to-bonding

[8] Those "spikes" (as they are known in the surety industry) in CCI's bonding program were short-lived since CCI worked off its backlog, thereby reducing the aggregate limit of the bonding program to approximately $60 million. Also, on a very few occasions, USF&G approved a spike in CCI's single limit bonding program to allow CCI to accept a project larger than $15 million. This was only done after considering both the facts and circumstances of the project and the financial position of CCI. The analysis of CCI's financial position was based, in large part, on the Audited Financial Statements. During the period from 1997 until USF&G/St. Paul ceased writing bonds for CCI in early October 1999, USF&G only approved four jobs that were larger than the $15 million single limit portion of the bonding program.

capacity ratio of 5% or better.[9] Based upon the Audited Financial Statements, CCI maintained the 3%-5% ratios described above, except on limited occasions when USF&G approved a bond which temporarily increased CCI's bonding capacity beyond $75 million.

USF&G would also receive an unaudited interim financial statement prepared internally by CCI (generally for the first six months of each year), as well as certain internally prepared work-in-progress schedules which were received quarterly. These work-in-progress schedules detailed how CCI's incomplete construction projects were performing. Although these interim reports from CCI were important, they were not nearly as important as the audited financial statements prepared by Brown Schultz each year.[10]

Thus, *almost every aspect of USF&G's underwriting process relied upon the then most recently issued Audited Financial Statement as a basis for comparing CCI's profitability, net worth, and ability to perform work* as well as serving as an indicator of the credibility of internally prepared information being received from CCI and its management.

An Interim Loss In 1998 Turns Into a Profit by Year End According to the 1998 Audit Report

On or about August 17, 1998, CCI's bonding agent, Dominiani, reported to USF&G that CCI had posted a net loss of $1.6 million for the first six months of 1998. Dominiani reported that this loss was attributable to certain problems which had since been rectified. According to Dominiani, CCI expected to show a small loss or break-even by December 31, 1998. Based on the 1998 Audit Report, Dominiani's statements and the corrective action allegedly implemented by CCI proved to be true.

[9] "Working capital" is the dollar amount obtained when current liabilities are subtracted from current assets and "net worth" is determined by subtracting all liabilities from all assets.

[10] USF&G would compare the interim financial statements with the Audited Financial Statements issued before the interim statements, as well as the Audited Financial Statements issued after the interim financial information had been received. This comparison was important when CCI experienced profit fades or losses on any of its projects. In those circumstances, USF&G reexamined the Audited Financial Statements issued before the interim financial statement to determine, among other things, whether the profit fades or losses were new occurrences or represented continuing losses on contracts in progress. USF&G also used the prior Audited Financial Statements to compute what CCI's cash and equity positions would be if such profit fades or losses continued.

Thus, USF&G decided to continue CCI's bonding program at the current level, at least until USF&G could verify and review the year end results for 1998.[11]

USF&G's Harrisburg, Pennsylvania office received a copy of the 1998 Audit Report on March 2, 1999. The 1998 Audit Report confirmed what Dominiani had represented to Phillips; namely, that CCI had its problem jobs under control and that CCI expected a break-even or slightly profitable year.[12]

USF&G Issues CCI's Last Bond

On or about August 30, 1999, Phillips received a letter from Dominiani reporting that CCI had sustained a loss of approximately $900,000.00 during the first six months of 1999 due to certain problem projects. Dominiani advised Phillips that CCI anticipated losing approximately $1 million in 1999.

Upon Phillips' receipt of the foregoing information, he requested a meeting with CCI management to ascertain exactly what problems CCI was experiencing. The only bond issued by USF&G thereafter was a small bond – in the penal sum of $191,083.00 for the Cool & Cold Aqua project – related to the same project as to which USF&G issued a $12 million bond on or about July 12, 1999. In early October 1999, all further bonding by USF&G of CCI was suspended. USF&G issued no further bonds to CCI.

C. CCI Defaults And USF&G Incurs Heavy Losses Under The Bonds Issued To CCI.

In September 1999, CCI advised USF&G that it lacked the financial resources to continue its operations and, consequently, would not be able to complete its work and pay its suppliers and

[11] This decision was premised, in large part, on the strong financial condition of CCI evidenced in the 1997 Audit Report, which demonstrated, *inter alia*, that CCI had a sufficient cash position, significant shareholder equity and favorable profit projections for its work in progress.

[12] In fact, as reported in the 1998 Audit Report, CCI produced a profit of $59,041.00 and reduced its operating loss to $116,629.00. CCI also maintained a comparatively strong net worth – $5,254,834.00 – and had, according to the 1998 Audit Report, cash and cash equivalents of at least $2,429,866.00 and marketable securities of $631,481.00.

subcontractors relative to the projects bonded by USF&G. This came as a shock to USF&G. *The Audited Financial Statements gave no indication of CCI's financial troubles.*

In February 2000, CCI closed business operations and in May 2000 it filed for bankruptcy protection.

Subsequent financial information provided by CCI and the testimony of knowledgeable individuals prove that CCI's eventual collapse cannot be blamed on any single catastrophic or intervening event. During the years 1997, 1998 and at least until October 1, 1999, CCI had encountered no labor strikes, uninsured losses, or project defaults.

As a surety, USF&G was required to and did expend substantial sums satisfying the claims of CCI's unpaid vendors, employees and subcontractors, and in completing the projects USF&G bonded on behalf of CCI. To date, USF&G has incurred losses in excess of $25,927,054.76 in connection with the bonds issued in reliance upon the Audited Financial Statements. The breakdown of these losses is illustrated on the following schedules:

1. Projects Underwritten In Reliance On The 1997 Brown Schultz Audit Report:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germsplasm | 26-0120-28306-98-1 | 6/16/98 | $4,049,491.71 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $2,532,447.20 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $307,758.53 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $2,869,808.49 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $1,449,469.53 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $4,949,384.03 |
| | | | | Subtotal: | $16,158,359.49 |

2. Projects Underwritten In Reliance On The 1998 Brown Schultz Audit Report:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $235,002.59 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $79,529.64 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $411,878.12 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $228,201.80 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $4,715,372.83 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $1,369,904.72 |
| G. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $2,728,805.57 |
| | | | | Subtotal: | $9,768,695.27 |

**Total: $25,927,054.76**

D. The Audit Reports Were Inaccurate and Contained Material Misinformation.[13]

The Audited Financial Statements

One of the primary objectives of an audit is to identify high-risk audit areas and to plan the audit procedures accordingly. Although the working papers identify high-risk characteristics in CCI and in CCI's individual construction contracts, *Brown Schultz' audit plans for 1996, 1997 and 1998 were virtually identical and did not reflect any consideration or additional testing procedures for any of the increased audit risks inherent in the CCI audit engagement.* Further, despite an increase in CCI's audit risk profile, the actual audit work performed by Brown Schultz for the fiscal years ended December 31, 1996, 1997 and 1998 did not change significantly from year to year.

