# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---

| | |
|---|---|
| United States Fidelity and Guaranty Company | : |
| | : |
| | : |
| v. | : |
| | : |
| Bruce J. Brown and Brown, Schultz Sheridan & Fritz | :    No: 01-CIV-813 |

---

## TRIAL MEMORANDUM OF DEFENDANTS, BRUCE J. BROWN AND BROWN, SCHULTZ SHERIDAN  FRITZ

### Facts and Contentions

This action involves a claim for negligent misrepresentation by a surety bond company against the auditors for CCI Construction.  The action arises out of the issuance of surety bonds by plaintiff to CCI Construction.  The action is based on the contention that the 1997 and 1998 audited financial statements of CCI misrepresented material information concerning the financial condition of CCI on which plaintiff reasonably relied in its underwriting decisions to issue surety bonds during 1998 and 1999.  The financial statements were audited by Brown Schultz.

Plaintiff's action is based on the contention that Brown Schultz did not adequately audit the CCI financial statements.  The financial statements allegedly included overstated revenue due to understated estimated costs to complete uncompleted contracts, and the inclusion of the amount of a warranty insurance claim guaranty.  Plaintiff contends that if the financial statements had been adjusted to reflect the proper amount of revenue from contracts based on more accurate

estimates of costs to complete contracts and the removal from revenue of the amount of the warranty insurance claim guaranty, then it would have been significant to underwriting.

CCI was a general contractor which had performed rehabilitation and renovation of nursing home and other health care facilities during the 1980's until the early 1990's for a company owned and operated by the father of the owner and operator of CCI Construction. CCI Construction then entered the public contracting and hard bid contracting business beginning during 1993.

The award of contracts to CCI Construction was often conditioned on the existence of payment and performance bonds in favor of the contracting party. CCI Construction had a relationship with Fireman's Fund Insurance Company for surety bonds until 1993 when Fireman's Fund declined to issue surety bond credit to CCI Construction for a particular contract. CCI Construction turned to the assistance of a bond agent, David Dominiani of Byerly Insurance Agency, to obtain surety bond credit for CCI Construction so it could proceed with the contract. Dominiani introduced CCI to plaintiff, USF&G.

Plaintiff commenced underwriting investigation concerning CCI. There was no formal written submission as was standard for surety bond program submissions. During the period of underwriting investigation, plaintiff learned there was a company known as Pennsylvania Contractors Insurance Company (PCIC) which was owned by the same person as owned CCI Construction. PCIC was an offshore

insurance company established to defer taxes by funding warranty insurance premiums which could then be used to fund warranty or remedial work at a later time. Plaintiff inquired about the nature and purpose of PCIC and learned that it was an offshore insurance company which had common ownership with CCI Construction, and collected "premiums" in exchange for construction warranty insurance. PCIC was a means by which CCI Construction could distribute profit PCIC for later use as needed. Plaintiff did not object to the PCIC concept even though there was an issue raised by the reinsurers of plaintiff. Plaintiff did not contact Brown Schultz. During many years, CCI paid PCIC premiums for warranty insurance.

Plaintiff agreed to establish a surety bond program for CCI with program limits in the amount of $100,000,000. There was no written commitment made by plaintiff to CCI for the bond program and there was no documented conditions for the existence and continuation of the bonding program. The relationship between plaintiff and CCI Construction for surety bonds began during 1994.

Each bond was individually underwritten by plaintiff. Bonds were issued by the field office provided it was within the field office authority, and by the home office when the amount of the bond exceeded field office authority. The Harrisburg Branch office administered the CCI account and had "specific discretionary authority" to issue bonds for CCI up to $15,000,000 per project and $75,000,000 total work program. Above those levels, the approval of plaintiff's home office underwriting

department in Baltimore was required. There were accountants in house in the home office which the underwriters could consult at any time. Plaintiff's underwriters did not consult accountants, but relied on the bond agents, Dominiani and Byerly, to a large extent who were accountants to alert them about significant issues concerning the financial condition of CCI. Plaintiff allowed CCI to exceed he single bond and total program limits on numerous occasions.

The field office underwriters included Steve Salazar who was supervised by Anthony Phillips. The home office underwriter was James Daily. Daily reported to Dave Hussey in home office.

The Introduction to plaintiff's Contract Underwriting Manual states:

> Surety evaluation of a contractor's financial statements and information system should be based on in-depth understanding of the unique nature and inherent risks of the construction industry. The contractor is confronted with many unknowns and inherent risks on every construction project because of the non-repetitive nature of the industry. Thus, contract prices are ESTIMATES and are subject to many variables, many of which are difficult to estimate with any accuracy.

The Introduction reminds the reader that because of the unusual operating aspects, a contractor's financial position can change drastically, almost overnight. The Introduction to plaintiff's own Contract Underwriting Manual, therefore, acknowledges the variability and risks associated with construction and recognizes that contract prices are estimates and that a contractor's financial position can change drastically, almost overnight.

