## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| United States Fidelity and | : | |
| Guaranty Company | : | |
| | : | Hon. Christopher Conner |
| v. | : | |
| | : | |
| Bruce J. Brown and Brown, Schultz | : | |
| Sheridan & Fritz | : | No: 01-CIV-813 |

## MOTION OF DEFENDANTS FOR JUDGMENT AS A
## MATTER OF LAW PURSUANT TO F.R.C.P. 52

Defendants move for judgment as a matter of law pursuant to F.R.C.P. 52 and

aver in support thereof:

1.    This action involves a claim for negligent misrepresentation.

2.    The action arises out of the issuance of audit reports by defendants to CCI

Construction.

3.    The claim is based on the contention that defendants misrepresented

information when they expressed an opinion in their audit reports in

connection with the 1997 and 1998 financial statements of CCI that the

financial statements fairly represented the financial condition of CCI, and that

the financial statements did not adequately disclose information concerning a

contract claim guaranteed by PCIC in the amount of $1,162,460.

4.    A negligent misrepresentation claim requires proof of the following elements:

1) a misrepresentation of material fact; 2) made under circumstances in which

the person who represented the information should have known, in the

exercise of appropriate care, was false; (3) with an intent to induce another to act on the misrepresentation; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.

5. A negligent misrepresentation claim is not the same as a claim for negligence.

6. A negligent misrepresentation claim cannot be based on the contention that more or additional procedures should have been performed.

7. A negligent misrepresentation claim cannot be based on a deviation from GAAP or GAAS.

8. A negligent misrepresentation claim cannot be based on the non-disclosure of information, or the inadequate disclosure of information.

9. A misrepresentation claim based on non-disclosure must be based on a contention that the non-disclosure was misleading.

10. The evidence presented at trial did not establish the necessary elements of plaintiff's negligent misrepresentation claim.

**A.    Plaintiff Did Not Establish a Misrepresentation of Fact**

**1.    There Was No Evidence to Establish the Existence of a Misrepresentation Relating to Contract Revenue from Uncompleted Projects**

11. A misrepresentation depends on proof of a false statement of fact.

12. The only representation made by Brown Schultz was its audit opinion of the financial statements of CCI Construction Company for the years 1997 and 1998.

13.  That opinion expressed only that the financial statements of CCI fairly

     represented the financial condition of CCI as of the closing date of the

     statement.

14.  To the extent that amounts related to contract revenue included on the 1997

     and 1998 financial statements from uncompleted contracts are considered to

     be representations by Brown Schultz, the financial statements clearly disclosed

     that

       revenues from construction contracts are recognized on the percentage of
       completion method, measured by the percentage of direct cost incurred to date
       to estimated total direct costs for each contract. . . . <u>Because of inherent
       uncertainties in estimating costs, it is at least reasonably possible that the
       estimates will change within the near term.</u>

Plaintiff's Exhibit 36 at p. 8.   In addition, the financial statements also state:

       Use of estimates:

       The preparation of financial statements in conformity with generally
       accepted accounting principles requires management to make estimates
       and assumptions that affect the reported amounts of assets and
       liabilities and disclosure of contingent assets and liabilities at the date of
       the financial statements and the reported amounts of revenues and
       expenses during the reporting period.  <u>Actual results could differ from
       those estimates.</u>

15.  The financial statements clearly disclosed the method by which revenue was

     recognized on uncompleted contracts and since that method involved the use

     of estimates,  it was at least reasonably possible that the estimates would

     change within the near term.

16.  The statements further disclosed that the actual results could differ from the

estimates.

17. Considering these disclosures, there was no false statement in the financial statements concerning the amount of contract revenue derived from uncompleted contracts and management's estimated costs to complete those contracts.

18. The evidence concerning a misrepresentation presented through the testimony of Steve J. DeBruyn, plaintiff's accounting expert, and the exhibits which set forth Mr. DeBruyn's proposed restatements to the 1997 and 1998 audited financial statements of CCI also did not establish the existence of a misrepresentation concerning contract revenue.

19. Mr. DeBruyn's testimony, at most, established that the amounts on the 1997 and 1998 financial statements concerning contract revenue derived from uncompleted contracts differed from the actual amount of revenue derived from the contract upon completion or from the amount of contract revenue reflected on Plaintiff's Exhibit 337.

