# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| United States Fidelity and | : | |
| Guaranty Company | : | |
| | : | Hon. Christopher J. Conner |
| v. | : | |
| | : | |
| Bruce J. Brown and Brown, Schultz | : | |
| Sheridan & Fritz | : | No: 01-CIV-813 |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO F.R.C.P. 52

## I.    Introduction

Defendants submit this memorandum in support of their motion for judgment as a matter of law pursuant to F.R.C.P. 52(c).  The evidence presented at trial did not establish the necessary elements of plaintiff's negligent misrepresentation claim.  There was no competent evidence of a misrepresentation of fact with regard to contract revenue from uncompleted contracts.  There was no false information concerning the PCIC guaranteed claim. Plaintiff's contention with regard to the adequacy of the disclosure concerning the PCIC guaranteed claim is legally insufficient to support a negligent misrepresentation claim.  Even assuming there was evidence to establish a misrepresentation of fact, there is no evidence that it was material to USF&G's underwriting of the CCI account, i.e., that USF&G would have ceased issuing bonds to CCI Construction Company.

There also was no proof that defendants should have known in the exercise of appropriate care that the 1997 and 1998 financial statements for CCI did not fairly represent the financial condition of the company.  Plaintiff did not establish the

events or the reasons for the difference between the estimates which were used to derive contract revenue at the time of the audits and the actual results which are supposedly reflected on Plaintiff's Exhibit 337 or whether those events or reasons could have been ascertained by the auditors at the time of the audits in the exercise of reasonable care.

There was also no evidence to establish that defendants intended to induce plaintiff to rely on the 1997 and 1998 audited financials. There was no evidence of privity or other basis for a duty between the defendants and plaintiff. There was no evidence that Brown Schultz had any financial interest in the transaction or pecuniary interest in the outcome of the transaction. While Brown Schultz was aware that USF&G was a potential recipient of the financial statement, it did not prepare the financial statement for plaintiff. Nor was there evidence that Brown Schultz prepared its audit opinion to influence a specific transaction in which plaintiff was involved.

The evidence at trial also did not establish that plaintiff, in fact, or justifiably, relied on the information contained in the financial statements or that plaintiff's alleged losses were proximately caused by defendants.

Finally, plaintiff's contributory negligence bars recovery for the alleged pecuniary loss sustained by plaintiff.

For these reasons, Defendants are entitled to judgment as a matter of law.

## II.    Argument

### A.    Elements of a Negligent Misrepresentation Claim

USF&G's sole cause of action against defendants is a negligent misrepresentation claim.  A negligent misrepresentation claim requires proof of the following elements:  1) a misrepresentation of material fact; 2) made under circumstances in which the person who represented the information should have known, in the exercise of appropriate care, was false; (3) with an intent to induce another to act on the misrepresentation; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.  *Bortz v. Noon*, 729 A.2d 555, 561 Pa. 1999); *see also Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994) *citing* Page Keaton, Prosser and Keaton on the Law of Torts § 105 (5th ed. 1984). "Like any action in negligence, there must be an existence of a duty owed by one party to another." *Kramer v. Dunn*, 749 A.2d 984 (Pa. Super. 2000) *citing, Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999); *Gibbs*, 647 A.2d at 890. In the absence of privity, a negligent misrepresentation claim can be established only if plaintiff can establish the elements of Restatement (Second) of Torts Section 552.  Section 552 provides:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> (2) . . . . The liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) Torts § 552.

### B.    The Evidence Did Not Establish the Existence of a Misrepresentation of Material Fact By Defendants

#### 1.    There Was No Evidence of a False Statement By the Defendants

There was no evidence of a false statement expressed by the defendants which is a required element of a negligent misrepresentation claim. *See Gibbs v. Ernst*, 647 A.2d at 890. The only representation made by Brown Schultz was its audit opinion of the financial statements of CCI Construction Company for the years 1997 and 1998. That opinion expressed only that the financial statements of CCI fairly represented the financial condition of CCI as of the closing date of the statement.

