UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | |
|---|---|
| ) | |
| UNITED STATES FIDELITY AND ) | |
| GUARANTY COMPANY, ) | |
|     Plaintiff ) | |
| ) | CIVIL ACTION NO. 1:01-CV-00813 |
| v. ) | |
| ) | JUDGE CONNER |
| BRUCE J. BROWN and BROWN ) | |
| SCHULTZ SHERIDAN & FRITZ, ) | |
|     Defendants. ) | |
| ) | |

**UNITED STATES FIDELITY & GUARANTY COMPANY'S OPPOSITION TO
DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Pursuant to Fed. R. Civ. P. 52(c), United States Fidelity & Guaranty Company

("USF&G") hereby opposes the Motion for Judgment as a Matter of Law (the "Motion") filed by

Brown Schultz Sheridan & Fritz and Bruce J. Brown (collectively, "Brown Schultz") after the

close of evidence.  USF&G has introduced sufficient credible and persuasive evidence to justify

findings in its favor on all elements of its cause of action and an award of the damages it seeks.

In further support of its Opposition, USF&G avers and asserts as follows:

1.      Since January 15, 2004 when the Court denied a motion for judgment pursuant to

Fed. R. Civ. P. 52(c) presented by Brown Schultz at the end of USF&G's case-in-chief, no

reliable or trustworthy evidence that in any manner contradicts or lessens the weight of evidence

supporting USF&G has been introduced.  In fact, Brown Schultz' failure to present any credible

evidence in support of its defenses has made USF&G's case stronger and more compelling and,

ironically, by the testimony of William Eskin, bolsters USF&G's case.

2.    A detailed response to the approximately 144 averments that constitute Brown Schultz' "Motion" (as distinct from its memorandum of law) is neither necessary nor propitious. USF&G is unaware of any law or rule requiring (or even suggesting) that a detailed but unsupported list of factual averments is either necessary or desirable in the context of a motion pursuant to Fed. R. Civ. P. 52(c). Additionally, of the 144 averments in the Motion, only approximately 15 averments contain any references to the trial transcript or, for that matter, affidavits, exhibits or other document or source attesting to or verifying the accuracy of such averments.[1] Further, the Court has set deadlines in March for the submission of detailed proposed findings of fact which are to be supported by references to the record extant. To the extent possible, USF&G has endeavored to support the factual averments in its Memorandum by reference to appropriate exhibits and trial transcript references. However, as of February 4, 2004, the transcript for January 16, 2004 has not been received.

3.    Finally, Brown Schultz' motion to strike Steve DeBruyn's testimony, relegated to a footnote in the Motion, is both procedurally and substantively flawed. It does not conform to Local Rule 7.10, which requires a certification that counsel has sought concurrence. It also should have been raised prior to the close of evidence in this case. Additionally, it was not part of the briefing schedule contained in the Court's order dated January 26, 2004. Moreover, the stated basis for the motion is groundless. The Court has already ruled several times that Mr. DeBruyn is both competent to testify and that the substance and basis of his opinions are admissible.

---

[1] USF&G notes that, without limitation, the transcript references in paragraphs numbered in Motion at ¶s 74, 75, 100, 105, 106, 110, 111, 113, 114 and Memorandum of Law at p. 8 (N.T. 1934-35, 1933, 1939), p. 9 (N.T. 1536), p. 10 (N.T. 440), p. 14 (N.T. 1923) and p. 15 (N.T. 1924, 1910, 1911) of Brown Schultz' Motion provide no support for the averments that are alleged.

USF&G files herewith and incorporates herein by reference United States Fidelity & Guaranty Company's Memorandum of Law in Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law.

WHEREFORE, USF&G respectfully requests that the Court enter an order:

1.     Denying the Motion for Judgment as a Matter of Law; and

2.     Providing such other and further relief as is just and proper.


UNITED STATES FIDELITY AND
GUARANTY COMPANY,
By its counsel,


s/ Bruce D. Levin__
Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:     (617) 790-3000
Facsimile:     (617) 790-3300
blevin@bgblaw.com
pmcglynn@bgblaw.com
and
Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:     (717) 237-7100
Facsimile:     (717) 237-7105
pjs@tthlaw.com

Dated: February 5, 2004
#284235 v1/36432/87

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

_____
                                                                  )
UNITED STATES FIDELITY AND                   )
GUARANTY COMPANY,                              )
                    Plaintiff                                  )
                                                                  )         CIVIL ACTION NO. 1:01-CV-00813
v.                                                               )
                                                                  )         JUDGE CONNER
BRUCE J. BROWN and BROWN                     )
SCHULTZ SHERIDAN & FRITZ,                    )
                    Defendants.                            )
_____)

**UNITED STATES FIDELITY & GUARANTY COMPANY'S
MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

**I.  INTRODUCTION**

Pursuant to Fed. R. Civ. P. 52(c), United States Fidelity & Guaranty Company

("USF&G") hereby submits this memorandum in opposition to the Motion for Judgment as a

Matter of Law (the "Motion") filed by Brown Schultz Sheridan & Fritz and Bruce J. Brown

(collectively, "Brown Schultz") after the close of evidence.  USF&G has introduced sufficient

credible and persuasive evidence to justify findings in its favor on all elements of its cause of

action and an award of the damages it seeks.  Moreover, since January 15, 2004 when the Court

denied a motion for judgment pursuant to Fed. R. Civ. P. 52(c) presented by Brown Schultz at

the end of USF&G's case-in-chief, no reliable or trustworthy evidence that in any manner

contradicts or lessens the weight of the evidence supporting USF&G's claims has been

introduced.  In fact, Brown Schultz' failure to present any credible evidence in support of its

defenses has made USF&G's case stronger and more compelling and, by its introduction of the testimony of William Eskin, USF&G's case has been bolstered.

## II. **ARGUMENT**

A.     Legal Standard for Fed. R. Civ. P. 52(c).

Fed. R. Civ. P. 52 governs "judgment as a matter of law" in non-jury trials. *Cutaiar v. United States,* 1992 WL 151754 (E.D. Pa). Fed. R. Civ. P. 52 (C) provides, in pertinent part, that:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

Regardless of when rendered, any such "judgment [pursuant to Fed. R. Civ. P. 52(c)] shall be supported by findings of fact and conclusions of law . . . ." *Bowen v. Celotex Corp.,* 292 F.3d 565 (8th Cir. 2002). The Motion provides the Court no assistance relative to the delineated requirement. More importantly, the facts as adduced and the controlling law simply do not support the Motion.

B.     The Elements of Negligent Misrepresentation.

1.     *Prima Facie* Case For Negligent Misrepresentation.

USF&G's sole cause of action is for negligent misrepresentation. Negligent misrepresentation requires proof that (1) there was a misrepresentation of a material fact; (2) the representor either knew of the misrepresentation, made the misrepresentation without knowledge as to its truth or falsity, or made the representation under circumstances in which he ought to have known of its falsity; (3) the representor intended the representation to induce another to act

on it; and (4) injury resulted to the party acting in justifiable reliance on the misrepresentation. *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F.Supp. 577 (M.D. Pa. 1999); *Gibbs v. Ernst*, 538 Pa. 193, 209, 647 A.2d 882 (1994). Negligent misrepresentation differs from intentional misrepresentation in that the defendant "need not know his or her words are untrue, but must have failed to make reasonable investigation of the truth of those words." *Gibbs v. Ernst*, 538 Pa. at 210. The plaintiff need not prove that the defendant knew of the falsity of the representation; it is sufficient to prove that the defendant "should have known." *Id.* at 213. Moreover, the word "intent" is not limited to the subjective state of wishing to bring about a certain result. Rather, the word "intent" means that the actor merely desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts §8A (1964).

As discussed below, USF&G has introduced evidence sufficient to justify findings in its favor on all of the delineated elements of its *prima facie* case. Brown Schultz, on the other hand, presented no credible evidence that contradicted or lessened USF&G's case.

