UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

_____
)
UNITED STATES FIDELITY AND            )
GUARANTY COMPANY,                     )
       Plaintiff                       )
                   )    CIVIL ACTION NO. 1:01-CV-00813
v.                                    )
                   )    JUDGE CONNER
BRUCE J. BROWN and BROWN             )
SCHULTZ SHERIDAN & FRITZ,             )
       Defendants.                      )
_____)

**UNITED STATES FIDELITY & GUARANTY**
**COMPANY'S POST-TRIAL MEMORANDUM**

<u>**TABLE OF CONTENTS**</u>

I.      INTRODUCTION ...................................................................................1

II.     ARGUMENT .......................................................................................3

A.      The Elements Of Negligent Misrepresentation..........................................3

        1.      *Prima Facie* Case For Negligent Misrepresentation ....................................3

        2.      Brown Schultz Misconstrues USF&G's Burden Of Proof For
                Misrepresentation.........................................................................4

B.      The Pertinent Auditing Standards And The Auditor's Standard Of Care ..............5

        1.      An Auditor Must Adhere To GAAS .............................................................5

        2.      The Standard Of Professional Care For Accountants ...............................10

C.      USF&G Has Proven That The Audited Financial Statements Were Inaccurate
        And Contained Material Misstatements..................................................11

        1.      Brown Schultz Made Numerous Misrepresentations In The Audited
                Financial Statements .....................................................................11

        2.      The Estimated Completion Costs And Profits Contained In The Audited
                Financial Statements Were Not Fair Presentations, In All Material
                Respects, Of CCI's Estimated Costs And Profits As Of December 31,
                1997 And December 31, 1998 .............................................................12

                (a)     The Magnitude Of Brown Schultz' Errors......................................12

                (b)     The Failures In Brown Schultz' Planning And Execution Of
                        The Audits........................................................................13

                (c)     The Methodology Utilized To Prove Brown Schultz' Breach
                        Of Professional Standards.................................................20

                (d)     Brown Schultz' Failure To Create Adequate Working Paper
                        Documentation..................................................................23

                (e)     "Disclaimers" In The Audited Financial Statements Do Not
                        Relieve Brown Schultz' Liability .........................................24

i

3.     Brown Schultz' Disclosure Of The PCIC Claim Guarantee And
        Including It In "Underbillings" Violated GAAP And Brown Schultz'
        Internal Related-Party Disclosure Standards ............................................25

        (a)     PCIC Issued A Remedial Work Period Insurance Policy For
                CCI's Mahanoy Prison Project ......................................................25

        (b)     Brown Schultz Failed To Comply With The Recognition
                Standards Contained In SOP 81-1 Regarding The Mahanoy
                Claim................................................................................................26

                (1)     The Mischaracterization Of CCI's Revenue In The
                        1998 Audit Report Was Material And Misleading............26

                (2)     Claims May Only Be Recognized As Revenue If
                        Certain Requirements Are Met ..........................................27

                (3)     Brown Schultz Did Not Investigate The Validity Of The
                        Mahanoy Claim..................................................................28

                (4)     Brown Schultz Failed To Determine If There Was A
                        Legal Basis For The Payment To CCI Pursuant To
                        The Remedial Work Period Insurance Policy....................29

                (5)     The Mahanoy Prison Guaranty Agreements Were
                        Insufficient To Justify Revenue Recognition Of The
                        Mahanoy Claim And Were Created At A Time When
                        Brown Schultz Knew CCI Was Losing Almost $1.2
                        Million.................................................................................30

                (6)     Even If The Mahanoy Claim Was Properly Included In
                        Revenue As An Underbilling, $448,000 Of That Claim
                        Had Previously Been Paid By PCIC Under The
                        Remedial Work Period Insurance Policy...........................32

                (7)     PCIC Lacked The Financial Ability To Pay The
                        Mahanoy Claim..................................................................33

                (8)     Inclusion Of The Mahanoy Claim As An Underbilling
                        Was Inappropriate .............................................................34

        (c)     Footnote 8 Does Not Adequately Disclose The Claim Guaranty
                Or The Recording Of Insurance Payments As A Reduction In
                Job Costs ........................................................................................35

(d)    Brown Schultz' Treatment Of The Mahanoy Claim And The Insurance Payments Were Materially Misleading And Detrimentally Relied Upon By USF&G ........................................38

(e)    The Purported Payment To CCI In 1999 Is Irrelevant..................42

D.    USF&G Justifiably Relied On The Audited Financial Statements.......................43

E.    Brown Schultz Made Its Misrepresentations Under Circumstances Under Which, At Minimum, It Ought To Have Known Of Their Falsity And It Did So With The Intent To Induce Another To Act ...............................................49

F.    The Defense Of Contributory Negligence Is Inapplicable ....................................51

G.    USF&G's Standing To Sue Brown Schultz Is Uncontrovertible..........................51

H.    The Testimony Of Brown Schultz' Expert Witnesses Should Be Disregarded.....52

I.    USF&G's Damages Were Proximately Caused By Brown Schultz' Misrepresentations And Resulted In Compensable Damages ..............................54

1.    Brown Schultz' Misrepresentations Were The Proximate Cause Of USF&G's Losses ......................................................................................54

2.    USF&G Has Proven The Amount Of Its Damages .................................56

J.    Brown Schultz' "Professional Skepticism" Was Severely Compromised ...........58

III.    CONCLUSION..................................................................................................62

# I. **INTRODUCTION**

During thirteen days of trial, significant and credible testimonial and documentary evidence was introduced proving United States Fidelity & Guaranty Company's ("USF&G") entitlement to damages of $25,927,054.76.  This evidence showed that to USF&G's extreme detriment, Bruce J. Brown ("Brown") and Brown Schultz Sheridan & Fritz (collectively, "Brown Schultz") attested to two financial statements of CCI Construction, Inc. ("CCI") as being compliant with Generally Accepted Accounting Principles ("GAAP") when in truth such financial statements were materially misleading, non-compliant with GAAP and were not adequately and properly tested by Brown Schultz in accordance with Generally Accepted Auditing Standards ("GAAS").  Rather than conducting the necessary testing and analysis and making appropriate inquiries of CCI's management and others, Brown Schultz engaged in "conversational auditing."

In addition, the evidence showed that in an 11th hour maneuver to boost CCI's sagging revenue and mask huge losses on the Mahanoy Prison project, Brown Schultz mischaracterized – and failed to properly disclose – a $1,162,000 claim guaranty issued to CCI by a related party, Pennsylvania Contractors Insurance Company ("PCIC"), as an "Underbilling."  The evidence also showed that Brown Schultz – the long-time accountant for CCI, PCIC and a dozen or so other entities owned or controlled by CCI's president, John Ortenzio ("Ortenzio"), and his family – knew that CCI's bonding program with USF&G would be in serious jeopardy if CCI's true financial condition were disclosed.

The foregoing and other errors committed by Brown Schultz resulted in its issuance of seriously misleading and inaccurate audited financial statements for CCI for the years ended December 31, 1997 (the "1997 Audit Report") and December 31, 1998 (the "1998 Audit

Report").  A comparison of the results in the foregoing audit reports and the restated results are summarized below:

? The 1997 Audit Report contained the representation that CCI's net profit was $706,879.  As restated, that profit turned into a *loss* of $109,801 (a total difference of $815,960).  *See*, Section II(C)(2)(a), *infra*.

? The 1998 Audit Report contained the representation that CCI's net profit was $59,041.  As restated, that profit turned into a *loss* of $3,067,467 (a total difference of $3,126,508).  *See*, Section II(C)(2)(a), *infra*.

? The mischaracterization of the $1,162,000 claim guaranty issued by PCIC to CCI in late 1998, *standing alone*, turned CCI's profit in the 1998 Audit Report of $59,041 into a *loss* of $1,102,959.  *See*, Section II(C)(3)(b)(1), *infra*.

? Brown Schultz' failure to adequately disclose, in accordance with the dictates of FAS No. 57, Related Party Disclosures, March 1982 ("FAS No. 57"), Exhibit "A" for ID, Tab 14, the PCIC claim guaranty and its effects on the 1998 Audit Report created the inaccurate and misleading impression on USF&G that payments, if any, made by PCIC on the $1,162,460 claim guaranty would only be made if the project owner failed to pay all or any part of the guaranteed claim after December 31, 1998.  *See*, Section II(C)(3)(c), *infra*.

? Brown Schultz' admitted failure to uncover the double counting of a $448,000 claim paid by PCIC to CCI in November 1998 into the $1,162,000 PCIC claim guaranty, *standing alone*, turned CCI's profit in the 1998 Audit Report of $59,041 into a *loss* of $388,959.  *See*, Section II(C)(3)(b)(6), *infra*.

2

The foregoing misrepresentations contained in the 1997 Audit Report and the 1998 Audit Report (collectively, the "Audited Financial Statements") resulted in significant losses to USF&G on bonds issued by it in justifiable reliance upon the Audited Financial Statements.

Brown Schultz' dereliction of its professional duty was the proximate cause of USF&G's losses notwithstanding Brown Schultz' efforts during the trial to assess blame for the inaccuracies in the Audited Financial Statements on USF&G.

## II. ARGUMENT

### A. The Elements Of Negligent Misrepresentation.

#### 1. *Prima Facie* Case For Negligent Misrepresentation.

USF&G's sole cause of action is for negligent misrepresentation. Negligent misrepresentation requires proof that (1) there was a misrepresentation of a material fact; (2) the representor either knew of the misrepresentation, made the misrepresentation without knowledge as to its truth or falsity, or made the representation under circumstances in which he ought to have known of its falsity; (3) the representor intended the representation to induce another to act on it; and (4) injury resulted to the party acting in justifiable reliance on the misrepresentation. *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F.Supp. 2d 577 (M.D. Pa. 1999); *Gibbs v. Ernst*, 538 Pa. 193, 209, 647 A.2d 882 (1994). Negligent misrepresentation differs from intentional misrepresentation in that the defendant "need not know his or her words are untrue, but must have failed to make reasonable investigation of the truth of those words." *Gibbs v. Ernst*, 538 Pa. at 210, 647 A.2d at 890.

Not only has USF&G proved its case, but Brown Schultz has *admitted* to several of its biggest blunders; to wit, the significant double-counting of $448,000 in the 1998 Audit Report, the failure to make any job site visits, the failure to conduct certain auditing tests of, *inter alia*,

CCI's job cost controls and the failure to analyze the legality and validity of a trumped up claim used as a last minute revenue boost.  Testimony of Brown, Transcript, pp. 1080-1081, 979-980, 1213, 1037-1039, 1064, 1092, 1096-1097, 1123.

**2.      Brown Schultz Misconstrues USF&G's Burden Of Proof For Misrepresentation.**

Brown Schultz has repeatedly asserted that it made no misrepresentations regarding the Audited Financial Statements because it purportedly made no representations.  As discussed in greater detail, *infra*, Brown Schultz not only made several representations in the Audited Financial Statements but either knew or should have known that such representations were false.  Moreover, Brown Schultz' assertion that either an omission or a failure to provide an affirmative representation cannot constitute a misrepresentation is legally incorrect and factually irrelevant.  "To be actionable, a misrepresentation need not be in the form of a positive assertion but is any artifice by which a person is deceived to his disadvantage and may be by false or misleading allegations . . . ."  *Sylk v. Bernsten*, 2003 WL 1848565, 4 (Pa. Com. Pl.), quoting *Wilson v. Donegal Mutual Insurance Co.*, 410 Pa. Super. 31, 41 (1991).[1]

USF&G has proved not only that Brown Schultz made numerous affirmative representations in the Audited Financial Statements that were false, but also that it made

---

[1] The cases relied upon in prior pleadings filed by Brown Schultz regarding USF&G's burden are easily distinguishable from this case as they involve circumstances where *complete* omissions, standing alone, were found insufficient to support the cause of action for negligent misrepresentation.  In *Lazin v. Pavillon Partners,* 1995 WL 614018 (E.D.Pa), the plaintiff entered into an option agreement with the State of New Jersey to develop real estate.  The option agreement was terminated, allegedly without plaintiff's knowledge, and thereafter, the defendant entered into an agreement with the State of New Jersey to develop the same parcel.  The District Court held that defendant's omission by itself did not constitute a negligent misrepresentation because, *inter alia*, the defendant did not "misrepresent a material fact" to the plaintiff as no "representation" was made by the defendant nor was the defendant found to have had any duty to speak.  Likewise, in *Weisblatt v. Minnesota Mutual Life Insurance Co.,* 4 F.Supp. 2d 371 (E.D. Pa. 1998), an insurance agent was not found liable for negligent misrepresentation to a survivor under a life insurance policy for allegedly failing to inform the insured about other life insurance policy options because, *inter alia*, the agent "had no duty to speak about such options."  *Id.* at 380.  The District Court found no evidence of any "affirmative misrepresentations."  *Id.* at 379.  These cases would be proper analogues only in the hypothetical case that Brown Schultz *never* prepared an audit report for CCI but was being sued for failing to inform others of CCI's financial condition.

incomplete or misleading representations, sometimes omitting crucial information, when it had a professional duty to honestly convey accurate and complete information. Thus, it is a misrepresentation (not an "omission") for Brown Schultz to have stated in its Independent Auditor's Report to the 1998 Audit Report that it complied with GAAS when, for example, Footnote 8 of the 1998 Audit ("Footnote 8") was misleading and failed, *inter alia*, to include a description of the "effect" of certain related party transactions involving PCIC on the financial statements. *See*, FAS No. 57, Exhibit "A" for ID, Tab 14.

Moreover, even an "omission" may be actionable if the "defendant has revealed some relevant, material information even though he had no duty (i.e., a defendant may not deal in half-truths)". *Fox Foods, Inc. v. Kmart Corp.*, 870 F.Supp. 599, 610 (M.D. Pa. 1994). Several of the disclosures and representations made by Brown Schultz regarding PCIC are, at best, half-truths, and perhaps, outright deceptions.[2]

## B.     The Pertinent Auditing Standards And The Auditor's Standard Of Care.

### 1.     An Auditor Must Adhere To GAAS.

GAAS comprises the standards and procedures which must be followed in the planning, preparation and issuance of an audit report by a Certified Public Accountant. Testimony of DeBruyn, Transcript, p. 1738. The phrase "Generally Accepted Auditing Standards" represents the "general standards of conduct relating to the auditor's professional qualities as well as to the judgments exercised by him in the performance of his examination and issuance of his report." *SEC v. Arthur Young & Co.*, 590 F.2d at 785 n.2.

---

[2] Under FAS No. 57, and its own disclosure checklists, Brown Schultz had a duty to not only disclose certain information regarding related transactions between CCI and a related party, PCIC, but to present all information "deemed necessary to an understanding of the *effects of the transactions on the financial statements*." (emphasis added). FAS No. 57, ¶2(b), Exhibit "A" for ID, Tab 14; Exhibit 222, p. 184 (CCX-13a - checklist for related party disclosures which required that such disclosures must contain "such other information deemed necessary to an understanding of the effects on the transactions on the financial statements").

One of the primary objectives of an audit is to identify high-risk audit areas and to plan the audit procedures accordingly. In connection with construction contractor audits, "[m]uch of the independent auditor's work involves evaluating subjective estimates relating to future events a process which involves highly technical data." Exhibit 360, Appendix A, p. 43, AICPA Audit and Accounting Guide for Construction Contractors. The "ultimate focus of the [construction] audit has to be on substantiating the reasonableness of gross profits on contracts, which usually includes a substantial estimated portion." PPC Guide to Construction Contractors, Section 520.05. Exhibit "A" for ID, Tab 16(E).[3]

The audit of a construction contractor is markedly different than an audit of a product manufacturer or service provider and, accordingly, it has many unique characteristics which must be taken into account by the auditor in defining audit risk and designing an appropriate audit plan. Exhibit 361. Testimony of DeBruyn, Transcript, pp. 1738-1745; Testimony of Bowman, Transcript, pp. 1303-1304. Such proprietary elements include the contractor's use of the "percentage of completion" method of accounting for his work in progress and the importance of overbillings and Underbillings to any analysis of the contractor's ability to successfully perform its contractual obligations.[4] Exhibit 362; Testimony of DeBruyn, Transcript, pp. 1747-1749.

---

[3] An audit differs from a "review" and "compilation," because, in an audit, the auditor must, *inter alia*, certify that management-produced financials comply with GAAP and that the auditor has independently tested and verified the figures presented in accordance with GAAS. An audit is the highest level of financial testing and analysis a Certified Public Accountant can perform. Testimony of DeBruyn, Transcript, pp. 1736-1737. "In an audit . . . the accountant provides verification of the financial statements, claims and assertions and expresses an opinion on the entity's financials." *Otto v. Pennsylvania State Education Association*, 330 F.3d 125, 134-35 (3rd Cir. 2003).

