UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | |
|---|---|
| _____ )<br>UNITED STATES FIDELITY AND )<br>GUARANTY COMPANY, )<br> )<br> Plaintiff )<br> )<br>v. )<br> )<br>BRUCE J. BROWN and BROWN )<br>SCHULTZ SHERIDAN & FRITZ, )<br> )<br> Defendants. )<br>_____) | CIVIL ACTION NO. 1:01-CV-00813<br><br>JUDGE CONNER |

**UNITED STATES FIDELITY & GUARANTY COMPANY'S**
**REQUEST FOR FINDINGS OF FACT AND RULINGS OF LAW**

# <u>TABLE OF CONTENTS</u>

FINDINGS OF FACT ........................................................................................................1

I.     THE KEY PLAYERS .........................................................................................1

       A.     USF&G ....................................................................................................1

       B.     CCI ..........................................................................................................1

       C.     Brown Schultz Sheridan & Fritz ...........................................................3

       D.     Pennsylvania Contractors Insurance Co. ..............................................3

       E.     Other Ortenzio Related Entities ...........................................................4

II.    SURETY BONDS AND THE UNDERWRITING PROCESS .............................5

III.   IN RELIANCE UPON THE CCI AUDITED FINANCIAL STATEMENTS
       PREPARED BY BROWN SCHULTZ, USF&G ISSUED BONDS TO CCI .......10

IV.    BROWN SCHULTZ WAS AWARE OF BOTH USF&G'S RELIANCE
       ON THE CCI AUDITED FINANCIAL STATEMENTS AND THE
       PARAMETERS OF THE BONDING PROGRAM .............................................15

V.     USF&G CONTINUES TO ISSUE BONDS IN RELIANCE ON THE
       AUDITED FINANCIAL STATEMENTS ...........................................................20

VI.    UPON LEARNING OF CCI'S TRUE FINANCIAL STATUS, USF&G
       CEASED TO ISSUE BONDS TO CCI ...............................................................27

VII.   THE AUDITOR'S STANDARD OF CARE AND PERTINENT AUDITING
       STANDARDS.....................................................................................................28

VIII.  THE RESTATED AUDITED FINANCIAL STATEMENTS .............................31

       A.     CCI's True Financial Condition.............................................................31

       B.     USF&G Would Not Have Issued Bonds If It Were Aware Of CCI's
              True Financial Condition ......................................................................32

IX.    USF&G HAS PROVEN THAT THE 1997 AND 1998 AUDITED FINANCIAL
       STATEMENTS WERE INACCURATE AND CONTAINED MATERIAL
       MISSTATEMENTS ...........................................................................................34

A.  Brown Schultz Made Numerous Misrepresentations In The CCI
    Audited Financial Statements ....................................................34

    1.  Representations In The Independent Auditor's Report ...............34

B.  The Estimated Completion Costs And Profits Contained In The 1997
    And 1998 Audited Financial Statements Were Not Fair Presentations,
    In All Material Respects, Of CCI's Estimated Costs And Profits As
    Of December 31, 1997 And December 31, 1998 .......................................35

    1.  Introduction – The Auditor's Responsibilities In Construction
        Audits ......................................................................35

        (a)  AICPA Guide ...........................................................35

        (b)  PPC Guide .............................................................35

        (c)  Testimony Adduced At Trial ............................................36

    2.  Ignoring The Obvious, Brown Schultz Does Not Adequately
        Plan And Prepare For Its Audit Work ........................................37

            (i)  "Low" Audit Precision Level .......................................38

    3.  CCI Had Significant Risk Factors That Were Known To
        Brown Schultz ..............................................................39

    4.  Brown Schultz' Execution Of Its Audit Plans Was Poor ..............41

            (i)    Bowman's Inexperience ...........................................41

            (ii)   Limited Supervision .............................................41

            (iii)  Inadequate Testing Of Cost Controls ............................42

            (iv)   The Client Conducts The Audit ...................................42

            (v)    Material Misstatements In The Audited Financial
                   Statements Resulted From Brown Schultz'
                   Carelessness And Sloppiness .....................................43

    5.  Brown Schultz' Burden Regarding Audit Working Papers ..........50

    6.  "Disclaimers" In The CCI Audited Financial Statements Do Not
        Relieve Brown Schultz' Liability ...........................................52

ii

7.      The "Look Back" Methodology Described By DeBruyn Is Admissible, Logical And Consistent .............................................54

(a)     *Daubert* Standard ....................................................54

(b)     CCI's Failure Cannot Be Attributed To Any Calamities ............................................................57

(i)     Exhibit 337 – CCI Internal Financials ...................57

(ii)    Eskin Memorandum (Exhibit 750) And Testimony ................................................57

(iii)   S. Phillips' Testimony............................................58

(iv)    Brenner's Reliance On Exhibit 337 .......................58

(v)     Other Testimony Adduced At Trial .......................58

8.      Conclusions And Professional Opinions .......................................59

X.    BROWN SCHULTZ' INADEQUATE DISCLOSURE OF THE PCIC CLAIM GUARANTEE AND RECORDING OF THE MAHANOY PRISON CLAIM AMOUNT IN REVENUE AS AN "UNDERBILLING" VIOLATED GAAP AND BROWN SCHULTZ' INTERNAL RELATED-PARTY DISCLOSURE STANDARDS.......................................................................................60

A.    PCIC Issued A Remedial Work Period Insurance Policy For CCI's Mahanoy Prison Project........................................................60

1.      PCIC And CCI Are Related Parties According To AICPA Standards....................................................60

2.      The Mahanoy Prison Project.........................................60

3.      The Mahanoy Prison Remedial Work Period Insurance Policy ....61

B.    Brown Schultz Failed To Comply With The Recognition Standards Contained In SOP 81-1 .............................................................62

1.      The Mischaracterization Of CCI's Revenue In The 1998 Audited Financial Statements Was Material And Misleading....................62

2.      Revenue May Only Be Recognized If Certain Requirements Are Met.  SOP 81-1 ...............................................................63

3.    Brown Schultz Did Not Investigate The Validity Of The Mahanoy Claim .................................................................................65

4.    Brown Schultz Failed To Determine If There Was A Legal Basis For The Payment Pursuant To The Remedial Work Period Insurance Policy .................................................................66

5.    The Two Guaranty Agreements Are Insufficient To Justify Revenue Recognition Of The Mahanoy Claim And Were Created At A Time When CCI And Brown Schultz Knew CCI Was Losing Almost $1.2 Million ...........................................69

6.    Even If The Mahanoy Claim Was Properly Included In Revenue And Underbillings, $448,000 Of That Claim Had Already Been Paid By PCIC Under The Remedial Work Period Insurance Policy ......................................................................................74

7.    PCIC Lacked The Financial Ability To Pay The Mahanoy Claim..................................................................................................75

8.    Inclusion Of The Mahanoy Claim In CCI's Revenue Was Inappropriate .......................................................................................78

C.    Footnote 8 To The 1998 Audit Does Not Adequately Disclose The PCIC Claim Guaranty And Other Important Transactions .......................81

D.    Brown Schultz' Treatment Of The Mahanoy Claim Was Materially Misleading And Detrimental To USF&G .................................................85

XI.    BROWN SCHULTZ SHOULD HAVE KNOWN OF THE MISREPRESENTATIONS ..................................................................................91

XII.    BROWN SCHULTZ INTENDED TO INDUCE RELIANCE OF ITS AUDITED FINANCIAL STATEMENTS ...........................................................92

XIII.    THE TESTIMONY OF BROWN SCHULTZ' EXPERTS SHOULD BE DISREGARDED ................................................................................................92

A.    Neuschaefer Was Unqualified To Opinion On Surety Industry Underwriting Standards ..............................................................................92

B.    Farnsworth Is Both Qualified And Credible ..............................................94

C.    Brenner, An Unlicensed Professional Witness, Was Not Credible ...........94

D.    DeBruyn Is An Expert In The Auditing Of Construction Contractors ......96

XIV.    USF&G'S DAMAGES WERE PROXIMATELY CAUSED BY USF&G'S
        JUSTIFIABLE RELIANCE ON BROWN SCHULTZ'
        MISREPRESENTATIONS AND RESULTED IN COMPENSABLE
        DAMAGES ........................................................................................................97

        A.      USF&G's Losses Are Well-Documented And Reasonable......................97

        B.      Damage Chart ........................................................................98

                1.      The 1997 Brown Schultz Audit Report .........................................98

                2.      The 1998 Brown Schultz Audit Report .........................................99

RULINGS OF LAW ...............................................................................................99

I.      NEGLIGENT MISREPRESENTATION ...............................................................99

II.     PRIVITY IS NOT REQUIRED BECAUSE PENNSYLVANIA HAS
        ADOPTED RESTATEMENT (SECOND) OF TORTS §552...........................103

III.    STANDARD OF CARE ...................................................................................105

IV.     JUSTIFIABLE RELIANCE ..............................................................................106

V.      COMPARATIVE AND CONTRIBUTORY NEGLIGENCE ARE
        INAPPLICABLE .............................................................................................109

VI.     STANDARDS FOR EXPERT TESTIMONY....................................................110

VII.    WORKING PAPERS.........................................................................................115

VIII.   DAMAGES.........................................................................................................115

Pursuant to Fed. R. Civ. P. 52 and Local Rule 16.6, United States Fidelity & Guaranty Company ("USF&G") submits the following proposed Findings of Fact and Rulings of Law:

## FINDINGS OF FACT

### I.    THE KEY PLAYERS.

#### A.    USF&G

1.    USF&G issues payment and performance bonds on behalf of contractor and subcontractor principals engaged in the performance of work on public and private construction projects. Exhibits 1-13. Testimony of Gregory Daily, Transcript, p. 11; Testimony of James Daily, Transcript, pp. 166-167.

2.    In 1998, USF&G merged with St. Paul Fire and Marine Insurance Co. ("St. Paul"). Testimony of G. Daily, Transcript, p. 7. USF&G and St. Paul serve as the bonding company for thousands of construction contractors and subcontractors, including some of the largest construction contractors in the United States. Testimony of G. Daily, Transcript, pp. 9-10. USF&G and St. Paul are considered "top tier" bonding companies. Testimony of Farnsworth, Transcript pp. 1441, 1671-1672, 1693.

#### B.    CCI

3.    CCI Construction Co., Inc. ("CCI") was a contractor engaged in construction work on public and private construction projects and maintained principal offices near Harrisburg, Pennsylvania. Exhibit 790A, pp. 0708-0722.

4.    John Ortenzio ("Ortenzio") formed CCI, formerly known as Commercial Construction Company, in 1983. Testimony of Brown, Transcript, p. 834. Ortenzio was the sole shareholder. Testimony of Brown, Transcript, p. 834.

5.      As part of the bond underwriting process, Ortenzio provided USF&G with an organization chart and resumes of the key officers and employees.  Exhibit 66.  According to USF&G's underwriting file, it is apparent that personal acquaintances of the individuals and of CCI concluded all key officers and employees to be of good character and well qualified for their respective corporate duties. There was a good balance of business, engineering and field production capabilities.  Exhibit 790; Testimony of Farnsworth, Transcript, p. 1493.

6.      CCI's job experience from its inception up to 1993-1994 was primarily in private, negotiated construction of medical and healthcare buildings, predominately for one owner, a large publicly traded corporation headed by Ortenzio's father, Rocco Ortenzio.  Testimony of J. Daily, Transcript, pp. 204-205; Testimony of Farnsworth, Transcript, 1493.  Documents in the underwriting file indicate, however, that CCI had done other commercial "hard bid" jobs. Exhibit 72.  Testimony of J. Daily, Transcript, p. 284.

7.      A review of the underwriting file reveals that in 1993 CCI had a strong balance sheet.  CCI consistently had working capital in the neighborhood of $4 million; it had a net worth of approximately $5 million and a strong cash position; and it had a $1 million line of credit with a bank.  Exhibit 790; Testimony of Farnsworth, Transcript, p. 1494.

8.      CCI's net worth as of December 31, 1993 was $4.1 million.  Exhibit 30.  Its business plan included plans for entry into the public bid market. Although this represented a change in the type of market in which CCI had historically operated, by all objective standards, CCI possessed the management and financial capabilities to move forward in this new direction. Testimony of J. Daily, Transcript, pp. 283-284.

C.    **Brown Schultz Sheridan & Fritz**

9.    At all times material and relevant to this action, Brown Schultz Sheridan & Fritz

("Brown Schultz") and its staff have been engaged in business as independent Certified Public

Accountants.  Testimony of Brown, Transcript, p. 833.  Bruce Brown ("Brown") has been

president of Brown Schultz since the firm's formation in 1990.  Testimony of Brown, Transcript,

p. 832.

10.    Brown provided accounting services to CCI and its predecessor since "sometime

in the 1980's."  Testimony of Brown, Transcript, pp. 834-835.  From at least 1993 through the

end of the fiscal year 1998, Brown Schultz provided audited financial statements to CCI

(collectively, the "CCI Audited Financial Statements"), including audits for the years ending

December 31, 1997 (the "1997 Audit Report") and the year ending December 31, 1998 (the

"1998 Audit Report").

D.    **Pennsylvania Contractors Insurance Co.**

11.    Pennsylvania Contractors Insurance Co. ("PCIC") is a captive insurance company

formed for tax planning purposes and to fund the cost of performing warranty work on

rehabilitation hospitals which CCI had previously constructed.  Testimony of Brown, Transcript,

p. 837.  Testimony of S. Phillips, Transcript, p. 2166.

12.    PCIC is wholly owned by CCI's sole stockholder, Ortenzio.  Testimony of Brown

Transcript, p. 838.  Ortenzio is also President of both PCIC and CCI.  Although incorporated in

the Turks & Caicos Islands, PCIC shared a business address with CCI in Pennsylvania.

Testimony of S. Phillips, Transcript, p. 2142.

13.    PCIC is no longer in business and was liquidated in 2002.  Testimony of Brown,

Transcript, p. 1019.

14.     Since its inception, Brown Schultz prepared tax returns and audited financial statements for PCIC.  Testimony of Brown, Transcript, pp. 838-839.

**E.     Other Ortenzio Related Entities**

15.     In addition to CCI and PCIC, Brown Schultz performed accounting services for Ortenzio, personally, as well as the following entities owned or controlled by Ortenzio and his family:  American Asset Recovery, Avon Land Co., CSH Industries, Mechanicsburg Land Co., Montgomery Land Co., Reliance Finance and the Ortenzio Family Partnership ("Ortenzio entities").  Testimony of Brown, Transcript, pp. 835-840.

16.     Starting in 1999 (and continuing through Brown's testimony in the trial), Brown Schultz performed accounting work for Select Medical Co., a publicly held company of which Ortenzio's father is Chairman of the Board.  Testimony of Brown, Transcript, pp. 840-841.  In 1999, Brown Schultz' billing to Select Medical Co. was approximately $200,000.  Testimony of Brown, Transcript, p. 841.

17.     Brown Schultz' audit fees for the audit years 1993 through 1998 was approximately $20,000 - $22,000 per year.  Testimony of Brown, Transcript, pp. 841-842.  Audit work for PCIC was approximately $10,000 per year.  Testimony of Brown, Transcript, p. 842.

18.     The total annual fees for the various Ortenzio related entities, inclusive of CCI and PCIC, was between $40,000 - $60,000.  Testimony of Brown, Transcript, p. 842.

19.     As Brown Schultz' total volume was approximately $4.5 million in 1998 and $7-8 million in 1999, the Ortenzio family and its entities comprise a significant percentage of Brown Schultz' revenue.  Testimony of Brown, Transcript, pp. 841-844.

II.     **SURETY BONDS AND THE UNDERWRITING PROCESS.**

20.     Unlike an insurance policy, which is a two-party contract between the insured and the insurance company, a construction surety bond is a three-party instrument between and among the "Surety," the "Principal," and the "Obligee." Construction surety performance bonds are binding commitments by the "Surety" (USF&G in this instance) by which the surety guarantees the performance of a construction contract by the contractor procuring the surety bond. The contractor procuring the bond is referred to as the "Principal" and the beneficiary of the bond – usually the project owner – is referred to as the "Obligee." Testimony of G. Daily, Transcript, p. 47.

21.     In this action, CCI was the Principal and the various project owners – including the Commonwealth of Pennsylvania – were the obligees as to all performance bonds issued by USF&G. Testimony of G. Daily, Transcript, pp. 46-47.

22.     The surety's obligations to the obligee arise only if there has been a default by the Principal. In such a case, the obligee makes demand upon the Surety to perform the work that should have been performed by the Principal or, in the case of payment bonds, to pay the claims of various unpaid supplies of labor and material. Testimony of Gregory Daily, Transcript, pp. 10-12; Testimony of Bowman, Transcript, p. 1307.

23.     Additionally, the surety's liability under the bond is usually capped by a penal sum set forth in the bond. The penal sum is usually the price stipulated in the bonded construction contract. Exhibits 1-13.

24.     Pennsylvania, most other states and the United States have statutes which require all contractors working on public projects to provide payment and performance bonds. *See*, 8 P.S. §191, *et seq.*; 40 U.S.C. §270 *et seq.* Thus, a bonding program is crucial to any contractor

seeking to perform public construction work.  Testimony of G. Daily, Transcript, pp. 12-13;

Testimony of Brown, Transcript, p. 887.

25.    Underwriting is the process of gathering facts relevant to the risk of bonding a

contractor.  The process includes evaluating the pertinent data, determining the strengths and

weaknesses of the account and deciding upon a course of action. The primary function of the

surety in the contract bond underwriting process is the prequalification of the contractor.

Testimony of Brown, Transcript, pp. 919-920; Testimony of Farnsworth, Transcript, p. 1469.

26.    When the surety executes a bond it is, in effect, saying to the obligee that it has

performed an analysis of the contractor's management and technical skills; that it has studied the

contractor's financial condition; and that it believes the contractor is fully qualified in all respects

to perform the contract in question. The surety is prepared to back this judgment by committing

the assets of its company in support of this decision.  Before the surety can make such a

commitment, it must first underwrite the account to satisfy itself that this is a company that it can

support and that it is a company that possesses the ability to meet current and future obligations.

If the surety's analysis is that it is an acceptable account, the surety then makes a decision on the

amount of bonding capacity it is willing to provide to the contractor.  Exhibit 360, AICPA Audit

and Accounting Guide Construction Contractors, May 1, 1997, Section 1.16, p. 4.  Testimony of

Farnsworth, Transcript, pp. 1468-1469; Testimony of J. Daily, Transcript, p. 167.

27.    Contract bond underwriting involves both objective and subjective evaluations by

the underwriter and is considered more "art" than "science."  Therefore, reducing surety

underwriting to quantitative terms is very difficult, if not impossible, in most cases.  Testimony

of Farnsworth, Transcript, p. 1498.

28.     The underwriter evaluates the contractor through three primary categories: Character, Capacity, and Capital.  These are colloquially referred to as the "three C's" of surety bond underwriting.  Testimony of J. Daily, Transcript, p. 146; Testimony of Farnsworth, Transcript, pp. 1469-1470; Testimony of Neuschaefer, Transcript, p. 2238.

29.     The underwriter analyzes and interprets the information provided to him by the contractor, such as, for example, financial statements, references, company history, management procedures, resumes of key personnel, prior job experience and from information provided by outside sources, the underwriter analyzes, interprets and applies financial data.  He also assesses the history, organization, and management capabilities of the contractor, the contractor's capacity to perform each new project and the backlog of projects undertaken by the contractor. Testimony of J. Daily, Transcript, pp. 167, 170-171, 173-174, 196.

30.     The underwriter also assesses the organization and contractor owner's reputation for fair dealing with project owners, subcontractors, suppliers, lenders, and other creditors, as well as the contractor's general reputation within the industry.  Testimony of J. Daily, Transcript, p. 174.

31.     Underwriting decisions are based, in large part, on the annual audited financial statements; interim unaudited financial information is used primarily for monitoring purposes. Testimony of Farnsworth, Transcript, pp. 1478-1479; Testimony of J. Daily, Transcript, pp. 170-171.

32.     The process of underwriting a construction contractor involves establishing and then reviewing each year the contractor's "bonding program," also known as his "bonding capacity."  Based on its assessment of the contractor, a surety will "prequalify" the contractor and create a line of credit that establishes both the maximum penal sum it will write for the

7

contractor on a single bond and the maximum aggregate limit for all bonds combined.  This amount is expressed in terms of a single job dollar amount (contract price) and the aggregate dollar amount of work to be performed on uncompleted contracts (backlog or work on hand) and is often referred to as the "bonding program."  Testimony of J. Daily, Transcript, pp. 186-188; Testimony of Farnsworth, Transcript, pp. 1482-1483.

33.    The bonding program may be expressed both as a single job and as an aggregate backlog limitation.  This aggregate limit is computed based upon the amount of backlog a contractor has and not on the total penal sum of all bonds issued by the surety.  The reason for this is that the contractor works off his backlog daily – which is known as "run off" – thereby reducing the surety's exposure on existing bonds and enabling the contractor to obtain new bonded work within the parameters of the bonding program.  Testimony of Farnsworth, Transcript, pp. 1482-1483, 1489-1490.  Testimony of J. Daily, Transcript, pp. 187-188.

34.    For bonds written within the bonding program, the amount of underwriting on each bond is usually minimal.  The program is normally conditioned on there being no material adverse changes in the contractor's finances and management and is limited to jobs that are within the contractor's normal type of work and geography, subject to standard contract terms and conditions.  The program normally stays in place for one year.  Testimony of J. Daily, Transcript, pp. 182-183, 185, 221.  Testimony of Farnsworth, Transcript, pp. 1488-1489.

35.    It is necessary to establish a bonding program because it is almost always impossible to predict the identity and size of the projects on which a contractor will be successful in obtaining throughout the year.  Thus, the bonding program allows a contractor to bid jobs knowing that, absent an adverse change in his business or finances, he is eligible to receive bonding within the bonding program's parameters.  This is especially true of public work where

8

initial bid advertisements may not be published until after the surety's annual underwriting review and after the determination as to whether the establishment or continuation of the bonding program has been made. Testimony of Farnsworth, Transcript, pp. 1482, 1484.

36.     The surety reviews the bonding program on an annual basis, normally at or about the time the surety receives the contractor's audited financial statement. Testimony of J. Daily, Transcript, pp. 187, 225-226, 239; Testimony of Farnsworth, Transcript, pp. 1475-1476, 1489. A meeting may be held between the contractor, agent and underwriter at that time to review the contractor's business plan for the remainder of the year. Sometimes, no meeting will be required. The underwriter determines the level of bonding support the contractor needs in order to meet his business plan and, if acceptable to the underwriter, an understanding is reached between the contractor, agent and surety as to the size of the bonding program. Testimony of Farnsworth, Transcript, pp. 1482-1483.

37.     It is the custom and practice of the surety industry for the "Home Office" to issue underwriting authority for specific contractors to field offices for a single limit maximum amount per project and an aggregate limit. Testimony of Farnsworth, Transcript, p. 1483.

38.     Although each job must be submitted to the surety for specific approval prior to bidding, a new annual audit is not required each time a bond is requested, provided the new request is within the parameters of the bonding program. Indeed, it would be extremely expensive and impractical (if not impossible) to require the contractor to provide the surety with an audit report every time the contractor obtains a new contract. Once a bond has been issued, it is nearly impossible for that bond to be revoked. Testimony of Farnsworth, Transcript, p. 1484.

### III.   IN RELIANCE UPON THE CCI AUDITED FINANCIAL STATEMENTS PREPARED BY BROWN SCHULTZ, USF&G ISSUED BONDS TO CCI.

39.     CCI became a USF&G account in 1993.  Testimony of Anthony Phillips, Transcript, p. 2414.  Testimony of J. Daily, Transcript, p. 190.

40.     At that time, CCI and its management team enjoyed a very good reputation and had previously been bonded with a large top-tier national surety company.  Testimony of J. Daily, Transcript, p. 190.  Testimony of Farnsworth, Transcript, pp. 1441.

41.     As a condition of the establishment and the annual extension of CCI's bonding program and the issuance of the payment and performance bonds to CCI, USF&G required that CCI furnish to it annually an audit report prepared by an independent certified public accountant consisting of, *inter alia*, an audit of CCI's balance sheet, income statement and the financial status of CCI's completed contracts and work in progress.  Testimony of J. Daily, Transcript, pp. 225-226, 239.

42.     USF&G also required that CCI, as well as Ortenzio, execute the Master Surety Agreement by which they agreed to, *inter alia*, indemnify and hold harmless USF&G for any losses USF&G might incur relative to its issuance of bonds on behalf of CCI.  Exhibit 790A, pp. 0671-0677.  Testimony of J. Daily, Transcript, pp. 148, 197.

43.     CCI's initial bonding program consisted of a $15 million per project limit and a $75 million aggregate limit.  Testimony of J. Daily, Transcript, p. 453.  CCI had a total annual revenue of approximately $48.2 million when the bonding program was established in 1993. Testimony of J. Daily, Transcript, p. 453.  CCI's bonding program was renewed annually, usually in March or April when USF&G received copies of the CCI Audited Financial Statements.  Testimony of A. Phillips, Transcript, pp. 2442, 2443.

10

44.    USF&G could not have conferred with CCI's prior surety, Fireman's Fund, because such conduct is believed by those in the surety industry to be a violation of federal antitrust law.  Testimony of Farnsworth, Transcript, p. 1572; Testimony of J. Daily, Transcript, p. 471.

