## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| United States Fidelity and | : | |
| Guaranty Company | : | |
| | : | Hon. Christopher Conner |
| v. | : | |
| | : | |
| Bruce J. Brown and Brown, Schultz | : | |
| Sheridan & Fritz | : | No: 01-CIV-813 |

## POST-TRIAL MEMORANDUM OF DEFENDANTS
## IN SUPPORT OF VERDICT FOR DEFENDANTS

The evidence did not establish the liability of defendants.  Defendants did not express false information material to plaintiff with the intent to induce plaintiff to rely.  Additionally, plaintiff did not sustain a loss due to justifiable reliance on information from defendants.  Accordingly, the verdict should be in favor of defendants and against plaintiff.

## I.    DISCUSSION

### A.    The Elements of the Cause of Action

This action involves a claim for negligent misrepresentation.  A cause of action for negligent misrepresentation requires proof of the following elements:  1) a misrepresentation of material fact; 2) made under circumstances in which the person who represented the information should have known the statement was false; (3) with an intent to induce another to act on the misrepresentation; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.  *Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 561 (Pa. 1999); *see also Gibbs v. Ernst*, 647 A.2d

882, 890 (Pa. 1994) citing Page Keaton, Prosser and Keaton on the Law of Torts §

105 (5th ed. 1984).  Pennsylvania's negligent misrepresentation claim is based on the

adoption of the Restatement (Second) of Torts Section 552.  *Bortz*, 729 A.2d at 561.

All of the elements must be established to impose liability.

> **B.**     **Negligent Misrepresentation Does Not Apply to Economic Loss**
>
> **Cases**

A negligent misrepresentation cause of action cannot possibly provide plaintiff

with a basis for recovery against defendants.  Pennsylvania does not permit recovery

for negligent misrepresentation where, as here, the loss is solely economic.  *David*

*Pflumm Paving & Excavating v. Foundation Services, Co.*, 2003 Pa.Super. 41, 816

A.2d 1164 (2003).  The law could not be clearer on the issue:

> This Court has already determined that Section 552
> applies to claims of negligent misrepresentation.  However,
> this Court has indicated that while Section 552 applies in
> Pennsylvania, it applies only in cases where the plaintiff
> alleges loss that is not solely economic.  ... [I]t is clear that
> our Courts have only permitted recovery under Section 552
> where the plaintiff has suffered losses in addition to his
> economic loss.
>
> *          *          *
>
> In sum, we hold that Pennsylvania allows suit for negligent
> misrepresentation, consistent with Section 552 of the
> Restatement (Second) of Torts, where such
> misrepresentation results in harm other than mere
> economic loss. However, the economic loss doctrine bars
> claims under Section 552 which result in solely economic
> loss.  Where a plaintiff asserts negligent misrepresentation
> and seeks only damages for economic loss, the defendant is
> entitled to judgment as a matter of law.

*David Pflumm Paving & Excavating v. Foundation Services, Co.*, 2003 Pa.Super. 41,

2

816 A.2d 1164, 1168 and 1171 (2003)(citations omitted).  Therefore, actions which involve recovery of strictly economic loss are not properly based on a claim for negligent misrepresentation.

*David Pflumm Paving & Excavating v. Foundation Services, Co.*, 2003 Pa.Super. 41, 816 A.2d 1164 (2003), involved a claim by an excavation contractor against architects and engineers who prepared drawings or provided information concerning a building site and its subsurface conditions.  Plaintiff relied on the information found in the drawings and related materials about the conditions at the job site, including the nature of the subsurface conditions, when plaintiff prepared and submitted a bid for excavation work at the site.  The site conditions and subsurface conditions were materially different than represented in the materials generated by defendants.  Plaintiff's claim involved recovery for strictly economic loss associated with the excessive cost in performing its contract with the builder.  The court held that plaintiff could not recover against defendants under a theory of negligent misrepresentation since the claim did not involve damages other than economic loss.

This action involves strictly economic loss.  The action arises out of the issuance of audit reports by defendants to CCI Construction, a construction contractor.  The audit reports were provided by CCI to plaintiff.  Plaintiff issued surety bonds for CCI in connection with numerous construction contracts to guarantee performance by CCI.  CCI defaulted on payment to subcontractors and

performance under its contracts with owners.  Plaintiff paid money pursuant to its surety obligation when CCI defaulted.

The claim is based on the contention that defendants misrepresented information when they expressed an opinion in their audit reports that the 1997 and 1998 financial statements presented fairly the financial condition of CCI since the audited financial statements allegedly 1) reflected incorrect amounts of revenue attributable to uncompleted contracts, and 2) the 1998 audited financial statement did not adequately disclose information concerning a contract claim guaranteed by Pennsylvania Contractors Insurance Company (PCIC) in the amount of $1,162,460. Plaintiff's damages are limited to the amount plaintiff paid on surety bonds.  There are no damages at stake other than for strictly economic loss.  Since this action involves strictly economic loss, negligent misrepresentation is not a legal theory on which plaintiff can rely to obtain recovery.

### C.     The Evidence Did Not Establish the Elements of Negligent Misrepresentation

The evidence presented at trial did  not establish the elements of a negligent misrepresentation cause of action even if plaintiff can properly proceed against defendants on a negligent misrepresentation claim.

### 1.     Defendants Did Not Misrepresent A Fact

### a.     There Was No Misrepresentation of Fact Relating to Contract Revenue from Uncompleted Projects

The first element of a cause of action for negligent misrepresentation requires

proof of a misrepresentation by defendants.  A misrepresentation depends on proof of

a false statement of fact.  *Sevin v. Kelshaw*, 417 Pa. Super. 1, 611 A.2d 1232, 1238

(1992).  Under Pennsylvania law, only a statement of a false fact expressed as if the

fact was true is a misrepresentation.  *Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555

(1999).  Plaintiff must establish that defendants represented the truth of a false fact.

