**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| United States Fidelity and | : | |
| Guaranty Company | : | |
| | : | Hon. Christopher J. Conner |
| v. | : | |
| | : | |
| Bruce J. Brown and Brown, Schultz | : | |
| Sheridan & Fritz | : | No: 01-CIV-813 |

**DEFENDANTS' PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

Defendants, Bruce J. Brown and Brown, Schultz, Sheridan & Fritz, through

their attorneys, Swartz Campbell LLC, submit the following proposed findings of fact

and conclusions of law:

**I.    Findings of Fact**

**A.    Background**

1.    CCI Construction Company ("CCI") was a construction company located in

Harrisburg, Pennsylvania and was owned by John Ortenzio ("Ortenzio") who

was also the company's chief executive officer. Trial Transcript at p. 201, 202,

834.

2.    Plaintiff, United States Fidelity & Guaranty Company ("USF&G") formed a

bond program relationship with CCI beginning during 1993 after another

major surety declined to continue to continue to bond CCI, and CCI changed

its business from the private negotiated work for Ortenzio's father to public

bid work.  At the outset of the relationship between CCI and USF&G, certain

reinsurers declined to participate on the risk. Trial Transcript at p. 219-20, 479-80, 481-87.

3.  The bonding relationship continued until 2000. Trial Transcript at p.742-43; 2563-64.

4.  Brown, Schultz, Sheridan & Fritz ("Brown Schultz") were the auditors of CCI during the bonding relationship between CCI and plaintiff. Trial Transcript at pp. 834; 1019:1-8.

5.  Brown Schultz audited the annual year end financial statements of CCI.

6.  The bonds which form the basis for damages in this action were issued during 1998 and 1999. Exhibits 14 and 15.

7.  The audited financial statements at issue are for the years ending December 31, 1997 and December 31, 1998.

## B. There Was No Evidence of a Misrepresentation By Brown Schultz[1]

### 1. Brown Schultz's Representations

8.  The only representations made by Brown Schultz were contained in the Independent Auditor's Reports on the financial statements of CCI Construction Company for the years ending December 31, 1997 and December 31, 1998. Exhibits 34 and 36; Trial Transcript at pp. 463, 2505.

---

[1]For purposes of organization, Defendant has included certain facts under certain headings. However, that a proposed finding is included under a particular heading is not intended to imply that such a proposed finding is not also applicable to rebut other elements of plaintiff's claim.

9.    Defendants' reports expressed that Brown Schultz conducted its audits of CCI

in accordance with generally accepted auditing standards. The 1997 report also

states:

In our opinion, the financial statements referred to above present fairly
in all material respects the financial position of CCI Construction
Company, Inc. as of December 31, 1997 and 1996 [December 31, 1998
and 1997] with the results of its operations and its cash flows for the
years then ended, in conformity with generally accepted accounting
principles.

Exhibits 34 and 36.

10.    The financial statements were the representations of CCI management.  Trial

Transcript at p. 1880:15-17; Exhibit 34 at p. 1; Exhibit 36 at p. 1 ("Those

financial statements are the responsibility of the Company's management.")

### 2.    The Financial Statements Prepared By CCI Were Accurate

11.    The financial statements developed by CCI were prepared by a certified public

accountant ("CPA") employed by CCI.  Trial Transcript at pp. 474-75.

12.    Sheri Phillips was the chief financial officer of CCI during 1998 and 1999.

Trial Transcript at pp. 577, 2086, 2089-90.

13.    Ms. Phillips was a certified public accountant with audit experience, including

audits of general contractors, and had considerable construction accounting

experience before joining CCI Construction.  Trial Transcript at p. 2087-2089.

14.    Sheri Phillips was a qualified and capable accountant knowledgeable about

construction accounting during the period she worked for CCI. Trial

Transcript at pp. 557, 2087-89.

15. Ms. Phillips started at CCI as its controller in 1991. Trial Transcript at p. 2089:4-8.

16. David Barber was Ms. Phillips' superior until he left the company in 1995. Trial Transcript at p. 2089:9-22.

17. When Mr. Barber left CCI, Ms. Phillips assumed his duties and responsibilities, and received the title of Chief Financial Officer sometime thereafter, but no later than 1997. Trial Transcript at pp. 2089: 23-2090:8.

18. Once she became chief financial officer of CCI, Ms. Phillips was in charge of CCI's accounting department. Trial Transcript at p. 2090:17-20.

19. CCI had a computerized accounting system. Trial Transcript at p. 2090:25-2091:2.

20. CCI had qualified estimators during the period from1996 to 1999. Trial Transcript at p. 2094:14-15.

21. The estimating department worked with the operations department to develop bids and, in particular, the project manager on the job if CCI got the job. In addition, John Ortenzio, the company's owner, Shane Miller, the chief operating officer, the vice president of estimating and the vice president of operations participated in developing bids. Trial Transcript at pp. 2092:22-2093:10.

22. CCI had extensive procedures for collecting and reporting job costs for project

4

contracts.  Trial Transcript at p.  2095:14-17.

23.   The procedures for collecting and reporting job costs were documented in the procedures manual for CCI.  Trial Transcript at p.  2095:18-20; Exhibit 356.

24.   CCI followed the procedures described in the manual for collecting and reporting job cost data.  Trial Transcript at p. 2096:9-12.

25.   Ms. Phillips understood the importance of accurately identifying and recording job costs to a particular contract in CCI's accounting system.  Trial Transcript at pp. 2097-98.

26.   CCI had extensive procedures to assure that the job costs were accurate including comparing invoices to purchase orders or subcontracts, and obtaining the approval of the project manager for all invoices.  Trial Transcript at pp. 2097-2098.

27.   CCI had internal controls to assure that it did not overpay on a purchase order or contract.  Trial Transcript at p. 2117:16-25.

28.   CCI  had a database which contained, among other things, all the actual costs that had been approved and posted to a job, the original budget, and any change orders.  Trial Transcript at pp. 2096-97.

29.   Estimated costs to complete were prepared by the project manager or project engineer and superintendent on the job site.  Trial Transcript at p. 2102:8-13.

30.   Reports were generated on a monthly basis which showed every phase of a job and each item within the phase ("estimated job costs reports").  Trial

Transcript at pp. 2096-98.

31. The estimated job cost reports were provided to the project managers for review and confirmation. Trial Transcript at pp. 2097, 2102-2103, 2108.

32. The project managers revised the estimated job costs reports each month on a line by line basis. Trial Transcript at pp. 2096-2097, 2099, 2100, 2108.

33. The project managers' revised estimated job costs reports were entered into the accounting department computer records. Trial Transcript at pp. 2099-2100.

34. The accounting department generated costs to complete reports that showed variances from the original budget or the prior estimated costs to complete. Trial Transcript at p. 2100.

35. All variances revealed by the reports were reviewed by the accounting department and CCI's managers. Trial Transcript at pp. 2104-2106.

36. Large variances required explanation by the project managers to verify the accuracy of the costs to complete and to explain the nature and reason for the variance. Trial Transcript at pp. 2100, 2102-2107.

37. CCI's accounting department discussed the costs to complete variances with the project manager. Trial Transcript at p. 2106.

38. The job costs and estimated costs to complete reports were also given to the vice president of operations or the person in charge of the particular division to address variances. Trial Transcript at pp. 2106-2107.

6

39.   CCI reviewed job costs and estimated costs to complete for accuracy and
      obtained explanations for variances on a monthly basis.  Trial Transcript at p.
      2107.

40.   The estimated costs to complete for CCI's projects changed monthly for a
      variety of reasons.  Trial Transcript at p. 2114-2116.

41.   CCI maintained project files which contained the contract with the owner, the
      contracts with the subcontractors, purchase orders for large material
      purchases, submittals, and anything related to the job itself. Trial Transcript
      at p. 2107.

42.   Stan Sechrist was the Vice President of Operations from approximately 1996
      to 1999.  Trial Transcript at p.  2110.

43.   Mr. Sechrist oversaw all the projects maintained by CCI.  Trial Transcript at p.
      at 2110.

44.   Mr. Sechrist was extremely knowledgeable about the projects performed by
      CCI.  Trial Transcript at p.  2110.

45.   The project managers either reported directly to Sechrist or reported to the
      person in charge of their division who in turn reported to Sechrist.  Trial
      Transcript at p. 2112.

46.   CCI conservatively stated anticipated profits for contracts in progress.  Trial
      Transcript at p. 530.

47.   The data used by CCI to develop its estimated costs to complete contracts was

7

reliable and the estimated costs to complete were reasonable.

### 3. The Numbers Complained By USF&G Are Estimates Which Are Subject to Change and Were Disclosed As Such

48.    An audit does not guarantee that the management prepared financial statements are absolutely correct. Trial Transcript at p. 2816.

49.    A financial statement reflects the financial condition of the company only for the moment reflected in the financial statement. Trial Transcript at p. 550.

50.    The financial condition of the construction company bonding client can change drastically following the end date of the financial statement. Trial Transcript at p. 551.

51.    Regardless of the time factors, experience, and knowledge, no two construction projects are the same. Trial Transcript at p. 453.

52.    The contractor is confronted with many unknowns and inherent risks on every construction project because of the non-repetitive nature of the industry. Trial Transcript at pp. 453-54.

53.    Contract prices are estimates and are subject to many variables, many of which are difficult to estimate with any accuracy. Trial Transcript at pp. 453-54.

54.    The variables on which the accuracy of estimates depend include weather, illness, subcontractor or supplier failure, and owner default. Trial Transcript at pp. 453-54.

55.    Because of the unusual operating aspects, a contractor's financial position can change drastically overnight. Trial Transcript at pp. 453-54.

56.    The estimated amounts included on the financial statements of CCI could change over the course of time because of different events including events which were not known, and could not have been anticipated at the time the estimate was made.  Trial Transcript at p. 599.

57.    The existence of disparity between an estimate and actual or later results does not establish that the estimate was incorrect or wrong at the time it was made. Trial Transcript at p. 2824.

58.    Conditions can change subsequent to the time the estimate was made which would change the actual result, but which would not make the estimate wrong. Trial Transcript at p. 2824.

59.    The audited financial statements disclosed that

revenues from construction contracts are recognized on the percentage of completion method, measured by the percentage of direct cost incurred to date to estimated total direct costs for each contract. . . . Because of inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates will change within the near term.

Plaintiff's Exhibit 36 at p. 8.

60.    In addition, the audited financial statements also state:

Use of estimates:

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

Plaintiff's Exhibit 36 at p. 8.

61.    The footnotes of a financial statement are an integral part of a financial statement and must be considered along with the information included on the financial statement schedules.  Trial Transcript at p. 498.

62.    Plaintiff was aware of and understood the content of footnote 1 of the audited financial statements which provided that revenue from contract amounts reflected on the financial statements of CCI were based on estimates of costs and that it was reasonably possible that the estimates used would change within the near term.  Trial Transcript at pp. 600-01; Exhibit 36, p. 8.

> **4.    The Testimony of Plaintiff's Expert, Steve DeBruyn, Does Not Establish the Existence of A Misrepresentation**
>
> **a.    The Information Relied Upon By DeBruyn Was Not Reliable**

63.    Plaintiff's proposed adjustments to the 1997 and 1998 audited financial statements to form the proposed restated financial statements are based on information included on exhibit 337 and the completed contracts schedule attached to the 1998 audited financial statement, exhibit 36, using the "look back" method.  Trial Transcript at pp. 1917, 1928.

64.    Exhibit 337 includes data which plaintiff's accounting expert witness, Steve DeBruyn, assumed was prepared by CCI and reflects job costs as of December 31, 1999. Trial Transcript at pp. 1917-1919:3, 1921:1-6.

65.    Plaintiff believed that financial data prepared by CCI after the latter part of

1999 was unreliable. Trial Transcript at pp. 1926-27, 2562.

66. The evidence did not establish the source of the information included in exhibit 337, or that the information was reliable.  Trial Transcript at pp. 429, 430, 1917-19, 1921.

67. The information contained in Exhibit 337 was not audited or tested in any way.  Trial Transcript at pp. 1918, 1921-22.

68. DeBruyn believed CCI did not historically produce reliable financial information.  Trial Transcript at pp. 1911, 1918, 1970.

69. DeBruyn's proposed adjustments to the financial statements were based on financial information which plaintiff did not believe was reliable.  Trial Transcript at pp. 2562-63.

70. Exhibit 337 was not a source of reliable data. Trial Transcript at pp. 1918, 1926-27, 2563.

71. An auditor should never use data that is unknown as to quality or reliability. Trial Transcript at p. 2976:22-2977:2.

72. Because of the unproven reliability of the data on Exhibit 337, the evidence did not establish that the estimated costs to complete were different from the actual costs for those contracts where plaintiff's expert used Exhibit 337 as a basis for his restatements.

### b. The Use of Hindsight Information Does Not Establish The Existence of a Misrepresentation As of the Date of the Audited Financial Statements

73. An independent auditor's report on financial statements is issued in connection with historical financial statements that purport to present a financial position at a stated date and results of operations and cash flows for a period ending on that date. Trial Transcript at p. 1902:2-8.

74. An auditor's report is based on information available to the auditor as of the audit date and through the end of their field work. Trial Transcript at p. 1902:2-8, 2976:13-22.

75. DeBruyn used the "look back" method to restate financial statements developed by DeBruyn for 1997 and 1998. Trial Transcript at p. 1939:6-9.

76. Donald Brenner is a licensed certified public accountant with considerable experience in auditing of construction companies. Trial Transcript at pp. 2745-48.

77. Mr. Brenner was on the committee that produced the Construction Contractor's AICPA Audit and Accounting Guide. Trial Transcript at pp. 2750-52.

78. Brenner is an authority on construction accounting. Trial Transcript at pp. 2745-52.

79. The testimony by Brenner was credible and correct in all respects.

80. The work and testimony by DeBruyn based on his work, did not comply with

12

AICPA professional standards.  Trial Transcript at p. 2804:6-7.

