UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

| | | |
|---|---|---|
| _____ ) | | |
| UNITED STATES FIDELITY AND ) | | |
| GUARANTY COMPANY, ) | | |
| ) | | |
| Plaintiff ) | | CIVIL ACTION NO. 1: 01-CV-00813 |
| ) | | |
| v. ) | | JUDGE CONNER |
| ) | | |
| BRUCE J. BROWN and BROWN ) | | |
| SCHULTZ SHERIDAN & FRITZ, ) | | |
| ) | | |
| Defendants. ) | | |
| _____) | | |

**RESPONSE AND OBJECTIONS OF UNITED STATES FIDELITY
AND GUARANTY COMPANY TO DEFENDANTS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

United States Fidelity and Guaranty Company ("USF&G") hereby objects and responds

to Defendants' Proposed Findings of Fact and Conclusions of Law (the "Proposed Findings")

filed by Bruce J. Brown and Brown Schultz Sheridan & Fritz (collectively, "Brown Schultz") as

follows:

## I. Statement and General Objections

1.      The provision of 661 Proposed Findings – many without references to the trial

transcript or exhibits in evidence – is excessive and unduly repetitive.  In fact, certain proposed

findings appear – in identical form – several times.  The sheer magnitude of the Proposed

Findings renders it impractical for USF&G to rebut the many errors, exaggerations and

mischaracterizations therein within the allotted time.  Accordingly, except where USF&G has

expressly manifested its concurrence to certain of the Proposed Findings in Section II(A), *infra*, the failure of USF&G to address every item raised by Brown Schultz in the Proposed Findings should not be construed as an agreement or acceptance by USF&G.

2.      USF&G incorporates herein by reference United States Fidelity & Guaranty Company's Post-Trial Memorandum ("USF&G Post-Trial Memorandum") and United States Fidelity & Guaranty Company's Request for Findings of Fact and Rulings of Law ("USF&G's Proposed Findings").

3.      None of the legal findings in the Proposed Findings contain references to any legal authorities.  As such, they should be disregarded by the Court.

4.      USF&G hereby incorporates the foregoing statements and objections into all of its responses, *infra*.

## II. <u>Responses and Objections</u>

### A.      Agreed Upon Findings and Conclusions

USF&G agree that the following numbered proposed findings and rulings submitted by Brown Schultz in all significant aspects reflect the testimony adduced at trial:    1, 4, 5, 6, 7, 12, 15, 16, 17, 19, 43, 51, 52, 58, 61, 73, 74, 87, 130, 175, 176, 179, 199, 213, 216, 219, 220, 222, 224, 267, 268, 280, 309, 312, 322, 323, 324, 423, 424, 428, 457, 458, 465, 503, 504, 505, 508, 539, 540, 541, 560, 562, 578, 587, 588, 593, 597, 611 and 622.

USF&G's agreement to the foregoing proposed findings does not extend to relevance or admissibility.

B.     **Contested Findings and Conclusions**[1]

**Brown Schultz Proposal No. 2**:  Plaintiff, United States Fidelity & Guaranty Company ("USF&G") formed a bond program relationship with CCI beginning during 1993 after another major surety declined to continue to continue to bond CCI, and CCI changed its business from the private negotiated work for Ortenzio's father to public bid work.  At the outset of the relationship between CCI and USF&G, certain reinsurers declined to participate on the risk. Trial Transcript at p. 219-20, 479-80, 481-87.

**The assertion is incorrect and misleading.  CCI procured bonds from USF&G after another bonding company declined to bond a single project consisting of approximately 15 buildings.  Testimony of J. Daily, Transcript, p. 219.  Additionally, CCI had performed public bid work prior to the commencement of its relationship with USF&G.  Testimony of J. Daily, Transcript, p. 480.  Reinsurer*s* did not decline "to participate in the risk."  The only evidence concerning *a* reinsurer is a letter from Employers Reinsurance Corp. dated November 15, 1993.  In that letter, the reinsurer indicates its willingness to participate if additional indemnification were obtained.  Exhibit 790A, p. 357.  In that USF&G never paid any claims relative to bonds issued to CCI in 1993 – 1996, the relevancy of the proposed finding relative to this period is questionable.  Moreover, Richard Farnsworth ("Farnsworth") opined that when it first issued bonds to CCI, USF&G's underwriting of the CCI account was within the standard of care of the surety industry.  Testimony of Farnsworth, Transcript, p. 1497.**

**Brown Schultz Proposal No. 3**:  The bonding relationship continued until 2000.  Trial Transcript at p.742-43; 2563-64.

**The assertion is incorrect and the phrase "bonding relationship" is vague.  Upon Anthony Phillips' receipt of a letter dated August 30, 1999 from David Dominiani**

---

[1] For the Court's convenience, Brown Schultz' proposed findings and conclusions to which USF&G wishes to object or otherwise respond are reprinted verbatim and will retain the number they are assigned in Brown Schultz' Proposed Findings.  All errors have been preserved as in Brown Schultz' original.

("Dominiani"), CCI's bonding agent, which revealed unexpected losses, Anthony Phillips immediately informed Dominiani that USF&G would not issue any bonds until numerous issues were addressed and questions satisfactorily answered.  Exhibit 320.  Testimony of A. Phillips, Transcript, pp. 2469-2470.  Anthony Phillips had the necessary authority to act as he did in suspending the bonding program.  Testimony of A. Phillips, Transcript, p. 2474. The *only* bond issued by USF&G thereafter was a very small bond in the penal sum of $191,083 for the Cool & Cold Aqua project.  This was a bond related to the same project as to which USF&G issued a $12 million bond on or about July 12, 1999.  Exhibit 15. Testimony of A. Phillips, Transcript, pp. 2470-2471; Testimony of G. Daily, Transcript, pp. 37, 44.  Thereafter, in early October 1999, further bonding by USF&G of CCI was suspended.  No further bonds were ever issued to CCI by USF&G.  Testimony of A. Phillips, Transcript, p. 2471.

**Brown Schultz Proposal No. 8**:  The only representations made by Brown Schultz were contained in the Independent Auditor's Reports on the financial statements of CCI Construction Company for the years ending December 31, 1997 and December 31, 1998.  Exhibits 34 and 36; Trial Transcript at pp. 463, 2505.

The citations to the trial transcript are incorrect; the testimony indicated by those citations concerns the degree of contact between Brown Schultz and USF&G.

While the Independent Auditor's Reports contain material misrepresentations, there are other (mis)representations contained in the audit reports for the years ending December 31, 1997 and December 31, 1998 (the "Audited Financial Statements").  These representations include various footnotes that are deceptive, incomplete and non-compliant with both Generally Accepted Auditing Standards ("GAAS") and Brown Schultz' internal requirements.  Additionally, since the Independent Auditor's Reports refer to and incorporate the financial statements it is misleading for the Independent Auditor's Reports

**and the incorporated financial statements to be treated as if they are wholly disparate.  The**

**Independent Auditor's Reports contain representations concerning the accuracy and**

**reliability of the financial statements.**

**Brown Schultz Proposal No. 9**:  Defendants' reports expressed that Brown Schultz conducted its audits of CCI in accordance with generally accepted auditing standards. The 1997 report also states:

In our opinion, the financial statements referred to above present fairly in all material respects the financial position of CCI Construction Company, Inc. as of December 31, 1997 and 1996 [December 31, 1998 and 1997] with the results of its operations and its cash flows for the years then ended, in conformity with generally accepted accounting principles.

Exhibits 34 and 36.

**The delineated quotation is but a small section – and only one of the representations**

**– of the Independent Auditor's Reports to the Audited Financial Statements.  It is**

**misleading for this portion of the Independent Auditor's Report to be quoted out of**

**context.  Exhibit 34, p. 1, Exhibit 36, p. 1.  Moreover, USF&G believes the statement that**

**Brown Schultz conducted its audits in accordance with GAAS to be a misrepresentation.**

**Brown Schultz Proposal No. 10**:  The financial statements were the representations of CCI management.  Trial Transcript at p. 1880:15-17; Exhibit 34 at p. 1; Exhibit  36 at p. 1 ("Those financial statements are the responsibility of the Company's management.")

**The delineated quotation is but a small section of the Independent Auditor's**

**Reports to the Audited Financial Statements.  It is misleading for this portion to be quoted**

**out of context.  Exhibit 34, p. 1, Exhibit 36, p. 1.  Moreover, the proper quote is that**

**"*[t]hese* financial statements are the responsibility of the Company's management."  The**

**delineated sentence refers only to "the related statements of income, shareholder's equity**

**and cash flows . . . ."  Exhibit 34, p. 1, ¶1, Exhibit 36, p.1, ¶1.  Brown Schultz has omitted**

from its proposed finding the subsequent sentence which indicates that it is Brown Schultz'

"responsibility to express an opinion . . . based on our audits." *Id.*

**Brown Schultz Proposal No. 11**:  The financial statements developed by CCI were prepared by a certified public accountant ("CPA") employed by CCI.  Trial Transcript at pp. 474-75.

This proposed finding is misleading to the extent it implies that Sheri Phillips, CCI's

Chief Financial Officer, acted as an auditor or certified public accountant in carrying out

her duties at CCI.  Although Ms. Phillips is a licensed certified public accountant, she was

not employed by CCI in that capacity.  In fact, her predecessor, David Barber, was not a

certified public accountant.  Testimony of S. Phillips, Transcript, p. 2089.  Moreover, she

was just one of several accounting employees.  Among other factors that would have

prevented her from serving as an auditor for CCI was her lack of independence.  It should

also be noted that she reported to Shane Miller, who received a bonus based on CCI's

financial results as reflected in its audit reports.  Testimony of Brown, Transcript, pp. 872-

874.  Further, USF&G objects to the terms "developed" and "prepared," to the extent they

create the erroneous impression that other than providing various representations, CCI's

management was responsible for preparation or development of the Audited Financial

Statements.

**Brown Schultz Proposal No. 13**:  Ms. Phillips was a certified public accountant with audit experience, including audits of general contractors, and had considerable construction accounting experience before joining CCI Construction.  Trial Transcript at p. 2087-2089.

This proposed finding is misleading to the extent it implies that Sheri Phillips, CCI's

Chief Financial Officer, acted as an auditor or certified public accountant in carrying out

her duties at CCI.  Although Ms. Phillips is a licensed certified public accountant, she was

not employed by CCI in that capacity.  In fact, her predecessor, David Barber, was not a

certified public accountant.  Testimony of S. Phillips, Transcript, p. 2089.  Further, her

construction audit experience was limited to auditing but *one* general contractor.

Testimony of S. Phillips, Transcript, pp. 2087-2089.

**Brown Schultz Proposal No. 14**:  Sheri Phillips was a qualified and capable accountant knowledgeable about construction accounting during the period she worked for CCI. Trial Transcript at pp. 557, 2087-89.

**USF&G incorporates herein its response to Brown Schultz Proposal No. 13.**

**Brown Schultz Proposal No. 18**:   Once she became chief financial officer of CCI, Ms. Phillips was in charge of CCI's accounting department.  Trial Transcript at p. 2090:17-20.

**Although she was "in charge of the accounting department," she reported to other**

**CCI executives, including Shane Miller and John Ortenzio ("Ortenzio").  Testimony of**

**Brown, Transcript, pp. 872-874.**

**Brown Schultz Proposal No. 20**:   CCI had qualified estimators during the period from1996 to 1999.  Trial Transcript at p. 2094:14-15.

**It is merely the opinion of Sheri Phillips that the estimators are "qualified."  It**

**should be noted that by the Fall 1999, Ms. Phillips had lost faith in the reliability of the**

**estimates she received from such purportedly qualified estimates.  Testimony of S. Phillips,**

**Transcript, pp. 2148-2149.  No estimators testified at trial nor did any expert opine as to**

**the level of skill of CCI's estimators.**

**Brown Schultz Proposal No. 21**:   The estimating department worked with the operations department to develop bids and, in particular, the project manager on the job if CCI got the job.  In addition, John Ortenzio, the company's owner, Shane Miller, the chief operating officer, the vice president of estimating and the vice president of operations participated in developing bids.  Trial Transcript at pp.  2092:22-2093:10.

**The only evidence supporting this assertion is from Ms. Phillips.  Her credibility on**

**this issue is marred by her testimony that Bruce Brown informed her (falsely) that USF&G**

**had defamed her and questions her skills.  Testimony of S. Phillips, Transcript, p. 2157.**

Additionally, it should be noted that there is nothing in Brown Schultz' working papers indicating that they tested those procedures.

**Brown Schultz Proposal No. 22**:    CCI had extensive procedures for collecting and reporting job costs for project contracts.  Trial Transcript at p.  2095:14-17.

The only evidence supporting this assertion is from Ms. Phillips.  Her credibility on this issue is marred by her testimony that Bruce Brown informed her (falsely) that USF&G had defamed her and questions her skills.  Testimony of S. Phillips, Transcript, p. 2157. Additionally, it should be noted that there is nothing in Brown Schultz' working papers indicating that they tested those procedures.

**Brown Schultz Proposal No. 23**:    The procedures for collecting and reporting job costs were documented in the procedures manual for CCI.  Trial Transcript at p.  2095:18-20; Exhibit 356.

The only evidence supporting this assertion is from Ms. Phillips.  Her credibility on this issue is marred by her testimony that Bruce Brown informed her (falsely) that USF&G had defamed her and questions her skills.  Testimony of S. Phillips, Transcript, p. 2157. Additionally, it should be noted that there is nothing in Brown Schultz' working papers indicating that they tested those procedures.

**Brown Schultz Proposal No. 24**:    CCI followed the procedures described in the manual for collecting and reporting job cost data.  Trial Transcript at p. 2096:9-12.

The only evidence supporting this assertion is from Ms. Phillips.  Her credibility on this issue is marred by her testimony that Bruce Brown informed her (falsely) that USF&G had defamed her and questions her skills.  Testimony of S. Phillips, Transcript, p. 2157. Additionally, it should be noted that there is nothing in Brown Schultz' working papers indicating that they tested those procedures.

**Brown Schultz Proposal No. 25**:   Ms. Phillips understood the importance of accurately identifying and recording job costs to a particular contract in CCI's accounting system.  Trial Transcript at pp. 2097-98.

**This proposal is wholly unsupported by the transcript reference given.  Sheri Phillips merely testified as to the process used to pay subcontractors and record certain costs.  Testimony of S. Phillips, Transcript, pp. 2097-2098.**

**Brown Schultz' inadequate testing of cost controls is discussed in USF&G's Proposed Findings No. 208-210.**

**Brown Schultz Proposal No. 26**:   CCI had extensive procedures to assure that the job costs were accurate including comparing invoices to purchase orders or subcontracts, and obtaining the approval of the project manager for all invoices.  Trial Transcript at pp. 2097-2098.

**The only evidence supporting this assertion is from Ms. Phillips.  Her credibility on this issue is marred by her testimony that Bruce Brown informed her (falsely) that USF&G had defamed her and questions her skills.  Testimony of S. Phillips, Transcript, p. 2157. Additionally, she admitted to grave doubts about the accuracy of CCI's projections regarding contract completion.  Testimony of S. Phillips, Transcript, pp. 2148, 2165.**

**Brown Schultz' inadequate testing of cost controls is discussed in USF&G's Proposed Findings No. 208-210.**

**Brown Schultz Proposal No. 27**:   CCI had internal controls to assure that it did not overpay on a purchase order or contract.  Trial Transcript at p. 2117:16-25.

**The only evidence supporting this assertion is from Ms. Phillips.  Her credibility on this issue is marred by her testimony that Bruce Brown informed her (falsely) that USF&G had defamed her and questioned her accounting skills.  Testimony of S. Phillips, Transcript, p. 2157.**

**Brown Schultz' inadequate testing of cost controls is discussed in USF&G's Proposed Findings No. 208-210.**

**Brown Schultz Proposal No. 28**:     CCI  had a database which contained, among other things, all the actual costs that had been approved and posted to a job, the original budget, and any change orders.  Trial Transcript at pp. 2096-97.

**The only evidence supporting this assertion is from Ms. Phillips.  Her credibility on this issue is marred by her testimony that Bruce Brown informed her (falsely) that USF&G had defamed her and questions her skills.  Testimony of S. Phillips, Transcript, p. 2157. Additionally, it should be noted that there is nothing in Brown Schultz' working papers indicating that they tested those procedures.**

**Brown Schultz Proposal No. 29**:     Estimated costs to complete were prepared by the project manager or project engineer and superintendent on the job site.  Trial Transcript at p. 2102:8-13.

**Sheri Phillips testified that the foregoing was performed by CCI employees. However, there is nothing in Brown Schultz' working papers that indicate that any of this was tested during an audit.  Additionally, there is no evidence that any of this was verified to be accurate by Brown Schultz.**

**Brown Schultz' inadequate testing of cost controls is discussed in USF&G's Proposed Findings No. 208-210.**

**Brown Schultz Proposal No. 30**:     Reports were generated on a monthly basis which showed every phase of a job and each item within the phase ("estimated job costs reports"). Trial Transcript at pp. 2096-98.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 29.**

**Brown Schultz Proposal No. 31**:     The estimated job cost reports were provided to the project managers for review and confirmation.  Trial Transcript at pp. 2097, 2102-2103, 2108.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 29.**

**Brown Schultz Proposal No. 32**:     The project managers revised the estimated job costs reports each month on a line by line basis.  Trial Transcript at pp. 2096-2097, 2099, 2100, 2108.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 29.**

**Brown Schultz Proposal No. 33**:    The project managers' revised estimated job costs reports were entered into the accounting department computer records. Trial Transcript at pp. 2099-2100.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 29.**

**Brown Schultz Proposal No. 34**:    The accounting department generated costs to complete reports that showed variances from the original budget or the prior estimated costs to complete.  Trial Transcript at p. 2100.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 29.**

**Brown Schultz Proposal No. 35**:    All variances revealed by the reports were reviewed by the accounting department and CCI's managers. Trial Transcript at pp. 2104-2106.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 29.**

**Brown Schultz Proposal No. 36**:    Large variances required explanation by the project managers to verify the accuracy of the costs to complete and to explain the nature and reason for the  variance.  Trial Transcript at pp. 2100, 2102-2107.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 29.**

**Brown Schultz Proposal No. 37**:    CCI's accounting department discussed the costs to complete variances with the project manager.  Trial Transcript at p. 2106.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 29.**

**Brown Schultz Proposal No. 38**:    The job costs and estimated costs to complete reports were also given to the vice president of operations or the person in charge of the particular division to address variances.  Trial Transcript at pp. 2106-2107.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 29.**

**Brown Schultz Proposal No. 39**:    CCI reviewed job costs and estimated costs to complete for accuracy and obtained explanations for variances on a monthly basis.  Trial Transcript at p.  2107.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 29.**

**Brown Schultz Proposal No. 40**:    The estimated costs to complete for CCI's projects changed monthly for a variety of reasons.  Trial Transcript at p. 2114-2116.

**Sheri Phillips testified that the foregoing was performed by CCI employees.**

**However, there is nothing in Brown Schultz' working papers that indicate that any of this**

11

was tested during an audit.  Additionally, there is no evidence that any of this was verified

to be accurate by Brown Schultz.

**Brown Schultz Proposal No. 41**:    CCI maintained project files which contained the contract with the owner, the contracts with the subcontractors, purchase orders for large material purchases, submittals, and anything related to the job itself. Trial Transcript at p. 2107.

**Sheri Phillips testified that the foregoing was performed by CCI employees.**

**However, there is nothing in Brown Schultz' working papers that indicate that any of this**

**was tested during an audit.  Additionally, there is no evidence that any of this was verified**

**to be accurate by Brown Schultz.**

**Brown Schultz Proposal No. 42**:    Stan Sechrist was the Vice President of Operations from approximately 1996 to 1999.  Trial Transcript at p.  2110.

**Sheri Phillips is uncertain as to whether Mr. Sechrist was a Vice President in 1996.**

**Testimony of S. Phillips, Transcript, p. 2110.**

**Brown Schultz Proposal No. 44**:    Mr. Sechrist was extremely knowledgeable about the projects performed by CCI.  Trial Transcript at p.  2110.

**This is solely the opinion of Sheri Phillips, an accountant.  No other testimony as to**

**his alleged construction prowess was introduced.**

**Brown Schultz Proposal No. 45**:    The project managers either reported directly to Sechrist or reported to the person in charge of their division who in turn reported to Sechrist. Trial Transcript at p. 2112.

**This is not accurate.  Project managers for self-performed work did *not* report**

**directly to Mr. Sechrist.  Testimony of S. Phillips, Transcript, p. 2112.**

**Brown Schultz Proposal No. 46**:    CCI conservatively stated anticipated profits for contracts in progress.  Trial Transcript at p. 530.

**The trial reference is to James Daily, who merely stated that he was "*told* that they**

**took a conservative approach . . . ."  Testimony of J. Daily, Transcript, p. 530.  He further**

stated that he was not an estimator and did not know how to verify whether this assertion was true. *Id.*

**Brown Schultz Proposal No. 47**:   The data used by CCI to develop its estimated costs to complete contracts was reliable and the estimated costs to complete were reasonable.

**This proposed finding is unsupported by the facts extant in the trial record.  There is strong evidence that the estimates were unreasonable and unreliable.  It should be noted that by Fall 1999, Sheri Phillips had lost faith in the reliability of the estimates she received.  Testimony of S. Phillips, Transcript, pp. 2148-2149.  The significant profit fades that occurred – as well as CCI's ultimate collapse – indicate that CCI's estimates may not have been as reasonable as was supposed.  It was Brown Schultz' responsibility to conduct sufficient tests to determine the reliability of management's estimates.  AU Section 342, Auditing Accounting Estimates, January 1, 1989 ("AU Section 342").  "The auditor is responsible for evaluating the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole.  As estimates are based on subjective as well as objective factors, it may be difficult for management to establish controls over them.  Even when management's estimation process involves competent personnel using relevant and reliable data, there is potential for bias in the subjective factors.  Accordingly, when planning and performing procedures to evaluate accounting estimates, the auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors." *Id.* at AU §342, ¶.04, Exhibit "A" for ID, Tab 4.**

**Brown Schultz Proposal No. 48**:   An audit does not guarantee that the management prepared financial statements are absolutely correct. Trial Transcript at p. 2816.

Donald Brenner's ("Brenner") opinion on this matter is unsupported by reference to any accounting standards.  Moreover, it must be noted that in the Independent Auditor's Reports to the Audited Financial Statements Brown Schultz guaranteed that, *inter alia*, "the financial statements . . . *present fairly, in all material respects* the financial position of CCI . . . ."  (emphasis supplied).  Exhibit 34, p. 1, Exhibit 36, p. 1.

**Brown Schultz Proposal No. 49**:    A financial statement reflects the financial condition of the company only for the moment reflected in the financial statement.  Trial Transcript at p. 550.

The assertion is an incorrect summary of the transcript reference.  James Daily testified that a "financial statement reflects financial conditions *only for the period reflected in the financial statement*."  Testimony of J. Daily, Transcript, p. 550.

**Brown Schultz Proposal No. 50**:    The financial condition of the construction company bonding client can change drastically following the end date of the financial statement.  Trial Transcript at p. 551.

James Daily's response that it is "possible" in a hypothetical situation that financial conditions can change is not tantamount to the bold statement of Brown Schultz' proposed finding.  In fact, there was no evidence adduced at trial of any drastic changes.

**Brown Schultz Proposal No. 53**:    Contract prices are estimates and are subject to many variables, many of which are difficult to estimate with any accuracy.  Trial Transcript at pp. 453-54.

Although the statement is technically true, it should be noted that such statement exemplifies the reason why an auditor should check and test the reasonableness of management's estimates.  In fact, GAAS requires that auditors conduct sufficient tests to determine the reliability of management's estimates.  AU Section 342.  Moreover, this statement is largely irrelevant to the issue of whether Brown Schultz fulfilled its duties as

an auditor.  If anything, it indicates why much more extensive field work should have been performed by Brown Schultz.

**Brown Schultz Proposal No. 54**:    The variables on which the accuracy of estimates depend include weather, illness, subcontractor or supplier failure, and owner default.  Trial Transcript at pp. 453-54.

**Although the statement is technically true, it should be noted that such statement exemplifies the reason why an auditor should check and test the reasonableness of management's estimates.  In fact, GAAS requires that auditors conduct sufficient tests to determine the reliability of management's estimates.  AU Section 342.  Moreover, this statement is largely irrelevant to the issue of whether Brown Schultz fulfilled its duties as an auditor.  If anything, it indicates why much more extensive field work should have been performed by Brown Schultz.**

**Brown Schultz Proposal No. 55**:    Because of the unusual operating aspects, a contractor's financial position can change drastically overnight.  Trial Transcript at pp. 453-54.

**Although the statement is technically true, it should be noted that such statement exemplifies the reason why an auditor should check and test the reasonableness of management's estimates.  In fact, GAAS requires that auditors conduct sufficient tests to determine the reliability of management's estimates.  AU Section 342.  Moreover, this statement is largely irrelevant to the issue of whether Brown Schultz fulfilled its duties as an auditor.  If anything, it indicates why much more extensive field work should have been performed by Brown Schultz.**

**Brown Schultz Proposal No. 56**:    The estimated amounts included on the financial statements of CCI could change over the course of time because of different events including events which were not known, and could not have been anticipated at the time the estimate was made.  Trial Transcript at p. 599.

**Although the statement is technically true, it should be noted that such statement exemplifies the reason why an auditor should check and test the reasonableness of management's estimates. In fact, GAAS requires that auditors conduct sufficient tests to determine the reliability of management's estimates. AU Section 342. Moreover, this statement is largely irrelevant to the issue of whether Brown Schultz fulfilled its duties as an auditor. If anything, it indicates why significantly more extensive field work should have been performed by Brown Schultz.**

<u>**Brown Schultz Proposal No. 57**</u>:    The existence of disparity between an estimate and actual or later results does not establish that the estimate was incorrect or wrong at the time it was made.  Trial Transcript at p. 2824.

**The proposed finding is misleading because it is true only if qualified by a phrase such as "standing alone." Moreover, this exemplifies the crucial responsibility of an auditor to carefully and thoroughly confirm the reasonableness of management's estimates. AU Section 342.**

<u>**Brown Schultz Proposal No. 59**</u>:    The audited financial statements disclosed that revenues from construction contracts are recognized on the percentage of completion method, measured by the percentage of direct cost incurred to date to estimated total direct costs for each contract. . . . Because of inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates will change within the near term.

Plaintiff's Exhibit 36 at p. 8.

**The statement is misleading and out of context. As discussed in greater detail in the response to Brown Schultz Proposal No. 60, *infra*, Brown Schultz' liability for its misrepresentations is not lessened or negated by this language taken from the footnotes of the 1998 Audit Report.**

**Brown Schultz Proposal No. 60**:     In addition, the audited financial statements also state:

Use of estimates:

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

Plaintiff's Exhibit 36 at p. 8.

Brown Schultz cannot abdicate its obligations to adhere to AICPA standards or its responsibilities for the inaccuracies of the Audited Financial Statements by relying on the "Use of Estimates" disclosure section in Footnote 1, Summary of Significant Accounting Policies, to the Audited Financial Statements ("Footnote 1").  Footnote 1 is a standard disclosure required by Statement of Position 94-6, "Disclosure of Certain Significant Risks and Uncertainties" ("SOP 94-6"), Exhibit "A" for ID, Tab 19B §§1408.1 and 1408.11, which requires disclosure that the preparation of financial statements requires the use of management's estimates.  SOP 94-6 "acknowledges that the disclosure will usually be standardized (*that is, boilerplate*)" and the "focus [is] primarily on risks and uncertainties that could significantly affect the amounts reported in the financial statements *in the near term* . . . ."  SOP 94-6, ¶.02 (emphasis supplied).  "Near term" is defined as "[a] period of time not to exceed one year from the date of the financial statements."  SOP 94-6, ¶.07; Exhibit A, Tab 19B §1408.18.  Footnote 1 serves merely to inform the reader that estimates may change within a period up to a year from the financial statement's date.

Moreover, Footnote 1 does not immunize Brown Schultz from liability for failing to properly test management's estimates.  Brown Schultz' Independent Auditor's Reports make specific representations that as of *a date certain* (**December 31, 1997 and December**

**31, 1998 respectively) the Audited Financial Statements "present fairly" and "in all material respects" CCI's financial position.  That "actual results [at project completion] *could* differ from those estimates" does not vitiate the representation that as of a date certain, Brown Schultz' representations are true or, at minimum, have been reviewed with "professional skepticism."**

**Brown Schultz Proposal No. 62**:    Plaintiff was aware of and understood the content of footnote 1 of the audited financial statements which provided that revenue from contract amounts reflected on the financial statements of CCI were based on estimates of costs and that it was reasonably possible that the estimates used would change within the near term.  Trial Transcript at pp. 600-01; Exhibit 36, p. 8.

**Actually, James Daily testified that he was "aware" of the contents of Footnote 1 of the Audited Financial Statements; he did not testify that he "understood" them to be as defined in the proposed finding.  Testimony of J. Daily, Transcript, pp. 600-601.  As discussed in the response to Brown Schultz Proposal No. 60, *supra*, Footnote 1 does not relieve Brown Schultz of any liability.**

**Brown Schultz Proposal No. 63**:    Plaintiff's proposed adjustments to the 1997 and 1998 audited financial statements to form the proposed restated financial statements are based on information included on exhibit 337 and the completed contracts schedule attached to the 1998 audited financial statement, exhibit 36, using the "look back" method.  Trial Transcript at pp. 1917, 1928.

**As stated, the proposed finding is incorrect.  DeBruyn's adjustments were based on several factors, such as work in progress schedules (Exhibit 337), the 1999 work in progress schedule and, for 1997, at least the information in the work in progress schedules for 1998 and the contents of the 1998 Audit Report.  As discussed in greater detail in the response to Brown Schultz Proposal No. 70, *infra*, Exhibit 337 was a reliable source.**

**Brown Schultz Proposal No. 64**:    Exhibit 337 includes data which plaintiff's accounting expert witness, Steve DeBruyn, assumed was prepared by CCI and reflects job costs as of December 31, 1999. Trial Transcript at pp. 1917-1919:3, 1921:1-6.

**Evidence adduced at trial showed that it was prepared by Sheri Phillips' staff and produced to USF&G as part of a financing request made by CCI. Testimony of J. Daily, Transcript, pp. 430-433. Additionally, Brown Schultz introduced no evidence indicating that it was unreliable. Having called Sheri Phillips as a witness, Brown Schultz was capable of having introduced any existing evidence that might call that exhibit into question. USF&G incorporates herein its response to Brown Schultz Proposal No. 70, *infra*.**

**Brown Schultz Proposal No. 65**:   Plaintiff believed that financial data prepared by CCI after the latter part of 1999 was unreliable. Trial Transcript at pp. 1926-27, 2562.

**This is misleading because, *inter alia*, USF&G held this belief only *after* CCI ceased doing business.**

**Brown Schultz Proposal No. 66**:   The evidence did not establish the source of the information included in exhibit 337, or that the information was reliable. Trial Transcript at pp. 429, 430, 1917-19, 1921.

**Evidence adduced at trial showed that it was prepared by Sheri Phillips' staff and produced to USF&G as part of a financing request made by CCI. Testimony of J. Daily, Transcript, pp. 430-433. USF&G incorporates herein its response to Brown Schultz Proposal No. 70, *infra*.**

**Brown Schultz Proposal No. 67**:   The information contained in Exhibit 337 was not audited or tested in any way. Trial Transcript at pp. 1918, 1921-22.

**Although USF&G is unaware of an audit having been performed relative to Exhibit 337, there is no reason to believe such information was not compiled, reviewed and prepared any differently than any other interim financials prepared by CCI or any information from CCI given to Brown Schultz as part of Brown Schultz' prior audits. In**

fact, there is no reason to assume it was not compiled using the same methods and means described in Brown Schultz Proposal Nos. 19-39.

**Brown Schultz Proposal No. 68**:   DeBruyn believed CCI did not historically produce reliable financial information.  Trial Transcript at pp. 1911, 1918, 1970.

**Actually, DeBruyn testified that CCI was not a capable estimator of costs to complete.  Testimony of DeBruyn, Transcript, p. 1970.  Such statement is not tantamount to the conclusion to the proposed finding.**

**Brown Schultz Proposal No. 69**:   DeBruyn's proposed adjustments to the financial statements were based on financial information which plaintiff did not believe was reliable. Trial Transcript at pp. 2562-63.

**Anthony Phillips testified that *after* he received the bad financial news from Dominiani in September 1999, he *then* realized – in retrospect – that the information received must not have always been accurate.  Testimony of A. Phillips, Transcript, pp. 2562-2563.  The proposed finding is emblematic of the confusion sowed by Brown Schultz throughout the litigation between what is known *now* and what was known in 1997, 1998 and 1999.**

**Brown Schultz Proposal No. 70**:   Exhibit 337 was not a source of reliable data. Trial Transcript at pp. 1918, 1926-27, 2563.

**Brown Schultz' assertion that DeBruyn's testimony is improper because it is based, in part, on Exhibit 337, a balance sheet and income statement dated December 31, 1999 internally prepared by CCI, is frivolous.  Exhibit 337.  It was fully admitted into evidence for all purposes.  Absolutely *no* testimony or documents adduced at trial call into question the credibility of the document or the financial data therein.  James Daily testified that (1) the information on Exhibit 337 was of the type that USF&G regularly requested from CCI; (2) USF&G regularly relied upon such information provided by CCI relative to its**

underwriting decisions; and (3) Exhibit 337 was submitted as part of a package of information by CCI to USF&G in connection with CCI's request for financing.  Testimony of J. Daily Transcript, pp. 430-433.  Likewise, although Sheri Phillips admitted to grave doubts about the accuracy of CCI's projections regarding contract completion, she never indicated that CCI's in-house financial statements were not reliable.  Testimony of S. Phillips, Transcript, pp. 2148, 2165.  If anything, Sheri Phillips' concerns would have encouraged conservatism in preparing financials to be provided to a third party for a specific purpose.  William Eskin ("Eskin") found the financial information provided to him by Sheri Phillips to be reliable.  *See,* Exhibit 750 (limited purpose).  Moreover, Brenner also relied on Exhibit 337 relative to his opinions.  Testimony of Brenner, Transcript, pp. 2995-2996.  The accuracy of Exhibit 337 – as well as Brown Schultz' multitude of errors in testing estimated costs and profits – is also demonstrated by considerable evidence that CCI's ultimate financial failure was not the result of a calamitous event but, rather, the natural result of its inability to profitably complete a contract.  Sheri Phillips testified that she did not recollect any labor strikes, uninsured losses or other events outside the ordinary that would have precipitated CCI's collapse.  Testimony of S. Phillips, Transcript, pp. 2149-2151.  A memorandum prepared by Eskin dated November 17, 1999 provides, *inter alia*, that "[p]er my discussion with Sherri it was represented there are no significant contingent liabilities (lawsuits, etc.) which would have a material impact on the company and would preclude them from completing their bonded obligations."  Exhibit 750, p. 5 (admitted for limited purpose).  Moreover, Eskin testified that he was not aware of any contingent liabilities, uninsured losses or anything that would have adversely impacted CCI's balance sheet.  Testimony of Eskin, Transcript, pp. 2729-2730.  Curiously, Brown

Schultz listed as a witness, but did not call Ortenzio, and introduced *no* evidence attributing CCI's collapse to any calamitous act.  Moreover, as of December 8, 1999, Brown Schultz' Corinne Rebinski ("Rebinski") signed off on a Checklist for Internal Controls relative to Brown Schultz' preparation of a 1999 audit of CCI.  In this document, maintained in Brown Schultz' "Permanent File" for CCI, she indicated that – as of December 8, 1999 – there were "no major problems or concerns in the prior year and none are anticipated."  Exhibit 145, p. 11; Testimony of Brown, Transcript, p. 880.  Previously, Brown Schultz has argued that the problems CCI allegedly had on the Scott Air Force Base project caused CCI's collapse.  The only credible testimony adduced at trial concerning that putative claim was by Gregory Daily, who opined that after investigation by experienced engineers, USF&G decided that that potential claim was essentially worthless.  Testimony of G. Daily, Transcript, pp. 56-57.  As discussed, *supra*, as of December 9, 1998, that project was not a sufficient problem to merit any qualifications to Rebinski's optimistic outlook.  Exhibit 145, p. 11.  In fact, CCI was never defaulted by the owner on the project, Testimony of S. Phillips, Transcript, p. 2174, and there is not a shred of paper in evidence indicating that there is any value attributable to this putative claim or even describing the specifics of such claim.  As Sheri Phillips admitted, there is a difference between believing you have a claim and it actually being decided by the owner or an appropriate authority that money is, in fact, owed.  Testimony of S. Phillips, Transcript, p. 2150.  As is discussed in greater detail, *infra*, CCI's "claim" of $1,162,460 filed with Department of General Services ("DGS") relative to the Mahanoy Prison resulted in payment by DGS of only approximately $200,000, less than 20% of the amount "estimated" by CCI to be its "claim."  Finally, according to CCI's interim financials, Scott Air Force

Base was (and was projected to continue to be) profitable as of December 31, 1999.  Exhibit

337.

**Brown Schultz Proposal No. 71**:    An auditor should never use data that is unknown as to quality or reliability. Trial Transcript at p. 2976:22-2977:2.

**Brenner's opinion on this matter is not only of dubious credibility but is rendered without reference to any particular professional guidance.  Testimony of Brenner, Transcript, pp. 2976-2977.  In fact, in neither of his two reports does he cite any standard, principle or procedure that specifically precludes the use of information of the type relied upon by DeBruyn.  Testimony of Brenner, Transcript, p. 2977.  In that DeBruyn's opinions are based on reliable evidence, Brenner's opinion is both hypothetical and irrelevant.**

**Brown Schultz Proposal No. 72**:    Because of the unproven reliability of the data on Exhibit 337, the evidence did not establish that the estimated costs to complete were different from the actual costs for those contracts where plaintiff's expert used Exhibit 337 as a basis for his restatements.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 70.**

**Brown Schultz Proposal No. 75**:    DeBruyn used the "look back" method to restate financial statements developed by DeBruyn for 1997 and 1998. Trial Transcript at p. 1939:6-9.

**This assertion is misleading because even though the methodology is referred to as "look back," DeBruyn's methodology involved much more.  He did not just transpose a method used by the Internal Revenue Service to another arena.  The evidence adduced at trial demonstrated that DeBruyn's testimony is predicated not only on an accepted and logical methodology, but based upon credible data that is in evidence.  It also has a high quotient of common sense.  DeBruyn opined – without qualification – that this methodology was used and employed by members of his profession and, further, that it was a reliable tool for analyzing and restating financials.  Testimony of DeBruyn, Transcript, p.**

1838.  DeBruyn's methodology is described in detail in Sections II(C)(1) and (F)(2)(c) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 76**:    Donald Brenner is a licensed certified public accountant with considerable experience in auditing of construction companies. Trial Transcript at pp. 2745-48.

Brenner was not licensed at the time he rendered his expert reports in this case, at the time he was deposed nor at the time he was originally scheduled to testify in November 2003.

Brenner is the paradigm of a professional, gun-for-hire witness.  He has handled approximately 150-200 litigation assignments in the last 10 years, involving everything from soup to nuts, although a majority concerned personal injury actions.  Testimony of Brenner, Transcript, p. 2765-2766.  In his report dated April 30, 2003, Brenner represented – without qualification – that he was licensed in Iowa, New Mexico, Florida, Georgia, South Carolina, New York and Illinois.  Exhibit 511.  Testimony of Brenner, Transcript, pp. 2776-2777.  Further, not only did he lack a valid professional license when he prepared his reports in the instant litigation but he blatantly lied about his qualifications at his deposition.  Testimony of Brenner, Transcript, p. 2780, 2787.

The importance of his licensure is evidenced by the fact that although he was scheduled to testify in court during the week of November 17 through 21, 2003 (and was present on some of those days), Brown Schultz' counsel decided at the last minute to call a different witness and to, instead, call Brenner to testify during the final days of trial in January 2004.  In the interim, Brenner undertook the necessary steps to revive his Illinois CPA license.  Exhibit 374, Exhibit 821.  Brenner admits that he was not licensed in Illinois

on September 30, 2000 but that he was as of December 19, 2003.  Exhibit 373, 821.

Testimony of Brenner, Transcript, p. 2779.

At the time he wrote his expert report on or about April 30, 2003 he was not licensed

in any state and could not have given the very audit opinions at issue in any jurisdiction.

Exhibit 511, 373.  Testimony of Brenner, Transcript, pp. 2795-2796.

Brenner's curriculum vitae contains references to organizations to which he does

not belong and certifications he is not allowed to claim.  Exhibits 373, 374, 375.  Testimony

of Brenner, Transcript, pp. 2787-2791.

Brenner claims the last time he performed any type of audit work was 5 or 6 years

ago.  Testimony of Brenner, Transcript, p. 2763.  Moreover, even in those instances he

merely worked as a consultant or subcontractor and the audit did not issue in his name or

that of his firm.  Testimony of Brenner, Transcript, pp. 2762-2763.

**Brown Schultz Proposal No. 77**:    Mr. Brenner was on the committee that produced the
Construction Contractor's AICPA Audit and Accounting Guide. Trial Transcript at pp. 2750-52.

Despite having no role on the committee for approximately 20 years, Brenner's

curriculum vitae identifies his role in that committee as if it were ongoing.  Testimony of

Brenner, Transcript, pp. 2772-2774.  Brenner admits that the committee went out of

existence in the early '80's.  Testimony of Brenner, Transcript, p. 2774.

**Brown Schultz Proposal No. 78**:    Brenner is an authority on construction accounting.
Trial Transcript at pp. 2745-52.

USF&G incorporates herein by reference its response to Brown Schultz Proposal

Nos. 76 and 77.

**Brown Schultz Proposal No. 79**:    The testimony by Brenner was credible and correct
in all respects.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 76 and 77.**

**Brown Schultz Proposal No. 80**:    The work and testimony by DeBruyn based on his work, did not comply with AICPA professional standards.  Trial Transcript at p. 2804:6-7.

**DeBruyn's methodology and opinions were fully explained at trial and are grounded in industry standards and practices.  Testimony of DeBruyn, Transcript, pp. 1795-1798, 1836-1837.  DeBruyn's methodology is described in detail in Section II(C)(2)(c) of USF&G's Post-Trial Memorandum and Section IX(B)(7) of USF&G's Proposed Findings.  Moreover, the unlicensed Brenner failed to identify the professional standards DeBruyn allegedly failed to follow and is hardly qualified to impugn DeBruyn's integrity.**

**Brown Schultz Proposal No. 81**:    The testimony of Steve DeBruyn is not credible and was, in all material respects, wrong.

**In marked contrast to Brenner, DeBruyn is an individual who is not only licensed to conduct audits of construction contractors but has done so within the past several years.  He is the firm-wide construction industry coordinator for a 40 office national accounting firm.  Testimony of DeBruyn, Transcript, pp. 1706-1707.  He has conducted approximately 400 audits, of which approximately 100 were of construction contractors.  Testimony of DeBruyn, Transcript, p. 1713.  His methodology and his opinions were fully explained at trial and are consistent, logical and grounded in industry standards and practices.  Testimony of DeBruyn, Transcript, pp. 1795-1798, 1836-1837.  The depth of DeBruyn's personal experience in construction auditing serves to buttress the reliability of his testimony.  Testimony of DeBruyn, Transcript, pp. 1706-1713.**

**Brown Schultz Proposal No. 82**:    The "look back" method described by DeBruyn is a formal process used by the Internal Revenue Service (IRS) for companies that have long term contracts to try to assess whether the company, on an estimated basis, is paying its fair share of taxes timely.  The IRS compares actual results of transactions with the estimates made at the

time the taxes were paid to determine if sufficient tax was paid and if interest and penalties are owed. Trial Transcript at p. 2846-47.

**This is misleading in that it implies that the methodology is limited to IRS proceedings.**

**Brown Schultz' criticism of the "look back" method not only ignores the pertinent law, but also the considerable testimony adduced in favor of such methodology. Not only is such method codified in the Internal Revenue Code, 26 U.S.C. §460(b), but appropriate variants (including the "book of wisdom") have been used in a variety of cases from patent litigation to eminent domain. Testimony of Brenner, Transcript, pp. 2978-2979. *See, e.g., Sinclair Ref. Co. v. Jenkins Petroleum*, 289 U.S. 698 (1933); *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Prince George's County, Maryland*, 1993 WL 524783 (D. Md.).**

**DeBruyn testified that this methodology was used and employed by members of his profession and, further, that it was a reliable tool for analyzing and restating financials. Testimony of DeBruyn, Transcript, p. 1838.**

**Moreover, DeBruyn testified that with respect to the 1997 audit, not only would Brown Schultz have been able to restate it based on the 1998 Audit, but if it had done so by extending its audit procedures to adequately test the estimated costs to complete, the inadequacies of CCI's estimates would have been apparent. Testimony of DeBruyn, Transcript, pp. 1800-1801, 1815-1816.**

**Brown Schultz' expert, Brenner, also admitted that a form of the "look back" method is used to restate financial statements where errors have been made. Testimony of Brenner, Testimony, pp 2983, 3116, 3118.**

**Brown Schultz Proposal No. 83**:    The look back methodology was designed by and is used by the IRS for compliance with federal income tax law and evaluation of tax returns and not for the preparation of financial statements in accordance with generally accepted accounting principles ("GAAP").  Trial Transcript at p. 2804:8-12.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 80 and 82.**

**Brown Schultz Proposal No. 84**:    The look back method is not in compliance with GAAP and is not intended to be used to evaluate the quality of an audit, or the accuracy of the amounts included in the financial statement as of the statement date. Trial Transcript at p. 2847.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 80 and 82.**

**Brown Schultz Proposal No. 85**:    The only means to properly determine if the amounts reflected on the audited financial statements were incorrect estimated amounts is to review CCI's records including CCI's project files, job cost files, other ledgers and invoices.  Trial Transcript at p. 1916:2-7; 1937:12-23.

**As exemplified by DeBruyn's testimony, a review of all of CCI's records is not the *only* means to make a determination to a reasonable degree of certainty.  USF&G incorporates herein its response to Brown Schultz Proposal Nos. 80 and 82.**

**Brown Schultz Proposal No. 86**:    Mr. DeBruyn did not access the CCI's records sufficient to allow him to determine whether the 1997 and 1998 audited financial statements included incorrect estimated amounts. Trial Transcript at p. 1916:9-11.

**DeBruyn had sufficient information to adequately support his opinions.  USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 80 and 82.**

**Brown Schultz Proposal No. 88**:    The information included in the completed contracts schedule attached to the 1998 audited financial statements was not available when the audit work was performed for the 1997 financial statements.  Trial Transcript at p. 1928:10-19.

**This is partially true, but misleading in that it omits DeBruyn's testimony that he saw clear evidence that CCI's estimates were unreliable in 1997.  *This information, of course, was available to Brown Schultz during its work on the 1998 Audit Report*.**

**Brown Schultz Proposal No. 89**:   DeBruyn assumed the information reflected on Exhibit 337 was actual contract cost data rather than estimated contract cost data. Trial Transcript at pp. 1970:23-1973:3, 1977-1979.

**The citations to the trial transcript do not support the proposed finding.  USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 63, 80 and 82.**

**Brown Schultz Proposal No. 90**:   The information contained in Exhibit 337 was not available when the audit work was done for either the 1997 or 1998 audit.  Trial Transcript at p. 1928:5-9.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 63, 80, 82 and 88.**

**Brown Schultz Proposal No. 91**:   Mr. DeBruyn's proposed adjustments were made using data which was developed after the audits.  Trial Transcript at p. 1916:25-1917:3.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 63, 80 and 82.**

**Brown Schultz Proposal No. 92**:   Mr. DeBruyn's proposed adjustments to the audited financial statements for 1997 and 1998 are based on substituting actual completed contract costs for estimated contract costs.  Trial Transcript at p. 1947.

**The citations to the trial transcript do not support the proposed finding.  Moreover, this is an inaccurate description of the methodology utilized.  In essence, DeBruyn obtained the actual gross profit amount at the completion of the contract and applied it back to the construction in progress schedule.  The actual costs are, of course, the best information available where, as here, the underlying financial data has been lost.  If, for example, it was necessary to recreate the work in progress schedule, it would have been done using the best available information; to wit, the actual costs (rather than trying to determine what the estimated costs were).  Testimony of DeBruyn, Transcript, pp. 1836-1839.  USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 80 and 82.**

**Brown Schultz Proposal No. 93**:   DeBruyn did not comply with AICPA standards for consulting services in connection with his work as it related to his restatements of the CCI financial statements for 1997 and 1998.  Trial Transcript at p. 2934.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 80.  Moreover, Brenner failed to identify with precision exactly what the purported violations were as well as why the standards of consulting services would apply to DeBruyn's preparation of expert reports and testimony in court.**

**Brown Schultz Proposal No. 94**:   DeBruyn's work failed to comply with the due professional care standard and the sufficient relevant data standard.  Trial Transcript at p. 2935.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 80 and 93.**

**Brown Schultz Proposal No. 95**:   The data used by DeBruyn was unsubstantiated and DeBruyn did nothing to substantiate it. Trial Transcript at pp. 1918, 1921-22, 2936.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 63 and 70.**

**Brown Schultz Proposal No. 96**:   It is not be proper to make adjustments to the financial statements based on changes in jobs that occurred subsequent to the auditor's sign off date. Trial Transcript at p. 2937.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 80.**

**Brown Schultz Proposal No. 97**:   In applying the data, DeBruyn was required to use GAAP. Trial Transcript at p. 2937.

**The citation to the trial transcript does not support the proposed finding. Moreover, DeBruyn was creating a restatement to illustrate a point.  He did not perform a re-audit, nor did Brenner.**

**Brown Schultz Proposal No. 98**:   Changes in estimates are not a basis to restate prior years financial statements. When management has information that indicates that there is a

significant change from their original estimate it is then their obligation to revise the estimate on a going forward basis.  Trial Transcript at p. 2826.

**The citation to the trial transcript does not support the proposed finding.  The proposal is also nonsensical; changes to correct errors are the very substance of a restatement.**

**Brown Schultz Proposal No. 99**:    There is no support in the accounting literature for the use of Mr. DeBruyn's  method of comparing actual cost and other sources of information developed after the estimate as a means to determine the correctness of estimates.  Trial Transcript at p. 1940:1-5; 1940:21-24.

**The citation to the trial transcript does not support the proposed finding.  USF&G incorporates herein its response to Brown Schultz Proposal No. 80.**

**Brown Schultz Proposal No. 100**:    DeBruyn did not document the source of his methodology.  Trial Transcript at p. 1939:3-4.

**USF&G incorporates herein its response to Brown Schultz Proposal No. 80.**

**Brown Schultz Proposal No. 101**:    The method used by DeBruyn to restate the financial statements is not used by accountant as a means to determine the correctness of estimates.  Trial Transcript at pp. 1944:18-1945:5.

**USF&G incorporates herein its response to Brown Schultz Proposal No. 80.**

**Brown Schultz Proposal No. 102**:    Mr. DeBruyn did not know and did not make a determination about the specific information that was available as of the end of audit field work for the years ended December 31, 1997 and 1998.  Trial Transcript at pp. 1897-98.

**The citation to the trial transcript does not support the proposed finding.  As best as can made out, the proposed finding insinuates that because DeBruyn was not active in Brown Schultz' fieldwork regarding CCI in 1998 and 1999 and/or did not review the documents then available he is unable to opine as to what is missing from Brown Schultz' working papers.  This is nonsensical.  It also raises the issue of whether Brown Schultz' working papers were adequate.**

**Brown Schultz Proposal No. 103**:   Mr. DeBruyn did not limit himself to historical information available as of the end of audit field work when he developed his proposed adjustments to the financial statements to arrive at the proposed restated financial statements. Trial Transcript at pp. 1897-98.

**The citation to the trial transcript does not support the proposed finding.  As best as can made out, the proposed finding insinuates that because DeBruyn was not active in CCI fieldwork in 1998 and 1999 and/or did not review the documents then available he is unable to opine as to what is missing from Brown Schultz' working papers.  This is nonsensical. USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 80.**

**Brown Schultz Proposal No. 104**:   The data used by DeBruyn was from well after the audit date.  Trial Transcript at p. 2936.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 63, 80 and 82.**

**Brown Schultz Proposal No. 105**:   Relevant data would have been records documents and facts that existed at the year end and at the auditor's signature date. Trial Transcript at p. 2937.

**Brown Schultz completely misunderstands the methodology utilized to create a restatement.  DeBruyn used the best evidence available which he found adequate for his purposes.  Moreover, DeBruyn focused on estimated profits and losses, not specific costs. DeBruyn opined that he had sufficient material to render his opinions to a reasonable degree of professional certainty.  There is no evidence that his having examined a project's blueprints or a specific invoice would have altered the credibility and reliability of the methodology used or the results obtained.  USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 80.**

**Brown Schultz Proposal No. 106**:   No evidence was presented about the specific information which was available to defendants through the end of the audit field work.  Trial Transcript at p. 1902:9-13.

**This is misleading to the extent it presumes the relevancy of such information.**

**Moreover, although not required to maintain a copy of every document examined, Brown**

**Schultz' working papers should have contained "sufficient audit evidence to afford a**

**reasonable basis for [its] audit opinion. AICPA SAS No. 31, "Evidential Matter" (1980).**

**Even Brown agrees that the basic principle at the time Brown Schultz performed audits for**

**CCI was that the main purpose of working papers is to document what is done in**

**connection with the audit. Testimony of Brown, Transcript, p. 914. USF&G incorporates**

**herein by reference its response to Brown Schultz Proposal No. 102.**

**Brown Schultz Proposal No. 107**:   A determination about the propriety of estimated amounts requires information about both the event and the date of the event of the cost item which was not accounted for in the estimate to know whether it was an amount which was erroneously not included in the estimate.  Trial Transcript at p. 1932-33; 1937:12-23, 2851.

**As an initial matter, USF&G states that the proposed finding is gibberish. The**

**testimony adduced did *not* indicate that a determination of estimated amounts was**

**"require[d]." Additionally, it should be noted that DeBruyn focused on estimated profits**

**and losses, not specific costs. USF&G incorporates herein by reference its response to**

**Brown Schultz Proposal No. 80.**

**Brown Schultz Proposal No. 108**:   DeBruyn did not determine the date or event of the unaccounted for cost item responsible for the difference between the estimated costs to complete and the actual cost to complete.  Trial Transcript at p. 1932-33.

**DeBruyn did not make such a determination because it was neither reasonable nor**

**necessary for his analysis. Additionally, DeBruyn was focused on estimated profits and**

**losses, not specific costs. USF&G incorporates herein by reference its response to Brown**

**Schultz Proposal No. 80.**

**Brown Schultz Proposal No. 109**:   Mr. DeBruyn employed the particular method he used to develop proposed adjustments to CCI's audited financial statements for 1997 and 1998

instead of a re-audit only because the records of CCI were not made available to him.  Trial
Transcript at p. 1944:7-17.

DeBruyn utilized the best evidence available which he believed was adequate for his
opinion.  He did not claim to do a re-audit nor was there credible testimony that a re-audit
was either possible, preferable or feasible.  USF&G incorporates herein by reference its
response to Brown Schultz Proposal No. 80.

**Brown Schultz Proposal No. 110**:    The job files and records which plaintiff would
have obtained or accessed to take over CCI's projects were either not preserved or, if preserved,
were not made available to Mr. DeBruyn. Trial Transcript at p. 2855.

As an initial matter, there is no evidence that such documentation would have made
a difference to DeBruyn's analysis.  DeBruyn identified what he relied upon and opined
that his methodology was accepted and utilized by his profession.  Further and moreover,
the Court has already indicated that it believed Brown Schultz' incessant probing into such
document issues was irrelevant and meritless.  Trial Transcript, pp. 2502, 2631-2632, 2700-
2701.

Brown Schultz peppers its proposed findings with innuendo hinting at spoliation of
evidence.  The Court has already dismissed the late-raised, unsupported and mean-spirited
insinuations concerning the alleged destruction or withholding of purportedly relevant
documents.  Trial Transcript, pp. 2499-2502; 2699-2702.  Moreover, Brown Schultz has
never explained why it failed to undertake efforts to obtain documents from third parties,
such as CCI, project owners and contractors.  Brown Schultz is believed to have spent
approximately $40,000 in copying onto CD ROM format thousands of documents made
available to Brown Schultz by USF&G during the discovery phase of the litigation.
Finally, the attempt to focus on architectural drawings, plans, invoices and other detritus of
the construction process seems calculated to deflect attention from the one germane issue;

**to wit, did the Audited Financial Statements contain material misrepresentations because Brown Schultz did not conduct its audit in compliance with Generally Accepted Auditing Standards?**

**Brown Schultz Proposal No. 111**:    Those files would have allowed DeBruyn to do a proper review of Brown Schultz's work because those documents would show the events causing changes and whether those events occurred between year end and the end of the audit field work for the audit years in question. Trial Transcript at p. 2855.

**As an initial matter, there is no evidence that such documentation would have made a difference to DeBruyn's analysis.  DeBruyn identified what he relied upon and opined that his methodology was accepted and utilized by his profession.  Further and moreover, the Court has already indicated that it believed Brown Schultz' incessant probing into such document issues was irrelevant and meritless.  Trial Transcript, pp. 2502, 2631-2632, 2700-2701.**

**Brown Schultz Proposal No. 112**:    Many of the project files exist for the CCI contracts bonded by plaintiff and for which plaintiff contends the estimated costs to complete were inaccurate.  Trial Transcript at p. 2621-22.

**As an initial matter, there is no evidence that such documentation would have made a difference to DeBruyn's analysis.  DeBruyn identified what he relied upon and opined that his methodology was accepted and utilized by his profession.  Further and moreover, the Court has already indicated that it believed Brown Schultz' incessant probing into such document issues was irrelevant and meritless.  Trial Transcript, pp. 2502, 2631-2632, 2700-2701.  There was significant evidence adduced at trial of USF&G's efforts to obtain, utilize and make available all pertinent documents.**

**Brown Schultz Proposal No. 113**:    CCI granted plaintiff access to the files relating to the projects. Trial Transcript at p. 2634, 2636.

As an initial matter, there is no evidence that such documentation would have made a difference to DeBruyn's analysis. DeBruyn identified what he relied upon and opined that his methodology was accepted and utilized by his profession. Further and moreover, the Court has already indicated that it believed Brown Schultz' incessant probing into such document issues was irrelevant and meritless. Trial Transcript, pp. 2502, 2631-2632, 2700-2701. There was significant evidence adduced at trial of USF&G's efforts to obtain, utilize and make available all pertinent documents.

**Brown Schultz Proposal No. 114**:    CCI never denied a request for materials made by plaintiff except for the Scott Air Force Base file which was in the possession of a consultant hired by plaintiff and which was obtained by subpoena. Trial Transcript at pp. 2635-36.

As an initial matter, there is no evidence that such documentation would have made a difference to DeBruyn's analysis. DeBruyn identified what he relied upon and opined that his methodology was accepted and utilized by his profession. Further and moreover, the Court has already indicated that it believed Brown Schultz' incessant probing into such document issues was irrelevant and meritless. Trial Transcript, pp. 2502, 2631-2632, 2700-2701. There was significant evidence adduced at trial of USF&G's efforts to obtain, utilize and make available all pertinent documents. Moreover, after May 2000, CCI's records were under the control of a bankruptcy trustee.

**Brown Schultz Proposal No. 115**:    Plaintiff did not establish that there were any project files for the CCI contracts bonded by plaintiff which no longer existed or were inaccessible to plaintiff. Trial Transcript at pp. 2624-27.

As an initial matter, there is no evidence that such documentation would have made a difference to DeBruyn's analysis. DeBruyn identified what he relied upon and opined that his methodology was accepted and utilized by his profession. Further and moreover, the Court has already indicated that it believed Brown Schultz' incessant probing into such

document issues was irrelevant and meritless.  Trial Transcript, pp. 2502, 2631-2632, 2700-2701.  There was significant evidence adduced at trial of USF&G's efforts to obtain, utilize and make available all pertinent documents.  Testimony of Silverstein, Transcript, pp. 2621-2624.

**Brown Schultz Proposal No. 116**:     The project files in the possession of plaintiff were never provided to plaintiff's accounting expert.  Trial Transcript at p. 2624.

As an initial matter, there is no evidence that such documentation would have made a difference to DeBruyn's analysis.  DeBruyn identified what he relied upon and opined that his methodology was accepted and utilized by his profession.  Further and moreover, the Court has already indicated that it believed Brown Schultz' incessant probing into such document issues was irrelevant and meritless.  Trial Transcript, pp. 2502, 2631-2632, 2700-2701.  There was significant evidence adduced at trial of USF&G's efforts to obtain, utilize and make available all pertinent documents.  Moreover, DeBruyn's testimony fully and adequately described the methodology and identified all data on which he based his conclusions.  USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 80.

**Brown Schultz Proposal No. 117**:     The project files for the CCI contracts bonded by plaintiff were available to plaintiff to provide to plaintiff's accounting expert.  Trial transcript at p. 2629.

As an initial matter, there is no evidence that such documentation would have made a difference to DeBruyn's analysis.  DeBruyn identified what he relied upon and opined that his methodology was accepted and utilized by his profession.  Further and moreover, the Court has already indicated that it believed Brown Schultz' incessant probing into such document issues was irrelevant and meritless.  Trial Transcript, pp. 2502, 2631-2632, 2700-2701.  There was significant evidence adduced at trial of USF&G's efforts to obtain, utilize

and make available all pertinent documents.  **Testimony of Silverstein, Transcript, pp. 2621-2624.**

**Brown Schultz Proposal No. 118**:    There were valid change orders and claims on projects that had not been pursued by plaintiff as of the end of Ms. Phillips employment with CCI.  Trial Transcript at p. 2126.

**Gregory Daily and Matthew Silverstein testified as to the procedures and processes used to evaluate any putative claims.  Brown Schultz introduced** *no* **evidence that USF&G did not act reasonably in attempting to mitigate its damages and to collect all available revenue.  Testimony of G. Daily, Transcript, pp. 14-15, 18-21, 85.  Moreover, the Court should be mindful of the difficulties encountered by a surety when it must complete a project(s) after the principal has defaulted.  Testimony of G. Daily, Transcript, pp. 15-16.  Brown Schultz introduced** *no* **documentation in support of its assertion in this proposed finding,** *no* **expert testimony and did not call any witnesses to quantify the putative change orders and claims.  As for the Scott Air Force Base Project, USF&G incorporates its responses to Brown Schultz Proposal No. 121,** *infra***.  Moreover, Sheri Phillips testified that she was only involved in "accounting" aspects of claims preparation.  Testimony of S. Phillips, Transcript, p. 2128.  Thus, she is unqualified to testify as to,** *inter alia***, the legality and validity of any claims.**

**Brown Schultz Proposal No. 119**:    If change orders and claims had been successfully pursued, then the amount of contract revenue and profit on contracts would increase. Trial Transcript at p. 1978.

**There is** *no* **evidence that change orders and claims were not properly and successfully pursued.  Moreover, Brown Schultz has not taken into consideration the considerable claims of owners and unpaid contractors for liquidated damages, penalties,**

back charges and completion costs.  USF&G incorporates herein by reference its response

to Brown Schultz Proposal No. 118.

**Brown Schultz Proposal No. 120**:    Mr. DeBruyn's proposed adjustments to the 1997 and 1998 financial statements did not account for the successful pursuit of change orders and claims.  Trial Transcript at p. 1978.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal**

**Nos. 80, 118 and 119.**

**Brown Schultz Proposal No. 121**:    CCI had cash flow issues during the latter part of 1999 because there were payments withheld and/or unapproved change order/claim in excess of $4,000,000, and subcontractor failure.  Trial Transcript at p. 727-38, 2123.

**Brown Schultz has argued that the problems CCI allegedly had on the Scott Air**

**Force Base project caused CCI's collapse.  The only credible testimony adduced at trial**

**concerning that putative claim was by Gregory Daily, who opined that after investigation**

**by experienced engineers, USF&G decided that that potential claim was essentially**

**worthless.  Testimony of G. Daily, Transcript, pp. 56-57.  As discussed,** *supra***, as of**

**December 9, 1998, that project was not a sufficient problem to merit** *any* **qualifications to**

**Rebinski's optimistic outlook.  Exhibit 145, p. 11.  In fact, Brown Schultz was never**

**defaulted by the owner on the project, Testimony of S. Phillips, Transcript, p. 2174, and**

**there is not a shred of paper in evidence indicating that there is any value attributable to**

**this putative claim or even describing the specifics of such claim.  As Sheri Phillips**

**admitted, there is a difference between believing you have a claim and it actually being**

**decided by the owner or an appropriate authority that money is, in fact, owed.  Testimony**

**of S. Phillips, Transcript, p. 2150.  As is discussed in greater detail,** *infra***, CCI's "claim" of**

**$1,162,460 filed with DGS relative to the Mahanoy Prison resulted in payment by DGS of**

**only approximately $200,000, less than 20% of the amount "estimated" by CCI to be its**

"claim." Finally, according to CCI's interim financials, Scott Air Force Base was (and was projected to continue to be) profitable as of December 31, 1999. Exhibit 337.

      <u>Brown Schultz Proposal No. 122</u>:    An unpaid Scott Air Force Base change order/claim in excess of $4,000,000 was the primary reason for the cash flow problem experienced by CCI during 1999. Trial Transcript at p. 2171:25-2172:8.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 121.**

      <u>Brown Schultz Proposal No. 123</u>:    The proof concerning the proposed restatements to the 1997 and 1998 audited CCI financial statements was not derived from an accepted and appropriate method for determining the propriety of those estimates on those financial statements.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 70, 75, 80 and 81.**

      <u>Brown Schultz Proposal No. 124</u>:    The evidence did not establish that the events which allegedly caused the increased costs to complete over the estimated costs to complete occurred prior to the end of audit field work, was known to or could have been known before the 1997 and 1998 audit reports were issued.

**Significant evidence concerning this issue is discussed in Sections II(B) and (E) of USF&G's Post-Trial Memorandum.**

      <u>Brown Schultz Proposal No. 125</u>:    The evidence did not establish that the reason for CCI's financial difficulties were related to incorrect amounts on the financial statements.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 70. This matter is also discussed in detail in Sections II(C), (E) and (I) of USF&G's Post-Trial Memorandum. Additionally, DeBruyn testified that Brown Schultz' nonconformance with the applicable standards of care resulted in material misstatements to the Audited Financial Statements. Testimony of DeBruyn, Transcript, pp. 1792-1793. Charts 364-A, 364-B (ID only).**

**Brown Schultz Proposal No. 126**:    The amount of contract revenue reflected on the 1997 and 1998 audited financial statements were based on reasonable, reliable, and dependable estimated costs to complete.

**The material inaccuracies concerning estimated completion costs and profits contained in the Audited Financial Statements are discussed in detail in Section II(C)(2) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 127**:    CCI had a contract claim against the owner of the Mahanoy Prison project  in the amount of $1,162,460.  Trial Transcript at p. 1412, Exhibit 222 at 284-292.

**CCI *alleges* it had a certain contract claim relating to the Mahanoy Prison Project (the "Mahanoy Claim").  In that the DGS paid CCI less than 20% of the amount requested by CCI relative to that putative claim, it is inaccurate for Brown Schultz to claim the amount of $1,162,460 as the value of such claim.  Testimony of Brown, Transcript, pp. 1283-1285.**

**Moreover, because of a double-counting error, the claim is overstated by at least $448,000.  Exhibit 222, p. 95.  Testimony of Brown, Transcript, pp. 1096-1097.**

**Further, Brown Schultz did not investigate the validity of the Mahanoy Claim. Testimony of Bowman, Transcript, pp. 1407-1408.  Bowman admitted that she could not identify anything in the working papers to indicate that tests were performed to determine if the Mahanoy Claim was valid.  Testimony of Bowman, Transcript, pp. 1378-1379.**

**Brown Schultz Proposal No. 128**:    The claim was presented to the owner.  Trial Transcript at p. 2164.

**Sheri Phillips testified that material concerning the putative claim was "put together" by CCI and given to the DGS at an indeterminate time.  Testimony of S. Phillips, Transcript, p. 2164.**

**Brown Schultz Proposal No. 129**:   Payment of the entire amount of the claim was guaranteed by Pennsylvania Contractors Insurance Company ("PCIC") in the event the owner did not pay all or a portion of the claim.  Exhibit 265.

**The legality and validity of the purported guaranty was never established.  USF&G discusses, *inter alia*, Brown Schultz' failure to investigate the validity of the guaranty, the validity of the claim, the legality of payment and PCIC's solvency in Section II(C)(3)(b) of USF&G's Post-Trial Memorandum.  Moreover, the validity, enforceability and applicability of the underlying Remedial Work Period Insurance Policy is questionable.  Further, PCIC was not solvent.**

**Brown Schultz Proposal No. 131**:   There existed a legally valid, binding, and enforceable guarantee by PCIC in the amount of $1,162,460 in favor of CCI.

**The legality and validity of the purported guaranty was never established.  USF&G discusses, *inter alia*, Brown Schultz' failure to investigate the validity of the guaranty, the validity of the claim, the legality of payment and PCIC's solvency in Section II(C)(3)(b) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 132**:   A legal basis for a claim does not require a legal opinion. Trial Transcript at p. 2922.

**Actually, accountants are required to seek assistance from specialists in such situations.  SAS No. 73, Using the Work of a Specialist (December 15, 1994) ("SAS No. 73").  Exhibit 272.  Brown Schultz admitted that no legal assistance was sought as to the validity of either the claim, the guaranty, or the pertinent policy.  Testimony of Brown, Transcript, pp. 1036-1038, 1219, 1067-1071.**

**Brown Schultz Proposal No. 133**:   If the claim guaranteed by PCIC does not meet the definition of a claim for purposes of recognition as revenue under SOP 81-1, it is appropriate to look to general accounting principles of revenue recognition. Trial Transcript at p. 2927.

SOP 81-1 enumerates certain conditions which must be met *before* a claim can be included in revenue:

      a.     The contract or other evidence provides a legal basis for the claim; or a legal opinion has been obtained, stating that under the circumstances there is a reasonable basis to support the claim.

      b.     Additional costs are caused by circumstances that were unforeseen at the contract date and are not the result of deficiencies in the contractor's performance.

      c.     Costs associated with the claim are identifiable or otherwise determinable and are reasonable in view of the work performed.

      d.     The evidence supporting the claim is objective and verifiable, not based on management's "feel" for the situation or on unsupported representations.

Exhibit 360, Appendix A, pp. 103-104. SOP 81-1, par. 1 "provides guidance on the application of generally accepted accounting principles in accounting for the performance of *contracts for which specifications are provided by the customer for the construction of facilities . . . .*" Exhibit 360, Appendix A, p. 85. Although the types of contracts covered by SOP 81-1 include the construction and design of buildings, ship building and the design and manufacture of complex aerospace construction and engineering, nothing in SOP 81-1 expressly includes within its scope insurance contracts or guarantees. Exhibit 360, par. 13, Appendix A, p. 88.

Brown admitted that there was no documentation in Brown Schultz' working papers demonstrating Brown Schultz' compliance with the requirements of SOP 81-1 regarding the Mahanoy Claim, Testimony of Brown, Transcript, pp. 1079, and DeBruyn testified that he did not observe any such documentation. Testimony of DeBruyn, Transcript, pp. 2065-2067.

Despite its absence from his two written reports and it not being raised by Brown or Bowman during their time on the witness stand, Brenner sought to justify Brown Schultz' non-compliance with SOP 81-1 by claiming that FASB Concept Statement 5, Recognition

and Measurements in Financial Statements of Business Entities, June 1, 19994 ("FASB

Concept Statement 5") was applicable, instead.  Brenner's reliance on FASB Concept

Statement 5 is misplaced for a number of reasons, not least of which is its low ranking on

the GAAP hierarchy.

FASB Concept Statement 5 merely provides general "guidance" on an application

of the "fundamental criteria" attendant with earnings recognition.  FASB Concept

Statement 5, para. 78.  It speaks generally of revenue recognition after the merchandise or

services have been sold for cash or *claims* have been *converted to cash*.  *Id.*, para. 83(a).

Additionally, the GAAP hierarchy provides that a concept statement has the *lowest* priority

of all GAAP rules and is at a level far lower than SOP 81-1.  Testimony of Brenner,

Transcript, pp. 3101-3102.  Moreover, SOP 81-1 has specific application, as noted above, to

contracts for construction of facilities, SOP 81-1, para. 1, and specifies the preconditions to

recognizing construction claims as revenue.

> **Brown Schultz Proposal No. 134**:    The circumstances under which an amount may be
> recognized as revenue on a financial statement under general accounting principles are as
> follows:    It must be probable that the completed transaction will result in profit; the amount
> must be ascertainable; and collection of the amount must be reasonably assured. Trial Transcript
> at p. 2927-28.

USF&G incorporates herein by reference is response to Brown Schultz Proposal No.

133.  Summarily, the method described is not applicable to construction contract revenue.

SOP 81-1.

FASB Concept Statement 5 merely provides general "guidance" on an application

of the "fundamental criteria" attendant with earnings recognition.  It speaks generally of

when revenue is recognized after merchandise or services have been sold for cash or claims

have been converted to cash.  FASB Concept Statement 5, para. 78 and para. 83(a).

Assuming, *arguendo*, that FASB Concept Statement 5 was applicable to the Mahanoy Claim, the GAAP Hierarchy provides that a FASB Concept Statement is the *lowest* priority level of all GAAP rules and standards and is on a much lower level than SOP 81-1.  Exhibit 377.  Testimony of Brenner, Transcript, pp. 3101-3102.

SOP 81-1 says specific application, as noted above, regarding performance of contracts for construction of facilities.  SOP 81-1, para. 1 and provides specific guidance on preconditions recognizing construction claims as revenue.  FASB Concept Statement 5 only speaks of recognition of a claim as revenue once it has been converted to cash.  FASB Concept Statement 5, para. 83a.

There is nothing in FASB Concept Statement 5 that requires the recording of the Mahanoy Claim in revenue in 1998.  Testimony of DeBruyn, Transcript, p. 3192.

**Brown Schultz Proposal No. 135**:    As of December 31, 1998, the full amount of the PCIC guaranteed claim could have been paid by PCIC.  Trial Transcript at p. 1111:6-10; 1112:22-1113:19; 1114:15-1115:3; 1120:19-23.

PCIC lacked the financial ability to pay the claim.  PCIC's lack of solvency is discussed in detail in Section II(C)(3)(b)(7) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 136**:    The guarantee made the claim probable of collection and properly included in revenue as disclosed in footnote 1 of the 1998 audited financial statement.  Trial Transcript at pp. 1101, 1192, 2928-30.

USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 133, 135 and 136.

Moreover, as discussed in greater detail, *infra*, CCI's claims paid by PCIC did not comply with the procedural requirements of the Remedial Work Period Insurance Policy nor were they necessarily covered by the Remedial Work Period Insurance Policy.

The Mahanoy Claim amount was purportedly included in underbillings by Brown Schultz because of "[t]he guarantee of PCIC of the claim to be submitted to the [DGS]." Testimony of Brown, Transcript, p. 1076.

SOP 81-1, par. 1 "provides guidance on the application of generally accepted accounting principles in accounting for the performance of *contracts for which specifications are provided by the customer for the construction of facilities . . . .*" Exhibit 360, Appendix A, p. 85. The claim does not meet the criteria for revenue recognition provided in SOP 81-1.

Further, DeBruyn did not observe any documentation in the Brown Schultz working papers that would support inclusion of the Mahanoy Claim of $1,162,460 in revenue based upon SOP 81-1. Testimony of DeBruyn, Transcript, p. 2067.

**Brown Schultz Proposal No. 137**:   The claim guaranteed by PCIC met the criteria for revenue recognition. Trial Transcript at p. 2928-30.

USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 133, 135 and 136.

**Brown Schultz Proposal No. 138**:   The recognition of the amount of the claim guaranteed by PCIC was in accordance with GAAP. Trial Transcript at p. 2931.

USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 133, 135 and 136.

**Brown Schultz Proposal No. 139**:   Because the claim was included in revenue, it ended up creating an underbilling consistent with the disclosure on how underbillings are calculated. Trial Transcript at p. 1271-72; Exhibit 36 at pp. 9, 11.

Where is the "disclosure" alluded to in this proposed finding?  It is not in Exhibit 36.  Brown Schultz is likely referring to its belief that Footnote 1 and Footnote 8 – read together – constitute an adequate disclosure.  As described in greater detail, *supra*,

Footnote 1 regarding revenue and cost recognition concerns contracts between CCI and project owners – *not* contracts between CCI and PCIC. Testimony of Brown, Transcript, p. 1104. The inadequacy of the disclosure in Footnote 8 is discussed in detail in Section II(C)(3)(c) and (d).

**Brown Schultz Proposal No. 140**:   Financial statements are prepared on an accrual basis so that transactions are recorded although cash may not have been collected or paid out. Trial Transcript at pp. 2805:22-2806:5; 2807.

This is incorrect. Recognition of revenue is subject to SOP 81-1. USF&G incorporates herein its response to Brown Schultz Proposal Nos. 133, 134 and 136.

**Brown Schultz Proposal No. 141**:   The full amount of the PCIC guaranteed claim was paid to and received by CCI. Trial Transcript at p. 1176, 2023.

This was not established at trial.

According to PCIC's trial balance sheet, PCIC paid $800,000 to CCI on July 7, 1999. PCIC also paid a total of $142,460 in two payment of $72,460 and $70,000 on December 7, 1999. The December 7, 1999 payments are described as "CCI/Mahanoy CLM PMT." *However, there is no indication as to the purpose of the payment of $800,000 on July 7, 1999*. Exhibit 331, p. BSSF 4978. Testimony of Brown, Transcript, pp. 1284-1285. Brown Schultz presented no evidence that PCIC actually paid the $800,000 to CCI and that such putative payment related to the Mahanoy Claim.

PCIC payments to CCI in 1999 were a form of revenue to CCI – to be accounted for in 1999. Testimony of DeBruyn, Transcript, pp. 3191-3192. The funds received or guaranteed by PCIC, however, would not have been "contract revenue." Testimony of DeBruyn, Transcript, p. 3193. Farnsworth opined that even if, *arguendo*, the claim were paid by PCIC, it should not have been included in revenue because it was a claim that CCI made against DGS for additional amounts over and above an agreed contract price and

such putative claim was guaranteed by a third party.  Testimony of Farnsworth, Transcript, p. 1544.

**Brown Schultz Proposal No. 142**:   Plaintiffs' expert did no analysis of the actual claim guaranteed by PCIC beyond a review of the Brown Schultz work papers.  Trial Transcript at p. 2077.

**The proposed finding mischaracterizes the question to which DeBruyn responded. He was asked if he did any analysis beyond the working papers "to determine if it was collectible."  Testimony of DeBruyn, Transcript, p. 2077.  Moreover, no analysis of either the merits or the collectibility of the underlying claim by DeBruyn was necessary.  The point is not whether the claim – in retrospect – was meritorious or not.  As an auditor, Brown Schultz was responsible for ensuring compliance with SOP 81-1 before it recognized revenue.  Bowman agrees that if the Mahanoy Claim was "phony" or a "false statement" it could not have been booked in revenue.  Testimony of Bowman, Transcript, p. 1407.  No independent investigation was conducted by Brown Schultz to determine if there was any merit to the Mahanoy Claim.**

**Bowman cannot identify anything in the working papers to indicate that tests were performed to determine if the Mahanoy Claim was valid.  Testimony of Bowman, Transcript, pp. 1378-1379.**

**In 1999, DGS paid CCI only approximately $200,000 of its putative claim of nearly $1,200,000.  Testimony of Brown, Transcript, pp. 1288-1289.  *The amount paid by DGS is only 17% of the amount of the Mahanoy Claim.***

**Brown Schultz Proposal No. 143**:   Plaintiff's expert believed that the PCIC guaranteed claim was a contingent gain and, therefore, should not be included in revenue.  Trial Transcript at p.  2025.

**DeBruyn *opined* that the guaranteed claim was a contingent claim which should not be included in revenue. Testimony of DeBruyn, Transcript, pp. 1848-1849, 3191. FAS No. 5, "Accounting for Contingencies," March 1975 (FAS No. 5), Exhibit "A" for ID, Tab 13.**

**Brown Schultz Proposal No. 144**:    Contingent gains are not included in revenue because the gain is dependent on a contingency which may never occur so that there is no assurance the company will actually ever receive the money.  Trial Transcript at p. 2025.

**DeBruyn *opined* that the guaranteed claim was a contingent claim which should not be included in revenue. Testimony of DeBruyn, Transcript, pp. 1848-1849, 3191. FAS No. 5, "Accounting for Contingencies," March 1975 (FAS No. 5), Exhibit "A" for ID, Tab 13.**

**Brown Schultz Proposal No. 145**:    The only contingency related to the PCIC guarantee related to the source of payment and not whether the amount would be paid.  Trial Transcript at p.  2027:14-17.

**The purportedly "only contingency" is still a contingency. Additionally, PCIC lacked the financial ability to pay the amount claimed. DeBruyn's testimony has been mischaracterized. He denied that the only contingency was the source of payment. Testimony of DeBruyn, Transcript, p. 2027. DeBruyn was unequivocal that the guarantee was contingent and that the claim never should have been recorded as revenue. *Id.* USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 135.**

**Brown Schultz Proposal No. 146**:    Plaintiff's expert had no authority from the accounting literature or otherwise for his position that a guarantee by itself is a contingent gain. Trial Transcript at pp. 2026-27.

**This is false. FAS No. 5, Exhibit "A" for ID, Tab 13.**

**Brown Schultz Proposal No. 147**:    The amount of the PCIC guaranteed claim was properly included in revenue in the 1998 audited financial statement. Trial Transcript at p. 2931.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal Nos. 133, 134 and 136. A detailed discussion of the inappropriateness of placing the claim in revenue is contained in Section II(C)(3) of USF&G Post-Trial Memorandum. DeBruyn**

was unequivocal that the claim never should have been recorded.  Testimony of DeBruyn, Transcript, p. 2027.

**Brown Schultz Proposal No. 148**:   The 1997 and 1998 audited financial statements fairly represented the financial condition of the company.

A detailed discussion of the material misrepresentations in the Audited Financial Statements in contained in Section II(C) of USF&G's Post-Trial Memorandum.  The restatements demonstrate that the Audited Financial Statements were not a fair representation of CCI's true financial condition.  Testimony of DeBruyn, Transcript, pp. 1800, 1759-1760.  Exhibits 365A and 365B (ID Only).

**Brown Schultz Proposal No. 149**:   The 1998 audited financial statement disclosed the existence of a claim in the amount of $1,162,460 against the owner of a project which was guaranteed by PCIC.  Exhibit 36, p. 13, fn 8.

Unfortunately, the 1998 Audit Report omitted other significant information required both by FAS No. 57 and Brown Schultz' internal requirements.  Exhibit 222, p. 184, FAS No. 57, Exhibit "A" for ID, Tab 14.  Testimony of DeBruyn, Transcript, p. 1853.  The disclosure did not *inter alia*, reveal the name of the project, that the claim was in revenue and underbillings and the effect of such treatment on the financial statements.  A detailed discussion of the inadequacy of the "disclosure" in Footnote 8 is contained in Section II(C)(3)(c) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 150**:   Footnote 1 to the 1998 financial statement also informed plaintiff that an amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.  Exhibit 36, p. 8.

Footnote 1 describes the auditor's methodology relative to certain revenue recognition issues.  Its disclosures are related to "construction contractors" and are utilized because contractors like CCI book their revenue and their costs based upon the percentage

of completion method, as discussed in the first paragraph of Footnote 1.  Exhibit 36, p. 8.

Testimony of Brown, Transcript, pp. 1102-1103.

Brown acknowledges that the two paragraphs in Footnote 1 regarding revenue and cost recognition concern contracts between CCI and project owners – *not* contracts between CCI and PCIC.  Testimony of Brown, Transcript, p. 1104.

Brenner also acknowledges that the paragraphs in Footnote 1 concerning cost recognition and revenue deal with construction contracts and the percentage of completion method, not "remedial work insurance contracts."  Testimony of Brenner, Transcript, p. 3093.

In the 1994 Audit Report for CCI, Brown Schultz provided a separate line-item entitled "Accounts Receivable Affiliates" in the revenue section of the balance sheet for a $461,320 claim against the Remedial Work Insurance Policy made by CCI.  Exhibit 31, p.1; Testimony of Bowman, Transcript, pp. 1341-1342, 1405-1406.

In the 1994 Audit Report, Brown Schultz also disclosed the *effects* of the related party PCIC transaction; to wit, it advised the reader that a "warranty insurance expense payment of $335,317" was included as a "direct cost of contracts."  Exhibit 31, p. 12, fn. 7; Testimony of Bowman, Transcript, pp. 1330, 1409-1410.

**Brown Schultz Proposal No. 151**:    The amount of the PCIC guaranteed claim was included as contract revenue on the 1998 audited financial statement.

While the claim was improperly included in revenue, the Proposal is misleading because it does not also state that such sum was also included in underbillings and that such inclusion was contrary to the precepts of SOP 81-1.  Exhibit 36.

**Brown Schultz Proposal No. 152**:   Footnote 8 to the 1998 audited financial statement specifically disclosed:

Pennsylvania Contractors Insurance Company has guaranteed a claim of $1,162,460 filed by the company with a contract owner.  If the owner fails to pay all or any part of this claim, the insurance company will pay the unpaid portion.

Exhibit 36 at p. 13.

**Unfortunately, it omitted other significant information required both by FAS No. 57 and Brown Schultz' internal requirements.  Exhibit 222, p. 184, FAS No. 57, Exhibit "A" for ID, Tab 14.  Testimony of DeBruyn, Transcript, p. 1853.  The disclosure did not *inter alia*, reveal the name of the project, that the claim was in revenue and underbillings and the effect of such treatment on the financial statements.  A detailed discussion of the inadequacy of the "disclosure" in Footnote 8 is contained in Section II(C)(3)(c) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 153**:   Plaintiff's underwriter, Tony Phillips, would have understood footnote 8 of the 1998 financial statement if he had read the footnote in connection with underwriting.  Trial Transcript at p. 2518.

**This is misleading because it implies that Mr. Phillips neither read nor understood the 1998 Audit Report.**

**Anthony Phillips testified that at the time he received the 1998 Audit Report, on or about March 2, 1999, he did not know that the Mahanoy Claim was included in underbillings in the 1998 Audit.  Testimony of Anthony Phillips, Transcript, pp. 2460, 2584.**

**Anthony Phillips reviewed the 1998 Audit Report when received from Dominiani and it was his standard procedure to read all footnotes in audit reports.  Testimony of Anthony Phillips, Transcript, p. 2583.**

**Anthony Phillips had no understanding that the Mahanoy Claim was included in underbillings until subsequent to finding out CCI was in financial trouble in late 1999. Testimony of Anthony Phillips, Transcript, p. 2583.**

**Anthony Phillips also testified that if he had known at the time of his receipt of the 1998 Audit Report that the Mahanoy Claim was included in revenue as an underbilling he would have *halted* bonding until he received a satisfactory answer regarding why CCI was not getting paid for the underbilling and whether there were additional underbillings that were not going to be paid. Testimony of Anthony Phillips, Transcript, p. 2472.**

**That, almost six years later, he does not have a specific recollection of a particular footnote is irrelevant.**

**Brown Schultz Proposal No. 154**:   Phillips would have understood from the contents of the financial statement that the amount of the PCIC guaranteed claim reflected in footnote 8 of the 1998 audited financial statement was included in revenue if he had read the footnote.  Trial Transcript at p. 2518.

**USF&G incorporates herein its response to Brown Schultz - Proposal No. 153.**

**Brown Schultz Proposal No. 155**:   Daily understood from the contents of footnote 8 of the 1998 audited financial statement that the $1.162 million claim guaranteed by PCIC could have been included in underbillings, a component of revenue.  Trial Transcript at p. 699.

**This is a mischaracterization.  James Daily testified that he had no understanding that the guaranty was in underbilings and, in fact, that he did not consider it.  Testimony of J. Daily, Transcript, pp. 416, 436, 439-440.**

**Brown Schultz Proposal No. 156**:   A reader of the 1998 audited financial statement would reasonably conclude from footnote 8 of that financial statement that the claim guaranteed by PCIC was included in revenue.  Trial Transcript at pp. 1538-1539, 1540.

**USF&G's underwriters believed that Footnote 8 in the 1998 Audit meant that if CCI did not receive a payment of all or a portion of the unnamed project related claim,**

PCIC would guaranty payment of the unpaid portion at some indeterminate time in the future.  Testimony of James Daily, Transcript, p. 399.

James Daily had no knowledge that the Mahanoy Claim was included as *revenue* in the 1998 Audit Report.  Testimony of J. Daily, Transcript, pp. 399, 411-412, 414.

James Daily testified that USF&G would have *ceased* to issue bonds if it knew that the Mahanoy Claim had been included in "underbillings."  Testimony of J. Daily, Transcript, pp. 415-416.

James Daily also testified of the importance of the revenue and underbilling sections of a financial statement to an underwriter.  Testimony of J. Daily, Transcript, pp. 349, 413.

Anthony Phillips testified that at the time he received the 1998 Audit Report, on or about March 2, 1999, he did not know that the Mahanoy Claim was included in underbillings in the 1998 Audit.  Testimony of Anthony Phillips, Transcript, pp. 2460, 2584.

Anthony Phillips reviewed the 1998 Audit Report when received from Dominiani and it was his standard procedure to read all footnotes in audit reports.  Testimony of Anthony Phillips, Transcript, p. 2583.

Anthony Phillips had no understanding that the Mahanoy Claim was included in underbillings until subsequent to finding out CCI was in financial trouble in late 1999.  Testimony of Anthony Phillips, Transcript, p. 2583.

Rolf Neuschaefer ("Neuschaefer") admitted that in his reading the 1998 Audit Report there was nothing that would have informed him that the Mahanoy Claim had been included in revenue.  Testimony of Neuschaefer, Transcript, pp. 2373-2374, 3379.

Neuschaefer also admitted that he could not have identified that the Mahanoy Claim was included in revenue by reading Footnote 8.  Testimony of Neuschaefer, Transcript, pp. 2378-2380.

Brenner admitted that Footnote 8 to the 1998 Audit Report does not show that the Mahanoy Claim is included in underbillings.  Testimony of Brenner, Transcript, p. 3070.

Brenner also admitted that even if Footnote 1 to the 1998 Audit Report is read in conjunction with Footnote 8 of that Audit, that the particular fact that the guarantee was included in underbillings is not disclosed.  Testimony of Brenner, Transcript, p. 3089.

DeBruyn testified that upon first reviewing Footnote 8 that he was unable to determine what effect the particular guaranteed amount of $1,162,460 had on the financial statement.  Testimony of DeBruyn, Transcript, p. 1847.

Farnsworth testified that by examining the 1998 Audit Report he was not able to tell that the Mahanoy Claim of $1,162,460 was included in revenue.  Testimony of Farnsworth, Transcript pp. 1538, 1540.

Farnsworth also testified that Footnote 8 does not inform the reader under what, if any, lines in the Balance Sheet or Income Statement the Mahanoy Claim of $1,162,460 is shown.  Testimony of Farnsworth, Transcript p. 1538.

Farnsworth also testified that even if, *arguendo*, he knew that the Mahanoy Claim was included in revenue, he would not necessarily have known it was included in underbillings because it could have been made a separate line item on the balance sheet. Testimony of Farnsworth, Transcript pp. 1562-1563.

Farnsworth also testified that nothing in Footnote 8 of the 1998 Audit Report showed the Mahanoy Claim was being included in revenue nor did it identify the name of the project to which the "claim" resulted.  Testimony of Farnsworth, Transcript p. 1565.

**Brown Schultz Proposal No. 157**:    A reader of the financial statement could reasonably understand from footnote 8 of the 1998 audited financials that the $1.162 million dollar amount guaranteed by PCIC was a claim against the project owner.  Trial Transcript at p. 2036:14-19.

**USF&G incorporates herein its response to Brown Schultz Proposal No. 156.**

**Brown Schultz Proposal No. 158**:    The evidence did not establish that plaintiff had an understanding of the PCIC guaranteed claim and its effect on the 1998 audited financial statement that was other than the correct understanding.

**USF&G incorporates herein its response to Brown Schultz Proposal No. 156.**

**Brown Schultz Proposal No. 159**:    Brown Schultz was not required to take into account the user of the financial statement in determining the sufficiency of the disclosures regarding the claim guaranteed by PCIC in the footnotes to the 1998 audited financial statement for CCI. Trial Transcript at p. 2933.

In its working papers, Brown Schultz indicated that USF&G was an intended user. Exhibit 144, p. 11, Exhibit 231, pp. 29, 238, Exhibit 222, pp. 146, 265, 271; Testimony of Brown, Transcript, pp. 835, 898, 901-902, 921, 893, 888; Testimony of Bowman, Transcript, pp. 1307-1308.  Regardless of its knowledge of the intended users, Brown Schultz was required by both FAS No. 57 and its own internal requirements to make appropriate disclosures.  FAS No. 57, Exhibit "A" for ID, Tab 14, Exhibit 222, p. 184 (CCX-13A).

**Brown Schultz Proposal No. 160**:    The anticipated user and the anticipated use of the financial statement is irrelevant to whether the statements are in accordance with GAAP or whether an audit has been conducted in accordance with GAAS. Trial Transcript at p. 2811.

**USF&G incorporates herein its response to Brown Schultz Proposal No. 159.**

**Brown Schultz Proposal No. 161**:    The presentation of a financial statement in accordance with generally accepted accounting principles (GAAP) does not depend on the user of a financial statement. Trial Transcript at p. 2811.

USF&G incorporates herein its response to Brown Schultz Proposal No. 159.

Brenner's testimony (monologue) is bereft of references to pertinent professional

standards.  Testimony of Brenner, Transcript, pp. 2811-2814.

**Brown Schultz Proposal No. 162**:    The disclosures in the 1998 CCI audited financials concerning the claim guaranteed by PCIC were sufficient to satisfy GAAP. Trial Transcript at p. 2930.

The inadequacy of the disclosures in the 1998 Audit Report is discussed in detail in

Section II(C)(3)(c) of USF&G's Post-Trial Memorandum.  USF&G incorporates herein its

response to Brown Schultz Proposal No. 156.

**Brown Schultz Proposal No. 163**:    There was no incorrect information in the disclosures regarding the claim guaranteed by PCIC.

The inadequacy of the disclosures in the 1998 Audit Report is discussed in detail in

Section II(C)(3)(c) of USF&G's Post-Trial Memorandum.  USF&G incorporates herein its

response to Brown Schultz Proposal No. 156.

**Brown Schultz Proposal No. 164**:    The disclosures about the claim guaranteed by PCIC were sufficient not to be misleading.

The inadequacy of the disclosures in the 1998 Audit Report, as well as their

misleading nature, is discussed in detail in Section II(C)(3)(c) of USF&G's Post-Trial

Memorandum.  USF&G incorporates herein its response to Brown Schultz Proposal No.

156.

**Brown Schultz Proposal No. 165**:    The look back method was not applied by DeBruyn consistently. Trial Transcript at p. 2936, 2940-42.

The analysis utilized by DeBruyn to determine the extent of Brown Schultz' failures

was conservative, logical and consistent.  DeBruyn's testimony is predicated not only on an

accepted and logical methodology employed in the accounting profession, but was based

upon credible data that was admitted into evidence.  DeBruyn merely took CCI's actual gross profit/loss at the completion of each contract and applied it to the same project in the prior year.  The actual profits or losses was the best information available where, as here, the underlying financial data had been lost.  Testimony of DeBruyn, Transcript, pp. 1836-1839.

Brown Schultz' criticism of DeBruyn's methodology not only ignores the pertinent law, but also the considerable testimony adduced in favor of such methodology.  Not only is such method codified in the Internal Revenue Code, 26 U.S.C. §460(b), but appropriate variants (including the "book of wisdom") have been used in a variety of cases from patent litigation to eminent domain proceedings.  Testimony of Brenner, Transcript, pp. 2978-2979.[2]  Nothing in either of Donald Brenner's ("Brenner") reports cites any GAAP standard, principle, procedure or guideline that precludes the use of the look-back method employed by DeBruyn.  Testimony of Brenner, Transcript, p. 2977.  Moreover, DeBruyn testified that this methodology was used and employed by members of his profession and that it was a reliable tool for analyzing and restating financial statements.  Testimony of DeBruyn, Transcript, pp. 1838-1839.  DeBruyn also testified that with respect to the 1997 Audit Report, not only would Brown Schultz have been able to restate the 1997 results based on 1998's results, but – if it had done so – the inadequacies of CCI's estimates would have been apparent.  Testimony of DeBruyn, Transcript, pp. 1840-1841.

Additionally, DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either of the restated financial statements or in his analysis and that his methodology

---

[2] *See, e.g., Sinclair Ref. Co. v. Jenkins Petroleum*, 289 U.S. 698 (1933); *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Prince George's County, Maryland*, 1993 WL 524783 (D. Md.).

had been applied consistently and conservatively therein. Exhibit 379, Exhibit 816, Exhibit 817, Exhibit 818, Exhibit 820. Testimony of DeBruyn, Transcript, pp. 3184-3194. Finally, even Brenner admitted that a form of the "look back" method is used to restate financial statements where errors have been made. Testimony of Brenner, Testimony, pp 2983, 3118.

Finally, Brown Schultz' assertion that DeBruyn's testimony is improper because it is based, in part, on Exhibit 337, a balance sheet and income statement dated December 31, 1999 internally prepared by CCI, is frivolous. Exhibit 337. It was fully admitted into evidence for all purposes. Absolutely no testimony or documents adduced at trial call into question the credibility of the document or the financial data therein. Moreover, Brenner also relied on Exhibit 337 relative to his opinions. Testimony of Brenner, Transcript, pp. 2995-2996. The accuracy of Exhibit 337 – as well as Brown Schultz' multitude of errors in testing estimated costs and profits – is also demonstrated by considerable evidence that CCI's ultimate financial failure was not the result of a calamitous event but, rather, the natural result of its inability to profitably complete a contract. Moreover, as of December 8, 1999, Brown Schultz' Corinne Rebinski ("Rebinski") signed off on a Checklist for Internal Controls relative to Brown Schultz' preparation of a 1999 audit of CCI. In this document, maintained in Brown Schultz' "Permanent File" for CCI, she indicated that – as of December 8, 1999 – there were "no major problems or concerns in the prior year and none are anticipated." Exhibit 145, p. 11; Testimony of Brown, Transcript, p. 880.

At least twice prior to the commencement of trial, the Court has ruled on DeBruyn's competency and qualifications to testify and the compliance of the "look back" methodology with *Daubert* and other pertinent evidentiary standards.

**Brown Schultz Proposal No. 166**:   At the end of 1999 neither the Perry Point nor the Albemarle job was completed.  Trial Transcript at p. 1971, 1978.

**As an initial matter, the citation to trial testimony does not support Brown Schultz' assertion.  Further, DeBruyn's restatements were based on information obtained from the 1999 WIP schedule.  Exhibit 337.  The reliability of Exhibit 337 is discussed in detail in response 70*, supra*.**

**Brown Schultz Proposal No. 167**:   As of December 31, 1999, the Albemarle Prison project was, according to DeBruyn, 81% complete.  Trial Transcript at p. 1969.

**While literally true, it is irrelevant and reveals no errors in DeBruyn's methodology. USF&G incorporates herein its response to Brown Schultz Proposal No. 165.**

**Brown Schultz Proposal No. 168**:  DeBruyn's adjustment to the Albemarle Prison job were not based on actual completed contract amounts.  Trial Transcript at p. 1969.

**While literally true, it is irrelevant and reveals no errors in DeBruyn's methodology. DeBruyn testified that he utilized the costs shown on Exhibit 337.  USF&G incorporates herein its response to Brown Schultz Proposal Nos. 70 and 165.**

**Brown Schultz Proposal No. 169**:  DeBruyn in restating the Albemarle Prison Project used estimated costs to complete from Exhibit 337 which he believes to have come from CCI.  Trial Transcript at p.  1969.

**Exhibit 337 is in evidence, without limitations.  As discussed in USF&G's response to Brown Schultz Proposal No. 70, Exhibit 337 is reliable.  Certainly, Brown Schultz has introduced no evidence to the contrary.  USF&G incorporates herein its response to Brown Schultz Proposal No. 165.**

**Brown Schultz Proposal No. 170**:  The Albemarle Prison project could have been completed with the gross profit amount equivalent to that reflected in the 1998 financial statement.  Trial Transcript at pp. 1971.

**This speculative assertion has no relevance to the use and reliability of the restatements.  USF&G incorporates herein its response to Brown Schultz Proposal No. 165.**

**Brown Schultz Proposal No. 171**:  At December 31, 1998, the Perry Point job was approximately 40% complete.  Trial Transcript at p. 1973.

**While literally true, it is irrelevant and reveals no errors in DeBruyn's methodology. DeBruyn testified that he utilized the costs shown on Exhibit 337.  USF&G incorporates herein its response to Brown Schultz Proposal No. 165.**

**Brown Schultz Proposal No. 172**:  DeBruyn's adjustment to the Perry Point job were not based on actual completed contract amounts.  Trial Transcript at p. 1977.

**DeBruyn used estimated costs from Exhibit 377, which was duly authenticated, fully in evidence and prepared by CCI's staff.  USF&G incorporates herein its response to Brown Schultz Proposal Nos. 70 and 165.**

**Brown Schultz Proposal No. 173**:  DeBruyn, in restating the Perry Point Project, used estimated costs to complete from Exhibit 337 which he believes to have come from CCI.  Trial Transcript at p. 1977.

**DeBruyn used estimated costs from Exhibit 377, which was duly authenticated, fully in evidence and prepared by CCI's staff.  USF&G incorporates herein its response to Brown Schultz Proposal Nos. 70 and 165.**

**Brown Schultz Proposal No. 174**:  The job, if completed, may have made up whatever profit differential was assumed by DeBruyn when he made his adjustment to the Perry Point job. Trial Transcript at p. 1978.

**This speculative assertion has no relevance to the use and reliability of the restatements.  Again, this is irrelevant and reveals no errors in DeBruyn's methodology.**

**Brown Schultz Proposal No. 177**:  It was not appropriate to make an adjustment on the 1998 financial statement with regard to Outlook Chesterfield.  Trial Transcript at pp. 1989-1990, 1993.

**This is incorrect and omits a crucial component of DeBruyn's testimony.  DeBruyn explained that if under the methodology utilized the contract ended up at a 6% profit margin there would have been a positive adjustment as of December 31, 1998.  Testimony**

of DeBruyn, Transcript, pp. 1990-1991.  DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either the restated financial statements or in his analysis and that his methodology had been applied consistently and conservatively therein.  Exhibits 379, 816, 817, 818, 820.  Testimony of DeBruyn, Transcript, pp. 3184-3194.

**Brown Schultz Proposal No. 178**:  The restated 1998 financial statements prepared by plaintiff's expert understate income for Outlook Chesterfield by $68,913.00. Trial Transcript at p. 1993-94.

This is incorrect and omits a crucial component of DeBruyn's testimony.  DeBruyn explained that under the methodology utilized he obtained the estimated cost from the WIP dated December 31, 1999 and the estimated contract amount represented a gross profit percentage.  Testimony of DeBruyn, Transcript, p. 1994.  DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either the restated financial statements or in his analysis and that his methodology had been applied consistently and conservatively therein.  Exhibits 379, 816, 817, 818, 820.  Testimony of DeBruyn, Transcript, pp. 3184-3194.

**Brown Schultz Proposal No. 180**:  It was not appropriate to make an adjustment on the 1998 financial statement with regard to Outlook Westerville. Trial Transcript at pp. 1996-97.

This is incorrect and omits a crucial component of DeBruyn's testimony in which DeBruyn explains the propriety of the adjustment.  Testimony of DeBruyn, Transcript, pp. 1996-1997.  DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either the restated financial statements or in his analysis and that his methodology had been applied consistently and conservatively therein.  Exhibits 379, 816, 817, 818, 820.  Testimony of DeBruyn, Transcript, pp. 3184-3194.

**Brown Schultz Proposal No. 181**:  The restated 1998 financial statements prepared by plaintiff's expert understated income by the amount of the inappropriate adjustment to the Outlook Westerville project by approximately $20,000. Trial Transcript at pp. 1993-97.

**USF&G incorporates herein its response to Brown Schultz Proposal No. 180.**

**Brown Schultz Proposal No. 182**:  The restated 1998 financial statements prepared by plaintiff's expert understated the gross profit for the UEPH project in the amount of $256,217. Trial Transcript at pp. 2007-2008, 2953-62; Exhibit 818.

**This is incorrect.  DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either the restated financial statements or in his analysis and that his methodology had been applied consistently and conservatively therein.  Exhibits 379, 816, 817, 818, 820.  Testimony of DeBruyn, Transcript, pp. 3184-3194.**

**Brown Schultz Proposal No. 183**:  The restated 1998 financial statements prepared by plaintiff's expert overstated the loss attributable to the Houtzdale Prison job by $353,113 and understated gross revenue in that amount. Trial Transcript at pp. 2038-39, 2043-2045, 2965-66.

**As an initial matter, the trial reference does not support the proposed finding.  Moreover, it is incorrect and omits DeBruyn's testimony that he would need to refer to his working papers – which he did on rebuttal.  DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either the restated financial statements or in his analysis and that his methodology had been applied consistently and conservatively therein.  Exhibits 379, 816, 817, 818, 820.  Testimony of DeBruyn, Transcript, pp. 3184-3194.**

**Brown Schultz Proposal No. 184**:  The restated 1998 financial statements prepared by plaintiff's expert understated the profit on the Outlook Point job by $46,000 and the UEPH headquarters job by $66,000.  Trial Transcript at pp. 2051-2053; 2054.

**This is incorrect and omits DeBruyn's testimony that he would need to refer to his working papers – which he did on rebuttal.  DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either the restated financial statements or in his analysis**

and that his methodology had been applied consistently and conservatively therein.

Exhibits 379, 816, 817, 818, 820.  Testimony of DeBruyn, Transcript, pp. 3184-3194.

**Brown Schultz Proposal No. 185**:  Mr. DeBruyn's error in connection with the Mahanoy project without regard to the PCIC guaranteed claim was approximately $450,000. Trial Transcript at p. 2951-52.  If the amount of the PCIC guaranteed claim is included the errors total $1,611,000.  Trial Transcript at p. 2942.

As an initial matter, the trial reference does not support the proposed finding.

Moreover, it is incorrect and omits DeBruyn's testimony that he would need to refer to his

working papers – which he did on rebuttal.  DeBruyn's rebuttal testimony demonstrated

that no mistakes were made in either the restated financial statements or in his analysis

and that his methodology had been applied consistently and conservatively therein.

Exhibits 379, 816, 817, 818, 820.  Testimony of DeBruyn, Transcript, pp. 3184-3194.

**Brown Schultz Proposal No. 186**:  It was not appropriate to use the loss recognition rule when applying the look back method to the Mahanoy Prison job. Trial Transcript at p. 2948.

DeBruyn included the total loss as required by the "loss recognition rule" in the

year in which the loss was first observed on every project he restated.  See, e.g. Job 454 -

CCI Job no. 445 - Albermarle Prison and Houtzdale Prison, Exhibits 367 and 369 (ID

only).  Testimony of DeBruyn, Transcript, pp. 1812-1813.  Again, Brown Schultz did not

provide any evidence that they had employed audit procedures to be sure the entire loss

was recognized in the year of the loss.  Testimony of DeBruyn, Transcript, pp. 1812-1813.

**Brown Schultz Proposal No. 187**:  As of 12-31-99, the Mahanoy Prison job, using DeBruyn's hindsight information, ended up with a profit of $1,245,661. Trial Transcript at p. 2949.

This is incorrect.  DeBruyn's rebuttal testimony demonstrated that no mistakes

were made in either the restated financial statements or in his analysis and that his

methodology had been applied consistently and conservatively therein.  Exhibits 379, 816,

817, 818, 820. Testimony of DeBruyn, Transcript, pp. 3184-3194. Moreover, it appears that the alleged profit was computing using approximately $2.2 million attributed to the guaranty issued by PCIC.

**Brown Schultz Proposal No. 188**: If done properly, under the look back method, the profit should have been allocated between 1997 and 1998 based on percentages of completion. Trial Transcript at p. 2950.

This is incorrect. DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either the restated financial statements or in his analysis and that his methodology had been applied consistently and conservatively therein. Exhibits 379, 816, 817, 818, 820. Testimony of DeBruyn, Transcript, pp. 3184-3194.

**Brown Schultz Proposal No. 189**: DeBruyn, in his restatement of the Mahanoy Prison job did not account for the fact that there was a gross profit on that job. Trial Transcript at p. 2951.

This is incorrect. DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either the restated financial statements or in his analysis and that his methodology had been applied consistently and conservatively therein. Exhibits 379, 816, 817, 818, 820. Testimony of DeBruyn, Transcript, pp. 3184-3194. Moreover, it appears that

**Brown Schultz Proposal No. 190**: The amount of the $1,162,460 PCIC guaranteed claim should have been recorded as revenue if the method used by DeBruyn was properly applied since the "look back" method is based on actual amounts and the full amount of the PCIC guaranteed claim was received. Trial Transcript at pp. 2940-41.

As discussed in USF&G's response to Brown Schultz Proposal No. 141, *supra*, it has not been established that the amount of $1,162,460 was paid.

Moreover, the proposal skirts the one germane issue; namely, *where* it should be recorded. If the funds were received from a non-contract source, it would still be improper for them to be included as underbillings.

**Brown Schultz Proposal No. 191**:   DeBruyn's errors in the application of the look back method totaled $2,372,843.  Trial transcript at pp. 2936; 2939-40; Exhibit 816.

**As an initial matter, the trial reference does not support the proposed finding. Moreover, it is incorrect.  DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either the restated financial statements or in his analysis and that his methodology had been applied consistently and conservatively therein.  Exhibits 379, 816, 817, 818, 820.  Testimony of DeBruyn, Transcript, pp. 3184-3194.**

**Brown Schultz Proposal No. 192**:   The restated financial statement for 1998 contained material errors and misstatements. Trial Transcript at pp. 2056-57, 2936, 2940-42.

**This is incorrect.  DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either the restated financial statements or in his analysis and that his methodology had been applied consistently and conservatively therein.  Exhibits 379, 816, 817, 818, 820.  Testimony of DeBruyn, Transcript, pp. 3184-3194.**

**Brown Schultz Proposal No. 193**:   Mr. DeBruyn's proposed adjustments to CCI's financial statements are faulty and not proper because of the significant use of hindsight information and data that was not available to the auditors at the time of the audited statements which methodology does not apply and does not comply with GAAP, and, in the process of applying the improper method DeBruyn, made significant errors. Trial Transcript at p. 2804:12-24.

**This is incorrect.  DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either the restated financial statements or in his analysis and that his methodology had been applied consistently and conservatively therein.  Exhibits 379, 816, 817, 818, 820.  Testimony of DeBruyn, Transcript, pp. 3184-3194.**

**USF&G incorporates herein its response to Brown Schultz Proposal No. 60.**

**Brown Schultz Proposal No. 194**:   The proposed restated financial statement developed by Mr. DeBruyn for the 1998 financial statement was incorrect, materially understated revenue,  unreliable, and can properly be disregarded.  Trial Transcript at pp. 1988, 2056-57.

**This is incorrect.  DeBruyn's rebuttal testimony demonstrated that no mistakes were made in either the restated financial statements or in his analysis and that his methodology had been applied consistently and conservatively therein.  Exhibits 379, 816, 817, 818, 820.  Testimony of DeBruyn, Transcript, pp. 3184-3194.**

**USF&G incorporates herein its response to Brown Schultz Proposal No. 60.**

<u>**Brown Schultz Proposal No. 195**</u>:   There is no evidence that the CCI audited financial statements for 1997 and 1998 are not in accordance with GAAP.  Trial Transcript at p. 2804:1-5.

**The material misrepresentations made by Brown Schultz are discussed in Section II(C) of USF&G's Post-Trial Memorandum.**

<u>**Brown Schultz Proposal No. 196**</u>:   The evidence did not establish that the 1997 and 1988 audited financial statements included false statements.

**The material misrepresentations made by Brown Schultz are discussed in Section II(C) of USF&G's Post-Trial Memorandum.**

<u>**Brown Schultz Proposal No. 197**</u>:   The audit reports of Brown Schultz for 1997 and 1998 did not contain a false statement.

**The material misrepresentations made by Brown Schultz are discussed in Section II(C) of USF&G's Post-Trial Memorandum.**

<u>**Brown Schultz Proposal No. 198**</u>:   The evidence did not establish that the audit reports of Brown Schultz for 1997 and 1998 contained a false statement.

**The material misrepresentations made by Brown Schultz are discussed in Section II(C) of USF&G's Post-Trial Memorandum.**

<u>**Brown Schultz Proposal No. 200**</u>:  Plaintiff's bond underwriting was relaxed during the period of the CCI bond program.  Trial Transcript at pp. 452, 1588-1591.

**The proposal is misleading because it does not acknowledge that USF&G's underwriting standards were not relaxed in comparison to the rest of the surety industry at that time.  James Daily does acknowledge, however, the increased flexibility on issues of**

personal indemnity were pervasive in the industry.  Farnsworth testified that USF&G's

underwriting of the CCI account generally conformed to the applicable standards of care

of the surety industry that were in effect during the 1993-1999 time period.  Testimony of

Farnsworth, Transcript, pp. 1530-1532.

**Brown Schultz Proposal No. 201**:   Plaintiff used relaxed underwriting standards in its underwriting of bonds for CCI to fend off competition.  Trial Transcript at p. 1591.

Not only is there no evidence of this but since USF&G's standards were comparable

to those in the rest of the industry, there was no competitive advantage.

USF&G incorporates herein its response to Brown Schultz Proposal No. 200.

**Brown Schultz Proposal No. 202**:   Relaxed underwriting included relief from the requirement of personal indemnity and the required financial ratios.  Trial Transcript at pp. 451-52.

This is misleading because such relief is appropriate only when warranted by

acceptable ratios.

USF&G incorporates herein its response to Brown Schultz Proposal No. 200.

**Brown Schultz Proposal No. 203**:   The relaxed underwriting standards led to increased risk for plaintiff. Trial Transcript at p. 1590:23-1591:1.

Not only is there no evidence of this but since USF&G's standards were comparable

to those in the rest of the industry, there was no competitive advantage.

USF&G incorporates herein its response to Brown Schultz Proposal No. 200.

**Brown Schultz Proposal No. 204**:   Bonds were approved by plaintiff for CCI during 1998 and 1999 based on interim financial information. Trial Transcript at pp. 576, 578-79, 580-86, 665, 667.

USF&G would receive an unaudited interim financial statement prepared internally

by CCI (generally for the first six months of each year), as well as certain internally

prepared work-in-progress schedules which were received quarterly.  Testimony of J.

Daily, Transcript, pp. 170-172, 251-252, 254.  However, such information was "ancillary to the audited financial information."  Testimony of A. Phillips, Transcript, p. 2436.  It is incorrect for Brown Schultz to insinuate that the bonds were issued "based" on a small portion of the information considered.  As testified to by Farnsworth, audited financials are one of the few really objective tests a surety has at its disposal.  Testimony of Farnsworth, Transcript, pp. 1536-1537.

**Brown Schultz Proposal No. 205**:   The bond program provided by plaintiff for CCI was approved by David Hussey. Trial Transcript at p. 442.

At all times pertinent hereto, the bond program was approved by USF&G employees acting within their lines of authority.  There is no evidence of Mr. Hussey overruling any bonding decisions that were made by his subordinates within the context of their Specific Discretionary Authority ("SDA").

**Brown Schultz Proposal No. 206**:   James Daily was the home office underwriter involved with the CCI bond account, but Daily did not have the authority to approve the bond program.  Trial Transcript at p.  516.

Each year, a SDA relative to CCI in the amount of $15 million per project and $75 million aggregate was conferred on the Harrisburg, Pennsylvania branch office (the "Harrisburg Office") by the Home Office.  The Harrisburg Office had authority to issue bonds to CCI with those limits.  Testimony of A. Phillips, Transcript, pp. 2414-2415.

If a bonding request exceeded the SDA, it would be necessary for the Harrisburg Office to make a submission to James Daily, the contract bond manager situated in the Home Office.  Testimony of A. Phillips, Transcript, p. 2416.

As CCI was a "Home Office" account, James Daily had authority regarding underwriting decisions from the Harrisburg Office and was required to approve projects in

excess of that office's SDA.  James Daily had a single job line of authority of approximately
$25,000,000.  Testimony of J. Daily, Transcript, pp. 184-185, 206, 726.

**Brown Schultz Proposal No. 207**:   Hussey had the authority to approve bonds without
regard for the recommendation of Daily.  Trial Transcript at p. 516.

**James Daily testified that Mr. Hussey could approve bonds against his
recommendation.  As in almost all corporations, USF&G had a "chain of command."
However, the existence of such a corporate structure is not commensurate with Brown
Schultz' insinuation that no one in the company is capable of taking actions binding the
company merely because that person has a superior in the chain of command.**

**Brown Schultz Proposal No. 208**:   Daily never acted to withhold or withdraw bond
authorization for CCI even when he believed bond approval should properly be withdrawn.  Trial
Transcript at p.  524.

**This is belied by James Daily's actions regarding the Fulk Rod project, in which he
expressed his initial misgivings regarding that project.**

**Brown Schultz Proposal No. 209**:   The authority to decide whether to suspend bonding
for CCI rested with David Hussey.  Trial Transcript at p. 726.

**Underwriters also had authority to suspend bonding within the limits of their SDA.
Testimony of A. Phillips, Transcript, p. 2474.  The Home Office never rejected or overruled
any recommendation from the Harrisburg branch office.  Testimony of A. Phillips,
Transcript, pp. 2415-2416.**

**Brown Schultz Proposal No. 210**:   Daily was not involved in the decision about
whether to suspend bonding to CCI, and did not take any action which led to the suspension of
bonding for CCI.  Trial Transcript at pp. 725-726, 741-44.

**Upon Anthony Phillips' receipt of the foregoing information from Dominiani, he
immediately called CCI's insurance agency and informed them that USF&G would not**

issue any bonds until numerous issues were addressed and questions satisfactorily answered.  Testimony of A. Phillips, Transcript, pp. 2469-2470.

Anthony Phillips had the necessary authority to act as he did in suspending the bonding program.  Testimony of A. Phillips, Transcript, p. 2474.

Thereafter, in early October 1999, further bonding by USF&G of CCI was suspended.  No further bonds were ever issued to CCI by USF&G.  Testimony of A. Phillips, Transcript, p. 2471.

The USF&G "Home Office" would have upheld Phillips' decision to halt bonding. Testimony of Anthony Phillips, Transcript, pp. 2435-2436, 2476-2477, 2588.  The "Home Office" never rejected or overruled any recommendation from his office.  Testimony of Anthony Phillips, Transcript, pp. 2435-2436.

All bonds issued by USF&G in reliance on the 1998 Audit Report were within the limits of the Specific Discretionary Authority of $15,000,000 per project/$75,000,000 total program allocated to the Harrisburg office except for the Pennsylvania Turnpike building. Exhibits 301, 15, 10, 12, 9, 2, 3, 4, 1; Testimony of Anthony Phillips, Transcript, pp. 2415-2416, 2468.  Home Office authority was received relative to the Pennsylvania Turnpike building.  Testimony of A. Phillips, Transcript, p. 2468.

**Brown Schultz Proposal No. 211**:   David Hussey approved bonds for CCI projects in spite of the absence of a recommendation for approval by Daily, and in spite of a recommendation against approval by Daily.  Trial Transcript at pp. 651, 653.

This is incorrect and misleading.  The testimony demonstrated that although James Daily initially disapproved of the Fulk Rod project, he and Hussey ultimately were in agreement.  The relevance of the Fulk Rod project is highly questionable, despite Brown Schultz' devotion to it of a disproportionate amount of testimonial time.

**Brown Schultz Proposal No. 212**:    The bond program for CCI was renewed each year by David Hussey.  Trial Transcript at p. 516.

**This is incorrect.  James Daily was the individual who executed the SDA.  However, there was a "chain of command," by which the Harrisburg branch office reported to James Daily and he, in turn, reported to David Hussey.  There was no evidence adduced at trial that the "chain" did not support decisions made by the Harrisburg branch office.  In fact, Anthony Phillips testified that his recommendations were never rejected or overruled. Testimony of A. Phillips, Transcript, pp. 2415-2416.**

**Brown Schultz Proposal No. 214**:    The evidence did not establish that the alleged misrepresentations were material to Hussey's decisions to approve the bonding program or any specific bond.

**USF&G incorporates herein its response to Brown Schultz Proposal Nos. 206-212.**

**Brown Schultz Proposal No. 215**:    The evidence did not establish Hussey would have decided to suspend and terminate bonding if the audited financial statements for 1997 and 1998 had been free of the alleged misrepresentations.

**USF&G incorporates herein its response to Brown Schultz Proposal Nos. 206-213.**

**Brown Schultz Proposal No. 217**:    Steve Salazar was the Harrisburg branch office underwriter responsible for performing the underwriting work and any financial analysis for the CCI bond account, and to input financial information into the Electronic Credit Folder (ECF). Trial Transcript at pp. 2426, 2428, 2491.

**Anthony Phillips also did analysis, including questioning Salazar and reviewing his work.  Testimony of A. Phillips, Transcript, pp. 2426-2428.**

**Farnsworth opined that the analysis of the financial statements was done within the custom and practice of the surety industry.  Testimony of Farnsworth, Transcript, pp. 1530-1531.**

**Brown Schultz Proposal No. 218**:   All underwriting work on the CCI bond account performed in the Harrisburg branch office was performed by the branch office staff and not by Phillips.  Trial Transcript at pp. 2504-2505.

**This is incorrect.  Testimony of A. Phillips, Transcript, pp. 2426-2468.**

**Brown Schultz Proposal No. 221**:   The evidence did not establish the alleged misrepresentations in the audited 1997 and 1998 financial statements were material to underwriting action by Salazar in connection with bonds issued for CCI.

**The material misrepresentations made by Brown Schultz are discussed in Section II(C) of USF&G's Post-Trial Memorandum.  USF&G's reliance on the Audited Financial Statements is discussed in Sections II(D) and II(I) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 223**:   The ASCA allowed the bond agent to issue bonds within the authority.  Trial Transcript at pp. 443, 819; Exhibit 790 USFG/BS 0747.

**This is misleading in that it does not reveal that such authority is subject to various conditions, including that there have been no adverse material changes.**

**Brown Schultz Proposal No. 225**:   The evidence did not establish that the alleged misrepresentations were material to any decisions by anyone with ASCA authority who approved bonds for CCI.

**The material misrepresentations made by Brown Schultz are discussed in Section II(C) of USF&G's Post-Trial Memorandum.  USF&G's reliance on the Audited Financial Statements is discussed in Sections II(D) and II(I) of USF&G's Post-Trial Memorandum.  Moreover, the SDA, which led to the ASCA, is based upon USF&G's review of audited financial statements.**

**Brown Schultz Proposal No. 226**:   Plaintiff did not base approval of bond credit for CCI on satisfaction of any minimum ratios or other requirements concerning financial condition.  Trial Transcript at pp. 459, 460, 676, 2433.

Part of the analysis performed by USF&G's underwriters was to examine the ratios of working capital to bonding capacity and net worth to bonding capacity. Testimony of A. Phillips, Transcript, pp. 2433-2434; Testimony of Farnsworth, Transcript, pp. 1505-1507.

Ratio analysis was used as a helpful tool; however, there were no mandatory or minimum ratios required to justify an underwriting decision. Testimony of A. Phillips, Transcript, pp. 2433-2434.

Farnsworth opined that USF&G's underwriting of the CCI account generally conformed to the applicable standards of care of the surety industry that were in effect during the 1994 to 1998 time period. Testimony of Farnsworth, Transcript, p. 1530.

**Brown Schultz Proposal No. 227**:   Plaintiff preferred a debt to equity ratio less than 3, but there was no limit on the debt to equity ratio which would cause plaintiff to cease bonding. Trial Transcript at p. 287, 676.

With respect to CCI and other USF&G accounts of a size similar to CCI, USF&G generally wanted the accounts to maintain a working capital-to-bonding capacity ratio of 3% or better ("net quick") and a net worth-to-bonding capacity ratio of 5% or better. Testimony of A. Phillips, Transcript, p. 2433.

Anthony Phillips recalls numerous instances in which accounts were underwritten by the Harrisburg Office that had less than a 3% to 5% ratio. Testimony of A. Phillips, Transcript, p. 2434.

In the rare instance when the net quick ratio is below 3%, it should be taken into account that this may be the result of the fact that USF&G's determination of net quick disallows certain assets that show up in an audit report as current assets. Testimony of A. Phillips, Transcript, pp. 2582-2583.

Based upon the information contained in the 1997 Audit Report and 1998 Audit Report, CCI maintained the 3%-5% ratios described above except on limited occasions when USF&G approved a bond which temporarily increased CCI's bonding capacity beyond $75 million.  In fact, from 1994-1997, CCI was at the 5%-6% net worth to bonding capacity ratio.  **Testimony of Farnsworth, Transcript, p. 1506.**

Farnsworth opined that USF&G's underwriting of the CCI account generally conformed to the applicable standards of care of the surety industry that were in effect during the 1994 to 1998 time period.  **Testimony of Farnsworth, Transcript, p. 1530.**

**Brown Schultz Proposal No. 228**:   Plaintiff considered 3% working capital to total work program and 5% net worth to total work program ("3%/5%") as an underwriting guideline, but it did not serve as a rule or requirement for underwriting the CCI account.  Trial Transcript at p.  2434, 2503.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 227.**

**Brown Schultz Proposal No. 229**:   There was no written corroboration for plaintiff's 3%/5% preference.  Trial Transcript at p. 459.

The term "written corroboration" is ambiguous and vague.  The underwriting file had significant evidence showing that ratio analysis was utilized.

**Brown Schultz Proposal No. 230**:   The Harrisburg branch office issued bond credit to contractors with less than 3%/5%.  Trial Transcript at p. 2434.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 227.**

**Brown Schultz Proposal No. 231**:   Plaintiff approved bonds for customers with negative working capital. Trial Transcript at p. 462.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 227.**

**Brown Schultz Proposal No. 232**:   Plaintiff knowingly deviated from the 3%/5% guideline during the CCI bond program.  Trial Transcript at pp. 2503, 2504.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 227.**

**Brown Schultz Proposal No. 233**:   Plaintiff did not consider suspending bonding when CCI did not meet the 3%/5% guideline.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 227.**

**Brown Schultz Proposal No. 234**:   Serious deterioration of the financial condition of CCI would not prompt concern by the underwriter to take action unless working capital disappeared or became a negative amount, net worth dropped below zero, cash disappeared, or the debt to equity ratio became 100 to one or doubled.  Trial Transcript at pp. 546, 752, 825-28.

**This mischaracterizes James Daily's testimony.  He indicated that it was impossible to pinpoint any exact change because, _inter alia_, underwriting requires looking at the account in the context of many factors.  Contract bond underwriting involves both objective and subjective evaluations by the underwriter and is considered more "art" than "science."  Therefore, reducing surety underwriting to quantitative terms is very difficult, if not impossible, in most cases.  Testimony of Farnsworth, Transcript, p. 1498.**

**Brown Schultz Proposal No. 235**:   Plaintiff cannot identify the point at which a deterioration of working capital or net worth, or an adverse change to financial ratios would have been material to underwriting.  Trial Transcript at pp. 547, 825-828.

**This mischaracterizes James Daily's testimony.  He indicated that it was impossible to pinpoint any exact change because, _inter alia_, underwriting requires looking at the account in the context of many factors.  Contract bond underwriting involves both objective and subjective evaluations by the underwriter and is considered more "art" than "science."  Therefore, reducing surety underwriting to quantitative terms is very difficult, if not impossible, in most cases.  Testimony of Farnsworth, Transcript, p. 1498.**

**Brown Schultz Proposal No. 236**:   Plaintiff did not establish the nature of the changes to the financial statements which would have changed its underwriting decisions.  Trial Transcript at pp. 752-54.

**Both Anthony Phillips and James Daily testified that based upon the restatements (Exhibits 365A and 365B) that they would not have issued the bonds identified in Exhibits**

76

**14 and 15.  Testimony of A. Phillips, Transcript, pp. 2474-2476, 2480; Testimony of J. Daily, Transcript, pp. 436, 438, 439-440.  USF&G's justifiable reliance is discussed in detail in Section II(D) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 237**:   Plaintiff did not establish the nature of changes to the financial statements which would have prompted plaintiff to withhold bonding or would have prompted its underwriters to recommend withholding bond approval for CCI.  Trial Transcript at p. 754.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 236.**

**Brown Schultz Proposal No. 238**:   Plaintiff could not identify the changes to the financial statement which would have changed its underwriting decisions, or express how it would determine whether a change to the financial statement was significant enough to affect underwriting decisions. Trial Transcript at pp. 2573-74, 2576.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 236.**

**Brown Schultz Proposal No. 239**:   The evidence did not establish that plaintiff would have stopped bonding CCI if the 1997 financial statement had reflected $100,000 net income loss, $3,183,138 working capital, and $4,638,834 net worth, the amounts indicated by the restated financial statement for 1997 developed by DeBruyn.  Trial Transcript at pp. 632-33, 2577.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 236.**

**Brown Schultz Proposal No. 240**:   The evidence did not establish that plaintiff would have ceased bonding for CCI even if the 1997 audited financial statement had reflected the amounts as adjusted and restated by DeBruyn.  Trial Transcript at p. 436-37, 798-99, 2475.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 236.**

**Brown Schultz Proposal No. 241**:   The difference between the amount of contract revenue reflected on the 1997 audited financial statements and the 1997 restated amounts was not material to underwriting.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 236.**

**USF&G also states that the magnitude of Brown Schultz' errors is discussed in Section II(C)(2)(a) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 242**:   If the amount of the PCIC guaranteed claim is removed from Mr. DeBruyn's adjustment to the 1998 audited financial statement, then the

amount of DeBruyn's erroneous adjustment is approximately $1,962,460 ($1,162,460 + 800,000 = $1,962,460)("minimum amount of corrected adjustment"). Trial Transcript at p. 2055, 2940-41.

**DeBruyn made no "erroneous adjustments." It is noteworthy that even if,** *arguendo***, the sum attributable to the recognition of the Mahanoy Claim is removed from revenue, the 1998 Audit Report would show a loss of approximately $2,000,000.**

**Brown Schultz Proposal No. 243**:    There were errors made in the application of the look back method which totaled $2,372,843. Trial Transcript at pp. 2936; 2939-40; Exhibit 816.

**The analysis utilized by DeBruyn to determine the extent of Brown Schultz' failures was conservative, logical and consistent. The evidence adduced at trial demonstrated that DeBruyn's testimony is predicated not only on an accepted and logical methodology, but based upon credible data that is in evidence.**

**In essence, DeBruyn obtained the actual gross profit amount at the completion of the contract and applied it back to the construction in progress schedule. The actual costs are, of course, the best information available where, as here, the underlying financial data has been lost. If, for example, it was necessary to recreate the work in progress schedule, it would have been done using the best available information; to wit, the actual costs (rather than trying to determine what the estimated costs were). Testimony of DeBruyn, Transcript, pp. 1836-1839.**

**Additionally, DeBruyn's rebuttal testimony demonstrated that no mistakes were made in the restated financials or in his analysis and that the "look back" method had been applied consistently and conservatively therein. Exhibits 379, 816, 817, 818, 820. Testimony of DeBruyn, Transcript, pp. 3181-3192.**

**For example, Brown Schultz' 1998 working papers for the Lord Fairfax project documented numerous problems and delays due to weather conditions and poor design**

documents, work accelerations to compensate for delays, self-performing problems and the default of the mechanical subcontractor.  Exhibit 222, page 275.  Brown Schultz 1998 working papers also showed that there had been no serious problems or catastrophic events suffered by CCI in 1999 which standing alone could have adversely impacted CCI's financial condition.  Exhibits 213, 222.  Testimony of DeBruyn, Transcript, p. 1839.

In connection with his restatement of CCI Job No. 451, Lord Fairfax as of December 31, 1997, DeBruyn recast the results for that project using the gross profit percentage  (4.34%) which was originally estimated by CCI at the inception of the project.  Exhibit 366 (ID only).  Testimony of DeBruyn, Transcript pp. 1802-1804.

In connection with the 1998 Audit Report, DeBruyn recast CCI Job No. 451-Lord Fairfax using the gross profit percentage as of December 31, 1999 (-10.43%) as opposed to the percentage (-3.08%) contained in the 1998 Audit Report.  Exhibit 36, Exhibit 337.  The reason DeBruyn utilized -10.43% was that under the "loss recognition rule," the total loss on the project has to be recognized in the year the loss is first observed.  Testimony of DeBruyn, Transcript, pp. 1812-1813.

DeBruyn included the total loss as required by the "loss recognition rule" in the year in which the loss was first observed on every project he restated.  See, e.g. Job 454 - CCI Job no. 445 - Albermarle Prison and Houtzdale Prison, Exhibits 367 and 369 (ID only).  Testimony of DeBruyn, Transcript, pp. 1812-1813.  Again, Brown Schultz did not provide any evidence that they had employed audit procedures to be sure the entire loss was recognized in the year of the loss.  Testimony of DeBruyn, Transcript, pp. 1812-1813.

With respect to the Lord Fairfax project, DeBruyn did not use the gross profit percentage (7.11%) contained in the 1997 Audit Report since Brown Schultz' working

papers lacked any support for an increase in estimated gross profit from 4.34% to 7.11% on a project that was only 6.44% complete as of December 31, 1997.  Brown Schultz' working papers for this project showed only that there was a "good 'buyout'" on the project and that there were no problems and none anticipated.  Exhibit 213, page 251, Exhibit 366 (ID only).  Testimony of DeBruyn, Transcript, pp. 1803-1810.

Brown Schultz' criticism of the "look back" method not only ignores the pertinent law, but also the considerable testimony adduced in favor of such methodology.  Not only is such method codified in the Internal Revenue Code, 26 U.S.C. §460(b), but appropriate variants (including the "book of wisdom") have been used in a variety of cases from patent litigation to eminent domain.  Testimony of Brenner, Transcript, pp. 2978-2979.  *See, e.g., Sinclair Ref. Co. v. Jenkins Petroleum*, 289 U.S. 698 (1933); *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Prince George's County, Maryland*, 1993 WL 524783 (D. Md.).

DeBruyn testified that this methodology was used and employed by members of his profession and, further, that it was a reliable tool for analyzing and restating financials.  Testimony of DeBruyn, Transcript, p. 1838.

Moreover, DeBruyn testified that with respect to the 1997 audit, not only would Brown Schultz have been able to restate it based on the 1998 Audit, but if it had done so by extending its audit procedures to adequately test the estimated costs to complete, the inadequacies of CCI's estimates would have been apparent.  Testimony of DeBruyn, Transcript, pp. 1800-1801, 1815-1816.

Brown Schultz' expert, Brenner, also admitted that a form of the "look back" method is used to restate financial statements where errors have been made.  Testimony of Brenner, Testimony, pp 2983, 3116, 3118.

**Brown Schultz Proposal No. 244**:   The actual amount of DeBruyn's overstatement of income adjustments (assuming the propriety of the use of the "look back" method and the validity of the data on exhibit 337) is $2,372,843 ("proper amount of corrected adjustment").  Trial Transcript at p.  2940; Exhibit 816.

USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 166-187, 243.  Further, USF&G states that Brenner's analysis is flawed because it presupposes an error where there is none.  As clarified in his rebuttal testimony, in making his adjustments to the CCI Audited Financial Statements, DeBruyn did not double-count the $(815,960) adjustment he made to the Statement of Income and Balance Sheet in the 1997 Audit Report.  DeBruyn subtracted that amount from the total of all adjustments made to the 1998 Audit Report $(3,942,468) which resulted in an adjustment of $3,126,508 ($3,942,468 minus $815,960) and, therefore, a restated net loss for the year ended December 31, 1998 of $(3,067,467).  Exhibits 365 A and B (ID only), Exhibit 379.  Testimony of DeBruyn, Transcript, pp. 3184-3186.

**Brown Schultz Proposal No. 245**:   The amount of DeBruyn's proposed adjustment to net income reflected on the 1998 audited financial statement was $3,126,508.  Exhibit 365a.

USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 243 and 244.

**Brown Schultz Proposal No. 246**:   DeBruyn's proposed adjustment to income (assuming the propriety of the use of the "look back" method and the validity of the data on exhibit 337) was overstated by $1,962,460.  Trial Transcript at p. 2055.

USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 243 and 244.

**Brown Schultz Proposal No. 247**:   If the minimum amount of corrected adjustment is used, then net income for the 1998 audited financial statement as corrected and restated is at least $(1,105,007) (($3,067,467) + 1,962,460 = ($1,105,007)).  Trial Transcript at pp. 1800, 2055; Exhibit 365a.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 60, 70, 243 and 244.**

**Brown Schultz Proposal No. 248**:   If the proper amount of corrected adjustment is used, then the net income as corrected and restated for the 1998 audited financial statement should be at least $(694,624) (($3,067,467) + 2,372,843 = ($694,624)).  Trial Transcript at pp. 1800, 2940; Exhibits 816 and 365a.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 60, 70, 243 and 244.**

**Brown Schultz Proposal No. 249**:   DeBruyn's proposed adjustment to working capital (current assets - current liabilities) and net worth (shareholder equity) should properly be corrected by reducing the proposed adjustments by the same amount as the correction to the adjustment for net income.  Exhibit 365a.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 60, 70, 243 and 244.**

**Brown Schultz Proposal No. 250**:   If the minimum amount of corrected adjustment is used, then working capital as corrected and restated for 1998 is $577,359 (($1,385,101) + 1,962,460 ' $577,359).  Trial Transcript at pp. 1800, 2055; Exhibit 365a.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 60, 70, 243 and 244.**

**Brown Schultz Proposal No. 251**:   If the proper amount of corrected adjustment is used, then working capital as corrected and restated for 1998 is $987,742 (($1,385,101) + 2,372,843 = $987,742).  Trial Transcript at pp. 1800, 2940; Exhibits 816 and 365a.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 60, 70, 243 and 244.**

**Brown Schultz Proposal No. 252**:   If the minimum amount of corrected adjustment is used, then net worth as corrected and restated for 1998 is $3,263,675 (1,301,215 + 1,962,460 = 3,263,675).  Trial Transcript at pp. 1800, 2055; Exhibit 365a.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 60, 70, 243 and 244.**

**Brown Schultz Proposal No. 253**:   If the proper corrected adjustment is used, then net worth as corrected and restated for 1998 is $3,674,058 (1,301,215 + 2,372,843 = $3,674,058). 1800, 2940; Exhibits 816 and 365a.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 60, 70, 243 and 244.**

**Brown Schultz Proposal No. 254**:   Even assuming the propriety of the method used by DeBruyn to restate the financial statements, the corrected restated amount of working capital and net worth had not diminished to an extent that would have prompted action by plaintiff to suspend or terminate bonding.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 236.**

**The materiality of the information revealed in the Restatements and USF&G's reaction thereto is discussed in detail in Section II(C)(2)(a), Section II(C)(3)(d) and Section II(D) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 255**:   The evidence did not establish that plaintiff would have suspended or terminated bonding for CCI even if the 1998 audited financial statement had reflected the minimum corrected restated or the corrected proper restated amounts.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 236.**

**The materiality of the information revealed in the Restatements and USF&G's reaction thereto is discussed in detail in Section II(C)(2)(a), Section II(C)(3)(d) and Section II(D) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 256**:   There was no evidence to establish that the difference between the corrected, restated 1998 audited financial statement was material to underwriting.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 236.**

The materiality of the information revealed in the Restatements and USF&G's reaction thereto is discussed in detail in Section II(C)(2)(a), Section II(C)(3)(d) and Section II(D) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 257**:   Plaintiff had expected CCI to have a loss of $500,000 for 1994.  Trial Transcript at p. 262.

Prior to September 1999, CCI had been diligent in promptly informing USF&G of significant news, good or bad.  Testimony of A. Phillips, Transcript, p. 2469.  It is very important to underwriters that contractors timely and honestly communicate both good news and bad news.  Testimony of Farnsworth, Transcript, p. 1525, Testimony of J. Daily, Transcript, p. 269.

CCI also had a history of successful turn-arounds.

For example, by letter dated July 21, 1994 and November 2, 1994, Dominiani indicated that CCI expected a loss of approximately $400,000 - $500,000 by fiscal year end 1994.  Exhibits 100, 104; Testimony of J. Daily, Transcript, p. 771.  However, the eventual loss was only $317,217.  Exhibit 31; Testimony of J. Daily, Transcript, p. 774.

As of September 30, 1995, CCI was showing a loss of $95,000.  However, CCI projected that it would break even for the year ending December 31, 1995.  According to the 1995 Audit Report, CCI did better than break even – it made a net profit of $103,210. Exhibit 790B, p. 1195, Exhibit 31; Testimony of J. Daily, Transcript, p. 775-776.

The Harrisburg Office received a copy of the 1998 Audit Report on March 2, 1999, which confirmed what Dominiani had represented to Anthony Phillips; namely, that CCI had its problem jobs under control and that CCI expected a break-even or slightly profitable year.  Exhibit 36.

**Brown Schultz Proposal No. 258**:   Plaintiff did not suspend or terminate bonding, or take any action at all in spite of its expectation and awareness that CCI would lose $500,000 for the year ending 1994. Trial Transcript at p. 273.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.**

**Brown Schultz Proposal No. 259**:   CCI reported to plaintiff that it had experienced a loss in the amount of $500,000 half-way through 1994. Trial Transcript at p. 525.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.**

**Brown Schultz Proposal No. 260**:   CCI experienced a loss from operations during 1995 in the amount of $308,362. Exhibit 32 at p. 3.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.**

**Brown Schultz Proposal No. 261**:   Plaintiff did not evaluate or analyze whether the losses CCI experienced would worsen and accepted the representation by the bond agent about the representation by CCI that the financial condition should improve based on projections even where revenue projections were known to be below original estimates.  Trial Transcript at pp. 525-28, 553.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.**

**Brown Schultz Proposal No. 262**:   CCI had net operating loss during 1994 in the amount of $864,000 and net loss in the amount of $317,000. Trial Transcript at pp. 262, 493.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.**

**Brown Schultz Proposal No. 263**:   Plaintiff did not suspend or terminate bonding in spite of its awareness that CCI sustained a loss for 1994 with only continued monitoring of the interim, internally provided work in process schedules.  Trial Transcript at p. 275.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.**

**Brown Schultz Proposal No. 264**:   The 1994 audited financial statement reflected CCI's working capital diminished to $2,384,192. Trial Transcript at p. 542-544.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.**

**Brown Schultz Proposal No. 265**:   The swing in operating profit from the year end 1993 to the year end 1994 was in excess of $1.2 million. Trial Transcript at p. 494.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.**

**Brown Schultz Proposal No. 266**:    Plaintiff was aware that CCI had sustained an interim loss during 1995 in the amount of $95,000.  Trial Transcript at pp. 282, 553.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.**

**Brown Schultz Proposal No. 269**:    Slow pay of trade debt is a sign of problems for the contractor.  Trial Transcript at p. 487.

**This mischaracterizes James Daily's testimony.  Although slow payment is an underwriting consideration, James Daily did not characterize it as a "problem."**

**Testimony of J. Daily, Transcript, p. 487.**

**Brown Schultz Proposal No. 270**:    CCI had an issue about profit fades at the beginning of the bonding relationship with plaintiff, and CCI continued to experience profit fade during the balance of the bonding relationship with plaintiff.  Trial Transcript at pp. 489-90.

**James Daily testified that he was aware of profit fade and believes that they may have numerous causes, including poor estimating.  Testimony of J. Daily, Transcript, pp. 490-491.**

**Brown Schultz Proposal No. 271**:    The continuing profit fades experienced by CCI concerned plaintiff.  Trial Transcript at pp. 490, 537.

**The trial reference is inaccurate.  James Daily testified that he did have some concerns regarding profit fades in 1995.  Farnsworth opined that USF&G underwriters adequately addressed all issues raised by the profit fades.  Testimony of Farnsworth, Transcript, p. 1517.**

**Brown Schultz Proposal No. 272**:    Plaintiff was aware that CCI experienced thin gross margins on many projects.  Trial Transcript at p. 531.

**This is misleading because it omits James Daily's testimony that thin gross margins are the nature of the construction business.  Exhibit 790A, p. 870.**

**Brown Schultz Proposal No. 273**:    Increased underbillings is an early warning sign of impending contractor failure at least in part because the amount of underbillings is included in working capital even though the contractor does not actually have the money available for use.  Trial Transcript at pp. 457, 492, 592.

**James Daily testified that increased underbillings "could" be an indication of a problem. Testimony of J. Daily, Transcript, p. 457. In that CCI's clients were almost always public authorities, there was never a serious question about the collectibility of legitimate underbillings.**

**Brown Schultz Proposal No. 274**:    Plaintiff had no information about the reason for the substantial increase in underbillings from 1996 to 1997. Trial Transcript at p. 591.

**James Daily testified that he did not remember if he had such information. Further, it is not established that the increase was "substantial." Testimony of J. Daily, Transcript, p. 591. In that CCI's clients were almost always public authorities, there was never a serious question about the collectibility of legitimate underbillings.**

**Brown Schultz Proposal No. 275**:    The annual review report dated April 15, 1998 prepared by Salazar concerning the December 31, 1997 audited financials did not reflect any information about the status of underbillings in spite of a substantial increase which was significant to underwriting. Trial Transcript at p. 610; Exhibit 229.

**The phrase "in spite of a substantial increase which was significant to underwriting" does not appear in the transcript. Testimony of J. Daily, Transcript, p. 610.**

**Brown Schultz Proposal No. 276**:    Plaintiff's underwriters did not react to or address CCI's projected losses, losses, profit fades, thin gross margins, or increased underbillings until September 1999. Trial Transcript at pp. 356, 361, 385, 527, 532, 535-36, 538, 540, 766, 813.

**Farnsworth opined that USF&G's underwriting of the CCI account generally conformed to the applicable standards of care of the surety industry that were in effect during the 1994 to 1998 time period. Testimony of Farnsworth, Transcript, p. 1530. He also opined that USF&G adequately addressed the issue of profit fades. Testimony of Farnsworth, Transcript, p. 1517.**

**Brown Schultz Proposal No. 277**:    Self-performing work presents an increased business risk to a contractor. Trial Transcript at pp. 587-88.

James Daily testified that its "not necessarily a problem area, but it does represent an increased risk to the contractor." Testimony of J. Daily, Transcript, p. 587. The word "business" has been added by Brown Schultz.

**Brown Schultz Proposal No. 278**:   A change in the type of work performed by a contractor inexperienced with new types of work and significant increase in size of individual projects are all events which may lead to contractor failure. Trial Transcript at pp. 588-89.

This is misleading to the extent it is not clear that it is a general response to a general hypothetical question.

**Brown Schultz Proposal No. 279**:   Daily did not believe CCI should self-perform work it had previously subcontracted. Trial Transcript at p. 588.

James Daily stated he did not think it was a good idea at the time. Testimony of J. Daily, Transcript, p. 588.

**Brown Schultz Proposal No. 281**:   Daily's approval of bonds was done without analysis and shortly within the time of the submission which included limited information based on interim financial reports. Trial Transcript at pp. 576-86.

This apparent ten page summation is a mischaracterization. It also omits testimony concerning work done by other USF&G employees and USF&G's reliance on the Audited Financial Statements. USF&G also hereby incorporates its response to Brown Schultz Proposal No. 276.

**Brown Schultz Proposal No. 282**:   A change in the type of work performed by a contractor inexperienced with new types of work and significant increase in size of individual projects are all events which may lead to contractor failure. Trial Transcript at pp. 588-89.

This is identical to Brown Schultz Proposal No. 278.

**Brown Schultz Proposal No. 283**:   Ortenzio terminated his personal indemnity during September 1997. Trial Transcript at p. 320.

Ortenzio requested termination of his personal indemnity on September 5, 1997, to be effective thirty days later. Testimony of J. Daily, Transcript, p. 320. Farnsworth opined

that USF&G met industry standard of care in continuing the bonding program after Ortenzio exercised his right of termination. Testimony of Farnsworth, Transcript, p. 1522. The work being done by CCI was within the capital structure of the company and did not present an undue risk to USF&G. *Id.*

**Brown Schultz Proposal No. 284**:   The loss of Ortenzio's personal indemnity increased plaintiff's risk of loss. Trial Transcript at p. 817.

This is misleading in that it is an incomplete and out of context response to a question posed to James Daily by the Court regarding the effect of risk on the calculation of bond premiums. Farnsworth opined that USF&G met industry standard of care in continuing the bonding program after Ortenzio exercised his right of termination. Testimony of Farnsworth, Transcript, p. 1522. The work being done by CCI was within the capital structure of the company and did not present an undue risk to USF&G. *Id.*

**Brown Schultz Proposal No. 285**:   Plaintiff had a choice whether to reduce or terminate bond credit without the personal indemnity. Trial Transcript at p. 321.

This is true only going forward. Bonds already issued cannot be cancelled. Farnsworth opined that USF&G met industry standard of care in continuing the bonding program after Ortenzio exercised his right of termination. Testimony of Farnsworth, Transcript, p. 1522. The work being done by CCI was within the capital structure of the company and did not present an undue risk to USF&G. *Id.*

**Brown Schultz Proposal No. 286**:   Plaintiff decided to continue to extend bond credit to CCI without Ortenzio's personal indemnity. Trial Transcript at p. 327.

This is misleading because the future extension of the bonding program without reinstatement of personal indemnity was based on Ortenzio's agreement that certain benchmarks would be maintained by CCI. Brown Schultz was aware of this. Farnsworth opined that USF&G met industry standard of care in continuing the bonding program

after Ortenzio exercised his right of termination.  Testimony of Farnsworth, Transcript, p.

1522.  The work being done by CCI was within the capital structure of the company and

did not present an undue risk to USF&G.  *Id.*

**Brown Schultz Proposal No. 287**:    In spite of the agreement of Ortenzio to maintain net worth of at least $4.8 million and to keep the total work program within $60 million, there was no modification to the requirements or limitations imposed by plaintiff on the CCI bond account. Trial Transcript at pp. 339-40; Exhibits 205, 206.

USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 284-286.

USF&G notes that documents in Brown Schultz' permanent file reveal that Brown Schultz

was aware of this agreement.  Exhibit 202, Exhibit 203.

**Brown Schultz Proposal No. 288**:    CCI exceeded the $60 million total program limit regularly after Ortenzio terminated his indemnity agreement during September 1997. Trial Transcript at p. 372; Exhibit 790 at pp. USFG/BS 0633, USFG/BS 0621,USFG/BS 0627, USFG/BS 0631, USFG/BS 0933, USFG/BS 0763-765, USFG/BS 0760-762, USFG/BS 1158, USFG/BS 0771-772, USFG/BS 0766-767, USFG/BS 0769-770.

As each Interoffice Correspondence demonstrates, USF&G's Harrisburg,

Pennsylvania office recommended a continuation of the $15 million/$75 million bonding

program for CCI.  Indeed, throughout CCI's bonding relationship with USF&G, those

bonding capacity limits continued year-to-year although, on a few occasions, USF&G

approved bonds which temporarily increased CCI's bonding capacity beyond $75 million.

Testimony of A. Phillips, Transcript, pp. 2416-2417, 2442-2443; Testimony of J. Daily,

Transcript, p. 189.

Farnsworth's analysis of Actual Work on Hand per Work in Progress demonstrates

that the work on hand, for most of the time, was well below the $75,000,000 aggregate.

Exhibit 359 (ID only).  Testimony of Farnsworth, Transcript, p. 1534.  Thus, the ratios

were often "well above a 5% case."  Testimony of Farnsworth, Transcript, pp. 1533-1534.

Even when the work in progress appeared to jump above the aggregate program limit for a short time, based upon the overall financial condition of CCI's balance sheet, there was still a strong case for further underwriting.  Testimony of Farnsworth, Transcript, p. 1534.

Those "spikes" (as they are known in the surety industry) in CCI's bonding program were short-lived since CCI worked off its backlog, thereby reducing the aggregate limit of the bonding program to $60 million or below.  Testimony of J. Daily, Transcript, pp. 332-333.

Also, on a very few occasions, USF&G approved a spike in CCI's single limit bonding program to allow CCI to accept a project larger than $15 million.  This was only done after considering both the facts and circumstances of the project and the financial position of CCI.  Testimony of J. Daily, Transcript, pp. 186, 188-189; Testimony of Farnsworth, Transcript, p. 1534.

During the period from 1997 until USF&G/St. Paul ceased writing bonds for CCI in early October 1999, USF&G only approved three jobs that were eventually awarded to CCI and were larger than the $15 million single limit portion of the bonding program.  The three were Germplasm Center ($15,500,000), VCU Life Science ($21,480,250) and Pennsylvania Turnpike Building ($24,612,843).  Exhibit 14, Exhibit 15.

**Brown Schultz Proposal No. 289**:   Plaintiff learned during August 1998 that CCI had experienced a $1.6 million loss halfway through the year.  Trial Transcript at pp. 2446, 2532; Exhibit 238 (including 6/1/98 internally prepared financial statement).

On or about August 17, 1998, Dominiani wrote to Anthony Phillips and reported that CCI had posted a net loss of $1.6 million for the first six months of 1998.  Dominiani

reported that this loss was attributable to certain problem jobs which had been rectified. Exhibit 237, 238.  Testimony of A. Phillips, Transcript, pp. 2445-2446.

Dominiani's letter included a spreadsheet which demonstrated how CCI's jobs would perform for the remainder of the year.  Exhibit 238.

In fact, according to Dominiani, CCI expected to show a small loss or break even by December 31, 1998.  Exhibit 237, 238.  Testimony of J. Daily, Transcript, p. 356.

The bonding program was renewed not only because Dominiani's turn around proposal seemed logical but because CCI had a past history of successful turnarounds. Testimony of A. Phillips, Transcript, pp. 2451-2452; Testimony of J. Daily, Transcript, pp. 283, 356.

The decision to renew was influenced, in part, by CCI's history of successful turn-arounds.  Testimony of A. Phillips, Transcript, pp. 2451-2452.

USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.

**Brown Schultz Proposal No. 290**:   Plaintiff did not take any underwriting action in response to the $1.6 million loss. Trial Transcript at pp. 638-40, 766.

USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 257 and 289.

**Brown Schultz Proposal No. 291**:   Plaintiff did not interrupt bonding and continued to issue bonds on the same basis after it learned about the $1.6 million loss as it did before learning about the $1.6 million loss. Trial Transcript at pp. 627, 766, 2533.

USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 257 and 289.

**Brown Schultz Proposal No. 292**:   Plaintiff did not consider requiring Ortenzio to restore his personal indemnity in spite of the $1.6 million dollar loss during 1998. Trial Transcript at p. 2533.

USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 257, 283 and 289.

**Brown Schultz Proposal No. 293**:   Plaintiff did not interrupt or discontinue bonding during any of the several occasions prior to 1998 when the financial condition of CCI deteriorated to an extent substantially greater than the change in financial condition reflected by plaintiff's restated financial statements for the year ending 1997.  Trial Transcript at pp. 2588-92.

USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 257 and 289.  USF&G notes that the phrase "to an extent substantially greater than the change in financial condition reflected in plaintiff's restated financial statements for the year ending 1997" is not support by the transcript reference.

**Brown Schultz Proposal No. 294**:   Analysis of the 1998 audited financial statement revealed a debt to equity ratio of 3.7.  Trial Transcript at p. 675.

Ratio analysis was used as a helpful tool; however, there were no mandatory or minimum ratios required to justify an underwriting decision.  Testimony of A. Phillips, Transcript, pp. 2433-2434.

With respect to CCI and other USF&G accounts of a size similar to CCI, USF&G generally wanted the accounts to maintain a working capital-to-bonding capacity ratio of 3% or better ("net quick") and a net worth-to-bonding capacity ratio of 5% or better. Testimony of A. Phillips, Transcript, p. 2433.

Anthony Phillips recalls numerous instances in which accounts were underwritten by the Harrisburg Office that had less than a 3% to 5% ratio.  Testimony of A. Phillips, Transcript, p. 2434.

In the rare instance when the net quick ratio is below 3%, it should be taken into account that this may be the result of the fact that USF&G's determination of net quick

disallows certain assets that show up in an audit report as current assets. Testimony of A. Phillips, Transcript, pp. 2582-2583.

According to the 1997 Audit Report and 1998 Audit Report, CCI maintained the 3%-5% ratios described above except on limited occasions when USF&G approved a bond which temporarily increased CCI's bonding capacity beyond $75 million. In fact, from 1994-1997, CCI was at the 5%-6% net worth to bonding capacity ratio. Testimony of Farnsworth, Transcript, p. 1506.

The delineated ratios were sufficiently reasonable to justify the bonding program. Testimony of Farnsworth, Transcript, p. 1506.

**Brown Schultz Proposal No. 295**:  Plaintiff took no underwriting action in response to the increase in debt to equity ratio in excess of 3 as reflected by the information on the 1998 audited financial statement. Trial Transcript at pp. 671-676.

USF&G hereby incorporates its response to Brown Schultz Proposal No. 294.

**Brown Schultz Proposal No. 296**:  Plaintiff favorably regarded CCI's arrangement with PCIC because it allowed money to flow back from PCIC during 1998 to cover losses. Trial Transcript at pp.  359, 1560:4-12.

USF&G first became familiar with PCIC when it acquired the CCI account in 1993. PCIC was presented to USF&G as an insurance company that could pay warranty claims. Testimony of Anthony Phillips, Transcript, pp. 2439-2440.

USF&G believed that the existence of a company *to pay warranty claims* was "a good thing." Testimony of Anthony Phillips, Transcript, p. 2440.

USF&G's understanding of the relationship between CCI and PCIC did not change at any time until after CCI's default in the fall of 1999. Testimony of Anthony Phillips, Transcript, p. 2440.

USF&G's underwriters believed that Footnote 8 in the 1998 Audit meant that if CCI did not receive a payment of all or a portion of the unnamed project related claim, PCIC would guaranty payment of the unpaid portion at some indeterminate time in the future.  Testimony of James Daily, Transcript, p. 399.

Anthony Phillips' testimony was consistent with the information in the letter from Dominiani to Anthony Phillips dated November 16, 1993 in which Dominiani discusses PCIC's role as a provider of "warranty insurance."  Exhibit 75.

Although Dominiani wrote in a letter to Anthony Phillips dated November 16, 1993 that funds from PCIC might be available "as a buffer to offset losses," in that same letter he reiterates that "PCIC [is] available to fund "warranty coverages" and has previously paid "warranty claims."  Exhibit 237.  Nothing in Dominiani's letter is inconsistent with the assertion in that letter - and in other letters from Dominiani - in which Dominiani reiterates the role of PCIC as provider of warranty insurance policies.  Exhibits 75, 237.

Anthony Phillips testified that Dominiani's letter reminded him of the availability of certain funds from PCIC, "[a]s long as it was for warranty coverages."  Exhibit 238. Testimony of Anthony Phillips, Transcript, pp. 2520-2521.

James Daily also testified that he did not have any understanding about the statement in Dominiani's letter that CCI might utilize PCIC to enhance CCI's profitability other than "[PCIC] was a warranty insurance company, and it paid warranty insurance claims."  Testimony of J. Daily, Transcript, pp. 645-648.

Anthony Phillips testified that based on his discussions with Dominiani he had no understanding that PCIC funds were available for anything other than to fund Remedial

**Work Period Insurance Policy warranty claims. Testimony of Anthony Phillips, Transcript, pp. 2584-2585.**

**Dominiani, a CPA and a former partner of Brown's, was listed on Brown Schultz' witness list but was never called to testify by Brown Schultz. Testimony of Brown, Transcript, p. 886.**

**No evidence was introduced that anyone at USF&G was aware that the funds represented by the Mahanoy Claim were included in revenue and underbillings in the 1998 Audit Report.**

**Brown Schultz Proposal No. 297**:   Plaintiff was informed and was aware CCI may utilize money from PCIC to enhance its profitability. Exhibits 238, 240.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 296.**

**Brown Schultz Proposal No. 298**:   The flow of money between PCIC and CCI was not an issue of underwriting concern to plaintiff.  Trial Transcript at pp. 296-97.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 296.**

**Brown Schultz Proposal No. 299**:   Plaintiff never inquired about or determined the effect of amounts claimed or received from PCIC on the financial statement of CCI.  Trial Transcript at pp. 297-98.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 296.**

**Brown Schultz Proposal No. 300**:   Plaintiff's underwriters never made inquiry about the effect of the claims by CCI to PCIC on the financial statements of CCI. Trial Transcript at pp. 497-98, 500, 563, 565-65.

**This proposal is a mischaracterization because it does not reveal that it concerns putative inquiries in 1995 about the effect of a claim identified in the 1994 Audit Report.**

**Brown Schultz Proposal No. 301**:   It was not material to plaintiff's underwriting to know the effect of CCI claims to PCIC on the financial statement of CCI.  Trial Transcript at pp. 497, 500, 1561:20-25.

**This proposal is a mischaracterization because it does not reveal that it concerns putative inquiries in 1995 about the effect of a claim identified in the 1994 Audit Report. Further, the claim amount of $397,000 materially differs from that of the Mahanoy Claim.**

**Brown Schultz Proposal No. 302**:   Plaintiff was more concerned about CCI's net profit than with any profit from operations. Trial Transcript at p. 562.

**This is misleading in that James Daily's statement is limited to the 1995 Audit Report.  Testimony of J. Daily, Transcript, p. 562.**

**Brown Schultz Proposal No. 303**:   It would have been appropriate for the underwriter to inquire about the treatment of the $1.162 million guaranteed claim included in the 1998 audited financial statement if it was of concern to the underwriter and the underwriter was uncertain.  Trial Transcript at p. 1567:21-1568:1.

**This assumes, *arguendo*, that there was any reason, whatsoever, for USF&G's underwriters to know that the representations made by Brown Schultz concerning compliance with GAAS and GAAP were untrue.  As discussed, *supra*, even Brown Schultz' experts admit that in reading the 1998 Audit Report there was nothing that would have informed them that the Mahanoy Claim had been included in revenue.  Testimony of Neuschaefer, Transcript, pp. 2373-2374, 2378-2380; Testimony of Brenner, Transcript, pp. 3070, 3089.**

**Brown Schultz Proposal No. 304**:   Phillips realized that the source of some of the substantial underbillings reflected on the 1998 year financial information was the Mahanoy Prison project, but did not make any inquiry or perform any investigation to determine whether the underbillings included the PCIC guaranteed claim disclosed in footnote 8 of the 1998 financial statement related to the Mahanoy Prison project. Trial Transcript at pp. 2594-95.

**This is a blatant misrepresentation.  Anthony Phillips did *not* say that he knew that the Mahanoy Claim was the source of underbillings.  USF&G hereby incorporates its response to Brown Schultz Proposal No. 303.**

That Brown Schultz' treatment of the Mahanoy Claim and the Insurance Payments was materially misleading and detrimentally relied upon by USF&G is discussed in Section II(C)(3)(e) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 305**:   It was not important for plaintiff to know for underwriting purposes whether money was received from PCIC since CCI had funded the warranty insurance and was entitled to the money. Trial Transcript at p. 2525.

According to PCIC's trial balance sheet, PCIC paid $800,000 to CCI on July 7, 1999.  PCIC also paid a total of $142,460 in two payment of $72,460 and $70,000 on December 7, 1999.  The December 7, 1999 payments are described as "CCI/Mahanoy CLM PMT." *However, there is no indication as to the purpose of the payment of $800,000 on July 7, 1999*.  Exhibit 331, p. BSSF 4978.  Testimony of Brown, Transcript, pp. 1284-1285. Brown Schultz presented no evidence that PCIC actually paid the $800,000 to CCI and that such putative payment related to the Mahanoy Claim.

PCIC payments to CCI in 1999 were a form of revenue to CCI – to be accounted for in 1999.  Testimony of DeBruyn, Transcript, pp. 3191-3192.  The funds received or guaranteed by PCIC, however, would not have been "contract revenue."  Testimony of DeBruyn, Transcript, p. 3193.  Farnsworth opined that even if, *arguendo*, the claim were paid by PCIC, it should not have been included in revenue because it was a claim that CCI made against DGS for additional amounts over and above an agreed contract price and such putative claim was guaranteed by a third party.  Testimony of Farnsworth, Transcript, p. 1544.

**Brown Schultz Proposal No. 306**:   Any concern had about the inclusion of the $1,162,000 claim guaranteed by PCIC in revenue would be resolved by CCI's receipt of that amount. Trial Transcript at p. 1545:1-13.

USF&G hereby incorporates its response to Brown Schultz Proposal No. 305.

**Brown Schultz Proposal No. 307**:   There would have been no change to the working capital and net worth of CCI if the $1,162,460 claim guaranteed by PCIC was not included in underbillings and, instead, was reflected as a receivable.  Trial Transcript at p. 1193.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 306.**

**Brown Schultz Proposal No. 308**:   Plaintiff did not establish that plaintiff would have permanently ceased bonding for CCI even if Phillips had been aware that the $1,162,460 million dollar PCIC guaranteed claim had been included in underbillings on the 1998 audited financial statement.  Trial Transcript at pp. 415-16, 2480.

**James Daily had no knowledge that the Mahanoy Claim was included as *revenue* in the 1998 Audit Report.  Testimony of J. Daily, Transcript, pp. 399, 411-412, 414.**

**James Daily testified that USF&G would have *ceased* to issue bonds if it knew that the Mahanoy Claim had been included in "underbillings."  Testimony of J. Daily, Transcript, pp. 415-416.**

**James Daily also testified of the importance of the revenue and underbilling sections of a financial statement to an underwriter.  Testimony of J. Daily, Transcript, pp. 349, 413.**

**Anthony Phillips testified that at the time he received the 1998 Audit Report, on or about March 2, 1999, he did not know that the Mahanoy Claim was included in underbillings in the 1998 Audit.  Testimony of Anthony Phillips, Transcript, pp. 2460, 2584.**

**Anthony Phillips reviewed the 1998 Audit Report when received from Dominiani and it was his standard procedure to read all footnotes in audit reports.  Testimony of Anthony Phillips, Transcript, p. 2583.**

**Anthony Phillips had no understanding that the Mahanoy Claim was included in underbillings until subsequent to finding out CCI was in financial trouble in late 1999. Testimony of Anthony Phillips, Transcript, p. 2583.**

Anthony Phillips also testified that if he had known at the time of his receipt of the 1998 Audit Report that the Mahanoy Claim was included in revenue as an underbilling he would have *halted* bonding until he received a satisfactory answer regarding why CCI was not getting paid for the underbilling and whether there were additional underbillings that were not going to be paid. Testimony of Anthony Phillips, Transcript, p. 2472.

James Daily also testified that USF&G would not have issued bonds if he had known that the Mahanoy Claim had been included in underbillings. Testimony of J. Daily, Transcript, p. 416.

The USF&G "Home Office" would have upheld Phillips' decision to halt bonding. Testimony of Anthony Phillips, Transcript, pp. 2435-2436, 2476-2477, 2588. The "Home Office" never rejected or overruled any recommendation from his office. Testimony of Anthony Phillips, Transcript, pp. 2435-2436.

**Brown Schultz Proposal No. 310**:   Deborah Bowman was an auditor employed by Brown Schultz Sheridan & Fritz from 1991 until September 1999. Trial Transcript at p. 1298.

Bowman was a supervisor, which in the Brown Schultz hierarchy is subordinate to the positions of manager, senior manager and principal. Testimony of Bowman, Transcript, pp. 1299-1300; Testimony of Brown, Transcript, p. 926.

**Brown Schultz Proposal No. 311**:   Ms. Bowman was well qualified to perform audit work on the 1997 and 1998 audits of CCI Construction. Trial Transcript at p. 931:7-932:2, 1298.

CCI was the only general contractor for which Bowman ever performed audit services. Testimony of Bowman, Transcript, p. 1301.

In 1998, unlike previous years, no manager, senior manager or principal was involved in the field work for the CCI audit. Testimony of Brown, Transcript, p. 927.

Although Bowman had the assistance of a manager, Suzanne Ehgartner ("Ehgartner") in connection with the 1997 Audit Report, she was essentially on her own for the 1998 Audit Report.  Testimony of Brown, Transcript, pp. 924-927.

Bowman's job specific performance evaluations for CCI in 1998 provides that "problems were experienced in testing client's estimated costs on completed contracts."  Exhibit 273; Testimony of Brown, Transcript, pp. 1241-1242.  Ironically, the only other evaluation revealing problems in Bowman's performance concerns PCIC.  Exhibit 273, Testimony of Brown, Transcript, pp. 1244-1246.

**Brown Schultz Proposal No. 313**:   The only procedure the auditing standards require is to confirm accounts receivable.  Otherwise, the procedures the auditor uses to comply with GAAS is a matter of judgment for the auditor.  Trial Transcript at p. 2813:22-2814:5.

This is false.  Although the choice of procedures to be used are sometimes within the auditors discretion, certain procedures are recommended and "AICPA members should be prepared to justify departures from [those recommended]."  Exhibit 360, AICPA Audit and Accounting Guide for Construction Contractors, p. iii, Notice to Readers.

**Brown Schultz Proposal No. 314**:   An auditor properly considers the auditor's familiarity with the account, whether the client has well documented procedures and competent people and management has integrity, when planning the audit. Trial Transcript at p. 2815:11-15.

Regardless of the auditor's putative "familiarity" with a client an auditor is required to, *inter alia*, conduct sufficient tests to determine the reliability of management's estimates.  AU Section 342.  Brown Schultz ignored its responsibilities and engaged in "conversational auditing" because of its belief in the purported – and untested – "high integrity" of CCI's management.  Exhibit 213, p. 44, Exhibit 222, p. 20, Testimony of Bowman, Transcript, pp. 1363-1364.

**Brown Schultz Proposal No. 315**:    Defendants were aware that CCI had a comprehensive written policy and procedures manual.  Trial Transcript at p. 1166, 1169, 1411-12; Exhibit 356.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 314.**

**Brown Schultz Proposal No. 316**:    Brown Schultz's historical experience was that CCI adhered to the policies and procedures set forth in the CCI policies and procedures manual. Trial Transcript at p. 1167; 1188; 1412-14.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 314.**

**Brown Schultz Proposal No. 317**:    Defendants were aware that CCI had effective systems and controls for financial reporting. Trial Transcript at p. 1188-89.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 314.**

**Brown Schultz Proposal No. 318**:    The more effective the internal control, the more assurance it provides about the reliability of accounting data and financial statements.  Trial Transcript at p. 978:25-979:6.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 314.**

**Brown Schultz Proposal No. 319**:    Based on historical experience with CCI and Brown Schultz's knowledge of CCI's systems and procedures, Brown Schultz believed that CCI's management was capable of and competent to accurately report financial information concerning the financial affairs of CCI. Trial Transcript at pp. 1186-87.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 314.**

**Brown Schultz Proposal No. 320**:    The information provided by CCI management to Brown Schultz through the completion of the 1998 fiscal year end audit was always reasonably accurate. Trial transcript at p. 1187.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 314.**

**Brown Schultz Proposal No. 321**:    Defendants understood the process by which CCI prepared its estimated costs to complete and reviewed the client's supporting documentation in connection with its audits of CCI including the job files, as part of its determination that CCI was capable of reliably estimating costs to complete.  Trial Transcript at pp. 952-54; 956; 1153-1154.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 314.**

**Brown Schultz Proposal No. 325**:    The audit plan for CCI did not materially change from 1993 through 1998 because it was devised at a time when the company had gross revenues similar to the revenue in 1998. Trial Transcript at pp. 934, 937.

Testimony at trial demonstrated that CCI's audit risk profile changed markedly between the early 1990's and the year ended December 31, 1998. Both Brown and Bowman admitted that they were aware of various significant changes in CCI's circumstances and operations, including CCI's decision to engage in increasingly greater amounts of self-performing work, the performance of increasing amounts of out-of-state work, CCI's significant investment in equipment, the rapid growth in the number of CCI's employees and fluctuating revenues. Testimony of Brown, Transcript pp. 1205-1208. Testimony of Bowman, Transcript, pp. 1368-1370.

These and other factors shown in Brown Schultz' working papers constituted significant audit risks. *See, e.g.*, Exhibit 213, pp. 39-44, Exhibit 222, pp. 13-20; Testimony of DeBruyn, Transcript, pp. 1763-1765.

Despite knowledge of the foregoing risks, Brown and Bowman admitted that the audit plans for CCI remained essentially the same from 1993 through 1998. Testimony of Brown, Transcript, pp. 934, 937, 1201-1202, 1204, 1206. Testimony of Bowman, Transcript, pp. 1339-1340, 1343, 1370, 1378.

Additionally, despite Brown Schultz' knowledge of numerous problems with CCI subcontractor defaults and the difficulties CCI had in self-performing work, no adjustments to the audit plans were ever made. Brown admitted – and the working papers reinforce – that despite an increase in CCI's audit risk profile, the actual audit work performed by Brown Schultz for the fiscal years ended December 31, 1996, 1997 and 1998 (and the audit fees) did not change significantly from year to year. Exhibits 109, 110, 111, 112, 113 114, 213, 222. Testimony of Brown, Transcript, pp. 934, 937, 1204-1206.

**Brown Schultz Proposal No. 326**:    There was no evidence that there were significant changes that required revisions to the CCI audit plan. Trial Transcript at pp. 3037; 3040:6-11.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 325.**

**Brown Schultz Proposal No. 327**:    When auditing financial statements the auditor is concerned with the direction of the risk, that is, whether there is a potential for either the overstatement or understatement of income. Trial Transcript at p. 1136.

**This is misleading in that direction of risk is but one factor to be considered by the auditor. Brown Schultz' working papers reveal factors that constitute considerable risk. *See, e.g.,* Exhibit 213, pp. 29-44; Exhibit 222, pp. 13-20. Despite knowledge of these audit risk factors, Brown and Bowman admit that the audit plans remain the same from 1993 until 1998. Testimony of Brown, Transcript, pp. 934-937, 1204-1206; Testimony of Bowman, Transcript, pp. 1339-1340, 1343. GAAS requires that the auditor properly address the risks involved in the audit. AU Section 230, AU Section 311.**

**Brown Schultz Proposal No. 328**:    Defendants were not familiar with the underwriting practices of plaintiff when the audit reports were issued. Trial Transcript at p. 1185.

**This is wholly irrelevant. Moreover, there was evidence adduced at trial that Brown Schultz knew, *inter alia*, that USF&G was an intended user of the financial statements and that bonding companies use financial statements to determine how they issue bonds. Testimony of Brown, Transcript, p. 921.**

**Brown Schultz Proposal No. 329**:    The auditor considers who the users of the financial statement might be when determining the direction of the risk, but the user does not determine the contents of the financial statements. Trial Transcript at p. 1136.

**This is a mischaracterization. Users of an audit report may indicate to the auditor the likely direction of the risk. Testimony of Brown, Transcript, p. 1136. There is ample evidence that Brown Schultz knew that USF&G was an intended user and understood the purposes for which the Audited Financial Statements would be used.**

**Brown Schultz Proposal No. 330**:   Brown Schultz properly assessed the audit risk associated with the 1997 and 1998 audits of CCI. Trial Transcript at p. 2914.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 325.**

**Brown Schultz Proposal No. 331**:   Brown Schultz properly relied on its historical experience with CCI when developing and performing the audits. Trial Transcript at p. 1905:11-15.; 2815:11-15.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 314.**

**Brown Schultz Proposal No. 332**:   The specific procedures to be used in an audit are subject to the judgment of the auditor.  Trial Transcript at p. 1891:14-17.

**This is false.  Although the choice of procedures to be used are sometimes within the auditors discretion, certain procedures are recommended and "AICPA members should be prepared to justify departures from [those recommended]."  Exhibit 360, AICPA Audit and Accounting Guide for Construction Contractors, p. iii, Notice to Readers.**

**Brown Schultz Proposal No. 333**:   Profit fade does not mean that a company's estimating was bad or that auditors did not do an audit in accordance with GAAS.  Trial Transcript at pp. 2841-42.

**Brown Schultz was aware that CCI had a history of profit fades, an indicia of poor estimating ability.**

**Brown Schultz Proposal No. 334**:   Changes in estimates over the course of time are not considered accounting errors. Trial Transcript at p. 2824.

**This is misleading in that the term "accounting errors" is vague and indefinite. Evidence that CCI's estimates were unreasonable was found in Brown Schultz' working papers which show that in 1998, for example, CCI was estimating gross profits on several contracts-in-progress that were materially higher than its historical or originally projected amounts.  Exhibits 213, 222.  Testimony of DeBruyn, Transcript, p. 1775.  It was violative of GAAS for Brown Schultz to alter its audit plan in light of the foregoing.  Testimony of**

DeBruyn, Transcript, p. 1770.  AU Sections 342, 311, 230.  Presumably, violation of GAAS constitutes an "accounting error."

**Brown Schultz Proposal No. 335**:   Brown Schultz properly planned for the 1997 and 1998 audits of CCI. Trial Transcript at p. 2914.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 325.**

**Brown Schultz Proposal No. 336**:   No evidence was presented that the system and procedures in place at CCI were not appropriate or adequate for developing reliable estimated costs to complete. Trial Transcript at p. 1936:15-19; 1916:12-15.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 325.**

**Brown Schultz Proposal No. 337**:   Brown Schultz was justified in relying on its experience with CCI's procedures and ability to estimate the costs of completion when performing its audit. Trial Transcript at p. 1906.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 314.**

**Brown Schultz Proposal No. 338**:   An auditor performing an audit of a construction company is expressing an opinion on the financial statements as a whole and not on specific numbers on the balance sheet or on individual contracts.  Trial Transcript at p. 2814:6-14.

One of the primary objectives of an audit is to identify high-risk audit areas and to plan the audit procedures accordingly.  In connection with construction contractor audits "[m]uch of the independent auditor's work involves evaluating subjective estimates relating to future events a process which involves highly technical data."  Exhibit 360, Appendix A, p. 43, AICPA Audit and Accounting Guide Construction Contractors.

In particular, the "ultimate focus of the [construction] audit has to be on substantiating the reasonableness of gross profits on contracts, which usually includes a substantial estimated portion."  PPC Guide to Construction Contractors, Section 520.05. Exhibit "A" for ID, Tab 16(E).

The audit of a construction contractor is markedly different than an audit of a product manufacturer or service provider and, accordingly, has many unique

characteristics which must be taken into account by the auditor in defining audit risk and designing an audit plan.  Exhibit 361 (ID only).  Testimony of DeBruyn, Transcript, pp. 1737-1741.  Such proprietary elements include the construction contractors' use of the "percentage of completion" method of accounting and the importance of overbillings and underbillings to any analysis of the contractors' ability to successfully perform their contractual obligations.  Exhibits 362 (ID only); Testimony of DeBruyn, Transcript, pp. 1745-1748.  Brown Schultz failed to implement necessary tests and safeguards sufficient to instill confidence in the numbers provided by CCI.  Testimony of DeBruyn, Transcript, pp. 1741-1742.

Brown acknowledges that one of the unique features about auditing general contractors is the auditor's responsibility to ascertain the accuracy of management's ability to estimate costs to complete and profit.  Testimony of Brown, Transcript, pp. 857, 860. Brown also acknowledges the authoritativeness of the AICPA Audit and Accounting Guide for Construction Contractors and the PPC Guide to Construction Contractors.  Testimony of Brown, Transcript, pp. 889-890, 894-896.

**Brown Schultz Proposal No. 339**:    An auditor is not required to audit all of the contracts of a construction company.  Nor is an auditor required to perform the same degree of work on all contracts.  Trial Transcript at p. 2815:2-15.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 338.**

**Brown Schultz Proposal No. 340**:    An audit is done on a test basis. Trial Transcript at p. 2816.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 338.**

**Brown Schultz Proposal No. 341**:    An audit does not guarantee that the financial statements are absolutely correct. Trial Transcript at p. 2816.

Although an audit does not guaranty absolute correctness, the Audited Financial Statements certified that the financials "present fairly, in all material respects the financial position of CCI . . . ."  Exhibit 34, p. 1, Exhibit 36, p. 1.

**Brown Schultz Proposal No. 342**:   Section 5 of the audit program describes the procedures used by Brown Schultz to audit the contracts in progress for CCI for the year ending December 31, 1997. Trial Transcript at p. 1200; Exhibit 213 at p. 194-197.

This is misleading to the extent it implies that – absent other proof – it can be concluded that such procedures were actually performed.

**Brown Schultz Proposal No. 343**:   The procedures described in section 5 of the audit program were performed by the Brown Schultz auditors for contracts in progress in connection with the 1997 year end audit. Trial Transcript at p. 1201.

DeBruyn testified that Brown Schultz failed to meet the minimal professional standards regarding its working papers.  Testimony of DeBruyn, Transcript, pp. 1758-1761, 1765-1770.

This is important not merely on technical grounds but because Brown Schultz claims to have conducted numerous tests and examinations that are simply *not* indicated in its working papers.  When evaluating the contents (or lack thereof) of Brown Schultz' working papers, the Court should do so cognizant that "[p]rofessional standards require an auditor to obtain sufficient audit evidence to afford a reasonable basis for his audit opinion."  AU Section 326, Exhibit "A" for ID, Tab 3.

Brown agrees that the basic principle at the time Brown Schultz performed audits for CCI was that the main purpose of working papers is to document what is done in connection with the audit.  Testimony of Brown, Transcript, p. 914.

Further, any excuses for the omission of information from working papers – intentionally or otherwise – should be viewed skeptically in light of the fact that working

papers have a "common purpose - to document the work done, and to preserve a body of evidence adequate in amount and quality and so organized as to lean logically to the professional conclusion expressed."  R. J. Gormley, *The Law of Accountants and Auditors*, ¶3.03[1], p. 3-26 (Warren, Gorham & Lamont 1981), AU Section 339A and 339, Exhibit "A" for ID, Tabs 8 and 6.

**Brown Schultz Proposal No. 344**:   Section 5, subsection C through K of the audit program describes with the procedures used to audit the estimated costs to complete for the contracts in progress. Trial Transcript at p. 1201-02; Exhibit 213 at p. 196-197.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 343.**

**Brown Schultz Proposal No. 345**:   The procedures described in Section 5, subsections C through K, of the audit program were performed by the Brown Schultz auditors in connection with the 1997 audit.  Trial transcript at p. 1202.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 343.**

**Brown Schultz Proposal No. 346**:   Brown Schultz performed similar audit procedures in the 1998 audit of the contracts in progress as it performed in the 1997 audit for contract in progress. Trial Transcript at pp. 1203, 1421.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 343.**

**Brown Schultz Proposal No. 347**:   Those procedures are reflected in Section 5 of the audit program for the 1998 audit. Trial transcript at p.  1203; Exhibit 222 at p. 214.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 343.**

**Brown Schultz Proposal No. 348**:   Those procedures were performed by Brown Schultz auditors for contracts in progress in connection with the 1998 year end audit of CCI. Trial Transcript at pp. 1203-04.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 343.**

**Brown Schultz Proposal No. 349**:   Ms. Bowman accessed the project files maintained by CCI  for the 1997 and 1998 audits.  Trial Transcript at p. 2132:6-9.

**Although this may be true in a general sense, the working papers do not contain sufficient evidential matter to prove what was performed. Additionally, Sheri Phillips lacks the personal knowledge to testify as to what was actually done by Bowman.**

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 21.**

**Brown Schultz Proposal No. 350**:    CCI provided Brown Schultz auditors with job cost reports and other job costs information during their audits of the 1997 and 1998 year end financial statements.  Trial Transcript at p. 2133.

**Although this may be true in a general sense, the working papers do not contain sufficient evidential matter to prove what was performed. Additionally, Sheri Phillips lacks the personal knowledge to testify as to what was actually done by Bowman.**

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 21, 343 and 348.**

**Brown Schultz Proposal No. 351**:    CCI provided Brown Schultz auditors with estimated costs to complete reports and other estimated cost to complete information during their audits of the 1997 and 1998 year end financial statements.  Trial Transcript at p. 2133.

**Although this may be true in a general sense, the working papers do not contain sufficient evidential matter to prove what was performed. Additionally, Sheri Phillips lacks the personal knowledge to testify as to what was actually done by Bowman.**

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 21, 343 and 348.**

**Brown Schultz Proposal No. 352**:    Bowman reviewed the job cost reports and the estimated costs to complete reports of CCI in connection with its 1997 and 1998 audits. Trial Transcript at p. 1374-1375; 1414-17.

**Bowman's general statement does not indicate that this was done relative to 1997 and 1998.  USF&G hereby incorporates its response to Brown Schultz Proposal No. 343.**

**Brown Schultz Proposal No. 353**:   Bowman reviewed information from CCI's job files during the course of their audits.  Trial Transcript at pp. 945:20-946:4, 946:9-12, 946:16-18, 1416-17.

**Absent specification of what was reviewed, the proposed findings is meaningless.**

**Based on the working papers, there is no evidence that Brown Schultz did anything other than look at WIPs prepared by CCI and then, purportedly, talked to Sheri Phillips and Stan Sechrist.**

**Brown Schultz Proposal No. 354**:   Brown Schultz used tick marks to reference that the job costs and estimated costs to complete reports were reviewed by the auditors.  Trial Transcript at p. 1428-30.

**Bowman testified that in one section she used tick marks for the WIP schedule. There is no evidence this was done regarding the costs to complete.**

**Brown Schultz Proposal No. 355**:   The content of an auditor's work papers is up to the judgment of the auditor. Trial Transcript at p. 1893:12-15.

**The AICPA Professional Standards Vol. I at AU §339, states in section .01: "The auditor should prepare and maintain working papers . . . .  The information contained in working papers constitutes the principal record of the work that the auditor has done and the conclusions that he has reached concerning significant matters."  AU §339 further states in section .02 that the function and nature of working papers serve mainly to:**

> **a.    Provide the principal support for the auditor's report, including his representation regarding observance of the standards of fieldwork, which is implicit in the reference in his report to generally accepted auditing standards.**
>
> **b.    Aid the auditor in the conduct and supervision of the audit.**

**When evaluating the contents (or lack thereof) of Brown Schultz' working papers, the Court should do so cognizant that "[p]rofessional standards require an auditor to**

obtain sufficient audit evidence to afford a reasonable basis for his audit opinion."  AICPA SAS no. 31, "Evidential Matter" (1980).

DeBruyn testified that Brown Schultz failed to meet the minimal professional standards regarding its working papers.  Testimony of DeBruyn, Transcript, pp. 1758-1761, 1765-1770.

This is important not merely on technical grounds but because Brown Schultz claims to have conducted numerous tests and examinations that are simply *not* indicated in its working papers.  When evaluating the contents (or lack thereof) of Brown Schultz' working papers, the Court should do so cognizant that "[p]rofessional standards require an auditor to obtain sufficient audit evidence to afford a reasonable basis for his audit opinion."  AU Section 326, Exhibit "A" for ID, Tab 3.

Brown agrees that the basic principle at the time Brown Schultz performed audits for CCI was that the main purpose of working papers is to document what is done in connection with the audit.  Testimony of Brown, Transcript, p. 914.

Further, any excuses for the omission of information from working papers – intentionally or otherwise – should be viewed skeptically in light of the fact that working papers have a "common purpose - to document the work done, and to preserve a body of evidence adequate in amount and quality and so organized as to lean logically to the professional conclusion expressed."  R. J. Gormley, *The Law of Accountants and Auditors*, ¶3.03[1], p. 3-26 (Warren, Gorham & Lamont 1981), AU Section 339A and 339, Exhibit "A" for ID, Tabs 8 and 6.

**Brown Schultz Proposal No. 356**:  The basic requirement for work paper content and authoritative pronouncements are so broad that an auditor has a great deal of discretion in deciding on the specific work papers to prepare. Trial Transcript. at pp. 1145-1146.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 355.**

**Brown Schultz Proposal No. 357**:   An auditor's work papers do not need to be prepared with constant attention to their defensive use.  Trial Transcript at p. 915:4-5.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 355.**

**Brown Schultz Proposal No. 358**:   Brown Schultz's work papers reflected and documented the procedures performed and conclusions reached by Brown Schultz in connection with the CCI audits. Trial Transcript at pp. 1144-1145.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 343.**

**Brown Schultz Proposal No. 359**:   Brown Schultz's work papers show that appropriate work was done and procedures performed in connection with the audits. Trial Transcript at pp. 2856-2912; Exhibits 809-812.

**When evaluating the contents (or lack thereof) of Brown Schultz' working papers, the Court should do so cognizant that "[p]rofessional standards require an auditor to obtain sufficient audit evidence to afford a reasonable basis for his audit opinion."  AICPA SAS no. 31, "Evidential Matter" (1980).**

**DeBruyn testified that Brown Schultz failed to meet the minimal professional standards regarding its working papers.  Testimony of DeBruyn, Transcript, pp. 1758-1761, 1765-1770.**

**This is important not merely on technical grounds but because Brown Schultz claims to have conducted numerous tests and examinations that are simply *not* indicated in its working papers.  When evaluating the contents (or lack thereof) of Brown Schultz' working papers, the Court should do so cognizant that "[p]rofessional standards require an auditor to obtain sufficient audit evidence to afford a reasonable basis for his audit opinion."  AU Section 326, Exhibit "A" for ID, Tab 3.**

USF&G hereby incorporates its response to Brown Schultz Proposal No. 343.

**Brown Schultz Proposal No. 360**:    The CCI job cost report was not included in the Brown Schultz work papers due to its size. Trial Transcript at pp. 1428-29.

**Bowman stated only that the job cost history was voluminous.  She stated that the estimated cost to complete was a smaller report.  Testimony of Bowman, Transcript, p. 1429.**

**Brown Schultz Proposal No. 361**:    Bowman met with the project managers for the specific jobs during the 1997 and 1998 audits.  Trial Transcript at p. 2134.

**Sheri Phillips is not competent to opine on meetings in which she was not personally involved.**

**Although this may be true in a general sense, the working papers do not contain sufficient evidential matter to prove what was performed.  Additionally, Sheri Phillips lacks the personal knowledge to testify as to what was actually done by Bowman.**

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 21, 343 and 348.**

**Brown Schultz Proposal No. 362**:    Bowman also met with Mr. Sechrist concerning specific jobs and discussed estimated costs to complete contracts.  Trial Transcript at pp.  987-88, 988-91, 1006-08, 1417-19, 2134.

**The transcript referenced merely provides that Bowman discussed the Abermarle Prison project with Mr. Sechrist.  USF&G hereby incorporates its response to Brown Schultz Proposal No. 343.**

**Brown Schultz Proposal No. 363**:    Ms. Bowman asked CCI for and was provided source documentation concerning costs and cost estimates in addition to the reports generated by CCI.  Trial Transcript at pp. 1416-17, 2136-2137.

**The transcript referenced merely provides that Bowman consulted the original bid file regarding the Lord Fairfax project.  USF&G hereby incorporates its response to Brown Schultz Proposal No. 343.**

**Brown Schultz Proposal No. 364**:   Ms. Bowman checked the source documentation against the job costs history.  Trial Transcript at p. 2137:13-19.

**This is a mischaracterization.  Sheri Phillips merely testified that Bowman checked some documents on a test basis.  Additionally, Sheri Phillips does not have the personal knowledge to testify as to exactly what work was performed.**

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 21.**

**Brown Schultz Proposal No. 365**:   Ms. Bowman obtained explanations about the reason for variances between the original contract amount or the earlier estimated costs to complete and the most recent estimated costs to complete in connection with the audits performed for the year end 1997 and year end 1988.  Trial Transcript at pp. 2138:12-19, 1417-19.

**The testimony merely supports the vague general statement that she asked for explanations.  USF&G hereby incorporates its response to Brown Schultz Proposal No. 343.**

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 21.**

**Brown Schultz Proposal No. 366**:   Bowman posed her questions to the project manager or Stan Sechrist. Trial Transcript at p. 2138:20-24.

**The testimony is that she posed her "more detailed questions" to Sechrist.**

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 21.**

**Brown Schultz Proposal No. 367**:   Stan Sechrist was the vice president of operations for CCI from approximately 1996 to 1999.  Mr. Sechrist oversaw all the projects maintained by CCI and was extremely knowledgeable about those projects. Trial Transcript at p. 2111.

**The transcript reference merely provides that Mr. Sechrist was operations manager.**

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 21.**

**Brown Schultz Proposal No. 368**:    The project managers either reported directly to Stan Sechrist or reported to the person in charge of their division who, in turn reported to Sechrist. Trial Transcript at p. 2112.

**This is a misstatement.  Self-performing divisions had additional layers of reporting.**

**Brown Schultz Proposal No. 369**:    Stan Sechrist was the appropriate person for the auditors to consult or to address questions concerning specific projects or contracts. Trial Transcript at pp. 1950:22-1951:1.

**This general statement is meaningless without attribution to either a CCI employee or someone very familiar with its operations.  The transcript reference is to a question by Brown Schultz' counsel to DeBruyn that poses a hypothetical which assumes the facts asserted in the proposed finding.**

**Brown Schultz Proposal No. 370**:    It is a matter of judgment by the auditor whether to send subcontractor confirmations.  Trial Transcript at p. 1891:10-13.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 313.**

**Brown Schultz Proposal No. 371**:    Owner confirmations verify the status of a job including the percentage of the job that is entitled to be billed. Trial Transcript at p. 983-983. The basis for the billings on a job is the owner's approval through his engineer or architect of the status of the  job.  Trial Transcript at p. 983-984.  Brown Schultz sent owner confirmations as part of its audit. Trial Transcript at p. 982.

**The transcript reference does *not* provide that the confirmations verify "the percentage of the job that is entitled to be billed."  Testimony of Brown, Transcript, p. 983.**

**Brown Schultz Proposal No. 372**:    Job site visits are not required by generally accepted audited standards.  Trial Transcript at pp. 980:5-7, 1961:21-23.

**Both DeBruyn and Brenner acknowledged the efficacy of job site visits in appropriate circumstances.  Testimony of DeBruyn, Transcript pp. 1825-1827.  Testimony of Brenner, Transcript, pp. 3022-2023, 3024-3026.**

**Among the reasons why a job site visit by an auditor may be necessary is "[t]o gain an understanding of those components of internal control maintained at the job site."**

Exhibit 360, AICPA Audit and Accounting Guide Construction Contractors, 10.02, p. 57. This is particularly true if there are troublesome jobs or where accounting functions are performed at the project site. *Id.* at 59.

Brown justified his failure to conduct job site visits on his belief that all documentation and purchasing was centralized at CCI's main office. Testimony of Brown, Transcript, p. 1252.

However, accounting and purchasing functions were performed by CCI at the job site level. Exhibits 356 and 357. Testimony of Brown, Transcript, pp. 1254-1255.

In light of the troublesome jobs identified in Brown Schultz' working papers, the significant profit fades which occurred, and the many other risk factors extant, job site visits should have been conducted and would likely have alerted Brown Schultz that the projects were in worse shape and job costs higher than represented by CCI's management. Testimony of DeBruyn, Transcript, pp. 1825-1826.

**Brown Schultz Proposal No. 373**:   Job site visits are useful where there is a decentralized accounting system, the records are kept at the field offices as opposed to the home office and there is infrequent evaluation of costs and the estimated costs to complete and there are not significant controls over the information that is kept at the field office and no history of having field office communication with the home office. Trial Transcript at pp. 980:21-981:7.

USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 372.

**Brown Schultz Proposal No. 374**:   CCI had a centralized accounting system. Information for the company was maintained and reviewed at the home office.  Invoices were approved and paid from the home office.  CCI had distinct policies and procedures for capturing the information.  Trial Transcript at p. 1165.

USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 372.

**Brown Schultz Proposal No. 375**:   The accounting department of CCI was very organized and financial statements were prepared and estimated costs to complete were evaluated on a monthly basis.  Trial Transcript at pp. 1168; 2107, 1350, 1372.

**The proposed finding is simply not supported by the transcript references.**

**Moreover, even if, *arguendo*, such assertion were true, it has no effect on Brown Schultz'**

**audit duties nor does it explain why the estimated costs to complete proved to be so**

**inaccurate.**

**Brown Schultz Proposal No. 376**:   Financial information relating to the jobs and the project files were maintained at CCI's home office and not at the job site.  Trial Transcript at p. 1417, 1952:3-7.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal**

**No. 372.**

**Brown Schultz Proposal No. 377**:   The evidence did not establish that visits to CCI construction job sites, or subcontractor confirmations would have revealed any information which would have changed the information in the audited financial statements.  Trial Transcript at pp. 752, 1891, 1951-52.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal**

**No. 372.**

**Brown Schultz Proposal No. 378**:   There was no reason for Brown Schultz to visit job sites in connection with its audits of CCI. Trial Transcript at pp. 980:21-981:7; 1165; 1168; 2107.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal**

**No. 372.**

**Brown Schultz Proposal No. 379**:   Auditors should follow the presumption that contractors generally have the ability to produce estimates that are sufficiently dependable to justify the use of the percentage of completion method of accounting.  Persuasive evidence to the contrary is necessary to overcome that presumption.  Trial Transcript at pp. 1903:18-1904:5.

**One of the primary objectives of an audit is to identify high-risk audit areas and to**

**plan the audit procedures accordingly.  In connection with construction contractor audits**

"[m]uch of the independent auditor's work involves evaluating subjective estimates relating to future events a process which involves highly technical data."  Exhibit 360, Appendix A, p. 43, AICPA Audit and Accounting Guide Construction Contractors.

In particular, the "ultimate focus of the [construction] audit has to be on substantiating the reasonableness of gross profits on contracts, which usually includes a substantial estimated portion."  PPC Guide to Construction Contractors, Section 520.05. Exhibit "A" for ID, Tab 16(E).

The PPC Guide to Construction Contractors is identified as a reference source in the Brown Schultz Accounting and Auditing Quality Control Manual.  Exhibit 38. Testimony of Bowman, Transcript, pp. 1308-1309; Testimony of Brown, Transcript, p. 890. The Horwath International Audit Manual utilized by Brown Schultz also provides that PPC guides should be consulted as a reference source.  Testimony of Brown, Transcript, p. 889.

The audit of a construction contractor is markedly different than an audit of a product manufacturer or service provider and, accordingly, has many unique characteristics which must be taken into account by the auditor in defining audit risk and designing an audit plan.  Exhibit 361 (ID only).  Testimony of DeBruyn, Transcript, pp. 1737-1741.  Such proprietary elements include the construction contractors' use of the "percentage of completion" method of accounting and the importance of overbillings and underbillings to any analysis of the contractors' ability to successfully perform their contractual obligations.  Exhibits 362 (ID only); Testimony of DeBruyn, Transcript, pp. 1745-1748.  Brown Schultz failed to implement necessary tests and safeguards sufficient to

instill confidence in the numbers provided by CCI.  Testimony of DeBruyn, Transcript, pp.

1741-1742.

**Brown Schultz Proposal No. 380**:    In order to challenge the estimated costs to complete developed by management, the auditor would have to develop persuasive evidence that the company was not able to adequately estimate the cost of completion. Trial Transcript at pp. 1904:14-19.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 379.**

**Brown Schultz Proposal No. 381**:    The previous reliability of a contractor's estimating process is usually an indication of continuing reliability particularly if the present circumstances are similar to those that prevailed in the past. Trial Transcript at pp. 1904:21-1905:1.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 379.**

**Brown Schultz Proposal No. 382**:    The existence of profit fades does not mean the estimating capability of the contractor is inadequate. Trial Transcript at p. 1908:8-11.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 379.**

**Brown Schultz Proposal No. 383**:    Estimating is an integral principal part of the contractor's business activities and there is a necessity to revise estimates on contracts continually as the work progresses. Trial Transcript at p. 1908:12-18.

Concomitantly, one of the primary objectives of an audit is to identify high-risk audit areas and to plan the audit procedures accordingly.  In connection with construction contractor audits "[m]uch of the independent auditor's work involves evaluating subjective estimates relating to future events a process which involves highly technical data."  Exhibit 360, Appendix A, p. 43, AICPA Audit and Accounting Guide Construction Contractors.

In particular, the "ultimate focus of the [construction] audit has to be on substantiating the reasonableness of gross profits on contracts, which usually includes a substantial estimated portion."  PPC Guide to Construction Contractors, Section 520.05. Exhibit "A" for ID, Tab 16(E).

**Additionally, GAAS requires that all auditors conduct sufficient tests to determine the reliability of management's estimates. AU Section 342. "The auditor is responsible for evaluating the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole. As estimates are based on subjective as well as objective factors, it may be difficult for management to establish controls over them. Even when management's estimation process involves competent personnel using relevant and reliable data, there is potential for bias in the subjective factors. Accordingly, when planning and performing procedures to evaluate accounting estimates, the auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors." *Id.* at AU Section 342, ¶.04, Exhibit "A" for ID, Tab 4.**

**Brown Schultz Proposal No. 384**:    The fact that circumstances may necessitate frequent revision of estimates does not indicate that the estimates are unreliable for the purpose for which they are used although results may differ widely from original estimates.  Trial Transcript at p. 1908:19-25; Exhibits 222 and 213.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 383.**

**Brown Schultz Proposal No. 385**:    Because of the nature of his business, the contractor may still find the estimates reasonably dependable despite these widely recognized conditions a contractors estimates should be regarded as reasonably dependable if the minimum total revenue and maximum total cost can be estimated with a sufficient degree of confidence to justify the contractor's bids on contracts. Trial Transcript at p. 1909:1-12.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 383.**

**Brown Schultz Proposal No. 386**:    The peer review process was put into place by the AICPA to provide independent review of the quality of work evidenced upon a review by one CPA of selected jobs and files of another CPA.  Trial Transcript at p. 2968.

**The results and findings of any peer review of Brown Schultz for the pertinent time period is wholly irrelevant to any germane issues in the litigation. It matters not whether Brown Schultz had the best or the worst system of quality control in the entire industry. The only relevant issue is whether or not the 1997 Audit Report and the 1998 Audit Report**

contained material misrepresentations.  Whether Brown Schultz' "peers" gave it a gold star or a block of coal for its general practice standards is irrelevant here.  Moreover, to the extent, *arguendo*, that any peer review touches directly on the issues raised in the instant case, it would be imperative that USF&G had been given an opportunity to have examined all personnel involved and all documents reviewed or created relative to that review.  Brown Schultz did not introduce any testimony from Margolis & Company, P.C. , the firm that purportedly performed a peer review of Brown Schultz.  In addition, Brown Schultz did not introduce any of the back-up documentation or working papers regarding the peer review nor has a peer reviewer been designated as an expert or lay witness.

The peer review process is deeply flawed and was not designed to measure whether all of a firm's audits were properly done.  In a 2002 public statement, then SEC chairman, Harvey Pitt ("Pitt"), spoke to the need of reformation of the regulation of the American accounting profession.  *Public Statement by SEC Chairman: Regulation of the Accounting Profession,* January 17, 2002.  Pitt proposed several changes in the accounting peer review process including:

- Avoiding firm on firm reviews;

- More frequent monitoring of audit quality (as opposed to the current triennial system); and

- Creation of a permanent Quality Control staff composed of individuals knowledgeable of the accounting industry, but not affiliated with any firm.

Pitt's proposed reform to the accounting industry's peer review system was due to the ineffectiveness of the current peer review system.  Shalani M. Aggarwal, *From the Individual to the Institution:  The SEC's Evolving Strategy for Regulating the Capital*

*Markets*, 2003 CLMBLR 581 (2003).  For example, in August 2001, Arthur Andersen received what it called 'the most extensive peer review in the firm's history.'  Months later, it was discovered that Arthur Andersen had failed to either uncover or report Enron's accounting violations.  CNN Money, *After Pitt Became Chairman Report "Just Petered Out"* (Jan. 29, 2002) *at: http://money.cnn.com/2002/01/29/news/sec accounting/index.htm.* Although Pitt brought the peer review process under scrutiny in 2002, the SEC had already begun drafting a report critical of the accounting peer review process and calling for its overhaul in 2000.  NYSSCPA.org News Staff, *SEC Accounting Report Criticizing Peer Review Unfinished*, (Jan.28-Feb.1, 2002) at http://www.nysscpa.org/home/ 2002/102/4week/article22.htm.  "Exhibits to the draft report, some never before made public, showed that in performing peer reviews of each other, Big Five accounting firms repeatedly unearthed what the SEC staff considered major flaws in the way audits were conducted – but nevertheless gave each other clean bills of health in public reports of the reviews."  As reported in the Wall Street *edited by* Jeffrey Taylor, *Peer Review*, (Jan. 29, 2002) *at:* http://executivecaliber.ws/sys-tmpl/peerreview/.

**Brown Schultz Proposal No. 387**:   Brown Schultz over the years obtained clean reviews which in effect say that Brown Schultz is complying with the standard of care in the industry as promulgated by the AICPA. Trial Transcript at p. 2968.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 386.**

**Brown Schultz Proposal No. 388**:   The 1997 audit of CCI by Brown Schultz was peer reviewed. Trial Transcript at p. 1141.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 386.**

**USF&G also states that no evidence was introduced as to what, if any, portion of the working papers was reviewed relative to the audit of CCI.**

**Brown Schultz Proposal No. 389**:   For that particular peer review, Brown Schultz received an unqualified opinion with no letter of comment, the best opinion that can be received with respect to a peer review. Trial Transcript at p. 1141.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 386.**

**Brown Schultz Proposal No. 390**:   Brown Schultz's work papers show that appropriate work was done and procedures performed in connection with the CCI audits.  Trial Transcript at pp. 2856; Exhibit 809-812.

**USF&G incorporates herein its response to Brown Schultz Proposal No. 359.**

**Brown Schultz Proposal No. 391**:   Brown Schultz accessed and reviewed sufficient relevant data during its audits of CCI.  Trial Transcript at p. 3122.

**DeBruyn testified that to a reasonable degree of accounting certainty, the work performed by Brown Schultz relative to the 1997 Audit Report and 1998 Audit Report did not conform to the applicable standards of care of a certified public accountant.  Testimony of DeBruyn, Transcript, pp. 1760, 1770.**

**In particular, Brown Schultz did not exercise due professional care in the testing of contracts in progress, the testing of the percentage of completion method, in the design and execution of the test of accumulated job costs and in obtaining sufficient competent evidential material to evaluate the reasonableness of accounting estimates.  Testimony of DeBruyn, Transcript, p. 1770.**

**Moreover, Brown Schultz' nonconformance with the applicable standards of care resulted in material misstatements in the 1997 Audit Report and 1998 Audit Report.  Testimony of DeBruyn, Transcript, pp. 1792-1793.  Charts 364-A, 364-B (ID only).**

**Brown Schultz Proposal No. 392**:   The Brown Schultz audit staff exercised due professional care in connection with their audits of CCI. Trial Transcript at p. 3122.

**DeBruyn testified that to a reasonable degree of accounting certainty, the work performed by Brown Schultz relative to the 1997 Audit Report and 1998 Audit Report did**

not conform to the applicable standards of care of a certified public accountant.  Testimony of DeBruyn, Transcript, pp. 1760, 1770.

In particular, Brown Schultz did not exercise due professional care in the testing of contracts in progress, the testing of the percentage of completion method, in the design and execution of the test of accumulated job costs and in obtaining sufficient competent evidential material to evaluate the reasonableness of accounting estimates.  Testimony of DeBruyn, Transcript, p. 1770.

Moreover, Brown Schultz' nonconformance with the applicable standards of care resulted in material misstatements in the 1997 Audit Report and 1998 Audit Report. Testimony of DeBruyn, Transcript, pp. 1792-1793.  Charts 364-A, 364-B (ID only).

Brenner, the (then) unlicensed professional witness retained by Brown Schultz, stated that he was *unable* to testify that CCI's financials complied with GAAP, an express representation made in the Independent Auditor's Reports in both the 1997 Audit Report and 1998 Audit Report.  Testimony of Brenner, Transcript p. 3084.

The pertinent auditing standards and the auditor's standard of care is discussed in detail in Section II(B) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 393**:   Brown Schultz's audits of the CCI financial statements for 1997 and 1998 were performed in accordance with generally accepted auditing standards.  Trial Transcript at p. 2803:22-25.

USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 391 and 392.

**Brown Schultz Proposal No. 394**:   Defendants exercised appropriate care and were not aware, and should not have been aware, that the 1997 and 1998 audited financial statements did not fairly present the financial condition of CCI.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 391 and 392.**

**Brown Schultz Proposal No. 395**:   Defendants reasonably believed, in the exercise of appropriate care, that the 1997 and 1998 audited financial statements fairly presented the financial condition of the CCI.

**Brown Schultz' subjective belief is irrelevant.  Why such belief, if truly held, would have been unreasonable is discussed in Section II(B) and II(E) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 396**:   An independent auditor's report is issued in connection with historical financial statements that purport to present a financial position at a stated date and results of operations and cash flows for a period ending on that date.  Trial Transcript at p. 1902:2-8.

**The pertinent auditing standards and the auditor's standard of care are discussed in Section II(B) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 397**:   An auditor's report is based on information available to the auditor as of the audit date and through the end of their field work. Trial Transcript at p. 1902:2-8; 2976:13-22.

**The pertinent auditing standards and the auditor's standard of care are discussed in Section II(B) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 398**:   In evaluating the professional competence of auditors in connection with a particular audit, the goal is to determine whether the information and data that was available to the company at year end and to the auditors was used and was properly used to estimate the jobs.  Trial Transcript at p. 2849.

**This is unsupported by any reference to professional standards or legal precedent. The pertinent accounting standards and the auditor's standard of care are discussed in Section II(B) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 399**:   No evidence was presented about the specific information which was available to the Brown Schultz auditors through the end of their field work. Trial Transcript at p. 1902:9-13.

**It was Brown Schultz' responsibility to obtain sufficient audit evidence to afford a reasonable basis for its opinion. AICPA SAS No. 31. DeBruyn's methodology and the documents upon which he based his restatements were fully disclosed.**

**This is important not merely on technical grounds but because Brown Schultz claims to have conducted numerous tests and examinations that are simply *not* indicated in its working papers. When evaluating the contents (or lack thereof) of Brown Schultz' working papers, the Court should do so cognizant that "[p]rofessional standards require an auditor to obtain sufficient audit evidence to afford a reasonable basis for his audit opinion." AU Section 326, Exhibit "A" for ID, Tab 3.**

**Brown Schultz Proposal No. 400**:    DeBruyn was required to use the same procedures which he contends should have been used by Brown Schultz in performing their audit to properly evaluate the work of Brown Schultz. Trial Transcript at p. 1944:1-5.

**DeBruyn did not conduct an audit relative to CCI nor was evidence adduced that it was necessary for him to do so. DeBruyn's methodology is discussed in detail in Section II(C)(2)(c) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 401**:    Mr. DeBruyn did not perform an audit of CCI using the additional procedures he contended should have been performed. Trial Transcript at p. 1915:6-12.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 80, 109 and 400.**

**Brown Schultz Proposal No. 402**:    The only way to determine if the results of the audit would have been different if Brown Schultz had applied the procedures and additional procedures Mr. DeBruyn contends should have been applied is to look at the detailed CCI records including CCI's project files, job cost files, other ledgers and invoices. Trial Transcript at pp. 1916:2-7, 1937:12-23; 2855.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 109 and 400.**

**Brown Schultz Proposal No. 403**:   Mr. DeBruyn was not given access to the records which would have been available to the auditors when the audits of the 1997 and 1998 financial statements were performed. Trial Transcript at p. 1916:9-11.

**DeBruyn testified that he had sufficient documentation to render his opinions to a reasonable degree of professional certainty.  Testimony of DeBruyn, Transcript, pp. 1760, 1770.**

**Brown Schultz Proposal No. 404**:   It is important to know both the date and the event which caused the increases costs in the estimated costs to complete in order to assess if it was an increased cost that could have been detected by Brown Schultz during its audits. Trial Transcript at p. 1932-33, 1937:12-23.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 108.**

**Brown Schultz Proposal No. 405**:   DeBruyn did not determine the date or event which led to the increase in estimated costs to complete. Trial Transcript at pp. 1932-33.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 108.**

**Brown Schultz Proposal No. 406**:   There is no evidence that if defendants had done more or additional audit procedures that it would have led to an audit which revealed estimated costs to complete were different or the equivalent of Mr. DeBruyn's proposed adjustments.  Trial Transcript at pp. 1931:20-1932:2; 1913:11-22.

**DeBruyn testified that to a reasonable degree of accounting certainty, the work performed by Brown Schultz relative to the 1997 Audit Report and 1998 Audit Report did not conform to the applicable standards of care of a certified public accountant.  Testimony of DeBruyn, Transcript, pp. 1760, 1770.**

**In particular, Brown Schultz did not exercise due professional care in the testing of contracts in progress, the testing of the percentage of completion method, in the design and execution of the test of accumulated job costs and in obtaining sufficient competent evidential material to evaluate the reasonableness of accounting estimates.  Testimony of DeBruyn, Transcript, p. 1770.**

Moreover, Brown Schultz' nonconformance with the applicable standards of care resulted in material misstatements in the 1997 Audit Report and 1998 Audit Report. Testimony of DeBruyn, Transcript, pp. 1792-1793. Charts 364-A, 364-B (ID only).

Brenner, the (then) unlicensed professional witness retained by Brown Schultz, stated that he was *unable* to testify that CCI's financials complied with GAAP, an express representation made in the Independent Auditor's Reports in both the 1997 Audit Report and 1998 Audit Report. Testimony of Brenner, Transcript p. 3084.

**Brown Schultz Proposal No. 407**:   Mr. DeBruyn did not know and did not make a determination about the specific information that was available to the auditors when they performed the audits for the years ended December 31, 1997 and 1998. Trial Transcript at pp. 1897-98.

It was Brown Schultz' responsibility to obtain sufficient audit evidence to afford a reasonable basis for its opinion. AICPA SAS No. 31. DeBruyn's methodology and the documents upon which he based his restatements were fully disclosed.

**Brown Schultz Proposal No. 408**:   Mr. DeBruyn did not limit himself to historical information available to the auditors as of the end of their field work when he developed his proposed adjustments to the financial statements to arrive at the proposed restated financial statements. Trial Transcript at pp. 1897-98.

This proposed finding is identical to Brown Schultz Proposal No. 103. USF&G incorporates herein its response to that finding.

**Brown Schultz Proposal No. 409**:   Mr. DeBruyn's proposed adjustments were made using data which was developed after the audits were performed by Brown Schultz. Trial Transcript at pp. 1916:25-1917:3.

USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 109 and 400.

**Brown Schultz Proposal No. 410**:   Mr. DeBruyn used data derived from Exhibit 337 to arrive at adjustments to the 1997 and 1998 CCI financial statements. Trial Transcript at p. 1917:14-18.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 109 and 400.**

**Brown Schultz Proposal No. 411**:   The information contained in Exhibit 337 was not available to Brown Schultz auditors when they performed the audits for either 1997 or 1998. Trial Transcript at p. 1928:5-9.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 109 and 400.**

**Brown Schultz Proposal No. 412**:   For the 1997 audited CCI financial statements, Mr. DeBruyn used the completed contracts schedule in the 1998 audit. Trial Transcript at p. 1928:3-4.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 109 and 400.**

**Brown Schultz Proposal No. 413**:   The information included in the completed contracts schedule attached to the 1998 audited financial statements was not available to the auditors when they performed the audit of the 1997 financial statements. Trial Transcript at p.  1928:10-19.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 109 and 400.**

**Brown Schultz Proposal No. 414**:   A re-audit using the information which was available to Brown Schultz and to which Brown Schultz had access when it perform its audits is the appropriate means by which to assess the propriety of the audits. Trial Transcript at p. 2856:3-18.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 80, 109 and 400.**

**Brown Schultz Proposal No. 415**:   The look back method in not an appropriate method by which to measure compliance with professional standards in connection with doing an audit. Trial transcript at p. 2936.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 80, 109 and 400.**

**Brown Schultz Proposal No. 416**:    The look back method is never an appropriate method to evaluate the performance of auditors to determine if they have complied with the standards of the profession under generally accepted auditing standards. Trial Transcript at pp. 2849, 2851.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 80, 109 and 400.**

**Brown Schultz Proposal No. 417**:    There is no support in the accounting literature for the use of Mr. DeBruyn's "look back" methodology in the context of evaluating the propriety of an audit.  Trial Transcript at p. 1940:1-5; 1940:21-24.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 80, 109 and 400.**

**Brown Schultz Proposal No. 418**:    DeBruyn did not document the source of his methodology. Trial Transcript at p.  1939:3-4.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 80, 109 and 400.**

**Brown Schultz Proposal No. 419**:    DeBruyn was not aware of another instance where his method has been employed to evaluate the propriety of work done by auditors performing audits of financial statements. Trial Transcript at pp. 1944:18-1945:5.

**DeBruyn testified that this methodology was used and employed by members of his profession and, further, that it was a reliable tool for analyzing and restating financials. Testimony of DeBruyn, Transcript, p. 1838.**

**Moreover, DeBruyn testified that with respect to the 1997 audit, not only would Brown Schultz have been able to restate it based on the 1998 Audit, but if it had done so by extending its audit procedures to adequately test the estimated costs to complete, the inadequacies of CCI's estimates would have been apparent.  Testimony of DeBruyn, Transcript, pp. 1800-1801, 1815-1816.**

Brown Schultz' criticism of the "look back" method not only ignores the pertinent law, but also the considerable testimony adduced in favor of such methodology. Not only is such method codified in the Internal Revenue Code, 26 U.S.C. §460(b), but appropriate variants (including the "book of wisdom") have been used in a variety of cases from patent litigation to eminent domain. Testimony of Brenner, Transcript, pp. 2978-2979. *See, e.g., Sinclair Ref. Co. v. Jenkins Petroleum*, 289 U.S. 698 (1933); *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Prince George's County, Maryland*, 1993 WL 524783 (D. Md.).

Brown Schultz' expert, Brenner, also admitted that a form of the "look back" method is used to restate financial statements where errors have been made. Testimony of Brenner, Testimony, pp 2983, 3116, 3118.

**Brown Schultz Proposal No. 420**:    Mr. DeBruyn used this methodology to adjust CCI's financial statements for 1997 and 1998 only because the records of CCI were not made available to him. Trial Transcript at p. 1944:7-17.

USF&G hereby incorporates its response to Brown Schultz Proposal No. 419.

**Brown Schultz Proposal No. 421**:    Mr. DeBruyn's opinion is that simply because the actual costs to complete contracts exceeded the estimated costs to complete reflected on the 1997 and 1998 audited financial statements for CCI that Brown Schultz deviated from the standard of care. Trial Transcript at p. 1947.

This is an inaccurate characterization of DeBruyn's testimony.

DeBruyn testified that to a reasonable degree of accounting certainty, the work performed by Brown Schultz relative to the 1997 Audit Report and 1998 Audit Report did not conform to the applicable standards of care of a certified public accountant. Testimony of DeBruyn, Transcript, pp. 1760, 1770.

In particular, Brown Schultz did not exercise due professional care in the testing of contracts in progress, the testing of the percentage of completion method, in the design and

execution of the test of accumulated job costs and in obtaining sufficient competent evidential material to evaluate the reasonableness of accounting estimates.  Testimony of DeBruyn, Transcript, p. 1770.

Moreover, Brown Schultz' nonconformance with the applicable standards of care resulted in material misstatements in the 1997 Audit Report and 1998 Audit Report.  Testimony of DeBruyn, Transcript, pp. 1792-1793.  Charts 364-A, 364-B (ID only).

**Brown Schultz Proposal No. 422**:   There was no evidence that Brown Schultz was aware of the actual completed contract amounts when it conducted its audit of the 1998 audited financial statement for a job which was not completed. Trial Transcript at p. 1966:5-9.

USF&G's proof that Brown Schultz made its misrepresentations under circumstances under which, at minimum, it ought to have known of their falsity and that it did so with intend to induce another to act is discussed in detail in Section II(E) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 425**:   Brown Schultz was aware that PCIC had the financial capability to pay the amount of the PCIC guaranty. Trial Transcript at p. 1111-1120.

Brown and Bowman's testimony revealed that not only are there serious doubts about PCIC's financial ability to pay the face amount of the Guaranty Agreement as of December 31, 1998, but that there is no analysis of PCIC's solvency contained in Brown Schultz' working papers for CCI.  Testimony of Brown, Transcript, pp. 1280-1281.

Brown Schultz was unable to give PCIC an unqualified audit opinion or to issue a solvency opinion to the Superintendent of Insurance for the Turks and Caicos Islands. Testimony of Brown, Transcript, p. 1281.

Although unable (or unwilling) to opine on PCIC's solvency for the Superintendent of Insurance for the Turks and Caicos Islands, Brown purportedly assessed PCIC's

solvency in connection with the Guaranty Agreements.  Testimony of Brown, Transcript, p. 1281.

Brown Schultz' opinion on PCIC's putative solvency was purportedly based on an audit of PCIC for the year ended December 31, 1998 (the "PCIC Audit") (which included a *qualified* opinion) and the "fair market value of the [PCIC] assets."  Exhibit 271; Testimony of Brown, Transcript, pp. 1105-1106, 1280-1281.

According to the *qualified* PCIC Audit Report PCIC had total assets of $1,775,931 and liabilities totaling $1,255,462.  Exhibit 271.  Testimony of Brown, Transcript, pp. 1107-1108.

The PCIC Audit could not be given a "clean opinion" by Brown Schultz because Brown Schultz did not know whether or not PCIC's claim reserve of $862,000 was adequate.  Testimony of Brown, Transcript, p. 1110.

The actuarial expert, Gregory Petrowski, retained by PCIC established a claims reserve for *all* outstanding Remedial Work Period Insurance Policies of $862,338 in connection with Brown Schultz' audit of PCIC Audit Report.  Only $581,230 (or one-half of the claim amount) was established as a reserve for the policy issued relative to the Mahanoy Prison Project.  Exhibit 270.  Testimony of Brown, Transcript, pp. 1092, 1109-1110, 1227.

According to the 1998 PCIC Audit, PCIC has a net worth of $520,469.  Testimony of Brown, Transcript, p. 1111.  The net worth falls short of the $581,230 reserve amount designated for the Mahanoy Prison Project.  Testimony of Brown, Transcript, p. 1094.

If added together, the net worth of $520,469 and reserve of $581,230 fall approximately $60,000 short of the amount of the $1,162,460 amount of the Mahanoy Claim.  Testimony of Brown, Transcript, p. 1112.

Of the total of $1,257,576 in liquid assets as shown in the PCIC's 1998 Audit Report Brown admitted that $180,000 of investment securities constituted "restricted cash" which could not be released without the permission of the Superintendent of Insurance of the Turks and Caicos Islands, Testimony of Brown, Transcript, pp. 1117-1120, and that another $23,000 had to be maintained in a separate escrow account for credit life mortality reserves.  Testimony of Brown, Transcript, p. 1121; Exhibit 271, p. 10 fn. 2.

Under the provisions of the laws of the Turks and Caicos Islands, PCIC maintained $180,000 of its investment securities in a separate escrow account that could not be released without the permission of the Superintendent of Insurance of the Turks and Caicos Islands.  Exhibit 58.  Testimony of Brown, Transcript, pp. 1117-1120.  Brown admits that this $180,000 is "restricted cash."  Testimony of Brown, Transcript, p. 1121.

PCIC was also required to maintain a separate escrow account of $23,000 for credit life mortality reserves.  Exhibit 271, p. 10, fn. 2.  Testimony of Brown, Transcript, p. 1121.

Brown Schultz was also aware that Ortenzio could revoke PCIC's remedial work insurance policies at will and had, in fact, done so on policies for projects other than the Mahanoy Prison Project.  Exhibit 309; Testimony of Brown, Transcript, pp. 1282-1283.

Seven other policies "underwritten" by PCIC were outstanding at the time Brown Schultz allegedly determined that PCIC had sufficient funds to support the Guaranty Agreements.  Exhibit 268; Testimony of Brown, Transcript, p. 1224.

Brown admitted that he relied on CCI's representations that CCI would not make any further claims against the seven outstanding Remedial Work Period Insurance Policies.  Testimony of Brown, Transcript, pp. 1223, 1226, 1281-1282.  This is *not* documented in the 1998 working papers.  Testimony of Brown, Transcript, p. 1228.

Brown admitted that such representations should have been documented in the working papers but cannot identify any such documentation.  Testimony of Brown, Transcript, pp. 1233-1234.

Both of the Guaranty Agreements provide that they "contain[s] the entire agreement between the parties hereto, and no agent, representative or officer of either party has authority to make or has made any statement, agreement or representation, either oral or written, in connection herewith, modifying, adding or changing the terms and conditions herein set forth."  Exhibits 264, 265.

The Guaranty Agreements also provide that "[n]o dealings between the parties or custom shall be permitted to contradict various additions to or to modify the terms hereto."  Exhibits 264, 265.

Brown Schultz did not obtain any legal advice as to whether the "integration clauses" of the Guaranty Agreements had any legal significance regarding CCI's alleged representation that it would not assert any additional claims against PCIC policies.  Testimony of Brown, Transcript, pp. 1221-1222, 1228-1229.

Brown Schultz did not obtain a legal opinion as to whether or not PCIC had the legal ability to disclaim any further coverage if a claim against any other of the seven outstanding policies was filed.  Testimony of Brown, Transcript, pp. 1228-1229, 1230.

Brown Schultz also did not consider subrogation rights.

**Brown Schultz Proposal No. 426**:    Brown Schultz confirmed that a claim was submitted by CCI to the Department of General Services for unforeseen costs incurred in connection with the Mahanoy Prison project which claim forms the basis for the $1,162,460 claim reflected on the 1998 audited financial statement.  Trial Transcript at p. 1412.

**This is misleading to the extent it implies that Brown Schultz undertook any actions other than confirming that a document purporting to be a claim was filed.**

**Brown Schultz Proposal No. 427**:    Defendants confirmed that there existed a written guarantee signed by John Ortenzio in the full amount of the Mahanoy Prison project claim.  Trial Transcript at p. 1083:8-15.

**Brown Schultz' working papers for the 1998 Audit Report acknowledge – and Sheri Phillips admitted – that as of October 31, 1998 CCI was losing $1,161,448.30.  Exhibit 222, p. 23; Testimony of S. Phillips, Transcript, pp. 2160-2162.**

**As appears in Brown Schultz' working papers, PCIC issued a Guaranty Agreement dated December 1, 1998, which purportedly guaranteed full payment of the Mahanoy Claim in the amount of $1,200,000, but *only* if DGS failed to do so.  Exhibit 264.**

**Brown also admitted that sometime in 1999, a new Guaranty Agreement backdated to December 1, 1998 was issued by PCIC in the amount of $1,162,460, the *exact* amount of the Mahanoy Claim submitted to DGS.  Exhibit 265.  Testimony of Brown, Transcript, pp. 1076-1078.**

**There is nothing in Brown Schultz' working papers that indicates whether one of the guarantees cancelled out the other.  Testimony of Brown, Transcript, p. 1079.**

**There is also nothing in Brown Schultz' working papers that shows that anything was done to determine if the Guaranty Agreements were legally enforceable.  Testimony of Brown, Transcript, pp. 1081-1086.**

**The Guaranty Agreements were unprecedented.**

Why the Guaranty Agreements were needed – particularly in light of the existence of the putatively valid Remedial Work Period Insurance Policy, discussed *infra* – has never been adequately explained by Brown Schultz.

Bowman claimed not to know why the Mahanoy Claim was guaranteed by PCIC. Testimony of Bowman, Transcript, pp. 1392-1393. Sheri Phillips also professed unawareness of the reason this act was undertaken. Testimony of Sheri Phillips, Transcript, pp. 2156-2157.

Bowman testified that she had no idea who prepared the Guaranty Agreements nor did Brown. Testimony of Bowman, Transcript, p. 1392.

There was no evidence that PCIC had ever issued any other instruments like the Guaranty Agreements.

**Brown Schultz Proposal No. 429**:    The claim guaranteed by PCIC met the criteria for revenue recognition. Trial Transcript at p. 2928-30.

SOP 81-1 enumerates certain conditions which must be met *before* a claim can be included in revenue:

> a.    The contract or other evidence provides a legal basis for the claim; or a legal opinion has been obtained, stating that under the circumstances there is a reasonable basis to support the claim.
> b.    Additional costs are caused by circumstances that were unforeseen at the contract date and are not the result of deficiencies in the contractor's performance.
> c.    Costs associated with the claim are identifiable or otherwise determinable and are reasonable in view of the work performed.
> d.    The evidence supporting the claim is objective and verifiable, not based on management's "feel" for the situation or on unsupported representations.

Exhibit 360, Appendix A, pp. 103-104. SOP 81-1, par. 1 "provides guidance on the application of generally accepted accounting principles in accounting for the performance of *contracts for which specifications are provided by the customer for the construction of*

*facilities . . . .*" **Exhibit 360, Appendix A, p. 85. Although the types of contracts covered by SOP 81-1 include the construction and design of buildings, ship building and the design and manufacture of complex aerospace construction and engineering, nothing in SOP 81-1 expressly includes within its scope insurance contracts or guarantees. Exhibit 360, par. 13, Appendix A, p. 88.**

**Brown admitted that there was no documentation in Brown Schultz' working papers demonstrating Brown Schultz' compliance with the requirements of SOP 81-1 regarding the Mahanoy Claim, Testimony of Brown, Transcript, pp. 1079, and DeBruyn testified that he did not observe any such documentation. Testimony of DeBruyn, Transcript, pp. 2065-2067.**

**Despite its absence from his two written reports and it not being raised by Brown or Bowman during their time on the witness stand, Brenner sought to justify Brown Schultz' non-compliance with SOP 81-1 by claiming that FASB Concept Statement 5, Recognition and Measurements in Financial Statements of Business Entities, June 1, 19994 ("FASB Concept Statement 5") was applicable, instead. Brenner's reliance on FASB Concept Statement 5 is misplaced for a number of reasons, not least of which is its low ranking on the GAAP hierarchy.**

**FASB Concept Statement 5 merely provides general "guidance" on an application of the "fundamental criteria" attendant with earnings recognition. FASB Concept Statement 5, para 78. It speaks generally of revenue recognition after the merchandise or services have been sold for cash or *claims* have been *converted to cash*. *Id.*, para. 83(a). Additionally, the GAAP hierarchy provides that a concept statement has the *lowest* priority of all GAAP rules and is at a level far lower than SOP 81-1. Testimony of Brenner,**

Transcript, pp. 3101-3102.  Moreover, SOP 81-1 has specific application, as noted above, to contracts for construction of facilities, SOP 81-1, para. 1, and specifies the preconditions to recognizing construction claims as revenue.

**Brown Schultz Proposal No. 430**:   The recognition of the amount of the claim guaranteed by PCIC was in accordance with GAAP. Trial Transcript at p. 2931.

**USF&G incorporates herein by reference Section II(C)(3) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 431**:   Common control means that two entities are owned by the same party. Trial Transcript at p. 1025:3-5.

**Brown Schultz has produced no expert testimony in support of this conclusion.**

**Brown Schultz Proposal No. 432**:   Common control is a correct disclosure of the relationship between CCI and PCIC. Trial Transcript at p. 1025:6-9.

**Brown Schultz has produced no expert testimony in support of this conclusion.**

**Brown Schultz Proposal No. 433**:   After the audits of CCI were performed and the financial statement was prepared, but prior to its release, the statement was reviewed by an independent party, John Sosinski of Kronick, Kalada & Berdy.  Trial Transcript at p. 1171-72.

**For a total of $150, Mr. Sosinski allegedly looked at the form of the Audited Financial Statement.  He did not examine any of the underlying documentation, including the working papers.  Testimony of Brown, Transcript, pp. 1258-1260.  No testimony from Mr. Sosinski was introduced.  Mr. Sosinki evidently missed the double-counting of approximately $450,000 relative to the Mahanoy Claim.**

**Brown Schultz Proposal No. 434**:   Mr. Sosinski reviewed the statement for all the required disclosures.  Trial Transcript at p. 1171-72.

**USF&G incorporates herein its response to Proposal No. 433.**

Additionally, not having reviewed any documents except for the audit report, it is unclear how Mr. Sosinski could review the report for disclosures of items he may not have known about.

**Brown Schultz Proposal No. 435**:    The disclosures in the 1998 CCI audited financial statement concerning the claim guaranteed by PCIC were sufficient to satisfy GAAP. Trial Transcript at p. 2930.

USF&G incorporates herein by reference Section II(C)(3) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 436**:    There is no evidence that the CCI financial statements for 1997 and 1998 are not in accordance with GAAP. Trial Transcript at p. 2804:12-24.

USF&G incorporates herein by reference Section II(C)(3) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 437**:    Defendants did not do anything wrong in connection with the audited financial statements.  Trial Transcript at p. 758.

USF&G incorporates herein by reference Section II(C)(3) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 438**:    There was no evidence of privity or other relationship between Brown Schultz and plaintiff. Trial Transcript at p. 1134.

It is beyond dispute – and the law of the case, as well – that USF&G has proven standing to sue Brown Schultz pursuant to Restatement (Second) of Torts §552.  The testimony of Brown and Bowman provided more than ample evidence that, *inter alia*, Brown Schultz knew that the audits performed for CCI would be both reviewed and relied upon by USF&G relative to its decisions to continue CCI's bonding program.  Testimony of Brown, Transcript, pp. 887-888, 901-902, 921; Testimony of Bowman, Transcript, pp. 1307-1308, 1313.  Among other documents, Brown Schultz' working papers repeatedly

reflect this knowledge.  **Exhibit 144, Exhibit 213, p. 43, Exhibit 222, p. 19.  Additionally,**

**Brown testified that the Audited Financial Statements were prepared in the course of**

**Brown Schultz' business and profession.  Testimony of Brown, Transcript, pp. 833-834.**

**Moreover, there are numerous exhibits in evidence that not only prove that Brown Schultz**

**knew that USF&G was the intended beneficiary but constitute persuasive evidence that**

**Brown Schultz knew** *the size and parameters of the bonding programs to be underwritten by*

*USF&G* **on behalf of CCI.  Exhibit 202, Exhibit 203, Exhibit 211.  Testimony of Brown,**

**Transcript, pp. 901-902, 916-917, 921.  Brown acknowledged that he knew the sizes of the**

**various contracts being worked on by CCI in 1997 and 1998.  Exhibit 217.  Testimony of**

**Brown, Transcript, pp. 916-917.  Moreover, Sheri Phillips testified that she would give**

**regular updates to Brown Schultz concerning CCI's level of bonding.  Testimony of S.**

**Phillips, Transcript, p. 2154.  Thus, USF&G's standing to sue Brown Schultz is**

**incontrovertible under the Restatement (Second) of Torts §552, including under its more**

**restrictive judicial interpretations.  *See*, *North American Specialty Ins. Co. v. Lapalme*, 258**

**F.3d 35, 41 (1ˢᵗ Cir. 2001).  As this Court has acknowledged, "[t]he risk perceived by the**

**supplier at the time of the engagement cabins the extent or the duty that the supplier owes**

**to known third parties."  Report and Recommendation dated November 5, 2002, p. 20**

**(Smyser, M.J.)  Brown Schultz was fully aware of the risks undertaken in performing**

**audits of CCI, a client for approximately a decade.**

**Brown Schultz Proposal No. 439**:    No one affiliated with plaintiff had contact with
defendants.  Trial Transcript at pp. 463, 1135, 2505.

**Although USF&G did not receive the Audited Financial Statements directly from**

**Brown Schultz, there is ample evidence that Brown Schultz knew that the Audited**

**Financial Statements would be provided to USF&G and would be utilized relative to the**

underwriting of bonds.  Exhibit 144, p. 11, ¶7, Exhibit 213, p. 43, 29, 238, Exhibit 222, p.

19, 146, 265, 271, Exhibit 202, Exhibit 211, Exhibit 217; Testimony of Brown, Transcript,

pp. 888-898, 901-902, 921; Testimony of Bowman, Transcript, pp. 1307-1308.

**Brown Schultz Proposal No. 440**:   Plaintiff did not receive the audited financial
statements from defendants. Trial Transcript at p. 901, 2438.

Although USF&G did not receive the Audited Financial Statements directly from

Brown Schultz, there is ample evidence that Brown Schultz knew that the Audited

Financial Statements would be provided to USF&G and would be utilized relative to the

underwriting of bonds.

Exhibit 144, p. 11, ¶7, Exhibit 213, p. 43, 29, 238, Exhibit 222, p. 19, 146, 265, 271,

Exhibit 202, Exhibit 211, Exhibit 217; Testimony of Brown, Transcript, pp. 888-898, 901-

902, 921; Testimony of Bowman, Transcript, pp. 1307-1308.

**Brown Schultz Proposal No. 441**:   Defendants did not issue its audit reports for the
1997 and 1998 CCI financial statements in connection with any particular bond request. Trial
Transcript at p. 1134, 1185.

Although USF&G did not receive the Audited Financial Statements directly from

Brown Schultz, there is ample evidence that Brown Schultz knew that the Audited

Financial Statements would be provided to USF&G and would be utilized relative to the

underwriting of bonds.  Exhibit 144, p. 11, ¶7, Exhibit 213, p. 43, 29, 238, Exhibit 222, p.

19, 146, 265, 271, Exhibit 202, Exhibit 211, Exhibit 217; Testimony of Brown, Transcript,

pp. 888-898, 901-902, 921; Testimony of Bowman, Transcript, pp. 1307-1308.

**Brown Schultz Proposal No. 442**:   Defendants did not know and could not know the
particular bonds for which USF&G would use the 1997 or the 1998 audited financials
statements. Trial Transcript at p. 1185, 3130:19-21.

Although USF&G did not receive the Audited Financial Statements directly from

Brown Schultz, there is ample evidence that Brown Schultz knew that the Audited

Financial Statements would be provided to USF&G and would be utilized relative to the

underwriting of bonds. Exhibit 144, p. 11, ¶7, Exhibit 213, p. 43, 29, 238, Exhibit 222, p.

19, 146, 265, 271, Exhibit 202, Exhibit 211, Exhibit 217; Testimony of Brown, Transcript,

pp. 888-898, 901-902, 921; Testimony of Bowman, Transcript, pp. 1307-1308.

**Brown Schultz Proposal No. 443**:   Defendants did know the specific manner in which USF&G would use the audit reports. Trial Transcript at p. 1185.

Although USF&G did not receive the Audited Financial Statements directly from

Brown Schultz, there is ample evidence that Brown Schultz knew that the Audited

Financial Statements would be provided to USF&G and would be utilized relative to the

underwriting of bonds. Exhibit 144, p. 11, ¶7, Exhibit 213, p. 43, 29, 238, Exhibit 222, p.

19, 146, 265, 271, Exhibit 202, Exhibit 211, Exhibit 217; Testimony of Brown, Transcript,

pp. 888-898, 901-902, 921; Testimony of Bowman, Transcript, pp. 1307-1308.

**Brown Schultz Proposal No. 444**:   The standards applied by defendants in connection with the CCI audits were not determined by the intended users of the financial statements.  Trial Transcript at p. 1135:19-22.

USF&G incorporates herein its response to Brown Schultz Proposal No. 159.

**Brown Schultz Proposal No. 445**:   Defendants' involvement with CCI was only as a paid professional for specific services. Trial Transcript at p. 928.

Brown Schultz issued the Audited Financial Statements.  There is ample evidence

that Brown Schultz knew of both the intended users and the intended use.  Exhibit 144, p.

11, ¶7, Exhibit 213, p. 43, 29, 238, Exhibit 222, p. 19, 146, 265, 271, Exhibit 202, Exhibit

211, Exhibit 217; Testimony of Brown, Transcript, pp. 888-898, 901-902, 921; Testimony of

Bowman, Transcript, pp. 1307-1308.

**Brown Schultz Proposal No. 446**:   Brown Schultz did not perform the audits of CCI for plaintiff.  Trial Transcript at p. 1134.

Although USF&G did not receive the Audited Financial Statements directly from Brown Schultz, there is ample evidence that Brown Schultz knew that the Audited Financial Statements would be provided to USF&G and would be utilized relative to the underwriting of bonds.  Exhibit 144, p. 11, ¶7, Exhibit 213, p. 43, 29, 238, Exhibit 222, p. 19, 146, 265, 271, Exhibit 202, Exhibit 211, Exhibit 217; Testimony of Brown, Transcript, pp. 888-898, 901-902, 921; Testimony of Bowman, Transcript, pp. 1307-1308.

**Brown Schultz Proposal No. 447**:    There is no evidence of an intent by defendants to induce plaintiff to rely on the CCI audited financial statements for 1997 and 1998.

Although USF&G did not receive the Audited Financial Statements directly from Brown Schultz, there is ample evidence that Brown Schultz knew that the Audited Financial Statements would be provided to USF&G and would be utilized relative to the underwriting of bonds.  Exhibit 144, p. 11, ¶7, Exhibit 213, p. 43, 29, 238, Exhibit 222, p. 19, 146, 265, 271, Exhibit 202, Exhibit 211, Exhibit 217; Testimony of Brown, Transcript, pp. 888-898, 901-902, 921; Testimony of Bowman, Transcript, pp. 1307-1308.

**Brown Schultz Proposal No. 448**:    Plaintiff's underwriting expert, Richard Farnsworth, was not conversant with surety bond underwriting standards in existence since January 1, 1999 Trial Transcript at p. 1455:19-21.

Farnsworth was in the surety industry for over thirty (30) years and has kept current on industry standards and practices since his retirement from Fireman's Fund as a Senior Vice President.  Testimony of Farnsworth, Transcript, pp. 1439-1440, 1459-1460.

At the time of his retirement on January 1, 1999, he was in charge of 150 employees in the home office and employees in 25 branches offices.  Testimony of Farnsworth, Transcript, p. 1440.

The Court has already determined that he is qualified to opine regarding surety industry practices in 1999.  Trial Transcript at 1461.

**Brown Schultz Proposal No. 449**:   Plaintiff's underwriting expert was not competent to testify about the propriety of the underwriting by plaintiff in connection with the bonds issued for CCI since January 1999.

**USF&G incorporates herein its response to Proposal No. 448.**

**Brown Schultz Proposal No. 450**:   Plaintiff did not have the support of expert witness evidence to establish that plaintiff reasonably and justifiably relied, on a bond by bond basis, on the audited financial reports by Brown Schultz for CCI since the opinion of plaintiff's underwriting expert witness, Richard Farnsworth, was limited to the annual renewal of the bond program.  Trial Transcript at p. 1582.

**Farnsworth testified that USF&G's reliance on the Audited Financial Statements**

**was justifiable.  Testimony of Farnsworth, Transcript, p. 1535.**

**Brown Schultz Proposal No. 451**:   The two underwriters presented by plaintiff to testify (Daily and Phillips) were compensated according to their revenue production. Trial Transcript at pp.  446, 2489.

**The underwriters testified that revenue production was a component of their**

**compensation.**

**Brown Schultz Proposal No. 452**:   Plaintiff's underwriters involved with the CCI bond account had an incentive to market and to generate revenue through bond account production during their involvement with the CCI bond account.  Trial Transcript at pp. 447, 2489.

**That the underwriters testified that revenue production was a component of their**

**compensation is not tantamount to their having an incentive to recklessly generate revenue.**

**Brown Schultz Proposal No. 453**:   Salazar and Phillips did not rely on the audited financial statements when underwriting bonds for CCI.  Trial Transcript at p. 2707:8-15.

**Having been fired by USF&G for billing personal travel expenses to the company,**

**Mr. Eskin's bias is manifest.  His attempt at revenge, however, was undercut not only by**

**testimony of Anthony Phillips and Steven Salazar (both no longer employed by USF&G/St.**

**Paul) but also by the testimony of Mark Holtschneider, John Simanski and Gregory Daily.**

**In fact, the testimony of the foregoing rebuttal witnesses directly and convincingly**

**contradicts Mr. Eskin's fantasies.  Moreover, through Gregory Daily, USF&G introduced**

documentary evidence proving that Mr. Eskin was *not* present at the meeting at which Mr. Eskin testified that he had a discussion with David Hussey.  Exhibit 823, Exhibit 378. Curiously, although Mark Holtschneider was called as a witness by Brown Schultz, he was never asked about his alleged conversation with Mr. Eskin.  Further, this topic was assiduously avoided by Brown Schultz in its cross-examination of both Gregory Daily and Anthony Phillips.  A week prior to the resumption of trial on January 14, 2004, Brown Schultz indicated to USF&G's counsel that it intended to call David Hussey and Steven Salazar as witnesses after Mr. Eskin and requested that USF&G assist them in obtaining their presence at trial.  Although USF&G arranged to have Messrs. Salazar and Hussey available on January 15, 2004 and January 16, 2004, Brown Schultz never called them as witnesses.

The reliance of USF&G on the Audited Financial Statements is discussed in Section II(D) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 454**:    Salazar and Phillips relied upon the personal financial statement of John Ortenzio and the financial position of John Ortenzio's father, Rocco Ortenzio. Trial Transcript at p. 2707:16-23.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 453.**

**Brown Schultz Proposal No. 455**:    Plaintiff continued to bond CCI after the termination of John Ortenzio's personal guarantee on the basis of the financial position and financial strength of John Ortenzio's father, Rocco Ortenzio. Trial Transcript at p. 2708:5-16.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 453.**

**Brown Schultz Proposal No. 456**:    Mr. Hussey did not rely on the audited financial statements for CCI, but relied instead on the financial position of Rocco Ortenzio.  Trial Transcript at pp.  2715:19-2716:6.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 453.**

**Brown Schultz Proposal No. 459**:    Plaintiff trusted and accepted the representations of the bond agent. Trial Transcript at pp. 772-73.

**James Daily testified that USF&G had a long history with the Byerly Agency.**

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.**

**Brown Schultz Proposal No. 460**:    Plaintiff trusted and had confidence in CCI management, and representations made by CCI management.  Trial Transcript at pp. 363-64, 529.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 257 and 289.**

**Brown Schultz Proposal No. 461**:    Plaintiff relied on the decision of a bank which provided CCI with a line of credit at below prime rate to support the propriety of its decision to extend bond credit to CCI.  Trial Transcript at pp. 779, 797.

**This mischaracterizes the testimony.  James Daily testified that a bank line of credit was a factor to be considered.  Testimony of J. Daily, Transcript, p. 797.**

**Brown Schultz Proposal No. 462**:    Plaintiff had confidence in the capabilities of Sheri Phillips, and her ability to perform construction accounting.  Trial Transcript at p. 577.

**This mischaracterizes the testimony.  James Daily testified he believed she was a competent accountant in connection with construction accounting.  Testimony of J. Daily, Transcript, p. 577.**

**Brown Schultz Proposal No. 463**:    Plaintiff believed that CCI conservatively stated anticipated profits for contracts in progress.  Trial Transcript at p. 530.

**This mischaracterizes the testimony.  James Daily testified that he was "told" that CCI conservatively stated its profits and that he had no way of testing this assertion. Testimony of J. Daily, Transcript, p. 530.**

**Brown Schultz Proposal No. 464**:    Plaintiff believed that the financial information internally prepared by CCI was accurate and plaintiff relied on the accuracy of the internally prepared financial information.  Trial Transcript at pp. 474-76.

**James Daily stated in this section that he believed the internally prepared financials to be accurate.  However, "reliance" is not mentioned.  Testimony of J. Daily, Transcript, pp. 474-476.**

**Brown Schultz Proposal No. 466**:   Interim financial information was important to assess whether the financial condition of the bond client materially changed since the end of the period reflected in the audited financial statement.  Trial Transcript at pp. 577, 1479.

**USF&G would also receive an unaudited interim financial statement prepared internally by CCI (generally for the first six months of each year), as well as certain internally prepared work-in-progress schedules which were received quarterly.  Testimony of J. Daily, Transcript, pp. 170-172, 251-252, 254.  Such information was "ancillary to the audited financial information."  Testimony of A. Phillips, Transcript, p. 2436.**

**Brown Schultz Proposal No. 467**:   Plaintiff depended on the accuracy of the interim financial information produced by CCI in its underwriting bonds for CCI. Trial Transcript at pp. 316-17, 373.

**USF&G would also receive an unaudited interim financial statement prepared internally by CCI (generally for the first six months of each year), as well as certain internally prepared work-in-progress schedules which were received quarterly.  Testimony of J. Daily, Transcript, pp. 170-172, 251-252, 254.  Such information was "ancillary to the audited financial information."  Testimony of A. Phillips, Transcript, p. 2436.**

**Brown Schultz Proposal No. 468**:   Plaintiff employed engineers and accountants who were accessible to the underwriting department.  Trial Transcript at p. 517.

**James Daily testified that the engineers and accountants belonged to the claims division.  Testimony of J. Daily, Transcript, p. 513.**

**Brown Schultz Proposal No. 469**:   Plaintiff independently verified the percentage of completion and the existence of problems by obtaining written confirmations directly from the project owners.  Exhibit 790B at p. USFG/BS 1288; Trial Transcript at pp. 2566-69.

This mischaracterizes the testimony of Anthony Phillips, who testified that status inquiry forms were sent out on certain projects.  He did not testify that the responses received were not independently verified.  Testimony of A. Phillips, Transcript, pp. 2566-2569.

**Brown Schultz Proposal No. 470**:    Plaintiff could only have reasonably relied on audited financial statements of CCI if plaintiff's underwriters capably analyzed the financial statements. Trial Transcript at p. 1663:3-9.

Following USF&G's receipt of CCI's Audited Financial Statements each year, USF&G's underwriters began the task of reviewing and analyzing each statement.  Testimony of A. Phillips, Transcript, pp. 2428, 2445, 2433-2434; Testimony of J. Daily, Transcript, pp. 760-761.

At all times pertinent hereto, Anthony S. Phillips ("Anthony Phillips"), a 32 year veteran underwriter, served as USF&G's and then St. Paul's surety bond underwriting manager in charge of the Harrisburg Office.  However, it was the job of Steven Salazar ("Salazar"), the other underwriter in the Harrisburg Office, to perform a more detailed analysis, which would then be reviewed by Anthony Phillips and James Daily.  Testimony of A. Phillips, Transcript, pp. 2422-2430; Testimony of J. Daily, Transcript, p. 186.

From 1993 through 1998, Anthony Phillips, then serving as a St. Paul Surety Underwriting Specialist handling several of St. Paul's major accounts, would review each of the CCI Audited Financial Statements, as well as Salazar's analysis of that audited financial statement.  Testimony of A. Phillips, Transcript, p. 2428.  It was his standard practice to read the entire document, including footnotes.  Testimony of A. Phillips, Transcript, p. 2583.

Anthony Phillips has a bachelors degree in business management and completed USF&G's 40 week training program, graduating first in his class on contract underwriting. Testimony of A. Phillips, Transcript, pp. 2401-2402.

Salazar was hired as an underwriter in 1986 and eventually became senior underwriter for the Harrisburg office.  Testimony of A. Phillips, Transcript, p. 2411.

Salazar has a bachelors degree in accounting from Penn State and completed a training program similar to that underwent by Anthony Phillips.  Testimony of A. Phillips, Transcript, pp. 2411-2412.

USF&G was known to have an extensive training program for its underwriters. Testimony of Farnsworth, Transcript, pp. 1693-1694.

Farnsworth opined that the analysis of financial statements by USF&G was done within the custom and practice of the surety industry.  Testimony of Farnsworth, Transcript, pp. 1530-1531.

**Brown Schultz Proposal No. 471**:   Analyzing financial statements is a material and significant part of the underwriting decision. Trial Transcript at p. 1692.

Underwriting decisions are based, in large part, on the annual audited financial statements; interim unaudited financial information is used primarily for monitoring purposes.  Testimony of Farnsworth, Transcript, pp. 1478-1479; Testimony of J. Daily, Transcript, pp. 170-171.

**Brown Schultz Proposal No. 472**:   Plaintiff had contract underwriting manuals in use during the bond program by plaintiff for CCI.  Trial Transcript at p. 177, 179-80; Exhibits 40, 41.

During the time when USF&G was writing bonds for CCI, USF&G did not have any specific, formal, underwriting guidelines for its bonding accounts.  Rather, USF&G relied upon a series of documents issued by USF&G's home office known as "gray letters,"

as well as an underwriting training manual which was only available on-line.  **Exhibit 52,**

**Exhibit 40, Exhibit 41.  Testimony of J. Daily, Transcript, pp. 174-180; Testimony of**

**Farnsworth, Transcript, pp. 1462-1463.**

The "gray letters" and the manual provided general guidance on the types of

information USF&G should be obtaining from its contractors (such as, for example,

obtaining an audited financial statement each year) and general guidance on underwriting

methods and procedures.  **Exhibit 52.  Testimony of J. Daily, Transcript, pp. 174-180;**

**Testimony of Farnsworth, Transcript, pp. 1458-1460.**

**Brown Schultz Proposal No. 473**:    The evidence did not establish that Phillips, Daily,
or Hussey reviewed and analyzed the financial statements or financial information concerning
CCI in connection with underwriting bonds for CCI.  Trial Transcript at pp. 2428, 2506-2507
2513.

From 1993 through 1998, Anthony Phillips, then serving as a St. Paul Surety

Underwriting Specialist handling several of St. Paul's major accounts, would review each

of the CCI Audited Financial Statements, as well as Salazar's analysis of that audited

financial statement.  **Testimony of A. Phillips, Transcript, p. 2428.**  It was his standard

practice to read the entire document, including footnotes.  **Testimony of A. Phillips,**

**Transcript, p. 2583.**

It was standard procedure for an audit to be analyzed in the Harrisburg Office and

then sent to the Home Office.  **Testimony of A. Phillips, Transcript, pp. 2443, 2445.**

To the best of his knowledge, the Home Office got a copy of each of CCI's Audited

Financial Statements from 1993 – 1998.  **Testimony of A. Phillips, Transcript, p. 2610.**

These were often sent by means of a routing slip.  **Exhibit 790-B, p. 1266 (sample routing**

**slip).**

**Brown Schultz Proposal No. 474**:    Plaintiff's home office expected the Harrisburg branch office to have contact with defendants in connection with the CCI account and to report to home office about information obtained from defendants.  Trial Transcript at pp. 464-65.

**James Daily stated that he did not think it was a regular practice.  Testimony of J.**

**Daily, Transcript, pp. 464-465.**

**Brown Schultz Proposal No. 475**:    Salazar did not analyze or sufficiently analyze financial information in connection with CCI.  Trial Transcript at p. 489.

**Farnsworth testified that USF&G's underwriting of the CCI account generally**

**conform to the applicable standards of care of the surety industry that were in effect**

**during the 1993-1999 time period.  Testimony of Farnsworth, Transcript, p. 1530.  Further,**

**he opined that "the analysis of the financial statements . . . were done within the customs**

**and practice of the industry.  Testimony of Farnsworth, Transcript, p. 1531.**

**Brown Schultz Proposal No. 476**:    Steve Salazar made mistakes. Trial Transcript at p. 621.

**This is incorrect.  Mr. Salazar made _a_ mistake, and it was trivial.**

**Brown Schultz Proposal No. 477**:    Salazar did not timely provide home office with information critical to underwriting.  Trial Transcript at p. 626-627.

**The trial citation given does not support the assertion.**

**Brown Schultz Proposal No. 478**:    Salazar did not completely analyze or evaluate underwriting materials in connection with the CCI bond account. Trial Transcript at p. 2486.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 475.**

**Brown Schultz Proposal No. 479**:    Phillips was not a competent surety bond underwriter, did not reliably and accurately communicate underwriting information, merely forwarded paper without adequate analysis, and did not capably and adequately analyze financial information in connection with underwriting. Trial Transcript at pp.  2484, 2485, 2487.

**These criticisms were written as part of a job evaluation _after_ the CCI losses were**

**incurred and were written by a corporate rival.**

**Brown Schultz Proposal No. 480**:    The lack of attention to analysis by the branch office for the CCI account concerned plaintiff since financial difficulty experienced by CCI could go undetected until a problem developed. Trial Transcript at pp. 491-92.

**James Daily criticized Steven Salazar in 1994 based, in large part, on the late submittal of his analysis that year.  Testimony of J. Daily, Transcript, pp. 488-489.**

**Brown Schultz Proposal No. 481**:    Daily was not capable of performing simple arithmetic or any degree of genuine analysis of the financial statements. Trial Transcript at p. 705-07, 735.

**This finding is highly unprofessional.  James Daily testified that he could not answer a mathematical question without a calculator.  Testimony of J. Daily, Transcript, p. 735. The insult is gratuitous.**

**Brown Schultz Proposal No. 482**:    The evidence did not establish that any of the underwriters affiliated with plaintiff who were involved in the CCI bond program could perform appropriate analysis of financial statements.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 475.**

**Brown Schultz Proposal No. 483**:    Plaintiff did not demonstrate that it took into account information included in the 1997 audited financial statement in its underwriting of the CCI bond account.  Trial Transcript at pp. 591-97.

**This is misleading.  James Daily merely testified that his memory was not clear as to certain details that happened approximately six years ago.  Testimony of J. Daily, Transcript, pp. 591-597.**

**Brown Schultz Proposal No. 484**:    Daily reviewed only the annual review report prepared during 1998 and did not analyze the 1997 audited financial statement or analyze the information included in the 1997 financial statement or the 1998 audited financial statement. Trial Transcript at pp. 611-12.

**This is a blatant mischaracterization.  James Daily testified that he reviewed the 1997 Audit Report but that he does not think he did an independent analysis.  Testimony of J. Daily, Transcript, pp. 611-612.**

**Brown Schultz Proposal No. 485**:   The evidence did not establish that Salazar correctly analyzed the audited financial statements.  Trial Transcript at p. 250.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 475.**

**Brown Schultz Proposal No. 486**:   The only evidence presented about the home office review of an analysis of financial information performed by Salazar was to review to see if the amounts were correctly transposed.  Trial Transcript at p. 250.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 475.**

**Brown Schultz Proposal No. 487**:   The evidence did not establish that the approval of the continuation of the bond program for 1998 was based on the information included in the April 15, 1998 annual review report.  Trial Transcript at p. 613.

**The citation to the trial testimony does not support the proposed finding.  Moreover, Anthony Phillips testified that the 1998 Audit Report was a substantial factor in USF&G's decision to renew CCI's bonding program.  Testimony of A. Phillips, Transcript, p. 2467.**

**Brown Schultz Proposal No. 488**:   Plaintiff did not establish that approval for any specific bond was based on the audited financial statements.

**USF&G proved that it received the Audited Financial Statements and, in reliance, USF&G agreed to continue the bonding program for CCI.  Exhibits 14, 15.  Testimony of A. Phillips, Transcript, pp. 2445, 2460.**

**Brown Schultz Proposal No. 489**:   The Harrisburg branch office did not timely provide Daily with interim financial information which reflected dramatic, adverse, material changes in the financial condition of CCI.  Trial Transcript at pp. 637-38.

**This is a mischaracterization.  James Daily stated that the information was provided to his boss.  Testimony of J. Daily, Transcript, pp. 637-638.**

**Brown Schultz Proposal No. 490**:   Daily was disturbed that the important interim financial information had not been timely provided to him by the Harrisburg branch office since it was so material to underwriting and he had approved the VCU bond in the meantime and other bonds had been issued since the receipt of the information.  Trial Transcript at p. 637.

**This is a mischaracterization.  James Daily testified that he did not remember the specifics and that he was probably disturbed.**

**Brown Schultz Proposal No. 491**:    Daily's boss, Bob Dixon, received the important 1998 interim financial information, which reflected that CCI sustained a $1.6 million loss, and did nothing to react to it.  Trial Transcript at p. 638.

**There was no testimony as to Mr. Dixon's reaction.**

**Brown Schultz Proposal No. 492**:    Daily's memory of the events and underwriting activities in connection with the CCI bond account is unreliable, often mistaken, inconsistent, and his testimony concerning all facts important to plaintiff's case is incredible.  Trial Transcript at pp.  522, 618-30, 668.  *Compare* Trial Transcript at pp. 624, 626, 637, 638, 644 with pp. 355, 630, 645; *compare* Trial Transcript at p. 748 with pp. 750-51.

**Considering his age and infirmity, and the rigors of approximately three full days of testimony, Brown Schultz' comparison of minor inconsistencies in James Daily's testimony is mean-spirited, petty and inappropriate.  The inconsistencies are obviously those of error rather than deceit.  Although he could not remember all events that happened over six years ago with precision, his credibility remained unscathed after cross-examination. James Daily has spent a lifetime in the surety business.  Moreover, the fact that he is on the verge of retirement gives him a level of credibility not necessarily enjoyed by those who contemplate future employment with the party on whose behalf they are testifying.**

**Brown Schultz Proposal No. 493**:    Each of the bonds were supposedly individually underwritten.  Trial Transcript at p. 2492.

**Although each job must be submitted to the surety for specific approval prior to bidding, a new annual audit is not required each time a bond is requested, provided the new request is within the parameters of the bonding program.  Indeed, it would be extremely expensive and impractical (if not impossible) to require the contractor to provide the surety with an audit report every time the contractor obtains a new contract.  Once a bond has been issued, it is nearly impossible for that bond to be revoked.  Testimony of Farnsworth, Transcript, p. 1484.**

**CCI's initial bonding program consisted of a $15 million per project limit and a $75 million aggregate limit. Testimony of J. Daily, Transcript, p. 453. CCI had a total annual revenue of approximately $48.2 million when the bonding program was established in 1993. Testimony of J. Daily, Transcript, p. 453. CCI's bonding program was renewed annually, usually in March or April when USF&G received copies of the CCI Audited Financial Statements. Testimony of A. Phillips, Transcript, pp. 2442, 2443.**

**Each year, a Specific Discretionary Authority ("SDA") relative to CCI in the amount of $15 million per project and $75 million aggregate was conferred on the Harrisburg, Pennsylvania branch office (the "Harrisburg Office") by the Home Office. The Harrisburg Office had authority to issue bonds to CCI with those limits. Testimony of A. Phillips, Transcript, pp. 2414-2415.**

**If a bonding request exceeded the SDA, it would be necessary for the Harrisburg Office to make a submission to James A. Daily ("James Daily"), the contract bond manager situated in the Home Office. Testimony of A. Phillips, Transcript, p. 2416.**

**Brown Schultz Proposal No. 494**:    No evidence concerning the specific underwriting for specific bonds was presented.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 493.**

**Brown Schultz Proposal No. 495**:    Plaintiff did not diligently obtain interim financial information for the quarter ending March 1998 to which it was entitled under the arrangement for bonding. Trial Transcript at pp. 2602-06.

**USF&G incorporates herein its response to Proposal No. 475.**

**Brown Schultz Proposal No. 496**:    It was significant to underwriting that plaintiff learned that CCI sustained a $1.6 million loss during 1998. Trial Transcript at p. 1619:24-1620:4.

**Dominiani's letter included a spreadsheet which demonstrated how CCI's jobs would perform for the remainder of the year. Exhibit 238.**

In fact, according to Dominiani, CCI expected to show a small loss or break even by December 31, 1998. Exhibit 237, 238. Testimony of J. Daily, Transcript, p. 356.

The bonding program was renewed not only because Dominiani's turn around proposal seemed logical but because CCI had a past history of successful turnarounds. Testimony of A. Phillips, Transcript, pp. 2451-2452; Testimony of J. Daily, Transcript, pp. 283, 356.

The decision to renew was influenced, in part, by CCI's history of successful turn-arounds. Testimony of A. Phillips, Transcript, pp. 2451-2452.

USF&G hereby incorporates its response to Brown Schultz Proposal No. 275.

**Brown Schultz Proposal No. 497**:    As of August 1998, plaintiff was aware that the financial condition of CCI had materially changed since the 1997 audited financial statement. *See* Exhibits 34 and 238.

USF&G hereby incorporates its response to Brown Schultz Proposal No. 496.

**Brown Schultz Proposal No. 498**:    There is no indication that plaintiff related or correlated the financial information received from the agent concerning the $1.6 million dollar loss to the 1997 audited financial statement. Trial Transcript at p. 1623:6-11.

USF&G hereby incorporates its response to Brown Schultz Proposal No. 496.

**Brown Schultz Proposal No. 499**:    Plaintiff continued to bond CCI in spite of the $1.6 million dollar loss because of its confidence in CCI management. Trial Transcript at p. 1623:12-16.

USF&G hereby incorporates its response to Brown Schultz Proposal No. 496.

**Brown Schultz Proposal No. 500**:    Knowledge of the $1.6 million loss during 1998 should have prompted plaintiff to interrupt bond approval until it received information sufficient to assure there was not a problem. Trial Transcript at p. 627.

USF&G hereby incorporates its response to Brown Schultz Proposal No. 496.

Farnsworth opined that USF&G acted reasonably in bonding CCI in light of, *inter alia*, the information provided by Dominiani. Testimony of Farnsworth, Transcript, pp. 1524-1525.

**Brown Schultz Proposal No. 501**:    The evidence did not establish the nature of the financial analysis performed by Salazar in connection with underwriting bonds for CCI except conceivably to make some adjustments to amounts which were input into the ECF.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 496.**

**Farnsworth opined that USF&G acted reasonably in bonding CCI in light of, *inter alia*, the**

**information provided by Dominiani.  Testimony of Farnsworth, Transcript, pp. 1524-1525.**

**Brown Schultz Proposal No. 502**:    The evidence did not establish that Salazar relied on information from either the 1997 or 1998 audited financial statement in any decision he made concerning bonds for CCI.

**USF&G relied upon the 1997 Audit Report as a substantial factor in its decision to**

**continue CCI's bonding program.  Testimony of A. Phillips, Transcript, p. 2445.**

**Every project approved in reliance on the 1997 Audit Report was within the SDA of**

**the Harrisburg Office except for VCU Life Sciences, which required Home Office**

**approval.  Testimony of A. Phillips, Transcript, pp. 2452-2453.**

**Bonding for VCU Life Sciences was approved by the Home Office.  Testimony of A.**

**Phillips, Transcript, pp. 2452-2453.**

**Upon receipt, Salazar promptly analyzed the 1998 Audit Report and his analysis**

**was immediately accessible by the Home Office via a relatively new software program at**

**USF&G known as the Electronic Credit File ("ECF").  Testimony of A. Phillips,**

**Transcript, pp. 2460, 2462-2463.**

**The 1998 Audit Report was a substantial factor in USF&G's decision to renew**

**CCI's bonding program.  Testimony of A. Phillips, Transcript, p. 2467.**

**All of the projects bonded in reliance upon the 1998 Audit Report were within the**

**SDA of the Harrisburg office, other than the Pennsylvania Turnpike Building.  Exhibit 15.**

**Testimony of A. Phillips, Transcript, p. 2468.**

The required Home Office approval to bond the Pennsylvania Turnpike Building was promptly received.  Testimony of A. Phillips, Transcript, p. 2468.

**Brown Schultz Proposal No. 506**:   The SDA for the CCI account which was the authority under which Salazar and Phillips could approve bonds was $15 million single project limit, $75 million total work program limit.  Trial Transcript at p. 790.

As each Interoffice Correspondence demonstrates, USF&G's Harrisburg, Pennsylvania office recommended a continuation of the $15 million/$75 million bonding program for CCI.  Indeed, throughout CCI's bonding relationship with USF&G, those bonding capacity limits continued year-to-year although, on a few occasions, USF&G approved bonds which temporarily increased CCI's bonding capacity beyond $75 million.  Testimony of A. Phillips, Transcript, pp. 2416-2417, 2442-2443; Testimony of J. Daily, Transcript, p. 189.

Farnsworth's analysis of Actual Work on Hand per Work in Progress demonstrates that the work on hand, for a good period of time, was well below the $75,000,000 aggregate.  Exhibit 359 (ID only).  Testimony of Farnsworth, Transcript, p. 1534.  Thus, the ratios were often "well above a 5% case."  Testimony of Farnsworth, Transcript, pp. 1533-1534.

Even when the work in progress appeared to jump above the aggregate program limit for a short time, based upon the overall financial condition of CCI's balance sheet, there was still a strong case for further underwriting.  Testimony of Farnsworth, Transcript, p. 1534.

Those "spikes" (as they are known in the surety industry) in CCI's bonding program were short-lived since CCI worked off its backlog, thereby reducing the aggregate limit of the bonding program to $60 million or below.  Testimony of J. Daily, Transcript, pp. 332-333.

Also, on a very few occasions, USF&G approved a spike in CCI's single limit bonding program to allow CCI to accept a project larger than $15 million. This was only done after considering both the facts and circumstances of the project and the financial position of CCI. Testimony of J. Daily, Transcript, pp. 186, 188-189; Testimony of Farnsworth, Transcript, p. 1534.

During the period from 1997 until USF&G/St. Paul ceased writing bonds for CCI in early October 1999, USF&G only approved three jobs that were eventually awarded to CCI and were larger than the $15 million single limit portion of the bonding program. The three were Germplasm Center ($15,500,000), VCU Life Science ($21,480,250) and Pennsylvania Turnpike Building ($24,612,843). Exhibit 14, Exhibit 15.

**Brown Schultz Proposal No. 507**:   Total work program limit is the "cost to complete plus unearned profit on all jobs in the backlog as well as outstanding bids, low bids, and anticipated awards. The program must be consistently measured and include bonded and unbonded work." Exhibit 40 at p. USFG/BS 1609, Exhibit 41 at p. USFG/BS 1473.

USF&G hereby incorporates its response to Brown Schultz Proposal No. 506.

**Brown Schultz Proposal No. 509**:   Phillips and/or Salazar were only conceivably involved in the approval of bonds within the specific discretionary authority (SDA) granted by David Hussey to the Harrisburg branch office. Trial Transcript at p. 2490.

USF&G relied upon the 1997 Audit Report as a substantial factor in its decision to continue CCI's bonding program. Testimony of A. Phillips, Transcript, p. 2445.

Every project approved in reliance on the 1997 Audit Report was within the SDA of the Harrisburg Office except for VCU Life Sciences, which required Home Office approval. Testimony of A. Phillips, Transcript, pp. 2452-2453.

Bonding for VCU Life Sciences was approved by the Home Office. Testimony of A. Phillips, Transcript, pp. 2452-2453.

All of the projects bonded in reliance upon the 1998 Audit Report were within the

SDA of the Harrisburg office, other than the Pennsylvania Turnpike Building.  Exhibit 15.

Testimony of A. Phillips, Transcript, p. 2468.

The required Home Office approval to bond the Pennsylvania Turnpike Building

was promptly received.  Testimony of A. Phillips, Transcript, p. 2468.

**Brown Schultz Proposal No. 510**:   Phillips was not involved in the approval of all the
bonds, and he did not know which bond(s) he was involved with the approval. Trial Transcript at
pp. 2492, 2496.

USF&G incorporates herein its response to Brown Schultz Proposal no. 55, *infra*.

**Brown Schultz Proposal No. 511**:   The total work program during 1999 was always in
excess of the total work program limit when the bonds were approved during 1999 and required
home office approval. *See* Exhibit 790 at pp. USFG/BS 0229, 0633, 0642, 0765, 0767, 0770,
0772.

As each Interoffice Correspondence demonstrates, USF&G's Harrisburg,

Pennsylvania office recommended a continuation of the $15 million/$75 million bonding

program for CCI.  Indeed, throughout CCI's bonding relationship with USF&G, those

bonding capacity limits continued year-to-year although, on a few occasions, USF&G

approved bonds which temporarily increased CCI's bonding capacity beyond $75 million.

Testimony of A. Phillips, Transcript, pp. 2416-2417, 2442-2443; Testimony of J. Daily,

Transcript, p. 189.

Farnsworth's analysis of Actual Work on Hand per Work in Progress demonstrates

that the work on hand, for a good period of time, was well below the $75,000,000 aggregate.

Exhibit 359 (ID only).  Testimony of Farnsworth, Transcript, p. 1534.  Thus, the ratios

were often "well above a 5% case."  Testimony of Farnsworth, Transcript, pp. 1533-1534.

Even when the work in progress appeared to jump above the aggregate program

limit for a short time, based upon the overall financial condition of CCI's balance sheet,

there was still a strong case for further underwriting.  **Testimony of Farnsworth, Transcript, p. 1534.**

Those "spikes" (as they are known in the surety industry) in CCI's bonding program were short-lived since CCI worked off its backlog, thereby reducing the aggregate limit of the bonding program to $60 million or below.  **Testimony of J. Daily, Transcript, pp. 332-333.**

Also, on a very few occasions, USF&G approved a spike in CCI's single limit bonding program to allow CCI to accept a project larger than $15 million.  This was only done after considering both the facts and circumstances of the project and the financial position of CCI.  **Testimony of J. Daily, Transcript, pp. 186, 188-189; Testimony of Farnsworth, Transcript, p. 1534.**

During the period from 1997 until USF&G/St. Paul ceased writing bonds for CCI in early October 1999, USF&G only approved three jobs that were eventually awarded to CCI and were larger than the $15 million single limit portion of the bonding program.  The three were Germplasm Center ($15,500,000), VCU Life Science ($21,480,250) and Pennsylvania Turnpike Building ($24,612,843).  **Exhibit 14, Exhibit 15.**

**Brown Schultz Proposal No. 512**:   None of the bonds approved during 1999 were within the SDA.  *See* Exhibit 790 at pp. USFG/BS 0229, 0633, 0642, 0765, 0767, 0770, 0772, Exhibit 15.

All of the projects bonded in reliance upon the 1998 Audit Report were within the SDA of the Harrisburg office, other than the Pennsylvania Turnpike Building.  **Exhibit 15. Testimony of A. Phillips, Transcript, p. 2468.**

The required Home Office approval to bond the Pennsylvania Turnpike Building was promptly received.  **Testimony of A. Phillips, Transcript, p. 2468.**

**Brown Schultz Proposal No. 513**:   The evidence did not establish the circumstances under which approval was provided for bonds on CCI projects known as Scott Air Force Base, Germplasm, Outlook Chesterfield, Outlook Westerville, James River, Perry County Road, Summerdale Road, Pennsylvania Turnpike Administration Building, Cambria County Road, Cool and Cold Aqua Headquarters, Bedford County State Road, and Cool and Cold Aqua buried process lines.  Trial Transcript at pp. 392, 748-50, 2492, 2496; Exhibits 14 and 15.

**The circumstances are described in detail in Section III and V of USF&G's**

**Proposed Findings.**

**Brown Schultz Proposal No. 514**:   There existed bond case files which were maintained separately from the underwriting file.  Trial Transcript at p. 2498.

**In cases where bonds were executed, they were kept in a specific bond file separate**

**from the underwriting file.  Testimony of A. Phillips, Transcript, p. 2498.**

**Brown Schultz Proposal No. 515**:   The preservation and custody of bond case files is uncertain.  Trial Transcript at p. 2651.

**This is a mischaracterization.  Matthew Silverstein merely testified that he was not**

**personally certain as to the exact present location of all files.  Testimony of Silverstein,**

**Transcript, p. 2651.**

**Brown Schultz peppers its proposed findings with innuendo hinting at spoliation of**

**evidence.  The Court has already dismissed the late-raised, unsupported and mean-spirited**

**insinuations concerning the alleged destruction or withholding of purportedly relevant**

**documents.  Trial Transcript, pp. 2499-2502; 2699-2702.  Moreover, Brown Schultz has**

**never explained why it failed to undertake efforts to obtain documents from third parties,**

**such as CCI, project owners and contractors.  Brown Schultz is believed to have spent**

**approximately $40,000 in copying onto CD ROM format thousands of documents made**

**available to Brown Schultz by USF&G during the discovery phase of the litigation.**

**Finally, the attempt to focus on architectural drawings, plans, invoices and other detritus of**

**the construction process seems calculated to deflect attention from the one germane issue;**

**to wit, did the Audited Financial Statements contain material misrepresentations because**

**Brown Schultz did not conduct its audit in compliance with Generally Accepted Auditing**

**Standards?**

    **Brown Schultz Proposal No. 516**:   The evidence did not establish that the underwriting and approval for any specific bond included consideration of information derived from the 1997 and 1998 audited financial statements of CCI. Trial Transcript at pp. 392, 616, 2452, 2468, 2550.

    **USF&G's reliance upon the Audited Financial Statements is described in detail in**

**Section II(D) of USF&G's Post-Trial Memorandum.**

    **Brown Schultz Proposal No. 517**:   The evidence did not establish that David Hussey was aware of and considered any information derived from the 1997 or 1998 audited financial statements.

    **USF&G's reliance upon the Audited Financial Statements is described in detail in**

**Section II(D) of USF&G's Post-Trial Memorandum.**

    **USF&G hereby incorporates its response to Brown Schultz Proposal No. 212.**

    **Brown Schultz Proposal No. 518**:   The evidence established only that information conceivably derived from the 1997 audited financial statement of CCI was included in the annual review report dated April 15, 1998  and that information conceivably derived from the 1998 audited financial statement of CCI was input in the ECF system.

    **USF&G's reliance upon the Audited Financial Statements is described in detail in**

**Section II(D) of USF&G's Post-Trial Memorandum.**

    **Brown Schultz Proposal No. 519**:   No requests for bond approval included information derived from audited financial statements even though the request for approval form used by the Harrisburg branch office included a place for the inclusion of financial information from the audited financial statements.  Trial Transcript at p. 577-586.

    **USF&G's reliance upon the Audited Financial Statements is described in detail in**

**Section II(D) of USF&G's Post-Trial Memorandum.**

    **Brown Schultz Proposal No. 520**:   The bonds for Outlook Westerville and James River were approved after plaintiff was aware CCI had a $1.6 million loss by mid-year.  Exhibit 14.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 257 and 289.**

<u>**Brown Schultz Proposal No. 521**</u>:   Daily approved the VCU bond on December 2, 1998, the same day and within hours of the request for approval.  Trial Transcript at p. 616.

**This is misleading.  Anthony Phillips testified that USF&G had the six month interims as of August 1998.  Testimony of A. Phillips, Transcript, p. 2453.  Only a bid bond was approved on December 2, 1998.  He also testified that the payment and performance bonds were not approved until December 8, 1998, after all interims were received.  Testimony of A. Phillips, Transcript, pp. 2454-2458.**

<u>**Brown Schultz Proposal No. 522**</u>:   Daily does not know whether the interim financial information in the possession of plaintiff was analyzed prior to approval of the VCU bond, or whether he even had the 6 month interim financial information when he approved the VCU bond.  Trial Transcript at p. 619; Exhibit 130.

**This mischaracterizes James Daily's testimony.  James Daily testified that he regularly received interim financials from CCI.  Testimony of J. Daily, Transcript, p. 616.  As discussed, *supra*, the payment and performance bonds were not approved until after all interim financials were received.**

<u>**Brown Schultz Proposal No. 523**</u>:   Daily approved the VCU bond without the benefit of ten month interim financial information.  Trial Transcript at p. 620.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 521 and 522.**

<u>**Brown Schultz Proposal No. 524**</u>:   Daily would not have approved the VCU bond if he had been aware CCI had a $1.6 million loss during 1998.  Trial Transcript at p. 627.

**This is a mischaracterization.  James Daily testified that he would not necessarily have ceased bonding.  Testimony of J. Daily, Transcript, p. 627.**

<u>**Brown Schultz Proposal No. 525**</u>:   Daily approved the VCU bond aware CCI had a problem related to a $1.6 million loss halfway through the year and did not cease bonding or

even obtain an explanation about the reason for the problem or other information relevant to the financial condition of CCI.  Trial Transcript at p. 627.

**On or about August 17, 1998, Dominiani wrote to Anthony Phillips and reported that CCI had posted a net loss of $1.6 million for the first six months of 1998.  Dominiani reported that this loss was attributable to certain problem jobs which had been rectified. Exhibit 237, 238.  Testimony of A. Phillips, Transcript, pp. 2445-2446.**

**Dominiani's letter included a spreadsheet which demonstrated how CCI's jobs would perform for the remainder of the year.  Exhibit 238.**

**In fact, according to Dominiani, CCI expected to show a small loss or break even by December 31, 1998.  Exhibit 237, 238.  Testimony of J. Daily, Transcript, p. 356.**

**The bonding program was renewed not only because Dominiani's turn around proposal seemed logical but because CCI had a past history of successful turnarounds. Testimony of A. Phillips, Transcript, pp. 2451-2452; Testimony of J. Daily, Transcript, pp. 283, 356.**

**The decision to renew was influenced, in part, by CCI's history of successful turn-arounds.  Testimony of A. Phillips, Transcript, pp. 2451-2452.**

**USF&G acted reasonably in bonding CCI in light of, *inter alia*, the information provided by Dominiani.  Testimony of Farnsworth, Transcript, pp. 1524-1525.**

**Brown Schultz Proposal No. 526**:   Plaintiff should not have issued the VCU bond in reliance on the 1997 audited financial statement.

**USF&G acted reasonably in bonding CCI in light of, *inter alia*, the information provided by Dominiani.  Testimony of Farnsworth, Transcript, pp. 1524-1525.**

**Brown Schultz Proposal No. 527**:   Plaintiff did not justifiably rely on the 1997 audited financial statement when it issued bonds after August of 1998 considering that those bonds allegedly issued in reliance on the 1997 audited financial statement were issued after plaintiff

was aware CCI had sustained a $1.6 million loss which was a material change over the financial condition reflected on the 1997 audited financial statement. *See* Exhibits 14, 34 and 238.

**USF&G acted reasonably in bonding CCI in light of,** *inter alia*, **the information provided by Dominiani.  Testimony of Farnsworth, Transcript, pp. 1524-1525.**

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.**

**Brown Schultz Proposal No. 528**:    Phillips recommended that plaintiff request Ortenzio restore his indemnity as of December 22, 1998 in connection with continuing the bond program for CCI.  Trial Transcript at p. 2538; Exhibit 790B at p. USFG/BS 1310.

**Anthony Phillips testified that he did not make a request to Mr. Ortenzio to restore his indemnity until** *after* **he learned of CCI's loss in the fall of 1999.  Testimony of A. Phillips, Transcript, pp. 2538-2539.**

**Brown Schultz Proposal No. 529**:    Plaintiff agreed to continue the bond program for CCI for 1999 on January 5, 1999 prior to receipt of the 1998 audited financial statement. Trial Transcript at p. 667, 786, 1591, 2457, 2546; Exhibit 275.

**This concerns the Fulk Rod project, which was a joint venture with two sureties that was distinct from the other bonds approved by USF&G.  Farnsworth testified that USF&G exercised reasonable care in its decision to support the Fulk Rod project.  Testimony of Farnsworth, Transcript, p. 1529.  The joint venture was not a successful bidder and USF&G incurred no losses.  It should be noted that although the 1998 Audit Report had not yet been received, USF&G had received June and October interim financials and a November 1998 WIP.  Testimony of J. Daily, Transcript, pp. 667-668.**

**Brown Schultz Proposal No. 530**:    The introduction of new business by CCI in the nature of self performing work and civil work and mechanical work during the period from September 1997 and January of 1999 favored increasing the expectation for working capital and net worth for CCI since more cash was needed. Trial Transcript at p. 1601:13-19.

**This mischaracterizes the testimony.  Farnsworth testified that** *the type of work* **to be done was an important factor.  Testimony of Farnsworth, Transcript, p. 1601.**

**Brown Schultz Proposal No. 531**:   Plaintiff reduced its guidelines from the 8% case it indicated was in place when Ortenzio terminated his indemnity to a 5% case of CCI when it approved the continuation of the bond program on January 5, 1999 to fend off competition which was then "knocking at the door" to obtain CCI's bond business.  Trial Transcript at p. 1591:6-18.

**USF&G incorporates herein its response to Proposal No. 532, *infra*.   USF&G also notes that the testimony referenced does not indicate a reduction from 8% to 5%.**

**Brown Schultz Proposal No. 532**:   Plaintiff did not require Ortenzio to restore his indemnity as a condition of approval for continuing the bond program for 1999. Trial Transcript at pp.  2538-39.

**It was the custom and practice of the surety industry in the latter half of the 1990's to continue to bond in the absence of personal indemnity from corporate executives so long as the contractor principal remained bound by an indemnity agreement.  Testimony of Farnsworth, Transcript, pp. 1520-1522.**

**It was not unusual for a surety to continue bonding after an indemnitor exercised a right of termination.  Testimony of Farnsworth, Transcript, p. 1521.**

**USF&G met the industry standard of care in continuing to bond CCI after Ortenzio cancelled his indemnity because, *inter alia*, the work being done by CCI was within the capital structure of the company and did not present an undue risk to USF&G.  Testimony of Farnsworth, Transcript, p. 1522.**

**Brown Schultz Proposal No. 533**:   Plaintiff's decision whether to require Ortenzio to restore his personal indemnity as a condition for continuing the bonding program was dependent on market factors and the extent of competition by other sureties for the business.  Trial Transcript at pp. 2442, 2595-96.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 532.**

**Brown Schultz Proposal No. 534**:   Plaintiff had no justification for not requiring Ortenzio to restore his indemnity as a condition for continuation of the bond program.  Trial Transcript at p. 2543.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 532.**

**Brown Schultz Proposal No. 535**:   Plaintiff approved the bond program for CCI for 1999 aware that CCI was not projected to do better than break even on the year in spite of earlier predictions of at least a one million dollar profit.  Trial Transcript at pp. 662-63.

**Dominiani's letter included a spreadsheet which demonstrated how CCI's jobs would perform for the remainder of the year.  Exhibit 238.**

**In fact, according to Dominiani, CCI expected to show a small loss or break even by December 31, 1998.  Exhibit 237, 238.  Testimony of J. Daily, Transcript, p. 356.**

**The bonding program was renewed not only because Dominiani's turn around proposal seemed logical but because CCI had a past history of successful turnarounds. Testimony of A. Phillips, Transcript, pp. 2451-2452; Testimony of J. Daily, Transcript, pp. 283, 356.**

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.**

**Brown Schultz Proposal No. 536**:   The difference between break even and a one million dollar profit is significant to underwriting. Trial Transcript at p.  663.

**James Daily testified it "could be . . ."  Testimony of J. Daily, Transcript, p. 663.**

**Brown Schultz Proposal No. 537**:   Plaintiff accepted the representation by Ortenzio during January 1999 that CCI would have a one million dollar profit if it received additional work even though CCI never had an annual profit in the amount of one million dollars and plaintiff was not aware of work on hand for CCI to achieve a one million dollar profit. Trial Transcript at pp.  663-64.

**This is a mischaracterization.  James Daily testified that he believed it conceivable. Testimony of J. Daily, Transcript, p. 664.**

**The bonding program was renewed not only because Dominiani's turn around proposal seemed logical but because CCI had a past history of successful turnarounds. Testimony of A. Phillips, Transcript, pp. 2451-2452; Testimony of J. Daily, Transcript, pp. 283, 356.**

The decision to renew was influenced, in part, by CCI's history of successful turn-arounds. **Testimony of A. Phillips, Transcript, pp. 2451-2452.**

USF&G hereby incorporates its response to Brown Schultz Proposal No. 257.

**Brown Schultz Proposal No. 538**:   Plaintiff decided it was appropriate to require Ortenzio to provide his personal indemnity as a condition of approval of bonds for the Fulk Rod project. Trial Transcript at p. 656.

**This is a mischaracterization. James Daily merely indicated that "it was discussed." Testimony of J. Daily, Transcript, p. 656.**

**Brown Schultz Proposal No. 542**:   Plaintiff's procedures required the Harrisburg branch office to provide its written recommendation concerning the renewal of the CCI bond program on an annual basis in connection with the annual review report.  Trial Transcript at pp. 554, 2506, 2508.

**The underwriting process is described in detail in Sections I, III, IV and V of USF&G's proposed findings.**

**Brown Schultz Proposal No. 543**:   The bond program was renewed for 1996 without home office review of the 1995 audited financial statement or the annual review report.  Trial Transcript at pp. 554-556; Exhibit 790 at USFG/BS 1197, 1201.

**The underwriting process is described in detail in Sections I, III, IV and V of USF&G's proposed findings.**

**Brown Schultz Proposal No. 544**:   Home office underwriters did not review the audited financial statements of CCI except in connection with the annual review report. Trial Transcript at pp. 515, 564.

**This is a mischaracterization. James Daily testified that he reviewed the 1995 Audit Report at the time received and the other audited financial statements in connection with the annual review.**

**Brown Schultz Proposal No. 545**:   There was no annual review report for 1999 based on the 1998 year end financial information. Trial Transcript at pp. 670, 2509.

**No Interoffice Correspondence was prepared by Salazar for 1998 as the financial information obtained from the 1998 Audit Report was entered that year into the ECF program.  Testimony of A. Phillips, Transcript, p. 2431.**

**Brown Schultz Proposal No. 546**:   The annual review was not performed because the branch office underwriters were too busy and it was overlooked.  Trial Transcript at p. 1639-39.

**Salazar, Anthony Phillips and Daily reviewed and analyzed the 1998 Audit Report shortly after receipt on March 2, 1999.  Exhibits 790, pp. 1255-1257, 90, 132, 159, 194 and 229.  Testimony of J. Daily, Transcript, pp. 370, 382, 386-388; Testimony of A. Phillips, Transcript, pp. 2460-2465.**

**Brown Schultz Proposal No. 547**:   There was no recommendation by the Harrisburg branch office concerning the renewal of the bond program for CCI during 1999 based on a review of the 1998 year end audited financial information. Trial Transcript at pp.  2509, 2510, 2609.

**USF&G hereby incorporates herein by reference its response to Brown Schultz Proposal No. 555, *infra*.**

**Brown Schultz Proposal No. 548**:   There is no documented consideration of approval of continuing the bond program for 1999 except Exhibit 257 which was generated on January 5, 1999 as a result of the January 5, 1999 meeting. *See generally* Exhibit 790-790B.

**USF&G does not know how to respond to the phrase "no documented consideration of approval."  USF&G incorporates Response No. 555, *infra*, which describes the underwriting process.**

**Brown Schultz Proposal No. 549**:   The preservation and custody of the home office underwriting file is uncertain.  Trial Transcript at p. 2647.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 515.**

**Brown Schultz peppers its proposed findings with innuendo hinting at spoliation of evidence.  The Court has already dismissed the late-raised, unsupported and mean-spirited insinuations concerning the alleged destruction or withholding of purportedly relevant documents.  Trial Transcript, pp. 2499-2502; 2699-2702.  Moreover, Brown Schultz has never explained why it failed to undertake efforts to obtain documents from third parties, such as CCI, project owners and contractors.  Brown Schultz is believed to have spent**

approximately $40,000 in copying onto CD ROM format thousands of documents made

available to Brown Schultz by USF&G during the discovery phase of the litigation.

Finally, the attempt to focus on architectural drawings, plans, invoices and other detritus of

the construction process seems calculated to deflect attention from the one germane issue;

to wit, did the Audited Financial Statements contain material misrepresentations because

Brown Schultz did not conduct its audit in compliance with Generally Accepted Auditing

Standards?

**Brown Schultz Proposal No. 550**:   The home office underwriting file was kept separate from the Harrisburg branch office underwriting file, but plaintiff produced only a single item as the underwriting file which was not divided, separated, or distinguished between the home office underwriting file and the branch office underwriting file.  Trial Transcript at p. at 192; Ex.790-790B.

There is no evidence that Brown Schultz was not provided with the entirety of the

underwriting files.  The citation in the Proposed Finding merely acknowledges that there

was a file maintained in the home office and one in the Harrisburg branch office.

Brown Schultz peppers its proposed findings with innuendo hinting at spoliation of

evidence.  The Court has already dismissed the late-raised, unsupported and mean-spirited

insinuations concerning the alleged destruction or withholding of purportedly relevant

documents.  Trial Transcript, pp. 2499-2502; 2699-2702.  Moreover, Brown Schultz has

never explained why it failed to undertake efforts to obtain documents from third parties,

such as CCI, project owners and contractors.  Brown Schultz is believed to have spent

approximately $40,000 in copying onto CD ROM format thousands of documents made

available to Brown Schultz by USF&G during the discovery phase of the litigation.

Finally, the attempt to focus on architectural drawings, plans, invoices and other detritus of

the construction process seems calculated to deflect attention from the one germane issue;

**to wit, did the Audited Financial Statements contain material misrepresentations because**

**Brown Schultz did not conduct its audit in compliance with Generally Accepted Auditing**

**Standards?**

**Brown Schultz Proposal No. 551**:   The underwriting file produced by plaintiff included only a single copy of the 1998 audited financial statement.  *See* Exhibit 790-790B, Exhibit 790 at USFG/BS 0439, Exhibit 36.

**That duplicate copies of the same document were not introduced into evidence by**

**Brown Schultz is not proof that multiple copies do not or did not exist.**

**Brown Schultz Proposal No. 552**:   The copy of the 1998 audited financial statement in the underwriting file does not reflect a stamp indicating receipt in the home office.  See Exhibit 36, Exhibit 790 at USFG/BS 0439.

**While the 1998 Audited Financial Statement does not have a stamp, it is likely**

**because documents were sent "by routing slip" to the Home Office.  Testimony of A.**

**Phillips, Transcript, pp. 2465-2466, Exhibit 790B, p. 1266 (sample routing slip).**

**Brown Schultz Proposal No. 553**:   The underwriting file did not contain a transmittal letter reflecting transmission of the 1998 audited financial statement to home office.  *See* Exhibit 790-790B.

**USF&G hereby incorporates herein by reference its response to Brown Schultz**

**Proposal No. 552.**

**Brown Schultz Proposal No. 554**:   Proof of transmission and receipt of documents by the home office would have been reflected by a receipt stamp or a writing on the financial statement and/or a transmittal letter.  Trial Transcript at pp. 265, 270, 281-282, 466, 468-69, 519, 549-50, 552, 560, 573-74, 805-06.

**USF&G hereby incorporates herein by reference its response to Brown Schultz**

**Proposal No. 552.**

**Brown Schultz Proposal No. 555**:   The evidence did not establish the 1998 audited financial statement was ever received by home office.  Trial Transcript at pp. 670, 693-94, 805-06.

On March 2, 1999, USF&G received a copy of the 1998 Audit Report and, in reliance, USF&G agreed to continue the $15 million/$75 million bonding program for CCI.

Upon receipt, Salazar promptly analyzed the 1998 Audit Report and his analysis was immediately accessible by the Home Office via a relatively new software program at USF&G known as the Electronic Credit File ("ECF").  Testimony of A. Phillips, Transcript, pp. 2460, 2462-2463.

Hard copies of the analysis input into ECF were printed out on March 4, 1999. Exhibit 294.  Testimony of A. Phillips, Transcript, p. 2464.

Not only was it standard procedure for the Harrisburg Office to send the CCI Audited Financial Statements to the Home Office but Anthony Phillips believes that, in particular, the 1998 Audit Report was promptly sent "by routing slip" to the Home Office. Testimony of A. Phillips, Transcript, pp. 2465-2466.  Exhibit 790-B, p. 1266 (sample routing slip).

The 1998 Audit Report was a substantial factor in USF&G's decision to renew CCI's bonding program.  Testimony of A. Phillips, Transcript, p. 2467.

**Brown Schultz Proposal No. 556**:   Daily did not remember receiving the 1998 audited financial statement. Trial Transcript at p. 671.

On March 2, 1999, USF&G received a copy of the 1998 Audit Report and, in reliance, USF&G agreed to continue the $15 million/$75 million bonding program for CCI.

Upon receipt, Salazar promptly analyzed the 1998 Audit Report and his analysis was immediately accessible by the Home Office via a relatively new software program at USF&G known as the ECF.  Testimony of A. Phillips, Transcript, pp. 2460, 2462-2463.

Hard copies of the analysis input into ECF were printed out on March 4, 1999. Exhibit 294.  Testimony of A. Phillips, Transcript, p. 2464.

Not only was it standard procedure for the Harrisburg Office to send the CCI Audited Financial Statements to the Home Office but Anthony Phillips believes that, in particular, the 1998 Audit Report was promptly sent "by routing slip" to the Home Office. Testimony of A. Phillips, Transcript, pp. 2465-2466.  Exhibit 790-B, p. 1266 (sample routing slip).

The 1998 Audit Report was a substantial factor in USF&G's decision to renew CCI's bonding program.  Testimony of A. Phillips, Transcript, p. 2467.

**Brown Schultz Proposal No. 557**:   Daily did not remember reviewing the 1998 financial statement. Trial Transcript at p.  671.

USF&G hereby incorporates its response to Brown Schultz Proposal No. 556.

**Brown Schultz Proposal No. 558**:   Daily cannot confirm he reviewed the 1998 audited financial statement.  Trial Transcript at p. 684.

USF&G hereby incorporates its response to Brown Schultz Proposal No. 556.

**Brown Schultz Proposal No. 559**:   Daily did not analyze the audited financial statements, or information derived from the audited financial statements. Trial Transcript at p. 762.

This Proposed Finding mischaracterizes Mr. Daily's testimony in which he admits that he did not perform an independent analysis, as was done by Salazar.  Further, James Daily testified that he compared the analysis contained in the ECF report with information he obtained from personally reading the 1998 Audit Report.  Testimony of J. Daily, Transcript, p. 762.

Farnsworth opined that USF&G's analysis of the financial statements conformed to industry custom and practice.  Testimony of Farnsworth, Transcript, pp. 1520-1522.

**Brown Schultz Proposal No. 561**:   The folder exceptions report and ratio analysis report were computer generated calculations from the ECF important to underwriting. Trial Transcript at pp.  671, 674, 809, 1650, 2553, 2555, 2556; Exhibit 790 at USFG/BS 0005.

**This is a mischaracterization.  In terms of underwriting, folder exception reports and ratio analysis was only an ancillary factor to reliance on audited financial statements. Testimony of A. Phillips, Transcript, p. 2558.**

**Farnsworth testified that the Dun & Bradstreet data was not reliable for a contractor of CCI's size.  Farnsworth, Transcript, p. 1513.**

**Brown Schultz Proposal No. 563**:   The reports were the product of a specifically developed, sophisticated mathematical analysis to measure the likelihood of construction firm failure due to financial stress. Trial Transcript at pp.  455-56.

**Farnsworth testified that the Dun & Bradstreet data was not reliable for a contractor of CCI's size.  Farnsworth, Transcript, p. 1513.**

**Brown Schultz Proposal No. 564**:   Plaintiff valued use of the computer generated reports to focus limited underwriting time on what may be a troubled account Trial Transcript at pp.  456-57.

**The Proposed Finding twists the quotation from James Daily, who did not indicate that underwriting time was limited.  Testimony of J. Daily, Transcript, pp. 456-457.**

**Brown Schultz Proposal No. 565**:   The folder exceptions report based on 1998 financial information indicated a potentially dangerous financial condition for CCI as reflected by the "red" status, and numerous conditions indicated by the financial data of CCI which was a substantial deviation from the comparative norm.  Trial Transcript at p. 2553, Exhibit 790 at p. USFG/BS 0230.

**The only accurate characterization is that the exhibit indicates the existence of "red" flags.  Anthony Phillips testified, *inter alia*, that the flags were only a guideline, that a majority of accounts had them and that such flags merely mean that "consideration" should be given, not that dire circumstances are present.  Testimony of A. Phillips, Transcript, pp. 2553, 2431-2432, 2556.  Moreover, Dun & Bradstreet's software was not relevant to CCI because of CCI's size.  Testimony of Farnsworth, Transcript, p. 1513.**

**Brown Schultz Proposal No. 566**:   The "red" status indicated on the folder exceptions report indicated the most severe financial condition and a great deal of risk of failure.  Trial Transcript at pp. 679-80.

**USF&G incorporates herein by reference its response to Brown Schultz Proposal No. 565.**

**Brown Schultz Proposal No. 567**:   The exceptions identified by the folder exceptions report indicated conditions which Daily indicated would cause an underwriter to investigate whether to there existed a problem before continuing to bond. Trial Transcript at p. 826.

**Farnsworth opined that USF&G's underwriting of the CCI account generally conformed to the applicable standards of care of the surety industry that were in effect during the 1993-1999 time period.  The actual amount of the bonding capacity that USF&G extended to CCI was well within the 5% case parameters.  Exhibit 359, Testimony of Farnsworth, Transcript, pp. 1530-1532.**

**Brown Schultz Proposal No. 568**:   Plaintiff's underwriters were required to underwrite the exceptions indicated by the ECF folder exceptions report.  Trial Transcript at pp. 810, 2553.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 565 and 567.**

**Brown Schultz Proposal No. 569**:   There is no indication that the ratio analysis report was generated earlier than August 20, 1999.  Trial Transcript at pp. 672, 1649.

**This is incorrect.  There is evidence that it was generated on March 3, 1999 or March 4, 1999.**

**Brown Schultz Proposal No. 570**:   The ratio analysis report indicated seven red flag distress signals out of a possible total 10.  Trial Transcript at p. 672-73.

**This is misleading in that it omits James Daily's testimony that this was merely a feed from Dunn & Bradstreet comparing CCI to other contractors.  The flags and ratios are comparative as opposed to indicative of danger.  Testimony of J. Daily, Transcript, pp.**

178

**674-675.  Moreover, many of the flags were of information already known to the**

**underwriters, such as the lack of personal indemnity.**

**Brown Schultz Proposal No. 571**:   Plaintiff's underwriters were required to underwrite and resolve the deviations indicated by the ratio analysis report. Trial Transcript at pp.  810, 2556.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 565 and**

**567.**

**Brown Schultz Proposal No. 572**:   There is no indication that plaintiff performed underwriting to resolve the numerous exceptions reflected on the folder exceptions report. Trial Transcript at pp. 810-11, 2553.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 565 and**

**567.**

**Brown Schultz Proposal No. 573**:   The ratio analysis report reflected numerous conditions which were "red" and substantially deviated from the comparative norm.  Exhibit 790 at p. USFG/BS 0004.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 565 and**

**567.**

**Brown Schultz Proposal No. 574**:   There is no indication that plaintiff performed underwriting to resolve the numerous "red" conditions reflected on the ratio analysis report. Trial Transcript at pp.  810-11, 1648, 2557.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 565 and**

**567.**

**Brown Schultz Proposal No. 575**:   No competent evidence was introduced to establish that the 1998 audited financial statement was the source of the information used by plaintiff in its ECF computer generated computations.

**Evidence proving USF&G's actual reliance – and the justifiability thereof – is**

**discussed in detail in Section II(D) of USF&G Post-Trial Memorandum.**

**Brown Schultz Proposal No. 576**:   There is no indication that a report reflecting calculations produced by ECF based on 1998 year end financial information was reviewed by any underwriter prior to August 20, 1999. Trial Transcript at p. 2552, 2556-57.

**This is an apparent mis-citation.  The pages identified by Brown Schultz discuss Anthony Phillips' authority and identify a folder exceptions report as being a guideline. Anthony Phillips testified that USF&G addressed the issues presented by the ratio analysis report but did not see any indication that it was addressed by anyone earlier than August 20, 1999.**

**Brown Schultz Proposal No. 577**:   Plaintiff did not consider the ECF analysis of CCI financial information for 1998 before August 20, 1999.  Trial Transcript at p. 2555, 2557, 2559, 3130:7-9.

**Anthony Phillips testified that the date is a print date, not necessarily a creation date.  James Daily also believes it is a print date and not an entry date.  USF&G hereby incorporates its response to Brown Schultz Proposal No. 555.**

**Brown Schultz Proposal No. 579**:   All of the bonds issued by plaintiff action (with the exception of one) were not issued in reliance on the analysis of 1998 financial information in the 1998 audited financial statement.

**USF&G's justified reliance is described in detail in Section II(D) of USF&G's Post-Trial Memorandum and proposed factual findings 39-71 and proposed legal rulings 33-45 of USF&G's Proposed Findings.**

**The rules for determining whether a plaintiff justifiably relied on a material misrepresentation are found in §§540 and 541 of the Restatement (Second) of Torts.  When read together, these rules demonstrate that the party to whom a misrepresentation is made is justified in relying upon the truth of that statement unless he *knows* it is false or its falsity would be *obvious* to him upon a cursory inspection.  *See, Silverman v. Bell Savings & Loan Association*, 367 Pa. Super. 464, 533 A.2d 110, 115 (Pa. Super. Ct. 1987).  As a comment to**

§541 explains, a person is found not to have justifiably relied on a representation "only

when the recipient of the misrepresentation is capable of appreciating its falsity at the time

by the use of his senses." Restatement (Second) of Torts §541 cmt. a (1977). A recipient

cannot recover if he *blindly* relies upon a misrepresentation of the *falsity* of which would be

*patent* to him if he had utilized his opportunity to make a *cursory* examination or

investigation." *Id*. (emphasis added).

> **Brown Schultz Proposal No. 580**:   Any bond issued by plaintiff aware of the analysis
> results of the 1998 financial information was not justifiable considering the dangerous financial
> condition reflected by the ECF reports and the absence of any indication that meaningful
> underwriting was done to resolve the serious issues identified by the analysis.

USF&G's justified reliance is described in detail in Section II(D) of USF&G's Post-

Trial Memorandum and proposed factual findings 39-71 and proposed legal rulings 33-45

of USF&G's Proposed Findings.

The rules for determining whether a plaintiff justifiably relied on a material

misrepresentation are found in §§540 and 541 of the Restatement (Second) of Torts. When

read together, these rules demonstrate that the party to whom a misrepresentation is made

is justified in relying upon the truth of that statement unless he *knows* it is false or its falsity

would be *obvious* to him upon a cursory inspection. *See, Silverman v. Bell Savings & Loan

Association*, 367 Pa. Super. 464, 533 A.2d 110, 115 (Pa. Super. Ct. 1987). As a comment to

§541 explains, a person is found not to have justifiably relied on a representation "only

when the recipient of the misrepresentation is capable of appreciating its falsity at the time

by the use of his senses." Restatement (Second) of Torts §541 cmt. a (1977). A recipient

cannot recover if he *blindly* relies upon a misrepresentation of the *falsity* of which would be

*patent* to him if he had utilized his opportunity to make a *cursory* examination or

investigation." *Id*. (emphasis added).

**Brown Schultz Proposal No. 581**:   The evidence did not establish that Daily had the benefit of an analysis of the 1998 year financial information when he approved bonds before August 20, 1999.  Trial Transcript at pp. 764 (the date is incorrectly reflected as 1994 when it should be 1999), 685-92.

**USF&G incorporates herein its response to Brown Schultz Proposal No. 585,** *infra***.**

**Brown Schultz Proposal No. 582**:   No credible evidence was presented that anyone affiliated with plaintiff reviewed and analyzed the 1998 audited financial statement in connection with underwriting bonds for CCI.  Trial Transcript at p. 670-7.

**Anthony Phillips testified that as a standard practice he reviewed the audited financial statements and that Salazar analyzed them.  Testimony of A. Phillips, Transcript, p. 2428.  Anthony Phillips also testified that he received the 1998 Audit Report and was pleased.  Testimony of A. Phillips, Transcript, pp. 2460-2461.**

**Brown Schultz Proposal No. 583**:   The extent of the analysis of the 1998 audited financial statement was to adjust the amount of current assets by deducting the amount for assets which would not be turned into cash during the normal operating cycle, and possibly adjust some current liabilities. Trial Transcript at pp.  2423, 2426-27, 2463, 808; Exhibit 294.

**Exhibit 294 demonstrates that as of March 4, 1999, the 1998 Audit Report was analyzed.**

**Brown Schultz Proposal No. 584**:   The earliest analysis of the 1998 financial information did not occur until August 20, 1999, the date on which the folder exceptions report and the ratio analysis report was printed. Trial Transcript at p. 678, 716-717, 718, 2554-55, 2557, 3130:10-13.

**August 20, 1999 is merely a print date.  Testimony of J. Daily, Transcript, p. 678.  Testimony of Farnsworth, Transcript, p. 1660-1661.  However, Exhibit 294 demonstrates that as of March 4, 1999, the 1998 Audit Report was analyzed.**

**Brown Schultz Proposal No. 585**:   The evidence did not establish that information derived from the 1997 or 1998 audited financial statement was analyzed or used in connection with underwriting bonds for CCI.

**This is contrary to significant testimony.**

**At all times pertinent hereto, Anthony Phillips, a 32 year veteran underwriter, served as USF&G's and then St. Paul's surety bond underwriting manager in charge of the Harrisburg Office.  However, it was the job of Steven Salazar ("Salazar"), the other underwriter in the Harrisburg Office, to perform a more detailed analysis, which would then be reviewed by Anthony Phillips and James Daily.  Testimony of A. Phillips, Transcript, pp. 2422-2430; Testimony of J. Daily, Transcript, p. 186.**

**From 1993 through 1998, Anthony Phillips, then serving as a St. Paul Surety Underwriting Specialist handling several of St. Paul's major accounts, would review each of the CCI Audited Financial Statements, as well as Salazar's analysis of that audited financial statement.  Testimony of A. Phillips, Transcript, p. 2428.  It was his standard practice to read the entire document, including footnotes.  Testimony of A. Phillips, Transcript, p. 2583.**

**It was standard procedure for an audit to be analyzed in the Harrisburg Office and then sent to the Home Office.  Testimony of A. Phillips, Transcript, pp. 2443, 2445.**

**To the best of his knowledge, the Home Office got a copy of each of CCI's Audited Financial Statements from 1993 – 1998.  Testimony of A. Phillips, Transcript, p. 2610. These were often sent by means of a routing slip.  Exhibit 790-B, p. 1266 (sample routing slip).**

**Upon receipt, Salazar promptly analyzed the 1998 Audit Report and his analysis was immediately accessible by the Home Office via a relatively new software program at**

USF&G known as the Electronic Credit File ("ECF").  Testimony of A. Phillips, Transcript, pp. 2460, 2462-2463.

Hard copies of the analysis input into ECF were printed out on March 4, 1999. Exhibit 294.  Testimony of A. Phillips, Transcript, p. 2464.

Not only was it standard procedure for the Harrisburg Office to send the CCI Audited Financial Statements to the Home Office but Anthony Phillips believes that, in particular, the 1998 Audit Report was promptly sent "by routing slip" to the Home Office. Testimony of A. Phillips, Transcript, pp. 2465-2466.  Exhibit 790-B, p. 1266 (sample routing slip).

The 1998 Audit Report was a substantial factor in USF&G's decision to renew CCI's bonding program.  Testimony of A. Phillips, Transcript, p. 2467.

Salazar's overall analysis of CCI, including his analysis of the CCI Audited Financial Statements, was memorialized annually in a document entitled "USF&G Interoffice Correspondence," which detailed the information contained in the CCI Audited Financial Statements as well as other information, such as CCI's banking relations, insurance coverages, and recommendations concerning CCI's bonding program.   Exhibit 194.  Testimony of A. Phillips, Transcript, pp. 2428-2430; Testimony of J. Daily, Transcript, pp. 300-301.

No Interoffice Correspondence was prepared by Salazar for 1998 as the financial information obtained from the 1998 Audit Report was entered that year into the ECF program.  Testimony of A. Phillips, Transcript, p. 2431.

Salazar, Anthony Phillips and Daily reviewed and analyzed the 1998 Audit Report shortly after receipt on March 2, 1999.  Exhibits 790, pp. 1255-1257, 90, 132, 159, 194 and

**229.  Testimony of J. Daily, Transcript, pp. 370, 382, 386-388; Testimony of A. Phillips,**

**Transcript, pp. 2460-2465.**

<u>**Brown Schultz Proposal No. 586**</u>:   There were numerous instances in which the printed report screens from the ECF incorrectly reflected the year end audited financial statements as the source of the financial information in the ECF relating to CCI since mistakes were made on input while "clicking buttons." Trial Transcript at pp. 620-21 (Garbage in; garbage out.) 647-648, 712, 2561, 2562; Exhibit 99, Exhibit 198.

**The trivial errors admitted to are insufficient to be characterized as either**

**numerous or material.  Moreover, although Daily admits that a column heading mistakenly**

**reads "CPA/CA," he also indicated that the heading identified the June 30, 1998 interims.**

**Testimony of J. Daily, Transcript, pp. 620-621.  There is no evidence that a labeling error**

**was of any significance to USF&G's analysis of the information.**

<u>**Brown Schultz Proposal No. 589**</u>:   The $6.3 million of underbillings reflected on the 1998 audited financial statement was sufficiently high and such a dramatic increase from the prior year that it should have raised the concerns of an underwriter and led the underwriter to question whether to continue to bond the account.  Trial Transcript at pp. at 694, 1653.

**Although such developments merit inquiry by the underwriter or analyst as to the**

**reasons for high underbillings, Farnsworth testified that the ECF financial analysis report**

**dated March 4, 1999 has a footnote relative to the underbillings as of the end of February**

**which indicates that the analyst of the financial statement had made an inquiry as to the**

**status of the underbillings.  Testimony of Farnsworth, Transcript, p. 1653.  Additionally, in**

**that almost all of CCI's work was for public authorities, collectibility of legitimate**

**underbillings was not a concern.**

<u>**Brown Schultz Proposal No. 590**</u>:   Plaintiff issued bonds in reliance on a determination by Salazar, independent of defendants and the 1998 audited financial statement, that the underbillings were reduced by $3.3 million as of early 1999. Trial Transcript at pp.  387-88, 708-09, 794-95, 1660.

**This is misleading.  Farnsworth testified that from USF&G's underwriting file, Exhibit 790, p. 0038, that "the financial statement as of December 31, 1998 was analyzed by a USF&G underwriter as of the print date of March 4, 1999."  Testimony of Farnsworth, Transcript, pp. 1660-1661.**

**Moreover, the testimony of Anthony Phillips and Farnsworth indicates that Salazar – as would any careful underwriter – made appropriate inquiry to CCI concerning the underbillings.  Exhibit 790, p. 0038.  Testimony of A. Phillips, Transcript, pp. 1656-1658.**

**Brown Schultz Proposal No. 591**:   The 1998 audited financial statement reflected a substantial decrease in net quick (current assets - current liabilities) or working capital from the prior year.  Trial Transcript at pp. 229-230, 733-34.

**The excerpt cited by Brown Schultz concerns the years 1993-1995 and defines "net quick" and "current ratio."**

**Brown Schultz Proposal No. 592**:   The extent of the decrease in working capital from 1997 to 1998 was material to underwriting, yet plaintiff continued to approve and issue bonds for CCI.  Trial Transcript at p. 734.

**This is misleading in that it insinuates that a change in any one factor should be determinative of underwriting decisions.**

**Brown Schultz Proposal No. 594**:   David Hussey, in spite of his awareness of the ECF computations which reflected the adverse financial condition of CCI, without a recommendation from Daily, approved bonds for a $20 million road project on August 20, 1999, the same date as the ECF analysis of 1998 financial information which generated numerous red flags and numerous exceptions.  Trial Transcript at pp. 721-22.

**The Fulk Rod project was a joint venture with two sureties that was distinct from the other bonds approved by USF&G.  Farnsworth testified that USF&G exercised reasonable care in its decision to support the Fulk Rod project.  Testimony of Farnsworth, Transcript, p. 1529.**

**Brown Schultz Proposal No. 595**:   Dave Dominiani, the bonding agent, was aware of the decision to book the Mahanoy prison claim in the amount of $1,162,000 as revenue in 1998. Trial Transcript at pp. 2152:3-8; 2166:1-6.

Dominiani, a former partner of Bruce Brown, was identified as a witness by Brown Schultz but was never called to testify.  Sheri Phillips testified that "Dave was aware of those claims."  Testimony of S. Phillips, Transcript, p. 2152.  However, she also said she did not remember any specific discussions with him.  *Id*.  In response to a question by the Court, she stated that she "had [no] personal knowledge of USF&G's awareness of the manner in which the claim was booked.  Testimony of S. Phillips, Transcript, p. 2166.

**Brown Schultz Proposal No. 596**:   Dominiani was plaintiff's agent. Exhibit 790 at p. USFG/BS 0747.

Sheri Phillips referred to Dominiani as "our [CCI's] broker."  Testimony of S. Phillips, Transcript, p. 2151.  Although Dominiani was authorized to perform certain duties by USF&G, the mere fact that he serves as a broker of USF&G policies (amongst other companies represented) does not make him USF&G's agent for all purposes.  *Fisher v. Aetna Life Ins. and Annuity Co.*, 39 F.Supp. 2d 508 (1998); *Rich Maid Kitchens v. Penn. Lumberman's Mutual Ins. Co.*, 641 F.Supp. 297, 303 (E.D. Pa. 1986).  Dominiani appeared on Brown Schultz' witness list but was never called to testify.  There was no testimony at trial as to the extent and nature of his roles and responsibilities.

**Brown Schultz Proposal No. 598**:   Plaintiff was not aware of the provisions of the insurance policies issued by PCIC to CCI and merely relied on the verbal information provided by the bond agent about the nature of the insurance. Trial Transcript at p. 478.

This is inaccurate.  A bonding agent is not mentioned.  James Daily testified that he understood that CCI paid premiums to PCIC and that he had no specific knowledge of policy provisions.  Testimony of J. Daily, Transcript, p. 478.

**Brown Schultz Proposal No. 599**:   Plaintiff learned during August 1998 that there was money in PCIC which could be used by CCI as a buffer to offset losses on certain jobs, and to enhance profitability.  Trial Transcript at pp. 640-41, 646; Exhibit 237, Exhibit 790 at p. USFG/BS 0927.

**USF&G incorporates herein its response to Brown Schultz Proposal Nos. 604, 605 and 606, *infra*.**

**Brown Schultz Proposal No. 600**:   The evidence did not establish that Salazar read footnote 8 of the 1998 audited financial statement.  Trial Transcript at p. 2546.

**This is a mischaracterization.  Anthony Phillips testified only that he did not have an exact memory as to his own actions.  Testimony of A. Phillips, Transcript, p. 2546.**

**Brown Schultz Proposal No. 601**:   Phillips did not read and was not familiar with the content of footnote 8 of the 1998 audited financial statement.  Trial Transcript at p. 2518.

**This is blatantly false.  Anthony Phillips merely testified that he has no specific memory of reading this particular footnote nearly five years ago.  Testimony of A. Phillips, Transcript, p. 2517.**

**Anthony Phillips testified that at the time he received the 1998 Audit Report, on or about March 2, 1999, he did not know that the Mahanoy Claim was included in underbillings in the 1998 Audit.  Testimony of Anthony Phillips, Transcript, pp. 2460, 2584.**

**Anthony Phillips reviewed the 1998 Audit Report when received from Dominiani and it was his standard procedure to read all footnotes in audit reports.  Testimony of Anthony Phillips, Transcript, p. 2583.**

**Anthony Phillips had no understanding that the Mahanoy Claim was included in underbillings until subsequent to finding out CCI was in financial trouble in late 1999.  Testimony of Anthony Phillips, Transcript, p. 2583.**

Anthony Phillips also testified that if he had known at the time of his receipt of the 1998 Audit Report that the Mahanoy Claim was included in revenue as an underbilling he would have *halted* bonding until he received a satisfactory answer regarding why CCI was not getting paid for the underbilling and whether there were additional underbillings that were not going to be paid.  Testimony of Anthony Phillips, Transcript, p. 2472.

**Brown Schultz Proposal No. 602**:   The ECF of the 1998 audited financial statement was performed and released without any indication that anyone affiliated with plaintiff had read footnote 8 of the 1998 audited financial statement.  Trial Transcript at p. 2546.

For the reasons stated in response to Brown Schultz Proposal No. 601, this is also false.

**Brown Schultz Proposal No. 603**:   Daily did not bother to determine where in the financial statement the amount of the PCIC guaranteed claim was included, or whether the amount related to the earlier reference that money from PCIC could be used to improve the financial condition of CCI.  Trial Transcript at pp. 699-700, 702.

This is a mischaracterization of James Daily's testimony.  He stated that he did not think about the matter merely because it was a claim guaranteed by PCIC.  In fact, he had no reason to believe the claim was included in underbillings because "it was a contract . . . you're not supposed to mix up receivables."  Testimony of J. Daily, Transcript, p. 704.

**Brown Schultz Proposal No. 604**:   Phillips was aware that there was $2,000,000 available in PCIC for use by CCI to improve the financial condition of CCI sufficient to meet the working capital and net worth guidelines.  Trial Transcript at pp. 2521-23.

This mischaracterizes Anthony Phillips' testimony.  He believed that any money from PCIC was for warranty insurance coverage.

Anthony Phillips' testimony was consistent with the information in the letter from Dominiani to Anthony Phillips dated November 16, 1993 in which Dominiani discusses PCIC's role as a provider of "warranty insurance."  Exhibit 75.

Although Dominiani wrote in a letter to Anthony Phillips dated November 16, 1993 that funds from PCIC might be available "as a buffer to offset losses," in that same letter he reiterates that "PCIC [is] available to fund "warranty coverages" and has previously paid "warranty claims." Exhibit 237. Nothing in Dominiani's letter is inconsistent with the assertion in that letter - and in other letters from Dominiani - in which Dominiani reiterates the role of PCIC as provider of warranty insurance policies. Exhibits 75, 237.

Anthony Phillips testified that Dominiani's letter reminded him of the availability of certain funds from PCIC, "[a]s long as it was for warranty coverages." Exhibit 238. Testimony of Anthony Phillips, Transcript, pp. 2520-2521.

James Daily also testified that he did not have any understanding about the statement in Dominiani's letter that CCI might utilize PCIC to enhance CCI's profitability other than "[PCIC] was a warranty insurance company, and it paid warranty insurance claims." Testimony of J. Daily, Transcript, pp. 645-648.

Anthony Phillips testified that based on his discussions with Dominiani he had no understanding that PCIC funds were available for anything other than to fund Remedial Work Period Insurance Policy warranty claims. Testimony of Anthony Phillips, Transcript, pp. 2584-2585.

**Brown Schultz Proposal No. 605**:   Phillips was aware that any money received by CCI from PCIC to improve the financial condition of CCI would be included in the revenue of CCI. Trial Transcript at p. 2524.

This mischaracterizes Anthony Phillips' testimony. He believed that any money from PCIC was for warranty coverage.

Anthony Phillips' testimony was consistent with the information in the letter from Dominiani to Anthony Phillips dated November 16, 1993 in which Dominiani discusses PCIC's role as a provider of "warranty insurance." Exhibit 75.

Although Dominiani wrote in a letter to Anthony Phillips dated November 16, 1993 that funds from PCIC might be available "as a buffer to offset losses," in that same letter he reiterates that "PCIC [is] available to fund "warranty coverages" and has previously paid "warranty claims." Exhibit 237. Nothing in Dominiani's letter is inconsistent with the assertion in that letter - and in other letters from Dominiani - in which Dominiani reiterates the role of PCIC as provider of warranty insurance policies. Exhibits 75, 237.

Anthony Phillips testified that Dominiani's letter reminded him of the availability of certain funds from PCIC, "[a]s long as it was for warranty coverages." Exhibit 238. Testimony of Anthony Phillips, Transcript, pp. 2520-2521.

James Daily also testified that he did not have any understanding about the statement in Dominiani's letter that CCI might utilize PCIC to enhance CCI's profitability other than "[PCIC] was a warranty insurance company, and it paid warranty insurance claims." Testimony of J. Daily, Transcript, pp. 645-648.

Anthony Phillips testified that based on his discussions with Dominiani he had no understanding that PCIC funds were available for anything other than to fund Remedial Work Period Insurance Policy warranty claims. Testimony of Anthony Phillips, Transcript, pp. 2584-2585.

**Brown Schultz Proposal No. 606**:   Phillips never reviewed the 1998 financial statement to determine whether money from PCIC was included on the financial statement of CCI. Trial Transcript at p. 2524-26.

This mischaracterizes Anthony Phillips' testimony. He believed that any money from PCIC was for warranty coverage.

Anthony Phillips' testimony was consistent with the information in the letter from Dominiani to Anthony Phillips dated November 16, 1993 in which Dominiani discusses PCIC's role as a provider of "warranty insurance." Exhibit 75.

Although Dominiani wrote in a letter to Anthony Phillips dated November 16, 1993 that funds from PCIC might be available "as a buffer to offset losses," in that same letter he reiterates that "PCIC [is] available to fund "warranty coverages" and has previously paid "warranty claims." Exhibit 237. Nothing in Dominiani's letter is inconsistent with the assertion in that letter - and in other letters from Dominiani - in which Dominiani reiterates the role of PCIC as provider of warranty insurance policies. Exhibits 75, 237.

Anthony Phillips testified that Dominiani's letter reminded him of the availability of certain funds from PCIC, "[a]s long as it was for warranty coverages." Exhibit 238. Testimony of Anthony Phillips, Transcript, pp. 2520-2521.

James Daily also testified that he did not have any understanding about the statement in Dominiani's letter that CCI might utilize PCIC to enhance CCI's profitability other than "[PCIC] was a warranty insurance company, and it paid warranty insurance claims." Testimony of J. Daily, Transcript, pp. 645-648.

Anthony Phillips testified that based on his discussions with Dominiani he had no understanding that PCIC funds were available for anything other than to fund Remedial Work Period Insurance Policy warranty claims. Testimony of Anthony Phillips, Transcript, pp. 2584-2585.

**Brown Schultz Proposal No. 607**:    Plaintiff did not inquire whether the loss was avoided at year end of 1998 by using money from PCIC even though it had received two written

communications from the bond agent indicating that money from PCIC was available for use to offset losses.  Trial Transcript at p. 642; Exhibits 238, 240.

**USF&G hereby incorporates its response to Brown Schultz Proposal Nos. 605 and 606.**

**Further, Exhibit 238 merely states that funds are available for warranty claims.**

**Brown Schultz Proposal No. 608**:    Plaintiff never learned the means by which CCI reversed the loss during 1998 and achieved a break even year.  Trial Transcript at p. 659.

**This is a blatant mischaracterization of testimony.  James Daily was asked if he "learn[ed] before the meeting [1/99] . . ."  He responded he did not.  Testimony of J. Daily, Transcript, p. 659.**

**Brown Schultz Proposal No. 609**:    Bonds were approved and issued by plaintiff during 1999 in reliance on the unsubstantiated statement by Ortenzio that CCI would have a one million dollar profit.  Trial Transcript at p. 664.

**This is a mischaracterization of James Daily's testimony.  James Daily does not state that bonds were issued only solely or substantially because of this factor.**

**Brown Schultz Proposal No. 610**:    Daily approved numerous bonds during 1999 above the branch level of authority before plaintiff received the 1998 audited financial statements. Trial Transcript at p. 666.

**This is yet another mischaracterization.  The trial testimony cited concerns only one bond – the FBI Firearms Renovation – that is not even at issue in this case.  Not only was CCI not the lowest bidder but the work on hand, including this project, was within CCI's work program.**

**Brown Schultz Proposal No. 612**:    The request for approval of the bonds for the Pennsylvania Turnpike Administration Building project did not include any information from the audited financial statement. Trial Transcript at pp. 689-92; Exhibit 790 at p. USFG/BS 0763/65.

**This mischaracterizes James Daily's testimony.  James Daily testified that he was certain that he already had an analysis of the 1998 Audit Report or he would not have**

**asked for the interim.  He also stated that he was certain he had the ECF analysis, although he could not remember a specific document.  Testimony of J. Daily, Transcript, pp. 689-691.**

**Brown Schultz Proposal No. 613**:   The bonds for the Turnpike Administration Building project were approved by Daily within hours of the request without any reference to information from an audited financial statement and even though the interim June 30, 1999 financial statement and work in progress reports had been requested, but not received.  Exhibit 790 at p. USFG/BS 0763.

**This mischaracterizes James Daily's testimony.  James Daily testified that he was certain that he already had an analysis of the 1998 Audit Report or he would not have asked for the interim.  He also stated that he was certain he had the ECF analysis, although he could not remember a specific document.  Testimony of J. Daily, Transcript, pp. 689-691.**

**Brown Schultz Proposal No. 614**:   The evidence did not establish that approval of the bonds for the Pennsylvania Turnpike Administration Building project was in reliance on the 1998 audited financial statement. Trial Transcript at pp. 689-92; Exhibit 790 at p. USFG/BS 0763/65.

**This mischaracterizes James Daily's testimony.  James Daily testified that he was certain that he already had an analysis of the 1998 Audit Report or he would not have asked for the interim.  He also stated that he was certain he had the ECF analysis, although he could not remember a specific document.  Testimony of J. Daily, Transcript, pp. 689-691.**

**Brown Schultz Proposal No. 615**:   Plaintiff did not justifiably rely on the CCI audited financial statements when it issued bonds because it failed to do the prerequisite analysis of the underwriting information and the financial statements. Trial Transcript at p. 2234.

**USF&G's justified reliance is described in detail in Section II(D) of USF&G's Post-Trial Memorandum and proposed factual findings 39-71 and proposed legal rulings 33-45 of USF&G's Proposed Findings.**

The rules for determining whether a plaintiff justifiably relied on a material misrepresentation are found in §§540 and 541 of the Restatement (Second) of Torts. When read together, these rules demonstrate that the party to whom a misrepresentation is made is justified in relying upon the truth of that statement unless he *knows* it is false or its falsity would be *obvious* to him upon a cursory inspection. *See, Silverman v. Bell Savings & Loan Association*, 367 Pa. Super. 464, 533 A.2d 110, 115 (Pa. Super. Ct. 1987). As a comment to §541 explains, a person is found not to have justifiably relied on a representation "only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses." Restatement (Second) of Torts §541 cmt. a (1977). A recipient cannot recover if he *blindly* relies upon a misrepresentation of the *falsity* of which would be *patent* to him if he had utilized his opportunity to make a *cursory* examination or investigation." *Id*. (emphasis added).

**Brown Schultz Proposal No. 616**:   The evidence did not establish that plaintiff justifiably relied on the 1997 or 1998 audited financial statement when it approved and issued the bonds for CCI which are reflected on Exhibits 14 and 15.

USF&G's justified reliance is described in detail in Section II(D) of USF&G's Post-Trial Memorandum and proposed factual findings 39-71 and proposed legal rulings 33-45 of USF&G's Proposed Findings.

The rules for determining whether a plaintiff justifiably relied on a material misrepresentation are found in §§540 and 541 of the Restatement (Second) of Torts. When read together, these rules demonstrate that the party to whom a misrepresentation is made is justified in relying upon the truth of that statement unless he *knows* it is false or its falsity would be *obvious* to him upon a cursory inspection. *See, Silverman v. Bell Savings & Loan Association*, 367 Pa. Super. 464, 533 A.2d 110, 115 (Pa. Super. Ct. 1987). As a comment to

§541 explains, a person is found not to have justifiably relied on a representation "only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses." Restatement (Second) of Torts §541 cmt. a (1977). A recipient cannot recover if he *blindly* relies upon a misrepresentation of the *falsity* of which would be *patent* to him if he had utilized his opportunity to make a *cursory* examination or investigation." *Id*. (emphasis added).

**Brown Schultz Proposal No. 617**:   Certain of the amounts sought in connection with the Pennsylvania Turnpike Administration Building Project did not relate to that project. Trial Transcript at pp. 109-114.

This is misleading. Although not all amounts sought are not related to the Pennsylvania Turnpike Administration Building Project, all amounts are related to bonds issued in reliance on the Audited Financial Statements. Testimony of G. Daily, Transcript, p. 113.

**Brown Schultz Proposal No. 618**:   Plaintiff produced no substantiation for certain of its damages.

USF&G's damages are discussed in detail in Section II(I)(1) and (2) of the USF&G Post-Trial Memorandum. Since Brown Schultz fails to identify which of its damages lack substantiation, it is not possible for USF&G to rebut this erroneous assertion with greater specificity. Both extensive back up documentation and summaries are in evidence. Exhibits 14, 15, 16, 20, 21, 22, 23, 24, 26, 27 and 29.

**Brown Schultz Proposal No. 619**:   Plaintiff is considering pursuing a claim against the owner of the Scott Air Force Base project. Any recovery on that claim would reduce USF&G's claimed damages in this case relating to that project. Trial Transcript at p. 2640.

As testified to by Gregory Daily, not only is the claim of uncertain value but, at best, such claim might only offset the liquidated damages assessed against CCI. Further, Matthew Silverstein's testimony has been mischaracterized. He stated that USF&G had

the ability to pursue the claim *if* it was determined to have merit.  **Testimony of Silverstein,**

**Transcript, p. 2640.**

**Brown Schultz Proposal No. 620**:   Plaintiff has not establish that it has pursued all available claims in connection with the bonds that serve as the basis for plaintiff's claimed damages in this case.

**Gregory Daily testified as to USF&G's actions undertaken to maximize its recovery**

**and to fulfill its obligations as a surety.  Testimony of G. Daily, Transcript, pp. 20-21, 46-**

**49, 80-81.  No evidence to contradict that testimony – nor any documentation – was**

**introduced by Brown Schultz.  Moreover, the burden of proving failure to mitigate rests**

**squarely on the breaching party.  *Koppers Co., Inc. v. Aetna Casualty and Surety Co.*, 98**

**F.3d 1440 (3rd Cir. 1996).**

**Brown Schultz Proposal No. 621**:   Plaintiff has the burden of proof of each element of the claim.

**USF&G has the burden of proof as to all elements of negligent misrepresentation.**

**Brown Schultz has the burden of proof relative to its affirmative defenses and any claim**

**that USF&G did not adequately mitigate its damages.**

**Brown Schultz Proposal No. 623**:   Plaintiff did not satisfy its burden of proof to establish the elements of the claim.

**As discussed in greater detail in USF&G Post-Trial Memorandum, USF&G has**

**established all elements of its cause of action by a preponderance of the evidence.**

**Brown Schultz Proposal No. 624**:   A negligent misrepresentation claim cannot be based on the contention that more or additional procedures should have been performed.

**Brown Schultz cites no legal authority in support of its legally erroneous assertion.**

**The elements of a *prima facie* case for negligent misrepresentation are discussed in Section**

**II(A) of USF&G's Post-Trial Memorandum.  Omissions and nondisclosures can constitute**

misrepresentations.  *Sylk v. Bernsten*, 2003 WL 1848565,4 (Pa. Com. Pl.); *Fox Foods, Inc. v.*

*Kmart Corp.*, 870 F.Supp. 599, 610 (M.D. Pa. 1994).

**Brown Schultz Proposal No. 625**:   A negligent misrepresentation claim cannot be based on a deviation from generally accepted auditing standards (GAAS), or generally accepted accounting principles (GAAP).

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 624.**

**Brown Schultz Proposal No. 626**:   Proof that actual results or subsequently developed information differed from estimated amounts for future events does not establish a misrepresentation.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 624.**

**Brown Schultz Proposal No. 627**:   A negligent misrepresentation claim concerning estimated amounts cannot be based on information subsequently developed about which defendants did not know or would not reasonably have known.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 624.**

**Brown Schultz Proposal No. 628**:   Proof that actual results or subsequently developed information differed from estimated amounts for future events does not establish that the representation was negligently made.

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 624.**

**Brown Schultz Proposal No. 629**:   An adverse inference arises in favor of defendants that if plaintiff had provided the records to DeBruyn, then the result of the re-audit would not support plaintiff's claim.

**Brown Schultz cites no legal authority in support of its legally erroneous assertion.**

**Moreover, a re-audit was not done nor was there any testimony that a re-audit was**

**possible, preferred or necessary to reveal the nature and extent of Brown Schultz'**

**misrepresentations.**

**Brown Schultz Proposal No. 630**:   The method used by DeBruyn to develop the restated financial statements is did not meet the legal requirements for competent expert witness evidence.

The methodology utilized by DeBruyn to prove Brown Schultz' breach of professional standards is predicated not only on an accepted and logical methodology employed in the accounting profession, but was based upon credible data that was admitted into evidence. A detailed discussions of DeBruyn's methodology is found in Section II(C)(2)(c) of USF&G's Post-Trial Memorandum. At least twice, the Court has ruled as DeBruyn's competency.

**Brown Schultz Proposal No. 631**:   A negligent misrepresentation claim cannot be based on the non-disclosure of information, or the inadequate disclosure of information.

Brown Schultz cites no legal authority in support of its legally erroneous assertion. The elements of a *prima facie* case for negligent misrepresentation are discussed in Section II(A) of USF&G's Post-Trial Memorandum. Omissions and nondisclosures can constitute misrepresentations. *Sylk v. Bernsten*, 2003 WL 1848565,4 (Pa. Com. Pl.); *Fox Foods, Inc. v. Kmart Corp.*, 870 F.Supp. 599, 610 (M.D. Pa. 1994).

**Brown Schultz Proposal No. 632**:   A misrepresentation claim based on non-disclosure must be based on a contention that the non-disclosure was misleading.

USF&G hereby incorporates its response to Brown Schultz Proposal No. 631.

**Brown Schultz Proposal No. 633**:   There existed a legally valid, binding, and enforceable guarantee by PCIC in the amount of $1,162,460 in favor of CCI.

Brown Schultz cites no legal authority in support of its legally erroneous assertion. The legality and validity of the purported guaranty was never established. USF&G discusses, *inter alia*, Brown Schultz' failure to investigate the validity of the guaranty, the validity of the claim, the legality of payment and PCIC's solvency in Section II(C)(3)(b) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 634**:   The alleged deficient disclosure about the PCIC guaranteed claim was not a misrepresentation.

**Brown Schultz cites no legal authority in support of its legally erroneous assertion. The elements of a *prima facie* case for negligent misrepresentation are discussed in Section II(A) of USF&G's Post-Trial Memorandum. Omissions and nondisclosures can constitute misrepresentations. *Sylk v. Bernsten*, 2003 WL 1848565,4 (Pa. Com. Pl.); *Fox Foods, Inc. v. Kmart Corp.*, 870 F.Supp. 599, 610 (M.D. Pa. 1994).**

**Brown Schultz Proposal No. 635**:    Plaintiff's contention regarding the adequacy of the disclosure concerning the PCIC guaranteed claim is legally insufficient to establish a misrepresentation.

**Brown Schultz cites no legal authority in support of its legally erroneous assertion. The elements of a *prima facie* case for negligent misrepresentation are discussed in Section II(A) of USF&G's Post-Trial Memorandum. Omissions and nondisclosures can constitute misrepresentations. *Sylk v. Bernsten*, 2003 WL 1848565,4 (Pa. Com. Pl.); *Fox Foods, Inc. v. Kmart Corp.*, 870 F.Supp. 599, 610 (M.D. Pa. 1994).**

**Brown Schultz Proposal No. 636**:    The evidence did not establish a misrepresentation by defendants.

**The material misrepresentations made by Brown Schultz are discussed in Section II(C) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 637**:    The evidence did not establish that the alleged misrepresentation by defendants was material to any transaction.

**The material misrepresentations made by Brown Schultz are discussed in Section II(C) of USF&G's Post-Trial Memorandum. USF&G's reliance on the Audited Financial Statements is discussed in Sections II(D) and II(I) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 638**:    None of the alleged misrepresentations were material.

**The significant evidence that Brown Schultz' misrepresentations were material is discussed in Sections II(C)(2)(a) and II(D) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 639**:   Defendants conducted their audits of CCI in accordance with GAAS.

DeBruyn testified that to a reasonable degree of accounting certainty, the work performed by Brown Schultz relative to the 1997 Audit Report and 1998 Audit Report did not conform to the applicable standards of care of a certified public accountant.  Testimony of DeBruyn, Transcript, pp. 1760, 1770.

In particular, Brown Schultz did not exercise due professional care in the testing of contracts in progress, the testing of the percentage of completion method, in the design and execution of the test of accumulated job costs and in obtaining sufficient competent evidential material to evaluate the reasonableness of accounting estimates.  Testimony of DeBruyn, Transcript, p. 1770.

Moreover, Brown Schultz' nonconformance with the applicable standards of care resulted in material misstatements in the 1997 Audit Report and 1998 Audit Report.  Testimony of DeBruyn, Transcript, pp. 1792-1793.  Charts 364-A, 364-B (ID only).

Brenner, the (then) unlicensed professional witness retained by Brown Schultz, stated that he was *unable* to testify that CCI's financials complied with GAAP, an express representation made in the Independent Auditor's Reports in both the 1997 Audit Report and 1998 Audit Report.  Testimony of Brenner, Transcript p. 3084.

**Brown Schultz Proposal No. 640**:   The financial statements were prepared in accordance with GAAP.

DeBruyn testified that to a reasonable degree of accounting certainty, the work performed by Brown Schultz relative to the 1997 Audit Report and 1998 Audit Report did not conform to the applicable standards of care of a certified public accountant.  Testimony of DeBruyn, Transcript, pp. 1760, 1770.

In particular, Brown Schultz did not exercise due professional care in the testing of contracts in progress, the testing of the percentage of completion method, in the design and execution of the test of accumulated job costs and in obtaining sufficient competent evidential material to evaluate the reasonableness of accounting estimates.  Testimony of DeBruyn, Transcript, p. 1770.

Moreover, Brown Schultz' nonconformance with the applicable standards of care resulted in material misstatements in the 1997 Audit Report and 1998 Audit Report. Testimony of DeBruyn, Transcript, pp. 1792-1793.  Charts 364-A, 364-B (ID only).

**Brown Schultz Proposal No. 641**:   Defendants complied with the applicable standard of care.

Evidence that the Audited Financial Statements did not comply with the applicable standard of care is discussed in Sections II(B) and (C) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 642**:   The evidence did not establish that defendants did not comply with the applicable standard of care.

Evidence that the Audited Financial Statements were inaccurate and contained material misstatements is discussed in Section II(C) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 643**:   The evidence did not establish that defendants did not exercise appropriate care when they formed and expressed their opinion that the financial statements fairly represented the financial condition of CCI.

Evidence that the Audited Financial Statements were inaccurate and contained material misstatements is discussed in Section II(C) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 644**:   No evidence was presented to establish that defendants should have realized that the amounts reflected on the audited financial statements for 1997 and 1998 for contract revenue were not reasonable if defendants had performed different or additional audit procedures.

Evidence that the Audited Financial Statements were inaccurate and contained material misstatements is discussed in Section II(C) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 645**:    Defendants exercised appropriate care.

Evidence that the Audited Financial Statements were inaccurate and contained material misstatements is discussed in Section II(C) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 646**:    The evidence did not establish that defendants did not exercise appropriate care.

Evidence that the Audited Financial Statements were inaccurate and contained material misstatements is discussed in Section II(C) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 647**:    The evidence did not establish that defendants did not act with appropriate care when forming and expressing their opinion about the financial statements.

Evidence that the Audited Financial Statements were inaccurate and contained material misstatements is discussed in Section II(C) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 648**:    There was no basis for duty owed by defendants to plaintiff.

The duties owed by Brown Schultz are discussed in Section II(B) of USF&G's Post-Trial Memorandum.

**Brown Schultz Proposal No. 649**:    Defendants' awareness that plaintiff was a potential recipient of, and a user of the financial statement did not impose a duty owed by defendants to plaintiff, or establish that defendants intended for plaintiff to rely on the audit reports.

This proposed finding is contrary to the plain language of Restatement (Second) of Torts, §552(1), adopted in Pennsylvania. *Bortz v. Noone*, 729 A.2d 555 (Pa. 1999); *Rempel v. Nationwide Life Ins. Co.*, 370 A.2d 366 (Pa. 1977).

**Brown Schultz Proposal No. 650**:    The evidence did not establish that defendants intended to induce plaintiff to rely on any representations by defendants.

**Facts establishing that Brown Schultz made its misrepresentations under circumstances under which, at minimum, it ought to have known of their falsity and that it did so with intent to induce another to act are discussed in Section II(E) of USF&G's Post-Trial Memorandum.**

**Brown Schultz Proposal No. 651**:    The evidence did not establish that plaintiff justifiably relied on the alleged misrepresentations by defendants.

**USF&G's justified reliance is described in detail in Section II(D) of USF&G's Post-Trial Memorandum and proposed factual findings 39-71 and proposed legal rulings 33-45 of USF&G's Proposed Findings.**

**The rules for determining whether a plaintiff justifiably relied on a material misrepresentation are found in §§540 and 541 of the Restatement (Second) of Torts.  When read together, these rules demonstrate that the party to whom a misrepresentation is made is justified in relying upon the truth of that statement unless he *knows* it is false or its falsity would be *obvious* to him upon a cursory inspection.  *See, Silverman v. Bell Savings & Loan Association*, 367 Pa. Super. 464, 533 A.2d 110, 115 (Pa. Super. Ct. 1987).  As a comment to §541 explains, a person is found not to have justifiably relied on a representation "only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses."  Restatement (Second) of Torts §541 cmt. a (1977).  A recipient cannot recover if he *blindly* relies upon a misrepresentation of the *falsity* of which would be *patent* to him if he had utilized his opportunity to make a *cursory* examination or investigation."  *Id*.  (emphasis added).**

**Brown Schultz Proposal No. 652**:    Plaintiff did not rely on the representations by defendants.

**USF&G's justified reliance is described in detail in Section II(D) of USF&G's Post-Trial Memorandum and proposed factual findings 39-71 and proposed legal rulings 33-45 of USF&G's Proposed Findings.**

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 651.**

<u>**Brown Schultz Proposal No. 653**</u>:    Reliance is justified only if the information was correctly analyzed and used.

**Brown Schultz cites no legal authority in support of its legally erroneous assertion.**

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 651.**

<u>**Brown Schultz Proposal No. 654**</u>:    Plaintiff did not justifiably rely on the audit reports by defendants for 1997 and 1998.

**USF&G's justified reliance is described in detail in Section II(D) of USF&G's Post-Trial Memorandum and proposed factual findings 39-71 and proposed legal rulings 33-45 of USF&G's Proposed Findings.**

**USF&G hereby incorporates its response to Brown Schultz Proposal No. 651.**

<u>**Brown Schultz Proposal No. 655**</u>:    Plaintiff did not sustain an injury attributable to its justifiable reliance on the alleged misrepresentations included in the contract revenue amounts in the 1997 and 1998 audited financial statements.

**USF&G's damages are discussed in detail in Section II(I)(1) and (2) of the USF&G Post-Trial Memorandum.  Summaries are in evidence.  Exhibits 14, 15, 16, 20, 21, 22, 23, 24, 26, 27 and 29.  Gregory Daily also testified as to the accuracy of the summary of the bonds issued in reliance upon the Audited Financial Statements and that the summaries of losses incurred were fair and accurate.  Testimony of G. Daily, Transcript, pp. 21-22, 35, 47.**

<u>**Brown Schultz Proposal No. 656**</u>:    The evidence did  not establish the elements of a cause of action for negligent misrepresentation.

As discussed in greater detail in the USF&G Post-Trial Memorandum and USF&G Proposed Findings, USF&G has established all elements of its cause of action for negligent misrepresentation.

**Brown Schultz Proposal No. 657**:    Contributory negligence is a complete bar to recovery for negligent misrepresentation.

"Under Pennsylvania law, a party's contributory negligence is not a defense to an action against an accountant for professional negligence unless that contributory negligence impeded the accountant from performing its obligations satisfactorily-- the so-called 'audit interference rule'" *Medical Consultants Network, Inc. v. Cantor & Johnston, P.C.,* 2001 WL 10788, *4 (E.D. Pa.), citing *Jewelcor Jewelers and Distributors, Inc. v. Corr*, 373 Pa. Super. 536, 551-552 (P.A. Super. 1988).  There is no evidence of any such interference by USF&G.

**Brown Schultz Proposal No. 658**:    The information included in the 1998 audited financial statement was sufficient to inform a user of the financial statement about the existence of the PCIC guaranteed claim and the amount of the claim.

Although sufficient to inform a user of the 1998 Audit Report of the mere existence of a guaranteed claim, there is insufficient information for any reader to conclude, *inter alia*, the identity of the project, that the putative claim was placed in revenue and underbillings, and that the putative claim was recognized in the 1998 fiscal year.

In another glaring admission, Brown Schultz' underwriting expert, Rolf Neuschaefer ("Neuschaefer"), admitted that in his reading of the 1998 Audit Report he saw nothing that would have informed him that the Mahanoy Claim had been included in revenue.  He also admitted that he could not have identified that the Mahanoy Claim was included in revenue by reading Footnote 8.  Testimony of Neuschaefer, Transcript, pp. 2387-2388, 2379.  Further, Brenner admitted that Footnote 8 to the 1998 Audit Report does

not show that the Mahanoy Claim is included in Underbillings, Testimony of Brenner,

Transcript, p. 3089, and that even if Footnote 1 in the 1998 Audit Report is read in

conjunction with Footnote 8, the specific fact that the Mahanoy Prison Claim was included

in Underbillings is not disclosed.  Testimony of Brenner, Transcript, p. 3097.  Bowman

admitted that there was nothing in the 1998 Audit Report that would enable the reader to

understand that the claim guaranty referred to in Footnote 8 was related to the Mahanoy

Prison project nor that the "claim" amount was included in CCI's revenue.  Testimony of

Bowman, Transcript, pp. 1402-1403.

    __Brown Schultz Proposal No. 659__:    Plaintiff was negligent when it relied on the alleged
misrepresentation relating to the PCIC guaranteed claim.

    **USF&G hereby incorporates its response to Brown Schultz Proposal No. 657.**

    **Farnsworth testified that USF&G's underwriting of the CCI account generally**

**conform to the applicable standards of care of the surety industry that were in effect**

**during the 1993-1999 time period.  Testimony of Farnsworth, Transcript, p. 1530.  Further,**

**he opined that "the analysis of the financial statements . . . were done within the customs**

**and practice of the industry.  Testimony of Farnsworth, Transcript, p. 1531.**

    __Brown Schultz Proposal No. 660__:    Contributory negligence bars plaintiff's recovery to
the extent plaintiff's alleged injury was due to the alleged misrepresentation concerning the
PCIC guaranteed claim.

    **USF&G hereby incorporates its response to Brown Schultz Proposal No. 657.**

    **Farnsworth testified that USF&G's underwriting of the CCI account generally**

**conform to the applicable standards of care of the surety industry that were in effect**

**during the 1993-1999 time period.  Testimony of Farnsworth, Transcript, p. 1530.  Further,**

**he opined that "the analysis of the financial statements . . . were done within the customs**

**and practice of the industry.  Testimony of Farnsworth, Transcript, p. 1531.**

**Brown Schultz Proposal No. 661**:     Judgment is entered in favor of defendant and against plaintiff.

**Based on the evidence adduced at trial, as well as the objections to Brown Schultz' findings, *supra*, judgment in the amount of $25,927,054.76 should enter in USF&G's favor.**

### III.  Conclusion

Having chosen to defend itself by, initially, doing everything possible to delay trial and then utilizing innuendo and confusion rather than introducing relevant and probative evidence, Brown Schultz' proposed findings should now be disregarded because such proposed findings neither reflect the evidence adduced at trial nor accurately reflect the content and effect of the pertinent documents that have been admitted into evidence.

Respectfully submitted,
UNITED STATES FIDELITY AND
GUARANTY COMPANY,
By its counsel,


s/ Bruce D. Levin
Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:     (617) 790-3000
Facsimile:     (617) 790-3300
              and
Peter Speaker, Esquire
Thomas, Thomas & Hafer
305 North Front Street
Harrisburg, Pennsylvania  17101
Telephone:     (717) 237-7100
Facsimile:     (717) 237-7105

Dated:   April 7, 2004
#287275 v1/36432/87

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Harrisburg Division)

_____
                                )
UNITED STATES FIDELITY AND      )
GUARANTY COMPANY,               )
                                )
            Plaintiff           )
                                )       CIVIL ACTION NO. 1: 01-CV-00813
v.                              )
                                )       JUDGE CONNER
BRUCE J. BROWN and BROWN        )
SCHULTZ SHERIDAN & FRITZ,       )
                                )
            Defendants.         )
_____)

## CERTIFICATE OF SERVICE

I, Bruce D. Levin, counsel for Plaintiff United States Fidelity & Guaranty Company, hereby certify that a copy of the **Response and Objections of United States Fidelity and Guaranty Company to Defendants' Proposed Findings of Fact and Conclusions of Law** was served upon the following by first class mail, postage pre-paid on April 7, 2004:

Kathleen Carson, Esquire
Swartz Campbell LLC
1601 Market Street, 34th Floor
Philadelphia, PA  19102

                            s/ Bruce D. Levin
                            Bruce D. Levin

Dated:   April 7, 2004
#287275 v1/36432/87