## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| United States Fidelity and | : | |
| Guaranty Company | : | |
| | : | Hon. Christopher Conner |
| v. | : | |
| | : | |
| Bruce J. Brown and Brown, Schultz | : | |
| Sheridan & Fritz | : | No: 01-CIV-813 |

### DEFENDANTS' MEMORANDUM IN RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND POST-TRIAL MEMORANDUM

Defendants, Bruce J. Brown and Brown, Schultz, Sheridan & Fritz submit this memorandum in response to plaintiff's post trial memorandum and proposed findings of fact and conclusions of law.[1] Defendants herein address those matters raised by plaintiff which are not already covered in defendants' proposed findings of fact and conclusions of law and post-trial memorandum.

## I.    The Burden of Production and Persuasion

Plaintiff contends in many instances that defendants did not present evidence. The defense did not have to present evidence since the burden of production and of persuasion rested with plaintiff on all issues except for contributory negligence. A substantial amount of evidence supporting the defense contentions was introduced during the defense cross-examination of witnesses presented by plaintiff. Plaintiff

---

[1]Defendants herein address those matters raised by plaintiff which are not already covered in defendants' proposed findings of fact and conclusions of law and post-trial memorandum.

pretends as if the only evidence is the testimony by its witnesses during direct examination. The admission of evidence through cross-examination is substantive proof.

Additionally, plaintiff's evidence presented through James Daily, Anthony Phillips, and Steve DeBruyn was proven wrong in all material respects through their own testimony during cross-examination. The testimony by those witnesses did not promote the cause of plaintiff and only served to support defendants' contentions. Plaintiff did not attempt to reconcile the gross disparity between the testimony provided by many of its witnesses during cross-examination and direct examination.

## II. Plaintiff's Contentions Regarding CCI's Estimated Costs to Complete Contracts In Progress

Plaintiff's claim is based on the contention that defendants misrepresented information when they expressed an opinion in their audit reports that the 1997 and 1998 financial statements presented fairly the financial condition of CCI since, *inter alia*, the audited financial statements allegedly reflected incorrect amounts of revenue attributable to uncompleted contracts.

While plaintiff contends that Brown Schultz also misrepresented that it conducted its audits in accordance with GAAS, that statement standing alone cannot be a basis for plaintiff's claim. Even if true, if not coupled with inaccurate or false information in the financial statements upon which plaintiff relied, that misrepresentation alone cannot be said to be the cause of any loss to plaintiff.

**A.    There Was No Misrepresentation By Brown Schultz Regarding CCI's Estimated Costs to Complete Contracts in Progress in the Audited Financial Statements**

**1.    DeBruyn's Reliance on Exhibit 337**

Plaintiff's expert, Steve DeBruyn used the data included on exhibit 337 to evaluate the accuracy of the amounts included on the audited financial statements. Plaintiff claims that no testimony at trial called into question the credibility of Exhibit 337 or the financial data contained therein.  This is simply not true.  Anthony Phillips, one of plaintiff's underwriters, testified that financial information produced by CCI after September 1999 was not reliable, dependable or accurate.  Trial Transcript at p. 2563.  He further testified that it was not appropriate for USF&G to rely on financial information produced by CCI as of the end of 1999.  *Id.* DeBruyn himself believed that CCI did not historically produce reliable financial data.  Trial Transcript at pp. 1911, 1918, 1970.

Moreover, Plaintiff's contention that data from CCI, including the data on exhibit 337, was credible contradicts its claim.  The claim is founded on the contention that information included in the audited financial statements was false. The data included in the financial statements was reported by CCI.  Defendants only audited the data included on the financial statements.  If data from CCI was credible, presumably meaning it was accurate, then the data included on the audited financial statements was accurate and not false.

Plaintiff's contentions concerning the ability of CCI to accurately report job

3

cost data and reasonably estimate its costs to complete are completely inconsistent.
On the one hand, plaintiff criticized defendants for inadequate audit procedures
performed on the job cost data of CCI to assure the accuracy of job cost data while, on
the other hand, plaintiff contends that the unaudited data included on exhibit 337
which plaintiff contends was job cost data from CCI prepared at a time when CCI's
financial reporting was known by plaintiff to be inaccurate was accurate.  The two
contentions cannot be reconciled and reflect the impropriety of plaintiff's claim which
depends on data from CCI as a source of proof of the inaccuracy of the data included
by CCI on CCI's audited financial statements.

  **2.  DeBruyn's Methodology**

  **a.  Use of the Look Back Method**

  Plaintiff claims that its expert's use of the look back method was
"conservative, logical and consistent."  The evidence at trial, however,  established
that the look back method was none of these things.  First, the look back method is
not GAAP and the fact that it is codified in the Internal Revenue Code is irrelevant
since the Code is not intended to be and is not in compliance with GAAP.  Trial
Transcript at p. 2804, 2847.

  This action also did not involve a situation, in which the financial statements
contained known errors.  No one testified that the look back method is used to
restate financial statements.  Rather, the testimony was that financial statements
can be restated in order to correct an error.  An error, however, does not get

corrected using data acquired after the audit date. More importantly, changes in estimates are not accounting errors and do not form the basis for restated financials. Trial Transcript at p. 2824, 2826. A change in estimate is not a an error.  When management has information to indicate a significant change from its original estimate,  the change is reflected on the financial statement on a going forward basis. Trial Transcript at p. 2826.

Since DeBruyn is attempting to prove that the auditing by Brown Schultz did not result in GAAP financial statements he must show a nexus between his alleged claim of faulty auditing and the allegedly misstated financial statements numbers and use the same methodology CCI and Brown Schultz used in order to measure the alleged misstatements, namely GAAP.  Plaintiff established no such nexus.  DeBruyn conceded that he could not state what the additional audit procedures he contended should have been performed would have revealed concerning CCI's estimated costs to complete.  Trial Transcript at pp. 1913, 1931-32.  DeBruyn's methodology does not conform to GAAP.  Trial Transcript at p. 2847.  His methodology was not, therefore, logical.

There is no basis to determine whether DeBruyn's methodology was conservative since he tried to measure or quantify alleged financial misstatements prepared under GAAP with a non-GAAP methodology.  Because of this, there is simply no basis to measure whether his restatements are conservative or not.

There were numerous examples presented during the trial where DeBruyn did

not apply his non-GAAP methodology consistently.  These examples were presented
by defendants' expert and/or acknowledged by DeBruyn. *See* Defendants' Proposed
Findings of Fact ¶¶ 165-191.

