## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES FIDELITY AND :     CIVIL ACTION NO. 1:01-CV-0813
GUARANTY COMPANY, :
        :     (Judge Conner)
        **Plaintiff** :
        :
        **v.** :
        :
**BRUCE J. BROWN and BROWN** :
**SCHULTZ SHERIDAN & FRITZ,** :
        :
        **Defendants** :

## MEMORANDUM

Presently before the court for judgment is the negligent misrepresentation claim of plaintiff, United States Fidelity and Guaranty Company ("USF&G").[1] USF&G, a national surety company, contends that the 1997 and 1998 audited financial statements for CCI Construction Company ("CCI"), prepared by defendants, Bruce J. Brown and Brown Schultz Sheridan & Fritz (collectively "Brown Schultz"), contained negligent and material misrepresentations on which USF&G justifiably relied in continuing its bonding program with CCI. USF&G seeks to recover over $25,000,000 that it was obligated to expend in completing construction contracts on behalf of CCI after the latter filed for bankruptcy in 2000.

During a thirteen-day bench trial, the parties presented substantial documentation and testimony relating to the audited financial statements,

---

[1] In 1998, USF&G merged with St. Paul Fire and Marine Insurance Co. (Doc. 146 at 7). All references to USF&G may also be construed as references to the merged company.

accounting standards, the construction industry, and the construction surety bond market.   The action is now ripe for judgment under Federal Rule of Civil Procedure 52.  Based on the findings that follow, the court concludes that defendants are not liable for negligent misrepresentation and will enter judgment in their favor.[2]

## I.    **Findings of Facts**

1.    USF&G is a national surety company that issues surety bonds to contractors and subcontractors engaged in the performance of public and private construction projects.  (Doc. 146[3] at 11, 166-67; Doc. 146, Exs. 1-13).

2.    Construction surety bonds are binding commitments by which the surety (the bonding company) guarantees to the obligee (the project owner) the performance of a construction contract by the principal (the contractor procuring the surety bond); in the event that the principal defaults in its performance of the construction contract, the obligee makes demand upon the surety to perform the work that should have been performed by the principal or to pay the claims of various unpaid supplies of labor and material.  (Doc. 146 at 10-12, 47, 1307).

---

[2] All counsel of record are commended for their professionalism and thoroughness in presenting the factual and legal issues in this case both at trial and in their submissions to the court.

[3] All references to document 146, the transcript of the first day of the thirteen-day bench trial, should be construed as references to the set of transcripts, consecutively paginated, for all days of trial.  (See Docs. 146-50, 158-63, 170, 185).

3.      The Commonwealth of Pennsylvania, like most states and the United States, requires all contractors working on public projects to secure surety bonds. (Doc. 146 at 12-13, 887).

4.      "Underwriting" is the process by which a bonding company gathers facts relevant to the risk of bonding a contractor—including the contractor's financial statements, references, reputation, history, management procedures, key personnel, and prior job experience—to determine whether it should issue a bond for the contractor or the particular project and the amount of such bond.  (Doc. 146 at 167, 170-74, 919-20, 1468-69; Doc. 146, Ex. 360).

5.      The underwriting process typically results in the assessment of monetary limits for the "bonding program" established for the construction company.  (Doc. 146 at 186-88, 1482-83, 1489-90).

6.      "Bonding program" refers both to the maximum sum that the surety will bond for a single job by the construction company and the maximum aggregate bonds that the surety will issue for all jobs by the construction company. (Doc. 146 at 186-88, 1482-83, 1489-90).

7.      The surety generally approves a bonding program for the upcoming year, during which the construction company is assured bonds for specific projects already obtained by the company and for those projects that the company may be successful in obtaining throughout the year.  (Doc. 146 at 182-85, 221, 1482-84, 1488-89).

8.     The bonding program normally stays in place for one year and is conditioned on there being no material adverse changes in the contractor's finances and management and is limited to jobs that are within the contractor's normal work.  (Doc. 146 at 182-185, 221, 1482-89).

9.     The surety reviews the bonding program on an annual basis, usually at or about the time the surety receives the contractor's audited financial statement.  (Doc. 146 at 187, 225-26, 239, 1475-76, 1482-83, 1489).

10.     USF&G serves as the bonding company for thousands of construction contractors and subcontractors, including some of the largest construction contractors in the United States, and is considered a "top tier" bonding company.  (Doc. 146 at 9-10, 1441, 1671-72, 1693).

11.     USF&G underwriters and managers have extensive education, training, and practical experience in the fields of underwriting construction contracts, business management, and the construction industry.  (Doc. 146 at 186, 1693-94, 2401-02, 2411-12, 2422-30).

12.     One of the construction companies for which USF&G issued surety bonds was CCI, a contractor with principal offices in Pennsylvania engaged in construction work on public and private construction projects.  (Doc. 146 at 201-02, 834; Doc. 146, Ex. 790A at 708-22).

13.     CCI became a USF&G account in 1993, and the bonding relationship continued until 2000.  (Doc. 146 at 190, 219-20, 479-87, 742-43, 2414, 2563-64).

14.     As a condition of the establishment and the annual extension of CCI's bonding program, USF&G required that CCI furnish to it annually an audit report prepared by an independent certified public accountant.  (Doc. 146 at 225-26, 239).

15.     Brown Schultz was the auditor for CCI during the bonding relationship between CCI and USF&G.  (Doc. 146 at 832-34, 1019).

16.     From 1993 through the end of the fiscal year 1998, Brown Schultz provided audited financial statements to CCI, and CCI forwarded these audited reports to USF&G.  (Doc. 146 at 834-35).

17.     Brown Schultz knew that USF&G was CCI's bonding company and that the CCI audited financial statements would be provided to USF&G for use in bonding decisions.  (Doc. 146 at 887-88, 893, 898, 901-02, 921, 1307-08; Doc. 146, Ex. 144 at 11, Ex. 213 at 43, Ex. 221 at 19).