[13] Detailed discussion of the many inaccuracies is contained in, *inter alia*, the Affidavit of Steve J. DeBruyn, CPA in Opposition to the Defendants' Motion for Summary Judgment, which was filed with the Court on or about October 8, 2002, which is incorporated herein by reference. USF&G also incorporates herein by reference the Expert Report of Stephen J. DeBruyn, CPA and the Supplemental Expert Report of Stephen J. DeBruyn, CPA. Both expert reports were filed with the Court on or about February 10, 2003 as Exhibits "C" and "D" to United States Fidelity & Guaranty Company's Opposition to Defendants' Motion to Strike the Supplemental Expert Report and Affidavit of Stephen J. DeBruyn.

The primary objective of the construction contractor auditor is to determine the level of reliance that can be placed on the contractor's estimated costs to complete the project. The auditor should perform sufficient testing and analysis to determine whether the contractor's estimates of its costs and profits is sound and reasonable. In light of the numerous risk factors extant, including the profit fades on a number of CCI projects from 1996 to 1997 and 1997 to 1998, Generally Accepted Auditing Standards ("GAAS") required Brown Schultz to, at minimum, test the reliability of CCI's estimates and its costs to complete contracts in progress and estimated profits thereon. Brown Schultz did not.

Despite the risk factors, Brown Schultz placed undue reliance on CCI management's assertions with respect to costs-to-complete and estimated profits on the CCI contracts. The estimated costs-to-complete CCI's contracts schedule contained in the Audited Financial Statements were also deficient because Brown Schultz relied on CCI's representations as to such costs and job profitability *with no documentation substantiating the fact that CCI's management estimates were reasonable other than the fact that they had allegedly been verified by Sherri Phillips, CCI's Chief Financial Officer and/or Stan Sechrist, CCI's Vice President - Construction Operations*. Brown Schultz either misunderstood or ignored the requirements of SAS No. 57, Auditing Accounting Estimates (Professional Standards, AU Section 342)[14], and did not follow the guidelines to properly assess the reasonableness of CCI's management estimates. The process engaged in by Brown Schultz is derogatorily referred to as "conversational auditing." Conversational auditing is not only offensive to GAAS but – as unfortunately demonstrated in this case – can lead to audited financial statements that materially misrepresent a company's true financial condition.

---

[14] AU Section 342.04 provides that "[t]he auditor is responsible for evaluating the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole. As estimates are based on subjective as well as objective factors, it may be difficult for management to establish controls over them. *Even when management's estimation process involves competent personnel using relevant and reliable data, there is potential for bias in the subjective factors. Accordingly, when planning and performing procedures to evaluate accounting estimates, the auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors*." (emphasis supplied). To that end, a plethora of tests and reviews are suggested, including the review of "subsequent events." Guy, Carmichael & Lach, *Practitioner's Guide to GAAS*; p. 308-309 (Wiley 2003).

It does not appear that Brown Schultz followed the *Horwath International Audit Manual* – the audit procedures manual it claims to have utilized – with respect to "basic" approaches to evaluate accounting estimates.[15]

Brown Schultz' working papers show that in 1998, CCI was estimating gross profits on several contracts-in-progress that were *materially higher than the historical or originally projected amounts.* Subsequent review of these projects revealed that these contracts had significant profit fades.[16] In addition, there was no follow-up between the documented preliminary analytical review work and the final work, despite a material increase in the contracts in process schedule. Brown Schultz also failed to document the reasons for the significant underbillings reported at the end of the 1998 year.[17] Despite the foregoing, Brown Schultz based its audits, in large part, on nothing more than its conversations with CCI's often non-disinterested management.

Brown Schultz' Inappropriate Recording And Inadequate
Disclosure Of Related-Party Transactions Between PCIC And CCI[18]

Brown Schultz performed the audit and tax work for PCIC, a captive insurance company owned by Ortenzio, since its formation. According to applicable accounting standards, PCIC was a related party to CCI. *See* SAS No. 57, Related Party Disclosures, March 1982.

---

[15] The requirements advocated in the *Horwath International Audit Manual* include, without limitation, the following:

- Reviewing and testing management's process used to develop the estimates;
- Developing an independent expectation to corroborate management's estimates; and,
- Reviewing subsequent events and transactions.

[16] One job - no. 454, Albemarle Prison - had a loss of $957,000.00, and profit fade, based on Brown Schultz' 1998 working papers, of approximately $2,600,000.00.

[17] The *Horwath International Audit Manual,* in section 12.049, specifically addresses the procedures to follow if unbilled construction receivables are significant, including the physical inspection of construction sites and architects' or engineers' reports, and, possibly, obtaining assistance from outside specialist.

[18] The devastating impact of Brown Schultz' improper treatment of the related-party transactions to Brown Schultz' defense is best evidenced by the extent to which Brown Schultz doggedly fought to avoid production of, *inter alia*, the PCIC audit reports, working papers and related documents. To obtain documents relating to PCIC, USF&G was forced to file a motion to compel production of documents on May 8, 2002. By order dated June 13, 2002, the Court (Smyser, M.J.) curtly dismissed the frivolous grounds Brown Schultz interposed to justify its unwillingness to produce documents related to PCIC and ordered prompt production of all the documents requested by USF&G relative to PCIC. USF&G was awarded its costs incurred in preparing its motion to compel.