-4-

CCI operated on a calendar year and maintained its accounting on an accrual basis. Accrual accounting differs from cash basis accounting. Accrual accounting recognizes revenue without regard for whether the cash is actually received or in the possession of the company. Similarly, expenses are recognized as they are incurred without regard for whether the company paid the expenses. Cash accounting recognizes revenue only when actually received and expenses only when actually paid.

Brown Schultz was the auditor of CCI Construction before and during the relationship between CCI and plaintiff. Brown Schultz annually audited the financial statements of CCI and issued unqualified opinions on the CCI financial statements for every year through and including 1998. Brown Schultz did not issue an opinion concerning CCI's financial statements for 1999. Brown Schultz provided the audit reports concerning the CCI financial statements to CCI. The audited financial statements were provided by CCI to the bonding agent who then provided the financial statements to plaintiff. No one affiliated with plaintiff ever had contact with anyone affiliated with Brown Schultz.

CCI maintained its financial statements on an accrual basis and used the percentage of completion method of accounting for revenue recognition. The percentage of completion method recognizes revenue based on costs incurred as of the audit date divided by total estimated costs on the job, multiplied by the contract amount. The equation is expressed as:

(contract amount) x (percentage complete through audit date) =
(revenue recognized through audit date)


percentage complete = <u>costs incurred through audit date</u>
                              estimated total costs to be incurred

The financial statements audited by Brown Schultz were prepared by the management of CCI.  Management is responsible for making the accounting estimates included in the financial statements.  Sheri Phillips was the CFO of CCI and was conversant in construction accounting.  CCI had, as among its procedures a reporting requirement concerning job costs.  CCI project managers provided monthly reports concerning job costs and estimated job costs.  The reports were provided to Stan Sechrist, Vice President of Operations of CCI.  Sechrist then provided the information to Phillips received the estimated cost to complete contracts from the project managers and scrutinized the amounts which included a review of the amounts on which the estimates were based along with supporting documentation and obtained explanations about the reasons for revisions to the amounts from previous estimates.  Phillips made site visits.  Testimony by Phillips will support the reasonableness of the estimates for the costs to complete.

Brown Schultz prepared a written audit program which it followed.  The audit program reflects the manner in which the testing/audit was performed and the workpapers reflect the items tested by Brown Schultz.  Brown Schultz tested job costs by testing 25 items to assure there existed a system to correctly record job costs.  There were no exceptions (errors) revealed by the systems test.  The number of items

tested was in accordance with GAAS. The audit included an evaluation of the reasonableness of estimates by management in the context of the financial statements taken as a whole as provided by GAAS. Brown Schultz confirmed contract amounts, reviewed files concerning job costs, reviewed files concerning costs to complete, and discussed the estimated cost to complete with CCI's Vice President of Operations. Brown Schultz also reviewed completed contracts to develop an understanding about how the estimating process by CCI performed. Brown Schultz was satisfied that the estimates were reasonable.

All of the audited financial statements for CCI included footnotes. Included among the footnotes as part of all of the audited financial statements were several significant footnotes which informed the reader about the information included in the financial statements. Common to all the financial statements was a footnote summarizing significant accounting policies which appeared as footnote 1. Included in footnote 1 (Summary of significant accounting policies) under the heading "Use of estimates" was written:

> The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of continent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Beneath the discussion about estimates appeared discussion under the subheading Revenue and cost recognition in which it was described:

Revenues from construction contracts are recognized on the percentage-of-completion method, measured by the percentage of direct cost incurred to date to estimated total direct cost for each contract. That method is used because management considers direct cost to be the best available measure of progress on the contracts. Because of the inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates used will change within the near term.

For purposes of determining percentage of completion estimates, contract costs include all direct material, labor and subcontracting costs and other direct costs related to contract performance. Indirect costs and general and administrative costs are charged to expense as incurred. Provisions for estimated losses on uncompleted contracts are made in the period in which such losses are first determined. Changes in job performance, job conditions and estimated profitability may result in revisions to costs and income and are recognized in the period in which the revisions are determined. An amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.

The asset, "Costs and estimated earnings in excess of billings on uncompleted contracts," represents revenues recognized in excess of amounts billed. The liability, "Billings in excess of coss and estimated earnings on uncompleted conracts," represents billings in excess of revenues recognized.

A significant component to the revenue determination is the amount of estimated cost to compete. If the estimated cost to complete is less than the actual amount, then too much revenue will be reflected on the financial statement since the percentage complete will be overstated leading to the capture of too much revenue. Developing the estimates is the responsibility of management of CCI. The auditor

(Brown Schultz) is responsible only for evaluating the reasonableness of the estimates produced by management.  Plaintiff's auditor expert agreed with the following concepts:

    i.    An auditor's report is issued in connection with historical financial statements that purport to present a financial position at a stated date and results of operations and cash flows for a period ended on that date.

    ii.    The percentage of completion method of accounting requires a presumption that contractors generally have the ability to produce estimates that are sufficiently dependable to justify the use of the percentage of completion method of accounting and that persuasive evidence to the contrary is necessary to overcome that presumption.

    iii.    The previous reliability of a contractor's estimating process is usually an indication of continuing reliability, particularly, if the present circumstances are similar to those that prevailed in the past.