20. The existence of disparity between an estimate and actual or later results does not establish that the estimate was incorrect or wrong at the time it was made.

21. Conditions can change subsequent to the time the estimate was made which would change the actual result, but which would not make the estimate wrong.

22. There was no evidence presented that estimated costs to complete used to determine the amount of contract revenue to recognize from uncompleted

contracts included in the 1997 or the 1998 audited financial statement were incorrect based on the information that was known or available as of the audit date.

23. The proof concerning actual results concerning contract revenue was unreliable.

24. Mr. DeBruyn used Exhibit 337 as the basis for his restatements.

25. There was no evidence that the amounts reflected on Exhibit 337 are correct.

26. The data included on Exhibit 337 was unaudited.

27. There was no evidence about the source or means of the compilation of the data used to form Exhibit 337.

28. The only evidence presented about Exhibit 337 suggested that if it came from CCI it was unreliable.

29. If Exhibit 337 came from a source other than CCI, then there is no evidence to establish the reliability or accuracy of the data contained therein.

30. There is no credible evidence that even establishes that the actual costs of the jobs in progress differed from the estimated costs used to determine contract revenue and which was included in the 1997 and 1998 audited financial statements.

31. The proof concerning the proposed restatements to the 1997 and 1998 audited financial statements was not derived from an accepted and appropriate method for determining the propriety of estimates on those financial statements.

32.    The method used by DeBruyn to develop his restated financial statements was inappropriate to determine whether the representations by defendants were true when made.

33.    DeBruyn's method used to develop his proposed adjustments and restatements to the 1997 and 1998 financial statements is not a method accepted by other experts or authorities in the profession, or supported by the accounting literature or other source of appropriate authority.

34.    The proposed restated financial statements were the product of inconsistent application of an unaccepted and inappropriate method to determine the propriety of the representations by defendants in connection with the 1997 and 1998 audited financial statements.

35.    DeBruyn made mistakes in his application of his method to determine the adjustments to develop the restated financial statement for 1998.

36.    DeBruyn included material misstatements in forming his restated financial statement for 1998 to an extent that his restatements and opinions are unreliable and are incompetent evidence.

37.    The amount of the PCIC guaranteed claim was properly included in revenue on the 1998 financial statement.

38.    There was no competent evidence of a misrepresentation of fact concerning contract revenue from uncompleted contracts.[1]

_____

[1]Defendants also move to strike Mr. DeBruyn's testimony to the extent it concerns the restatement of the financial statements because it was not based on an

### 2.     There Was No Evidence of a Misrepresentation of Fact Concerning the PCIC Guaranteed Claim

39.    Plaintiff's contention about PCIC relates to the inadequacy of the disclosure which is insufficient to support a negligent misrepresentation claim.

40.    An omission of information cannot form the basis for a claim for negligent misrepresentation.

41.    Even if an omission can serve as the basis for a negligent misrepresentation claim, the evidence did not establish that plaintiff had an understanding of the PCIC guaranteed claim and its effect on the financial statement was other than the correct understanding.

42.    The information or disclosures included within the 1998 audited financial statement revealed an amount related to the PCIC guaranteed claim.

43.    The evidence established that a user of the financial statement would reasonably conclude that the amount of the PCIC guaranteed claim was included in revenue.

44.    Mr. Farnsworth, plaintiff's underwriting expert, agreed that he testified at his deposition that a user of the 1998 audited financial statement would reasonably conclude that the claim guaranteed by PCIC was included in revenue and that if it was not it should have been disclosed.  N.T. at p. 1536.

45.    Mr. Phillips, the Harrisburg branch manager of USF&G's Harrisburg office,

accepted and reliable method and because it was based upon data which was never substantiated to be valid or accurate.

testified that he did not read footnote 8 to the 1998 audited financial statement, but if he had read footnote 8 to the 1998 audited financial statement, then he would have understood the PCIC claim was included in revenue.

46. The alleged deficient disclosure about the PCIC guaranteed claim was not a misrepresentation.

47. No incorrect information was included within the financial statement concerning the PCIC guaranteed claim.

48. CCI had a contract claim.

49. There was a guarantee by PCIC for that full amount of the contract claim.

50. The amount of the guarantee was correctly reflected in the financial statement.

51. A user of the financial statement would not be mislead by the disclosure to believe that the amount of the PCIC guaranteed claim was other than in revenue.