#### 2.    There Was No Evidence To Establish the Existence of A Misrepresentation Relating to Contract Revenue on Uncompleted Projects

According to plaintiff, there are two sources of purported misrepresentations. The first concerns the amount of contract revenue included on the 1997 and 1998 audited financial statements and, in particular, contract revenue derived from uncompleted contracts and the reasonableness of management's estimated costs to complete those contracts.  To the extent that amounts related to contract revenue

4

included on the 1997 and 1998 financial statements from uncompleted contracts are

considered to be representations by Brown Schultz, the financial statements clearly

disclosed that

> revenues from construction contracts are recognized on the percentage of
> completion method, measured by the percentage of direct cost incurred to date
> to estimated total direct costs for each contract. . . . <u>Because of inherent
> uncertainties in estimating costs, it is at least reasonably possible that the
> estimates will change within the near term.</u>

Plaintiff's Exhibit 36 at p. 8.   In addition, the financial statements also state:

> Use of estimates:
>
> The preparation of financial statements in conformity with generally
> accepted accounting principles requires management to make estimates
> and assumptions that affect the reported amounts of assets and
> liabilities and disclosure of contingent assets and liabilities at the date of
> the financial statements and the reported amounts of revenues and
> expenses during the reporting period.  <u>Actual results could differ from
> those estimates.</u>

*Id.*   The financial statements set forth the method by which revenue was

recognized on uncompleted contracts and since that method involved the use of

estimates,  it was at least reasonably possible that the estimates would change within

the near term.  The statements further disclosed that the actual results could differ

from the estimates.  Considering these disclosures, there was no false statement in

the financial statements concerning the amount of contract revenue derived from

uncompleted contracts and management's estimated costs to complete those

contracts.

The evidence concerning a misrepresentation presented through the testimony

of Steve J. DeBruyn, plaintiff's accounting expert, and the exhibits which set forth

5

Mr. DeBruyn's proposed restatements to the 1997 and 1998 audited financial statements of CCI also did not establish the existence of a misrepresentation concerning contract revenue for a number of reasons.

First, Mr. DeBruyn's testimony, at most, established that the amounts on the 1997 and 1998 financial statements concerning contract revenue derived from uncompleted contracts differed from the actual amount of revenue derived from those contract upon completion or from the amount of contract revenue reflected on Plaintiff's Exhibit 337. The existence of disparity between an estimate and actual or later results does not establish that the estimate was incorrect or wrong at the time it was made. Conditions can change subsequent to the time the estimate was made which would change the actual result but which would not make the estimate wrong. There was no evidence presented that estimated costs to complete used to determine the amount of contract revenue to recognize from uncompleted contracts included in the 1997 or the 1998 audited financial statement were incorrect based on the information that was known or available as of the audit date.

Second, the proof concerning actual results concerning contract revenue was unreliable. Mr. DeBruyn used Exhibit 337 as the basis for his restatements. Exhibit 337 purports to be a 12/31/99 CCI prepared work in process schedule. *See* Plaintiff's Exhibit 337. There was no evidence that the amounts reflected on Exhibit 337 are correct. The data included on Exhibit 337 was unaudited. N.T. at p. 1913. There was no evidence as to the source or means of the compilation of the data used to form Exhibit 337. The only evidence presented about Exhibit 337 suggested that if it came

6

from CCI it was unreliable. N.T. at p. 1913. If it came from a source other than CCI, then there is no evidence to establish the reliability or accuracy of the data contained therein.  There is no credible evidence that establishes that the actual costs of the jobs in progress differed from the estimated costs used to determine contract revenue and which was included in the 1997 and 1998 audited financial statements.

Third, the proof concerning the proposed restatements to the 1997 and 1998 audited financial statements was not derived from an accepted and appropriate method for determining the propriety of estimates on those financial statements. The method used by DeBruyn to develop his restated financial statements was inappropriate to determine whether the representations by defendants were true when made.  Moreover, the proposed restated financials were the product of inconsistent application of and unaccepted and inappropriate method.  As such, there is no competent evidence of a misrepresentation on the 1997 or 1998 financial statements.

In that regard, plaintiff's auditing expert, Steve J. DeBruyn used what he termed a "look back method" to derive his proposed restatements which method involved the significant and improper use of hindsight.  Mr. DeBruyn conceded that he was required to use the same procedures which should have been used by Brown Schultz in performing their audit to properly evaluate the work of Brown Schultz. N.T. at p. 1938.  DeBruyn testified that an auditor's report is based on information available to the auditor as of the audit date and through the end of field work.  N.T. at p. 1897.  In coming up with his restatements, Mr. DeBruyn, however, did not limit

himself to historical information available to the auditors as of the end of their field work. *Id.* Indeed, Mr. DeBruyn did not know and did not make a determination about the specific information that was available to the auditors when they performed the audits for the years ended December 31, 1997 and 1998. N.T. at pp. 1897-98. DeBruyn's proposed adjustments were made based on data developed after the audits were performed by Brown Schultz. N.T. at p. 1911.