2.      Brown Schultz Misconstrues USF&G's Burden Of Proof Of A Misrepresentation.

Brown Schultz has repeatedly asserted that it allegedly made no misrepresentations regarding the audited financial statements for the years ending December 31, 1997 and December 31, 1998 (the "Audited Financial Statements") because it purportedly made no representations. As discussed in greater detail in Section D, *infra*, Brown Schultz has made several representations in the Audited Financial Statements that it knew or should have known were false. Moreover, Brown Schultz' assertion at pages 8-9 of Defendants' Memorandum of Law in Support of its Motion for Judgment as a Matter of Law Pursuant to F.R.C.P. 52 ("Defendants' Memo") that either an omission or a failure to provide an explicit representation

cannot constitute a misrepresentation is legally incorrect and factually irrelevant. Defendants'

Memo, at pp. 8-9. "To be actionable, a misrepresentation need not be in the form of a positive

assertion but is any artifice by which a person is deceived to his disadvantage and may be by

false or misleading allegations . . . ." *Sylk v. Bernsten*, 2003 WL 1848565, 4 (Pa. Com. Pl.),

quoting *Wilson v. Donegal Mutual Insurance Co.*, 410 Pa. Super. 31, 41 (1991).

The cases cited by Brown Schultz at Defendants' Memo at pp. 8-9 regarding USF&G's

burden of proof of a false statement are easily distinguished from the instant case because they

involve circumstances in which the parties made complete omissions which standing alone

supported the cause of action for negligent misrepresentation. For example, in *Lazin v. Pavillon

Partners,* 1995 WL 614018 (E.D.Pa), the plaintiff entered into an agreement to develop a hotel

conference center on an 3.16 acre site. However, that agreement only remained in effect until a

certain date, when the Commonwealth terminated it. After the agreement terminated, the

defendant purchased the 3.16 acres from the Commonwealth without informing the plaintiff,

although defendant had an agreement with the plaintiff that contained a non-compete clause.

The plaintiff argued that the defendant's failure to inform constituted a misrepresentation. In

discussing these facts, the District Court held that defendant's omission by itself did not

constitute a negligent misrepresentation. More importantly, these facts raise the question of

whether a party has a duty to speak under certain circumstances. *Weisflatt v. Minnesota Mutual

Life Insurance Co.,* 4 F.Supp. 2d 371 (E.D. Pa. 1998). The foregoing analysis is unnecessary

here because USF&G does not allege that Brown Schultz made any omissions that standing

alone constituted misrepresentations. In contrast, as discussed in Section D(3), *infra*, the

disclosures made by Brown Schultz regarding Pennsylvania Contractors Insurance Corporation

("PCIC") are, at best, half-truths, and perhaps, outright deceptions.

Moreover, an omission may be actionable if the "defendant has revealed some relevant, material information even though he had no duty (i.e., a defendant may not deal in half-truths)". *Fox Foods, Inc. v. Kmart Corp.*, 870 F.Supp. 599, 610 (M.D. Pa. 1994). Pursuant to FAS 57 and Brown Schultz' audit plans, Brown Schultz had a duty to not only disclose certain information regarding related transactions between CCI Construction, Inc. ("CCI") and PCIC, but to present all information "deemed necessary to an understanding of the *effects of the transactions on the financial statements*." (emphasis added). FAS 57, ¶2(b), Exhibit "A" for ID; Exhibit 222, p. 184 (CCX-13a) (related party disclosures must contain "such other information deemed necessary to an understanding of the effects on the transactions on the financial statements.").

C.    The Auditor's Standard Of Care And Pertinent Auditing Standards.

    1.    An Auditor Should Adhere To The Requirements Of GAAS.

Generally Accepted Auditing Standards ("GAAS") comprises the standards and procedures which must be followed in the planning, preparation and issuance of an audit report by a Certified Public Accountant. The phrase "generally accepted auditing standards" represents the "general standards of conduct relating to the auditor's professional qualities as well as to the judgments exercised by him in the performance of his examination and issuance of his report." *SEC v. Arthur Young & Co.*, 590 F.2d 708, 785 n.2 (9th Cir. 1979).

One of the primary objectives of an audit is to identify high-risk audit areas and to plan the audit procedures accordingly. In connection with construction contractor audits "[M]uch of the independent auditor's work involves evaluating subjective estimates relating to future events a process which involves highly technical data." AICPA Audit and Accounting Guide Construction Contractors, p. 43 (Exhibit 360). In particular, the "ultimate focus of the [construction] audit has to be on substantiating the reasonableness of gross profits on contracts,

which usually includes a substantial estimated portion."  PPC Guide to Construction Contractors, Section 520.05.  Exhibit "A" for ID, Tab 16(E).

Brown Schultz' audit planning and its audit procedures fell below those applicable standards of care of a certified public accountant performing an audit of CCI's financial statements.  In particular, some of the material ways in which Brown Schultz failed to conform its audit work for CCI to GAAS and other applicable audit standards are as follows:

- GAAS requires that all auditors conduct sufficient tests to determine the reliability of management's estimates.  SAS No. 57, AU Section 342.  "The auditor is responsible for evaluating the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole.  As estimates are based on subjective as well as objective factors, it may be difficult for management to establish controls over them.  Even when management's estimation process involves competent personnel using relevant and reliable data, there is potential for bias in the subjective factors.  Accordingly, when planning and performing procedures to evaluate accounting estimates, the auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors."  *Id.* at AU §342, ¶.04, Exhibit "A" for ID, Tab 4.  Brown Schultz ignored its responsibilities and engaged in "conversational auditing" because of its belief in the purported "high integrity" of CCI's management.  Exhibit 213, p. 44; Exhibit 222, p. 20.  (Bowman Transcript, pp. 1339-41);

- GAAS requires all auditors to exercise "due professional care…in the performance of the audit and the preparation of the report."  SAS No. 1, AU Section 230.  Exhibit "A" for ID, Tab 2.  Included in the foregoing section, is the fact that due professional care requires the auditor to exercise professional skepticism.  Significant

testimony was adduced at trial that Brown Schultz failed to act with sufficient

professional skepticism and was not diligent in evaluating audit evidence;

> • GAAS also requires that audit field work must be "adequately planned and
properly supervised." SAS No. 22, AU Section 311. Exhibit "A" for ID, Tab 7. Brown
Schultz' planning documentation for the audit reports for 1997 and 1998 remained
virtually *unchanged* from those of earlier years, despite the fact that CCI had experienced
significant growth in those years, was self-performing more work (some of which CCI
experienced significant problem work), had acquired millions of dollars of new
equipment and had exhibited significant profit fades on a number of jobs;

> • GAAS requires that the auditor properly address the risks involved in the
audit. SAS No. 1, AU Section 230 and SAS No. 22, AU Section 311. Brown Schultz did
not modify or change its audit procedures or its approach to the audit work for CCI; and,

> • GAAS requires that an auditor insure during its performance of audit field
work that "sufficient competent evidential matter . . . was obtained . . . ." SAS No. 31,
AU Section 326. Exhibit "A" for ID, Tab 3. Brown Schultz' limited testing of, among
other things, accumulated job costs and subcontractor costs were violative of this auditing
standard.

2.    The Standard Of Professional Care For Accountants.

The standard of care for accountants has been expressed as follows:

> Accountants and auditors have the duty to exercise that degree of
> care, skill and competence exercised by reasonably competent
> members of their profession under the circumstances . . . .