[4] "Overbillings" are the difference between the total billings to date and the total costs and recognized estimated earnings to date. These are a liability that offsets the effects of those contracts where billings exceed the progress toward the completion of the project. "Underbillings" are the difference between the total of costs and recognized estimated earnings to date and total billings to date. This is an asset that offsets the understatement of sales, net income and ultimately equity when the actual completion of the project is ahead of billings. Testimony of DeBruyn, Transcript, pp. 1748-1749, *see also*, Jeffrey S. Russell, *Surety Bonds for Construction Contracts*, pp. 80, 82, 91, ASCE Press (2000). These relate solely to the contract between the contractor and the owner, and none other. Testimony of DeBruyn, Transcript, p. 1749.

Brown Schultz failed to implement necessary tests and to employ safeguards sufficient to demonstrate that the financial statements fairly present the financial information provided by CCI. Testimony of DeBruyn, Transcript, pp. 1769-1777.[5]

Because of its belief (warranted or not) in the "high integrity" of CCI's management, Brown Schultz failed to design and implement an audit plan capable of addressing the vagaries of construction industry accounting and, in turn, producing a reliable audit report, especially as CCI embarked in new types of work, some of which it was self-performing, in 1997. Exhibit 222, p. 13. Testimony of Bowman, Transcript, pp. 1375-1376. Some of the ways in which Brown Schultz failed to conform its audit work for CCI to GAAS and other applicable audit standards are listed below:

- GAAS requires that auditors conduct sufficient tests to determine the reliability of management's estimates. AU Section 342, Auditing Accounting Estimates, January 1, 1989 (Source: SAS No. 57) ("AU Section 342").[6] Brown Schultz ignored its responsibilities and engaged in "conversational auditing" because of its belief in the purported – and untested – "high integrity" of CCI's management. Exhibit 213, p. 44; Exhibit 222, p. 20. Testimony of Bowman, Transcript, pp. 1363-1364;

---

[5] During the trial, Brown acknowledged that one of the unique features about auditing general contractors is the auditor's responsibility to ascertain the accuracy of management's ability to estimate costs to complete and profit. Testimony of Brown, Transcript, pp. 857, 860. Determining whether or not CCI management's estimates of the costs to complete work and estimated profits were reasonable was an important part of Brown Schultz' function as auditor. Exhibit 360, AICPA Audit and Accounting Guide for Construction Contractors, May 1, 1997, §§7.0 and 7.02; Testimony of Bowman, Transcript, p. 1303.

[6] "The auditor is responsible for evaluating the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole. As estimates are based on subjective as well as objective factors, it may be difficult for management to establish controls over them. Even when management's estimation process involves competent personnel using relevant and reliable data, there is potential for bias in the subjective factors. Accordingly, when planning and performing procedures to evaluate accounting estimates, the auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors." *Id.* at AU §342, ¶.04, Exhibit "A" for ID, Tab 4.

- GAAS requires all auditors to exercise "due professional care…in the performance of the audit and the preparation of the report."  AU Section 230, Due Professional Care in the Performance of work, November 1972 ("AU Section 230") (Source:  SAS No. 1).  Exhibit "A" for ID, Tab 2.  Included in the foregoing section, is the fact that due professional care requires the auditor to exercise "professional skepticism."  *Id.* at AU Section 230, ¶.07.  Significant testimony was adduced at trial that Brown Schultz failed to act with sufficient professional skepticism and was not diligent in evaluating audit evidence.  Testimony of DeBruyn, Transcript, pp. 1769-1770;

- GAAS also requires that audit field work must be "adequately planned and properly supervised."  AU Section 311, Planning and Supervision, September 30, 1978 ("AU Section 311") (Source:  SAS No. 22).  Exhibit "A" for ID, Tab 7.  Brown Schultz' planning documentation for the audit reports for 1997 and 1998 remained virtually *unchanged* from those of earlier years, despite CCI having experienced significant growth in those years, having self-performed more work (on some of which CCI experienced significant problems), having acquired millions of dollars of new equipment and having exhibited significant profit fades on a number of jobs.  Testimony of DeBruyn, Transcript, pp. 1763-1764; Testimony of Bowman, Transcript, p. 1378; Testimony of Brown, Transcript, pp. 934-937.  Additionally, as discussed, *infra*, the audits were poorly staffed and lacked adequate supervision.  Exhibit 213, p. 73. Testimony of Bowman, Transcript, p. 1301; Testimony of Brown, Transcript, pp. 931-932, 1239-1240;

- GAAS requires that the auditor properly address the risks involved in the audit.  AU Section 230 and AU Section 311.  Brown Schultz did not modify or change its

8

audit procedures nor its approach to the audit work for CCI.  Testimony of Bowman, Transcript, pp. 1339-1340, 1343, 1357, 1370, 1378; Testimony of Brown, Transcript, pp. 934-937, 1204-1205;

- GAAS requires that an auditor make certain that during its performance of audit field work that "sufficient competent evidential matter . . . was obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  AU Section 326, Evidential Matter, August 1980 (Source:  SAS No. 31) ("AU Section 326").  Exhibit "A" for ID, Tab 3.  Brown Schultz' limited testing of, among other things, accumulated job costs and subcontractor costs were violative of this auditing standard.  Testimony of DeBruyn, Transcript, pp. 1775-1777;

- GAAS provides guidance concerning the circumstances where the work of a specialist is needed and details appropriate use of that specialist.  Exhibit 272.  SAS No. 73, Using the Work of a Specialist, (December 15, 1994) ("SAS No. 73).  Despite using experts on other issues in a prior audit for CCI and for PCIC, Brown Schultz did not consult any specialists regarding, *inter alia*, the validity of certain guarantees, the interpretation of Remedial Work Period Insurance Policy provisions and the merits of significant claims.  Exhibit 99, Testimony of Brown, Transcript, pp. 1039, 1079, 1083; and,

- GAAS requires compliance with FAS No. 57 when related party transaction are present.  Exhibit "A" for ID, Tab 14.  A crucial footnote in the 1998 Audit Report describing significant related party transactions between PCIC and CCI was not only woefully inadequate, but materially misleading.  Testimony of A. Phillips,

Transcript, pp. 2480, 2584; Testimony of Neuschaefer, Transcript, pp. 2390-2391;

Testimony of Brenner, Transcript, pp. 3089-3090; Testimony of DeBruyn, Transcript, pp.

1847-1848; Testimony of Farnsworth, Transcript, pp. 1562-1563.

**2.      The Standard Of Professional Care For Accountants.**

The standard of care for accountants has been expressed as follows:  "[A]ccountants and

auditors have the duty to exercise that degree of care, skill and competence exercised by

reasonably competent members of their profession under the circumstances . . . ."  *Robert*

*Wooler Co. v. Fidelity Bank*, 330 Pa. Super. 523, 479 A.2d 1027 (1984); Restatement (Second)

of Torts §229A, comment b (standard is applicable to accountants).  Accountants must "use such

skill in the performance of their agreement as reasonably prudent, skillful accountants would use

under the circumstances."  *Official Committee of Unsecured Creditors of Corell Steel v. Fishbein*

*and Co.*, 1992 WL 196768 (S.D. Pa.).  This implies a duty to act in accordance with GAAS and

GAAP notwithstanding the terms of any contract or agreement to the contrary.  *In re Computer*

*Personality Systems v. Stockton Bates LLP*, 2003 WL 22844863, *4.[7]

In evaluating whether an accountant complied with the requisite standard of care, most

courts also consider whether the accountants complied with their own internal accounting

manuals and other internal procedures.  *Bily v. Arthur Young & Co.*, 271 Cal. Rptr. 2d at 476

(internal manuals can properly be deemed relevant to the broader standard of care).  The

evidence adduced at trial demonstrated that Brown Schultz acted contrary to both its own

internal guidelines as well as those of other sources normally relied upon by auditors and

---

[7] Compliance with GAAS does not necessarily establish satisfaction of the duty of care.  *Bily v. Arthur Young & Co.*, 271 Cal. Rptr. 2d 470, 475-476 (Cal. App. 1990).  However, a breach of duty may be found when an accountant does not adhere to the rules and standards of his profession, such as GAAS.  *Rhode Island Hospital Trust National Bank v. Swartz, Bresenoff, Yavner & Jacobs*, 455 F.2d 847 (4th Cir. 1972).  Pennsylvania regards a violation of a professional standard as evidence of negligence but not negligence *per se*.  *Edwards v. Brandywine Hospital*, 438 Pa.Super. 673, 652 A.2d 1382 (1995).

acknowledged as trustworthy by Brown Schultz, such as the PPC Guides to the Audits of

Construction Contractors, the AICPA Audit and Accounting Guide for Construction Contractors

and the Horwath International Audit Manual.  Exhibit A for ID, Exhibit 38, Exhibit 39, Exhibit

42, Exhibit 360.  Testimony of Bowman, Transcript, pp. 1237, 1308-1309; Testimony of Brown,

Transcript, pp. 953-956, 958-960, 991-992.

**C.     USF&G Has Proven That The Audited Financial Statements Were Inaccurate And Contained Material Misstatements.**

      **1.     Brown Schultz Made Numerous Misrepresentations In The Audited Financial Statements.**

In the Audited Financial Statements, Brown Schultz represented, *inter alia*, that it

complied with GAAS in opining that CCI's financials complied with GAAP.  Additionally,

disclosures regarding the use of estimates contained in Footnote 1, the Summary of Significant

Accounting Policies, of both the 1997 Audit Report and the 1998 Audit Report ("Footnote 1") –

which inform the reader of management's use of estimates – neither vitiates the explicit

representations made in the Audited Financial Statements nor immunizes Brown Schultz from

the consequences of its failure to adhere to professional accounting standards.  Exhibit 34, p. 7,

Exhibit 36, p. 8.

The Audited Financial Statements are prefaced by the Independent Auditors' Report,

which contain the following representations:  (1) "[Brown Schultz] conducted [its] audits in

accordance with generally accepted auditing standards"; (2) the "audit includes examining, on a

test basis, evidence supporting the amounts and disclosures in the financial statements"; (3) an

audit "includes assessing the accounting principles used and significant estimates made by

management . . . "; and (4) that "the financial statements . . . *present fairly, in all material

respects the financial position of CCI . . . .*"  (emphasis supplied).  Exhibit 34, p. 1, Exhibit 36, p.

1. Since Brown Schultz represented that it conducted its audits "in accordance with generally accepted auditing standards" and that the financial statement, "present fairly" the financial position of CCI, evidence that GAAS was not followed or that the financial statements do not "present fairly" the financial position of CCI would directly and unequivocally contradict such explicit and unqualified representations in Brown Schultz' Independent Auditor's Reports.

    **2.    The Estimated Completion Costs And Profits Contained In The Audited Financial Statements Were Not Fair Presentations, In All Material Respects, Of CCI's Estimated Costs And Profits As Of December 31, 1997 And December 31, 1998.**

        **(a)    The Magnitude Of Brown Schultz' Errors.**

Stephen J. DeBruyn ("DeBruyn"), a Certified Public Accountant with significant experience in construction industry audits, testified that the 1997 Audit Report incorrectly represented that CCI produced a net profit of $706,879 when, in fact, CCI actually *lost* $109,801. Testimony of DeBruyn, Transcript, p. 1797. Exhibit 34, Exhibit 221 (ID only), Exhibit 365A (ID only). The 1998 Audit Report incorrectly showed that CCI produced a profit of $59,041 when, in fact, CCI actually lost $3,067,467. Testimony of DeBruyn, Transcript, p. 1800. Exhibit 36, Exhibit 186 (ID only), Exhibit 365B (ID only). DeBruyn opined that the significant variance between CCI's net profits as represented in the Audited Financial Statements and Brown Schultz' actual net profits (losses) was the result of Brown Schultz' failure to utilize due care and to adhere to AICPA professional standards. Testimony of DeBruyn, Transcript pp. 1759-1760. Donald Brenner ("Brenner"), the unlicensed (until approximately December 20, 2003) professional witness retained by Brown Schultz, stated that he was *unable* to testify that the Audited Financial Statements complied with GAAP. Testimony of Brenner, Transcript p. 2920.

12

      **(b)**      **The Failures In Brown Schultz' Planning And Execution Of The Audits.**

Testimony at trial demonstrated that CCI's audit risk profile changed markedly between the early 1990's and the year ended December 31, 1998.[8] Both Brown and Bowman testified that they were aware of significant changes in CCI's business and operations, including CCI's decision to engage in increasingly greater amounts of self-performing work, the performance of increasing amounts of out-of-state work, significant subcontractor defaults, CCI's significant investment in equipment, the rapid growth in the number of CCI's employees and CCI's fluctuating revenues. Testimony of Brown, Transcript pp. 934-937. Testimony of Bowman, Transcript, pp. 1368-1370, 1377-1378. These and other factors *shown in Brown Schultz' working papers* constituted significant audit risks. See, e.g., Exhibit 213, pp. 39-44; Exhibit 222, pp. 13-20. Testimony of DeBruyn, Transcript, pp. 1763-1766. Despite knowledge of these audit risk factors, Brown and Bowman both admitted that the audit plans for CCI remained essentially the same from 1993 until 1998. Testimony of Brown, Transcript, pp. 934-937, 1204-1206; Testimony of Bowman, Transcript, pp. 1339-1340, 1343, 1357, 1370, 1378; Testimony of DeBruyn, Transcript, p. 1763. Moreover, Brown admitted – and Brown Schultz' working papers show – that despite an increase in CCI's audit risk profile, the actual audit work performed by Brown Schultz for the fiscal years ended December 31, 1997 and 1998 (and the audit fees charged) did not change significantly from year to year. Exhibit 109, Exhibit 110, Exhibit 111, Exhibit 112, Exhibit 113, Exhibit 114, Exhibit 213, Exhibit 222. Testimony of Brown, Transcript, pp 934-937, 1204-1206.

---

[8] "Audit risk" consists of the inherent risk in the audit. It is the overall engagement risk. Testimony of DeBruyn, Transcript, pp. 1740-1741.

The Contracts-in-Progress schedules contained in the Audited Financial Statements were seriously inaccurate because Brown Schultz relied on CCI management's representations as to such project costs and profitability *with no documentation substantiating the fact that CCI management's estimates were reasonable other than the fact that they had allegedly been verified by Sherri Phillips, CCI's Chief Financial Officer and/or Stan Sechrist, CCI's Vice President - Construction Operations*. There is no evidence that Brown Schultz critically reviewed or challenged management's estimates. Testimony of DeBruyn, Transcript, p. 1775-1777, 1808, 1887.

The only test Brown Schultz conducted of CCI's job costs was a "haphazard" selection of 25 job costs. Exhibit 222, p. 262. Testimony of Bowman, Transcript, p. 1344. However, that was only a test to determine whether job costs were being *properly recorded* in CCI's books and records. It was *not* sufficient to determine whether costs had actually been incurred. Exhibit 112, ¶5A-K. Testimony of Bowman, Transcript, pp. 1344-1345. According to DeBruyn, this was a test of transactions, not a test of internal controls as the planning forms indicate. Brown Schultz should have tested significant job costs as described and suggested in the PPC Audit Guide in addition to performing analytical review procedures over direct job costs. Moreover, Brown Schultz should have vouched (checked underlying documentation) significant job costs. Testimony of DeBruyn, Transcript, pp. 1779-1780. Additionally, Brown Schultz did not adequately test subcontractor costs. Subcontractor expense as a component of direct job costs was significant and represented anywhere from over 80% to over 50% of total job costs in any given year between 1995 and 1998. This is particularly important in light of the several subcontractor defaults noted in Brown Schultz' working papers. Testimony of DeBruyn, Transcript, p. 1782.

14

Indeed, Brown Schultz' audit work papers show that Brown Schultz elected *not* to test CCI's financial controls, instead relying on CCI management's purported "high integrity." Exhibit 213, pp. 44 and 60, para. 14; Exhibit 222, p. 20 and 30, para. 14.  As admitted by both Bowman and Brown, CCI's audit plan had not materially changed since at least 1993. Testimony of Brown, Transcript, pp. 934, 937, 1204-1205; Testimony of Bowman, Transcript, pp. 1339-1340, 1343, 1357.

Overall, Brown Schultz' audit work for CCI is a paradigm of "conversational auditing." DeBruyn testified that Brown Schultz either misunderstood or ignored the requirements of both AU Section 342, and the AICPA Audit and Accounting Guide for Construction Contractors §10-33 *et seq.*, and did not follow the standards and guidelines therein to properly assess the reasonableness of CCI management's estimates.  Exhibit 360, p. 64.  Testimony of DeBruyn, Transcript, pp. 1762-1766; 1815-1816.