45.    When it first issued bonds to CCI in 1993, USF&G's underwriting of the CCI account was within the standard of care of the surety industry.  Testimony of Farnsworth, Transcript, p. 1497.

46.    Each year, a Specific Discretionary Authority ("SDA") relative to CCI in the amount of $15 million per project and $75 million aggregate was conferred on the Harrisburg, Pennsylvania branch office (the "Harrisburg Office") by the Home Office.  The Harrisburg Office had authority to issue bonds to CCI with those limits.  Testimony of A. Phillips, Transcript, pp. 2414-2415.

47.    If a bonding request exceeded the SDA, it would be necessary for the Harrisburg Office to make a submission to James A. Daily ("James Daily"), the contract bond manager situated in the Home Office.  Testimony of A. Phillips, Transcript, p. 2416.

48.    As CCI was a "Home Office" account, James Daily had authority regarding underwriting decisions from the Harrisburg Office and was required to approve projects in excess of that office's SDA.  James Daily had a single job line of authority of approximately $25,000,000.  Testimony of J. Daily, Transcript, pp. 184-185, 206, 726.

49.    James Daily had been a surety bond underwriter for approximately 38 years and has been employed by USF&G and St. Paul for approximately 23 of those years.  Testimony of J. Daily, Transcript, pp. 161-164.

50.     Following USF&G's receipt of CCI's Audited Financial Statements each year, USF&G's underwriters began the task of reviewing and analyzing each statement. Testimony of A. Phillips, Transcript, pp. 2428, 2445, 2433-2434; Testimony of J. Daily, Transcript, pp. 760-761.

51.     At all times pertinent hereto, Anthony S. Phillips ("Anthony Phillips"), a 32 year veteran underwriter, served as USF&G's and then St. Paul's surety bond underwriting manager in charge of the Harrisburg Office. However, it was the job of Steven Salazar ("Salazar"), the other underwriter in the Harrisburg Office, to perform a more detailed analysis, which would then be reviewed by Anthony Phillips and James Daily. Testimony of A. Phillips, Transcript, pp. 2422-2430; Testimony of J. Daily, Transcript, p. 186.

52.     From 1993 through 1998, Anthony Phillips, then serving as a St. Paul Surety Underwriting Specialist handling several of St. Paul's major accounts, would review each of the CCI Audited Financial Statements, as well as Salazar's analysis of that audited financial statement. Testimony of A. Phillips, Transcript, p. 2428. It was his standard practice to read the entire document, including footnotes. Testimony of A. Phillips, Transcript, p. 2583.

53.     Anthony Phillips has a bachelors degree in business management and completed USF&G's 40 week training program, graduating first in his class on contract underwriting. Testimony of A. Phillips, Transcript, pp. 2401-2402.

54.     Salazar was hired as an underwriter in 1986 and eventually became senior underwriter for the Harrisburg office. Testimony of A. Phillips, Transcript, p. 2411.

55.     Salazar has a bachelors degree in accounting from Penn State and completed a training program similar to that underwent by Anthony Phillips. Testimony of A. Phillips, Transcript, pp. 2411-2412.

56.     USF&G was known to have an extensive training program for its underwriters. Testimony of Farnsworth, Transcript, pp. 1693-1694.

57.     It was standard procedure for an audit to be analyzed in the Harrisburg Office and then sent to the Home Office.  Testimony of A. Phillips, Transcript, pp. 2443, 2445.

58.     To the best of his knowledge, the Home Office got a copy of each of CCI's Audited Financial Statements from 1993 – 1998.  Testimony of A. Phillips, Transcript, p. 2610. These were often sent by means of a routing slip.  Exhibit 790-B, p. 1266 (sample routing slip).

59.     During the time when USF&G was writing bonds for CCI, USF&G did not have any specific, formal, underwriting guidelines for its bonding accounts.  Rather, USF&G relied upon a series of documents issued by USF&G's home office known as "gray letters," as well as an underwriting training manual which was only available on-line.  Exhibit 52, Exhibit 40, Exhibit 41.  Testimony of J. Daily, Transcript, pp. 174-180; Testimony of Farnsworth, Transcript, pp. 1462-1463.

60.     The "gray letters" and the manual provided general guidance on the types of information USF&G should be obtaining from its contractors (such as, for example, obtaining an audited financial statement each year) and general guidance on underwriting methods and procedures.  Exhibit 52.  Testimony of J. Daily, Transcript, pp. 174-180; Testimony of Farnsworth, Transcript, pp. 1458-1460.

61.     Part of the analysis performed by USF&G's underwriters was to examine the ratios of working capital to bonding capacity and net worth to bonding capacity.  Testimony of A. Phillips, Transcript, pp. 2433-2434; Testimony of Farnsworth, Transcript, pp. 1505-1507.

62.     "Working capital" is the dollar amount obtained when current liabilities are subtracted from current assets; "net worth" is determined by subtracting all liabilities from all assets.  Testimony of Farnsworth, Transcript, pp. 1504-1505.

63.     Ratio analysis was used as a helpful tool; however, there were no mandatory or minimum ratios required to justify an underwriting decision.  Testimony of A. Phillips, Transcript, pp. 2433-2434.

64.     With respect to CCI and other USF&G accounts of a size similar to CCI, USF&G generally wanted the accounts to maintain a working capital-to-bonding capacity ratio of 3% or better ("net quick") and a net worth-to-bonding capacity ratio of 5% or better.  Testimony of A. Phillips, Transcript, p. 2433.

65.     Anthony Phillips recalls numerous instances in which accounts were underwritten by the Harrisburg Office that had less than a 3% to 5% ratio.  Testimony of A. Phillips, Transcript, p. 2434.

66.     In the rare instance when the net quick ratio is below 3%, it should be taken into account that this may be the result of the fact that USF&G's determination of net quick disallows certain assets that show up in an audit report as current assets.  Testimony of A. Phillips, Transcript, pp. 2582-2583.

67.     According to the 1997 Audit Report and 1998 Audit Report, CCI maintained the 3%-5% ratios described above except on limited occasions when USF&G approved a bond which temporarily increased CCI's bonding capacity beyond $75 million.  In fact, from 1994-1997, CCI was at the 5%-6% net worth to bonding capacity ratio.  Testimony of Farnsworth, Transcript, p. 1506.

68.     The delineated ratios were sufficiently reasonable to justify the bonding program. Testimony of Farnsworth, Transcript, p. 1506.

69.     USF&G would also receive an unaudited interim financial statement prepared internally by CCI (generally for the first six months of each year), as well as certain internally prepared work-in-progress schedules which were received quarterly.  Testimony of J. Daily, Transcript, pp. 170-172, 251-252, 254.  Such information was "ancillary to the audited financial information."  Testimony of A. Phillips, Transcript, p. 2436.

70.     These work-in-progress schedules detailed how CCI's incomplete construction projects were performing.  Although these interim reports from CCI were important, they were not nearly as important as the audited financial statements prepared by Brown Schultz each year. Testimony of Farnsworth, Transcript, pp. 1478-1479; Testimony of J. Daily, Transcript, pp. 170-171, 246-247.

71.     Accordingly, USF&G would compare the interim financial statements with the CCI Audited Financial Statements issued before the interim statements, as well as the CCI Audited Financial Statements issued after the interim financial information had been received. Testimony of J. Daily, Transcript, pp. 252-253.

## IV.    BROWN SCHULTZ WAS AWARE OF BOTH USF&G'S RELIANCE ON THE CCI AUDITED FINANCIAL STATEMENTS AND THE PARAMETERS OF THE BONDING PROGRAM.

72.     As the long term auditor of CCI and PCIC – as well as other entities owned by Ortenzio and his family – Brown Schultz was familiar with CCI's business operations and its financial condition.  Exhibit 144.  Testimony of Brown, Transcript, p. 835.

73.     From 1993 onwards, Brown Schultz knew that USF&G and St. Paul were CCI's bonding company and that the CCI Audited Financial Statements would be provided to USF&G

and St. Paul.  Testimony of Brown, Transcript, pp. 898, 901-902; Testimony of Bowman, Transcript, pp. 1307-1308.

74.     Brown Schultz' working papers show that the audits were done for the benefit of CCI's "bonding company," which they identify as USF&G and St. Paul.  Exhibit 144, p. 11. Testimony of Bowman, Transcript, p. 1307-1308.

75.     Brown Schultz knew USF&G required that CCI provide it with an annual audited financial statement.  Testimony of Brown, Transcript, p. 887.

76.     Brown knew, in general, what bonding capacity was and knew that a bonding company established a bonding program based upon a bonding capacity.  Testimony of Brown, Transcript, 921.

77.     Brown Schultz also knew that bonding companies rely upon audited financial statements to determine whether to extend, suspend, cancel or modify bonding programs and whether to issue payment and performance bonds to CCI.  Testimony of Brown, Transcript, p. 921.

78.     Brown Schultz's principal, Brown, not only knew that bonding companies use financial statements to determine how they issue bonds, but expected his audit staff to understand that surety bond underwriters are a primary third party user of audits.  Testimony of Brown, Transcript, p. 893.

79.     Brown acknowledged that he knew that contractors in public sector work required bonds.  Testimony of Brown, Transcript, p. 887.

80.     Not only did Brown Schultz know that USF&G would receive and rely upon the CCI Audited Financial Statements but Brown Schultz also considered USF&G's intended use of the financial statements in designing its audit plan for CCI.  Exhibit 144, p. 11, ¶7.

81.     Brown Schultz' working papers also show that bonding companies not only review such audits but that they "expect favorable financial statements."  Exhibit 213, p. 43; Exhibit 222, p. 19.  Testimony of Brown, Transcript, p. 888.

82.     Brown Schultz' working papers show that Brown Schultz knew that because the CCI Audited Financial Statements would be used by USF&G there was a risk of an "overstatement" of the financials by CCI's management.  Exhibit 213, p. 43; Exhibit 222, p. 19. Testimony of Brown, Transcript, p. 888.

83.     In fact, Brown admits that he "assumed" that the 1997 Audit Report and the 1998 Audit Report would be delivered to USF&G.  Testimony of Brown, Transcript, pp. 901-902.

84.     Brown Schultz' working papers also contain several documents which show that Brown Schultz was aware of the parameters and capacity of CCI's bonding program.  Exhibit 231, pp. 29, 238, Exhibit 222, pp. 146, 265, 271.

85.     A document contained in Brown Schultz' "Permanent File" entitled "Written Consent of Shareholder in Lieu of Special Meeting" ("Written Consent") dated August 27, 1997 states, in pertinent part, that Ortenzio "has agreed to maintain the equity level of [CCI] no less than $4,800,000 and require an aggregate work [bonding] program no higher than $60,000,000 . . . ."  Exhibit 202.  Testimony of Brown, Transcript, p. 902.

86.     Another document bearing the same title and date contains an excerpt from Brown Schultz' working papers showing that for the year ended "12/31/97" CCI had equity greater than $4,800,000 and its sales were less than $60,000,000 (with actual sales being listed as "$35,000,000").  The working paper was prepared by "CPR," the initials of Brown Schultz' former employee Corinne Rebinski ("Rebinski").  Exhibit 203.  Testimony of Brown, Transcript, p. 904.

17

87.     In a letter dated October 9, 1997, CCI's bonding agent, David Dominiani ("Dominiani") wrote to Ortenzio to warn him that "it is critical that CCI maintain the retained earnings and equity levels . . . [to avoid] jeopardy[izing] your current bonding program."  Brown is an indicated recipient of a copy of Dominiani's letter.  Exhibit 209.  Testimony of Brown, Transcript, p. 907.

88.     In a letter dated November 7, 1997, Dominiani wrote to Ortenzio concerning "[CCI's] current bonding program" and reminded Ortenzio about CCI's earlier agreement reflected in the Written Consent that "USF&G requires your corporate balance sheet to maintain an equity level of no less than $4,800,000."  Brown is an indicated recipient of a copy of Dominiani's letter.  Exhibit 211.  Testimony of Brown, Transcript, p. 908.

89.     Sheri Phillips testified that not only did she discuss the identity of CCI's bonding company with Brown Schultz but that the "bonding limit" was also discussed.  Additionally, she testified that she would give updates to Brown Schultz concerning CCI's level of bonding.  Testimony of S. Phillips, Transcript, p. 2154.

90.     Further, Brown Schultz knew of the type of work engaged in by CCI, including – at least from 1993 onwards – a considerable amount of public construction work that, as a matter of Pennsylvania and federal law, would require that Brown Schultz be able to procure payment and performance bonds.  Testimony of Brown, Transcript, p. 887; Testimony of Bowman, Transcript, p. 1307.

91.     Brown acknowledges that he was aware of the various sizes of the construction contracts being worked on by CCI in 1997 and 1998.  Exhibit 217, Testimony of Brown, Transcript, pp. 916-917.

92.    Brown Schultz' familiarity with the scope and parameters of the total amount of work which CCI performed each year, as well as the anticipated amount of work it would perform in subsequent years can be seen in the schedule labeled "Contracts-in-Progress" which is part of Brown Schultz' audited financial statements for the years ended December 31, 1995 through 1998.  This schedule identifies the projects which remained incomplete in each year; a good indicator of the outstanding work which CCI had to complete and a close approximation of the extent to which CCI had used the aggregate limit portion of its bonding program.  It also showed that the size of CCI's projects did not materially change from year to year.  Exhibit 32, p. 19, Exhibit 33, p. 19, Exhibit 34, p. 17, Exhibit 36, p. 18.

93.    The "Contracts-in-Progress" chart incorporated into the 1996 Audit Report shows that CCI was engaged in four significant projects ranging from approximately $2 million to $16.4 million.  Exhibit 33, p. 19.

94.    The "Contracts-in-Progress" chart incorporated into the 1997 Audit Report shows that CCI was engaged in seven significant projects ranging from approximately $1.3 million to $18.9 million.  Exhibit 34, p. 17.

95.    The "Contracts-in-Progress" chart incorporated into the 1998 Audit Report shows that CCI was engaged in 11 significant projects ranging from approximately $1.5 million to $15.5 million.  Exhibit 36, p. 18.

96.    The mix and size of projects – heavily tilted to the public sector – shows that Brown Schultz was aware of the type and scale of the work being performed by CCI and the approximate amount of bonding capacity that would be needed by CCI to do such work.  Exhibit 33, p. 19, Exhibit 34, p. 17, Exhibit 36, p. 18.

## V.    USF&G CONTINUES TO ISSUE BONDS IN RELIANCE ON THE AUDITED FINANCIAL STATEMENTS.

97.    In August 1997, USF&G received notification from CCI's president, Ortenzio, that he wanted to cancel his personal indemnity agreement with USF&G.  Ortenzio had the right to cancel his indemnity agreement upon giving proper notice to USF&G.  Ortenzio did agree, however, that if CCI's equity level fell below $4.8 million and/or CCI's bonding program consistently went above $60 million, Ortenzio understood that USF&G reserved the right to discuss the need for reinstatement of his personal indemnity.  Testimony of J. Daily, Transcript, pp. 322-324.

98.    Brown Schultz performed tests in 1997 necessary to determine whether CCI's financial status was such that Ortenzio could cancel his personal indemnity.  Exhibit 208. Testimony of Brown, Transcript, pp. 902-904.

99.    The right of cancellation in indemnity agreements is a standard industry clause. Testimony of Farnsworth, Transcript, p. 1519.

100.    It was the custom and practice of the surety industry in the latter half of the 1990's to continue to bond in the absence of personal indemnity from corporate executives so long as the contractor principal remained bound by an indemnity agreement.  Testimony of Farnsworth, Transcript, pp. 1520-1522.

101.    It was not unusual for a surety to continue bonding after an indemnitor exercised a right of termination.  Testimony of Farnsworth, Transcript, p. 1521.

102.    USF&G met the industry standard of care in continuing to bond CCI after Ortenzio cancelled his indemnity because, *inter alia*, the work being done by CCI was within the capital structure of the company and did not present an undue risk to USF&G.  Testimony of Farnsworth, Transcript, p. 1522.

103.    Based upon the Brown Schultz audited financial statements for 1997 and 1998, CCI's equity levels were well in excess of $4.8 million; in 1997, CCI's net equity was approximately $5,455,000 and in 1998 it was approximately $5,250,000. This would support at least a $60 million bonding program. Exhibit 34, Exhibit 36. Testimony of Farnsworth, Transcript, pp. 1596-1598.

104.    It was reasonable for USF&G to assume that Ortenzio's commitment of a certain dollar amount of net worth might require CCI to find sources of income or sources of capital from a source other than work in progress. Testimony of Farnsworth, Transcript, p. 1599.

105.    On March 3, 1998, USF&G received a copy of the 1997 Audit Report and, in reliance, USF&G agreed to continue the $15 million/$75 million bonding program for CCI. Thereafter, USF&G issued payment and performance bonds to CCI for, *inter alia*, the following projects:

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germplasm | 26-0120-28306-98-1 | 6/16/98 | $15,500,000 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $7,199,508 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-28307-98-8 | 6/24/98 | $3,850,000 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $5,589,900 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $13,698,278 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $21,480,250 |

Exhibit 14.

106.    USF&G relied upon the 1997 Audit Report as a substantial factor in its decision to continue CCI's bonding program. Testimony of A. Phillips, Transcript, p. 2445.

107.    Every project approved in reliance on the 1997 Audit Report was within the SDA of the Harrisburg Office except for VCU Life Sciences, which required Home Office approval. Testimony of A. Phillips, Transcript, pp. 2452-2453.

108.    Bonding for VCU Life Sciences was approved by the Home Office.  Testimony of A. Phillips, Transcript, pp. 2452-2453.

109.    I find that USF&G issued the bonds described in paragraph 105, *supra*, in reliance on the 1997 Audit Report.

110.    I find that USF&G's reliance on the 1997 Audit Report was justifiable. Testimony of Farnsworth, Transcript, p. 1535.

111.    On March 2, 1999, USF&G received a copy of the 1998 Audit Report and, in reliance, USF&G agreed to continue the $15 million/$75 million bonding program for CCI. Thereafter, it issued payment and performance bonds to CCI for, *inter alia*, the following projects:

|    | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|----|---------|-------------|----------|-----------|--------------|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $514,976 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $835,299 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $1,688,000 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $191,083 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $12,191,000 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $4,107,051 |
| E. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $24,612,843 |

Exhibits 15, 36, 37.  Testimony of A. Phillips, Transcript, p. 2460.

112.    Upon receipt, Salazar promptly analyzed the 1998 Audit Report and his analysis was immediately accessible by the Home Office via a relatively new software program at

USF&G known as the Electronic Credit File ("ECF").  Testimony of A. Phillips, Transcript, pp. 2460, 2462-2463.

113.    Hard copies of the analysis input into ECF were printed out on March 4, 1999. Exhibit 294.  Testimony of A. Phillips, Transcript, p. 2464.

114.    Not only was it standard procedure for the Harrisburg Office to send the CCI Audited Financial Statements to the Home Office but Anthony Phillips believes that, in particular, the 1998 Audit Report was promptly sent "by routing slip" to the Home Office. Testimony of A. Phillips, Transcript, pp. 2465-2466.  Exhibit 790-B, p. 1266 (sample routing slip).

115.    The 1998 Audit Report was a substantial factor in USF&G's decision to renew CCI's bonding program.  Testimony of A. Phillips, Transcript, p. 2467.

116.    All of the projects bonded in reliance upon the 1998 Audit Report were within the SDA of the Harrisburg office, other than the Pennsylvania Turnpike Building.  Exhibit 15. Testimony of A. Phillips, Transcript, p. 2468.

117.    The required Home Office approval to bond the Pennsylvania Turnpike Building was promptly received.  Testimony of A. Phillips, Transcript, p. 2468.

118.    I find that USF&G issued the bonds described in paragraph 111, *supra*, in reliance on the 1998 Audit Report.

119.    I find that USF&G's reliance on the 1998 Audit Report was justifiable. Testimony of Farnsworth, Transcript, p. 1535.

120.    Salazar's overall analysis of CCI, including his analysis of the CCI Audited Financial Statements, was memorialized annually in a document entitled "USF&G Interoffice Correspondence" ("Interoffice Correspondence"), which detailed the information contained in

23

the CCI Audited Financial Statements as well as other information, such as CCI's banking relations, insurance coverages, and recommendations concerning CCI's bonding program. Exhibit 194.  Testimony of A. Phillips, Transcript, pp. 2428-2430; Testimony of J. Daily, Transcript, pp. 300-301.

121.    No Interoffice Correspondence was prepared by Salazar for 1998 as the financial information obtained from the 1998 Audit Report was entered that year into the ECF program. Testimony of A. Phillips, Transcript, p. 2431.

122.    Salazar, Anthony Phillips and Daily reviewed and analyzed the 1998 Audit Report shortly after receipt on March 2, 1999.  Exhibits 790, pp. 1255-1257, 90, 132, 159, 194 and 229.  Testimony of J. Daily, Transcript, pp. 370, 382, 386-388; Testimony of A. Phillips, Transcript, pp. 2460-2465.

123.    The CCI Audited Financial Statements appeared to be well-presented and, on their face, they did not reveal any defects in the manner in which Brown Schultz audited CCI's balance sheet.  Testimony of DeBruyn, Transcript, p. 1732; Testimony of Farnsworth, Transcript, p. 1545; Testimony of J. Daily, Transcript, p. 783; Testimony of A. Phillips, Transcript, pp. 2443-2444.

124.    As each Interoffice Correspondence demonstrates, USF&G's Harrisburg, Pennsylvania office recommended a continuation of the $15 million/$75 million bonding program for CCI.  Indeed, throughout CCI's bonding relationship with USF&G, those bonding capacity limits continued year-to-year although, on a few occasions, USF&G approved bonds which temporarily increased CCI's bonding capacity beyond $75 million.  Testimony of A. Phillips, Transcript, pp. 2416-2417, 2442-2443; Testimony of J. Daily, Transcript, p. 189.

125.    Farnsworth's analysis of Actual Work on Hand per Work in Progress demonstrates that the work on hand, for a good period of time, was well below the $75,000,000 aggregate.  Exhibit 359 (ID only).  Testimony of Farnsworth, Transcript, p. 1534.  Thus, the ratios were often "well above a 5% case."  Testimony of Farnsworth, Transcript, pp. 1533-1534.

126.    Even when the work in progress appeared to jump above the aggregate program limit for a short time, based upon the overall financial condition of CCI's balance sheet, there was still a strong case for further underwriting.  Testimony of Farnsworth, Transcript, p. 1534.

127.    Those "spikes" (as they are known in the surety industry) in CCI's bonding program were short-lived since CCI worked off its backlog, thereby reducing the aggregate limit of the bonding program to $60 million or below.  Testimony of J. Daily, Transcript, pp. 332-333.

128.    Also, on a very few occasions, USF&G approved a spike in CCI's single limit bonding program to allow CCI to accept a project larger than $15 million.  This was only done after considering both the facts and circumstances of the project and the financial position of CCI.  Testimony of J. Daily, Transcript, pp. 186, 188-189; Testimony of Farnsworth, Transcript, p. 1534.

129.    During the period from 1997 until USF&G/St. Paul ceased writing bonds for CCI in early October 1999, USF&G only approved three jobs that were eventually awarded to CCI and were larger than the $15 million single limit portion of the bonding program.  The three were Germplasm Center ($15,500,000), VCU Life Science ($21,480,250) and Pennsylvania Turnpike Building ($24,612,843).  Exhibit 14, Exhibit 15.

130.    On or about August 17, 1998, Dominiani wrote to Anthony Phillips and reported that CCI had posted a net loss of $1.6 million for the first six months of 1998.  Dominiani

reported that this loss was attributable to certain problem jobs which had been rectified. Exhibit 237, 238. Testimony of A. Phillips, Transcript, pp. 2445-2446.

131.    Dominiani's letter included a spreadsheet which demonstrated how CCI's jobs would perform for the remainder of the year. Exhibit 238.

132.    In fact, according to Dominiani, CCI expected to show a small loss or break even by December 31, 1998. Exhibit 237, 238. Testimony of J. Daily, Transcript, p. 356.

133.    The bonding program was renewed not only because Dominiani's turn around proposal seemed logical but because CCI had a past history of successful turnarounds. Testimony of A. Phillips, Transcript, pp. 2451-2452; Testimony of J. Daily, Transcript, pp. 283, 356.

134.    The decision to renew was influenced, in part, by CCI's history of successful turn-arounds. Testimony of A. Phillips, Transcript, pp. 2451-2452.

135.    For example, by letter dated July 21, 1994 and November 2, 1994, Dominiani indicated that CCI expected a loss of approximately $400,000 - $500,000 by fiscal year end 1994. Exhibits 100, 104; Testimony of J. Daily, Transcript, p. 771. However, the eventual loss was only $317,217. Exhibit 31; Testimony of J. Daily, Transcript, p. 774.

136.    As of September 30, 1995, CCI was showing a loss of $95,000. However, CCI projected that it would break even for the year ending December 31, 1995. According to the 1995 Audit Report, CCI did better than break even – it made a net profit of $103,210. Exhibit 790B, p. 1195, Exhibit 31; Testimony of J. Daily, Transcript, p. 775-776.