The only representations by defendants are included in the audit reports

concerning defendants' audits of the 1997 and 1998 financial statements of CCI.  It is

significant that an audit report is not a guarantee of the correctness of the

information included in the audited financial statements.  Rather, an audit

> does not guarantee that a client's accounts and financial
> statements are correct any more than a sanguine medical
> diagnosis guarantees well-being; indeed, even an audit
> conducted in strict accordance with professional standards
> countenances some degree of calibration for tolerable error
> which, on occasion, may result in a failure to detect a
> material omission or misstatement.  Rather, the "objective
> of the ordinary examination of financial statements by the
> independent auditor is the expression of an opinion on the
> fairness with which they present financial position, results
> of operations, and changes in financial position in
> conformity with generally accepted accounting principles."
> In other words, in issuing an opinion, the auditor certifies
> only that it exercised appropriate, not flawless, levels of
> professional care and judgment.

*In re IKON Office Solutions, Inc.*, 277 F.3d 658 (3d Cir. 2002)(citations omitted).  The

inquiry focuses on whether the expression by defendants that the financial

statements presented fairly the financial condition of the company as of the date of

the audit report.

The only representation made by defendants was its audit opinion of the financial statements of CCI Construction Company for the years 1997 and 1998. That opinion expressed only that the financial statements of CCI presented fairly the financial condition of CCI as of the closing date of the statement.  To the extent that amounts related to contract revenue included on the 1997 and 1998 financial statements from uncompleted contracts are considered to be representations by defendants, the financial statements clearly disclosed that

> revenues from construction contracts are recognized on the percentage of completion method, measured by the percentage of direct cost incurred to date to estimated total direct costs for each contract. . . . Because of inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates will change within the near term.

Plaintiff's Exhibit 36 at p. 8.   In addition, the financial statements also state:

> Use of estimates:
>
> The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

The financial statements clearly disclosed the method by which revenue was recognized on uncompleted contracts and, since that method involved the use of estimates,  it was at least reasonably possible that the estimates would change within the near term.  The statements further disclosed that the actual results could differ from the estimates.   Considering these disclosures, there was no false statement in

the financial statements concerning the amount of contract revenue derived from uncompleted contracts and management's estimated costs to complete those contracts.

The information included on the financial statements was correct, presented fairly the financial condition of CCI, and the amount of revenue from uncompleted contracts was based on reasonable estimates of the cost to complete.  CCI had substantial procedures for collecting and recording data and for developing cost estimates.  Cost estimates were developed in the field and reviewed by management.  The cost estimates were detailed and itemized.  Cost estimates were revised regularly and reviewed at various levels in the operations of CCI.  The cost estimates were studied and variances from prior estimates were studied and explained.  The system was designed to produce reliable data concerning cost estimates.  CCI followed the procedures it established.  CCI produced reliable cost estimates which it used in the determination of contract revenue included on the financial statement.

The only proof of a misrepresentation was the testimony of Steve J. DeBruyn, plaintiff's accounting expert, and the exhibits which set forth Mr. DeBruyn's proposed restatements to the 1997 and 1998 audited financial statements of CCI.  DeBruyn's restated financial statements were developed using data which DeBruyn believed is from actual results on completed contracts as a substitute for the estimated amounts for contracts in progress included on the audited financial statements.  A difference between estimated amounts and actual amounts does not

7

establish that the estimates were wrong at the time the estimates were made. Conditions can change subsequent to the time the estimate was made which would change the actual result, but which would not make the estimate wrong.

The source of completed contracts data used by DeBruyn to develop his restated financial statements is the completed contracts schedule attached to the 1998 audited financial statement, and a print-out identified as exhibit 337 of unknown origin containing unaudited data believed to be year end 1999 information internally prepared by CCI. Neither the completed contracts schedule attached to the audited financial statement, nor exhibit 337 was available when the audited financial statements were prepared and defendants issued their audit reports. Therefore, the use of data which was unavailable, and allegedly represents actual rather than estimated results, is not properly a source of proof to establish the estimated amounts were wrong when defendants' audit reports were issued. There was no evidence presented that estimated costs to complete used to determine the amount of contract revenue to recognize from uncompleted contracts included in the 1997 or the 1998 audited financial statement were incorrect based on the information that was known or available as of the audit date.

Additionally, the data included on exhibit 337 was not proven reliable and was allegedly prepared at a time when plaintiff believed the financial reporting by CCI was not correct. No evidence was presented to establish the source of exhibit 337, the source of the data on exhibit 337, or the manner in which the data on exhibit 337 was

compiled.  Exhibit 337 is not properly a source of information to evaluate the
accuracy of the amounts included on the audited financial statements.  Therefore,
the evidence presented did not establish that any amount included in revenue from
uncompleted contracts was wrong.  There was no credible evidence which established
that the actual costs of the jobs in progress differed from the estimated costs used to
determine contract revenue and which was included in the 1997 and 1998 audited
financial statements.

The proof concerning the proposed restatements to the 1997 and 1998 audited
financial statements was not derived from an accepted and appropriate method for
determining the propriety of estimates on those financial statements.  The method
used by DeBruyn to develop his restated financial statements was inappropriate to
determine whether the representations by defendants were true when made.
DeBruyn's method used to develop his proposed adjustments and restatements to the
1997 and 1998 financial statements is not a method accepted by other experts or
authorities in the profession, or supported by the accounting literature or other
source of appropriate authority.  The proposed restated financial statements were the
product of inconsistent application of an unaccepted and inappropriate method to
determine the propriety of the representations by defendants in connection with the
1997 and 1998 audited financial statements.  DeBruyn made mistakes in his
application of his method to determine the adjustments to develop the restated
financial statement for 1998.  DeBruyn included material misstatements in forming

his restated financial statement for 1998 to an extent that his restatements and opinions are unreliable and incredible evidence.

The appropriate manner in which to assess the accuracy of the amounts included on the audited financial statements is to perform a re-audit. A re-audit would allow an auditor to review the information available at the time of the audit and determine the accuracy of the financial statements. DeBruyn agrees that a re-audit is the appropriate means by which to assess the accuracy of the financial statements, but used other data since he was not provided the records necessary to perform an audit. A party which reasonably anticipates litigation has an affirmative duty to preserve relevant evidence. *Baliotis v. McNeil*, 870 F. Supp. 1285, 1290 (M.D. Pa. 1994). Plaintiff had available the records from CCI and anticipated litigation during a time when it could have obtained and preserved the records. Additionally, the evidence established that the records for many of the projects exist, and the status of the records for the other projects is uncertain. Therefore, the records either exist and plaintiff withheld the records from its expert witness, or plaintiff failed to preserve the records. In either case, an adverse presumption arises against plaintiff and in favor of defendants that the records would not support plaintiff. In the alternative, plaintiff cannot use the testimony of DeBruyn since plaintiff cannot take advantage of a circumstance it caused.