81.   The testimony of Steve DeBruyn is not credible and was, in all material respects, wrong.

82.   The "look back" method described by DeBruyn is a formal process used by the Internal Revenue Service (IRS) for companies that have long term contracts to try to assess whether the company, on an estimated basis, is paying its fair share of taxes timely.  The IRS compares actual results of transactions with the estimates made at the time the taxes were paid to determine if sufficient tax was paid and if interest and penalties are owed. Trial Transcript at p. 2846-47.

83.   The look back methodology was designed by and is used by the IRS for compliance with federal income tax law and evaluation of tax returns and not for the preparation of financial statements in accordance with generally accepted accounting principles ("GAAP").  Trial Transcript at p. 2804:8-12.

84.   The look back method is not in compliance with GAAP and is not intended to be used to evaluate the quality of an audit, or the accuracy of the amounts included in the financial statement as of the statement date. Trial Transcript at p. 2847.

85.   The only means to properly determine if the amounts reflected on the audited financial statements were incorrect estimated amounts is to review CCI's records including CCI's project files, job cost files, other ledgers and invoices.

Trial Transcript at p. 1916:2-7; 1937:12-23.

86. Mr. DeBruyn did not access the CCI's records sufficient to allow him to determine whether the 1997 and 1998 audited financial statements included incorrect estimated amounts. Trial Transcript at p. 1916:9-11.

87. The information reflected on the completed contracts schedule attached to the 1998 audited financial statement is actual contract cost data rather than estimated contract cost data. Trial Transcript at p. 1928.

88. The information included in the completed contracts schedule attached to the 1998 audited financial statements was not available when the audit work was performed for the 1997 financial statements. Trial Transcript at p. 1928:10-19.

89. DeBruyn assumed the information reflected on Exhibit 337 was actual contract cost data rather than estimated contract cost data. Trial Transcript at pp. 1970:23-1973:3, 1977-1979.

90. The information contained in Exhibit 337 was not available when the audit work was done for either the 1997 or 1998 audit. Trial Transcript at p. 1928:5-9.

91. Mr. DeBruyn's proposed adjustments were made using data which was developed after the audits. Trial Transcript at p. 1916:25-1917:3.

92. Mr. DeBruyn's proposed adjustments to the audited financial statements for 1997 and 1998 are based on substituting actual completed contract costs for

estimated contract costs.  Trial Transcript at p. 1947.

93.    DeBruyn did not comply with AICPA standards for consulting services in connection with his work as it related to his restatements of the CCI financial statements for 1997 and 1998.  Trial Transcript at p. 2934.

94.    DeBruyn's work failed to comply with the due professional care standard and the sufficient relevant data standard.  Trial Transcript at p. 2935.

95.    The data used by DeBruyn was unsubstantiated and DeBruyn did nothing to substantiate it. Trial Transcript at pp. 1918, 1921-22, 2936.

96.    It is not be proper to make adjustments to the financial statements based on changes in jobs that occurred subsequent to the auditor's sign off date. Trial Transcript at p. 2937.

97.    In applying the data, DeBruyn was required to use GAAP. Trial Transcript at p. 2937.

98.    Changes in estimates are not a basis to restate prior years financial statements. When management has information that indicates that there is a significant change from their original estimate it is then their obligation to revise the estimate on a going forward basis.  Trial Transcript at p. 2826.

99.    There is no support in the accounting literature for the use of Mr. DeBruyn's method of comparing actual cost and other sources of information developed after the estimate as a means to determine the correctness of estimates.  Trial Transcript at p. 1940:1-5; 1940:21-24.

100.   DeBruyn did not document the source of his methodology.  Trial Transcript at
       p. 1939:3-4.

101.   The method used by DeBruyn to restate the financial statements is not used
       by accountant as a means to determine the correctness of estimates.  Trial
       Transcript at pp. 1944:18-1945:5.

102.   Mr. DeBruyn did not know and did not make a determination about the
       specific information that was available as of the end of audit field work for the
       years ended December 31, 1997 and 1998.  Trial Transcript at pp. 1897-98.

103.   Mr. DeBruyn did not limit himself to historical information available as of the
       end of audit field work when he developed his proposed adjustments to the
       financial statements to arrive at the proposed restated financial statements.
       Trial Transcript at pp. 1897-98.

104.   The data used by DeBruyn was from well after the audit date.  Trial Transcript
       at p. 2936.

105.   Relevant data would have been records documents and facts that existed at the
       year end and at the auditor's signature date. Trial Transcript at p. 2937.

106.   No evidence was presented about the specific information which was available
       to defendants through the end of the audit field work.  Trial Transcript at p.
       1902:9-13.

107.   A determination about the propriety of estimated amounts requires
       information about both the event and the date of the event of the cost item

16

which was not accounted for in the estimate to know whether it was an amount which was erroneously not included in the estimate. Trial Transcript at p. 1932-33; 1937:12-23, 2851.

108. DeBruyn did not determine the date or event of the unaccounted for cost item responsible for the difference between the estimated costs to complete and the actual cost to complete. Trial Transcript at p. 1932-33.

109. Mr. DeBruyn employed the particular method he used to develop proposed adjustments to CCI's audited financial statements for 1997 and 1998 instead of a re-audit only because the records of CCI were not made available to him. Trial Transcript at p. 1944:7-17.

110. The job files and records which plaintiff would have obtained or accessed to take over CCI's projects were either not preserved or, if preserved, were not made available to Mr. DeBruyn. Trial Transcript at p. 2855.

111. Those files would have allowed DeBruyn to do a proper review of Brown Schultz's work because those documents would show the events causing changes and whether those events occurred between year end and the end of the audit field work for the audit years in question. Trial Transcript at p. 2855.

112. Many of the project files exist for the CCI contracts bonded by plaintiff and for which plaintiff contends the estimated costs to complete were inaccurate. Trial Transcript at p. 2621-22.

113. CCI granted plaintiff access to the files relating to the projects. Trial

17

Transcript at p. 2634, 2636.

114. CCI never denied a request for materials made by plaintiff except for the Scott Air Force Base file which was in the possession of a consultant hired by plaintiff and which was obtained by subpoena. Trial Transcript at pp. 2635-36.

115. Plaintiff did not establish that there were any project files for the CCI contracts bonded by plaintiff which no longer existed or were inaccessible to plaintiff. Trial Transcript at pp. 2624-27.

116. The project files in the possession of plaintiff were never provided to plaintiff's accounting expert. Trial Transcript at p. 2624.

117. The project files for the CCI contracts bonded by plaintiff were available to plaintiff to provide to plaintiff's accounting expert. Trial transcript at p. 2629.

118. There were valid change orders and claims on projects that had not been pursued by plaintiff as of the end of Ms. Phillips employment with CCI. Trial Transcript at p. 2126.

119. If change orders and claims had been successfully pursued, then the amount of contract revenue and profit on contracts would increase. Trial Transcript at p. 1978.

120. Mr. DeBruyn's proposed adjustments to the 1997 and 1998 financial statements did not account for the successful pursuit of change orders and claims. Trial Transcript at p. 1978.

121. CCI had cash flow issues during the latter part of 1999 because there were

payments withheld and/or unapproved change order/claim in excess of $4,000,000, and subcontractor failure.  Trial Transcript at p. 727-38, 2123.

122.  An unpaid Scott Air Force Base change order/claim in excess of $4,000,000 was the primary reason for the cash flow problem experienced by CCI during 1999. Trial Transcript at p.  2171:25-2172:8.

123.  The proof concerning the proposed restatements to the 1997 and 1998 audited CCI financial statements was not derived from an accepted and appropriate method for determining the propriety of those estimates on those financial statements.

124.  The evidence did not establish that the events which allegedly caused the increased costs to complete over the estimated costs to complete occurred prior to the end of audit field work, was known to or could have been known before the 1997 and 1998 audit reports were issued.

125.  The evidence did not establish that the reason for CCI's financial difficulties were related to incorrect amounts on the financial statements.

126.  The amount of contract revenue reflected on the 1997 and 1998 audited financial statements were based on reasonable, reliable, and dependable estimated costs to complete.

### c.    The PCIC Guaranteed Claim Was Properly Recognized as Revenue on the 1998 Audited Financial Statement

127.  CCI had a contract claim against the owner of the Mahanoy Prison project  in

the amount of $1,162,460.  Trial Transcript at p. 1412, Exhibit 222 at 284-292.

128.    The claim was presented to the owner.  Trial Transcript at p. 2164.

129.    Payment of the entire amount of the claim was guaranteed by Pennsylvania Contractors Insurance Company ("PCIC") in the event the owner did not pay all or a portion of the claim.  Exhibit 265.

130.    The guarantee was executed by John Ortenzio beneath text in which PCIC indicated that it intended to be legally bound.  Exhibit 265.

131.    There existed a legally valid, binding, and enforceable guarantee by PCIC in the amount of $1,162,460 in favor of CCI.

132.    A legal basis for a claim does not require a legal opinion. Trial Transcript at p. 2922.

133.    If the claim guaranteed by PCIC does not meet the definition of a claim for purposes of recognition as revenue under SOP 81-1, it is appropriate to look to general accounting principles of revenue recognition. Trial Transcript at p. 2927.

134.    The circumstances under which an amount may be recognized as revenue on a financial statement under general accounting principles are as follows:  It must be probable that the completed transaction will result in profit; the amount must be ascertainable; and collection of the amount must be reasonably assured. Trial Transcript at p. 2927-28.

135.    As of December 31, 1998, the full amount of the PCIC guaranteed claim could

have been paid by PCIC. Trial Transcript at p. 1111:6-10; 1112:22-1113:19; 1114:15-1115:3; 1120:19-23.

136. The guarantee made the claim probable of collection and properly included in revenue as disclosed in footnote 1 of the 1998 audited financial statement. Trial Transcript at pp. 1101, 1192, 2928-30.

137. The claim guaranteed by PCIC met the criteria for revenue recognition. Trial Transcript at p. 2928-30.

138. The recognition of the amount of the claim guaranteed by PCIC was in accordance with GAAP. Trial Transcript at p. 2931.

139. Because the claim was included in revenue, it ended up creating an underbilling consistent with the disclosure on how underbillings are calculated. Trial Transcript at p. 1271-72; Exhibit 36 at pp. 9, 11.

140. Financial statements are prepared on an accrual basis so that transactions are recorded although cash may not have been collected or paid out. Trial Transcript at pp. 2805:22-2806:5; 2807.

141. The full amount of the PCIC guaranteed claim was paid to and received by CCI. Trial Transcript at p. 1176, 2023.

142. Plaintiffs' expert did no analysis of the actual claim guaranteed by PCIC beyond a review of the Brown Schultz work papers. Trial Transcript at p. 2077.

143. Plaintiff's expert believed that the PCIC guaranteed claim was a contingent

gain and, therefore, should not be included in revenue. Trial Transcript at p. 2025.

144.    Contingent gains are not included in revenue because the gain is dependent on a contingency which may never occur so that there is no assurance the company will actually ever receive the money. Trial Transcript at p. 2025.

145.    The only contingency related to the PCIC guarantee related to the source of payment and not whether the amount would be paid. Trial Transcript at p. 2027:14-17.

146.    Plaintiff's expert had no authority from the accounting literature or otherwise for his position that a guarantee by itself is a contingent gain. Trial Transcript at pp. 2026-27.

147.    The amount of the PCIC guaranteed claim was properly included in revenue in the 1998 audited financial statement. Trial Transcript at p. 2931.

148.    The 1997 and 1998 audited financial statements fairly represented the financial condition of the company.

### d.    The Disclosures Regarding the PCIC Guaranteed Claim Were Sufficient

149.    The 1998 audited financial statement disclosed the existence of a claim in the amount of $1,162,460 against the owner of a project which was guaranteed by PCIC. Exhibit 36, p. 13, fn 8.

150.    Footnote 1 to the 1998 financial statement also informed plaintiff that an amount equal to contract costs attributable to claims is included in revenues

when realization is probable and the amount can be reliably estimated.

Exhibit 36, p. 8.

151.  The amount of the PCIC guaranteed claim was included as contract revenue

on the 1998 audited financial statement.

152.  Footnote 8 to the 1998 audited financial statement specifically disclosed:

> Pennsylvania Contractors Insurance Company has
> guaranteed a claim of $1,162,460 filed by the company with
> a contract owner.  If the owner fails to pay all or any part
> of this claim, the insurance company will pay the unpaid
> portion.

Exhibit 36 at p. 13.

153.  Plaintiff's underwriter, Tony Phillips, would have understood footnote 8 of the

1998 financial statement if he had read the footnote in connection with

underwriting.  Trial Transcript at p. 2518.

154.  Phillips would have understood from the contents of the financial statement

that the amount of the PCIC guaranteed claim reflected in footnote 8 of the

1998 audited financial statement was included in revenue if he had read the

footnote.  Trial Transcript at p. 2518.

155.  Daily understood from the contents of footnote 8 of the 1998 audited financial

statement that the $1.162 million claim guaranteed by PCIC could have been

included in underbillings, a component of revenue.  Trial Transcript at p. 699.

156.  A reader of the 1998 audited financial statement would reasonably conclude

from footnote 8 of that financial statement that the claim guaranteed by PCIC

was included in revenue.  Trial Transcript at pp. 1538-1539, 1540.

157.  A reader of the financial statement could reasonably understand from footnote 8 of the 1998 audited financials that the $1.162 million dollar amount guaranteed by PCIC was a claim against the project owner.  Trial Transcript at p. 2036:14-19.

158.  The evidence did not establish that plaintiff had an understanding of the PCIC guaranteed claim and its effect on the 1998 audited financial statement that was other than the correct understanding.

159.  Brown Schultz was not required to take into account the user of the financial statement in determining the sufficiency of the disclosures regarding the claim guaranteed by PCIC in the footnotes to the 1998 audited financial statement for CCI. Trial Transcript at p. 2933.

160.  The anticipated user and the anticipated use of the financial statement is irrelevant to whether the statements are in accordance with GAAP or whether an audit has been conducted in accordance with GAAS. Trial Transcript at p. 2811.