 Plaintiff's attempt to justify the work and opinions by DeBruyn is unavailing.
DeBruyn's testimony was not predicated on an accepted and logical method employed
in the accounting profession for evaluating the propriety of an audit.  While the look
back method or some variant is used by the accounting profession, it is not used for
the purpose for which DeBruyn employed it.  Trial Transcript at p. 1944-1945.
DeBruyn's own testimony established that his method was not accepted as a means
by which to assess the propriety of the professional conduct of an auditor, and the
accuracy of estimates.  *Id.* As DeBruyn agreed, the proper means was to perform a re-
audit.  Trial Transcript at p. 1944.  A re-audit was not performed.  Trial Transcript at
pp. 1915.

 The method employed by DeBruyn used data of unknown origin and of
unknown reliability, and employed a method which could not have been used by
defendants in performing their audits, or by CCI during its preparation of its
financial statements.  *See* Trial Transcript at pp. 1911, 1917-19, 1921, 1926-1927,
1928, 2563.  Therefore, the information derived from DeBruyn's procedures and
DeBruyn's opinions derived from the procedures is not appropriate proof that either
the information included on the audited financial statements were wrong, or that
defendants knew or had reason to know the information included on the audited

financial statements was wrong.

DeBruyn's excuse for using the improper method and data of unknown reliability as the only means available is not sufficient to satisfy plaintiff's burden of proof. Trial Transcript at p. 1944. The evidence did not establish that the records DeBruyn needed did not exist. Rather, the proof was only that DeBruyn asked for, but was not provided the records he needed to perform a re-audit. Trial Transcript at p. 2624. Additionally, the evidence established that the records were either available to plaintiff and not preserved, or that plaintiff had or had access to the records. Trial Transcript at p. 2621-2622, 2624-2627, 2629, 2634, 2636.

Plaintiff has provided no legal authority for its contention that it can use something other than the essential evidence as a substitute. In any event, plaintiff cannot satisfy its burden to prove the liability of defendants if evidence plaintiff needs is not available.

### b.    DeBruyn's Opinion That the Financial Statements Were Not In Conformity With GAAP

Plaintiff inappropriately makes use of Brenner's testimony concerning his ability to express an opinion concerning the financial statements. Brenner's testified only that he could not identify any deviations from GAAP since he did not perform the audit. Trial Transcript at p. 2804. DeBruyn did not perform an audit of CCI either. Trial Transcript at p. 1915. Therefore, DeBruyn could not credibly express an opinion that the financial statements were not in conformity with GAAP. Without regard for whether Brenner could not determine the absence of compliance with

7

GAAP, DeBruyn could not properly express an opinion that the financial statements were not in conformity with GAAP.

### 3.    The Disclosures In Footnote 1 Concerning Estimates

The only representation made by defendants was its audit opinion of the financial statements of CCI Construction Company for the years 1997 and 1998. That opinion expressed only that the financial statements of CCI presented fairly the financial condition of CCI as of the closing date of the statement.

The financial statements clearly disclosed the method by which revenue was recognized on uncompleted contracts and, cautioned that because that method involved the use of estimates, it was at least reasonably possible that the estimates would change within the near term. The statements further cautioned the reader that the actual results could differ from the estimates. *See, e.g.*, Exhibit 36 at fn. 1. Considering these disclosures, there was no false statement in the financial statements concerning the amount of contract revenue derived from uncompleted contracts and management's estimated costs to complete those contracts.

Moreover, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law. *In re Trump,* 7 F.3d 357, 371 (3d Cir. 1993). Here, the language of the footnote is sufficient to render alleged misrepresentations immaterial. The footnote clearly discloses that revenue recognition with regard to uncompleted contracts involved the use of estimates and, therefore, it was *at least* reasonably possible that the estimates would change within

the near term and that the actual results could differ from the estimates. Considering the cautionary language, any alleged misrepresentation in the financial statements concerning the amount of contract revenue derived from uncompleted contracts and management's estimated costs to complete those contracts is immaterial.

### B.    Plaintiff Did Not Establish A Misrepresentation Made Under Circumstances In Which the Representor Should Have Known the Information Was False

A cause of action for negligent misrepresentation requires proof of the following elements:  1) a misrepresentation of material fact; 2) made under circumstances in which the person who represented the information should have known the statement was false; (3) with an intent to induce another to act on the misrepresentation; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 561 (Pa. 1999). They are separate elements and each must be proven in order for plaintiff to succeed on its claim.

In Section II.E. of its post-trial memorandum, plaintiff attempts to disguise its failure to establish that any representation made by Brown Schultz was made under circumstances in which it knew or should have the statement was false by combining it with the third element of the cause of action–that the representation be made with an intent to induce another to act on it.

The question of whether any representation by Brown Schultz was made with

an intent to induce plaintiff to act on it is addressed in defendants' post trial memorandum and proposed findings of fact and conclusion of law and will not be reiterated here other than to state that defendants' knowledge that USF&G was a user of the financial statement does not equate to proof that USF&G was a third party who Brown Schultz actually intended to rely on the information with regard to specific transactions Brown Schultz actually knew would be influenced by the supplied information. *See North American Specialty Insurance Company v. Lapalme*, 258 F.3d 35 (1st Cir. 2001).

### 1.    The Alleged Brown Schultz Failures

Plaintiff's contentions about the alleged deficiencies with the audits by defendants ignore the evidence presented during plaintiff's case-in-chief. Plaintiff claims that: (1) defendants' audit planning in 1997 and 1998 was deficient essentially because the audit plan did no change significantly since its development in 1993; (2) that Brown Schultz test of 25 job costs was insufficient; (3) that Brown Schultz should have tested and vouched significant job costs; (4) that Brown Schultz did not adequately test subcontractor costs; (5) that Brown Schultz should have performed site visits; and (6) that with regard to contracts in progress Brown Schultz overly relied on CCI's management representations as to project costs and profitability.

During plaintiff's case-in-chief, the witnesses involved in the audits testified that their audit work included a review of the project files including detailed substantiation to support the job costs, and estimated costs to complete contracts.

The audit of estimated costs to complete was reflected by the audit program, workpaper documentation, and established by the testimony of Brown and Bowman. Auditors are not engineers, architects, or estimators and have a limited ability to be critical of estimates of job costs. For that reason, the accounting literature allows the auditor to credit the reliability of the estimates by management in the absence of contrary information. DeBruyn's opinion and plaintiff's contention about the breach by defendants and the "conversational audit" was based on the erroneous assumption that defendants did not perform the work they testified was performed, and is reflected in the audit documents. Trial Transcript at p. 1898. Discussions by the auditors with various management representatives was an appropriate audit procedure, but was not the only source of information to substantiate job costs and estimated costs to complete. Trial Transcript at p. 1888. Defendants' audit work concerning job costs and estimated costs to complete was corroborated by CCI's chief financial officer, Sheri Phillips. *See* Trial Transcript at pp. 2132-2133. Phillips was a trained observer considering she was knowledgeable about auditing, and was familiar with the materials accessed by defendants during the audits. Trial Transcript at pp. 2087-2089. No evidence was presented which undermined, discredited, or disproved the testimony by Brown, Bowman, and Phillips about the audit work performed by defendants.