18.     Underwriters for USF&G reviewed all aspects of the audited financial statements, including the footnotes of these documents, and substantially based their decisions to recommend bonding and to continue bonding of CCI on the information contained in the audited financial statements.  (Doc. 146 at 2428, 2455, 2467, 2583).

19.     CCI's bonding program was renewed annually, after USF&G received copies of the CCI audited financial statements.  (Doc. 146 at 760-61, 2428-34, 2442-43).

20.     In February 2000 CCI closed business operations, and in May 2000 it filed for bankruptcy protection.  (Doc. 146 at 1231, 2124).

5

21.     Subsequently, USF&G, as the bonding company for CCI, was required to expend substantial sums, approximately $25,000,000, in satisfying the claims of CCI's unpaid vendors, employees, and subcontractors and in completing the projects USF&G bonded on behalf of CCI.  (Doc. 146 at 21, 91; Doc. 146, Exs. 16, 20, 21, 23, 24, 26, 27, 29).

22.     USF&G claims that the 1997 and 1998 audited financial statements contain material misrepresentations upon which it justifiably relied in continuing the bonding program, resulting in significant losses when CCI filed for bankruptcy in 2000.  (Docs. 1, 124, 190).

23.     USF&G identifies several representations that were allegedly inaccurate:  (1) representations in the 1997 and 1998 audited financial statements concerning the nature of the auditing process and the accuracy of financial information relating to CCI, (2) representations in the 1997 and 1998 audited financial statements concerning the relationship between CCI and another company, Pennsylvania Contractors Insurance Co. ("PCIC"), and (3) representations in the 1998 audited financial statement concerning a guaranty agreement issued to CCI by PCIC.  (Docs. 124, 190).

**<u>Representations Concerning the Nature of the Auditing Process and Accuracy of Financial Information Relating to CCI</u>**

24.     The 1997 and 1998 audited financial statements contain the following general representations:  (1) "[Brown Schultz] conducted [its] audits in accordance with generally accepted auditing standards," (2) the "audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements," (3) the audit "includes assessing the accounting principles used and significant estimates made by management," and (4) "the financial statements . . . present fairly, in all material respects, the financial position of CCI."  (Doc. 146, Ex. 34 at 1, Ex. 36 at 1).

25.     Generally accepted auditing standards ("GAAS") comprise the standards and procedures which must be followed in the planning, preparation, and issuance of an audit report.  (Doc. 146 at 1738-40, 2812).

26.     GAAS require that auditors conduct sufficient tests to determine the reliability of management's estimates, that auditors critically assess management estimates and take account of potential risks, and that audit work be "adequately planned and properly supervised."  (Doc. 146 at 1216, 1738-43, 2812; Doc. 146, Ex. 272).

7

27.    GAAS require that auditors follow an audit program that ensures that the financial statements compiled and submitted by the construction company reflect to a reasonable degree of accuracy the company's current financial position and that estimates provided by the company regarding future revenues and costs are reasonably supported.  (Doc. 146 at 2814-16).

28.    GAAS recognize that the specific procedures to be used in an audit are subject to the judgment of the auditor based on the particular circumstances of the audit.  (Doc. 146 at 1891).

29.    The Brown Schultz audit program describes the procedures used by Brown Schultz to audit the contracts in progress and the estimated costs to complete for the contracts in progress for CCI.  (Doc. 146 at 1201-03, 1421; Doc. 146, Ex. 213 at 194-97, Ex. 222 at 8, 213-17).

30.    The audit program details the procedures by which Brown Schultz auditors assessed the risks of misstatement of financial information by CCI officials and employees, critically reviewed financial statements and estimates provided by CCI, and conducted evidentiary tests of transactions impacting the financial position of CCI.  (Doc. 146 at 1200-03, 1421; Doc. 146, Ex. 213 at 194-97, Ex. 222 at 8, 213-17).

31.    Brown Schultz followed a consistent audit program from 1993 to 1998 because neither the gross revenues nor other material characteristics of CCI changed during this period.  (Doc. 146 at 982-83, 934-37, 1916, 1936, 3037-40).

32.    Brown Schultz acted in accordance with GAAS in utilizing a consistent audit program from 1993 to 1998.  (Doc. 146 at 982-83, 934-37, 1916, 1936, 3037-40).

33.    Brown Schultz followed the procedures of the audit program during the audits of CCI for the years ending 1997 and 1998.  (Doc. 146 at 1200-03, 1421; Doc. 146, Ex. 213 at 194-97, Ex. 222 at 8, 213-17).

34.    Brown Schultz's work papers reflected and documented the procedures performed and conclusions reached by Brown Schultz in connection with the 1997 and 1998 audits.  (Doc. 146 at 1144-45, 2856-2912, 2968-75; <u>see</u> Doc. 146, Exs. 222, 809-12).

35.    The content of an auditor's work papers is up to the judgment of the auditor and Brown Schultz did not violate GAAS in failing to include all documentation of efforts made to verify estimates during the 1997 and 1998 audits.[4] (Doc. 146 at 915, 1145-46, 1890-95, 2968-75).

36.    Brown Schultz assigned experienced employees to coordinate the 1997 and 1998 audits with adequate supervision from management.  (Doc. 146 at 931-32, 1298).

37.    Brown Schultz properly assessed the audit risk associated with the 1997 and 1998 audits.  (Doc. 146 at 1136, 2914).

---

[4] The CCI job cost report was not included in the Brown Schultz work papers due to its size.  (Doc. 146 at 1428-29).

38.    When assessing audit risk, an auditor properly considers historical experience with the client, the client's reputation, and internal controls on compiling and reporting of financial information.  (Doc. 146 at 2815).

39.    Brown Schultz had been the auditor for CCI since the 1980s and had significant experience with the company, and Brown Schultz properly relied on its historical experience with CCI when developing and performing the audits. (Doc. 146 at 1905, 2815).