As appears in Brown Schultz' working papers, PCIC issued a Guaranty Agreement dated December 1, 1998, which purports to guarantee full payment of a claim in the amount of $1,161,448.63 which CCI had asserted against the Commonwealth of Pennsylvania on Job Number 439, Mahanoy Prison (the "Mahanoy Prison Claim"). Sometime thereafter, a new Guaranty Agreement backdated December 1, 1998, was executed in the amount of $1,162,460.00, the exact amount of the Mahanoy Prison Claim submitted to the Commonwealth of Pennsylvania. Why the Guaranty Agreements were needed – particularly in light of the existence of the putatively valid insurance policy, discussed *infra* – has never been adequately explained. Additionally, the harried creation of the two Guarantee Agreements immediately before the close of CCI's books for the year is more than a little suspicious.

The Mahanoy Prison Claim was, in the main, a claim for increased expenses and costs allegedly incurred by CCI attributable to *owner-caused delays and unusually severe winter conditions.*[19]

The Mahanoy Prison Claim was purportedly covered by an insurance policy issued by PCIC. However, *the insurance policy issued by PCIC is limited to remedial work claims*. In fact, it is entitled "Remedial Work Insurance Policy." The PCIC policy also contains a detailed set of procedures which must be followed as part of the claims process. In 1998, PCIC paid CCI $900,000.00 on two "remedial work claims" related to the Mahanoy Prison Project. The amount of $448,000.00 was paid purportedly because CCI's masonry subcontractor – Johnson Masonry, Inc. – defaulted. The amount of $452,000.00 was paid purportedly because CCI's mechanical work "was impacted as a result of union issues and default of [its] sheet metal fabricator."

---

[19] The written claim filed by CCI with the Commonwealth of Pennsylvania for $1,162,460.00 states that it is for the following 3 "impacts": (1) "extensions of time"; (2) "acceleration, lost productivity and other delays"; and (3) "unforeseen winter construction." There is no indication that removal or warranty work was involved.

Footnote 8 to the 1998 Audit Report states that the Mahanoy Prison claim had been guaranteed by PCIC. However, *neither Footnote 8 nor anything else in the 1998 Audit Report contained any information indicating that the Mahanoy Prison claim had already been included as revenue for CCI in 1998.* Unfortunately, USF&G learned only *after* CCI's bankruptcy filing that the full amount of CCI's Mahanoy Prison claim had been included as revenue and as an underbilling in the 1998 Audit Report.

The CCI claim of $1,162,460.00 did not meet the recognition standards for *revenue* set forth in AICPA Technical Aids, Statement of Position ("SOP") 81-1, Accounting for Performance of Construction-Type and Certain Production-Type Contracts, July 15, 1981. SOP 81-1, par. 65 states that recognition of additional contract revenue relating to claims is appropriate only when it is "probable" the claim will result in additional revenue and the amount can be reliably estimated. However, in purportedly satisfying those requirements, Brown Schultz failed to document any evidence that: (1) There was a legal basis for the claim or a legal opinion had been obtained (SOP 81-1 par. 65 a); and (2) The evidence supporting the claim was objective and verifiable and not based upon management's "feel" for the situation or on unsupported representations (SOP 81-1 par. 65 d).

*The working papers for the 1998 Audit Report utterly fail to provide any support for the contention that there was a "legal basis for the claim or a legal opinion had been obtained," a necessary prerequisite to the inclusion of such sum as revenue.* There is no indication that Brown Schultz obtained any expert opinions that, *inter alia*, the claim asserted against the Commonwealth of Pennsylvania for various delays was covered by the Remedial Work Insurance Policy or that even if, *arguendo*, the coverage issue was determined in CCI's favor, that all other pertinent terms and conditions of the Remedial Work Insurance Policy had been met.

Further, even if, *arguendo*, a rational reason for guaranteeing a claim purportedly covered by an insurance policy exists – and none has been proffered by Brown Schultz – the Guaranty Agreement

executed by PCIC in favor of CCI and suspiciously dated less than a month before the close of CCI's books for the year ended December 31, 1998 simply does not support the recognition of $1,162,460.00 in revenue for CCI for the year ended December 31, 1998, as recorded in the 1998 Audit Report.

Because the PCIC Guaranty was recorded by Brown Schultz as revenue, the recording and disclosure of the third-party transaction involving PCIC and CCI in the 1998 Audit Report was materially misleading to users of that report. Further, the PCIC transaction was recorded as an underbilling instead of as a separate line item on the balance sheet clearly denoted as being a related party transaction. *The result was a material misstatement in the 1998 Audit Report as $1,162,460.00 was incorrectly reported as revenue in 1998 and its disclosure in Footnote 8 failed to clearly point that out.* The removal of this misplaced sum from revenue would turn a company that otherwise appeared to be a healthy company into what any competent reviewer of the 1998 Audit Report would characterize as "dead man walking." Had USF&G's underwriters known of this deception, the bonding program would have been promptly terminated.

USF&G will introduce testimony that its underwriters believed that Footnote 8 in the 1998 Audit Report merely meant that if CCI did not receive a payment of all or a portion of the Mahanoy Prison Claim, PCIC would guaranty payment of the unpaid portion at some indeterminate time in the future. USF&G never understood that the full amount of the Mahanoy Prison Claim was included as *revenue* in the 1998 Audit Report. Additionally, USF&G will introduce testimony both from an underwriter and its expert as to the importance of the revenue and underbilling sections of a financial statement.

A more appropriate disclosure – which would have eliminated any confusion and comported with GAAS – would have been for CCI to report the transaction as a separate line item on the balance sheet of CCI, indicating that it was specifically guaranteed by a company owned by the sole stockholder of CCI. This is particularly true in light of the same Footnote 8 providing, *inter alia*, that

"[d]uring 1998, two insurance claims for contract losses incurred of $900,000.00 were *paid by* [PCIC]. These claims were covered under the terms of a remedial work period insurance policy."