    iv.    A profit fade (reduction in profit from the amount of profit previously predicted) is not, alone, indicative of a problem with job cost estimates or financial reporting by the contractor.

    v.    Estimating is an integral part of a contractor's business activities and there is a necessity to revise estimates on contracts continually as the work progresses.  The fact that circumstances may necessitate frequent revision of estimates does not indicate that the estimates are unreliable for the purpose for which they are used, although results may differ widely from original estimates.  Because of the nature of the business, the contractor in the conduct of his business, may still find the estimates reasonably dependable.  Despite these widely recognized conditions, a contractor's estimates of total contract revenue and total contract costs should be regarded as reasonably dependable if the minimum total revenue and the maximum total cost can be estimated with a sufficient degree of confidence to justify the contractor's bids on contracts.

vi.   Contractors, like all business enterprises, are exposed to numerous business risks that vary from contract to contract. The reliability of the estimating process in contract accounting does not depend on the absence of such risks. Assessing business risks is a function of users of financial condition.

During the period from 1994 through 1998, in addition to the audited year end financial statements for CCI, plaintiff received interim financial statements from CCI which were internally prepared, work in process information prepared by CCI, Dun & Bradstreet reports on CCI, information on jobs CCI was considering bidding, and various other information regarding CCI provided to plaintiff by its bond agent. The bonding agent regularly provided reports to plaintiff concerning the financial condition of CCI Construction.

Included in a couple of the reports by the bonding agent to plaintiff was reference to the use of PCIC funds to boost the financial condition of CCI. Phillips did not fully review or analyze the financial statements. Hussey never reviewed the financial statements, but depended on his subordinate underwriters.

Plaintiff learned during 1994 that CCI had a mid-year operating loss of $500,000 which it did not expect to improve by year end. CCI Construction had an operating loss in the amount of $864,000 and a net loss in the amount of $317,000. Thereafter, CCI was marginally profitable and only made profit from money in the bank and not from contracts as a whole. CCI's working capital reflected on the 1994 audited financial statement was $2,384,192 and equity was $4,290,336. In January

1995, prior to receiving CCI's year end audited financial statements, plaintiff agreed to hold to the $100,000,000 program level for CCI.

Each year, after receiving the audited financials for CCI, Salazar prepared an "annual review" describing CCI's results for the year and making a recommendation as to a bonding program for the following year. As part of the process, Salazar used a computer program from Dun & Bradstreet to provide some analysis of the financial statement information. In his annual review of the December 31, 1994 audited financials, even though the company sustained a $300,000 net loss for the year and an operating loss of over $800,000, Salazar recommended to home office that the bond program for CCI continue.

In March 1996, plaintiff received the audited financial statement for the year ended December 31, 1995. The financial statement reflected a small profit of $103,210, but a loss from operations of $308,362. Working capital was $4,183,681 and equity was $4,820,675. Mr. Salazar's annual review of the CCI financial statement is dated May 3, 1996 and showed a Yellow Stress Score and a "Bear Flag F1 -Net Worth less than 10% of work program." Notwithstanding the loss from operations, the yellow stress score and bear flag, Salazar again recommended continuing the CCI bond program.

CCI began to self-perform work which it had previously sub-contracted during the later part of 1996. CCI Construction made extensive capital purchases of

equipment in connection with the self-performed work. Self-performed work is a substantial risk factor acknowledged by plaintiff. Plaintiff did not change its underwriting in spite of its awareness that CCI began to self-perform work. The decision to self-perform work led to expensive equipment purchases which required bank financing. For the first time, CCI was in debt to a lender. Plaintiff contends it did not become aware CCI planned to self-perform work until late 1998, but the use of bank debt should have alerted plaintiff to the equipment purchases and the intention by CCI to self-perform work it had previously sub-contracted.

On May 1, 1997, plaintiff received a copy of the audit report for the year ended December 31, 1996. The financial statement reflected net income of $363,124, and for the first time since 1993, an operating profit of $139,097, working capital in the amount of $4,641,702, and equity of $4,802,675. Salazar's annual review of CCI dated May 1, 1997, again showed a yellow stress score as of March, 1997 and the following bear flags: A20-gross profit fade factor is greater than 20% and M01-Equity less that 10% of total program. Even with the foregoing warning signs, Mr. Salazar recommended that the bonding program be continued.

In August of 1997, Dominiani advised the supervisor of the field office, Tony Phillips, that John Ortenzio, CCI's sole stockholder, wanted his personal indemnity on the Master Surety Agreement removed. James Daily, of plaintiff's home office underwriting department, agreed to remove Ortenzio's indemnity.

On March 5, 1998, plaintiff received the audited financials for the year ended December 31, 1997. Income from operations was $350,000. On April 15, 1998, Steve Salazar prepared his annual review of the audited financials for 1997. The annual review again showed a yellow stress score and bear flags "A20-gross profit fade factor is greater than 20%" and "M01-Equity less than 10% of total program. Mr. Salazar recommended continuing the bonding program for CCI.