52. The evidence did not establish that the allegedly deficient disclosure of the PCIC guaranteed claim transaction caused USF&G to misunderstand the PCIC guaranteed claim transaction and the effect of the transaction on the financial statement.

53. The evidence did not establish that USF&G had an understanding about the PCIC guaranteed claim transaction which was other than correct.

54. The evidence did not establish a false statement by defendants concerning the PCIC guaranteed claim.

55. The absence of the information which plaintiff contends should have been included in the 1998 financial statement concerning the PCIC guaranteed claim was not necessary to prevent a misunderstanding about the transaction.

56. Plaintiff's criticism relates to the completeness of the disclosure to allow a full understanding about the PCIC guaranteed claim rather than a misrepresentation about the PCIC guaranteed claim.

57. The absence of additional information about the PCIC guaranteed claim was not misleading.

58. Plaintiff's contention regarding the adequacy of the disclosure concerning the PCIC guaranteed claim is legally insufficient to support a negligent misrepresentation claim.

59. No competent evidence was presented which established a misrepresentation by defendants.

**B.    Plaintiff Did Not Establish the Alleged Misrepresentation Was Material**

**1.    The Testimony of David Hussey Was Necessary To Establish the Materiality of the Representations to USF&G's Underwriting**

59. A misrepresentation is conceivably actionable only if it involves a material fact.

60. Plaintiff must establish that defendants actually misrepresented a material fact.

61.     The evidence established that only David Hussey had the authority to approve or suspend the bonding program for CCI. N.T. at p. 516, 723.

62.     No testimony was presented from David Hussey.

63.     There was no about what action, if any,  he would have taken if presented with the information contained in Mr. DeBruyn's restated financial statements.

64.     In the absence of Mr. Hussey's testimony, there is no evidence of a misrepresentation of fact that was material to USF&G.

**2.      The 1997 Audited CCI Financial Statements**

65.     The evidence established that USF&G would have continued to bond CCI even if the 1997 audited financials had been changed to reflect the amounts as restated by Mr. DeBruyn.

66.     Mr. Daily, USF&G's home office underwriter involved on the CCI account and the designee representative of plaintiff, testified that USF&G would have continued its bonding program even if the 1997 audited financial statement had reflected Mr. DeBruyn's restatements.  N.T. at p. 630-32.

67.     Daily testified USF&G would have continued the CCI bonding program even if the 1997 audited financial statement has reflected a $100,000 net income loss, net worth in the amount of $4,638,834 and working capital of $3,183,138.  *Id.*

68.     USF&G would have continued the bonding program for CCI even if the 1997 audited financial statement had reflected the same amounts as Mr. Debruyn's proposed restated financial statement for 1997.

69. The evidence did not establish the nature and extent of the changes to the 1997 financial statement which would have been material to underwriting.

70. The difference between the amount of contract revenue reflected on the 1997 audited financial statements and the restated amounts is not material to underwriting.

### 3.    The 1998 Audited CCI Financial Statements

71. There was no evidence to establish that the difference between the corrected, restated 1998 financial statements and the 1998 audited financial statement was material to underwriting.

72. The evidence did not establish the nature and extent of the changes to the 1998 financial statements which would have been material to underwriting.

73. There was no evidence that USF&G would have ceased bonding or otherwise changed its underwriting in any significant way to avoid the loss if the 1998 audited financials contained those corrected, restated amounts.

74. Mr. Daily was unable to state to what extent working capital would have to deteriorate before it would become material to underwriting or USF&G would have suspended bonding. N.T. at p. 546-47.

75. Mr. Daily was unable to say how high the underbilling to net quick ratio would have to be before USF&G would cease issuing bonds to CCI.  N.T. at p. 67?

76. Plaintiff did not stop bonding CCI when CCI sustained losses and/or changes in financial condition which were less favorable than those reflected on the

1998 restated financial statements, as corrected.

### 4.     The PCIC Guaranteed Claim

77.    The evidence did not establish that knowledge of the PCIC guaranteed claim was included in the underbillings portion of revenue was significant to underwriting.

78.    The evidence did not establish that it was significant to plaintiff to know the sources of revenue included in the 1998 audited financial statement.

79.    The evidence did not establish that it was significant to plaintiff to know the sources of revenue from the Mahanoy Prison contract included on the 1998 audited financial statement.