DeBruyn testified that there is no support in the accounting literature for the use of his methodology in the context of evaluating the propriety of an audit. N.T. at p. 1934-35. DeBruyn did not document the source of his methodology. N.T. at p. 1933. DeBruyn was not aware of another instance where his method has been employed to evaluate the propriety of work done by auditors performing audits of financial statements. N.T. at p. 1939.

The evidence presented did not establish that the information included in the 1997 or the 1998 audited financial statements was incorrect or false.

### 3.    There Was No Evidence of a Misrepresentation of Fact Concerning the PCIC Guaranteed Claim

There was no evidence to establish that the information contained in the 1998 audited financial statement concerning the PCIC guaranteed claim transaction was incorrect or false. Plaintiff's contention about PCIC relates to the inadequacy of the disclosure which is insufficient to support a negligent misrepresentation claim. Under Pennsylvania law, Plaintiff must establish that defendants actually misrepresented a material fact to him. *Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994). An omission of

8

information cannot form the basis for a claim for negligent misrepresentation. *Lazin v. Pavilion Partners*, Civ.A. No. 95-601, 1995 U.S. Dist LEXIS 15255, 1995 WL 614018 at *7 (E.D. Pa. Oct.11, 1995)(non-disclosure of a material fact does not give rise to a cause of action for negligent misrepresentation); *Lord v. Living Bridges*, 1999 U.S. Dist. LEXIS 11513 at *8 (E.D. Pa. July 30, 1999).  Non-disclosure of a material fact would give rise to a cause of action for fraudulent non-disclosure, not for negligent misrepresentation. *Lazin, citing, Lang v. Helios Capital Corp*., No. 86-08031, 1989 WL 299241, at *4 n.6 (Pa. Com. Pl. Ct. Jan. 20, 1989).

Even assuming that an omission can serve as the basis for a negligent misrepresentation claim, no one testified that plaintiff's understanding of the transaction was other than correct.  Mr. Farnsworth, plaintiff's underwriting expert, agreed that he testified at his deposition that a reader of the 1998 audited financial statement would reasonably conclude that the claim guaranteed by PCIC was included in revenue and that, if it was not, it should have been disclosed.  N.T. at p. 1536.  Mr. Phillips, the Harrisburg branch manager of USF&G's Harrisburg office, testified that he did not read footnote 8 to the 1998 audited financial statement but if he had he would have understood the PCIC claim was included in revenue.  Mr. Daily simply did not consider whether the PCIC guaranteed claim amount was included in the balance sheet somewhere.  N.T. at p. 697.

The information included within the 1998 audited financial statement revealed the amount related to the PCIC guaranteed claim and the evidence established that a user of the financial statement would reasonably conclude that the amount of that

9

claim was included in revenue. There was no evidence of a misrepresentation of fact concerning the PCIC guaranteed claim transaction.

### 4. There Was No Evidence that the Purported Misrepresentations Were Material.

#### a. The Testimony of David Hussey Was Necessary To Establish the Materiality of the Representations to USF&G's Underwriting

In order to be actionable, a misrepresentation must be material. There was no evidence that the amounts contained in Mr. DeBruyn's restated financials were such that, had USF&G been apprised of them, it would have ceased or suspended CCI's bonding program. The evidence established that only David Hussey had the authority to approve or suspend the bonding program for CCI. N.T. at p. 440, 516, 723. There was no testimony from Mr. Hussey as to what action, if any, he would have taken if presented with the information contained in Mr. DeBruyn's restated financials. In the absence of Mr. Hussey's testimony, there is no evidence of a misrepresentation of fact that was material to USF&G.

#### b. The 1997 Audited CCI Financials.

In any event, the evidence established that USF&G would have continued to bond CCI even if the 1997 audited financials had been changed to reflect the amounts as restated by Mr. DeBruyn. Mr. Daily, USF&G's home office underwriter involved on the CCI account, testified that USF&G would have continued its bonding program even if the 1997 audited financial statement had reflected Mr. DeBruyn's restatements. N.T. at p. 630-32. Daily testified USF&G would have continued the

10

CCI bonding program even if the 1997 audited financial statement had reflected a $100,000 net income loss, net worth in the amount of $4,638,834 and working capital of $3,183,138. *Id.* These amounts are what CCI's net income, net worth and working capital would be pursuant to Mr. DeBruyn's 1997 restated financials. The evidence did not establish a material misrepresentation with regard to the 1997 audited financials.