*Robert Wooler Co. v. Fidelity Bank*, 330 Pa. Super. 523, 479 A.2d 1027 (1984); *Matter of*

*Hawaii Corp.*, 567 F.Supp. 609 617 (D. Hawaii 1983); Restatement (Second) of Torts §229A,

comment b (standard is applicable to accountants).  Compliance with GAAS does not necessarily establish satisfaction of the duty of care.  *Bily v. Arthur Young & Co.*, 271 Cal. Rptr. 2d 470, 475-76 (Cal. App. 1990).  However, a breach of duty may be found when an accountant does not adhere to the rules and standards of his profession, such as GAAS.  *Rhode Island Hospital Trust National Bank v. Swartz, Bresenoff, Yavner & Jacobs*, 455 F.2d 847 (4th Cir. 1972). Pennsylvania regards a violation of a professional standard as evidence of negligence but not negligence *per se*.  *Edwards v. Brandywine Hospital*, 438 Pa.Super. 673, 652 A.2d 1382 (1995).

In evaluating whether an accountant complied with the requisite standard of care, most courts consider whether the accountants complied with their own internal accounting manuals and other internal procedures.  *Bily v. Arthur Young & Co.*, 271 Cal. Rptr. at 476 (internal manuals can properly be deemed relevant to the broader standard of care); *see also,*  Spellmire, Baliga & Winiarski, *Accounting Auditing and Financial Malpractice*, §3.06, p. 45 (Harcourt Brace 1998).

D.     **USF&G Has Proven That The 1997 and 1998 Audited Financial Statements Were Inaccurate And Contained Material Misstatements.**

     1.     Brown Schultz Made Numerous Misrepresentations In The 1997 And 1998 Audited Financial Statements.

As an initial matter, the rhetoric employed by Brown Schultz in support of its contention that USF&G has failed to prove the existence of any misrepresentations is at variance with a significant body of evidence to the contrary.  Additionally, certain statements regarding the use of estimates contained in footnote 1, the Summary of Significant Accounting Policies of each of the Audited Financial Statements – which merely informs the reader of management's use of estimates – neither vitiates the explicit representations made in the Audited Financial Statements

nor immunizes Brown Schultz from the consequences of its failure to adhere to professional accounting standards.

Both of the Audited Financial Statements are prefaced by an introductory letter referred to as the Independent Auditors' Report, which contain the following representations: (1) "[Brown Schultz] conducted [its] audits in accordance with generally accepted auditing standards"; (2) the "audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements"; (3) an audit "includes assessing the accounting principles used and significant estimates made by management . . . "; and (4) that "the financial statements . . . *present fairly, in all material respects the financial position of CCI* . . . ." (emphasis supplied). To the extent that such representations are demonstrably false, they are misrepresentations. Thus, having represented that it conducted its audits "in accordance with generally accepted auditing standards" and that the financial statement "present fairly" the financial position of CCI, evidence that GAAS was not followed or that the financial statements do not "present fairly" the financial position of CCI would directly and unequivocally contradict explicit representations in the Independent Auditor's Report.

    2.    The Estimated Completion Costs And Profits Contained In The 1997 And 1998 Audited Financial Statements Were Not Fair Presentations, In All Material Respects, Of CCI's Estimated Costs And Profits As Of December 31, 1997 And December 31, 1998.

USF&G has introduced credible evidence demonstrating that Brown Schultz failed to conduct its audits of CCI in accordance with GAAS and in a competent and professional manner, that the Audited Financial Statements materially misrepresented CCI's true financial condition, that Brown Schultz knew or should have known of the falsity of its representations and that Brown Schultz intended its representations to induce another to act thereon. Highlights of this evidence follows.

Stephen J. DeBruyn ("DeBruyn"), a Certified Public Accountant with significant experience in construction industry audits, testified that the Audited Financial Statement for the year ended December 31, 1997 (the "1997 Audit") incorrectly represented that CCI produced a net profit of $706,879.00 when, in fact, CCI actually *lost* $109,801.00.  (DeBruyn Transcript, p. 1783).  The Audited Financial Statement for the year ended December 31, 1998 (the "1998 Audit") incorrectly showed that CCI produced a profit of $59,041.00 when, in fact, CCI actually lost $3,067,467.00.  (DeBruyn Transcript, p. 1786).  Exhibits 34, 36, 186 (I.D. only), Exhibit 365B (ID only).  Mr. DeBruyn opined that the significant variance between CCI's net profits as represented in the 1997 and 1998 Audited Financial Statements and Brown Schultz' actual net profits (losses) was the result of Brown Schultz' failure to utilize due care and to adhere to professional standards.  (DeBruyn Transcript pp. 1751-52; 1760-63).  Donald Brenner, the unlicensed professional witness retained by Brown Schultz, stated that he was unable to testify that CCI's financials complied with GAAP, an express representation made in the Independent Auditor's Reports in both the 1997 and 1998 Audited Financial Statements.  (Brenner Transcript p. 2876).

The delineated misrepresentations and gross financial disparities were caused by many errors and auditing failures, some of the more egregious of which are discussed below. Summarily, by failing to adjust and implement an audit plan sufficient to address CCI's increasing risk profile, ignoring obvious weaknesses in CCI's internal controls and disregarding CCI's difficulties in estimating completion costs and profits, Brown Schultz' Independent Auditor's Reports provided an unqualified opinion for seriously and incorrect financial statements.  Accordingly, the Audited Financial Statements failed to provide accurate information in the areas that are of critical concern to the auditor of a construction company and

that are of vital importance to surety bond underwriters; to wit, revenue recognition and the company's ability to profitability complete its contracts.

Testimony at trial demonstrated that CCI's audit risk profile changed markedly between the early 1990's and the year ended December 31, 1998. Both Bruce J. Brown ("Brown") and Deborah Bowman ("Bowman") testified that they were aware of various significant changes in CCI's circumstances and operations, including CCI's decision to engage in increasingly greater amounts of self-performing work. (Brown Transcript pp. 1201-04; Bowman Transcript, pp. 1343-44). These and other factors shown in Brown Schultz' workpapers constituted significant audit risks. See, e.g., Exhibit 213, pp. 39-44; Exhibit 222, pp. 13-20. Despite proof of the foregoing risks, Brown and Bowman admitted that the audit plans for CCI remained essentially the same from 1993 until 1998. (Brown Transcript, pp. 910, 912 and 1201-02; Bowman Transcript, pp. 1313, 1318 and 1384). Additionally, despite Brown Schultz' knowledge of numerous problems with subcontractor defaults and the inherent difficulties in self-performing work, no adjustments to the audit plans were ever made. Moreover, Brown admitted – and the working papers reinforce – that despite an increase in CCI's audit risk profile, the actual audit work performed by Brown Schultz for the fiscal years ended December 31, 1996, 1997 and 1998 (and the audit fees) did not change significantly from year to year. Exhibits 109, 110, 111, 112, 113 114, 213, 222. (Brown Transcript, pp 910, 912, 1201-02).

The estimated costs-to-complete CCI's contracts schedule contained in the 1997 and 1998 Audited Financial Statements were also deficient because Brown Schultz relied on CCI's representations as to such costs and job profitability *with no documentation substantiating the fact that CCI's management estimates were reasonable other than the fact that they had allegedly been verified by Sherri Phillips, CCI's Chief Financial Officer and/or Stan Sechrist,*

*CCI's Vice President - Construction Operations.*  In fact, Brown Schultz' audit work of CCI is a paradigm of "conversational auditing."  DeBruyn testified that Brown Schultz either misunderstood or ignored the requirements of both SAS No. 57, Auditing Accounting Estimates (Professional Standards, AU Section 342), and the AICPA Audit and Accounting Guide for Construction Contractors §10-33 *et seq.*, and did not follow the standards and guidelines therein to properly assess the reasonableness of CCI's management's estimates.  (DeBruyn Transcript, pp. 1762-66; 1815-16).  Evidence that CCI's estimates were unreasonable was found in Brown Schultz' working papers which show that in 1998, for example, CCI was estimating gross profits on several contracts-in-progress that were *materially higher than its historical or originally projected amounts.*  Exhibits 213, 222.  Subsequent review of these projects revealed that these contracts had significant profit fades.  Exhibits 326, 337.  Disturbingly, Brown Schultz' working papers merely contained comments such as "good buyout," "good buy," "no problems and none anticipated," and "job was bid very tight," on the very projects that proved to later have serious losses.  Exhibits 222, p. 272, 273, 279; Exhibit 213, pp. 249, 251, 253, 255.  Brown Schultz' working papers also revealed a carelessness in documenting CCI's initial profit percentages in its 1997 and 1998 work-in-progress comparative analysis.  See Exhibit 213, p. 251 and Exhibit 222, p. 275 (Job 451 – Lord Fairfax ?  CCI's initial profit allegedly rose from 4.34% in 1997 to 10.11% in 1998); and see Exhibit 213, p. 249 and Exhibit 222, p. 258 (Job 445 – Houtzdale Prison ?  CCI's initial profit allegedly rose from 1.94% in 1997 to 4.21% in 1998).  Such carelessness in documenting CCI's initial profit estimates – one of several critical aspects of contract estimating – creates a strong inference that Brown Schultz was careless in other aspects of its audits of CCI's financial statements.