Evidence that CCI's estimates were unreasonable was also found in Brown Schultz' working papers, which show that in 1998, for example, CCI was estimating gross profits on several contracts-in-progress that were *materially higher than its historical or originally projected amounts*.[9]

Brown Schultz' working papers also show that many of CCI's projects had significant profit fades and construction-related problems.  Exhibit 326 and 337.  Yet, Brown Schultz'

---

[9] For example, the original gross profit estimate for the Germplasm Center project in 1997 was 2.78%, which, by December 31, 1998 had increased to 5.77% according to CCI.  Nothing in Brown Schultz' working papers shows that Brown Schultz did anything to verify this information.  Exhibit 213, p. 273.  Testimony of Bowman, Transcript, pp. 1381-1382.  Additionally, the original gross profit estimate for the Lord Fairfax project was 4.34%, which by December 31, 1998 increased by 10.11%.  Brown Schultz has no idea why this happened and Brown Schultz' working papers are devoid of any substantiation of this 233% increase in estimated gross profits.  Exhibit 213, p. 251, Exhibit 222, p. 275.  Testimony of Bowman, Transcript, pp. 1385-1386.  This is particularly troublesome because there were significant differences on many individual contracts between gross profit percentage in the contract-in-progress schedule and those contracts CCI had previously performed.  Testimony of DeBruyn, Transcript, p. 1776.

working papers merely contained comments such as "good buyout," "good buy," "no problems and none anticipated," and "job was bid very tight," on the very projects that later proved to have serious losses.  Exhibit 222, p. 272, 273, 279; Exhibit 213, pp. 249, 251, 253, 255.  There is no evidence that Brown Schultz verified the accuracy of such comments.  More disturbingly, it appears that Brown Schultz conducted no further investigation even after being forearmed with the knowledge that CCI's projects had significant problems.[10]

The extent of Brown Schultz' conversational auditing is also evidenced by various conclusions in its "Checklist for Consideration of Internal Control Components (Form B-2A)" contained in its Permanent File for CCI and purportedly updated annually.  Brown Schultz' conclusion was that "CCI's management has a low tolerance for business risk."  Exhibit 145, p. 11.  Testimony of Bowman, Transcript, pp. 1316-1317.  Brown Schultz, however, did not conduct *any* independent analysis of CCI's management's tolerance of risk.  Testimony of Bowman, Transcript, p. 1317.  Additionally, Brown Schultz did not consult outside sources to check whether CCI management was, indeed, exhibiting "low tolerance of business risk."

---

[10] For example, Brown Schultz' working papers for the Albermarle Prison state "good buyout on this job."  Exhibit 222, p. 272.  Testimony of Bowman, Transcript, p. 1350.  However, there is nothing in the working papers that reveals the source of that information.  Testimony of Bowman, Transcript, pp. 1350-1351.  Bowman also admits that she did not look at the actual subcontracts for this project.  Testimony of Bowman, Transcript, p. 1352.  Further, Brown Schultz took no steps to verify either the original budget estimate or subsequent cost information.  Testimony of Bowman, Transcript, p. 1354.  Other than confirming the contract amount and the amounts paid, Brown Schultz did not discus any issues with the owner.  Testimony of Bowman, Transcript, p. 1354.  Moreover, nothing in the working papers reveals what CCI is spending in costs.  Testimony of Bowman, Transcript, p. 1355.  Can it really be sufficient for an auditor to determine there was a "good buyout" just because the client said so?  AU §342, along with other pertinent standards, requires, at minimum, a modicum of investigation beyond that of mere conversation while AU §230 requires that in addition, the auditor question the client-furnished information with "professional skepticism."

Testimony of Bowman, Transcript, p. 1317.  Moreover, Brown Schultz *knew* of several facts that contradicted its conclusion.[11]

Brown Schultz' working papers also show carelessness in documenting CCI's initial profit percentages in its 1997 and 1998 work-in-progress comparative analysis.  See Exhibit 213, p. 251 and Exhibit 222, p. 275 (Job 451 – Lord Fairfax: CCI's initial profit allegedly rose from 4.34% in 1997 to 10.11% in 1998); and see Exhibit 213, p. 249 and Exhibit 222, p. 258 (Job 445 – Houtzdale Prison: CCI's initial profit allegedly rose from 1.94% in 1997 to 4.21% in 1998).  Such carelessness in documenting CCI's initial profit estimates and its failure to uncover the Mahanoy Prison claim double count (*see*, Section II(C)(3)(b)(6), *infra*) creates a strong inference that Brown Schultz was careless in other aspects of its audits of CCI's financial statements.

In addition, Brown Schultz seems to have been blind to significant profit fades and other indicia of poor estimating by CCI's management.[12]  For example, the Houtzdale Prison project was initially projected to earn a 1.94% gross profit.  Exhibit 213, p. 249; Testimony of Brown, Transcript, p. 943.  It is noteworthy that, with CCI's overhead included, CCI actually stood to lose money on this project.  Testimony of Brown, Transcript, p. 944.  As of December 31, 1997, the job is 38% complete and the loss is projected to be -.80%.  Testimony of Brown, Transcript, pp. 946-947.  Yet, the working papers for the 1997 Audit Report show that this project had a "good buyout" as well as a subcontractor default.  Testimony of Brown, Transcript, p. 949.  In

---

[11] Brown Schultz knew, for example, that by 1997 CCI was involved in different lines of work and that CCI was having problems with self-performing work.  Testimony of Bowman, Transcript, p. 1319.  Brown Schultz, however, failed to conduct any analysis of whether such activity was consistent with that of a contractor with a purportedly low business risk tolerance.  Testimony of Bowman, Transcript, pp. 1319-1320.

[12] Profit fades are declines in the estimated or the interim profits (or losses) at the end of the preceding year to the project's actual performance at its completion.  Profit fades can be due to a number of factors ranging from the contractor's performance to the default or insolvency of its subcontractors or suppliers.  It can also signify that the contractor's original estimate of its costs to perform the work and its profits were inaccurate.  Testimony of Farnsworth, Transcript, pp. 1514-1515; *see also*, Carmichael, Roberts and Griffith, *Guide to Construction Contractors*, Vol. 1, Sec. 502.17 (Practitioners Publishing Co. 2002).

that regard, Brown acknowledged during the trial that completion subcontractors usually charge a premium to complete the work of a defaulting subcontractor. Testimony of Brown, Transcript, p. 949. Despite the foregoing, Brown Schultz' working papers for the Houtzdale Prison note that "costs to complete as estimated at December 31, 1997 are not expected to change significantly." Exhibit 213, p. 249. Testimony of Brown, Transcript, p. 950. However, there is *no* documentation in Brown Schultz' working papers that anyone performed any additional test to determine how much the completing subcontractor's premium was going to be. Testimony of Brown, Transcript, pp. 951-955. Likewise, the type of subcontract involved is not identified nor is there any determination as to whether it is part of the project's "critical path." Testimony of Brown, Transcript, pp. 957-959. There is also no evidence of any calculation being done of that cost. Testimony of Brown, Transcript, p. 959.

Finally, Brown Schultz took no documented action to verify CCI management's representations despite its knowledge, among other things, that: CCI bid the job below cost, a loss is projected even though the Houtzdale project is less than 40% complete, and there has been a subcontractor default. Testimony of Brown, Transcript, p. 960. There is also no documentation that any steps were taken by Brown Schultz to determine the extent of the loss, as is required by the "loss recognition rule." Testimony of Brown, Transcript, pp. 959-960; Testimony of DeBruyn, Transcript, p. 1812. Brown Schultz's 1998 working papers reveal that the Houtzdale Prison project was completed at a 4.21% loss. Exhibit 222, p. 258. Testimony of Brown, Transcript, p. 961.

The Houtzdale Prison is but one of numerous contracts in progress where serious problems are revealed, yet Brown Schultz took no steps to quantify or investigate them. *See, e.g.,* UEPH Headquarters, Mahanoy Prison Project, Lord Fairfax Project, Albermarle Prison.

18

Exhibits 366, 367, 368, 369 and 370.  Brown Schultz cannot credibly claim that such fades do not indicate a serious gap in management's estimating credibility.

Brown Schultz' failure to uncover (or acknowledge) the patently obvious may be attributed to the undisputed fact that Brown Schultz made no job site visits, nor did it confirm amounts due with subcontractors nor did it even test CCI's job cost entries.  Testimony of Brown, Transcript, pp. 979-980, 985.[13]

In light of the troublesome jobs, the significant profit fades which occurred and the many other risk factors *identified in Brown Schultz' working papers*, job site visits, construction cost testing, and "professional skepticism" about management's representations would have alerted Brown Schultz that the projects were in worse shape and job costs higher than represented by CCI's management.  Testimony of DeBruyn, Transcript, pp. 1825-1827.

Brown Schultz' failures can also be attributed to the lack of experience of those to whom was delegated the specialized task of auditing CCI.  This lack of experience was compounded by a failure of supervision.

Bowman, a supervisor, never became a manager of Brown Schultz even though she was Brown Schultz' "main" person on the CCI audits.  Exhibit 348, p. 2.  Testimony of Brown, Transcript, p. 925.  Bowman's lack of experience – CCI was the only general contractor she ever audited – was demonstrated by her problems with CCI's job cost estimates and the PCIC audit. Exhibit 302; Testimony of Bowman, Transcript, p. 1301.  Although Bowman had the assistance

---

[13] Both DeBruyn and Brenner acknowledged the efficacy of job site visits in appropriate circumstances.  Testimony of DeBruyn, Transcript pp. 1825-1827.  Testimony of Brenner, Transcript, pp. 3021-3022, 3024-3025.  Among the reasons why a job site visit by an auditor may be necessary is "[t]o gain an understanding of those components of internal control maintained at the job site."  Exhibit 360,  AICPA Audit and Accounting Guide Construction Contractors, §10.02, p. 57.  This is particularly true if there are troublesome jobs or where accounting functions are performed at the project site.  *Id.* at 59.  Brown justified his failure to conduct job site visits on his belief that all documentation and purchasing was centralized at CCI's main office.  Testimony of Brown, Transcript, p. 1252. However, the evidence adduced at trial showed that some accounting and purchasing functions were performed by CCI at the job site level.  Exhibit 356 and Exhibit 357.  Testimony of Brown, Transcript, pp. 1254-1255.

of a manager, Suzanne Ehgartner ("Ehgartner"), in connection with the 1997 Audit Report, she

was essentially on her own in performing the work for the 1998 Audit Report.  Testimony of

Brown, Transcript, pp. 924-927.  In fact, no one from any of the top three positions of the Brown

Schultz hierarchy – manager, senior manager or principal – had any significant involvement

relative to the 1998 Audit Report.  Testimony of Brown, Transcript, pp. 926-927; Testimony of

Bowman, Transcript, pp. 1299-1300.  Brown's failure to adequately supervise his employees,

including Bowman, also likely contributed to the many errors extant.  According to his billing

records, Brown devoted less than 8 hours to the 1998 Audit Report, with *no* participation in the

field work.  Exhibit 222, p. 54.  Testimony of Brown, Transcript, pp. 1017-1018.  He abstained

from field work despite Ehgartner's absence from the field work for the 1998 Audit work.  In

that Bowman was neither a manager nor experienced in auditing general contractors – and

Brown describes his employees as merely "*fairly* qualified" – significantly closer supervision

was appropriate.  Exhibit 348, p. 1.  Testimony of Brown, Transcript, p. 933.

### (c)     The Methodology Utilized To Prove Brown Schultz' Breach Of Professional Standards.

The analysis utilized by DeBruyn to determine the extent of Brown Schultz' failures was

conservative, logical and consistent.  DeBruyn's testimony is predicated not only on an accepted

and logical methodology employed in the accounting profession, but was based upon credible

data that was admitted into evidence.  DeBruyn merely took CCI's actual gross profit/loss at the

completion of each contract and applied it to the same project in the prior year.  The actual

profits or losses was the best information available where, as here, the underlying financial data

had been lost.  Testimony of DeBruyn, Transcript, pp. 1836-1839.

Brown Schultz' criticism of DeBruyn's methodology not only ignores the pertinent law,

but also the considerable testimony adduced in favor of such methodology.  Not only is such

method codified in the Internal Revenue Code, 26 U.S.C. §460(b), but appropriate variants (including the "book of wisdom") have been used in a variety of cases from patent litigation to eminent domain proceedings. Testimony of Brenner, Transcript, pp. 2978-2979.[14]  Nothing in either of Donald Brenner's ("Brenner") reports cites any GAAP standard, principle, procedure or guideline that precludes the use of the look-back method employed by DeBruyn. Testimony of Brenner, Transcript, p. 2977. Moreover, DeBruyn testified that this methodology was used and employed by members of his profession and that it was a reliable tool for analyzing and restating financial statements. Testimony of DeBruyn, Transcript, pp. 1838-1839. DeBruyn also testified that with respect to the 1997 Audit Report, not only would Brown Schultz have been able to restate the 1997 results based on 1998's results, but – if it had done so – the inadequacies of CCI's estimates would have been apparent. Testimony of DeBruyn, Transcript, pp. 1840-1841.

Additionally, DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either the restated financial statements or in his analysis and that his methodology had been applied consistently and conservatively therein. Exhibit 379, Exhibit 816, Exhibit 817, Exhibit 818, Exhibit 820. Testimony of DeBruyn, Transcript, pp. 3184-3194. Finally, even Brenner admitted that a form of the "look back" method is used to restate financial statements where errors have been made. Testimony of Brenner, Testimony, pp 2983, 3118.

Finally, Brown Schultz' assertion that DeBruyn's testimony is improper because it is based, in part, on Exhibit 337, a balance sheet and income statement dated December 31, 1999 internally prepared by CCI, is frivolous. Exhibit 337. It was fully admitted into evidence for all purposes. Absolutely no testimony or documents adduced at trial call into question the

---

[14] *See, e.g., Sinclair Ref. Co. v. Jenkins Petroleum*, 289 U.S. 698 (1933); *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Prince George's County, Maryland*, 1993 WL 524783 (D. Md.).

credibility of the document or the financial data therein.[15]  Moreover, Brenner also relied on

Exhibit 337 relative to his opinions.  Testimony of Brenner, Transcript, pp. 2995-2996.  The

accuracy of Exhibit 337 – as well as Brown Schultz' multitude of errors in testing estimated

costs and profits – is also demonstrated by considerable evidence that CCI's ultimate financial

failure was not the result of a calamitous event but, rather, the natural result of its inability to

profitably complete a contract.[16]  Moreover, as of December 8, 1999, Brown Schultz' Corinne

Rebinski ("Rebinski") signed off on a Checklist for Internal Controls relative to Brown Schultz'

preparation of a 1999 audit of CCI.  In this document, maintained in Brown Schultz' "Permanent

File" for CCI, she indicated that – as of December 8, 1999 – there were "no major problems or

---

[15] James Daily testified that (1) the information on Exhibit 337 was of the type that USF&G regularly requested from CCI; (2) USF&G regularly relied upon such information provided by CCI relative to its underwriting decisions; and (3) Exhibit 337 was submitted as part of a package of information by CCI to USF&G in connection with CCI's request for financing.  Testimony of J. Daily Transcript, pp. 430-433.  Likewise, although Sheri Phillips admitted to grave doubts about the accuracy of CCI's projections regarding contract completion, she never indicated that CCI's in-house financial statements were not reliable.  Testimony of S. Phillips, Transcript, pp. 2148, 2165.  If anything, Sheri Phillips' concerns would have encouraged conservatism in preparing financials to be provided to a third party.  William Eskin found the financial information provided to him by Sheri Phillips to be reliable.  *See,* Exhibit 750 (limited purpose).