137.    The Harrisburg Office received a copy of the 1998 Audit Report on March 2, 1999, which confirmed what Dominiani had represented to Anthony Phillips; namely, that CCI

had its problem jobs under control and that CCI expected a break-even or slightly profitable year. Exhibit 36.

138.    In fact, as reported in the 1998 Audit Report, CCI produced a profit of $59,041 and reduced its operating loss to $116,629.  CCI also maintained a comparatively strong net worth – $5,254,834 – and had, according to Brown Schultz, cash and cash equivalents of at least $2,429,866 and marketable securities of $631,481.  Exhibit 36.

139.    Thus, the decision was again made by USF&G to continue CCI's bonding program at the $15 million/$75 million levels, at least until USF&G could verify and review the year end results for 1998.  Testimony of J. Daily, Transcript, pp. 360-361; Testimony of A. Phillips, Transcript, pp. 2451-2452.

140.    USF&G acted reasonably in bonding CCI in light of, *inter alia*, the information provided by Dominiani.  Testimony of Farnsworth, Transcript, pp. 1524-1525.

## VI.    UPON LEARNING OF CCI'S TRUE FINANCIAL STATUS, USF&G CEASED TO ISSUE BONDS TO CCI.

141.    During the years 1997, 1998 and at least until October 1, 1999, neither Anthony Phillips nor James Daily was aware of any serious problems that CCI had suffered such as labor strikes, uninsured losses, or project defaults.  Testimony of J. Daily, Transcript, p. 340; Testimony of A. Phillips, Transcript, p. 2469.

142.    On or about August 30, 1999, Anthony Phillips received a letter from Dominiani reporting that CCI had sustained a loss of approximately $900,000 during the first six months of 1999 due to certain problem projects.  In that letter, Dominiani advised Anthony Phillips that CCI anticipated losing approximately $1 million in 1999.  Exhibit 320.  Testimony of A. Phillips, Transcript, p. 2469.

143.     This news was remarkable and shocking not just because of the extent of the loss but because CCI had previously been diligent in promptly informing USF&G of significant news, good or bad.  Testimony of A. Phillips, Transcript, p. 2469.

144.     It is very important to underwriters that contractors timely and honestly communicate both good news and bad news.  Testimony of Farnsworth, Transcript, p. 1525; Testimony of J. Daily, Transcript, p. 269.

145.     Upon Anthony Phillips' receipt of the foregoing information from Dominiani, he immediately called CCI's insurance agency and informed them that USF&G would not issue any bonds until numerous issues were addressed and questions satisfactorily answered.  Testimony of A. Phillips, Transcript, pp. 2469-2470.

146.     Anthony Phillips had the necessary authority to act as he did in suspending the bonding program.  Testimony of A. Phillips, Transcript, p. 2474.

147.     The only bond issued by USF&G thereafter was a very small bond in the penal sum of $191,083 for the Cool & Cold Aqua project.  This was a bond related to the same project as to which USF&G issued a $12 million bond on or about July 12, 1999.  Exhibit 15. Testimony of A. Phillips, Transcript, pp. 2470-2471; Testimony of G. Daily, Transcript, pp. 37, 44.

148.     Thereafter, in early October 1999, further bonding by USF&G of CCI was suspended.  No further bonds were ever issued to CCI by USF&G.  Testimony of A. Phillips, Transcript, p. 2471.

## VII.     THE AUDITOR'S STANDARD OF CARE AND PERTINENT AUDITING STANDARDS.

149.     Generally Accepted Auditing Standards ("GAAS") comprise the standards and procedures which must be followed in the planning, preparation and issuance of an audit report

by a Certified Public Accountant.  One of the primary objectives of an audit is to identify high-risk audit areas and to plan the audit procedures accordingly.  Testimony of DeBruyn, Transcript, pp. 1738, 1740.

150.     GAAS requires that all auditors conduct sufficient tests to determine the reliability of management's estimates.  AU Section 342, Auditing Accounting Estimates, January 1, 1989 ("AU Section 342") (Source:  SAS No. 57).  "The auditor is responsible for evaluating the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole.  As estimates are based on subjective as well as objective factors, it may be difficult for management to establish controls over them.  Even when management's estimation process involves competent personnel using relevant and reliable data, there is potential for bias in the subjective factors.  Accordingly, when planning and performing procedures to evaluate accounting estimates, the auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors."  *Id.* at AU §342, ¶.04, Exhibit "A" for ID, Tab 4.

151.     GAAS requires all auditors to exercise "due professional care…in the performance of the audit and the preparation of the report."  AU Section 230, Due Professional Care in the Performance of work, November 1972 ("AU Section 230") (Source:  SAS No. 1).  Exhibit "A" for ID, Tab 2.  Included in the foregoing section, is the fact that due professional care requires the auditor to exercise "professional skepticism."  *Id.* at AU Section 230, ¶.07.  Professional skepticism is a critical assessment of management representations.  It requires going beyond the belief that management is honest and requires examining the audit evidence.  Testimony of DeBruyn, Transcript, p. 1743.

29

152.    GAAS also requires that audit field work must be "adequately planned and properly supervised."  AU Section 311, Planning and Supervision, September 30, 1978 ("AU Section 311) (Source:  SAS No. 22).  Exhibit "A" for ID, Tab 7.

153.    GAAS also requires that the auditor properly address the risks involved in the audit.  AU Section 230 and AU Section 311.  Exhibit "A" for ID, Tabs 2 and 7.

154.    GAAS requires that an auditor insure during its performance of audit field work that "sufficient competent evidential matter . . . was obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  AU Section 326, Evidential Matter, August 1980 ("AU Section 326") (Source:  SAS No. 31).  Exhibit "A" for ID, Tab 3.

155.    GAAS provides guidance concerning the circumstances where the work of a specialist is needed and details appropriate use of that specialist.  Exhibit 272.  SAS No. 73, Using the Work of a Specialist (December 15, 1994) ("SAS No. 73).  In the main, SAS No. 73 presumes that the auditor is not expected to have the expertise of a person trained to engage in the practice of another profession.  SAS No. 73, ¶16.  Testimony of Brown, Transcript, p. 1216. The use of specialists is particularly necessary for "[i]nterpretation of technical requirements, regulations, or agreements," including the "potential significance of contracts or other legal documents.  Exhibit 272, Exhibit 43 (not admitted), SAS No. 73, ¶7.

156.    The AICPA Professional Standards Vol. I at AU §326, third standard of field work states:  "[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."

157.    AICPA Technical Aids Statement of Position 81-1, Accounting for Performance of Construction-Type and Certain Production-Type Contracts, July 15, 1981 ("SOP 81-1"), which is discussed in greater detail, *infra*, provides the standards by which revenue may be recognized.  SOP 81-1.  Exhibit 360, Appendix A, p. 104.

## VIII.   THE RESTATED AUDITED FINANCIAL STATEMENTS.

### A.    CCI's True Financial Condition

158.    Stephen J. DeBruyn ("DeBruyn"), a Certified Public Accountant with significant experience in construction industry audits, testified that the 1997 Audit Report incorrectly represented that CCI produced a net profit of $706,879 when, in fact, CCI actually *lost* $109,801. Testimony of DeBruyn, Transcript, pp. 1794-1797.  Exhibit 34, Exhibit 221 (ID only), Exhibit 365A (ID only).

159.    A comparison of CCI's net worth and net income in 1997 Audited Financial Statements and as restated by DeBruyn revealed the following:

|  | | As Reported In the 1997 Audited Financial Statement | As Restated by DeBruyn |
|---|---|---|---|
| • | Net Income | $  706,879 | $  (109,081) |
| • | Net Worth | $5,454,794 | $4,638,834 |

Exhibits 364A and B; Testimony of DeBruyn, Transcript, pp. 1793-1798.

160.    In addition, CCI's restated net worth of $4,638,834 represented a 15% drop from the $5,454,794 reported in the 1997 Brown Schultz Audit Report.

161.    A comparison of CCI's net worth and net income in the 1998 Audited Financial Statements and as restated by DeBruyn revealed the following:

|   | | As Reported In the 1998 Audited Financial Statement | As Restated by DeBruyn |
|---|---|---|---|
| • | Net Income | $    59,041 | $(3,067,467) |
| • | Net Worth | $5,243,683 | $1,301,215 |

Exhibits 365 A and B (ID only); Testimony of DeBruyn, Transcript, pp. 1798-1800.

162.    The 1998 Audit Report incorrectly showed that CCI produced a profit of $59,041 when, in fact, CCI actually lost $3,067,467.  Testimony of DeBruyn, Transcript, p. 1786. Exhibits 36, 186 (ID only), Exhibit 365B (ID only).

163.    As discussed in greater detail in para. 273-276, *infra*, in making his adjustments to the CCI Audited Financial Statements, DeBruyn did not double-count the $(815,960) adjustment he made to the Statement of Income and Balance Sheet in the 1997 Audit Report.  DeBruyn subtracted that amount from the total of all adjustments made to the 1998 Audit Report $(3,942,468) which resulted in an adjustment of $3,126,508 ($3,942,468 minus $815,960) and, therefore, a restated net loss for the year ended December 31, 1998 of $(3,067,467).  Exhibits 365 A and B (ID only), Exhibit 379.  Testimony of DeBruyn, Transcript, pp. 3184-3186.

164.    DeBruyn opined that the significant variance between CCI's net profits as represented in the CCI Audited Financial Statements and Brown Schultz' actual net profits (losses) was the result of Brown Schultz' failure to utilize due care and to adhere to professional standards.  Testimony of DeBruyn, Transcript pp. 1751-1752; 1760-1763.

**B.    USF&G Would Not Have Issued Bonds If It Were Aware Of CCI's True Financial Condition**

165.    Based upon the foregoing, and assuming that Ortenzio was unwilling to inject additional capital into CCI and was also unwilling to reinstate his personal indemnity, USF&G's underwriters were unequivocal that USF&G would not have approved any of the bonds for the

following projects which were issued as part of a bonding program approved in reliance upon the

1997 Audit Report:

|  | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germplasm | 26-0120-28306-98-1 | 6/16/98 | $15,500,000 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $7,199,508 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $3,850,000 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $5,589,900 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $13,698,278 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $21,480,250 |

Exhibit 14, Testimony of A. Phillips, Transcript, pp. 2474-2476; Testimony of J. Daily,

Transcript, pp. 436, 438.

166.    With respect to the restated financial statement for CCI for the year ended

December 31, 1998, USF&G underwriters are unequivocal that none of the following bonds

issued after USF&G's receipt of the 1998 Audit Report on March 2, 1999 would have been

issued had that 1998 Audit Report contained the information in restated financials which were

issued as part of a bonding program approved in reliance upon the 1998 Audit Report:

|  | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | PENAL AMOUNT |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $514,976 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $835,299 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $1,688,139 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $191,083 |

| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $12,191,000 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $4,107,051 |
| G. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $24,612,843 |

Exhibit 15.  Testimony of A. Phillips, Transcript, p. 2480; Testimony of J. Daily, Transcript, pp. 438, 439-440.

167.    In February 2000, CCI closed business operations and in May 2000, it filed for bankruptcy protection.  Testimony of Brown, Transcript, p. 1231; Testimony of S. Phillips, Transcript, p. 2124.

168.    Subsequently, USF&G, as the surety for the payment and performance bonds which it issued for various CCI projects, was required to and did expend substantial sums satisfying the claims of CCI's unpaid vendors, employees and subcontractors, and in completing the projects USF&G bonded on behalf of CCI.  Exhibit 16, 20, 21, 23, 24, 26, 27, 29.  Testimony of G. Daily, Transcript, pp. 21, 91.

## IX.    USF&G HAS PROVEN THAT THE 1997 AND 1998 AUDITED FINANCIAL STATEMENTS WERE INACCURATE AND CONTAINED MATERIAL MISSTATEMENTS.

### A.    Brown Schultz Made Numerous Misrepresentations In The CCI Audited Financial Statements

#### 1.    Representations In The Independent Auditor's Report

169.    The CCI Audited Financial Statements are prefaced by an introductory letter referred to as the Independent Auditors' Report, which contain the following representations:  (1) "[Brown Schultz] conducted [its] audits in accordance with generally accepted auditing standards"; (2) the "audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements"; (3) an audit "includes assessing the accounting principles used and significant estimates made by management . . . "; and (4) that "the financial

34

statements . . . *present fairly, in all material respects the financial position of CCI . . . .*"

(emphasis supplied).  Exhibit 34, p. 1, Exhibit 36, p. 1.

170.    To the extent that such representations are demonstrably false, they are

misrepresentations.  Thus, an auditor's representation that it conducted its audits "in accordance

with Generally Accepted Auditing Standards" and that the financial statement "present fairly"

the financial position of CCI, evidence that GAAS was not followed or that the financial

statements do not "present fairly" the financial position of CCI would directly and unequivocally

contradict explicit representations in the Independent Auditor's Report.

**B.    The Estimated Completion Costs And Profits Contained In The 1997 And 1998 Audited Financial Statements Were Not Fair Presentations, In All Material Respects, Of CCI's Estimated Costs And Profits As Of December 31, 1997 And December 31, 1998**

### 1.    Introduction – The Auditor's Responsibilities In Construction Audits

#### (a)    AICPA Guide

171.    One of the primary objectives of an audit is to identify high-risk audit areas and to

plan the audit procedures accordingly.  In connection with construction contractor audits

"[m]uch of the independent auditor's work involves evaluating subjective estimates relating to

future events a process which involves highly technical data."  Exhibit 360, Appendix A, p. 43,

AICPA Audit and Accounting Guide Construction Contractors.

#### (b)    PPC Guide

172.    In particular, the "ultimate focus of the [construction] audit has to be on

substantiating the reasonableness of gross profits on contracts, which usually includes a

substantial estimated portion."  PPC Guide to Construction Contractors, Section 520.05.  Exhibit

"A" for ID, Tab 16(E).

173.    The PPC Guide to Construction Contractors is identified as a reference source in the Brown Schultz Accounting and Auditing Quality Control Manual.  Exhibit 38.  Testimony of Bowman, Transcript, pp. 1308-1309; Testimony of Brown, Transcript, p. 890.  The Horwath International Audit Manual utilized by Brown Schultz also provides that PPC guides should be consulted as a reference source.  Testimony of Brown, Transcript, p. 889.

### (c)    Testimony Adduced At Trial

174.    The audit of a construction contractor is markedly different than an audit of a product manufacturer or service provider and, accordingly, has many unique characteristics which must be taken into account by the auditor in defining audit risk and designing an audit plan.  Exhibit 361 (ID only).  Testimony of DeBruyn, Transcript, pp. 1737-1741.  Such proprietary elements include the construction contractors' use of the "percentage of completion" method of accounting and the importance of overbillings and underbillings to any analysis of the contractors' ability to successfully perform their contractual obligations.  Exhibits 362 (ID only); Testimony of DeBruyn, Transcript, pp. 1745-1748.  As discussed in greater depth, *infra*, Brown Schultz failed to implement necessary tests and safeguards sufficient to instill confidence in the numbers provided by CCI.  Testimony of DeBruyn, Transcript, pp. 1741-1742.

175.    Brown acknowledges that one of the unique features about auditing general contractors is the auditor's responsibility to ascertain the accuracy of management's ability to estimate costs to complete and profit.  Testimony of Brown, Transcript, pp. 857, 860.  Brown also acknowledges the authoritativeness of the AICPA Audit and Accounting Guide for Construction Contractors and the PPC Guide to Construction Contractors.  Testimony of Brown, Transcript, pp. 889-890, 894-896.

2.    **Ignoring The Obvious, Brown Schultz Does Not Adequately Plan And Prepare For Its Audit Work**

176.    Testimony at trial demonstrated that CCI's audit risk profile changed markedly between the early 1990's and the year ended December 31, 1998.  Both Brown and Bowman admitted that they were aware of various significant changes in CCI's circumstances and operations, including CCI's decision to engage in increasingly greater amounts of self-performing work, the performance of increasing amounts of out-of-state work, CCI's significant investment in equipment, the rapid growth in the number of CCI's employees and fluctuating revenues.  Testimony of Brown, Transcript pp. 1205-1208.  Testimony of Bowman, Transcript, pp. 1368-1370.

177.    These and other factors shown in Brown Schultz' working papers constituted significant audit risks.  *See, e.g.*, Exhibit 213, pp. 39-44, Exhibit 222, pp. 13-20; Testimony of DeBruyn, Transcript, pp. 1763-1765.

178.    Despite knowledge of the foregoing risks, Brown and Bowman admitted that the audit plans for CCI remained essentially the same from 1993 through 1998.  Testimony of Brown, Transcript, pp. 934, 937, 1201-1202, 1204, 1206.  Testimony of Bowman, Transcript, pp. 1339-1340, 1343, 1370, 1378.

179.    Additionally, despite Brown Schultz' knowledge of numerous problems with CCI subcontractor defaults and the difficulties CCI had in self-performing work, no adjustments to the audit plans were ever made.  Brown admitted – and the working papers reinforce – that despite an increase in CCI's audit risk profile, the actual audit work performed by Brown Schultz for the fiscal years ended December 31, 1996, 1997 and 1998 (and the audit fees) did not change significantly from year to year.  Exhibits 109, 110, 111, 112, 113 114, 213, 222.  Testimony of Brown, Transcript, pp. 934, 937, 1204-1206.

### (i)    "Low" Audit Precision Level

180.    As part of its annual audit planning, Brown Schultz would fill out a Checklist for Evaluating Business Risk and Overall Inherent and Audit Risk (the "Risk Checklist").  Exhibit 213, pp. 39-44, Exhibit 222, pp. 15-20.

181.    In the Risk Checklist, Brown Schultz, *inter alia*, identifies "[b]ank & [b]onding Co." as a likely user.  Moreover, it identifies that CCI in "very competitive industry" and that such industry is characterized by "rapidly changing technology."  Further, the Risk Checklist indicates that there are significant related party transaction[s]" and "management bonuses based on financial results."  As a result, Brown Schultz concludes not only that there is a significant risk of "overstatement" but indicates that "bonding co. and bank expect favorable financial statements."  Exhibit 213, pp. 41-44; Exhibit 222, p. 19.

182.    The purported and unverified "high integrity" was the *only* factor indicated in the Risk Checklist that Brown Schultz indicated in supposed mitigation of the numerous risk factors it identified therein.  Exhibit 213, p. 44, Exhibit 222, p. 13.

183.    As part of its annual audit planning, Brown Schultz also completed a Checklist for Determining Materiality ("Materiality Checklist").  Exhibit 213, pp. 46-47; Exhibit 222, pp. 13-14.

184.    On the Materiality Checklist, Brown Schultz indicated that it believed the lowest possible audit precision level to be appropriate.  Exhibit 213, p. 46.  Exhibit 222, p. 13.  Testimony of Bowman, Transcript, p. 1365.

185.    In fact, Brown Schultz concluded in the Materiality Checklist that such low level of scrutiny was appropriate because there were "no unusual business factors indicating a higher precision level."  Exhibit 213, p. 46, Exhibit 222, p. 13.

186.    Again, Brown Schultz justified using the lowest audit precision level because of its belief in the "high integrity" of management.  Exhibit 213, p. 44, 46.  Testimony of Bowman, Transcript 1366.  However, Brown Schultz never conducted any independent assessment of management team.  Testimony of Bowman, Transcript, p. 1364.

### 3.    CCI Had Significant Risk Factors That Were Known To Brown Schultz

187.    Brown Schultz' determination of a low audit precision level was made despite Brown Schultz' knowledge of numerous risk factors that, at minimum, required a much stricter audit.  Testimony of DeBruyn, Transcript, pp. 1763-1764.

188.    The working papers demonstrate that Brown Schultz knew that CCI was having problems with subcontractor defaults on, among other projects, the Houtzdale Project, the Mahanoy Prison Project and UEPH Headquarters Project.  Exhibit 213, p. 249 (Houtzdale), Exhibit 222, p. 295 (Mahanoy), Exhibit 213, 254 (UEPH Headquarters).  Testimony of DeBruyn, Transcript, pp. 1783-1785.

189.    Brown Schultz also knew that CCI intended to self-perform various tasks that it formerly subcontracted out and that CCI intended to engage in increased amount of heavy construction and highway work.  Testimony of Brown, Transcript, pp. 1205-1209.

190.    Brown was aware that CCI was having trouble with its self-performing work on the Mahanoy Prison Project and the Lord Fairfax Project in 1997 and in 1998.  Testimony of Brown, Transcript, p. 1011.

191.    Because of, *inter alia*, the need to employ additional employees and obtain additional equipment, self-performing work increases the risk to the general contractor.  Testimony of Farnsworth, Transcript, pp. 1502-1503.

192.    Brown Schultz was aware that CCI had a history of profit fades, an indicia of poor estimating ability.  Exhibit 222, p. 273.  Testimony of Bowman, Transcript, pp. 1381-1389.

193.    Brown knew in 1998 and 1999 that CCI was engaging in new lines of construction business.  Exhibit 144, p. 3, ¶3; Testimony of Bowman, Transcript, p. 1319.

194.    Brown Schultz did not, however, conduct any independent analysis as to whether CCI's goals of getting involved in a new line of business was cautious and reasonably achievable.  Testimony of Bowman, Transcript, p. 1320.

195.    Brown Schultz also knew CCI had a history of fluctuating revenue.  Testimony of Brown, Transcript, pp. 934-937.  Between 1992 and 1998 CCI fluctuated from a low of $20 million in revenue to a high of $52 million.  Testimony of Brown, Transcript, pp. 936-937.

196.    Brown Schultz knew that CCI was hiring additional employees and leasing additional office space.  Exhibit 222, p. 26.  Testimony of Brown, Transcript, pp. 1206-1207.

197.    Brown also knew of the inherent conflict of interest attributable to the fact that CCI's internal financials were reviewed and approved by Shane Miller, CCI's second highest executive, who had an incentive to overstate CCI's financial condition.  Testimony of Brown, Transcript, pp. 872-874.

198.    Sheri Phillips, who became the Chief Financial Officer of CCI in 1995, reported to Shane Miller.  Testimony of S. Phillips, Transcript, pp. 2089-2090, 2100-2101.  This was known by Brown Schultz.  Testimony of Bowman, Transcript, p. 1359.

199.    Shane Miller was paid bonuses based upon CCI's performance as reflected in the audited financials.  Testimony of Brown, Transcript, p. 874.  Testimony of Bowman, Transcript, p. 1361.

200.    In 1998, Shane Miller received a bonus of approximately $680,000 based on the 1997 Audit Report.  Exhibit 208, Exhibit 222, p. 333.  Testimony of Brown, Transcript, p. 874.

201.    As discussed, *infra*, Sheri Phillips performed integral parts of the audit work. Testimony of S. Phillips, Transcript, p. 2141.

### 4.    Brown Schultz' Execution Of Its Audit Plans Was Poor

#### (i)    Bowman's Inexperience

202.    Bowman was the "main" Brown Schultz person on the CCI audits.  Exhibit 348, p. 2; Testimony of Brown, Transcript, pp. 925-926.

203.    CCI was the only general contractor for which Bowman ever performed audit services.  Testimony of Bowman, Transcript, p. 1301.

204.    Bowman was a supervisor, which in the Brown Schultz hierarchy is subordinate to the positions of manager, senior manager and principal.  Testimony of Bowman, Transcript, pp. 1299-1300; Testimony of Brown, Transcript, p. 926.

#### (ii)    Limited Supervision

205.    In 1998, unlike previous years, no manager, senior manager or principal was involved in the field work for the CCI audit.  Testimony of Brown, Transcript, p. 927.

206.    Although Bowman had the assistance of a manager, Suzanne Ehgartner ("Ehgartner") in connection with the 1997 Audit Report, she was essentially on her own for the 1998 Audit Report.  Testimony of Brown, Transcript, pp. 924-927.

207.    According to time records, in 1997 Brown spent only 9.3 hours relative to the 1997 Audit and only 8.2 relative to the 1998 Audit.  Exhibit 213, p. 73, Exhibit 222, pp. 52-54. Testimony of Brown, Transcript, pp. 931, 1017.  He had no involvement in the field work. Testimony of Brown, Transcript, p. 1018.

### (iii)     Inadequate Testing Of Cost Controls

208.     Brown Schultz tested a sample of 25 job costs.  Exhibit 222, p. 262.  Testimony of Bowman, Transcript, p. 1344.  The testing Brown Schultz performed was only able to determine whether job costs were being properly recorded in CCI's books and records.  It was *not* sufficient to determine whether costs had been actually incurred.  Exhibit 112, ¶5A-K.  Testimony of Bowman, Transcript, pp. 1344-1345.

209.     According to DeBruyn, this was a test of transactions, not a test of internal controls as the planning forms indicate.  Brown Schultz should have tested significant job costs as described and suggested in the PPC Audit Guide in addition to performing analytical review procedures over direct job costs.  Moreover, Brown Schultz should have vouched (check underlying documentation) significant job costs.  Testimony of DeBruyn, Transcript, pp. 1779-1780.

210.     Additionally, Brown Schultz did not adequately test subcontractor costs.  Subcontractor expense as a component of direct job costs was significant and represented anywhere from over 80% to over 50% of total job costs in any given year between 1995 and 1998.  This is particularly important in light of the several subcontractor defaults noted in Brown Schultz' working papers.  Testimony of DeBruyn, Transcript, pp. 1781-1782.