The amount of the PCIC guaranteed claim was properly included in revenue on the 1998 financial statement. An amount is properly recognized as revenue if it is

reasonably probable of collection.  The PCIC claim was reasonably probable of collection.  A written promise to pay is not invalid or unenforceable for lack of consideration provided the writing expressly indicates that "the signer intends to be legally bound."  33 P.S. § 6 (2003).  The guarantee by PCIC, signed by the sole shareholder, expressly indicated that PCIC intended to be legally bound.  Therefore, the guarantee was legally valid, was binding on PCIC and was enforceable by CCI against PCIC.  Additionally, PCIC had assets sufficient to satisfy the full amount of the guarantee as of December 31, 1998.  The revenue reflected on the CCI financial statement properly included the amount of the PCIC guaranteed claim.

### b.    There Was No Misrepresentation of Fact Concerning the PCIC Guaranteed Claim

Plaintiff's contention about PCIC relates to the inadequacy of the disclosure which is insufficient to support a negligent misrepresentation claim.  An omission of information cannot form the basis for a claim for negligent misrepresentation.  *Lazin v. Pavilion Partners*, Civ.A. No. 95-601, 1995 U.S. Dist LEXIS 15255, 1995 WL 614018 at *7 (E.D. Pa. Oct.11, 1995)(non-disclosure of a material fact does not give rise to a cause of action for negligent misrepresentation); *Lord v. Living Bridges*, 1999 U.S. Dist. LEXIS 11513 at *8 (E.D. Pa. July 30, 1999).  Non-disclosure of a material fact would give rise to a cause of action for fraudulent non-disclosure, not for negligent misrepresentation.  *Lazin, citing, Lang v. Helios Capital Corp.*, No. 86-08031, 1989 WL 299241, at *4 n.6 (Pa. Com. Pl. Ct. Jan. 20, 1989); *see also*, *Sunquest Information Systems v. Dean Witter Reynolds, Inc.*, 40 F. Supp. 2d 644, 656-57 (W.D.

11

Pa. 1999)(non-disclosure is not a misrepresentation in the absence of a relationship, usually a fiduciary or confidential relationship, to affirmatively disclose information).

Plaintiff's contention as it relates to the inadequate disclosure of the PCIC transaction is an alleged omission. Plaintiff's contention that the financial statement, in particular footnote 8, did not include enough information about the PCIC transaction for the reader to understand the effect of the transaction on the financial statement is not a false statement of fact. Rather, the contention relates to an omission which cannot properly serve as a basis for liability for negligent misrepresentation.

Even if an omission can serve as the basis for a negligent misrepresentation claim, the evidence did not establish that the alleged insufficient disclosure was a misrepresentation. The information included within the footnote was sufficient to inform the reader there existed a transaction between related parties–CCI and PCIC–involving guaranteed payment by PCIC to CCI of a specific amount in connection with a contract claim against a contract owner. All the information included in the financial statement concerning the PCIC guaranteed claim was true. There existed a guarantee by PCIC in favor of CCI, in the amount indicated in footnote 8, for a contract claim presented to the owner. There was no incorrect or false information included in the financial statement about the PCIC guaranteed claim transaction. In footnote 1 of the financial statement, it was disclosed that amounts from contract claims were included in revenue. A reader of the financial

statement could reasonably conclude that the amount of the PCIC guaranteed claim was included in revenue, and obviously a component of revenue. There was no information included in the financial statement from which a reader of the financial statement reasonably conclude that the amount of the contract claim was included in other than revenue, or not included in any amount on the financial statement. A reader who did not understand the financial statement conceivably might not understand or realize the treatment of the PCIC guaranteed claim, but certainly the reader would not be misled by the information in the financial statement about the treatment of the PCIC claim. The disclosures about the PCIC guaranteed claim transaction was sufficient not to be misleading.

Without regard for a "reader" of the financial statement, the evidence did not establish that plaintiff had an understanding of the PCIC guaranteed claim and its effect on the financial statement other than the correct understanding. The evidence did not establish that the allegedly insufficient disclosure of the PCIC guaranteed claim transaction caused plaintiff to misunderstand the PCIC guaranteed claim transaction and the effect of the transaction on the financial statement. Rather, the evidence established that if plaintiff had read the footnotes to the financial statement, then plaintiff would have understood the PCIC guaranteed claim transaction and its effect on the financial statement.

The absence of the information which plaintiff contends should have been included in the 1998 financial statement concerning the PCIC guaranteed claim was

not necessary to prevent a misunderstanding about the transaction.  Plaintiff's criticism relates to the completeness of the disclosure to allow a full understanding about the PCIC guaranteed claim rather than a misrepresentation about the PCIC guaranteed claim transaction.  The absence of additional information about the PCIC guaranteed claim was not misleading.  Plaintiff's contention regarding the adequacy of the disclosure concerning the PCIC guaranteed claim is legally insufficient to support a negligent misrepresentation claim.

### 2.     The Alleged Misrepresentation Was Not Material

#### a.     The alleged misrepresentation was not proven material

A misrepresentation is conceivably actionable only if it involves a material fact. Plaintiff must establish that defendants actually misrepresented a material fact.  A misrepresentation will be deemed material where "it is of such character that had it not been made,  ... the transaction would not have been consummated."  *GMH Associates v. The Prudential Realty* Group, 2000 Pa. Super. 59, 752 A.2d 889, 902 (2000), *citing*, *Sevin v. Kelshaw*, 417 Pa. Super. 1, 611 A.2d 1232, 1237 (1992). Therefore, in the absence of proof that plaintiff would not have issued the bonds except for the alleged misrepresentation, plaintiff did not sustain its burden of proof concerning the materiality element.