161.  The presentation of a financial statement in accordance with generally accepted accounting principles (GAAP) does not depend on the user of a financial statement. Trial Transcript at p. 2811

162.  The disclosures in the 1998 CCI audited financials concerning the claim guaranteed by PCIC were sufficient to satisfy GAAP. Trial Transcript at p.

2930.

163. There was no incorrect information in the disclosures regarding the claim guaranteed by PCIC.

164. The disclosures about the claim guaranteed by PCIC were sufficient not to be misleading.

### e.   Plaintiff's Accounting Expert Incorrectly and Inconsistently Applied His Look Back Method

165. The look back method was not applied by DeBruyn consistently. Trial Transcript at p. 2936, 2940-42.

166. At the end of 1999 neither the Perry Point nor the Albemarle job was completed. Trial Transcript at p. 1971, 1978.

167. As of December 31, 1999, the Albemarle Prison project was, according to DeBruyn, 81% complete. Trial Transcript at p. 1969.

168. DeBruyn's adjustment to the Albemarle Prison job were not based on actual completed contract amounts. Trial Transcript at p. 1969.

169. DeBruyn in restating the Albemarle Prison Project used estimated costs to complete from Exhibit 337 which he believes to have come from CCI. Trial Transcript at p. 1969.

170. The Albemarle Prison project could have been completed with the gross profit amount equivalent to that reflected in the 1998 financial statement. Trial Transcript at pp. 1971.

171. At December 31, 1998, the Perry Point job was approximately 40% complete.

Trial Transcript at p. 1973.

172. DeBruyn's adjustment to the Perry Point job were not based on actual completed contract amounts.  Trial Transcript at p. 1977.

173. DeBruyn, in restating the Perry Point Project, used estimated costs to complete from Exhibit 337 which he believes to have come from CCI.  Trial Transcript at p. 1977.

174. The job, if completed, may have made up whatever profit differential was assumed by DeBruyn when he made his adjustment to the Perry Point job. Trial Transcript at p. 1978.

175. Outlook Chesterfield was a cost plus project.  Exhibit 222 at p. 276.

176. A cost plus job is one in which the contractor is guaranteed to make a certain profit over and above the cost. Trial Transcript at p. 1989.

177. It was not appropriate to make an adjustment on the 1998 financial statement with regard to Outlook Chesterfield.  Trial Transcript at pp. 1989-1990, 1993.

178. The restated 1998 financial statements prepared by plaintiff's expert understate income for Outlook Chesterfield by $68,913.00. Trial Transcript at p. 1993-94.

179. Outlook Westerville was also a cost plus project where CCI was guaranteed a profit of 6%.  Trial Transcript at p. 1995-96; Exhibit 222 at p. 278.

180. It was not appropriate to make an adjustment on the 1998 financial statement with regard to Outlook Westerville. Trial Transcript at pp. 1996-97.

181.   The restated 1998 financial statements prepared by plaintiff's expert understated income by the amount of the inappropriate adjustment to the Outlook Westerville project by approximately $20,000. Trial Transcript at pp. 1993-97.

182.   The restated 1998 financial statements prepared by plaintiff's expert understated the gross profit for the UEPH project in the amount of $256,217. Trial Transcript at pp. 2007-2008, 2953-62; Exhibit 818.

183.   The restated 1998 financial statements prepared by plaintiff's expert overstated the loss attributable to the Houtzdale Prison job by $353,113 and understated gross revenue in that amount. Trial Transcript at pp. 2038-39, 2043-2045, 2965-66.

184.   The restated 1998 financial statements prepared by plaintiff's expert understated the profit on the Outlook Point job by $46,000 and the UEPH headquarters job by $66,000.  Trial Transcript at pp. 2051-2053; 2054.

185.   Mr. DeBruyn's error in connection with the Mahanoy project without regard to the PCIC guaranteed claim was approximately $450,000. Trial Transcript at p. 2951-52.  If the amount of the PCIC guaranteed claim is included the errors total $1,611,000.  Trial Transcript at p. 2942.

186.   It was not appropriate to use the loss recognition rule when applying the look back method to the Mahanoy Prison job. Trial Transcript at p. 2948.

187.   As of 12-31-99, the Mahanoy Prison job, using DeBruyn's hindsight

information, ended up with a profit of $1,245,661. Trial Transcript at p. 2949.

188.  If done properly, under the look back method, the profit should have been allocated between 1997 and 1998 based on percentages of completion. Trial Transcript at p. 2950.

189.  DeBruyn, in his restatement of the Mahanoy Prison job did not account for the fact that there was a gross profit on that job. Trial Transcript at p. 2951.

190.  The amount of the $1,162,460 PCIC guaranteed claim should have been recorded as revenue if the method used by DeBruyn was properly applied since the "look back" method is based on actual amounts and the full amount of the PCIC guaranteed claim was received.  Trial Transcript at pp. 2940-41.

191.  DeBruyn's errors in the application of the look back method totaled $2,372,843.  Trial transcript at pp. 2936; 2939-40; Exhibit 816.

192.  The restated financial statement for 1998 contained material errors and misstatements. Trial Transcript at pp. 2056-57, 2936, 2940-42.

193.  Mr. DeBruyn's proposed adjustments to CCI's financial statements are faulty and not proper because of the significant use of hindsight information and data that was not available to the auditors at the time of the audited statements which methodology does not apply and does not comply with GAAP, and, in the process of applying the improper method DeBruyn, made significant errors. Trial Transcript at p. 2804:12-24.

194.  The proposed restated financial statement developed by Mr. DeBruyn for the

28

1998 financial statement was incorrect, materially understated revenue, unreliable, and can properly be disregarded.  Trial Transcript at pp. 1988, 2056-57.

195.    There is no evidence that the CCI audited financial statements for 1997 and 1998 are not in accordance with GAAP.  Trial Transcript at p. 2804:1-5.

196.    The evidence did not establish that the 1997 and 1988 audited financial statements included false statements.

197.    The audit reports of Brown Schultz for 1997 and 1998 did not contain a false statement.

198.    The evidence did not establish that the audit reports of Brown Schultz for 1997 and 1998 contained a false statement.

## C.    The Alleged Misrepresentations Were Not Material

199.    The surety industry was highly competitive during the 1990's when plaintiff maintained the bonding program for CCI. Trial Transcript at pp. 320, 451.

200.    Plaintiff's bond underwriting was relaxed during the period of the CCI bond program.  Trial Transcript at pp. 452, 1588-1591.

201.    Plaintiff used relaxed underwriting standards in its underwriting of bonds for CCI to fend off competition.  Trial Transcript at p. 1591.

202.    Relaxed underwriting included relief from the requirement of personal indemnity and the required financial ratios.  Trial Transcript at pp. 451-52.

203.    The relaxed underwriting standards led to increased risk for plaintiff. Trial

Transcript at p. 1590:23-1591:1.

204. Bonds were approved by plaintiff for CCI during 1998 and 1999 based on interim financial information. Trial Transcript at pp. 576, 578-79, 580-86, 665, 667.

205. The bond program provided by plaintiff for CCI was approved by David Hussey. Trial Transcript at p. 442.

206. James Daily was the home office underwriter involved with the CCI bond account, but Daily did not have the authority to approve the bond program. Trial Transcript at p. 516.

207. Hussey had the authority to approve bonds without regard for the recommendation of Daily. Trial Transcript at p. 516.

208. Daily never acted to withhold or withdraw bond authorization for CCI even when he believed bond approval should properly be withdrawn. Trial Transcript at p. 524.

209. The authority to decide whether to suspend bonding for CCI rested with David Hussey. Trial Transcript at p. 726.

210. Daily was not involved in the decision about whether to suspend bonding to CCI, and did not take any action which led to the suspension of bonding for CCI. Trial Transcript at pp. 725-726, 741-44.

211. David Hussey approved bonds for CCI projects in spite of the absence of a recommendation for approval by Daily, and in spite of a recommendation

against approval by Daily.  Trial Transcript at pp. 651, 653.

212. The bond program for CCI was renewed each year by David Hussey.  Trial

Transcript at p.  516.

213. No testimony by Hussey was introduced during the trial.

214. The evidence did not establish that the alleged misrepresentations were

material to Hussey's decisions to approve the bonding program or any specific

bond.

215. The evidence did not establish Hussey would have decided to suspend and

terminate bonding if the audited financial statements for 1997 and 1998 had

been free of the alleged misrepresentations.

216. Tony Phillips was the Harrisburg branch office manager during the period

when plaintiff issued bonds for CCI. Trial Transcript at p. 180.

217. Steve Salazar was the Harrisburg branch office underwriter responsible for

performing the underwriting work and any financial analysis for the CCI bond

account, and to input financial information into the Electronic Credit Folder

(ECF).  Trial Transcript at pp. 2426, 2428, 2491.

218. All underwriting work on the CCI bond account performed in the Harrisburg

branch office was performed by the branch office staff and not by Phillips.

Trial Transcript at pp. 2504-2505.

219. Salazar had authority to approve bonds for CCI within the Specific

Discretionary Authority (SDA).  Trial Transcript at p. 2491.

220. Salazar testified only during rebuttal about his contact with William Eskin. *See* Trial Transcript at pp. 3170-73.

221. The evidence did not establish the alleged misrepresentations in the audited 1997 and 1998 financial statements were material to underwriting action by Salazar in connection with bonds issued for CCI.

222. Agent specific contract authority (ASCA) was extended by plaintiff to the bond agent, Byerly Insurance Agency and then DJL Associates. Trial Transcript at p. 443.

223. The ASCA allowed the bond agent to issue bonds within the authority. Trial Transcript at pp. 443, 819; Exhibit 790 USFG/BS 0747.

224. No one with ASCA testified during the trial.

225. The evidence did not establish that the alleged misrepresentations were material to any decisions by anyone with ASCA authority who approved bonds for CCI.

226. Plaintiff did not base approval of bond credit for CCI on satisfaction of any minimum ratios or other requirements concerning financial condition. Trial Transcript at pp. 459, 460, 676, 2433.

227. Plaintiff preferred a debt to equity ratio less than 3, but there was no limit on the debt to equity ratio which would cause plaintiff to cease bonding. Trial Transcript at p. 287, 676.

228. Plaintiff considered 3% working capital to total work program and 5% net

worth to total work program ("3%/5%") as an underwriting guideline, but it did not serve as a rule or requirement for underwriting the CCI account. Trial Transcript at p. 2434, 2503.

229. There was no written corroboration for plaintiff's 3%/5% preference. Trial Transcript at p. 459.

230. The Harrisburg branch office issued bond credit to contractors with less than 3%/5%. Trial Transcript at p. 2434.

231. Plaintiff approved bonds for customers with negative working capital. Trial Transcript at p. 462.

232. Plaintiff knowingly deviated from the 3%/5% guideline during the CCI bond program. Trial Transcript at pp. 2503, 2504.

233. Plaintiff did not consider suspending bonding when CCI did not meet the 3%/5% guideline.

234. Serious deterioration of the financial condition of CCI would not prompt concern by the underwriter to take action unless working capital disappeared or became a negative amount, net worth dropped below zero, cash disappeared, or the debt to equity ratio became 100 to one or doubled. Trial Transcript at pp. 546, 752, 825-28.

235. Plaintiff cannot identify the point at which a deterioration of working capital or net worth, or an adverse change to financial ratios would have been material to underwriting. Trial Transcript at pp. 547, 825-828.

236. Plaintiff did not establish the nature of the changes to the financial statements which would have changed its underwriting decisions. Trial Transcript at pp. 752-54.

237. Plaintiff did not establish the nature of changes to the financial statements which would have prompted plaintiff to withhold bonding or would have prompted its underwriters to recommend withholding bond approval for CCI. Trial Transcript at p. 754.

238. Plaintiff could not identify the changes to the financial statement which would have changed its underwriting decisions, or express how it would determine whether a change to the financial statement was significant enough to affect underwriting decisions. Trial Transcript at pp. 2573-74, 2576.

239. The evidence did not establish that plaintiff would have stopped bonding CCI if the 1997 financial statement had reflected $100,000 net income loss, $3,183,138 working capital, and $4,638,834 net worth, the amounts indicated by the restated financial statement for 1997 developed by DeBruyn. Trial Transcript at pp. 632-33, 2577.

240. The evidence did not establish that plaintiff would have ceased bonding for CCI even if the 1997 audited financial statement had reflected the amounts as adjusted and restated by DeBruyn. Trial Transcript at p. 436-37, 798-99, 2475.

241. The difference between the amount of contract revenue reflected on the 1997 audited financial statements and the 1997 restated amounts was not material

to underwriting.

242. If the amount of the PCIC guaranteed claim is removed from Mr. DeBruyn's adjustment to the 1998 audited financial statement, then the amount of DeBruyn's erroneous adjustment is approximately $1,962,460 ($1,162,460 + 800,000 = $1,962,460)("minimum amount of corrected adjustment"). Trial Transcript at p. 2055, 2940-41.

243. There were errors made in the application of the look back method which totaled $2,372,843. Trial Transcript at pp. 2936; 2939-40; Exhibit 816.

244. The actual amount of DeBruyn's overstatement of income adjustments (assuming the propriety of the use of the "look back" method and the validity of the data on exhibit 337) is $2,372,843 ("proper amount of corrected adjustment"). Trial Transcript at p. 2940; Exhibit 816.

245. The amount of DeBruyn's proposed adjustment to net income reflected on the 1998 audited financial statement was $3,126,508. Exhibit 365a.

246. DeBruyn's proposed adjustment to income (assuming the propriety of the use of the "look back" method and the validity of the data on exhibit 337) was overstated by $1,962,460. Trial Transcript at p. 2055.

247. If the minimum amount of corrected adjustment is used, then net income for the 1998 audited financial statement as corrected and restated is at least $(1,105,007) (($3,067,467) + 1,962,460 = ($1,105,007)). Trial Transcript at pp. 1800, 2055; Exhibit 365a.