Plaintiff's criticism about the audit program used by defendants is unfounded. The audit program was developed during a point when the gross revenue of CCI and

the audit risk was appreciably the same as existed during 1997 and 1998. Trial Transcript at p. 934, 937, 1875-76, 3037, 3040.The evidence established the audit program used by defendants for the CCI audits was appropriate, included all required procedures, and did not require any alteration.

No evidence was presented to support plaintiff's contention that the audit was poorly staffed, lacked adequate supervision, or was performed by inexperienced staff. None of the criticisms by plaintiff about the audit reflect issues attributable to poor staffing, inadequate supervision, or inexperienced staff. Rather, the evidence revealed that defendants had adequately conducted the audits of CCI for many years prior to the audits in question, the audit staff had substantial years of audit experience, and the same audit staff had performed the audits for many years and developed considerable experience with CCI operations and management.

Plaintiff's own post trial memorandum makes it clear that the job cost test was in fact a test of internal controls. As plaintiff points out, it was a test to determine whether job costs were being properly recorded in CCI's books and records.

Plaintiff gives no indication of how vouching of significant job costs would have impacted the reasonableness of CCI's estimated costs to complete. Trial Transcript at p. 1781.

Similarly, there was no evidence that the testing of subcontractor costs would have provided any information regarding potential subcontractor defaults. Trial Transcript at p. 1931. GAAS does not require confirmations to subcontractors. Trial

Transcript at p. 1881, 1889.  Mr. DeBruyn does not know what Brown Schultz might have learned from subcontractor confirmations.  Trial Transcript at p. 1890. [2]

The evidence established without contradiction that job site visits were not indicated under the circumstances.  *See* Defendants' Proposed Findings of Fact ¶¶ 372-378.  No evidence was presented to establish that job site visits would have altered the outcome of the audits.

A difference between the estimated profit margin and the average profit margin is meaningless. Trial Transcript at p. 2956-2957. The validity of the estimated costs to complete and the estimated profit is not based on the average profit margin experienced by CCI on contracts.  As plaintiff contends, every construction contract is different.  The average profit was the product of contracts with greater and less than the average profit margin.  Therefore, a profit margin in excess of the historical average profit margin is not evidence of the inaccuracy of the estimated profit margin.  Additionally, under plaintiff's theory of auditing, the auditor should refuse to express an opinion about the financial statements if the amounts included contracts for which the estimated profit margin was less than the historical average profit margin.  Therefore, even though the loss recognition rule requires the contractor to report the full extent of the estimated loss in the year in which the loss

---

[2]Plaintiff citation to Exhibits 326 and 337 as support for the proposition that Brown Schultz's workpapers also show that many of CCI's projects had significant profit fades and construction related problems is baffling.  Exhibits 326 and 337 purport to be in-house financial data prepared by CCI as of October and December 31, 1999, long after Brown Schultz performed its last audit.  They are not a part of Brown Schultz's papers for either the 1997 or the 1998 audits.

is first known, under plaintiff's theory of auditing, the auditor could not express an opinion about the financial statements unless the amounts for contract revenue reflected at least as much profit as the historical average. If contract revenue on CCI's financial statements had reflected amounts based on the historical profit margin, then the amounts would have reflected only the historical average profit and would not have fairly presented the financial condition of the company.

Plaintiff did not establish that defendants violated GAAS or GAAP in any respect.

> **2.    Plaintiff's Failure to Establish The Existence of Information Available to the Auditors At the Time of the Audit From Which Brown Schultz Should Have Known that Financial Statement Information Was False**

Plaintiff did not establish that Brown Schultz knew or should have known at the time of its audits that any information in the 1997 and 1998 audited financial statements was false. An auditor's report is based upon the information available to the auditor as of the audit date and through the end of field work. Trial Transcript at p. 1902, 2976. In evaluating the professional competence of auditors in connection with a particular audit, the goal is to determine the information and data available to the company at year end and the auditors was used properly to estimate the jobs. Trial Transcript at p. 2849. There was no evidence presented about the specific information available to Brown Schultz through the end of their field work on the audits. Trial Transcript at p. 1902.

The only way to determine if the audit results would have been different if

Brown Schultz had applied the procedures plaintiff's expert contended were necessary, was to perform those procedures, which plaintiff's expert did not do. Trial Transcript at pp. 1915, 1944. In order to do this, Plaintiff's expert had to look at the detailed CCI records including project files, job costs files, other ledgers and invoices. Trial Transcript at pp. 1916, 1937, 2855. Plaintiff had access to this information at the time it took over CCI's projects in 2000. Plaintiff obtained certain of this information, the project files, in connections with its takeover of the CCI projects upon CCI's default. Trial Transcript at pp. 2621-2622, 2624-2627. Plaintiff's expert, however, was not given access to these records. Trial Transcript at p. 1916.

Plaintiff had to establish the date and the event which caused the increased costs to complete the various jobs in progress in order to establish it was something that could have been detected by Brown Schultz during it audits. Trial Transcript at p. 1932-1933, 1937. There was no evidence presented at trial as to the date or the event causing any increases in estimated costs to complete. Trial Transcript at p. 1932-33. There was no evidence that if Brown Schultz had done more or different audit procedures it would have led to an audit that would have revealed estimated costs to complete that were other than as reflected in the financial statements. Trial Transcript at pp. 1931-1932, 1913.

As plaintiff's expert testified, absent performing audit procedures in connection with the estimated costs to complete, he was making the significant assumption that there was information which would reveal that management's costs

to complete were unreasonable. *See* Trial Transcript at p. 1929. Plaintiff's expert did nothing to confirm the validity of that assumption. Trial Transcript at pp. 1929-30.

Plaintiff depends on inferences which do not arise from the proof. In place of actual evidence that the estimated costs for completion were inaccurate as of the audit date and that information existed form which defendants should have known when they performed the audits that the estimated costs were wrong, plaintiff relies on the alleged disparity between the estimated costs to complete and the alleged actual costs to complete as proof that the estimates were wrong when made and the erroneous estimates could have been detected by defendants. The inference on which plaintiff depends does not arise from the evidence even if the actual costs to complete were in fact greater than the estimated costs to complete. Without proof about the reason for the difference between the estimated costs and the actual costs, the timing of the event which led to the increased costs, and whether the information about increased costs was available to the auditors, there is insufficient proof from which the inference can arise that the estimates were wrong when made, and that defendants should have known the estimates were wrong. Plaintiff's case is grounded entirely on the benefit of information acquired after the audits, employs hindsight, and uses inferences which are not supported by the evidence.