40.    Based on historical experience with CCI and Brown Schultz's knowledge of CCI's systems and procedures, Brown Schultz believed that CCI's management was competent to report accurate information concerning the financial position of CCI.  (Doc. 146 at 1186-87).

41.    Management officials and employees of CCI were well qualified for their respective corporate duties and there was a good balance of business, accounting, engineering, and field production capabilities within the company. (Doc. 146 at 1493; Doc. 146, Exs. 66, 790).

42.    Management officials and employees of CCI were experienced in the construction industry and in business management, had substantial accounting experience (the person responsible for developing the company's financial statements was a certified public accountant) and good reputations in the industry, and were knowledgeable about the performance of CCI with respect to individual projects.  (Doc. 146 at 190, 577, 1166-69, 1411-12, 1441, 1493, 2086-94, 2110-12; Doc. 146, Exs. 66, 356, 790).

43.     CCI had extensive internal procedures, documented in the procedures manual for CCI, for collecting and reporting job costs for project contracts, comparing invoices to purchase orders or subcontracts, and obtaining the approval of the project manager for all invoices.  (Doc. 146 at 1165-66, 1169, 1411-12, 2095-98; Doc. 146, Ex. 356).

44.     Brown Schultz understood the process by which CCI prepared its estimated costs to complete and reviewed the client's supporting documentation in connection with its audits of CCI—including the job files—as part of its determination that CCI was capable of reliably estimating costs to complete. (Doc. 146 at 952-56, 1153-54).

45.     Brown Schultz's historical experience was that CCI adhered to the policies and procedures set forth in the CCI policies and procedures manual. (Doc. 146 at 1167, 1188, 1412-14).

46.     CCI had internal controls to assure that it did not overpay on a purchase order or contract, including a database which contained, among other things, all the actual costs that had been approved and posted to a job, the original budget, and any change orders.  (Doc. 146 at 2096-97, 2117).

47.     CCI had a centralized accounting system, and information for the company was maintained and reviewed—and invoices were approved and paid—from the home office.  (Doc. 146 at 1165, 1252-58, 1417, 1952; Doc. 146, Exs. 356, 357).

48.     The accounting department of CCI was well organized.  (Doc. 146 at 1168, 2107, 1350-72).

49.     The accounting department of CCI supervised preparation of financial statements and evaluated estimated costs to complete for all projects.  (Doc. 146 at 1168, 2107, 1350-72).

50.     Estimated costs to complete were prepared by the project manager or project engineer and superintendent on the job site, were submitted to project managers for review and confirmation, and were submitted to the accounting department for reporting purposes.  (Doc. 146 at 2097-2108).

51.     All variances revealed by the accounting reports were reviewed by the accounting department and CCI managers, and large variances required explanation by the project managers to verify the accuracy of the costs to complete and to explain the nature and reason for the variance.  (Doc. 146 at 2100-07).

52.     CCI reviewed job costs and estimated costs to complete for accuracy and obtained explanations for variances on a monthly basis.  (Doc. 146 at 1891-92, 2100-07).

53.     Brown Schultz was justified in relying on its experience with CCI's procedures and ability to estimate the costs of completion when assessing audit risk and conducting the 1997 and 1998 audits.  (Doc. 146 at 978-79, 1891-92, 1906).

54.     Brown Schultz critically reviewed financial statements and estimates provided by CCI.  (Doc. 146 at 982-83).

12

55.    Brown Schultz reviewed information from CCI's job files during the 1997 and 1998 audits.  (Doc. 146 at 945-46, 1416-30, 2132-33; <u>see</u> Doc. 146, Ex. 222).

56.    Brown Schultz reviewed job cost reports and the estimated costs to complete reports of CCI during the 1997 and 1998 audits.  (Doc. 146 at 1374-75, 1414-17, 2132-33; <u>see</u> Doc. 146, Ex. 222).

57.    Brown Schultz met with the project managers for the specific jobs during the 1997 and 1998 audits and discussed estimated costs to complete contracts.  (Doc. 146 at 987-91, 1006-08, 1417-19, 2134; <u>see</u> Doc. 146, Ex. 222).

58.    Brown Schultz obtained explanations from the appropriate management officials of CCI about the reason for variances between the original contract amount or the earlier estimated costs to complete and the most recent estimated costs to complete in connection with the 1997 and 1998 audits.  (Doc. 146 at 1417-19, 1891, 1950-51, 2111-38; <u>see</u> Doc. 146, Ex. 222 at 296).

59.    Brown Schultz sufficiently accounted for profit increases and profit fades that occurred during the course of certain projects.  (Doc. 146 at 949-57, 1315-18, 1348-52, 1888-92; Doc. 146, Ex. 145 at 4, Ex. 213 at 249-55, Ex. 222 at 272-79).

60.    The profit increases and fades that occurred during the course of several projects were attributable to reasonable fluctuations in material and personnel costs, variations and alterations in third-party contracts, and the inherent uncertainty in construction estimates.  (Doc. 146 at 949-57, 981-84 1315-18, 1348-52, 1888-92; Doc. 146, Ex. 145 at 4, Ex. 213 at 249-55, Ex. 222 at 272-79).

61.    The existence of profit fades does not mean the estimating capability of the contractor is inadequate or that auditors did not comply with GAAS. (Doc. 146 at 1889-1908, 2841-42).

62.    The estimates provided by CCI were reasonable and Brown Schultz acted properly in accepting those estimates.  (Doc. 146 at 951-58, 1151-56, 1186-88, 1890-93).

63.    Estimating is an integral principal part of the contractor's business activities, and frequent revisions of estimates in light of changing conditions does not indicate that the estimates are unreliable for the purpose for which they are used although results may differ widely from original estimates.  (Doc. 146 at 1905-08, 2820-25; see Doc. 146, Exs. 222, 223).