The inappropriateness and misleading nature of the erroneous revenue recognition in the 1998 Audit Report is not assuaged by any payments made by PCIC or by Ortenzio in *subsequent* fiscal years. Brown Schultz' averment that the misleading and detrimental effects of the improper recognition of revenue was nullified by payments purportedly made by PCIC in 1999 fails to address the one germane issue; to wit, why was $1,162,460.00 included *in revenue* and *as an underbilling*, contrary to the dictates of SOP 81-1 and SAS 57 and without either an appropriate footnote or other method being used to alert those relying on the 1998 Audit Report? Likewise, the PCIC Guaranty and the limited disclosures made in Footnote 8 are little more than "red herrings" intended to divert attention from the misleading nature of the inflated revenue and underbilling totals contained in the 1998 Audit Report.

E. CCI's Restated Financials Demonstrate That The Losses Incurred By USF&G Are Attributable To Brown Schultz' Failure To Properly Conduct Its Audits And To Issue Accurate Audit Reports.

The delineated errors, omissions and violations of professional standards resulted in the Audited Financial Statements presenting a skewed and highly inaccurate portrait of CCI's true financial conditions. Restated financial statements prepared by Stephen J. DeBruyn, C.P.A. ("DeBruyn"), an expert retained by USF&G, which USF&G will offer into evidence, reveal the magnitude of the deleterious effect Brown Schultz' errors had on CCI's financial picture and, consequently, the underwriting process.[20]

[20] According to the restated balance sheet for CCI for the year ended December 31, 1997, CCI's reported net income of $706,879.00 turned into a net *loss* of $109,081.00 and its retained earnings dropped from $5,208,489.00 to $4,392,529.00. As restated, the net loss for the fiscal year ended December 31, 1997 was in stark contrast to the June 30 and September 30, 1997 interim financial statements which reported that CCI had made profits as of each of those dates of $283,339.31 and $807,000.00 respectively. In addition, CCI's restated net worth of $4,638,834.00 represented a 15% drop from the $5,454,794.00 reported in the 1997 Brown Schultz Audit Report.

Based upon the foregoing, and assuming that Ortenzio was unwilling to inject additional capital into CCI and was also unwilling to reinstate his personal indemnity, Daily is unequivocal that USF&G would not have approved any of the bonds for the six projects identified, *supra*, as having been bonded in reliance upon the 1997 Audit Report.

The 1998 Audit Report did not disclose that a CCI claim for delay damages and winter conditions in the amount of $1,162,460.00 for the Mahanoy Prison project had been booked as revenue. *Taking that claim out of revenue would have, standing alone, caused CCI to suffer a net loss of over $1 million for 1998.* That information, standing alone, would have caused USF&G to suspend CCI's bonding program as of March 2, 1999. Thus, with respect to the restated financial statement for CCI for the year ended December 31, 1998, based upon the factors enumerated in the proceeding paragraphs, Daily is unequivocal that USF&G would not have approved any of the bonds for the 7 projects identified, *supra*, as having been bonded in reliance upon the 1998 Audit Report.

The combined losses incurred on the 13 projects underwritten in reliance upon the Audited Financial Statements exceed $25,927,054.76.

## III. USF&G'S CAUSE OF ACTION

USF&G's sole cause of action is for negligent misrepresentation. Negligent misrepresentation requires proof that (1) there was a misrepresentation of a material fact; (2) the representor either knew of the misrepresentation, made the misrepresentation without knowledge as to its truth or falsity, or made the representation under circumstances in which he ought to have known of its falsity; (3) the representor intended the representation to induce another to act on it; and (4) injury resulted to the party acting in justifiable reliance on the misrepresentation. *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F.Supp. 577 (M.D. Pa. 1999); *Gibbs v. Ernst*, 538 Pa. 193, 209, 647 A.2d 882 (1994). Negligent misrepresentation differs from intentional misrepresentation in that the defendant "need not know his or her words are untrue, but must have failed to make reasonable

investigation of the truth of those words." *Gibbs v. Ernst*, 538 Pa. at 210. The plaintiff need not prove that the defendant knew of the falsity of the representation; it is sufficient to prove that the defendant "should have known." *Id.* at 213.

USF&G will introduce credible evidence demonstrating, *inter alia*, that Brown Schultz failed to conduct its audits of CCI in accordance with GAAS and in a competent and professional manner, that the Audited Financial Statements materially misrepresented CCI's true financial condition,[21] that Brown Schultz knew or should have known of the falsity of its representations and that Brown Schultz intended its representations to induce another to act thereon.[22]

To recover damages for an accountant's negligence in rendering an unqualified audit opinion, a plaintiff must prove that the accountant's negligence was the proximate or legal cause of its injury. *See, Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F.Supp. 557, 563 (W.D. Pa. 1996); *Gibbs v. Ernst*, 538 Pa. at 212. Cause in fact or "but for" causation provides that if the harmful result would not have come about but for the negligent conduct, then there is a direct causal connection between the negligence and the injury. *Commonwealth of Pennsylvania v. United States Mineral Products Co.*, 2002 WL 31454023*2 (Pa. Cmwlth); Restatement (Second) of Torts, §548A (a misrepresentation is the proximate cause of the plaintiff's loss, "if but only if, the loss might reasonably be expected to result from reliance"). In a negligent misrepresentation claim against an accountant, the plaintiff's reliance on the misrepresentation provides the requisite causal connection between the misrepresentation and the plaintiff's injury. *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 683 N.Y.S.2d 179 (1st Dept. 1998). Legal or proximate cause exists "where a defendant's wrongful

[21] At minimum, the following statements in the introductory letters to Independent Auditors' Report[s] dated February 10, 1998 and February 10, 1999 constitute material misrepresentations: (1) "[Brown Schultz] conducted [its] audits in accordance with generally accepted auditing standards"; (2) the "audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements"; (3) an audit "includes assessing the accounting principles used and significant estimates made by management..."; and (4) that "the financial statements . . . present fairly, in all material respects the financial position of CCI . . . ."