On August 17, 1998, Dave Dominiani advised Tony Phillips that CCI sustained a loss through June 30, 1998 in the amount of $1,600,000 and to expect year end loss from operations. He also advised that money held by PCIC was available to use as a buffer to offset losses or profit fades on certain jobs during any given year. In his letter to Phillips, Dominiani wrote:

> ... [P]lease remember that we have PCIC available to fund warranty claims if we choose to utilize it. As you are aware, we funded almost $900,000 into PCIC last year for warranty coverages on existing projects. There is approximately $2,000,000 funded into that insurance vehicle and can be drawn on for warranty claims at any time. CCI can actually use this as a buffer to offset losses or profit fades on certain jobs during any given year. That is an additional feature than none of my other contractor's have.

Plaintiff continued with the bond program uninterrupted based on its belief that CCI had its business under control and would accomplish the predicted turnaround by year end. Plaintiff had confidence in the capability of CCI management.

In late December, 1998, Dominiani wrote Tony Phillips outlining CCI's desire to bid on any upcoming $40,000,000 heavy highway project in joint venture with

Fulkroad Construction.  On, January 5, 1999, prior to receipt of the audited financial statements for December 31, 1998, plaintiff  met with CCI and Dominiani to discuss the joint venture project.  Daily recommended to Dave Hussey, Daily's superior, that plaintiff not approve bonds for the Fulkroad project because the project was a different kind of work than previously performed by CCI, and because CCI planned to self perform work it previously subcontracted.  In spite of Daily's concerns, Dave Hussey approved the bid bond for the Fulkroad joint venture because he had faith in CCI's management and he believed CCI could capably self-perform the work.  Hussey depended on CCI's representation that the loss experienced during mid-year 1998 had been turned around along with CCI's representations about its financial condition for the new year.

The 1997 audit of CCI by Brown Schultz was peer reviewed during 1998. There were no comments expressed as a result of the peer review.  The audit by Brown Schultz of the CCI 1998 financial statement came after it learned the results of the peer review concerning the prior year's audit.

On March 1, 1999, Dominiani submitted the December 31, 1998 audited financial statements to Tony Phillips.  The audited financial statements showed that even though CCI had made a small profit of $59,015, working capitol decreased to $2.5 million and the company had an operating loss of $116,629.  The 1998 audited financial statement also showed underbillings of $6,341,726 representing 36% of total current assets.  This was a significant increase from prior years.  In 1997,

underbillings were $1,072,281 and in 1996 underbillings were $37,663. This increase in underbillings prompted no comment or investigation by plaintiff.

Included in revenue on the 1998 financial statement was contract revenue for the Mahanoy Prison job with total contract revenue which contained $1,162,000 as the amount of a guaranty by PCIC for a warranty claim presented by CCI. The total amount of contract revenue included in the 1998 audited financial statement from the Mahanoy Prison job was approximately $1,000,000. PCIC guaranteed the payment of the claim in the event the owner of the property did not pay. The guaranty was disclosed in footnote 8 to the financial statement under related party transactions:

> During 1998, two insurance claims for contract losses incurred of $900,000 were paid by Pennsylvania Contractors Insurance Company. These claims were covered under the terms of a remedial work period insurance policy.

> In addition, Pennsylvania Contractors Insurance Company has guaranteed a claim of $1,162,460 filed by the Company with a contract owner. If the owner fails to pay all or any part of this claim, the insurance company will pay the unpaid portion.

No inquiry was made by plaintiff about the PCIC transaction. The full amount of the guaranty was received by CCI Construction through the combination of payments from PCIC and the property owner. Plaintiff's underwriting expert witness testified that he understood, based on footnote 8 of the financial statement the amount of the PCIC claim guaranty was included in revenue. Any concern, from an underwriting

standpoint, about the inclusion of the PCIC amount in revenue was eliminated,

according to plaintiff's underwriting expert witness, because of the knowledge that

the amount was paid in full.

The claim for Mahanoy Prison was Pursuant to the PCIC insurance policy.

Under the policy, PCIC

> agreed to reimburse the INSURED for all COSTS
> reasonably incurred in fulfilling its legally binding
> obligations under each DESIGNATED CONTRACT, as
> defined in Section II, VALIDLY ISSUED by the INSURED
> during the POLICY TERM, in accordance with the terms
> and conditions of such DESIGNATED CONTRACT.

COSTS are the "ordinary and customary charge for the type of services performed in

the geographical area where the remedial work services are performed. . . ."

Even if there existed an issue about whether the claim was covered under the

policy, the PCIC guaranty provided:

> PCIC will guarantee the claim that was filed by CCI, in the
> amount of One Million Two Hundred Thousand Dollars
> ($1,162,000), with the Department of General Services,
> Commonwealth of Pennsylvania, for the project known as
> Mahanoy State Correctional Institution, Frackville,
> Pennsylvania.  If the Department of General Services,
> Commonwealth of Pennsylvania, fails to pay all or any part
> of the subject claim, PCIC will pay the difference owing or
> the full amount of the claim if no part of the claim is paid.

Plaintiff does not challenge the validity of the guaranty.  Brown Schultz was the

auditor of PCIC financial statements and knew PCIC had the financial capability to

pay the guaranty.