80.    The evidence did not establish that it was significant to plaintiff to know whether the operations of CCI were profitable, or whether CCI was profitable on any specific contract.

81.    James Daily did not consider the treatment of the PCIC guaranteed claim and whether it was included in any amount on the 1998 audited financial statement.  Testimony of James Daily, N.T. 697.

82.    None of the alleged misrepresentations were material.

### C.     Plaintiff Did Not Establish That Defendants Did Not Exercise Appropriate Care and Should Have Known the Information in the Audited Financial Statements Was False

83.    Plaintiff must establish a misrepresentation of material fact made under circumstances in which the person who represented the information should

have known, in the exercise of appropriate care, was false.

84. No evidence was presented to establish defendants had any reason to know the information included in the financial statements was false.

85. The only evidence presented concerning the absence of appropriate care by defendants was the testimony by DeBruyn.

86. The method used by DeBruyn to develop his restated financial statements was inappropriate to address the propriety of the professional conduct by defendants.

87. A difference between actual results or later results and earlier estimates included in the financial statements did not establish that defendants did not exercise appropriate care.

88. Plaintiff did not establish that difference between actual or later results and earlier estimates included in the financial statements was known or would, in the exercise of appropriate care, have been known by defendants if additional or different audit procedures had been performed.

89. DeBruyn's testimony concerning the absence of appropriate care by defendants assumed that defendants did not audit contract costs and estimated contract costs of CCI.

90. The evidence established that defendants did audit the contract costs and estimated contract costs of CCI and audited the amounts of contract revenue reflected by CCI on the 1997 and 1998 financial statements based on the

percentage of completion method of accounting.

91.    The evidence did not establish that defendants did not exercise appropriate

care when they formed and expressed their opinion that the financial

statements fairly represented the financial condition of CCI.

92.    No evidence was presented to establish that defendants should have realized

that the amounts reflected on the audited financial statements for 1997 and

1998 for contract revenue were not reasonable if defendants had performed

different or additional audit procedures.

93.    The evidence did not establish that defendants should have known, in the

exercise of appropriate care, that the 1997 and 1998 financial statements for

CCI did not fairly represent the financial condition of the company.

94.    Plaintiff did not establish the events or the reasons for the difference between

the estimates which were used to derive contract revenue at the time of the

audits and the actual results which are reflected on plaintiff's Exhibit 337, or

whether those events or reasons could have been ascertained by the auditors at

the time of the audits in the exercise of reasonable care.

95.    The evidence did not establish that defendants would have known the

information included in the financial statements was not correct even if

defendants acted with appropriate care.

96.    The evidence did not establish that there was information known by or

available to defendants from which defendants should have known that their

opinion the financial statements fairly represented the financial condition of CCI was false.

97.  The evidence did not establish that defendants did not conduct their audits of CCI in accordance with GAAS, and the financial statements were other than in accordance with GAAP.

98.  The propriety of the audits can only be determined by a re-audit using the information and materials available to the auditors when the audit was conducted.  N.T. at p. 1910.

99.  DeBruyn used what he termed a "look back method" to derive his proposed restatements which involved the significant and improper use of hindsight

100.  Mr. DeBruyn agreed that he was required to use the same procedures which should have been used by Brown Schultz in performing their audit to properly evaluate the work of Brown Schultz. N.T. at p. 1938.

101.  DeBruyn testified that an auditor's report is based on information available to the auditor as of the audit date and through the end of field work. N.T. at p. 1897.

102.  In coming up with his restatements, DeBruyn, however, did not limit himself to historical information available to the auditors as of the end of their field work. Id.

103.  DeBruyn did not know and did not make a determination about the specific information that was available to the auditors when they performed the audits

for the years ended December 31, 1997 and 1998. N.T. at pp. 1897-98.

104. DeBruyn's proposed adjustments were made based on data developed after the audits were performed by Brown Schultz. N.T. at p. 1911.

105. The information included in Plaintiff's Exhibit 337 used by DeBruyn in his determination the audits were not adequate was not available to Brown Schultz during its 1998 audit. N.T. at p. 1923.

106. The information included on the completed contract schedule attached to the 1998 audited financial statement was not available to the auditors when they performed the 1997 audit. N.T. at p. 1923.

107. DeBruyn simply made "a significant assumption that the information was there" when Brown Schultz performed its audits of CCI. N.T. at p. 1924.