### c.    The 1998 Audited CCI Financials

The evidence also did not establish that USF&G would have stopped bonding CCI if the 1998 financial statements had been changed to reflect the amounts as restated by Mr. DeBruyn.  Mr. DeBruyn admitted that his restatements for 1998 had substantial errors.  There was no evidence that USF&G would have ceased bonding or otherwise changed its underwriting in any significant way to avoid the loss if the 1998 audited financials contained those corrected, restated amounts.

Mr. Daily was unable to state to what extent working capital would have to deteriorate before it would become material to underwriting or USF&G would have suspended bonding. N.T. at p. 546-47.  Mr. Daily was unable to say how high the underbilling to net quick ratio would have to be before USF&G would cease issuing bonds to CCI.  N.T. at p. 674.  In fact, Plaintiff did not stop bonding CCI when CCI sustained losses and/or changes in financial condition which were less favorable than those reflected on the 1998 restated financials, as corrected.

The evidence did not establish a material misrepresentation with regard to the 1998 audited financials.

11

### d.    The PCIC Guaranteed Claim Transaction

There was no evidence presented that the inclusion of the PCIC guaranteed claim in revenue or the disclosures concerning the guaranteed claim were material to underwriting. No evidence was presented to establish that knowledge of the PCIC guaranteed claim was included in the underbilling portion of revenue was significant to underwriting. No evidence was presented to establish that it was significant to plaintiff to know the sources of revenue included in the financial statement. Mr. Daily testified that he gave no consideration about whether the amount of the PCIC guaranteed claim was included in the balance sheet somewhere.  N.T. at p. 697.  No evidence was presented to establish that it was significant to plaintiff to know the sources of revenue for the Mahanoy Prison project, the job to which the guaranteed claim related. Daily did not consider the treatment of the PCIC guaranteed claim and whether it was included in any amount on the 1998 audited financial statement. N.T. at p. 697.

None of the alleged misrepresentations were material.

### C.    The Evidence Did Not Establish that Brown Schultz, In the Exercise of Appropriate Care Should Have Know that the 1997 and 1998 Financial Statements for CCI Did Not Fairly Represent the Financial Condition of the Company

#### 1.    The Evidence Did Not Establish that Different or Additional Audit Procedures Would Have Led Defendants to Realize that the Amounts Set Forth On the 1997 and 1998 Financial Statements Were Incorrect

In order for plaintiff to succeed on its claim, the evidence must establish a misrepresentation of material fact <u>made under circumstances in which the person</u>

who represented the information should have known, in the exercise of appropriate care, was false. *Bortz v. Noon*, 729 A.2d 555, 561 Pa. 1999); *Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994). A person is not a guarantor of the correctness of the statements he provides. Rather, a person is liable for negligent misrepresentation only if "he has failed to exercise the care or competence of a reasonable man in obtaining or communicating the information." Restatement (Second) of Torts § 552, comment on § 1 (e).

> Likewise, an audit
>
> does not guarantee that a client's accounts and financial statements are correct any more than a sanguine medical diagnosis guarantees well-being; indeed, even an audit conducted in strict accordance with professional standards countenances some degree of calibration for tolerable error which, on occasion, may result in a failure to detect a material omission or misstatement. Rather, the "objective of the ordinary examination of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present financial position, results of operations, and changes in financial position in conformity with generally accepted accounting principles." In other words, in issuing an opinion, the auditor certifies only that it exercised appropriate, not flawless, levels of professional care and judgment.

*In re IKON Office Solutions, Inc.*, 277 F.3d 658 (3d Cir. 2002)(citations omitted). Proof of negligent misrepresentation depends on expert testimony or other evidence of a failure to exercise ordinary care. *Bortz v. Noon*, 729 A.2d at 563 (expert testimony or other competent evidence of appropriate care required to establish a breach of duty for a negligent misrepresentation claim).

Here, DeBruyn's testimony concerning the absence of appropriate care by defendants assumed that defendants did not audit contract costs and estimated

contract costs of CCI. The evidence, however, did in fact establish that defendants did audit those costs and audited the amount of contract revenue reflected by CCI on the 1997 and 1998 financial statements.