It is undisputed that Brown Schultz made no job site visits. Both DeBruyn and Brenner acknowledged the efficacy of job site visits in appropriate circumstances. (DeBruyn Transcript pp. 1807-08; Brenner – Day 13, transcript unavailable). Among the reasons why a job site visit by an auditor may be necessary is "[t]o gain an understanding of those components of internal control maintained at the job site." AICPA Audit and Accounting Guide Construction Contractors, p. 57 (Exhibit 360). This is particularly true if there are troublesome jobs or where accounting functions are performed at the project site. *Id.* at 59. There was evidence adduced at trial that some accounting and purchasing functions were performed by CCI at the job site level. Exhibits 356 and 357. In light of the troublesome jobs identified in Brown Schultz' working papers, the significant profit fades which occurred, and the many other risk factors extant, job site visits should have been conducted and would likely have altered Brown Schultz that the projects were in worse shape and job costs higher than represented by CCI's management.

Bowman was Brown Schultz' "main" person involved in the CCI audits. Exhibit 348, p. 2. Bowman's lack of experience – having audited only 2 other general contractors – was demonstrated by her problems with CCI's job cost estimates and the PCIC audit. (Bowman Transcript, pp. 1283-84). Exhibit 302. Brown's failure to adequately supervise his employees, including Bowman, also likely contributed to the many errors extant. In that Brown describes his employees as merely "fairly competent," close supervision would have been appropriate. Exhibit 348, p. 1.

The analysis utilized by DeBruyn to determine the extent of Brown Schultz' failures was conservative, logical and consistent. By means of a footnote to paragraph 38 of the Motion, Brown Schultz moves – for the umpteenth time – to strike or to bar DeBruyn's testimony.

Again, the criticism of his testimony is inappropriate and wholly unsupported.[2]  The evidence

adduced at trial demonstrated that DeBruyn's testimony is predicated not only on an accepted

and logical methodology, but based upon credible data that is in evidence.

Brown Schultz' criticism of the "look back" method not only ignores the pertinent law,

but also the considerable testimony adduced in favor of such methodology.  Not only is such

method codified in the Internal Revenue Code, 26 U.S.C. §460(b), but appropriate variants

(including the "book of wisdom") have been used in a variety of cases from patent litigation to

eminent domain.  *E.g., Sinclair Ref. Co. v. Jenkins Petroleum*, 280 U.S. 698 (1933); *Washington*

*Metropolitan Area Transit Authority v. One Parcel of Land in Prince George's County,*

*Maryland*, 1993 WL 524783 (D. Md.).  DeBruyn also testified that this methodology was used

and employed by members of his profession and, further, that it was a reliable tool for analyzing

and restating financials.  (DeBruyn Transcript, pp. 1817-18).  Moreover, DeBruyn testified that

with respect to the 1997 audit, not only would Brown Schultz have been able to restate it based

on the 1998 Audit, but if it had done so by extending its audit procedures to adequately test the

estimated costs to complete, the inadequacies of CCI's estimates would have been apparent.

(DeBruyn Transcript, pp. 1819-20).  DeBruyn's testimony easily meets the Third Circuit's

liberal standards favoring admissibility of non-scientific evidence.  *See, e.g., In re. Unisys Sav.*

*Plan Litig.*, 173 F.3d 145, 157 (3d Cir. 1999).  Additionally, Brown Schultz has chosen to fully

ignore DeBruyn's rebuttal testimony in which, *inter alia*, he demonstrated that no mistakes were

made in the restated financials or in his analysis and that the "look back" method had been

---

[2] The long history of Brown Schultz' pre-trial attempts to prevent or to strike DeBruyn's testimony is detailed in Section II of USF&G's Opposition to Brown Schultz' Motion-in-Limine to Preclude the Testimony of Plaintiff's Expert Steve J. DeBruyn, filed on or about October 13, 2003.

applied consistently and conservatively therein.  (DeBruyn Transcript, Day 13 – currently

unavailable).[3]

The only aspect about DeBruyn's testimony that has not been previously and repeatedly

raised by Brown Schultz – and responded to by USF&G – is Brown Schultz' assertion that

DeBruyn's testimony is improper because it is based, in part, on Exhibit 337, a balance sheet

dated December 31, 1999 internally prepared by CCI which Brown Schultz indicates was

unaudited.  Exhibit 337 is a copy of an income statement and balance sheet for CCI for the

period ending December 31, 1999.  It was fully admitted into evidence for all purposes.

Absolutely no testimony or documents adduced at trial call into question the credibility of the

document or the financial data therein.  James Daily testified that (1) the information on Exhibit

337 was of the type that USF&G regularly requested from CCI; (2) USF&G regularly relied

upon such information provided by CCI relative to its underwriting decisions; and (3) Exhibit

337 was submitted as part of a package of information by CCI to USF&G in connection with

CCI's request for financing.  (J. Daily Transcript, pp. 408-12).  Likewise, although Sheri Phillips

admitted to grave doubts about the accuracy of CCI's projections regarding contract completion,

she never indicated that CCI's in-house financial statements were not reliable.  (S. Phillips

Transcript, pp. 2124-25).  If anything, Sheri Phillips' concerns would have encouraged

conservatism in preparing financials to be provided to a third party.  William Eskin found the

financial information provided to him by Sheri Phillips to be reliable.  Exhibit 750.

The accuracy of Exhibit 337 – as well as Brown Schultz' multitude of errors in testing

estimated costs and profits – is also demonstrated by considerable evidence that CCI's ultimate

financial failure was not the result of a calamitous event but, rather, the natural result of its

---

[3] Brown Schultz' expert, Brenner, also admitted that a form of the "look back" method is used to restate financial statements where errors have been made.  Brenner Testimony, Day 13 (transcript currently unavailable).

inability to profitably complete a contract.  Brown Schultz' working papers are replete with references that not only are projects proceeding well, but there are "no problems and none anticipated" as of December 8, 1999.  Exhibit 145, p. B-2A.  Sheri Phillips testified that she did not recollect any labor strikes, uninsured losses or other events outside the ordinary course of business in 1999 that would have precipitated CCI's collapse.  (Phillips Transcript, pp. 2127-2128).  A memorandum prepared by William Eskin dated November 17, 1999 provides, *inter alia*, that "[p]er my discussion with Sherri it was represented there are no significant contingent liabilities (lawsuits, etc.) which would have a material impact on the company and would preclude them from completing their bonded obligations."  Exhibit 750, p. 5.  Brown Schultz did not call CCI's President, John Ortenzio, and introduced no evidence that CCI's failure was attributable to any calamitous act.