[16] Sheri Phillips also testified that she did not recollect any labor strikes, uninsured losses or other events outside the ordinary that would have precipitated CCI's collapse.  Testimony of S. Phillips, Transcript, pp. 2149-2151.  A memorandum prepared by William Eskin dated November 17, 1999 provides, *inter alia*, that "[p]er my discussion with Sherri it was represented there are no significant contingent liabilities (lawsuits, etc.) which would have a material impact on the company and would preclude them from completing their bonded obligations."  Exhibit 750, p. 5 (admitted for limited purpose).  Moreover, Eskin testified that he was not aware of any contingent liabilities, uninsured losses or anything that would have adversely impacted CCI's balance sheet.  Testimony of Eskin, Transcript, pp. 2729-2730.  Curiously, Brown Schultz listed as a witness, but did not call Ortenzio, and introduced *no* evidence attributing CCI's collapse to any calamitous act.

concerns in the prior year and none are anticipated."  Exhibit 145, p. 11; Testimony of Brown,

Transcript, p. 880.[17]

(d)    <b>Brown Schultz' Failure To Create Adequate Working Paper Documentation.</b>

DeBruyn testified that Brown Schultz failed to meet even minimal professional standards

in the documentation needed to support its audit conclusions.  Testimony of DeBruyn,

Transcript, p. 1760.  When evaluating the contents (or lack thereof) of Brown Schultz' working

papers, the Court should do so cognizant that "[p]rofessional standards require an auditor to

obtain sufficient audit evidence to afford a reasonable basis for his audit opinion."  AU Section

326, Exhibit "A" for ID, Tab 3.  Brown agrees with this basic principle.  Testimony of Brown,

Transcript, pp. 910-911, 914.  Further, any excuses for the omission of information from the

working papers – intentionally or otherwise – should be viewed skeptically in light of the fact

that working papers have a "common purpose - to document the work done, and to preserve a

body of evidence adequate in amount and quality and so organized as to lean logically to the

professional conclusion expressed."  R. J. Gormley, *The Law of Accountants and Auditors*,

¶3.03[1], p. 3-26 (Warren, Gorham & Lamont 1981), AU Section 339A and 339, Exhibit "A" for

ID, Tabs 8 and 6.  At least one District Court has ruled that an audit that was adequate in fact

---

[17] Previously, Brown Schultz has argued that the problems CCI allegedly had on the Scott Air Force Base project caused CCI's collapse.  The only credible testimony adduced at trial concerning that putative claim was by Gregory Daily, who opined that after investigation by experienced engineers, USF&G decided that potential claim was essentially worthless.  Testimony of G. Daily, Transcript, pp. 56-57.  As discussed, *supra*, as of December 9, 1998, that project was not a sufficient problem to merit any qualifications to Rebinski's optimistic outlook.  Exhibit 145, p. 11.  In fact, Brown Schultz was never defaulted by the owner on the project, Testimony of S. Phillips, Transcript, p. 2174, and there is not a shred of paper in evidence indicating that there is any value attributable to this putative claim or even describing the specifics of such claim.  As Sheri Phillips admitted, there is a difference between believing you have a claim and it actually being decided by the owner or an appropriate authority that money is, in fact, owed.  Testimony of S. Phillips, Transcript, p. 2150.  As is discussed in greater detail, *infra*, CCI's "claim" of $1,162,460 filed with Department of General Services ("DGS") relative to the Mahanoy Prison resulted in payment by DGS of only approximately $200,000, less than 20% of the amount "estimated" by CCI to be its "claim."  Finally, according to CCI's interim financials, Scott Air Force Base was (and was projected to continue to be) profitable as of December 31, 1999.  Exhibit 337.

may be inadequate in law because of a failure of proof through lack of documentation.  *Adams v. Standard Knitting Mills, Inc.,* 623 F. 2d 422, 435 (6th Cir. 1980) (the "District Judge evidently inferred from [accountant's] failure to document such testing in its work papers, that the testing did not occur.  The record also establishes adequate foundation for this inference").

Brown Schultz' undocumented assertion that it reviewed certain documents and conducted certain tests should be looked at with a jaundiced eye given that:  (a) there is a lack of substantiation of such review in Brown Schultz' working papers; (b) Brown was not personally involved in any field work; (c) according to the time sheets, Bowman only spent limited time conducing fieldwork in 1997 or 1998; (d) other lower level Brown Schultz employees, like Corinne Rebinski, performed most of the field work; and (e) because of Bowman's lack of experience, she failed to question further problems in 1997 and 1998 that she did know were serious.  Essentially, Brown is unqualified to opine as to what happened in the field – except to the extent reflected in the working papers – and Bowman lacks not only experience, but personal knowledge concerning much of the field work for the 1997 and 1998 Audit Reports.

> **(e)     "Disclaimers" In The Audited Financial Statements Do Not Relieve Brown Schultz' Liability.**

Brown Schultz cannot abdicate its obligations to adhere to AICPA standards or its responsibilities for the inaccuracies of the Audited Financial Statements by relying on the "Use of Estimates" disclosure in Footnote 1.  Footnote 1 is a standard disclosure required by Statement of Position 94-6, "Disclosure of Certain Significant Risks and Uncertainties" ("SOP 94-6"), Exhibit "A" for ID, Tab 19B §§1408.1 and 1408.11, which requires disclosure that preparation of financial statements requires the use of management's estimates.  SOP 94-6 "acknowledges that the disclosure will usually be standardized (*that is, boilerplate*)" and the "focus [is] primarily on risks and uncertainties that could significantly affect the amounts reported in the

24

financial statements *in the near term . . . .*" SOP 94-6, ¶.02 (emphasis supplied). "Near term" is

defined as "[a] period of time not to exceed one year from the date of the financial statements."

SOP 94-6, ¶.07; Exhibit A, Tab 19B §1408.18. Footnote 1 serves merely to inform the reader

that estimates may change within a period up to a year from the financial statement's date.

Moreover, Footnote 1 does not immunize Brown Schultz from liability for failing to

properly test management's estimates. Brown Schultz' Independent Auditor's Reports make

specific representations that as of *a date certain* (December 31, 1997 and December 31, 1998

respectively) the Audited Financial Statements "present fairly" and "in all material respects"

CCI's financial position. That "actual results [at project completion] *could* differ from those

estimates" does not vitiate the representation that as of a date certain, Brown Schultz'

representations are true or, at minimum, have been reviewed with "professional skepticism."

> **3. Brown Schultz' Disclosure Of The PCIC Claim Guarantee And Including It In "Underbillings" Violated GAAP And Brown Schultz' Internal Related-Party Disclosure Standards.**

> **(a) PCIC Issued A Remedial Work Period Insurance Policy For CCI's Mahanoy Prison Project.**

On or about April 3, 1997, CCI was awarded a project by the Department of General

Services ("DGS") for the construction of two medium security housing units affiliated with the

State Correctional Institute – Mahanoy City (the "Mahanoy Prison Project"). Exhibit 222, p.

285. According to Brown Schultz' working papers for the 1997 Audit Report, CCI bid the

Mahanoy Prison Project expecting to lose approximately $42,000 (-.41%). Exhibit 222, p. 281.

Testimony of Bowman, Transcript, pp. 1388-1389.

In late 1998, CCI asserted a claim against DGS for allegedly "unforeseen costs" totaling

$1,162,460 on the Mahanoy Prison Project (the "Mahanoy Claim") attributable to "owner-caused

delays" and "unusually severe winter conditions." Exhibit 59, Exhibit 222, pp. 284-292. As

with approximately 46 of CCI's other projects, the Mahanoy Prison Project was covered by an insurance policy issued by PCIC ("Remedial Work Period Insurance Policy").[18]  Exhibit 222, pp. 295, 268.  The Remedial Work Period Insurance Policy for the Mahanoy Prison Project was typical of other policies issued by PCIC relative to various CCI projects, Exhibit 222, p. 299, 268; Testimony of Brown, Transcript, pp. 1021-1022.  The Remedial Work Period Insurance Policy provided that PCIC will "reimburse" the insured for certain "costs" defined in Part I of the policy as: "[t]he ordinary and customary charge for the type of services performed in the geographical area where the remedial work services are performed . . . ."  *Id.*, p. 300.  The Remedial Work Period Insurance Policy also has a number of conditions to a claim for payment.[19]

    **(b)**    **Brown Schultz Failed To Comply With The Recognition Standards Contained In SOP 81-1 Regarding The Mahanoy Claim.**

        **(1)**    **The Mischaracterization Of CCI's Revenue In The 1998 Audit Report Was Material And Misleading.**

It is undisputed that in the 1998 Audit Report the Mahanoy Claim was included as part of CCI's $6,341,726 of "Costs and Estimated Earnings in Excess of Billings."  These are also known as "Underbillings."  Exhibit 36.  Testimony of Brown, Transcript, pp. 1065-1066, 1076.  The Mahanoy Claim amount was purportedly included in Underbillings by Brown Schultz

---

[18] PCIC and CCI are "related parties," as that term is used in AICPA guidelines and rules.  FAS No. 57, Exhibit "A" for Identification, Tab 14.  Testimony of Brown, Transcript, pp. 1081-1082.

[19] These conditions include the following:  (a)  a Proof of Loss had to be submitted "*after* each remedial work *repair*" made by the insured part IV.  The Proof of Loss must be submitted after the pertinent repair has been made and after PCIC has received a "sworn proof by a Designated Contract Holder," a term specifically defined in the Remedial Work Period Insurance Policy at part II(3).  Exhibit 222, pp. 300, 302; (b) CCI must notify and request authorization from [PCIC]" prior to proceeding with the "repair" and shall, at that time, provide an estimate of the anticipated repair costs.  Exhibit 222, p. 299; and (c) upon payment, PCIC "shall be subrogated to all of [CCI's] rights of recovery . . . ."  Part XIII.  Exhibit 222, p. 306.  Testimony of Brown, Transcript, pp. 1056-1060.

because of "[t]he guarantee of PCIC of the claim to be submitted to the [DGS]." Testimony of Brown, Transcript, pp. 1076-1077.

The Mahanoy Claim did not meet the recognition standards for *revenue* set forth in SOP 81-1. Exhibit 360, Appendix A, p. 104, AICPA Technical Aids, Statement of Position 81-1, Accounting for Performance of Construction-Type and Certain Production-Type Contracts, July 15, 1981 ("SOP 81-1"); Testimony of DeBruyn, Transcript, pp. 1850-1851, 2067-2068, 2030-2031. If the mischaracterized amount of the Mahanoy Claim is removed from revenue, CCI's net income of $59,000 converts to a net *loss* in excess of $1.1 million dollars. Testimony of Bowman, Transcript, p. 1405.

### (2)    Claims May Only Be Recognized As Revenue If Certain Requirements Are Met.

SOP 81-1 enumerates certain conditions which must be met *before* a claim can be included in revenue:

> a.    The contract or other evidence provides a legal basis for the claim; or a legal opinion has been obtained, stating that under the circumstances there is a reasonable basis to support the claim.
> b.    Additional costs are caused by circumstances that were unforeseen at the contract date and are not the result of deficiencies in the contractor's performance.
> c.    Costs associated with the claim are identifiable or otherwise determinable and are reasonable in view of the work performed.
> d.    The evidence supporting the claim is objective and verifiable, not based on management's "feel" for the situation or on unsupported representations.

Exhibit 360, Appendix A, pp. 103-104.[20]

Brown admitted that there was no documentation in Brown Schultz' working papers demonstrating Brown Schultz' compliance with the requirements of SOP 81-1 regarding the

---

[20] SOP 81-1, par. 1 "provides guidance on the application of generally accepted accounting principles in accounting for the performance of *contracts for which specifications are provided by the customer for the construction of facilities . . . .*" Exhibit 360, Appendix A, p. 85. Although the types of contracts covered by SOP 81-1 include the construction and design of buildings, ship building and the design and manufacture of complex aerospace construction and engineering, nothing in SOP 81-1 expressly includes within its scope insurance contracts or guarantees. Exhibit 360, par. 13, Appendix A, p. 88.

Mahanoy Claim, Testimony of Brown, Transcript, pp. 1079, and DeBruyn testified that he did not observe any such documentation.  Testimony of DeBruyn, Transcript, pp. 2065-2067.

Despite its absence from his two written reports and it not being raised by Brown or Bowman during their time on the witness stand, Brenner sought to justify Brown Schultz' non-compliance with SOP 81-1 by claiming that FASB Concept Statement 5, Recognition and Measurements in Financial Statements of Business Entities, June 1, 19994 ("FASB Concept Statement 5") was applicable, instead.  Brenner's reliance on FASB Concept Statement 5 is misplaced for a number of reasons, not least of which is its low ranking on the GAAP hierarchy.

FASB Concept Statement 5 merely provides general "guidance" on an application of the "fundamental criteria" attendant with earnings recognition.  FASB Concept Statement 5, para 78.  It speaks generally of revenue recognition after the merchandise or services have been sold for cash or *claims* have been *converted to cash*.  *Id.*, para. 83(a).  Additionally, the GAAP hierarchy provides that a concept statement has the *lowest* priority of all GAAP rules and is at a level far lower than SOP 81-1.  Testimony of Brenner, Transcript, pp. 3101-3102.  Moreover, SOP 81-1 has specific application, as noted above, to contracts for construction of facilities, SOP 81-1, para. 1, and specifies the preconditions to recognizing construction claims as revenue.

### (3)    Brown Schultz Did Not Investigate The Validity Of The Mahanoy Claim.

During the trial, Bowman admitted that if the Mahanoy Claim was "phony" or a "false statement" it could not have been booked in revenue.  Testimony of Bowman, Transcript, p. 1407.  However, *no* independent investigation or testing was performed by Brown Schultz to determine if there was any merit to the Mahanoy Claim.  Testimony of Bowman, Transcript, pp. 1407-1408.

In 1999, DGS paid CCI only approximately $220,000 of its putative claim of nearly $1,200,000.  Testimony of Brown, Transcript, pp. 1283-1285.  *The amount paid by DGS is only 17% of the total amount of the Mahanoy Claim.*

> **(4)** **Brown Schultz Failed To Determine If There Was A Legal Basis For The Payment To CCI Pursuant To The Remedial Work Period Insurance Policy.**

Brown Schultz was familiar with SAS No. 73.[21]  Exhibit 272; Testimony of Brown, Transcript, pp. 1216-1218; Testimony of Brown, Transcript, p. 1216.[22]  Brown admitted that no legal assistance was sought as to whether certain claims relating to the Mahanoy Prison Project were covered by the Remedial Work Period Insurance Policy for the Mahanoy Prison Project or if the policy's claims procedures had been followed.  Exhibit 222.  Testimony of Brown, Transcript, pp. 1036-1038, 1219.

Specifically, in late 1998, PCIC paid CCI a total of $900,000 on two Mahanoy Prison Project claims.  Exhibit 222, pp. 295-298.  Testimony of Brown, Transcript, pp. 1064-1065.  Brown Schultz failed to obtain a legal opinion on whether the $900,000 was validly paid under the terms of the Remedial Work Period Insurance Policy, Testimony of Brown, Transcript, pp. 1036-1038, 1219, nor did Brown Schultz consult with any attorney to determine whether CCI correctly followed the claims payment and documentation provisions of the Remedial Work Period Insurance Policy.  Testimony of Brown, Transcript, p. 1045-1046.

---

[21] SAS No. 73 requires the auditor to consider using the work of a specialist to "[i]nterpret technical requirements, regulations or agreements . . ." and its presumption that the auditor lacks the expertise to interpret or assess the legal significance of contracts.  SAS No. 73, Exhibit 272, para. 7(d), Exhibit 43 (designated only).

[22] In connection with the audit report for the year ending December 31, 1994 (the "1994 Audit Report"), Brown Schultz obtained a legal opinion pursuant to SAS No. 73 to clarify the scope of coverage under a specific Remedial Work Period Insurance Policy issued by PCIC.  Exhibits 34, 99.  Testimony of Brown, Transcript, pp. 1040-1042.  That legal opinion letter provided that although the particular claim was covered, CCI needed "to complete the submission of an appropriate Proof of Loss and to observe the other provisions of the Remedial Work Period Insurance Policy regarding the filing and perfection of the claim."  Exhibit 31, Exhibit 99.

Of the $900,000 paid, $448,000 was paid purportedly because CCI's masonry subcontractor – Johnson Masonry – defaulted (the "Johnson Masonry Claim"). The remaining amount of $452,000 was paid because CCI's mechanical work "was impacted as a result of union issues and default of [its] sheet metal fabricator" (the "Union Claim"). Neither of these claims is "remedial" according to the terms of the Remedial Work Period Insurance Policy, Exhibit 222, pp. 295-298; Testimony of Brown, Transcript, pp. 1045-1046, 1062-1063, and the pre-conditions to payment were ignored.[23]

> ### (5) The Mahanoy Prison Guaranty Agreements Were Insufficient To Justify Revenue Recognition Of The Mahanoy Claim And Were Created At A Time When Brown Schultz Knew CCI Was Losing Almost $1.2 Million.

Brown Schultz' working papers for the 1998 Audit Report acknowledge – and Sheri Phillips admitted – that as of October 31, 1998 CCI was *losing* $1,161,448.30. Exhibit 222, p. 23; Testimony of S. Phillips, Transcript, pp. 2160-2162.