### (iv)     The Client Conducts The Audit

211.     Brown Schultz charged CCI modest annual audit fees.  Exhibit 213, p. 35, Exhibit 143; Testimony of Brown, Transcript, p. 928.  This was likely as an inducement or loss-leader not only for future business from CCI, but in the hope of obtaining business from other entities with which Ortenzio was affiliated including Select Medical Co.  Testimony of Brown, Transcript, pp. 840-841.

212.    Sheri Phillips would negotiate the audit fees "hard" with Brown Schultz Testimony of S. Phillips, Transcript, p. 2140.

213.    On a dollar for dollar basis, Brown Schultz' fees came down after Sheri Phillips became Chief Financial Officer in 1995.  Testimony of S. Phillips, Transcript, p. 2141.

214.    Brown Schultz wrote off a fee of $1,763 relative to the 1997 Audit Report. Exhibit 222, p. 52.  Testimony of Brown, Transcript, p. 930.

215.    Sheri Phillips justified the financial squeeze she imposed on Brown Schultz on the basis that since CCI did an increased amount of work that would (or should) otherwise have been done by Brown Schultz, it was only fair that Brown Schultz receive less compensation. Testimony of S. Phillips, Transcript, p. 2141.

216.    The work done by CCI in-house included "analytical work."  Testimony of S. Phillips, Transcript, p. 2141.

217.    As discussed, *supra*, Sheri Phillips reported to Shane Miller, who had financial incentives for overstating the financials.  Testimony of Brown, Transcript, pp. 872-874.

(v)    **Material Misstatements In The Audited Financial Statements Resulted From Brown Schultz' Carelessness And Sloppiness**

218.    The estimated costs-to-complete CCI's contracts schedule contained in the 1997 and 1998 Audited Financial Statements were deficient because Brown Schultz relied on CCI's representations as to such costs and job profitability *with no documentation substantiating the fact that CCI's management estimates were reasonable other than the fact that they had allegedly been verified by Sherri Phillips, CCI's Chief Financial Officer and/or Stan Sechrist, CCI's Vice President - Construction Operations*.  Exhibit 34, p. 17, Exhibit 36, p. 18; Testimony of DeBruyn, pp. 1775-1777, 1808, 1887.

43

219.     There is no evidence that Brown Schultz critically reviewed or challenged management's estimates.  Testimony of DeBruyn, Transcript, p. 1774.

220.     Brown Schultz' audit work of CCI was a paradigm of "conversational auditing." DeBruyn testified that Brown Schultz either misunderstood or ignored the requirements of both AU Section 342, and the AICPA Audit and Accounting Guide for Construction Contractors §10-33 *et seq.*, and did not follow the standards and guidelines therein to properly assess the reasonableness of CCI's management's estimates.  Exhibit 360, p. 64.  Testimony of DeBruyn, Transcript, pp. 1762-1766; 1815-1816.

221.     Evidence that CCI's estimates were unreasonable was found in Brown Schultz' working papers which show that in 1998, for example, CCI was estimating gross profits on several contracts-in-progress that were *materially higher than its historical or originally projected amounts*.  Exhibits 213, 222.

222.     There were significant differences on many individual CCI contracts between gross profit percentage in the contract-in-progress schedule and those contracts CCI had previously performed.  Testimony of DeBruyn, Transcript, p. 1775.  Nothing was done; no explanations sought.  Testimony of DeBruyn, Transcript, p. 1775.

223.     Evidence that CCI's estimates were unreasonable was also found in Brown Schultz' working papers which show that in 1998, for example, CCI was estimating gross profits on several contracts-in-progress that were *materially higher than its historical or originally projected amounts*.  For example, the original gross profit estimate for the Germplasm Center project in 1997 was 2.78%, which, by December 31, 1998 had increased to 5.77% according to CCI.  Nothing in Brown Schultz' working papers shows that Brown Schultz did anything to verify this information.  Exhibit 213, p. 273.  Testimony of Bowman, Transcript, pp. 1381-1382.

44

Additionally, the original gross profit estimate for the Lord Fairfax project was 4.34%, which by December 31, 1998 increased by 10.11%. Brown Schultz has no idea why this happened and Brown Schultz' working papers are devoid of any substantiation of this 233% increase in estimated gross profits. Exhibit 213, p. 251, Exhibit 222, p. 275. Testimony of Bowman, Transcript, pp. 1385-1386. This is particularly troublesome because there were significant differences on many individual contracts between gross profit percentage in the contract-in-progress schedule and those contracts CCI had previously performed. Testimony of DeBruyn, Transcript, p. 1775.

224.    Many of CCI's projects also revealed that these contracts had significant profit fades. Exhibits 326, 337.

225.    For example, on the UEPH Headquarters Project (Job 449), the project went from an original estimated profit of 6.27% *down* to .92% in 1997 and a loss of 4.47% at the end of the job in 1998. Exhibit 213, p. 254. Exhibit 222, p. 260. The working papers for the 1997 Audit Report cavalierly provide that there are "no other problems and none anticipated at this time." Exhibit 213, p. 254.

226.    As to several other projects that proved to be significant losses, Brown Schultz' working papers also contained comments such as "good buyout," "good buy," "no problems and none anticipated," and "job was bid very tight," on the very projects that proved to later have serious losses. Exhibit 213, pp. 249, 251, 253, 255, Exhibit 222, p. 272, 273, 279.

227.    By way of example, on the Albermarle Prison project, the working papers state "good buyout on this job." Exhibit 222, p. 272. Testimony of Bowman, Transcript, p. 1350. However, there is nothing in the working papers that reveals the source of that information. Testimony of Bowman, Transcript, pp. 1350-1352.

45

228. Profit fades should alert the auditor of the need to do additional work because it may be indicative of management's inability to competently estimate costs. Testimony of DeBruyn, Transcript, pp. 1765-1766.

229. There is no evidence that Brown Schultz verified the accuracy of comments by CCI's management nor, perhaps more disturbingly, did anything once it became apparent that the projects had significant problems.

230. Bowman admits that she did not look at the actual subcontracts. Testimony of Bowman, Transcript, p. 1352.

231. Moreover, Brown Schultz took no steps to verify either the original budget estimate or subsequent cost information. Testimony of Bowman, Transcript, p. 1354.

232. Other than confirming the contract amount and the amounts paid by the owner, Brown Schultz did not discuss any issues with CCI. Testimony of Bowman, Transcript, p. 1354.

233. Budget estimates were accepted as true based solely on the representations of Stan Sechrist, a construction executive of CCI. Brown Schultz never did any investigations as to whether Mr. Sechrist could be reasonably relied upon. Testimony of Bowman, Transcript, p. 1354.

234. Moreover, nothing in the working papers reveals what CCI was spending in costs. Testimony of Bowman, Transcript, pp. 1354-1355.

235. The extent of Brown Schultz' "conversational auditing" is also evidenced by various conclusions in its Checklist for Consideration of Internal Control Components (Form B-2A) contained in its Permanent File for CCI and purportedly updated annually. In that checklist it is indicated that "CCI's management has a low tolerance for business risk." Exhibit 145, p. 4. Testimony of Bowman, Transcript, pp. 1316-1317.

236.    Such a conclusion had obvious impact on Brown Schultz' planning of its audit of CCI.  Bowman admits, however, that Brown Schultz did not conduct any independent analysis of CCI's management's tolerance of risk.  Testimony of Bowman, Transcript, p. 1317.

237.    Additionally, Brown Schultz did not consult any outside sources to check whether CCI's management was exhibiting a low tolerance of business risk.  Testimony of Bowman, Transcript, pp. 1317, 1319.

238.    Moreover, as discussed, *supra*, Brown Schultz *knew* of several facts that contradict its conclusion.  For example, Brown Schultz knew that CCI was getting involved in different lines of construction and was self-performing complex work.  Testimony of Bowman, Transcript, p. 1319.

239.    Brown Schultz, however, did not conduct any independent analysis of whether CCI's goals of getting involved in new lines of business and self-performing complex work (such as HVAC) increased business risk (and consequently, audit risk) or was cautious and reasonable.  Testimony of Bowman, Transcript, pp. 1319-1320.

240.    Brown Schultz' working papers also revealed a carelessness in documenting CCI's initial profit percentages in its 1997 and 1998 work-in-progress comparative analysis.  See Exhibit 213, p. 251 and Exhibit 222, p. 275 (Job 451 – Lord Fairfax: CCI's initial profit allegedly rose from 4.34% in 1997 to 10.11% in 1998); and see Exhibit 213, p. 249 and Exhibit 222, p. 258 (Job 445 – Houtzdale Prison: CCI's initial profit allegedly rose from 1.94% in 1997 to 4.21% in 1998).  Such carelessness in documenting CCI's initial profit estimates – one of several critical aspects of contract estimating – creates a strong inference that Brown Schultz was careless in other aspects of its audits of CCI's financial statements.

47

241.    Brown Schultz seems to have been willfully blind to CCI's profit fades.  Exhibit 326, Exhibit 337.  For example, the original estimate for Germplasm in 1997 was a profit of 2.78%.  Exhibit 222, p. 273.  However, by December 31, 1998 this had jumped to 5.77% based on information provided by CCI.  There is nothing in the working papers indicating that anything was done by Brown Schultz to verify this information.  Exhibit 222, p. 273.  Testimony of Bowman, Transcript, pp. 1381-1382.  The original 1997 estimate of the Lord Fairfax project was 4.34%.  However, this jumped to 10.11% in one year.  Brown Schultz has no idea why this happened.  Exhibit 213, p. 251, Exhibit 222, p. 275.  Testimony of Bowman, Transcript, pp. 1385-1386.

242.    By way of further example, Brown Schultz' treatment of the Houtzdale Prison project – a job on which it knew of a subcontractor default – was severely deficient.  Brown Schultz' working papers for the Houtzdale Prison note that "costs to complete as estimated at December 31, 1997 are not expected to change significantly."  Exhibit 213, p. 249.  Testimony of Brown, Transcript, p. 950.

243.    Despite the foregoing note, there is *no* documentation in Brown Schultz' working papers that anyone performed any additional test to determine how much the completing subcontractor's premium was going to be.  Testimony of Brown, Transcript, pp. 951-955.  Likewise, the type of subcontract is not identified nor was there any determination as to whether it is part of the project's "critical path."  Testimony of Brown, Transcript, pp. 957-959.  There is also no evidence of any calculation being done of that cost.  Testimony of Brown, Transcript, p. 957.

244.    Finally, Brown Schultz takes no documented action to verify management's representations regarding the Houtzdale Prison project despite knowing, among other things,

48

that:  CCI bid the job below cost, a loss is projected even though the Houtzdale project is less than 40% complete, and there has been a subcontractor default.  Testimony of Brown, Transcript, p. 957.

245.    There is also no documentation in Brown Schultz' working papers that any steps were taken to determine the extent of the loss, as is required by the "loss recognition rule." Testimony of Brown, Transcript, pp. 959-960; Testimony of DeBruyn, Transcript, p. 1812. Brown Schultz's 1998 working papers reveal that the Houtzdale Prison project was completed at a 4.21% loss.  Exhibit 222, p. 258.  Testimony of Brown, Transcript, p. 961.

246.    The Houtzdale Prison is but one of numerous contracts in progress where serious problems are revealed, yet Brown Schultz takes no steps to quantify or investigate them.  *See, e.g.,* UEPH Headquarters, Mahanoy Prison Project, Lord Fairfax Project, Johnstown.  Brown Schultz cannot credibly claim that such fades do not indicate a serious gap in management's estimating credibility.  Exhibit 213, p. 250 (Johnstown), p. 251 (Lord Fairfax), p. 252 (Mahanoy Prison), p. 254 (UEPH Headquarters), Exhibits 366, 367, 368, 369, Exhibit 222, p. 274 (Johnstown), p. 251 (Lord Fairfax), p. 281 (Mahanoy Prison).

247.    Brown Schultz' failure to uncover (or acknowledge) the patently obvious may be attributed to the undisputed fact that, among other failures, Brown Schultz made no job site visits.  Testimony of Brown, Transcript, pp. 979-980.

248.    Additionally, Brown Schultz never contacted any of CCI's subcontractors directly.  Testimony of Brown, Transcript, p. 985.

249.    Both DeBruyn and Brenner acknowledged the efficacy of job site visits in appropriate circumstances.  Testimony of DeBruyn, Transcript pp. 1825-1827.  Testimony of Brenner, Transcript, pp. 3022-2023, 3024-3026.

49

250.    Among the reasons why a job site visit by an auditor may be necessary is "[t]o gain an understanding of those components of internal control maintained at the job site." Exhibit 360,  AICPA Audit and Accounting Guide Construction Contractors, 10.02, p. 57.  This is particularly true if there are troublesome jobs or where accounting functions are performed at the project site.  *Id.* at 59.

251.    Brown justified his failure to conduct job site visits on his belief that all documentation and purchasing was centralized at CCI's main office.  Testimony of Brown, Transcript, p. 1252.

252.    However, accounting and purchasing functions were performed by CCI at the job site level.  Exhibits 356 and 357.  Testimony of Brown, Transcript, pp. 1254-1255.

253.    In light of the troublesome jobs identified in Brown Schultz' working papers, the significant profit fades which occurred, and the many other risk factors extant, job site visits should have been conducted and would likely have altered Brown Schultz that the projects were in worse shape and job costs higher than represented by CCI's management.  Testimony of DeBruyn, Transcript, pp. 1825-1826.

### 5.    Brown Schultz' Burden Regarding Audit Working Papers

254.    The AICPA Professional Standards Vol. I at AU §339, states in section .01: "The auditor should prepare and maintain working papers . . . .  The information contained in working papers constitutes the principal record of the work that the auditor has done and the conclusions that he has reached concerning significant matters."  AU §339 further states in section .02 that the function and nature of working papers serve mainly to:

> a.    Provide the principal support for the auditor's report, including his representation regarding observance of the standards of fieldwork, which is implicit in the reference in his report to generally accepted auditing standards.

b.     Aid the auditor in the conduct and supervision of the audit.

255.     With respect to the content of an auditor's working papers, AU §339 provides the

following guidance:

> .05     The quantity, type, and content of working papers vary . . . , but they
> should be sufficient to show that the accounting records agree or reconcile with the
> financial statements or other information reported on and that the applicable standards of
> fieldwork have been observed.  Working papers ordinarily should include documentation
> showing that –
>
> a.     The work has been adequately planned and supervised.
>
> b.     A sufficient understanding of the internal control structure has been
> obtained to plan the audit and to determine the nature, timing, and extent
> of tests to be performed.
>
> c.     The audit evidence obtained, the auditing procedures applied, and the
> testing performed have provided sufficient competent evidential matter to
> afford a reasonable basis for an opinion, including observance of the third
> standard of field work.

256.     When evaluating the contents (or lack thereof) of Brown Schultz' working papers,

the Court should do so cognizant that "[p]rofessional standards require an auditor to obtain

sufficient audit evidence to afford a reasonable basis for his audit opinion."  AICPA SAS no. 31,

"Evidential Matter" (1980).

257.     DeBruyn testified that Brown Schultz failed to meet the minimal professional

standards regarding its working papers.  Testimony of DeBruyn, Transcript, pp. 1758-1761,

1765-1770.

258.     This is important not merely on technical grounds but because Brown Schultz

claims to have conducted numerous tests and examinations that are simply *not* indicated in its

working papers.  When evaluating the contents (or lack thereof) of Brown Schultz' working

papers, the Court should do so cognizant that "[p]rofessional standards require an auditor to

51

obtain sufficient audit evidence to afford a reasonable basis for his audit opinion." AU Section 326, Exhibit "A" for ID, Tab 3.

259.    Brown agrees that the basic principle at the time Brown Schultz performed audits for CCI was that the main purpose of working papers is to document what is done in connection with the audit. Testimony of Brown, Transcript, p. 914.

260.    Further, any excuses for the omission of information from working papers – intentionally or otherwise – should be viewed skeptically in light of the fact that working papers have a "common purpose - to document the work done, and to preserve a body of evidence adequate in amount and quality and so organized as to lean logically to the professional conclusion expressed." R. J. Gormley, *The Law of Accountants and Auditors*, ¶3.03[1], p. 3-26 (Warren, Gorham & Lamont 1981), AU Section 339A and 339, Exhibit "A" for ID, Tabs 8 and 6.

### 6.    "Disclaimers" In The CCI Audited Financial Statements Do Not Relieve Brown Schultz' Liability

261.    Brown Schultz cannot shrug off its responsibilities by relying on the "Use of Estimates" disclosure language in Footnote 1 of both the 1997 Audit Report and 1998 Audit Report. An "estimates" footnote of the type utilized by Brown Schultz is required by Statement of Position 94-6, Disclosure of Certain Significant Risks and Uncertainties ("SOP 94-6"). Exhibit "A" for ID, Tab 19B §§1408.1 and 1408.11.

262.    SOP 94-6 requires financial statement disclosures to include an explanation that preparation of financial statements requires the use of management's estimates. This "acknowledges that the disclosure will usually be standardized (*that is, boilerplate*)." (emphasis supplied). SOP 94-6. Exhibit "A" for ID, Tab 19B §1408.14.

263.    The disclosures required in SOP 94-6 "focus primarily on risks and uncertainties that could significantly affect the amounts reported in the financial statements *in the near term . . .*." SOP 94-6, ¶.02 (emphasis supplied).  "Near term" is defined as "[a] period of time not to exceed one year from the date of the financial statements."  SOP 94-6, ¶.07; Exhibit A, Tab 19B §1408.18.

264.    Accordingly, the requisite footnote is not a disclaimer of liability but, rather, serves merely to inform the reader that the estimates may change with time.  It seems obvious that, in the context of construction projects, estimates sometimes change as the project proceeds and the contract edges toward completion.  Exhibit 34, p. 8, n.1; Exhibit 36, p. 8, n.1.

265.    The delineated notification of anticipated change in Footnote 1 of the CCI Audited Financial Statements is not tantamount to notification that the estimates *as of a date certain* are incorrect or that the auditor has not determined the reliability of management's figures, as is required by SAS 57.

266.    Moreover, the "boilerplate" language in Footnote 1 to the 1997 Audit Report and 1998 Audit Report regarding the use of estimates – by its own terms – does not immunize Brown Schultz from liability for failing to properly test management's estimates.  Exhibit 34, p. 8, Exhibit 36, p. 8.

267.    Not only does the Independent Auditor's Report make specific representations concerning the financial statements and the audit work purportedly performed by Brown Schultz, but it is acknowledged that "it is at least reasonably possible that the estimates *will change* within the *near* term."  (emphasis supplied).  Exhibits 34, p. 1, Exhibit 36, p. 1.

268.    However, the 1997 Audit Report and 1998 Audit Report and Brown Schultz' representations related thereto neither concern nor predict future results but, instead, represent

that as of *a date certain* (December 31, 1997 and December 31, 1998) the financial statements "present fairly" and "in all material respects" CCI's financial position. Likewise, that "actual results *could* differ from those estimates" does not vitiate the representation that as of a date certain, Brown Schultz' representations are true or, at minimum, have been reviewed with "professional skepticism."

### 7. The "Look Back" Methodology Described By DeBruyn Is Admissible, Logical And Consistent

#### (a) *Daubert* Standard

269. The analysis utilized by DeBruyn to determine the extent of Brown Schultz' failures was conservative, logical and consistent. The evidence adduced at trial demonstrated that DeBruyn's testimony is predicated not only on an accepted and logical methodology, but based upon credible data that is in evidence.

270. In essence, DeBruyn obtained the actual gross profit amount at the completion of the contract and applied it back to the construction in progress schedule. The actual costs are, of course, the best information available where, as here, the underlying financial data has been lost. If, for example, it was necessary to recreate the work in progress schedule, it would have been done using the best available information; to wit, the actual costs (rather than trying to determine what the estimated costs were). Testimony of DeBruyn, Transcript, pp. 1836-1839.

271. Additionally, DeBruyn's rebuttal testimony demonstrated that no mistakes were made in the restated financials or in his analysis and that the "look back" method had been applied consistently and conservatively therein. Exhibits 379, 816, 817, 818, 820. Testimony of DeBruyn, Transcript, pp. 3181-3192.

272. For example, Brown Schultz' 1998 working papers for the Lord Fairfax project documented numerous problems and delays due to weather conditions and poor design

documents, work accelerations to compensate for delays, self-performing problems and the default of the mechanical subcontractor. Exhibit 222, page 275. Brown Schultz 1998 working papers also showed that there had been no serious problems or catastrophic events suffered by CCI in 1999 which standing alone could have adversely impacted CCI's financial condition. Exhibits 213, 222. Testimony of DeBruyn, Transcript, p. 1839.

273.     In connection with his restatement of CCI Job No. 451, Lord Fairfax as of December 31, 1997, DeBruyn recast the results for that project using the gross profit percentage (4.34%) which was originally estimated by CCI at the inception of the project. Exhibit 366 (ID only). Testimony of DeBruyn, Transcript pp. 1802-1804.

274.     In connection with the 1998 Audit Report, DeBruyn recast CCI Job No. 451-Lord Fairfax using the gross profit percentage as of December 31, 1999 (-10.43%) as opposed to the percentage (-3.08%) contained in the 1998 Audit Report. Exhibit 36, Exhibit 337. The reason DeBruyn utilized -10.43% was that under the "loss recognition rule," the total loss on the project has to be recognized in the year the loss is first observed. Testimony of DeBruyn, Transcript, pp. 1812-1813.

275.     DeBruyn included the total loss as required by the "loss recognition rule" in the year in which the loss was first observed on every project he restated. See, e.g. Job 454 - CCI Job no. 445 - Albermarle Prison and Houtzdale Prison, Exhibits 367 and 369 (ID only). Testimony of DeBruyn, Transcript, pp. 1812-1813. Again, Brown Schultz did not provide any evidence that they had employed audit procedures to be sure the entire loss was recognized in the year of the loss. Testimony of DeBruyn, Transcript, pp. 1812-1813.

276.     With respect to the Lord Fairfax project, DeBruyn did not use the gross profit percentage (7.11%) contained in the 1997 Audit Report since Brown Schultz' working papers

55

lacked any support for an increase in estimated gross profit from 4.34% to 7.11% on a project that was only 6.44% complete as of December 31, 1997. Brown Schultz' working papers for this project showed only that there was a "good 'buyout'" on the project and that there were no problems and none anticipated. Exhibit 213, page 251, Exhibit 366 (ID only). Testimony of DeBruyn, Transcript, pp. 1803-1810.

277.    Brown Schultz' criticism of the "look back" method not only ignores the pertinent law, but also the considerable testimony adduced in favor of such methodology. Not only is such method codified in the Internal Revenue Code, 26 U.S.C. §460(b), but appropriate variants (including the "book of wisdom") have been used in a variety of cases from patent litigation to eminent domain. Testimony of Brenner, Transcript, pp. 2978-2979. *See, e.g., Sinclair Ref. Co. v. Jenkins Petroleum*, 289 U.S. 698 (1933); *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Prince George's County, Maryland*, 1993 WL 524783 (D. Md.).

278.    DeBruyn testified that this methodology was used and employed by members of his profession and, further, that it was a reliable tool for analyzing and restating financials. Testimony of DeBruyn, Transcript, p. 1838.

279.    Moreover, DeBruyn testified that with respect to the 1997 audit, not only would Brown Schultz have been able to restate it based on the 1998 Audit, but if it had done so by extending its audit procedures to adequately test the estimated costs to complete, the inadequacies of CCI's estimates would have been apparent. Testimony of DeBruyn, Transcript, pp. 1800-1801, 1815-1816.

280.    Brown Schultz' expert, Donald Brenner ("Brenner"), also admitted that a form of the "look back" method is used to restate financial statements where errors have been made. Testimony of Brenner, Testimony, pp 2983, 3116, 3118.

**(b)      CCI's Failure Cannot Be Attributed To Any Calamities**

**(i)      Exhibit 337 – CCI Internal Financials**

281.    Brown Schultz' assertion that DeBruyn's testimony is improper because it is based, in part, on Exhibit 337, a balance sheet dated December 31, 1999 internally prepared by CCI, is frivolous.  Exhibit 337 is a copy of an income statement and balance sheet for CCI for the period ending December 31, 1999.  Exhibit 337.

282.    It was fully admitted into evidence for all purposes.  Transcript, p. 2082.

283.    Absolutely no testimony or documents adduced at trial call into question the credibility of Exhibit 337.

284.    James Daily testified that (1) the information on Exhibit 337 was of the type that USF&G regularly requested from CCI; (2) USF&G regularly relied upon such information provided by CCI relative to its underwriting decisions; and (3) Exhibit 337 was submitted as part of a package of information by CCI to USF&G in connection with CCI's request for financing. Testimony of J. Daily Transcript, pp. 430-432.

**(ii)      Eskin Memorandum (Exhibit 750) And Testimony**

285.    A memorandum prepared by William Eskin dated November 17, 1999 provides, *inter alia*, that "[p]er my discussion with Sherri [Phillips] it was represented there are no significant contingent liabilities (lawsuits, etc.) which would have a material impact on the company and would preclude them from completing their bonded obligations."  Exhibit 750, p. 5 (limited purpose).

286.    Eskin also testified at trial that he was aware of no contingent liabilities, uninsured losses or anything that would have adversely impacted on CCI's balance sheet. Testimony of Eskin, Transcript, p. 2729.