In the context of this action, materiality depends on whether the alleged misrepresentations were significant to underwriting to an extent that plaintiff would have taken underwriting action sufficient to avoid the loss.  According to plaintiff's

14

contentions, the only underwriting action which plaintiff contends would have avoided its loss was to terminate bonding so that the bonds which are the subject of the damages never issued. The alleged misrepresentations were material to underwriting only if plaintiff would have suspended and terminated bonding except for the misrepresentations.

The alleged misrepresentations were not material. Plaintiff did not establish minimum financial condition criteria which it required CCI to maintain to qualify for surety bond credit. Although plaintiff indicated the existence of guidelines and financial ratio preferences against which it compared bond customers, plaintiff did not use any articulable, quantifiable, financial condition criteria threshold below which bonding would not continue. Surety bond credit was not extended to CCI conditioned on avoiding any events of default, operating profitably, or maintaining a minimum net worth or minimum working capital. There was clearly no identifiable demarcation between a financial condition which qualified for bonding and a financial condition which did not or would no longer qualify for bonding. Plaintiff's underwriters were unable to express the nature and extent of changes to the audited financial statements which would have been material to underwriting. Plaintiff did not relate a trigger point to cease bonding to any specific degree of deterioration or change in financial condition.

Plaintiff employed relaxed underwriting criteria due to competitive concerns to maintain market share. Relaxed underwriting criteria included tolerance flexibility

in financial condition expectations and elimination of personal indemnity by principals.  Plaintiff's underwriting decisions were predominantly grounded on its confidence of CCI's management, and market pressure.

Plaintiff's bond program for CCI existed under the authority of David Hussey. No one subordinate to Hussey had sufficient authority to approve continuation or suspension/termination of the bond program.  Without regard for a recommendation from any underwriter, and apparently without regard for CCI's financial condition, Hussey could continue the bond program and approve specific bonds for CCI.  Hussey continued the bond program and approved specific bonds even when subordinate underwriters recommended against approval, or made no recommendation concerning approval.  Therefore, action by anyone except Hussey is not material.

Hussey did not testify during the trial.  No evidence was presented to establish that Hussey was aware of, received, read, examined, analyzed, or reviewed the audited financial statements, the annual review report prepared during 1998 based on 1997 year end financial information, the electronic credit folder, or any other source of financial information which was conceivably derived from the 1998 audited financial statement.  No evidence was presented to establish the information which was material to Hussey's decisions to approve the bonding program or any specific bonds.  Whether Hussey considered the differences between the audited financial statements and the restated financial statements prepared by DeBruyn material was not established.

16

Specific bonds were approved under the specific discretionary authority (SDA) granted to the Harrisburg branch office, and the agent specific contract authority (ASCA) extended to the bond agent. Anthony Phillips was the only person from the branch office who testified. Phillips did not identify any specific bond which he approved. Phillips was the manager of the branch office, but Phillips did not perform any financial analysis or actual underwriting in connection with bonds issued for CCI. Any financial analysis and all the underwriting for the CCI bond program and specific bonds was done by Steve Salazar and other staff in the branch office. No evidence was presented to establish the information which was material to the decisions by Salazar or anyone else who approved bonds for CCI.

During the years since the bond relationship between CCI and plaintiff began, the financial condition of CCI changed considerably without interruption in bonding.

### b.    The 1997 audited financial statement

The evidence established that plaintiff would have continued to bond CCI even if the 1997 audited financial statement had reflected the amounts as restated by DeBruyn. James Daily, plaintiff's home office underwriter involved on the CCI account and the designee representative of plaintiff, testified that plaintiff would have continued its bonding program even if the 1997 audited financial statement had reflected the amounts as restated by DeBruyn. The evidence did not establish the nature and extent of the changes to the 1997 financial statement which would have been material to underwriting. The difference between the amount of contract

17

revenue reflected on the 1997 audited financial statement and the restated amounts are not material to underwriting.

### c.    The 1998 audited financial statement

The evidence concerning the materiality of the alleged misrepresentations in connection with the 1998 audited financial statement was based on the full amount of the adjustments made by DeBruyn made to the 1998 financial statement.  There were, however, substantial, material errors and misrepresentations by DeBruyn in his restatement of the 1998 financial statement.  Even assuming the validity of DeBruyn's "look back" method, DeBruyn inconsistently and erroneously applied the method he used to determine the adjustments to the 1998 audited financial statement.  When the errors were corrected and the amount of the PCIC guaranteed claim included, DeBruyn's restated 1998 financial statement understated revenue by $2,372,843.  When corrected, the restated amounts for the 1998 financial statement based on the "look back" method reflected, in some respects, a healthier financial condition than earlier years.  Although the corrected, restated 1998 financial statement would show a net income loss, the net worth and working capital would remain above a deficit sufficient that CCI would not have halted bonding.  There was no evidence to establish that the difference between the corrected, restated 1998 financial statement and the 1998 audited financial statement was material to underwriting.  No one testified that the corrected restated 1998 financial statement was different to an extent that it was material to underwriting.  The evidence did not

establish the nature and extent of the changes to the 1998 financial statement which would have been material to underwriting.  In the only expression about the extent to which the financial condition of CCI would have to deteriorate to prompt underwriting action, Daily testified that serious deterioration of the financial condition of CCI would not prompt concern by the underwriter to take action unless working capital disappeared or became a negative amount, net worth dropped below zero, cash disappeared, or the debt to equity ratio became 100 to one or doubled. Under the circumstances, the difference between the corrected restated 1998 financial statement and the 1998 audited financial statement was not material.

### d.    The PCIC guaranteed claim

The evidence did not establish that it was significant to underwriting for plaintiff to know that the amount of the PCICI guaranteed claim was included in the underbillings portion of revenue.  The only conceivable significance of knowing that the amount of the PCIC guaranteed claim was included in underbillings was to assess profitability due to operations.  Daily, however, testified that net profit, and not operating net profit, was significant to underwriting.  According to Daily, the amount of net operating profit was not of particular interest to underwriting.  The evidence did not establish that it was significant to plaintiff to know the sources of revenue included in the 1998 audited financial statement, or the contract to which the PCIC guaranteed claim related.  If it was significant to underwriting to know the source of underbillings and the source of revenue from the Mahanoy Prison contract included

on the 1998 audited financial statement, then inquiry would have been made. There is no evidence that consideration was made by plaintiff about the treatment of the PCIC guaranteed claim and whether it was included in any amount on the 1998 audited financial statement. It was not significant for plaintiff to know the treatment of the PCIC guaranteed claim on the financial statement because it was not material to underwriting.