248. If the proper amount of corrected adjustment is used, then the net income as corrected and restated for the 1998 audited financial statement should be at least $(694,624) (($3,067,467) + 2,372,843 = ($694,624)).  Trial Transcript at pp. 1800, 2940; Exhibits 816 and 365a.

249. DeBruyn's proposed adjustment to working capital (current assets - current liabilities) and net worth (shareholder equity) should properly be corrected by reducing the proposed adjustments by the same amount as the correction to the adjustment for net income.  Exhibit 365a.

250. If the minimum amount of corrected adjustment is used, then working capital as corrected and restated for 1998 is $577,359 (($1,385,101) + 1,962,460 = $577,359).  Trial Transcript at pp. 1800, 2055; Exhibit 365a.

251. If the proper amount of corrected adjustment is used, then working capital as corrected and restated for 1998 is $987,742 (($1,385,101) + 2,372,843 = $987,742).  Trial Transcript at pp. 1800, 2940; Exhibits 816 and 365a.

252. If the minimum amount of corrected adjustment is used, then net worth as corrected and restated for 1998 is $3,263,675 (1,301,215 + 1,962,460 = 3,263,675).  Trial Transcript at pp. 1800, 2055; Exhibit 365a.

253. If the proper corrected adjustment is used, then net worth as corrected and restated for 1998 is $3,674,058 (1,301,215 + 2,372,843 = $3,674,058).  1800, 2940; Exhibits 816 and 365a.

254. Even assuming the propriety of the method used by DeBruyn to restate the

financial statements, the corrected restated amount of working capital and net worth had not diminished to an extent that would have prompted action by plaintiff to suspend or terminate bonding.

255.    The evidence did not establish that plaintiff would have suspended or terminated bonding for CCI even if the 1998 audited financial statement had reflected the minimum corrected restated or the corrected proper restated amounts.

256.    There was no evidence to establish that the difference between the corrected, restated 1998 audited financial statement was material to underwriting.

257.    Plaintiff had expected CCI to have a loss of $500,000 for 1994.  Trial Transcript at p. 262.

258.    Plaintiff did not suspend or terminate bonding, or take any action at all in spite of its expectation and awareness that CCI would lose $500,000 for the year ending 1994. Trial Transcript at p. 273.

259.    CCI reported to plaintiff that it had experienced a loss in the amount of $500,000 half-way through 1994. Trial Transcript at p. 525.

260.    CCI experienced a loss from operations during 1995 in the amount of $308,362. Exhibit 32 at p. 3.

261.    Plaintiff did not evaluate or analyze whether the losses CCI experienced would worsen and accepted the representation by the bond agent about the representation by CCI that the financial condition should improve based on

projections even where revenue projections were known to be below original estimates. Trial Transcript at pp. 525-28, 553.

262.   CCI had net operating loss during 1994 in the amount of $864,000 and net loss in the amount of $317,000. Trial Transcript at pp. 262, 493.

263.   Plaintiff did not suspend or terminate bonding in spite of its awareness that CCI sustained a loss for 1994 with only continued monitoring of the interim, internally provided work in process schedules. Trial Transcript at p. 275.

264.   The 1994 audited financial statement reflected CCI's working capital diminished to $2,384,192. Trial Transcript at p. 542-544.

265.   The swing in operating profit from the year end 1993 to the year end 1994 was in excess of $1.2 million. Trial Transcript at p. 494.

266.   Plaintiff was aware that CCI had sustained an interim loss during 1995 in the amount of $95,000. Trial Transcript at pp. 282, 553.

267.   Plaintiff did not suspend or terminate bonding in spite of its expectation and awareness that CCI had an interim loss during 1995. Trial Transcript at p. 553-54.

268.   CCI had an issue with slow payables on trade debt which continued during the bond program. Trial Transcript at p. 487-88.

269.   Slow pay of trade debt is a sign of problems for the contractor. Trial Transcript at p. 487.

270.   CCI had an issue about profit fades at the beginning of the bonding

relationship with plaintiff, and CCI continued to experience profit fade during the balance of the bonding relationship with plaintiff. Trial Transcript at pp. 489-90.

271. The continuing profit fades experienced by CCI concerned plaintiff. Trial Transcript at pp. 490, 537.

272. Plaintiff was aware that CCI experienced thin gross margins on many projects. Trial Transcript at p. 531.

273. Increased underbillings is an early warning sign of impending contractor failure at least in part because the amount of underbillings is included in working capital even though the contractor does not actually have the money available for use. Trial Transcript at pp. 457, 492, 592.

274. Plaintiff had no information about the reason for the substantial increase in underbillings from 1996 to 1997. Trial Transcript at p. 591.

275. The annual review report dated April 15, 1998 prepared by Salazar concerning the December 31, 1997 audited financials did not reflect any information about the status of underbillings in spite of a substantial increase which was significant to underwriting. Trial Transcript at p. 610; Exhibit 229.

276. Plaintiff's underwriters did not react to or address CCI's projected losses, losses, profit fades, thin gross margins, or increased underbillings until September 1999. Trial Transcript at pp. 356, 361, 385, 527, 532, 535-36, 538, 540, 766, 813.

277. Self-performing work presents an increased business risk to a contractor. Trial Transcript at pp. 587-88.

278. A change in the type of work performed by a contractor inexperienced with new types of work and significant increase in size of individual projects are all events which may lead to contractor failure. Trial Transcript at pp. 588-89.

279. Daily did not believe CCI should self-perform work it had previously subcontracted. Trial Transcript at p. 588.

280. Daily was concerned that CCI entered into road building without any prior experience. Trial Transcript at p. 588.

281. Daily's approval of bonds was done without analysis and shortly within the time of the submission which included limited information based on interim financial reports. Trial Transcript at pp. 576-86.

282. A change in the type of work performed by a contractor inexperienced with new types of work and significant increase in size of individual projects are all events which may lead to contractor failure. Trial Transcript at pp. 588-89.

283. Ortenzio terminated his personal indemnity during September 1997. Trial Transcript at p. 320.

284. The loss of Ortenzio's personal indemnity increased plaintiff's risk of loss. Trial Transcript at p. 817.

285. Plaintiff had a choice whether to reduce or terminate bond credit without the personal indemnity. Trial Transcript at p. 321.

40

286. Plaintiff decided to continue to extend bond credit to CCI without Ortenzio's personal indemnity. Trial Transcript at p. 327.

287. In spite of the agreement of Ortenzio to maintain net worth of at least $4.8 million and to keep the total work program within $60 million, there was no modification to the requirements or limitations imposed by plaintiff on the CCI bond account. Trial Transcript at pp. 339-40; Exhibits 205, 206.

288. CCI exceeded the $60 million total program limit regularly after Ortenzio terminated his indemnity agreement during September 1997. Trial Transcript at p. 372; Exhibit 790 at pp. USFG/BS 0633, USFG/BS 0621,USFG/BS 0627, USFG/BS 0631, USFG/BS 0933, USFG/BS 0763-765, USFG/BS 0760-762, USFG/BS 1158, USFG/BS 0771-772, USFG/BS 0766-767, USFG/BS 0769-770.

289. Plaintiff learned during August 1998 that CCI had experienced a $1.6 million loss halfway through the year.  Trial Transcript at pp. 2446, 2532; Exhibit 238 (including 6/1/98 internally prepared financial statement).

290. Plaintiff did not take any underwriting action in response to the $1.6 million loss. Trial Transcript at pp. 638-40, 766.

291. Plaintiff did not interrupt bonding and continued to issue bonds on the same basis after it learned about the $1.6 million loss as it did before learning about the $1.6 million loss. Trial Transcript at pp. 627, 766, 2533.

292. Plaintiff did not consider requiring Ortenzio to restore his personal indemnity in spite of the $1.6 million dollar loss during 1998. Trial Transcript at p. 2533.

41

293.   Plaintiff did not interrupt or discontinue bonding during any of the several
occasions prior to 1998 when the financial condition of CCI deteriorated to an
extent substantially greater than the change in financial condition reflected by
plaintiff's restated financial statements for the year ending 1997.  Trial
Transcript at pp. 2588-92.

294.   Analysis of the 1998 audited financial statement revealed a debt to equity ratio
of 3.7.  Trial Transcript at p. 675.

295.   Plaintiff took no underwriting action in response to the increase in debt to
equity ratio in excess of 3 as reflected by the information on the 1998 audited
financial statement. Trial Transcript at pp. 671-676.

296.   Plaintiff favorably regarded CCI's arrangement with PCIC because it allowed
money to flow back from PCIC during 1998 to cover losses.  Trial Transcript at
pp. 359, 1560:4-12.

297.   Plaintiff was informed and was aware CCI may utilize money from PCIC to
enhance its profitability. Exhibits 238, 240.

298.   The flow of money between PCIC and CCI was not an issue of underwriting
concern to plaintiff.  Trial Transcript at pp. 296-97.

299.   Plaintiff never inquired about or determined the effect of amounts claimed or
received from PCIC on the financial statement of CCI.  Trial Transcript at pp.
297-98.

300.   Plaintiff's underwriters never made inquiry about the effect of the claims by

CCI to PCIC on the financial statements of CCI. Trial Transcript at pp. 497-98, 500, 563, 565-65.

301. It was not material to plaintiff's underwriting to know the effect of CCI claims to PCIC on the financial statement of CCI. Trial Transcript at pp. 497, 500, 1561:20-25.

302. Plaintiff was more concerned about CCI's net profit than with any profit from operations. Trial Transcript at p. 562.

303. It would have been appropriate for the underwriter to inquire about the treatment of the $1.162 million guaranteed claim included in the 1998 audited financial statement if it was of concern to the underwriter and the underwriter was uncertain. Trial Transcript at p. 1567:21-1568:1.

304. Phillips realized that the source of some of the substantial underbillings reflected on the 1998 year financial information was the Mahanoy Prison project, but did not make any inquiry or perform any investigation to determine whether the underbillings included the PCIC guaranteed claim disclosed in footnote 8 of the 1998 financial statement related to the Mahanoy Prison project. Trial Transcript at pp. 2594-95.

305. It was not important for plaintiff to know for underwriting purposes whether money was received from PCIC since CCI had funded the warranty insurance and was entitled to the money. Trial Transcript at p. 2525.

306. Any concern had about the inclusion of the $1,162,000 claim guaranteed by

PCIC in revenue would be resolved by CCI's receipt of that amount. Trial Transcript at p. 1545:1-13.

307. There would have been no change to the working capital and net worth of CCI if the $1,162,460 claim guaranteed by PCIC was not included in underbillings and, instead, was reflected as a receivable. Trial Transcript at p. 1193.

308. Plaintiff did not establish that plaintiff would have permanently ceased bonding for CCI even if Phillips had been aware that the $1,162,460 million dollar PCIC guaranteed claim had been included in underbillings on the 1998 audited financial statement. Trial Transcript at pp. 415-16, 2480.

   **D.    The Evidence Does Not Establish that Defendants Knew or Should Have Known that Any Information in the 1997 and 1998 CCI Audited Financial Statements Was False**

309. Brown Schultz was CCI's auditor since 1990. Trial Transcript at p. 1188.

310. Deborah Bowman was an auditor employed by Brown Schultz Sheridan & Fritz from 1991 until September 1999. Trial Transcript at p. 1298.

311. Ms. Bowman was well qualified to perform audit work on the 1997 and 1998 audits of CCI Construction. Trial Transcript at p. 931:7-932:2, 1298.

312. Generally accepted auditing standards (GAAS) provide the professional guidance that the auditor must adhere to in doing his work. Trial Transcript at p. 2812:1-8.

313. The only procedure the auditing standards require is to confirm accounts receivable. Otherwise, the procedures the auditor uses to comply with GAAS

is a matter of judgment for the auditor.  Trial Transcript at p. 2813:22-2814:5.

314.  An auditor properly considers the auditor's familiarity with the account, whether the client has well documented procedures and competent people and management has integrity, when planning the audit. Trial Transcript at p. 2815:11-15.

315.  Defendants were aware that CCI had a comprehensive written policy and procedures manual.  Trial Transcript at p. 1166, 1169, 1411-12; Exhibit 356.

316.  Brown Schultz's historical experience was that CCI adhered to the policies and procedures set forth in the CCI policies and procedures manual. Trial Transcript at p. 1167; 1188; 1412-14.

317.  Defendants were aware that CCI had effective systems and controls for financial reporting. Trial Transcript at p. 1188-89.

318.  The more effective the internal control, the more assurance it provides about the reliability of accounting data and financial statements.  Trial Transcript at p. 978:25-979:6.

319.  Based on historical experience with CCI and Brown Schultz's knowledge of CCI's systems and procedures, Brown Schultz believed that CCI's management was capable of and competent to accurately report financial information concerning the financial affairs of CCI. Trial Transcript at pp. 1186-87.

320.  The information provided by CCI management to Brown Schultz through the completion of the 1998 fiscal year end audit was always reasonably accurate.

45

Trial transcript at p. 1187.

321.    Defendants understood the process by which CCI prepared its estimated costs to complete and reviewed the client's supporting documentation in connection with its audits of CCI including the job files, as part of its determination that CCI was capable of reliably estimating costs to complete.  Trial Transcript at pp. 952-54; 956; 1153-1154.

322.    In 1993 the gross revenues of CCI were $48 million.  Trial Transcript at p. 935.

323.    Revenues in 1996 and 1997 dropped to $24 million and $35 million respectively.  Trial Transcript at p. 936.

324.    In 1998, CCI had revenues of $52.5 million. Trial Transcript at p. 936.

325.    The audit plan for CCI did not materially change from 1993 through 1998 because it was devised at a time when the company had gross revenues similar to the revenue in 1998. Trial Transcript at pp. 934, 937.

326.    There was no evidence that there were significant changes that required revisions to the CCI audit plan. Trial Transcript at pp. 3037; 3040:6-11.

327.    When auditing financial statements the auditor is concerned with the direction of the risk, that is, whether there is a potential for either the overstatement or understatement of income. Trial Transcript at p. 1136.

328.    Defendants were not familiar with the underwriting practices of plaintiff when the audit reports were issued. Trial Transcript at p. 1185.