### C.    The Materiality of the Alleged Misrepresentations

A misrepresentation will be deemed material where "it is of such character that had it not been made, ... the transaction would not have been consummated."

16

*GMH Associates v. The Prudential Realty* Group, 2000 Pa. Super. 59, 752 A.2d 889, 902 (2000), *citing*, *Sevin v. Kelshaw*, 417 Pa. Super. 1, 611 A.2d 1232, 1237 (1992).

Whether the audits were performed in accordance with GAAS and the financial statements were prepared in accordance with GAAP was not established to be material to plaintiff's underwriting decisions. The evidence did not establish that plaintiff would have discontinued bonding if it had been aware the audits were not in conformity with GAAS or the financial statements were not been prepared in accordance with GAAP in those respects contended by plaintiff. Again, plaintiff did not reliably establish the circumstances under which it would have discontinued bonding CCI if it had been aware of the audit and financial statement deficiencies contended by plaintiff.

The testimony of David Hussey was necessary to establish that the alleged misrepresentations were such that USF&G would have ceased bonding CCI if it had known of CCI's "true" financial condition. Mr. Hussey was the only person at USF&G with the authority to approve or suspend CCI's bonding program. Trial Transcript at pp. 516, 726. Plaintiff had the burden of proving materiality. Without Mr. Hussey's testimony plaintiff cannot establish that it would have ceased bonding CCI had it been informed of the financial condition of CCI as restated by DeBruyn. The fact that defendant did not call Hussey to testify is irrelevant. The fact that plaintiff did not call its former employee, who was the ultimate authority regarding the CCI bond program, on an issue upon which it bore the burden of proof, however,

17

is telling.[3]

Plaintiff does not attempt to address the testimony of Daily that plaintiff would have continued to bond CCI even if the 1997 audited financial statement had reflected the amounts as restated by DeBruyn.   See Trial Transcript at pp. 436-437, 632-633, 798-799.

Plaintiff also does not address Tony Phillips' testimony on cross examination that he could not say he would have discontinued CCI's bonding program if the 1997 audited financial statement had reflected the amounts as restated by DeBruyn.  See Trial Transcript at p. 2577.

The evidence concerning the materiality of the alleged misrepresentations in connection with the 1998 audited financial statement was based on the full amount of the adjustments made by DeBruyn made to the 1998 financial statement.  Even assuming the validity of the approach used to develop those adjustments, there were substantial, material errors and misstatements by DeBruyn in his restatement of the 1998 financial statement.  When the errors were corrected and the amount of the PCIC guaranteed claim included, DeBruyn's restated 1998 financial statement understated revenue by $2,372,843. Trial Transcript at p. 2936, 2939-2940, Exhibit 816. When corrected, the restated amounts for the 1998 financial statement based on the "look back" method reflected, in some respects, a healthier financial condition

---

[3]Based on USF&G's stated ability to produce Mr. Hussey at trial, there was no reason for USF&G not to call him as a witness. *See* Plaintiff's Post Trial Memorandum at p. 43, n. 33.

than earlier years.  Although the corrected, restated 1998 financial statement would show a net income loss, the net worth and working capital would remain above a deficit sufficient that CCI would not have halted bonding.  There was no evidence to establish that the difference between the corrected, restated 1998 financial statement and the 1998 audited financial statement was material to underwriting.  No one testified that the corrected restated 1998 financial statement was different to an extent that it was material to underwriting.

### D.    Plaintiff Did Not Establish Justifiable Reliance On the 1997 and 1998 Audited Financial Statements

Under Pennsylvania law, justifiable reliance comprises two elements: 1) the plaintiff must in fact rely on the information and 2) the reliance must be reasonable. *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285 A.2d 451 (1971).  Reliance is justifiable where plaintiff in the exercise of common prudence or diligence could not have ascertained the truth.  *Wittekamp v. Gulf & W., Inc.*, 991 F.2d 1137 (3d Cir. 1993); *Fisher v. Aetna Life Ins. & Annuity Co.*, 39 F. Supp. 2d 508, 511 (M.D. Pa. 1998); *Piper v. Am. National Life Insurance Co.*, 228 F. Supp. 2d 553 (M.D. Pa. 2002). Whether reliance on an alleged fraudulent misrepresentation is justified, is dependent in part on subjective factors such as the respective intelligence and experience. *Id.* ; *Mohney v. Forney*, 2004 U.S. App. LEXIS 5468 (3d Cir. March 24, 2004).  In deciding whether the recipient justifiably relied on information, a court may consider the degree of sophistication of the parties.  *Fort Washington Resources, Inc. v. Tannen*, 854 F. Supp. 455 (E.D. Pa. 1994); *Greenberg v. Tomlin*, 816 F. Supp.

1039, 1056 (E.D. Pa. 1993); *Mellon Bank Corp. v. First Union Real Estate Equity &*
*Mortg.*, 750 F. Supp. 711 (W.D. Pa. 1990).

Plaintiff did not establish that Mr. Eskin's testimony concerning USF&G's
lack of reliance on the audited financial was not credible. The fact that Mr. Salazar
and Mr. Phillips did not recall their conversation does not establish that it did not
take place. Trial Transcript at pp. 3164, 3172. Plaintiff did not call Mr. Hussey to
testify with regard to his statements concerning USF&G's lack of reliance to Mr.
Eskin. Gregory Daily's testimony was merely that Mr. Eskin was not present at one
of the claim meetings relating to CCI. Trial Transcript at p. 3160-3161.

Use of the financial statements does not establish reliance on the financial
statements. The evidence established only that it was the practice to include
information from the audited financial statement in the annual review report. In
addition to the absence of an annual review report for 1999 based on the 1998
audited financial statement, there was no evidence that plaintiff actually based its
bonding decisions on the audited financial statements. Plaintiff's lengthy discussion
in its post trial memorandum did not reveal the manner in which plaintiff made any
underwriting decision concerning the bonds which are the subject of this action. The
evidence established that Daily and Phillips could not have based any underwriting
action on their analysis of the 1997 audited financial statement, and there was no
evidence that Hussey approved the continuation of the bond program in reliance on
the 1997 audited financial statement. Similarly, the evidence established that Daily

and Phillips could not have based any underwriting decision on their review or analysis of the 1998 audited financial statement[4], there was no evidence that Salazar made any underwriting decision based on the 1998 audited financial statement, and the evidence established that continuation of the bonding program for 1999 was not in reliance on the 1998 financial statement.  Instead, the evidence established that Salazar, Phillips and Hussey did not rely on the audited financial statements for their underwriting decisions.  Evidence about the manner in which the audited financial statements were used is imperative to establish that the allegedly false information was material information relied on by plaintiff in its underwriting decisions.