64.    Brown Schultz conducted adequate evidentiary tests of transactions impacting the financial position of CCI.  (Doc. 146 at 982-84, 1416-17, 2136-37; see Doc. 146, Exs. 213, 222).

65.    Brown Schultz was provided source documentation concerning costs and cost estimates in addition to the reports generated by CCI.  (Doc. 146 at 1416-17, 2136-37; see Doc. 146, Ex. 222).

66.    Brown Schultz checked the source documentation against the job costs history.  (Doc. 146 at 2136-37; see Doc. 222 at 295-96).

67.    Brown Schultz sent owner confirmations as part of the 1997 and 1998 audits.  (Doc. 146 at 982-84; Doc. 146, Ex. 213 at 218).

14

68.    Visits by Brown Schultz to CCI project sites to confirm estimated costs and profits were unnecessary in light of the centralized nature of accounting functions at CCI and the strong managerial and accounting backgrounds of CCI officials and employees.  (Doc. 146 at 750-53, 980-83, 1160-69, 1250-58, 1890-93, 1950-64, 2105-08).

69.    The evidence did not establish that visits to CCI construction job sites or subcontractor confirmations would have revealed any information that would have changed materially the 1997 and 1998 audited financial statements.  (Doc. 146 at 750-53, 980-83, 1160-69, 1890-93, 1950-64, 2105-08).

70.    Job site visits are useful where there is a decentralized accounting system, the records are kept at the field offices as opposed to the home office and there is infrequent evaluation of costs and the estimated costs to complete and there are not significant controls over the information that is kept at the field office and no history of having field office communication with the home office.  (Doc. 146 at 980-83, 1959-64).

71.    GAAS did not require Brown Schultz to conduct job site visits with respect to CCI projects.  (Doc. 146 at 980-83, 1959-64, 2105-08).

72.    Brown Schultz properly assessed the risks of misstatement of financial information by CCI officials and employees, reviewed financial statements and estimates provided by CCI, and conducted evidentiary tests of transactions impacting the financial position of CCI.  (Doc. 146 at 982-83, 1200-03, 1421, 2802-05, 2914, 2968-75, 3122; Doc. 146, Ex. 213 at 194-97, Ex. 222 at 8, 213-17).

15

73.     In accordance with GAAS, the audit program utilized by Brown Schultz ensured that the financial statements compiled and submitted by CCI reflected to a reasonable degree of accuracy CCI's current financial position and that estimates provided by CCI regarding future revenues and costs were reasonably supported.  (Doc. 146 at 982-83, 2802-05, 2814-16, 2914, 2968-75, 3122).

74.     In accordance with GAAS and its audit program, Brown Schultz conducted sufficient tests to determine the reliability of management's estimates, critically assessed management estimates and took account of potential risks, and ensured that audit work was adequately planned and properly supervised.  (Doc. 146 at 982-83, 1216, 1738-43, 2802-05, 2812, 2914, 2968-75, 3122; Doc. 146, Ex. 272).

75.     The representations in the 1997 and 1998 audited financial statements were correct in all material aspects and Brown Schultz reasonably believed, in the exercise of due professional care, that the 1997 and 1998 audited financial statements were conducted in accordance with GAAS, included sufficient testing of evidence supporting the amounts and disclosures in the financial statements, included adequate assessment of the accounting principles and estimates made by CCI, and fairly presented in all material aspects the financial condition of CCI. (Doc. 146 at 2802-05, 2968-75, 3122).

76.     An expert for USF&G, Stephen J. DeBruyn ("DeBruyn"), opined that the 1997 and 1998 audited financial statements, particularly those aspects concerning estimated costs to complete and expected profits, did not fairly present the financial position of CCI, and he presented "corrected" estimated costs and profits contradicting those in the audited financial statements.  (Doc. 146 at 1750-77, 3181-92).

77.     The methodology used by DeBruyn to calculate the "corrected" estimated costs and profits, and to conclude that the 1997 and 1998 audited financial statements did not fairly present the financial position of CCI, is known colloquially as the "look-back" method.  (Doc. 146 at 1750-77, 3181-92).

78.     The look-back method uses actual costs and profits to assess the propriety of estimates.   (Doc. 146 at 1750-77, 1901-03, 1915-18, 1932-39, 1944-48, 1966, 2802-05, 2846-55, 2980-87, 3115-19, 3181-92).

79.     The look-back method uses information that was not available to Brown Schultz at the time of the audit to assess the accuracy of estimates. (Doc. 146 at 1750-77, 1901-03, 1915-18, 1932-39, 1944-48, 1966, 2802-05, 2846-55, 2980-87, 3115-19, 3181-92).

80.    Although useful as a general tool to evaluate estimates after the fact, the look-back method does not provide a reliable method by which to assess whether estimates were correct when they were made or whether auditors acted reasonably in accepting those estimates when the audit was conducted.  (Doc. 146 at 1750-77, 1901-03, 1915-18, 1932-39, 1944-48, 1966, 2802-05, 2846-55, 2980-87, 3115-19, 3181-92).

81.    An auditor's report is based on information available to the auditor as of the audit date and through the end of field work.  (Doc. 146 at 1902, 2976, 2846-55).

82.    DeBruyn's proposed adjustments to the 1997 and 1998 audited financial statements are not credible because of their reliance on information and data that were not available to the auditors at the time of the audits.  (Doc. 146 at 1902-16, 1940-48, 2804, 2980-87, 3115-19).

83.    The look-back method is not sufficiently reliable to establish that the estimates made by CCI were incorrect, that Brown Schultz acted below the applicable standard of care in accepting those estimates, or that the 1997 and 1998 audited financial statements did not fairly present the financial position of CCI. (Doc. 146 at 1750-77, 1901-03, 1915-18, 1932-39, 1944-48, 1966, 2802-05, 2846-55, 2980-87, 3115-19, 3181-92).