[22] The word "intent" is not limited to the subjective state of wishing to bring about a certain result. Rather, the word "intent" means that the actor merely desires to cause consequences of his act, *or that he believes that the consequences are substantially certain to result from it."* Restatement (Second) of Torts §8A (1964) (emphasis supplied).

conduct is a substantial factor in bringing about plaintiff's harm." *Id.*, citing *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643 (Pa. Super. 2002). To establish the required legal nexus, a plaintiff must show that the loss was a foreseeable result of the fact or condition that the financial statements misrepresented or concealed. *See*, Restatement (Second) of Torts, §548A, comment b; *Bily v. Arthur Young & Co.*, 271 Cal. Rptr. 2d 470, 485 (Cal. Ct. App. 1990) ("[a] legal cause of loss is a cause which is a substantial factor in bringing about the loss"). A cause can be found to be a substantial factor so long as it is significant or recognizable; it need not be quantified as considerable. *Jeter v. Owens-Corning Fiberglass Corp.*, 716 A.2d 633 (Pa. Super. 1998). A plaintiff is not bound to exclude the possibility that the event might have happened in some other way. *World Radio Laboratories, Inc. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d1 (1996). Rather, the plaintiff need only satisfy the trier of fact that the injury occurred in the manner claimed. *Id.*

Not only do the facts extant fail to demonstrate any intervening or concurring causes that might extricate Brown Schultz from liability, but it is axiomatic that "a defendant is not relieved from liability because another concurring cause may also be responsible for producing injury." *Powell v. Drumheller*, 539 Pa. 484 (1995). Further, an intervening cause is not a superseding cause where the negligence of the accountant creates or increases the foreseeable risk of harm. Restatement (Second) of Torts §§440 and 442A.[23] An intervening force which is the normal consequence of the situation created by the accountant's negligence is not a superseding cause. Restatement (Second) of Torts §443.[24] Likewise, an intervening force is not a superseding cause of a loss when the force is of little

---

[23] For example, in one case it was held that the failure of a state Commissioner of Insurance to challenge the continued operation of an insolvent insurance company was not a superseding cause of losses resulting from its continued operation, because his examiners relied upon the entries the defendant accountant had made in the company's books. *Bonhiver v. Graff*, 311 Minn. 111, 248 N.W.2d 291, 297 (1976).

[24] In *Bick v. Peat Marwick and Main*, 14 Kan. App. 2d 699, 799 P.2d 94 (1990), accountants who had negligently prepared tax returns argued that the negligence of their client in failing to review the tax returns was an intervening force insulating them from liability. The Court soundly rejected the accountants attempt to insulate themselves from their errors. *Id.*

consequence in causing the loss.[25] Here, there is simply no evidence of any intervening or concurring causes. In fact, as evidenced by the restated financials, CCI's ultimate demise was almost inevitable.

Causation is evident in this case in, *inter alia*, the timing of USF&G's actions in issuing additional bonds based on the underwriters' review of the Audited Financial Statements. USF&G will also introduce unequivocal evidence that its underwriters not only relied upon the Audited Financial Statements as a substantial factor in their underwriting decisions, but that they would not have issued bonds to CCI if they were aware of its true financial condition, as is revealed in, *inter alia*, the restated financial statements.

## IV. LEGAL ARGUMENT

### A. USF&G Will Prove That Brown Schultz' Work Fell Markedly Short Of The Requisite Standard Of Care.

The standard of care for accountants has been expressed as follows:

> Accountants and auditors have the duty to exercise that degree of care, skill and competence exercised by reasonably competent members of their profession under the circumstances . . . .

*Robert Wooler Co. v. Fidelity Bank*, 330 Pa. Super. 523, 479 A.2d 1027 (1984); *Matter of Hawaii Corp.*, 567 F.Supp. 609 617 (D. Hawaii 1983); Restatement (Second) of Torts §229A, comment b (standard is applicable to accountants). Compliance with GAAS does not necessarily establish satisfaction of the duty of care. *Bily v. Arthur Young & Co.*, 271 Cal. Rptr. 2d at 475-76. However, a breach of duty may be found when an accountant does not adhere to the rules and standards of his profession, such as GAAS. *Rhode Island Hospital Trust National Bank v. Swartz, Bresenoff, Yavner & Jacobs*, 455 F.2d 847 (4th Cir. 1972). Pennsylvania regards a violation of a professional standard as

[25] For example, in one case the plaintiff alleged that the negligence of the accountant caused it to purchase a company believing it to be profitable when in fact it was insolvent. The accountant argued that other factors including the loss of two key employees, competition from another business, the lack of a market, and the leveraged condition of the business contributed to the plaintiff's loss. The court determined that substantial evidence supported the jury verdict in favor of the plaintiff and that the subsequent events cited by the accountant as the reasons for the company's failure were "of little consequence." *Thayer v. Hicks*, 243 Mont. 138, 793 P.2d 784 (Mont. 1990).

evidence of negligence but not negligence *per se*. *Edwards v. Brandywine Hospital*, 438 Pa.Super. 673, 652 A.2d 1382 (1995).

In evaluating whether an accountant complied with the requisite standard of care, most courts consider whether the accountants complied with their own internal accounting manuals and other internal procedures. *Bily v. Arthur Young & Co.*, 271 Cal. Rptr. at 476 (internal manuals can properly be deemed relevant to the broader standard of care); *see also,* Spellmire, Baliga & Winiarski, *Accounting Auditing and Financial Malpractice*, §3.06, p. 45 (Harcourt Brace 1998).

B. The Defenses Of Contributory Negligence Is Inapplicable To This Case.[26]

Brown Schultz has dedicated an inordinate amount of time to attempting to prove that USF&G's underwriters were negligent in performing their duties. Such efforts are all for naught. USF&G will introduce expert testimony proving that its underwriters acted prudently and in accordance with industry standards. Even if, *arguendo*, USF&G's underwriters performed in a less than stellar manner, their putative negligence does not excuse Brown Schultz' errors and omissions pursuant to the theory of contributory negligence. As a matter of law, the defense of contributory negligence is inapplicable.