Plaintiff received the 1998 audited financial statement for CCI during the beginning of March 1999. The first indication of any analysis of the 1998 financial statement did not appear until August 20, 1999. The evidence of an analysis performed on August 20, 1999 is a folder exception report. In 1999 after receipt of the 1998 audited financials but prior to any analysis of the 1998 year end audited financial statement, plaintiff issued final bonds on the Phase 1 Laboratory Center (Summerdale) and Cambria County, Bedford County and Cool and Cold Aquaculture projects.

The folder exception report reflected numerous red and yellow flags and only one green flag. The folder exception report was a computer program generated report used to analyze financial data for underwriting. noted the account's status as "red" because of the following reasons: underbillings were greater than 50% of equity; the folder had five open claim files; equity was less than 10% of the total program; net quick was less than 5% of the total program; the debt to equity ratio was greater that 3 to 1; underbillings were 120% of equity; notes payable were 104.9% of equity; and the indemnity agreement did not include the owner/principal. In spite of the warnings about the financial condition of CCI revealed by the folder exception report, plaintiff issued bonds for CCI.

On the very same day the folder exceptions report was generated, Steve Salazar recommended to and received approval from Jim Daily for a bid bond for a $20,000,000 road construction project.

On August 30, 1999, Dave Dominiani reported that CCI had a loss of $900,000 through the first six months of 1999.  In spite of learning about the deteriorating condition of CCI, a month later, on September 30, 1999, plaintiff issued a performance bond on the Cool and Cold Aquaculture project.

In late 1999 or early 2000, CCI advised plaintiff that it lacked the financial resources to continue its operations and, as a result, would not be able to complete its work and pay its suppliers and subcontractors.  On May 19, 2000, CCI filed for bankruptcy.  Plaintiff contends that as surety for the payment and performance bonds, it was required to expend substantial sums to satisfy claims of CCI's unpaid vendors, employees and subcontractors in completing the projects.

According to John Ortenzio, the Chief Operating Officer of CCI, the financial difficulty experienced by CCI occurred due to increased costs related to self-performing work coupled with payment hold backs on two significant jobs which depleted the cash position of CCI to an extent that it could not meet on its existing cash flow.

Plaintiff's auditor expert has proposed that adjustments to the revenue reflected on the 1997 and 1998 financial statements is warranted.  The proposed adjustment to the 1997 financial statement relates entirely to the amount of contract revenue recognized on uncompleted contracts based on the contention that the estimated cost to complete was too low when calculating the percentage of completion.  The proposed adjustment to the 1998 financial statement relates to the

amount of contract revenue recognized on uncompleted contracts based on the contention that the estimated cost to complete was too low when calculating the percentage of completion, plus the removal from revenue due from the Mahanoy Prison job in the amount of the PCIC guaranty--$1.162 million.  There were no proposed adjustments relating to any of the criticisms by plaintiff's auditor expert of the audit procedures by Brown Schultz other than contract revenue based on percentage completion.

Plaintiff's auditor expert used the actual profit margin CCI realized on each of the contracts which were in progress during 1997 and 1998 to revise the estimated cost to complete when calculating the proposed adjustments.  The actual profit margin could not be determined until the contract was completed and the amount of the actual costs incurred were known.  In other words, plaintiff's auditor expert, essentially, substituted "actual costs to complete" for "estimated total costs to be incurred" in the denominator of the above fraction.  The result is an amount which is based on information obtained subsequent to the audit by Brown Schultz and is no longer an estimate, and is not based on information available to the auditors when the audit was performed.  Additionally, the source of the final contract costs is the completed contracts schedule included in the audit work by Brown Schultz, and, for contracts not completed until 1999, the amounts reflected on the unaudited financial records of CCI.

Plaintiff's auditor agrees that, in order to determine whether additional or different audit procedures would have led to a change in the amounts reflected on the audited financial statements, a re-audit is required. A re-audit was not performed. Plaintiff's expert cannot perform a re-audit because the documents necessary to perform a re-audit reportedly do not exist. There is no evidence to establish that Brown Schultz could not have, or should not have, believed CCI's estimated costs to complete were reasonable.

Plaintiff's auditor expert did not revise the amounts where the "look back" method would have led to an increase in revenue either because the actual profit was greater than reported on the audited financial statement or because the actual costs to complete were less than estimated, or the contract amount was greater than used in the original calculation for the amount of contract revenue to include based on the percentage complete. Plaintiff's auditor expert did not apply the look back method in its entirety to change amounts based on actual experience, only to change the profit margin to make a downward adjustment to estimated costs to complete.

The look back method and the restatement of financial statements using information developed after the preparation of the financial statement is not an appropriate means by which to evaluate the propriety of an auditor's work. The look back method is a process appropriate for measuring damages and income tax, but it is not appropriate to measure the professional conduct of an auditor. The propriety of the auditor's work can properly be scrutinized using information available to the

auditor at the time the audit was conducted. Using information developed after the audit would lead to a result which was not known or knowable to the auditor at the time of the audit. There is no support for the contention that the financial statement amounts should be restated.