108. DeBruyn did not confirm the validity of that assumption. Id.

109. DeBruyn did not perform a re-audit.

110. DeBruyn agreed it is important to know both the date and the event which caused the increased costs over the estimated costs to complete in order to assess if it was an increased cost that could have been detected by Brown Schultz during its audits. N.T. at pp. 1926-27, 1932

111. DeBruyn did not determine the date or the cause of the increased costs over the estimated costs to complete. N.T. at p. 1926-27.

112. DeBruyn testified that there is no support in the accounting literature for the use of his methodology in the context of evaluating the propriety of an audit.

N.T. at p. 1934-35.

113. DeBruyn did not document the source of his methodology. N.T. at p. 1933.

114. DeBruyn was not aware of another instance where his method has been employed to evaluate the propriety of work done by auditors performing audits of financial statements. N.T. at p. 1939.

115. The records and other materials necessary to perform a re-audit were in the possession of, or available to plaintiff.

116. Plaintiff did not preserve the records necessary to properly assess the propriety of the audits by defendants, or did not provide the records and materials to DeBruyn to allow DeBruyn to re-audit the 1997 and 1998 financial statements.

117. An adverse inference arises in favor of defendants that if plaintiff had provided the records to DeBruyn, then the result of the re-audit would not support plaintiff's claim.

118. Plaintiff did not establish that defendants did not act with appropriate care when forming and expressing their opinion about the financial statements.

**D.    There is No Evidence of An Intent By Defendants To Induce Plaintiff to Rely on the Audited Financial Statements for 1997 and 1998**

99. There was also no evidence to establish that defendants intended to induce plaintiff to rely on the 1997 and 1998 audited financial statements.

100. There was no evidence of privity or other relationship between the defendants and plaintiff.

101. No evidence was presented that defendants had any financial interest in the

transaction or pecuniary interest in the outcome of the transaction.

102.    Defendants did not prepare the financial statements for plaintiff.

103.    Defendants did not provide the financial statements to plaintiff.

104.    There was no evidence that defendants were aware of the specific bonds for which plaintiff would use the audited financial statements.

105.    Defendants' awareness that USF&G was a potential recipient of, and a user of the financial statement did not impose a duty owed by defendants to USF&G, or establish that defendants intended for USF&G to rely on the audit reports.

106.    There was no evidence that defendants intended to influence a specific transaction in which plaintiff was involved.

107.    The evidence did not establish that defendants intended to induce plaintiff to act on the alleged misrepresentation.

**E.    The Evidence Did Not Establish that Plaintiff Justifiably Relied On the Audited Financial Statements**

108.    Plaintiff must establish that it actually relied on the alleged misrepresentations by defendants, and that its reliance on the alleged misrepresentations was justifiable.

109.    Reliance is justified only if the information was correctly analyzed and used.

**1.    The Audited Financial Statements**

110.    Plaintiff did not establish that the 1997 and 1998 audited financial statements were analyzed, the nature and extent of the analysis applied by USF&G to the 1997 and 1998 audited financial statements, and the role, if any, the 1997 and

18

1998 audited financial statements played in the underwriting decisions of USF&G for CCI bonds.

111.  The evidence did not establish that information from the 1997 and 1998 audited financial statements was properly analyzed and used in underwriting decisions by USF&G.

112.  No evidence was presented to establish that Hussey approved the bonds or the bond program for CCI in reliance on any audited financial statement.

113.  The evidence did not establish that Salazar, Phillips, or Daily approved bonds in reliance on an analysis of the information included in the 1997 and 1998 audited financial statements.

114.  The evidence did not establish that USF&G properly used the results of any analysis of the 1997 and 1998 audited financial statements.

115.  Plaintiff applied relaxed underwriting standards to the CCI bond account and did not follow the underwriting criteria established by USF&G's own underwriting manual and other sources of company underwriting criteria.

116.  Plaintiff made underwriting decisions in response to market conditions and competitive business concerns.

117.  Plaintiff did not establish the specific manner in which plaintiff used the financial statement.

118.  The evidence did not establish that any specific bond was approved in reliance on any specific information included within either the 1997 or the 1998

financial statement.

119. The bond program was continued during 1998 after USF&G learned CCI had sustained an operating loss in excess of $1,600,000 halfway through the year.