Moreover, there was no evidence presented to establish that defendants had any reason to know the information included in the 1997 and 1998 financial statements was not correct. Plaintiff's auditing expert, Mr. DeBruyn, agreed that an auditor's report is based on information available to the auditor as of the audit date and through their field work. N.T. at p. 1897. Mr. DeBruyn, however, conceded that he does not know and did not make a determination about the specific information which was available to the auditors when they performed the audits for 1997 and 1998. N.T. at pp. 1897-98. Mr. DeBruyn agreed his proposed adjustments to the 1997 and 1998 financial statements were based on data developed after the audits were performed by Brown Schultz. N.T. at p. 1911. The information included in Plaintiff's Exhibit 337 was not available to Brown Schultz during its 1998 audit.[1] N.T. at p. 1923. The information included on the completed contract schedule attached to the 1998 audited financial statement was not available to the auditors when they performed the 1997 audit. N.T. at p. 1923.     Mr. DeBruyn simply made "a significant assumption that the information was there" when Brown Schultz

---

[1]The arguments set forth previously that: (1) the proof concerning contract revenue, plaintiff's exhibit 337, was unreliable; and (2) that Mr. DeBruyn's methodology was neither an accepted nor appropriate method to determine the propriety of the estimates in the 1997 or 1998 audited financial statements and the propriety of Brown Schultz's audits, apply equally here. Rather than reiterate them, Defendants incorporate those arguments by reference.

performed its audits of CCI.  N.T. at p. 1924.  However, he did not confirm the validity of that assumption.  *Id.*

DeBruyn admitted it was important to know both the date and the event which caused the increased costs over the estimated costs to complete in order to assess if it was an increased cost that could have been detected by Brown Schultz during its audits. N.T. at pp. 1926-27, 1932.  He did not determine the date or the cause of the increased costs over the estimated costs to complete.  N.T. at p. 1926-27.

In addition, no evidence was presented to establish that defendants should have realized that the amounts reflected on the audited financial statements for 1997 and 1998 for contract revenue were not reasonable if defendants had performed different of additional audit procedures. Plaintiff's auditing expert was unable to say that if Brown Schultz had done more in their audit procedures, it would have revealed estimated costs to complete equivalent to Mr. DeBruyn's restated costs or that the results of the audit and the audit opinion would have been different.  N.T. at pp. 1908, 1926.  Mr. DeBruyn admitted that the only way he could tell whether the results of the audit would have been different if Brown Schultz had applied the correct and/or additional audit procedures he contends should have been performed would be to look at CCI's records.  N.T. at p. 1910.  Mr. DeBruyn did not gain access to those records. N.T. 1911.

The evidence did not establish that defendants did not conduct their audits of CCI in accordance with generally accepted auditing standards and that they financial statements were presented other than in accordance with generally accepted

15

accounting principles.  The evidence did not establish that the defendants should

have known the information included in the 1997 and 1998 financial statements was

not correct.  The evidence presented did not establish that Brown Schultz, in the

exercise of appropriate care should have known that either the 1997 or the 1998

audited financial statements for CCI did not fairly present the financial condition of

the company as of the closing date of the statement.

**D.     There is No Evidence of An Intent By Defendants To Induce Plaintiff to Rely Upon the Audited Financial Statements for 1997 and 1998**

There was  no evidence to establish that defendants intended to induce

plaintiff to rely on the 1997 and 1998 audited financials.  There was no evidence of

privity or other basis for a duty between the defendants and plaintiff.

Under § 552, a duty arises only if there was privity between plaintiff and

defendant, or the defendant had a pecuniary interest in the transaction.  *First*

*Options of Chicago, Inc. v. Wallenstein*,  1994 WL 229554 at * 4 (E.D. Pa. 1994).  A

negligent misrepresentation claim cannot serve as a basis for a third-party to avoid

the privity requirement of a negligence claim.  *In re Phar-Mor, Inc. Securities*

*Litigation*, 892 F. Supp. 676, 694 (W.D. Pa. 1995).  "Pennsylvania's strict adherence

to the privity rule would result in a ruling that negligent misrepresentation may not

be used to plead professional negligence claims by persons not in privity with the

professional defendant." *PNC Bank, Kentucky, Inc.  v. Housing Mortgage Corp.*, 899

F. Supp. 1399, 1408 (W.D. Pa. 1994).  A claim involving an alleged breach by an

accountant of his obligation to perform audits according generally accepted auditing

principals, such as the claim presented by plaintiff here, is a professional negligence claim for which privity is required. *Id*. at 1407. No evidence was presented that privity existed between USF&G and Brown Schultz.