DeBruyn testified that Brown Schultz failed to meet the minimal professional standards regarding its working papers.  (DeBruyn Transcript, pp. 1751-52; 1763-64).  This is important not merely on technical grounds but because Brown Schultz claims to have conducted numerous tests and examinations that are simply *not* indicated in its working papers.  When evaluating the contents (or lack thereof) of Brown Schultz' working papers, the Court should do so cognizant that "[p]rofessional standards require an auditor to obtain sufficient audit evidence to afford a reasonable basis for his audit opinion."  Exhibit "A" for ID, Tab 3.  AICPA SAS no. 31, "Evidential Matter" (1980).  Further, any excuses for the omission of information from working papers - intentionally or otherwise - should be viewed skeptically in light of the fact that working papers have a "common purpose - to document the work done, and to preserve a body of evidence adequate in amount and quality and so organized as to lean logically to the professional conclusion expressed."  R. J. Gormley, *The Law of Accountants and Auditors*, ¶3.03[1], p. 3-26

(Warren, Gorham & Lamont 1981).  Moreover, an audit that was adequate in fact may be ruled

inadequate in law because of a failure of proof through lack of documentation.  *Adams v.*

*Standard Knitting Mills, Inc.,* 623 F. 2d 422, 435 (6th Cir. 1980) (The "District Judge evidently

inferred from [accountant's] failure to document such testing in its work papers, that the testing

did not occur.  The record also establishes adequate foundation for this inference.")

  Brown Schultz cannot shrug off its responsibilities by relying on the "Use of Estimates"

disclosure language in footnote 1 of both the 1997 and 1998 Audited Financial Statements.  An

"estimates" footnote of the type utilized by Brown Schultz is required by Statement of Position

94-6, Disclosure of Certain Significant Risks and Uncertainties ("SOP 94-6").  Exhibit "A" for

ID, Tab 19B §§1408.1 and 1408.11.  SOP 94-6 requires financial statement disclosures to

include an explanation that preparation of financial statements requires the use of management's

estimates.  This "acknowledges that the disclosure will usually be standardized (*that is,*

*boilerplate*)."  (emphasis supplied).  The disclosures required in SOP 94-6 "focus primarily on

risks and uncertainties that could significantly affect the amounts reported in the financial

statements *in the near term . . . .*"  SOP 94-6, ¶.02 (emphasis supplied).  "Near term" is defined

as "[a] period of time not to exceed one year from the date of the financial statements."  SOP 94-

6, ¶.07; Exhibit A, Tab 19B §1408.18.  Accordingly, the requisite footnote is not a disclaimer of

liability but, rather, serves merely to inform the reader that the estimates may change with time.

In the context of construction projects, estimates sometimes change as the project proceeds and

the contract edges toward completion.  The delineated notification of anticipated change is not

tantamount to notification that the estimates *as of a date certain* are incorrect or that the auditor

has not determined the reliability of management's figures, as is required by SAS 57.

Moreover, the boilerplate language in footnote 1 to the Audited Financial Statements regarding the use of estimates – by its own terms – does not immunize Brown Schultz from liability for failing to properly test management's estimates. Not only does the Independent Auditor's Report for CCI make specific representations concerning the financial statements and the audit work purportedly performed by Brown Schultz, they acknowledge that "it is at least reasonably possible that the estimates *will change* within the *near* term." (emphasis supplied). Exhibits 34, 36. However, the Audited Financial Statements and Brown Schultz' representations related thereto neither concern nor predict future results but, instead, represent as of *a date certain* (December 31, 1997 and December 31, 1998) the financial statements "present fairly" and "in all material respects" CCI's financial position. Likewise, that "actual results *could* differ from those estimates" does not vitiate the representation that as of a date certain, Brown Schultz' representations are true or, at minimum, have been reviewed with "professional skepticism."

3.    Brown Schultz' Disclosure Of The PCIC Claim Guarantee And The Booking Of The Claim Amount As An "Underbilling" Violated GAAP And Brown Schultz' Related-Party Disclosure Standards.

(a)    Brown Schultz failed to comply with SOP 81-1.

Evidence was introduced by USF&G which demonstrated by a preponderance of the evidence that the mischaracterization of related-party transactions between CCI and PCIC as revenue in the 1998 Audit constituted serious misrepresentations and a failure of Brown Schultz to exercise due care in the performance of its audit work. The evidence adduced at trial leads to but one conclusion; viz, the 1998 Audit was materially misleading. If the mischaracterized amount is removed from revenue – as is required by GAAP – what appears to be a profitable year for CCI is revealed to be, in fact, a $1.1 million dollar *loss*. DeBruyn testified that the CCI claim of $1,162,460.00 relative to the Mahanoy Prison Project ("Mahanoy Claim") did not meet

the recognition standards for *revenue* set forth in AICPA Technical Aids, Statement of Position

("SOP") 81-1, Accounting for Performance of Construction-Type and Certain Production-Type

Contracts, July 15, 1981.  (DeBruyn Transcript, pp. 1826, 1830-31).  SOP 81-1, par. 65 states

that recognition of construction revenue relating to claims is appropriate only when it is

"probable" the claim will result in additional revenue and the amount can be reliably estimated.

However, in purportedly satisfying those requirements, Brown Schultz failed to document any

evidence that: (1)  There was a legal basis for the claim or a legal opinion had been obtained

(SOP 81-1 par. 65 a); and (2) The evidence supporting the claim was objective and verifiable and

not based upon management's "feel" for the situation or on unsupported representations (SOP

81-1, par. 65(d).

Brown admitted that there was no documentation in the working papers demonstrating

the foregoing.  (Brown Transcript, pp. 129-30, 134-35, 1065, 1074, 1209 and 1213-15).  Brown

Schultz' failures are particularly curious in that legal opinion letters had been obtained in a prior

CCI audit with respect to coverage under a PCIC "Remedial Work Insurance Policy" in 1999.

Exhibit 99.  Moreover, *Brown admitted that the sum of $1,162,460.00 included in revenue and*

*attributable to the Mahanoy Claim contains a double-counting of a subcontractor claim to*

*Johnson Masonry of approximately $448,000.00.*  (Brown Transcript, pp. 1080-81).  Exhibit 222,

p. 95.  Even if, *arguendo*, the Mahanoy Claim could properly have been included in revenue, the

amount of such claim is overstated by approximately $448,000.00 in a manner directly bearing

on CCI's profitability.[4]  As noted earlier, glaring errors such as this create a strong inference that

Brown Schultz' carelessness was pervasive.

---

[4] Standing alone, this mistake would have changed CCI's profit in the 1998 Audit of $59,041 to a *loss* of $389,000.

As appears in Brown Schultz' working papers, PCIC issued a Guaranty Agreement dated December 1, 1998, which purports to guarantee full payment of the Mahanoy Claim in the amount of $1,200,000.00.  Exhibit 264.  Brown also admitted that sometime thereafter in 1999, a new Guaranty Agreement backdated to December 1, 1998, was executed in the amount of $1,162,460.00, the *exact* amount of the Mahanoy Prison Claim submitted to the Commonwealth of Pennsylvania.  Exhibit 265.  (Brown Transcript, p. 1064).  Why the Guaranty Agreements were needed – particularly in light of the existence of the putatively valid Remedial Work Insurance Policy, discussed *infra* – has never been adequately explained.  At trial, Bowman claimed not to know why the Mahanoy Claim was guaranteed by PCIC.  (Bowman Transcript, pp. 1364-65).  Additionally, the harried creation of the two Guaranty Agreements immediately before – and after – the close of CCI's books for the year ended December 31, 1998 is more than a little suspicious.  This is particularly true in that, as Sherri Phillips testified – and is evidenced in the working papers – as of October 31, 1998, CCI was projected to lose $1,161,448.43 – an amount which is *almost identical to the amount of the Mahanoy Claim and the latter of the two Guaranty Agreements*.  Exhibit 222, p. 23.  (S. Phillips Transcript, p. 2137).