Brown Schultz' working papers also revealed the existence of a PCIC-issued Guaranty Agreement dated as of December 1, 1998, which purportedly guaranteed payment of the Mahanoy Claim up to $1,200,000, but *only* if DGS failed to pay. Exhibit 264. In 1999, a second Guaranty Agreement backdated to December 1, 1998 was issued by PCIC in the amount of $1,162,460 – the *exact* amount of the Mahanoy Claim submitted to DGS – and only $1,011.57 more than CCI's net loss as of October 31, 1998. Exhibit 265; Testimony of Brown, Transcript,

---

[23] There were no executed Proof of Loss forms and Brown does not recollect ever seeing signed copies of them. Exhibit 222, pp. 295-298, 300-302 (Section IV. Proof of Loss); Testimony of Brown, Transcript, pp. 1037-1038, 1051-1052. No prior authorization from PCIC was obtained before the work was performed. Testimony of Brown, Transcript, p. 1048. No "sworn proof by a Designated Contract Holder [DGS]" was obtained, Exhibit 222, pp. 299-300 (II. Definitions); Testimony of Brown, Transcript, pp. 1038-1040, 1052, and no analysis was done to determine whether the $448,000 relative to Johnson Masonry was calculated in accordance with the "costs" definition contained in the Remedial Work Period Insurance Policy. Testimony of Brown, Transcript, pp. 1041, 1046-1048. Brown also admitted that Brown Schultz had an obligation to determine whether claims were validly paid pursuant to the Remedial Work Period Insurance Policy. Testimony of Brown, Transcript, pp. 1053-1054.

p. 1064. No legal opinion was obtained as to whether either of the Guaranty Agreements were legally enforceable. Furthermore, why the Guaranty Agreements were needed – particularly in light of the existence of the Remedial Work Period Insurance Policy, discussed *infra* – was never adequately explained by Brown Schultz. Testimony of Brown, Transcript, pp. 1067-1071.[24]

Bowman claims to have discussed the inclusion of the Mahanoy Claim in revenue in February 1999 with Brown and Sheri Phillips. Testimony of Bowman, Transcript, pp. 1390-1391. She not only insists that Brown was present, but claimed that she had no involvement in the decision to include the claim in Underbillings. Testimony of Bowman, Transcript, pp. 1392-1393. Sheri Phillips recalled a conversation with Bowman in February 1999 concerning the treatment of the Mahanoy Claim, but testified that Brown was *not* present during that conversation. Testimony of Sheri Phillips, Transcript, pp. 2154-2155.[25]

Against this backdrop of the curious circumstances and undocumented and unknown reasons for the Guaranty Agreements' creation are Brown and Brown Schultz' admissions that the initial projected loss of approximately $42,000 on the Mahanoy Prison Project was expected to mushroom to a loss of over $2 million. Testimony of Brown, Transcript, pp. 1388-1390. Brown also knew in December 1998 from his prior communications with David Dominiani ("Dominiani"), CCI's bonding agent, that CCI's bonding program with USF&G would be in peril and Ortenzio would be faced with reinstating his personal indemnity to USF&G if CCI's

---

[24] Bowman and Sheri Phillips did not know why the Guaranty Agreements were created. Testimony of Bowman, Transcript, p. 1378; Testimony of Sheri Phillips, Transcript, pp. 2156-2157. Bowman and Brown also testified that they had no idea who prepared the Guaranty Agreements. Testimony of Bowman, Transcript, p. 1392. Brown Schultz' Audit Planning Memorandum for the 1998 Audit Report dated December 2, 1998 – a date which was one day *after* the purported execution date of the Guaranty Agreements – does not even list the Guaranty Agreements. Exhibit 222, p. 26. Testimony of Bowman, Transcript, p. 1378.

[25] This is consistent with Brown's admission that he did not engage in any supervision of the CCI audit work in the field and that he limited his participation to a review of the working papers. Testimony of Brown, Transcript, p. 1018.

31

net worth fell below $4.8 million.  Exhibits 209, 211; Testimony of Brown, Transcript, pp. 1122-

1123.

In short, but for PCIC's payment of $900,000 in purported remedial work insurance

claims and the undisclosed and improper inclusion of the Mahanoy Claim in Underbillings, CCI

would have posted a net *loss* as of December 31, 1998 of over $2 million.

> **(6)     Even If The Mahanoy Claim Was Properly Included In
> Revenue As An Underbilling, $448,000 Of That Claim Had
> Previously Been Paid By PCIC Under The Remedial Work
> Period Insurance Policy.**

The Johnson Masonry Claim was included as part of the Mahanoy Claim, Exhibit 222, p.

291, Testimony of Brown, Transcript, pp. 1095-1096, and as a result, the Mahanoy Claim was

*overstated* by $448,000; a fact admitted by Brown.  Exhibit 222, p. 95; Testimony of Brown,

Transcript, pp. 1096-1097.  Thus, even if, *arguendo*, the Mahanoy Claim could properly have

been included in Underbillings, it was overstated by $448,000.

Standing alone, this mistake would have changed CCI's net income profit in the 1998

Audit of $59,041 to a net *loss* of $389,000.  Testimony of Brown, Transcript, pp. 1213-1214.

Brown Schultz also failed to disclose that the $900,000 paid by PCIC to CCI in

settlement of two claims – one of which was the Johnson Masonry Claim – was treated as a

reduction in the Mahanoy Prison Project job costs.  Exhibit 222, p. 282.  Brown admitted during

the trial that applying insurance claim proceeds to a reduction of job costs will inflate a particular

project's profitability (or reduce the loss).  Testimony of Brown, Transcript, pp. 1071-1072.

Brown also admitted that project profitability was information that a bonding company would

want to see in an audit report.  Testimony of Brown, Transcript, p. 888; Testimony of Bowman,

Transcript, pp. 1337-1338, 1339.

### (7)     PCIC Lacked The Financial Ability To Pay The Mahanoy Claim.

In large part, Brown Schultz based its decision to approve the inclusion of the full amount of the Mahanoy Claim in Underbillings on PCIC's purported ability to satisfy that claim in full. Although unable (or unwilling) to opine on PCIC's solvency for the Superintendent of Insurance for the Turks and Caicos Islands, Brown claims to have assessed PCIC's solvency in connection with Brown Schultz' decision to include the Mahanoy Claim in Underbillings based on the Guaranty Agreements. Testimony of Brown, Transcript, p. 1281. Brown Schultz' opinion on PCIC's putative solvency was purportedly based on an audit of PCIC for the year ending December 31, 1998 (the "PCIC Audit Report") (which included a *qualified* auditor's opinion) and the "fair market value of the [PCIC] assets." Exhibit 271; Testimony of Brown, Transcript, pp. 1110-1111, 1280. Indeed, Brown admitted that the PCIC Audit Report was qualified because Brown Schultz did not know whether PCIC's claims reserve of $862,338 was adequate.

Significant evidence adduced during the trial demonstrated that PCIC was *not* capable of having legally satisfied the Mahanoy Claim in full.[26]

---

[26] The evidence of insolvency included, without limitation, the following: (a) of the $862,388 reserve for all seven outstanding remedial work insurance claims issued by PCIC to CCI, Petrowski had established a reserve for the Mahanoy Claim of $581,230 (or one-half of the claim amount). Exhibit 270; Testimony of Brown, Transcript, p. 1109. Thus, standing alone, PCIC's net worth of $520,469 was $60,761 *less* than the reserve amount established by Petrowski for the Mahanoy Claim; (b) of the total of $1,257,576 in liquid assets as shown in the PCIC Audit Report, Brown admitted that $180,000 of investment securities constituted "restricted cash" which could not be released without the permission of the Superintendent of Insurance of the Turks and Caicos Islands, Testimony of Brown, Transcript, pp. 1117-1118, and that another $23,000 had to be maintained in a separate escrow account for credit life mortality reserves. Testimony of Brown, Transcript, p. 1121; Exhibit 271, p. 10 fn. 2; (c) There were seven outstanding Remedial Work Period Insurance Policies against which Petrowski had established $862,338 in reserves. Exhibit 268; Testimony of Brown, Transcript, pp. 1114, 1224; (d) Brown knew that Ortenzio could revoke any and all policies at will and had done so with respect to other projects. Exhibit 309; Testimony of Brown, Transcript, p. 1283; (e) in connection with the inclusion of the Mahanoy Claim as an Underbilling, Brown admitted that he relied on CCI's representation that it would not make any further claims against the seven outstanding Remedial Work Period Insurance Policies. Testimony of Brown, Transcript, pp. 1281-1282. This is *not* documented in Brown Schultz' working papers. Testimony of Brown, Transcript, p. 1226; and (f) the combined total of PCIC's net worth and the designated reserve - $1,101,699 – fall short of the amount of the Mahanoy Claim, $1,161,448.30.

**(8)     Inclusion Of The Mahanoy Claim As An Underbilling Was Inappropriate.**

Even if, *arguendo*, a rational reason for guaranteeing a claim purportedly covered by a Remedial Work Period Insurance Policy existed – and none has been proffered by Brown Schultz – DeBruyn's testimony was unequivocal that the Guaranty Agreements do not support the recognition of the Mahanoy Claim as an Underbilling in the 1998 Audit Report. Testimony of DeBruyn, Transcript, p. 3191. The reason, as Bowman acknowledged, lies in the important distinction that exists between proceeds generated from the actual construction contract between DGS and CCI and proceeds obtained from another source such as, for example, the Guaranty Agreement. Testimony of Bowman, Transcript, pp. 1398-1399.

As DeBruyn explained during the trial, a guaranty agreement represents a contingent gain for CCI and, accordingly, FAS No. 5 "Accounting for Contingencies," March 1975 (FAS No. 5) would not allow the Mahanoy Claim to be recognized as revenue because it is contingent upon a future event; viz, DGS' failure to pay the Mahanoy Claim. Exhibit A for ID, Tab 13; Testimony of DeBruyn, Transcript, pp. 1848-1849. This distinction was also acknowledged by James Daily. Testimony of J. Daily, Transcript, p. 399.

DeBruyn saw nothing in Brown Schultz' working papers for the 1998 Audit Report showing any analysis or testing as to whether or not the criteria set forth in SOP 81-1 were met with respect to the Mahanoy Prison Claim. Testimony of DeBruyn, Transcript, pp. 1847-1848.

**(c)    Footnote 8 Does Not Adequately Disclose The Claim Guaranty Or The Recording Of Insurance Payments As A Reduction In Job Costs.**

Footnote 8 in the 1998 Audit Report merely states that a claim in the amount of $1,162,460 had been guaranteed by PCIC.[27]  Exhibit 36, p. 13.  Footnote 8 does not identify the "claim" as being connected with any specific CCI construction project or that it has been *included in revenue* for CCI in 1998.  Exhibit 36, pp. 1, 3, 13.  Testimony of Bowman, Transcript, pp. 1402-1403.  Moreover, Bowman admitted that there was nothing in the 1998 Audit Report that would enable the reader to understand that the claim guaranty referred to in Footnote 8 was related to the Mahanoy Prison project, nor that the "claim" amount was included in CCI's revenue.  Testimony of Bowman, Transcript, pp. 1402-1403.

FAS No. 57 requires that related-party transaction disclosures must describe the transaction and its *effect* on the financial statement.  FAS No. 57, par. 2(b), Exhibit "A" for Identification, tab 14; Testimony of DeBruyn, Transcript, pp. 1845-1846.  Footnote 8 merely identifies the transaction – the existence of a guaranteed claim – but does not describe its effect on the financial statement; that the claim guaranteed relates to the Mahanoy Prison Project and was included in Underbillings.[28]  Exhibit 36, p. 8; Testimony of DeBruyn, Transcript, p. 1853.

Very clearly, FAS No. 57 and Brown Schultz' internal disclosure checklist mandated disclosure of the basic transaction and how it effected CCI's financial statement.  The completeness requirements of FAS No. 57 could not be clearer; sufficient information to enable the reader to make an informed decision about the related party transaction and its effects on the

---

[27] Brown Schultz admitted that the "claim" referenced to in Footnote 8 was the Mahanoy Claim.  Testimony of Brown, Transcript, pp. 1066, 1070-1071.

[28] Footnote 8 also did not satisfy Brown Schultz' internal audit plan requirement that the audit report disclose both the related-party transaction and the "effect" of related-party transactions on the financial statements.  Exhibit 222, p. 184 (CCX-13A) (checklist in Brown Schultz' working papers indicating that, as to Footnote 8, related party actions were being described to the extent "deemed necessary to an understanding of the effects of the transactions on the financial statements").

financial statement must be disclosed.[29]  Brown Schultz' abject failure to identify both the identity of the relevant project – Mahanoy Prison – and that the Mahanoy Claim had been included in the Underbillings falls far short of what FAS No. 57 requires.  Even more egregious is that Brown Schultz knew that USF&G was an intended user of the Audited Financial Statements and that it would be important for USF&G to know that the Mahanoy Prison Project was slated to lose over $2 million had it not been propped up by the Guaranty Agreement.  In addition, as pointed out, *supra*, Brown Schultz failed to disclose that the $900,000 paid by PCIC to CCI in settlement of two claims was treated as a reduction in job costs.  Exhibit 222, p. 282.  This failure to disclose the effect such payment had on the 1998 Audit Report also violated FAS No. 57.  It was clearly material as $900,000 out of approximately $10,000,000 in job costs were eradicated by this accounting procedure.  It also would have been "capable of making a difference" to an audit report reader like USF&G since the eradication of over 8% of the Mahanoy Prison Project's job costs would have increased the project's profit (or reduced its loss) by that same amount.  None of this was disclosed in Footnote 8 and neither Brown, Bowman or Brenner explained why FAS No. 57 was inapplicable.

Being forced to admit that Footnote 8 did not adequately disclose the effects of Guaranty Agreements on CCI's financial statement, Brown Schultz asserted that Footnote 1, when read in conjunction with Footnote 8, provided such disclosure.  That assertion fails for many reasons.

---

[29] FAS No. 57 disclosures are mandatory and the annotations to FAS 57 make clear that disclosure of relevant information "capable of making a difference in a decision by helping users to form predictions about the outcomes of past, present, and future events are to confirm or correct expectations."  FAS No. 57, para. 13, Exhibit "A" for ID, Tab 14.  The disclosure also must be complete:

> . . . nothing material [should be] left out of the information that may be necessary to insure that it validly represents the underlying events and conditions.
> . . .
> Completeness of information also effects is relevance.  Relevance of information is adversely effected if a relevant piece of information is omitted, even if the omission does not falsify what is shown . . .

Therefore, *information about transactions with a related party that would make a difference in decision making* should be disclosed so that users of the financial statements can evaluate their significance.  *Id.*, para. 16-18.

The disclosure in Footnote 1 relates to "construction contractors" and employment by CCI of the percentage of completion method of booking revenue, costs and profits.  Exhibit 36, p. 8.  Testimony of Brown, Transcript, p. 1103.  Furthermore, Brown acknowledged that the two paragraphs in Footnote 1 regarding revenue and cost recognition addresses revenue from contracts between CCI and its project owners – *not* contracts between CCI and PCIC.  Testimony of Brown, Transcript, p. 1104.  Brenner also acknowledged that Footnote 1 concerned cost recognition and revenue for construction contracts not remedial work insurance contracts.  Testimony of Brenner, Transcript, pp. 3094-3095.  Indeed, the last sentence in Footnote 1 virtually repeats the key criteria set out in SOP 81-1 for recognition of claims as revenue on construction contracts.  SOP 81-1, para. 65 ("recognition of amounts of additional contract revenue relating to claims is appropriate only if it is probable that the claim will result in additional contract revenue and if the amount can be reliably estimated").[30]

In at least one prior year, Brown Schultz demonstrated its ability to properly describe both the related-party transaction and its effect on the balance sheet as required by FAS No. 57.[31]

Finally, in a glaring admission, Brown admitted that it would not have violated GAAP or any ethical standards if Brown Schultz had added in Footnote 8 a statement informing the reader

---

[30] Brown admitted that PCIC would be subrogated to CCI's recovery rights against DGS on the Mahanoy Claim.  Exhibit 222, p. 306 (XIII.  Subrogation); Testimony of Brown, Transcript, pp. 1290-1291.  However, despite the unambiguous language of the Remedial Work Period Insurance Policy nothing in the 1998 Audit Report discloses that there is any right of subrogation by PCIC to amounts CCI recovered from DGS.  Testimony of Brown, Transcript, p. 1291.

[31] In the 1994 Audit Report for CCI, Brown Schultz provided a separate line-item entitled "Accounts Receivable Affiliates" in the revenue section of the balance sheet for a $461,320 claim against the Remedial Work Period Insurance Policy made by CCI.  Exhibit 31, p.1; Testimony of Bowman, Transcript, pp. 1340-1341.  Brown Schultz also disclosed in that same report the *effects* of the PCIC transaction; vis, that a "warranty insurance expense payment of $335,317" was included as a "direct cost of contracts."  Exhibit 31, p. 12, fn. 7; Testimony of Bowman, Transcript, pp. 1330-1332.  The 1994 Audit Report also advises the reader not only that "[i]n 1994 the company submitted a warranty insurance claim of $397,800 to PCIC" but that such "claim was pending payment as of December 31, 1994."  Exhibit 31; Testimony of Brown, Transcript, p. 1042.

that the Mahanoy Claim appeared in the 1998 Audit Report as an Underbilling.  Testimony of

Brown, Transcript, pp. 1102, 1267.