287.     Eskin also testified at trial that in 1999 there was nothing like a major owner default that would result in the uncollectibility of receivables or uninsured loss or anything that would have impaired CCI's balance sheet.  Testimony of Eskin, Transcript, p. 2730.

### (iii)     S. Phillips' Testimony

288.     Although Sheri Phillips admitted to grave doubts about the accuracy of CCI's projections regarding contract completion, she never indicated that CCI's in-house financial statements were not reliable.  Testimony of S. Phillips, Transcript, pp. 2146-2148.

289.     Sheri Phillips testified that she did not recollect any labor strikes, uninsured losses or other events outside the ordinary course of business in 1999 that would have precipitated CCI's collapse.  Testimony of S. Phillips, Transcript, pp. 2150-2151.

290.     If anything, Sheri Phillips' concerns would have encouraged conservatism in preparing financials to be provided to a third party.

### (iv)     Brenner's Reliance On Exhibit 337

291.     Moreover, Brenner also testified as to his reliance on Exhibit 337.  Testimony of Brenner, Transcript, pp. 2995-2996.

### (v)     Other Testimony Adduced At Trial

292.     The accuracy of Exhibit 337 – as well as Brown Schultz' multitude of errors in testing estimated costs and profits – is also demonstrated by considerable evidence that CCI's ultimate financial failure was not the result of a calamitous event but, rather, the natural result of its inability to profitably complete a contract.  Testimony of Sheri Phillips, Transcript, p. 2149-2151; Testimony of Eskin, Transcript, p. 2729.

293.    Brown Schultz' working papers are not only replete with references that not only are projects proceeding well, but the Permanent File provides that there are "no problems and none anticipated" *as of December 8, 1999*.  Exhibit 145, p. B-2A.

294.    DeBruyn did not observe anything in the Brown Schultz audit materials he reviewed that would have led him to conclude that any significant calamity or loss occurred or was sustained by CCI in 1999.  Testimony of DeBruyn, Transcript, p. 1839.

295.    Curiously, Brown Schultz listed as a witness, but did not call, CCI's President, John Ortenzio, and introduced no evidence that CCI's failure was attributable to any calamitous act.

## 8.    Conclusions And Professional Opinions

296.    DeBruyn testified that to a reasonable degree of accounting certainty, the work performed by Brown Schultz relative to the 1997 Audit Report and 1998 Audit Report did not conform to the applicable standards of care of a certified public accountant.  Testimony of DeBruyn, Transcript, pp. 1760, 1770.

297.    In particular, Brown Schultz did not exercise due professional care in the testing of contracts in progress, the testing of the percentage of completion method, in the design and execution of the test of accumulated job costs and in obtaining sufficient competent evidential material to evaluate the reasonableness of accounting estimates.  Testimony of DeBruyn, Transcript, p. 1770.

298.    Moreover, Brown Schultz' nonconformance with the applicable standards of care resulted in material misstatements in the 1997 Audit Report and 1998 Audit Report.  Testimony of DeBruyn, Transcript, pp. 1792-1793.  Charts 364-A, 364-B (ID only).

299.    Brenner, the (then) unlicensed professional witness retained by Brown Schultz, stated that he was *unable* to testify that CCI's financials complied with GAAP, an express representation made in the Independent Auditor's Reports in both the 1997 Audit Report and 1998 Audit Report.  Testimony of Brenner, Transcript p. 3084.

## X.    BROWN SCHULTZ' INADEQUATE DISCLOSURE OF THE PCIC CLAIM GUARANTEE AND RECORDING OF THE MAHANOY PRISON CLAIM AMOUNT IN REVENUE AS AN "UNDERBILLING" VIOLATED GAAP AND BROWN SCHULTZ' INTERNAL RELATED-PARTY DISCLOSURE <u>STANDARDS.</u>

### A.    PCIC Issued A Remedial Work Period Insurance Policy For CCI's Mahanoy Prison Project

#### 1.    PCIC And CCI Are Related Parties According To AICPA Standards.

300.    PCIC was set up to comply with both Internal Revenue Code and the laws and regulations of the Turks & Caicos Islands.  Testimony of Brown, Transcript, p. 1210.

301.    PCIC and CCI are "related parties," as that term is used in AICPA guidelines and rules.  FAS No. 57, Related Party Disclosures, March 1982 ("FAS No. 57"), Exhibit "A" for Identification, tab 14.  Testimony of Brown, Transcript, pp. 1023, 1267-1268.

302.    At all times material to this action, Brown Schultz audited PCIC's financial statements at the same time it was auditing CCI's financial statements.  Testimony of Brown, Transcript, pp. 838-839.

#### 2.    The Mahanoy Prison Project

303.    On or about April 3, 1997, CCI was awarded a project by the Department of General Services ("DGS") for the construction of two medium security housing units affiliated with the State Correctional Institute – Mahanoy City (the "Mahanoy Prison Project").  Exhibit 222, p. 285.

304.    According to Brown Schultz' working papers for the 1997 Audit, CCI had bid the Mahanoy Prison Project at a .41% net loss.  Exhibit 222, p. 281.  Testimony of Bowman, Transcript, pp. 1388-1389.

305.    On or about 1998, CCI asserted a claim "for unforeseen costs" against DGS relative to the Mahanoy Prison Project (the "Mahanoy Claim").  Exhibit 222, pp. 284-292.  This claim was, primarily, a claim for increased expenses and costs allegedly incurred by CCI and attributable to owner-caused delays and unusually severe winter conditions.  Exhibit 59, Exhibit 222, pp. 284-292.

306.    By the Mahanoy Claim, CCI sought to recover $1,162,460 from DGS relative to the Mahanoy Prison Project.  Exhibit 222, pp. 284-292.  Testimony of Brown, Transcript, pp. 1076-1078.

### 3.    The Mahanoy Prison Remedial Work Period Insurance Policy

307.    The Mahanoy Prison Project was purportedly covered by an insurance policy issued by PCIC.  Exhibit 222, p. 299.  This policy, and all similar policies issued for CCI by PCIC, is entitled "Remedial Work Period Insurance Policy."  *Id.*

308.    The Remedial Work Period Insurance Policy issued by PCIC for CCI for the Mahanoy Prison Project was typical of other policies issued by PCIC relative to various CCI projects.  Exhibit 222, p. 299, 268.  Testimony of Brown, Transcript, pp. 1029-1030.

309.    The Remedial Work Period Insurance Policy provides that PCIC will "*reimburse*" the insured for certain "costs" (I. Insuring Clause).  The Remedial Work Period Insurance Policy defines the term "costs" and describes in detail the manner in which they must be calculated.  (II. Definitions).  Exhibit 222, pp. 299-300.  "Costs" are defined as "[t]he ordinary and customary

charge for the type of services performed in the geographical area where the remedial work services are performed . . . ." *Id.*

310.     The Remedial Work Period Insurance Policy also requires that a Proof of Loss be submitted "*after* each remedial work *repair*" made by the insured (IV. Proof of Loss).  The Proof of Loss must be submitted after the pertinent repair has been made and after PCIC has received a "sworn proof by a Designated Contract Holder," a term specifically defined in the Remedial Work Period Insurance Policy (II.(3).  Designed Contract Holder).  Exhibit 222, pp. 300, 302.

311.     Further, the Remedial Work Period Insurance Policy requires that CCI shall "notify and request authorization from [PCIC]" prior to proceeding with the "repair" and shall, at that time, provide an estimate of the anticipated repair costs.  Exhibit 222, p. 299.

312.     The Remedial Work Period Insurance Policy provides that upon payment, PCIC "shall be subrogated to all of [CCI's] rights of recovery . . . . (XIII.  Subrogation).  Exhibit 222, p. 306.  Testimony of Brown, Transcript, pp. 1289-1291.

313.     As discussed in greater detail, *infra*, CCI's claims paid by PCIC did not comply with the foregoing procedural requirements of the Remedial Work Period Insurance Policy nor were they necessarily covered by the Remedial Work Period Insurance Policy.

**B.     Brown Schultz Failed To Comply With The Recognition Standards Contained In SOP 81-1**

**1.     The Mischaracterization Of CCI's Revenue In The 1998 Audited Financial Statements Was Material And Misleading**

314.     It is undisputed that in the 1998 Audit Report, the amount of $1,162,460 for the Mahanoy Claim is contained in the Income Statement line entitled "revenue" and in the Balance Sheet line entitled "costs and estimated earnings in excess of billings" also known as

"underbillings." Exhibit 36. Testimony of Brown, Transcript, pp. 1063, 1258. *See*, Glossary, filed by USF&G on October 14, 2003.

315.    The Mahanoy Claim amount was purportedly included in underbillings by Brown Schultz because of "[t]he guarantee of PCIC of the claim to be submitted to the [DGS]." Testimony of Brown, Transcript, p. 1076.

316.    The Mahanoy Claim of $1,162,460 did not meet the recognition standards for *revenue* set forth in SOP 81-1. SOP 81-1. Exhibit 360, Appendix A, p. 104. Testimony of DeBruyn, Transcript, pp. 1847-1848, 1849-1852, 1854, 1857.

317.    If the mischaracterized amount of the Mahanoy Claim is removed from revenue CCI's net income of $59,000 becomes a net *loss* in excess of $1.1 million dollars. Testimony of Bowman, Transcript, p. 1405.

**2.    Revenue May Only Be Recognized If Certain Requirements Are Met. SOP 81-1**

318.    SOP 81-1, par. 1 "provides guidance on the application of generally accepted accounting principles in accounting for the performance of *contracts for which specifications are provided by the customer for the construction of facilities . . . .*" Exhibit 360, Appendix A, p. 85.

319.    The contracts covered by SOP 81-1 include, *inter alia*, the construction and design of buildings, ship building and design and complex aerospace construction and engineering. There is nothing in SOP 81-1 concerning insurance contracts or guarantees or similar agreements. Exhibit 360, par. 13, Appendix A, p. 88.

320.    SOP 81-1, par. 65 states that recognition of construction revenue relating to claims is appropriate only when it is "probable" the claim will result in additional revenue and the amount can be reliably estimated. These requirements are satisfied only by the existence of all of the following conditions:

63

a.    The contract or other evidence provides a legal basis for the claim; or a legal opinion has been obtained, stating that under the circumstances there is a reasonable basis to support the claim.

b.    Additional costs are caused by circumstances that were unforeseen at the contract date and are not the result of deficiencies in the contractor's performance.

c.    Costs associated with the claim are identifiable or otherwise determinable and are reasonable in view of the work performed.

d.    The evidence supporting the claim is objective and verifiable, not based on management's "feel" for the situation or on unsupported representations.

Exhibit 360, Appendix A, pp. 103-104.

321.    In purportedly satisfying those requirements, Brown Schultz failed to document in its working papers any evidence that: (1)  There was a legal basis for the claim or a legal opinion had been obtained (SOP 81-1 par. 65 a); and (2) The evidence supporting the claim was objective and verifiable and not based upon management's "feel" for the situation or on unsupported representations (SOP 81-1, par. 65(d)).  Exhibit 360, Appendix A, p. 104.

322.    Brown admitted that there was no documentation in the working papers demonstrating compliance with the requirements of SOP 81-1 regarding the PCIC Guaranty. Testimony of Brown, Transcript, pp. 1082-1083, 1089-1090.

323.    DeBruyn did not observe any documentation in the Brown Schultz working papers that would support inclusion of the Mahanoy Claim of $1,162,460 in revenue based upon SOP 81-1.  Testimony of DeBruyn, Transcript, p. 2067.

324.    In explaining Brown Schultz' purported compliance with SOP 81-1, Brown implicitly acknowledges the applicability of SOP 81-1 by stating that he allegedly took actions to determine if the Mahanoy Claim was "quantifiable and probable of collection."  Moreover, Brown does not indicate that FASB Concept Statement 5, Recognition and Measurements in Financial Statements of Business Entities, June 1, 1994 ("FASB Concept Statement 5") would in

any manner be applicable.  Exhibit 360, Appendix A; Exhibit 813.  Testimony of Brown, Transcript, pp. 1192-1193.

325.    Brenner did not identify FASB Concept Statement 5 in any of his expert reports or during his deposition.  Exhibit 813.  *See*, Exhibits 510 and 511 [designated by Brown Schultz, not in evidence].

326.    FASB Concept Statement 5 merely provides general "guidance" on an application of the "fundamental criteria" attendant with earnings recognition.  It speaks generally of when revenue is recognized after merchandise or services have been sold for cash or claims have been converted to cash.  FASB Concept Statement 5, para. 78 and para. 83(a).

327.    Assuming, *arguendo*, that FASB Concept Statement 5 was applicable to the Mahanoy Claim, the GAAP Hierarchy provides that a FASB Concept Statement is the *lowest* priority level of all GAAP rules and standards and is on a much lower level than SOP 81-1. Exhibit 377.  Testimony of Brenner, Transcript, pp. 3101-3102.

328.    SOP 81-1 says specific application, as noted above, regarding performance of contracts for construction of facilities.  SOP 81-1, para. 1 and provides specific guidance on preconditions recognizing construction claims as revenue.  FASB Concept Statement 5 only speaks of recognition of a claim as revenue once it has been converted to cash.  FASB Concept Statement 5, para. 83a.

329.    There is nothing in FASB Concept Statement 5 that requires the recording of the Mahanoy Claim in revenue in 1998.  Testimony of DeBruyn, Transcript, p. 3192.

> **3.    Brown Schultz Did Not Investigate The Validity Of The Mahanoy Claim.**

330.    Bowman agrees that if the Mahanoy Claim was "phony" or a "false statement" it could not have been booked in revenue.  Testimony of Bowman, Transcript, p. 1407.

331.    No independent investigation was conducted by Brown Schultz to determine if there was any merit to the Mahanoy Claim.  Testimony of Bowman, Transcript, pp. 1407-1408.

332.    Bowman cannot identify anything in the working papers to indicate that tests were performed to determine if the Mahanoy Claim was valid.  Testimony of Bowman, Transcript, pp. 1378-1379.

333.    In 1999, DGS paid CCI only approximately $200,000 of its putative claim of nearly $1,200,000.  Testimony of Brown, Transcript, pp. 1288-1289.  *The amount paid by DGS is only 17% of the amount of the Mahanoy Claim.*

### 4.    Brown Schultz Failed To Determine If There Was A Legal Basis For The Payment Pursuant To The Remedial Work Period Insurance Policy.

334.    Brown Schultz' working papers show that Brown Schultz was familiar with SAS No. 73, *Using the Work of a Specialist*, December 15, 1994 ("SAS No. 73") and the admonition therein that the auditor lacks the expertise to interpret or asses the legal significance of contracts. Exhibit 272.  Testimony of Brown, Transcript, pp. 1216-1220.

335.    There is a presumption that an auditor is not expected to have the expertise of a person trained to engage in the practice of another profession.  SAS No. 73.  Exhibit 272, para. 6. Testimony of Brown, Transcript, p. 1218.

336.    SAS No. 73, para. 7(d) requires the Auditor to consider using the work of a specialist to "[i]nterpret technical requirements, regulations or agreements . . . ."  SAS No. 73, Exhibit 272, para. 7(d).  Testimony of Brown, Transcript, p. 1219.

337.    In connection with the 1994 Audit Report, Brown Schultz procured a legal opinion pursuant to SAS No. 73 to clarify issues concerning the scope of coverage afforded by

66

Remedial Work Period Insurance Policies issued by PCIC in a particular circumstance. Exhibits 34, 99. Testimony of Bowman, Transcript, pp. 1040-1041, 1321.

338.     In that legal opinion, CCI's lawyer stated, *inter alia*, that CCI needed "to complete the submission of an appropriate Proof of Loss and to observe the other provisions of the Remedial Work Period Insurance Policy regarding the filing and perfection of the claim." Exhibit 31, Exhibit 99.

339.     Brown admitted that PCIC was advised by legal counsel to make certain that the provisions of the insurance policies were followed. Testimony of Brown, Transcript, pp. 1040-1041.

340.     Because Brown Schultz lacked actuarial expertise, Gregory Petrowski ("Petrowski") was retained to provide actuarial expertise relative to Brown Schultz' audit of PCIC. Testimony of Brown, Transcript, p. 1218.

341.     Brown admitted that no legal assistance was sought nor was any analysis done to determine whether the Mahanoy Claim was covered by the Remedial Work Period Insurance Policy or if the requisite claims procedures were followed, and no such analysis of these issues is documented in Brown Schultz' work papers. Exhibit 222. Testimony of Brown, Transcript, pp. 1038, 1039, 1044, 1045-1046, 1219.

342.     Purportedly pursuant to the Remedial Work Period Insurance Policy, in 1998 PCIC paid CCI $900,000 on two claims related to the Mahanoy Prison Project. Exhibit 222, pp. 295-298. Testimony of Brown, Transcript, pp. 1044-1046.

343.     Brown Schultz failed to obtain a legal opinion on whether the $900,000 that was paid by PCIC to CCI in 1998 was validly paid pursuant to the terms of the Remedial Work Period Insurance Policy. Testimony of Brown, Transcript, pp. 1218-1219.

67

344.     Brown Schultz did not consult with any attorney to determine whether or not CCI had followed the provisions of the Remedial Work Period Insurance Policy relative to this payment.  Testimony of Brown, Transcript, p. 1045-1046.

345.     Of the $900,000 paid, $448,000 was purportedly made because CCI's masonry subcontractor – Johnson Masonry – defaulted (the "Johnson Masonry Claim").  The remaining amount of $452,000 was paid because CCI's mechanical work "was impacted as a result of union issues and default of [its] sheet metal fabricator" (the "Union Claim").  Neither of these claims is "remedial" according to the terms of the Remedial Work Period Insurance Policy. Exhibit 222, pp. 295-298.  Testimony of Brown, Transcript, pp. 1044-1050, 1062-1064.

346.     There are no signed PCIC Proof of Loss forms in the working papers relative to the Johnson Masonry Claim or the Union Claim and Brown does not recollect ever seeing signed copies of Proofs of Loss.  Exhibit 222, pp. 295-298, 300-302 (Section IV.  Proof of Loss). Testimony of Brown, Transcript, pp. 1057-1058, 1063.

347.     The Brown Schultz working papers do not indicate that prior authorization from CCI was obtained before and work was performed as is required by the Remedial Work Period Insurance Policy.  Testimony of Brown, Transcript, pp. 1059-1060.

348.     Brown admitted that there was a difference between how "costs" were defined and were to be calculated pursuant to the Remedial Work Period Insurance Policy and how costs were actually calculated to purportedly justify the payment of $900,000 to CCI.  Additionally, no "sworn proof by a Designated Contract Holder [DGS]" was obtained, as was expressly required by the Remedial Work Period Insurance Policy.  Exhibit 222, pp. 299-300 (II.  Definitions). Testimony of Brown, Transcript, pp. 1050-1052, 1056-1058.

349.     Brown admitted that the Designated Contract Holder from whom a sworn proof should have been obtained (and was not) was DGS.  Testimony of Brown, Transcript, pp. 1055-1056.

350.     Brown admits that no analysis was done to determine whether the $448,000 relative to the Johnson Masonry Claim was reimbursed to CCI based upon the definition of "costs" contained in the Remedial Work Period Insurance Policy.  Testimony of Brown, Transcript, pp. 1051-1052.

351.     Brown admits that Brown Schultz had an obligation to determine whether claims were validly paid pursuant to the Remedial Work Period Insurance Policy.  Testimony of Brown, Transcript, p. 1062.

 5.     **The Two Guaranty Agreements Are Insufficient To Justify Revenue Recognition Of The Mahanoy Claim And Were Created At A Time When CCI And Brown Schultz Knew CCI Was Losing Almost $1.2 Million**

352.     Brown Schultz' working papers for the 1998 Audit Report acknowledge – and Sheri Phillips admitted – that as of October 31, 1998 CCI was losing $1,161,448.30.  Exhibit 222, p. 23; Testimony of S. Phillips, Transcript, pp. 2160-2162.

353.     As appears in Brown Schultz' working papers, PCIC issued a Guaranty Agreement dated December 1, 1998, which purportedly guaranteed full payment of the Mahanoy Claim in the amount of $1,200,000, but *only* if DGS failed to do so.  Exhibit 264.

354.     Brown also admitted that sometime in 1999, a new Guaranty Agreement backdated to December 1, 1998 was issued by PCIC in the amount of $1,162,460, the *exact* amount of the Mahanoy Claim submitted to DGS.  Exhibit 265.  Testimony of Brown, Transcript, pp. 1076-1078.

355.    There is nothing in Brown Schultz' working papers that indicates whether one of the guarantees cancelled out the other.  Testimony of Brown, Transcript, p. 1079.

356.    There is also nothing in Brown Schultz' working papers that shows that anything was done to determine if the Guaranty Agreements were legally enforceable.  Testimony of Brown, Transcript, pp. 1081-1086.

357.    Why the Guaranty Agreements were needed – particularly in light of the existence of the putatively valid Remedial Work Period Insurance Policy, discussed *infra* – has never been adequately explained by Brown Schultz.

358.    Bowman claimed not to know why the Mahanoy Claim was guaranteed by PCIC.  Testimony of Bowman, Transcript, pp. 1392-1393.  Sheri Phillips also professed unawareness of the reason this act was undertaken.  Testimony of Sheri Phillips, Transcript, pp. 2156-2157.

359.    Bowman testified that she had no idea who prepared the Guaranty Agreements nor did Brown.  Testimony of Bowman, Transcript, p. 1392.

360.    There was no evidence that PCIC had ever issued any other instruments like the Guaranty Agreements.

361.    Brown Schultz' Planning Memorandum for the 1998 Audit Report does not show that PCIC intended to guarantee a claim of approximately $1,162,000.  Exhibit 222, p. 26.  Testimony of Bowman, Transcript, pp. 1377-1378.  This Planning Memorandum was dated December 2, 1998, one day *after* the purported execution date of December 1, 1998 contained on both Guaranty Agreements.  Testimony of Bowman, Transcript, pp. 1378-1379.

362.    Sheri Phillips testified – and as is evidenced in the Brown Schultz working papers – that as of October 31, 1998, CCI was projected to *lose* $1,161,448.43 – an amount which is only $1,011.57 *less than the amount of the Mahanoy Claim and the amount of the later of the*

70

*two Guaranty Agreements.*  Exhibit 222, p. 23; Testimony of Sheri Phillips, Transcript, pp. 2160-2162; Testimony of Bowman, Transcript, pp. 1351-1352, 1377-1379.

363.     Bowman claims to have discussed the inclusion of the Mahanoy Claim in revenue in February 1999 with Brown and Sheri Phillips.  Testimony of Bowman, Transcript, pp. 1390-1391.

364.     Bowman insists that Brown was present.  Testimony of Bowman, Transcript, p. 1391.  This was at a time in which it was known that CCI had lost almost $1.2 million through October 31, 1998.  Testimony of Bowman, Transcript, p. 1395.

365.     Bowman testified as to Brown's involvement in decisions relating to the Mahanoy Claim and refused to admit that the treatment of the Mahanoy Claim was her idea.  Testimony of Bowman, Transcript, pp. 1379, 1390-1391.

366.     Sheri Phillips recalled a conversation with Bowman in February 1999 concerning the treatment of the Mahanoy Claim in the 1998 Audit Report but testified that Brown was *not* present during that conversation.  Testimony of Sheri Phillips, Transcript, pp. 2131, 32.

367.     Brown admitted to not having engaged in any supervision in the CCI audit field work and that he limited his participation to a review of the working papers.  Testimony of Brown, Transcript, p. 1018.

368.     Bowman claims that CCI was expected to break even by the end of the year 1998 even though at the time of the preparation of Brown Schultz' Planning Memorandum for the 1998 Audit Report on December 2, 1998, CCI was experiencing problems with subcontractor defaults and self-performing work.  Testimony of Bowman, Transcript, p. 1395.

369.     Brown was aware that the Mahanoy Prison Project was bid at a loss and that CCI was experiencing trouble on that job.  Testimony of Brown, Transcript, pp. 1088-1089.

370.     Brown was aware that CCI needed to maintain equity of not less than $4,800,000 pursuant to an agreement with USF&G that USF&G would have the right to request him to reinstate his personally indemnify USF&G as long as this equity threshold was maintained. Exhibits 209, 211.  Testimony of Brown, Transcript, pp. 1122-1123.

371.     Bowman admitted that the only reason that CCI did not lose money for the year ending December 31, 1998 was because the Mahanoy Claim was included in revenue. Testimony of Bowman, Transcript, p. 1395.

372.     Brown admitted that there had been *no* consideration given to PCIC for the Guaranty Agreements nor is there any consideration recited in the Guaranty Agreements. Testimony of Brown, Transcript, pp. 1084-1085.

373.     Additionally, PCIC was not paid a premium or fee for its Guaranty Agreements. Testimony of Brown, Transcript, pp. 1084-1085.

374.     Brenner admitted that there is nothing in Brown Schultz' 1998 working papers showing that any inquiry was made as to whether the Guaranty Agreements were valid and enforceable.  Testimony of Brenner, Transcript, pp. 3112-3113.

375.     Brown admitted to having consulted no legal authority regarding the validity of the Guaranty Agreements nor is there any opinion letter in Brown Schultz' working papers regarding such agreements.  SAS 73; Testimony of Brown, Transcript, pp. 1079, 1218-1221, 1228-1230.