### 3.    Defendants Did Not Have Reason to Know Information Was False

A material misrepresentation of fact can conceivably form the basis for liability only if the misrepresentation had reason to know the information was false. To be actionable, the alleged misrepresentation of material fact must have been made under circumstances in which defendants ought to have known of its falsity. *Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 561 (1999). The speaker must have failed to make reasonable investigation of the truth of his words. *Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994). It is negligent to misrepresent information only if defendant "failed to exercise the care or competence of a reasonable man in obtaining or communicating the information." Restatement (Second) of Torts § 552, comment on § 1 (e). Expert witness evidence is necessary to establish that defendant did not exercise ordinary care and would or should have realized the falsity of the defendant's representations. *Bortz*, 729 A.2d at 563 (expert testimony or other competent evidence of appropriate care required to establish a breach of duty for a negligent misrepresentation claim).

No competent credible evidence was presented to establish defendants had any

reason to know the information included in the financial statements was false.  The only evidence presented concerning the absence of appropriate care by defendants was the testimony by plaintiff's expert witness, Steve DeBruyn.  Although DeBruyn was critical of the nature and extent of the audit procedures used by defendants, DeBruyn did not substantiate that more or additional audit procedures would have altered the outcome of the audit and led to a change in the financial statements.  Therefore, the evidence did not establish that, in the exercise of appropriate care, defendants would have realized that any information included in the 1997 or 1998 audited financial statement was not correct, that management's estimates of costs to complete were not reliable, and that the financial statements did not fairly present the financial condition of CCI.  Accordingly, the evidence did not establish that defendants would have realized their statements were false.

Defendants exercised appropriate care.  Defendants accessed and reviewed information concerning cost estimates to complete contracts to verify the amounts presented by CCI.  Defendants inquired about and learned information from CCI's management about the status of contracts and conditions which would affect the cost to complete.  The process by which cost data was developed and recorded had proven reliable.  Defendants' historical experience with CCI indicated that management could reliably produce cost estimates and accurately report financial information.  CCI's financial information was prepared by a centralized accounting department operated by a capable accountant experienced in construction accounting.

Defendants' audit was performed in accordance with generally accepted auditing standards (GAAS). From their audit, defendants had the benefit of information which confirmed and reasonably led them to believe that CCI's estimated costs to complete were reliable. The audit procedures were certainly adequate to determine whether CCI could substantiate the amounts CCI expressed on its financial statements, and whether the financial statements were prepared in accordance with generally accepted accounting principles (GAAP).

Defendants were entitled to properly follow the presumption that contractors generally have the ability to produce estimates that are sufficiently dependable to justify the use of the percentage of completion method of accounting. Persuasive evidence to the contrary is necessary to overcome that presumption. In order to challenge the estimated costs to complete developed by management, the auditor would have to develop persuasive evidence that the company was not able to adequately estimate the cost of completion. The previous reliability of a contractor's estimating process is usually an indication of continuing reliability particularly if the present circumstances are similar to those that prevailed in the past. The existence of profit fades does not mean the estimating capability of the contractor is inadequate. Estimating is an integral principal part of the contractor's business activities and there is a necessity to revise estimates on contracts continually as the work progresses. The fact that circumstances may necessitate frequent revision of estimates does not indicate that the estimates are unreliable for the purpose for

which they are used although results may differ widely from original estimates. Because of the nature of his business, the contractor may still find the estimates reasonably dependable despite these widely recognized conditions a contractors estimates should be regarded as reasonably dependable if the minimum total revenue and maximum total cost can be estimated with a sufficient degree of confidence to justify the contractor's bids on contracts. Therefore, there is no support for a contention that defendants had a basis to believe the information included in the audit reports was not accurate.

The peer review process was put into place by the AICPA to provide independent review of the quality of work evidenced upon a review by one CPA of selected jobs and files of another CPA. Brown Schultz, over the years, obtained clean reviews which in effect say that Brown Schultz is complying with the standard of care in the industry as promulgated by the AICPA. The 1997 audit of CCI by Brown Schultz was peer reviewed. For that particular peer review, Brown Schultz received an unqualified opinion with no letter of comment, the best opinion that can be received with respect to a peer review.

DeBruyn's criticisms of defendants is inappropriate. As DeBruyn agreed, the appropriate measure of the propriety of the auditor's professional conduct is to perform a re-audit using the procedures which DeBruyn testified were not done or were inadequately done. However, DeBruyn did not perform a re-audit and instead relied on information developed subsequent to the audit. DeBruyn, however, did not

limit himself to historical information available to the auditors as of the end of their field work. DeBruyn did not know and did not make a determination about the specific information that was available to the auditors when they performed the audits for the years ended December 31, 1997 and 1998. DeBruyn's proposed adjustments were made based on data developed after the audits were performed by Brown Schultz. The information included in Plaintiff's Exhibit 337, used by DeBruyn in his determination the audits were not adequate, was not available to defendants during their 1998 audit. The information included on the completed contract schedule attached to the 1998 audited financial statement was not available to the auditors when they performed the 1997 audit. Unless the propriety of the conduct of defendants is assessed using the information available when the audit was conducted, any review of the conduct of defendants would be under circumstances different than existed when defendants performed their audits and issued their audit opinions. Any criticisms of defendants are not based on the circumstances presented to defendants during the relevant time. Therefore, DeBruyn's testimony did not establish that defendants should have known information was false.

The method used by DeBruyn to develop his restated financial statements was inappropriate to address the propriety of the professional conduct by defendants. A difference between actual results or later results and earlier estimates included in the financial statements did not establish that defendants did not exercise appropriate care. Plaintiff did not establish that a difference between actual or later results and

earlier estimates included in the financial statements was known or would, in the exercise of appropriate care, have been known by defendants if additional or different audit procedures had been performed. DeBruyn's testimony concerning the absence of appropriate care by defendants assumed that defendants did not audit contract costs and estimated contract costs of CCI. The evidence established that defendants did audit the contract costs and estimated contract costs of CCI and audited the amounts of contract revenue reflected by CCI on the 1997 and 1998 financial statements based on the percentage of completion method of accounting. The evidence did not establish that defendants did not exercise appropriate care when they formed and expressed their opinion that the financial statements fairly presented the financial condition of CCI. No evidence was presented to establish that defendants should have realized that the amounts reflected on the audited financial statements for 1997 and 1998 for contract revenue were not reasonable.