329.    The auditor considers who the users of the financial statement might be when

determining the direction of the risk, but the user does not determine the contents of the financial statements. Trial Transcript at p. 1136.

330. Brown Schultz properly assessed the audit risk associated with the 1997 and 1998 audits of CCI. Trial Transcript at p. 2914.

331. Brown Schultz properly relied on its historical experience with CCI when developing and performing the audits. Trial Transcript at p. 1905:11-15.; 2815:11-15.

332. The specific procedures to be used in an audit are subject to the judgment of the auditor. Trial Transcript at p. 1891:14-17.

333. Profit fade does not mean that a company's estimating was bad or that auditors did not do an audit in accordance with GAAS. Trial Transcript at pp. 2841-42.

334. Changes in estimates over the course of time are not considered accounting errors. Trial Transcript at p. 2824.

335. Brown Schultz properly planned for the 1997 and 1998 audits of CCI. Trial Transcript at p. 2914.

336. No evidence was presented that the system and procedures in place at CCI were not appropriate or adequate for developing reliable estimated costs to complete. Trial Transcript at p. 1936:15-19; 1916:12-15.

337. Brown Schultz was justified in relying on its experience with CCI's procedures and ability to estimate the costs of completion when performing its audit. Trial

Transcript at p. 1906.

338.    An auditor performing an audit of a construction company is expressing an opinion on the financial statements as a whole and not on specific numbers on the balance sheet or on individual contracts.  Trial Transcript at p. 2814:6-14.

339.    An auditor is not required to audit all of the contracts of a construction company.  Nor is an auditor required to perform the same degree of work on all contracts.  Trial Transcript at p. 2815: 2-15.

340.    An audit is done on a test basis. Trial Transcript at p. 2816

341.    An audit does not guarantee that the financial statements are absolutely correct. Trial Transcript at p. 2816.

342.    Section 5 of the audit program describes the procedures used by Brown Schultz to audit the contracts in progress for CCI for the year ending December 31, 1997. Trial Transcript at p. 1200; Exhibit 213 at p. 194-197.

343.    The procedures described in section 5 of the audit program were performed by the Brown Schultz auditors for contracts in progress in connection with the 1997 year end audit. Trial Transcript at p. 1201.

344.    Section 5, subsection C through K of the audit program describes with the procedures used to audit the estimated costs to complete for the contracts in progress. Trial Transcript at p. 1201-02; Exhibit 213 at p. 196-197.

345.    The procedures described in Section 5, subsections C through K, of the audit program were performed by the Brown Schultz auditors in connection with the

48

1997 audit.  Trial transcript at p. 1202.

346.  Brown Schultz performed similar audit procedures in the 1998 audit of the contracts in progress as it performed in the 1997 audit for contract in progress. Trial Transcript at pp. 1203, 1421.

347.  Those procedures are reflected in Section 5 of the audit program for the 1998 audit. Trial transcript at p.  1203; Exhibit 222 at p. 214.

348.  Those procedures were performed by Brown Schultz auditors for contracts in progress in connection with the 1998 year end audit of CCI. Trial Transcript at pp. 1203-04.

349.  Ms. Bowman accessed the project files maintained by CCI  for the 1997 and 1998 audits.  Trial Transcript at p. 2132:6-9.

350.  CCI provided Brown Schultz auditors with job cost reports and other job costs information during their audits of the 1997 and 1998 year end financial statements.  Trial Transcript at p. 2133.

351.  CCI provided Brown Schultz auditors with estimated costs to complete reports and other estimated cost to complete information during their audits of the 1997 and 1998 year end financial statements.  Trial Transcript at p. 2133.

352.  Bowman reviewed the job cost reports and the estimated costs to complete reports of CCI in connection with its 1997 and 1998 audits. Trial Transcript at p. 1374-1375; 1414-17.

353.  Bowman reviewed information from CCI's job files during the course of their

audits.  Trial Transcript at pp. 945:20-946:4, 946:9-12, 946:16-18, 1416-17.

354.   Brown Schultz used tick marks to reference that the job costs and estimated costs to complete reports were reviewed by the auditors.  Trial Transcript at p. 1428-30.

355.   The content of an auditor's work papers is up to the judgment of the auditor. Trial Transcript at p. 1893:12-15.

356.   The basic requirement for work paper content and authoritative pronouncements are so broad that an auditor has a great deal of discretion in deciding on the specific work papers to prepare. Trial Transcript. at pp. 1145-1146.

357.   An auditor's work papers do not need to be prepared with constant attention to their defensive use.  Trial Transcript at p. 915:4-5.

358.   Brown Schultz's work papers reflected and documented the procedures performed and conclusions reached by Brown Schultz in connection with the CCI audits. Trial Transcript at pp. 1144-1145.

359.   Brown Schultz's work papers show that appropriate work was done and procedures performed in connection with the audits. Trial Transcript at pp. 2856-2912; Exhibits 809-812.

360.   The CCI job cost report was not included in the Brown Schultz work papers due to its size. Trial Transcript at pp. 1428-29.

361.   Bowman met with the project managers for the specific jobs during the 1997

and 1998 audits.  Trial Transcript at p. 2134.

362.  Bowman also met with Mr. Sechrist concerning specific jobs and discussed estimated costs to complete contracts.  Trial Transcript at pp.  987-88, 988-91, 1006-08, 1417-19, 2134.

363.  Ms. Bowman asked CCI for and was provided source documentation concerning costs and cost estimates in addition to the reports generated by CCI.  Trial Transcript at pp. 1416-17, 2136-2137.

364.  Ms. Bowman checked the source documentation against the job costs history. Trial Transcript at p. 2137:13-19.

365.  Ms. Bowman obtained explanations about the reason for variances between the original contract amount or the earlier estimated costs to complete and the most recent estimated costs to complete in connection with the audits performed for the year end 1997 and year end 1988.  Trial Transcript at pp. 2138:12-19, 1417-19.

366.  Bowman posed her questions to the project manager or Stan Sechrist. Trial Transcript at p. 2138:20-24.

367.  Stan Sechrist was the vice president of operations for CCI from approximately 1996 to 1999.  Mr. Sechrist oversaw all the projects maintained by CCI and was extremely knowledgeable about those projects. Trial Transcript at p. 2111.

368.  The project managers either reported directly to Stan Sechrist or reported to the person in charge of their division who, in turn reported to Sechrist. Trial

Transcript at p. 2112.

369. Stan Sechrist was the appropriate person for the auditors to consult or to address questions concerning specific projects or contracts. Trial Transcript at pp. 1950:22-1951:1.

370. It is a matter of judgment by the auditor whether to send subcontractor confirmations. Trial Transcript at p. 1891:10-13.

371. Owner confirmations verify the status of a job including the percentage of the job that is entitled to be billed. Trial Transcript at p. 983-983. The basis for the billings on a job is the owner's approval through his engineer or architect of the status of the job. Trial Transcript at p. 983-984. Brown Schultz sent owner confirmations as part of its audit. Trial Transcript at p. 982.

372. Job site visits are not required by generally accepted audited standards. Trial Transcript at pp. 980:5-7, 1961:21-23.

373. Job site visits are useful where there is a decentralized accounting system, the records are kept at the field offices as opposed to the home office and there is infrequent evaluation of costs and the estimated costs to complete and there are not significant controls over the information that is kept at the field office and no history of having field office communication with the home office. Trial Transcript at pp. 980:21-981:7.

374. CCI had a centralized accounting system. Information for the company was maintained and reviewed at the home office. Invoices were approved and paid

from the home office.  CCI had distinct policies and procedures for capturing

the information.  Trial Transcript at p. 1165.

375.   The accounting department of CCI was very organized and financial

statements were prepared and estimated costs to complete were evaluated on a

monthly basis.  Trial Transcript at pp. 1168; 2107, 1350, 1372.

376.   Financial information relating to the jobs and the project files were maintained

at CCI's home office and not at the job site.  Trial Transcript at p. 1417,

1952:3-7.

377.   The evidence did not establish that visits to CCI construction job sites, or

subcontractor confirmations would have revealed any information which

would have changed the information in the audited financial statements.  Trial

Transcript at pp. 752, 1891, 1951-52.

378.   There was no reason for Brown Schultz to visit job sites in connection with its

audits of CCI. Trial Transcript at pp. 980:21-981:7; 1165; 1168; 2107.

379.   Auditors should follow the presumption that contractors generally have the

ability to produce estimates that are sufficiently dependable to justify the use

of the percentage of completion method of accounting.  Persuasive evidence to

the contrary is necessary to overcome that presumption.  Trial Transcript at

pp. 1903:18-1904:5.

380.   In order to challenge the estimated costs to complete developed by

management, the auditor would have to develop persuasive evidence that the

company was not able to adequately estimate the cost of completion. Trial Transcript at pp. 1904:14-19.

381. The previous reliability of a contractor's estimating process is usually an indication of continuing reliability particularly if the present circumstances are similar to those that prevailed in the past. Trial Transcript at pp. 1904:21-1905:1.

382. The existence of profit fades does not mean the estimating capability of the contractor is inadequate. Trial Transcript at p. 1908:8-11.

383. Estimating is an integral principal part of the contractor's business activities and there is a necessity to revise estimates on contracts continually as the work progresses. Trial Transcript at p. 1908:12-18.

384. The fact that circumstances may necessitate frequent revision of estimates does not indicate that the estimates are unreliable for the purpose for which they are used although results may differ widely from original estimates. Trial Transcript at p. 1908:19-25; Exhibits 222 and 213.

385. Because of the nature of his business, the contractor may still find the estimates reasonably dependable despite these widely recognized conditions a contractors estimates should be regarded as reasonably dependable if the minimum total revenue and maximum total cost can be estimated with a sufficient degree of confidence to justify the contractor's bids on contracts. Trial Transcript at p. 1909:1-12.

386.  The peer review process was put into place by the AICPA to provide independent review of the quality of work evidenced upon a review by one CPA of selected jobs and files of another CPA.  Trial Transcript at p. 2968.

387.   Brown Schultz over the years obtained clean reviews which in effect say that Brown Schultz is complying with the standard of care in the industry as promulgated by the AICPA. Trial Transcript at p. 2968.

388.  The 1997 audit of CCI by Brown Schultz was peer reviewed. Trial Transcript at p. 1141.

389.  For that particular peer review, Brown Schultz received an unqualified opinion with no letter of comment, the best opinion that can be received with respect to a peer review. Trial Transcript at p. 1141.

390.  Brown Schultz's work papers show that appropriate work was done and procedures performed in connection with the CCI audits.  Trial Transcript at pp. 2856; Exhibit 809-812.

391.  Brown Schultz accessed and reviewed sufficient relevant data during its audits of CCI.  Trial Transcript at p. 3122.

392.  The Brown Schultz audit staff exercised due professional care in connection with their audits of CCI. Trial Transcript at p. 3122.

393.  Brown Schultz's audits of the CCI financial statements for 1997 and 1998 were performed in accordance with generally accepted auditing standards.  Trial Transcript at p. 2803:22-25.

394.  Defendants exercised appropriate care and were not aware, and should not have been aware, that the 1997 and 1998 audited financial statements did not fairly present the financial condition of CCI.

395.  Defendants reasonably believed, in the exercise of appropriate care, that the 1997 and 1998 audited financial statements fairly presented the financial condition of the CCI.

396.  An independent auditor's report is issued in connection with historical financial statements that purport to present a financial position at a stated date and results of operations and cash flows for a period ending on that date. Trial Transcript at p. 1902:2-8.

397.  An auditor's report is based on information available to the auditor as of the audit date and through the end of their field work. Trial Transcript at p. 1902:2-8; 2976:13-22.

398.  In evaluating the professional competence of auditors in connection with a particular audit, the goal is to determine whether the information and data that was available to the company at year end and to the auditors was used and was properly used to estimate the jobs.  Trial Transcript at p. 2849.

399.  No evidence was presented about the specific information which was available to the Brown Schultz auditors through the end of their field work. Trial Transcript at p. 1902:9-13.

400.  DeBruyn was required to use the same procedures which he contends should

56

have been used by Brown Schultz in performing their audit to properly

evaluate the work of Brown Schultz. Trial Transcript at p. 1944:1-5.

401.  Mr. DeBruyn did not perform an audit of CCI using the additional procedures

he contended should have been performed. Trial Transcript at p. 1915:6-12.

402.  The only way to determine if the results of the audit would have been different

if Brown Schultz had applied the procedures and additional procedures Mr.

DeBruyn contends should have been applied is to look at the detailed CCI

records including CCI's project files, job cost files, other ledgers and invoices.

Trial Transcript at pp. 1916:2-7, 1937:12-23; 2855.

403.  Mr. DeBruyn was not given access to the records which would have been

available to the auditors when the audits of the 1997 and 1998 financial

statements were performed. Trial Transcript at p. 1916:9-11.

404.  It is important to know both the date and the event which caused the increases

costs in the estimated costs to complete in order to assess if it was an increased

cost that could have been detected by Brown Schultz during its audits. Trial

Transcript at p. 1932-33, 1937:12-23.

405.  DeBruyn did not determine the date or event which led to the increase in

estimated costs to complete. Trial Transcript at pp. 1932-33.

406.  There is no evidence that if defendants had done more or additional audit

procedures that it would have led to an audit which revealed estimated costs to

complete were different or the equivalent of Mr. DeBruyn's proposed

adjustments.  Trial Transcript at pp. 1931:20-1932:2; 1913:11-22.

407.  Mr. DeBruyn did not know and did not make a determination about the
specific information that was available to the auditors when they performed
the audits for the years ended December 31, 1997 and 1998.  Trial Transcript
at pp. 1897-98.

408.  Mr. DeBruyn did not limit himself to historical information available to the
auditors as of the end of their field work when he developed his proposed
adjustments to the financial statements to arrive at the proposed restated
financial statements.  Trial Transcript at pp. 1897-98.

409.  Mr. DeBruyn's proposed adjustments were made using data which was
developed after the audits were performed by Brown Schultz.  Trial Transcript
at pp. 1916:25-1917:3.