The bond program was continued during 1998 after USF&G learned CCI had sustained an operating loss in excess of $1.6 million halfway through the year.  Trial Transcript at pp.  1623.  James Daily testified that he was not aware of the $1.6 million loss until the end of 1998 because plaintiff's branch office did not forward the information to him.  Trial Transcript at pp. 626.  Daily would have suspended bonding and would not have authorized the VCU bond if he had been aware of the

---

[4]Anthony Phillips' testimony offered to save plaintiff's case concerning the 1999 bonds by indicating that sometimes materials were transmitted to home office by routing slip and that no annual review report was performed for 1999 based on the 1998 audited financial statement is not credible or persuasive.  Phillips explained to Richard Farnsworth, plaintiff's underwriting expert witness, that the reason no annual review report was prepared was because the branch office underwriters were too busy and the preparation of the report was overlooked.  Additionally, James Daily had no explanation for the reason no annual review report was prepared.  Certainly the home office underwriter would know whether the annual review report was excused for 1999.  Plaintiff cannot explain the reason the underwriting file does not include either the 1998 audited financial statement or a transmittal letter bearing the home office received stamp.

loss. Trial Transcript at pp. 626-627. Daily was, obviously, not justified if he issued the VCU bond in reliance on the 1997 audited financial statement without review of the more current interim financial information. Plaintiff, therefore, was not justified if it relied on the 1997 audited financial statement when it issued any bonds once plaintiff became aware of the $1.6 million loss halfway through 1998. Bonds issued after August 17, 1998 when plaintiff learned about the $1.6 million loss was not in reliance on the 1997 audited financial statement. Therefore, any reliance on the 1997 audited financial statement once more recent financial information became available was not justified.

The CCI bond program was renewed by plaintiff for 1999 before receipt of and without reliance on the 1998 audited financial statement. Trial Transcript at pp. 554-556. No evidence was presented to establish that plaintiff re-evaluated its decision to renew the CCI bond program during 1999 after receipt of the 1998 audited financial statements. No evidence was presented to establish that the CCI bond program for 1999 was continued in reliance on the 1998 audited financial statement. Daily does not recall if he ever received the 1998 audited financial statement. Trial Transcript at p. 671. There was no testimony from Daily's superior, David Hussey, that he read or analyzed the audited financial statements.

No evidence was presented to establish that plaintiff relied on the 1997 and/or 1998 audited financial statements in its decision to issue any specific bond. No information from the audited financial statements was included in any request for

approval of any individual bond. The evidence did not establish that plaintiff actually and justifiably relied on the information contained in the 1997 and 1998 audited financial statements. Plaintiff did not sustain an injury attributable to its justifiable reliance on the alleged misrepresentations included in the contract revenue amounts in the 1997 and 1998 audited financial statements.

## III.    Plaintiff's Contentions Concerning PCIC

### A.    Recognition of the PCIC Guaranteed Claim as Revenue Was In Accordance With GAAP

DeBruyn's opinion with regard to the PCIC claim was that it could not have been recognized as revenue under SOP 81-1. However, as Mr. Brenner, the Edit Chairman of the AICPA Committee that promulgated the construction accounting rules, testified the PCIC guaranty agreement, which provided total assurance of the revenue collection, could be recognized as revenue under GAAP without regard to the requirements of SOP 81-1. *See* Trial Transcript at pp. 2921-2930. Brenner testified that, while it was a close call whether the guaranteed claim could be recognized under SOP 81-1, the transaction was properly recognized as revenue under FASB Concept Statement No. 5. Trial Transcript at 2921-2930, 3100-3101, 3107.

In addition, while there is a GAAP hierarchy, as long as a transaction complies with the criterion for one of the GAAP rules (regardless of its ranking in the GAAP hierarchy), it is still GAAP accounting. Trial Transcript at p. 3098-3099, 3101.

Finally, once the PCIC claim was reported in revenue, there is no specific GAAP authority for how it is accounted for on the balance sheet. Where various

23

accounts are classified on a balance sheets is a judgment call. There is no specific publication or regulations that required the PCIC guaranteed claim to be included in underbillings, or as a separate line item. Trial Transcript at pp. 3106-3107.

### B.    Plaintiff's Contention that The PCIC Claim Was a Contingent Gain

Plaintiff's expert opined that the PCIC guaranteed claim was a contingent gain and, therefore, should not have been included in revenue. Trial Transcript at p. 2025. Plaintiff's expert had no authority from the accounting literature or otherwise for his position that a guarantee is a contingent gain. Trial Transcript at p. 2026-2027. Contingent gains are not included in revenue because the gain is dependent on a contingency which may never occur so that there is no assurance the company will actually receive the money. Trial Transcript at p. 2025. The only contingency related to the PCIC guaranteed claim related to the source of payment and not whether the amount would be paid. Trial Transcript at p. 2027. Accordingly, the evidence adduced at trial established that the PCIC guaranteed claim is not a contingent gain.

### C.    PCIC Paid the Guaranteed Claim in 1999

#### 1.    The Evidence Established that the Claim Was Paid

The evidence established that the PCIC claim was paid. Bruce Brown testified that PCIC received the entire amount of guaranteed claim. The owner paid a portion of the claim and the remainder was paid by PCIC. Trial Transcript at p. 1176. Plaintiff's expert, Steve DeBruyn, conceded that the claim was paid. Trial Transcript at pp. 2023, 3192:15-19. There was no evidence submitted challenging payment of the

guaranteed claim.

### 2.    PCIC Did Not Lack the Financial Ability to Pay the Claim

At the risk of being accused of using hindsight, the fact that PCIC paid the

guaranteed claim demonstrates that it had the wherewithal to do so. *See* Trial

Transcript at p. 1176, 2023, 3192  Moreover, Mr. Brown explained during his

testimony that PCIC did, in fact, have sufficient assets as of December 31, 1998 to

pay the claim.  Trial Transcript at pp. 1111-1115.  Defendants' expert, Donald

Brenner, testified that the 1997 audited financial statements of PCIC, which were the

latest available at the time of CCI's 1998 audit, demonstrated the financial

wherewithal of PCIC.  Trial Transcript at pp. 2929-2930.

### 3.    Recognition of the Guaranteed Claim As Revenue In the 1998 Audited Financial Statement Was Appropriate

Plaintiff contends that only when CCI received the funds from PCIC could it

have recognized that payment as revenue.  This contention is without merit.

Plaintiff chooses to ignore the fact that financial statements are prepared on an

accrual basis so that transactions are recorded even though case may not have been

collected or paid out.  Trial Transcript at p. 2805-2807.  For the reasons discussed

above, the transaction met the criteria for revenue recognition under GAAP in 1998

notwithstanding the fact that the funds had not yet been received by CCI.

In addition, consistent application of plaintiff's look back method required that

the PCIC guaranteed claim be recognized as revenue in the 1998 audited financials.