18

84.     A re-audit using the information which was available to Brown Schultz and to which Brown Schultz had access when it performed its audits is the appropriate means by which to assess the propriety of the audits.  (Doc. 146 at 1915-16, 1932-37, 2855, 2980-87).

85.     DeBruyn did not limit himself to historical information available to the auditors as of the end of their field work when he developed his proposed adjustments to the 1997 and 1998 audited financial statements.  (Doc. 146 at 1897-98, 1900-05, 1915-29, 1947).

86.     DeBruyn's proposed adjustments were made using data that was developed after the 1997 and 1998 audits were performed by Brown Schultz.  (Doc. 146 at 1897-98, 1900-05, 1915-29, 1947; see Doc. 146, Ex. 337).

87.     DeBruyn did not know and did not make a determination about the specific information that was available to the auditors when they performed the 1997 and 1998 audits.  (Doc. 146 at 1897-98, 1915-29, 1937, 2849).

88.     DeBruyn's testimony relating to Brown Schultz's compliance with the applicable standard of care and the accuracy of the estimates provided by CCI was not credible.  (Doc. 146 at 1900-05, 1913-18, 1927-38, 1943-47, 1966, 2804, 2849-55, 2983-85, 3116-19).

89.     There is no credible evidence that conducting additional audit procedures at the time of the audit would have revealed estimated costs to complete different from those represented in the 1997 and 1998 audited financial statements.  (Doc. 146 at 1900-05, 1913-18, 1927-37, 2849-55; see Doc. 146, Ex. 337).

90.     The testimony by defendants' expert, Donald Brenner—that the 1997 and 1998 audits were conducted in accordance with GAAS, that they included appropriate testing of supporting evidence and assessment of the accounting principles used and significant estimates made by management, and that they fairly present in all material aspects the financial position of CCI—was credible and correct.  (Doc. 146 at 2745-52).

91.     The representations in the 1997 and 1998 audited financial statements concerning the nature of the auditing process and accuracy of financial information relating to CCI were complete and accurate in all materials aspects. (Doc. 146 at 2802-05, 2968-75, 3122).

92.     USF&G offered insufficient evidence that Brown Schultz knew or should have known of any misrepresentations concerning the nature of the auditing process or accuracy of financial information relating to CCI.  (Doc. 146 at 436-38, 547, 576-86, 638-53, 665-67, 726, 752-54, 766, 798-99, 825-27, 2445-48, 2474-76, 2532-34, 2573-75, 2802-05, 2968-75, 3122).

**Representations Concerning the Relationship Between CCI and PCIC**

93.     The 1997 and 1998 audited financial statements contain representations that PCIC is a "related party" and is under "common control." (Doc. 146, Ex. 34 at 11 n.8, Ex. 36 at 13 n.8).

94.     PCIC is wholly owned by CCI's sole stockholder, John Ortenzio, who serves as president of both PCIC and CCI.  (Doc. 146 at 837-38, 2142).

20

95.    PCIC is a captive insurance company that was formed for the purpose of providing warranty insurance to CCI and other companies also owned by the president of CCI.  (Doc. 146 at 837-38, 1019-25, 1267-69, 2166).

96.    PCIC and CCI are under "common control" as that phrase is used under GAAS.  (Doc. 146 at 1025).

97.    PCIC and CCI are "related parties" as that phrase is used under GAAS.  (Doc. 146 at 1019-25, 1267-69).

98.    Footnote 8 of the 1997 and 1998 audited financial statements properly identify PCIC as a "related party" and as a company under "common control" of the owner of CCI.  (Doc. 146 at 1019-25, 1267-69; Doc. 146, Ex. 34 at 11 n.8, Ex. 36 at 13 n.8).

99.    The representations concerning the relationship between CCI and PCIC were accurate in all material aspects and conformed with GAAS.  (Doc. 146 at 1019-25, 1267-69, 2802-05, 2968-75, 3122).

100.    USF&G was well aware of the relationship between CCI and PCIC. (Doc. 146 at 296-97, 359, 1560; Doc. 146, Exs. 238, 240).

101.    USF&G offered insufficient evidence that Brown Schultz knew or should have known of any misrepresentations concerning the relationship between CCI and PCIC.  (Doc. 146 at 296-97, 359, 1019-25, 1267-69, 1560, 2802-05, 2968-75, 3122; Doc. 146, Exs. 238, 240).

## **Representations Concerning a Guaranty Agreement Issued to CCI by PCIC**

102.     The 1998 audited financial statement contains representations that a "[PCIC] has guaranteed a claim of $1,162,460 filed by [CCI] with a contract owner" and that, "[i]f the owner fails to pay all or part of this claim, [PCIC] will pay the unpaid portion."  (Doc. 146, Ex. 36 at 13 n.8; see Doc. 146 at 1063, 1258).

103.     The 1998 audited financial statement also contains representations that the amounts of "revenue" and "underbillings" of CCI for 1998 were $52,534,453 and $6,341,726, respectively.  (Doc. 146, Ex. 36 at 1, 3; see Doc. 146 at 1063, 1258).

104.     The amounts of revenue and underbillings in the 1998 audited financial statement include the claim of $1,162,460 guaranteed by PCIC.  (Doc. 146 at 1063, 1258).

105.     Although the audited financial statement does not expressly identify the "claim" as being connected with any specific CCI construction project, the "claim" was based on a project known as the "Mahanoy Prison Project."  (Doc. 146 at 699, 1066-74, 1402, 1538-40, 2036, 2518; Doc. 146, Ex. 36 at 1, 3, 13).

106.     The Mahanoy Prison Project was awarded to CCI in 1997 by the Department of General Services ("DGS") for the construction of two medium security housing units affiliated with the State Correctional Institute—Mahanoy City.  (Doc. 146, Ex. 222 at 285).