Pennsylvania upholds the "audit interference rule," which provides that an accountant may only utilize the defense of contributory negligence to the extent that such contributory negligence consists of actions *by the plaintiff that interfere with the conduct of the audit*. *Jewelcor Jewelers and Distributors, Inc. v. Corr*, 373 Pa. Super. 536, 551-52 (P.A. Super. 1988) (emphasis supplied); *Medical Consultants Network, Inc. v. Cantor & Johnston, P.C.,* 2001 WL 10788(E.D. Pa.) ("[A] party's contributory negligence is not a defense to an action against an accountant for professional negligence

[26] On October 8, 2003, USF&G filed United States Fidelity & Guaranty Company's Motion in Limine to Bar Evidence Concerning Certain Affirmative Defenses Raised in the Answer of Bruce J. Brown and Brown Schultz Sheridan & Fritz. That motion seeks to bar any evidence concerning, *inter alia,* the defense of contributory negligence because of Brown Schultz' failure to properly supplement its responses to interrogatories seeking the factual basis underlying this affirmative defense. The Trial Memorandum is submitted without prejudice to the pending motion in limine.

unless that contributory negligence impeded the accountant from performing its obligations satisfactorily-- the so-called 'audit interference rule'"). An accounting firm sued for negligently performing an audit may assert the defense of contributory negligence *only* when the plaintiff's conduct interfered with the audit and this interference was a substantial factor in causing the plaintiff's loss. *In re Jack Greenburg, Inc.*, 212 B.R 76 (E.D. Pa. 1997). Further, the plaintiff must be negligent and the negligence must contribute to the defendant's failure to perform his contract and report the truth. *Id.*

Brown Schultz has not even *alleged* that USF&G interfered in Brown Schultz' conduct of any aspect of its audit of CCI. Absent *any* degree of participation by USF&G in the audits, it is hard to imagine that Brown Schultz could demonstrate any active interference. As such, the "audit interference rule" bars the affirmative defense of contributory negligence.

C. USF&G's Justifiable Reliance On The Audited Financial Statements Is Manifest By, *Inter Alia*, Uncontrovertible Evidence That USF&G Would Not Have Issued The Bonds To CCI If It Had Known Of CCI's True Financial Condition.

The gravamen of the cause of action for negligent misrepresentation is justifiable reliance on the representations contained in the auditor's report. The rules for determining whether a plaintiff justifiably relied on a material misrepresentation are found in §§540 and 541 of the Restatement (Second) of Torts.[27] When read together, these rules demonstrate that the party to whom a misrepresentation is made is justified in relying upon the truth of that statement unless he knows it is false or its falsity would be obvious to him upon a cursory inspection. *See, Silverman v. Bell Savings & Loan Association*, 533 A.2d 110, 115 (Pa. Super. Ct. 1987). As a comment to §541 explains, a person is found not to have justifiably relied on a representation "only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses."

[27] "The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." Restatement (Second) of Torts, § 540: "The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." Restatement (Second) of Torts, § 541.

Restatement (Second) of Torts §541 cmt. a (1977). A recipient cannot recover if he *blindly* relies upon a misrepresentation of the *falsity* of which would be *patent* to him if he had utilized his opportunity to make a *cursory* examination or investigation." *Id.* (emphasis added).

Both subjectively and objectively, it is hard to fault USF&G for relying on an *unqualified* audit prepared by a *certified public accountant*, especially one, like Brown Schultz, who purportedly had considerable construction auditing experience.

The "justifiability" of USF&G's reliance is also evidenced by common sense. Why shouldn't USF&G have relied on an unqualified audit performed by a purportedly reputable firm of certified public accountants? As a general rule, "one to whom a duty is due has the right to assume that it will be performed and is not required to anticipate the negligence of another." *KBF Associates L.P. v. Saul Ewing Remick & Saul*, 1998 WL 658557*5, citing *Bortz v. Henne*, 415 Pa. 150, 204 A.2d 52 (1964).

As a matter of law, USF&G need not prove that any particular audit report was the sole inducement for its decision to issue payment and performance bonds on behalf of CCI. *Delahanty v. First Pennsylvania Bank*, 318 Pa. Super. 90, 464 A.2d 1243 (1983). USF&G can prove justifiable reliance for purposes of the cause of action for negligent misrepresentation merely by proving that the information in the audit reports was a "substantial factor" in determining its course of conduct. *Neuman v. Corn Exchange Nat. Bank & Trust Co.*, 356 Pa. 442, 445, 51 A.2d 759 (1947).

Whether couched as a failure of "justifiable reliance" or as "contributory negligence," the existence of any errors or even poor judgment in the underwriting process does not negate the fact that USF&G need merely prove that the information in the Audited Financial Statements was a "substantial factor" in USF&G's decision to issue bonds on behalf of CCI. *Id.* Even if, *arguendo*, the work of USF&G's underwriters was of poor quality, it is axiomatic that "[f]oolhardiness or stupidity does not mitigate in favor of the defendants." *Bonhiver v. Graff*, 248 N.W.2d at 297.

D. USF&G Has Standing To Sue Brown Schultz Pursuant To Restatement (Second) Of Torts §552.

As recognized by the Court in several of its Orders, Pennsylvania has adopted the Restatement (Second) of Torts §552 and, accordingly, a plaintiff asserting a cause of action for negligent misrepresentation need not prove privity with the defendants. Report and Recommendation dated August 10, 2001, p. 9-10 (relative to Brown Schultz' Motion to Dismiss) (not appealed; adopted per 28 U.S.C. §636(b)(1)(B)); Report and Recommendation dated November 5, 2002, p. 13-19 (relative to Brown Schultz' Motion for Summary Judgment) (appealed by Brown Schultz and adopted by Order dated January 31, 2003).

In the present case, significant and substantial evidence will show not only that Brown Schultz knew the purposes for which the Audited Financial Statements would be utilized, but that it knew both that the Audited Financial Statements would be relied upon for a "continuation" or extension of the bonding program and the parameters of that bonding program. All prerequisites for standing pursuant to Restatement (Second) of Torts §552 have been met.