Defendants' auditor expert witness testified that Brown Schultz properly conducted its audit of CCI's financial statements. There was no basis to believe that the amounts recognized in revenue for contracts in progress should have been adjusted since there was no information discovered by Brown Schultz which drew into question the reasonableness of the estimates. Defendants' auditor expert also testified the amount of the PCIC guaranty was properly included in revenue and no further disclosure was necessary. The PCIC guaranty was sufficient to assure the amount was received by CCI so that GAAP allowed for the recognition of the PCIC guaranty since it satisfied GAAP for revenue recognition. (The full amount of the guaranty was received by CCI). No specific disclosure was necessary to indicate the inclusion of the amount in revenue since no disclosure is necessary when the amount qualifies for recognition under GAAP. The disclosure about the PCIC claim and guaranty in the footnote for related party transactions was conceivably unnecessary, but satisfied any obligation concerning the rules of disclosure for related party transactions. The reason for the related party transaction disclosure was to alert the reader of the financial statement about specific characteristics of the amount

included in revenue.  Brown Schultz properly performed its audit in accordance with

GAAS, and the financial statements were prepared in accordance with GAAP.

Acceptance of the proposed restatement of the December 31, 1997 Balance

Sheet would have produced equity in the amount of $4,638,834.  This was greater

than the equity reported for 1994 ($4,290,336) and 1995 ($4,501,729).  Similarly, as

restated in plaintiff's auditor's report, working capitol would have been $3,183,138.

This was greater than the working capitol reported for CCI in 1994 ($2,384,192) and

the amount reported as working capitol in 1998 ($2,557,367).  Plaintiff continued its

bonding program for CCI in 1994 when CCI had less working capitol and equity than

that which is shown on the restated financials by plaintiff's expert.  Plaintiff

continued to bond CCI in 1998 with less working capitol and equity than the amount

shown on the restated financials of plaintiff's expert.  Plaintiff would have issued the

bonds without regard to the proposed changes to the amounts on the financial

statements.

Plaintiff's underwriters could not identify the nature or the amounts of the

changes to the financial statements which would have been significant to

underwriting.  Hussey indicated that it is difficult to terminate bonding since the

consequences may be more disastrous by termination than by continuing.

Plaintiff's underwriting expert expressed the opinion that plaintiff's

underwriting was consistent with the "relaxed" underwriting standards employed

during the competitive market at the time. The underwriting file did not include the information the expert expected to find, or preferred to have in the file.

Defendants' underwriting expert witness will testify that there was nothing impressive about CCI's financial condition from the start, that the bond program was established without following plaintiff's own, usual procedures, and that the underwriting file was extremely deficient and the financial statements by Brown Schultz were sufficient for underwriting to determine the signs of problems. Bonding of CCI by plaintiff should have ceased as of the receipt of the 1997 financial statement and proceeded only with extreme caution. No bonding should have occurred following notice about the $1.6 million loss, and certainly no bonds should have been issued until receipt and analysis of the 1998 financial statements. Analysis of the audited1998 financial statements should have alerted plaintiff there existed genuine problems with CCI and plaintiff should have taken control to remedy the problems or develop a plan of escape, but not continued to issue bonds. Plaintiff's underwriters performed little or no meaningful analysis of the financial statements, made a calculated risk to chase premium in spite of the risk of loss, and allowed CCI to escape scrutiny. Proper analysis of the financial statements by plaintiff's underwriters would have led to the realization that CCI' equity and cash position should be adjusted for factors important to underwriting so that both amounts would have been reduced to a much less amount "as allowed" for underwriting than "as

reported" on the audited financial statements. Plaintiff did not properly use, analyze, understand, or rely on the information included in the financial statements.

**Legal Issues**

Plaintiff asserts a claim for negligent misrepresentation. A negligent misrepresentation claim requires proof of: 1) a misrepresentation of material fact; 2) made under circumstances in which the person who represented the information should have known, in the exercise of appropriate care, was false; (3) with an intent to induce another to act on the misrepresentation; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bortz v. Noon*, 729 A.2d 555, 561 Pa. 1999); *see also Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994) *citing* Page Keaton, Prosser and Keaton on the Law of Torts § 105 (5th ed. 1984). The alleged misrepresentation must be material. *Bortz v. Noon, supra.*, 729 A.2d at 561. Furthermore, "like any action in negligence, there must be an existence of a duty owed by one party to another." *Kramer v. Dunn*, 749 A.2d 984 (Pa. Super. 2000) *citing, Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999); *Gibbs*, 647 A.2d at 890. In the absence of privity, a negligent misrepresentation claim can be established only if plaintiff can establish the elements of Restatement (Second) of Torts Section 552. Section 552 provides:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to

exercise reasonable care or competence in obtaining or communicating the information.

(2) . . . . The liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Under § 552, a duty arises only if there was privity between plaintiff and defendant, or the defendant had a pecuniary interest in the transaction. "[T]he Pennsylvania Supreme Court, in adopting section 552 of the Restatement, did not intend to eliminate the privity requirement for the maintenance of negligence claims ...." *In re Phar-Mor, Inc. Securities Litigation*, 892 F. Supp. 676, 693 (W.D. Pa. 1995). The negligent misrepresentation claim cannot serve as a basis for a third-party to avoid the privity requirement of a negligence claim:

In sum, we conclude that the negligent misrepresentation claims of plaintiffs are merely cloaked professional malpractice claims and that, under Pennsylvania law, privity is a requisite element to such claims.