120. James Daily testified that he was unaware of the $1,600,000 loss until the end of 1998 because USF&G's branch office did not forward the information to him, but that he would have suspended bonding and would not have authorized the VCU bond if he had been aware of the loss.

121. The VCU bond was the only bond which was conceivably not within the authority of the branch office approved by Daily.

122. Any bonds issued after the August 17, 1998 when USF&G became aware that CCI had lost $1,600,000 was not justifiably in reliance on the 1997 audited financial statement.

123. The CCI bond program was renewed by USF&G for 1999 before receipt of and without reliance on the 1998 audited financial statement.

124. No evidence was presented to establish that USF&G re-evaluated its decision to renew the CCI bond program during 1999 after receipt of the 1998 audited financial statements.

125. No evidence was presented to establish that the CCI bond program for 1999 was continued in reliance on the 1998 audited financial statement.

126. No evidence was presented to establish that USF&G relied on the 1997 and/or 1998 audited financial statements in its decision to issue any specific bond.

127.   The evidence did not establish that plaintiff actually and justifiably relied on the information contained in the 1997 and 1998 audited financial statements.

128.   Plaintiff did not sustain an injury attributable to its justifiable reliance on the alleged misrepresentations included in the contract revenue amounts in the 1997 and 1998 audited financial statements.

### 2.    The PCIC Guaranteed Claim

129.   No evidence was presented to establish that USF&G was aware of the PCIC guaranteed claim.

130.   No evidence was presented to establish that the allegedly deficient disclosure of the PCIC guaranteed claim transaction caused USF&G to misunderstand the PCIC guaranteed claim transaction and the effect of the transaction on the financial statement.

131.   Anthony Phillips testified that he was not aware of footnote 8 to the 1998 audited financial statement or its contents during his involvement with underwriting bonds for CCI.

132.   Anthony Phillips testified that the field office underwriter, Steve Salazar, did not bring to his attention the information included in footnote 8 to the 1998 audited financial statement.

133.   The evidence did not establish that the 1998 audited financial statement was ever received in the home office of USF&G where Daily and Hussey were located.

134. The evidence did not establish that Daily and Hussey ever reviewed or analyzed the 1997 and 1998 audited financial statements.

135. James Daily testified that he did not read or pay attention to footnote 8 to the 1998 audited financial statement.

136. No evidence was presented to establish that Hussey was aware of footnote 8 to the 1998 financial statement.

137. No evidence was presented to establish that USF&G used information concerning the PCIC guaranteed claim transaction in its underwriting decisions.

138. No evidence was presented to establish that USF&G relied on information included in the audited financial statement concerning the PCIC guaranteed claim transaction.

139. Plaintiff did not sustain an injury attributable to its justifiable reliance on the alleged misrepresentation included in the 1998 audited financial statement concerning the PCIC guaranteed claim.

**F.   Plaintiff Is Barred from Recovery Due to Contributory Negligence**

138. Contributory negligence is a complete bar to recovery for negligent misrepresentation.

139. The information included in the 1998 audited financial statement was sufficient to inform a user of the financial statement about the existence of the PCIC guaranteed claim and the amount of the claim.

140. Any alleged deficiency concerning the disclosure of the PCIC guaranteed claim was limited to the absence of additional information about the effect of the PCIC guaranteed claim on the financial statement.

141. If the disclosure included in the 1998 audited financial statement concerning the PCIC guaranteed claim was inadequate, then USF&G proceeded to issue bonds without an understanding about the effect of the PCIC guaranteed claim on the financial statement and without knowing whether the effect of the PCIC guaranteed claim was material to underwriting.

142. Plaintiff did not exercise appropriate care for its own protection under the circumstances.

143. Plaintiff was negligent when it relied on the alleged misrepresentation relating to the PCIC guaranteed claim.

144. Contributory negligence bars plaintiff's recovery to the extent plaintiff's alleged injury was due to the alleged misrepresentation concerning the PCIC guaranteed claim.

Wherefore, defendants request the court enter judgment in their favor and against plaintiff.

Respectfully submitted,

SWARTZ CAMPBELL LLC

BY:    s/Jeffrey B. McCarron
JEFFREY B. MC CARRON
KATHLEEN M. CARSON
1601 Market Street
34th Floor
Philadelphia, PA 19103

Attorneys for Defendants

Dated : January 26, 2004