A third party can maintain a Section 552 action against a professional notwithstanding an absence of privity where the professional had a pecuniary interest in the transaction. *See Eisenberg v. Gagnon*, 766 F.2d 770, 779-80 (3d Cir. 1985) (holding that privity was not required in limited partners' Section 552 action against an attorney who provided opinion letter concerning tax implications of investing in a partnership in which attorney was the general partner.) In *Eisenberg*, the court distinguished negligent misrepresentation actions from ordinary negligence claims on the basis that where an attorney negligently misrepresents facts concerning a transaction in which he has a pecuniary interest

> the action does not hinge on the breach of a duty an attorney owes clients or others in privity, but rests on the more general principles applicable to a seller or other interested party who misrepresents the nature and value of goods. . .

*Eisenberg*, 766 F.2d at 779. The involvement of an accountant as a paid professional does not establish a pecuniary interest in the transaction. *First Options of Chicago, Inc. v. Wallenstein*, 1994 WL 229554 at * 4 (E.D. Pa.1994). There was no evidence presented that Brown Schultz's involvement was other than as a paid professional. There was no evidence presented at trial that Brown Schultz had any financial interest in the transaction or pecuniary interest in the outcome of the transaction.

Even if privity is not a requirement under § 552, the Restatement still limits

an accountant's liability for negligent misrepresentation to those third parties who the accountant actually knows will receive the information, and then, only for transactions that are the same as, or substantially similar to, the ones the accountant actually knows will be influenced by the supplied information. *Restatement (Second) of Torts* at § 552(2); *North American Specialty Insurance Company v. Lapalme*, 258 F.3d 35 (1st Cir. 2001). There must be evidence that the accountants knew that they were undertaking additional, open ended liability with respect to future bonds by releasing the financial statement in order for there to be liability under Section 552. *Id.*

> Simply because transactions are of the same general nature (e.g. "bonds") is not enough to render them substantially similar for purposes of the Restatement rule. Any other conclusion would make a mockery of the basic premise that underbraces the Restatement rule: that an acquiescent accountant is only deemed to accept the risks of specific transactions that were made known to him in advance (or substantially similar ones).

*Id.* at 44. Pennsylvania courts have also required that an accountant know that the information he was providing would be used for a specific transaction before liability will be imposed against an accountant in a negligent misrepresentation claim. See, e.g., *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F. Supp. 2d 517, (M.D. Pa. 1999) (Accountant knew it was performing its work solely for the sale of a particular division of company and knew that its work would be relied upon in this transaction.)

Here, while Brown Schultz was aware that USF&G was a potential recipient of the audited financial statements, there was no evidence that Brown Schultz's audit

18

report was prepared for USF&G or in connection with specific transactions that were made known to Brown Schultz in advance.

There is no evidence to establish that defendants intended to induce plaintiff to rely on the 1997 and 1998 audited financials.

**E.    The Evidence Presented At Trial Did Not Establish that Plaintiff In Fact or Justifiably Relied On the 1997 and 1998 Audited Financial Statements When Issuing Bonds On CCI's Behalf.**

In order to succeed on a negligent misrepresentation claim, plaintiff must establish that it justifiably relied on the information in the 1997 and 1998 financial statements in deciding whether to extend bond credit to CCI. Justifiable reliance comprises two elements: 1) the plaintiff must in fact rely on the information and 2) the reliance must be reasonable. *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606 (5th Cir. 1996); *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285 A.2d 451 (1971) (whether reliance on an alleged misrepresentation is justified depends on whether the recipient knew or should have known that the information supplied was false). Where the means of obtaining the information in question were not equal, the representations of the person believed to possess superior information may be relied upon. *Siskin v. Cohen*, 363 Pa. 580, 70 A.2d 293, 295 (1950). Reliance is unjustified when the relying party was negligent. *Scottish Heritable Trust PLC*, 81 F.3d 606. In deciding whether the recipient justifiably relied on information, a court may consider the degree of sophistication of the parties. *Fort Washington Resources, Inc. v. Tannen*, 854 F. Supp. 455 (E.D. Pa. 1994); *Greenberg v.*

19

*Tomlin*, 816 F. Supp. 1039, 1056 (E.D. Pa. 1993). Here, there is no evidence to establish that plaintiff in fact or reasonably relied on the audited financial statements in connection with its determination to issue bonds to CCI.