Moreover, as Brown admitted that there had been *no* consideration given to PCIC for the Guaranty Agreements nor is there any consideration recited in the Guaranty Agreements.  (Brown Transcript, p. 1216).  Such lack of consideration renders the Guaranty Agreements invalid as a matter of law.  *Alcorn v. Christian*, 1897 WL 4127, *2 (Pa. Super).  The Motion provides no legal authority regarding any valid consideration nor did Brown Schultz produce one iota of evidence at trial that any consideration for the Guaranty Agreements was exchanged.  As pointed out earlier, Brown admitted to having consulted no legal authority regarding the validity of the Guaranty Agreements nor is there any opinion letter in Brown Schultz' working papers

regarding such agreements.  Brown Schultz' working papers show that Brown Schultz was familiar with SAS No. 73 – using the work of a specialist and the prescription therein that the auditor lacks the expertise to interpret or asses the legal significance of contracts.  Exhibit 272.

The Mahanoy Claim was, in the main, a claim for allegedly unforeseen increased expenses and costs allegedly incurred by CCI attributable to *owner-caused delays and unusually severe winter conditions*.  (Brown Transcript, p. 1062); Exhibit 222, p. 284.  The Mahanoy Claim was purportedly covered by the Remedial Work Insurance Policy issued by PCIC.  However, *that insurance policy issued by PCIC is limited to remedial work claims*.  In fact, it is entitled "Remedial Work Insurance Policy."  Exhibits 59, 222.  This policy also contains a detailed set of procedures which must be followed as part of the claims submissions and approval process.  Both Bowman and Brown admitted that no analysis was done to determine whether the Mahanoy Claim was covered by the PCIC policy or if the requisite claims procedures were followed and no analysis is documented in Brown Schultz' work papers.

In 1998, PCIC paid CCI $900,000.00 on two "remedial work claims" related to the Mahanoy Project.  The amount of $448,000.00 was paid purportedly because CCI's masonry subcontractor – Johnson Masonry – defaulted.  The amount of $452,000.00 was paid purportedly because CCI's mechanical work "was impacted as a result of union issues and default of [its] sheet metal fabricator."  Neither of these claims is "remedial."  Moreover, as discussed, *supra*, the purported payment to Johnson Masonry was counted *twice* in the computation of the $1,162,460 Mahanoy Claim amount submitted to the Commonwealth of Pennsylvania and purportedly guaranteed by PCIC.  Brown did not dispute the double counting and Donald Brenner testified that although he charged Brown Schultz in excess of $90,000 for his expert witness services to Brown Schultz' law firm, he was never asked to render an opinion regarding

this grievous error.  (Brown Transcript, pp. 1080-81; Brenner Transcript, Day 13 – currently unavailable).

Further, the testimony of Brown and Bowman revealed that not only are there serious doubts about PCIC's ability to pay claims as of December 31, 1998, but that there is no analysis of this concern in the working papers.  In fact, Bowman admitted that Brown Schultz was unable to give PCIC an unqualified audit opinion or to issue a solvency opinion to the Superintendent of Insurance for the Turks and Caicos Islands.  Exhibit 295.  (Bowman Transcript, p. 1267).

Even if, *arguendo*, a rational reason for guaranteeing a claim purportedly covered by a remedial insurance policy exists – and none has been proffered by Brown, Bowman or Sherri Phillips – DeBruyn's testimony was unequivocal that the Guaranty Agreement executed by PCIC in favor of CCI and suspiciously dated less than a month before the close of CCI's books for the year ended December 31, 1998 simply does not support the recognition of $1,162,460.00 in revenue for CCI for the year ended December 31, 1998, as recorded in the 1998 Audit Report. (DeBruyn Transcript, pp. 1825-1830).

> (b)    Footnote 8 to the 1998 Audit does not contain an Adequate Disclosure of the PCIC Claim Guaranty.

Footnote 8 to the 1998 Audit states that a claim in the amount of $1,162,460 had been guaranteed by PCIC.  However, neither footnote 8 nor anything else in the 1998 Audit contained any information indicating that it related to the Mahanoy Prison payment or that had been *included as revenue* for CCI in 1998.  Additionally, footnote 8 did not satisfy the AICPA's or Brown Schultz' audit plan requirement that a disclosure reveal the "effect" of related-party transactions on the financial statements.  Exhibit 222, p. 184 (checklist in Brown Schultz' working papers indicating that, as to footnote 8, related party actions were being described to the extent "deemed necessary to an understanding of the effects of the transactions on the financial

statements"). Brown Schultz self-imposed duty is apparently based on FAS 57 which provides, in pertinent part, that the description of related-party transaction should include "information deemed necessary to an understanding of the effects of the transactions on the financial statements". FAS 57, ¶2(b). It should be noted that in a prior audit for CCI, Brown Schultz provided a separate line-item in the revenue section of the balance sheet of the 1999 audited financial statements for a PCIC insurance claim. Exhibit 31.

        (c)     Brown Schultz' treatment of the Mahanoy Claim is misleading.

USF&G introduced credible testimony that its underwriters believed that footnote 8 in the 1998 Audit merely meant that if CCI did not receive a payment of all or a portion of the unnamed project related claim, PCIC would guaranty payment of the unpaid portion at some indeterminate time in the future. James Daily never understood that the guaranty related to Mahanoy Prison payment or that it was included as *revenue* in the 1998 Audit Report. (J. Daily Transcript, pp. 393, 394, 396, 696). Most importantly, James Daily testified that USF&G would have ceased to issue bonds if it knew that the Mahanoy Claim had been included in "underbillings." (J. Daily Transcript, pp. 393, 394, 396, 397). Anthony Phillips testified likewise. (A. Phillips Transcript, p. 2472). James Daily also testified that as to the importance of the revenue and underbilling sections of a financial statement to an underwriter. (J. Daily Transcript, pp. 212, 307 and 308). Interestingly enough, even Rolf Neuschaefer ("Neuschaefer"), a purported "expert" retained by Brown Schultz, admitted that in reading the 1998 Audit there was nothing that would have informed him that the Mahanoy Claim has been included as revenue. In fact, Neuschaefer also admitted that he could not have identified that the claim was included in revenue by reading Footnote 8. (Neuschaefer Transcript, pp. 2349-50, 2357).

The inappropriateness and misleading nature of the erroneous revenue recognition is not assuaged by any payments made by PCIC in *subsequent* fiscal years. Brown Schultz' averment that the misleading and detrimental effects of the improper recognition of revenue was nullified by payments purportedly made by PCIC in 1999 fails to address the one germane issue; to wit, why was $1,162,460.00 included *in revenue* and *as an underbilling*, contrary to the dictates of SOP 81-1 and SAS 57 and without either an appropriate footnote or other method being used to alert those relying on the 1998 Audit Report?

D.    USF&G Justifiably Relied On The Audited Financial Statements.

The Court recognized at the end of USF&G's case-in-chief that "the evidence is pretty clear that the financial statements were used by USF&G in their analysis of the account in their decision making." (Transcript, p. 2684). Other than the obviously perjured testimony of William Eskin – who had no involvement in the underwriting process – Brown Schultz did not even attempt to introduce any evidence on this issue as part of its defense.[5]

USF&G's justifiable reliance on the Audited Financial Statements is manifested by, *inter alia*, uncontrovertible evidence that USF&G reviewed and relied upon the Audited Financial Statements and that USF&G would not have issued certain bonds to CCI if it had known of CCI's true financial condition, as revealed in the restated financial reports. James Daily testified