> ### (d)   Brown Schultz' Treatment Of The Mahanoy Claim And The Insurance Payments Were Materially Misleading And Detrimentally Relied Upon By USF&G.

USF&G first became familiar with PCIC when it acquired the CCI account in 1993.

PCIC was presented to USF&G as an insurance company that could pay warranty claims.

Testimony of Anthony Phillips, Transcript, p. 2439.  USF&G believed that the existence of a

company to pay warranty claims was "a good thing."  Testimony of Anthony Phillips,

Transcript, p. 2440.  USF&G's understanding of the relationship between CCI and PCIC did not

change at any time until after CCI's default in the fall of 1999.  Testimony of Anthony Phillips,

Transcript, p. 2440.  USF&G's underwriters believed that Footnote 8 in the 1998 Audit meant

that if CCI did not receive a payment of all or a portion of the unnamed project related claim,

PCIC would guaranty payment of the unpaid portion at some time in the future.  Testimony of

James Daily, Transcript, p. 399.  Neither James Daily nor Anthony Phillips knew that the

Mahanoy Claim was included as *revenue* in the 1998 Audit Report.  Testimony of J. Daily,

Transcript, pp. 416, 436, 439-440; Testimony of Anthony Phillips, Transcript, pp. 2477-2478,

2587-2588.  James Daily testified that USF&G would have *ceased* to issue bonds if it knew that

the Mahanoy Claim had been included in "Underbillings."  Testimony of J. Daily, Transcript, pp.

416, 436, 439-440.

Anthony Phillips reviewed the 1998 Audit Report when received from Dominiani and it

was his standard procedure to read all footnotes in audit reports.  Testimony of Anthony Phillips,

Transcript, p. 2583.  He had no understanding that the Mahanoy Claim was included in

Underbillings until subsequent to finding out CCI was in financial trouble in late 1999.

Testimony of Anthony Phillips, Transcript, p. 2584. Anthony Phillips also testified that if he had known at the time of his receipt of the 1998 Audit Report that the Mahanoy Claim was included in revenue as an Underbilling he would have *halted* bonding until he received a satisfactory answer regarding why CCI was not getting paid for the Underbilling and whether there were additional Underbillings that were not going to be paid. Testimony of Anthony Phillips, Transcript, pp. 2477-2478, 2587-2588.[32]

All bonds issued by USF&G in reliance on the 1998 Audit Report were within the limits of the Specific Discretionary Authority ("SDA") of $15,000,000 per project/$75,000,000 total program allocated to the Harrisburg office, except for the Pennsylvania Turnpike building. Exhibits 301, 15, 10, 12, 9, 2, 3, 4, 1; Testimony of Anthony Phillips, Transcript, pp. 2414-2415, 2468. The Pennsylvania Turnpike building required approval from the Home Office, which was received on or about June 15, 1999. Testimony of Anthony Phillips, Transcript, p. 2468.

Anthony Phillips' testimony was consistent with the information contained in the letter from Dominiani to Anthony Phillips dated November 16, 1993 in which Dominiani discusses PCIC's role as a provider of "warranty insurance." Exhibit 75. Although Dominiani subsequently wrote in a letter to Anthony Phillips dated August 17, 1998 that funds from PCIC might be available "as a buffer to offset losses," in that same letter he reiterates that "PCIC [is] available to fund 'warranty coverages' and has previously paid "warranty claims." Exhibit 237. Anthony Phillips also testified that Dominiani's letter reminded him of the availability of certain funds from PCIC, "[a]s long as it was for warranty coverages." Testimony of Anthony Phillips, Transcript, pp. 2520-2521. In sum, nothing in Dominiani's letters is inconsistent with USF&G's

---

[32] The USF&G "Home Office" would have upheld Phillips' decision to halt bonding. Testimony of Anthony Phillips, Transcript, pp. 2435-2436. The "Home Office" never rejected or overruled any recommendation from his office. Testimony of Anthony Phillips, Transcript, pp. 2435-2436.

understanding of PCIC's role as a provider of warranty insurance policies to CCI. Exhibits 75, 237.

James Daily also testified that he did not have any understanding about the statement in Dominiani's August 17, 1998 letter that CCI might utilize PCIC to enhance CCI's profitability other than "[PCIC] was a warranty insurance company, and it paid warranty insurance claims." Testimony of J. Daily, Transcript, pp. 645-646.

Anthony Phillips testified that based on his discussions with Dominiani he had no understanding that PCIC funds were available for anything other than to fund Remedial Work Period Insurance Policy warranty claims. Testimony of Anthony Phillips, Transcript, p. 2525. Curiously, although Dominiani, a CPA and a former partner of Brown's, was listed on Brown Schultz' witness list, he was never called to testify by Brown Schultz. Testimony of Brown, Transcript, pp. 885-886. *In fact, no evidence was introduced that anyone at USF&G was aware that the funds represented by the Mahanoy Claim were included in revenue and Underbillings in the 1998 Audit Report.*

In another glaring admission, Brown Schultz' underwriting expert, Rolf Neuschaefer ("Neuschaefer"), admitted that in his reading of the 1998 Audit Report he saw nothing that would have informed him that the Mahanoy Claim had been included in revenue. He also admitted that he could not have identified that the Mahanoy Claim was included in revenue by reading Footnote 8. Testimony of Neuschaefer, Transcript, pp. 2387-2388, 2379. Further, Brenner admitted that Footnote 8 to the 1998 Audit Report does not show that the Mahanoy Claim is included in Underbillings, Testimony of Brenner, Transcript, p. 3089, and that even if Footnote 1 in the 1998 Audit Report is read in conjunction with Footnote 8, the specific fact that

the Mahanoy Prison Claim was included in Underbillings is not disclosed.  Testimony of
Brenner, Transcript, p. 3097.

DeBruyn also testified that upon reviewing Footnote 8 that he was unable to determine
what effect the guaranteed amount of $1,162,460 had on CCI's financial statement.  Testimony
of DeBruyn, Transcript, p. 1847.  Additionally, Farnsworth testified that by examining the 1998
Audit Report he was unable to tell that the Mahanoy Claim of $1,162,460 was included in
revenue, Testimony of Farnsworth, Transcript pp. 1538, 1540, and that Footnote 8 does not
inform the reader in what, if any, lines in the CCI balance sheet or income statement the
Mahanoy Claim is shown.  Testimony of Farnsworth, Transcript p. 1538.  Farnsworth added that
even if he knew that the Mahanoy Claim was included in revenue, he would not have known it
was included in Underbillings because it should have been set out in a separate line item on
CCI's balance sheet.  Testimony of Farnsworth, Transcript p. 1562.

Additionally, Farnsworth stated that he saw nothing in Footnote 8 of the 1998 Audit
Report showing that the Mahanoy Claim was being included in revenue nor did anything identify
the name of the project to which the "claim" resulted.  Testimony of Farnsworth, Transcript p.
1565.  Moreover, if – at the time of review of the 1998 Audit Report – it was known to
USF&G's underwriters that the Mahanoy Prison Claim was included in revenue and was
reflected in the balance sheet as an asset, it would have been relevant to underwriting.
Testimony of Farnsworth, Transcript, p. 1625.

To the same effect was Brown Schultz' failure to adequately disclose the effect of the
$900,000 insurance claim payments as a reduction in the Mahanoy Prison Project's job costs.
There is no doubt that that information cannot be read or even inferred in any part of the 1998
Audit Report.  It is equally undisputed that the treatment of an insurance claim as a reduction in

job costs – as opposed to simply including it in revenue – would have been important for USF&G to know.  Footnote 8 did not even describe the projects for which the $900,000 of insurance claims were paid.

In short, Brown Schultz violated FAS No. 57 and its own disclosure rules by failing to adequately disclose these two transactions involving the Mahanoy Prison Project.  Combined these two transactions turned the Mahanoy Prison Project's $234,000 net loss as of December 31, 1997 into a $1,265,957 net profit as of December 31, 1998.  Exhibit 213, p. 29; Exhibit 222, p. 146.  It is undisputed, based on prior audits, that Brown Schultz clearly knew what constituted a proper disclosure under FAS No. 57 but ignored – or even intentionally overlooked – those requirements in connection with the 1998 Audit Report.

### (e)  The Purported Payment To CCI In 1999 Is Irrelevant.

According to PCIC's trial balance sheet, PCIC paid $800,000 to CCI on July 7, 1999.  PCIC also paid a total of $142,460 in two payment of $72,460 and $70,000 on December 7, 1999.  The December 7, 1999 payments are described as "CCI/Mahanoy CLM PMT."  *However, there is no indication as to the purpose of the payment of $800,000 on July 7, 1999.*  Exhibit 331, p. BSSF 4978.  Testimony of Brown, Transcript, pp. 1284-1285.  Brown Schultz presented no evidence that PCIC actually paid the $800,000 to CCI and that such putative payment related to the Mahanoy Claim.

PCIC payments to CCI in 1999 were a form of revenue to CCI – to be accounted for in 1999.  Testimony of DeBruyn, Transcript, pp. 3191-3192.  The funds received or guaranteed by PCIC, however, would not have been "contract revenue."  Testimony of DeBruyn, Transcript, p. 3193.  Farnsworth opined that even if, *arguendo*, the claim were paid by PCIC, it should not have been included in revenue because it was a claim that CCI made against DGS for additional

42

amounts over and above an agreed contract price and such putative claim was guaranteed by a third party. Testimony of Farnsworth, Transcript, p. 1544.

D.    **USF&G Justifiably Relied On The Audited Financial Statements.**

The Court recognized at the end of USF&G's case-in-chief that "the evidence is pretty clear that the financial statements were used by USF&G in their analysis of the account in their decision making." Transcript, p. 2690. Other than the perjured testimony of William Eskin[33] – who had no involvement in the underwriting process – Brown Schultz did not even attempt to introduce any evidence on this issue as part of its defense.

To detract attention from its own errors, Brown Schultz attempted to turn the trial into a referendum on the skills of USF&G's underwriters. However, all bonds were issued in reliance on the Audited Financial Statements which showed, *inter alia*, that CCI appeared to be in good financial condition. Exhibit 34; Exhibit 36. The evidence adduced at trial proved that USF&G not only relied upon the Audited Financial Statements but that such reliance – as well as the underwriting skills utilized – was reasonable. Exhibit 790. Testimony of Farnsworth, Transcript, pp. 1507, 1534-1537. Based on CCI's financial status as attested to by Brown Schultz in the Audited Financial Statements, the continuance of CCI's bonding program at the

---

[33] Having been fired by USF&G for billing personal travel expenses to the company, Mr. Eskin's bias is manifest. His attempt at revenge, however, was undercut not only by testimony of Anthony Phillips and Steven Salazar (both no longer employed by USF&G/St. Paul) but also by the testimony of Mark Holtschneider, John Simanski and Gregory Daily. In fact, the testimony of the foregoing rebuttal witnesses directly and convincingly contradicts Mr. Eskin's fantasies. Moreover, through Gregory Daily, USF&G introduced documentary evidence proving that Mr. Eskin was *not* present at the meeting at which Mr. Eskin testified that he had a discussion with David Hussey. Exhibit 823, Exhibit 378. Curiously, although Mark Holtschneider was called as a witness by Brown Schultz, he was never asked about his alleged conversation with Mr. Eskin. Further, this topic was assiduously avoided by Brown Schultz in its cross-examination of both Gregory Daily and Anthony Phillips. A week prior to the resumption of trial on January 14, 2004, Brown Schultz indicated to USF&G's counsel that it intended to call David Hussey and Steven Salazar as witnesses after Mr. Eskin and requested that USF&G assist them in obtaining their presence at trial. Although USF&G arranged to have Messrs. Salazar and Hussey available on January 15, 2004 and January 16, 2004, Brown Schultz never called them as witnesses.

same $15 million/$75 million level was reasonable.  Testimony of Farnsworth, Transcript, p. 1687.

At all times pertinent hereto, Anthony Phillips, a 32 year veteran underwriter, served as USF&G's and then St. Paul's surety bond underwriting manager in charge of the Harrisburg Office.  However, it was the job of Steven Salazar ("Salazar"), the other underwriter in the Harrisburg Office, to perform a more detailed analysis, which would then be reviewed by Anthony Phillips and James Daily.  Testimony of A. Phillips, Transcript, pp. 2422-2430; Testimony of J. Daily, Transcript, p. 186.

From 1993 through 1998, Anthony Phillips, then serving as a St. Paul Surety Underwriting Specialist handling several of St. Paul's major accounts, would review each of the CCI Audited Financial Statements, as well as Salazar's analysis of that audited financial statement.  Testimony of A. Phillips, Transcript, p. 2428.  It was his standard practice to read the entire document, including footnotes.  Testimony of A. Phillips, Transcript, p. 2583.

Salazar's overall analysis of CCI, including his analysis of the CCI Audited Financial Statements, was memorialized annually in a document entitled "USF&G Interoffice Correspondence" ("Interoffice Correspondence"), which detailed the information contained in the CCI Audited Financial Statements as well as other information, such as CCI's banking relations, insurance coverages, and recommendations concerning CCI's bonding program.  Exhibit 194.  Testimony of A. Phillips, Transcript, pp. 2428-2430; Testimony of J. Daily, Transcript, pp. 300-301.

No Interoffice Correspondence was prepared by Salazar for 1998 as the financial information obtained from the 1998 Audit Report was entered that year into the recently acquired ECF ("Electronic Credit File") program.  Testimony of A. Phillips, Transcript, p. 2431.

44

Not only was it standard procedure for an audit to be analyzed in the Harrisburg branch office and then sent to the Home Office, Testimony of A. Phillips, Transcript, pp. 2443, 2445, but the Home Office got a copy of each of CCI's Audited Financial Statements from 1993 – 1998.  Testimony of A. Phillips, Transcript, p. 2610.  These were often sent by means of a routing slip.  Exhibit 790-B, p. 1266 (sample routing slip).

Salazar, Anthony Phillips and James Daily reviewed and analyzed the 1998 Audit Report shortly after receipt on March 2, 1999.  Exhibits 790, pp. 1255-1257, 90, 132, 159, 194 and 229.  Testimony of J. Daily, Transcript, pp. 370, 382, 386-388; Testimony of A. Phillips, Transcript, pp. 2460-2465.

The CCI Audited Financial Statements appeared to be well-presented and, on their face, they did not reveal any defects in the manner in which Brown Schultz audited CCI's balance sheet.  Testimony of DeBruyn, Transcript, p. 1730; Testimony of Farnsworth, Transcript, pp. 1545, 1558; Testimony of J. Daily, Transcript, p. 783; Testimony of A. Phillips, Transcript, pp. 2443-2444.

Part of the analysis performed by USF&G's underwriters was to examine the ratios of working capital to bonding capacity and net worth to bonding capacity.  Testimony of A. Phillips, Transcript, pp. 2433-2434; Testimony of Farnsworth, Transcript, pp. 1505-1507.  With respect to CCI and other USF&G accounts of a size similar to CCI, USF&G generally wanted the accounts to maintain a working capital-to-bonding capacity ratio of 3% or better ("net quick") and a net worth-to-bonding capacity ratio of 5% or better.  Testimony of A. Phillips, Transcript, pp. 2433-2434.  Anthony Phillips recalls numerous instances in which accounts were underwritten by the Harrisburg branch office that had less than a 3% to 5% ratio.  Testimony of A. Phillips, Transcript, p. 2434.  However, in the rare instance when the net quick ratio is below

45

3%, it should be taken into account that this may be the result of the fact that USF&G's determination of net quick disallows certain assets that show up in an audit report as current assets.  Testimony of A. Phillips, Transcript, pp. 2582-2583.

According to the 1997 Audit Report and 1998 Audit Report, CCI maintained the 3%-5% ratios described above except on limited occasions when USF&G approved a bond which temporarily increased CCI's bonding capacity beyond $75 million.  In fact, from 1994-1997, CCI was at the 5%-6% ratio.  Testimony of Farnsworth, Transcript, p. 1506.