376.     Brown admitted that as of December 31, 1998, he did not know whether and when PCIC was ever going to make any payments to CCI relative to the Guaranty Agreements. Testimony of Brown, Transcript, p. 1271.

377.    Brown admits that the decision to book the $1,162,000 claim for "unforeseen costs" as underbillings was based solely on the existence of the Guaranty Agreements. Testimony of Brown, Transcript, pp. 1076-1079.

378.    Brenner testified that he stopped his analysis of SOP 81-1 "once [he] saw the [G]uarantee [Agreements], because that justified in his opinion recognition of that $1,162,000 as revenue" regardless of whether other criteria under SOP 81-1 are met.  Testimony of Brenner, Transcript, pp. 3098-3099.

379.    Brenner also testified that he had no opinion on whether the Mahanoy Claim could have been booked as revenue in the absence of the Guarantee Agreement.  Testimony of Brenner, Transcript, p. 3099.

380.    Brown admitted that without inclusion of the $900,000 received from PCIC relative to the Johnson Masonry Claim and the Union Claim and without the Claim Guarantee of $1,162,000, CCI would have had a substantial net loss for 1998.  Testimony of Brown, Transcript, p. 1122.

381.    Without the $900,000 payment and the inclusion of the Claim Guarantee, CCI would have went from a profit of approximately $60,000 to a *loss* of more than $2,000,000. Testimony of Brown, Transcript, p. 1122.

382.    Against this backdrop of the curious circumstances and undocumented and unknown reasons for the guaranty agreements' creation are Bruce Brown and Brown Schultz' admissions that the initial projected loss for approximately $42,000 on the Mahanoy Prison Project was expected to mushroom to a loss of over $2 million.  Exhibit 222, p. 281.  Testimony of Brown, Transcript, pp. 1122, 1096-1097.

383.    Brown also knew upon his communications with Dominiani that CCI's bonding program with USF&G would be in peril and Ortenzio would be faced with reinstating his personal indemnity to USF&G if CCI's net worth fell below $4.8 million.  Exhibits 209, 211; Testimony of Brown, Transcript, pp. 902, 1122-1123.

384.    Essentially, over $2,000,000 was pumped in to prop up the Mahanoy Claim in the last two months of 1998.  Testimony of Brown, Transcript, p. 1093.

> **6.    Even If The Mahanoy Claim Was Properly Included In Revenue And Underbillings, $448,000 Of That Claim Had Already Been Paid By PCIC Under The Remedial Work Period Insurance Policy**

385.    The Johnson Masonry Claim was included as part of the Mahanoy Claim.  Exhibit 222, p. 291.  Testimony of Brown, Transcript, pp. 1094-1097.  As a result, the Mahanoy Claim was *overstated* by approximately $450,000.  Testimony of Brown, Transcript, p. 1097.

386.    $448,000 of the Mahanoy Claim – a claim which was booked as an underbilling in the 1998 Audit Report – had already been *paid* to CCI by PCIC on or about November, 1998. Testimony of Brown, Transcript, pp. 1067-1068.

387.    Brenner admitted that although he charged in excess of $90,000 for his expert witness services to Brown Schultz' law firm, he was never asked to render an opinion regarding this grievous error.  Testimony of Brown, Transcript, pp. 1080-1081; Testimony of Brenner, Transcript, pp. 3111-3113.

388.    *Brown admitted that the sum of $1,162,460 included in revenue and attributable to the Mahanoy Claim contains a double-counting of a claim regarding Johnson Masonry of $448,000.*  Exhibit 222, p. 95; Testimony of Brown, Transcript, pp. 1213-1214.

389.    Brown agrees that it would be important for an auditor to make sure that there was no double-counting or duplication in the Mahanoy Claim.  Testimony of Brown, Transcript, p. 1213.

390.    Brenner admitted that a double-counting of a claim could result in an overstatement of net income.  Testimony of Brenner, Transcript, pp. 3057-3058.

391.    Even if, *arguendo*, the Mahanoy Claim could properly have been included in revenue, the claim was overstated by $448,000.  Standing alone, this mistake would have changed CCI's net income profit in the 1998 Audit of $59,041 to a net *loss* of $389,000.  Testimony of Brown, Transcript, pp. 1213-1214.

### 7.    PCIC Lacked The Financial Ability To Pay The Mahanoy Claim

392.    Brown and Bowman's testimony revealed that not only are there serious doubts about PCIC's financial ability to pay the face amount of the Guaranty Agreement as of December 31, 1998, but that there is no analysis of PCIC's solvency contained in Brown Schultz' working papers for CCI.  Testimony of Brown, Transcript, pp. 1280-1281.

393.    Brown Schultz was unable to give PCIC an unqualified audit opinion or to issue a solvency opinion to the Superintendent of Insurance for the Turks and Caicos Islands.  Testimony of Brown, Transcript, p. 1281.

394.    Although unable (or unwilling) to opine on PCIC's solvency for the Superintendent of Insurance for the Turks and Caicos Islands, Brown purportedly assessed PCIC's solvency in connection with the Guaranty Agreements.  Testimony of Brown, Transcript, p. 1281.

395.    Brown Schultz' opinion on PCIC's putative solvency was purportedly based on an audit of PCIC for the year ended December 31, 1998 (the "PCIC Audit") (which included a

*qualified* opinion) and the "fair market value of the [PCIC] assets." Exhibit 271; Testimony of Brown, Transcript, pp. 1105-1106, 1280-1281.

396.     According to the *qualified* PCIC Audit Report PCIC had total assets of $1,775,931 and liabilities totaling $1,255,462. Exhibit 271. Testimony of Brown, Transcript, pp. 1107-1108.

397.     The PCIC Audit could not be given a "clean opinion" by Brown Schultz because Brown Schultz did not know whether or not PCIC's claim reserve of $862,000 was adequate. Testimony of Brown, Transcript, p. 1110.

398.     The actuarial expert, Gregory Petrowski, retained by PCIC established a claims reserve for *all* outstanding Remedial Work Period Insurance Policies of $862,338 in connection with Brown Schultz' audit of PCIC Audit Report. Only $581,230 (or one-half of the claim amount) was established as a reserve for the policy issued relative to the Mahanoy Prison Project. Exhibit 270. Testimony of Brown, Transcript, pp. 1092, 1109-1110, 1227.

399.     According to the 1998 PCIC Audit, PCIC has a net worth of $520,469. Testimony of Brown, Transcript, p. 1111. The net worth falls short of the $581,230 reserve amount designated for the Mahanoy Prison Project. Testimony of Brown, Transcript, p. 1094.

400.     If added together, the net worth of $520,469 and reserve of $581,230 fall approximately $60,000 short of the amount of the $1,162,460 amount of the Mahanoy Claim. Testimony of Brown, Transcript, p. 1112.

401.     Of the total of $1,257,576 in liquid assets as shown in the PCIC's 1998 Audit Report Brown admitted that $180,000 of investment securities constituted "restricted cash" which could not be released without the permission of the Superintendent of Insurance of the Turks and Caicos Islands, Testimony of Brown, Transcript, pp. 1117-1120, and that another

$23,000 had to be maintained in a separate escrow account for credit life mortality reserves. Testimony of Brown, Transcript, p. 1121; Exhibit 271, p. 10 fn. 2.

402.    Under the provisions of the laws of the Turks and Caicos Islands, PCIC maintained $180,000 of its investment securities in a separate escrow account that could not be released without the permission of the Superintendent of Insurance of the Turks and Caicos Islands.  Exhibit 58.  Testimony of Brown, Transcript, pp. 1117-1120.  Brown admits that this $180,000 is "restricted cash."  Testimony of Brown, Transcript, p. 1121.

403.    PCIC was also required to maintain a separate escrow account of $23,000 for credit life mortality reserves.  Exhibit 271, p. 10, fn. 2.  Testimony of Brown, Transcript, p. 1121.

404.    Brown Schultz was also aware that Ortenzio could revoke PCIC's remedial work insurance policies at will and had, in fact, done so on policies for projects other than the Mahanoy Prison Project.  Exhibit 309; Testimony of Brown, Transcript, pp. 1282-1283.

405.    Seven other policies "underwritten" by PCIC were outstanding at the time Brown Schultz allegedly determined that PCIC had sufficient funds to support the Guaranty Agreements.  Exhibit 268; Testimony of Brown, Transcript, p. 1224.

406.    Brown admitted that he relied on CCI's representations that CCI would not make any further claims against the seven outstanding Remedial Work Period Insurance Policies. Testimony of Brown, Transcript, pp. 1223, 1226, 1281-1282.  This is *not* documented in the 1998 working papers.  Testimony of Brown, Transcript, p. 1228.

407.    Brown admitted that such representations should have been documented in the working papers but cannot identify any such documentation.  Testimony of Brown, Transcript, pp. 1233-1234.

77

408.    Both of the Guaranty Agreements provide that they "contain[s] the entire agreement between the parties hereto, and no agent, representative or officer of either party has authority to make or has made any statement, agreement or representation, either oral or written, in connection herewith, modifying, adding or changing the terms and conditions herein set forth."  Exhibits 264, 265.

409.    The Guaranty Agreements also provide that "[n]o dealings between the parties or custom shall be permitted to contradict various additions to or to modify the terms hereto." Exhibits 264, 265.

410.    Brown Schultz did not obtain any legal advice as to whether the "integration clauses" of the Guaranty Agreements had any legal significance regarding CCI's alleged representation that it would not assert any additional claims against PCIC policies.  Testimony of Brown, Transcript, pp. 1221-1222, 1228-1229.

411.    Brown Schultz did not obtain a legal opinion as to whether or not PCIC had the legal ability to disclaim any further coverage if a claim against any other of the seven outstanding policies was filed.  Testimony of Brown, Transcript, pp. 1228-1229, 1230.

## 8.    Inclusion Of The Mahanoy Claim In CCI's Revenue Was Inappropriate

412.    Even if, *arguendo*, a rational reason for guaranteeing a claim purportedly covered by a Remedial Work Period Insurance Policy existed – and none has been proffered by Brown, Bowman or Sherri Phillips – DeBruyn's testimony was unequivocal that the Guaranty Agreements simply do not support the recognition of $1,162,460 in revenue for CCI for the year ended December 31, 1998, as recorded in the 1998 Audit Report.  Testimony of DeBruyn, Transcript, pp. 1847-1853.

78

413.     Brenner produced no GAAP authority for including the Mahanoy Claim in underbillings.  Testimony of Brenner, Transcript, pp. 3098-3099, 3111-3112.

414.     Brenner did not know where the Mahanoy Claim shows up in CCI's balance sheet.  Testimony of Brenner, Transcript, p. 3089.

415.     DeBruyn – who has conducted approximately 100 audits of construction companies – was unequivocal that the amount of the Mahanoy Claim of $1,162,000 should not have been recorded in underbillings or, for that matter, recorded at all.  Testimony of DeBruyn, Transcript, pp. 1713, 1847-1848.

416.     Farnsworth also opined that the Mahanoy Claim should not have been included in revenue.  Testimony of Farnsworth, Transcript, p. 1544.

417.     The Mahanoy Claim did not qualify under the revenue recognition rules described in SOP 81-1.  Testimony of DeBruyn, Transcript, p. 1848.

418.     Even if, *arguendo*, the Guaranty Agreement was valid and enforceable, the Mahanoy Claim does not qualify for recognition pursuant to SOP 81-1.  Testimony of DeBruyn, Transcript, pp. 1848, 1850-1852.

419.     Bowman acknowledged that there is an important distinction between contract proceeds and proceeds obtained in another manner, such as lottery winnings.  Bowman admitted that although lottery winnings might be included in revenue, *they would never be included in underbillings*.  Testimony of Bowman, Transcript, pp. 1398-1399.

420.     James Daily testified about the distinction between underbillings and the proceeds from a different, non-construction contract, such as the Guaranty Agreement or the Remedial Work Period Insurance Policy.  Underbilling concerns a contract between the contractor and the owner.  Proceeds from an insurance policy (or lottery proceeds or an inheritance) have nothing to

do with how well a contractor can profitably complete his contracts. Testimony of J. Daily, Transcript, pp. 245, 404. Moreover, the purported contract between PCIC and CCI (the guaranty agreement) is different than that between CCI and DGS, the owner of the Mahanoy Prison Project. There is no reason to ever expect the proceeds of any contract other than that between the contractor and the project owner to be in underbilling. Testimony of J. Daily, Transcript, pp. 412-415.

421.    In contrast to the treatment of the Mahanoy Claim in the 1998 Audit Report, the $900,000 paid relative to the Johnson Masonry Claim and the Union Claim was treated as a reduction in job costs on the Mahanoy Prison project. Such payment was not included in underbillings or in any other balance sheet line item. Testimony of Brown, Transcript, pp. 1067-1068, 1071.

422.    Brown agrees that by treating the $900,000 received from PCIC as a reduction in job costs, the profit structure of CCI is significantly changed; namely, the profits are increased because the extra costs incurred are offset by the claim that was received. Testimony of Brown, Transcript, pp. 1071-1073.

423.    Even if, *arguendo*, the Guaranty Agreements are valid and enforceable, recognition would not be appropriate because of, *inter alia*, FAS 5: Accounting for Contingencies, March 1975 ("FAS 5"), which concerns "contingencies." Exhibit "A" for Identification, tab 13. Testimony of DeBruyn, Transcript, pp. 1826, 1848-1849.

424.    According to DeBruyn, the reason is that the Guaranty Agreement represents a contingent gain and, accordingly, recognition would not be appropriate under FAS 5. Testimony of DeBruyn, Transcript, p. 1848.

425.     DeBruyn testified that the Guaranty Agreements are *contingent* on an event happening or not happening; to wit, failure of payment by DGS to CCI and, accordingly, they should not have been recognized.  At the time the audit was being conduced, Brown Schultz did not know who the ultimate payee of the Mahanoy Claim would be.  Testimony of DeBruyn, Transcript, pp. 1848-1849; Testimony of Bowman, Transcript, pp. 1406-1407.

426.     Additionally, payments made under the Guaranty Agreements are not construction contract revenue.  Payments made pursuant to the Guaranty Agreements would not be based on the contract *which CCI had with DGS.*  Rather, any such payments would be based on an alleged contract between PCIC and CCI.  Testimony of DeBruyn, Transcript, pp. 1849-1850, 1846, 3192.

427.     DeBruyn saw nothing in Brown Schultz' working papers for the 1998 Audit Report showing any type of analysis or testing as to whether or not the criteria set forth in SOP 81-1 were met with respect to the claim for unforeseen costs.  Testimony of DeBruyn, Transcript, p. 1852.

### C.     Footnote 8 To The 1998 Audit Does Not Adequately Disclose The PCIC Claim Guaranty And Other Important Transactions

428.     Footnote 8, Related Party Transactions, to the 1998 Audit Report ("Footnote 8"), states that a claim in the amount of $1,162,460 had been guaranteed by PCIC.  Exhibit 36, p. 13.

429.     Brown Schultz admitted that the "claim" referenced to in Footnote 8 was the Mahanoy Claim.  Testimony of Brown, Transcript, pp. 1066, 1070-1071.

430.     Footnote 8 does not identify the "claim" as being connected with any specific CCI construction project.  Neither Footnote 8 nor anything else in the 1998 Audit showed the "claim" was the Mahanoy Claim or that the claim amount had been *included as revenue* for CCI in 1998.

Exhibit 36, pp. 13, 1, 3.  Testimony of Bowman, Transcript, p. 1402; Testimony of Brown, Transcript, pp. 1071, 1074.

431.    Bowman admitted that there was nothing in the 1998 Audit Report that would allow a reader to understand that the particular claim guaranty referred to in Footnote 8 was related to the Mahanoy Prison Project.  Testimony of Bowman, Transcript, p. 1402.

432.    Bowman also admitted that Footnote 8 does not inform the reader that the "claim" amount was included in CCI's revenue.  Testimony of Bowman, Transcript, p. 1403.

433.    Brenner admitted that the Guaranty Agreements are related-party transactions and concern a "material" amount of money.  Testimony of Brenner, Transcript, pp. 3085-3086.

434.    FAS No. 57 requires disclosure of related party transactions to include an understanding of the *effect* of the transaction on the financial statement.  FAS No. 57, par. 2(b), Exhibit "A" for Identification, tab 14.  Testimony of DeBruyn, Transcript, p. 1853.

435.    Footnote 8 merely identifies the existence of a guarantee.  It does not say that the claim is recorded in revenue and it does not say it is recorded in underbillings.  Exhibit 36, p. 8; Testimony of DeBruyn, Transcript, p. 1853.

436.    Footnote 8 did not satisfy the AICPA's or Brown Schultz' internal audit plan requirement, that the audit report disclose both the related-party transaction and the "effect" of related-party transactions on the financial statements.  Exhibit 222, p. 184 (CCX-13A) (checklist in Brown Schultz' working papers indicating that, as to Footnote 8, related party actions were being described to the extent "deemed necessary to an understanding of the effects of the transactions on the financial statements").

437.    Brown Schultz' self-imposed duty in its audit plan (CCX-13A) is apparently based on FAS No. 57 which provides, in pertinent part, that the description of related-party

transaction should include "information deemed necessary to an understanding of the effects of the transactions on the financial statements." FAS No. 57, ¶2(b). Exhibit "A" for Identification, tab 14.

438.     Brenner admitted that the related-party disclosure standard contained in Brown Schultz' working papers checklist (CCX-13A) is standard in the industry for non-public businesses. Testimony of Brenner, Transcript, pp. 3086-3087.

439.     Brown Schultz checked the box adjacent to the related-party disclosure standard form CCX-13A, thereby demonstrating its agreement that such disclosure of both the transaction and its effect on the balance sheet was necessary. Exhibit 222, p. 184 (CCX-13A); Testimony of Brenner, Transcript, pp. 3088-3089.

440.     Footnote 1 to the 1998 Audit, Summary of Significant Accounting Policies – Revenue and Cost Recognition ("Footnote 1"), describes the auditor's methodology relative to certain revenue recognition issues. Its disclosures are related to "construction contractors" and are utilized because contractors like CCI book their revenue and their costs based upon the percentage of completion method, as discussed in the first paragraph of Footnote 1. Exhibit 36, p. 8. Testimony of Brown, Transcript, pp. 1102-1103.

441.     Brown acknowledges that the two paragraphs in Footnote 1 regarding revenue and cost recognition concerns contracts between CCI and project owners – *not* contracts between CCI and PCIC. Testimony of Brown, Transcript, p. 1104.

442.     Brenner also acknowledges that the paragraphs in Footnote 1 concerning cost recognition and revenue deal with construction contracts and the percentage of completion method, not "remedial work insurance contracts." Testimony of Brenner, Transcript, p. 3093.

443.    In the 1994 Audit Report for CCI, Brown Schultz provided a separate line-item entitled "Accounts Receivable Affiliates" in the revenue section of the balance sheet for a $461,320 claim against the Remedial Work Insurance Policy made by CCI.  Exhibit 31, p.1; Testimony of Bowman, Transcript, pp. 1341-1342, 1405-1406.

444.    In the 1994 Audit Report, Brown Schultz also disclosed the *effects* of the related party PCIC transaction; to wit, it advised the reader that a "warranty insurance expense payment of $335,317" was included as a "direct cost of contracts."  Exhibit 31, p. 12, fn. 7; Testimony of Bowman, Transcript, pp. 1330, 1409-1410.

445.    The 1994 Audit Report also advises the reader not only that "[i]n 1994 the company submitted a warranty insurance claim of $397,800 to PCIC" but that such "claim was pending payment as of December 31, 1994."  Exhibit 31; Testimony of Brown, Transcript, pp. 1042; Testimony of Bowman, Transcript, p. 1342.

446.    Although the Balance Sheet portion of the 1998 Audit Report also contains a line item for "Accounts Receivable Affiliates," the Mahanoy Claim guaranteed by PCIC was not included therein but, rather, was included in underbillings.  Testimony of Bowman, Transcript, p. 1406.

447.    DeBruyn indicated that he would not have included the Mahanoy Claim in revenue or underbillings but, rather, would have recorded it as an "accounts receivable affiliates" – just as Brown Schultz did in the 1994 Audit Report.  Exhibits 31, 36; Testimony of DeBruyn, Transcript, pp. 1854-1855.

448.    If, *arguendo*, such claim was included in revenue and underbillings, he would have indicated in a footnote both that it was recorded in revenue and what the effect of such recording was on the income statement.  Testimony of DeBruyn, Transcript, pp. 1854-1855.

449.    Brown admitted that Brown Schultz would not have violated GAAP or any ethical standards if Brown Schultz had added a sentence (or less) describing where the Mahanoy Claim appeared in the CCI balance sheet in the 1998 Audit.  Testimony of Brown, Transcript, pp. 1266-1267.

450.    The $900,000 actually paid by PCIC in 1998 – relative to the Johnson Masonry Claim and the Union Claim is disclosed in Footnote 8 as being paid in on remedial work period insurance to CCI.  Testimony of Brown, Transcript, pp. 1064-1065.

451.    As discussed, *supra*, the books and records of CCI reflect that the $900,000 was used to reduce job costs relative to the Mahanoy Prison Project.  Testimony of Brown, Transcript, pp. 1067-1068.  This, however, is not described in Footnote 8 in the 1998 Audit Report.  Testimony of Brown, Transcript, pp. 1058, 1070-1071.  Additionally, the project is not identified.  Testimony of Brown, Transcript, pp. 1073-1074.

452.    Brown admitted that PCIC would be subrogated to CCI's recovery rights against DGS on the Mahanoy Claim.  Exhibit 222, p. 306 (XIII.  Subrogation); Testimony of Brown, Transcript, pp. 1289-1291.

453.    However, despite the unambiguous language of the Remedial Work Period Insurance Policy nothing in the 1998 Audit Report discloses that there is any right of subrogation by PCIC to amounts CCI recovered from DGS.  Testimony of Brown, Transcript, pp. 1290-1291.

**D.    Brown Schultz' Treatment Of The Mahanoy Claim Was Materially Misleading And Detrimental To USF&G**

454.    USF&G first became familiar with PCIC when it acquired the CCI account in 1993.  PCIC was presented to USF&G as an insurance company that could pay warranty claims. Testimony of Anthony Phillips, Transcript, pp. 2439-2440.

455.    USF&G believed that the existence of a company to pay warranty claims was "a good thing."  Testimony of Anthony Phillips, Transcript, p. 2440.

456.    USF&G's understanding of the relationship between CCI and PCIC did not change at any time until after CCI's default in the fall of 1999.  Testimony of Anthony Phillips, Transcript, p. 2440.

457.    USF&G's underwriters believed that Footnote 8 in the 1998 Audit meant that if CCI did not receive a payment of all or a portion of the unnamed project related claim, PCIC would guaranty payment of the unpaid portion at some indeterminate time in the future.  Testimony of James Daily, Transcript, p. 399.

458.    James Daily had no knowledge that the Mahanoy Claim was included as *revenue* in the 1998 Audit Report.  Testimony of J. Daily, Transcript, pp. 399, 411-412, 414.

459.    James Daily testified that USF&G would have *ceased* to issue bonds if it knew that the Mahanoy Claim had been included in "underbillings."  Testimony of J. Daily, Transcript, pp. 415-416.

460.    James Daily also testified of the importance of the revenue and underbilling sections of a financial statement to an underwriter.  Testimony of J. Daily, Transcript, pp. 349, 413.

461.    Anthony Phillips testified that at the time he received the 1998 Audit Report, on or about March 2, 1999, he did not know that the Mahanoy Claim was included in underbillings in the 1998 Audit.  Testimony of Anthony Phillips, Transcript, pp. 2460, 2584.

462.    Anthony Phillips reviewed the 1998 Audit Report when received from Dominiani and it was his standard procedure to read all footnotes in audit reports.  Testimony of Anthony Phillips, Transcript, p. 2583.

86

463.     Anthony Phillips had no understanding that the Mahanoy Claim was included in underbillings until subsequent to finding out CCI was in financial trouble in late 1999. Testimony of Anthony Phillips, Transcript, p. 2583.

464.     Anthony Phillips also testified that if he had known at the time of his receipt of the 1998 Audit Report that the Mahanoy Claim was included in revenue as an underbilling he would have *halted* bonding until he received a satisfactory answer regarding why CCI was not getting paid for the underbilling and whether there were additional underbillings that were not going to be paid.  Testimony of Anthony Phillips, Transcript, p. 2472.

465.     James Daily also testified that USF&G would not have issued bonds if he had known that the Mahanoy Claim had been included in underbillings.  Testimony of J. Daily, Transcript, p. 416.

466.     The USF&G "Home Office" would have upheld Phillips' decision to halt bonding.  Testimony of Anthony Phillips, Transcript, pp. 2435-2436, 2476-2477, 2588.  The "Home Office" never rejected or overruled any recommendation from his office.  Testimony of Anthony Phillips, Transcript, pp. 2435-2436.

467.     All bonds issued by USF&G in reliance on the 1998 Audit Report were within the limits of the Specific Discretionary Authority of $15,000,000 per project/$75,000,000 total program allocated to the Harrisburg office except for the Pennsylvania Turnpike building. Exhibits 301, 15, 10, 12, 9, 2, 3, 4, 1; Testimony of Anthony Phillips, Transcript, pp. 2415-2416, 2468.