It is important to the evaluation about whether defendants should have known the information was false to know both the date and the event which caused the increase in the estimated costs to complete in order to assess if it was an increased cost that could have been detected by defendants during the audits. Plaintiff did not establish the events or the reasons for the difference between the estimates which were used to derive contract revenue at the time of the audits and the actual results which are reflected on plaintiff's Exhibit 337, or whether those events or reasons could have been ascertained by the auditors during the audits. The evidence did not

establish that the events which caused the alleged increased costs to complete over the estimated costs to complete occurred prior to the end of audit field work, was known to, or could have been known before, the 1997 and 1998 audit reports were issued. The evidence did not establish that there was information known by, or available to, defendants from which defendants should have known that their opinion the financial statements presented fairly the financial condition of CCI was false. The evidence did not establish that defendants did not conduct their audits of CCI in accordance with GAAS, and the financial statements were other than in accordance with GAAP.

The records and other materials necessary to perform a re-audit were in the possession of, or available to, plaintiff. Plaintiff did not preserve the records necessary to properly assess the propriety of the audits by defendants, or did not provide the records and materials to DeBruyn to allow DeBruyn to re-audit the 1997 and 1998 financial statements. An adverse inference arises in favor of defendants that if plaintiff had provided the records to DeBruyn, then the result of the re-audit would not support plaintiff's claim. Plaintiff did not establish that defendants did not act with appropriate care when forming and expressing their opinion about the financial statements.

DeBruyn's assertion that defendants should have realized that some of the profit margins reflected on the uncompleted contracts were above the historical average profit margin for completed contracts does not establish that defendants had

reason to know the profit margin for the contracts under audit were excessive.

Contract revenue based on the estimated cost to complete is based on estimates of

anticipated costs.  Contract revenue on uncompleted contracts is not determined by

the historical profit margin experienced on completed contracts.  If contract revenue

was determined by the historical profit margin experienced by the company on

completed contracts, then there would be no need to determine the estimated cost to

complete contracts as a means to determine the amount of revenue to recognize on

the financial statement from uncompleted contracts.  The average profit margin is

not even an appropriate reference point since the average profit margin was the

product of varying profit margins on many contracts which included higher and lower

profit margins than the average profit margin.

### 4.    Defendants Did Not Intend to Induce Plaintiff to Rely on the Audit Reports

Plaintiff must establish a basis for duty owed by defendants to plaintiff to

maintain a negligent misrepresentation claim.  "Like any action in negligence, there

must be an existence of a duty owed by one party to another." *Kramer v. Dunn*, 749

A.2d 984 (Pa. Super. 2000), *citing, Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 561

(1999); *Gibbs*, 647 A.2d at 890.  Under Section 552, a duty arises only if there was

privity between plaintiff and defendant, or the defendant had a pecuniary interest in

the transaction. *First Options of Chicago, Inc. v. Wallenstein*,  1994 WL 229554 at * 4

(E.D.Pa.1994).  "... the Pennsylvania Supreme Court, in adopting section 552 of the

Restatement, did not intend to eliminate the privity requirement for the maintenance

of negligence claims ... ." *In re Phar-Mor, Inc. Securities Litigation*, 892 F.Supp. 676,

693 (W.D.Pa. 1995). Additionally, Section 552 applies only to claims which do not

involve strictly economic loss. *David Pflumm Paving & Excavating v. Foundation*

*Services, Co.*, 2003 Pa.Super. 41, 816 A.2d 1164, 1168 and 1171 (2003). A claim for

negligent misrepresentation requires proof "sufficient to demonstrate that

[defendant] negligently supplied information while engaging in a specific undertaking

on [plaintiff]'s behalf." *I & S Associates Trust v. Lasalle National Bank*, 2001 U.S.

Dist. LEXIS 17049, *15 (E.D.Pa. 2001). Of course, plaintiff has no claim for

misrepresentation if "[defendant] never had any direct interaction with [plaintiff]." *I*

*& S* at 18.

      The negligent misrepresentation claim cannot serve as a basis for a third-party

to avoid the privity requirement of a negligence claim. The comment by the court in

*Phar-Mor* cautioning against allowing a malpractice claim disguised as a claim for

negligent misrepresentation is applicable to this action:

> In sum, we conclude that the negligent misrepresentation claims
> of plaintiffs are merely cloaked professional malpractice claims
> and that, under Pennsylvania law, privity is a requisite element
> to such claims.

*Phar-Mor* at 694. "... Pennsylvania's strict adherence to the privity rule would result

in a ruling that negligent misrepresentation may not be used to plead professional

negligence claims by persons not in privity with the professional defendant." *PNC*

*Bank, Kentucky, Inc.  v. Housing Mortgage Corp.*,  899 F.Supp. 1399, 1408 (W.D.Pa.

1994).

In *PNC Bank*, the court considered a claim against an accountant for negligent misrepresentation in connection with the preparation of audited financial records which were relied upon by a party not in privity with the accountant. In rejecting the claim for failing to properly audit a company, the court concluded:

> [t]he plaintiffs' claim, although couched in terms of negligent misrepresentation, clearly involves the alleged breach by the accountant of his obligation to perform audits of HMC financial statement according to generally accepted auditing principals. This is the very heart of a professional negligence claim.

Id. at 1407. Accordingly, privity is required to maintain a claim based on an alleged failure to properly perform an audit. There was no privity between plaintiff and defendants to serve as a basis for duty owed by defendants to plaintiff.