410.  Mr. DeBruyn used data derived from Exhibit 337 to arrive at adjustments to
the 1997 and 1998 CCI financial statements. Trial Transcript at p. 1917:14-18.

411.  The information contained in Exhibit 337 was not available to Brown Schultz
auditors when they performed the audits for either 1997 or 1998. Trial
Transcript at p. 1928:5-9.

412.  For the 1997 audited CCI financial statements, Mr. DeBruyn used the
completed contracts schedule in the 1998 audit. Trial Transcript at p. 1928: 3-
4.

413.  The information included in the completed contracts schedule attached to the

1998 audited financial statements was not available to the auditors when they performed the audit of the 1997 financial statements. Trial Transcript at p. 1928:10-19.

414.  A re-audit using the information which was available to Brown Schultz and to which Brown Schultz had access when it perform its audits is the appropriate means by which to assess the propriety of the audits. Trial Transcript at p. 2856:3-18.

415.  The look back method in not an appropriate method by which to measure compliance with professional standards in connection with doing an audit. Trial transcript at p. 2936.

416.  The look back method is never an appropriate method to evaluate the performance of auditors to determine if they have complied with the standards of the profession under generally accepted auditing standards. Trial Transcript at pp. 2849, 2851.

417.  There is no support in the accounting literature for the use of Mr. DeBruyn's "look back" methodology in the context of evaluating the propriety of an audit. Trial Transcript at p. 1940:1-5; 1940:21-24.

418.  DeBruyn did not document the source of his methodology. Trial Transcript at p. 1939:3-4.

419.  DeBruyn was not aware of another instance where his method has been employed to evaluate the propriety of work done by auditors performing audits

of financial statements. Trial Transcript at pp. 1944:18-1945:5.

420. Mr. DeBruyn used this methodology to adjust CCI's financial statements for
1997 and 1998 only because the records of CCI were not made available to him.
Trial Transcript at p. 1944:7-17.

421. Mr. DeBruyn's opinion is that simply because the actual costs to complete
contracts exceeded the estimated costs to complete reflected on the 1997 and
1998 audited financial statements for CCI that Brown Schultz deviated from
the standard of care. Trial Transcript at p. 1947.

422. There was no evidence that Brown Schultz was aware of the actual completed
contract amounts when it conducted its audit of the 1998 audited financial
statement for a job which was not completed. Trial Transcript at p. 1966:5-9.

423. Brown Schultz was the auditor for PCIC during its entire existence. Trial
Transcript at p. 1019:1-8.

424. PCIC was wholly owned by John Ortenzio who was the company's sole
shareholder. Trial Transcript at p. 1023:13-18.

425. Brown Schultz was aware that PCIC had the financial capability to pay the
amount of the PCIC guaranty. Trial Transcript at p. 1111-1120.

426. Brown Schultz confirmed that a claim was submitted by CCI to the
Department of General Services for unforeseen costs incurred in connection
with the Mahanoy Prison project which claim forms the basis for the
$1,162,460 claim reflected on the 1998 audited financial statement.  Trial

Transcript at p. 1412.

427. Defendants confirmed that there existed a written guarantee signed by John Ortenzio in the full amount of the Mahanoy Prison project claim. Trial Transcript at p. 1083:8-15.

428. The PCIC guarantee included the language that PCIC intended to be legally bound thereby. *See* Plaintiff's Exhibit 265.

429. The claim guaranteed by PCIC met the criteria for revenue recognition. Trial Transcript at p. 2928-30.

430. The recognition of the amount of the claim guaranteed by PCIC was in accordance with GAAP. Trial Transcript at p. 2931.

431. Common control means that two entities are owned by the same party. Trial Transcript at p. 1025:3-5.

432. Common control is a correct disclosure of the relationship between CCI and PCIC. Trial Transcript at p. 1025:6-9.

433. After the audits of CCI were performed and the financial statement was prepared, but prior to its release, the statement was reviewed by an independent party, John Sosinski of Kronick, Kalada & Berdy. Trial Transcript at p. 1171-72.

434. Mr. Sosinski reviewed the statement for all the required disclosures. Trial Transcript at p. 1171-72.

435. The disclosures in the 1998 CCI audited financial statement concerning the

claim guaranteed by PCIC were sufficient to satisfy GAAP. Trial Transcript at p. 2930.

436. There is no evidence that the CCI financial statements for 1997 and 1998 are not in accordance with GAAP. Trial Transcript at p. 2804:12-24.

437. Defendants did not do anything wrong in connection with the audited financial statements. Trial Transcript at p. 758.

**E.    Defendants Did Not Intend to Induce Plaintiff to Act**

438. There was no evidence of privity or other relationship between Brown Schultz and plaintiff. Trial Transcript at p. 1134

439. No one affiliated with plaintiff had contact with defendants. Trial Transcript at pp. 463, 1135, 2505.

440. Plaintiff did not receive the audited financial statements from defendants. Trial Transcript at p. 901, 2438.

441. Defendants did not issue its audit reports for the 1997 and 1998 CCI financial statements in connection with any particular bond request. Trial Transcript at p. 1134, 1185.

442. Defendants did not know and could not know the particular bonds for which USF&G would use the 1997 or the 1998 audited financials statements. Trial Transcript at p. 1185, 3130:19-21.

443. Defendants did know the specific manner in which USF&G would use the audit reports. Trial Transcript at p. 1185.

444. The standards applied by defendants in connection with the CCI audits were not determined by the intended users of the financial statements. Trial Transcript at p. 1135:19-22.

445. Defendants' involvement with CCI was only as a paid professional for specific services. Trial Transcript at p. 928.

446. Brown Schultz did not perform the audits of CCI for plaintiff. Trial Transcript at p. 1134.

447. There is no evidence of an intent by defendants to induce plaintiff to rely on the CCI audited financial statements for 1997 and 1998.

**F.    Plaintiff Did Not Justifiably Rely on the Alleged Misrepresentations**

448. Plaintiff's underwriting expert, Richard Farnsworth, was not conversant with surety bond underwriting standards in existence since January 1, 1999 Trial Transcript at p. 1455:19-21.

449. Plaintiff's underwriting expert was not competent to testify about the propriety of the underwriting by plaintiff in connection with the bonds issued for CCI since January 1999.

450. Plaintiff did not have the support of expert witness evidence to establish that plaintiff reasonably and justifiably relied, on a bond by bond basis, on the audited financial reports by Brown Schultz for CCI since the opinion of plaintiff's underwriting expert witness, Richard Farnsworth, was limited to the annual renewal of the bond program. Trial Transcript at p. 1582.

451.  The two underwriters presented by plaintiff to testify (Daily and Phillips) were compensated according to their revenue production. Trial Transcript at pp. 446, 2489.

452.  Plaintiff's underwriters involved with the CCI bond account had an incentive to market and to generate revenue through bond account production during their involvement with the CCI bond account. Trial Transcript at pp. 447, 2489.

453.  Salazar and Phillips did not rely on the audited financial statements when underwriting bonds for CCI. Trial Transcript at p. 2707:8-15

454.  Salazar and Phillips relied upon the personal financial statement of John Ortenzio and the financial position of John Ortenzio's father, Rocco Ortenzio. Trial Transcript at p. 2707:16-23.

455.  Plaintiff continued to bond CCI after the termination of John Ortenzio's personal guarantee on the basis of the financial position and financial strength of John Ortenzio's father, Rocco Ortenzio. Trial Transcript at p. 2708:5-16.

456.  Mr. Hussey did not rely on the audited financial statements for CCI, but relied instead on the financial position of Rocco Ortenzio. Trial Transcript at pp. 2715:19-2716:6.

457.  Underwriting is the process of gathering and analyzing facts relevant to making a decision or relative to bonding a contractor. The underwriter gathers information from various sources and reviews that information,

evaluates the strengths and weaknesses of an account, and comes to a decision about whether to bond a particular contractor.  Trial Transcript at p. 1468:20-1469:3.

458.  The surety agent plays an important roll in the underwriting process since the agent is the liaison between the surety company underwriter and the contractor.  The surety company relies upon the agent to deal with the contractor and to gather and submit to the surety company financial information, background information and underwriting information that the surety company requests or requires.  Trial Transcript at pp. 1500-1501.

459.  Plaintiff trusted and accepted the representations of the bond agent. Trial Transcript at pp. 772-73.

460.  Plaintiff trusted and had confidence in CCI management, and representations made by CCI management.  Trial Transcript at pp. 363-64, 529.

461.  Plaintiff relied on the decision of a bank which provided CCI with a line of credit at below prime rate to support the propriety of its decision to extend bond credit to CCI.  Trial Transcript at pp. 779, 797.

462.  Plaintiff had confidence in the capabilities of Sheri Phillips, and her ability to perform construction accounting.  Trial Transcript at p. 577.

463.  Plaintiff believed that CCI conservatively stated anticipated profits for contracts in progress.  Trial Transcript at p. 530.

464.  Plaintiff believed that the financial information internally prepared by CCI

was accurate and plaintiff relied on the accuracy of the internally prepared financial information.  Trial Transcript at pp. 474-76.

465.   Plaintiff required quarterly internally prepared, interim financial statements from CCI.  Trial Transcript at p. 315-16.

466.   Interim financial information was important to assess whether the financial condition of the bond client materially changed since the end of the period reflected in the audited financial statement.  Trial Transcript at pp. 577, 1479.

467.   Plaintiff depended on the accuracy of the interim financial information produced by CCI in its underwriting bonds for CCI. Trial Transcript at pp. 316-17, 373.

468.   Plaintiff employed engineers and accountants who were accessible to the underwriting department.  Trial Transcript at p. 517.

469.   Plaintiff independently verified the percentage of completion and the existence of problems by obtaining written confirmations directly from the project owners.  Exhibit 790B at p. USFG/BS 1288; Trial Transcript at pp. 2566-69.

470.   Plaintiff could only have reasonably relied on audited financial statements of CCI if plaintiff's underwriters capably analyzed the financial statements. Trial Transcript at p. 1663:3-9.

471.   Analyzing financial statements is a material and significant part of the underwriting decision. Trial Transcript at p. 1692.

472.   Plaintiff had contract underwriting manuals in use during the bond program

by plaintiff for CCI.  Trial Transcript at p. 177, 179-80; Exhibits 40, 41.

473.   The evidence did not establish that Phillips, Daily, or Hussey reviewed and

analyzed the financial statements or financial information concerning CCI in

connection with underwriting bonds for CCI.  Trial Transcript at pp. 2428,

2506-2507 2513.

474.   Plaintiff's home office expected the Harrisburg branch office to have contact

with defendants in connection with the CCI account and to report to home

office about information obtained from defendants.  Trial Transcript at pp.

464-65.

475.   Salazar did not analyze or sufficiently analyze financial information in

connection with CCI.  Trial Transcript at p. 489.

476.   Steve Salazar made mistakes. Trial Transcript at p.  621.

477.   Salazar did not timely provide home office with information critical to

underwriting.  Trial Transcript at p. 626-627.

478.   Salazar did not completely analyze or evaluate underwriting materials in

connection with the CCI bond account. Trial Transcript at p. 2486.

479.   Phillips was not a competent surety bond underwriter, did not reliably and

accurately communicate underwriting information, merely forwarded paper

without adequate analysis, and did not capably and adequately analyze

financial information in connection with underwriting. Trial Transcript at pp.

2484, 2485, 2487.

480. The lack of attention to analysis by the branch office for the CCI account concerned plaintiff since financial difficulty experienced by CCI could go undetected until a problem developed. Trial Transcript at pp. 491-92.

481. Daily was not capable of performing simple arithmetic or any degree of genuine analysis of the financial statements. Trial Transcript at p. 705-07, 735.

482. The evidence did not establish that any of the underwriters affiliated with plaintiff who were involved in the CCI bond program could perform appropriate analysis of financial statements.

483. Plaintiff did not demonstrate that it took into account information included in the 1997 audited financial statement in its underwriting of the CCI bond account. Trial Transcript at pp. 591-97.

484. Daily reviewed only the annual review report prepared during 1998 and did not analyze the 1997 audited financial statement or analyze the information included in the 1997 financial statement or the 1998 audited financial statement. Trial Transcript at pp. 611-12.

485. The evidence did not establish that Salazar correctly analyzed the audited financial statements. Trial Transcript at p. 250.

486. The only evidence presented about the home office review of an analysis of financial information performed by Salazar was to review to see if the amounts were correctly transposed. Trial Transcript at p. 250.

487. The evidence did not establish that the approval of the continuation of the

bond program for 1998 was based on the information included in the April 15, 1998 annual review report. Trial Transcript at p. 613.

488. Plaintiff did not establish that approval for any specific bond was based on the audited financial statements.

489. The Harrisburg branch office did not timely provide Daily with interim financial information which reflected dramatic, adverse, material changes in the financial condition of CCI. Trial Transcript at pp. 637-38.

490. Daily was disturbed that the important interim financial information had not been timely provided to him by the Harrisburg branch office since it was so material to underwriting and he had approved the VCU bond in the meantime and other bonds had been issued since the receipt of the information. Trial Transcript at p. 637.

491. Daily's boss, Bob Dixon, received the important 1998 interim financial information, which reflected that CCI sustained a $1.6 million loss, and did nothing to react to it. Trial Transcript at p. 638.

492. Daily's memory of the events and underwriting activities in connection with the CCI bond account is unreliable, often mistaken, inconsistent, and his testimony concerning all facts important to plaintiff's case is incredible. Trial Transcript at pp. 522, 618-30, 668. *Compare* Trial Transcript at pp. 624, 626, 637, 638, 644 with pp. 355, 630, 645; *compare* Trial Transcript at p. 748 with pp. 750-51.

493.  Each of the bonds were supposedly individually underwritten.  Trial
      Transcript at p. 2492.

494.  No evidence concerning the specific underwriting for specific bonds was
      presented.

495.  Plaintiff did not diligently obtain interim financial information for the quarter
      ending March 1998 to which it was entitled under the arrangement for
      bonding.  Trial Transcript at pp. 2602-06.