See Trial Transcript at p. 2940-2941.  Plaintiff does not get to use hindsight

information only where it suits its purpose. Plaintiff's expert knew that payment of the full amount of the guaranteed claim had been received by CCI in 1999 and certainly as of the date of the hindsight information used to prepare his restated financials.

There is no basis for plaintiff's contention that the PCIC guaranteed claim could not have been recognized as revenue until it was received in 1999.

**D.     The Two Claim Payments By PCIC Totaling $900,000**

Plaintiff, for the first time in its post trial submissions, raises issues with regard to the payments by PCIC to CCI on two claims submitted under a Remedial Work Insurance Policy. *See* Plaintiff's Post Trial Memorandum at p. 29. Without explaining why, Plaintiff contends that Brown Schultz needed to obtain a legal opinion concerning whether the $900,000 was validly paid under the policy or whether CCI correctly followed the claims payment and documentation provisions of the policy. *Id.* There would be no need to seek the advice of a specialist or legal opinion since the transactions were completed (i.e., claims collected before the audit date).

There was no expert evidence presented by plaintiff that the lack of a legal opinion concerning these insurance claims had any impact on whether the financial statements were prepared in accordance with GAAP or whether GAAS required that such an opinion be obtained where the claims had already been paid by the insurer. Defendants' expert, Donald Brenner, testified that the disclosures in the CCI

26

financial statements relative to claims complied with GAAP and that the auditing

thereof was in compliance with GAAS.  He indicated that the $900,000 was properly

included in gross profit in the income statement, due to the collections under the

insurance policy.  Trial Transcript at pp. 3052-3053.

Whether the claims were "remedial" under the terms of the policy or the

preconditions to payment were met is irrelevant. PCIC had already paid the claims

and the cash came into CCI prior to December 31, 1998.   Clearly PCIC was satisfied

and believed that CCI was in compliance with the policy premium since they paid the

claims.

### E.    Plaintiff Did Not Establish that the Mahanoy Claim Submitted to the Project Owner and Guaranteed By PCIC Was Overstated By $448,000 Or, If It Was, That It Was Material to USF&G

Plaintiff did not establish that the Mahanoy Claim was overstated by $448,000.

Bruce Brown's testimony was that he was unable to tell whether that was the case

without looking at the job records. Trial Transcript at p.  1191, 1212. *See also* Trial

Transcript at pp. 3050-3051.

Even assuming the $448,000 was "double counted," the evidence did not

establish that the alleged "double counting of a $448,000 claim paid by PCIC to CCI"

was material.  Plaintiff's underwriters were unable to identify or express in any

meaningful way the nature and extent to which a change in the audited financial

statement would have caused plaintiff to discontinue bonding of CCI and certainly

presented no evidence that the alleged double counted $448,000 amount was material

to any underwriting decision. In any event, whether characterized as double counted or not, the full amount of the $448,000 was paid and the financial condition of CCI was not overstated in that amount.

### F.    Disclosures Concerning PCIC Transaction

#### 1.    A Defendant Can Only Be Liable for Affirmatively Supplying False Information

Plaintiff maintains that an omission or a failure to provide an affirmative representation is sufficient for a negligent misrepresentation claim.  The only case cited by plaintiff for this proposition is a trial court decision which in turn cites *Wilson v. Donegal Mutual Insurance Company*, 410 Pa. Super 31, 41 (1991).  *Wilson* involved a fraud claim not a negligent misrepresentation claim and, therefore, is inapposite.

Negligent misrepresentation does not lie for omissions.  A defendant can only be liable for affirmatively supplying false information. *See   Lazin v. Pavilion Partners*, Civ.A. No. 95-601, 1995 U.S. Dist LEXIS 15255, 1995 WL 614018 at *7 (E.D. Pa. Oct. 11, 1995)(non-disclosure of a material fact does not give rise to a cause of action for negligent misrepresentation); *Lord v. Living Bridges*, 1999 U.S. Dist. LEXIS 11513 at *8 (E.D. Pa. July 30, 1999). *See also, Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 150, 684 N.E.2d 1261 (1996) ("Negligent misrepresentation does not lie for omissions; there must be some affirmative false statement."); *Hayes v. Computer Assocs. Int'l, Inc.*, 2003 U.S. Dist. LEXIS 10712 (W.D. Oh. 2003); *Wilson v. Century 21 Great W. Realty*, 15 Cal. App. 4th

298, 18 Cal. Rptr. 2d 779, 783 (Cal. App. 1 Dist. 1993) ("Negligent misrepresentation is a species of fraud or deceit specifically requiring a positive assertion" based on California statutory language); *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 919 (Colo. App. 1991) (failure to make disclosure not evidence of supplying false information to support claim of negligent misrepresentation); *Hagans v. Woodruff*, 830 S.W.2d 732, 736 (Tex. App. 1992) ( defendant must provide false information and refusing to impose on broker duty to investigate and disclose); *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 132-33 (Tenn. App.1982).

Plaintiff's contention regarding footnote 8 of the 1998 audited CCI financial statement concerns the alleged inadequate disclosure of CCI's transactions with PCIC. Plaintiff's contention that footnote eight of the 1998 audited financial statement did not include enough information about the PCIC transactions for the reader to understand the effect of the transaction on the financial statement is not a false statement of fact.  The contention relates to an omission which cannot properly serve as a basis for liability for negligent misrepresentation.

### 2.     Disclosures Concerning The PCIC Guaranteed Claim

Plaintiff's contention about the disclosure of the PCIC guaranteed claim transaction reflected in the 1998 audited financial statement is improperly based on the idea that footnote 8 of the 1998 audited financial statement "mischaracterized and failed to properly disclose," was "incomplete or misleading," and created an

"inaccurate and misleading impression" about the transaction.[5]  Plaintiff's post-trial memorandum at 1, 2, 5.  However, plaintiff did not identify in any submission any information included in the 1998 audited financial statement which mischaracterized the PCIC guaranteed claim transaction or was misleading, or any credible proof that anyone affiliated with plaintiff ever read footnote 8 of the financial statement in connection with underwriting CCI bonds, were aware of the PCIC guaranteed claim transaction, had a false impression about the PCIC guaranteed claim transaction, or were misled by any information included in the 1998 audited financial statement about the PCIC guaranteed transaction.

Plaintiff's complaint as to the sufficiency of the disclosure is that the footnote does not state that the guaranteed claim relates to the Mahanoy Prison Project and that it was included in underbillings. There is nothing to suggest that GAAP requires the particular project be disclosed. Once the PCIC claim was reported in revenue, there is no specific GAAP authority for how it is accounted for on the balance sheet. Where various accounts are classified on a balance sheets is a judgment call.  There is no specific publication or regulations that required the PCIC guaranteed claim to be included in underbillings, or as a separate line item.  Trial Transcript at pp. 3106-3107.