107.    The Mahanoy Prison Project was covered by a remedial work insurance policy issued by PCIC under which PCIC agreed to reimburse CCI for costs incurred if a default or other problem required CCI to make expenditures to complete a project.  (Doc. 146 at 1029-31; Doc. 146, Ex. 222 at 299-302).

108.    Pursuant to the remedial work period insurance policy, in 1998 PCIC paid CCI $900,000 on two claims related to the Mahanoy Prison Project due to subcontractor defaults.  (Doc. 1044-46; Doc. 146, Ex. 222 at 295-98).

109.    Of the $900,000 paid, $448,000 was due to the default of CCI's masonry subcontractor, Johnson Masonry, and the remaining $452,000 was due to the default of CCI's sheet metal fabricator.  (Doc. 146, Ex. 222 at 295-98; see Doc. 146 at 1044-50, 1062-64).

110.    The claims were properly paid by PCIC in November 1998 under the remedial work period insurance policy to cover contract losses incurred by CCI.  (Doc. 146, Ex. 222 at 282).

111.    Footnote 8 of the 1998 audited financial statement properly discloses that "two insurance claims for contract losses incurred of $900,000 were paid by [PCIC] . . . under the terms of a remedial work period insurance policy."  (Doc. 146, Ex. 36 at 13 n.8; see Doc. 146 at 1044-64; Doc. 146, Ex. 222 at 295-98).

112.    In December 1998, CCI asserted a claim "for unforeseen costs" in the amount of $1,162,460 against DGS relative to the Mahanoy Prison Project (the "Mahanoy Claim") for increased expenses and costs allegedly incurred by CCI and attributable to owner-caused delays and unusually severe winter conditions. (Doc. 146 at 1076-78; Doc. 146, Ex. 59, Ex. 222 at 284-92).

113.    The amount of the Mahanoy Claim—$1,162,460—included the $448,000 that had been expended due to the default of CCI's masonry subcontractor, Johnson Masonry, and that had been recovered under the remedial work period insurance policy.  (Doc. 146 at 1094-97; Doc. 146, Ex. 222 at 291, 295-96).

114.    PCIC issued a guaranty agreement dated December 1, 1998, which guaranteed, without reservation, full payment of the Mahanoy Claim in the amount of $1,200,000 if DGS failed to do so.  (Doc. 146, Ex. 264).

115.    Soon thereafter, a new guaranty agreement backdated to December 1, 1998, was issued by PCIC in the amount of $1,162,460, the exact amount of the Mahanoy Claim submitted to DGS.  (Doc. 146, Ex. 265; see Doc. 146 at 1076-78).

116.    Footnote 8 of the 1998 audited financial statement represents that a claim in the amount of $1,162,460 had been guaranteed by PCIC.  (Doc. 146, Ex. 36 at 13 n.8).

117.    The 1998 audited financial statement also represents that the amounts of "revenue" and "underbillings" of CCI for 1998 were $52,534,453 and $6,341,726, respectively.  (Doc. 146, Ex. 36 at 1, 3; see Doc. 146 at 1063, 1258).

118.    "Underbillings" are the difference between the total of costs and recognized estimated earnings to date and total billings to date; they are considered assets that offset the understatement of sales when the actual completion of the project is ahead of billings.  (Doc. 146 at 1101, 1192, 1271-72, 1748-49, 2280-85, 2928-30).

119.    The amounts of revenue and underbillings in the 1998 audited financial statement include the claim of $1,162,460 guaranteed by PCIC.  (Doc. 146 at 1063, 1258).

120.    The Mahanoy Claim amount was included in underbillings by Brown Schultz based on the existence of the PCIC guaranty agreement.  (Doc. 146 at 1076).

121.    Although the Mahanoy Claim, as submitted to DGS, included a "double-counting" of $448,000, based on the inclusion of the costs associated with the default of Johnson Masonry that had been paid under the remedial work period insurance policy, the full amount of the claim of $1,162,460 was appropriately considered revenue based on the guaranty of PCIC to pay that amount, without reference to the validity of the Mahanoy Claim.  (Doc. 146 at 1076-96, 1101, 1192-94, 2027-28, 2928-30; see Doc. 146, Ex. 265).

122.    The Mahanoy Claim, as guaranteed by PCIC, of $1,162,460 met recognition standards for revenue.  (Doc. 146 at 1079, 1105-30, 1192-94, 1218-30, 1280-81, 1543-44,[5] 2380-81, 3098-99, 3112-13; Doc. 146, Exs. 268-271, Ex. 360 at 103-04).

123.    An amount may be recognized as revenue on a financial statement under GAAS if it is probable that the completed transaction will result in profit, the amount is ascertainable, and collection of the amount is reasonably assured.  (Doc. 146 at 2927-28).

124.    Payment of the Mahanoy Claim would have resulted in profit for CCI, based on the costs to complete the project.  (Doc. 146 at 2927-30).

125.    The amount of the payment was clearly ascertainable based on submission of a claim in the amount of $1,162,460 and the existence of the PCIC guaranty for that amount.  (Doc. 146 at 1076-79, 2927-30; Doc. 146, Ex. 265).

---

[5] Plaintiff's expert, Richard Farnsworth, testified at a deposition that the Mahanoy Claim met recognition standards for revenue and that "[a] reader of the . . . 1998 audited financial statement would reasonably interpret that [the amount of the Mahanoy Claim] was included in revenue."  (Doc. 146 at 1538-39).  He later submitted an errata sheet purporting to "correct" this testimony to reflect the "right answer":  that the 1998 audited financial statement does not reasonably disclose inclusion of the Mahanoy Claim in revenue.  (Doc. 146 at 1539-40).  Assuming that such a material change in testimony is permissible, see FED. R. CIV. P. 30(e) (permitting deponent to make "changes in form or substance" to the transcript of testimony); Titanium Metals Corp. v. Elkem Mgmt., Inc., 191 F.R.D. 468, 472 (W.D. Pa. 1998) (permitting material changes to deposition testimony provided that the original answers remain in record); but see Burns v. Bd. of County Comm'rs, 330 F.3d 1275, 1282 (10th Cir. 2003) (precluding material changes to deposition testimony absent satisfactory justification); Greenway v. Int'l Paper Co., 144 F.R.D. 322, 325 (W.D. La. 1992) ("A deposition is not a take home examination."), the court does not credit the expert's attempts to avoid his original answer and finds his original deposition testimony well supported by the record.