E. DeBruyn's Testimony Is Admissible, Competent And Based On Reliable Methodology.

Brown Schultz has filed a motion in limine seeking to bar DeBruyn's testimony (presumably on all issues) because of his use of the "look back" method as a part of his analysis of the Audited Financial Statements. In that motion, Brown Schultz avers – without the support of expert testimony – that such testimony is barred by Fed. R. Evid. 702 and the *Daubert* standard. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). USF&G incorporates herein by reference United States Fidelity & Guaranty Company's Opposition to Brown Schultz' Motion in Limine to Preclude Testimony of Plaintiff's Expert Steve J. DeBruyn.

Summarily, the methodology utilized by DeBruyn is based on common sense, logic, an analogous doctrine – the "look back" method – utilized to determine tax liability and other issues

relating to contractual obligations performed over a period of time, and the recognized accounting procedure of subsequent events testing. DeBruyn's expected testimony easily meets the Third Circuit's liberal standards favoring admissibility of non-scientific evidence. *See e.g. In re. Unisys Sav. Plan Litig.*, 173 F.3d 145, 157 (3d Cir. 1999) (testimony concerning investigation methods for determining financial health should not be evaluated "by the particular standards required for testimony based on a particular scientific ethic"). Additionally, the "book of wisdom," in and of itself, allows the use of evidence of subsequent events to analyze the reasonableness of prior judgment.[28]

F. That Which Is Missing From Brown Schultz' Work Papers Will Be As Revealing As The Errors Contained Therein.

AICPA Professional Standards Vol. I at AU §339, states in section .01: "The auditor should prepare and maintain working papers . . . . The information contained in working papers constitutes the principal record of the work that the auditor has done and the conclusions that he has reached

[28] The "book of wisdom" is a concept which recognizes that the trier of fact may be allowed to hear, consider and take into account facts that happened after the event that is the subject of the litigation even though those facts might not have been known or knowable at the time of the happening of that event. *Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. 689, 698 (1933). Simply, "[t]he reasonableness of estimates may be tested in light of actual experience." *Ralph L. Patsch v. Commissioner*, 19. T.C. 189, 198 (1952). As stated by Justice Cardoza, "[e]xperience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within." *Id.* The book of wisdom has been utilized in a variety of situations, none of which indicate any judicial proclivity to limit or narrow its uses. *E.g., Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. at 698 (determination of damages for patent infringement); *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Prince George's County*, 1993 WL at 524785 (eminent domain litigation). "To correct uncertain prophecies in such circumstances is not to charge the offender with elements of value nonexistent at the time of his offense. It is to bring out and expose to light the elements of value that were there from the beginning." *Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. at 698 (citations omitted).

concerning significant matters."[29]

When evaluating the contents (or lack thereof) of Brown Schultz' working papers, the Court should do so cognizant that "[p]rofessional standards require an auditor to obtain sufficient audit evidence to afford a reasonable basis for his audit opinion." AICPA SAS no. 31, "Evidential Matter" (1980).

The AICPA Professional Standards Vol. I at AU §326, third standard of field work states: "[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."

Excuses proffered by Brown Schultz for information "omitted" from work papers – intentionally or otherwise – should be viewed skeptically in light of the fact that work papers have "a common purpose – to document the work done, and to preserve a body of evidence adequate in amount and quality and so organized as to lean logically to the professional conclusion expressed." R.J. Gormley, *The Law of Accountants and Auditors*, ¶3.03[1], p. 3-26 (Warren, Gorham & Lamont 1981). Moreover, an audit that was adequate in fact may be ruled inadequate in law because of a failure of proof through lack of documentation. *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 435 (6th Cir. 1980) (The "District Judge evidently inferred from [accountant's] failure to document such testing

---

[29] AU §339 further states in section .02 that the function and nature of working papers serve mainly to:

a. Provide the principal support for the auditor's report, including his representation regarding observance of the standards of fieldwork, which is implicit in the reference in his report to generally accepted auditing standards.

With respect to the content of an auditor's working papers, AU §339 gives the following guidance:

.05 The quantity, type, and content of working papers vary . . . , but they should be sufficient to show that the accounting records agree or reconcile with the financial statements or other information reported on and that the applicable standards of fieldwork have been observed. Working papers ordinarily should include documentation showing that –

a. The work has been adequately planned and supervised.

b. A sufficient understanding of the internal control structure has been obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

c. The audit evidence obtained, the auditing procedures applied, and the testing performed have provided sufficient competent evidential matter to afford a reasonable basis for an opinion, including observance of the third standard of field work.

in its work papers, that the testing did not occur. The record also establishes adequate foundation for this inference.").

## V. DAMAGES

### A. USF&G Is Entitled To Recover All Damages Necessary To Compensate It For Losses For Which The Misrepresentation Is A Legal Cause.

The "damages recoverable for negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause." Restatement (Second) of Torts, §552B(1); *Medical Consultants Network, Inc. v. Cantor & Johnston, P.C.*, 2001 WL 10788 (E.D. Pa.). The "out of pocket" loss is the proper measurement for the claim. *Id.* Once negligence is proven, the negligent actor is responsible for all the unforeseen consequences thereof – no matter how remote – which follow in a natural sequence of events. *Comm. v. United States Mineral Products Co.*, 2002 WL 31454023. (Pa. Comm.). Essentially, a tort-feasor is liable for all damages which "ordinarily and in natural course of things have resulted from the commission of the tort." *Frank v. Volkswagenwerk, A.G. of West Germany*, 522 F.2d 321 (C.A. Pa. 1975).

Damages need not be proved with mathematical certainty, but only reasonable certainty. *Dehanty v. First Pennsylvania Bank*, 464 A.2d 1243 (Pa. Super. 1983); *see, Bostick v. ITT Hartford Group, Inc.*, 82 F.Supp. 2d 376 (E.D. Pa. 2000). For example, "[i]f the injured party produces the best evidence available of his damages and if such evidence provides a reasonable basis for determining his loss, he is entitled to recover although the exact amount cannot be ascertained." *Greenstein, Logan & Co. v. Burgess Marketing*, 744 SW2d 170, 187 (Tex. App. 1987); *Jamison, Money, Farmer & Co. v. Standeffer*, 678 So.2d 1061, 1067 (Ala. 1996) (A plaintiff is not required to quantify all damages with precision but merely to produce evidence tending to show the extent of damages as a matter of just and reasonable inference).