*Phar-Mor*, 892 F. Supp. at 694. "Pennsylvania's strict adherence to the privity rule would result in a ruling that negligent misrepresentation may not be used to plead professional negligence claims by persons not in privity with the professional defendant." *PNC Bank, Kentucky, Inc. v. Housing Mortgage Corp.*, 899 F. Supp. 1399, 1408 (W.D. Pa. 1994).

In *PNC Bank*, the court considered a claim against an accountant for negligent misrepresentation in connection with the preparation of audited financial records which were relied upon by a party not in privity with the accountant. In rejecting the claim for failing to properly audit a company, the court concluded:

> [t]he plaintiffs' claim, although couched in terms of negligent misrepresentation, clearly involves the alleged breach by the accountant of his obligation to perform audits of HMC financial statement according to generally accepted auditing principals. This the very heart of a professional negligence claim.

*Id.* at 1407. Accordingly, privity or a pecuniary interest in the transaction, a misrepresentation, and the failure to exercise appropriate care in the transmission of the information is required to maintain a negligent misrepresentation claim. There is no evidence that privity exists between USF&G and Brown Schultz. It is undisputed that Brown Schultz's client, with whom it had a contractual relationship, was CCI, not USF&G.[1]

---

[1] This Court must be careful to distinguish between a negligent misrepresentation claim from a negligence claim. Although not asserted by plaintiff, plaintiff cannot base a claim on negligence due to the bar imposed by the economic loss rule. As a general rule, a plaintiff cannot recover strictly economic loss which is not the result of bodily injury or property damage on a negligence cause of action. East River Steamship Co. v. Transamerica Delaware, Inc., 476 U.S. 858, 106 S.Ct.2295, 90 L.Ed.2d (1986); Aikens v. Baltimore and Ohio Railroad Co., 348 Pa.Super. 17, 501 A.2d 277, 278, Lower Lake Dock v. Messinger Bearing, ___Pa.Super.___, 577 A.2d 631, 635 (1990); PPG Industries, Inc. v. Sundstrand Corp., 681 F.Supp. 287, Palco Linings, Inc. v. Pavex, Inc., 755 F.Supp. 1269, 1275 (M.D.Pa. 1990); Margolis v. Jackson, ___Pa.Super.___, 543 A.2d 1238 (1988). "[T]he economic loss doctrine bars a plaintiff from bringing a negligence action solely for economic losses absent physical injury or property damage." I & S Associates Trust v. Lasalle National Bank, 2001 U.S. Dist. LEXIS 17049, *9 (E.D.Pa. 2001), citing, Ellenbogen v. PNC Bank, 1999 Pa. Super. 131, 731 A.2d 175, 188 (1999). The economic loss doctrine is designed to "maintain[ ] the separate spheres of the law of contract and

Even if privity is not a requirement under Section 552, the Restatement still limits an accountant's liability for negligent misrepresentation to those third parties who the accountant actually knows will receive the information, and then, only for transactions that are the same as, or substantially similar to, the ones the accountant actually knows will be influenced by the supplied information. *Restatement (Second) of Torts* at § 552(2); *North American Specialty Insurance Company v. Lapalme*, 258 F.3d 35 (1st Cir. 2001). "An accountant remains potentially liable in situations in which he actually knows that a third party recipient of his information will rely on that information in the course of a specific transaction, even though the transaction itself does not transpire as long as it is supplanted by a substantially similar transaction." *Id.* at 40.

*Lapalme* involved a situation strikingly similar to the facts of the instant case. In *Lapalme*, the accounting firm of Dias & Lapalme rendered accounting services to Canty Roofing and Sheetmetal, Inc. Canty, because it was doing repair work on public buildings, was required to post payment and performance bonds. In 1994, North American Specialty Insurance Company inspected Canty's financial records as well as those of Canty's principal and entered into a bonding relationship with Canty. North American required that Canty provide updated financial statements prepared by an independent certified public accountant for each succeeding calendar year. In late 1995, the sole shareholder of Canty sold the company to a group of businessmen.

---

tort." New York State Elect. & Gas. Corp., 387 Pa. Super. 537, 564 A.2d 919 (1989)(en banc). Therefore, plaintiff cannot recover for strictly economic loss.

Shortly after the transaction, the accounting firm prepared an independent, review level financial statement which lacked specific information concerning the change in ownership and the notes to the financial statement contained misleading comments that implied the prior owner's continuing participation as sole shareholder.  Canty obtained new work on public buildings for which North American issued bonds.  North American claimed it relied on the 1995 financial statement in issuing those bonds.  Canty foundered under its new owners and defaulted on the bonds.  North American, as surety, was forced to step in, which cost it nearly $2,000,000. North American then sued the accountants alleging among other things, negligent misrepresentation, i.e., but for the accountants' omission of accurate ownership information in the 1995 financial statement, it would not have continued furnishing bonds to Canty and would have avoided the ensuing loss.