### 1. USF&G Did Not Rely on the 1997 Audited Financial Statements

There is no evidence that USF&G's underwriters relied on the 1997 audited financial statements for purposes of underwriting the bond program or specific bonds for CCI. The evidence did not establish that any specific bond was approved based on some specific information included within the 1997 financial statements or that the bond program in general was continued because of any specific information in the 1997 financial statement. Mr. Daily testified that he did not analyze the 1997 audited financial statement. N.T. at 611. Mr. Phillips did not analyze any of the audited financial statements for CCI. There is no evidence that Mr. Hussey, whose decision it was to continue the bond program, was aware of any information included within the 1997 audited financial statement or made use of that financial statement to any extent in making his decision.

### 2. USF&G Did Not Rely on the 1998 Audited Financial Statements

With regard to the 1998 audited financial statement, Mr. Daily did not know whether or when he even received it and has no recollection of reviewing it. N.T. at pp. 668-69. Again, the evidence did not establish that Salazar, Phillips or Daily approved bonds in reliance on an analysis of the information contained in the 1998 audited financial statement. No evidence was presented that Hussey approved the

bonds or bond program for CCI in reliance on any audited financial statement. The earliest analysis of the 1998 audited financial statement for CCI in USF&G's underwriting file is dated August 20, 1999. *See* Exhibit 790 at pp. USFG/BS 0004, 0005, 0230.

Mr. Daily testified that the bond program for 1999 was approved at the January 5, 1999 meeting, prior to receipt of the 1998 audited financials for CCI. N.T. at p. 665. The CCI bond program was renewed by USF&G before the receipt of and without reliance on the 1998 audited financial statement. *Id.* No evidence was presented to establish that USF&G, in fact, re-evaluated its decision to renew the CCI bond program during 1999 after receipt of the 1998 audited financial statement. No evidence was presented to establish that the CCI bond program for 1999 was continued in reliance on the 1998 audited financial statement. No evidence was presented to establish that information from the 1998 audited financial statement was used in underwriting decisions by USF&G or that USF&G issued any specific bonds in reliance upon the 1998 audited financial statements.

With regard to information concerning the PCIC guaranteed claim transaction, no evidence was presented to establish that USF&G relied on the information concerning that transaction in considering whether to issue bonds for CCI. No evidence was presented that USF&G was aware of the PCIC guaranteed claim transaction. Mr. Phillips testified Mr. Salazar did not bring to his attention the information included in footnote 8 to the 1998 audited financial statement. Mr. Phillips did not read footnote 8 concerning the $1.162 million PCIC guaranteed claim

transaction.  As set forth above, Mr. Daily could not recall whether or when he

received and reviewed the 1998 audited financial statement. Daily further testified

that he gave no consideration about whether the amount of the PCIC guaranteed

claim was included in the balance sheet somewhere.  N.T. at p. 697.  No evidence was

presented to establish that Hussey was aware of footnote 8 to the 1998 financial

statement.

No evidence was presented to establish that USF&G used or considered

information concerning the PCIC guaranteed claim transaction in its underwriting

decisions.  No evidence was presented to establish that USF&G relied on information

concerning the PCIC guaranteed claim transaction in its underwriting decisions.

### 3.    USF&G Did Not Reasonably Rely On The 1997 and 1998 Audited Financial Statements in its Underwriting of Bonds for CCI

The evidence presented did not establish that USF&G reasonably relied on the

1997 or 1998 audited financial statements in decision to issue bonds for CCI.

USF&G's underwriters were sophisticated users of financial statements.  N.T.

at p. 1689.   USF&G was informed in August 1998 of a substantial change in CCI's

financial condition, i.e., that CCI had sustained a loss of $1.6 million through the first

six months of that year.  To the extent that USF&G claims it relied on the 1997

financial statement in issuing bonds for CCI subsequent to August of 1998, its

reliance on the 1997 audited financial statement was no longer reasonable.  The data

was no longer meaningful in that CCI's financial condition had undergone a

significant change.  Bonds for the Outlook Westerville, James River, and VCU Life

Science Building projects were issued after USF&G received the interim CCI financials indicating that CCI had sustained a $1.6 million dollar loss as of June 30, 1998. *See* Plaintiff's Exhibit 14. The bonds were also issued long after the information contained in the December 31, 1997 audited financials was stale. Plaintiff's reliance on the 1997 audited financial statements with regard to these bonds was clearly not justified.