---

[5] Having been fired by USF&G for billing personal travel expenses to the company, Mr. Eskin's bias is manifest. His attempt at revenge, however, was undercut not only by testimony of Anthony Phillips and Steven Salazar (both no longer employed by USF&G/St. Paul) but also by the testimony of Mark Holtschneider, John Simanski and Gregory Daily. In fact, the testimony of the foregoing rebuttal witnesses directly and convincingly contradicts Mr. Eskin's fantasies. Moreover, through Gregory Daily, USF&G introduced documentary evidence proving that Mr. Eskin was *not* present at the meeting at which Mr. Eskin testified that he had a discussion with David Hussey. Exhibits 823, 378. Curiously, although Mark Holtschneider was called as a witness by Brown Schultz, he was never asked about his alleged conversation with Mr. Eskin. Further, this topic was assiduously avoided by Brown Schultz in its cross-examination of both Gregory Daily and Anthony Phillips. A week prior to the resumption of trial on January 14, 2004, Brown Schultz indicated to USF&G's counsel that it intended to call David Hussey and Steven Salazar as witnesses after Mr. Eskin and requested that USF&G assist them in obtaining their presence at trial. Although USF&G arranged to have Messrs. Salazar and Hussey available on January 15, 2004 and January 16, 2004, Brown Schultz never called them as witnesses.

that USF&G's underwriters reviewed and analyzed the Audited Financial Statements prior to

making the determination to continue CCI's bonding program. (J. Daily Transcript, pp. 203,

204, 219, 222, 261, 296, 297, 328, 330, 332, 368, 369 and 376). James Daily also testified that

USF&G would not have continued CCI's bonding program if the Audited Financial Statements

reflected CCI's true financial condition; to wit, a loss of $109,801.00 for 1997 and of

$3,067,467.00 for 1998. (J. Daily Transcript, pp. 415-419). James Daily's response on cross-

examination that if he had been aware of CCI's true financial condition he would have "asked

questions" is not inconsistent with his direct testimony but, rather, acknowledges that a loss – in

and of itself – does not mandate permanent discontinuation of a bonding program under all

circumstances, such as when, hypothetically, an owner might inject significant new equity into

the business or would provide a personal indemnity; rather, it calls for an immediate suspension

and inquiry. Significant documentary evidence was introduced to support James Daily's

testimony that the Audited Financial Statements were received, reviewed, analyzed and relied

upon relative to the decision to issue bonds on behalf of CCI. Exhibits 790, p. 1255-57, 90, 132,

159, 194 and 229. Likewise, Anthony Phillips indicated that he would not have utilized his

discretionary authority nor recommended the continuation of the bonding program if he were

aware of the misrepresentations in the 1997 and 1998 Audited Financial Statements. (A. Phillips

Transcript, pp. 2465-72).

James Daily was also unequivocal that USF&G would have immediately halted the

bonding program if it knew that the Mahanoy Claim was included in the 1998 Audit. (J. Daily

Transcript, p. 397). Further, USF&G introduced testimony by both DeBruyn and Richard

Farnsworth ("Farnsworth"), as well as James Daily and Anthony Phillips, that the Audited

Financial Statements appeared "facially" proper. (Phillips Transcript, p. 2439; J. Daily

Transcript, p. 777; Farnsworth Transcript, pp. 1515-1516; DeBruyn Transcript, p. 1732).
Farnsworth testified that audit reports were not only customarily required in the underwriting
process but were usually heavily relied upon by underwriters.  (Farnsworth Transcript, p. 1472).

Brown Schultz has continually sought to extricate itself from its negligence and its
negligent misrepresentations by attempting to shift the focus in the instant litigation to the
putative impropriety of USF&G's underwriting efforts.  Brown Schultz argues that poor
underwriting decisions would negate the "justifiability" of USF&G's reliance.  Not only is
Brown Schultz' theory legally dubious, but testimony – both lay and expert – and exhibits
adduced at trial demonstrate that USF&G's actions were reasonable and in conformity with
industry practice and standards.  Furthermore, the gravamen of the cause of action for negligent
misrepresentation is justifiable reliance on the representations contained in the auditor's report.
The rules for determining whether a plaintiff justifiably relied on a material misrepresentation
are found in §§540 and 541 of the Restatement (Second) of Torts.  When read together, these
rules demonstrate that the party to whom a misrepresentation is made is justified in relying upon
the truth of that statement unless he *knows* it is false or its falsity would be *obvious* to him upon a
cursory inspection.  *See, Silverman v. Bell Savings & Loan Association*, 533 A.2d 110, 115 (Pa.
Super. Ct. 1987).  As a comment to §541 explains, a person is found not to have justifiably relied
on a representation "only when the recipient of the misrepresentation is capable of appreciating
its falsity at the time by the use of his senses."  Restatement (Second) of Torts §541 cmt. a
(1977).  A recipient cannot recover if he *blindly* relies upon a misrepresentation of the *falsity* of
which would be *patent* to him if he had utilized his opportunity to make a *cursory* examination
or investigation."  *Id.*  (emphasis added).  Essentially, a plaintiff can satisfy the reliance element
by demonstrating that he actually relied, in part, on an accountant's opinion in taking some

action. *Fine v. American Solar King Corp.*, 919 F.2d 290, 299 (5th Cir. 1990); *In re Sahlen &*
*Associates, Inc.*, 773 F.Supp. 342, 352-53 (S.D. Fla. 1991).

Additionally, a person claiming justifiable reliance need not prove that the
misrepresentation was the sole inducement but, rather, merely a "substantial factor" in
determining its course of conduct. *Fort Washington Resources, Inc. v. Tannen*, 858 F.Supp. 455,
460 (E.D. Pa. 1994); *Delhanty v. First Pennsylvania Bank*, 318 Pa. Super. 90 (1983). James
Daily testified that he had no knowledge that the Mahanoy Claim was included in revenue nor
did they have any knowledge that would have lead them to believe their reliance on unqualified
audit reports unjustified. (J. Daily, Transcript pp. 393, 394, 396, 696). Whether couched as a
failure of "justifiable reliance" or as "contributory negligence," the existence of any errors or
even poor judgment in an underwriting process – which it is undisputed is both an "art" and a
"science" – does not negate the fact that USF&G need merely prove that the information in the
Audited Financial Statements was a "substantial factor" in USF&G's decision to issue bonds on
behalf of CCI. *Id.* Even if, *arguendo*, the work of USF&G's underwriters was of poor quality, it
is axiomatic that "[f]oolhardiness or stupidity does not mitigate in favor of the defendants."
*Bonhiver v. Graff*, 248 N.W.2d 291, 297 (Minn. 1976). James Daily's and Anthony Phillips'
testimony demonstrates the care and procedures utilized by USF&G in the underwriting process.
Farnsworth, an experienced surety industry executive employed by one of the "top tier" sureties
at one of the most senior levels, testified that USF&G acted reasonably and in accordance with
industry standards in issuing bonds in reliance on the Audited Financial Statements. (Farnsworth
Transcript, pp. 1514-15, 1517-19). Neuschaefer, on the other hand, lacked the qualifications to
opine on relevant industry standards and admitted that much of his opinion testimony was a
reflection of his personal opinions and experiences. Further, Neuschaefer admitted that he was

fired from Aetna due to lack of bond production and bond losses and that St. Paul terminated his authority to write bonds at his new job only a few months before he took on the Brown Schultz assignment for lack of production.  (Neuschaefer Transcript, p. 2185).

Brown Schultz' averment that "only David Hussey had the authority to approve or suspend the bonding program" (Motion, ¶61, citing pp. 516 and 723 of the trial transcript) not only reeks of desperation but misquotes the testimony of James Daily.  James Daily's testimony that David Hussey was his superior and had authority to overturn his decisions is not tantamount to Brown Schultz' assertion that David Hussey needed to sign off on all decisions.  By analogy, such statement is no different than saying that this court cannot render a binding order because such order may be subject to appellate review.  Brown Schultz' latest tack also disregards Anthony Phillips' testimony that not only were most of the bonds written within his discretionary authority but that his decisions regarding the continuation or termination of a bonding program were never reversed by "the home office."  (A. Phillips Transcript, p. 2432).  If this was such a key aspect of Brown Schultz' defense, why did they subpoena but not call David Hussey to the stand?