USF&G's justifiable reliance on the Audited Financial Statements was also manifested by uncontrovertible evidence that USF&G reviewed and relied upon the Audited Financial Statements and that USF&G would *not* have issued certain bonds to CCI if it had known of CCI's true financial condition, as revealed in the restated financial reports.  Testimony of A. Phillips, pp. 2474-2478; Testimony of J. Daily, Transcript, pp. 436, 438, 439-440.  Certain aspects of USF&G's reliance regarding the 1998 Audit Report is discussed in greater detail in Section II(C)(3)(d), *supra*.

The rules for determining whether a plaintiff justifiably relied on a material misrepresentation are found in §§540 and 541 of the Restatement (Second) of Torts.  When read together, these rules demonstrate that the party to whom a misrepresentation is made is justified in relying upon the truth of that statement unless he *knows* it is false or its falsity would be *obvious* to him upon a cursory inspection.  *See, Silverman v. Bell Savings & Loan Association*, 367 Pa. Super. 464, 533 A.2d 110, 115 (Pa. Super. Ct. 1987).[34]

---

[34] As a comment to §541 explains, a person is found not to have justifiably relied on a representation "only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses." Restatement (Second) of Torts §541 cmt. a (1977).  A recipient cannot recover if he *blindly* relies upon a misrepresentation of the *falsity* of which would be *patent* to him if he had utilized his opportunity to make a *cursory* examination or investigation." *Id.*  (emphasis added).

Essentially, a plaintiff can satisfy the reliance element by demonstrating that he actually relied, in part, on an accountant's opinion in taking some action. *Fine v. American Solar King Corp.*, 919 F.2d 290, 299 (5th Cir. 1990); *In re Sahlen & Associates, Inc.*, 773 F.Supp. 342, 352-53 (S.D. Fla. 1991). A finding of justifiable reliance is particularly warranted where a party relies upon a professional who is presumed to be knowledgeable. See *Laken v. Fryer Group of Cos.,* 32 Fed.Appx. 24, 28 (3rd Cir. Pa 2002). Brown Shultz' professional status, its knowledge of CCI's financial condition, and its actual knowledge that USF&G was relying on it for information renders USF&G's reliance on Brown Shultz' misrepresentations justifiable. *Id.* at 28.

Additionally, a person claiming justifiable reliance need not prove that the misrepresentation was the sole inducement but, rather, merely that it was a "substantial factor" in determining his course of conduct. *Fort Washington Resources, Inc. v. Tannen*, 858 F.Supp. 455, 460 (E.D. Pa. 1994); *Delhanty v. First Pennsylvania Bank*, 318 Pa. Super. 90 (1983).

Even if, *arguendo*, the work of USF&G's underwriters was of poor quality, it is axiomatic that "[f]oolhardiness or stupidity does not mitigate in favor of the defendants." *Bonhiver v. Graff*, 248 N.W.2d 291, 297 (Minn. 1976).

Farnsworth, an experienced surety industry executive employed by one of the "top tier" sureties at one of the most senior levels, testified that USF&G acted reasonably and in accordance with industry standards in issuing bonds in reliance on the Audited Financial Statements. Testimony of Farnsworth, Transcript, pp. 1529-1532. Neuschaefer, on the other hand, lacked the qualifications to opine on relevant industry standards and admitted that much of his opinion testimony was a reflection of his personal opinions and experiences. Testimony of Neuschaefer, Transcript, pp. 2192-2195, 2185-2187. Further, Neuschaefer came to the witness

stand with a personal agenda; to wit, to obtain some form of validation of his unreasonably stringent underwriting standards which resulted, in part, in his termination from Travelers due to lack of bond production and bond losses and as a "payback" for St. Paul's termination of his bond writing authority at his new job at the Robert Harris Agency.  Exhibit 371; Testimony of Neuschaefer, Transcript, pp. 2185, 2204.[35]  Neuschaefer admitted that he was fired from Travelers due to lack of bond production and bond losses and that St. Paul terminated his authority to write bonds at his new job only a few months before he took on the Brown Schultz assignment because of his lack of production.  Exhibit 371.  Testimony of Neuschaefer, Transcript, pp. 2185-2186.

Brown Schultz' contention, raised for the first time in its post-trial motion pursuant to Fed. R. Civ. P. 52, that only David Hussey had the authority to approve or suspend the bonding program reeks of desperation.  James Daily's testimony that David Hussey was his superior is not tantamount to any requirement that David Hussey needed to sign off on all decisions or that David Hussey's testimony was required to corroborate James Daily or Anthony Phillips' testimony.  By analogy, Brown Schultz' contention is no different than saying that this court cannot render a binding order because such order may be subject to appellate review.  Moreover, Anthony Phillips testified that not only were most of the bonds written within his SDA but that his decisions regarding the continuation or termination of a bonding program were never reversed by "the Home Office."  Testimony of A. Phillips, Transcript, pp. 2435-2436, 2452, 2468.  He further testified that he acted within his authority both in issuing bonds and in discontinuing the bonding program.  Testimony of A. Phillips, Transcript, pp. 2444-2445, 2469-

---

[35] Evidence was also adduced at trial that, contrary to Neuschaefer's testimony, the documents in evidence showed that St. Paul had terminated his bond writing authority *before* he had accepted the assignment as an expert witness for Brown Schultz in this case.  Exhibits 371 and 372 (ID only); Testimony of Neuschaefer, Transcript, pp. 2206-2207.

2470.  If this was such a key aspect of Brown Schultz' defense, why did Brown Schultz

subpoena David Hussey but not call him to the stand?

**E.    Brown Schultz Made Its Misrepresentations Under Circumstances Under Which, At Minimum, It Ought To Have Known Of Their Falsity And It Did So With The Intent To Induce Another To Act.**

Among other elements, a claim for negligent misrepresentation requires proof that the

representor either knew of the misrepresentation, made the misrepresentation without knowledge

as to its truth or falsity, or made the representation under circumstances in which he ought to

have known of its falsity and that the representor intended the representation to induce another to

act on it.  *Williams Controls*, 39 F. Supp. 2d at 577; *Gibbs v. Ernst*, 538 Pa. 193 at 209 (1994).

Under Pennsylvania law, negligent misrepresentation arises from a "want of reasonable care or

competence in obtaining or communicating information."  *Constitution Bank v. Dimarco*, 155

B.R. 913 (E.D. 1993).

The word "intent" means that the actor merely desires to cause the consequences of his

act, or "that he believes that the consequences are substantially certain to result from it."

Restatement (Second) of Torts §8A (1964).  "Knowledge to a substantial certainty constitutes

intent in the eyes of the law."  *In re: C.F. Foods, L.P. v. Campus Crusade for Christ, Inc.*, 280

B.R. 103, 110 (E.D. Pa. 2002).  Moreover, consequences desired by an actor when committing

an act and consequences that although not desired, are substantially certain to result from the act

comprise "intent."  *Conte v. Guatam,* 33 F.3d 303, 308 (3rd C.A. 1994).  It is beyond cavil that

Brown Schultz knew of the purposes of the audit reports, knew of the intended users and knew of

the purposes for which they would be utilized.  When a misrepresentation is made by one having

"means of knowledge at hand, he cannot say that he did not know what he should have known

since the misrepresentation under such circumstances is fraud in law as well as in equity." *La Course v. Kiesel*, 366 Pa. 385 (1951).

Brown Schultz certainly knew that USF&G was an intended user of the Audited Financial Statements – it is identified as such in Brown Schultz' working papers. Exhibit 144, Exhibit 213, p. 43, Exhibit 222, p. 19. Testimony of Bowman, Transcript, pp. 1307-1308, 1313, 1404; Testimony of Brown, Transcript, pp. 851-852, 887-888, 901-902, 1072-1073. In that Brown Schultz was required to use the level of skill of "reasonably prudent, skillful accountants," it is also manifest that Brown Schultz knew or should have known of the strictures and requirements of GAAS and GAAP. *Official Committee of Unsecured Creditors of Corell Steel v. Fishbein and Co.*, 1992 WL 196768 (S.D. Pa.). Moreover, in the Independent Auditor's Report to the Audited Financial Statements Brown Schultz expressly represented that it was knowledgeable concerning GAAS and GAAP and that its audits were sufficient to ensure compliance with such standards. Exhibit 34, p. 1, Exhibit 36, p. 1. Undoubtedly, Brown Schultz knew that USF&G's receipt and use of the Audited Financial Statements was a natural – if not inevitable – result of Brown Schultz' issuance of such documents.

When Brown Shultz asserted in a pleading that it had no "reason to know the information included in the 1997 and 1998 financial statements was not correct," it stated a position that not only defied logic, but raised questions as to whether Brown Schultz actually performed the audit tasks which it claims to have performed. Brown Shultz, as the accounting firm hired to audit CCI, certainly is a party with the "means of knowledge at hand" of both CCI's financial condition as well as the application of GAAS and GAAP to construction audits. *La Course v. Kiesel*, 366 Pa. 385 (1951).

**F.    The Defense Of Contributory Negligence Is Inapplicable.**

The defense of contributory negligence is inapplicable in this case because of Pennsylvania's adoption of the "audit interference" rule. *Jewelcor Jewelers and Distributors, Inc. v. Corr.*, 373 Pa. Super. 536, 551-552 (P.A. Super. 1988). "Under Pennsylvania law, a party's contributory negligence is not a defense to an action against an accountant for professional negligence unless that contributory negligence impeded the accountant from performing its obligations satisfactorily . . . ." *Medical Consultants Network, Inc. v. Cantor & Johnson, P.C.*, 2001 WL 10788 (E.D. Pa. ), citing *Jewelcor Jewelers and Distributors, Inc. v. Corr.*, 373 Pa. Super. at 551-552. Brown Schultz failed to introduce evidence of any purported obstruction or interference by USF&G.[36]

Even if, *arguendo*, the defense of contributory negligence was applicable, Farnsworth opined that USF&G's underwriting of the CCI account conformed to the applicable standards of care of the surety industry that were in effect during the 1993-1999 time period. Testimony of Farnsworth, Transcript, pp. 1529-1530.

**G.    USF&G's Standing To Sue Brown Schultz Is Uncontrovertible.**

It is beyond dispute – and the law of the case, as well – that USF&G has proven standing to sue Brown Schultz pursuant to Restatement (Second) of Torts §552. The testimony of Brown and Bowman provided more than ample evidence that, *inter alia*, Brown Schultz knew that the audits performed for CCI would be both reviewed and relied upon by USF&G relative to its

---

[36] Brown Schultz asserts that factual distinctions between the present case and those in *Medical Consultants* are not material to determining whether the audit interference rule bars contributory negligence. In *Medical Consultants*, the plaintiff was a third-party purchaser of a business who relied upon an audit and brought a claim for negligent misrepresentation. Similarly, USF&G is a third party that relied upon an audit to its detriment and now brings a claim for negligent misrepresentation. Although the defendants in *Medical Consultants* argued that the audit interference rule did not apply because of a lack of privity between the plaintiff and the accountant, the Court did not find that argument compelling. This Court has already determined that USF&G's claim for negligent misrepresentation does not fail for lack of privity.

decisions to continue CCI's bonding program.  Testimony of Brown, Transcript, pp. 887-888, 901-902, 921; Testimony of Bowman, Transcript, pp. 1307-1308, 1313.[37]  Thus, USF&G's standing to sue Brown Schultz is incontrovertible under the Restatement (Second) of Torts §552, including under its more restrictive judicial interpretations.  *See*, *North American Specialty Ins. Co. v. Lapalme*, 258 F.3d 35, 41 (1st Cir. 2001).  As this Court has acknowledged, "[t]he risk perceived by the supplier at the time of the engagement cabins the extent or the duty that the supplier owes to known third parties."  Report and Recommendation dated November 5, 2002, p. 20 (Smyser, M.J.)  Brown Schultz was fully aware of the risks undertaken in performing audits of CCI, a client for approximately a decade.

**H.    The Testimony Of Brown Schultz' Expert Witnesses Should Be Disregarded.**

"The finder of fact is always entitled to evaluate expert testimony and may disregard it entirely. . . the weight to be accorded expert testimony is to be determined by the jury, or the judge sitting without a jury, according to the fact finder's evaluation of the expert's qualifications . . ."  *Eagle v. Snyder*, 412 Pa. Super. 557, 569 (1992); *see, Smith v. Shaffer*, 511 Pa. 421, 426 (1986).  Courts must also exclude expert testimony where, although the expert is qualified generally, he or she opines on a separate issue.  *In Re: Diet Drugs Products Liability Litigation,* 2000 WL 876900 (E.D. Pa.).  *See also Tokio Marine & Fire Insurance Co., Ltd. v. Grove Manufacturing Co.,* 958 F.2d 1169 (1st Cir. 1992) (expert testimony barred because

---

[37] Among other documents, Brown Schultz' working papers repeatedly reflect this knowledge.  Exhibit 144, Exhibit 213, p. 43, Exhibit 222, p. 19.  Additionally, Brown testified that the Audited Financial Statements were prepared in the course of Brown Schultz' business and profession.  Testimony of Brown, Transcript, pp. 833-834.  Moreover, there are numerous exhibits in evidence that not only prove that Brown Schultz knew that USF&G was the intended beneficiary but constitute persuasive evidence that Brown Schultz knew *the size and parameters of the bonding programs to be underwritten by USF&G* on behalf of CCI.  Exhibit 202, Exhibit 203, Exhibit 211.  Testimony of Brown, Transcript, pp. 901-902, 916-917, 921.  Brown acknowledged that he knew the sizes of the various contracts being worked on by CCI in 1997 and 1998.  Exhibit 217.  Testimony of Brown, Transcript, pp. 916-917.  Moreover, Sheri Phillips testified that she would give regular updates to Brown Schultz concerning CCI's level of bonding.  Testimony of S. Phillips, Transcript, p. 2154.

expert's "background did little to suggest expert knowledge of economic issues and industry standards.")  *Id.* at 1174.

As discussed in Section D, *supra*, Neuschaefer's testimony should be disregarded not only because of his personal bias and general lack of credentials but also because of the undisputed fact that he is unable to testify as to the proper industry standard at the pertinent times and places.  Testimony of Neuschaefer, Transcript, pp. 2192-2195, 2185-2187.  Neuschaefer *admits* that he is not familiar with, *inter alia*, the market for construction work in central Pennsylvania for the years 1993 through 1999, is not knowledgeable concerning USF&G's underwriting practices and, moreover, believes that underwriting industry standards are subject to conjecture.  Testimony of Neuschaefer, Transcript, pp. 2192-2195.  The extent of Neuschaefer's unreliability and limited knowledge of the pertinent issues is only magnified when his career is compared to that of Farnsworth.[38]

Brenner is the paradigm of a professional, gun-for-hire witness.  If the fact that he makes his living testifying in court was not sufficient to cast major aspersions on his testimony in the instant case, it should be noted that his usual trial testimony involves everything from soup to nuts, although his favored main course appears to be personal injury actions.  Testimony of Brenner, Transcript, pp. 2765-2766.  Further, not only did he lack a valid professional license when he prepared his two "expert" reports in the instant litigation, but he blatantly lied about his qualifications at his deposition on May 6, 2003.  Testimony of Brenner, Transcript, pp. 2777-

---

[38] Farnsworth was in the surety industry for over thirty (30) years and has kept current on industry standards and practices since his retirement from Fireman's Fund as a Senior Vice President.  Testimony of Farnsworth, Transcript, pp. 1459-1460.  At the time of his retirement on January 1, 1999, he was in charge of 150 employees in the home office and employees in 25 branches offices.  Testimony of Farnsworth, Transcript, p. 1440.  An achiever – rather than a testifier – he has only previously testified at one jury trial and one arbitration.  Testimony of Farnsworth, Transcript, p. 1439.

2784, 2796-2797.[39]  Furthermore, his *curriculum vitae* is littered with references to organizations to which he does not belong and certifications he is not allowed to claim.  Exhibit 373, Exhibit 374, Exhibit 375.  Testimony of Brenner, Transcript, pp. 2786-2787.  Not surprisingly, an accountant unable to keep track of his licensing registration fees and his dues for professional organizations demonstrated the same sloppiness as his client in failing to discern a double-counting of approximately $448,000 relative to the Mahanoy Claim.  Testimony of Brenner, Transcript, p. 3059.