468.     The Pennsylvania Turnpike building required approval from the Home Office, which was received on or about June 15, 1999.  Testimony of Anthony Phillips, Transcript, p. 2468.

469.    Anthony Phillips' testimony was consistent with the information in the letter from David Dominiani ("Dominiani") to Anthony Phillips dated November 16, 1993 in which Dominiani discusses PCIC's role as a provider of "warranty insurance."  Exhibit 75.

470.    Although Dominiani wrote in a letter to Anthony Phillips dated November 16, 1993 that funds from PCIC might be available "as a buffer to offset losses," in that same letter he reiterates that "PCIC [is] available to fund "warranty coverages" and has previously paid "warranty claims."  Exhibit 237.  Nothing in Dominiani's letter is inconsistent with the assertion in that letter - and in other letters from Dominiani - in which Dominiani reiterates the role of PCIC as provider of warranty insurance policies.  Exhibits 75, 237.

471.    Anthony Phillips testified that Dominiani's letter reminded him of the availability of certain funds from PCIC, "[a]s long as it was for warranty coverages."  Exhibit 238. Testimony of Anthony Phillips, Transcript, pp. 2520-2521.

472.    James Daily also testified that he did not have any understanding about the statement in Dominiani's letter that CCI might utilize PCIC to enhance CCI's profitability other than "[PCIC] was a warranty insurance company, and it paid warranty insurance claims." Testimony of J. Daily, Transcript, pp. 645-648.

473.    Anthony Phillips testified that based on his discussions with Dominiani he had no understanding that PCIC funds were available for anything other than to fund Remedial Work Period Insurance Policy warranty claims.  Testimony of Anthony Phillips, Transcript, pp. 2584-2585.

474.    Dominiani, a CPA and a former partner of Brown's, was listed on Brown Schultz' witness list but was never called to testify by Brown Schultz.  Testimony of Brown, Transcript, p. 886.

475.    No evidence was introduced that anyone at USF&G was aware that the funds represented by the Mahanoy Claim were included in revenue and underbillings in the 1998 Audit Report.

476.    Rolf Neuschaefer ("Neuschaefer") admitted that in his reading the 1998 Audit Report there was nothing that would have informed him that the Mahanoy Claim had been included in revenue.  Testimony of Neuschaefer, Transcript, pp. 2373-2374, 3379.

477.    Neuschaefer also admitted that he could not have identified that the Mahanoy Claim was included in revenue by reading Footnote 8.  Testimony of Neuschaefer, Transcript, pp. 2378-2380.

478.    Brenner admitted that Footnote 8 to the 1998 Audit Report does not show that the Mahanoy Claim is included in underbillings.  Testimony of Brenner, Transcript, p. 3070.

479.    Brenner also admitted that even if Footnote 1 to the 1998 Audit Report is read in conjunction with Footnote 8 of that Audit, that the particular fact that the guarantee was included in underbillings is not disclosed.  Testimony of Brenner, Transcript, p. 3089.

480.    DeBruyn testified that upon first reviewing Footnote 8 that he was unable to determine what effect the particular guaranteed amount of $1,162,460 had on the financial statement.  Testimony of DeBruyn, Transcript, p. 1847.

481.    Farnsworth testified that by examining the 1998 Audit Report he was not able to tell that the Mahanoy Claim of $1,162,460 was included in revenue.  Testimony of Farnsworth, Transcript pp. 1538, 1540.

482.    Farnsworth also testified that Footnote 8 does not inform the reader under what, if any, lines in the Balance Sheet or Income Statement the Mahanoy Claim of $1,162,460 is shown. Testimony of Farnsworth, Transcript p. 1538.

483.     Farnsworth also testified that even if, *arguendo*, he knew that the Mahanoy Claim was included in revenue, he would not necessarily have known it was included in underbillings because it could have been made a separate line item on the balance sheet.  Testimony of Farnsworth, Transcript pp. 1562-1563.

484.     Farnsworth also testified that nothing in Footnote 8 of the 1998 Audit Report showed the Mahanoy Claim was being included in revenue nor did it identify the name of the project to which the "claim" resulted.  Testimony of Farnsworth, Transcript p. 1565.

485.     If – at the time of review of the 1998 Audit Report – it was known to USF&G's underwriters that $1,162,460 was included in revenue and was reflected in the balance sheet as an asset, it would have been relevant to underwriting.  Testimony of Farnsworth, Transcript, p. 1625.

486.     If the Mahanoy Claim was not included in revenue, the 1998 Audit would have shown a *loss* in excess of approximately $1,100,000.  Testimony of Bowman, Transcript, p. 1377.

487.     According to PCIC's trial balance, PCIC paid $800,000 to CCI on July 7, 1999.  PCIC also paid $72,460 and $70,000 on December 7, 1999.  The $142,460 paid on December 7, 1999 is represented by the entries "CCI/Mahanoy CLM PMT."  *However, there is no indication as to the purpose of the payment of $800,000 on July 7, 1999*.  Exhibit 331, p. BSSF 4978.  Testimony of Brown, Transcript, pp. 1284-1286.

488.     Brown Schultz presented no evidence that PCIC actually paid the $800,000 to CCI and that such putative payment related to the Mahanoy Claim.

489.     PCIC payments to CCI in 1999 were a form of revenue to CCI – to be accounted for in 1999.  Testimony of DeBruyn, Transcript, p. 3192.

90

490.    The funds received or guaranteed by PCIC, however, would not have been "contract revenue."  Testimony of DeBruyn, Transcript, p. 3193.

491.    Farnsworth opined that even if, *arguendo*, the claim were paid by PCIC, it should not have been included in revenue because it was a claim that CCI made against the DGS for additional amounts over and above an agreed contract price and such putative claim was guaranteed by a third party.  Testimony of Farnsworth, Transcript, p. 1544.

492.    Brown Schultz' averment that the misleading and detrimental effects of the improper recognition of revenue was nullified by payments purportedly made by PCIC in 1999 fails to address the one germane issue; to wit, why was $1,162,460 included *in revenue* and *as an underbilling*, contrary to the dictates of SOP 81-1 and FAS No. 57 and without either an appropriate footnote or other method being used to alert those relying on the 1998 Audit Report?

## XI.    BROWN SCHULTZ SHOULD HAVE KNOWN OF THE MISREPRESENTATIONS.

493.    Brown Schultz certainly knew that USF&G was an intended user of the 1997 Audit Report and 1998 Audit Report – it is identified as such in Brown Schultz' working papers. Exhibit 144, Exhibit 213, p. 43, Exhibit 222, p. 19.  Testimony of Bowman, Transcript, p. 1308; Testimony of Brown, Transcript, pp. 887, 898, 901-902.

494.    Moreover, in the Independent Auditor's Reports Brown Schultz expressly represented that it was knowledgeable concerning GAAS and GAAP and that its audits were sufficient to ensure compliance with such standards.  Exhibit 34, p. 1, Exhibit 36, p. 1.

495.    The 1997 Audit Report and 1998 Audit Report are violative of both the industry standard, GAAS, and of Brown Schultz' own internal standards, such as its disclosure checklist. (CCX-13A).

91

496.    Brown Schultz has likewise ignored, contradicted and refuted both advice and warnings from texts it regards as appropriate reference sources, such as PPC and AICPA guides.

497.    USF&G incorporates herein by reference proposed findings nos. 149-157, 169-253, 296-298, 300-453.

## XII.    BROWN SCHULTZ INTENDED TO INDUCE RELIANCE OF ITS AUDITED FINANCIAL STATEMENTS.

498.    Brown Schultz knew that USF&G's receipt and use of the 1997 Audit Report and 1998 Audit Report was a natural – if not inevitable – result of its issuance of such documents. Exhibits 144, 213, p. 43, Exhibit 222, p. 19, 902, 904, 907, 211.  Testimony of Brown, Transcript, pp. 898-899, 901-902, 887, 921, 893; Testimony of Bowman, Transcript, pp. 1308, 1313.

499.    Brown Schultz not only knew that USF&G was the intended user of the 1997 Audit Report and 1998 Audit Report but knew the purposes for which it would be relied upon. Exhibits 133, p. 11, para. 7, Testimony of Brown, Transcript, pp. 921, 887.

500.    Unlike the PCIC audit, the 1997 Audit Report and 1998 Audit Report are without qualification.  Exhibit 34, p. 1, Exhibit 36, p. 1.

501.    USF&G incorporates herein by reference proposed findings nos. 72-96.

## XIII.    THE TESTIMONY OF BROWN SCHULTZ' EXPERTS SHOULD BE DISREGARDED.

### A.    Neuschaefer Was Unqualified To Opinion On Surety Industry Underwriting Standards.

502.    Neuschaefer's testimony should be disregarded not only because of his general lack of credentials and his poor employment history but also because of the undisputed fact that he is unable to testify as to the proper industry standard at the pertinent times and places. Testimony of Neuschaefer, Transcript, pp. 2193-2196, 2185-2187.

503.    Neuschaefer *admits* that he is not familiar with, *inter alia*, the market for construction work in central Pennsylvania for the years 1993 through 1999, is not knowledgeable concerning USF&G's underwriting practices and believes that underwriting industry standards are subject to conjecture.  Testimony of Neuschaefer, Transcript, pp. 2192-2195.

504.    Moreover, Neuschaefer admits that most of his testimony is based on "personal opinion."  Testimony of Neuschaefer, Transcript, pp. 2199-2200.

505.    Neuschaefer conducted no surveys or studies of any industry standards as pertains to surety underwriting in the years 1990-1999.  Testimony of Neuschaefer, Transcript, p. 2195. Additionally, in opining on what he considers to be a prudent surety bond underwriter not only did he not conduct any surveys but he did no analysis.  Testimony of Neuschaefer, Transcript, pp. 2199-2200.

506.    His career in the surety industry has been fairly low level and markedly undistinguished.  In fact, he was fired from his job at Aetna because of his lack of production and his responsibility for bond losses.  Testimony of Neuschaefer, Transcript, pp. 2185-2187.

507.    At least since March 2000, Neuschaefer has not taken any continuing education courses regarding surety bond underwriting.  Testimony of Neuschaefer, Transcript, pp. 2197-2198.

508.    St. Paul terminated its agency relationship with his current employer, the Robert Harris Agency in July 2002, several months prior to Brown Schultz' retention of Neuschaefer in the instant case.  Exhibit 371.  Testimony of Neuschaefer, Transcript, pp. 2204-2205.

509.    The total annual bond premiums generated by the Robert Harris Agency is approximately $200,000.  Testimony of Neuschaefer, Transcript, p. 2189.

510.     As an underwriter, the highest discretionary level of authority he ever had was $10 million per project/$10 million aggregate.  Testimony of Neuschaefer, Transcript, p. 2203.

511.     Whether because of lack of knowledge or a desire to be evasive, Neuschaefer assiduously avoided giving a direct answer to just about every question posed to him.

512.     The extent of Neuschaefer's unreliability and limited knowledge of the pertinent issues is only magnified when his career is compared to that of Farnsworth.

### B.     Farnsworth Is Both Qualified And Credible

513.     Farnsworth was in the surety industry for over thirty (30) years and has kept current on industry standards and practices since his retirement from Fireman's Fund as a Senior Vice President.  Testimony of Farnsworth, Transcript, pp. 1439-1440, 1459-1460.

514.     At the time of his retirement on January 1, 1999, he was in charge of 150 employees in the home office and employees in 25 branches offices.  Testimony of Farnsworth, Transcript, p. 1440.

515.     An achiever – rather than a testifier – he has only previously testified at one jury trial and one arbitration.  Testimony of Farnsworth, Transcript, p. 1439.

### C.     Brenner, An Unlicensed Professional Witness, Was Not Credible

516.     Brenner is the paradigm of a professional, gun-for-hire witness.  If the fact that he makes his living working for lawyers was not sufficient to cast major aspersions on his testimony in the instant case (approximately 150-200 assignments in the last 10 years), it should be noted that his usual trial testimony involves everything from soup to nuts, although his favored main course appears to be personal injury actions.  Testimony of Brenner, Transcript, p. 2765-2766.

517.    In his report dated April 30, 2003, Brenner represented – without qualification – that he was licensed in Iowa, New Mexico, Florida, Georgia, South Carolina, New York and Illinois.  Exhibit 511.  Testimony of Brenner, Transcript, pp. 2776-2777.

518.    Further, not only did he lack a valid professional license when he prepared his reports in the instant litigation but he blatantly lied about his qualifications at his deposition.  Testimony of Brenner, Transcript, p. 2780, 2787.

519.    The importance of his licensure is evidenced by the fact that although he was scheduled to testify in court during the week of November 17 through 21, 2003 (and was present on some of those days), Brown Schultz' counsel decided at the last minute to call a different witness and to, instead, call Brenner to testify during the final days of trial in January 2004.  In the interim, Brenner undertook the necessary steps to revive his Illinois CPA license.  Exhibit 374, Exhibit 821.

520.    Brenner admits that he was not licensed in Illinois on September 30, 2000 but that he was as of December 19, 2003.  Exhibit 373, 821.  Testimony of Brenner, Transcript, p. 2779.

521.    At the time he wrote his expert report on or about April 30, 2003 he was not licensed in any state and could not have given the very audit opinions at issue in any jurisdiction.  Exhibit 511, 373.  Testimony of Brenner, Transcript, pp. 2795-2796.

522.    Brenner's curriculum vitae contains references to organizations to which he does not belong and certifications he is not allowed to claim.  Exhibits 373, 374, 375.  Testimony of Brenner, Transcript, pp. 2787-2791.

523.    Brenner claims the last time he performed any type of audit work was 5 or 6 years ago.  Testimony of Brenner, Transcript, p. 2763.  Moreover, even then he worked as a consultant

and the audit did not issue in his name or that of his firm.  Testimony of Brenner, Transcript, pp. 2762-2763.

524.     Not surprisingly, an accountant unable to keep track of his licensing registration fees and his dues for professional organizations demonstrated the same sloppiness as his client in failing to discern a double-counting of approximately $450,000 relative to the Mahanoy Claim. Testimony of Brenner, Transcript, pp. 3049-3051, 3058-3060.

### D.     DeBruyn Is An Expert In The Auditing Of Construction Contractors

525.     In marked contrast to Brenner, DeBruyn is an individual who is not only licensed to conduct audits of construction contractors but has done so within the past several years.  He is the firm-wide construction industry coordinator for a 40 office national accounting firm. Testimony of DeBruyn, Transcript, pp. 1706-1707.  He has conducted approximately 400 audits, of which approximately 100 were of construction contractors.  Testimony of DeBruyn, Transcript, p. 1713.

526.     His methodology and his opinions were fully explained at trial and are consistent, logical and grounded in industry standards and practices.  Testimony of DeBruyn, Transcript, pp. 1795-1798, 1836-1837.

527.     The depth of DeBruyn's personal experience in construction auditing serves to buttress the reliability of his testimony.  Testimony of DeBruyn, Transcript, pp. 1706-1713.

**XIV.  USF&G'S DAMAGES WERE PROXIMATELY CAUSED BY USF&G'S JUSTIFIABLE RELIANCE ON BROWN SCHULTZ' MISREPRESENTATIONS AND RESULTED IN COMPENSABLE DAMAGES.**

    **A.      USF&G's Losses Are Well-Documented And Reasonable**

528.    USF&G proved its damages are not only that significant – approximately $26,000,000 – but that such damages are directly attributable to Brown Schultz' failure to properly conduct its audits and to issue accurate audit reports.  Exhibit 29.

529.    Both summaries of the bonds issued in reliance on the 1997 Audit Report and 1998 Audit Report and binders containing extensive back-up and documentation relative to the costs and expenses incurred on each bond are in evidence.  Exhibits 14, 15, 16, 20, 21, 22, 23, 24, 26, 27 and 29.

530.    Gregory Daily testified that certain losses were incurred as a result of USF&G's obligations as surety and that USF&G's losses were incurred as a direct result of the bonds issued on behalf of CCI in reliance on the 1997 Audit Report and 1998 Audit Report.  Testimony of G. Daily, Transcript, p. 45-47, 58, 81, 35-37, 21-23.

531.    He also testified about USF&G's efforts to mitigate its losses, including analyzing any potential claims against project owners.  Testimony of G. Daily, Transcript, pp. 14-15, 18-21.

532.    In fact, he testified that nothing further could have been done by USF&G to mitigate its damages.  Testimony of G. Daily, Transcript, p. 85.

533.    In evaluating damages, the Court should bear in mind the difficulties encountered by a surety when it must complete a project after the principal has defaulted.  Testimony of G. Daily, Transcript, pp. 15-16.

534.   Brown Schultz introduced *no* testimony indicating either that the damages as alleged by Gregory Daily – and supported by extensive documentation – were inaccurate or that USF&G failed to take reasonable efforts to mitigate its losses.

535.   Brown Schultz did not come remotely close to meeting its burden of showing that USF&G failed to mitigate its damages.

**B.   Damage Chart**

536.   The breakdown of these losses is illustrated on the following schedules:

**1.     The 1997 Brown Schultz Audit Report:**

|  | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Germplasm Ctr | Phase I and II; National Plant Germplasm | 26-0120-28306-98-1 | 6/16/98 | $4,049,491.71 |
| B. | James River | Construction of Juvenile Detention Center | 26-0120-08946-99-2 | 1/7/99 | $2,532,447.20 |
| C. | Outlook-Chesterfield | Construction of Outlook Point at Chesterfield | 26-0120-29307-98-8 | 6/24/98 | $307,758.53 |
| D. | Outlook-Westerville | Construction of Outlook Point at Westerville | 26-0120-28312-98-1 | 9/27/98 | $2,869,808.49 |
| E. | Scott A.F. Base | Aircraft Parking Apron & Jet Fuel Storage | 26-0120-28305-98-5 | 5/18/98 | $1,449,469.53 |
| F. | VCU Life Science | The Life Sciences Building | 26-0120-08953-99-9 | 1/15/99 | $4,949,384.03 |
|  |  |  |  | Subtotal: | $16,158,359.49 |

2.    **The 1998 Brown Schultz Audit Report:**

| | PROJECT | DESCRIPTION | BOND NO. | BOND DATE | NET LOSS |
|---|---|---|---|---|---|
| A. | Bedford County, State Route 0030 | Road Improvements | 26-0120-08963-99-4 | 7/27/99 | $235,002.59 |
| B. | Cambria County SR 0022 | Road Improvements | 26-0120-08959-99-7 | 6/24/99 | $79,529.64 |
| C. | Summerdale | Sitework-Laboratory Centers of Excellence | 26-0120-08958-99-1 | 6/14/99 | $411,878.12 |
| D. | Cool & Cold Aqua | Buried Process Water Lines and Valve | 26-0120-40376-99-3 | 9/30/99 | $228,201.80 |
| E. | Cool & Cold Aqua | Construction of National Center | 26-0120-08961-99-1 | 7/12/99 | $4,715,372.83 |
| F. | SR II Perry Cnty | Excavation, Presplit Blasting | 26-0120-08953-99-9 | 3/2/99 | $1,369,904.72 |
| G. | PA Tpkbldg-Kost Rd | Central Administration Building Renovation | 26-0120-40371-99-1 | 6/15/99 | $2,728,805.57 |
| | | | | Subtotal: | $9,768,695.27 |

Total:  25,927,054.76

Exhibit 29.  Testimony of G. Daily, Transcript, p. 75.

## RULINGS OF LAW

### I.    NEGLIGENT MISREPRESENTATION.

1.    "Under Pennsylvania law, the tort of negligent misrepresentation has been interpreted to require a plaintiff to prove: (1) a misrepresentation of material fact, (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation."  *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F.Supp. 2d 517, 526 (M.D. Pa. 1999); *Borough of Landsdowne, Penn. v. Sevenson Environmental Services, Inc.*, 2000 WL 1886578, *3; *Burland v. Manor Care Health Servs., Inc.*,

1999 WL58580, *3 (E.D. Pa.); *Weisblatt v. Minnesota Mutual Life Ins.*, 4 F.Supp. 2d 371, 377 (E.D. Pa. 1998).

2.      The tort of negligent misrepresentation is provable by a mere preponderance of evidence. *Fiorentino v. Travelers Ins. Co.*, 448 F.Supp. 1364 (E.D. Pa. 1978).

3.      To prove negligent misrepresentation, a party is only required to show by a preponderance of the evidence that there was a failure to "exercise reasonable care or competence in obtaining or communicating the information." *Fort Washington Resources, Inc. v. Tannen*, 858 F. Supp. 455,461 (E.D. Pa. 1994); *Robert Wooler Co. v. Fidelity Bank*, 330 Pa. Super. 523 (1984) (accounting firm has duty to exercise care and skill customarily exercised by an accountant); Restatement (Second) of Torts §229A, comment c.  The speaker need not know that his words are untrue, but must have failed to make reasonable investigation of the truth of the words. *Bortz v Noon*, 556 Pa. 489, 500 (1999).  Additionally, the causation element of negligent misrepresentation does not have to be proven to a certainty; rather, the trier must be able to reasonably conclude that the reliance on the misrepresentation was a substantial factor in causing the alleged harm. *Browne v. Maxfield*, 663 F.Supp. 1193, 1203-1206 (E.D. Pa. 1987).

4.      It is sufficient for purposes of establishing negligent misrepresentation that "the representor must make the misrepresentation without knowledge as to its truth or falsity *or must make the representation under circumstances in which he ought to have known of its falsity. . . ." Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F.Supp. 2d at 526 (emphasis supplied).

5.      "The elements of negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern a material fact and *the speaker need not know his or her words are untrue…." Bortz v. Noon*, 556 Pa. at 500. (emphasis supplied).  A

party alleging negligent misrepresentation need only show that there was a failure to "exercise reasonable care or competence in obtaining or communicating the information." *Fort Washington Resources, Inc. v. Tannen*, 858 F.Supp. at 459.

6.     The word "intent" is not limited to the subjective state of wishing to bring about a certain result.  Rather, the word "intent" means that the actor merely desires to cause consequences of his act or *that he believes that the consequences are substantially certain to result from it*."  Restatement (Second) of Torts §8A (1964) (emphasis supplied).

7.     To recover damages for an accountant's negligence in rendering an unqualified audit opinion, a plaintiff must prove that the accountant's negligence was the proximate or legal cause of its injury.  *See, Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F.Supp. 557, 563 (W.D. Pa. 1996); *Gibbs v. Ernst*, 538 Pa. at 212.

8.     Cause in fact or "but for" causation provides that if the harmful result would not have come about but for the negligent conduct, then there is a divert causal connection between the negligence and the injury.  *Commonwealth of Pennsylvania v. United States Mineral Products Co.*, 809 A.2d 1000, 1010 (Pa. Cmwlth 2002); Restatement (Second) of Torts, §548A (a misrepresentation is the proximate cause of the plaintiff's loss, "if but only if, the loss might reasonably be expected to result from reliance.").

9.     Legal or proximate cause exists "where a defendant's wrongful conduct is a substantial factor in bringing about plaintiff's harm."  *Id.*, citing *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643, 655 (Pa. Super. Ct. 2002).

10.     To establish the required legal nexus, a plaintiff must show that the loss was a foreseeable result of the fact or condition that the financial statements misrepresented or concealed.  *See*, Restatement (Second) of Torts, §548A, comment b; *Bily v. Arthur Young & Co.*,

271 Cal. Rptr. 470, 485 (Cal. Ct. App. 1990) ("[a] legal cause of loss is a cause which is a substantial factor in bringing about the loss").  A cause can be found to be a substantial factor so long as it is significant or recognizable; it need not be quantified as considerable.  *Jeter v. Owens-Corning Fiberglass Corp.*, 716 A.2d 633 (Pa. Super. 1998).

11.    A plaintiff is not bound to exclude the possibility that the event might have happened in some other way.  *World Radio Laboratories, Inc. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996); *Thayer v. Hicks*, 243 Mont. 138, 793 P.2d 784 (1990).  Rather, the plaintiff is only required to satisfy the trier of fact, by a preponderance of the evidence, that the injury occurred in the manner claimed.  *Id.*

12.    It is axiomatic that "a defendant is not relieved from liability because another concurring cause may also be responsible for producing injury.  *Powell v. Drumheller*, 539 Pa. 484, 653 A.2d 619 (1995).

13.    Further, an intervening cause is not a superseding cause where the negligence of the accountant creates or increases the foreseeable risk of harm.  Restatement (Second) of Torts §§440 and 442A.

14.    An intervening force which is the normal consequence of the situation created by the accountant's negligence is not a superseding cause.  Restatement (Second) of Torts §443.

15.    Likewise, an intervening force is not a superseding cause of a loss when the force is of little consequence in causing the loss.  *Thayer v. Hicks*, 793 P.2d 784 at 155 (Mont. 1990).

16.    In a negligent misrepresentation claim against an accountant, the plaintiff's reliance on the misrepresentation provides the requisite causal connection between the misrepresentation and the plaintiff's injury.  *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 197, 683 N.Y.S.2d 179, 197 (1st Dept. 1998).

## II.     PRIVITY IS NOT REQUIRED BECAUSE PENNSYLVANIA HAS ADOPTED RESTATEMENT (SECOND) OF TORTS §552.

17.     *"[U]nder Pennsylvania law, privity is not a requirement of a claim for negligent misrepresentation."*  Report and Recommendation dated August 10, 2001 (the "Report"), p. 9. (emphasis supplied), citing *Williams Controls v. Parente, Randolph, Orlando, Carey & Assoc.*, 39 F.Supp. 2d 517 (M.D. Pa. 1999) (Vanaskie, J.); *Borough of Landsdowne v. Sevenson Envir. Serv., Inc.*, 99-3781, 2000 WL 1886578 (E.D. Pa. Dec. 12, 2000).