Even if privity is not a requirement under Section 552, the Restatement still limits an accountant's liability for negligent misrepresentation to those third parties who the accountant actually intends to rely on the information, and then, only for transactions that are the same as, or substantially similar to, the ones the accountant actually knows will be influenced by the supplied information. *Restatement (Second) of Torts* at § 552(2); *North American Specialty Insurance Company v. Lapalme*, 258 F.3d 35 (1st Cir. 2001). Section 552(b) restricts liability to situations in which defendant "intends the information to influence or knows that the recipient so intends or in a substantially similar transaction." Restatement (Second) Torts § 552.

*Lapalme* involved a situation strikingly similar to the facts of this case. In *Lapalme*, the accounting firm of Dias & Lapalme rendered accounting services to

Canty Roofing and Sheetmetal, Inc. Canty, because it was doing repair work on public buildings, was required to post payment and performance bonds. In 1994, North American Specialty Insurance Company inspected Canty's financial records as well as those of Canty's principal and entered into a bonding relationship with Canty. North American required that Canty provide updated financial statements prepared by an independent certified public accountant for each succeeding calendar year. In late 1995, the sole shareholder of Canty sold the company to a group of businessmen. Shortly after the transaction, the accounting firm prepared an independent, review level financial statement which lacked specific information concerning the change in ownership and the notes to the financial statement contained misleading comments that implied the prior owner's continuing participation as sole shareholder. Canty obtained new work on public buildings for which North American issued bonds. North American claimed it relied on the 1995 financial statement in issuing those bonds. Canty foundered under its new owners and defaulted on the bonds. North American, as surety, was forced to step in, which cost it nearly $2,000,000. North American then sued the accountants alleging among other things, negligent misrepresentation, i.e., but for the accountants' omission of accurate ownership information in the 1995 financial statement, it would not have continued furnishing bonds to Canty and would have avoided the ensuing loss.

The court in the *Lapalme* case held that North American failed to raise facts with regard to whether the accountant actually had knowledge of the critical

transactions, i.e., the issuance of the bonds on which Canty defaulted. According to

the First Circuit, the critical issue was what the accountants knew about North

American's intent to use the statement in deciding whether to maintain a bonding

program which involved writing new bonds for Canty in 1996. While the accountants

were apparently told that Canty's new owners intended to use the financial

statement meet the corporation's obligations for ongoing bonds, there was no

evidence that the financial statement would be used to obtain future bonds. The

court found no evidence to support the conclusion that the accountants knowingly

undertook "the substantial risks inherent in the issuance of future bonds."

The court also found that defaulted bonds were not transactions which were

substantially similar to those that the accountants intended to influence. The court

found that without some evidence that the accountants knew that they were

undertaking "additional, open ended liability with respect to future bonds by

releasing the financial statement" there was no basis for liability under Section 552.

Simply because transactions are of the same general nature (e.g. "bonds") is not

enough to render them substantially similar for purposes of the Restatement rule.

Any other conclusion would make a mockery of the basic premise that underbraces

the Restatement rule: that an acquiescent accountant is only deemed to accept the

risks of specific transactions that were made known to him in advance (or

substantially similar ones). *Id*. at 44.

In this action, as in *Lapalme*, plaintiff cannot establish that defendants had

31

actual knowledge of and intended to influence the issuance of the bonds which are the subject of this litigation. Defendants' awareness that plaintiff was a user of the audited financials provided by CCI to plaintiff does not establish that defendants intended to influence a specific transaction or to induce reliance by plaintiff.

Plaintiff did not establish that defendants induced plaintiff to rely on its audit reports to any extent and certainly not for any specific transaction. The audit reports were not prepared by defendants for plaintiff, the reports were not provided to plaintiff by defendants, there was no contact between plaintiff and defendants to any extent, defendants never received or responded to any request for information by plaintiff, and there was no evidence that defendants were aware of any specific bond transactions involving plaintiff. The audit reports were issued by defendants as part of a year end routine and not with knowledge of, or to influence any, transaction involving plaintiff. No work or other services were performed by defendants for plaintiff. Defendants never conveyed to plaintiff that the audit reports were suitable for use by plaintiff, or that defendants issued the reports for plaintiff's use and reliance. Defendants' involvement with CCI was only as a paid professional for specific services and had no pecuniary interest in the outcome of the transactions between plaintiff and defendants. Defendants' awareness that plaintiff was a potential user of CCI's financial statements is not proof of inducement by defendants, or proof of intent by defendants that plaintiff rely on the financial statements. There was no basis for duty owed by defendants to plaintiff. The absence of contact

between defendants and plaintiff establishes that defendants did not intend to induce reliance by plaintiff on defendants' audit reports for any specific transaction.

### 5.     Plaintiff Did Not Justifiably Rely on the Audit Reports

Plaintiff must establish that it actually relied on the alleged misrepresentations by defendants, and that its reliance on the alleged misrepresentations was justifiable.  Justifiable reliance comprises two elements: 1) the plaintiff must in fact rely on the information and 2) the reliance must be reasonable.  *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606 (5th Cir. 1996); *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285 A.2d 451 (1971).  Reliance is unjustified when the relying party was negligent.  *Scottish Heritable Trust, PLC*, 81 F.3d 606.  In deciding whether the recipient justifiably relied on information, a court may consider the degree of sophistication of the parties. *Fort Washington Resources, Inc. v. Tannen*, 854 F. Supp. 455 (E.D. Pa. 1994); *Greenberg v. Tomlin*, 816 F. Supp. 1039, 1056 (E.D. Pa. 1993).  Reliance is justified only if the information was correctly analyzed and used.

### a.     The audited financial statements

Plaintiff did not establish that the 1997 and 1998 audited financial statements were analyzed, the nature and extent of the analysis applied by plaintiff to the 1997 and 1998 audited financial statements, and the role, if any, the 1997 and 1998 audited financial statements played in the underwriting decisions of plaintiff for CCI bonds.  Neither of the two underwriters who testified analyzed the financial

statements.  The evidence did not establish that information from the 1997 and 1998 audited financial statements was analyzed to any appreciable extent and used in underwriting decisions by plaintiff.  No evidence was presented to establish that Hussey approved the bonds or the bond program for CCI in reliance on any audited financial statement.  The evidence did not establish that Salazar, Phillips, or Daily approved bonds in reliance on an analysis of the information included in the 1997 and 1998 audited financial statements.  The evidence did not establish that USF&G properly used the results of any analysis of the 1997 and 1998 audited financial statements.  Plaintiff did not establish the specific manner in which plaintiff used the financial statement.  The evidence did not establish that any specific bond was approved in reliance on any specific information included within either the 1997 or the 1998 financial statement.