496.  It was significant to underwriting that plaintiff learned that CCI sustained a
      $1.6 million loss during 1998. Trial Transcript at p. 1619: 24-1620:4.

497.  As of August 1998, plaintiff was aware that the financial condition of CCI had
      materially changed since the 1997 audited financial statement. *See* Exhibits 34
      and 238.

498.  There is no indication that plaintiff related or correlated the financial
      information received from the agent concerning the $1.6 million dollar loss to
      the 1997 audited financial statement.  Trial Transcript at p. 1623:6-11.

499.  Plaintiff continued to bond CCI in spite of the $1.6 million dollar loss because
      of its confidence in CCI management.  Trial Transcript at p. 1623:12-16.

500.  Knowledge of the $1.6 million loss during 1998 should have prompted plaintiff
      to interrupt bond approval until it received information sufficient to assure
      there was not a problem.  Trial Transcript at p. 627.

501.  The evidence did not establish the nature of the financial analysis performed

by Salazar in connection with underwriting bonds for CCI except conceivably to make some adjustments to amounts which were input into the ECF.

502.    The evidence did not establish that Salazar relied on information from either the 1997 or 1998 audited financial statement in any decision he made concerning bonds for CCI.

503.    The ASCA granted the bond agent under the ASCA was for bonds within $10 million single project limit, $75 million total work program.  Trial Transcript at pp. 443, 445; Exhibit 790 USFG/BS 0747.

504.    All of the bonds issued during 1998 which are the subject of this action were within the ASCA except for Germplasm.  Exhibit 14.

505.    The evidence did not establish that anyone who approved bonds for CCI using ASCA authority relied on information derived from the 1997 or 1998 audited financial statements.

506.    The SDA for the CCI account which was the authority under which Salazar and Phillips could approve bonds was $15 million single project limit, $75 million total work program limit.  Trial Transcript at p. 790.

507.    Total work program limit is the "cost to complete plus unearned profit on all jobs in the backlog as well as outstanding bids, low bids, and anticipated awards.  The program must be consistently measured and include bonded and unbonded work."  Exhibit 40 at p. USFG/BS 1609, Exhibit 41 at p. USFG/BS 1473.

508.  All of the bonds which are the subject of this action are within the SDA single limit except Germplasm, VCU, and PA Turnpike Headquarters bonds.  Trial Transcript at pp.  2452, 2468; Exhibits 14 and 15 (Phillips' testimony did not include Germplasm as outside SDA limit, but a review of Exhibit 14 indicates that the bond amount was in excess of the SDA limit).

509.  Phillips and/or Salazar were only conceivably involved in the approval of bonds within the specific discretionary authority (SDA) granted by David Hussey to the Harrisburg branch office.  Trial Transcript at p. 2490.

510.  Phillips was not involved in the approval of all the bonds, and he did not know which bond(s) he was involved with the approval. Trial Transcript at pp. 2492, 2496.

511.  The total work program during 1999 was always in excess of the total work program limit when the bonds were approved during 1999 and required home office approval. *See* Exhibit 790 at pp. USFG/BS 0229, 0633, 0642, 0765, 0767, 0770, 0772.

512.  None of the bonds approved during 1999 were within the SDA.  *See* Exhibit 790 at pp. USFG/BS 0229, 0633, 0642, 0765, 0767, 0770, 0772, Exhibit 15.

513.  The evidence did not establish the circumstances under which approval was provided for bonds on CCI projects known as Scott Air Force Base, Germplasm, Outlook Chesterfield, Outlook Westerville, James River, Perry County Road, Summerdale Road, Pennsylvania Turnpike Administration

Building, Cambria County Road, Cool and Cold Aqua Headquarters, Bedford County State Road, and Cool and Cold Aqua buried process lines.  Trial Transcript at pp. 392, 748-50, 2492, 2496; Exhibits 14 and 15.

514.   There existed bond case files which were maintained separately from the underwriting file.  Trial Transcript at p. 2498.

515.   The preservation and custody of bond case files is uncertain.  Trial Transcript at p. 2651.

516.   The evidence did not establish that the underwriting and approval for any specific bond included consideration of information derived from the 1997 and 1998 audited financial statements of CCI. Trial Transcript at pp. 392, 616, 2452, 2468, 2550.

517.   The evidence did not establish that David Hussey was aware of and considered any information derived from the 1997 or 1998 audited financial statements.

518.   The evidence established only that information conceivably derived from the 1997 audited financial statement of CCI was included in the annual review report dated April 15, 1998  and that information conceivably derived from the 1998 audited financial statement of CCI was input in the ECF system.

519.   No requests for bond approval included information derived from audited financial statements even though the request for approval form used by the Harrisburg branch office included a place for the inclusion of financial information from the audited financial statements.  Trial Transcript at p. 577-

586.

520. The bonds for Outlook Westerville and James River were approved after plaintiff was aware CCI had a $1.6 million loss by mid-year. Exhibit 14.

521. Daily approved the VCU bond on December 2, 1998, the same day and within hours of the request for approval. Trial Transcript at p. 616.

522. Daily does not know whether the interim financial information in the possession of plaintiff was analyzed prior to approval of the VCU bond, or whether he even had the 6 month interim financial information when he approved the VCU bond. Trial Transcript at p. 619; Exhibit 130.

523. Daily approved the VCU bond without the benefit of ten month interim financial information. Trial Transcript at p. 620.

524. Daily would not have approved the VCU bond if he had been aware CCI had a $1.6 million loss during 1998. Trial Transcript at p. 627.

525. Daily approved the VCU bond aware CCI had a problem related to a $1.6 million loss halfway through the year and did not cease bonding or even obtain an explanation about the reason for the problem or other information relevant to the financial condition of CCI. Trial Transcript at p. 627.

526. Plaintiff should not have issued the VCU bond in reliance on the 1997 audited financial statement.

527. Plaintiff did not justifiably rely on the 1997 audited financial statement when it issued bonds after August of 1998 considering that those bonds allegedly

issued in reliance on the 1997 audited financial statement were issued after plaintiff was aware CCI had sustained a $1.6 million loss which was a material change over the financial condition reflected on the 1997 audited financial statement. *See* Exhibits 14, 34 and 238.

528. Phillips recommended that plaintiff request Ortenzio restore his indemnity as of December 22, 1998 in connection with continuing the bond program for CCI. Trial Transcript at p. 2538; Exhibit 790B at p. USFG/BS 1310.

529. Plaintiff agreed to continue the bond program for CCI for 1999 on January 5, 1999 prior to receipt of the 1998 audited financial statement. Trial Transcript at p. 667, 786, 1591, 2457, 2546; Exhibit 275.

530. The introduction of new business by CCI in the nature of self performing work and civil work and mechanical work during the period from September 1997 and January of 1999 favored increasing the expectation for working capital and net worth for CCI since more cash was needed. Trial Transcript at p. 1601:13-19.

531. Plaintiff reduced its guidelines from the 8% case it indicated was in place when Ortenzio terminated his indemnity to a 5% case of CCI when it approved the continuation of the bond program on January 5, 1999 to fend off competition which was then "knocking at the door" to obtain CCI's bond business. Trial Transcript at p. 1591:6-18.

532. Plaintiff did not require Ortenzio to restore his indemnity as a condition of

approval for continuing the bond program for 1999. Trial Transcript at pp. 2538-39.

533.   Plaintiff's decision whether to require Ortenzio to restore his personal indemnity as a condition for continuing the bonding program was dependent on market factors and the extent of competition by other sureties for the business.  Trial Transcript at pp. 2442, 2595-96.

534.   Plaintiff had no justification for not requiring Ortenzio to restore his indemnity as a condition for continuation of the bond program.  Trial Transcript at p. 2543.

535.   Plaintiff approved the bond program for CCI for 1999 aware that CCI was not projected to do better than break even on the year in spite of earlier predictions of at least a one million dollar profit.  Trial Transcript at pp. 662-63.

536.   The difference between break even and a one million dollar profit is significant to underwriting. Trial Transcript at p.  663.

537.   Plaintiff accepted the representation by Ortenzio during January 1999 that CCI would have a one million dollar profit if it received additional work even though CCI never had an annual profit in the amount of one million dollars and plaintiff was not aware of work on hand for CCI to achieve a one million dollar profit. Trial Transcript at pp.  663-64.

538.   Plaintiff decided it was appropriate to require Ortenzio to provide his personal

indemnity as a condition of approval of bonds for the Fulk Road project. Trial Transcript at p. 656.

539. Bonding for the Fulk Road project was approved on January 5, 1999 without the 1998 audited financial statement. Trial Transcript at p. 655; Exhibit 275.

540. Plaintiff approved bonding for the Fulk Road project without the personal indemnity of Ortenzio. Trial Transcript at pp. 657, 660; Exhibit 275.

541. The Harrisburg branch office was required to prepare a report annually based on a review of the year end audited financial statement, and transmit the audited financial statement along with the annual review report to home office for consideration. Trial Transcript at pp. 276-77, 515.

542. Plaintiff's procedures required the Harrisburg branch office to provide its written recommendation concerning the renewal of the CCI bond program on an annual basis in connection with the annual review report. Trial Transcript at pp. 554, 2506, 2508.

543. The bond program was renewed for 1996 without home office review of the 1995 audited financial statement or the annual review report. Trial Transcript at pp. 554-556; Exhibit 790 at USFG/BS 1197, 1201.

544. Home office underwriters did not review the audited financial statements of CCI except in connection with the annual review report. Trial Transcript at pp. 515, 564.

545. There was no annual review report for 1999 based on the 1998 year end

financial information. Trial Transcript at pp. 670, 2509.

546. The annual review was not performed because the branch office underwriters were too busy and it was overlooked. Trial Transcript at p. 1639-39.

547. There was no recommendation by the Harrisburg branch office concerning the renewal of the bond program for CCI during 1999 based on a review of the 1998 year end audited financial information. Trial Transcript at pp. 2509, 2510, 2609.

548. There is no documented consideration of approval of continuing the bond program for 1999 except Exhibit 257 which was generated on January 5, 1999 as a result of the January 5, 1999 meeting. *See generally* Exhibit 790-790B.

549. The preservation and custody of the home office underwriting file is uncertain. Trial Transcript at p. 2647.

550. The home office underwriting file was kept separate from the Harrisburg branch office underwriting file, but plaintiff produced only a single item as the underwriting file which was not divided, separated, or distinguished between the home office underwriting file and the branch office underwriting file. Trial Transcript at p. at 192; Ex.790-790B.

551. The underwriting file produced by plaintiff included only a single copy of the 1998 audited financial statement. *See* Exhibit 790-790B, Exhibit 790 at USFG/BS 0439, Exhibit 36.

552. The copy of the 1998 audited financial statement in the underwriting file does

not reflect a stamp indicating receipt in the home office. See Exhibit 36,

Exhibit 790 at USFG/BS 0439.

553. The underwriting file did not contain a transmittal letter reflecting

transmission of the 1998 audited financial statement to home office. *See*

Exhibit 790-790B.

554. Proof of transmission and receipt of documents by the home office would have

been reflected by a receipt stamp or a writing on the financial statement

and/or a transmittal letter. Trial Transcript at pp. 265, 270, 281-282, 466, 468-

69, 519, 549-50, 552, 560, 573-74, 805-06.

555. The evidence did not establish the 1998 audited financial statement was ever

received by home office. Trial Transcript at pp. 670, 693-94, 805-06.

556. Daily did not remember receiving the 1998 audited financial statement. Trial

Transcript at p. 671.

557. Daily did not remember reviewing the 1998 financial statement. Trial

Transcript at p. 671.

558. Daily cannot confirm he reviewed the 1998 audited financial statement. Trial

Transcript at p. 684.

559. Daily did not analyze the audited financial statements, or information derived

from the audited financial statements. Trial Transcript at p. 762.

560. There were computer generated reports which reflected analysis of financial

data, calculations, or information provided by ECF. Trial Transcript at pp.

304, 2551, 2555-2556, 2557.

561.  The folder exceptions report and ratio analysis report were computer generated calculations from the ECF important to underwriting. Trial Transcript at pp. 671, 674, 809, 1650, 2553, 2555, 2556; Exhibit 790 at USFG/BS 0005.

562.  The exceptions report and the ratio analysis report are based on standards developed by Dunn & Bradstreet.  Trial Transcript at p. 674.

563.  The reports were the product of a specifically developed, sophisticated mathematical analysis to measure the likelihood of construction firm failure due to financial stress. Trial Transcript at pp. 455-56.

564.  Plaintiff valued use of the computer generated reports to focus limited underwriting time on what may be a troubled account Trial Transcript at pp. 456-57.

565.  The folder exceptions report based on 1998 financial information indicated a potentially dangerous financial condition for CCI as reflected by the "red" status, and numerous conditions indicated by the financial data of CCI which was a substantial deviation from the comparative norm.  Trial Transcript at p. 2553, Exhibit 790 at p. USFG/BS 0230.

566.  The "red" status indicated on the folder exceptions report indicated the most severe financial condition and a great deal of risk of failure.  Trial Transcript at pp. 679-80.

567. The exceptions identified by the folder exceptions report indicated conditions which Daily indicated would cause an underwriter to investigate whether there existed a problem before continuing to bond. Trial Transcript at p. 826.

568. Plaintiff's underwriters were required to underwrite the exceptions indicated by the ECF folder exceptions report. Trial Transcript at pp. 810, 2553.

569. There is no indication that the ratio analysis report was generated earlier than August 20, 1999. Trial Transcript at pp. 672, 1649.

570. The ratio analysis report indicated seven red flag distress signals out of a possible total 10. Trial Transcript at p. 672-73.

571. Plaintiff's underwriters were required to underwrite and resolve the deviations indicated by the ratio analysis report. Trial Transcript at pp. 810, 2556.

572. There is no indication that plaintiff performed underwriting to resolve the numerous exceptions reflected on the folder exceptions report. Trial Transcript at pp. 810-11, 2553.