The disclosures concerning the guaranteed claim were sufficient to satisfy

---

[5]Plaintiff characterized footnote 8 as "crucial."  Plaintiff's post-trial memorandum at 9.  Plaintiff overstated the significance of footnote 8 considering that no one affiliated with plaintiff ever read footnote 8, or had any recollection of its contents in connection with underwriting.

GAAP. Trial Transcript at p. 2930. There was no incorrect information in the disclosure of the guaranteed claim. Trial Transcript at p. 2688. The evidence proved only that plaintiff's only understanding about a transaction between PCIC and CCI came from letters from plaintiff's agent and attorney-in-fact, Dave Dominiani, and not from the audited financial statement. However, if plaintiff's underwriters had read footnote 8 they would have realized there existed a transaction involving PCIC for $1,162,460 related to a claim on a contract which was included in revenue on the financial statement. The absence of the identity of the specific contract from which the transaction arose, or that the amount was included in underbillings was not a violation of GAAP, and it did not make the information included in the footnote misleading, inaccurate, improper, or a mischaracterization of the transaction. There was a claim made against the project owner which was guaranteed by PCIC up to the full amount of the claim, i.e., $1,162,460. The disclosure also was not deceptive or misleading. Plaintiff had to know the information that could not be ascertained from the disclosure. Plaintiff had to know that it could not tell from the footnote which project the guaranteed claim related to or how it was classified on the balance sheet.

In any event, USF&G understood from a reading of the 1998 financial statement that the PCIC guaranteed claim was included in revenue. Plaintiff's Harrisburg branch manager, Anthony Phillips testified on cross-examination that he would have understood from the contents of the financial that the amount of the PCIC guaranteed claim reflected in footnote 8 of the 1998 audited financial statement

was included in revenue if he had read the footnote.  Trial Transcript at p. 2518.

David Dominiani, the bond agent for the CCI account and USF&G's attorney in fact was aware that the PCIC guaranteed claim was recorded as revenue in the 1998 audited financial statements.  Trial Transcript at pp 2152, 2166, Exhibit 790 at p. USFG/BS 0747.  Mr. Dominiani is USF&G's agent and, as such, his knowledge is imputed to USF&G.  *Barron v. First Pennsylvania Bank*, 1989 U.S. Dist. LEXIS 3564 (E.D. Pa. 1989).

Plaintiff's own expert, Richard Farnsworth admitted that a reader of the financial statements would reasonably conclude from reading footnote 8 that the amount of the PCIC guaranteed claim was included in revenue.[6]  Trial Transcript at pp. 1538-1540.

Knowledge of the particular project to which the guaranteed claim related and that it was included as an underbilling was not significant to USF&G. The only conceivable significance of knowing that the amount of the PCIC guaranteed claim was included in underbillings was to assess profitability due to operations.  Daily, however, testified that net profit, and not operating net profit, was significant to

---

[6]    Mr. Farnsworth agreed that he testified under oath at his deposition that he understood from reading footnote that it was included in revenue and if it was not that should have been disclosed.  *See* Trial Transcript at p. 1539-1543.  Mr. Farnsworth's attempt to change his deposition testimony through the errata sheet to reflect a materially different answer and subsequent trial testimony to that same effect should be disregarded as incredible.  An errata sheet may be used to correct errors or to clarify or change an answer when a question is misunderstood, it may not be used to allow a person to alter what has been said under oath. *Greenway* v. *International Paper Co.,* 144 F.R.D. 322, 325 (W.D. La. 1992) ("A deposition is not a take home examination.").

underwriting.  Trial Transcript at p. 562. According to Daily, the amount of net

operating profit was not of particular interest to underwriting. Trial Transcript at p.

562.  Similarly, since Mr. Daily was only concerned with the bottom it is difficult to

see how the identity of the project would be significant to USF&G.

 If it was significant to underwriting to know the source of underbillings and

the source of revenue from the Mahanoy Prison contract included on the 1998

audited financial statement, then inquiry would have been made.  There is no

evidence that consideration was made by plaintiff about the treatment of the PCIC

guaranteed claim and whether it was included in any amount on the 1998 audited

financial statement.

 USF&G apparently believes that Brown Schultz was required to make those

disclosures concerning the PCIC transactions that USF&G contends, rather

disingenuously in light of its underwriters' trial testimony, were important to it. *See*

Plaintiff's Post-Trial Memorandum at p. 36.  Brown Schultz, however, was not

required to take into account the anticipated user of the financial statement in

determining the sufficiency of the disclosures of the PCIC transactions.  Trial

Transcript at p. 2811, 2933.

### 3. The Disclosures Concerning $900,000 Paid By PCIC to CCI in 1998

 Plaintiff now also contends that the disclosure in footnote 8 of the 1998

audited CCI financial statement concerning the $900,000 paid by PCIC  during 1998

in settlement of two claims was inadequate.

USF&G cites to no expert testimony that the disclosure relating to these claims was in any way inadequate under GAAP. *See* Plaintiff's Proposed Findings of Fact at ¶450-453. Mr. DeBruyn, during his testimony, offered no opinion with regard to the adequacy of the disclosures in footnote 8 with regard to these particular transactions. Trial Transcript at pp. 1843-1855.

Plaintiff's home office underwriter, James Daily testified the payment of claims by PCIC to CCI was of no concern to underwriting. Trial Transcript at pp. 497, 500.

### G. The Fact that $2,000,000 of CCI's Revenues in 1998 Were from PCIC is Obvious From the 1998 Audited Financial Statement

Plaintiff's attempt to imply that there was some sort of nefarious conduct on the part of the Brown Schultz because, if not for PCIC's payment of two claims under the remedial work policy issued to CCI and the inclusion of the PCIC guaranteed claim in revenue, CCI would have posted a net loss of over $2 million, is unavailing. That fact was obvious from the 1998 audited financial statement. *See* Exhibit 36. The financial statements report a net profit of approximately $59,000 for CCI for 1998. *See* Exhibit 36. The financial statements also indicate that CCI received $900,000 from PCIC and that PCIC guaranteed a claim against a project owner in the amount of $1,162,460. *Id.* at fn. 8. The information necessary for USF&G to understand that, but for money received from PCIC, CCI would have sustained a loss was available to USF&G. If plaintiff considered the inclusion of these amounts in revenue inappropriate for its underwriting use then simple subtraction would have

provided the adjustment just as plaintiff provided other adjustments from "as stated" to "as allowed".