126.    Brown Schultz confirmed that a claim in the amount of $1,162,460 was submitted by CCI to DGS for unforeseen costs incurred in connection with the Mahanoy Prison Project and that there existed a written guaranty issued by PCIC in the full amount of the Mahanoy Claim.  (Doc. 146 at 1083, 1412; Doc. 146, Ex. 222 at 282-83).

127.    Collection of the $1,162,460 Mahanoy Claim was reasonably assured. (Doc. 146 at 1101, 1111-20, 1192, 2922, 2927-30).

128.    Brown Schultz had prepared tax returns and audited financial statements for PCIC since its inception and was aware that PCIC had the financial ability to pay the amount of the PCIC guaranty.  (Doc. 146 at 1111-20).

129.    The PCIC guaranty included the language that PCIC intended to be legally bound thereby.  (Doc. 146 at 2927-30; Doc. 146, Ex. 265).

130.    GAAS does not requires auditors to obtain a legal opinion on the validity of a claim when payment of the claim is reasonably assured based on the language of the operative documents and the relationship of the parties to the claim.  (Doc. 146 at 2922, 2927-30).

131.    Brown Schultz acted in accordance with GAAS in determining that the Mahanoy Claim and the PCIC guaranty agreement were valid without obtaining a legal opinion based on the language of the agreement and the relationship of CCI and PCIC.  (Doc. 146 at 1111-20, 2922, 2927-30; Doc. 146, Ex. 265).

132.    The amount of the Mahanoy Claim was properly included as contract revenue on the 1998 audited financial statement even though CCI had not yet received payment of the claim.  (Doc. 146 at 1101, 1192, 2928-30).

133.    CCI's financial statements are prepared on an accrual basis so that its transactions are recorded although cash may not have been collected or paid out. (Doc. 146 at 2805-07).

134.    Although contingent gains are generally not included as revenue, payment of the Mahanoy Claim was not contingent on the happening of any event; rather, CCI was assured to receive the full amount of the claim regardless of whether DGS denied any portion of the claim.  (Doc. 146 at 2025-27, 2928-30).

135.    The only contingency related to the PCIC guaranty related to the source of payment and not whether the amount would be paid.  (Doc. 146 at 1101, 1192, 2025-27, 2928-30).

136.    Because the claim was included in revenue, it created an underbilling consistent with the disclosure on how underbillings are calculated.  (Doc. 146 at 1101, 1192, 1271-72, 2928-30).

137.    The claim was properly included in underbillings in the 1998 audited financial statement.  (Doc. 146 at 1101, 1192, 1271-72, 2928-30).

138.    Footnote 8 accurately and adequately described the effect of the guaranty agreement for purposes of meeting professional standards.  (Doc. 146 at 699, 1264-74, 1538-41, 1853, 2036, 2380-81, 2518, 2802-05, 2968-75, 3089-98, 3122).

139.    In 1999, DGS paid to CCI $220,000 in partial satisfaction of the Mahanoy Claim.  (Doc. 146 at 1283-90; Doc. 146, Ex. 331).

140.    DGS refused to pay the remaining portion of the claim.  (Doc. 146 at 1283-90; Doc. 146, Ex. 331).

141.    In July and December 1999, PCIC paid to CCI $942,460 in satisfaction of the outstanding portion of the Mahanoy Claim and in accordance with its obligation under the guaranty agreement.  (Doc. 146 at 1283-90; Doc. 146, Ex. 331).

142.    The full amount of the Mahanoy Claim was paid to and received by CCI.  (Doc. 146 at 1176, 1283-90, 2023; Doc. 146, Ex. 331).

143.    Representations in the 1998 audited financial statement concerning PCIC and the transactions related to the Mahanoy Prison Project and the Mahanoy Claim were, in all material aspects, complete and accurate and were in accordance with GAAS.  (Doc. 146 at 2802-05, 2928-30, 2968-75, 3122).

144.    USF&G's underwriters believed that Footnote 8 in the 1998 Audit meant that, if CCI did not receive a payment of all or a portion of the unnamed project related claim, PCIC would guarantee payment of the unpaid portion at some indeterminate time in the future.  (Doc. 146 at 399, 699, 1538-44, 2036, 2460, 2517-19, 2584).

145.    Footnote 1 of the 1998 audited financial statement expressly advises the user that claims are included in revenues when realization is probable and the amount can be reliably estimated.  (Doc. 146, Ex. 36 at 13 n.8; see Doc. 146 at 498).

146.    Footnote 8, particularly in conjunction with other aspects of the audited financial statement, reasonably alerted users of the statement, including USF&G, that the guaranteed amount was included in underbillings and in revenue.  (Doc. 146 at 699, 1538-44,[6] 2036, 2373-2379, 2517-19, 3089-98).

147.    USF&G underwriters and managers were sophisticated users of construction company estimates and understood the representations concerning the claim guaranteed by PCIC to mean that the guaranteed amount was included as underbillings and in revenue.  (Doc. 146 at 699, 1538-44, 2036, 2373-2379, 2517-19, 3089-98).

148.    USF&G offered insufficient evidence that Brown Schultz knew or should have known of any misrepresentations concerning the claim guaranteed by PCIC.  (Doc. 146 at 297-98, 349, 399, 411-16, 497-500, 563-65, 699, 1538-44, 1561, 2036, 2460, 2517-19, 2472, 2584, 2802-05, 2928-30, 2968-75, 3122).