B. Brown Schultz Cannot Meet The Burden Of Proving Any Failure By USF&G To Mitigate Its Damages.

"It is well-established law in Pennsylvania that a plaintiff has a duty to minimize his harm when possible. . . It is also, however, well-established that the burden of showing that plaintiff could have but did not lessen his harm is that of the defendant." *Muzikar v. National Railroad Passenger Corporation*, 1997 WL 1433780 (Pa. Com. Pl). The *burden of proving failure to mitigate rests squarely upon the breaching party. Koppers Co., Inc. v. Aetna Casualty and Surety Co.*, 98 F.3d. 1440 (3rd Cir. 1996) (mitigation is affirmative defense, so burden of proving failure to mitigate is on defendant). To prove a failure to mitigate, the defendant must prove (1) what reasonable actions the plaintiff ought to have taken; (2) that those actions would have reduced the damages; and (3) the amount by which the damages would have been reduced. *Koppers Co., Inc. v. Aetna Casualty and Surety Co.*, 98 F.3d. at 1448. Mitigation never requires an unreasonable act, and a party is not expected to go through the motions of attempting to avoid damages when it is certain that such efforts will prove of no avail. *Krauss v. Greenberg*, 137 F.2d 569 (3rd Cir. 1943).[30]

C. USF&G's Provable Losses Exceed $25,927,054.76

A project by project breakdown of USF&G's loss is contained in Section II(C), *supra*. The losses consist of, *inter alia*, payments to unpaid subcontractors of CCI, the costs of retaining and paying contractors to finish uncompleted projects, administrative costs and professional fees. The

[30] It is illogical for Brown Schultz to assert that any advantage would accrue to USF&G by not paying claimants and completing projects in as efficient and economical a manner as it could. Lacking solvent indemnitors, USF&G had every incentive to keep the amount of its losses on the bonds issued in reliance on the Audited Financial Statements as low as it could without dishonoring its obligations as a surety. A surety completing defaulted projects is faced with unpaid contractors and angry owners. There are often severe financial penalties if a project is not completed by a date provided for in the contract. Threats of lawsuits for unfair claims settlement practices abound. Contractors asked to complete work defaulted on by another contractor are particularly wary of potential problems and hesitant to accept work that they do not believe will be sufficiently profitable to justify the risks extant. Moreover, it is no secret to contractors and owners that the completing surety is over the proverbial barrel and often has little negotiating leverage. Undoubtedly, and with 20/20 hindsight, it is possible to second guess a completing surety's decisions. Possibly, among the several *hundred* unpaid subcontractors who made payment bond claims against USF&G, a few were paid a nickel or two more (or less) than may have been ultimately necessary. However, the mere fact that – in retrospect – an argument can be raised that completion of projects and payment to bond claimants could have been cheaper, faster or better does not indicate a failure to mitigate by the surety nor ease the heavy burden of proof on the breaching party.

amounts represented in the losses itemized in Section II(C) are net of contract balances received from owners and any claims to which USF&G was subrogated.

Although theoretically possible, the process of introducing into evidence – one by one – every invoice, payment check, wire transfer documentation, takeover contract and claims letter that evidences USF&G's loss of in excess of $25,927,054.76 would take several months, if not longer.[31] Accordingly, USF&G will prove most of its damages by the use of summaries, including computer generated records evidencing payments made by USF&G to claimants under the payment and performance bonds issued relative to CCI's bonded projects. Such method is not only envisioned and allowed by the pertinent rules of evidence but is fair, logical and efficient. Summarized information can be in the form of an exhibit or a witness' oral testimony. *Becker v. ARCO Chemical Company*, 15 F.Supp.2d 600, 617 (E.D.Pa. 1998). Fed. R. Evid. 1006.

Payments made by USF&G to claimants are recorded in digital form on USF&G's computer system in the ordinary course of business. After the introduction of testimony as to the necessary foundational elements, USF&G intends to introduce computer printouts referred to by the initials "PMS" (Payment Maintenance Screen) that provide reliable data concerning payments made by USF&G relative to the various projects. Copies of the PMS sheets have previously been made available to Brown Schultz for inspection and copying. Computer business records are admissible if the records are kept pursuant to some routine procedure, created for motives that would tend to assure accuracy, and are not mere accumulations of hearsay or uniformed opinion. *See Rosenburg v. Collins*, 624 F.2d 659 (C.A. Tex. 1980) (the court admitted a summary of the bankrupt's commodity trading activity); *see also Capital Marine Supply, Inc. v. M/V Roland Thomas, II,* 719 F.2d 104, 105-106 (C.A.

---

[31] The payment of claims and the completion of CCI's contractual obligations on approximately 18 different projects generated a predictably large amount of paper. Each of the 13 projects bonded in reliance upon the Audited Financial Statements had numerous subcontractors who made various and diverse claims and submitted myriad documents in support of those claims. In turn, USF&G made payments to several hundred subcontractors owed money by CCI by means of checks, bank drafts and wire transfers. USF&G also incurred the sizeable costs of arranging for the completion of 13 complex construction projects that were abandoned by CCI in "midstream."

La. 1983) (court admitted computer records reflecting payments made and amounts due under promissory note).

## VI. CONCLUSION

By the testimony of both lay witnesses and experts, as well as considerable documentary evidence, USF&G will prove that judgment should enter in its favor in an amount of $25,927,054.76 plus appropriate interest, costs and expenses.

UNITED STATES FIDELITY AND GUARANTY COMPANY,
By its counsel,

/s/Bruce D. Levin
Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone: (617) 790-3000
Facsimile: (617) 790-3300

and

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA 17101
Telephone: (717) 237-7100
Facsimile: (717) 237-7105

Dated: October 14, 2003

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of **United States Fidelity & Guaranty Company's Trial Memorandum** was served upon the following by first class mail, postage prepaid, on October 14, 2003:

Kathleen Carson
Swartz Campbell LLC
1601 Market Street
34th Floor
Philadelphia, PA 19103-2316

/s/ Bruce D. Levin

#274784 v1/36432/87