The court in the *Lapalme* case held that North American failed to raise facts with regard to whether the accountant actually had knowledge of the critical transactions, i.e., the issuance of the bonds on which Canty defaulted.  According to the First Circuit, the critical issue was what the accountants knew about North American's intent to use the statement in deciding whether to maintain a bonding program which involved writing new bonds for Canty in 1996.  While the accountants were apparently told that Canty's new owners intended to use the financial statement meet the corporation's obligations for ongoing bonds, there was no evidence that the financial statement would be used to obtain future bonds.  The

court found no evidence to support the conclusion that the accountants knowingly

undertook "the substantial risks inherent in the issuance of future bonds."

    The court also found that defaulted bonds were not transactions which were

substantially similar to those that the accountants intended to influence.  The court

found that without some evidence that the accountants knew that they were

undertaking "additional, open ended liability with respect to future bonds by

releasing the financial statement" there was no basis for liability under Section 552.

> Simply because transactions are of the same general nature (e.g. "bonds") is
> not enough to render them substantially similar for purposes of the
> Restatement rule.  Any other conclusion would make a mockery of the basic
> premise that underbraces the Restatement rule: that an acquiescent
> accountant is only deemed to accept the risks of specific transactions that
> were made known to him in advance (or substantially similar ones).

*Id*. at 44.

    While the *Lapalme* court was applying Massachusetts law, as set forth above,

Pennsylvania, like Massachusetts, follows the Section 552 with regard to negligent

misrepresentation claims.  Moreover, cases applying Pennsylvania law, in which

liability has been imposed against an accountant, have involved a situation where the

accountant knew that the information he was providing would be used for a specific

transaction.

    For example, in *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey*

*& Associates*, 39 F. Supp. 2d 517, (M.D. Pa. 1999), Parente prepared audited financial

statements for Sparkomatic for the period from 1990 to 1992.  In June of 1993,

Sparkomatic and Williams Controls entered in to a Memorandum of Intent for the

purchase of certain assets of the Kenco Division. For purposes of the transaction,

Sparkomatic engaged Parente to perform audit the Kenco financial statements for

the years ended December 31, 1990, 1991 and 1992 and the certify and interim

balance sheet dated July 31, 1993.

The *Williams* court found that Pennsylvania would recognize a negligent

misrepresentation claim under these facts because Parente knew it was performing

its work solely for the sale of the Kenco Division and knew that its work would be

relied upon in this transaction. According to the court,

> Parente was not performing services generically for its
> client; rather, its work was specifically requested for a
> sales transaction. ... This case does not present the specter
> of near limitless liability caused by the accountants
> knowledge "of the ever present possibility of repetition to
> anyone, and the possibility of action in reliance upon [the
> information] on the part of anyone to whom it may be
> repeated." Restatement (Second) of Torts § 552 cmt. h.
> Indeed it presents a scenario sufficiently approaching
> privity as to warrant liability.

*Id.* at 534. The *Williams* court like the court in *Lapalme* indicated that an accountant

could have liability where the information provided to a third party was provided in

connection with a specific transaction of which the accountant was aware and where

the accountant knew that the information would be relied upon by the third party in

connection with *that transaction*. In this action, as in *Lapalme*, plaintiff cannot

establish that Brown Schultz had actual knowledge of and intended to influence the

issuance of the bonds which are the subject of this litigation.

-30-

A person is not a guarantor of the correctness of the statements he provides. Rather, a person is liable for negligent misrepresentation only if "he has failed to exercise the care or competence of a reasonable man in obtaining or communicating the information."  Restatement (Second) of Torts § 552, comment on § 1 (e).  An audit

> does not guarantee that a client's accounts and financial statements are correct any more than a sanguine medical diagnosis guarantees well-being; indeed, even an audit conducted in strict accordance with professional standards countenances some degree of calibration for tolerable error which, on occasion, may result in a failure to detect a material omission or misstatement.  Rather, the "objective of the ordinary examination of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present financial position, results of operations, and changes in financial position in conformity with generally accepted accounting principles." In other words, in issuing an opinion, the auditor certifies only that it exercised appropriate, not flawless, levels of professional care and judgment.

*In re IKON Office Solutions, Inc.*, 277 F.3d 658 (3d Cir. 2002)(citations omitted).

There was no statement by Brown Schultz which conceivably may form the basis for a misrepresentation.  Although none of the amounts warrant adjusting, an amount which depends on the use of an estimate is not a representation of an actual amount particularly considering the information and disclosures included in the footnotes to the financial statements in which Brown Schultz specifically addressed the significance and attendant possible issues associated with the use of estimates.

Contributory negligence is an absolute defense in an action for negligent misrepresentation action.   Restatement (Second) of Torts §552A.

Respectfully submitted,

SWARTZ CAMPBELL LLC


BY:   s/Jeffrey B. McCarron
      JEFFREY B. MC CARRON
      KATHLEEN M. CARSON
      1601 Market Street
      34th Floor
      Philadelphia, PA 19103

      Attorneys for Defendants

Dated : October 17, 2003