There was no evidence presented of any meaningful analysis of the 1998 audited financial statements prior to August 20, 1999. As such, USF&G did not justifiably rely on the 1998 financial statement with regard to its decision to issue to bonds subsequent to its receipt of the 1998 audited financials but prior to August 20, 1999.[2] The analysis performed on August 20, 1999, which included the ratio analysis report, the folder exceptions report and other similar reports, revealed significant issues of concern from an underwriting standpoint with regard to the financial condition of CCI. *See* Exhibit 790 at pp. USFG/BS 0004, 0005, 0230. Any decision to continue bonding thereafter in light of the issues raised by those reports was not in justifiable reliance on the 1998 audited financial statement.

USF&G also did not justifiably rely on the 1998 audited financial statement when it issue the bonds on the Cool & Cold Aquaculture (Buried Process Water Lines). The bonds on that  project were not issued until September 30, 1999 which was after USF&G received notice that CCI had sustained a significant loss for the

---

[2]This includes all of the bonds plaintiff contends it issued in reliance upon the 1998 audited financial statement. *See* Plaintiff's Exhibit 15.

first six months of the year and was projecting a loss at year end and after USF&G

had the benefit of the August 20, 1999 analyses concerning the financial condition of

CCI which raised serious issues concerning CCI's financial condition. *See* Plaintiff's

Exhibit 15, Defendants' Exhibit 790A at USFG/BS 0945-946.

The evidence did not establish that USF&G justifiably relied on the

information contained in the 1997 and 1998 audited financial statements. Plaintiff

did not sustain an injury attributable to its justifiable reliance on the alleged

misrepresentations contained in the 1997 and 1998 audited financial statements.

## F.    Plaintiff's Contributory Negligence Bars Recovery For Its Alleged Loss

Section 552A of the Restatement (Second) of Torts provides that:

> The recipient of a negligent misrepresentation is barred from recovery
> for pecuniary loss suffered in reliance upon it if he is negligent in so
> relying.

Restatement (Second) of Torts § 552A. The information included in the 1998 audited

financial statement was sufficient to inform a user of the financial statement about

the existence of the PCIC guaranteed claim and the amount of the claim. Any alleged

deficiency concerning the disclosure of the PCIC guaranteed claim was limited to the

absence of additional information about the effect of the PCIC guaranteed claim on

the financial statement. If the disclosure included in the 1998 audited financial

statement concerning the PCIC guaranteed claim was inadequate, then USF&G

proceeded to issue bonds without an understanding about the effect of the PCIC

guaranteed claim on the financial statement and without knowing whether the effect

of the PCIC guaranteed claim was material to underwriting.

Plaintiff did not exercise appropriate care for its own protection under the circumstances.  Plaintiff was negligent when it relied on the alleged misrepresentation relating to the PCIC guaranteed claim.  Contributory negligence bars plaintiff's recovery to the extent plaintiff's alleged injury was due to the alleged misrepresentation concerning the PCIC guaranteed claim.

## III.    Conclusion

Based on the foregoing, the evidence presented at trial did  not establish the necessary elements of plaintiff's negligent misrepresentation claim.  Defendants' respectfully request that this Court enter judgment in their favor and against plaintiff.

Respectfully submitted,

SWARTZ CAMPBELL LLC


BY:    s/ Jeffrey B. McCarron
        JEFFREY B. MC CARRON
        KATHLEEN M. CARSON
        1601 Market Street, 34th Floor
        Philadelphia, PA 19102
        (215) 299-4272

        Attorneys for Defendants

Dated: January 26, 2004

## CERTIFICATE OF SERVICE

I, Jeffrey B. McCarron, Esquire, counsel for defendants, Bruce J. Brown and Brown, Schultz Sheridan & Fritz, hereby certify that a copy of DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO F.R.C.P. 52 was served upon all counsel listed below by first class U.S. mail, postage prepaid on January 26, 2004

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA 17101

Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA 02110


s/Jeffrey B. McCarron
Jeffrey B. McCarron


Date: January 26, 2004