E.    Contributory Negligence Is Inapplicable.

The defense of contributory negligence is inapplicable in this case because of Pennsylvania's adoption of the "audit interference" rule.  *Jewelcor Jewelers and Distributors, Inc. v. Corr.*, 373 Pa. Super. 536, 551-52 (P.A. Super. 1988).  "Under Pennsylvania law, a party's contributory negligence is not a defense to an action against an accountant for professional negligence unless that contributory negligence impeded the accountant from performing its obligations satisfactorily . . . ."  *Medical Consultants Network, Inc. v. Cantor & Johnson, P.C.*, 2001 WL 10788 (E.D. Pa. ), citing *Jewelcor Jewelers and Distributors, Inc. v.*

*Corr.*, 373 Pa. Super. at 551-52. Not only did Brown Schultz fail to introduce evidence of any purported obstruction or interference by USF&G but the Motion and its accompanying memorandum fail to cite a single case in support of Brown Schultz' obviously incorrect assertion that contributory negligence is applicable.

F.     USF&G's Standing To Sue Brown Schultz Is Uncontrovertible.

It is beyond dispute – and the law of the case, as well – that USF&G has proven standing to sue Brown Schultz pursuant to Restatement (Second) of Torts §552. The testimony of Brown and Bowman provided more than ample evidence that, *inter alia*, Brown Schultz knew that the audits performed for CCI Construction Inc. ("CCI") would be both reviewed and relied upon by USF&G relative to its decisions to continue CCI's bonding program. Among other documents, Brown Schultz' working papers repeatedly reflect this knowledge. Additionally, Brown testified that the 1997 and 1998 Audited Financial Statements were prepared in the course of Brown Schultz' business and profession. Moreover, there are numerous exhibits in evidence that not only prove that Brown Schultz knew that USF&G was the intended beneficiary but constitute persuasive evidence that Brown Schultz knew the size and parameters of the bonding programs to be underwritten by USF&G on behalf of CCI. Exhibits 202, 203, 211.

G.     USF&G's Damages Were Proximately Caused By Brown Schultz' Misrepresentations And Resulted In Comparable Damages.

1.     Brown Schultz' Misrepresentations Were The Proximate Cause Of USF&G's Losses.

To recover damages for an accountant's negligence in rendering an unqualified audit opinion, a plaintiff must prove that the accountant's negligence was the proximate or legal cause of its injury. *See, Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F.Supp. 557, 563 (W.D. Pa. 1996); *Gibbs v. Ernst*, 538 Pa. at 212. Cause in fact or "but for" causation provides

that if the harmful result would not have come about but for the negligent conduct, then there is a direct causal connection between the negligence and the injury.  *Commonwealth of Pennsylvania v. United States Mineral Products Co.*, 2002 WL 31454023*2 (Pa. Cmwlth); Restatement (Second) of Torts, §548A (a misrepresentation is the proximate cause of the plaintiff's loss, "if but only if, the loss might reasonably be expected to result from reliance").  In a negligent misrepresentation claim against an accountant, the plaintiff's reliance on the misrepresentation provides the requisite causal connection between the misrepresentation and the plaintiff's injury.  *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 683 N.Y.S.2d 179 (1st Dept. 1998).  Legal or proximate cause exists "where a defendant's wrongful conduct is a substantial factor in bringing about plaintiff's harm."  *Id.*, citing *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643 (Pa. Super. 2002).  To establish the required legal nexus, a plaintiff must show that the loss was a foreseeable result of the fact or condition that the financial statements misrepresented or concealed.  *See*, Restatement (Second) of Torts, §548A, comment b; *Bily v. Arthur Young & Co.*, 271 Cal. Rptr. 2d 470, 485 (Cal. Ct. App. 1990) ("[a] legal cause of loss is a cause which is a substantial factor in bringing about the loss").  A cause can be found to be a substantial factor so long as it is significant or recognizable; it need not be quantified as considerable.  *Jeter v. Owens-Corning Fiberglass Corp.*, 716 A.2d 633 (Pa. Super. 1998).  A plaintiff is not bound to exclude the possibility that the event might have happened in some other way.  *World Radio Laboratories, Inc. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996).  Rather, the plaintiff need only satisfy the trier of fact that the injury occurred in the manner claimed.  *Id.*

Not only do the facts extant fail to demonstrate any intervening or concurring causes that might extricate Brown Schultz from liability, but it is axiomatic that "a defendant is not relieved from liability because another concurring cause may also be responsible for producing injury."

*Powell v. Drumheller*, 539 Pa. 484 (1995).  Further, an intervening cause is not a superseding cause where the negligence of the accountant creates or increases the foreseeable risk of harm. Restatement (Second) of Torts §§440 and 442A.  An intervening force which is the normal consequence of the situation created by the accountant's negligence is not a superseding cause. Restatement (Second) of Torts §443.  Likewise, an intervening force is not a superseding cause of a loss when the force is of little consequence in causing the loss.  Here, there is simply no evidence of any intervening or concurring causes.  In fact, as evidenced by the restated financials there is compelling evidence that CCI suffered no calamitous event in 1999 which would have wiped out in less than 10 months equity of $5.2 million and cash available from an undrawn line of credit of $4 million.  Exhibits 36 and 298.

  2.  USF&G Has Proven The Amount Of Its Damages.

  USF&G proved its damages are not only significant – approximately $26,000,000.00 – but that such damages are directly attributable to Brown Schultz' failure to properly conduct its audits and to issue accurate audit reports.  Both summaries of the bonds issued in reliance on the Audited Financial Statements and binders containing extensive back-up and documentation relative to the costs and expenses incurred on each bond are in evidence.  Exhibits 14, 15, 16, 20, 21, 22, 23, 24, 26, 27 and 29.  Gregory Daily testified that certain losses were incurred as a result of USF&G's obligations as surety and that USF&G's losses were incurred as a direct result of the bonds issued on behalf of CCI in reliance on the Audited Financial Statements.  (G. Daily Transcript, p. 50, 65-66).  He also testified about USF&G's efforts to mitigate its losses, including analyzing any potential claims against project owners.  (G. Daily Transcript, pp. 17, 45-47).  Brown Schultz introduced no testimony indicating either that the damages as alleged by

Gregory Daily – and supported by extensive documentation – were inaccurate or that USF&G failed to take reasonable efforts to mitigate its losses.

### III. CONCLUSION

The inaccuracies, half-truths and unsupported allegations made by Brown Schultz fall far short of that necessary to justify any findings that the entry of judgment in favor of Brown Schultz is proper.

UNITED STATES FIDELITY AND
GUARANTY COMPANY,
By its counsel,


s/ Bruce D. Levin
Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:     (617) 790-3000
Facsimile:     (617) 790-3300
blevin@bgblaw.com
pmcglynn@bgblaw.com
and
Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, PA  17101
Telephone:     (717) 237-7100
Facsimile:     (717) 237-7105
pjs@tthlaw.com

Dated: February 5, 2004
281159 v1/36432/87

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

_____
                                        )
UNITED STATES FIDELITY AND              )
GUARANTY COMPANY,                       )
                Plaintiff               )
                                        )    CIVIL ACTION NO. 1:01-CV-00813
v.                                      )
                                        )    JUDGE CONNER
BRUCE J. BROWN and BROWN                )
SCHULTZ SHERIDAN & FRITZ,               )
                Defendants.             )
_____)

**CERTIFICATE OF SERVICE**

        I, Bruce D. Levin, Esquire, counsel for Plaintiff United States Fidelity & Guaranty

Company, hereby certify that a copy of **United States Fidelity & Guaranty Company's**

**Opposition to Defendants' Renewed Motion for Judgments as a Matter of Law and**

**Memorandum of Law in Support** of same, was sent via first class mail, postage pre-paid to:


Kathleen Carson, Esquire
Swartz Campbell
1601 Market Street
Philadelphia, PA  19103-2316

                                        /s/ Bruce D. Levin
                                        Bruce D. Levin


Dated: February 5, 2004