In marked contrast to Brenner, DeBruyn is an individual who is not only licensed to conduct audits of construction contractors but has done so within the past several years.[40]

I.     **USF&G's Damages Were Proximately Caused By Brown Schultz' Misrepresentations And Resulted In Compensable Damages.**

1.     **Brown Schultz' Misrepresentations Were The Proximate Cause Of USF&G's Losses.**

To recover damages for an accountant's negligence in rendering an unqualified audit opinion, a plaintiff must prove that the accountant's negligence was the proximate or legal cause of its injury.  *See, Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F.Supp. 557, 563 (W.D. Pa. 1996); *Gibbs v. Ernst*, 538 Pa. at 212.  Cause in fact or "but for" causation provides that if the harmful result would not have come about but for the negligent conduct, then there is a

---

[39] The importance of his licensure is evidenced by the fact that although he was scheduled to testify in court during the week of November 17 through 21, 2003 (and was even present in court on some of those days), Brown Schultz' counsel decided at the last minute to call a different witness and to call Brenner to testify during the final days of trial in late January 2004.  In the interim, Brenner apparently undertook the necessary steps to revive his Illinois CPA license.  Exhibit 374, Exhibit 821.  Ironically, at the time that he wrote his expert reports he was not licensed to give the very audit opinions at issue.  Exhibit 373, Exhibit 511 (designated by Brown Schultz).  Testimony of Brenner, Transcript, pp. 2795-2796.

[40] DeBruyn is the firm-wide construction industry coordinator for a 40 office national accounting firm.  Testimony of DeBruyn, Transcript, p. 1706.  He has conducted approximately 400 audits, of which approximately 100 were of construction contractors.  Testimony of DeBruyn, Transcript, p. 1713.  His methodology and his opinions were fully explained at trial and are consistent, logical and grounded in industry standards and practices.  The depths of DeBruyn's personal experience in construction auditing serves to buttress the reliability of his testimony.

direct causal connection between the negligence and the injury. *Commonwealth of Pennsylvania v. United States Mineral Products Co.*, 2002 WL 31454023*2 (Pa. Cmwlth); Restatement (Second) of Torts, §548A (a misrepresentation is the proximate cause of the plaintiff's loss, "if but only if, the loss might reasonably be expected to result from reliance"). In a negligent misrepresentation claim against an accountant, the plaintiff's reliance on the misrepresentation provides the requisite causal connection between the misrepresentation and the plaintiff's injury. *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 683 N.Y.S.2d 179 (1st Dept. 1998). Legal or proximate cause exists "where a defendant's wrongful conduct is a substantial factor in bringing about plaintiff's harm." *Id.*, citing *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643 (Pa. Super. 2002). To establish the required legal nexus, a plaintiff must show that the loss was a foreseeable result of the fact or condition that the financial statements misrepresented or concealed. *See*, Restatement (Second) of Torts, §548A, comment b; *Bily v. Arthur Young & Co.*, 271 Cal. Rptr. 2d 470, 485 (Cal. Ct. App. 1990) ("[a] legal cause of loss is a cause which is a substantial factor in bringing about the loss"). A cause can be found to be a substantial factor so long as it is significant or recognizable; it need not be quantified as considerable. *Jeter v. Owens-Corning Fiberglass Corp.*, 716 A.2d 633 (Pa. Super. 1998). A plaintiff is not bound to exclude the possibility that the event might have happened in some other way. *World Radio Laboratories, Inc. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996). Rather, the plaintiff need only satisfy the trier of fact that the injury occurred in the manner claimed. *Id.*

Not only do the facts extant fail to demonstrate any intervening or concurring causes that might extricate Brown Schultz from liability, but it is axiomatic that "a defendant is not relieved from liability because another concurring cause may also be responsible for producing injury." *Powell v. Drumheller*, 539 Pa. 484 (1995). Further, an intervening cause is not a superseding

cause where the negligence of the accountant creates or increases the foreseeable risk of harm. Restatement (Second) of Torts §§440 and 442A. An intervening force which is the normal consequence of the situation created by the accountant's negligence is not a superseding cause. Restatement (Second) of Torts §443. Likewise, an intervening force is not a superseding cause of a loss when the force is of little consequence in causing the loss. There is simply no evidence of any intervening or concurring causes in this case. In fact, the testimony adduced at trial and several documents (including Brown Schultz' working papers) evidence that CCI suffered no calamitous event in 1999 which would have wiped out in less than 10 months its equity of $5.2 million and the cash available from an undrawn line of credit of $4 million. Exhibit 36 and Exhibit 298. The only logical conclusion is that the numbers in the 1997 Audit Report and 1998 Audit Report were wrong.

### 2. USF&G Has Proven The Amount Of Its Damages.

The "damages recoverable for negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause." Restatement (Second) of Torts, §552B(1); *Medical Consultants Network, Inc. v. Cantor & Johnston, P.C.*, 2001 WL 10788 (E.D. Pa.). The "out of pocket" loss is the proper measurement for the claim. *Id.* The negligent actor is responsible for all the unforeseen consequences thereof – no matter how remote – which follow in a natural sequence of events. *Comm. v. United States Mineral Products Co.*, 2002 WL 31454023. (Pa. Comm.); *Frank v. Volkswagenwerk, A.G. of West Germany*, 522 F.2d 321 (C.A. Pa. 1975) (a tort-feasor is liable for all damages which "ordinarily and in natural course of things have resulted from the commission of the tort").

Damages need not be proved with mathematical certainty, but only reasonable certainty. *Dehanty v. First Pennsylvania Bank*, 464 A.2d 1243 (Pa. Super. 1983); *see, Bostick v. ITT Hartford Group, Inc.*, 82 F.Supp. 2d 376 (E.D. Pa. 2000). "[I]f the injured party produces the best evidence available of his damages and if such evidence provides a reasonable basis for determining his loss, he is entitled to recover although the exact amount cannot be ascertained." *Greenstein, Logan & Co. v. Burgess Marketing*, 744 S.W.2d 170, 187 (Tex. App. 1987); *Jamison, Money, Farmer & Co. v. Standeffer*, 678 So.2d 1061, 1067 (Ala. 1996) (a plaintiff is not required to quantify all damages with precision but merely to produce evidence tending to show the extent of damages as a matter of just and reasonable inference).

USF&G proved that its damages are directly attributable to Brown Schultz' failure to properly conduct its audits and to issue accurate audit reports. Exhibit 29. Both summaries of the bonds issued in reliance on the Audited Financial Statements and binders containing extensive back-up and documentation relative to the costs and expenses incurred on each bond are in evidence. Exhibit 14, Exhibit 15, Exhibit 16, Exhibit 20, Exhibit 21, Exhibit 22, Exhibit 23, Exhibit 24, Exhibit 26, Exhibit 27 and Exhibit 29. Gregory Daily testified that certain losses were incurred as a result of USF&G's obligations as surety and that USF&G's losses were incurred as a direct result of the bonds issued on behalf of CCI in reliance on the Audited Financial Statements. Testimony of G. Daily, Transcript, pp. 20-21, 48-49.

As of April 2003, USF&G's damages were $25,927,054.76. Exhibit 29. Testimony of G. Daily, Transcript, p. 80. Moreover, since April 2003, USF&G's damages have increased by over a million dollars. Testimony of G. Daily, Transcript, p. 81. Gregory Daily also testified as to the accuracy of the summary of the bonds issued in reliance upon the Audited Financial

Statements and of the summary losses incurred relative to defaulted projects were fair and accurate. Testimony of G. Daily, Transcript, pp. 21-22, 35, 47.

Gregory Daily described in detail USF&G's efforts to mitigate its losses, including analyzing any potential claims against project owners. Testimony of G. Daily, Transcript, pp. 46-49, 85. He testified, in fact, that there was nothing further USF&G could have done to mitigate its damages. Testimony of G. Daily, Transcript, p. 85. Brown Schultz introduced *no* testimony indicating either that the damages as alleged by Gregory Daily – and supported by extensive documentation – were inaccurate or that USF&G failed to take reasonable efforts to mitigate its losses. The burden of proving failure to mitigate rests squarely on the breaching party. *Koppers Co., Inc. v. Aetna Casualty and Surety Co.*, 98 F.3d 1440 (3rd Cir. 1996) (mitigation is an affirmative defense, so burden of proving failure to mitigate is on defendant). Brown Schultz did not come remotely close to meeting its burden of proof. Brown Schultz introduced no evidence of improper or excessive payments to claimants. There was no testimony – expert or otherwise – that USF&G's completion of the default projects was unreasonable or that its obligation could have been completed cheaper or more efficiently.

## J.     Brown Schultz' "Professional Skepticism" Was Severely Compromised.

A nagging question persists: why would an otherwise reputable accounting firm give a "clean opinion" to audit reports that so uncontestedly paint a false and misleading picture of CCI's financial condition? Negligent misrepresentation requires neither scienter, malice nor willfulness. However, numerous facts in evidence indicate that while Brown Schultz may have borne no ill will to the known and intended users of the audit reports, a confluence of sloppy practices – mixed with the desire to appease and assist an important client and numerous other related-party clients – may have resulted in a "perfect storm" that whisked away Brown Schultz'

"professional skepticism," lead to corner cutting, and temporarily blinded Brown Schultz to its obligation to be a watch dog for the public rather than an advocate for its client.

Because of the many unexplained circumstances surrounding the 1998 Audit Report – such as the reason the Guaranty Agreements were utilized and the identity of who decided how the Mahanoy Claim would be booked – it is unclear whether Brown Schultz' actions are the result of undue pressure from a client, from Brown Schultz' desire to maintain and even grow its relationship with a wealthy Harrisburg family or a combination of the foregoing. It became apparent at trial that no one presently or formerly associated with Brown Schultz will accept responsibility for some of the decisions and unexplained phenomena regarding the Mahanoy Claim. Testimony of Bowman, Transcript, pp. 1391-1392; Testimony of Brown, Transcript, pp. 1096-1097. Apparently, there is some truth to the aphorism that while success has a 1,000 fathers, failure is an orphan.

Brown personally has also shown an unfortunate propensity for bending (or breaking) the law for CCI. Brown admits performing personal tax and other work for Ortenzio and then deliberately wording his invoice for such work in a "vague" manner so that a personal expense could become a business expense write-off. Exhibit 196, Exhibit 244. Testimony of Brown, Transcript, pp. 1125-1126. Additionally, despite acknowledging that PCIC was formed with great care so as to provide tax benefits to Ortenzio, Brown was rather lackluster in counseling compliance with PCIC's corporate and legal formalities – as if tax benefits are gifted by the government without the concomitant incursion of responsibilities and obligations. Testimony of Brown, Transcript, pp. 1106, 1230. Brown was certain of the care than went into ascertaining that PCIC was formed in compliance with applicable law and regulations. Testimony of Brown, Transcript, pp. 1019-1020. Apparently, however, when it is necessary to pump up revenue, all's

fair and legal obligations– such as escrow requirements and honoring other outstanding insurance policies – can be ignored.

Brown and his firm also derived substantial revenues from his relationship with the Ortenzio family. In addition to CCI and PCIC, Brown Schultz performed accounting services for Ortenzio, personally, as well as the several entities owned or controlled by Ortenzio and his family.[41] Testimony of Brown, Transcript, pp. 835-840. Starting in 1999 (and continuing through Brown's testimony in the trial), Brown Schultz performed accounting work for Select Medical Co., a publicly held company of which Ortenzio's father, Rocco, is Chairman of the Board. Testimony of Brown, Transcript, pp. 840-841. In 1999, Brown Schultz' billing to Select Medical Co. was approximately $200,000. Testimony of Brown, Transcript, p. 841. As Brown Schultz' total volume was approximately $4.5 million in 1998 and $7-8 million in 1999, it is indisputable that the Ortenzio family and its entities comprise a significant percentage of Brown Schultz' revenue. Testimony of Brown, Transcript, pp. 842-844.

Not only may the audit work performed for CCI have been a loss-leader but it was likely a highly unprofitable venture for Brown Schultz, at least once Sheri Phillips became CCI's Chief Financial Officer in 1995.[42] While Sheri Phillips may be a skilled accountant, as Chief Financial Officer of CCI she obviously lacked the independence and objectivity that Brown Schultz should

---

[41] These entities include American Asset Recovery, Avon Land Co., CSH Industries, Mechanicsburg Land Co., Montgomery Land Co., Reliance Finance and the Ortenzio Family Partnership.

[42] Sheri Phillips negotiated Brown Schultz' engagement fees "pretty hard." Testimony of S. Phillips, Transcript, p. 2140. The fee for the 1998 Audit Report was only $21,800, which sum also included the fee for preparation of tax returns. Exhibit 213. Testimony of Brown, Transcript, p. 928. In fact, on a dollar for dollar basis, Brown Schultz' fees came down after 1995. Testimony of S. Phillips, Transcript, p. 2141. Sheri Phillips justified the financial squeeze on the basis that since CCI did an increased amount of work that would (or should) otherwise have been done by Brown Schultz, it was only fair that Brown Schultz receive less compensation. Testimony of S. Phillips, Transcript, pp. 2140-2141. The work done by CCI in-house included "analytical work." Testimony of S. Phillips, Transcript, p. 2141.

have brought to the audits, particularly since Sheri Phillips' boss, Shane Miller, received bonuses – in one year $680,000 – based on CCI's audited financial results.

As discussed in II(C)(2)(b), *supra*, significant errors were almost inevitable in light of the inadequate staffing and supervision utilized by Brown Schultz, particularly with respect to the 1998 Audit Report. Bowman's job specific performance evaluations for CCI in 1998 provides that "problems were experienced in testing client's estimated costs on completed contracts. Exhibit 273. Testimony of Brown, Transcript, pp. 1241-1242. Bowman's inexperience probably served to exacerbate the natural effects of a rushed job; not only did the audit team "complete the job quickly" but there were less than 2 weeks between when field work started and final statements were delivered. Exhibit 273; Testimony of Brown, Transcript, p. 1242-1243. Brown's plaint that all audits have problems is belied by other job specific evaluations received by Bowman, which bear no indicia of any such problems. Exhibit 239, Exhibit 300. Testimony of Brown, Transcript, p. 1244. Ironically, the only other evaluation revealing problems in Bowman's performance concerns PCIC. Exhibit 273. Testimony of Brown, Transcript, pp. 1244-1246.

"Consciousness of guilt" has been evident throughout the instant litigation. Sheri Phillips testified that, prior to her deposition, she was falsely informed by Brown that USF&G had defamed her. Testimony of S. Phillips, Transcript, p. 2157. There is no explanation for this calumny other than to assume that Brown was deeply fearful that he would be hurt by her testimony. Brown Schultz also failed to produce any documentation concerning PCIC until after the Court allowed USF&G's motion to compel such production. *See*, Order dated June 13, 2002, allowing United States Fidelity and Guaranty Company's Motion to Compel Production of Documents. After thirteen days of trial, it is difficult to believe that objections to the production

of such documents on, *inter alia*, grounds of relevancy were ever anything but a desperate attempt to bury a fatal flaw in Brown Schultz' audit work. Further, as discussed, *supra*, Brown Schultz was sufficiently worried about Brenner's lack of standing as a licensed Certified Public Accountant that it delayed his testimony for two months. Brown Schultz also introduced perjured testimony from Eskin, an embittered ex-employee of USF&G whose employment was terminated by USF&G for theft during the course of the litigation. This was done despite Brown Schultz' possession of a memorandum from Eskin which states that Eskin believed that "an accounting malpractice action against Brown Schultz was warranted" – or at least he did until he was terminated. Exhibit 360. Such a risky and unseemly gambit reveals a substantial insecurity in Brown Schultz' defense of this case and simply would not have been attempted if Brown Schultz believed that USF&G had not already offered highly persuasive evidence in support of its case.

### III.  CONCLUSION

For the foregoing reasons, judgment should enter in USF&G's favor in an amount of $25,927,054.76.

UNITED STATES FIDELITY AND
GUARANTY COMPANY,
By its counsel,


s/ Bruce D. Levin
Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300
blevin@bgblaw.com
pmcglynn@bgblaw.com
and

Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, Pennsylvania  17101
Telephone:     (717) 237-7100
Facsimile:      (717) 237-7105
pjs@tthlaw.com

Dated: March 24, 2004
#285424 v1/36432/87

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | | |
|---|---|---|
| _____ ) | | |
| UNITED STATES FIDELITY AND ) | | |
| GUARANTY COMPANY, ) | | |
| ) | | |
| Plaintiff ) | | CIVIL ACTION NO. 1:01-CV-00813 |
| ) | | |
| v. ) | | |
| ) | | JUDGE CONNER |
| BRUCE J. BROWN and BROWN ) | | |
| SCHULTZ SHERIDAN & FRITZ, ) | | |
| ) | | |
| Defendants. ) | | |
| _____) | | |

## CERTIFICATE OF SERVICE

I, Bruce D. Levin, Esquire, counsel for Plaintiff United States Fidelity & Guaranty Company, hereby certify that a copy of **Plaintiff's Post-Trial Memorandum** was served upon the following, first class mail, postage pre-paid on March 24, 2004.

Kathleen Carson, Esquire
Swartz Campbell LLC
1601 Market Street
Philadelphia, PA  19103-2316

__s/ Bruce D. Levin__
Bruce D. Levin

Dated: March 24, 2004