18.     Further, "the Pennsylvania Supreme Court has adopted the Restatement (Second) of Torts §552 . . . ."  Report, p. 7.

19.     The standard for an accountant's liability to non-clients for negligent misrepresentation is governed by Pennsylvania's adoption of the Restatement (Second) of Torts §552.  *Bortz v. Noon*, 729 A.2d 555 (Pa. 1999); *Rempel v. Nationwide Life Insurance Co., Inc.*, 370 A.2d 366, 367-68 (Pa. 1977) (adopting the first Restatement of Torts §552, which is held to be substantially the same as the Restatement (Second) of Torts §552).

20.     The Restatement provides, in relevant part, that:

> (1)     One who, *in the course of his business, profession or employment*, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability of pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
> (2)     . . . [T]he liability stated in Subsection (1) is limited to loss suffered
> (a)     by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or *knows that the recipient intends to supply it*; and
> (b)     through reliance upon it *in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.*

Restatement (Second) of Torts §552 (1977) (emphasis supplied).

21.     In adopting this standard, Pennsylvania joined the majority of states that have
chosen this moderate test to determine the liability of accountants to non-clients in lieu of the
more restrictive "near-privity" test  and the broader "foreseeability" test.  *See*, *Bily v. Arthur
Young & Co.*, 11 Cal. Rptr. 2d 51, 64-67 (1992) (detailed discussion of the differing standards
utilized to define the scope of liability of accountants to non-clients, including citation to the 17
states that had adopted Restatement (Second) of Torts §552 to that date).

22.     Courts adopting the Restatement have recognized that, when properly interpreted,
§552(2) limits potential liability of an accountant to a select group of non-client third parties who
can demonstrate knowledge on the part of accountants of the limited-though unnamed-group of
potential third parties that will rely upon the accountant's report, as well as knowledge of the
particular financial transaction that such information is designed to influence, or a substantially
similar transaction.  *Id.*; *see Industrial Indemnity Co. v. Touche Ross & Co.,* 13 Cal. App. 4th
1086, 1094-1095 (Cal. App. 1st Dist. 1993).

23.     Although, under the Restatement, an accountant is liable only where he or she
"intends" certain things, it is important to note that the word "intent," as defined in the
Restatement, is not limited to the subjective state of wishing to bring about a certain result.
Thus, the Restatement provides that the word "intent" means "that the actor desires to cause
consequences of his act, *or that he believes that the consequences are substantially certain to
result from it."*  Restatement (Second) of Torts §8A (1964) (emphasis supplied).

24.     One of the key legal precepts concerning the interpretation of §552 is that courts
are hesitant to impose liability on a professional that greatly exceeds that professional's
understanding of the risks undertaken in accepting a particular assignment.  *See, Briggs v.*

*Sterner*, 529 F.Supp. 1155, 1177 (S.D. Iowa 1981) (The Restatement is a compromise between

the harshness of strict privity requirements and the "specter of unlimited liability.")

      25.     Section 552 of the Restatement provides, in pertinent part, that:

> One who, in the ordinary course of his business, profession or
> employment, *or* in any other transaction in which he has a
> pecuniary interest, supplies false information . . . is subject to
> liability . . . if he fails to exercise reasonable care or competence in
> obtaining or communicating the information.

Restatement (Second) of Torts §552 (emphasis supplied).  The word "or" in §552

indicates the existence of a disjunctive requirement; namely, the pertinent section of the

Restatement is applicable *either* to one who is rendering advice in the "ordinary course of his

business, profession or employment *or* to one that is doing so in a transaction in which he has a

pecuniary interest."  *Sain v. Cedar Rapids Community School District*, 626 N.W.2d 115, 124-25

(Iowa 2001) (§552 of the Restatement provides that a duty arises when information is provided

by persons in the business or profession of supplying information to others).

## III.    <u>STANDARD OF CARE.</u>

      26.     The standard of care for accountants has been expressed as follows:

> "Accountants and auditors have the duty to exercise that degree of
> care, skill and competence exercised by reasonably competent
> members of their profession under the circumstances . . . .

*Matter of Hawaii Corp.*, 567 F.Supp. 609 617 (D. Hawaii 1983).

      27.     Compliance with GAAP and GAAS will not immunize an accountant when he

consciously chooses not to disclose on a financial statement a known material fact.  *Matter of*

*Hawaii Corp., supra; Halvorson v. Sooy*, 782 P.2d 161 (Or. Ct. App. 1989).

      28.     Accountants must meet those standards of expertise and diligence appropriate

under the facts and circumstances of the particular case, as established by the testimony of an

appropriately qualified expert witness. *Bily v. Arthur Young & Co.*, 11 Cal. Rptr. 2nd at 76;

*Maduff Mortgage Corp. v. Deloitte, Haskins & Sells*, 779 P.2d 1083 (Or. Ct. App. 1989).

29.    A breach of duty is found when an accountant does not adhere to the rules and

standards of his profession. *Rhode Island Hospital Trust National Bank v. Swartz, Bresenoff,*

*Yavner & Jacobs*, 455 F.2d 847 (4th Cir. 1972); *MacNerland v. Barnes*, 129 Ga. App. 367, 199

S.E.2d 564 (1973).

30.    Pennsylvania law regards a violation of a professional standard as evidence of

negligence but not negligence *per se*. *Edwards v. Brandywine Hospital*, 438 Pa. Super. 673

(1975).

31.    In evaluating whether an accountant complied with the requisite standard of care,

most courts will consider whether the accountants complied with their own internal accounting

manuals and other procedures. *Bily v. Arthur Young & Co.*, 271 Cal. Rptr. 470, 476 (Cal. Ct.

App. 1990) (internal manuals can properly be deemed relevant to the broader standard of care).

32.    Moreover, where an auditor's engagement is for a particular purpose or the

auditor has notice of the special importance of a particular aspect of the auditing work, the

auditor may be held to a higher standard of performance than might otherwise be applicable.

*Ryan v. Kanne*, 170 N.W.2d 395 (Iowa 1969); *City of East Grand Forks v. Steele*, 121 Minn.

296, 141 N.W. 181 (1913).

## IV.    **JUSTIFIABLE RELIANCE.**

33.    The test for justifiable reliance is whether the recipient knew or should have

known that the information supplied was false. *Fort Washington Resources, Inc. v. Tannen*, 858

F. Supp. 455, 459 (E.D. Pa. 1994) citing *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280,

285 (1971). Where the means of obtaining information is not equal, the "representations of the

person believed to possess superior information may be relied upon." *Id*. at 460, citing *Sisken v. Cohen*, 363 Pa. 580 (1950).

34.     Essentially, a plaintiff can satisfy the reliance element by demonstrating that he actually relied, in part, on an accountant's opinion in taking some action. *Fine v. American Solar King Corp.*, 919 F.2d 290, 299 (5th Cir. 1990); *In re Sahlen & Associates, Inc.*, 773 F.Supp. 342, 352-353 (S.D. Fla. 1991).

35.     A person claiming justifiable reliance on a misrepresentation does not have to prove that the misrepresentation was the sole inducement. *Fort Washington Resources, Inc. v. Tannen*, 858 F.Supp. at 460.

36.     USF&G need not prove that any particular audit report was the sole inducement for its decision to issue payment and performance bonds on behalf of CCI. *Delahanty v. First Pennsylvania Bank*, 318 Pa. Super. 90 (1983).

37.     USF&G can prove justifiable reliance for purposes of the cause of action for negligent misrepresentation by proving that the information in the audit reports was a "substantial factor" in determining its course of conduct. *Neuman v. Corn Exchange Nat. Bank & Trust Co.*, 356 Pa. 442, 445 (1947); *Blue Bell v. Peat, Marwick*, 715 S.W.2d 408, 415 (Tx. 1986).

38.     The gravamen of the cause of action for negligent misrepresentation is justifiable reliance on the representations contained in the auditor's report. The rules for determining whether a plaintiff justifiably relied on a material misrepresentation are found in §§540 and 541 of the Restatement (Second) of Torts. When read together, these rules demonstrate that the party to whom a misrepresentation is made is justified in relying upon the truth of that statement unless

he knows it is false or its falsity would be obvious to him upon a cursory inspection.  *See,*

*Silverman v. Bell Savings & Loan Association*, 533 A.2d 110, 115 (Pa. Super. Ct. 1987).

39.     "The recipient of a fraudulent misrepresentation is not justified in relying upon its

truth if he knows that it is false or its falsity is obvious to him."  Restatement (Second) of Torts,

§ 540.  "The recipient of a fraudulent misrepresentation of fact is justified in relying upon its

truth, although he might have ascertained the falsity of the representation had made an

investigation."  Restatement (Second) of Torts, § 541.

40.     As a comment to §541 explains, a person is found not to have justifiably relied on

a representation "only when the recipient of the misrepresentation is capable of appreciating its

falsity at the time by the use of his senses."  Restatement (Second) of Torts §541 cmt. a (1977).

A recipient cannot recover if he *blindly* relies upon a misrepresentation of the *falsity* of which

would be *patent* to him if he had utilized his opportunity to make a *cursory* examination or

investigation."  *Id.*  (emphasis added).

41.     As a general rule, "one to whom a duty is due has the right to assume that it will

be performed and is not required to anticipate the negligence of another."  *KBF Associates L.P.*

*v. Saul Ewing Remick & Saul*, 1998 WL 658557, *3, citing *Bortz v. Henne*, 415 Pa. 150 (1964).

42.     As a matter of law, USF&G need not prove that any particular audit report was

the sole inducement for its decision to issue payment and performance bonds on behalf of CCI.

*Delahanty v. First Pennsylvania Bank*, 318 Pa. Super. 90 (1983).

43.     USF&G can prove justifiable reliance for purposes of the cause of action for

negligent misrepresentation merely by proving that the information in the audit reports was a

"substantial factor" in determining its course of conduct.  *Neuman v. Corn Exchange Nat. Bank*

108

& *Trust Co.*, 356 Pa. 442, 455 (1947); *Blue Bell v. Peat, Marwick*, 715 S.W.2d 408, 415 (Tx. 1986).

44.     Even if, *arguendo*, the work of USF&G's underwriters was anything less than stellar, it is axiomatic that "[f]oolhardiness or stupidity does not mitigate in favor of the defendants." *Bonhiver v. Graff*, 248 N.W.2d 291, 297 (Minn. 1976).

45.     Accountants are not "immune from the consequences of their negligence because those who employ them have conducted their own business negligently." *KBF Associates L.P. v. Saul Ewing Remick & Saul*, 1998 WL 658557 at *6, citing, *National Surety Corp. v. Lybrand*, 9 N.Y.S. 2d 554, 563 (1939).

## V.     COMPARATIVE AND CONTRIBUTORY NEGLIGENCE ARE INAPPLICABLE.

46.     Under Pennsylvania law, comparative negligence is governed by statute, 42 Pa. C.S.A. §7102.  The statute applies "in all actions brought to recover damages for negligence resulting in death or injury to person or property."  It does not apply to cases involving only financial loss and, accordingly, is inapplicable in this case.  *See Rizzo v. Michener*, 584 A.2d 973, 976 (Pa. Super. 1990).

47.     Pennsylvania upholds the "audit interference rule," which provides that an accountant may only utilize the defense of contributory negligence to the extent that such contributory negligence consists of actions *by the plaintiff that interfere with the conduct of the audit.  Jewelcor Jewelers and Distributors, Inc. v. Corr*, 373 Pa. Super. 536, 551-552 (Pa. Super. 1988) (emphasis supplied).

48.     An accounting firm which has been sued for negligently performing an audit may assert the defense of contributory negligence *only* when the plaintiff's conduct interfered with

the audit and this interference was a substantial factor in causing the plaintiff's loss. *In re Jack Greenburg, Inc.,* 212 B.R 76 (E.D. Pa. 1997).

49.      Further, the plaintiff must be negligent and the negligence must contribute to the defendant's failure to perform his contract and report the truth. *Id.* The *Greenburg* Court affirmed this two-part test: did the plaintiff's conduct interfere with the audit; if so, was the interference a substantial factor in causing the plaintiff's loss. *Id.* at 92.

50.      "Under Pennsylvania law, a party's contributory negligence is not a defense to an action against an accountant for professional negligence unless that contributory negligence impeded the accountant from performing its obligations satisfactorily-- the so-called 'audit interference rule'" *Medical Consultants Network, Inc. v. Cantor & Johnston, P.C.,* 2001 WL 10788, *4 (E.D. Pa.), citing *Jewelcor Jewelers and Distributors, Inc. v. Corr*, 373 Pa. Super. 536, 551-552 (P.A. Super. 1988).

## VI.      STANDARDS FOR EXPERT TESTIMONY.

51.      As a general rule, an expert witness may testify, in the form of opinion or otherwise, if scientific, technical or other specialized knowledge possessed by the expert will assist the trier of fact in understanding the evidence or in determining a fact in issue. Fed. R. Evid. 702. An exception to the need for expert testimony exists where issues regarding the standard of care are within the realm of ordinary lay knowledge. *Wagenheim v. Alexander Grant & Co.*, 482 N.E.2d 955, 969 (Ohio Ct. App. 1983). This is not likely in most accounting cases. *Seward International v. Price Waterhouse*, 391 S.E.2d 283 (Va. 1990).

52.      While recognizing the need for expert testimony in certain areas of litigation, the *Daubert* decision appointed the trial judge as a "gate keeper" invested with the responsibility of determining whether an expert's testimony is based on sound methodology or is mere conjecture.

110

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. at 593. The "gate keeper" function of the court is intended to prevent a jury from being swayed by evidence that is irrelevant or non-reliable. *Id.* at 590.

53.     For purposes of evaluating whether or not an expert witness may rely on a certain methodology as a basis for his testimony, various factors set out in *Daubert* are applied. The *Daubert* factors governing the reliability of expert testimony are as follows: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of the standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to the methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been has been put. *Id.; Protocomm Corp. v. Novell Advanced Services, Inc.,* 171 F.Supp.2d 473 (E.D. Pa. 2001) (applying *Daubert to* accountants). As discussed, *infra*, the *Daubert* factors are primarily designed to eliminate "junk science" and possess significantly less utility in vetting other areas of expert testimony.

54.     The Third Circuit has adopted the factors laid out in *Daubert*, *with the qualification that the reliability requirements not be applied too strictly, and that they "not be used as a tool by which the court excludes all questionably reliable evidence." In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3rd Cir. 1994); *see also I.D. Security Systems Canada, Inc. v. Checkpoint Systems Inc.*, 259 F.Supp.2d 622 (E.D. Mich. 2003) (trial judge "should consider specific *Daubert* factors only to the extent they are reasonable measures of such reliability"). Both the Third Circuit and Pennsylvania courts apply a "liberal standard" for

assessing the qualification of an expert and the reliability of expert testimony. *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d at 742; *In re Glosser Bros. Inc.*, 382 Pa. Super. 177 (1989).

55.     As a general proposition, rather than exclude proffered expert testimony there is a *presumption of admissibility with it then left to the fact finder to determine how much weight to give to the testimony. LePage's Inc. v. 3M*, 324 F.3d 141, 165 (3d Cir. 2003) ("The credibility of LePage's and 3M's experts was for the jury to determine."); *Paoli*, 35 F.3d at 744 ("The ultimate touchstone [of admissibility] is helpfulness to the trier of fact."); *Commonwealth v. Gonzalez*, 519 Pa. 116 (1988); *Kuiss v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 338 (1974); *Davis v. Steigerwalt*, 822 A.2d 22 (Pa. Super. 2003).

56.     When dealing with non-scientific expert testimony, the Third Circuit evidences an even more generous standard favoring admissibility. *See e.g. In re Unisys Sav. Plan Litig.,* 173 F.3d 145, 157 (3d Cir. 1999) (testimony concerning investigation methods for determining financial health should not be evaluated "by the particular standards required for testimony based on a particular scientific ethic"); *ProtoComm Corp. v. Novell Adv. Servs., Inc.*, 171 F.Supp.2d at 477 ([The *Daubert* factors] do not so readily and easily apply in the context of testing the reliability of opinions concerning the characterization of complicated business transactions.").  In *Main Street Mortgage, Inc. v. Main Street Bancorp.*, 158 F.Supp.2d 510 (E.D.Pa. 2001) the Court held that the testimony of an accounting expert is "non-scientific" and reiterates that a more relaxed standard should apply to such testimony.

57.     In terms of actual methodology used by the expert, any challenges to the methodology must explain why the calculations are improper. *Davis v. Steigerwalt*, 822 A.2d at 26.  The mere fact that an expert's method differs from other possible methods does not raise any presumption that the expert's approach is improper. *Id.*; *see also Allegheny Ludlum Corp. v.*

*Municipal Authority of Westmoreland County*, 659 A.2d. 20, 30 (Pa. Cmwlth. Ct. 1995); Fed. R. Evid. 702.

58.     In the context of financial analysis, Pennsylvania courts have been receptive to new methodologies on the rationale that "[n]ew methods of valuing instruments have been developed and are generally accepted in the financial community as being reliable." *Glosser Bros.*, 382 Pa.Super. at 187 (court allowed new valuation methodology despite case law that formerly recognized three different methods of valuation).

59.     The "look-back" method involves the process of "looking back" to prior years when a contract was in progress and recalculating profits, losses, and other financial data based upon the actual data that becomes available when the contract is completed. *Id.*; *see also Tutor-Saliba Corp. v. Commissioner of Internal Revenue*, 115 T.C. 1 (2000); *Chilton Ins. Co. v. Pate & Pate Enterprises, Inc.*, 930 S.W. 2d 877 (Tex. 1996). Section 460(b) of the IRS Code introduced the "look-back" method to the calculation of taxes on long-term contracts. After the taxes are filed based upon estimates of the contract price and costs, the taxes are later recalculated when the contract is complete in order to compare the initial estimates to the actual results. *Id.*

60.     The first step in the look-back calculation involves the re-determination of the prior year's gross profit on any contracts completed during the current year. This re-determination is also analogous to the subsequent events procedures performed by accountants, requiring accountants to be concerned with events that occur in a subsequent period that affect estimated gross profit reported in financial statements. In fact, the *Horwath International Audit Manual*, supposedly utilized by Brown Schultz in its conduct of the audits of CCI, provides that in appropriate circumstances the auditor should "review[ing] subsequent events and transactions" as part of the audit plan. DeBruyn's method of recasting CCI's contracts-in-process is an

established method of evaluating profits, losses, and other financial data, which is recognized by accountants in auditing construction companies and in calculating taxes on profits for long-term contracts.

61.    The "book of wisdom" is a concept which recognizes that the trier of fact may be allowed to hear, consider and take into account facts that happened after the event that is the subject of the litigation even though those facts might not have been known or knowable at the time of the happening of that event. *Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. 689, 698 (1933). Simply, "[t]he reasonableness of estimates may be tested in light of actual experience." *Ralph L. Patsch v. Commissioner*, 19. T.C. 189, 198 (1952).

62.    As stated by Justice Cardoza, "[e]xperience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within." *Id.* In essence, the "book of wisdom" is little more than a judicial acknowledgment "that the law should express 'a judgment from experience as against a judgment from speculation.'" *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Price George's County, Maryland*, 1993 WL 524783 (D. Md.), citing *Tanner v. Little*, 240 US 369, 386 (1916).

63.    The book of wisdom has been utilized in a variety of situations, none of which indicate any judicial proclivity to limit or narrow its uses. *E.g., Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. at 698 (determination of damages for patent infringement); *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Prince George's County*, 1993 WL at 524785, *8 fn. 6 (eminent domain litigation); *Ralph L. Patsch v. Commissioner of Internal Revenue*, 19 T.C. at 198 (determination of amount of tax deduction).

64.    "To correct uncertain prophecies in such circumstances is not to charge the offender with elements of value nonexistent at the time of his offense.  It is to bring out and expose to light the elements of value that were there from the beginning."  *Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. at 698 (citations omitted).

## VII.    WORKING PAPERS.

65.    Further, any excuses for information omitted from working papers – intentionally or otherwise – should be viewed skeptically in light of the fact that work papers have "a common purpose – to document the work done, and to preserve a body of evidence adequate in amount and quality and so organized as to lean logically to the professional conclusion expressed."  R.J. Gormley, *The Law of Accountants and Auditors*, ¶3.03[1], p. 3-26 (Warren, Gorham & Lamont 1981).

66.    Moreover, an audit that was adequate in fact may be ruled inadequate in law because of a failure of proof through lack of documentation.  *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 435 (6th Cir. 1980) (The "District Judge evidently inferred from [accountant's] failure to document such testing in its work papers, that the testing did not occur.  The record also establishes adequate foundation for this inference.").

## VIII.    DAMAGES.

67.    The "damages recoverable for negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause."  Restatement (Second) of Torts, §552B(1); *Medical Consultants Network, Inc. v. Cantor & Johnston, P.C.*, 2001 WL 10788 (E.D. Pa.) (citing §552B of Restatement as correct measure of damages for negligent misrepresentation).  The "out of pocket" loss is the proper measurement for the claim.  *Id.*

115

68.    Once negligence is proven, the negligent actor is responsible for all the unforeseen consequences thereof – no matter how remote – which follow in a natural sequence of events. *Comm. v. United States Mineral Products Co.*, 2002 WL 31454023.  (Pa. Comm.); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1376 (S.D.N.Y. 1982). Essentially, a tort-feasor is liable for all damages which "ordinarily and in natural course of things have resulted from the commission of the tort." *Frank v. Volkswagenwerk, A.G. of West Germany*, 522 F.2d 321 (C.A. Pa. 1975).

69.    In establishing damages, the plaintiff is only required to furnish a reasonable quantity of information from which the trier of fact may estimate the amount of damages. Generally, damages need not be proved with mathematical certainty, but only reasonable certainty. *Dehanty v. First Pennsylvania Bank*, 464 A.2d 1243 (Pa. Super. 1983); *see, Bostick v. ITT Hartford Group, Inc.*, 82 F.Supp. 2d 376 (E.D. Pa. 2000); *Jameson, Money, Farmer & Co. v. Standeffer*, 678 So.2d 1061 (Ala. 1996).

70.    For example, "[i]f the injured party produces the best evidence available of his damages and if such evidence provides a reasonable basis for determining his loss, he is entitled to recover although the exact amount cannot be ascertained." *Greenstein, Logan & Co. v. Burgess Marketing*, 744 SW.2d at 187.

71.    In essence, plaintiff is not required to quantify all damages with precision but merely to produce evidence tending to show the extent of damages as a matter of just and reasonable inference. *Jamison, Money, Farmer & Co. v. Standeffer*, 678 So.2d at 1067.

72.    "It is well-established law in Pennsylvania that a plaintiff has a duty to minimize his harm when possible. . . It is also, however, well-established that the burden of showing that

116

plaintiff could have but did not lessen his harm is that of the defendant." *Muzikar v. National Railroad Passenger Corporation*, 1997 WL 1433780 (Pa. Com. Pl).

73.     The *burden of proving failure to mitigate rests squarely upon the breaching party*. *Advanta Mortgage Conduit Services, Inc. v. MG Investments, Inc.,* 2000 WL 830727 (E.D. Pa); *Koppers Co., Inc. v. Aetna Casualty and Surety Co.*, 98 F.3d. 1440 (3rd Cir. 1996) (mitigation is affirmative defense, so burden of proving failure to mitigate is on defendant).

74.     Mitigation never requires an unreasonable act, and a party is not expected to go through the motions of attempting to avoid damages when it is certain that such efforts will prove of no avail. *Krauss v. Greenberg*, 137 F.2d 569 (3rd Cir. 1943); *Runner v. National Industry Builders, Inc.*, 64 Pa. D.&C. 2d 65 (1972).

Respectfully submitted,
UNITED STATES FIDELITY AND
GUARANTY COMPANY,
By its counsel,


s/ Bruce D. Levin
Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:     (617) 790-3000
Facsimile:     (617) 790-3300
         and
Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, Pennsylvania  17101
Telephone:     (717) 237-7100
Facsimile:     (717) 237-7105

Dated: March 24, 2004
#284984 v1/36432/87

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

_____
                                    )
UNITED STATES FIDELITY AND          )
GUARANTY COMPANY,                   )
                                    )
            Plaintiff               )
                                    )        CIVIL ACTION NO. 1:01-CV-00813
v.                                  )
                                    )        JUDGE CONNER
BRUCE J. BROWN and BROWN            )
SCHULTZ SHERIDAN & FRITZ,           )
                                    )
            Defendants.             )
_____)

## CERTIFICATE OF SERVICE

        I, Bruce D. Levin, Esquire, counsel for Plaintiff United States Fidelity & Guaranty
Company, hereby certify that a copy of **United States Fidelity & Guaranty Company's
Request for Findings of Fact and Rulings of Law** was served upon the following, first class
mail, postage pre-paid on March 24, 2004.

Kathleen Carson, Esquire
Swartz Campbell LLC
1601 Market Street
Philadelphia, PA  19103-2316

                                        s/ Bruce D. Levin
                                        Bruce D. Levin

Dated: March 24, 2004

118