The bond program was continued during 1998 after USF&G learned CCI had sustained an operating loss in excess of $1.6 million halfway through the year.  James Daily testified that he was not aware of the $1.6 million loss until the end of 1998 because plaintiff's branch office did not forward the information to him.  Daily would have suspended bonding and would not have authorized the VCU bond if he had been aware of the loss.  Daily was, obviously, not justified if he issued the VCU bond in reliance on the 1997 audited financial statement without review of the more current interim financial information.  Plaintiff, therefore, was not justified if it relied on the 1997 audited financial statement when it issued any bonds once plaintiff became

aware of the $1.6 million loss halfway through 1998. Any bonds issued after August 17, 1998 when plaintiff learned about the $1.6 million loss was not in reliance on the 1997 audited financial statement. Additionally, earlier bonds were issued during 1998 without review of the interim financial information. Therefore, any reliance on the 1997 audited financial statement once more recent financial information became available was not justified.

The CCI bond program was renewed by plaintiff for 1999 before receipt of and without reliance on the 1998 audited financial statement. No evidence was presented to establish that plaintiff re-evaluated its decision to renew the CCI bond program during 1999 after receipt of the 1998 audited financial statements. No evidence was presented to establish that the CCI bond program for 1999 was continued in reliance on the 1998 audited financial statement. No information from the audited financial statements was included in any request for approval of any bond. The evidence did not establish that plaintiff actually and justifiably relied on the information contained in the 1997 and 1998 audited financial statements.

No evidence was presented to establish that plaintiff relied on the 1997 and/or 1998 audited financial statements in its decision to issue any specific bond. Plaintiff did not sustain an injury attributable to its justifiable reliance on the alleged misrepresentations included in the contract revenue amounts in the 1997 and 1998 audited financial statements.

### b.     The PCIC guaranteed claim

The evidence did not establish that plaintiff was aware of the PCIC guaranteed claim.  No evidence was presented to establish that the allegedly deficient disclosure of the PCIC guaranteed claim transaction caused plaintiff to misunderstand the PCIC guaranteed claim transaction and the effect of the transaction on the financial statement.  Anthony Phillips testified that he was not aware of footnote 8 to the 1998 audited financial statement or its contents during his involvement with underwriting bonds for CCI.  Anthony Phillips testified that the field office underwriter, Steve Salazar, did not bring to his attention the information included in footnote 8 to the 1998 audited financial statement.  The evidence did not establish that the 1998 audited financial statement was ever received in the home office of plaintiff where Daily and Hussey were located.  The evidence did not establish that Daily and Hussey ever reviewed or analyzed the 1997 and 1998 audited financial statements.  James Daily testified that he did not read or pay attention to footnote 8 to the 1998 audited financial statement.  No evidence was presented to establish that Hussey was aware of footnote 8 to the 1998 financial statement.  No evidence was presented to establish that plaintiff used information concerning the PCIC guaranteed claim transaction in its underwriting decisions.  No evidence was presented to establish that plaintiff relied on information included in the audited financial statement concerning the PCIC guaranteed claim transaction.  Plaintiff did not sustain an injury attributable to its justifiable reliance on the alleged misrepresentation included in the 1998

36

audited financial statement concerning the PCIC guaranteed claim.

### 6.    Contributory Negligence Bars Recovery

Plaintiff cannot recover if it was negligent to any degree.  Contributory negligence is a complete bar to recovery for negligent misrepresentation.  Section 552A of the Restatement (Second) of Torts provides that:

> The recipient of a negligent misrepresentation is barred from recovery for pecuniary loss suffered in reliance upon it if he is negligent in so relying.

Restatement (Second) of Torts § 552A.  Contributory negligence remains a complete bar in those instances involving strictly economic loss.  *Wescoat v. Northwest Savings Association*, 378 Pa. Super. 295, 548 A.2d 619 (1988); *Commonwealth Federal Savings and Loan Association v. Pettit*, 137 Pa. Commw. 523, 532, 586 A.2d 1021, 1026 (1991).  Under the contributory negligence doctrine, a party is totally barred from any recovery when his own negligence, however slight, contributes to his injury in a proximate way.  *Elder v. Orluck*, 511 Pa. 402, 515 A.2d 517 (1986); *Brown v. Jones*, 404 Pa. 513, 172 A.2d 831 (1961); *Matteo v. Sharon Hill Lanes, Inc.*, 216 Pa.Super. 188, 263 A.2d 910 (1970).

The information included in the 1998 audited financial statement was sufficient to inform a reader of the financial statement about the existence of the PCIC guaranteed claim and the amount of the claim.  Any alleged deficiency concerning the disclosure of the PCIC guaranteed claim was limited to the absence of additional information about the effect of the PCIC guaranteed claim on the financial

statement.  If the disclosure included in the 1998 audited financial statement concerning the PCIC guaranteed claim was inadequate, then plaintiff proceeded to issue bonds without an understanding about the effect of the PCIC guaranteed claim on the financial statement and without knowing whether the effect of the PCIC guaranteed claim was material to underwriting.  In other words, plaintiff proceeded to issue bonds aware of what it did not know.  Plaintiff did not exercise appropriate care for its own protection under the circumstances.  Plaintiff was negligent when it relied on the alleged insufficient disclosure relating to the PCIC guaranteed claim.  Contributory negligence bars plaintiff's recovery to the extent plaintiff's alleged injury was due to the alleged misrepresentation concerning the PCIC guaranteed claim.

## II.    CONCLUSION

The Court's verdict should be in favor of defendants and against plaintiff.

Judgment should be entered in favor of defendants and against plaintiff.

Respectfully submitted,

SWARTZ CAMPBELL LLC

BY:    s/Jeffrey B. McCarron
       JEFFREY B. MC CARRON
       KATHLEEN M. CARSON
       1601 Market Street
       34th Floor
       Philadelphia, PA 19103

       Attorneys for Defendants

Dated : March 24, 2004