573. The ratio analysis report reflected numerous conditions which were "red" and substantially deviated from the comparative norm. Exhibit 790 at p. USFG/BS 0004.

574. There is no indication that plaintiff performed underwriting to resolve the numerous "red" conditions reflected on the ratio analysis report. Trial Transcript at pp. 810-11, 1648, 2557.

575. No competent evidence was introduced to establish that the 1998 audited

financial statement was the source of the information used by plaintiff in its ECF computer generated computations.

576.  There is no indication that a report reflecting calculations produced by ECF based on 1998 year end financial information was reviewed by any underwriter prior to August 20, 1999. Trial Transcript at p. 2552, 2556-57.

577.  Plaintiff did not consider the ECF analysis of CCI financial information for 1998 before August 20, 1999.  Trial Transcript at p. 2555, 2557, 2559, 3130:7-9.

578.  All the bonds issued by plaintiff which form the basis for damages in this (with the exception of one) were issued prior to August 20, 1999. *See* Exhibit 14 and 15.

579.  All of the bonds issued by plaintiff action (with the exception of one) were not issued in reliance on the analysis of 1998 financial information in the 1998 audited financial statement.

580.  Any bond issued by plaintiff aware of the analysis results of the 1998 financial information was not justifiable considering the dangerous financial condition reflected by the ECF reports and the absence of any indication that meaningful underwriting was done to resolve the serious issues identified by the analysis.

581.  The evidence did not establish that Daily had the benefit of an analysis of the 1998 year financial information when he approved bonds before August 20, 1999.  Trial Transcript at pp. 764 (the date is incorrectly reflected as 1994

when it should be 1999), 685-92.

582.  No credible evidence was presented that anyone affiliated with plaintiff
      reviewed and analyzed the 1998 audited financial statement in connection with
      underwriting bonds for CCI.  Trial Transcript at p. 670-7.

583.  The extent of the analysis of the 1998 audited financial statement was to
      adjust the amount of current assets by deducting the amount for assets which
      would not be turned into cash during the normal operating cycle, and possibly
      adjust some current liabilities. Trial Transcript at pp.  2423, 2426-27, 2463,
      808; Exhibit 294.

584.  The earliest analysis of the 1998 financial information did not occur until
      August 20, 1999, the date on which the folder exceptions report and the ratio
      analysis report was printed. Trial Transcript at p. 678, 716-717, 718, 2554-55,
      2557, 3130:10-13.

585.  The evidence did not establish that information derived from the 1997 or 1998
      audited financial statement was analyzed or used in connection with
      underwriting bonds for CCI.

586.  There were numerous instances in which the printed report screens from the
      ECF incorrectly reflected the year end audited financial statements as the
      source of the financial information in the ECF relating to CCI since mistakes
      were made on input while "clicking buttons." Trial Transcript at pp. 620-21
      (Garbage in; garbage out.) 647-648, 712, 2561, 2562; Exhibit 99, Exhibit 198.

587. The 1998 audited financial statements revealed adverse financial information about CCI including profit fade on all four completed jobs, eleven underbilled jobs, and the existence of $6.3 million in underbillings.  Trial Transcript at pp. 1629-30.

588. The 1998 audited financial statement reflected underbillings in the amount of $6,341,000. Trial Transcript at p. 694; Exhibit 36.

589. The $6.3 million of underbillings reflected on the 1998 audited financial statement was sufficiently high and such a dramatic increase from the prior year that it should have raised the concerns of an underwriter and led the underwriter to question whether to continue to bond the account.  Trial Transcript at pp. at 694, 1653.

590. Plaintiff issued bonds in reliance on a determination by Salazar, independent of defendants and the 1998 audited financial statement, that the underbillings were reduced by $3.3 million as of early 1999. Trial Transcript at pp. 387-88, 708-09, 794-95, 1660.

591. The 1998 audited financial statement reflected a substantial decrease in net quick (current assets - current liabilities) or working capital from the prior year.  Trial Transcript at pp. 229-230, 733-34.

592. The extent of the decrease in working capital from 1997 to 1998 was material to underwriting, yet plaintiff continued to approve and issue bonds for CCI. Trial Transcript at p. 734.

593. The 1998 audited financial statement reflected that working capital was less than 3% of the work program. Trial Transcript at pp. 734-35.

594. David Hussey, in spite of his awareness of the ECF computations which reflected the adverse financial condition of CCI, without a recommendation from Daily, approved bonds for a $20 million road project on August 20, 1999, the same date as the ECF analysis of 1998 financial information which generated numerous red flags and numerous exceptions.  Trial Transcript at pp. 721-22.

595. Dave Dominiani, the bonding agent, was aware of the decision to book the Mahanoy prison claim in the amount of $1,162,000 as revenue in 1998.  Trial Transcript at pp. 2152:3-8; 2166:1-6.

596. Dominiani was plaintiff's agent. Exhibit 790 at p. USFG/BS 0747.

597. Plaintiff's understanding about the nature of the insurance and other business of PCIC was based on information provided exclusively by the bond agent. Trial Transcript at p. 477.

598. Plaintiff was not aware of the provisions of the insurance policies issued by PCIC to CCI and merely relied on the verbal information provided by the bond agent about the nature of the insurance. Trial Transcript at p. 478.

599. Plaintiff learned during August 1998 that there was money in PCIC which could be used by CCI as a buffer to offset losses on certain jobs, and to enhance profitability.  Trial Transcript at pp. 640-41, 646; Exhibit 237, Exhibit 790 at

p. USFG/BS 0927.

600.  The evidence did not establish that Salazar read footnote 8 of the 1998 audited financial statement.  Trial Transcript at p. 2546.

601.  Phillips did not read and was not familiar with the content of footnote 8 of the 1998 audited financial statement.  Trial Transcript at p. 2518.

602.  The ECF of the 1998 audited financial statement was performed and released without any indication that anyone affiliated with plaintiff had read footnote 8 of the 1998 audited financial statement.  Trial Transcript at p. 2546.

603.  Daily did not bother to determine where in the financial statement the amount of the PCIC guaranteed claim was included, or whether the amount related to the earlier reference that money from PCIC could be used to improve the financial condition of CCI.  Trial Transcript at pp. 699-700, 702.

604.  Phillips was aware that there was $2,000,000 available in PCIC for use by CCI to improve the financial condition of CCI sufficient to meet the working capital and net worth guidelines.  Trial Transcript at pp. 2521-23.

605.  Phillips was aware that any money received by CCI from PCIC to improve the financial condition of CCI would be included in the revenue of CCI.  Trial Transcript at p. 2524.

606.  Phillips never reviewed the 1998 financial statement to determine whether money from PCIC was included on the financial statement of CCI. Trial Transcript at p. 2524-26.

607.  Plaintiff did not inquire whether the loss was avoided at year end of 1998 by
      using money from PCIC even though it had received two written
      communications from the bond agent indicating that money from PCIC was
      available for use to offset losses.  Trial Transcript at p. 642; Exhibits 238, 240.

608.  Plaintiff never learned the means by which CCI reversed the loss during 1998
      and achieved a break even year.  Trial Transcript at p. 659.

609.  Bonds were approved and issued by plaintiff during 1999 in reliance on the
      unsubstantiated statement by Ortenzio that CCI would have a one million
      dollar profit.  Trial Transcript at p. 664.

610.  Daily approved numerous bonds during 1999 above the branch level of
      authority before plaintiff received the 1998 audited financial statements.  Trial
      Transcript at p. 666.

611.  Daily approved bonds for the Pennsylvania Turnpike Administration Building
      on July 27, 1999 (not June 14, 1999 as reflected on Exhibit 15). *See* Exhibit
      790 at p. USFG/BS 0763.

612.  The request for approval of the bonds for the Pennsylvania Turnpike
      Administration Building project did not include any information from the
      audited financial statement. Trial Transcript at pp. 689-92; Exhibit 790 at p.
      USFG/BS 0763/65.

613.  The bonds for the Turnpike Administration Building project were approved by
      Daily within hours of the request without any reference to information from

an audited financial statement and even though the interim June 30, 1999 financial statement and work in progress reports had been requested, but not received.  Exhibit 790 at p. USFG/BS 0763.

614.    The evidence did not establish that approval of the bonds for the Pennsylvania Turnpike Administration Building project was in reliance on the 1998 audited financial statement. Trial Transcript at pp. 689-92; Exhibit 790 at p. USFG/BS 0763/65.

615.    Plaintiff did not justifiably rely on the CCI audited financial statements when it issued bonds because it failed to do the prerequisite analysis of the underwriting information and the financial statements. Trial Transcript at p. 2234.

616.    The evidence did not establish that plaintiff justifiably relied on the 1997 or 1998 audited financial statement when it approved and issued the bonds for CCI which are reflected on Exhibits 14 and 15.

### G.    Plaintiff's Damages

617.    Certain of the amounts sought in connection with the Pennsylvania Turnpike Administration Building Project did not relate to that project. Trial Transcript at pp. 109-114.

618.    Plaintiff produced no substantiation for certain of its damages.

619.    Plaintiff is considering pursuing a claim against the owner of the Scott Air Force Base project.  Any recovery on that claim would reduce USF&G's

claimed damages in this case relating to that project. Trial Transcript at p. 2640.

620. Plaintiff has not establish that it has pursued all available claims in connection with the bonds that serve as the basis for plaintiff's claimed damages in this case.

## II.    Conclusions of Law

621. Plaintiff has the burden of proof of each element of the claim.

622. A negligent misrepresentation claim requires proof of the following elements: 1) a misrepresentation of material fact; 2) made under circumstances in which the person who represented the information should have known, in the exercise of appropriate care, was false; (3) with an intent to induce another to act on the misrepresentation; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.

623. Plaintiff did not satisfy its burden of proof to establish the elements of the claim.

624. A negligent misrepresentation claim cannot be based on the contention that more or additional procedures should have been performed.

625. A negligent misrepresentation claim cannot be based on a deviation from generally accepted auditing standards (GAAS), or generally accepted accounting principles (GAAP).

626. Proof that actual results or subsequently developed information differed from

estimated amounts for future events does not establish a misrepresentation.

627. A negligent misrepresentation claim concerning estimated amounts cannot be based on information subsequently developed about which defendants did not know or would not reasonably have known.

628. Proof that actual results or subsequently developed information differed from estimated amounts for future events does not establish that the representation was negligently made.

629. An adverse inference arises in favor of defendants that if plaintiff had provided the records to DeBruyn, then the result of the re-audit would not support plaintiff's claim.

630. The method used by DeBruyn to develop the restated financial statements is did not meet the legal requirements for competent expert witness evidence.

631. A negligent misrepresentation claim cannot be based on the non-disclosure of information, or the inadequate disclosure of information.

632. A misrepresentation claim based on non-disclosure must be based on a contention that the non-disclosure was misleading.

633. There existed a legally valid, binding, and enforceable guarantee by PCIC in the amount of $1,162,460 in favor of CCI.

634. The alleged deficient disclosure about the PCIC guaranteed claim was not a misrepresentation.

635. Plaintiff's contention regarding the adequacy of the disclosure concerning the

PCIC guaranteed claim is legally insufficient to establish a misrepresentation.

636. The evidence did not establish a misrepresentation by defendants.

637. The evidence did not establish that the alleged misrepresentation by defendants was material to any transaction.

638. None of the alleged misrepresentations were material.

639. Defendants conducted their audits of CCI in accordance with GAAS.

640. The financial statements were prepared in accordance with GAAP.

641. Defendants complied with the applicable standard of care.

642. The evidence did not establish that defendants did not comply with the applicable standard of care.

643. The evidence did not establish that defendants did not exercise appropriate care when they formed and expressed their opinion that the financial statements fairly represented the financial condition of CCI.

644. No evidence was presented to establish that defendants should have realized that the amounts reflected on the audited financial statements for 1997 and 1998 for contract revenue were not reasonable if defendants had performed different or additional audit procedures.

645. Defendants exercised appropriate care.

646. The evidence did not establish that defendants did not exercise appropriate care.

647. The evidence did not establish that defendants did not act with appropriate

care when forming and expressing their opinion about the financial statements.

648. There was no basis for duty owed by defendants to plaintiff.

649. Defendants' awareness that plaintiff was a potential recipient of, and a user of the financial statement did not impose a duty owed by defendants to plaintiff, or establish that defendants intended for plaintiff to rely on the audit reports.

650. The evidence did not establish that defendants intended to induce plaintiff to rely on any representations by defendants.

651. The evidence did not establish that plaintiff justifiably relied on the alleged misrepresentations by defendants.

652. Plaintiff did not rely on the representations by defendants.

653. Reliance is justified only if the information was correctly analyzed and used.

654. Plaintiff did not justifiably rely on the audit reports by defendants for 1997 and 1998.

655. Plaintiff did not sustain an injury attributable to its justifiable reliance on the alleged misrepresentations included in the contract revenue amounts in the 1997 and 1998 audited financial statements.

656. The evidence did  not establish the elements of a cause of action for negligent misrepresentation.

657. Contributory negligence is a complete bar to recovery for negligent misrepresentation.

658.   The information included in the 1998 audited financial statement was

sufficient to inform a user of the financial statement about the existence of the

PCIC guaranteed claim and the amount of the claim.

659.   Plaintiff was negligent when it relied on the alleged misrepresentation relating

to the PCIC guaranteed claim.

660.   Contributory negligence bars plaintiff's recovery to the extent plaintiff's

alleged injury was due to the alleged misrepresentation concerning the PCIC

guaranteed claim.

661.   Judgment is entered in favor of defendant and against plaintiff.

                              SWARTZ CAMPBELL LLC


                      BY:    s/Jeffrey B. McCarron
                             JEFFREY B. MC CARRON
                             KATHLEEN M. CARSON
                             1601 Market Street, 34th Floor
                             Philadelphia, PA 19102
                             (215) 299-4272

                             Attorneys for Defendants
                             Bruce J. Brown and Brown Schultz
                             Sheridan & Fritz

Dated:        March 24, 2004