###### H. The PCIC Transactions Were Not Material to USF&G and It Did Not Justifiably Rely on Information In the 1998 Audited Financial Statements Concerning Those Transactions

Plaintiff did not establish that it would have ceased CCI's bonding program if it had know that the PCIC guaranteed claim had been included in underbillings. Mr. Daily testified that USF&G merely would have asked questions about the transactions and would not have issued bid bonds until they knew what was happening. Trial Transcript at pp. 415-16. He did not testify as plaintiff indicated that, upon learning that the claim was in underbillings, USF&G would have ceased CCI's bonding program.

Mr. Phillips, like Mr. Daily, did not testify that if he had known that the PCIC guaranteed claim was included in underbillings he would have ceased the bonding program. Trial Transcript at p. 2480. He merely would have inquired about the transaction and said he would have held up bonding until he received an explanation. *Id.*

In any event, what Mr. Phillips would have done in response to the knowledge that the PCIC guaranteed claim was included as an underbilling in the 1998 audited financials is irrelevant. Mr. Phillips did not have the authority to suspend the bonding program. That authority rested with David Hussey who did not testify at trial. Trial Transcript at p. 726. While Mr. Phillips testified that his

recommendations were always accepted by the home office, this is belied by the fact that there were instances when his recommendations when it was disregarded. For example, Mr. Phillips recommendation that the indemnity of John Ortenzio be reinstated in connection with consideration of the Fulkroad project was not followed by home office. Trial Transcript at pp. 2532-39.

The testimony of Daily and Phillips that, if they knew that the $1,162,000 claim was included as an underbilling they would have temporarily halted issuing bonds to CCI until they had received an explanation, is not credible. The 1998 audited financial statements disclosed $6.3 million in underbillings. *See* Exhibit 36. USF&G, however, took no action to halt, temporarily or otherwise, CCI's bonding program upon receipt of that information.

The record is completely devoid of any evidence that USF&G would have taken any action in response to learning that the two claims totaling $900,000 paid by PCIC in 1998 were classified as a reduction in job costs. Rather, as Daily testified, the payment of these claims by PCIC was of no underwriting significance to USF&G.

Mr. Phillips admits that he did not read footnote 8 so it is difficult to see any basis for plaintiff's claimed reliance based on his testimony. Trial Transcript at p. 2517-2518. Moreover, Mr. Phillips concedes that if he read the footnote he would have understood it. *Id.*

The evidence did not establish that the 1998 audited financial statement was ever received in the home office of plaintiff where Daily and Hussey were located.

The evidence did not establish that Daily and Hussey ever reviewed or analyzed the 1998 audited financial statements. James Daily testified that he did not read or pay attention to footnote 8 to the 1998 audited financial statement. No evidence was presented to establish that Hussey was aware of footnote 8 to the 1998 financial statement.

No evidence was presented to establish that plaintiff used information concerning the PCIC guaranteed claim transaction in its underwriting decisions. No evidence was presented to establish that plaintiff relied on information included in the audited financial statement concerning the PCIC guaranteed claim transaction.

In the exercise of common prudence, USF&G, a sophisticated user of financial information, should have inquired of its own agent, CCI, or Brown Schultz about the treatment and classification of the PCIC claim on the financial statement and the project to which it related. USF&G, in the exercise of common prudence and diligence could have easily ascertained this information. There is no evidence that consideration was made by plaintiff about the treatment of the PCIC guaranteed claim and whether it was included in any amount on the 1998 audited financial statement.

Plaintiff did not establish that the PCIC transactions were material to it or that it justifiably relied on information in the 1998 audited financial statements concerning those transactions.

## IV.     Causation

Although mischaracterized as relating to causation, plaintiff's contention about the rapid financial decline of CCI relates to the existence of misrepresentation. Plaintiff inappropriately attempts to generate the inference that the financial decline of CCI during 1999 establishes that the 1998 audited financial statement could not have presented fairly the financial condition of CCI.  The inference does not arise from the evidence.  No evidence was presented that the financial decline that took place could not have occurred in the information on the 1998 audited financial statements was correct.  Considering the size of project, the amount of underbillings at the end of 1998, the enormous unpaid change order associated with the Scott Air Force Base Project, the need for additional work to break even for 1999, the absence of proof of any additional work, the financial condition certainly could have declined even if the 1998 audited financial statement presented fairly the financial condition of CCI.

## V.     Contributory Negligence

Defendants do not rely on contributory negligence as a means to succeed in this action, and only assert contributory negligence in connection with that portion of the claim related to the disclosure of the PCIC guaranteed claim transaction. Defendants do not blame plaintiff for any alleged deficiency in the audited financial statements as plaintiff contends.  Rather, defendants contend, as it relates to plaintiff's conduct, that plaintiff did not rely on the audited financial statements and

the alleged deficiencies are not material. Aside from the fact that plaintiff's underwriters involved with CCI's bonding were obviously unknowledgeable underwriters with poor judgment and more interested in revenue production than proper underwriting, there can be no acceptable explanation for the reason that plaintiff approved bonding for a $40,000,000 road project without regard for CCI's lack of prior road building experience and approved continuation of the bonding program and issued bonds without audited or year end financial information after learning that the company had lost $1,600,000 halfway through the year less than four months earlier without proof the loss had been resolved or had not deepened, underbillings had increased to $6,300,000 from approximately $1,000,0000 the year before, CCI had profit fades on all completed contracts, a debt to equity ratio had increased to in excess of three, problems with self-performing work, and CCI needed additional work just to break even for the year except that plaintiff did not depend on or consider material the information included in the financial statements.

## V.    Conclusion

Judgment should be entered in favor or defendants and against plaintiff.

Respectfully submitted,

SWARTZ CAMPBELL LLC


BY: <u>s/ Kathleen M. Carson</u>
     Jeffrey B. McCarron
     Kathleen M. Carson
     1601 Market Street
     34th Floor
     Philadelphia, PA 19103
     (215) 564-5190

Attorneys for Defendants
Bruce J. Brown and Brown, Schultz,
Sheridan & Fritz

Dated: April 7, 2004

40

**CERTIFICATE OF SERVICE**

I, Kathleen M. Carson, Esquire, counsel for defendants, Bruce J. Brown and

Brown, Schultz Sheridan & Fritz, hereby certify that a copy of DEFENDANTS'

MEMORANDUM IN RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF

FACT AND CONCLUSIONS OF LAW AND POST-TRIAL MEMORANDUM was

served upon all counsel listed below by U.S. regular mail and postage prepaid on April

7, 2004.

Peter Speaker, Esquire  
Thomas, Thomas & Hafer  
305 North Front Street  
Harrisburg, PA 17101  

Peter B. McGlynn, Esquire  
Bruce D. Levin, Esquire  
Bernkopf, Goodman & Baseman LLP  
125 Summer Street, Suite 1300  
Boston, MA 02110  




/s Kathleen M. Carson  
Kathleen M. Carson  


Date: April 7, 2004