## II.    **Discussion**

Pennsylvania courts recognize the common law claim for negligent misrepresentation based on the elements outlined in the Restatement (Second) of Torts.[7]  See, e.g., Gibbs v. Ernst, 647 A.2d 882, 890 (Pa. 1994) (citing RESTATEMENT (SECOND) OF TORTS § 552 (1977)); see also Williams Controls, Inc. v. Parente,

---

[6] See supra note 5 (discussing the attempt of plaintiff's expert to "correct" his deposition testimony).

[7] Jurisdiction over the claim is based on diversity of citizenship, see 28 U.S.C. § 1332, and none of the parties dispute the applicability of Pennsylvania law, see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79-80 (1938).

Randolph, Orlando, Carey & Assocs., 39 F. Supp. 2d 517, 529-30 (M.D. Pa. 1999);

Bortz v. Noon, 729 A.2d 555, 561 (Pa. 1999).

> Negligent misrepresentation requires proof of: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.

Id. Under this standard, those who supply commercial information on which another will presumably rely must engage in reasonable investigation to assure the accuracy of the information. RESTATEMENT (SECOND) OF TORTS § 552 cmt. a.

Central to a claim of negligent misrepresentation is, of course, a misrepresentation. See Donegal Mut. Ins. Co. v. Grossman, 195 F. Supp. 2d 657, 670 (M.D. Pa. 2001). The 1997 and 1998 audited financial statements asserted that the auditing process had been completed in accordance with GAAS, included adequate testing and assessment of project data and management estimates, and resulted in a fair presentation of the financial position of CCI. All these representations were accurate. Several experts testified that GAAS imposes a relatively minimal and malleable burden, which generally requires the auditor to view management estimates critically but renders specific procedures a matter of the auditor's discretion based on the circumstances of the project and the nature of the company. Brown Schultz assigned competent managers and employees to oversee the audits and properly assessed estimates and project costs provided by CCI, testing these figures through sufficient field work. Any reliance by Brown Schultz on the integrity of CCI was justified and permissible under GAAS based on

the industry reputation of CCI, the significant internal controls established and

followed by CCI, and Brown Schultz's familiarity with the company's management

and procedures.  The evidence demonstrated that Brown Schultz assessed and

tested the financial statements of CCI with the critical attention required under

GAAS, and its representations to this effect were accurate.

Neither did the reports of revenue and cost figures in the audited financial

statements contain any misrepresentations.  The financial position of the company

was accurately reflected in the statements, as confirmed by experts for Brown

Schultz.  The "corrected" figures provided by experts for USF&G and based on the

"look-back" methodology, using actual costs and profits to assess the propriety of

estimates, do not demonstrate that the estimates in the audited financial

statements were incorrect when they were made.  Much more credible were the

methods used by experts for Brown Schultz, who reviewed data available to

Brown Schultz at the time of the audit and concluded that the estimates were

accurate.

The only error established by USF&G related to the "double-counting" of

the $448,000 in both the remedial work period insurance claim and the Mahanoy

Claim.  However, this error was not made by Brown Schultz and had no impact on

the accuracy of the audited financial statements.  The $448,000 was paid by PCIC

pursuant to the remedial work insurance policy in November 1998, and was

thereafter included again in the $1,162,460 Mahanoy Claim, submitted to DGS in

December 1998.  DGS presumably could have denied payment of the $448,000 based

on this fact, and inclusion of the full Mahanoy Claim in revenue would have been problematic if based solely on the *DGS obligation*. But it was not. The Mahanoy Claim was included in revenue based on the *PCIC guaranty agreement*, which guaranteed without reservation to satisfy any portion of the Mahanoy Claim that DGS refused to pay. Regardless of the double-counting error, PCIC had obliged itself to honor the full amount of the Mahanoy Claim. Collection of the claim was reasonably assured, and Brown Schultz acted properly in recognizing the Mahanoy Claim as an underbilling and as revenue.[8]

All representations by Brown Schultz concerning the audited financial statements were accurate. Moreover, USF&G did not demonstrate that, even if the representations had been false, Brown Schultz knew or should have known of their falsity. Gibbs, 647 A.2d at 890 ("[T]he speaker . . . must have failed to make reasonable investigation of the truth of [the] words."); RESTATEMENT (SECOND) OF TORTS § 552. Brown Schultz complied with GAAS and its own auditing program in assessing CCI estimates and project costs. Any errors appearing in the audited financial statements are not attributable to Brown Schultz, but to inaccurate reports by CCI that could not be discovered through a professional and adequate auditing process. Brown Schultz adhered to the proper standard of care in conducting its audit, and had no reason to know of any misrepresentations in the audited financial statements.

---

[8] It should also be noted that CCI did, in fact, receive the full amount of the Mahanoy Claim from DGS and PCIC.

**III.**    **Conclusions of Law**

1.    Plaintiff has failed to prove by a preponderance of the evidence the elements necessary to succeed on a claim for negligent misrepresentation under Pennsylvania law.

2.    Plaintiff failed to prove by a preponderance of the evidence that defendants made any misrepresentations.

3.    Plaintiff failed to prove by a preponderance of the evidence that defendants knew or should have known of any misrepresentations.

4.    Judgment should be entered against plaintiff and in favor of defendants.

An appropriate order will issue.


 S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:    July 6, 2004

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES FIDELITY AND** | : | **CIVIL ACTION NO. 1:01-CV-0813** |
| **GUARANTY COMPANY,** | : | |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BRUCE J. BROWN and BROWN** | : | |
| **SCHULTZ SHERIDAN & FRITZ,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 6th day of July, 2004, upon consideration of the complaint (Doc. 1), and following a bench trial, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the Clerk of Court is directed to enter JUDGMENT in favor of defendants and against plaintiff and to CLOSE this file.

<span style="margin-left:3em">S/ Christopher C. Conner</span>
CHRISTOPHER C. CONNER
United States District Judge